THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER,<br><br>              Plaintiff,<br><br>v.<br><br>PPD DEVELOPMENT, L.P.,<br><br>              Defendant. | C.A. NO: |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Dr. Lisa Menninger ("Dr. Menninger") brings this action against her former employer, PPD Development, L.P. ("PPD"), to recover damages caused by PPD's knowing and intentional violations of state and federal anti-discrimination laws.  As alleged below, in January 2018 Dr. Menninger made the difficult decision to disclose her mental health disability to PPD.  But rather than engage in a good faith dialogue with Dr. Menninger regarding her disability, or how it could be accommodated, PPD jumped to the conclusion that Dr. Menninger was unable to perform her responsibilities, and set about a campaign to force her out of the company.  These efforts took an immense toll on Dr. Menninger's health and ultimately resulted in the destruction of her once flourishing career.

This case exemplifies both the insidiousness of disability discrimination and the importance of the interactive process required under state and federal.  Had PPD given credence to the information provided by Dr. Menninger and her physician, instead of their own uninformed preconceptions about her disability, they would have known that she remained fully capable of performing the essential functions of her job.  Had PPD engaged in a good faith dialogue with Dr. Menninger regarding how her disability impacted her work, they could have

discovered that many of their assumptions concerning her disability were completely wrong.
That her disability did not prevent her from going to work dinners or doing the many other tasks
that PPD appears to have mistakenly assumed she was unable to perform. Had PPD done any of
this, the nightmare that Dr. Menninger has endured for the past year and a half may well have
been avoided.

**Parties**

1.      At all times relevant hereto, Dr. Menninger resided at 8 Waterford Circle,
Dighton, Massachusetts.

2.      PPD is a limited partnership organized under the laws of Delaware with a
principal place of business located at 929 North Front Street, Wilmington, North Carolina.

**Jurisdiction**

3.      This Court has jurisdiction over Dr. Menninger's claim under the Americans with
Disabilities Act ("ADA") pursuant to 28 U.S.C. § 1331 because it is a claim arising under the
laws of the United States.

4.      This Court has supplemental jurisdiction over the remaining claim asserted herein
pursuant to 28 U.S.C. § 1367 because these claims are so closely related to the ADA claim that
they form part of the same case or controversy under Article III of the United States Constitution.

5.      Dr. Menninger timely filed a Charge of Discrimination ("Charge") with the
Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment
Opportunity Commission ("EEOC") on July 27, 2018.

6.      Dr. Menninger withdrew her Charge from the MCAD and EEOC after 90 days to
pursue her claims in court, and thereafter received a Right to Sue letter from the EEOC to pursue
her ADA claim in court.

**Facts**

7.      For as long as she can remember, Dr. Menninger has suffered from anxiety and panic attacks, typically triggered by social interactions and public speaking.  As these and other symptoms have persisted throughout her life, she has been diagnosed with Panic Disorder with Agoraphobia, Social Anxiety Disorder, and Generalized Anxiety Disorder.

8.      Despite this disability, Dr. Menninger succeeded in establishing a successful career as a Medical Doctor and Board Certified Clinical Pathologist.

9.      In July of 2015, Dr. Menninger accepted an employment offer from PPD to serve as the Executive Director of its Global Central Labs ("GCL").

10.      PPD is a leading global contract research organization providing comprehensive, integrated drug development, laboratory and lifecycle management services.

11.      As Executive Director of GCL, Dr. Menninger was responsible for oversight of PPD laboratories located in Highland Heights, KY, US; Zaventem, Belgium; Shanghai, China and Singapore.

12.      Dr. Menninger's disability made certain aspects of her job more difficult for her to perform.  In particular, Dr. Menninger experienced anxiety and panic attacks on the few occasions that she was required to make presentations in front of large groups.  Fortunately, these types of presentations were very infrequent, and Dr. Menninger was able to successfully complete these tasks with the aid of medication.

13.      Despite the challenges posed by her disability, Dr. Menninger performed her job extremely well.  This is reflected in the annual performance reviews that she received in December 2016 and December 2017, copies of which are attached as Exhibit A and B.

14.     In late December 2017, Dr. Menninger was scheduled to have a performance review with her direct supervisor, Hacene Mekerri ("Mekerri").  The performance review never occurred.  Mr. Mekerri instead discussed feedback from a "360" review involving Dr. Menninger's subordinates.

15.     The feedback was overall positive.  Among other things, Mr. Mekerri complimented Dr. Menninger on her management style and professionalism.

16.     As part of this same meeting, Mr. Mekerri informed Dr. Menninger that he was considering making changes to her role in order to make it more "visible."  He did not specify what he had in mind, but suggested that it would include increased client visits, social interactions and presentations.  Mr. Mekerri indicated that he would discuss these possible changes with Dr. Menninger in more detail when they met to discuss her annual review, which he had apparently not yet had an opportunity to complete.

17.     Dr. Menninger had not previously disclosed her disability to Mr. Mekerri or anyone else at PPD.  However, as the changes that Mr. Mekerri was considering to her role seemed likely to include activities that would be made more difficult by her disability, Dr. Menninger thought it was important to be open and honest with him regarding the challenges that she faced.

18.     Accordingly, on January 11, 2018, Dr. Menninger sent Mr. Mekerri an email informing him of her disability.  A copy of that email is attached as Exhibit C.

19.     While Dr. Menninger's email was intended to help facilitate further discussion with Mr. Mekerri, it had quite the opposite effect.

20.     Dr. Mekerri became cold and distant.  And instead of having the follow up conversation that had been promised, he told Dr. Menninger that she needed to deal directly with Human Resources.

21.     On January 15, 2018, Dr. Menninger received an email from Chad St. John, a representative of PPD's Human Resources Department.  Mr. St. John asserted that Dr. Menninger had "eluded to a need for an accommodation to be able to perform the essential functions of [her] job" and instructed Dr. Menninger to have her doctor complete and return certain forms.

22.     Dr. Menninger fully complied with Mr. St. John's request and had her physician submit the requested forms on January 31, 2018.

23.     Dr. Menninger hoped that this would finally facilitate her long-awaited discussion with Mr. Mekerri regarding the changes he was considering making to her role.  But it didn't.

24.     Instead, Dr. Menninger received another request from Mr. St. John on February 2, 2018.  This time, he instructed Dr. Menninger to have her physician provide a written statement addressing each of the "specific expectations that [Mr. Mekerri] shared with [her] for 2018 that [she] believe[d] that [she] cannot or limitedly perform."

25.     Dr. Menninger promptly reminded Mr. St. John that her concern related to the changes that Mr. Mekerri was considering making to Dr. Menninger's role.  She further noted that Mr. Mekerri still had not specified what those changes would be or had any further discussions with her regarding the issue.

26.     Mr. St. John responded by instructing Mr. Mekerri to provide "documented clarification …regarding the role expectations as the business continue to grow." He further observed that "[i]t will be important to understand all of the specific duties within your current

role that are consistent with the areas of concern identified by your physician (public speaking &
social interaction)."

27.     On February 6, 2018, Mr. Mekerri responded via email by attaching a copy of Dr.
Menninger's job description and identifying five broad categories of activities, which consisted
of the following:

    a.  SLT Presentations, Town Hall, COO/EVP meeting;

    b.  Client Bid Defense, Issue resolution calls, HH/Client site meetings, phone;

    c.  Technical Sales presentation internal and external (i.e. internal Sales meeting),
HH/Client site meetings, phone;

    d.  For customer visits, Lunch/dinner and social interactions may occur (expected 60-
80% of the time) in order to build business relationships;

    e.  Travels: Up to 30%.

28.     No further explanation was provided.

29.     As instructed by Mr. St. John, Dr. Menninger provided these categories to her
physician and asked her to respond.  She did so on February 14, 2018—first providing a brief
information summary to assist PPD in understanding Dr. Menninger's disability, and then
proposed possible accommodations relating to each of the five categories referenced above.

30.     Importantly, Dr. Menninger's physician never suggested that the accommodations
she was recommending were the only accommodations available.  Indeed, for example, she noted
with respect to category 4 that it would be beneficial to "brainstorm other potential avenues."

31.     No such brainstorming ever took place.  On February 26, 2018, Dr. Menninger
received an email from Mr. St. John informing her that Mr. Mekerri had agreed to the suggested
accommodations concerning categories 1 and 5, but that no accommodation would be provided

for categories 2, 3, and 4 because they are "critical for your level and for the growth of the business."

32.     Dr. Menninger found this response distressing on multiple levels.  For one, she did not understand how they could reach such a conclusion without at least having a conversation with her.  Again, Dr. Menninger had been trying to have this conversation with Mr. Mekerri since the start of January.

33.     Further, Dr. Menninger was also concerned about what this meant for her future. It still was not clear what specific changes Mr. Mekerri had in mind for her role.  Accordingly, she was left in a state of constant anxiety wondering just how and when her job was going to change—if at all.

34.     Dr. Menninger hoped to address these concerns with Mr. Mekerri and Mr. St John during a meeting scheduled for February 28, 2018, but they had a very different plan.  When the meeting began they presented Dr. Menninger with two "options"—she could either accept a temporary role as a "consultant," or she could leave PPD and receive an "exit package."

35.     Dr. Menninger was not interested in either.  She told them that she wanted to keep her job, and that she was confident they could work through the issues concerning her disability if they simply talked about the specific changes that Mr. Mekerri was considering making.  Dr. Menninger noted that she had been doing her job successfully for the past two years, and that she was clearly capable of performing the essential functions of her job with or without accommodation.

36.     But they persisted.  Mr. Mekerri and Mr. St. John refused to engage in any discussion regarding Dr. Menninger's role or any of the categories that they claimed could not be accommodated.  They insisted that these were all requirements set forth in her job description,

and told her that they could continue the discussion the following day after Dr. Menninger had considered their "options."

37.     The next morning, Dr. Menninger wrote Mr. Mekerri and Mr. St. John an email reiterating her desire to have a genuine dialogue concerning her disability and their changing expectations for her role.  Specifically, Dr. Menninger wrote that "[i]f you can be more specific regarding the tasks that you believe [cannot be accommodated], I think we could have a more productive dialogue regarding which specific tasks implicate my disability and what reasonable accommodations may be available with respect to those specific tasks."

38.     Dr. Menninger further reiterated her desire to keep her job and made clear that she had no desire to discuss the other "options" they had proposed.

39.     Shortly thereafter, Dr. Menninger received this response from Mr. St. John: "I am cancelling this meeting since we will be considering the items conveyed in your email that you sent a little while ago and will get back to you soon."

40.     Soon was eleven days later.  Dr. Menninger received an email that purported to come from Mr. St. John, but it was clearly written by someone else.  It was in no way responsive to her prior email.  While Dr. Menninger had asked Mr. St. John and Mr. Mekerri to "be more specific regarding the tasks that you believe [cannot be accommodated]," the email did nothing of the sort.  Instead, it accused Dr. Menninger of trying to "rewrite [her] job description," and insisted that the burden was solely on Dr. Menninger and her physician to propose new accommodations for PPD to consider.

41.     Dr. Menninger's response politely pointed out that they had still not answered her question.  For the third time, Dr. Menninger asked that they "identify the specific tasks" that they believe cannot be accommodated, so that they could "have a productive dialogue regarding

which specific tasks implicate [Dr. Menninger's] disability and what reasonable accommodations may be available with respect to those specific tasks."

42.     Again they refused. On April 3, 2018 Dr. Menninger received another message from Mr. St. John's email address. As with the prior message sent from his email address, it mischaracterized her request for accommodation, misstated the essential functions of her job and twisted the words of Dr. Menninger's physician in an effort to make her look unreasonable. They continued to refuse to engage in any kind of interactive dialogue.

43.     Meanwhile, Mr. Mekerri was attacking Dr. Menninger from another angle.

44.     On January 12, 2018, the day after he learned of Dr. Menninger's disability, Mr. Mekerri submitted Dr. Menninger's annual review. Unlike Dr. Menninger's prior review, in which Mr. Mekerri had rated her as "Highly Effective" (4 on a scale of 1 to 5) in every category, he gave Dr. Menninger an overall rating of just "Fully Effective" (3), and failed to rate her as "Highly Effective" in a single category.

45.     Notably, Mr. Mekerri never spoke to Dr. Menninger about why his perception of her performance fell so drastically. Indeed, he never even discussed the annual review with her, which was contrary to PPD policy.

46.     Mr. Mekerri also took adverse action against Dr. Menninger with respect to her compensation. Following disclosure of her disability, Dr. Menninger was awarded a merit increase of just 1.9% while similarly situated non-disabled laboratory professionals received increases of 2.6% or more. Upon information and belief, Dr. Menninger's bonus was also below that awarded to similarly situated peers who do not suffer from a disability.

47.     Mr. Mekerri also progressively cut Dr. Menninger out from important decision-making that affected her business unit. In particular, he did not keep Dr. Menninger apprised of

potential hires and did not allow her to participate in the decision making process. This was generally contrary to how he had treated Dr. Menninger prior to the disclosure of her disability.

48.     Perhaps most significant, however, was Mr. Mekerri's increasingly unreasonable scrutiny of Dr. Menninger's job performance. In particular, Mr. Mekerri began to blame Dr. Menninger for errors within the organization that were not her fault, and he falsely suggested that Dr. Menninger was failing to provide appropriate "leadership" and "communication."

49.     Mr. Mekerri had not treated Dr. Menninger in this manner before he learned of her disability.

50.     Dr. Menninger complained of Mr. Mekerri's harassment and retaliation on April 17, 2018 via an email to Mr. St. John. She received no response and, upon information and belief, no action was taken by PPD in response to this complaint.

51.     Mr. Mekerri's misconduct continued, and Dr. Menninger complained again to Mr. St. John via email on April 27, 2018.

52.     Finally, on April 30, 2018, Dr. Menninger received a response from Mr. St. John. Again, he refused to respond to Dr. Menninger's repeated requests to engage in an interactive dialogue with respect to her request for accommodation.

53.     With respect to Mr. Mekerri's harassment and retaliation, Mr. St. John flatly denied—without any evidence or analysis—that such misconduct had taken place. Nonetheless, he assured Dr. Menninger that PPD would conduct a proper investigation and that she would be contacted by another member of the Human Resources Department.

54.     On May 2, 2018, Dr. Menninger was contacted by Deborah Ballweg, from PPD's Human Resources Department. Ms. Ballweg informed Dr. Menninger that she would be conducting an investigation into her allegations of discrimination and retaliation.

55.     Dr. Menninger cooperated fully in the investigation and provided ample evidence to demonstrate that Mr. Mekerri had engaged in both discrimination and retaliation in connection with Dr. Menninger's disability.

56.     Despite this evidence, Dr. Menninger was informed by Deborah Ballweg, on May 22, 2018, that PPD had concluded that no discrimination or retaliation had taken place.

57.     PPD's refusal to recognize the existence of the discrimination and retaliation to which Dr. Menninger was being subjected, along with its continued refusal to engage in an interactive dialogue concerning her disability, greatly exacerbated the anxiety, stress and other symptoms that she had been suffering from since disclosing her disability.  Rather than help alleviate Dr. Menninger's burden, PPD made it progressively worse, and its refusal to recognize that misconduct was the last straw.

58.     As a result of the emotional distress that she was suffering, Dr. Menninger's physician instructed her to take an immediate medical leave effective June 3, 2018.  Dr. Menninger was subsequently required to take part in an intensive partial hospitalization treatment program to deal with the anxiety, depression and other emotional distress caused by this situation.

59.     The significant decline in Dr. Menninger's health, which was caused by PPD's unlawful conduct, ultimately resulted in Dr. Menninger losing her job.

## COUNT I

### (Americans with Disabilities Act)

60.     Dr. Menninger realleges and incorporates paragraphs 1 through 59 above, as if fully set forth herein.

61.     Dr. Menninger timely met the administrative prerequisites to suit under the Americans with Disabilities Act ("ADA").

62.     At all times relevant hereto, Dr. Menninger had a "disability" as defined by the ADA, 42 U.S.C. § 12102(2), as amended.

63.     At all times relevant hereto, Dr. Menninger was a "qualified individual with a disability" within the meaning of the ADA, 42 U.S.C. § 12111(8).

64.     Through conduct alleged above, PPD has discriminated and retaliated against Dr. Menninger in violation of the ADA, 42 U.S.C. § 12112.

65.     As a direct and proximate result thereof, Dr. Menninger has suffered and continues to suffer damages, including but not limited to loss of compensation and benefits, and emotional distress damages.

## COUNT II

### (M.G.L. c. 151B)

66.     Dr. Menninger realleges and incorporates paragraphs 1 through 65 above, as if fully set forth herein.

67.     Dr. Menninger timely met the administrative prerequisites to suit under M.G.L. c. 151B.

68.     At all times relevant hereto, Dr. Menninger had a "handicap" as defined by G.L. c. 151B § 1(17).

69.     At all times relevant hereto Dr. Menninger was a "qualified handicapped person" within the meaning of G.L. c. 151B § 1(16).

70.     Through conduct alleged above, PPD has discriminated and retaliated against Dr. Menninger in violation of G.L. c. 151B.

71.    As a direct and proximate result thereof, Dr. Menninger has suffered and continues to suffer damages, including but not limited to loss of compensation and benefits, and emotional distress damages.

**WHEREFORE**, Dr. Menninger respectfully requests that this Court:

1.    Enter judgment in dr. Menninger's favor and against PPD on all Counts;

2.    Award Dr. Menninger compensatory damages, including, but not limited to, back pay, front pay, and lost benefits, all with interest at the statutory rate;

3.    Award Dr. Menninger emotional distress damages, with interest at the statutory rate;

4.    Award Dr. Menninger punitive damages;

5.    Award Dr. Menninger her attorneys' fees and costs; and

6.    Order such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Lisa Menninger hereby demands a trial by jury on all Counts that are so triable.

Respectfully submitted,
**Plaintiff Lisa Menninger**,
By her attorneys,

Patrick J. Hannon, BBO# 664958
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
P: (617) 723-8000
F: (617) 447-2800
phannon@hartleymichonrobb.com

**DATED**: June 28, 2019