**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LISA MENNINGER,<br><br>          Plaintiff,<br><br>v.<br><br><br>PPD DEVELOPMENT, L.P.,<br><br>          Defendant. | Civil Action No.  1:19-CV-11441-LTS |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant PPD Development, L.P. ("PPD" or the "Company") submits this Memorandum in Support of its Motion for Summary Judgment pursuant to Local Rule 56.1. The undisputed facts do not support Plaintiff's claims that PPD discriminated against her on the basis of her disability (or her request for workplace accommodations), or that it retaliated against her after she made internal complaints. Rather, PPD accommodated Plaintiff's very specific and unreasonably limiting requests to the best of its ability, took no adverse action against her whatsoever, and allowed her to take *eight months* of leave (six months of which were paid under the Company's short-term disability policy). Performance issues stemming from Plaintiff's remote work arrangement were first addressed *prior to* Plaintiff's disclosure of her disability. As set forth fully below (and in PPD's Statement of Undisputed Material Facts), Plaintiff's claims under the Americans with Disabilities Act ("ADA") and M.G.L. c. 151B should be dismissed because there is no evidence that PPD acted unlawfully.

1

<u>**Summary of Undisputed Material Facts**</u>[1]

On August 31, 2015, PPD hired Plaintiff, Dr. Lisa Menninger, as the Executive Director of its Global Central Labs,[2] based in its Highland Heights, Kentucky laboratory. In this role, Plaintiff was responsible for overseeing the Labs' operations, both with respect to day-to-day functionality and to support research and business development.[3] Given Plaintiff's prior relevant experience (which directly aligned with her responsibilities at PPD) and her strong references (which highlighted Plaintiff's interpersonal skills), PPD was confident that Plaintiff would succeed in her new role, and for the first full calendar year of her employment (2016), she did. Plaintiff integrated to the Company's work environment successfully and quickly. Her supervisor, Hacene Mekerri, rated her as "Highly Effective" for 2016. *See* SOF ¶¶1-11.

In late 2016, the Company granted Plaintiff's request to work remotely for personal reasons (her daughter was being bullied, and Plaintiff wanted to move her family to the east coast). She continued to work in Highland Heights for the next several months. In April 2017, Mr. Mekerri told Plaintiff that he wanted her to be more involved in client meetings and in influencing business development – two important aspects of her job. *See id.* at ¶¶14-16.

---

[1] Pursuant to Local Rule 56.1, PPD has separately filed the complete Statement of Undisputed Material Facts ("SOF").

[2] The Global Central Labs are made up of four labs in Belgium, China, Singapore, and the United States (Highland Heights, Kentucky). *See* SOF, ¶2.

[3] The essential functions of Plaintiff's role include: (1) providing operational leadership to laboratory services; integrating operational processes, furthering research development, and maintaining quality assurance functions for optimal performance within the Labs, (2) supporting business development in obtaining new customers and maintaining current relationships; directing the development of new programs for revenue enhancement/cost expense reduction, including post-evaluation of new implementations for effectiveness, (3) performing financial reviews, establishing an operating budget, and developing forecasts maximizing profit; providing business updates to senior leadership, (4) setting operational standards/goals and directing the implementation of laboratory goals and policies; overseeing resource allocation including space, capital equipment, scientific instrumentation and staff, (5) performing administrative responsibilities including Human Resources functions, personnel development, facilities management, and creating standard operating procedures and position descriptions, and (6) overseeing the quality assurance and quality control aspects of the lab to ensure compliance with regulatory standards. *See id.* at ¶6.

Plaintiff moved to Massachusetts (nearly 900 miles away) in June 2017, which soon began to cause problems (specifically in the Highland Heights lab).[4] On December 20, 2017, Mr. Mekerri met with Plaintiff to discuss her performance and the Company's expectations for 2018. He again encouraged Plaintiff to focus on being more involved in client meetings and various aspects of business development (including increased social interactions and presentations). As part of the Company's annual executive talent assessment (also completed on December 20, 2017), Mr. Mekerri rated Plaintiff's 2017 performance as "Limited Progress," which was defined as, "Solid business performance today but with risk of falling behind due to lack of leadership capability." He also completed Plaintiff's 2017 review, rating her as "fully effective." These ratings did not result in any adverse employment action. *See id*. at ¶¶17-28.

On January 11, 2018, Plaintiff emailed Mr. Mekerri and disclosed for the first time that she suffered from "generalized anxiety disorder that includes social anxiety disorder and panic attacks." Mr. Mekerri was traveling, but he spoke with Plaintiff on January 15, 2018 and connected her to Chad St. John in Human Resources (who provided Plaintiff with accommodation request forms). On January 31, 2018, Plaintiff's psychiatrist, Dr. Marianna Kessimian, submitted a request form, noting that "[a]ny changes to [Plaintiff's] role that increase the need for public speaking and/or social interactions will increase her anxiety and worsen her somatic symptoms, which would make it substantially more difficult, if not impossible, for [Plaintiff] to perform her job." *See id*. at ¶¶29-33.

---

[4] In November 2017, Plaintiff's peer, Brent McKinnon (Executive Director, Laboratory Quality Assurance), noted that Plaintiff did not demonstrate leadership strength, was dismissive of repeatedly raised concerns (regarding compliance and bench level supervision in the Highland Heights lab), and was lackadaisical toward her time on-site since moving to Massachusetts.  In addition, two of Plaintiff's subordinates complained about Plaintiff's ineffective leadership style.  *See id*. at ¶¶22-24.

Mr. St. John subsequently worked with Plaintiff to get more detail about her requests, and with Mr. Mekerri to get more detail about his expectations. On February 6, 2018, Mr. Mekerri emailed Plaintiff and Mr. St. John to describe his specific expectations of Plaintiff:

> (1) senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or quarterly), (2) client bid defenses, issue resolution calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via phone (once a month at minimum per client), (3) technical sales presentations (internal and external) (monthly, quarterly, and as-needed), (4) meals and social interactions while at client visits (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%).
> *See id*. at ¶¶34-36.

Mr. St. John told Plaintiff that she should forward the information Mr. Mekerri had provided to Dr. Kessimian, so she could review and develop specific parameters or limitations that Plaintiff could tolerate. On February 9, 2018, Plaintiff told Mr. St. John that she hoped to have "something ready" the next week. Plaintiff did not indicate that she had any questions or concerns about Mr. Mekerri's expectations. *See id*. at ¶¶37-38.

On February 14, 2018, Dr. Kessimian sent her recommended accommodations:

> For senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President, Dr. Kessimian requested: [Plaintiff will be] "responsible for all slides/handouts/ presentation material with necessary information but will require a reader to present to the group, or can pre-record the audio/video and it can be played at the meeting available for questions via email after the meeting."  For client bid defenses, issue resolution calls, and meetings at Highland Heights, Dr. Kessimian requested: [Plaintiff will be] "available via email/ text/ remote video conferencing for a representative of the client, 1-2 person audience maximum … If it is a site meeting, surrogate or reader with all necessary information / real time access to [Plaintiff] will be available."  For client site meetings, Dr. Kessimian requested: [Plaintiff] "would like a surrogate to attend, but [Plaintiff] will be responsible for all problem solving/ ideas for resolution if emailed/ communicated to [Plaintiff] a few days before anticipated visit."  For technical sales presentations (internal and external), Dr. Kessimian requested: [for Plaintiff to be] "excused from sales presentations but again [Plaintiff] will provide any necessary data information for the reader/ surrogate to have at their disposal."  For meals and social interactions while at client visits, Dr. Kessimian requested: "[a] surrogate, as this is not [Plaintiff's] strength/ skill set and her disability will flare with significant impairment.  [Plaintiff] is able to build business relationship in a more 'behind the scenes' fashion and would like [to] brainstorm other potential avenues

where she can add value as she does understand this is an important part of the business."
Finally, for travel, Dr. Kessimian inexplicably requested that Plaintiff be allowed to
travel to PPD's Belgium laboratory, versus its laboratories in the United States (which
included the Global Central Labs home-base in Highland Heights, Kentucky).
*See id*. at ¶39.

On February 26, 2018, Mr. St. John emailed Plaintiff to let her know that the Company

would provide accommodations with respect to two of the five categories. He explained that the

other tasks – which constituted sub-categories of specific expectations falling under the umbrella

categories of client-facing meetings and sales presentations – were central to Plaintiff's role and

critical to the needs of the business. At Mr. Mekerri's request, Mr. St. John scheduled a meeting

for February 28, 2018, to discuss Plaintiff's requests and PPD's responses. *See id*. at ¶¶42-43.

After their meeting, Plaintiff emailed Mr. St. John and Mr. Mekerri to thank them for

agreeing to provide some accommodations, and to ask for more information regarding the other

categories of tasks for which PPD could not provide accommodations. On March 12, 2018, Mr.

St. John explained the reasons why the Company could not provide some of the accommodations

Plaintiff sought. He referenced specific tasks falling within the categories of client-facing

meetings and sales presentations – i.e., business development meetings, client dinners, and bid

defenses – and noted their importance to the business. The Company was open to

"brainstorm[ing] other potential avenues where [Plaintiff] could add value" as Dr. Kessimian had

suggested, but it was not possible to do away with these core job requirements. Mr. St. John

asked Plaintiff to review her job description with Dr. Kessimian to see if there might be other

accommodations that would allow her to perform these essential functions. *See id*. at ¶¶44-45.

On March 24, 2018, Plaintiff emailed Mr. St. John, explaining that although "certain

types of tasks" were "challenging due to [her] disability," she was "capable of performing all of

[her] responsibilities with or without accommodation." Plaintiff noted that she had met with Mr.

Mekerri the week prior, and it did not appear that there would be any "activities or events in the near future that would implicate [her] disability" – therefore, she suggested that they "table this discussion until a particular task arises." She further explained that "[d]ealing with these issues in context … might … help us all engage in a more meaningful dialogue." *See id*. at ¶46.

On April 3, 2018, Mr. St. John assured Plaintiff that the Company was committed to an open dialogue, and that he would continue to review any accommodation requests as she raised them. He asked Plaintiff to let him know if she had any additional accommodation requests. Plaintiff did not ask for any additional or different accommodation(s). Instead, on April 17, 2018, she responded to Mr. St. John's email to tell him that she remained unsatisfied with his attempts to clarify PPD's position and felt he was "refusing to answer" her questions. She also complained that Mr. Mekerri was "targeting [her] because of [her] disability," attaching an email she had received from him on April 11, 2018.[5] *See id*. at ¶¶47-48.

Mr. St. John immediately notified Deborah Ballweg, a more senior member of the Human Resources department, of Plaintiff's complaint about Mr. Mekerri, and they agreed that Ms. Ballweg would conduct an investigation (because Mr. St. John had been involved in the discussions leading up to Plaintiff's complaint). On April 30, 2018, Mr. St. John emailed Plaintiff, attempting to provide additional clarity regarding PPD's position as to Plaintiff's accommodation requests, and assuring her that another member of Human Resources would reach out about her complaint soon. *See id.* at ¶¶51-52.

---

[5] In the April 5 email, Mr. Mekerri was following up on his conversation with Plaintiff the day prior, in which he had raised recent quality issues that had come to his attention (at the request of the Executive Vice President, Chris Fikry). Mr. Mekerri asked for Plaintiff's "full attention and dedication to resolve [the issues] and be more proactive to prevent any further issues." He also suggested two goals for Plaintiff to work on for 2018: (1) a proactive approach to increase lab quality, and (2) ensuring lab goals and strategy are clear and well-communicated. Under each of the two goals, he suggested several specific ways in which Plaintiff might achieve them. *See id*. at ¶¶ 48-49.

Ms. Ballweg began her investigation, interviewing Plaintiff on May 2, 2018 (and again on May 15, 2018).[6] She also interviewed Mr. St. John, Mr. Mekerri, Andrew Supp (Executive Director of Business Development), Brent Mann (Senior Recruiter), and Mr. McKinnon. After concluding the investigation, Ms. Ballweg made the following findings: (1) laboratory quality issues had doubled from mid-2017 to April 2018 (25 such issues) versus the prior year (11 such issues) and Mr. Mekerri's feedback to Plaintiff on those issues was appropriate, (2) Plaintiff had told Mr. Mekerri in November 2017 that she was feeling overwhelmed, and after their discussion in December 2017, Mr. Mekerri agreed to take over recruiting in 2018 (and thus Plaintiff was not unfairly excluded), (3) the expectation for Plaintiff to attend bid defenses and client visits was not new – both of those tasks were essential functions of her job, (4) Mr. Mekerri had no control over the scheduling of sales and marketing meetings from which Plaintiff claimed to have been excluded (and Ms. Ballweg encouraged Plaintiff to reach out to Mr. Supp, who scheduled those meetings), (5) there was no planning meeting, nor any formal introductions, with respect to the recent Town Hall meeting about which Plaintiff complained (and therefore Plaintiff was not unfairly excluded), (6) the December 2017 meeting between Plaintiff and Mr. Mekerri, in which Mr. Mekerri raised the "360 feedback," was the basis for Plaintiff's 2017 review,[7] and, finally, (7) Mr. St. John's mention of an exit package or consulting role in the February 28 conversation was not intended as a suggestion (and it was not made by Mr. Mekerri). *See id.* at ¶¶53-55.

---

[6] Plaintiff raised several concerns: (1) she felt Mr. Mekerri was going out of his way to document performance issues, (2) she was excluded from Company recruiting efforts, (3) she was "new[ly]" expected to attend bid defenses and client visits (and being asked to speak about unfamiliar topics), (4) she was not being invited to routine sales and marketing meetings, (5) she was not included in the planning of (or introduced at) a recent Town Hall meeting, (6) she had no formal performance review meeting for 2017 (only the "360 feedback" discussion in December 2017), and, finally, (7) that Mr. St. John had discussed an exit package and/or a consulting role during their February 28, 2018 conversation. *See id.* at ¶53.

[7] Moreover, though he had done things differently the year before, Mr. Mekerri had similar review discussions – i.e., a discussion on "360 feedback" prior to providing the written review – with two other employees. *See id.* at ¶55.

Ms. Ballweg concluded that there was no evidence of discrimination and informed Plaintiff of her findings on May 22, 2018. On June 2, 2018, Plaintiff went out on unannounced, unplanned leave (with pay covering the majority of the leave). She remained out of work for the next eight months, at which time PPD needed to find a permanent replacement. The Company terminated Plaintiff's employment effective February 1, 2019. *See id*. at ¶¶56-60.

<u>**Argument**</u>

**I. Standard of review**.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19 (1st Cir. 2003). The moving party has the initial burden of establishing the absence of a triable issue, and it may do so with respect to issues as to which it does not have the burden of proof at trial by demonstrating "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has carried its burden, the burden shifts to the non-movant to come forward with "specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999). "Conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish the presence of a trialworthy issue. *Id.*; *see Mesnick v. General Elec. Co.*, 950 F.2d 816, 826 (1st Cir. 1991) (the court is "under no obligation to draw unreasonably speculative inferences" in favor of the nonmoving party). A failure of proof concerning an essential element of the non-movant's case renders all other facts immaterial. *See Celotex*, 477 U.S. at 323.

Plaintiff has asserted two Counts in her Complaint: Count I alleges violations of the ADA (alleging discrimination and retaliation), and Count II alleges violations of C. 151B (also

alleging discrimination and retaliation). Though the allegations under each Count are somewhat vague and nonspecific, Plaintiff's Complaint describes two categories of allegedly unlawful conduct: 1) PPD's purported "refusal" to engage in the interactive disability accommodation process, and 2) alleged "targeting" by Plaintiff's supervisor after she disclosed her disability and requested accommodations. As set forth below, there is no evidence from which a reasonable juror might conclude that PPD engaged in unlawful discrimination or retaliation.

## II. Plaintiff's disability discrimination claims fail as a matter of law.[8]

In order to withstand summary judgment, Plaintiff must establish the existence of a genuine dispute of material fact as to all three elements of her prima facie case: (1) that she is disabled;[9] (2) that she "is qualified to perform the essential functions of [her] job with or without reasonable accommodation"; and (3) that she "was discharged or otherwise adversely affected in whole or in part because of [her] disability." *See Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017). As set forth below, Plaintiff cannot meet her prima facie burden.

### a. Plaintiff cannot establish that she was a qualified handicapped person under the ADA or c. 151B.

Plaintiff is unable to show that she was qualified to perform the essential functions of her job (with or without a reasonable accommodation). PPD does not question or doubt Plaintiff's qualifications, credentials, or experience, nor does it argue that Plaintiff's job performance was unacceptably poor. Rather, Plaintiff's own requests for accommodation compel the conclusion that she was physically unable to engage in client meetings (business and social) or make external presentations – two key responsibilities of the Executive Director of Global Central

---

[8] The ADA and c. 151B are "nearly identical" and, therefore, state and federal courts analyze them "in exactly the same manner." *See, e.g., Audette v. Town of Plymouth, MA*, 858 F.3d 13, 20 (1st Cir. 2017). PPD does so here, but notes the different standards for establishing pretext under state and federal law below.

[9] For purposes of this Motion, PPD assumes, but does not concede, that Plaintiff has a legally protected disability.

Labs.[10] Because Plaintiff presented her requested accommodations as necessary to allow her to "continue to be a productive and healthy member" of PPD's team, PPD reasonably assumed that they were stated parameters for the performance of her job tasks. While Plaintiff did claim that she could do her job *without* the accommodations, she never retracted them, nor did she indicate that they were unnecessary (or that her medical provider was otherwise wrong or misinformed). Instead, she merely postponed the accommodation discussion and suggested that she, Mr. Mekerri, and Mr. St. John address issues as they arose. Based on Plaintiff's own assertions (as documented by Dr. Kessimian), PPD made the reasonable conclusion that she was unable to perform the essential functions of her job. *See Finnegan v. CSX Transp., Inc*., 368 F. Supp. 3d 263, 288 (D. Mass. 2019) (where plaintiff's accommodation requests sought to excuse him from essential functions of his job, he was unable to show that he was qualified individual).

> *b. PPD did not take any adverse action against Plaintiff because of her disability.*

Plaintiff is also unable to show that Mr. Mekerri – or anyone else at PPD – took any adverse employment action against her because of her disability. Indeed, she cannot make the initial showing that PPD took any adverse employment action against her whatsoever, which "typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Eichenholz v. Brink's Inc.*, 2019 U.S. Dist. LEXIS 35522, *12 (internal citations omitted).  An "action taken by an employer is an adverse employment action where it is substantial enough to have materially disadvantaged an employee. Material

---

[10] Plaintiff maintains that she was able to perform her job with *or without* a reasonable accommodation.  PPD disagrees with this basic premise because, though Plaintiff had performed her job mostly satisfactorily in 2016 and 2017, the Company expected her to interface with clients *more* (and asked her to do so multiple times in 2017) – as part of the essential functions of her job.  Plaintiff subsequently requested to be exempted from this very important job requirement. Assuming this exemption request was valid and necessary, Plaintiff was in fact unable to perform the essential functions of her job.

disadvantage for this purpose arises when objective aspects of the work environment are affected. The disadvantage must be objectively apparent to a reasonable person in the employee's position; subjective feelings of disappointment and disillusionment will not suffice." *Yee v. Mass. State Police*, 481 Mass. 290, 296 (2019).

Mr. Mekerri rated Plaintiff's 2017 job performance slightly lower than he had rated her 2016 job performance ("fully effective" in 2017 versus "highly effective" in 2016) (as described below, this review was completed *prior to* Plaintiff's disclosure of her disability and is therefore immaterial to Plaintiff's discrimination claims). However, even if it were somehow material, a rating of "fully effective" is a good rating, if not quite as good as "highly effective."[11] With respect to the *two instances* of feedback Plaintiff received in the spring of 2018 – which Plaintiff baselessly refers to as "harassment" – this feedback, too, fails to rise to the level of a materially adverse employment action as it had no actual impact on the terms or conditions of Plaintiff's employment.[12] *See Boutin v. Home Depot U.S.A., Inc*., 490 F. Supp. 2d 98, 106 (D. Mass. 2007) (supervisor's "nitpicking" did not constitute an adverse employment action under the ADA and C. 151B); *Jodoin v. Baystate Health Sys*., No. 08-40037-TSH, 2010 U.S. Dist. LEXIS 29931, at *74 (D. Mass. Mar. 29, 2010) (a "reprimand which does not result in any change in the terms or conditions of employment is not an adverse employment action"). Plaintiff also alleges that she

[11] Plaintiff received a slight decrease in her merit bonus for 2017 due to her performance rating (1.9% in 2017 versus 2.6% in 2016). Aside from the fact that the review was completed before Plaintiff disclosed her disability, this decrease was not a materially adverse employment action, which (with respect to benefits) requires a *significant change*. *See Eichenholz,* 2019 U.S. Dist. LEXIS 35522 at *12. With Plaintiff's $270,000 base salary, a .7% difference in her merit bonus resulted in a very insignificant change.

[12] In her Complaint, Plaintiff alleges that Mr. Mekerri unreasonably scrutinized her performance after she disclosed her disability, and that she complained to Mr. St. John twice. In Plaintiff's two email complaints to Mr. St. John, she attached two emails from Mr. Mekerri as evidence of this purported "harassment": one from April 11, 2018 in which Mr. Mekerri summarized their conversation about Plaintiff's 2018 goals, and one from April 25, 2018, in which Mr. Mekerri merely replied to Plaintiff's April 17 email (wherein she deflected blame for recent errors).  *See* St. John Aff., ¶ 24. As explained here and in the SOF, Mr. Mekerri addressed the issues described in these emails for entirely legitimate business reasons (and at Mr. Fikry's direction). Moreover, his April emails to Plaintiff do *not* reflect unreasonable scrutiny by any means, and do not constitute an adverse employment action(s).

11

was excluded from hiring decisions after she disclosed her disability, but this claim is belied by the record, which shows that Mr. Mekerri agreed to take on recruiting responsibilities after Plaintiff complained that she was feeling overwhelmed (in November 2017).[13] Moreover, an alteration of job responsibilities that is not "material" or "disruptive" is not an adverse action. *See Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 (1st Cir. 2017).[14]

Finally, to the extent Plaintiff intends to argue that she experienced a hostile work environment, this claim fails. A hostile work environment requires a showing that the employee's "workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive work environment." *See Buono v. Cioppa*, Civil Action No. 03-40142-FDS, 2006 U.S. Dist. LEXIS 107478, at *19 (D. Mass. Mar. 24, 2006). Harassment must also be both subjectively and objectively offensive, such that a reasonable person would perceive the conduct as hostile or abusive. While Plaintiff may have subjectively perceived Mr. Mekerri's feedback to be hostile, it was not objectively offensive. *See, e.g., Brader v. Biogen Inc*., 362 F. Supp. 3d 25, 43 (D. Mass. 2019) (plaintiff's characterization of his supervisor's feedback as "harassment" did not make it so for purposes of disability discrimination claims under the ADA and c. 151B).

---

[13] During Plaintiff's December 2017 performance review, Mr. Mekerri brought up the stalled recruiting/hiring process, and he agreed to take the lead on those efforts to allow Plaintiff more time to focus on her other responsibilities. When Ms. Ballweg interviewed Plaintiff as part of her investigation in May 2018, Plaintiff acknowledged that, in November 2017, she had told Mr. Mekerri that she was feeling "overwhelmed" and that she and Mr. Mekerri had discussed recruiting as part of their December 2017 conversation. *See* SOF, ¶ 55.

[14] Plaintiff will likely argue that PPD's "refusal" to grant certain of her accommodation requests constituted an adverse employment action.  In order for any such refusal to constitute an adverse employment action, the accommodations requested must be "reasonable."  *See Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 157 (1st Cir. 2009).  As described below, Plaintiff's requests were not reasonable, and, therefore, PPD's inability to grant those requests cannot give rise to an actionable adverse employment action. Moreover, PPD did grant two of Plaintiff's accommodation requests, which *were* reasonable.

Even if Plaintiff could somehow establish that she suffered an adverse employment action (she cannot), she is unable to show that any such action was taken *because of her disability*. PPD rightfully addressed concerns it had with Plaintiff's performance, none of which related to her disability. *Prior to* Plaintiff's disclosure of her disability in January 2018, Mr. Mekerri encouraged her on at least two occasions (in April and December 2017) to improve her performance with respect to proactive leadership and being more involved in client meetings and presentations. Regarding the 2017 performance review (which Plaintiff falsely claims Mr. Mekerri completed on January 12, 2018), it is undisputed that: (1) Mr. Mekerri received negative feedback from Plaintiff's colleagues about her leadership in late 2017, (2) Mr. Mekerri met with Plaintiff on December 20, 2017, (3) the meeting was specifically scheduled as Plaintiff's 2017 performance review, and (4) Mr. Mekerri raised feedback about Plaintiff's 2017 performance during the meeting. *See* Complaint, ¶14; SOF, ¶¶22-26. It is also undisputed that Mr. Mekerri and other members of executive leadership rated Plaintiff's 2017 performance as "Limited Progress" on December 20, 2017. *See* SOF ¶¶ 25, 27. Even if Mr. Mekerri *had* completed Plaintiff's 2017 review after she disclosed her disability (which PPD strongly refutes[15]), there is ample evidence to show that it was in fact earlier that he began to address the issues contributing to Plaintiff's slightly lower (but still good) 2017 rating.

Likewise, regarding the laboratory quality issues in early 2018, the record proves that all levels of PPD's senior leadership were being asked to work to mitigate and resolve any errors. Indeed, though Mr. Mekerri's role was to advance the remediation, the effort was ultimately

---

[15] Plaintiff's suggestion that Mr. Mekerri hastily "completed" her 2017 performance review on January 12, 2018 after seeing her January 11 email disclosing her disability is particularly far-fetched (and unsubstantiated). In reality, Ms. Ballweg – who had no knowledge of Plaintiff's disability at this time – merely *advanced* the review in the Company's electronic system on January 12, 2018 to move it toward finalization (as she did for other employees' 2017 reviews, as well, and as Human Resources commonly does when supervisors are traveling or otherwise unable to advance reviews themselves). *See* Ballweg Aff., ¶18.

driven by Mr. Fikry, who specifically asked Mr. Mekerri to have a discussion with Plaintiff. Aside from Plaintiff's speculation and assumptions that Mr. Mekerri was unfairly targeting her, she has not put forth any *evidence* to show that his feedback (which, again, cannot reasonably be considered an adverse action) was tied to her disability. Conclusory allegations – without any basis in fact – cannot support a discrimination claim. *See Kleya v. Karl Storz Endovision, Inc.*, 385 F. Supp. 3d 99, 107 (D. Mass. 2019) (dismissing plaintiff's disability discrimination claim where plaintiff had "done nothing to demonstrate a link between her disabilities and the adverse actions other than the conclusory assertion that there is one").

> *c. Plaintiff has failed to meet her burden to show that a facially reasonable accommodation was available.*

Plaintiff bears the burden of establishing the existence of a reasonable accommodation. *See Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 136 (1st Cir. 2009) ("it is the plaintiff's burden to show availability of 'reasonable accommodations,' and the defendant then has the opportunity to 'demonstrate that the accommodation would impose an undue hardship on the operation of [its] business'"); *see also Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258 (1st Cir. 2001). To satisfy that burden, Plaintiff "needs to show not only that (1) the proposed accommodation would enable her to perform the essential functions of her job, but also that, (2) at least on the face of things, it is feasible for the employer under the circumstances." *Echevarria* 856 F.3d at 127. Plaintiff has failed to meet her burden.

As described above, Plaintiff sought to exempt herself from certain key requirements of her job as Executive Director, which is objectively and facially unreasonable. *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006) ("Although a reasonable accommodation may include job restructuring, an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees") (internal citations

omitted); *Gudava v. Ne. Hosp. Corp.*, 440 F. Supp. 3d 49, 58 (D. Mass. 2020) ("An employer need not forgo an essential function of a position to accommodate and employee's disability").

Plaintiff may argue that the functions for which she sought accommodations (those which PPD could not provide) were not truly essential, because she had been performing her job satisfactorily in the years prior without needing to interact with clients or give presentations very often. However, PPD's view of Plaintiff's core job duties – versus Plaintiff's self-serving perspective – must be given substantial weight. *See E.E.O.C. v. Amego, Inc*., 110 F.3d 135, 144 (1st Cir. 1997). Moreover, the record shows that PPD took numerous steps to encourage Plaintiff to dedicate more attention to client meetings and business development aspects of her job – and first did so as early as April 2017. When Plaintiff's colleagues complained of her lack of leadership in November and December 2017, Mr. Mekerri addressed the necessary improvements to Plaintiff's job performance, and again asked her to participate more fully and frequently in client meetings and presentations, a key component of her high level role. Plaintiff claims that in doing so, Mr. Mekerri somehow altered or changed the duties of her job, but that is not true. Rather, he wanted her to perform better in these areas, as he had first suggested more than eight months prior. Plaintiff's underperformance and misconceptions regarding the essential functions of her job are insufficient to challenge PPD's position, and she is unable to show that the duties from which she wanted to be exempted were not essential, or that her proposed accommodations were reasonable.

*d. PPD engaged in the interactive process required by the ADA and c. 151B.*

Plaintiff's Complaint suggests that PPD somehow "refused" or otherwise failed to engage in the interactive process required by state and federal law. The record, however, proves that the opposite is true. After Plaintiff submitted her accommodation requests, PPD properly asked for additional information and detail. In response, and instead of providing additional detail

regarding her own condition and limitations, Plaintiff demanded further information from PPD about Mr. Mekerri's specific expectations – even though those expectations fell strictly within the essential functions of the job she was hired to do. PPD repeatedly provided information in response to Plaintiff's requests and, in fact, accommodated two of Plaintiff's requests. Plaintiff's dissatisfaction with the Company's responses does not support a finding that PPD failed to engage in the interactive process. The ADA and c. 151B do *not* require employers to provide each precise, unyielding accommodation the employee seeks, or only engage in an interactive dialogue in the specific manner dictated by the employee. *See, e.g., Tobin* 433 F.3d at 109 (neither the ADA or c. 151B imposes an "unreasonable burden of raising and discussing every conceivable accommodation with the disabled employee").

Moreover, Plaintiff ignores her own duties to engage in the interactive process – state and federal law both impose obligations on both the employer and the employee: "Upon request for an accommodation from the employee… *the employee… and the employer* shall engage in a timely, good faith and interactive process to determine an effective, reasonable accommodation[.]" G.L. c. 151B, § 1E(c) (emphasis added); *see also EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) (dismissing employee's ADA claim where she resigned without engaging in employer's attempt to discuss alternative accommodations after denying her initial request, because the interactive process "requires bilateral cooperation and communication"). Though Plaintiff did not like PPD's responses, she cannot dispute that PPD did indeed respond. In fact, it was Plaintiff who never responded substantively to PPD's requests as to whether there were any additional accommodation(s) that might help Plaintiff perform the essential functions of her job. Any claim based on PPD's purported failure to engage in the interactive process must, therefore, be dismissed. *See Fiumara v. President & Fellows of*

16

*Harvard Coll.,* 526 F. Supp. 2d 150, 158 (D. Mass. 2007), aff'd, 327 F. App'x 212 (1st Cir. 2009) (dismissing plaintiff's claim where plaintiff initiated interactive dialogue process, but ultimately failed to engage).

*e. Plaintiff is estopped from showing that she could perform her job duties.*

Plaintiff's pursuit and receipt of Social Security Disability Insurance ("SSDI") benefits (*see* SOF, ¶60) directly contradicts her argument that she is able to perform her job duties. To qualify for SSDI benefits, an employee must suffer from a "disability," defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(a), (d)(1)(A). Plaintiff's SSDI application (which was successful) therefore estops her from demonstrating that she was able to perform her duties in connection with her prima facie case of discrimination, unless she is able to sufficiently explain why her claim of total disability is consistent with her contradictory argument that she is able to perform the essential functions of her job at PPD. *See Sullivan v. Raytheon Co.*, 262 F.3d 41, 47 (1st Cir. 2001). As described above, Plaintiff cannot show that she was (or is) able to perform the essential functions of her job because she sought to be exempted from those essential functions.[16] Moreover, her argument that she is able to perform the job is wholly inconsistent with, and contradictory to, her SSDI claim of total disability – there is nothing on the record (or elsewhere) which allows for those two positions to logically coexist. Thus, Plaintiff is estopped from now claiming she is able to perform her job duties.

---

[16] Discovery has only underscored Plaintiff's inability to perform her job at PPD (or anywhere else) in 2018. Dr. Kessimian testified that Plaintiff was unable to work as of June 2018. Mason Menninger, Plaintiff's husband, testified that she has been unable to work since *January 2018* (i.e., when she was still working at PPD). *See* SOF, ¶60.

**III. Plaintiff's retaliation claims fail as a matter of law.**

In order to establish a prima facie case of retaliation under the ADA or c. 151B, Plaintiff must show: (1) that she engaged in protected activity,[17] (2) that she suffered an adverse employment action, and (3) that the adverse employment action was causally related to the protected activity. *See Thelusma v. Newton-Wellesley Hosp., Inc*., 90 Mass. App. Ct. 1120, (2016); *Cherkaoui*, 877 F.3d at 28. Here, assuming (but not conceding) that Plaintiff engaged in protected activity by complaining to Human Resources in April and May 2018, she is unable to establish the second and third elements of a retaliation claim. As described above, Plaintiff cannot show that she suffered an adverse employment action. *See Simon v. Harvard Vanguard Med. Assocs.,* No. 14-12558-RGS, 2015 U.S. Dist. LEXIS 154911, at *23 (D. Mass. Nov. 16, 2015) (non-disciplinary feedback does not constitute adverse employment action).

However, even if Plaintiff could show that she suffered an adverse employment action (she cannot), for the reasons described above (*see* pp. 10-12, *supra*), she is unable to show that any such action was causally connected to her requests for accommodation. While Plaintiff claims that Mr. Mekerri unreasonably scrutinized her job performance following her disability disclosure and subsequent complaints to Human Resources, she has not put forth any evidence of causation aside from the temporal proximity between any theoretically protected activity and Mr. Mekerri's feedback. However, a "narrow focus [on timing may] ignore[ ] the larger sequence of events and also the larger truth." *Freadman v. Metro. Prop. & Cas. Ins. Co*., 484 F.3d 91, 100–01 (1st Cir. 2007) (internal citations omitted); *see also Wright v. CompUSA, Inc*., 352 F.3d 472, 478 (1st Cir. 2003) ("[C]hronological proximity does not by itself establish causality...."). Such is the case here: the "larger truth" is evident from the sworn statements submitted by Mr.

---

[17] Both the ADA and c. 151B's retaliation provisions protect employees' opposition of unlawful practices. *See* 42 U.S.C. § 12203(a); c. 151B, § 4(4).

Mekerri, Mr. McKinnon, and Mr. Fikry, which describe the uptick in laboratory quality issues in early 2018, and the Company's need to quickly and effectively address those issues. Plaintiff cannot dispute these facts, and she cannot show that anyone at PPD retaliated against her.

### IV. There is no evidence of pretext.

Even assuming Plaintiff could somehow establish prima facie cases of discrimination or retaliation (as set forth above, she cannot), there is no evidence that PPD's proffered reasons for taking any purported adverse action against Plaintiff were pretextual.[18]  Where, as here, an employer has advanced a legitimate, nondiscriminatory reason for its action (i.e., the need to address performance concerns and laboratory errors), the employee must clear two hurdles: 1) she must refute the evidence presented by the employer, and 2) she must advance *evidence* of her own to show pretext. *See Tobin*, 433 F.3d at 105 (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir.1991) (stating that "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [she] must elucidate specific facts which would enable a jury to find that the reason given is … a sham intended to cover up the employer's real motive").

Plaintiff cannot do so here. There is no evidence to call into question PPD's legitimate, nondiscriminatory reasons for addressing Plaintiff's 2017 performance deficiencies, and ensuring that she work toward resolving the uptick in quality issues in early 2018. This is certainly true with respect to Count I (Plaintiff's ADA claim), for which she would need to show that PPD's legitimate bases for providing Plaintiff with performance feedback were pretext *for discrimination*. It is also true under the lower pretext hurdle for Count II (Plaintiff's c. 151B

---

[18] State and federal law diverge with respect to the standard for establishing pretext. Under the ADA, an employee must show that the employer's stated reason for taking an adverse action was pretext *for discrimination* (i.e., she must show that the employer's true motive was discriminatory). Under c. 151B, the employee need only show that the employer's stated reason for taking an adverse action was not the true reason. As set forth herein, Plaintiff is not able to meet either standard.

claim) – there is no evidence that PPD has misrepresented, mischaracterized, or overemphasized the issues raised by Plaintiff's colleagues in 2017 (regarding her lack of proactive leadership), or the uptick in laboratory quality issues in early 2018. These legitimate, nondiscriminatory business reasons for addressing Plaintiff's performance deficiencies are not implausible or otherwise suspect. Finally, there is no evidence that PPD acted improperly or in bad faith. Rather, it accommodated Plaintiff's requests to the best of its ability. Moreover, after Plaintiff went out on leave in June 2018, PPD kept her position open for *eight months*, despite the fact that she showed no indication or desire to return to work. This is more than the law requires, and demonstrates PPD's good faith efforts to accommodate Plaintiff's needs. For these reasons, Plaintiff cannot show pretext.

## V. Conclusion.

For the reasons set forth above, Plaintiff cannot meet the prima facie standard for her claims under the ADA or c. 151B. Even if she could, however, there is no evidence that PPD's actions were undertaken for any reason other than legitimate, nondiscriminatory business concerns. As such, Plaintiff's Complaint must be dismissed in its entirety.

PPD DEVELOPMENT, L.P.,
By its attorneys,

/s/ *Alexandra E. Shaw*
Rachel Reingold Mandel (BBO #660495)
Alexandra E. Shaw (BBO #694534)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701
rachel.mandel@ogletree.com
Dated: March 24, 2021          alexandra.shaw@ogletree.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 24, 2021.

/s/ *Alexandra E. Shaw*
Alexandra E. Shaw

46449769.1