| | |
|---|---|
| LISA MENNINGER, | |
| Plaintiff, | |
| v. | Civil Action No. 1:19-CV-11441-LTS |
| PPD DEVELOPMENT, L.P., | |
| Defendant. | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant PPD Development, L.P. ("PPD" or the "Company") submits the following Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

**Relevant Company Background**

1.      PPD is a global contract research organization that provides comprehensive, integrated drug development, laboratory, and lifecycle management services. The Company maintains offices and laboratories in 47 countries and works together with pharmaceutical, biotechnology, medical device, academic, and government partners and clients. *See* Affidavit of Deborah Ballweg ("Ballweg Aff."), ¶¶3-4.

2.      PPD's Global Central Labs provide standardized testing and innovative data solutions across a wide range of technologies and applications for all phases of pharmaceutical development. The Global Central Labs are made up of four laboratories in four parts of the

1

world: Belgium, China, Singapore, and the United States (Highland Heights, Kentucky). *See* Ballweg Aff., ¶5.

**Plaintiff's Employment at PPD**

3.      On August 31, 2015, PPD hired Plaintiff, Dr. Lisa Menninger, as the Executive Director of its Global Central Labs, based in the Highland Heights, Kentucky laboratory. PPD paid for Plaintiff to relocate to Cincinnati, Ohio.  *See* Ballweg Aff., ¶6.

4.      During the onboarding process, Plaintiff filled out paperwork provided to her by PPD's Human Resources Department. One of the forms was a Voluntary Self-Identification of Disability, and included several examples of impairments that might qualify as a disability, including psychiatric impairments. Plaintiff selected the option, "No, I don't have a disability." *See* Ballweg Aff., ¶ 7.

5.      As Executive Director of Global Central Labs, Plaintiff was responsible for overseeing and managing the Labs' operations, both with respect to day-to-day functionality and to support research and business development. Plaintiff also held specific licenses and certifications necessary to the operation of the laboratories in Belgium and Kentucky. *See* Ballweg Aff., ¶8.

6.      The essential functions of Plaintiff's role – as set forth in the job description provided to Plaintiff upon her hire – include: (1) providing operational leadership to laboratory services; integrating operational processes, furthering research development, and maintaining quality assurance functions for optimal performance within the Labs, (2) supporting business development in obtaining new customers and maintaining current relationships; directing the development of new programs for revenue enhancement/cost expense reduction, including post-evaluation of new implementations for effectiveness, (3) performing financial reviews,

establishing an operating budget, and developing forecasts maximizing profit; providing business updates to senior leadership, (4) setting operational standards/goals and directing the implementation of laboratory goals and policies; overseeing resource allocation including space, capital equipment, scientific instrumentation and staff, (5) performing administrative responsibilities including Human Resources functions, personnel development, facilities management, and creating standard operating procedures and position descriptions, and (6) overseeing the quality assurance and quality control aspects of the lab to ensure compliance with regulatory standards. *See* Ballweg Aff., ¶9.

7.    Given the importance of the Executive Director position to the continued success of the Global Central Labs, PPD was pleased to have found Plaintiff, who was highly regarded and appeared more than qualified for the job. *See* Ballweg Aff., ¶10.

8.    Indeed, one of PPD's primary reasons for hiring Plaintiff was that, immediately prior to coming to PPD, she had been serving in a similarly demanding role, as Laboratory Director of Clinical Reference Laboratory ("CRL"). According to her resume (and as communicated by her in interviews), Plaintiff had been (among other things): (1) providing directorship for the company's General and Clinical Trials Laboratories, (2) ensuring an effective quality management program for CRL laboratories, (3) partnering with the Chief Executive Officer, Chief Financial Officer, and Vice Presidents in strategic planning and budgeting sessions, (4) interacting with international, national, and state regulatory agencies for laboratory-related matters, (5) providing consultation to CRL clients, and (6) overseeing the communication of laboratory data and patient result reporting. *See* Ballweg Aff., ¶11; Affidavit of Alexandra Shaw ("Shaw Aff."), <u>Tab 2</u>, 33:16-21.

9.    Each of these duties closely aligned with the expectations and responsibilities of PPD's Executive Director of Global Central Labs. Plaintiff's assurance that she had been performing those duties successfully over the past five years was a significant motivating factor in the decision to hire her. *See* Ballweg Aff., ¶12.

10.    Plaintiff's references were also quite positive. One of her former colleagues included among Plaintiff's "strongest attributes," her "[w]illingness to take on new challenges" and that she was "not afraid to offer an opinion." Another colleague described Plaintiff's "interpersonal skills" to include an "[e]xcellent ability to work with all types of individuals." *See* Ballweg Aff., ¶13.

11.    PPD was confident that Plaintiff would perform her job well, and for the first full calendar year of her employment (2016), she did. Plaintiff integrated to the Company's work environment successfully and quickly. Her supervisor, Hacene Mekerri (then Vice President of Central Lab Services), rated her as "Highly Effective" for 2016.  *See* Affidavit of Hacene Mekerri ("Mekerri Aff."), ¶6.

12.    Plaintiff's office (in Highland Heights, Kentucky) was a few doors down from Mr. Mekerri's office. She and Mr. Mekerri interacted regularly and had standing weekly meetings in which they discussed business issues and Plaintiff's progression in her role as Executive Director. In addition, Plaintiff frequently visited the analyzers in the laboratory. On an average day, she would have face-to-face interactions with ten different colleagues. *See* Mekerri Aff., ¶7; Shaw Aff., Tab 2, 82:13-22.

13.    As noted above, Plaintiff was also required to travel somewhat frequently as part of her job duties. In 2016, she made approximately four visits to the laboratories in Belgium,

China, and Singapore (two or three visits to Belgium and one visit to China and Singapore). She travelled to Virginia to evaluate a potential partnership. *See* Shaw Aff., Tab 2, 82:23-83:18.

14.     In late 2016, Plaintiff approached Mr. Mekerri to discuss the fact that her daughter was being bullied at her school in Cincinnati. Plaintiff told Mr. Mekerri that she wanted to transfer her daughter to a school in Rhode Island, and asked whether the Company would allow her to work remotely. *See* Shaw Aff., Tab 2, 40:2-43:18; Mekerri Aff., ¶8.

15.     Mr. Mekerri was sympathetic and supported the idea generally. He obtained approval from his supervisor and informed Plaintiff that the Company would allow her to work remotely from the east coast – with the expectation that she would travel to Highland Heights on a regular basis (and continue traveling to the other laboratory locations as she had been doing). 2016 had been a very successful year for the Company, and at the time, Plaintiff's request to work remotely did not present any particular cause for concern. *See* Shaw Aff., Tab 2, 40:2 – 43:18; Mekerri Aff., ¶9.

16.     Plaintiff continued to work in Highland Heights for the next several months (as she made preparations to move), and continued to meet regularly with Mr. Mekerri. At this time (early 2017), Mr. Mekerri had no concerns with Plaintiff's job performance. He did, however, want her to be more involved in client meetings and in influencing business development – two important aspects of the job she was hired to do and as set forth in her job description. In April 2017, as all members of senior leadership worked on forward-thinking objectives and goals for the coming year, Mr. Mekerri suggested these two areas to Plaintiff as a focus for further development. Plaintiff acknowledged Mr. Mekerri's feedback and they agreed to work together to effectuate their shared goals. *See* Mekerri Aff., ¶10.

17.     Plaintiff and her family moved to Dighton, Massachusetts in June 2017. The move took some time to complete, and Plaintiff then took a couple of weeks of paid time off to study for her Board of Medicine recertification. *See* Shaw Aff., <u>Tab 2</u>, 90:12-91:2.

18.     Despite agreeing to travel to Highland Heights regularly, Plaintiff visited on only two occasions after moving to Massachusetts (PPD paid for the expenses related to this travel, in addition to all other work-related travel, even though Plaintiff relocated to Massachusetts for personal reasons). She travelled to the Belgium laboratory three times in 2017, and to Seattle, Washington, once, for a potential partnership. *See* Shaw Aff., <u>Tab 2</u>, 91:3-93:14.

19.     2017 was a relatively unsuccessful year in terms of sales numbers and revenue (especially in comparison to 2016). As a result, PPD was ramping up its efforts to encourage more visibility and productivity among its senior leadership to increase sales and support business development. All executives were being asked to become more proactive, especially with respect to outward-facing meetings and presentations. *See* Mekerri Aff., ¶11.

20.     In November 2017, Plaintiff expressed to Mr. Mekerri that she was feeling overwhelmed with her job duties. Mr. Mekerri asked her to send him a list of her day-to-day responsibilities so they could work together to ensure that Plaintiff was not overwhelmed. *See* Mekerri Aff., ¶12.

21.     At the same time, Plaintiff's new remote work arrangement began to cause some problems. Now that she was geographically distant and no longer available for impromptu, face-to-face meetings, Mr. Mekerri found it more difficult to work on the goals he had identified back in April (i.e., having Plaintiff more involved in client meetings and in influencing business development). *See* Mekerri Aff., ¶13.

22.     Plaintiff's colleagues also expressed concerns with her remote work arrangement. On November 17, 2017, as part of feedback-sourcing in preparation for end-of-year performance appraisals, Mr. Mekerri emailed Brent McKinnon (Executive Director, Laboratory Quality Assurance) to inquire about Plaintiff's performance. In response, Mr. McKinnon wrote: "While I feel that Lisa is technically strong and a very nice, amenable person, she has not demonstrated the leadership strength that I would expect. Lisa has been very indecisive on numerous important matters (e.g. lab training, competency documentation, supervisor responsibilities) that have resulted in lingering compliance concerns raised by internal auditors, [senior leadership team] peers and customers. She has been dismissive of repeatedly raised concerns regarding the lack of bench level supervision, and, since her decision to relocate, she has been lackadaisical toward her time on-site in US lab. This style has led to an environment where a lack of accountability is prevalent and overall disrespect for leadership decisions persist." *See* Affidavit of Brent McKinnon ("McKinnon Aff."), ¶¶5-6; Mekerri Aff., ¶14.

23.     Plaintiff's subordinates communicated similar concerns regarding what they perceived as a lack of leadership. On December 11, 2017, Susan Pattison (Director of Laboratory Technical Scientific Affairs) commented that, "[i]n the absence of a strong leadership presence, Lisa indirectly has generated scope creep, deferred expectation setting, and resource deployment for the [department] to other more advocate-style leaders." *See* Mekerri Aff., ¶15.

24.     On December 12, 2017, Karen Allen (Associate Director) noted that Plaintiff "tends to waiver on some critical issues. The company leans on her for direction and at times her direction appears to change course." *See* Mekerri Aff., ¶16.

25.     Over the next several days, Mr. Mekerri discussed Plaintiff's 2017 job performance (along with that of her peers) with other members of executive leadership and

Human Resources as part of the Company's annual executive talent review. *See* Mekerri Aff., ¶ 17; Ballweg Aff. ¶15.

26.     On December 20, 2017, Mr. Mekerri met with Plaintiff to discuss her performance and the Company's expectations for 2018 in light of the concerns recently expressed by her colleagues and the issues arising from Plaintiff's remote work arrangement. Mr. Mekerri again brought up the goals he had raised in April, and encouraged Plaintiff to focus on being more involved in client meetings and various aspects of business development (including, but not limited to, increased social interactions and presentations). In addition, Mr. Mekerri agreed to take the lead on recruiting and hiring duties, to give Plaintiff some room for her other responsibilities. *See* Mekerri Aff., ¶18; Shaw Aff., <u>Tab 1</u>, ¶16.

27.     Later that day, Deborah Ballweg (Human Resources) circulated a finalized copy of a document titled "9 Box Talent Review," which summarized the outcome and conclusions of the annual executive talent review with nine different narrative options for overall standards of performance (e.g., "Low Impact Leader," "Solid/Steady," and "Leading Edge"). Plaintiff's category rating was "Limited Progress," which was defined as, "Solid business performance today but with risk of falling behind due to lack of leadership capability." *See* Mekerri Aff., ¶19; Ballweg Aff., ¶16.

28.     Mr. Mekerri completed Plaintiff's 2017 review. Given the recent issues raised regarding her leadership, Mr. Mekerri rated Plaintiff's 2017 performance as "fully effective" (one rating lower than "highly effective"). A "Fully effective" rating is good, and it was not an adverse employment action. *See* Mekerri Aff., ¶20; Ballweg Aff., ¶18.

29.     On January 11, 2018, after having taken some time off for the holidays, Plaintiff emailed Mr. Mekerri: "As you mentioned that you'd like to discuss some ideas you have

regarding how to make my role more visible, I think it's important that I make you aware of a medical condition that I've been suffering from. … I have a generalized anxiety disorder that includes social anxiety disorder and panic attacks. … some of the new tasks you've suggested will be difficult in light of my disability, as they would include increased client visits/social interactions and presentations (internal and external). I am, of course, open to discussing whatever ideas you have for my role. But my condition presents some very significant challenges for me…." *See* Mekerri Aff., ¶21.

30.     Mr. Mekerri was traveling when he received Plaintiff's email, but he scheduled a time to speak with her on January 15, 2018. During that conversation, which Plaintiff surreptitiously recorded, Mr. Mekerri thanked Plaintiff for disclosing her condition. He told her that he wanted to speak further, as he was still traveling at this time, but that he had wanted to make sure to connect with her (apart from just exchanging emails). *See* Mekerri Aff., ¶22; Shaw Aff., Tab 2, 134:19-135:18.

31.     After they spoke on the phone, Mr. Mekerri connected Plaintiff with Chad St. John (Associate Director, Human Resources) via email. Plaintiff replied and said to Mr. St. John, "I'm not sure how much Hacene disclosed to you about my medical condition, but I wanted to follow up to see what you need from an HR perspective." Mr. St. John replied and provided Plaintiff with the Company's standard accommodation request forms (one for her to fill out, and one for her medical provider to fill out), noting that they were entering into an "interactive process" and that he looked forward to talking with Plaintiff about her specific needs. *See* Affidavit of Chad St. John ("St. John Aff."), ¶6.

32.     Two weeks later, on January 31, 2018, Plaintiff submitted an accommodation form to Mr. St. John. In it, she stated that she had been "diagnosed with Panic Disorder with

agoraphobia, Social Anxiety Disorder, and Generalized Anxiety Disorder" and that she was "seeking treatment to minimize and/or alleviate [her] symptoms." *See* St. John Aff., ¶7.

33.     Plaintiff's psychiatrist, Dr. Marianna Kessimian, also submitted an accommodation form on January 31, 2018.  Dr. Kessimian noted that "[a]ny changes to [Plaintiff's] role that increase the need for public speaking and/or social interactions will increase her anxiety and worsen her somatic symptoms, which would make it substantially more difficult, if not impossible, for [Plaintiff] to perform her job."  She further recommended that, "[t]o the extent [Plaintiff] is required to engage in social interactions and/or public speaking, these activities should be planned in consultation with her medical provider[.]"  *See* St. John Aff., ¶8.

34.     Given the vagueness of Plaintiff's requests with regard to what could reasonably be changed in her role, Mr. St. John reached out to her on February 2, 2018 to ask for additional information.  He asked which "specific expectations" Plaintiff and Dr. Kessimian believed that Plaintiff could not perform (or perform on a limited basis). Plaintiff responded that Mr. Mekerri had suggested that she participate in more client visits and social interactions, as well as internal and external presentations. Aside from those general expectations, Plaintiff told Mr. St. John that she was unable to provide further specifics, and asked for clarification as to what additional information Dr. Kessimian might be able to provide to facilitate the process. Mr. St. John told Plaintiff that he would connect with Mr. Mekerri to get some more detail regarding the Company's expectations of Plaintiff in her role as Executive Director. *See* St. John Aff., ¶9.

35.     Mr. St. John asked Mr. Mekerri to provide additional detail with regard to his expectations for Plaintiff as the Central Labs business continued to grow. He noted that the Company would need to seek specific parameters from Dr. Kessimian in order to have a clear picture in assessing reasonable accommodation(s). *See* St. John Aff., ¶10.

36.     Upon receiving this email, Mr. Mekerri called Plaintiff to discuss her requests and the additional detail she and Dr. Kessimian needed to move the process forward. On February 6, 2018, Mr. Mekerri emailed Plaintiff (copying Mr. St. John), thanking her for their discussion the day before, and setting forth his specific expectations given her role and the Company's business goals. These expectations fell within five categories (at varying frequencies): (1) senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or quarterly), (2) client bid defenses, issue resolution calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via phone (once a month at minimum per client), (3) technical sales presentations (internal and external) (monthly, quarterly, and as-needed), (4) meals and social interactions while at client visits (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%). *See* Mekerri Aff., ¶25; St. John Aff., ¶11.

37.     On February 7, 2018, having received no response from Plaintiff to Mr. Mekerri's email the day prior, Mr. St. John emailed Plaintiff to follow up, inviting her to schedule a call if she needed or wanted additional information. Mr. St. John told Plaintiff that if she had no questions, she should forward the information Mr. Mekerri had provided to her medical provider (Dr. Kessimian), so Dr. Kessimian could review and develop specific parameters or limitations that would be tolerable to Plaintiff. *See* St. John Aff., ¶12.

38.     Two days later, on February 9, 2018, Plaintiff responded to Mr. St. John and told him that she had forwarded Mr. Mekerri's email (with the five categorical specifications regarding Plaintiff's job duties) to Dr. Kessimian, and that she hoped to have "something ready" the next week. Plaintiff did not indicate that she had any questions or concerns about Mr. Mekerri's stated expectations. *See* St. John Aff., ¶13.

39.     On February 14, 2018, Dr. Kessimian sent her recommended accommodations to Mr. St. John. In her letter, Dr. Kessimian explained that Plaintiff's "brain and body are not able to tolerate public speaking engagements/ socializing, and it is as if her vocal cords become paralyzed while her blood pressure, heart rate and breathing all increase[.]" By way of introducing the specific accommodation requests, Dr. Kessimian wrote, "[b]elow are reasonable accommodations for Lisa so she can continue to be a productive and healthy member of your team." She then set forth the specific accommodation requests (which mirrored the five categories provided by Mr. Mekerri, though Dr. Kessimian separated the second category into two, thus ending with six categories instead of five). For senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President, Dr. Kessimian requested: [Plaintiff will be] "responsible for all slides/handouts/ presentation material with necessary information but will require a reader to present to the group, or can pre-record the audio/video and it can be played at the meeting available for questions via email after the meeting." For client bid defenses, issue resolution calls, and meetings at Highland Heights, Dr. Kessimian requested: [Plaintiff will be] "available via email/ text/ remote video conferencing for a representative of the client, 1-2 person audience maximum … If it is a site meeting, surrogate or reader with all necessary information / real time access to [Plaintiff] will be available." For client site meetings, Dr. Kessimian requested: [Plaintiff] "would like a surrogate to attend, but [Plaintiff] will be responsible for all problem solving/ ideas for resolution if emailed/ communicated to [Plaintiff] a few days before anticipated visit." For technical sales presentations (internal and external), Dr. Kessimian requested: [for Plaintiff to be] "excused from sales presentations but again [Plaintiff] will provide any necessary data information for the reader/ surrogate to have at their disposal." For meals and social interactions while at client

visits, Dr. Kessimian requested: "[a] surrogate, as this is not [Plaintiff's] strength/ skill set and her disability will flare with significant impairment. [Plaintiff] is able to build business relationship in a more 'behind the scenes' fashion and would like [to] brainstorm other potential avenues where she can add value as she does understand this is an important part of the business." Finally, for travel, Dr. Kessimian requested that Plaintiff be allowed to travel to PPD's Belgium laboratory, versus its laboratories in the United States (which included the Global Central Labs home-base – and Plaintiff's former workplace before moving to Massachusetts – in Highland Heights, Kentucky). *See* St. John Aff., ¶14.

40.     Upon receiving these accommodation requests, Mr. St. John was somewhat taken aback. He had not previously understood the extent to which Plaintiff's condition impacted her ability to interact with others, and he was not expecting her requests to be so significantly restrictive. Given Mr. St. John's original request of Plaintiff and Dr. Kessimian – i.e., to describe Plaintiff's specific limitations and the parameters which would allow her to do her job – he did not perceive any flexibility in the accommodation requests. While Dr. Kessimian suggested "brainstorm[ing] other potential avenues where [Plaintiff] could add value[,]" it was clear from her letter that Plaintiff was unable to socially engage with clients because any such activity would cause her "disability [to] flare with significant impairment." *See* St. John Aff., ¶15.

41.     Mr. Mekerri was traveling when Dr. Kessimian sent the accommodation requests. On Friday, February 23, 2018, Mr. St. John reached out to Plaintiff to explain that he had not yet had a chance to connect with Mr. Mekerri, but that he would be in touch. *See* St. John Aff., ¶16.

42.     The following Monday, February 26, 2018, Mr. St. John emailed Plaintiff to let her know that the Company would provide certain accommodations with respect to two of the five categories Mr. Mekerri had initially laid out. For senior leadership team presentations, Town

Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President, the Company would allow Plaintiff to have a designated reader present in her stead. And for travel, it would reduce the expectation from 30% to 15%. Mr. St. John explained that the other tasks – which constituted sub-categories of specific expectations falling under the umbrella categories of client-facing meetings and sales presentations – were central to Plaintiff's role as Executive Director of Global Central Labs and critical to the needs of the business. *See* St. John Aff., ¶17.

43. At Mr. Mekerri's request, Mr. St. John also scheduled a meeting with Plaintiff and Mr. Mekerri, which occurred on February 28, 2018. During that meeting, Mr. St. John explained the importance of client-facing meetings (both business-oriented and social engagements) and sales presentations (internal and external). He also raised concerns regarding what the Company understood to be Plaintiff's limitations in Dr. Kessimian's February 14, 2018 letter, and mentioned the possibility of an exit package or transitioning to a consulting role (these options were not suggested, merely brought up in passing for Plaintiff's consideration). Plaintiff was not interested in these options, and stated that she was able to continue doing her job without the requested accommodations. She, Mr. St. John, and Mr. Mekerri agreed to discuss further the next day and scheduled a meeting for the afternoon on March 1, 2018. *See* St. John Aff., ¶18.

44. The next morning, before their scheduled meeting, Plaintiff emailed Mr. St. John and Mr. Mekerri to thank them for agreeing provide some accommodations (she did not object to the travel accommodation, which was slightly different than what she had requested). She also asked for more information and specifics regarding the other categories of tasks for which PPD could not provide accommodations. Mr. St. John cancelled the afternoon meeting to instead work to address Plaintiff's request. He emailed Plaintiff to tell her, and she responded, "Sounds good, thanks Chad." *See* St. John Aff., ¶19.

45.     On March 12, 2018, Mr. St. John wrote to Plaintiff to explain the reasons why the

Company could not provide some of the accommodations Plaintiff sought. He reminded Plaintiff

of the essential functions of her job (including providing operational leadership; supporting

business development in obtaining new customers and maintaining relationships; and performing

Human Resources functions, personnel development and facility management). In addition, Mr.

St. John referenced specific tasks falling within the categories of client-facing meetings and sales

presentations – business development meetings, client dinners, and bid defenses – and noted

their importance to the business. Though it was certainly possible to "brainstorm other potential

avenues where [Plaintiff] could add value" as Dr. Kessimian had suggested, it was *not* possible

to do away with these core job requirements. Mr. St. John asked Plaintiff to review her job

description with Dr. Kessimian to see if there might be other potential accommodations that

would allow her to perform the essential functions of her job. *See* St. John Aff., ¶20.

46.     Plaintiff did not respond for nearly two weeks. On March 24, 2018, she wrote an

email to Mr. St. John, explaining that although "certain types of tasks (e.g., formal group

presentations)" were "challenging due to [her] disability," she was "capable of performing all of

[her] responsibilities with or without accommodation." Plaintiff noted that she had met with Mr.

Mekerri the week prior, and it did not appear that there would be any "activities or events in the

near future that would implicate [her] disability" – therefore, she suggested that they "table this

discussion until a particular task arises." Plaintiff further explained that "[d]ealing with these

issues in context … might make this whole issue seem less daunting and help us all engage in a

more meaningful dialogue."  *See* St. John Aff., ¶21.

47.     On April 3, 2018, Mr. St. John replied to Plaintiff and assured her that the

Company was committed to an open dialogue, and that he would continue to review any

accommodation requests as she raised them. He reconfirmed that PPD had agreed to accommodate Plaintiff by decreasing her required travel and providing her with a designee for internal meetings. Mr. St. John also took the opportunity to reiterate the Company's basis for denying Plaintiff's other requests: where Plaintiff had asked to be excused from attending client bid defenses, technical sales presentations, and customer visits/meetings (with a "surrogate" attending in her stead), Mr. St. John explained that she could not perform these tasks in a "behind the scenes" role as her position required her to be a client-facing leader. He asked Plaintiff to let him know if she had any additional accommodation requests. *See* St. John Aff., ¶22.

48.     Plaintiff did not ask for any additional or different accommodation(s). Instead, two weeks later, on April 17, 2018, she responded to Mr. St. John's email to tell him that she remained unsatisfied with his attempts to clarify PPD's position and felt as if he was "refusing to answer" her questions. She also complained that Mr. Mekerri was "targeting [her] because of [her] disability," referring specifically to (and attaching) an email she had received from him on April 11, 2018. In that email, Mr. Mekerri was following up on his conversation with Plaintiff the day prior, in which he had raised recent laboratory errors that had come to his attention. He asked for Plaintiff's "full attention and dedication to resolve them and be more proactive to prevent any further issues" and suggested two goals to work on for 2018: (1) a proactive approach to increase lab quality, and (2) ensuring lab goals and strategy are clear and well-communicated. Under each of the two goals, he suggested several specific ways in which Plaintiff might achieve them. *See* St. John Aff., ¶23.

49.     This April 11, 2018 email from Mr. Mekerri did not constitute a disciplinary action or measure in any way: it was not considered significant enough to add to Plaintiff's personnel record, and it had no impact on her job status whatsoever. Rather, it was an attempt to

encourage Plaintiff to be a more proactive leader, a continuing theme which had begun in late 2017. Moreover, Mr. Mekerri provided this feedback in part at the direction of Chris Fikry (Executive Vice President) after the Company had discovered a recent, concerning uptick in laboratory errors and quality issues. *See* Mekerri Aff., ¶¶31-35; McKinnon Aff., ¶¶ 7-8; Affidavit of Chris Fikry ("Fikry Aff."), ¶¶ 7-9.

50. Plaintiff's response to Mr. Mekerri's email (which she included in her subsequent communication to Mr. St. John on April 17) deflected blame for the recent lab errors. For one of the errors, she stated that a "lab tech [had] failed to follow the [standard operation procedure]." For a different error, she again blamed a "lab tech[,]" who she said had made a "clerical error in labeling sample results[.]" These errors, while directly attributable to laboratory technicians, are ultimately Plaintiff's responsibility (Mr. Mekerri again explained this to Plaintiff in his April 25, 2018 response to her April 17 email; Plaintiff forwarded Mr. Mekerri's response to Mr. St. John on April 27, 2018). *See* St. John Aff., ¶24; Mekerri Aff., ¶31.

51. Upon receiving Plaintiff's April 17, 2018 email and seeing her complaint that she felt as if Mr. Mekerri was "targeting [her] because of [her] disability," Mr. St. John immediately informed Ms. Ballweg (Ms. Ballweg, as Mr. St. John's supervisor, was generally aware of Plaintiff's situation and accommodation requests, but she was not directly involved). Mr. St. John and Ms. Ballweg agreed – given Mr. St. John's close involvement with Plaintiff's accommodation discussions – that Ms. Ballweg should be the person to conduct an investigation into Plaintiff's complaint. *See* St. John Aff., ¶25; Ballweg Aff., ¶¶19-20.

52. Mr. St. John also responded to Plaintiff's April 17 and 27, 2018 emails. First, he again attempted to provide additional information and clarity regarding PPD's position as to Plaintiff's accommodation requests. For each of the five categories (originally provided by Mr.

Mekerri in February), Mr. St. John explained why, from a business perspective, Plaintiff's specific requests were unreasonable. He also assured Plaintiff that PPD takes discrimination complaints very seriously, and that another member of Human Resources would reach out to her soon. *See* St. John Aff., ¶26.

53.     Ms. Ballweg began her investigation. She interviewed Plaintiff on May 2, 2018 (and again on May 15, 2018). Plaintiff made several complaints: (1) she felt Mr. Mekerri was going out of his way to document performance issues, (2) she was excluded from Company recruiting efforts, (3) she was "new[ly]" expected to attend bid defenses and client visits (and being asked to speak about unfamiliar topics), (4) she was not being invited to routine sales and marketing meetings, (5) she was not included in the planning of (or introduced at) a recent Town Hall meeting, (6) she had no formal performance review meeting for 2017 (only the "360 feedback" discussion in December 2017), and, finally, (7) that Mr. St. John had discussed an exit package and/or a consulting role during their February 28 conversation. *See* Ballweg Aff., ¶21.

54.     As part of her investigation, Ms. Ballweg also interviewed Mr. St. John, Mr. Mekerri, Andrew Supp (Executive Director of Business Development), Brent Mann (Senior Recruiter), and Mr. McKinnon. *See* Ballweg Aff., ¶ 22.

55.     After concluding the interviews, Ms. Ballweg made the following findings: (1) laboratory quality issues had doubled from mid-2017 to April 2018 (25 such issues) versus the prior year (11 such issues) and Mr. Mekerri's feedback to Plaintiff on those issues was appropriate, (2) Plaintiff told Mr. Mekerri in November 2017 that she was feeling overwhelmed, and after a conversation in December 2017 (in which Plaintiff and Mr. Mekerri discussed the stalled recruiting process), Mr. Mekerri agreed to take over recruiting in 2018 (and thus Plaintiff was not unfairly excluded), (3) the expectation for Plaintiff to attend bid defenses and client

visits was not new – both of those tasks were essential functions of her job, and Mr. Mekerri had communicated high expectations for all senior leadership to make 2018 a more successful year than 2017 had been (which included bringing in new – perhaps unfamiliar – technologies), (4) Mr. Mekerri had no control over the scheduling of sales and marketing meetings from which Plaintiff claimed to have been excluded (and Ms. Ballweg encouraged Plaintiff to reach out to Mr. Supp, who scheduled those meetings), (5) there was no planning meeting, nor any formal introductions, with respect to the recent Town Hall meeting about which Plaintiff complained (and therefore Plaintiff was not unfairly excluded), (6) the December 2017 meeting between Plaintiff and Mr. Mekerri, in which Mr. Mekerri raised the "360 feedback," was the basis for Plaintiff's 2017 review (moreover, though he had done things differently the year before, Mr. Mekerri had similar review discussions – i.e., a discussion on "360 feedback" prior to providing the written review – with two other employees, not just Plaintiff), and, finally, (7) Mr. St. John's mention of an exit package or consulting role in the February 28, 2018 conversation was purely hypothetical (not intended as a suggestion), and Mr. Mekerri did not actively participate in that part of the conversation. *See* Ballweg Aff., ¶23.

56. These findings led Ms. Ballweg to conclude that Mr. Mekerri was not unfairly "targeting" Plaintiff after she disclosed her disability in January 2018, and she communicated her findings and conclusions to Plaintiff on May 22, 2018. *See* Ballweg Aff., ¶¶ 24-25.

57. Two days later, on May 24, 2018, PPD received a letter from Plaintiff's counsel requesting a copy of her personnel record. The following week, on June 2, 2018, Plaintiff sent a two-sentence email to Mr. St. John and Ms. Ballweg, stating: "My doctor has advised me to take medical leave, effective immediately. Please let me know if there are any specific forms that I need to have her fill out." *See* Ballweg Aff., ¶¶26-27.

58.     Plaintiff's decision to take immediate leave put the Company in the position of having to scramble to find a solution. Though it took a significant amount of effort and planning, PPD was eventually able to split Plaintiff's job duties among other employees and consultants. *See* Ballweg Aff., ¶28.

59.     Plaintiff remained out on leave for the next eight months (six months of which were paid under the Company's short-term disability policy, after which PPD transitioned her to unpaid leave as an additional accommodation). During this time, Plaintiff showed no sign of intending to return to work. PPD left her position open, but by January 15, 2019, it needed to identify a long-term solution and terminated Plaintiff's employment effective February 1, 2019. *See* Ballweg Aff., ¶¶29-31.

60.     In January 2019, Plaintiff applied for Social Security Disability Insurance benefits, certifying in her application that is unable to work. *See* Shaw Aff., <u>Tab 5</u>. Dr. Kessimian testified that Plaintiff was unable to work as of June 2018. Plaintiff's husband testified that she has been unable to work since January 2018 (i.e. while she was still working at PPD). *See* Shaw Aff., <u>Tab 3</u> at 136:3-8, <u>Tab 4</u> at 109:21-111:4.

PPD DEVELOPMENT, L.P.,

by its attorneys,

/s/ *Alexandra E. Shaw*
Rachel Reingold Mandel (BBO #660495)
Alexandra E. Shaw (BBO #694534)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701
rachel.mandel@ogletree.com
alexandra.shaw@ogletree.com

Dated: March 24, 2021

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 24, 2021.

/s/ *Alexandra E. Shaw*
Alexandra E. Shaw

46449697.1