UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER,<br><br>        Dr. Menninger,<br><br>v.<br><br>PPD DEVELOPMENT, L.P.,<br><br>        Defendant. | Civil Action No. 1:19-CV-11441-LTS |

## AFFIDAVIT OF DEBORAH BALLWEG

I, Deborah Ballweg, hereby depose and state as follows:

1. I make this affidavit upon personal knowledge and I can testify competently to the matters discussed below.

2. I started working at PPD Development, L.P. ("PPD" or the "Company") in 1994 as a Human Resources Specialist. I worked my way up, serving in various HR roles over the years. In 2018, my title was Senior Director of Human Resources. Between April 2018 and April 2020, I was the Executive Director of Human Resources. My title is now Vice President of Human Resources.

3. PPD is a global contract research organization that provides comprehensive, integrated drug development, laboratory, and lifecycle management services.

4. The Company maintains offices and laboratories in 47 countries and works together with pharmaceutical, biotechnology, medical device, academic, and government partners and clients.

1

5. PPD's Global Central Labs provide standardized testing and innovative data solutions across a wide range of technologies and applications for all phases of pharmaceutical development. The Global Central Labs are made up of four laboratories in four parts of the world: Belgium, China, Singapore, and the United States (Highland Heights, Kentucky).

6. On August 31, 2015, PPD hired Dr. Lisa Menninger as the Executive Director of its Global Central Labs, based in the Highland Heights, Kentucky laboratory. PPD paid for Dr. Menninger to relocate to Cincinnati, Ohio (which is very close to Highland Heights, Kentucky).

7. During the onboarding process, Dr. Menninger filled out paperwork provided to her by PPD's Human Resources Department. One of the forms was a Voluntary Self-Identification of Disability. The form included several examples of impairments that might qualify as a disability, including examples of psychiatric impairments. Dr. Menninger selected the option, "No, I don't have a disability." *See* Self-Identification Form (PPD_MENNINGER 000414-17), attached as Tab 1.

8. As Executive Director of Global Central Labs, Dr. Menninger was responsible for overseeing and managing the Labs' operations, both with respect to day-to-day functionality and to support research and business development. Dr. Menninger also held specific licenses and certifications necessary to the operation of the laboratories in Belgium and Kentucky.

9. The essential functions of Dr. Menninger's role – as set forth in the job description provided to Dr. Menninger upon her hire – include: (1) providing operational leadership to laboratory services; integrating operational processes, furthering research

development, and maintaining quality assurance functions for optimal performance within the Labs, (2) supporting business development in obtaining new customers and maintaining current relationships; directing the development of new programs for revenue enhancement/cost expense reduction, including post-evaluation of new implementations for effectiveness, (3) performing financial reviews, establishing an operating budget, and developing forecasts maximizing profit; providing business updates to senior leadership, (4) setting operational standards/goals and directing the implementation of laboratory goals and policies; overseeing resource allocation including space, capital equipment, scientific instrumentation and staff, (5) performing administrative responsibilities including Human Resources functions, personnel development, facilities management, and creating standard operating procedures and position descriptions, and (6) overseeing the quality assurance and quality control aspects of the lab to ensure compliance with regulatory standards. *See* ED Job Description (PPD_MENNINGER 000058-61), attached as Tab 2.

10. Given the importance of the Executive Director position to the continued success of the Global Central Labs, PPD was pleased to have found Dr. Menninger, who was highly regarded and appeared more than qualified for the job.

11. Indeed, one of PPD's primary reasons for hiring Dr. Menninger was that she had been serving in a similarly demanding role immediately prior, as Laboratory Director of Clinical Reference Laboratory ("CRL"). According to her resume (and as communicated by her in interviews), Dr. Menninger had been (among other things): (1) providing directorship for the company's General and Clinical Trials Laboratories, (2) ensuring an effective quality management program for CRL laboratories, (3) partnering with the

Chief Executive Officer, Chief Financial Officer, and Vice Presidents in strategic planning and budgeting sessions, (4) interacting with international, national, and state regulatory agencies for laboratory-related matters, (5) providing consultation to CRL clients, and (6) overseeing the communication of laboratory data and patient result reporting. *See* Menninger Resume (PPD_MENNINGER 000406-07), attached as Tab 3.

12. Each of these duties closely aligned with the expectations and responsibilities of PPD's Executive Director of Global Central Labs. Assurance that Dr. Menninger had been performing them successfully over the past five years was a significant motivating factor in the decision to hire her.

13. Dr. Menninger's references were also quite positive. One of her former colleagues included among Dr. Menninger's "strongest attributes," her "[w]illingness to take on new challenges" and that she was "not afraid to offer an opinion." Another colleague described Dr. Menninger's "interpersonal skills" to include an "[e]xcellent ability to work with all types of individuals." *See* References (PPD_MENNINGER 000432-34), attached as Tab 4.

14. I had little to no interaction with Dr. Menninger during the first two full calendar years of her employment. I am aware that in or around June 2016, she moved to Massachusetts, and began working remotely from that time on.

15. In late 2017, I worked with Dr. Menninger's supervisor, Hacene Mekerri (then Vice President of Central Lab Services) and other members of executive leadership on the Company's annual executive talent review (in which we review and assess employees' current performance and prospective outlook).

4

16. On December 20, 2017, I sent an email to Mr. Mekerri (and other members of executive leadership) with a finalized copy of a document titled "9 Box Talent Review," which summarized the outcome and conclusions of the annual executive talent review with nine different narrative options for overall standards of performance (e.g., "Low Impact Leader," "Solid/Steady," and "Leading Edge"). Dr. Menninger's category rating was "Limited Progress," which was defined as, "Solid business performance today but with risk of falling behind due to lack of leadership capability." *See* December 20, 2017 Email (PPD_MENNINGER 002999-003000), attached as Tab 5.

17. I am aware that on January 11, 2018, Dr. Menninger disclosed a psychiatric disability to Mr. Mekerri, and that she subsequently requested workplace accommodations. One of my direct reports, Chad St. John, worked directly with Dr. Menninger and Mr. Mekerri to review and assess Dr. Menninger's accommodation requests. I was not directly involved in this process, though Mr. St. John did keep me apprised as it progressed.

18. I am also aware that Dr. Menninger has claimed that Mr. Mekerri only completed her 2017 performance review on January 12, 2018 (i.e., the day after Dr. Menninger disclosed her disability). This is not true. As I testified to in my deposition, on or around January 12, 2018, I advanced Dr. Menninger's performance review in the Company's internal electronic system to move the review toward finalization (as I did for other employees' 2017 reviews, as well – and as Human Resources commonly does when supervisors are traveling or otherwise unable to advance the reviews themselves). Mr. Mekerri had already completed Dr. Menninger's 2017 review when I advanced it (which I did for him because he was traveling at the time).

19. On April 17, 2018, Mr. St. John forwarded me an email from Dr. Menninger in which she complained that after disclosing her disability to Mr. Mekerri in January, he had been "targeting [her] because of [her] disability."

20. PPD takes any such complaints very seriously. We decided that since Mr. St. John was closely involved with Dr. Menninger's accommodation requests, and had been working with her and Mr. Mekerri since Dr. Menninger first disclosed her disability three months prior, I should be the person to investigate Dr. Menninger's complaint about Mr. Mekerri.

21. I promptly began my investigation. I interviewed Dr. Menninger on May 2, 2018 (and again on May 15, 2018). Her complaints were as follows: (1) she felt Mr. Mekerri was going out of his way to document performance issues, (2) she was excluded from Company recruiting efforts, (3) she was "new[ly]" expected to attend bid defenses and client visits (and being asked to speak about unfamiliar topics), (4) she was not being invited to routine sales and marketing meetings, (5) she was not included in the planning of (or introduced at) a recent Town Hall meeting, (6) she had no formal performance review meeting for 2017 (only the "360 feedback" discussion in December 2017), and, finally, (7) that Mr. St. John had discussed an exit package and/or a consulting role during their February 28, 2018 conversation.

22. I also interviewed Mr. St. John, Mr. Mekerri, Andrew Supp (Executive Director of Business Development), Brent Mann (Senior Recruiter), and Brent McKinnon (Executive Director of Laboratory Quality Assurance). *See* Interview Notes, attached as Tab 6.

23. After I concluded my interviews, I made the following findings: (1) laboratory quality issues had doubled from mid-2017 to April 2018 (25 such issues) versus the prior year (11 such issues) and Mr. Mekerri's feedback to Dr. Menninger on those issues was

6

appropriate, (2) Dr. Menninger had told Mr. Mekerri in November 2017 that she was feeling overwhelmed, and that after a conversation in December 2017 (in which Dr. Menninger and Mr. Mekerri discussed the stalled recruiting process), Mr. Mekerri agreed to take over recruiting in 2018 (and thus Dr. Menninger was not unfairly excluded), (3) the expectation for Dr. Menninger to attend bid defenses and client visits was not new – both of those tasks were essential functions of her job, and Mr. Mekerri had communicated high expectations for all senior leadership to make 2018 a more successful year than 2017 had been (which included bringing in new – perhaps unfamiliar – technologies), (4) Mr. Mekerri had no control over the scheduling of sales and marketing meetings from which Dr. Menninger claimed to have been excluded (and Ms. Ballweg encouraged Dr. Menninger to reach out to Mr. Supp, who scheduled those meetings), (5) there was no planning meeting, nor any formal introductions, with respect to the recent Town Hall meeting about which Dr. Menninger complained (and therefore Dr. Menninger was not unfairly excluded), (6) the December 2017 meeting between Dr. Menninger and Mr. Mekerri, in which Mr. Mekerri raised the "360 feedback," was the basis for Dr. Menninger's 2017 review (moreover, though he had done things differently the year before, Mr. Mekerri had similar review discussions – i.e., a discussion on "360 feedback" prior to providing the written review – with two other employees, not just Dr. Menninger), and, finally, (7) Mr. St. John's mention of an exit package or consulting role in the February 28, 2018 conversation was purely hypothetical (not intended as a suggestion), and Mr. Mekerri did not actively participate in that part of the conversation. *See* Investigation Findings, attached as Tab 7.

24. These findings led me to conclude that Mr. Mekerri had not been unfairly "targeting" Dr. Menninger after she disclosed her disability. Rather, he had first begun to address performance concerns with Dr. Menninger in December 2017 (prior to her disclosure of her disability), and then appropriately addressed serious (and increasing) laboratory errors in early 2018.

25. I informed Dr. Menninger of the outcome of my investigation on May 22, 2018.

26. Two days later, on May 24, 2018, PPD received a letter from Dr. Menninger's attorney, requesting a copy of her personnel record.

27. The following week, on June 2, 2018, Dr. Menninger sent a two-sentence email to Mr. St. John and me, stating: "My doctor has advised me to take medical leave, effective immediately. Please let me know if there are any specific forms that I need to have her fill out." *See* June 2, 2018 Email (PPD_MENNINGER 001529), attached as Tab 8.

28. Dr. Menninger's decision to take immediate leave put the Company in the position of having to scramble to find a solution, both with respect to her job duties as well as necessary licensures. Though it took a significant amount of effort and planning, the Company eventually was able to split Dr. Menninger's job duties among other employees and outside consultants.

29. Dr. Menninger remained out on leave for the next eight months (six months of which were paid under the Company's short-term disability policy, after which we transitioned Dr. Menninger to unpaid leave as an additional accommodation).

30. During this time, Dr. Menninger showed no sign of intending to return to work. We left her position open in the hopes that Dr. Menninger would return, but by January 15, 2019, the Company needed to identify a long-term solution.

31. I emailed Dr. Menninger and told her that her employment would be terminated effective February 1, 2019. *See* January 15, 2019 Email (PPD_MENNINGER 002055), attached here as Tab 9.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 19 DAY OF March, 2021.

Deborah Ballweg

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2021 the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Alexandra E. Shaw
Alexandra E. Shaw