UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

      Plaintiff,

      v.

PPD DEVELOPMENT, L.P.,

      Defendants.

Civil Action No: 1:19-CV-11441-LTS

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The ADA recognizes that unfair and unnecessary prejudice against persons with disabilities costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity. 42 U.S.C. § 12101(a)(8). The facts here offer a prime example of this harm, as well as the insidious nature of disability discrimination in the workplace—particularly against persons with mental health disorders.

By all accounts—even the Defendant's—Plaintiff Lisa Menninger ("Dr. Menninger") was a talented and accomplished medical doctor. Despite suffering from a mental health disorder since childhood, one that made certain social interactions extremely challenging, Dr. Menninger proved successful both academically and professionally. That success was due, at least in part, to Dr. Meninger charting a professional course that allowed her to utilize her many strengths, without being held back by the limitations of her disability.

Through those efforts, Dr. Menninger earned the opportunity to serve as Executive Director of Defendant PPD Development, L.P.'s ("PPD") Global Central Labs. It was a role for which Dr. Menninger was well-suited, and which she performed extremely well for nearly two and a half years. Indeed, PPD was so impressed with Dr. Menninger, that it wanted to increase her responsibilities, and suggested the possibility of having her engaged in more client-facing activities.

Fearing that these changes would involve activities that implicated her disability, such as presentations and increased social engagements, Dr. Menninger made the difficult decision to disclose her disability to PPD, in the hopes that they could work together so that any changes to her role would not unnecessarily impact her disability. But that cooperation never happened, as PPD opted for a different course.

No matter how talented and accomplished Dr. Menninger might be, PPD simply did not want such an important role in its organization filled by someone with a mental health disorder. So PPD decided to get rid of her. That is not merely an inference a jury could draw based upon the record evidence—it is an established fact directly shown by the bevy of internal communications produced by PPD in this litigation, none of which they expected would ever see the light of day.

But rather than simply fire Dr. Menninger—which they acknowledged would be a bad option given her strong record of performance—they hatched a plan to get her out, by hook or by crook. In the months that followed, Dr. Menninger was stonewalled, harassed, and essentially gaslighted by a purported internal "investigation" conducted by the very same person who, unbeknownst to Dr. Menninger, had been overseeing the effort to drive her out from the start.

Utilizing this "death by a thousand cuts" approach, PPD achieved its objective. By June 2018, Dr. Menninger had developed a major depressive disorder. Her doctor feared she might commit suicide, and she was forced to take medical leave to obtain psychiatric treatment. She has been unable to work ever since.

*     *     *

PPD's summary judgment motion essentially asks the Court to side with its own unfounded, prejudicial, and unilateral <u>assumptions</u> about Dr. Menninger's abilities. But PPD does not offer even the most basic evidence to carry its burden, and the extensive factual record provides ample ground on which a jury could find in favor of Dr. Menninger on all of her claims. Accordingly, summary judgment should be denied, and a jury should be permitted to hold PPD accountable for the extensive harm that its unlawful conduct has caused.

**FACTS**

The material facts are set forth in Dr. Menninger's enclosed Local Rule 56.1 statement, which we incorporate herein.

**ARGUMENT**

**I.  A Jury Could Find PPD Failed to Accommodate Dr. Menninger's Disability.**

The ADA and Chapter 151B § 4(16), both modeled on the federal Rehabilitation Act, are aimed at ensuring persons who are physically and mentally impaired are nevertheless capable of becoming productive and successful members of the workforce. Dahill v. Police Dep't of Bos., 434 Mass. 233, 241 (2001)[1]; see Dudley v. Hannaford Bros. Co., 333 F.3d 299, 303 (1st Cir. 2003); PGA Tour, Inc. v. Martin, 532 U.S. 661, 674–75 (2001) (citing 42 U.S.C. § 12101(a)(8)). Both statutes impose an affirmative duty on employers to offer a reasonable accommodation to a disabled employee. Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 20 (1st Cir. 2004); Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010). The failure to reasonably accommodate a disabled employee is, in and of itself, a form of disability discrimination. Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016); Ocean Spray Cranberries v. Mass. Comm'n Against Discrimination, 441 Mass. 632, 644 (2004).

The essential elements of Dr. Menninger's failure to accommodate claim are (1) that she is disabled (or handicapped) under the statutory definition; (2) she could perform the essential functions of her job either with or without a reasonable accommodation, and (3) her employer knew of her disability yet failed to accommodate it. Lang, 813 F.3d at 454; Gustafson v. Genesis Eldercare Rehab. Servs., Inc., 89 Mass. App. Ct. 1135, 2016 WL 4129408, at *3 (2016) (Rule

---

[1] Chapter 151B must be liberally construed for the accomplishment of its remedial purposes. Id.

1:28). An employer that knows of a disability yet fails to make a reasonable accommodation violates the ADA and Chapter 151B, no matter its intent, unless it can show the proposed accommodation would create an undue hardship for the business. Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008) (citing 42 U.S.C. § 12112(b)(5)(A)); see Godfrey, 457 Mass. at 119. Each failure-to-accommodate case must be scrutinized on its own unique facts. Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 (1st Cir. 2000); Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 596 (2004).

As the summary judgment movant, PPD bears the burden to demonstrate "an absence of evidence supporting the non-moving party's case." Hickey v. Tompkins, No. CV 19-11349-LTS, 2021 WL 858439, at *3 (D. Mass. Mar. 8, 2021) (Sorokin, J.) (citing Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir. 2000) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

Here, PPD challenges only the second element, which is comprised of two issues: whether PPD has proved these tasks were "essential" functions of Dr. Menninger's job, and whether, if they were, a jury could find Dr. Menninger was able to perform those disputed tasks either with an accommodation or without one. For the reasons that follow, PPD falters in its initial burden to prove that any claimed tasks (which it fails to even identify) were essential. The evidence amply supports, in any event, a finding that Dr. Menninger could perform all functions, essential and marginal, of her job even without an accommodation, as she did consistently for nearly two and a half years. Further, there is ample evidence from which a reasonable jury could conclude that (1) Dr. Menninger could have been accommodated by reasonable accommodations such as those proposed by Dr. Kessimian or the alternatives offered by her expert, Dr. Summergrad; and (2) PPD was responsible for the failure to determine an accommodation due to its failure to engage in the required interactive process.

A.  PPD Fails to Carry its Burden to Identify the Functions it Claims are Essential, Much Less Offer Proof on the Fact-Intensive Question of Whether They Were Essential.

PPD bears the burden to prove that a disputed job task was an "essential function." Ward v. Massachusetts Health Rsch. Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000) (employer always bears the burden to prove a function was essential due to its superior access to information). Federal law defines an "essential" function as a fundamental job duty, not a marginal one; and under Massachusetts law, the term is defined as a function that must necessarily be performed in order to accomplish the principal objectives of the job. 29 C.F.R. § 1630.2(n)(1); Cargill, 60 Mass. App. Ct. at 594. To determine if a function is essential, both federal and Massachusetts law rely on the three "reasons" why a function may be essential that are listed in the EEOC's regulations on the ADA, 29 C.F.R. § 1630.2(n)(2), and the seven evidentiary factors listed in § 1630.2(n)(3). Cargill, 60 Mass. App. Ct. at 595–96; Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 24–25 (1st Cir. 2002). Summary judgment is rarely appropriate where there is a dispute about an essential function, as the inquiry is fact-sensitive and must be determined on a case-by-case basis. Carmichael v. Verso Paper, LLC, 679 F. Supp. 2d 109, 127 (D. Me. 2010) (citing Gillen, 283 F.3d at 25). Where the employer fails to come forward with any significant evidence on the essential function issue, summary judgment must be denied. See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 107 (1st Cir. 2005) ("Tobin I") (noting that the "surprising failure" of a party to offer evidence on its essential-function burden is often outcome determinative.)

Here, the Court cannot even reach the factors for determining whether a task is essential, because PPD's efforts to identify the tasks in the first place are hopelessly contradictory. Identification of the functions is a necessary first step in the essential function inquiry, and precision is critical. Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 75 (1st Cir. 2010). Even

6

if the Court looks only to PPD's summary judgment brief (ECF No. 44), PPD takes contradictory positions on whether Dr. Menninger's job function was changing: arguing on p. 10 n.10 that Dr. Menninger's job was going to change materially (via an increase in certain tasks), but arguing on page 15 that her job was not being altered or changed. Nor is it clear what tasks are at stake. In its brief, PPD refers at times to what it calls the "key" or "important" tasks (tellingly avoiding the word "essential") of "client meetings" and "presentations," although PPD at times interchanges the term "presentations" with "business development aspects." Def. Br. at 2, 5, 9, 15.

PPD's Statement of Material Facts tells a different story—claiming the "essential functions" were actually the six bullets listed in Dr. Menninger's written job description. Def. SMF (ECF No. 45) ¶ 6; Def. Br. at 2 n.3. Yet neither of the two tasks of "client meetings" nor "presentations" is listed at all in the written job description's six-item list of "essential functions." Adding even more to the confusion, the two-pronged reference to "client meetings" and "presentations" is not the way PPD characterized the "essential functions" of Dr. Menninger's job at the time of her request for accommodation in the first half of 2018. Instead, the purported rationale offered by PPD to explain why it would not grant any accommodation as to Items 2–4 in the February 6th email from her supervisor Hacene Mekerri was that these items were "critical" for Dr. Menninger's "role."[2] (St. John Tab 14, March 12, 2018 email). As PPD has offered at least three distinct and incompatible sets of "essential functions," and fails to define its purported functions with any precision, there is no basis from which the Court can engage in meaningful inquiry into whether the functions were truly "essential." Indeed, it is deeply unfair to ask Dr. Menninger to argue this point against a moving target—particularly because PPD's new

---

[2] Of course, merely claiming Items 2–4 were "critical" in no way relieved PPD of its obligations to grant a reasonable accommodation, or to engage in the interactive process of determining one.

7

"umbrella" terms offered at summary judgment are not the tasks it asked Dr. Menninger's doctor to evaluate when PPD asked Dr. Menninger to submit proposed accommodations in February 2018. Summary judgment should be denied on Dr. Menninger's failure-to-accommodate claim for this reason alone.

Even if the Court proceeds further, PPD comes nowhere close to carrying its burden to show any tasks were essential. In face of a fact-intensive, multi-factor inquiry, PPD relies entirely on one data point: its own "view," in arguing (in its summary judgment brief, at least) that "client meetings" and "presentations" were essential functions. Def. Br. at 15. However, there is no record evidence supporting that PPD ever had this "view" in 2018, when it repeatedly referred Dr. Menninger back to her written job description and/or to Items 2–4 in Mekerri's February 6th email, and never framed the issue in terms of "client meetings" and "presentations." See, e.g., Exhibit 55 (St. John Tab 14). Moreover, because the employer's "view" is only one factor in a multi-factor analysis it is not dispositive. Gillen, 283 F.3d at 25; Tufts Medical Ctr. v. Dalexis, No. 2084CV00156-H, at 13 (Mass Super. Feb. 17, 2021) (citing Cargill, 60 Mass. App. Ct. at 594). Within the six evidentiary factors in 29 C.F.R. § 1630.2(n)(3), the second factor (written job description) flatly contradicts PPD's "view," since the six bullets in Dr. Menninger's written job description is entirely distinct from the two functions referenced above.

As to the remaining factors, PPD offers nothing showing the amount of time Dr. Menninger spent performing these functions (factor 3), what consequences PPD would face if someone else had to perform the functions (factor 4), or the work experience of past or current incumbents in Dr. Menninger's job (factors 6 and 7).

Turning to the "reasons" in § 1630.2(n)(2), PPD offers no evidence that Dr. Menninger's position exists to perform these functions; no evidence that there is somehow a limited number of

employees who can meet clients or give presentations; and no evidence that these functions are highly specialized such that Dr. Menninger was hired for her expertise or ability in being able to meet with clients or give presentations. In short, PPD's "surprising failure" to offer evidence on these points results in it wholly failing to carry its burden. In the absence of proof defining the functions and proving them to be essential, genuine issues of fact preclude summary judgment.[3]

**B.** <u>Dr. Menninger Could Perform the Essential Functions of Her Job With or Without Accommodation</u>

Even if PPD had carried its burden above, Dr. Menninger has offered ample evidence from which a jury could find that she could perform the essential functions of her job with or without an accommodation. PPD concedes that it does not question Dr. Menninger's performance, qualifications, credentials, or experience in general. Def. Br. at 9–10. Instead, PPD's sole contention is quite narrow: that Dr. Menninger was "physically incapable" of engaging in "client meetings" and "presentations." <u>Id.</u> For two reasons, there exist genuine issues of fact.

First, a jury could find Dr. Menninger performed <u>all</u> functions of her job, including those implicated by the terms "client meetings" and "presentations," throughout her employment. Albeit rarely, Dr. Menninger gave presentations to the senior leadership team (SLT), to laboratory teams, and at PPD town halls, albeit sometimes with the use of medication. Pl. SAMF ¶ 12. Her supervisor, Mekerri, thought she had done a great job in the presentations she gave, and was surprised to learn that Dr. Menninger had a disability. <u>Id.</u> at ¶¶ 12, 19. And while the term "client meetings" is highly ambiguous (as it is not clear if this refers to one or more of the Items in

---

[3] <u>See</u>, <u>e.g.</u>, <u>Eldredge v. City of St. Paul</u>, 809 F. Supp. 2d 1011, 1032 (D. Minn. 2011)) ("Before the Court can even address whether Plaintiff is qualified to perform the essential functions of the firefighter position for purposes of Plaintiff's disability discrimination claims, there must clear, undisputed facts as to what constitutes the essential functions of the firefighter position.")

Mekerri's February 6th email, or something else), Dr. Menninger successfully handled issue resolution calls with clients nearly every day, Pl. SAMF ¶ 37, occasionally attended dinners, Pl. SAMF ¶ 42, provided assistance for client bid defenses a few times, Pl. SAMF ¶ 36, and occasionally helped with client site visits for audits, Pl. SAMF ¶ 38.

Second, there is ample evidence from which a jury could find that "presentations" and "client meetings" were <u>marginal</u> functions (which would make Dr. Menninger's ability to perform them irrelevant). Dr. Menninger's job plainly did not exist so that she could give presentations or have meetings. <u>Cf.</u> <u>Cargill</u>, 60 Mass. App. Ct. at 594; 29 C.F.R. § 1630.2(n)(2)(i). Hers was a highly technical and scientific, operational oversight role over PPD's laboratories that required a doctoral degree and training and certification as a pathologist. Pl. SAMF ¶¶ 8–11. PPD had a vast army of other personnel who could have meetings with clients, including its entire Business Development and Lab Partnership departments, and the Project Management division of the Labs department headed by Dr. Menninger's peer Chris Clendening. <u>Id.</u>; 29 C.F.R. § 1630.2(n)(2)(ii). Pl. SAMF ¶¶ 7–8. The record also shows that for presentations such as client bid defenses, other lab employees in Dr. Menninger's reporting chain would commonly cover the responsibility to be available for questions. Pl. SAMF ¶ 36; 1630.2(n)(2)(ii), (3)(iv). As indicated above, Dr. Menninger's written job description (Exhibit 1) strongly suggests (by omission) that "client meetings" and "presentations" were not "essential functions." 29 C.F.R. § 1630.2(n)(3)(ii). Further, the list Dr. Menninger prepared in November 2017 of the "responsibilities" of her job (Exhibit 7) says nothing about client meetings or public speaking, and the record evidence shows that Dr. Menninger only rarely delivered presentations or engaged in "client meetings," spending very little time on those tasks. <u>Id.</u> § 1630.2(n)(3)(iii). These indicia more than suffice to support a finding that client meetings and presentations were marginal tasks.

To the extent PPD claims client meetings and presentations were expected to substantially increase in the future, there is no evidence that PPD actually <u>did</u> increase these tasks at any time during Dr. Menninger's employment. PPD cannot sustain its motion by arguing that Dr. Menninger was unable to perform an undefined set of tasks that were never actually imposed, were never explained to Dr. Menninger, and which PPD still refuses to delineate with any precision to this Court at summary judgment.

    C. <u>Numerous Reasonable Accommodations Were Available.</u>

With respect to the availability of an accommodation, Dr. Menninger need only show some evidence that **<u>a</u>** reasonable accommodation was possible. <u>See</u> <u>Godfrey v. Globe Newspaper Co.</u>, 457 Mass. 113, 119 (2010). Here, Dr. Menninger offers multiple paths for a jury to make that finding.

First, a jury could find Dr. Kessimian's recommended accommodations of a surrogate with respect to Items 2–4 in Mekerri's February 6th email were entirely reasonable and feasible. PPD <u>granted</u> substantially the same accommodation (a reader) for Item 1, and as with Item 1, Dr. Kessimian's proposals would still have left Dr. Menninger responsible for the content of presentations and other substantive preparation. EEOC regulations, and their interpretive guidance, expressly recognize "job restructuring" may be a reasonable accommodation, 29 C.F.R. § 1630.2(o)(2)(ii), as when the employer alters "when and/or how an essential function is performed." EEOC Interpretive Guidance, 29 C.F.R. § Pt. 1630, App. (Section 1630.2(o)). And a jury could find from Dr. Kessimian's own written explanations to her accommodation request, and from Dr. Summergrad's opinion, that these accommodations would have allowed Dr. Menninger to continue performing her job without having to suffer the unique burdens of her disability. <u>See</u> Pl. SAMF ¶¶ 45, 111–13 and sources cited.

Dr. Summergrad's expert report also identifies multiple other reasonable accommodations that could have been reached. These include planning out the activities such as presentations or social interactions that implicated Dr. Menninger's disability so she would have time to mentally prepare beforehand and recharge afterwards, as well as simply giving Dr. Menninger more specifics about the ways her role was purportedly going to change, so that she could make better use of her coping skills with the aid of advance notice. Pl. SAMF ¶¶ 112–13. Notably, PPD's motion makes no effort to argue that these proposed accommodations would have been unreasonable.

D. A Jury Could Find that PPD, in Bad Faith, Failed to Engage in the Interactive Process.

If that were not enough, a jury could also find that PPD was responsible for the failure to identify a reasonable accommodation due to its abject failure to engage in the interactive process. Contrary to PPD's argument that it was entitled to sit on its hands and make assumptions about Dr. Menninger's abilities after receiving her initial accommodations proposals, Def. Br. at 10, both federal and Massachusetts law obligated PPD to engage in a highly communicative, meaningful, and interactive dialogue with Dr. Menninger—in good faith—to find the best means of accommodating her disability. E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014); Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008); Ocean Spray Cranberries, 441 Mass. at 644. The need for a "great deal of communication" is even more acute in the cases involving mental disability. Tobin I, 433 F.3d at 109; Bultemeyer v. Fort Wayne Cmty. Sch., 100 F.3d 1281, 1285 (7th Cir. 1996). Under the ADA, an employer's refusal to participate in the process may itself be evidence of the employer's violation of the statute, including where the employer simply rejects an accommodation request without further discussion. Garcia-Ayala, 212 F.3d at 648 n.12. Where

a jury could find the employer responsible for a breakdown in the interactive process, summary judgment should be denied. Calero-Cerezo, 355 F.3d at 24–25.

Under Chapter 151B, meanwhile, the failure to engage in the interactive process is itself a violation of the law. Ocean Spray Cranberries, 441 Mass. at 644 ("The refusal of an employer to participate in that process once initiated, or to make a reasonable accommodation once it has been identified, is a violation of our discrimination laws."); Barbuto v. Advantage Sales & Mktg., LLC, 477 Mass. 456, 463 (2017) (where a handicapped employee requests an accommodation, the "employer is obligated to participate in the interactive process of determining one.") (citing MTBA, 450 Mass. at 342 n.17) (emphasis added)).[4] Crucially, "[i]f the accommodation proposed by the employee appears unduly onerous, the employer has an obligation to work with the employee to determine whether another accommodation is possible." Barbuto, 477 Mass. at 463 (quoting Godfrey, 457 Mass. at 120).

Here, there is overwhelming evidence that PPD violated this duty. Indeed, that conclusion is made evident by PPD's own internal communications, which admit that PPD had no intention of engaging in a good faith dialogue with Dr. Menninger, and intentionally avoided answering her question in order to further the plan to force her out. See Pl. SAMF ¶¶ 52–59, 62, 64–65, 67–69,

---

[4] Consistently with these authorities, the Massachusetts Commission Against Discrimination has long enforced the duty to engage in the interactive process as itself a requirement of the Massachusetts anti-discrimination laws. See, e.g., Carta v. Wingate Healthcare, Inc., No. 11-BEM-02841, 2020 WL 9257120, at *6 (MCAD Full Comm'n Jun. 8, 2020) ("Respondent failed in its obligation to engage in the interactive process when it **unilaterally determined** that Complainant would not be able to complete the essential functions of the position **without investigating possible accommodations** and engaging in an interactive process"); Savage v. Mass. Rehabilitation Commission, 10-BEM-02259, 2016 WL 3124677, at *18 (MCAD May 25, 2016) ("Respondent's failure to engage in any **meaningful communication** with Complainant to determine the **precise nature of the problems** he was encountering and to fashion some meaningful accommodation focused on his difficulty learning the computer system violated **the obligation of Massachusetts employers to engage in an interactive process** with a disabled employee who requests or requires an accommodation.").

75, 81, 88. This was a paradigmatic example of bad faith, and precludes PPD from claiming that no accommodations were possible.

E.  PPD's Estoppel Argument is Anachronistic and Meritless.

PPD's argument about Dr. Menninger's application for Social Security Disability Insurance benefits is simply anachronistic. Dr. Menninger applied for SSDI in January 2019— after she had already been on leave for several months and had already been informed she was being fired. All Dr. Menninger certified in her application was that she was disabled (under the Social Security definition) as of the <u>time of the application</u> in January 2019. She did not claim, and no evidence suggests, that she was unable to work at any time prior to June 2, 2018, the date she first took medical leave due to the profound mental health decline she suffered as a result of PPD's discrimination and retaliation.[5] Moreover, even if the argument were not temporally confused, an application for Social Security Disability Benefits does not work an estoppel where a jury could find the plaintiff could still have done her job with an accommodation, as the jury could (for reasons discussed above) find here on multiple grounds. <u>See</u>, <u>e.g.</u>, <u>Russell v. Cooley Dickinson Hospital, Inc.</u>, 437 Mass. 443, 452 (2002); <u>Kovaco v. Rockbestos-Surprenant Cable Corp.</u>, 834 F.3d 128, 138 (2d Cir. 2016). PPD is the party that caused Dr. Menninger's health decline by discriminating and retaliating against her, and cannot twistedly use its own misconduct as a basis to avoid responsibility.

**II.  A Jury Could Find PPD Took Adverse Employment Action Against Dr. Menninger As a Result of Her Disclosure of Her Disability.**

---

[5] Further, it is well established that where an employer's unlawful conduct causes an employee's inability to mitigate damages, the employee may recover the entire amount of lost salary that results. <u>Tobin v. Liberty Mut. Ins. Co.</u>, 553 F.3d 121, 141–44 & n.29 (1st Cir. 2009) (<u>Tobin II</u>) (affirming damages award through retirement date where employee's depression and panic and anxiety disorders were exacerbated by his employer, causing his total disability); <u>Johnson v. Spencer Press of Maine, Inc.</u>, 364 F.3d 368, 379 (1st Cir. 2004); <u>Blockel v. J.C. Penney Co.</u>, 337 F.3d 17, 27 (1st Cir. 2003).

While PPD's failure to extend a reasonable accommodation for Dr. Menninger's disability is itself discrimination, a jury could also find even under Defendant's own articulated standard that PPD subjected Dr. Menninger to disparate treatment directly as a result of her disability. For purposes of the three *prima facie* elements of Dr. Menninger's disparate treatment claim, as explained above, (1) Defendant does not contest that Dr. Menninger has a legally protected disability, and (2) a reasonable factfinder could conclude that Dr. Menninger was qualified to perform the essential functions of her job with or without reasonable accommodation. That leaves (3) the element of adverse employment action, i.e., that Dr. Menninger was "adversely affected in whole or in part because of her disability." Echevarria v. AstraZeneca Pharm., LP, 856 F.3d 119, 126 (2017). A jury could find this present here for at least two reasons.

First, Defendant acknowledges that a "typical" form of adverse employment action is "reassignment with significantly different responsibilities." Def. Br. at 10 (citing Eichenholz v. Brink's Inc., No. 16-CV-11786-LTS, 2019 WL 1061053, at *4 (D. Mass. Mar. 6, 2019), aff'd, No. 19-1339, 2020 WL 7213206 (1st Cir. Feb. 19, 2020) (Sorokin, J.) (citing Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010))). Assignment of "more difficult" job responsibilities is a recognized form of adverse employment action. Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico, 743 F.3d 278, 286 (1st Cir. 2014) (citing Tart v. Illinois Power Co., 366 F.3d 461, 473 (7th Cir.2004)). Moreover, both the EEOC and the M.C.A.D. have recognized that an employer may not intentionally assign new job duties to targets an employee's known disability, i.e., by selecting tasks that would be more difficult due to the disability. See 29 C.F.R. § Pt. 1630, App. (Section 1630.2(n) Essential Functions) ("if it is alleged that the employer intentionally selected the particular level of production to exclude individuals with disabilities, the employer may have to offer a legitimate, nondiscriminatory reason for its selection."); Cooper v. Raytheon

15

Co., No. 11-BEM-01635, 2020 WL 9257136, at **3, 5 (MCAD Full Comm'n Jun. 29, 2020) ("while an employer may add duties to jobs. . . Chapter 151B prohibits targeting employees with known disabilities . . . in exercising those prerogatives.").

Here, a jury could find that Mekerri's selected the five-item list of "expectations" for Dr. Menninger's role in his February 6, 2018 email in a way that deliberately targeted Dr. Menninger's known social anxiety and panic disorders to make her job more difficult. That is, a jury could find PPD knew from Dr. Kessimian's January 31, 2018 accommodations paperwork that "public speaking and/or social interactions" were difficult for Dr. Menninger to perform due to her disability, Def. SMF ¶ 36, and concocted the Items in Mekerri's February 6th email to create an extreme and sudden leap in the amount of public speaking and social interaction that would have been expected of Dr. Menninger. For example, while Dr. Menninger had only very rarely performed public speaking for PPD before, Pl. SAMF ¶ 12, Mekerri's Item 1 suggested that certain "presentations" might suddenly leap to as often as "bi-weekly" Pl. SAMF ¶ 32. And while she had attended at most about six dinners during her first two-plus years of employment, Mekerri's Item 4 suggested she might attend meals with clients as often as "80%" of the time clients visited Highland Heights, depending on Mekerri's meaning. Pl. SAMF ¶ 42.

Under a McDonnell-Douglas approach, before even reaching pretext, PPD has not carried its burden to explain why it was suddenly necessary for Dr. Menninger, specifically, to undergo a multi-quantum leap in the frequency of the very activities that most implicated her disability. Furthermore, there is ample evidence of pretext—public speaking and sales-type activities had simply not previously been salient parts of Dr. Menninger's technical, scientific, and compliance-focused job, and PPD had a large team of other interlocking departments, divisions within departments, and specialized employees that handled the responsibilities of sales and interfacing

with existing clients. See Pl. SAMF ¶¶ 7–10; see also id. ¶¶ 31–42. On top of that, St. John was already emailing his bosses on February 7, 2018—the day after Mekerri's February 6th email—noting Dr. Menninger's limitations with anxiety, and proposing the idea of "providing [Dr. Menninger] with a package to move her out." Pl. SAMF ¶ 43. A jury could find that PPD's February 6th email, as well subsequent refusal to further clarify or delineate those responsibilities, was an unlawful attempt to target her known disability.

Second, for the reasons discussed below, a jury could find PPD's implementation of a deliberate plan to remove Dr. Menninger from her position—either by forcing her to quit or by creating a pretextual basis for termination—was an adverse employment action. The anti-discrimination laws do not provide a safe harbor allowing employers to achieve unlawful goals through a "death by a thousand cuts" strategy. As there is no dispute that discharge is an adverse employment action, PPD cannot rest on an argument the premise of which is that Dr. Menninger's medically necessitated leave occurred before its plan to discharge her for entirely pretextual "performance" issues, e.g. by setting her up for 2018 "goals" that were impossible and manufacturing a lengthy trail of pretextual "performance" criticisms, had reached its planned end.

III. **A Jury Could Find PPD Retaliated Against Dr. Menninger for Requesting a Reasonable Accommodation of Her Disability.**

That leads to the retaliation claim. Though PPD puts its focus primarily on the element of adverse action, PPD misperceives the nature of Dr. Menninger's protected conduct under this claim (which is her request for accommodation)[6] and directs its adverse-action contentions to the wrong legal standard. All Dr. Menninger need show, at this juncture, is sufficient evidence from

---

[6] A request for accommodation qualifies as protected conduct for purposes of an ADA or Chapter 151B retaliation claim. Incutto v. Newton Pub. Sch., No. CV 16-12385-LTS, 2019 WL 1490132, at *4 (D. Mass. Apr. 4, 2019) (Sorokin, J.); Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 244 (D. Mass. 2008).

which a jury could find that PPD's <u>cumulative</u> actions in response to her protected request for accommodation might well have dissuaded a reasonable person with her disabilities from requesting an accommodation. There is ample evidence here to meet that standard.

A. <u>PPD's Conduct Might Well Have Dissuaded a Request for Accommodation.</u>

To demonstrate the adverse action element of her retaliation claim, Dr. Menninger "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Incutto v. Newton Pub. Sch.</u>, No. CV 16-12385-LTS, 2019 WL 1490132, at *4 (D. Mass. Apr. 4, 2019) (Sorokin, J.) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)).[7] In flat contradiction to PPD's reliance in its brief on the standard for "adverse employment action" applicable to **discrimination** claims, i.e., referring to the "impact on the terms or conditions of Plaintiff's employment," Def. Br. at 11, 18, the governing legal standard of <u>Burlington Northern</u> for **retaliation** claims holds that "conduct need not relate to the terms or conditions of employment to give rise to a retaliation claim." <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 54 (1st Cir. 2008) (citing <u>Burlington N.</u>, 548 U.S. at 64).[8] Rather, the issue is whether the evidence, assessed "<u>cumulatively,</u>" sufficiently paints a picture that would allow a factfinder to find the conduct might well have deterred a reasonable person from engaging in the protected conduct—here, a request for accommodation.   <u>Fox v. Town of Framingham</u>, No. 14-

---

[7] A similar standard applies where the protected activity is a request for accommodation. <u>See</u> <u>Supinski v. United Parcel Serv., Inc.</u>, 413 F. App'x 536, 543 (3d Cir. 2011); <u>Psy-Ed Corp. v. Klein</u>, 459 Mass. 697, 708 (2011).

[8] Courts have often used the term "adverse <u>employment</u> action" in reference to retaliation claims, where the proper standard under <u>Burlington Northern</u> is more correctly stated as "<u>materially adverse action.</u>" PPD's argument on the adverse action element of retaliation is premised on the **discrimination** standard for "adverse employment action" <u>i.e.</u>, something impacting the "terms and conditions" of Dr. Menninger's employment, again in defiance of <u>Burlington Northern</u>.

CV-10337-LTS, 2016 WL 4771057, at \*7–8 (D. Mass. Sept. 13, 2016) (Sorokin, J.). Importantly, material adversity is judged from the standpoint of a reasonable person in the employee's position—in this case meaning a person with Dr. Menninger's disabilities. See Burlington N., 548 U.S. at 69 (explaining that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."). As the Supreme Court went on to say, "Context matters," and "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. (emphasis added).

Here, that "context" begins with the fact that PPD was well aware after January 11, 2018 and certainly after January 31st and February 14th that Dr. Menninger suffered from anxiety disorders and panic attacks. On February 7th, St. John explicitly described his awareness that Dr. Menninger's disability might make her more sensitive to certain types of interactions. (Exhibit 28). Despite this, a jury could find that PPD took a number of adverse actions against Dr. Menninger in direct response to her requests for accommodation. Beginning chronologically with January 15, 2018, first, there is evidence from which a jury could find that St. John pressured Mekerri to lower Dr. Menninger's performance rating for the year 2017 immediately after Mekerri informed him of Dr. Menninger's January 11, 2018 email. Cf. Eichenholz v. Brink's Inc., No. 16-CV-11786-LTS, 2019 WL 1061053, at \*8 (D. Mass. Mar. 6, 2019) (Sorokin, J.) (lowering performance review scores could be materially adverse).

Second, following Dr. Kessimian's submission of proposed accommodations for Dr. Menninger on February 14th, there is voluminous evidence from which a jury could find PPD tried to coerce Dr. Menninger to quit—in its words, "delicately work[] Lisa out" so that she would "self select"—and/or compile pretextual "documentation" of "performance" problems to justify a later termination. Cf. Fox, 2016 WL 4771057, at \*8 (repeatedly asking employee if he intended to

19

resign, threatening imposed administrative leave, and imposing later-vacated discipline cumulatively could be materially adverse); Supinski, 413 F. App'x at 543 (remanding for District Court to consider if telling worker that company "does not take cripples back," telling him not to come looking for work as often, and offering $1 to resign, would have dissuaded worker from requesting an accommodation). See, e.g., Pl. SAMF ¶¶ 52, 68–69, 75.

Third, the jury could find Dr. Menninger was deliberately shut out of hiring and recruiting decisions within her business unit, including as to Dr. Mann and Dr. Ryder, specifically because PPD did not want Dr. Menninger to realize it was trying to replace her. Id. ¶ 69. As managing the scientific qualifications and credentials/certifications of the labs' supervisory personnel was a core component of Dr. Menninger's role, and one of her explicit goals for 2017, a jury could find PPD's actions in this regard interfered with her ability to do her job. See Pl. SAMF ¶ 9–10; Exhibit 15.

Fourth, both Massachusetts and federal courts have recognized that conducting a "sham" investigation into an employee's HR complaint may constitute retaliation. Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 303–04 (2016); Heywood v. Buckley, No. SUCV201603146A, 2017 WL 1838466, at *5 (Mass. Super. Mar. 28, 2017) (sham investigation allegation stated retaliation claim); Cox v. Onondaga Cty. Sheriff's Dep't, 760 F.3d 139, 146 (2d Cir. 2014) ("an employer's investigation may constitute a cognizable retaliatory action if . . . conducted in such an egregious manner as to "dissuade a reasonable worker from making or supporting a charge of discrimination"). Ballweg's "investigation" here handily qualifies. See Pl. Resp. SMF ¶ 56.

The evidence of retaliation is not just sufficient, it is overwhelming.

B. The Record Evidence Overwhelmingly Supports an Inference of Causation.

The record evidence easily supports a finding of causal relationship between Dr. Menninger's request for accommodation and PPD's campaign of materially adverse action. Dr.

Menninger's burden on this point is light, as she need only show at minimum a temporal proximity between her protected conduct and the adverse action to support the required causal nexus. DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008). That burden is easily met on the evidence presented here, as there is both direct and circumstantial evidence of a causal relationship.

C. The Evidence of Pretext is Also Overwhelming.

Finally, contrary to PPD's contentions, there is a library of evidence that the "performance concerns and laboratory errors" PPD claims were the basis for its retaliatory conduct, Def. Br. at 19, were pretextual. PPD had given Dr. Menninger a "good" rating for 2017, and delivered mostly positive feedback from her end-of-2017 "360" review. The evidence shows that Mekerri and multiple HR professionals concocted a deliberate plan to "document" purported issues of "performance" and to give Dr. Menninger deliberately "tough feedback" specifically to achieve Dr. Menninger's "exit"—something they referred to as the "performance gap accountability route." Pl. SAMF ¶¶ 68–69, 71, 73–76, 78–79 83–84, 89–95. Nor, even looking to PPD's own evidence, was there any change in laboratory errors that warranted a sudden and unprecedented campaign of criticism, performance coaching, and goal adjustments. See id. ¶ 94. PPD had already decided no later than February 28, 2018 to delicately work Dr. Menninger out of her job, and began planning its "exit strategy" no later than March 7, 2018. Pl. SAMF ¶ 52, 59.

## CONCLUSION

Defendant's motion for summary judgment must be denied.


Respectfully submitted,


*/s/ Hampton M. Watson*
Patrick J. Hannon (BBO #664958)

Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
P: (617) 723-8000
F: (617) 447-2800
Attorneys for Plaintiff Lisa Menninger

Date: May 6, 2021

## CERTIFICATE OF SERVICE

I, Patrick J. Hannon, certify that on May 6, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Defendant by electronically serving its counsel of record.

/s/ *Hampton M. Watson*
Hampton M. Watson