# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

               Plaintiff,

v.

PPD DEVELOPMENT, L.P.,

               Defendant.

Civil Action No.  1:19-CV-11441-LTS

## PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS, AND PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1 and this Court's Standing Order Regarding Briefing of Summary Judgment Motions, Plaintiff Lisa Menninger ("Plaintiff" or "Dr. Menninger") submits the following responses to Defendant's "Statement of Material Undisputed Facts" (ECF No. 45) ("Pl. Resp. SMF") and the following Statement of Additional Material Facts ("Pl. SAMF"), in support of her Opposition to Defendant's Motion for Summary Judgment.

## PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF FACTS

1.        PPD is a global contract research organization that provides comprehensive, integrated drug development, laboratory, and lifecycle management services. The Company maintains offices and laboratories in 47 countries and works together with pharmaceutical, biotechnology, medical device, academic, and government partners and clients. *See* Affidavit of Deborah Ballweg ("Ballweg Aff."), ¶¶3-4.

**RESPONSE**: Undisputed.

1

2.     PPD's Global Central Labs provide standardized testing and innovative data solutions across a wide range of technologies and applications for all phases of pharmaceutical development. The Global Central Labs are made up of four laboratories in four parts of the world: Belgium, China, Singapore, and the United States (Highland Heights, Kentucky). *See* Ballweg Aff., ¶5.

**RESPONSE**: Undisputed.

3.     On August 31, 2015, PPD hired Plaintiff, Dr. Lisa Menninger, as the Executive Director of its Global Central Labs, based in the Highland Heights, Kentucky laboratory. PPD paid for Plaintiff to relocate to Cincinnati, Ohio.  *See* Ballweg Aff., ¶6.

**RESPONSE**: Undisputed, but clarified that Dr. Menninger's position was not literally based "in" the laboratory. Dr. Menninger had an office in an administrative area in the same building as the laboratory at Highland Heights. Exhibit 137, Menninger Depo. 81:17–82:9.

4.     During the onboarding process, Plaintiff filled out paperwork provided to her by PPD's Human Resources Department. One of the forms was a Voluntary Self-Identification of Disability, and included several examples of impairments that might qualify as a disability, including psychiatric impairments. Plaintiff selected the option, "No, I don't have a disability." *See* Ballweg Aff., ¶ 7.

**RESPONSE**: Undisputed as to substance, but Plaintiff disputes the materiality of this statement. PPD does not dispute that Plaintiff qualifies as disabled for purposes of the Motion for Summary Judgment (hereinafter, this "Motion"). Def. Br. (ECF. No. 44) at 9 n.9.

5.      As Executive Director of Global Central Labs, Plaintiff was responsible for overseeing and managing the Labs' operations, both with respect to day-to-day functionality and to support research and business development. Plaintiff also held specific licenses and certifications necessary to the operation of the laboratories in Belgium and Kentucky. *See* Ballweg Aff., ¶8.

> **RESPONSE**: Dr. Menninger objects to this Statement of Fact as unsupported by admissible evidence for the reasons described in her Motion to Strike. Subject to her objections, disputed in part. Not disputed that Dr. Menninger's responsibilities included supporting business development and oversight of Lab operations, or that she held specific licenses and certifications necessary to the operation of the Belgium and Kentucky labs. However, Dr. Menninger was not solely responsible for oversight of lab operations; rather, she was part of a team that shared responsibility for different aspects of the complex operations of the labs. Pl. SAMF ¶ 7. Further, Dr. Menninger did not directly oversee the day-to-day testing functions at the laboratories; each laboratory had an on-site director who oversaw the day-to-day responsibilities of the laboratory staff that performed the actual testing that took place at the labs. Exhibit  137, Menninger Depo. 55:9–12, 55:4–58:4.

6.      The essential functions of Plaintiff's role – as set forth in the job description provided to Plaintiff upon her hire – include: (1) providing operational leadership to laboratory services; integrating operational processes, furthering research development, and maintaining quality assurance functions for optimal performance within the Labs, (2) supporting business development in obtaining new customers and maintaining current relationships; directing the development of new programs for revenue enhancement/cost expense reduction, including post-

evaluation of new implementations for effectiveness, (3) performing financial reviews,

establishing an operating budget, and developing forecasts maximizing profit; providing business

updates to senior leadership, (4) setting operational standards/goals and directing the

implementation of laboratory goals and policies; overseeing resource allocation including space,

capital equipment, scientific instrumentation and staff, (5) performing administrative

responsibilities including Human Resources functions, personnel development, facilities

management, and creating standard operating procedures and position descriptions, and (6)

overseeing the quality assurance and quality control aspects of the lab to ensure compliance with

regulatory standards. *See* Ballweg Aff., ¶9.

7.      Given the importance of the Executive Director position to the continued success of the Global Central Labs, PPD was pleased to have found Plaintiff, who was highly regarded and appeared more than qualified for the job. *See* Ballweg Aff., ¶10.

**RESPONSE**:  Dr. Menninger objects to this Statement of Fact as unsupported by admissible evidence for the reasons described in her Motion to Strike. Subject to her objections, undisputed.

8.      Indeed, one of PPD's primary reasons for hiring Plaintiff was that, immediately prior to coming to PPD, she had been serving in a similarly demanding role, as Laboratory Director of Clinical Reference Laboratory ("CRL"). According to her resume (and as communicated by her in interviews), Plaintiff had been (among other things): (1) providing directorship for the company's General and Clinical Trials Laboratories, (2) ensuring an effective quality management program for CRL laboratories, (3) partnering with the Chief Executive Officer, Chief Financial Officer, and Vice Presidents in strategic planning and budgeting sessions, (4) interacting with international, national, and state regulatory agencies for laboratory-related matters, (5) providing consultation to CRL clients, and (6) overseeing the communication of laboratory data and patient result reporting. *See* Ballweg Aff., ¶11; Affidavit of Alexandra Shaw ("Shaw Aff."), Tab 2, 33:16-21.

**RESPONSE**: Dr. Menninger objects to this Statement of Fact as unsupported by admissible evidence for the reasons described in her Motion to Strike. Subject to her objections, undisputed.

9.      Each of these duties closely aligned with the expectations and responsibilities of PPD's Executive Director of Global Central Labs. Plaintiff's assurance that she had been

performing those duties successfully over the past five years was a significant motivating factor in the decision to hire her. *See* Ballweg Aff., ¶12.

> **RESPONSE**: Dr. Menninger objects to this Statement of Fact as unsupported by admissible evidence for the reasons described in her Motion to Strike. Subject to her objections, undisputed.

10.     Plaintiff's references were also quite positive. One of her former colleagues included among Plaintiff's "strongest attributes," her "[w]illingness to take on new challenges" and that she was "not afraid to offer an opinion." Another colleague described Plaintiff's "interpersonal skills" to include an "[e]xcellent ability to work with all types of individuals." *See* Ballweg Aff., ¶13.

> **RESPONSE**: Undisputed.

11.     PPD was confident that Plaintiff would perform her job well, and for the first full calendar year of her employment (2016), she did. Plaintiff integrated to the Company's work environment successfully and quickly. Her supervisor, Hacene Mekerri (then Vice President of Central Lab Services), rated her as "Highly Effective" for 2016.  *See* Affidavit of Hacene Mekerri ("Mekerri Aff."), ¶6.

> **RESPONSE**: Undisputed.

12.     Plaintiff's office (in Highland Heights, Kentucky) was a few doors down from Mr. Mekerri's office. She and Mr. Mekerri interacted regularly and had standing weekly meetings in which they discussed business issues and Plaintiff's progression in her role as Executive Director. In addition, Plaintiff frequently visited the analyzers in the laboratory. On an average day, she would have face-to-face interactions with ten different colleagues. *See* Mekerri Aff., ¶7; Shaw Aff., <u>Tab 2</u>, 82:13-22.

**RESPONSE**: The first sentence is undisputed. Disputed otherwise. Mekerri traveled often, and many times did not even inform Dr. Menninger if he was traveling. Exhibit 137, Menninger Depo. 88:24–90:6. His meetings with Dr. Menninger were only occasional and not frequent. Exhibit 137, Menninger Depo. 88:24–90:6 Id. Dr. Menninger would sometimes provide Mekerri with updates about the lab or various projects, but only at a high level, because Mekerri's background was not technical. Id. Mekerri did not have a good understanding of what Dr. Menninger's job entailed, and could only provide feedback at a high level. See Menninger Aff. ¶ 17. The cited sources do not support that "Plaintiff frequently visited the analyzers in the laboratory." Dr. Menninger only visited the analyzers when doing rounds from time to time. Menninger Aff. ¶ 14. Dr. Menninger never provided direct manager oversight to the staff doing the testing in the lab. Exhibit 137, Menninger Depo. 55:16–17. Finally, the cited testimony does not say ten "colleagues," but rather, a mix of people working in the labs and the administrative offices. Id. 82:13–22.

13.     As noted above, Plaintiff was also required to travel somewhat frequently as part of her job duties. In 2016, she made approximately four visits to the laboratories in Belgium, China, and Singapore (two or three visits to Belgium and one visit to China and Singapore). She travelled to Virginia to evaluate a potential partnership. *See* Shaw Aff., Tab 2, 82:23-83:18.

**RESPONSE**: Undisputed, but clarified that nothing is "noted above" concerning travel.

14.     In late 2016, Plaintiff approached Mr. Mekerri to discuss the fact that her daughter was being bullied at her school in Cincinnati. Plaintiff told Mr. Mekerri that she wanted to transfer her daughter to a school in Rhode Island, and asked whether the Company would allow her to work remotely. *See* Shaw Aff., Tab 2, 40:2-43:18; Mekerri Aff., ¶8.

**RESPONSE**: Undisputed.

15.     Mr. Mekerri was sympathetic and supported the idea generally. He obtained

approval from his supervisor and informed Plaintiff that the Company would allow her to work

remotely from the east coast – with the expectation that she would travel to Highland Heights on

a regular basis (and continue traveling to the other laboratory locations as she had been doing).

2016 had been a very successful year for the Company, and at the time, Plaintiff's request to

work remotely did not present any particular cause for concern. *See* Shaw Aff., Tab 2, 40:2 –

43:18; Mekerri Aff., ¶9.

**RESPONSE**: Disputed in part. Mekerri did not communicate any "expectation" about

the frequency of Dr. Menninger's visits to the laboratory at Highland Heights, or

otherwise place conditions on her move. Dr. Menninger objects to the second sentence as

not supported by admissible evidence for the reasons described in her Motion to Strike.

Subject to her objections, Mekerri and Dr. Menninger generally discussed travel to the

global labs but did not discuss any specific frequencies or expectations. Exhibit 137,

Menninger Depo. 133:16–134:14. Mekerri wanted to help Dr. Menninger make her move

happen. Id. 60:21–23. He felt that Dr. Menninger had an impressive background in

science, and trusted her capabilities and knowledge; as such, Dr. Menninger had

discretion to determine how often she needed to visit the laboratory at Highland Heights.

Exhibit 139, Mekerri Depo. 61:16-62:8. Dr. Menninger planned to visit the laboratories a

certain number of times per year as needed to comply with regulatory requirements, and

otherwise as needed. Menninger Aff. ¶ 16.

16.     Plaintiff continued to work in Highland Heights for the next several months (as

she made preparations to move), and continued to meet regularly with Mr. Mekerri. At this time

(early 2017), Mr. Mekerri had no concerns with Plaintiff's job performance. He did, however, want her to be more involved in client meetings and in influencing business development – two important aspects of the job she was hired to do and as set forth in her job description. In April 2017, as all members of senior leadership worked on forward-thinking objectives and goals for the coming year, Mr. Mekerri suggested these two areas to Plaintiff as a focus for further development. Plaintiff acknowledged Mr. Mekerri's feedback and they agreed to work together to effectuate their shared goals. *See* Mekerri Aff., ¶10.

> **RESPONSE:** The first two sentences are undisputed, except that Dr. Menninger did not meet "regularly" with Mekerri. <u>See</u> Pl. Resp. SMF ¶ 12, above. The third sentence is disputed in part. While providing "support" to PPD's business development efforts was an important part her role, Dr. Menninger was hired to serve as the medical director for PPD's Global Central Labs, not to serve as a salesperson. Menninger Aff. ¶¶ 10–11. She had no prior experience in sales and during her tenure at PPD was rarely called upon to directly participate in client meetings. Exhibit 137, Menninger Depo. 63:7–64:4. Further, Dr. Menninger objects to the phrase "she was hired to do" as not supported by admissible evidence for the reasons explained in her Motion to Strike. The fourth sentence is disputed in part: the cited source reflects that Mekerri mentioned "have you more involve in client meetings and influencing sales increase" only as a "suggestion" for Dr. Menninger's "objectives," not as a "focus," and does not support the implication that Mekerri was telling Dr. Menninger she needed "improvement." Mekerri felt Dr. Menninger was doing a "great job" as of the first half of 2017. Mekerri Depo. 54:14–24.

Not disputed that Dr. Menninger acknowledged Mekerri's feedback or agreed to work toward the goals ultimately incorporated into her performance review, see Exhibit 15, but disputed as to the assertions about the contents of his feedback as stated above.

17.    Plaintiff and her family moved to Dighton, Massachusetts in June 2017. The move took some time to complete, and Plaintiff then took a couple of weeks of paid time off to study for her Board of Medicine recertification. *See* Shaw Aff., Tab 2, 90:12-91:2.

**RESPONSE**: Undisputed.

18.    Despite agreeing to travel to Highland Heights regularly, Plaintiff visited on only two occasions after moving to Massachusetts (PPD paid for the expenses related to this travel, in addition to all other work-related travel, even though Plaintiff relocated to Massachusetts for personal reasons). She travelled to the Belgium laboratory three times in 2017, and to Seattle, Washington, once, for a potential partnership. *See* Shaw Aff., Tab 2, 91:3-93:14.

**RESPONSE**: Disputed in part. The cited evidence does not support the proposition that Dr. Menninger agreed to travel to Highland Heights "regularly," see Pl. Resp. SMF ¶ 15, and there was no condition or agreement associated with Dr. Menninger's remote work arrangement concerning the frequency of her travel to Highland Heights—i.e., Dr. Menninger did not "agree" to come to Highland Heights at any particular frequency. See Exhibit 137, Menninger Depo. 133:16–134:14. In fact, while Dr. Menninger needed to travel to Highland Heights for some purposes such as inspections, as a general matter PPD was discouraging unnecessary travel: in 2017 PPD sent an email to employees instructing them to watch their travel expenses, to only travel when necessary, and to use WebEx or a conference call to avoid unnecessary expenses. Exhibit 137, Menninger Depo. 93:18–23, 94:16–20.

The cited testimony does not support the proposition that Dr. Menninger visited Highland

Heights "on only two occasions after moving to Massachusetts," but rather, that  Dr.

Menninger traveled twice to Highland Heights in <u>2017</u> after her move (in September and

November)—that is, twice in approximately six months, <u>id.</u> 90:12–91:13. Dr. Menninger

was also "on site" (at Highland Heights) in late February 2018, when she met in person

with Chad St. John and Mekerri, and St. John presented her with the options of taking an

exit package or a temporary consulting role. <u>Id.</u> 109:8–19, 168:7–21.

The parenthetical and final sentence are undisputed.

19.     2017 was a relatively unsuccessful year in terms of sales numbers and revenue

(especially in comparison to 2016). As a result, PPD was ramping up its efforts to encourage

more visibility and productivity among its senior leadership to increase sales and support

business development. All executives were being asked to become more proactive, especially

with respect to outward-facing meetings and presentations. *See* Mekerri Aff., ¶11.

> **RESPONSE**: The cited evidence does not support the assertion that 2017 was an
>
> unsuccessful year—only that it was less successful than the prior year in terms of sales
>
> numbers and revenue. Otherwise, undisputed.

20.     In November 2017, Plaintiff expressed to Mr. Mekerri that she was feeling

overwhelmed with her job duties. Mr. Mekerri asked her to send him a list of her day-to-day

responsibilities so they could work together to ensure that Plaintiff was not overwhelmed. *See*

Mekerri Aff., ¶12.

> **RESPONSE**: Disputed in part, as the interaction described was merely a casual
>
> interchange about Dr. Menninger being busy, not an indication that Dr. Menninger was
>
> struggling with her "job duties." Exhibit 155, Menninger Aff. ¶ 17.

21.    At the same time, Plaintiff's new remote work arrangement began to cause some problems. Now that she was geographically distant and no longer available for impromptu, face-to-face meetings, Mr. Mekerri found it more difficult to work on the goals he had identified back in April (i.e., having Plaintiff more involved in client meetings and in influencing business development). *See* Mekerri Aff., ¶13.



22.    Plaintiff's colleagues also expressed concerns with her remote work arrangement. On November 17, 2017, as part of feedback-sourcing in preparation for end-of-year performance appraisals, Mr. Mekerri emailed Brent McKinnon (Executive Director, Laboratory Quality Assurance) to inquire about Plaintiff's performance. In response, Mr. McKinnon wrote: "While I feel that Lisa is technically strong and a very nice, amenable person, she has not demonstrated the leadership strength that I would expect. Lisa has been very indecisive on numerous important matters (e.g. lab training, competency documentation, supervisor responsibilities) that have resulted in lingering compliance concerns raised by internal auditors, [senior leadership team]

peers and customers. She has been dismissive of repeatedly raised concerns regarding the lack of bench level supervision, and, since her decision to relocate, she has been lackadaisical toward her time on-site in US lab. This style has led to an environment where a lack of accountability is prevalent and overall disrespect for leadership decisions persist." *See* Affidavit of Brent McKinnon ("McKinnon Aff."), ¶¶5-6; Mekerri Aff., ¶14.

> **RESPONSE**: Disputed in part. The cited source identifies only one "colleague," Brent McKinnon, and aside from his statement that Dr. Meninger had been "lackadaisical toward her time on-site in US lab" the criticisms he expresses had nothing to do with Dr. Menninger's remote working arrangement, but instead were issues which Mr. Mekerri was well aware were not caused by any deficiencies in Dr. Menninger's performance. Exhibit 155, Menninger Aff. ¶ 20. Again, Mekerri did not raise any concerns about Dr. Menninger's remote work arrangement with Dr. Menninger when they met telephonically to go over the 360 feedback, nor did Mekerri convey any of McKinnon's specific feedback to Dr. Menninger. Id. ¶¶ 19–20.

23.     Plaintiff's subordinates communicated similar concerns regarding what they perceived as a lack of leadership. On December 11, 2017, Susan Pattison (Director of Laboratory Technical Scientific Affairs) commented that, "[i]n the absence of a strong leadership presence, Lisa indirectly has generated scope creep, deferred expectation setting, and resource deployment for the [department] to other more advocate-style leaders." *See* Mekerri Aff., ¶15.







24.     On December 12, 2017, Karen Allen (Associate Director) noted that Plaintiff "tends to waiver on some critical issues. The company leans on her for direction and at times her direction appears to change course." *See* Mekerri Aff., ¶16.

**RESPONSE**: Undisputed.

25.     Over the next several days, Mr. Mekerri discussed Plaintiff's 2017 job performance (along with that of her peers) with other members of executive leadership and Human Resources as part of the Company's annual executive talent review. *See* Mekerri Aff., ¶ 17; Ballweg Aff. ¶15.

**RESPONSE**: Undisputed.

26.     On December 20, 2017, Mr. Mekerri met with Plaintiff to discuss her performance and the Company's expectations for 2018 in light of the concerns recently expressed by her colleagues and the issues arising from Plaintiff's remote work arrangement. Mr. Mekerri again brought up the goals he had raised in April, and encouraged Plaintiff to focus

on being more involved in client meetings and various aspects of business development

(including, but not limited to, increased social interactions and presentations). In addition, Mr.

Mekerri agreed to take the lead on recruiting and hiring duties, to give Plaintiff some room for

her other responsibilities *See* Mekerri Aff., ¶18; Shaw Aff., <u>Tab 1</u>, ¶16.



27.     Later that day, Deborah Ballweg (Human Resources) circulated a finalized copy of a document titled "9 Box Talent Review," which summarized the outcome and conclusions of the annual executive talent review with nine different narrative options for overall standards of performance (e.g., "Low Impact Leader," "Solid/Steady," and "Leading Edge"). Plaintiff's category rating was "Limited Progress," which was defined as, "Solid business performance today but with risk of falling behind due to lack of leadership capability." *See* Mekerri Aff., ¶19; Ballweg Aff., ¶16.

**RESPONSE**: Undisputed.

28.     Mr. Mekerri completed Plaintiff's 2017 review. Given the recent issues raised regarding her leadership, Mr. Mekerri rated Plaintiff's 2017 performance as "fully effective" (one rating lower than "highly effective"). A "Fully effective" rating is good, and it was not an adverse employment action. *See* Mekerri Aff., ¶20; Ballweg Aff., ¶18.



29.    On January 11, 2018, after having taken some time off for the holidays, Plaintiff

emailed Mr. Mekerri: "As you mentioned that you'd like to discuss some ideas you have

regarding how to make my role more visible, I think it's important that I make you aware of a

medical condition that I've been suffering from. … I have a generalized anxiety disorder that

includes social anxiety disorder and panic attacks. … some of the new tasks you've suggested will be difficult in light of my disability, as they would include increased client visits/social interactions and presentations (internal and external). I am, of course, open to discussing whatever ideas you have for my role. But my condition presents some very significant challenges for me…." *See* Mekerri Aff., ¶21.

**RESPONSE**: Undisputed.

30.     Mr. Mekerri was traveling when he received Plaintiff's email, but he scheduled a time to speak with her on January 15, 2018. During that conversation, which Plaintiff surreptitiously recorded, Mr. Mekerri thanked Plaintiff for disclosing her condition. He told her that he wanted to speak further, as he was still traveling at this time, but that he had wanted to make sure to connect with her (apart from just exchanging emails). *See* Mekerri Aff., ¶22; Shaw Aff., Tab 2, 134:19-135:18.

**RESPONSE**: Undisputed.

31.     After they spoke on the phone, Mr. Mekerri connected Plaintiff with Chad St. John (Associate Director, Human Resources) via email. Plaintiff replied and said to Mr. St. John, "I'm not sure how much Hacene disclosed to you about my medical condition, but I wanted to follow up to see what you need from an HR perspective." Mr. St. John replied and provided Plaintiff with the Company's standard accommodation request forms (one for her to fill out, and one for her medical provider to fill out), noting that they were entering into an "interactive process" and that he looked forward to talking with Plaintiff about her specific needs. *See* Affidavit of Chad St. John ("St. John Aff."), ¶6.

██████████████████████████████████████████

██████████████████████████████████████████

████████████

32.     Two weeks later, on January 31, 2018, Plaintiff submitted an accommodation form to Mr. St. John. In it, she stated that she had been "diagnosed with Panic Disorder with agoraphobia, Social Anxiety Disorder, and Generalized Anxiety Disorder" and that she was "seeking treatment to minimize and/or alleviate [her] symptoms." *See* St. John Aff., ¶7.

**RESPONSE**: Undisputed.

33.     Plaintiff's psychiatrist, Dr. Marianna Kessimian, also submitted an accommodation form on January 31, 2018.  Dr. Kessimian noted that "[a]ny changes to [Plaintiff's] role that increase the need for public speaking and/or social interactions will increase her anxiety and worsen her somatic symptoms, which would make it substantially more difficult, if not impossible, for [Plaintiff] to perform her job."  She further recommended that, "[t]o the extent [Plaintiff] is required to engage in social interactions and/or public speaking, these activities should be planned in consultation with her medical provider[.]"  *See* St. John Aff., ¶8.

**RESPONSE**: Undisputed.

34.     Given the vagueness of Plaintiff's requests with regard to what could reasonably be changed in her role, Mr. St. John reached out to her on February 2, 2018 to ask for additional information.  He asked which "specific expectations" Plaintiff and Dr. Kessimian believed that Plaintiff could not perform (or perform on a limited basis). Plaintiff responded that Mr. Mekerri had suggested that she participate in more client visits and social interactions, as well as internal and external presentations. Aside from those general expectations, Plaintiff told Mr. St. John that she was unable to provide further specifics, and asked for clarification as to what additional

information Dr. Kessimian might be able to provide to facilitate the process. Mr. St. John told

Plaintiff that he would connect with Mr. Mekerri to get some more detail regarding the

Company's expectations of Plaintiff in her role as Executive Director. *See* St. John Aff., ¶9.

35.     Mr. St. John asked Mr. Mekerri to provide additional detail with regard to his expectations for Plaintiff as the Central Labs business continued to grow. He noted that the Company would need to seek specific parameters from Dr. Kessimian in order to have a clear picture in assessing reasonable accommodation(s). *See* St. John Aff., ¶10.

**RESPONSE**:  Undisputed.

36.     Upon receiving this email, Mr. Mekerri called Plaintiff to discuss her requests and the additional detail she and Dr. Kessimian needed to move the process forward. On February 6, 2018, Mr. Mekerri emailed Plaintiff (copying Mr. St. John), thanking her for their discussion the day before, and setting forth his specific expectations given her role and the Company's business goals. These expectations fell within five categories (at varying frequencies): (1) senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or quarterly), (2) client bid defenses, issue resolution calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via phone (once a month at minimum per client), (3) technical sales presentations (internal and external) (monthly, quarterly, and as-needed), (4) meals and social interactions while at client visits (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%). *See* Mekerri Aff., ¶25; St. John Aff., ¶11.

**RESPONSE**: The first sentence is disputed in part: undisputed that Mekerri and Dr. Menninger spoke on February 5, 2018, but Mekerri has no memory of that conversation, Exhibit 139, Mekerri Depo. 153:6, and the cited source does not support the claim concerning what was discussed. The third sentence is undisputed.

The second sentence is disputed in part: the "expectations" that Mekerri communicated were not "specific." They were "large buckets" or "broad bucket[s]" only. Exhibit 142,

St. John Depo. 100:18–19, 117:20; Exhibit 64 at PPD_MENNINGER 001073–74 (March 24, 2018 email from Dr. Menninger to St. John) ("As you know, that discussion led to Hacene identifying three broad categories of duties/responsibilities for which he believes no accommodation is possible (items 2, 3 and 4). In my last email to you, on March 1st, I noted that those categories are very broad, and asked that you and/or Hacene identify the specific tasks that might fall within those categories.").

37.    On February 7, 2018, having received no response from Plaintiff to Mr. Mekerri's email the day prior, Mr. St. John emailed Plaintiff to follow up, inviting her to schedule a call if she needed or wanted additional information. Mr. St. John told Plaintiff that if she had no questions, she should forward the information Mr. Mekerri had provided to her medical provider (Dr. Kessimian), so Dr. Kessimian could review and develop specific parameters or limitations that would be tolerable to Plaintiff. *See* St. John Aff., ¶12.

**RESPONSE:** Undisputed.

38.    Two days later, on February 9, 2018, Plaintiff responded to Mr. St. John and told him that she had forwarded Mr. Mekerri's email (with the five categorical specifications regarding Plaintiff's job duties) to Dr. Kessimian, and that she hoped to have "something ready" the next week. Plaintiff did not indicate that she had any questions or concerns about Mr. Mekerri's stated expectations. *See* St. John Aff., ¶13.

**RESPONSE:** Undisputed except as to the phrase "categorical specifications regarding Plaintiff's job duties." As stated above, Mekerri's February 6th email consisted of large and/or broad buckets, but did not contain "specifications" or specifics. Exhibit 142, St. John Depo. 100:18–19, 117:20; Exhibit 64 at PPD_MENNINGER 001073–74 (March 24, 2018 email from Dr. Menninger to St. John). Further, the words "regarding Plaintiff's

job duties" is disputed insofar as it suggests that Mekerri's email was a description of
Plaintiff's job duties as of February 6, 2018. Mekerri's email was not a summary of the
essential functions of Dr. Menninger's job; rather, it was a summary of various tasks
involving public speaking and social interaction that might be implicated if Dr.
Menninger's role were changed to become more visible. Exhibit 25 at
PPD_MENNINGER 002916–17 (Feb. 4, 2018 email from Dr. Menninger to St. John)
("Hacene and I had a general discussion concerning changes that he's considering to
make my role 'more visible.' He didn't get into specifics, but suggested that this might
include increased client visits/social interactions and presentations (internal and
external)."); Exhibit 139, Mekerri Depo. 146:16–147:11 (agreeing Dr. Menninger's Feb.
4th email is accurate); Exhibit 25 at PPD_MENNINGER 002916 (Feb. 5, 2018 Email
from St. John to Mekerri) ("Please be specific bucketing any **new duties** and existing
duties that may have an **increase** beyond previous levels expected in the role as the CL
business continues to grow.") (emphasis added); Exhibit 26 (Feb. 6, 2018 email from
Mekerri to Dr. Menninger copying St. John) ("As you already know, the
percentage/scope of interactions, internal or external, is increasing in 2018 due to the
needs of the business and our aggressive commercial goals.")

39.     On February 14, 2018, Dr. Kessimian sent her recommended accommodations to
Mr. St. John. In her letter, Dr. Kessimian explained that Plaintiff's "brain and body are not able
to tolerate public speaking engagements/ socializing, and it is as if her vocal cords become
paralyzed while her blood pressure, heart rate and breathing all increase[.]" By way of
introducing the specific accommodation requests, Dr. Kessimian wrote, "[b]elow are reasonable
accommodations for Lisa so she can continue to be a productive and healthy member of your

team." She then set forth the specific accommodation requests (which mirrored the five

categories provided by Mr. Mekerri, though Dr. Kessimian separated the second category into

two, thus ending with six categories instead of five). For senior leadership team presentations,

Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice

President, Dr. Kessimian requested: [Plaintiff will be] "responsible for all slides/handouts/

presentation material with necessary information but will require a reader to present to the group,

or can pre-record the audio/video and it can be played at the meeting available for questions via

email after the meeting." For client bid defenses, issue resolution calls, and meetings at Highland

Heights, Dr. Kessimian requested: [Plaintiff will be] "available via email/ text/ remote video

conferencing for a representative of the client, 1-2 person audience maximum … If it is a site

meeting, surrogate or reader with all necessary information / real time access to [Plaintiff] will be

available." For client site meetings, Dr. Kessimian requested: [Plaintiff] "would like a surrogate

to attend, but [Plaintiff] will be responsible for all problem solving/ ideas for resolution if

emailed/ communicated to [Plaintiff] a few days before anticipated visit." For technical sales

presentations (internal and external), Dr. Kessimian requested: [for Plaintiff to be] "excused from

sales presentations but again [Plaintiff] will provide any necessary data information for the

reader/ surrogate to have at their disposal." For meals and social interactions while at client

visits, Dr. Kessimian requested: "[a] surrogate, as this is not [Plaintiff's] strength/ skill set and

her disability will flare with significant impairment. [Plaintiff] is able to build business

relationship in a more 'behind the scenes' fashion and would like [to] brainstorm other potential

avenues where she can add value as she does understand this is an important part of the

business." Finally, for travel, Dr. Kessimian requested that Plaintiff be allowed to travel to PPD's

Belgium laboratory, versus its laboratories in the United States (which included the Global

Central Labs home-base – and Plaintiff's former workplace before moving to Massachusetts – in Highland Heights, Kentucky). *See* St. John Aff., ¶14.

**RESPONSE:** Undisputed.

40.     Upon receiving these accommodation requests, Mr. St. John was somewhat taken aback. He had not previously understood the extent to which Plaintiff's condition impacted her ability to interact with others, and he was not expecting her requests to be so significantly restrictive. Given Mr. St. John's original request of Plaintiff and Dr. Kessimian – i.e., to describe Plaintiff's specific limitations and the parameters which would allow her to do her job – he did not perceive any flexibility in the accommodation requests. While Dr. Kessimian suggested "brainstorm[ing] other potential avenues where [Plaintiff] could add value[,]" it was clear from her letter that Plaintiff was unable to socially engage with clients because any such activity would cause her "disability [to] flare with significant impairment." *See* St. John Aff., ¶15.

**RESPONSE**: Disputed as the reaction that St. John claims to have had, as it is inconsistent with other record evidence. For example, there was no reason for St. John to be "taken aback," as Dr. Kessimian's submission was wholly consistent with the documentation she and Dr. Meninger had previously provided on January 30th and 31st. See Exhibits 120, 122. Likewise, St. John testified at his deposition that he knew Dr. Menninger had gone out for lunch or dinner or social interactions with customers before, Exhibit 142, St. John Depo. 231:23–232:21; see also Exhibit 137, Menninger Depo. 162:4–20, which is inconsistent with his claim that he believed simply from reading Dr. Kessimian's requests for accommodations that Dr. Menninger was unable to socially engage with clients. Moreover, St. John testified that he did not necessarily get the

impression from Dr. Kessimian's request for accommodation that Dr. Menninger was incapable of performing public speaking activities. Exhibit 142, St. John Depo. 256:14.

The third sentence is also disputed on multiple grounds. The cited source (Exhibit 27, February 7, 2018 email from St. John to Mekerri and Dr. Menninger) does not support that St. John used the words "which would allow her to do her job" or similar language; and it is inconsistent with Def. SMF ¶ 37 above; and Dr. Menninger objects to that phrase for the reasons expressed in her Motion to Strike. Disputed that it was ever contemplated that Dr. Menninger would not be able to do her job without an accommodation; rather, Dr. Menninger did not need an accommodation to perform the essential functions of her job. See, e.g., Exhibit 45 at PPD_MENNINGER 002782 (March 1, 2018 email from Dr. Menninger to St. John and Mekerri) ("I wish to reiterate that I am capable of performing all functions of my job with or without accommodation."); Exhibit 139, Mekerri Depo. 136:7–8 (noting Dr. Menninger's 2017 performance rating was "good"); Exhibit 45 at PPD_MENNINGER 002782-86 (March 1, 2018 email from Dr. Menninger to St. John copying Mekerri).

Lastly, St. John was well aware that Dr. Menninger had flexibility in her request for accommodations. Exhibit 50 at PPD_MENNINGER 003885 (March 6, 2018 email from St. John to Ballweg). He also understood that Dr. Menninger was repeatedly asking for more detail on the tasks identified by Mekerri so that she and PPD could creatively identify other potential accommodations. Exhibit 137, Menninger Depo. 172:5–8 (February 28th meeting); Exhibit 39 at PPD_MENNINGER 001167-69 (March 1, 2018 email from Dr. Menninger to St. John copying Mekerri); Exhibit 64 at PPD_MENNINGER 001073–74 (March 24, 2018 email from Dr. Menninger to St. John).

41.     Mr. Mekerri was traveling when Dr. Kessimian sent the accommodation requests. On Friday, February 23, 2018, Mr. St. John reached out to Plaintiff to explain that he had not yet had a chance to connect with Mr. Mekerri, but that he would be in touch. *See* St. John Aff., ¶16.

**RESPONSE**: Undisputed.

42.     The following Monday, February 26, 2018, Mr. St. John emailed Plaintiff to let her know that the Company would provide certain accommodations with respect to two of the five categories Mr. Mekerri had initially laid out. For senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President, the Company would allow Plaintiff to have a designated reader present in her stead. And for travel, it would reduce the expectation from 30% to 15%. Mr. St. John explained that the other tasks – which constituted sub-categories of specific expectations falling under the umbrella categories of client-facing meetings and sales presentations – were central to Plaintiff's role as Executive Director of Global Central Labs and critical to the needs of the business. *See* St. John Aff., ¶17.



43.     At Mr. Mekerri's request, Mr. St. John also scheduled a meeting with Plaintiff

and Mr. Mekerri, which occurred on February 28, 2018. During that meeting, Mr. St. John

explained the importance of client-facing meetings (both business-oriented and social

engagements) and sales presentations (internal and external). He also raised concerns regarding

what the Company understood to be Plaintiff's limitations in Dr. Kessimian's February 14, 2018

letter, and mentioned the possibility of an exit package or transitioning to a consulting role (these

options were not suggested, merely brought up in passing for Plaintiff's consideration). Plaintiff

was not interested in these options, and stated that she was able to continue doing her job without

the requested accommodations. She, Mr. St. John, and Mr. Mekerri agreed to discuss further the

next day and scheduled a meeting for the afternoon on March 1, 2018. *See* St. John Aff., ¶18.



44.     The next morning, before their scheduled meeting, Plaintiff emailed Mr. St. John and Mr. Mekerri to thank them for agreeing provide some accommodations (she did not object to the travel accommodation, which was slightly different than what she had requested). She also asked for more information and specifics regarding the other categories of tasks for which PPD could not provide accommodations. Mr. St. John cancelled the afternoon meeting to instead work to address Plaintiff's request. He emailed Plaintiff to tell her, and she responded, "Sounds good, thanks Chad." *See* St. John Aff., ¶19.

**RESPONSE**: Undisputed except as to the purported reason St. John cancelled the meeting scheduled for March 1st.

St. John had no intention of working to address Dr. Menninger's request for "more information and specifics regarding the other categories of tasks." (Items 2, 3, and 4 on Mekerri's list provided February 6th). Even before receiving Dr. Menninger's email dated March 1, 2018, St. John was already planning on "delicately working Lisa out." Exhibit 96 at PPD_MENNINGER 001174 (Feb. 28, 2018 email from St. John to Ballweg, copying Jerry Williams). On March 1st, the same day he cancelled the March 1st meeting, St. John drafted a response to Dr. Menninger's email (which he sent to Ballweg for review) in which St. John planned to refuse to provide any additional detail to Dr. Menninger. Exhibit 44 at PPD_MENNINGER 001116. The draft email stated:

> Lisa,
>
> As stated in the meeting. . . Items 2–4 [. . .] are all core items in the role you are in and we need 100% in 1-4 for the business to meet objectives. **Adding additional detail below would only present the opportunity to select items in each bucket you believe you can or can't do**. The [sic] will be no accommodations made outside of items 1 & 5.

Id. (emphasis added). St. John subsequently did not use the next several days to work on providing detail to Dr. Menninger. Instead, he drafted a timeline of events of Dr.

Menninger's request for accommodation and prepared a packet of information to send to PPD's Legal department seeking "guidance in responding to Lisa and assisting us with potential options as we seek a path forward to an exit strategy." Exhibit 51 at PPD_MENNINGER 004083. In his subsequent emails on March 12, 2018 and April 3, 2018, St. John did not provide Dr. Menninger with the information he knew she was requesting. Exhibit 142, St. John Depo. 114:2–11; 122:4–123:17.

45.     On March 12, 2018, Mr. St. John wrote to Plaintiff to explain the reasons why the Company could not provide some of the accommodations Plaintiff sought. He reminded Plaintiff of the essential functions of her job (including providing operational leadership; supporting business development in obtaining new customers and maintaining relationships; and performing Human Resources functions, personnel development and facility management). In addition, Mr. St. John referenced specific tasks falling within the categories of client-facing meetings and sales presentations – business development meetings, client dinners, and bid defenses – and noted their importance to the business. Though it was certainly possible to "brainstorm other potential avenues where [Plaintiff] could add value" as Dr. Kessimian had suggested, it was *not* possible to do away with these core job requirements. Mr. St. John asked Plaintiff to review her job description with Dr. Kessimian to see if there might be other potential accommodations that would allow her to perform the essential functions of her job. *See* St. John Aff., ¶20.

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████





46.     Plaintiff did not respond for nearly two weeks. On March 24, 2018, she wrote an email to Mr. St. John, explaining that although "certain types of tasks (e.g., formal group presentations)" were "challenging due to [her] disability," she was "capable of performing all of [her] responsibilities with or without accommodation." Plaintiff noted that she had met with Mr.

Mekerri the week prior, and it did not appear that there would be any "activities or events in the near future that would implicate [her] disability" – therefore, she suggested that they "table this discussion until a particular task arises." Plaintiff further explained that "[d]ealing with these issues in context … might make this whole issue seem less daunting and help us all engage in a more meaningful dialogue."  *See* St. John Aff., ¶21.

**RESPONSE**: Undisputed.

47.      On April 3, 2018, Mr. St. John replied to Plaintiff and assured her that the Company was committed to an open dialogue, and that he would continue to review any accommodation requests as she raised them. He reconfirmed that PPD had agreed to accommodate Plaintiff by decreasing her required travel and providing her with a designee for internal meetings. Mr. St. John also took the opportunity to reiterate the Company's basis for denying Plaintiff's other requests: where Plaintiff had asked to be excused from attending client bid defenses, technical sales presentations, and customer visits/meetings (with a "surrogate" attending in her stead), Mr. St. John explained that she could not perform these tasks in a "behind the scenes" role as her position required her to be a client-facing leader. He asked Plaintiff to let him know if she had any additional accommodation requests. *See* St. John Aff., ¶22.

**RESPONSE**:  Undisputed that the above accurately summarizes the contents of St. John's April 3, 2018 email. Disputed as to the truthfulness of the assertions contained therein, as PPD was not committed to an open dialogue. See Pl. SAMF ¶¶ 53–55 (February 28th meeting); Pl. Resp. SMF ¶¶ 44–45 above.

48.      Plaintiff did not ask for any additional or different accommodation(s). Instead, two weeks later, on April 17, 2018, she responded to Mr. St. John's email to tell him that she remained unsatisfied with his attempts to clarify PPD's position and felt as if he was "refusing to

answer" her questions. She also complained that Mr. Mekerri was "targeting [her] because of [her] disability," referring specifically to (and attaching) an email she had received from him on April 11, 2018. In that email, Mr. Mekerri was following up on his conversation with Plaintiff the day prior, in which he had raised recent laboratory errors that had come to his attention. He asked for Plaintiff's "full attention and dedication to resolve them and be more proactive to prevent any further issues" and suggested two goals to work on for 2018: (1) a proactive approach to increase lab quality, and (2) ensuring lab goals and strategy are clear and well-communicated. Under each of the two goals, he suggested several specific ways in which Plaintiff might achieve them. *See* St. John Aff., ¶23.



49.    This April 11, 2018 email from Mr. Mekerri did not constitute a disciplinary

action or measure in any way: it was not considered significant enough to add to Plaintiff's

personnel record, and it had no impact on her job status whatsoever. Rather, it was an attempt to

encourage Plaintiff to be a more proactive leader, a continuing theme which had begun in late

2017. Moreover, Mr. Mekerri provided this feedback in part at the direction of Chris Fikry

(Executive Vice President) after the Company had discovered a recent, concerning uptick in

laboratory errors and quality issues. *See* Mekerri Aff., ¶¶31-35; McKinnon Aff., ¶¶ 7-8; Affidavit

of Chris Fikry ("Fikry Aff."), ¶¶ 7-9.



50.     Plaintiff's response to Mr. Mekerri's email (which she included in her subsequent

communication to Mr. St. John on April 17) deflected blame for the recent lab errors. For one of

the errors, she stated that a "lab tech [had] failed to follow the [standard operation procedure]." For a different error, she again blamed a "lab tech[,]" who she said had made a "clerical error in labeling sample results[.]" These errors, while directly attributable to laboratory technicians, are ultimately Plaintiff's responsibility (Mr. Mekerri again explained this to Plaintiff in his April 25, 2018 response to her April 17 email; Plaintiff forwarded Mr. Mekerri's response to Mr. St. John on April 27, 2018). *See* St. John Aff., ¶24; Mekerri Aff., ¶31.



51.     Upon receiving Plaintiff's April 17, 2018 email and seeing her complaint that she felt as if Mr. Mekerri was "targeting [her] because of [her] disability," Mr. St. John immediately informed Ms. Ballweg (Ms. Ballweg, as Mr. St. John's supervisor, was generally aware of Plaintiff's situation and accommodation requests, but she was not directly involved). Mr. St. John and Ms. Ballweg agreed – given Mr. St. John's close involvement with Plaintiff's accommodation discussions – that Ms. Ballweg should be the person to conduct an investigation into Plaintiff's complaint. *See* St. John Aff., ¶25; Ballweg Aff., ¶¶19-20.

**RESPONSE**: Undisputed that St. John immediately informed Ballweg of Dr. Menninger's email. Disputed otherwise. Ballweg <u>was</u> "directly involved," including as to PPD's responses to Dr. Menninger's complaints about Mekerri's targeting, and in PPD's efforts to find an "exit strategy" for Dr. Menninger instead of engaging in good faith dialogue with her to determine a reasonable accommodation for her disability. <u>See</u> Pl. Resp. SMF ¶ 56 below. Her purported lack of involvement therefore was not the reason Ballweg became the investigator. Additionally, PPD did not respond to Dr. Menninger's April 17th email, but assigned Ballweg to conduct the purported "investigation" only after Dr. Menninger complained on April 27th that Mekerri's targeting was getting worse. Exhibit 93 at PPD_MENNINGER 000967-72.

52.    Mr. St. John also responded to Plaintiff's April 17 and 27, 2018 emails.  First, he again attempted to provide additional information and clarity regarding PPD's position as to Plaintiff's accommodation requests. For each of the five categories (originally provided by Mr. Mekerri in February), Mr. St. John explained why, from a business perspective, Plaintiff's specific requests were unreasonable. He also assured Plaintiff that PPD takes discrimination complaints very seriously, and that another member of Human Resources would reach out to her soon. *See* St. John Aff., ¶26.

**RESPONSE**: Undisputed that the above summarizes what St. John's April 30, 2018 email says. Disputed as to what St. John was actually "attempting." St. John knew that Dr. Menninger had asked him for additional detail about the tasks within Items 2–4 in Mekerri's February 6th email (not for another explication of PPD's "position"), but St. John continually failed to provide any more detail about those tasks. Exhibit 142, St. John Depo. 114:2–11; 122:4–123:17; 125:15–22. All St. John was attempting to do was to

43

stonewall, in service of "delicately working Lisa out" pursuant to PPD's "exit strategy."
See Pl. Resp. SMF ¶¶ 45, 47–48, above.

53.     Ms. Ballweg began her investigation. She interviewed Plaintiff on May 2, 2018

(and again on May 15, 2018). Plaintiff made several complaints: (1) she felt Mr. Mekerri was

going out of his way to document performance issues, (2) she was excluded from Company

recruiting efforts, (3) she was "new[ly]" expected to attend bid defenses and client visits (and

being asked to speak about unfamiliar topics), (4) she was not being invited to routine sales and

marketing meetings, (5) she was not included in the planning of (or introduced at) a recent Town

Hall meeting, (6) she had no formal performance review meeting for 2017 (only the "360

feedback" discussion in December 2017), and, finally, (7) that Mr. St. John had discussed an exit

package and/or a consulting role during their February 28 conversation. *See* Ballweg Aff., ¶21.

> **RESPONSE**: Disputed only as to the characterization of Ballweg's activities as an
>
> "investigation." Ballweg was already aware of the events that had transpired because she
>
> had been intimately involved behind the scenes. See Pl. Resp. SMF ¶ 56, below.

54.     As part of her investigation, Ms. Ballweg also interviewed Mr. St. John, Mr.

Mekerri, Andrew Supp (Executive Director of Business Development), Brent Mann (Senior

Recruiter), and Mr. McKinnon. *See* Ballweg Aff., ¶ 22.

> **RESPONSE**: Disputed only as to the characterization of Ballweg's activities as an
>
> "investigation." See Pl. Resp. SMF ¶ 53, above.

55.     After concluding the interviews, Ms. Ballweg made the following findings: (1)

laboratory quality issues had doubled from mid-2017 to April 2018 (25 such issues) versus the

prior year (11 such issues) and Mr. Mekerri's feedback to Plaintiff on those issues was

appropriate, (2) Plaintiff told Mr. Mekerri in November 2017 that she was feeling overwhelmed,

and after a conversation in December 2017 (in which Plaintiff and Mr. Mekerri discussed the stalled recruiting process), Mr. Mekerri agreed to take over recruiting in 2018 (and thus Plaintiff was not unfairly excluded), (3) the expectation for Plaintiff to attend bid defenses and client visits was not new – both of those tasks were essential functions of her job, and Mr. Mekerri had communicated high expectations for all senior leadership to make 2018 a more successful year than 2017 had been (which included bringing in new – perhaps unfamiliar – technologies), (4) Mr. Mekerri had no control over the scheduling of sales and marketing meetings from which Plaintiff claimed to have been excluded (and Ms. Ballweg encouraged Plaintiff to reach out to Mr. Supp, who scheduled those meetings), (5) there was no planning meeting, nor any formal introductions, with respect to the recent Town Hall meeting about which Plaintiff complained (and therefore Plaintiff was not unfairly excluded), (6) the December 2017 meeting between Plaintiff and Mr. Mekerri, in which Mr. Mekerri raised the "360 feedback," was the basis for Plaintiff's 2017 review (moreover, though he had done things differently the year before, Mr. Mekerri had similar review discussions – i.e., a discussion on "360 feedback" prior to providing the written review – with two other employees, not just Plaintiff), and, finally, (7) Mr. St. John's mention of an exit package or consulting role in the February 28, 2018 conversation was purely hypothetical (not intended as a suggestion), and Mr. Mekerri did not actively participate in that part of the conversation. *See* Ballweg Aff., ¶23.





████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

56.     These findings led Ms. Ballweg to conclude that Mr. Mekerri was not unfairly

"targeting" Plaintiff after she disclosed her disability in January 2018, and she communicated her

findings and conclusions to Plaintiff on May 22, 2018. *See* Ballweg Aff., ¶¶ 24-25.

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████



[redacted]

57.     Two days later, on May 24, 2018, PPD received a letter from Plaintiff's counsel requesting a copy of her personnel record. The following week, on June 2, 2018, Plaintiff sent a two-sentence email to Mr. St. John and Ms. Ballweg, stating: "My doctor has advised me to take medical leave, effective immediately.  Please let me know if there are any specific forms that I need to have her fill out." *See* Ballweg Aff., ¶¶26-27.

**RESPONSE**: Undisputed.

58.     Plaintiff's decision to take immediate leave put the Company in the position of having to scramble to find a solution. Though it took a significant amount of effort and planning, PPD was eventually able to split Plaintiff's job duties among other employees and consultants. *See* Ballweg Aff., ¶28.



59.     Plaintiff remained out on leave for the next eight months (six months of which were paid under the Company's short-term disability policy, after which PPD transitioned her to unpaid leave as an additional accommodation). During this time, Plaintiff showed no sign of intending to return to work. PPD left her position open, but by January 15, 2019, it needed to identify a long-term solution and terminated Plaintiff's employment effective February 1, 2019. *See* Ballweg Aff., ¶¶29-31.

**RESPONSE**: Undisputed.

60.     In January 2019, Plaintiff applied for Social Security Disability Insurance benefits, certifying in her application that is unable to work. *See* Shaw Aff., <u>Tab 5</u>. Dr. Kessimian testified that Plaintiff was unable to work as of June 2018. Plaintiff's husband testified that she has been unable to work since January 2018 (i.e. while she was still working at PPD). *See* Shaw Aff., <u>Tab 3</u> at 136:3-8, <u>Tab 4</u> at 109:21-111:4.

> **RESPONSE**: The first sentence is undisputed. The second sentence is undisputed, but
> clarified that Dr. Kessimian's cited deposition testimony was not related to Dr.
> Menninger's Social Security application. The third sentence is disputed. The cited
> testimony from Mason Menninger's testimony refers to "early 2018" in response to a
> hypothetical question and does not support the assertion; moreover, Dr. Menninger
> objects that this statement is immaterial.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1.     Prior to the disclosure of her disability to PPD, Dr. Menninger enjoyed a successful career as a clinical pathologist and laboratory director. Dr. Menninger earned her M.D. from Saba University School of Medicine in 2003 and thereafter successfully completed her permanent certification to practice medicine in the United States from the Educational Commission for Foreign Medical Graduates. She completed her medical residency in anatomic and clinical pathology at Truman Medical Center at the University of Missouri-Kansas City from 2003 to 2004, and in clinical pathology at Virginia Commonwealth University Health System from 2004 to 2006. In 2007, Dr. Menninger successfully completed all requirements for Board certification in clinical pathology from the American Board of Pathology, becoming a Fellow Member of the American Society for Clinical Pathology and a Fellow Member of the College of

American Pathologists (CAP). Expecting to pursue a career working in laboratories, Dr.

Menninger obtained certifications from CAP and other regulatory bodies that were necessary to

serve as a lab director. Exhibit 2 at PPD_MENNINGER 00406-07; Exhibit 137, Menninger

Depo. 21:14–29:14.

2.       After completing her residency, Dr. Menninger earned her medical licenses to

practice in both Missouri and Kansas, and in 2006, she accepted a position as clinical pathologist

at Saint Luke's Health System in Kansas City, Missouri. In that role, Dr. Menninger worked as a

clinical pathologist, serving as a medical staff member of seven member hospitals of the St.

Luke's system in the Kansas City area. In that position, Dr. Menninger served as laboratory

medical director at Wright Memorial Hospital and Saint Luke's South. She also served at the

"main" hospital, Saint Luke's Hospital, as clinical laboratory director of the Saint Luke's Cancer

Institute, Cell Processing Laboratory, and laboratory medical director of the Hematology

Section. She received positive annual performance reviews from her supervisor, the overall lab

director. Exhibit 2 at PPD_MENNINGER 00406-07; Exhibit 137, Menninger Depo. 32:10–33:4.

3.       In 2010, Dr. Menninger accepted a new position as Laboratory Director/Corporate

Officer at Clinical Reference Laboratory, Inc. ("CRL") also in the Kansas City area. CRL is a

large, privately held clinical testing laboratory based in Lenexa, Kansas that has hundreds of

associates on staff. Exhibit 155, Menninger Aff. ¶ 5.

4.       Dr. Menninger's job at CRL was to provide directorship for CRL's general and

clinical trials laboratories. This overall responsibility entailed a number of different supervisory

tasks, including supervising the labs' quality management program; working with international,

national, and state regulatory agencies to ensure the laboratories remained compliant with

applicable regulatory requirements; providing consultation to CRL clients on topics such as test

ordering and interpreting test results; and managing the labs' personnel to ensure the labs'

workforce was at all times qualified and competent. During her employment with CRL, Dr.

Menninger oversaw testing of samples from around the nation, and obtained licensures from

several states (including California, New York, Pennsylvania, and Maryland) to comply with

state-specific regulatory requirements for laboratories. As a corporate officer, additionally, Dr.

Menninger reported directly to the CEO and participated in strategic and budgetary planning

with the CEO, CFO, and corporate vice presidents. She never performed public speaking at CRL.

Exhibit 2 at PPD_MENNINGER 00406-07; Exhibit 137, Menninger Depo. 34:15–20; Exhibit

155, Menninger Aff. ¶ 6.

     5.     In 2015, Dr. Menninger was contacted by a recruiter from PPD. Since Dr.

Menninger was already reporting directly to the CEO at CRL, she felt there was no more room to

grow in that role. Upon learning more about PPD, Dr. Menninger welcomed the opportunity for

career advancement that PPD, as a large, global company, offered, and made the decision to

accept a new job at PPD as the Executive Director of PPD's Global Central Labs (the "GCL")

(PPD's four "central" laboratories in Highland Heights, Kentucky; Zaventem, Belgium,

Singapore, and Shanghai, China). Exhibit 137, Menninger Depo. 35:1–18.

     6.     ███████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████

7.      Dr. Menninger had several peers who also reported to the VP of Labs. Along with Dr. Menninger, these peers shared in the responsibility of overseeing the complex operations of the Global Central Labs through their different capabilities and roles. These peers included the data management director; the director of project management (during 2017 and 2018, Chris Clendening); the senior director of Asia-Pacific (during the applicable period, Esther Ee); and the senior director of Europe (Els Pluymers). Exhibit 155, Menninger Aff. ¶ 8.

8.      Dr. Menninger and her colleagues also worked with other departments beyond the Labs department. PPD's Business Development (i.e., sales) team had primary responsibility for selling PPD's services to potential customers—typically pharmaceutical companies who were interested in PPD's laboratory testing services. After a company signed on to work with PPD, a Project Management professional within Global Central Labs (that is, someone reporting to Clendening) would have primary responsibility for interfacing with the client. Large accounts were handled by the Lab Partnerships department. The Quality Assurance department was responsible for coordinating quality management activities for the PPD Global Central Labs. The "Senior Leadership Team" (SLT) at PPD included the Executive Directors of Business Development, Lab Partnership, Quality Assurance, and IT, along with Dr. Menninger, Clendening, Pluymers, and Ee from the Labs department. Exhibit 155, Menninger Aff. ¶ 9.

9.      Dr. Menninger's core responsibility at PPD was to serve as medical laboratory director for the GCL, providing scientific oversight for the testing operations at the laboratories, and ensuring that the pre-analytical, analytical, and post-analytical processes at the labs met applicable regulatory standards. Her role was highly technical, and both her MD degree and status as a pathologist were essential to her role. It was also highly important to PPD that Dr. Menninger held a number of certifications, including from bodies such as the College of

American Pathologists (CAP), CLIA, and several U.S. state governments with unique regulatory requirements for laboratories, that were necessary for the lab director to hold in order to comply with regulatory requirements. Another key part of Dr. Menninger's role was to be available for client questions about the studies that PPD ran; and to help clients with any consultations they needed about the results PPD produced. Additionally, she performed a personnel management function, using her specialized knowledge as a pathologist and lab director to ensure the laboratories had qualified and licensed personnel for the various scientific areas (for example, molecular diagnostics or flow cytometry) in which PPD provided testing services. Exhibit 155, Menninger Aff. ¶ 10; Exhibit 137, Menninger Depo. 53:1–54:4; Exhibit 139, Mekerri Depo. 32:13–33:16.

10. ████████████████████████████████████
████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
███████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
████████

11. 

12.     Dr. Menninger rarely performed public speaking tasks during her employment at PPD. For example, Dr. Menninger spoke twice at PPD town halls, a task that involved speaking to 500 to 600 PPD employees. Exhibit 139, Mekerri Depo. 68:6–22; Exhibit 137, Menninger Depo. 154:3–155:13. On another occasion, she hosted the inspector for CAP certification and delivered a message to a large auditorium of people reporting the positive outcome of this inspection. Id. 69:5–13. For those occasions when she gave a presentation, Dr. Menninger took medication that masked the internal discomfort and panic she experienced. Exhibit 137, Menninger Depo. 170:16–171:7; Exhibit 147, Summergrad Report at 4. She did a great job speaking to large laboratory teams, and in reporting on data to the senior leadership team (the SLT). Mekerri Depo. 69:20–70:5.

13.

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████.

14.     ████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████

15.     On December 20, 2017, Mekerri had a conversation with Dr. Menninger by

telephone. Dr. Menninger had believed the meeting with Mekerri was to discuss her annual

performance review for 2017, but Mekerri only briefly discussed some of the feedback from the

recent "360" feedback that PPD had collected on Dr. Menninger, and conveyed that the feedback

was mostly positive. He then announced that he wanted to make changes to Dr. Menninger's role

to make her "more visible" in front of clients and PPD's internal sales team. Mekerri indicated

that he and Dr. Menninger would discuss those changes more after the holidays. Exhibit 137,

Menninger Depo. 118:9–13, 189:5–8; Exhibit 14 at PPD_MENNINGER 002989 (Jan. 11, 2018

email from Dr. Menninger to Mekerri); Exhibit 22 at PPD_MENNINGER 001247 (Feb. 4, 2018

email from Dr. Menninger to St. John); Exhibit 139, Mekerri Depo. 146:16–147:11 (admitting

Dr. Menninger's Feb. 4, 2018 email quoted above is accurate). Mekerri did not review Dr.

Menninger's annual performance or otherwise discuss her annual goals in this December 2017

call. Exhibit 155, Menninger Aff. ¶¶ 19, 25; Exhibit 137, Menninger Depo 118:9–22. The

promised conversation to discuss in more detail after the holidays never occurred. Exhibit 137,

Menninger Depo. 223:6.

16.     Dr. Menninger was never told of any negative feedback concerning her remote

work arrangement at any time during her employment with PPD, including in the December

2017 call with Mekerri. Exhibit 155, Menninger Aff. ¶ 19.

17.     Following the conversation with Mekerri in December 2017, Dr. Menninger was

concerned that Mekerri's desire for increased "visibility" would involve greater participation in

tasks such as social interactions or presentations that were challenging for her in light of her

disability. Although she found her disability very difficult to talk about, she made the decision to

disclose her disabilities, including Social Anxiety Disorder and Panic Disorder, to Mekerri by

email on January 11, 2018. Dr. Menninger hoped Mekerri would take her disability into account

when she and he discussed the changes to her role. Exhibit 155, Menninger Aff. ¶ 23;  Exhibit 14

at PPD_MENNINGER 002989.

18.     As of January 11, 2018, Dr. Menninger had been performing all functions (both

marginal and essential) of her job successfully for nearly two and a half years, without

accommodation. Exhibit 14 at PPD_MENNINGER 002989; Exhibit 155, Menninger Aff. ¶ 22.

19.     Prior to disclosing her disability at PPD on January 11, 2018, Dr. Menninger's

fellow employees at PPD, including her supervisor Mekerri, were unaware that she suffered from

a disability or any limitations in public speaking, and were surprised to learn that she suffered

from a disability or any such limitations. Exhibit 137, Mekerri Depo. 67:14–68:2.



20.

21.

22.

23.    That afternoon, Mekerri and Dr. Menninger spoke by phone about her disclosure of disability. Exhibit 18, at PPD_MENNINGER 003735. After that conversation, Mekerri emailed Dr. Menninger at 3:48 PM to connect her with St. John, who at 5:12 PM sent Dr. Menninger an email with instructions for requesting a workplace accommodation and forms to be filled out by Dr. Menninger and her physician. At 5:23 PM, St. John forwarded his 5:12 PM email to Dr. Menninger to Ballweg and Jerry Williams (the head of HR), promising to continue to keep each of them posted. Id. at PPD_MENNINGER 003733. That same minute, St. John then forwarded his 5:23 PM email to Ballweg and Williams to Mekerri. Id.

24.    St. John did continue to keep Ballweg and Williams posted during the coming weeks. This included emails on February 1st, the day after Dr. Menninger and Dr. Kessimian completed the initial accommodation forms, Exhibit 23, PPD_MENNINGER 001284; on February 7th, the day after Mekerri provided the five-item list for Dr. Menninger to have Dr. Kessimian evaluate, Exhibit 29, PPD_MENNINGER 001308; and on February 14th, when Dr. Kessimian submitted her recommended accommodations with respect to Mekerri's February 6th email, Exhibit 33, PPD_MENNINGER 002007.

25.    ██████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████

26. 

27.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

28.     On January 31, 2018, Dr. Menninger and Dr. Kessimian submitted initial

accommodations paperwork using the forms that had been supplied by St. John on January 15th.

Dr. Menninger explained on her form that she was able to perform the essential functions of her

job without accommodation, as she had been doing for several years, but that social interactions

and public speaking often triggered anxiety and panic attacks. Exhibit 20 at PPD_MENNINGER

000313. Thus, Dr. Menninger explained that her psychiatrist had recommended that public

speaking and social interaction be minimized and not increased, but to the extent they were

deemed necessary, that a plan for these activities be developed with the assistance of Dr.

Menninger's psychiatrist to minimize Dr. Menninger's symptoms. Id. On Dr. Kessimian's form

(Exhibit 22 at PPD_MENNINGER 000030-32), likewise, Dr. Kessimian explained that Dr.

Menninger reported having performed the essential functions of her job without accommodation,

but that Dr. Menninger's disability (Panic Disorder with agoraphobia, Social Anxiety Disorder,

and Generalized Anxiety Disorder) made public speaking and social interactions difficult. Thus,

Dr. Kessimian recommended that social interactions and public speaking be minimized to the

extent possible and not increased; but that to the extent these activities were deemed necessary,

that a plan be developed for these activities in consultation with Dr. Kessimian or another

qualified health care provider. Id. at PPD_MENNINGER 000032.

29.     St. John, after receiving these forms, asked Dr. Menninger in a February 2nd

email what specific expectations Mekerri had shared with her for 2018 that she believed she

could not, or could limitedly, perform, and stated, "I would like to understand from your physicians [sic] perspective in-writing the specific limits or maximum percentage related to the specific expected duties." Exhibit 24 at PPD_MENNINGER 002916-20. Dr. Menninger replied on February 4th that Mekerri had only had a general discussion with her thus far about making her role "more visible," and that Mekerri had suggested that this might include increased client visits/social interactions and presentations (internal and external). She further explained that she and Mekerri were supposed to have had a follow-up conversation to discuss specifics, but that this had not yet occurred. Id. As noted above, (Def. SMF ¶ 35), St. John asked Mekerri for "documented clarity around your expectations for the role that Lisa is in." St. John Tab 6. Mekerri responded the following day, February 6th, to Dr. Menninger with a list of five bulleted items ("Items 1–5"). Exhibit 26 at PPD_MENNINGER 002904 ("Mekerri's February 6th email").

30. ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

31.  ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

32.     "SLT Presentations" refers to presentations to the senior leadership team (the

"SLT"), that is, the senior leaders in GCL. Exhibit 137, Menninger Depo. 120:6–8. Dr.

Menninger had presented to the SLT approximately two to three times, Id. 155:22–23. More

typically, however, rather than making formal presentations, Dr. Menninger's interaction with

the SLT took the form of joining conference calls to discuss topics such as quality or strategy.

Exhibit 137, Menninger Depo. 76:20–24 (quality); 117:14–118:5 (describing conference format);

119:17 (strategy). She also provided typed-out monthly business updates to the SLT via

Mekerri's assistant, who would pass the updates to Mekerri for delivery to the SLT. Id. 68:7–11.

33.     "Town Hall" refers to meetings held approximately twice per year at which lab

staff were updated on what was going on within GCL. Exhibit 137, Menninger Depo. 154:1–9.

There would be approximately 500-600 total attendees, including employees in Belgium and

Asia who would attend remotely. Exhibit 139, Mekerri Depo. 68:16–22. Previously in her

employment Dr. Menninger had participated in this task twice, presenting between two to four

slides maximum. Exhibit 137, Menninger Depo. 155:9–15.

34.  ██████████████████████████████████████████

████████████████████████████████████████████████████████



35.

36.



37.

38. 

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

40.    Dr. Menninger does not know what "external" sales presentations meant precisely, and never had any specific discussion about that task with St. John or Mekerri, who as stated below refused to discuss Items 2–4 in any further detail beyond what was listed in Mekerri's February 6th email. Exhibit 155, Menninger Aff. ¶ 30.

41.    The mention of "HH/Client site meetings" within Item 3 is unclear because Mekerri listed the same phrase in Item 2. Dr. Menninger understood this to possibly refer to client visits to Highland Heights not otherwise connected to bid defenses. Exhibit 137, Menninger Depo. 159:21–23. Dr. Menninger was never asked to participate in this type of client site meeting during her employment. Id. 160:8–9.

42.    █████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



43.

44.

45. ███████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

46.     Nobody from PPD ever contacted Dr. Kessimian to ask questions or start a

dialogue about her recommended accommodations or about potential alternatives to what Dr.

Kessimian had recommended. Id. 123:3–20.

47.     ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

███████████████████

48.     However, PPD was not planning to give a positive response to Dr. Menninger's

accommodation request. On February 23rd, St. John emailed Mekerri a draft response to the

accommodation request for him to review and tweak; St. John stated that the draft was based on

an interpretation of his previous conversations with Mekerri on the topic. Exhibit 37 at

PPD_MENNINGER 001255. St. John's draft flatly rejected accommodations for Items 1 and 3.

For Item 2, the draft email approved an accommodation of having a "designee" to participate. On

Item 4, the "60-80%" expectation for meals and social interactions at customer visits was

reduced to "50%," and for Item 5, the "30%" travel was reduced to "20%." Id.

49.     Mekerri responded to St. John that day (February 23rd), writing, "As discussed, I

am ok to accommodate points 1 and 5. Points 2, 3, 4 below are critical for her level and for the

growth of the business. I am happy to discuss further with Lisa of course to make sure this is

understood." Id. at PPD_MENNINGER 001254–55. In Mekerri's response, the accommodation of a "designee" was now granted for Item 1 instead of Item 2. Mekerri's explanation rejecting the proposed accommodation for Item 2 stated simply that the "expectation is for Lisa to participate in Client Bid Defense, issue resolution calls, HH/Client site meetings, phone is critical for the business." No accommodation was accepted for Items 3 or 4, either. Under each of those, Mekerri wrote simply that Dr. Menninger's "participation" was "imperative in gaining prospective clients trust to obtain new business." St. John forwarded this email to Ballweg that same day, requesting her thoughts on the draft so that a final version could be sent to Dr. Menninger soon. Id. The final version sent to Dr. Menninger on February 26th was substantially the same as Mekerri's February 23rd draft. Exhibit 45 at PPD_MENNINGER 002782-86.

50. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

51.     Dr. Menninger received St. John's February 26th email (Exhibit 45 at

PPD_MENNINGER 002782), in which accommodations for Items 1 and 5 were granted but 2–4

were rejected, while en route to Highland Heights. Exhibit 137, Menninger Depo. 168:7–11. St.

John and Mekerri scheduled a meeting for February 28th to discuss further in person. Id.

52.     ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

53.     That afternoon, on February 28th, Mekerri and St. John met with Dr. Menninger.

At the outset of the meeting, St. John presented Dr. Menninger with two options: to take an exit

package, or to take a temporary role as a consultant. Menninger Depo. 168:16–19; Exhibit 42 at

MENNINGER 001162. Dr. Menninger was shocked and scared. Exhibit 137, Menninger Depo. 168:22–169:11. She did not understand why Mekerri and St. John were unwilling to discuss possible accommodations, and were instead trying to make her leave the company. Id. Emphasizing that she did not want to leave, and loved her job, Dr. Menninger asked to discuss possible accommodations that related to the specific categories in Mekerri's February 6th email. Id. 169:5–11. She explained that not everything lumped into the categories in Mekerri's February 6th email implicated her disability and that she actually performed many of the identified tasks day in and day out. Id. 169:12–16. For example, she explained that she regularly performed tasks such as client calls which did not trigger panic attacks and did not cause her any issues. Exhibit 42 at MENNINGER001162. With respect to items such as formal presentations that did implicate her disability, Dr. Menninger further emphasized that she was capable of performing those tasks too, as she had done in the past with the use of medication. Indeed, during past formal presentations, she had performed so well that Mekerri could not tell she was experiencing any difficulty and had complimented her. Exhibit 137, Menninger Depo. 170:8–171:7, 172:9–15.

54.    Dr. Menninger therefore asked to break out and discuss in further detail the specific tasks that would affect her disability from within the stated categories, and to discuss the possible accommodations that might exist for those specific tasks. Id. 169:17–23. St. John and Mekerri, however, responded that they would not provide any more detail than what was stated in Mekerri's February 6th email concerning the identified categories. Id. 169:24–170:7. Referring to the February 26th email (which listed the categories stated in Mekerri's February 6th email and Dr. Kessimian's February 14th proposed accommodations as to each), St. John insisted that Dr. Kessimian had provided "medical restrictions" and claimed that PPD did not want to go against Dr. Kessimian's "restrictions." Id. 169:24–170:7, Exhibit 42 at

MENNINGER001162. Dr. Menninger explained that what Dr. Kessimian had provided were recommended accommodations, not medical restrictions, but St. John insisted again that the recommended accommodations were in fact "medical restrictions." Id. 170:2–7. Mekerri and St. John repeated that they would not break out the tasks any further. Id. 172:9–15.

55.    Mekerri and St. John urged Dr. Menninger to consider the "options" of the temporary consulting arrangement or exit package. Id. 172:1–8. Dr. Menninger continued to emphasize that she did not want to leave her job, and repeated her requests to discuss the specific tasks and potential accommodations for those tasks, but they refused. Id. Mekerri mused that "the business is bigger than all of us," and told Dr. Menninger he did not want to hurt her "reputation," an implicit threat that resigning would be better for Dr. Menninger than having to be fired. Id. 172:9–15, Exhibit 42 at MENNINGER001163. The meeting ended with an agreement that St. John, Mekerri, and Dr. Menninger would meet again face-to-face to further discuss.

56.    ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

57.    However, St. John had vastly different intentions. First, he drafted a responsive email to send in reply to Dr. Menninger's March 1st email (in which Dr. Menninger had requested "additional detail regarding items 2, 3 and 4"). In the draft response email, St. John planned to refuse to provide any additional detail to Dr. Menninger about Items 2–4, and flatly to

refuse to consider <u>any</u> further accommodation for those Items. Exhibit 44 at PPD_MENNINGER

001116. The draft email stated:

> Lisa,
>
> As stated in the meeting. . . Items 2–4 [. . .] are all core items in the role you are in
> and we need 100% in 1-4 for the business to meet objectives. **Adding additional
> detail below would only present the opportunity to select items in each
> bucket you believe you can or can't do**. The [sic] **will be no accommodations
> made outside of items 1 & 5.**

<u>Id.</u> (emphasis added). St. John did not send this draft to Dr. Menninger, but rather, sent it to

Ballweg, in order to be "cautious" and obtain her thoughts. <u>Id.</u>  Ballweg and St. John had a

discussion that day, after which St. John prepared for Ballweg a timeline of Dr. Menninger's

disclosure of disability and accommodation request events; a chart of the February 6th email

categories and the February 14th proposed accommodations from Dr. Kessimian; and the draft

email St. John had composed earlier that day on March 1st. Exhibit 48 at PPD_MENNINGER

004186–87. Ballweg planned to send this information to Lisa Noecker, PPD's in-house counsel.

<u>Id.</u> On March 5th, Ballweg sent St. John a set of standard PPD form communications, including

an email template for denying accommodation requests, and asked St. John to ensure he followed

the standard format for emails to the PPD Legal department in preparing information about Dr.

Menninger for Legal's review. Exhibit 49 at PPD_MENNINGER 004177.

58.     As St. John continued to prepare his packet of information for Attorney Noecker,

he admitted to Ballweg on March 6th that Dr. Menninger "shared that she <u>did</u> have flexibility to

the items that Hacene [Mekerri] wanted to hold firm on (2–4)." St. John added: "I reminded her

that her physician is requesting an accommodation due to their assessment of her condition." <u>Id.</u>

at PPD_MENNINGER 004181.

59.     St. John completed his packet of information to send to Attorney Noecker on

March 7th. (Exhibit 51, PPD_MENNINGER 004065–83). In the packet, St. John wrote:

HR is requesting guidance in responding to Lisa and assisting us with potential options **as we seek a path forward to an exit strategy** with consultancy as an element (or others [sic] options not being considered now) to protect the business and the CL [central labs] licensure requirements. . . . **HR support [sic] the business** (Hacene Mekerri, VP, Global Lab Services) **in their recommendation to only provide reasonable accommodation for point #1 & #5** at this time but it would also be prefeed [sic - preferred] to package this employee while also allowing them to consult to protect the CL licensure requirements that Lisa holds. **The business believes Lisa can no longer fully service the CL business as the Senior Lab leader** to the degree that the business requires to grown [sic] and hit aggressive business targets.

Id. at PPD_MENNINGER 004083 (emphasis added).



60.

61.

62.    St. John finally responded to Dr. Menninger's March 1st email on March 12th. St. John Tab 14. His email was drafted by PPD's counsel. Exhibit 54 ("Conversation 1") at

PPD_MENNINGER 004351. Despite understanding that Dr. Menninger was asking for more detail about Tasks 2–4 in Mekerri's February 6, 2018 email, St. John did not provide any such detail. Exhibit  142, St. John Depo. 114:2–11, 119:12–14. Instead, St. John's email attached Dr. Menninger's job description and re-stated that PPD was unwilling to agree to the proposed accommodations to Items 2–4 that Dr. Kessimian had submitted on February 14th. Exhibit 55 at PPD_MENNINGER 001151-52.





66.

67.

68.     At this point, PPD was determined to accelerate the process of working Dr.

Menninger out of her job. Immediately after emailing Dr. Menninger on April 3rd, St. John

emailed Ballweg, indicating that he would "coach Hacene accordingly" according to Ballweg's recommendations. Exhibit 63 at PPD_MENNINGER 001043–44. Later that morning, St. John spoke to Mekerri, coaching him on the importance of documenting criticisms of Dr. Menninger. Exhibit 65 at PPD_MENNINGER 000913. He then followed up with an email to Mekerri, providing firm instructions that it was "critically important" to document Dr. Menninger's "performance issues" in line with the "2017 review." Id. at 914. He also instructed that it was "imperative" to address these "performance issues" "separately from the accommodation request issue." Id. Mekerri indicated he would do so, and St. John forwarded their exchange to Ballweg to confirm he had coached Mekerri verbally and in writing. Id.

69. ██████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

70. ███████████████████████████████████

71. ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████

72.     Dr. Menninger expressed to Dr. Kessimian on April 6th that she had had a hard week, and did not know how much more she could handle without going to the hospital. Exhibit 68 at MENNINGER 000686.

73.     ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

74.   ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

75.   ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████



76.

77.

78.

_____

[1] This treatment note appears to inadvertently contain the incorrect date 4/13/18 rather than 4/20/18.

79.

████████████████████████████████████████████████████████

██████████

80.     To St. John, Dr. Menninger responded to St. John's April 3rd email. Exhibit 93 at

PPD_MENNINGER 000969. Dr. Menninger reiterated for the third time (in writing) her request

for a conversation about the specific tasks that Mekerri wanted her to do, so that she and PPD

could more productively identify an accommodation. Id. Dr. Menninger expressed to St. John in

direct terms that his April 3rd email had not provided any clarification; rather, St. John was

twisting her doctor's words (e.g., by claiming that Dr. Kessimian had set out medical

"restrictions" instead of just proposed accommodations) and refusing to answer her questions

seeking more detail about the tasks. Id. She further brought to St. John's attention the fact that

Mekerri was now targeting her because of her disability, including by going out of his way to

"document" baseless criticisms of her performance to "build a case" against her. Id.  Dr.

Menninger explained: "I'm not a problem employee. I have a disability, but I do a good job and I

don't deserve to be treated this way. I just want to do my job and support my family." Id.

81.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

82.     ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

███████████

83.     Mekerri's April 25th email harshly criticized Dr. Menninger for not "tak[ing] the lead" on a lab error for client Gideon Richter. Id. at PPD_MENNINGER 002539. He even more sharply criticized her over an issue for client GSK, accusing her of having not been involved enough, and adding "This is your job--to handle these situations." Id.

84.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

85.     To St. John, Dr. Menninger explained, "Things with Hacene are getting worse. He is completely mischaracterizing things and looking for any excuse possible to criticize my 'leadership.' He never treated me like this before I told him about my disability. I don't know if he's doing this intentionally, but it really needs to stop. My panic attacks are increasing and he's making it really hard for me to do my job." Exhibit 93 at PPD_MENNINGER 000968.

86.     █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

87.     █████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

88.     On April 30th, St. John sent Dr. Menninger a response. In this email, he again did not provide Dr. Menninger with any additional detail about Items 2–4. Exhibit  142, St. John Depo. 125:15–22. Instead, he simply provided another "explanation" purporting to once again describe why PPD was unwilling to grant the proposed accommodations that Dr. Kessimian had sent two and a half months prior on February 14th. Exhibit 93 at PPD_MENNINGER 000967. St. John stated he would have another member of the HR team reach out to Dr. Menninger to investigate any incidences of Mekerri targeting her or discriminating against her based on her disability. Id. at PPD_MENNINGER 000967–68.

89.     Mekerri met with Dr. Menninger on May 1st to discuss her 2018 "goals." Exhibit 95 at MENNINGER001172. Mekerri refused to provide any specifics about how to adapt these goals, telling Dr. Menninger that "at our level [we] can't go into much detail," and that it was Dr. Menninger's responsibility, not his, to provide granularity. Following the email, Mekerri emailed himself an account of the meeting, acknowledging that Dr. Menninger had "repeatedly asked for more details" and "asked for granularity." He added self-servingly that "She seems to have a difficult time accepting and understanding the goals." Exhibit 94 at PPD_MENNINGER 002527. Dr. Menninger and Mekerri met to have another conversation about goals on May 7th. Exhibit 96 at MENNINGER 001174. Mekerri again refused to provide granularity, but they agreed Dr. Menninger would work with St. John to draft goals with more granularity. Id.

90.     On May 10th, McKinnon (the EVP for QA) sent Dr. Menninger an email copying Mekerri and three of Dr. Menninger's direct reports, attaching a list of "Quality System Items." McKinnon threateningly warned that he and Mekerri would be setting aside time to discuss the

"overdue QMS items" and that he was "looking for an update on remaining activities and a firm timeline for resolution." Exhibit 98 at PPD_MENNINGER 000307.

91.     On May 11th, Dr. Menninger emailed Mekerri and St. John on the topic of PPD's coverage/compliance gaps—the same personnel management topic that had been part of Dr. Menninger's 2017 goals, and which St. John, Mekerri, Ballweg, and others had been discussing behind her back since February. Exhibit 99 at PPD_MENNINGER 004443. Dr. Menninger explained that Dr. Mann (who had been hired without her input, with an expected start date later that summer) had some weaknesses in qualifications that needed to be considered, and that some other existing gaps (including ones being filled by Dr. Reddy on an interim basis) still needed to be filled. Id. St. John forwarded Dr. Menninger's email to Mekerri and Ballweg (who was in the middle of her "investigation" into Dr. Menninger's complaint of retaliation), with a series of his thoughts about how Dr. Menninger's email should be addressed. Id. at PPD_MENNINGER 004442–43. St. John discussed the candidacy of Dr. Ryder (the candidate that Dr. Reddy had texted Dr. Menninger over a month earlier that PPD was planning to hire), to whom PPD still had not yet actually extended an offer because PPD was holding that decision while it awaited the outcome of Dr. Menninger's "exit." See Pl. SAMF ¶ 69 above. In his May 11th email, St. John shared that he wanted Mekerri to consider hiring Dr. Ryder, noting that this would have the benefit of appearing to be a response to something Dr. Menninger had now asked for in writing, so that "it couldn't be perceived as being created to work her out of the organization." Exhibit 99. He noted that Dr. Ryder's hire might work in PPD's benefit to the extent it helped to "imped[e]" Dr. Menninger's performance, or, on the other hand, it could "elongate the issues and timeline." In other words, if Dr. Ryder turned out to be poorly suited for the role, this would help

PPD fire Dr. Menninger for performance problems, but if he were <u>successful</u>, it would be even <u>harder</u> to fire Dr. Menninger for performance problems. <u>Id.</u>

92. ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████

███████████████████

93.     That same day, May 14th, while Ballweg's "investigation" continued, St. John emailed Ballweg, dejectedly reporting that he was unable to find any more evidence of Dr. Menninger having performance problems aside from one previously forwarded email. Conversation 8, Exhibit 101 at PPD_MENNINGER 004448.

94. ████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██

95. ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

96. ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████

97. ███████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

█████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

████████████████████████

98.   ███████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████

99.   ████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

100.   ████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



101.

102.

103.   ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

104.     While the partial hospitalization program helped reduce Dr. Menninger's

symptoms in the short term, she began to struggle once more after it had concluded. Exhibit 118

at MENNINGER000715; Exhibit 137, Menninger Depo. 216:3–7. For the next six months, Dr.

Menninger continued to exhibit symptoms of Major Depressive Disorder and "life paralyzing

anxiety," including daily panic attacks, recurrent suicidal ideation, avoidance of PPD-related

triggers, and disturbed sleep. Exhibits 119–124, 128–30.

105.   ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

106.   █████████████████████████████████████

██████████████████████████████████████



107.

108.

109. 

110.

111.

112.



113.

LISA MENNINGER,

by her attorneys,

/s/ *Hampton M. Watson*
Patrick J. Hannon (BBO# 664958)
Hampton M. Watson (BBO# 705983)
HARTLEY MICHON ROBB HANNON LLP
155 Seaport Blvd, 2nd Floor
Boston, MA 02110
Telephone: (617) 723-8000
Facsimile:  (617) 447-2800
phannon@hmrhlaw.com
hwatson@hmrhlaw.com

Dated: May 6, 2021

## **CERTIFICATE OF SERVICE**

     I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on May 6, 2021.


                /s/ *Hampton M. Watson*
                Hampton M. Watson