UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
LISA MENNINGER,                     )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )          Civil No. 19-11441-LTS
                                    )
PPD DEVELOPMENT, L.P.,              )
                                    )
        Defendant.                  )
                                    )
```

ORDER ON PPD'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 43) AND
MENNINGER'S MOTION TO STRIKE (DOC. NO. 64)

March 22, 2022

SOROKIN, J.

On June 28, 2019, Lisa Menninger filed suit against PPD Development, L.P. ("PPD")

alleging disability discrimination and retaliation in violation of state and federal law.[1]  Pending

now is PPD's Motion for Summary Judgment, in which it challenges Menninger's ability to

succeed at trial on all four claims she brings against it.  Doc. No. 43.  The Court has carefully

reviewed the parties' submissions and arguments and applied the familiar summary judgment

standard, drawing all reasonable inferences and resolving disputes of genuine material fact in

favor of Menninger as the non-moving party.  For the reasons that follow, the Court DENIES IN

PART and ALLOWS IN PART PPD's Motion for Summary Judgment (Doc. No. 43) and

DENIES Menninger's Motion to Strike (Doc. No. 64).

---

[1] The operative complaint includes four claims: (1) disability discrimination in violation of the
Americans with Disabilities Act ("ADA"); (2) retaliation in violation of the ADA; (3) disability
discrimination in violation of Chapter 151B of the Massachusetts General Laws; and (4)
retaliation in violation of Chapter 151B.  Doc. No. 1.

I.    BACKGROUND[2]

On August 31, 2015, PPD hired Dr. Lisa Menninger as the Executive Director of its

Global Central Labs based in Kentucky.  Pl.'s Resp. to Def.'s Statement of Facts ("Pl.'s Resp. to

Def.'s SOF"), Doc. No. 66-158 ¶ 3.  The job description provided to Menninger upon her hire

specified that the "essential functions"[3] of her role included:

- Provides operational leadership to laboratory services. Integrates operational processes, business development, research & development and quality assurance functions for optimal performance within the labs;
- Supports [b]usiness [d]evelopment in obtaining new customers and maintaining relationships. Directs the development of new programs for revenue enhancement/cost expense reduction, including post-evaluation of new implementations for effectiveness;
- Performs financial review, establishes operating budget, and develops forecasts maximizing operating profit. Provides business updates to senior leadership;
- Sets operational standards/goals and directs the implementation of laboratory goals and policies. Oversees resource allocation including space, capital equipment, scientific instrumentation and staff;
- Performs administrative responsibilities including HR functions, personnel development, facilities management, writing SOPs and PDs;
- Oversees the quality assurance and quality control aspects of the lab to ensure compliance with regulatory standards.

See Doc. No. 46-2 at 7.

Hacene Mekerri, Menninger's supervisor and then Vice President of Central Lab

Services, gave Menninger a "Highly Effective" rating for 2016.  Pl.'s Resp. to Def.'s SOF, Doc.

No. 66-158 ¶ 11.  In late 2016, Menninger asked Mekerri whether she could work remotely from

the east coast due to family circumstances.  Id. ¶ 14.  PPD approved this request, and Menninger

eventually moved to Massachusetts in June 2017.  Id. ¶¶ 15, 17.  At some point in November

_____

[2] Unless specifically noted, these facts are undisputed.  "Where material disputes remain, they are highlighted in the court's legal analysis and viewed in the light most favorable to the nonmoving party."  Davis v. Murphy, No. 13-CV-11900-IT, 2018 WL 1524532, at *1 (D. Mass. Mar. 28, 2018).
[3] PPD's mere characterization of these functions as "essential" in its job description is relevant, but not dispositive, of whether these functions were in fact essential.  The Court engages in that analysis later in this Order.

2017, Menninger mentioned to Mekerri that she was "overwhelmed," and Mekerri asked her to send him a list describing what she did on a day-to-day basis. Id. ¶ 20. Then, in the same month, as a part of feedback-sourcing process, another colleague told Mekerri that he had concerns about Menninger because she had been "indecisive on numerous important matters . . . and, since her decision to relocate, she has been lackadaisical toward her time on-site[.]" Id. ¶ 22. One subordinate communicated similar concerns, but others had positive feedback as well. Id. ¶ 23.

After gathering feedback from other members of executive leadership, Mekerri met with Menninger on December 20, 2017 to discuss performance feedback, and Mekerri suggested that her role will become more visible involving increased client visits, social interactions, and presentations. Id. ¶ 26. Mekerri explained that 2017 was less successful for PPD than 2016 in terms of sales numbers and revenue, so PPD was bolstering efforts to encourage "more visibility and productivity among its senior leadership to increase sales and support business development." Id. ¶ 19.[4] Mekerri rated Menninger's 2017 performance as "Fully Effective" which is one rating lower than her 2016 rating, although the date on which the review was completed is somewhat disputed.[5] Id. ¶ 28.

The very prospect of making Menninger more visible with increased client visits and social interactions caused great distress for Menninger resulting in "increased anxiety with somatic symptoms, including diarrhea, heart racing, sweatiness, and increased respiratory rate." Doc. No. 66-22. PPD did not know of this distress then. The distress and the prospect of change

---

[4] PPD also asserts that during this December 20, 2017 meeting Mekerri agreed to take on the hiring and recruiting responsibilities. Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 26. Menninger disputes ever discussing this matter during this meeting. Id.
[5] But see infra note 18.

prompted Menninger on January 11, 2018 to disclose, for the first time to anyone at PPD, that she suffers from "generalized anxiety disorder that includes social anxiety disorder and panic attacks" via email to Mekerri in response to Mekerri's prior suggestions that her role would become more visible.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 29.  Mekerri then connected Menninger with Chad St. John, Associate Director of Human Resources ("HR"), who emailed her PPD's accommodation request forms.  Id. ¶¶ 30-31. On January 31, 2018, Menninger submitted an accommodation form along with a form from her psychiatrist, Dr. Kessimian, who noted that changes to Menninger's role would increase her anxiety and make it "substantially more difficult, if not impossible, for [Plaintiff] to perform her job," so such interactions if required should be "planned in consultation with her medical provider[.]"  Id. ¶ 33.  Further communication resulted in Menninger requesting and Mekerri providing additional detail on the new or enlarged responsibilities of her role.  On February 6, 2018, Mekerri emailed Menninger his expectations for her role that fell within five categories:

> (1) [S]enior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or quarterly) [up to an audience of 500 people], (2) client bid defenses, issue resolution calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via phone (once a month at minimum per client) [up to an audience of 50 people], (3) technical sales presentations (internal and external) (monthly, quarterly, and as-needed) [up to an audience of 100 people], (4) meals and social interactions while at client visits (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%).

Id. ¶ 36; Doc. No. 66-26.

Although Menninger performed some of these responsibilities frequently, such as "issue resolution calls," others she engaged in infrequently.  Doc. No. 66-155 ¶ 28.  For example, she rarely engaged in "client bid defenses," had never been asked to give a formal presentation to clients, and was asked only a few times to be available to answer questions at these bid defenses.

Id.  Additionally, she recalls attending approximately six dinners and zero lunches during her time at PPD.  Doc. No. 73 ¶ 42.

On February 14, 2018, Menninger's psychiatrist sent St. John her specific accommodation requests in response to Mekerri's email.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 39; Doc. No. 66-32.  These requests more or less mapped onto the categories Mekerri specified in his email:

- For internal team presentations and meetings, Menninger will be "responsible for all slides/handouts/ presentation material with necessary information but will require a reader to present to the group, or can pre-record the audio / video and it can be played at the meeting available for questions via email after the meeting."
- For client bid defenses, issue resolution calls, and meetings at Highland Heights, Menninger will be "available via email/ text/ remote video conferencing for a representative of the client, 1-2 person audience maximum. If it is a site meeting, surrogate or reader with all necessary information / real time access to [Menninger] will be available."
- For client site meetings, Menninger "would like a surrogate to attend, but will be responsible for all problem solving/ ideas for resolution if emailed/ communicated to [her] a few days before anticipated visit."
- For internal and external technical sales presentations, Menninger requested to be "excused from sales presentations but again will provide any necessary data information for the reader/ surrogate to have at their disposal."
- For meals and social interactions while at client visits, Menninger requested a "surrogate, as this is not her strength/ skill set and her disability will flare with significant impairment. She is able to build business relationship in a more 'behind the scenes' fashion and would like [to] brainstorm other potential avenues where she can add value as she does understand this is an important part of the business."
- For travel, Menninger requested to travel to the Belgium laboratory versus its laboratories in the United States.

Id.

On February 26, 2018, St. John emailed Menninger that PPD would provide accommodations for two of the five categories by reducing travel expectations from 30% to 15% and by allowing Menninger to have a reader present for internal company meetings.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 42.  That said, PPD could not grant the proposed accommodations for categories 2, 3, and 4 because they involved, according to PPD, functions

central to Menninger's role and PPD's needs.  Id.  On February 28, 2018, St. John discussed the possibility of an exit package or transitioning to a consultant role during a meeting with Menninger and Mekerri.[6]  Id. ¶ 43.  Menninger stated she was not interested in those options and asked for "additional detail regarding [categories] 2, 3, and 4" for which PPD had rejected the proposed accommodations, because she thought that there were "many tasks that could fall within those items that would not implicate [her] disability."  Doc. No. 66-46 at 6.  PPD responded by referring Menninger to her job description and stating that "it is not reasonable for PPD to . . . do away with core requirements such as that you attend business development meetings, dinners, bid defenses, etc. [because] [t]hese are not 'behind the scenes' functions[.]"  Doc. No. 66-55.  PPD asked Menninger to let it "know if there are other accommodations that would allow [her] to perform the essential functions of [her] job."  Id.  On March 24, 2018, Menninger emailed St. John reiterating that categories 2-4 were broad in her opinion but nonetheless explaining that despite her disability, she was "capable of performing all of [her] responsibilities with or without accommodation."  Doc. No. 66-59 at 3.  That said, she suggested they could "table this discussion until a particular task arises" because there seemed to be no upcoming events or activities that would implicate her disability.  Id.

On April 17, 2018, Menninger told St. John that she felt like Mekerri was "starting to target [her] because of [her] disability."  Doc. No. 60-93 at 5.  Upon receipt of the email, St. John informed his supervisor Deborah Ballweg of the email, and they agreed that Ballweg would investigate Menninger's complaint.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 51.  As a part

---

[6] This fact is disputed in that Menninger argues the meeting began with St. John presenting her with the two options of taking an exit package or transitioning to a consulting role, but PPD argues that these options were "not suggested" but rather mentioned as a possibility.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 43.

of the investigation, Ballweg interviewed Menninger, St. John, Mekerri, and three other employees.  Id. ¶¶ 53-54.  Ultimately on May 22, 2018, Ballweg concluded that Mekerri was not targeting Menninger because of her disability and communicated her findings to Menninger.  Id. ¶ 56.

On June 2, 2018, Menninger informed PPD that her doctor advised her to take medical leave immediately.  Id. ¶ 57.  Menninger remained on leave for the next eight months, six of which were paid.  Id. ¶ 59.  Eventually on February 1, 2019, PPD terminated Menninger's employment.  Id.  The Court sets out further facts as necessary in discussing the individual issues.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to [] view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III. PPD'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 43)

A. Discrimination

Menninger's Complaint (Doc. No. 1) fairly read presents two theories of disability discrimination under the ADA: (1) failure to reasonably accommodate and (2) disparate treatment. The Court assesses each theory of liability in turn.

1. *Failure to Reasonably Accommodate*

To withstand summary judgment, Menninger must establish a genuine dispute of material fact as to the three elements of an ADA disability discrimination claim for a failure to reasonably accommodate:[7] (1) "she is disabled within the ADA's definition;" (2) she "could perform the job's essential functions either with or without a reasonable accommodation;" and that (3) "the employer knew of her disability, yet failed to reasonably accommodate it." Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017) (quoting Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016)).

Here, the first element is not at issue because all parties agree or assume for the purposes of summary judgment that Menninger is disabled under the ADA. Doc. No. 44 at 9 n.9. The second element, however, is at issue and imposes a burden on Menninger to show: (1) "'that she possesses the requisite skill, experience, education and other job-related requirements for the position'; and (2) 'that she is able to perform the essential functions of the position with or

_____

[7] The First Circuit has noted that "Massachusetts's handicap discrimination statute . . . is nearly identical to the ADA" and so "we analyze the statute in exactly the same manner as the ADA." Audette, 858 F.3d at 20 (internal quotation marks omitted). Moreover, no party has argued that the Court should analyze the discrimination claim separately under federal and state law.

without reasonable accommodation.'" Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir. 2017) (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006)). PPD does not dispute the first requirement that Menninger is qualified for the position.[8] See Doc. No. 44 at 9. Accordingly, we narrow our inquiry further to assess whether Menninger is able to perform the essential functions of her position with or without a reasonable accommodation. As to this second requirement, the plaintiff "bears the burden of showing the existence of a reasonable accommodation" by demonstrating that (1) it would enable her "to perform the essential functions of the job" and (2) that it is "facially reasonable." Echevarria, 856 F.3d at 127 (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 258-60 (1st Cir. 2001)). Once a plaintiff has made this showing, "the defendant[] then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." Eustace v. Springfield Pub. Sch., 463 F. Supp. 3d 87, 103 (D. Mass. 2020) (quoting U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)).

"An essential function is a 'fundamental job duty of the position at issue. The term does not include marginal tasks, but may encompass individual or idiosyncratic characteristics' [sic] of the job.'" Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012) (quoting Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001)). Courts consider factors such as "the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the

---

[8] PPD states that it "does not question or doubt Plaintiff's qualifications, credentials, or experience, nor does it argue that Plaintiff's job performance was unacceptably poor," but argues instead that Menninger's requests for accommodation compel the conclusion that she was not able to do the essential functions of her job. Doc. No. 44 at 9. Although PPD later contests in its Reply that Menninger "is not a qualified individual under state or federal law," Doc. No. 71 at 5, its argument stems from a belief that she cannot do the essential functions of her job with or without accommodation. Accordingly, the Court does not engage in an analysis of the first requirement of whether Menninger is a qualified individual given that PPD's contention essentially turns on the second requirement.

current work experience of incumbents in similar jobs," and give a "significance degree of deference to an employer's business judgment about the necessities of a job." Id. (internal quotation marks omitted). Furthermore, courts consider "evidence of the amount of time spent performing the particular function." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002).

On the record before the Court, PPD has established that an essential function of Menninger's role included at least some of the meetings, public speaking, or client engagements described in categories 2, 3 and 4 of Mekerri's February 6, 2018 email. According PPD's judgment as to the needs of its business for 2018 onwards significant deference and considering the job description, the Court reaches this conclusion. That said, a genuine issue of material fact remains regarding the extent of those activities qualifying as essential. Although the categories of functions in Mekerri's email arguably fell within the general description of Menninger's job,[9] that description did not spell out the allegedly essential functions with the level of detail and frequency that Mekerri did. See, e.g., Doc. No. 46-2.

Moreover, the record does establish that Menninger performed some of those tasks prior to December 2017 involving in-person, group, or social activities. Clearly, she could perform at a minimum a limited amount of such activities.[10] This is not the case where the record

---

[9] For example, the job description states Menninger will "support[] business development in obtaining new customers," "interact[] frequently with internal personnel and outside representatives," "participate[] and may present at meetings with internal and external representatives," and "present capabilities and solutions to clients." Doc. No. 46-2 at 7-8.
[10] PPD separately asserts that Menninger is "estopped from showing that she could perform her job duties" because of her receipt of Social Security Disability Insurance ("SSDI") benefits. Doc. No. 44 at 17. Menninger, however, applied for SSDI benefits in January 2019 when "she had already been on leave for several months." Doc. No. 65 at 14. Thus, her receipt of SSDI benefits months after she took leave from PPD does not prevent her from arguing before this Court that she could perform her job duties during the underlying events at issue.

establishes that Menninger could not perform this function at all without an accommodation, whether reasonable or not. Whether the full <u>extent</u> of the functions described in Mekerri's email all qualify as essential (<u>i.e.</u>, not only the nature of the functions but also the amount or frequency) presents a question of fact on this record, especially in light of her prior performance of only a limited quantity of these functions and the newly required expansion of these functions. <u>See, e.g.</u>, Doc. No. 73 ¶¶ 36, 41-42. For this reason, the Court DENIES PPD's Motion for Summary Judgment (Doc. No. 43) on this ground.[11]

---

[11] Two further points bear mention. First, Menninger asserts that she was "capable of performing all of [her] responsibilities . . . <u>without</u> accommodation." Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 46 (emphasis added). Whether Menninger could in fact do so is a jury question which necessarily turns on whether the full scope of the activities listed in Mekerri's February 6, 2018 email is essential. The Court simply notes that Menninger's assertion was in tension with her doctor's statement that "any changes to her role that increase the need for public speaking and/or social interactions . . . would make it substantially more difficult, if not impossible, for [Menninger] to perform her job." Doc. No. 66-22 at 4. That said, the Court does not reach the question of whether Menninger could perform the essential functions without accommodation at this stage since it has denied summary judgment on the essential functions issue. Second, Menninger asserts she could perform the essential functions of her job <u>with</u> a reasonable accommodation. To the extent that a jury determines that the functions described in Mekerri's February 6, 2018 email as described are in fact essential, the burden falls on Menninger to demonstrate a reasonable accommodation existed. <u>See</u> <u>Echevarria</u>, 856 F.3d at 127; <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 F.3d 91, 102 (1st Cir. 2007) (internal quotation marks omitted) ("[T]he plaintiff has the burden of showing that she sufficiently requested the accommodation in question."). In particular, the plaintiff needed to have "sufficiently requested the accommodation in question" because "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the employee." <u>Reed</u>, 244 F.3d at 260-61 (quoting Henry Perrett, Jr., 1 <u>Americans With Disabilities Act Handbook</u>, § 4.17, at 121 (3d ed. 1997)). Importantly, the employee's request must be "sufficiently direct and specific to give the employer notice of the needed accommodation." <u>Tobin v. Liberty Mut. Ins. Co.</u>, 553 F.3d 121, 129 (1st Cir. 2009) (internal quotation marks omitted) (quoting <u>Reed</u>, 244 F.3d at 261). This means that although the jury will ultimately decide whether the accommodations proposed by Menninger's doctor were reasonable, any accommodations not requested at the time of the underlying events cannot be considered at summary judgment or trial as possible reasonable accommodations. Although there are limited situations where different rules may apply such that an employer may be required to provide an accommodation on its own accord, this is not that case. <u>See</u> <u>Enica v. Principi</u>, 544 F.3d 328, 339-40 (1st Cir. 2008). Those limited situations include when an "employee's disability may prevent the employee from requesting an accommodation, or . . . [when] the employee's need for an accommodation will be obvious."

## 2. *Interactive Process*

Under the third element that "the employer knew of her disability, yet failed to reasonably accommodate it," Audette, 858 F.3d at 20 (quoting Lang, 813 F.3d at 454), "an employee's request for accommodation sometimes creates a duty on the part of the employer to engage in an interactive process." E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014) (internal quotation marks omitted).[12] For example, "[i]f the accommodation proposed by the employee appears unduly onerous, the employer has an obligation to work with the employee to determine whether another accommodation is possible." Barbuto v. Advantage Sales & Mktg., LLC, 477 Mass. 456, 463 (2017) (quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 120 (2010)). "[I]t is imperative that both the employer and the employee have a duty to engage in good faith, and that empty gestures on the part of the employer will not satisfy the good faith standard." E.E.O.C., 774 F.3d at 132.

On this ground, the Court ALLOWS PPD's Motion for Summary Judgment (Doc. No. 43). After Menninger initiated the process by requesting accommodations, PPD asked for additional information upon which Menninger's doctor submitted proposed accommodations. See, e.g., Doc. No. 66-64 at 3, 5. PPD allowed two of her requested accommodations. Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 42. Mere rejection of the other proposed accommodations, however, does not necessarily mean that PPD did not engage in an interactive process. In contrast to situations where an employer "completely disregarded" an employee's

---

Reed, 244 F.3d at 261 n.7. Here, to the contrary, Menninger's disability was neither obvious nor did it prevent her from requesting an accommodation—as evident from the requests she did make.

[12] Under Massachusetts law, the "refusal of an employer to participate in [the interactive] process once initiated . . . is a violation of" state discrimination laws in and of itself. Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 644 (2004).

requests for help, "extended no response at all to [employee's] requests, and failed to give any explanations for its failure to do so," PPD engaged, responded, and gave explanations for why it could not grant the other accommodations. See Ocean Spray, 441 Mass. at 647. No reasonable jury could conclude that PPD failed to engage in the interactive process. In fact, after PPD asked Menninger to consult her health care provider and propose other accommodations, Menninger herself suggested that they table the discussion until later when a particular task arises which would require an accommodation. Doc. No. 66-64 at 3-4. PPD responded that it remained "committed to an open dialogue" and would continue to review requests for accommodations as she raises them. Id. This series of events is far from a failure to engage in the interactive process. Thus, the Court ALLOWS PPD's Motion for Summary Judgment (Doc. No. 43) on this ground.

### 3. *Disparate Treatment*

Under the disparate treatment theory of liability, Menninger must establish the first two elements of the ADA disability discrimination claim described previously: "(1) that she is disabled under the ADA; (2) that she is 'qualified to perform the essential functions of [her] job with or without reasonable accommodation[.]'"[13] Echevarria, 856 F.3d at 126 (quoting Jones, 696 F.3d at 87). In addition, Menninger must show "(3) that she 'was discharged or otherwise adversely affected in whole or in part because of [her] disability.'" Id.

An adverse action typically involves "discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27,

---

[13] The Court's conclusion on these two elements under the failure to accommodate theory of liability controls here as well.

13

35 (1st Cir. 2010) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)).  For an employment action to be adverse, it "must materially change the conditions of plaintiffs' employ," <u>id.</u>, which means that it must "be more disruptive than a mere inconvenience or an alteration of job responsibilities."  <u>Marrero v. Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 23 (1st Cir. 2002).[14]  "[R]eassignment with significantly different responsibilities may be actionable."  <u>Burns v. Johnson</u>, 829 F.3d 1, 10 (1st Cir. 2016) (internal quotation marks omitted).  Importantly, this analysis often "depends on a constellation of surrounding circumstances," and a contextual analysis is therefore necessary.  <u>Burlington N. v. White</u>, 548 U.S. 53, 69 (2006) (describing that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.").

On this factual record, a reasonable jury could find that Menninger experienced an adverse employment action.  Menninger alleges two adverse actions related to the disparate treatment claim: (1) Mekerri's February 6, 2018 email containing five categories of expectations and (2) PPD's plan to force her to quit or create a pretextual basis for termination.  Doc. No. 65 at 16-17.  As to the first alleged adverse action, a reasonable jury could find that Mekerri's February 6, 2018 email that emphasized public speaking and client interactions involved "more difficult" job responsibilities.  <u>See</u> <u>Rodriguez-Vives v. Puerto Rico Firefighters Corps</u>, 743 F.3d 278, 286 (1st Cir. 2014).  Although client-facing responsibilities can be and usually are

---

[14] The standard applied by the Supreme Judicial Court of Massachusetts for claims brought under Mass. Gen. Laws ch. 151B is substantially similar to the federal standard.  <u>See, e.g.</u>, <u>Yee v. Massachusetts State Police</u>, 481 Mass. 290, 296-96 (2019) (internal quotation marks omitted) ("We have said that an action taken by an employer is an adverse employment action where it is substantial enough to have materially disadvantaged an employee.").  Neither party has argued, nor does the Court believe, that the adverse action analysis is meaningfully different under the federal and state discrimination claims.  Accordingly, the Court analyzes both disability discrimination claims under the same standard.

beneficial to advancing one's career, the applicable legal standard requires consideration of whether the addition of these responsibilities is materially adverse for a reasonable person in Menninger's particular circumstances.  See Burlington N., 548 U.S. at 68-69; Yee, 481 Mass. at 296 ("The disadvantage must be objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment' will not suffice.").  Mekerri was aware of Menninger's disability and that changes to her role would make it "substantially more difficult, if not impossible," for her to do her job when he sent this email.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶¶ 29, 33.  Drawing all reasonable inferences in Menninger's favor, a reasonable jury could find that expectations of increased public speaking and client interactions sent to someone with anxiety and panic disorders constituted a materially adverse employment action.  There is at least a question of material fact.[15]

As to the second alleged adverse action that PPD "implement[ed] . . . a deliberate plan to remove" Menninger from her position, Doc. No. 65 at 17, Menninger has not shown that it materially changed the terms and conditions of her employment.  No reasonable jury could find that predominantly internal communications allegedly showing that PPD was trying to force Menninger out affected the terms and conditions of her employment.  Neither could they find that her termination nearly eight months after she took a medical leave, and where she showed "no sign of intending to return to work," Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 59, was discharge under the pretext of performance issues.  Menninger does not dispute that PPD left her position open for those eight months and that it needed to identify a long-term solution after that

---

[15] Of course, a reasonable jury could evaluate the facts differently including concluding that the increase in client-facing and public speaking responsibilities was not adverse or that since the increase was discussed initially prior to knowledge of the disability, it had no connection to the disability.

period to fill her role.  Id.  Accordingly, the Court DENIES IN PART and ALLOWS IN PART PPD's Motion for Summary Judgment (Doc. No. 43) on the disparate treatment theory of liability.[16]

### B.  Retaliation

To prove retaliation, Menninger must show the basic elements that 1) she engaged in protected conduct; 2) she suffered an adverse employment action; and 3) the adverse employment action was causally linked to the protected conduct.  Cherkaoui v. City of Quincy, 877 F.3d 14, 28 (1st Cir. 2017).  Put another way, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse."  Id. at 52.  PPD assumes the first element is established here, Doc. No. 44 at 18, directing its summary judgment arguments at the remaining two elements—adverse employment action and causation.  The standard for proving the second element of adverse employment is largely the same as the disparate treatment claim described above with one material difference: "conduct need not relate to the terms and conditions of employment to give rise to a retaliation claim."  Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008) (citing Burlington N., 548 U.S. at 70).[17]

Menninger alleges four theories of materially adverse employment actions: (1) her 2017 performance rating was lowered immediately after she made PPD aware of her disability; (2) PPD tried to coerce her to quit; (3) PPD excluded her from hiring and recruiting decisions, a core

---

[16] The question of whether some or all of the internal communications suggesting efforts to push Menninger out of PPD are admissible at trial on other issues presents a separate question not now before the Court.

[17] PPD has not shown, nor is the Court aware, any caselaw suggesting that the standards for adverse action are meaningfully different for a retaliation claim under Title VII and the ADA. Instead, PPD argues only that "[e]ven if there are two different standards for Plaintiff's discrimination and retaliation claims, she is unable to meet either."  Doc. No. 71 at 9.

component of her role; and (4) PPD conducted a sham investigation into her HR complaint. See, e.g., Doc. No. 65 at 19-20.

The Court turns to Menninger's first alleged adverse action that her 2017 performance rating was immediately lowered after she informed PPD of her disability. Even assuming, without deciding, that lowering her performance rating is a materially adverse employment action, it suffers from a causation issue. The record shows that HR merely "advanced . . . [the] performance review in the Company's internal electronic system to move the review towards finalization" on January 12, 2018 on behalf of Mekerri since he was traveling then and he "had already completed Dr. Menninger's 2017 review when [HR] advanced it." Doc. No. 46 ¶ 18. Menninger does not sufficiently dispute this chronology of events.[18] Thus, even if adverse, Menninger is unable to demonstrate that there was a causal connection between her protected conduct and this allegedly adverse action. Accordingly, PPD's Motion for Summary Judgment (Doc. No. 43) is ALLOWED on this ground.

Second, Menninger asserts that PPD's efforts to coerce her to quit after receiving her requests for accommodations was an adverse action. Menninger describes that during a February 28, 2018 meeting, PPD presented her with "two options at the start" of either "tak[ing] an exit package or a temporary role as a consultant" and that Mekerri and St. John urged her to consider those options. Doc. No. 66-137 at 168:16-21; 172:1-8. PPD disputes this fact, arguing that "these options were not suggested, [but instead] merely brought up in passing for Plaintiff's

---

[18] In fact, Menninger begins "chronologically with January 15, 2018" in her Opposition, days after her 2017 performance review was moved forward in the internal system on January 12, 2018, to argue that there is sufficient evidence "St. John pressured Mekerri to lower [her] performance rating for the year 2017 immediately after Mekerri informed him of" Menninger's disability. Doc. No. 65 at 19. Even drawing all reasonable inferences in Menninger's favor, no reasonable jury could conclude that Mekerri reduced her 2017 rating after she disclosed her disability.

consideration." Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 43. Viewing this disputed fact in

Menninger's favor as the Court must in considering this motion, a reasonable jury could

conclude that presenting Menninger with two options, neither of which included remaining in her

position, at the beginning of a meeting intended to discuss her disability and proposed

accommodations, constituted an adverse employment action. Cf. Fox v. Town of Framingham,

No. 14-CV-10337-LTS, 2016 WL 4771057, at *5 (D. Mass. Sept. 13, 2016) (describing that the

plaintiff was "repeatedly asked whether [he] intended to resign").[19] Especially considering the

temporal proximity to Menninger's disclosure of her disability and requests for accommodations,

a reasonable jury could find the causation needed for this action to constitute an adverse action.[20]

Third, Menninger argues that PPD excluded her from hiring and recruiting decisions

within her unit so she would not realize that it was trying to replace her. PPD points to a

causation issue because Mekerri agreed to take lead on hiring and recruiting efforts on December

20, 2017, prior to Menninger's disclosure. Doc. No. 48 ¶¶ 12, 18. Menninger disputes

discussing altering her hiring and recruiting responsibilities during this December 2017 meeting

or ever asking to be excluded from these responsibilities. Doc. No. 66-155 ¶ 31. For purposes

of summary judgment, the Court views this disputed fact in Menninger's favor and concludes

that a reasonable jury could find that excluding Menninger from hiring and recruiting

responsibilities after her disclosure constituted a materially adverse action. See, e.g., Doc. No.

66-66 at 2-4 (noting in an April 2018 email that Menninger was not involved in some interviews

---

[19] Even if unlike Fox the facts here do not suggest PPD repeatedly presented these options to
Menninger, PPD has not shown why one instance cannot be sufficient to find an adverse action,
especially when the exit options were presented at the very meeting intended to discuss possible
accommodations.

[20] Notably, the fate of this adverse action is different under the retaliation claim in contrast to the
discrimination claim because the adverse action here need not change the terms and conditions of
employment. See Billings, 515 F.3d at 54.

since PPD was "headed down a performance gap accountability route with Lisa"); Doc. No. 66-155 ¶ 33 (explaining that PPD hired an employee without giving Menninger an "opportunity to participate in the hiring process for this candidate," and the reporting arrangement seemed to skip Menninger's "level in the chain of command"). A reasonable jury could find that such exclusion from hiring and recruiting efforts, especially when Menninger was responsible for the quality control, and thereby talent, in her labs, Doc. No. 46-2, was materially adverse because it "could well dissuade a reasonable [employee] from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 57.[21]

Fourth, Menninger contends that PPD conducted a sham investigation into her discrimination and retaliation complaint made to HR. Doc. No. 65 at 20. Sham investigations can form the basis of retaliation claims. See Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 302-3 (2016) (finding sham investigation where investigator did not interview key employees, was biased against complainant from the beginning, and prematurely concluded the investigation). Specifically, Menninger describes that Ballweg, who conducted the investigation, was "directly involved" in her accommodation process and was working to get her terminated in the background. Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 56. Although a close case, a reasonable jury could find from the record that Ballweg's investigation was a sham because of bias stemming from both her proximity to Menninger's accommodation process and efforts to

---

[21] PPD points to Ballweg's investigation notes to show that Menninger "did recall a conversation with Mr. Mekerri about recruiting and hiring 'at the end of December.'" Doc. No. 73 ¶ 50. Menninger's sworn affidavit, however, states that "[w]hile working for PPD, [she] never asked to be excluded from the tasks of hiring and recruiting" and did not discuss altering her hiring and recruiting responsibilities during the December 2017 meeting with Mekerri. Doc. No. 66-155 ¶ 31. Menninger's statements during Ballweg's investigation were not made under the penalty of perjury. Accordingly, at least for summary judgment, the Court concludes there is no causation issue for this adverse action, drawing the reasonable inference in Menninger's favor.

push her out.  See, e.g., Doc. Nos. 66-41, 66-44, 66-71, 66-74, 66-81, 66-84, 66-87 (showing multiple email communications where Ballweg was updated about Menninger's accommodation process and efforts to "delicately work [Menninger] out," provided feedback on some emails between HR and Menninger, and apprised others on the status of Menninger's exit).

PPD attempts to distinguish between Menninger's disability and her work performance issues, but it cannot reasonably dispute that Menninger's complaint was intimately tied to her belief that she was being targeted for her disability.  See, e.g., Doc. No. 66-93 (describing Menninger's email in which she stated that Mekerri was "looking for any excuse possible to criticize [her] 'leadership.' He never treated [her] like this before [she] told him about [her] disability.").  Given that all these matters unfolded simultaneously in a relatively short period, untangling them is a jury question rather than summary judgment matter on this record. Accordingly, PPD's Motion for Summary Judgment (Doc. No. 43) is ALLOWED IN PART and DENIED IN PART as described herein on the retaliation claim.

C.  Pretext

Finally, PPD challenges that even if Menninger can show prima facie cases of discrimination or retaliation, she cannot show that PPD's proffered reasons were pretextual. Plainly, the record shows several internal communications among senior leadership and HR showing efforts to push Menninger out, among other evidence, that a reasonable jury could find were pretext for discrimination based on her disability.  Accordingly, PPD's Motion for Summary Judgment (Doc. No. 43) is DENIED on this ground.

IV.  MENNINGER'S MOTION TO STRIKE (DOC. NO. 64)

Menninger moves to strike certain statements PPD employees made in their affidavits based on the following objections: (1) lack of personal knowledge, (2) legal conclusions, (3)

conclusory characterizations of the record, and (4) the sham affidavit rule. Doc. No. 64. The

Motion to Strike (Doc. No. 64) is DENIED in all respects. Insofar as statements in the affidavits

could be considered legal conclusions, the Court construes them instead as statements of fact.

V.    CONCLUSION

In sum, PPD's Motion for Summary Judgment (Doc. No. 43) is DENIED IN PART and

ALLOWED IN PART. Menninger's Motion to Strike (Doc. No. 64) is DENIED. The parties

shall file a joint status report within fourteen days stating their joint or separate positions as to (1)

the anticipated duration of trial, (2) whether they request an opportunity to mediate this case

prior to trial, and (3) whether they request the Court establish a trial date in the course of an

initial pretrial conference with counsel. After receiving the report, the Court will establish a firm

trial date either on the papers or at a pretrial conference.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge