UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>PPD DEVELOPMENT, L.P.,<br><br>　　　　　Defendant. | Civil Action No.  1:19-CV-11441-LTS |

**MEMORANDUM IN SUPPORT OF DEFENDANT PPD DEVELOPMENT, L.P.'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF STRAY REMARKS BY ANY PERSON WHO WAS NOT A DECISION-MAKER WITH RESPECT TO DEFENDANT'S CHALLENGED EMPLOYMENT DECISIONS**

By accompanying Motion, Defendant PPD Development, L.P. ("PPD") has moved *in limine* to exclude from the evidence admitted at trial evidence of stray remarks by any person who was not a decision-maker with respect to those of Defendant's employment decisions that Plaintiff Lisa Menninger alleges were discriminatory or retaliatory. In particular, PPD anticipates that Plaintiff will seek to introduce into evidence emails apparently sent by (and statements attributed to) Christopher C. Fikry, M.D., inquiring about Plaintiff's status and potential departure from PPD. The emails and supposed statements are irrelevant to Plaintiff's disability discrimination and retaliation claims because there is no evidence that Dr. Fikry had anything to do with the employment decisions that Plaintiff claims are discriminatory or retaliatory. Any inquiries that he may have made about Plaintiff's status and potential departure are therefore irrelevant to the question whether PPD made the challenged employment decisions for discriminatory or retaliatory reasons.

**Background**

    A.    Plaintiff's employment and requests for accommodation.

On August 31, 2015, PPD hired Plaintiff as the Executive Director of its Global Central Labs, based in Highland Heights, Kentucky. In this role, Plaintiff was responsible for overseeing the Labs' operations. In late 2016, Plaintiff asked that she be permitted to work remotely because her daughter was being bullied, and Plaintiff wanted to move her family to the east coast. PPD granted that request, and in June 2017 Plaintiff moved to Massachusetts.

In April 2017, Plaintiff's supervisor, Hacene Mekerri, told Plaintiff that he wanted her to be more involved than she had been in two important aspects of her job: client meetings and influencing business development. In addition, on December 20, 2017—during a meeting with Plaintiff to discuss her performance and PPD's expectations for 2018—Mr. Mekerri again encouraged Plaintiff to focus on being more involved in client meetings and in various aspects of business development, including increased social interactions and presentations. As part of PPD's annual executive talent assessment, completed on December 20, 2017, Mr. Mekerri rated Plaintiff's performance as "fully effective," but also noted that while her business performance had been "solid," there was a "risk of falling behind due to lack of leadership capability."

On January 11, 2018, Plaintiff sent an email to Mr. Mekerri in which she disclosed, for the first time, that she suffered from "generalized anxiety disorder that includes social anxiety disorder and panic attacks." Mr. Mekerri connected Plaintiff with Chad St. John, an employee in PPD's Human Resources department, who provided Plaintiff with accommodation request forms. On January 31, 2018, Plaintiff's psychiatrist, Dr. Marianna Kessimian, submitted to PPD an accommodation request form noting that "[a]ny change to [Plaintiff's] role that increase the need for public speaking and/or social interactions will increase her anxiety and worsen her

somatic symptoms, which would make it substantially more difficult, if not impossible, for [Plaintiff] to perform her job."

On February 6, 2018, Mr. Mekerri emailed Plaintiff and Mr. St. John to describe his specific expectations of Plaintiff with respect to her involvement in client meetings and business development that he had referred to during the December 20, 2017 meeting:

> (1) senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or quarterly), (2) client bid defenses, issue resolution calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via phone (once a month at minimum per client), (3) technical sales presentations (internal and external) (monthly, quarterly, and as-needed), (4) meals and social interactions while at client visits (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%).

On February 14, 2018, Dr. Kessimian sent her requested accommodations to Mr. St. John and Mr. Mekerri:

> For senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President, Dr. Kessimian requested: [Plaintiff will be] "responsible for all slides/handouts/ presentation material with necessary information but will require a reader to present to the group, or can pre-record the audio/video and it can be played at the meeting available for questions via email after the meeting." For client bid defenses, issue resolution calls, and meetings at Highland Heights, Dr. Kessimian requested: [Plaintiff will be] "available via email/ text/ remote video conferencing for a representative of the client, 1-2 person audience maximum … If it is a site meeting, surrogate or reader with all necessary information / real time access to [Plaintiff] will be available." For client site meetings, Dr. Kessimian requested: [Plaintiff] "would like a surrogate to attend, but [Plaintiff] will be responsible for all problem solving/ ideas for resolution if emailed/ communicated to [Plaintiff] a few days before anticipated visit." For technical sales presentations (internal and external), Dr. Kessimian requested: [for Plaintiff to be] "excused from sales presentations but again [Plaintiff] will provide any necessary data information for the reader/ surrogate to have at their disposal." For meals and social interactions while at client visits, Dr. Kessimian requested: "[a] surrogate, as this is not

> [Plaintiff's] strength/ skill set and her disability will flare with significant impairment. [Plaintiff] is able to build business relationship in a more 'behind the scenes' fashion and would like [to] brainstorm other potential avenues where she can add value as she does understand this is an important part of the business." Finally, for travel, Dr. Kessimian inexplicably requested that Plaintiff be allowed to travel to PPD's Belgium laboratory, versus its laboratories in the United States (which included the Global Central Labs home-base in Highland Heights, Kentucky).

On February 26, 2018, Mr. St. John emailed Plaintiff to let her know that the Company would provide accommodations with respect to two of the five categories. He explained that the other tasks – which constituted sub-categories of specific expectations falling under the umbrella categories of client-facing meetings and sales presentations – were central to Plaintiff's role and critical to the needs of the business. At Mr. Mekerri's request, Mr. St. John scheduled a meeting for February 28, 2018, to discuss Plaintiff's requests and PPD's responses. *See id*. at ¶¶42-43.

After their meeting, Plaintiff emailed Mr. St. John and Mr. Mekerri to thank them for agreeing to provide some accommodations, and to ask for more information regarding the other categories of tasks for which PPD could not provide accommodations. On March 12, 2018, Mr. St. John explained the reasons why the Company could not provide some of the accommodations Plaintiff sought. He referenced specific tasks falling within the categories of client-facing meetings and sales presentations – i.e., business development meetings, client dinners, and bid defenses – and noted their importance to the business. The Company was open to "brainstorm[ing] other potential avenues where [Plaintiff] could add value" as Dr. Kessimian had suggested, but it was not possible to do away with these core job requirements. Mr. St. John asked Plaintiff to review her job description with Dr. Kessimian to see if there might be other accommodations that would allow her to perform these essential functions.

On March 24, 2018, Plaintiff emailed Mr. St. John, explaining that although "certain types of tasks" were "challenging due to [her] disability," she was "capable of performing all of

[her] responsibilities with or without accommodation." Plaintiff noted that she had met with Mr. Mekerri the week before, and it did not appear that there would be any "activities or events in the near future that would implicate [her] disability" – therefore, she suggested that they "table this discussion until a particular task arises." She further explained that "[d]ealing with these issues in context … might … help us all engage in a more meaningful dialogue."

      B.    <u>Plaintiff's internal complaint of discrimination, and PPD's investigation of her complaint.</u>

On April 3, 2018, Mr. St. John assured Plaintiff that the Company was committed to an open dialogue, and that he would continue to review any accommodation requests as she raised them. He asked Plaintiff to let him know if she had any additional accommodation requests. Plaintiff did not ask for any additional or different accommodation(s). Instead, on April 17, 2018, she responded to Mr. St. John's email to tell him that she remained unsatisfied with his attempts to clarify PPD's position and felt he was "refusing to answer" her questions. She also complained that Mr. Mekerri was "targeting [her] because of [her] disability," attaching an email she had received from him on April 11, 2018.

Mr. St. John immediately notified Deborah Ballweg, a more senior member of the Human Resources department, of Plaintiff's complaint about Mr. Mekerri, and they agreed that Ms. Ballweg would conduct an investigation (because Mr. St. John had been involved in the discussions leading up to Plaintiff's complaint). On April 30, 2018, Mr. St. John emailed Plaintiff, attempting to provide additional clarity regarding PPD's position as to Plaintiff's accommodation requests, and assuring her that another member of Human Resources would reach out about her complaint soon.

In connection with her investigation of Plaintiff's complaint to Mr. St. John, Ms. Ballweg interviewed Plaintiff on May 2, 2018 (and again on May 15, 2018). During the interviews,

Plaintiff raised the following concerns: (1) she felt that Mr. Mekerri was going out of his way to document performance issues; (2) she was excluded from Company recruiting efforts; (3) she was "new[ly]" expected to attend bid defenses and client visits (and being asked to speak about unfamiliar topics); (4) she was not being invited to routine sales and marketing meetings; (5) she was not included in the planning of (or introduced at) a recent Town Hall meeting; (6) she had no formal performance review meeting for 2017 other than the "360 feedback" discussion in December 2017; and (7) Mr. St. John had discussed an exit package and/or a consulting role during their February 28, 2018 conversation. In the course of her investigation, Ms. Ballweg also interviewed Mr. Mekerri, Mr. St. John, and three other PPD employees. After completing the investigation, Ms. Ballweg concluded that there was no evidence of discrimination, and on May 22, 2018, she informed Plaintiff of that conclusion and of her specific findings with respect to the concerns that Plaintiff had communicated to her.

  C. <u>Plaintiff's medical leave, employment termination, and lawsuit.</u>

On June 2, 2018, Plaintiff went out on unannounced, unplanned leave (with pay covering the majority of the leave). She remained out of work for the next eight months, at which time PPD needed to find a permanent replacement. Accordingly, the Company terminated Plaintiff's employment effective February 1, 2019.

On June 28, 2019, Plaintiff initiated this action by filing her Complaint and Demand for Jury Trial. *See* ECF Doc. No. 1. In her Complaint, Plaintiff alleges that PPD's refusal to provide her with all of the accommodations that Dr. Kessimian had requested on her behalf in February 2018 constituted a failure to reasonably accommodate her disability in violation of the Americans with Disabilities Act (the "ADA") and Chapter 151B of the Massachusetts General Laws ("Chapter 151B"), and (2) that the actions by Mr. Mekerri that she had complained about

in April 2018, as well as Ms. Ballweg's subsequent investigation of her complaint, constituted disability discrimination and retaliation in violation of the ADA and Chapter 151B.

        D.        <u>Dr. Fikry's employment with PPD, and his lack of involvement in the complained-of employment decisions.</u>

In June 2017, PPD hired Dr. Fikry as its Executive Vice President of Laboratories. In that capacity, Dr. Fikry was responsible for managing and overseeing PPD's global laboratory business, which included the Global Central Labs. There is no evidence that Dr. Fikry had any involvement in PPD's decision to grant only two of the five categories of accommodations that Plaintiff requested in February 2018. Indeed, Dr. Fikry has attested that he was not involved in the workplace accommodations discussions with Plaintiff, and while that he was aware that Plaintiff had communicated some hesitancy with respect to some aspects of her job duties, he understood that she was working on those issues with Mr. Mekerri and PPD's Human Resources department. *See* Affidavit of Chris Fikry (ECF Doc. No. 51) ("Fikry Aff.") at ¶ 10. Further, although Dr. Fikry brought to Mr. Mekerri's attention the feedback that he had received in early 2018 from a client concerning quality issues within Plaintiff's area of responsibility, there is no evidence that he had any involvement in Mr. Mekerri's communication of those concerns to Plaintiff, or in the other conduct by Mr. Mekerri that Plaintiff complained to Mr. St. John about in April 2018. *See id.* at ¶¶ 7-9. And there also is no evidence that Dr. Fikry had any involvement in, or even was aware of, Ms. Ballweg's investigation of Plaintiff's complaint.

In the spring of 2018, Dr. Fikry sent several emails to PPD colleagues in which he (i) requested an update concerning Plaintiff's "transition," or (ii) inquired about Plaintiff's status and the "timing" on her exit from the company, noting that he needed the information because PPD's Finance department was "trying to update the forecast." *See* Plaintiff's Proposed Exhibit Nos. 292, 293, & 332 (attached at Exhs. A-C). Also, in a chat conversation with Mr. St. John in

April 2018, another employee attributed to Dr. Fikry an inquiry concerning Plaintiff's potential departure from PPD. *See* Plaintiff's Proposed Exhibit No. 184 (attached at Exh. D).[1]

## Argument

I. **The emails and statements are irrelevant stray remarks and are not evidence of discrimination.**

The First Circuit has recognized that "[a]lthough statements directly related to the challenged employment action may be highly probative in the pretext inquiry, mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) (quoting *McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998)). It is therefore well-settled that a stray remark made by a non-decision maker "cannot support an inference of pretext." *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 178 (1st Cir. 2008); *Bonefont-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 125 (1st Cir. 2011); *see also Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002) (observing that "'stray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus"); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990) ("the biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case").

---

[1] PPD has redacted from the documents attached to this Memorandum at Exhibits A-D all material other than the stray remarks at issue here, in order to avoid having to ask leave to file the documents (which have been designated "Confidential") under seal. If the Court wishes, PPD will submit unredacted copies of the documents for the Court's review in camera, and will bring unredacted copies to the Final Pretrial Conference.

The First Circuit's approach is consistent with the weight of federal precedent, which mandates that testimony, even if it arguably supports a claim of employment discrimination, should be excluded if it is provided by employees who did not participate in the decision to implement the alleged adverse employment actions. *See, e.g.*, *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 558-59 (3rd Cir. Feb. 4, 2009) (holding that discriminatory remarks made seven months before termination, and not in connection with termination, were insufficient to support discrimination claim); *Bhatt v. Brownsville General Hosp.*, 236 F. App'x 764, 766 (3rd Cir. June 6, 2007) (holding that isolated stray remarks by non-decision makers were irrelevant and could not serve as evidence of discrimination); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3rd Cir. 1999) (holding that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

The inquiries purportedly made by Dr. Fikry in the documents that Plaintiff seeks to admit into evidence are precisely the kind of stray remarks that the First Circuit and other courts have held are irrelevant. As noted above, the documents appear to show Dr. Fikry asking about Plaintiff's employment status and the timing of her departure from the Company, noting that PPD's Finance department needs the information for "forecast[ing]" purposes. Those inquiries by Dr. Fikry, who played no role in the employment decisions that Plaintiff alleges violated her rights under the ADA and Chapter 151B, are nothing more than isolated stray remarks and cannot serve as evidence of discrimination or retaliation. As such, evidence of those remarks should be excluded from the evidence at trial as irrelevant to the issues the that jury must decide.

**II.     Even if Dr. Fikry's stray remarks were relevant, and they are not, they would nevertheless be subject to exclusion as unduly prejudicial under Rule 403 of the Federal Rules of Evidence.**

Even if Dr. Fikry's alleged remarks could be deemed relevant to Plaintiff's claims against PPD for violation of the ADA and Chapter 151B, they still should be excluded from the evidence at trial because their probative value, such as it is, is far outweighed by their prejudicial effect. Under Rule 403 of the Federal Rules of Evidence, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The probative value of stray remarks by Dr. Fikry, who had no involvement in the employment decisions at issue in this case, is substantially outweighed by the concrete and substantial risk of unfair prejudice to PPD. Introduction of those remarks are highly likely to confuse the jury on the issues that they must decide—i.e., whether the employees who made the employment decisions challenged were in fact motivated by disability discrimination or retaliation. Further, even if the Court were to issue a limiting jury instruction with respect to the alleged remarks, the jury would still likely be misled into believing that the remarks evidence a proscribed bias or motive adopted by PPD's decision makers, in light of the nature of Plaintiff's claims. Thus, the substantial risk of prejudice to PPD outweighs any probative value that the remarks might have, and they should be excluded from the evidence at trial.

## Conclusion

For all of the foregoing reasons, PPD respectfully requests that the Court exclude evidence of inquiries from Dr. Fikry concerning Plaintiff's status and the timing of her departure from the Company.

PPD DEVELOPMENT, L.P.

By its attorneys,

*/s/ Patrick M. Curran, Jr.*
Rachel Reingold Mandel (BBO #660495)
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701
rachel.mandel@ogletree.com
patrick.curran@ogletree.com

Dated: March 10, 2023

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 10, 2023 the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                  */s/ Patrick M. Curran, Jr.*
                                  Patrick M. Curran, Jr.

23370737.1