UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

      Plaintiff,

      v.

PPD DEVELOPMENT, L.P.,

      Defendants.

Civil Action No: 1:19-CV-11441-LTS

## JOINT PRETRIAL MEMORANDUM

Pursuant to the Court's Order Setting Case for Trial (Doc. No. 94), Plaintiff Lisa Menninger ("Dr. Menninger") and Defendant PPD Development, L.P. ("PPD") hereby submit this Joint Pretrial Memorandum. Where possible, the parties have submitted agreed-upon documents and sections, and separate documents or sections where the parties did not reach agreement. By submitting this Joint Pretrial Memorandum, the parties do not intend to waive any arguments, or otherwise indicate agreement with the positions or contentions unless explicitly stated.

### a. Concise summary of the evidence

The following are the parties' respective summaries of the evidence that each party anticipates will be presented at trial. They are not intended to be a complete statement of every fact that will be adduced at trial, and each side reserves the right to submit additional evidence, based on, among other things, the manner in which the case unfolds at trial.

#### *Plaintiff*

Since her childhood, Dr. Menninger has suffered from Social Anxiety Disorder, and in later adolescence and adulthood, she has also suffered from Panic Disorder. Dr. Menninger's impairments of Social Anxiety Disorder and Panic Disorder constitute a "disability" and

"handicap" under federal and state law, as they substantially limited her major life activities, including speaking, interacting with others, and breathing.

Prior to disclosing her disability to PPD, Dr. Menninger enjoyed a successful career as a clinical pathologist and laboratory director. Dr. Menninger earned her M.D. from Saba University School of Medicine in 2003 and thereafter completed her permanent certification to practice medicine in the United States from the Educational Commission for Foreign Medical Graduates. She completed her medical residency in anatomic and clinical pathology at Truman Medical Center at the University of Missouri-Kansas City from 2003 to 2004, and in clinical pathology at Virginia Commonwealth University Health System from 2004 to 2006. After completing her residency, Dr. Menninger worked as a clinical pathologist at Saint Luke's Health System in Kansas City, Missouri. In 2010, Dr. Menninger accepted a new position as Laboratory Director/Corporate Officer at Clinical Reference Laboratory, Inc. also in the Kansas City area. Dr. Menninger was recruited to join PPD in 2015.

Dr. Menninger's core responsibility at PPD was to serve as medical laboratory director for the Global Central Labs ("GCL"), providing scientific oversight for the testing operations at the laboratories, and ensuring that the pre-analytical, analytical, and post-analytical processes at the labs met applicable regulatory standards. Her role was highly technical, and both her MD degree and status as a pathologist were essential to her role. It was also highly important to PPD that Dr. Menninger held a number of certifications, including from bodies such as the College of American Pathologists (CAP), CLIA, and several U.S. state governments with unique regulatory requirements for laboratories, that were necessary for the lab director to hold in order to comply with regulatory requirements.

On December 20, 2017, Dr. Menninger had a conversation with her supervisor, Hacene Mekerri, by telephone. Dr. Menninger had believed the meeting with Mekerri was to discuss her annual performance review for 2017, but Mekerri only briefly discussed some of the feedback from the recent "360" feedback that PPD had collected on Dr. Menninger, and conveyed that the feedback was mostly positive. He then announced that he wanted to make changes to Dr. Menninger's role to make her "more visible" in front of clients and PPD's internal sales team. Mekerri indicated that he and Dr. Menninger would discuss those changes more after the holidays.

Following the conversation with Mekerri in December 2017, Dr. Menninger was concerned that Mekerri's desire for increased "visibility" would involve greater participation in tasks such as social interactions or presentations that were challenging for her in light of her disability. Although she found her disability very difficult to talk about, she made the decision to disclose her disability, including Social Anxiety Disorder and Panic Disorder, to Mekerri by email on January 11, 2018. Dr. Menninger hoped Mekerri would take her disability into account when she and he discussed the changes to her role.

But Dr. Menninger's disclosure of her disability and request for accommodation caused Mekerri to drastically change course. Despite Dr. Menninger's years of successful performance in her role, and repeated assurances that she remained able to perform her job, PPD concluded that it no longer wanted Dr. Menninger to serve in her role and concocted a scheme to drive her out.

In furtherance of this scheme, the evidence at trial will show that PPD engaged in repeated acts of discrimination and retaliation. The evidence at trial will further show that these acts had their desired effect, as they caused Dr. Menninger to become fully disabled and unable to work.

The harm suffered by Dr. Menninger is immense. In addition to economic harm, she has suffered (and continues to suffer) severe physical and emotional trauma. The evidence at trial will

3

show that Dr. Meninger is entitled to compensation for all of the harm that she has suffered, as well the harm that she is likely to suffer in the future.

The evidence at trial will also show that PPDs unlawful conduct was knowing and intentional, and that an award of significant punitive damages is appropriate.

### *Defendant*

PPD is a global contract research organization that provides comprehensive, integrated drug development, laboratory, and lifecycle management services.  PPD's Global Central Labs provide laboratory testing and data services for pharmaceutical development out of four laboratory locations (Highland Heights, Kentucky (US), Belgium, China, and Singapore).  In 2015, PPD hired Plaintiff, Dr. Lisa Menninger, as the Executive Director of its Global Central Labs, based out of the Highland Heights laboratory.  PPD paid for Dr. Menninger to relocate to Cincinnati, Ohio, which is a short drive from Highland Heights.  During the onboarding process at PPD, Dr. Menninger selected "No, I don't have a disability." on a voluntary self-identification form.

As Executive Director of Global Central Labs, Dr. Menninger was responsible for overseeing and managing the Labs' operations, both with respect to day-to-day functionality and to support research and business development. It was also necessary for the position that Dr. Menninger Plaintiff also held specific licenses and certifications necessary to the operation of the labs. Dr. Menninger's job description (which she received at the time of hiring) listed certain essential functions, which included: (1) providing operational leadership to laboratory services; integrating operational processes, furthering research development, and maintaining quality assurance functions for optimal performance within the Labs, (2) supporting business development in obtaining new customers and maintaining current relationships; directing the development of new programs for revenue enhancement/cost expense reduction, including post-evaluation of new

implementations for effectiveness, (3) performing financial reviews, establishing an operating budget, and developing forecasts maximizing profit; providing business updates to senior leadership, (4) setting operational standards/goals and directing the implementation of laboratory goals and policies; overseeing resource allocation including space, capital equipment, scientific instrumentation and staff, (5) performing administrative responsibilities including Human Resources functions, personnel development, facilities management, and creating standard operating procedures and position descriptions, and (6) overseeing the quality assurance and quality control aspects of the lab to ensure compliance with regulatory standards. Given the importance of the Executive Director position to the continued success of the Global Central Labs, PPD was pleased to have found Dr. Menninger, who was highly regarded and appeared more than qualified for the job based on her comparable experience at the job she held immediately preceding her work at PPD.

Dr. Menninger and her supervisor, Hacene Mekerri (then Vice President of Central Lab Services), had close-by offices at the Highland Heights location and interacted regularly, including through standing weekly meetings.  Dr. Menninger also spent considerable time visiting the laboratory in person, including regular face-to-face interaction with numerous colleagues.  Dr. Menninger also regularly traveled as part of her role.  For example, in 2016 alone, she made at least four visits to the laboratories in Belgium, China, and Singapore (two or three visits to Belgium and one visit to China and Singapore). She also travelled to Virginia to evaluate a potential partnership.

In late 2016, Dr. Menninger approached Mr. Mekerri to discuss the fact that her daughter was being bullied at her school in Cincinnati, and she told Mr. Mekerri that she wanted to transfer her daughter to a private school in Rhode Island.  Dr. Menninger asked the Company to

accommodate her working remotely so that she could move across the country with her family. Mr. Mekerri was sympathetic to Dr. Menninger's needs and supported her making this move. After obtaining the necessary approval from his supervisor, he informed Dr. Menninger that she could work remotely from the east coast as long as she would travel back to Highland Heights on a regular basis (and continue traveling to the other laboratory locations as she had been doing), with PPD paying for the travel, including her travel from her home on the east coast to Highland Heights.

Dr. Menninger continued to work in Highland Heights for the next several months (as she made preparations to move), and continued to meet regularly with Mr. Mekerri. Dr. Menninger ultimately moved with her family moved to Dighton, Massachusetts in June 2017.  Despite her commitment to travel to Highland Heights regularly, Plaintiff visited on only two occasions during the rest of 2017.

PPD had some challenges with regard to sales number and revenue in 2017 (in comparison with 2016), and, as a result, ramped up its efforts to encourage visibility and productivity among senior leadership (which included Dr. Menninger) to increase sales and support business development. In connection with this effort, PPD, asked senior leadership to be more proactive, especially with respect to outward-facing meetings and presentations (consistent with goals that Mr. Mekerri had set in April 2017).

In November 2017, Dr. Menninger reported to Mr. Mekerri that she was feeling overwhelmed with her job duties. Dr. Menninger's remote work arrangement was also posing challenges.  Now that she was geographically distant and no longer available for impromptu, face-to-face meetings, Dr. Menninger was less involved in client meetings and business development. Dr. Menninger's colleagues at multiple levels also expressed concern about her effectiveness and

leadership while working remotely.  In late 2017, Mr. Mekerri addressed these concerns with Dr. Menninger and encouraged her to be more involved in client development and business development (including increased social interactions and presentations).  Mr. Mekerri also agreed to take the lead on recruiting and hiring duties to allow Dr. Menninger to focus on these other priority areas.

On January 11, 2018, Dr. Menninger disclosed (by e-mail) to Mr. Mekerri for the first time that she has generalized anxiety disorder (which she described as including social anxiety disorder and panic attacks), and said that the tasks Mr. Mekerri instructed her to do would be "difficult," and that her "condition presents some very significant challenges."  Mr. Mekerri was traveling at the time, but scheduled a time to speak with Dr. Menninger on January 15.   During that conversation, Mr. Mekerri said that he was still traveling and wanted to speak further, and also asked for permission to connect Dr. Menninger with Human Resources.  Mr. Mekerri then connected Dr. Menninger with Chad St. John in PPD's Human Resources department, and Mr. St. John followed up by sending Dr. Menninger disability accommodation paperwork.  Two weeks later, Dr. Menninger returned the accommodation paperwork to Mr. St. John.  Dr. Menninger's psychiatrist, Dr. Marianna Kessimian, also submitted an accommodation form on January 31, 2018.  Dr. Kessimian noted that "[a]ny changes to [Plaintiff's] role that increase the need for public speaking and/or social interactions will increase her anxiety and worsen her somatic symptoms, which would make it substantially more difficult, if not impossible, for [Plaintiff] to perform her job."  She further recommended that, Dr. Menninger's involvement in public speaking or social engagements should be planned in consultation with her doctor.

Given the vagueness of these requests with regard to what could reasonably be changed in her role, Mr. St. John asked for clarification about what job tasks Dr. Menninger could and could

not perform.  Dr. Menninger responded by saying that Mr. Mekerri had suggested that she participate in more client visits and social interactions, as well as internal and external presentations, but said that she was unable to provide further specifics.  Mr. St. John then asked Mr. Mekerri to provide additional detail with regard to his expectations for Dr. Menninger's role. Mr. Mekerri called Dr. Menninger to continue this discussion, and he also sent her an e-mail further explaining PPD's expectations for her position. These expectations fell within five categories (at varying frequencies): (1) senior leadership team presentations, Town Hall meetings, and meetings with the Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or quarterly), (2) client bid defenses, issue resolution calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via phone (once a month at minimum per client), (3) technical sales presentations (internal and external) (monthly, quarterly, and as-needed), (4) meals and social interactions while at client visits (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%).

Over a week later (and after follow-up by PPD), Dr. Kessimian sent her recommended accommodations to Mr. St. John. In her letter, Dr. Kessimian explained that Dr. Menninger's "brain and body are not able to tolerate public speaking engagements/ socializing, and it is as if her vocal cords become paralyzed while her blood pressure, heart rate and breathing all increase[.]" She then set forth the specific accommodation requests that were generally responsive to the job task categories in Dr. Mekerri's list. Dr. Kessimian proposed that Dr. Menninger prepare background material for meetings of various types, but that a surrogate or reader present the information, both within PPD and to clients.  She also requested that Dr. Menninger be excused from business development meetings, meals, and social interactions. Finally, for travel, Dr. Kessimian requested that Plaintiff be allowed to limit travel to PPD's Belgium laboratory (and

notably, not to her actual assigned work location of Highland Heights). Mr. St. John and Mr. Mekerri discussed these requests and responded that PPD could fully accommodate two of the areas of Dr. Menninger's requests (including having a surrogate reader for certain meetings and limiting her travel), but that the other categories were central to Dr. Menninger's role and critical to the needs of the business. Mr. Mekerri and Mr. St. John also arranged to have a follow-up meeting to discuss this with Dr. Menninger. They discussed the requested accommodations and Dr. Menninger's job tasks several times over the next few weeks, and then, on March 24, 2018, Dr. Menninger said that she did not see any of work activities in the near future implicating her accommodation requests, and she suggested they "table this discussion."

In mid-April, 2018, Dr. Menninger told Mr. St. John that she was still unhappy with PPD's response to her accommodation requests and also said she felt Mr. Mekerri was "targeting [her] because of [her] disability" (referencing an e-mail from the day before in which Mr. Mekerri addressed some laboratory errors with Dr. Menninger). PPD did not discipline Dr. Menninger in connection with these errors. Mr. St. John again responded to Dr. Menninger's accommodation requests and also involved his superior, Deborah Ballweg, to address Dr. Menninger's complaints about how she was treated.

Ms. Ballweg conducted a thorough investigation over the course of several weeks, including speaking with numerous witnesses. Ms. Ballweg ultimately concluded that Dr. Menninger had not been "unfairly targeted" after telling Mr. Mekerri that she had a disability. Two days later, Dr. Menninger's attorney wrote to PPD requesting a copy of her personnel file, and a few days after that, Dr. Menninger informed PPD that she would take a medical leave effective immediately.

Dr. Menninger remained out of work on medical leave from June 4, 2018 to January 2019 (and PPD kept her position open during that time).  Dr. Menninger has not worked since June 2018 and has received Social Security Disability Insurance benefits based on her statement in January 2019 that she is unable to work.  Dr. Menninger's husband, Mason Menninger, has also testified that Dr. Menninger was unable to work beginning in <u>January 2018</u> (i.e. while she was still working at PPD).

The evidence at trial will show that the job tasks for Dr. Menninger's position that she asked, through her accommodation discussions with PPD in early 2018, to be excused from performing, were essential functions of the position.  The evidence will also show that Dr. Menninger's own treating physician told PPD explicitly that she was unable to perform those essential functions.  The evidence at trial will further show that Dr. Menninger's requested accommodations were not reasonable given the requirements of her job.

The evidence will also show that PPD was supportive of Dr. Menninger and did not discriminate or retaliate against her in any way after she informed Mr. Mekerri (and PPD) that she had a disability.  In particular, the evidence will show that PPD's expectations of Dr. Menninger around public speaking and social interactions (with customers and within the PPD) preexisted Dr. Menninger's disclosure of a disability (and were in no way imposed as a response to her disability disclosure), but that Dr. Menninger had selectively chosen not to perform those tasks (including not traveling back to her workplace despite committing to PPD that she would do so after they accommodated her requested relocation to Massachusetts).

The evidence will further show that Dr. Menninger has not actually been unable to work since her departure from PPD, but that even if she has been, that is in no way the result of PPD's actions.  Moreover, the evidence will show that Dr. Menninger has not suffered any harm or

damages that are reasonably attributable to PPD, and that any emotional distress she has experienced is attributable to other causes.

**b. Facts established by pleadings or stipulation**

A.        <u>Agreed by all Parties.</u>

1.  PPD's Global Central Labs provide laboratory testing and data services for pharmaceutical development out of four laboratory locations (Highland Heights, Kentucky (US), Belgium, China, and Singapore).

2.  On August 31, 2015, PPD hired Dr. Menninger as the Executive Director of its Global Central Labs, based out of the Highland Heights laboratory.

3.  Dr. Menninger requested, and took, a medical leave from her position at PPD beginning June 3, 2018.

4.  Dr. Menninger did not return to her position at PPD after she commenced medical leave on June 3, 2018.

5.  Dr. Menninger's employment with PPD ended effective February 1, 2019.

B.  <u>Additional Facts Asserted by Plaintiff.</u>

1.  In late December 2017, Dr. Menninger had a discussion with her supervisor—Hacene Mekerri—that included feedback from a "360" review involving Dr. Menninger's subordinates. The feedback was overall positive, and Mr. Mekerri complimented Dr. Menninger on her management style and professionalism. (<u>See</u> Answer, ¶¶ 14 and 15)

**c.  Contested issues of fact**

A.  <u>Agreed by all Parties</u>

1.  Whether, during the course of her employment with Defendant, Dr. Menninger was  a "qualified individual" with a handicap/disability within the meaning of federal and state law.

2.  Whether PPD discriminated against Dr. Menninger because of her handicap/disability.

3.  Whether PPD retaliated against Dr. Menninger after she informed PPD that she had a disability in January 2018.

B.  <u>Additional Contested Facts Asserted by Plaintiff</u>

1.  Whether Dr. Menninger is entitled to recover damages and, if so, in what amount.

2.  Whether an award of punitive damages is appropriate and, if so, in what amount.

**d.  Jurisdictional questions**

None anticipated at this time.

**e.  Questions raised by pending motions**

The only pending motions are the motions *in limine* filed by the parties on March 10, 2023.

**f.  Issues of law**

    ***a.  Plaintiff***

No additional legal issues. To the extent the contested issues of fact above include contested issues of law, Dr. Menninger incorporates those here by reference. Dr. Menninger also incorporates by reference the legal issues in the motions *in limine*, as well as requests for jury instructions.

###### *b.* *Defendant*

PPD incorporates here by reference contested issues of law included in the contested issues of fact identified above.  PPD further incorporates by reference the legal issues in the motions *in limine* and requests for jury instructions.

### g.  Requested amendments to the pleadings

None.

### h.  Additional matters to aid in the disposition of the action

PPD has one witness (Dr. Martin Kelly) who is recovering from surgery and currently walks with a cane and may require extra time to walk up to and get situated on the witness stand. PPD respectfully asks that the Court allow this witness to get on and off the witness stand without the jury in the courtroom, both to allow Dr. Kelly to use the time and assistance needed to get situated, and to avoid any prejudicial assumptions about Dr. Kelly as a result of his need for physical assistance.  Counsel for both parties have discussed this request and counsel for Dr. Menninger assents to the requested arrangement.

### i.  Probable length of trial

The parties believe that the jury trial will be completed within ten days.

### j.  Names, addresses, and telephone numbers of witnesses and the manner of presentation of testimony, and whether the testimony of any witness is intended to be presented by deposition

The parties respective witness lists were submitted on March 10, 2023 with their Trial Briefs. The testimony of witnesses Mason Menninger and Hacene Mekerri is expected to be presented via deposition.

**k. Proposed exhibits**

The parties' list of uncontested exhibits is attached as Exhibit A.

The parties' list of contested exhibits is attached as Exhibit B.

**l. Positions on remaining objections to evidence**

The parties' respective objections to the contested exhibits are reflected in Exhibit B.

LISA MENNINGER, by her attorneys:

/s/ Patrick J. Hannon
Patrick J. Hannon (BBO# 664958)
Hampton M. Watson (BBO# 705983)
Hartley Michon Robb Hannon, LLP
155 Seaport Blvd., 2nd Floor
Boston, MA 02210
P: (617) 723-8000
F: (617) 447-2800
phannon@hmrhlaw.com
hwatson@hmrhlaw.com

PPD DEVELOPMENT, L.P., by its attorneys:

/s/ Rachel Reingold Mandel
Rachel Reingold Mandel (BBO #660495)
Patrick M. Curran, Jr. (BBO# 659322)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Place
Suite 3500
Boston, MA 02108
P: (617) 994-5700
F: (617) 994-5701
Rachel.mandel@ogletree.com
Patrick.curran@ogletree.com

**CERTIFICATE OF SERVICE**

I, Patrick J. Hannon, certify that on March 13, 2023, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to all counsel by electronically serving their counsel of record.

/s/ Patrick J. Hannon
Patrick J. Hannon