# EXHIBIT 2



## PERSONAL AND CONFIDENTIAL MEMORANDUM

DATE:      August 14, 2017

TO:        Lisa A. Menninger

FROM:      David Simmons, Chairman and CEO

RE:        **Equity Incentive Plan**

CC:        Ed Murray, EVP Chief Human Resources Officer
           Debra Moreland, VP Corporate Human Resources
           Amy Poore, Executive and Incentive Compensation Executive Director

___

Congratulations on your eligibility to participate in the Eagle Holding Company I 2017 Equity Incentive Plan. The purpose of the plan is to attract and retain the best talent for positions of substantial responsibility in our company and to incentivize all participants to contribute to the accomplishment of PPD's strategic objectives and drive long-term shareholder value. We are bullish on the prospects for PPD and the potential value we can create together in PPD's Chapter 2 for all participants in the equity plan.

Enclosed in this package you will find the following:

1.  Your Stock Option Agreement (consisting of your Grant Notice and Appendices A and B);
2.  Stock Option Summary Q&A;
3.  Stockholders Agreement;
4.  Summary of Stockholders Agreement; and
5.  Joinder Agreement.

**Please read each of these documents carefully.** Please note the nondisclosure provision in Section 1.1 of Appendix A to your Stock Option Agreement. This provision prohibits you from disclosing your stock option grant to anyone other than your spouse and/or tax or financial advisor without prior approval of the Administrator (our board of directors).

**To accept your stock option award, you must sign and return both the grant notice and the joinder agreement within 15 days following receipt of your award package.** You can scan and email the signed grant notice and joinder agreement to [ExecutiveCompensationSM@ppdi.com](mailto:ExecutiveCompensationSM@ppdi.com). An email confirming receipt will be returned to you.

Please see the enclosed Stock Option Summary Q&A. This Q&A provides a summary of your stock option grant and an explanation of the key features of the equity incentive plan. We also included a short description of the relevant provisions in the Stockholders Agreement. We hope these summaries help you understand your option grant. **If you still have questions about your stock option grant or any aspect of it after reviewing the enclosed materials, the senior human resource leaders copied on this memo are available to answer your questions.**

As a company leader, you play an important role in the future success of PPD and our ability to generate long-term shareholder value. This equity incentive plan represents a significant investment by our owners in PPD's entire executive leadership team. As an option holder, you will have the chance to participate in the long-term growth of PPD, and hope you understand and appreciate the potential value of our new equity incentive plan. By working together in pursuit of our purpose, mission and strategy, we are confident we will achieve true industry leadership, accomplish our long-term strategic and business goals and create significant shareholder value. This new equity incentive plan will allow you to also share in that success.

Thank you for your hard work, commitment, dedication and passion. This is what PPD is all about, and it's what sets us apart. We look forward to working with you as we continue our pursuit of CRO industry leadership.

CONFIDENTIAL

MENNINGER_SUPP000479

**EAGLE HOLDING COMPANY I**
**2017 EQUITY INCENTIVE PLAN**
**STOCK OPTION AGREEMENT**

**GRANT NOTICE**

Unless otherwise defined herein, the terms defined in the Eagle Holding Company I 2017 Equity Incentive Plan, as the same has been or may be amended from time to time in accordance therewith (the "Plan"), shall have the same defined meanings in this Stock Option Agreement, which includes the terms in this Grant Notice (the "Grant Notice"), Appendix A attached hereto, and Appendix B attached hereto (collectively, the "Agreement").

You have been granted an Option to purchase Shares, subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Name of Optionee: | Lisa A. Menninger |
| Total Number of Shares Subject to the Option: | 25,660.00 |
| Exercise Price per Share | $27.086 |
| Grant Date: | July 24, 2017 |
| Vesting Commencement Date: | May 11, 2017 |
| Type of Option: | Non-Qualified Stock Option |
| Final Expiration Date: | 10th anniversary of Grant Date |
| Vesting Schedule: | This Option will vest and become exercisable in accordance with the vesting schedule set forth in Appendix A, depending on the classification of the Option as follows: |

|  |  |  |
|---|---|---|
| | Time Options: | 12,830.00 Shares Subject to the Option |
| | Performance Options: | 12,830.00 Shares Subject to the Option |

CONFIDENTIAL

MENNINGER_SUPP000480

      Your signature below indicates your agreement and understanding that this Option is subject to all of the terms and conditions contained in the Agreement (including this Grant Notice and <u>Appendix A</u> and <u>Appendix B</u> to the Agreement) and the Plan. **ACCORDINGLY, PLEASE BE SURE TO READ ALL OF <u>APPENDIX A</u> AND <u>APPENDIX B</u>, WHICH CONTAIN THE SPECIFIC TERMS AND CONDITIONS OF THIS OPTION.**

**OPTIONEE**                                                           **EAGLE HOLDING COMPANY I**

_____                  _____
Lisa A. Menninger                                                  Name: B. Judd Hartman
                                                                              Title:  EVP General Counsel and
                                                                                         Chief Administrative Officer

*[Signature Page to Stock Option Agreement]*

CONFIDENTIAL                                                                                    MENNINGER_SUPP000481

## APPENDIX A TO STOCK OPTION AGREEMENT

### ARTICLE I.

### GRANT OF OPTION

Section 1.1     Grant of Option. The Company hereby grants to the Optionee the Option to purchase any part or all of an aggregate of the Shares set forth in the Grant Notice to which this Appendix A is attached, upon the terms and conditions set forth in the Plan and this Agreement (including the Grant Notice, this Appendix A and Appendix B). The Optionee hereby agrees that except as required by law, he or she will not disclose to any Person other than the Optionee's spouse and/or tax or financial advisor (if any) the grant of the Option or any of the terms or provisions hereof without the prior approval of the Administrator, and the Optionee agrees that, in the discretion of the Administrator, the Option shall terminate and any unexercised portion of such Option (whether or not then exercisable) shall be forfeited if the Optionee violates the non-disclosure provisions of this Section 1.1.

Section 1.2     Option Subject to Plan. The Option granted hereunder is subject to the terms and provisions of the Plan, except as modified by the terms of this Agreement.

Section 1.3     Exercise Price. The Exercise Price of a Share covered by the Option shall be the Exercise Price per Share as set forth in the Grant Notice (without commission or other charge), subject to adjustment pursuant to the terms hereof and/or the Plan.

### ARTICLE II.

### VESTING SCHEDULE; EXERCISABILITY

Section 2.1     Vesting and Exercisability of Time Options.

(a)     *Time-Based Vesting*. Except as provided below, the Time Options shall become vested and exercisable as to 20% of the Shares subject to the Time Options on the first, second, third, fourth and fifth anniversaries of the Vesting Commencement Date.

(b)     *Liquidity Event Vesting*. Upon the occurrence of a Liquidity Event, all then-unvested Time Options shall vest and become exercisable as of immediately prior to such Liquidity Event, provided the Optionee remains continuously in service as a Service Provider through the date of such Liquidity Event.

Section 2.2     Vesting and Exercisability of Performance Options.

(a)     *Performance-Based Vesting*. Except as provided below, the Performance Options shall be eligible to vest and become exercisable as to 20% of the Shares subject to the Performance Options (each such 20% portion, a "Tranche") on the last day of each Fiscal Year 2017 through 2021 (each, an "Applicable Year") as follows:

041945-0274-14663-Active.21613950.5
CONFIDENTIAL

MENNINGER_SUPP000482

(i)      100% of the Tranche for an Applicable Year shall vest and become exercisable if the Administrator determines that the EBITDA attained for the Applicable Year equals or exceeds the EBITDA Target for the Applicable Year;

(ii)      if the Administrator determines that the EBITDA attained for the Applicable Year is less than the EBITDA Target for the Applicable Year but greater than or equal to 90% of the EBITDA Target for the Applicable Year, then the Tranche for such Applicable Year shall vest as to a percentage determined by adding (1) 50% and (2) the product of (A) the number 5 and (B) the difference between the percentage amount of the EBITDA Target for the Applicable Year actually attained (rounded down to the nearest one-tenth of one percent) and 90.0%. For example, if the EBITDA attained for the 2017 Applicable Year is 92.5% of the EBITDA Target for the 2017 Applicable Year, then 62.5% of the 2017 Tranche would vest (50% + (5 x (92.5% - 90.0%) = 62.5%); and

(iii)      notwithstanding the foregoing, in the event that any portion of a Tranche that was eligible to vest in a particular Applicable Year does not vest due to the Company's failure to attain the EBITDA Target for the Applicable Year, then the unvested portion of the Tranche shall nevertheless remain eligible to vest and become exercisable at the end of any subsequent Applicable Year (a "Catch-Up Year") if the Administrator determines that the EBITDA attained for the Catch-Up Year equals or exceeds the EBITDA Target for such Catch-Up Year.

(b)      *Administrator Determination of Performance Vesting*. The Administrator shall make the determination as to whether the Financial Targets for an Applicable Year have been met and shall determine the extent, if any, to which the Performance Options have become vested and exercisable as soon as reasonably practicable following the last day of the Applicable Year, with the expectation that such determination will be made within 45 days following the last day of such Applicable Year (the actual date of such determination, the "Performance Determination Date").

(c)      *Liquidity Event Vesting*. Subject to Section 2.3, if in connection with a Liquidity Event, on any single date, Liquidity Proceeds both (i) equal or exceed two (2) times the Investment and (ii) result in an IRR that equals or exceeds 17.5% (together the "Liquidity Event Hurdles"), in each case, as determined by the Administrator, then all then unvested Performance Options shall vest and become exercisable as of immediately prior to such Liquidity Event.

Section 2.3      Limitations on Performance Option Vesting. If, upon a Liquidity Event, the vesting of 100% of the Shares subject to the then unvested Performance Options that are eligible to vest in connection with such transaction pursuant to Section 2.2(c) and the participation of such Performance Options (or the Shares underlying such Performance Options) would result in the failure to satisfy the Liquidity Event Hurdles, then such number of the Performance Options (if any) shall become vested and exercisable as to the percentage of Shares subject thereto that will result in, as a result of the Liquidity Event, the achievement of the Liquidity Event Hurdles, taking into account the vesting of such Shares subject to the Performance Options that so vest and, if applicable, the participation of such Options (or the Shares underlying such Options) in such transaction.  Such reduction shall apply pro-rata to all holders of Performance Options, as determined by the Administrator.

A-2

Section 2.4    Discretionary Vesting. The Administrator in its discretion may accelerate the vesting of any portion of the Option that does not otherwise vest pursuant to Section 2.1 or Section 2.2.

Section 2.5    No Vesting of Options; Forfeiture. Notwithstanding any other provision to the contrary in this Agreement, unless otherwise determined by the Administrator, (a) any portion of the Option that has not become vested and exercisable on or prior to the date of the Optionee's Termination of Service shall be forfeited on the date of the Optionee's Termination of Service and shall not thereafter become vested or exercisable and (b) any portion of the Option that is not vested and exercisable as of the occurrence of a Liquidity Event or does not vest and become exercisable as a result of such Liquidity Event shall be terminated without consideration upon the occurrence of such Liquidity Event.

Section 2.6    Exercisability of the Option. The Optionee shall not have the right to exercise the Option until the date the applicable portion of the Option becomes vested. The date that the applicable portion of the Option becomes vested is referred to herein as the "Exercise Commencement Date." Subject to Section 8 of the Plan, following the Exercise Commencement Date, the applicable portion of the Option shall be and shall remain exercisable until it becomes unexercisable under Section 2.7. Once the Option becomes unexercisable, it shall be forfeited immediately.

Section 2.7    Expiration of Option.

(a)    The Option may not be exercised to any extent by anyone after the first to occur of the following events:

(i)    The Final Expiration Date;

(ii)    Except for such longer period of time as the Administrator may otherwise approve, 90 days following the Optionee's Termination of Service for any reason other than Cause, death or Disability;

(iii)    Except as the Administrator may otherwise approve, the Optionee's Termination of Service for Cause; or

(iv)    Except for such longer period of time as the Administrator may otherwise approve, 12 months following the Optionee's Termination of Service by reason of the Optionee's death or Disability.

(b)    If the Company has a right to repurchase the Optionee's Option and/or Shares, the Company may exercise such right regardless of whether the Optionee continues to have a right to exercise the Option under this Section 2.7.

Section 2.8    Partial Exercise. Any exercisable portion of the Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable.

A-3

Section 2.9     Exercise of Option. The exercise of the Option shall be governed by the terms of this Agreement and the terms of the Plan.

Section 2.10    Manner of Exercise.  Unless determined otherwise by the Administrator, as a condition to the exercise of the Option, the Optionee shall notify the Company at least 30 days prior to exercise and no earlier than 90 days prior to exercise that the Optionee intends to exercise. This Section 2.10 shall not apply if the Shares underlying the Option are registered on Form S-8.

## ARTICLE III.

## OTHER PROVISIONS

Section 3.1     Optionee Representation; Not a Contract of Service. The Optionee hereby represents that the Optionee's execution of this Agreement and participation in the Plan is voluntary and that the Optionee has in no way been induced to enter into this Agreement in exchange for or as a requirement of the expectation of service with the Company or any of its parents and subsidiaries. Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue as a Service Provider or shall interfere with or restrict in any way the rights of the Company or its parents and subsidiaries, which are hereby expressly reserved, to discharge the Optionee at any time for any reason whatsoever, with or without Cause except pursuant to an employment or consulting agreement executed by and between the Company and the Optionee and approved by the Board.

Section 3.2     Application of Plan and Stockholders Agreement.  The Optionee acknowledges that this Option and any Shares acquired upon exercise of the Option are subject to the terms of the Plan and the Stockholders Agreement. In the event of a conflict between the terms of this Agreement and the Plan or the Stockholders Agreement, the terms of this Agreement shall control, except as provided in Section 8 of the Plan.

Section 3.3     Adjustments in Financial Targets . The Financial Targets specified in Appendix B are based upon (i) certain revenue and expense assumptions about the future business of the Company, (ii) a management model prepared by the Company for the projected financial performance of the Company and (iii) the continued application of accounting policies used by the Company as of the date the Option is granted. Accordingly, in the event that, after such date, the Administrator determines, in its sole discretion, that any acquisition or disposition of any business, division or entity by the Company or its subsidiaries, any dividend or other distribution (whether in the form of cash, Common Stock, other securities, or other property), recapitalization, reclassification, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Common Stock or other securities of the Company, issuance of warrants or other rights to purchase Common Stock or other securities of the Company, any unusual or nonrecurring transactions or events affecting the Company, or the financial statements of the Company, or change in applicable laws, regulations, or changes in generally accepted accounting principles applicable to, or the accounting policies used by, the Company occurs such that an adjustment is determined by the Administrator to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available with respect to the Option, then the Administrator may in good faith and in such manner as it may deem equitable following consultation with the Company's then Chief Executive Officer, if any, adjust the Financial Targets to reflect the projected effect of such transaction(s) or event(s)

041945-0274-14663-Active.21613950.5
CONFIDENTIAL                                                                                                  MENNINGER_SUPP000485

on the Financial Targets.  Notwithstanding the foregoing, in the event of any acquisition or disposition by the Company or its subsidiaries of any business, division or entity, the Financial Targets will be adjusted upon completion of such transaction to take into account the pro forma impact of such acquisition or disposition on the Financial Targets using forecasts associated with the acquired or disposed of business, division or entity that have been approved by the Administrator.

Section 3.4    Construction. This Agreement shall be administered, interpreted and enforced under the laws of the state of Delaware, disregarding choice-of-law principles of the law of any state that would require the application of the laws of a jurisdiction other than such state.

Section 3.5    Equity Securities to be Issued on the Deferred Payment Date.  For all purposes of this Appendix A, all equity securities required to be issued to the Principal Stockholders on the Deferred Payment Date (as defined in the Merger Agreement) that are actually issued to the Principal Stockholders will be deemed to have been issued to the Principal Stockholders on the Effective Date and to have been held by the Principal Stockholders at all times on and after the Effective Date through (and including) their actual date of issuance notwithstanding that they are not actually issued until such later issuance date.

## ARTICLE IV.

### DEFINITIONS

Whenever the following terms are used in this Agreement (including the Grant Notice), they shall have the meaning specified below unless the context clearly indicates to the contrary. Capitalized terms used in this Agreement and not defined below shall have the meaning given such terms in the Plan. The singular pronoun shall include the plural, where the context so indicates.

Section 4.1    Affiliate.  "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person where "control" shall have the meaning given such term under Rule 405 of the Securities Act. For the purposes of this Agreement, Affiliates of the Company shall include all Principal Stockholders, except where otherwise specified.

Section 4.2    Change of Control Transaction.  "Change of Control Transaction" shall have the meaning set forth in the Stockholders Agreement; provided, however, that the exclusion of a Portfolio Company (as defined in the Stockholders Agreement) of any Sponsor Investor (as defined in the Stockholders Agreement) shall be disregarded.

Section 4.3    EBITDA. "EBITDA" for a given Fiscal Year shall mean the consolidated net income of the Company and its consolidated subsidiaries determined in accordance with GAAP; as adjusted as follows without duplication:

(a)    increased, without duplication, to the extent the same was deducted in calculating the consolidated net income of the Company and its consolidated subsidiaries:

(i)        any corporate income tax expenses; *plus*

(ii)       any depreciation, amortization, impairment (including without limitation impairments to goodwill and fixed asset values) and other similar non-cash expenses or charges of the Company and its consolidated subsidiaries; *plus*

(iii)      any equity compensation expenses of the Company and its consolidated subsidiaries (including without limitation stock-based compensation expense, and any expenses associated with the Company's or any subsidiary's long-term incentive compensation plan for employees of the Company and its subsidiaries, as may hereafter be amended from time to time); *plus*

(iv)      any management, transaction, monitoring, consulting, advisory and any similar or other fees paid to the Principal Stockholders or their Affiliates and any related expenses (or any accruals for such fees and expenses) and any expenses reimbursed to other Financial Investors (as defined in the Stockholders Agreement) under Section 7.4 of the Stockholders Agreement, *plus*

(v)       any expenses associated with the transactions contemplated by the Merger Agreement, including any expenses relating to the payment of the Additional Merger Consideration (as defined in the Merger Agreement); *plus*

(vi)      any restructuring or similar extraordinary non-recurring charges; *plus*

(vii)     any realized or unrealized foreign exchange losses (including without limitation transaction and remeasurement losses classified as other expense on the face of the financial statements); *plus*

(viii)    any realized or unrealized losses attributable to cost or fair value investments; *plus*

(ix)      any interest expense of the  Company and its consolidated subsidiaries; *plus*

(x)       any expenses or losses associated with any sale or other disposition of any assets of the Company or its consolidates subsidiaries; *plus*

(xi)      any expenses or losses associated with discontinued operations; *plus*

(xii)     any purchase accounting related non-cash expenses or losses from an acquisition; *plus*

(xiii)    any expenses or costs incurred to generate future cash savings or cost reductions; *plus*

(xiv)    any costs or expenses incurred with any acquisition, disposition or financing transaction; *plus*

A-6

MENNINGER_SUPP000487

      (xv)    any costs or expenses incurred with the integration of an acquired business; and

(b)    decreased, without duplication, to the extent the same was included in calculating the consolidated net income of the Company and its consolidated subsidiaries:

      (i)    any income associated with corporate income taxes; *plus*

      (ii)    any realized or unrealized foreign exchange gains (including without limitation transaction and remeasurement gains classified as other income on the face of the financial statements); *plus*

      (iii)    any realized or unrealized gains attributable to cost or fair value investments; *plus*

      (iv)    any income or gains associated with any sale or other disposition of any assets of the Company or its consolidates subsidiaries; *plus*

      (v)    any interest income; *plus*

      (vi)    any income associated with the transactions contemplated by the Merger Agreement, including any income relating to the payment of the Additional Merger Consideration (as defined in the Merger Agreement); *plus*

      (vii)    any income or gains associated with discontinued operations; *plus*

      (viii)    any purchase accounting related non-cash income or gains from an acquisition.

In the event the Company or any of its consolidated subsidiaries incur any extraordinary, non-recurring, one-time or other unusual item in a given Fiscal Year that is not described in clause (a) or (b) above, the Chief Financial Officer will submit a recommendation for an adjustment to EBITDA to the Administrator, which shall promptly consider the recommendation in good faith and make such adjustment to EBITDA for such Fiscal Year as it determines in good faith to be just and equitable.  For the avoidance of doubt, the Administrator may make such adjustment in good faith regardless of whether or not the Chief Financial Officer has submitted such a recommendation, provided that the Administrator shall consult with the Chief Financial Officer prior to making such adjustment.

Section 4.4    EBITDA Target. "EBITDA Target" for any given Applicable Year shall be as set forth in Appendix B of this Agreement, subject to the provisions of Section 3.3.

Section 4.5    Effective Date. "Effective Date" shall mean May 11, 2017.

Section 4.6    Exercise Price. "Exercise Price" shall mean the exercise price per Share set forth in the Grant Notice.

A-7

<u>Section 4.7</u>     <u>Final Expiration Date</u>. "Final Expiration Date" shall mean the final expiration date set forth in the Grant Notice.

<u>Section 4.8</u>     <u>Financial Targets</u>. "Financial Targets" shall mean the EBITDA Targets set forth on <u>Appendix B</u> of this Agreement, subject to Section 3.3.

<u>Section 4.9</u>     <u>Fiscal Year</u>. "Fiscal Year" shall mean the fiscal year of the Company, as in effect from time to time.

<u>Section 4.10</u>     <u>GAAP</u>. "GAAP" shall mean the generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, as in effect from time to time.

<u>Section 4.11</u>     <u>Grant Date</u>. "Grant Date" shall be the grant date set forth in the Grant Notice.

<u>Section 4.12</u>     <u>Grant Notice</u>. "Grant Notice" shall mean the Grant Notice referred to in Section 1.1 of this Agreement, which Grant Notice is for all purposes a part of the Agreement.

<u>Section 4.13</u>     <u>Investment</u>. "Investment" shall mean any investment of funds on or after the Closing Date (as defined in the Merger Agreement) by the Principal Stockholders, directly or indirectly, in equity securities of the Company and its subsidiaries (but excluding the funds invested by the Principal Stockholders directly or indirectly in any Shares transferred in a Post-Closing Syndication Transfer (as defined in the Merger Agreement) unless such Shares continue to be held by a Principal Stockholder following completion of such Post-Closing Syndication Transfer); <u>provided</u>, that the Investment of each of Hellman & Friedman Capital Partners VII, L.P., Hellman & Friedman Capital Partners VII (Parallel), L.P., H&F Executives VII, L.P. and HFCP VII (Parallel-A), L.P. made in respect of the shares of Common Stock issued to each of them on the Closing Date shall be deemed to equal $27.086 per share of Common Stock and, <u>provided further</u>, that in the event of a Post-Closing Syndication Transfer in which the Shares relating to such Post-Closing Syndication Transfer continue to be held by a Principal Stockholder, then the transferee shall be deemed to have made an Investment in respect of such Shares equal to the amount paid to the Company in consideration for the issuance of such Shares (whether paid by the transferee or the transferor) and the transferor shall be deemed to have not made any Investment in respect of such Shares.

<u>Section 4.14</u>     <u>IRR</u>. "IRR" shall mean, as of the relevant date, the annual, compounded internal rate of return achieved as of such date by the Principal Stockholders in respect of the Investment, which IRR shall be based on the Liquidity Proceeds actually received or held by the Principal Stockholders as of the relevant date.

<u>Section 4.15</u>     <u>Liquidity Event</u>. "Liquidity Event" shall mean either (a) the consummation of the sale, transfer, conveyance or other disposition in one or a series of transactions, of the equity securities of the Company or its successor held, directly or indirectly, by all of the Principal Stockholders in exchange for cash, or in the case of any transaction resulting in the exchange for consideration other than cash ("non-cash consideration") the receipt of cash upon the disposition

of such non-cash consideration, such that immediately following such transaction or disposition (or series of transactions or dispositions), the equity securities held, directly or indirectly, by all of the Principal Stockholders is, in the aggregate, less than 30% of the equity securities (as such securities may be adjusted for the occurrence of a stock split, reverse stock split, or other corporate event) held, directly or indirectly, by all of the Principal Stockholders as of the Effective Date; or (b) the consummation of the sale, lease, transfer, conveyance or other disposition (other than by way of merger, equity purchase or consolidation), in one or a series of transactions, of all or substantially all of the assets of the Company, or the Company and its subsidiaries taken as a whole, to any "person" (as such term is defined in Section 13(d)(3) of the Exchange Act) other than to any Principal Stockholders or an Affiliate of any Principal Stockholders.

Section 4.16   Liquidity Proceeds. "Liquidity Proceeds" shall mean, the sum (without duplication) of (a) the aggregate fair market value of the consideration actually received by the Principal Stockholders after the Effective Date on their Investment in connection with a Liquidity Event, after taking into account all post-closing adjustments, and assuming exercise of all options and warrants to purchase equity securities of the Company outstanding as of the effective date of such Liquidity Event (after giving effect to any dilution of securities or instruments arising in connection with such Liquidity Event); *provided however,* that if the Principal Stockholders retain any Investment or portion thereof following such Liquidity Event, the fair market value of such Investment (or portion) immediately following such Liquidity Event shall be deemed "consideration received" for purposes of calculating the Liquidity Proceeds, and *provided further* that the fair market value of any non-cash consideration (including stock) shall be determined by the Administrator in its sole discretion as of the date of such Liquidity Event plus (b) the aggregate value of any cash received after the Effective Date in connection with the prior disposition of any portion of the Investment or in connection with the disposition of any property previously for or in consideration of any portion of the Investment prior to such Liquidity Event, plus (c) the aggregate value of any cash received after the Effective Date from time to time from the Company or any successor in the form of dividends or other stockholder distributions in respect of the Investment plus (d) the aggregate value of any cash received after the Effective Date upon disposition of any non-cash dividends or other non-cash stockholder distributions received from time to time from the Company or any successor in respect of the Investment and the fair market value of any non-cash dividends or other non-cash stockholder distributions received from time to time from the Company or any successor in respect of the Investment not previously disposed of for cash, as determined by the Administrator in its sole discretion as of the date of the Liquidity Event.   Notwithstanding the foregoing, in no event shall Liquidity Proceeds include any consideration received by the Principal Stockholders and their Affiliates (i) pursuant to the Merger Agreement, (ii) pursuant to the Post-Closing Syndication Transfer which is excluded from the definition of "Investment" or (iii) in respect of any management, transaction or similar fees.

Section 4.17   Merger Agreement. "Merger Agreement" shall mean that certain Agreement and Plan of Merger dated as of April 26, 2017, by and among Eagle Holding Company I, Eagle Holding Company II, LLC, Eagle Reorganization Merger Sub, Inc., Eagle Buyer, Inc., and Jaguar Holding Company I, as amended, supplemented or otherwise modified from time to time.

Section 4.18   Option. "Option" shall mean the option to purchase Common Stock granted under this Agreement.

A-9

<u>Section 4.19</u>    <u>Optionee</u>. "Optionee" shall be the Person designated as such in the Grant Notice.

<u>Section 4.20</u>    <u>Performance Options</u>. "Performance Options" shall mean the portion of the Option designated as Performance Options in the Grant Notice.

<u>Section 4.21</u>    <u>Plan</u>. "Plan" shall mean the Eagle Holding Company I 2017 Equity Incentive Plan.

<u>Section 4.22</u>    <u>Share</u>. "Share" shall mean a share of Common Stock (which may be voting or non-voting, as provided in the Plan).

<u>Section 4.23</u>    <u>Time Options</u>. "Time Options" shall mean the portion of the Option designated as Time Options in the Grant Notice.

<u>Section 4.24</u>    <u>Vesting Commencement Date</u>. "Vesting Commencement Date" shall mean the vesting commencement date set designated as Vesting Commencement Date in the Grant Notice.

<div align="center">*      *      *</div>

## <u>APPENDIX B TO STOCK OPTION AGREEMENT</u>

### FINANCIAL TARGETS
(US$ Millions as of the end of the Applicable Year)

| | Applicable Year | | | | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 |
| **EBITDA Target** | 716 | 755 | 825 | 906 | 1,000 |

A-11

MENNINGER_SUPP000492

## PPD STOCK OPTION SUMMARY Q&A

The following questions and answers (this "**Summary**") are intended to provide a brief summary of the stock option ("**Option**") that you have been granted pursuant to the Eagle Holding Company I 2017 Equity Incentive Plan (as may be amended, the "**Plan**"). This Summary does not contain a summary of all of the terms of your Option. Your Option is governed by the Plan and the stock option agreement you received (the "**Option Agreement**"). This Summary is only being provided to help you understand your Option. Accordingly, if there is any difference between the terms and conditions of your Option as described in this Summary and the actual provisions of your Option as described in the Plan and your Option Agreement, then the actual provisions of your Option will control. In addition, if you are located outside of the United States, additional terms and conditions may apply to your Option to comply with local law, as may be set forth in your Option Agreement.

1.      **What is an Option? How do I benefit from my Option?**

Your Option gives you the right to purchase a specified number of shares of non-voting common stock ("**Shares**") of Eagle Holding Company I (the "**Company**") for a fixed price, commonly referred to as the "exercise price," during a prescribed period of time.

The principal benefit of an Option is the potential to profit from an increase in the value of the Shares underlying the Option during the period in which the Option is exercisable. If the value of the Shares increases above your exercise price during such period, you will be able to effectively buy the Shares at a "discount" to their value at the time of exercise. However, if the value of the Shares does not increase above your exercise price, you will not realize a benefit from your Option.

Please see the *Tax Information* section below for information regarding the tax consequences of an Option. The discussion in the *Tax Information* section is general in nature and is not intended to address all tax consequences relating to an Option or the tax consequences that may arise in your particular circumstances. You are encouraged to consult your own independent tax advisor regarding the tax consequences to you relating to the Option.

2.      **What is Eagle Holding Company I?**

Eagle Holding Company I is the holding company established by investment funds affiliated with The Carlyle Group and Hellman & Friedman (collectively, the "**Sponsors**") in connection with the Sponsors' recent recapitalization of Pharmaceutical Product Development ("**PPD**"). The Company is the entity in which the Sponsors and affiliates of GIC (Singapore's sovereign wealth fund) and the Abu Dhabi Investment Authority (together with the Sponsors, the "**Financial Investors**") made their investment pursuant to the recapitalization and through which the Financial Investors acquired and now own PPD. Thus, your Option covers Shares in the same entity in which the Financial Investors invested.

3.      **What is the purpose of the Plan and why was I granted my Option? Will I receive annual grants?**

1

MENNINGER_SUPP000493

The Plan is intended to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to employees and to promote the success of PPD's business.  You were granted your Option as a form of incentive compensation because you were identified as a key employee of PPD having the ability to contribute to PPD's overall long-term success.

Instead of an annual grant, you are receiving a one-time, upfront Option grant. If  we are successful in increasing the value of PPD over time, this is a significant benefit as the exercise price of your Option is fixed based on today's value as opposed to a potentially higher value in future years.

**4.      How many Shares does my Option cover and what is the exercise price of my Option?**

The maximum number of Shares you can purchase pursuant to the exercise of your Option and the exercise price of your Option are specified on the Grant Notice of your Option Agreement.

**5.      How does my Option vest?**

Your Option consists of two types of options: Time Options and Performance Options. The difference between them is how and when they vest and become exercisable by you.

Generally, Time Options will become vested and exercisable in five equal annual installments on the first, second, third, fourth and fifth anniversaries of the date of grant.  .

Generally, Performance Options will become vested and exercisable in five equal annual installments generally on December 31 of the calendar year of the date of grant and on December 31 of each of the next four succeeding calendar years based on the Company's achievement against the EBITDA targets for those calendar years. If you are hired or promoted between October 1 through December 31 and receive an Option in connection therewith, however, your Performance Options will become vested and exercisable December 31 of the following calendar year and on December 31 of each of the next four succeeding calendar years.  The EBITDA targets for each calendar year are set forth in Appendix B to your Option Agreement.

In addition, your Option may become vested and exercisable in connection with a "Liquidity Event," as described in Question 12 below. Until your Option becomes vested, it may not be exercised.

**Vesting of Time and Performance Options is subject to your continued employment with PPD on each vesting date.**

**6.      What happens if the Company misses the EBITDA target for a calendar year?**

If the Company misses its EBITDA target for a calendar year, your Performance Option for that calendar year will not fully vest, and may not vest at all depending on the

2

Company's actual EBITDA compared to the applicable EBITDA target. The table below sets forth how your Performance Option will vest in this circumstance.  If the Company fails to achieve at least 90% of its EBITDA target for a calendar year, none of your Performance Option for that year will vest.

| IF ACTUAL EBITDA DIVIDED BY THE EBITDA TARGET IS: | THEN THE % OF YOUR PERFORMANCE OPTION THAT WILL VEST IS: |
|---|---|
| < 90.0% | 0.0% |
| 90% | 50.0% |
| 91.0% | 55.0% |
| 92.0% | 60.0% |
| 93.0% | 65.0% |
| 94.0% | 70.0% |
| 95.0% | 75.0% |
| 96.0% | 80.0% |
| 97.0% | 85.0% |
| 98.0% | 90.0% |
| 99.0% | 95.0% |
| 100.0% | 100.0% |

If the Company misses its EBITDA target in one calendar year, the portion of the Performance Option for that year that did not vest will remain eligible to vest at the end of any subsequent year (a "**Catch-Up Year**") if the Company's actual EBITDA for the Catch-Up Year equals or exceeds the EBITDA Target for that Catch-Up Year. For example, if the Company misses its EBITDA Target in 2017 by more than 10%, then the whole Performance Option that was eligible to vest in 2017 will not vest. However, if the Company achieves the EBITDA Target for 2018, then the Performance Option for both 2017 and 2018 will vest at the end of 2018.

**7.     How can I exercise my Option?**

If vested, an Option or any vested portion thereof may be exercised as described in the Option Agreement and the Plan. Unless the Shares underlying your Option have been registered with the U.S. Securities and Exchange Commission, you are required to notify the Company between 30 and 90 days prior to exercise that you intend to exercise your Option. Once you exercise your Option and receive the underlying Shares, you will have rights as a stockholder with respect to such Shares, including rights to receive dividends and distributions in respect of the Shares, but not have voting rights (because your Option is to purchase shares of non-voting common stock) or certain other governance rights provided to the Financial Investors under the Stockholders Agreement.

Because the Company is not a publicly traded company, all employees who are granted Options have been required to enter into the Stockholders Agreement with the Company, the Financial Investors and the other persons who are a party thereto (the "**Stockholders Agreement**").  The Stockholders Agreement sets forth the terms and conditions under which stockholders hold their Shares.  This includes provisions that govern when you will be

3

MENNINGER_SUPP000495

permitted to sell your Shares, when, in certain circumstances, you will be required to sell your Shares, and repurchase provisions that apply in the event your employment with PPD terminates or if you materially breach a restrictive covenant to which you are bound with PPD. For additional information relating to the circumstances under which you may be permitted or required to sell your Shares, see *Question 9* below.  For information on what happens to your Shares if you cease to be employed with PPD or materially breach a restrictive covenant to which you are bound with PPD, see *Question 11* below.

**8.      How do I pay the exercise price of my Option?**

The Administrator determines how you may pay the exercise price of your Option, and the permissible ways are generally set forth in your Award Agreement and the Plan. The Plan provides that the method for paying the exercise price applicable to your Option may, in the discretion of the Administrator and subject to applicable law, consist of:

- cash,

- personal, certified or bank cashier check,

- with the consent of the Administrator, certain other Shares of the Company held by you,

- with the consent of the Administrator, Shares to be issued to you upon exercise of your Option, or

- with the consent of the Administrator, any combination of the foregoing methods of payment or as may be permitted by applicable laws.

You will also have to make arrangements with the Company for settling any tax withholding that arises on exercise of your Option (see *Question 16* below).

**9.      Can I sell the Shares I receive upon exercise of my Option? When will I receive cash for my Option?**

There is not currently a public market for the Shares and unless there is initial public offering of the Company's Shares (an "**IPO**"), it is not expected that a public market for the Company's Shares will develop.  In addition, as a condition to receiving the grant of your Options, you were required to become a party to the Stockholders Agreement, which generally prohibits the sale or transfer of Shares except in connection with a sale or transfer of Shares by the Sponsors.  As a result, unless there is an initial public offering of the Company's Shares, you generally will not be able to sell Shares you acquire upon exercise of the Option, except in connection with certain sales of Shares by the Sponsors.

It is generally expected that optionees will receive liquidity for their Options at the time the Sponsors exit their investment in PPD either through an IPO or a sale of the Company or PPD. If the Sponsors exit their investment in PPD through an IPO, you may be able to exercise vested Options and sell Shares generally into the market, subject to applicable law, the terms of the Stockholders Agreement, and any "lock-up" agreement that may be required

4

in connection with an IPO. In addition, if an IPO has not occurred, under the Stockholders Agreement, upon certain private sales of Shares by the Sponsors, optionees will have the right to exercise their vested Options and sell their Shares alongside the Sponsors generally in the same proportions as the Shares sold by the Sponsors (and in certain circumstances, the Sponsors may require optionees to participate in such transactions). In addition, upon a sale of PPD by the Sponsors, the Company may exercise its discretion under the Plan to cash-out your Option in connection with such sale.

**10.     When does my Option expire?**

The expiration date is the date on which your Option expires and after which you may no longer exercise the Option. Your Option may not be exercised more than ten years after the date the Option was granted. In addition, your Option may expire earlier in the event your employment terminates (see *Question 11*, below) or under certain other situations described in your Option Agreement or the Plan.

**11.     What happens if I cease to be an employee?**

In general, if you resign or are terminated (including by reason of your death or disability), you (or your beneficiary or estate) may exercise the vested portion of your Option for the period of time following such termination, if any, as stated in Section 2.7 of your Option Agreement. Any unvested portion of your Option will expire on the date of your termination. If you (or your beneficiary or estate) do not exercise your Option within the period of time  specified in the Option Agreement, your Option will expire.

In general, you (or your beneficiary or estate) may exercise your Option for the following time periods following your termination:

- One year following your termination due to death or disability.

- 90 days following the date of your termination by the Company without cause or by your voluntary resignation.

- You may not exercise any portion of your Option after, and your Option (whether or not vested) will be immediately forfeited upon, your termination for cause.

Upon your termination of employment, or in connection with any material breach of any confidentiality, non-competition, non-solicitation or similar restrictive covenant contained in any written agreement between you and the Company (a "**Restrictive Covenant Breach**"), the Company will have the right, but not the obligation, to repurchase any Shares you acquire upon exercise of your Option for up to one year following your termination or your Restrictive Covenant Breach, as applicable. The purchase price in connection with such repurchase will be the fair market value of the Shares at the time of repurchase, unless you have committed a Restrictive Covenant Breach or your termination is for cause, in which case the repurchase price will be the lesser of the fair market value at the time of repurchase or the price you paid to acquire the Shares.

CONFIDENTIAL                                                                                    MENNINGER_SUPP000497

**12.      What is a "Liquidity Event"? What happens if a Liquidity Event occurs?**

The term "Liquidity Event" is defined in your Option Agreement. Generally, a Liquidity Event occurs at the time the Sponsors liquidate more than 70% of their investment in PPD, whether in a single transaction or a series of transactions. If a Liquidity Event occurs, 100% of your unvested Time Option will vest and become exercisable as of immediately prior to the Liquidity Event. In addition, 100% of your unvested Performance Option will vest and become exercisable to the extent the Sponsors attain, with respect to their investment in PPD, an internal rate of return of 17.5% and a multiple of invested capital of 2.0x (the "**Exit Hurdles**"), in each case, after taking into account the vesting of any options to purchase shares of common stock of the Company or other awards that vest in connection with the Liquidity Event.

**13.      Who makes determinations with respect to the Options? Can my Options be adjusted?**

Determinations under the Plan, such as whether applicable performance targets or the Exit Hurdles have been attained, are made by the Company's Board of Directors or a committee appointed by the Board (the "**Administrator**"). The Administrator's decisions are binding on participants in the Plan.

If there is an equity restructuring, such as a stock dividend or stock split, the Administrator will make such equitable adjustments to outstanding Options to reflect the equity restructuring as it deems appropriate. Additionally, if the Company experiences a recapitalization, reclassification, stock split, reverse stock split, reorganization, merger, consolidation, acquisition, disposition, split-up, spin-off, combination, repurchase, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the capital stock or assets of the Company, or other similar change in its capital structure, such that the Administrator determines that an adjustment is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits to be made available under the Plan, then the Administrator may make adjustments to outstanding Options as it may deem equitable, including adjustments to the number and class of Shares subject to and exercise price of outstanding Options.

**14.      Does my Option give me the rights of a stockholder in the Company?**

No. Being an optionholder is not the same as being a stockholder. As explained above, an optionholder has the right to buy a share of stock in a company, but is not an actual stockholder. You will only become a stockholder in the Company if and when you exercise your Option. Until a Share is issued to you in connection the exercise of your Option, you will not have the right to receive dividends, or have any other rights as a stockholder with respect to the Shares underlying your Option.

**15.      Can I transfer or sell my Option?**

No. During your lifetime, only you may exercise any portion of the Option. After your death, your Option may be exercised by your beneficiary or estate during the period of time

CONFIDENTIAL                                              MENNINGER_SUPP000498

noted in *Question 11* above.

## TAX INFORMATION

The following discussion is intended only as a summary of the general income tax laws that apply to Options granted under the Plan. However, the tax consequences of any Option will depend upon the taxing jurisdiction and your individual circumstances. Accordingly, you are strongly advised to seek the advice of a qualified tax adviser regarding the Option and your participation in the Plan.

**16.   What are the tax consequences of an Option?**

### US Taxpayers

In the U.S., there are generally no tax consequences to the Company or to you by reason of the grant to you of an Option. Upon exercise of a vested Option, or portion thereof, you will recognize taxable ordinary income equal to the excess of the fair market value of the Shares subject to the Option on the date of exercise over the exercise price that you paid. Generally, with respect to employees, the Company is required to withhold taxes in an amount based on the ordinary income recognized. You will be responsible for the tax withholding amounts and will be required to make arrangements with the Company and its subsidiaries for the satisfaction of all tax withholding amounts prior to the exercise of your Option. Upon disposition of the Shares, you will recognize a capital gain or loss equal to the difference between the disposition price and the sum of the exercise price paid for such Shares plus any amount recognized as taxable ordinary income upon exercise. Such gain or loss will be: (a) long-term if the Shares were held for more than 12 months, or (b) short-term if the Shares were held for 12 months or less.

### Non-US Taxpayers

Depending on local tax rules, there are generally no tax consequences to the Company or to you by reason of the grant to you of an Option. Upon exercise of a vested Option, or portion thereof, you will likely be subject to taxation. Generally this taxation is based on the excess of the fair market value of the Shares subject to the Option on the date of exercise over the exercise price that you paid. Generally, with respect to employees, the Company is required to withhold taxes in an amount based on the income recognized. You will be responsible for the tax withholding amounts and will be required to make arrangements with the Company and its subsidiaries for the satisfaction of all tax withholding amounts prior to the exercise of your Option. Where the Company does not have a withholding obligation under local tax rules, you will be responsible for paying the tax on submission of your personal tax return. You may also incur a further tax liability on the sale of the Shares which you acquired by exercising your Option.

### Expatriate employees

If you undertake an international assignment or permanent relocation whilst holding Options your taxation affairs may be complicated and may result in taxation liabilities in more than one country. If this applies to you, you are strongly advised to seek the advice of a

7

MENNINGER_SUPP000499

qualified tax adviser regarding the Option and your participation in the Plan.

*          *          *

8

MENNINGER_SUPP000500

**Execution Version**

**STOCKHOLDERS AGREEMENT**

**AMONG**

**EAGLE HOLDING COMPANY I**

**AND**

**THE STOCKHOLDERS AS DEFINED HEREIN**

May 11, 2017

CONFIDENTIAL
MENNINGER_SUPP000501

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS

Section 1.1    Certain Defined Terms................................................................. 5
Section 1.2    Other Defined Terms.................................................................. 17
Section 1.3    Other Definitional and Interpretation Provisions............................... 20

### ARTICLE II
### CORPORATE GOVERNANCE

Section 2.1    Boards of Directors ................................................................... 22
Section 2.2    Board Committees ..................................................................... 27
Section 2.3    Acts of the Boards and Approval Rights. ....................................... 28
Section 2.4    Applicability of Preceding Provisions ........................................... 33
Section 2.5    Financial Investor Consent Rights ................................................ 33
Section 2.6    VCOC Stockholders.................................................................. 40
Section 2.7    No Transfer of Rights ................................................................ 42

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of the Company............................... 42
Section 3.2    Representations and Warranties of the Stockholders.......................... 43

### ARTICLE IV
### TRANSFER RESTRICTIONS

Section 4.1    General Limitations on Transfers. ................................................ 44
Section 4.2    Permitted Transfers................................................................... 46
Section 4.3    Right of First Refusal................................................................ 48
Section 4.4    Tag-Along Rights..................................................................... 50
Section 4.5    Drag-Along Right. .................................................................... 54
Section 4.6    Recapitalization Transactions. .................................................... 58
Section 4.7    Contingent Sale Right. .............................................................. 60
Section 4.8    Additional Provisions Relating to Restrictions on Transfers................ 61

### ARTICLE V
### REGISTRATION RIGHTS

Section 5.1    Certain Definitions................................................................... 62
Section 5.2    Shelf Registration..................................................................... 66
Section 5.3    Demand Registration ................................................................ 72
Section 5.4    Piggyback Registration ............................................................. 75
Section 5.5    Expenses of Registration............................................................ 76

i

Section 5.6     Obligations of the Company ........................................................................ 77
Section 5.7     Indemnification ......................................................................................... 79
Section 5.8     Information by Holder ............................................................................... 82
Section 5.9     Transfer of Registration Rights ............................................................... 82
Section 5.10    Delay of Registration ................................................................................ 82
Section 5.11    Limitations on Subsequent Registration Rights ...................................... 82
Section 5.12    Rule 144 Reporting ................................................................................... 82
Section 5.13    "Market Stand Off" Agreement ................................................................ 83
Section 5.14    Termination of Registration Rights .......................................................... 83

ARTICLE VI
RIGHT OF PARTICIPATION

Section 6.1     Offer ........................................................................................................... 83
Section 6.2     Exercise ...................................................................................................... 84
Section 6.3     Closing ....................................................................................................... 85
Section 6.4     Exigent Circumstances .............................................................................. 85
Section 6.5     Expenses ..................................................................................................... 86
Section 6.6     Securities Law Matters .............................................................................. 86
Section 6.7     Further Assurances ..................................................................................... 87
Section 6.8     Excluded Transactions ............................................................................... 87
Section 6.9     Certain Definitions .................................................................................... 88
Section 6.10    Transfer of Rights ..................................................................................... 89
Section 6.11    Termination ................................................................................................ 89

ARTICLE VII
OTHER COVENANTS

Section 7.1     No Voting or Conflicting Agreements ....................................................... 89
Section 7.2     Confidentiality ........................................................................................... 89
Section 7.3     Access and Information Rights .................................................................. 89
Section 7.4     Expense Reimbursement ............................................................................ 90
Section 7.5     Notice of Secondary Debt Purchases ........................................................ 90
Section 7.6     Corporation Status ..................................................................................... 90

ARTICLE VIII
INDEMNIFICATION

Section 8.1     Indemnification of Financial Investors ..................................................... 91
Section 8.2     Jointly Indemnifiable Claims .................................................................... 92
Section 8.3     Non-Exclusive Right ................................................................................. 93

ARTICLE IX
COMPANY SALE OR QUALIFYING IPO

Section 9.1     Request for Liquidity ................................................................................. 93
Section 9.2     Process for Company Sale ......................................................................... 95
Section 9.3     Process for Qualifying IPO ....................................................................... 97

Section 9.4      Legal Costs and Expenses.................................................................................... 98

ARTICLE X
RIGHT TO REPURCHASE SHARES HELD BY MANAGERS

Section 10.1     Call Right............................................................................................................ 98
Section 10.2     Exercise of Call Right......................................................................................... 98
Section 10.3     Repurchase Price................................................................................................. 98
Section 10.4     Repurchase Notes................................................................................................ 99
Section 10.5     Extension of Repurchase Period ......................................................................... 99
Section 10.6     Exercise of Call Right by Financial Investors ................................................... 99
Section 10.7     Certain Definitions.............................................................................................. 99

ARTICLE XI
MISCELLANEOUS

Section 11.1     Amendment and Waiver .................................................................................... 101
Section 11.2     Severability ...................................................................................................... 102
Section 11.3     Entire Agreement; Third Party Beneficiaries ................................................... 102
Section 11.4     Successors and Assign; Assignments ............................................................... 103
Section 11.5     Counterparts...................................................................................................... 103
Section 11.6     Remedies........................................................................................................... 103
Section 11.7     Notices .............................................................................................................. 104
Section 11.8     Governing Law; Consent to Jurisdiction. .......................................................... 107
Section 11.9     Waiver of Jury Trial.......................................................................................... 108
Section 11.10    Headings ........................................................................................................... 108
Section 11.11    Consulting Services Agreement......................................................................... 108
Section 11.12    Termination........................................................................................................ 108
Section 11.13    Subsequent Acquisition of Shares ..................................................................... 108
Section 11.14    Manager Group Representatives......................................................................... 109
Section 11.15    Aggregation of Shares....................................................................................... 109
Section 11.16    No Third Party Liability..................................................................................... 110
Section 11.17    Consents, Approvals and Actions ...................................................................... 110
Section 11.18    No Partnership ................................................................................................... 111

iii

# STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT, dated as of May 11, 2017, is by and among (i) Eagle Holding Company I, a Delaware corporation (together with its successors and assigns, the "**Company**"); (ii) Carlyle Partners VI Holdings II, L.P., a Delaware limited partnership ("**CP VI Holdings**"), Carlyle Partners VI, L.P., a Delaware limited partnership ("**Carlyle VI**"), CP VI Coinvestment A, L.P., a Delaware limited partnership ("**CP VI Coinvestment A**"), CP VI Coinvestment B, L.P., a Delaware limited partnership ("**CP VI Coinvestment B**" and, together with Carlyle VI and CP VI Coinvestment A, the "**Initial Carlyle Entities**"); (iii) Hellman & Friedman Capital Partners VII, L.P., a Cayman Islands limited partnership ("**HFCP VII**"), Hellman & Friedman Capital Partners VII (Parallel), L.P., a Cayman Islands limited partnership ("**HFCP VII Parallel**"), HFCP VII (Parallel-A), L.P., a Delaware limited partnership ("**HFCP VII Parallel-A**"), H&F Executives VII, L.P., a Cayman Islands limited partnership ("**HFCP VII Executives**" and, together with HFCP VII, HFCP VII Parallel and HFCP Parallel-A, the "**Pre-Closing H&F Entities**"), Hellman & Friedman Capital Partners VIII, L.P., a Cayman Islands limited partnership ("**HFCP VIII**"), Hellman & Friedman Capital Partners VIII (Parallel), L.P., a Cayman Islands limited partnership ("**HFCP VIII Parallel**"), HFCP VIII (Parallel-A), L.P., a Delaware limited partnership ("**HFCP VIII Parallel-A**"), H&F Executives VIII, L.P., a Cayman Islands limited partnership ("**HFCP VIII Executives**"), and H&F Associates VIII, L.P., a Cayman Islands limited partnership ("**HFCP VIII Associates**" and, together with the Pre-Closing H&F Entities, HFCP VIII, HFCP VIII Parallel, HFCP VIII Parallel-A and HFCP VIII Executives, the "**Initial H&F Entities**"); (iv) Blue Spectrum ZA 2015 L.P., a Cayman Island exempted limited partnership ("**Initial Blue Spectrum Investor**"); (v) Clocktower Investment Pte Ltd., a private company limited by shares organized under the laws of the Republic of Singapore ("**Initial GIC Investor**"); (vi) the Persons who became parties to this Agreement by executing a signature page hereto on the date hereof (collectively, the "**Initial Managers**"); and (vii) any other Persons who become parties to this Agreement pursuant to a Joinder Agreement (as defined herein) from time to time.

WHEREAS, the Company, Eagle Holding Company II, LLC, a Delaware limited liability company and wholly owned subsidiary of the Company ("**Holdings**"), Eagle Reorganization Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Holdings ("**Merger Sub**"), Eagle Buyer, Inc., a Delaware corporation ("**Buyer**") and Jaguar Holding Company I, a Delaware corporation ("**Jaguar I**"), entered into an Agreement and Plan of Merger, dated as of April 26, 2017 (as it may be amended from time to time, the "**Merger Agreement**"), pursuant to which, among other things, Merger Sub merged with and into Jaguar I (the "**Reorganization Merger**") with Jaguar I surviving the Reorganization Merger, Jaguar I was converted into a Delaware limited liability company following the Reorganization Merger, and immediately thereafter, Buyer merged with and into the Company (the "**Merger**") with the Company surviving the Merger.

WHEREAS, as of the date of this Agreement, CP VI Holdings, the Initial Carlyle Entities, the Initial H&F Entities, the Initial Blue Spectrum Investor, the Initial GIC Investor and the Initial Managers hold the respective amounts of the issued and outstanding Common Stock (as defined herein) set forth in Schedule 1 to this Agreement.

WHEREAS, the parties deem it in their best interests and in the best interests of

4

the Company to set forth their respective rights and obligations with respect to the affairs of the Company and the Equity Securities now or hereafter held by the Stockholders.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations hereinafter set forth, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1        *Certain Defined Terms*. As used herein, the following terms shall have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person; provided, that (i) in no event shall the Affiliates of the H&F Entities, the Carlyle Entities, the Blue Spectrum Entities or the GIC Entities, respectively, include any of their respective Portfolio Companies and (ii) the Company, its Subsidiaries and the Company's other controlled Affiliates will not be deemed to be Affiliates of any of the H&F Entities, any of the Carlyle Entities, any of the Blue Spectrum Entities or any of the GIC Entities.

"**Agreement**" means this Stockholders Agreement as it may be amended, supplemented, restated or modified from time to time.

"**AIV/Parallel Vehicle**" means any alternative investment vehicle or parallel investment vehicle through which investors in any private equity investment fund Affiliate of a Sponsor Fund Entity are or may be permitted or required to invest pursuant to the terms of such private equity investment fund.

"**Applicable Employee**" shall mean (i) with respect to any Manager who is an employee, consultant or Independent Director of the Company or any of its Subsidiaries, such employee, consultant or Independent Director and (ii) with respect to any Manager who is not an employee, consultant or Independent Director of the Company or any of its Subsidiaries, the employee, consultant or Independent Director of the Company or any of its Subsidiaries with respect to whom such Manager was, directly or (through another Permitted Transferee) indirectly, a Permitted Transferee at the time such Manager became the Beneficial Owner of any Shares or Options.

"**Applicable Transfer Date**" means (i) with respect the Blue Spectrum Entities and the GIC Entities, the first anniversary of an IPO and (ii) with respect to the Managers, the date following the IPO determined by the Company Board to be the Applicable Transfer Date with respect to the Managers.

"**Beneficial Ownership**" by a Person of any securities includes ownership by any Person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares (i) voting power which includes the power to vote, or to direct the voting of, such security; and/or (ii) investment power which includes the power to dispose, or to direct the disposition, of such security.  The terms "**Beneficially Own**" and

CONFIDENTIAL                                    MENNINGER_SUPP000506

"**Beneficial Owner**" shall have a correlative meaning. For the avoidance of doubt, no Stockholder shall be deemed to Beneficially Own (x) any securities of the Company or any of its Subsidiaries held by any other holder of such securities solely by virtue of the provisions of this Agreement (other than this definition), (y) any Restricted Shares held by such Stockholder or (z) any shares issuable upon exercise of an unvested Option.

"**Blue Spectrum Board Representation Number**" means the following number as applicable from time to time:

(i) one (1) if the Blue Spectrum Entities, collectively, hold of record and Beneficially Own at least 5% of the outstanding Shares, or

(ii) zero (0), if the condition in clause (i) above is not satisfied.

"**Blue Spectrum Entities**" means each of the Initial Blue Spectrum Investor and the Blue Spectrum Entities' Permitted Transferees that hold of record and Beneficially Own any Shares or Options from time to time.

"**Blue Spectrum Investor**" means the Initial Blue Spectrum Investor (or such other Blue Spectrum Entity as may be designated by the Initial Blue Spectrum Investor from time to time).

"**Business Day**" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Capital Stock**" means, with respect to any Person at any time, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital stock, partnership interests (whether general or limited) or equivalent ownership interests in or issued by such Person.

"**Carlyle Board Representation Number**" means the following number as applicable from time to time:

(i) two (2), if (x) the Carlyle Entities, collectively, hold of record and Beneficially Own at least 15% of the outstanding Shares or (y) (A) the H&F Entities, collectively, hold of record and Beneficially Own at least 15% of the outstanding Shares and (B) the Continuing Ownership Percentage of the Carlyle Entities is no less than the Continuing Ownership Percentage of the H&F Entities,

(ii) one (1), if (x) (A) the Carlyle Entities, collectively, hold of record and Beneficially Own less than 15%, but at least 7.5%, of the outstanding Shares and (B) clause (i)(y) above does not apply or (y) (A) the H&F Entities, collectively, hold of record and Beneficially Own less than 15%, but at least 7.5%, of the outstanding Shares and (B) the Continuing Ownership Percentage of the Carlyle Entities is no less than the Continuing Ownership Percentage of the H&F Entities, or

(iii) zero (0), if (x) the Carlyle Entities, collectively, hold of record and Beneficially Own less than 7.5% of the outstanding Shares and (y) neither clause (i)(y)

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000507

nor (ii)(y) above applies.

"**Carlyle Co-Investor Entities**" means each of the Carlyle Entities' Permitted Co-Investor Transferees that hold of record and Beneficially Own any Shares or Options from time to time.

"**Carlyle Entities**" means each of the Carlyle Fund Entities and the Carlyle Co-Investor Entities.

"**Carlyle Equity Commitment Letter**" means the Equity Commitment Letters of the Initial Carlyle Entities.

"**Carlyle Fund Entities**" means each of CP VI Holdings, the Initial Carlyle Entities and the Carlyle Entities' Permitted Sponsor Transferees that hold of record (except with respect to Carlyle VI, CP VI Coinvestment A and CP VI Coinvestment B) and Beneficially Own any Shares or Options from time to time; provided, that, CP VI Holdings shall only be deemed to be a Carlyle Fund Entity if all of its Equity Securities are owned of record and Beneficially Owned by one or more Carlyle Fund Entities and/or Carlyle Co-Investor Entities.

"**Carlyle Independent Director**" means any Carlyle Designated Director or Carlyle Nominee who the Carlyle Sponsor identifies in writing to the H&F Sponsors as not being an investment professional employed by, or a partner or member of, a management entity affiliate of the Carlyle Fund Entities.

"**Carlyle Sponsor**" means CP VI Holdings (or such other Carlyle Fund Entity as may be designated by the holders of a majority of the Shares Beneficially Owned by the Carlyle Entities from time to time); provided, that, in the event that CP VI Holdings is no longer a Carlyle Fund Entity, then the Carlyle Entities will designate a Carlyle Fund Entity to serve as the Carlyle Sponsor.

"**Change of Control Transaction**" means (i) the sale, in one transaction or series of related transactions (including one or more stock sales, mergers, business combinations, recapitalizations, consolidations, reorganizations, restructurings or similar transactions), of all or substantially all of the consolidated assets of the Company and its Subsidiaries to any Person (other than, without the consent of all Sponsors, any Sponsor Investor or any Person(s) who prior to such transaction is a Permitted Transferee or Portfolio Company of any Sponsor Investor) or (ii) any transaction or series of related transactions resulting in any Person (other than, without the consent of all Sponsors, any Sponsor Investor or any Person(s) who prior to such transaction is a Permitted Transferee or Portfolio Company of any Sponsor Investor) acquiring at least 50% of the aggregate voting power of all outstanding Voting Securities of the Company or its successor.

"**Closing**" means the Closing (as defined in the Merger Agreement).

"**Common Stock**" means the Voting Common Stock and the Non-Voting Common Stock.

"**Company Board**" means the Board of Directors of the Company.

041945-0274-16469-Active.21575798.1
CONFIDENTIAL                                                              MENNINGER_SUPP000508

"**Company Sale**" means a Change of Control Transaction, <u>provided</u> that for purposes of this definition the reference to "50%" in the definition of "Change of Control Transaction" shall be deemed to be a reference to "100%" (for the avoidance of doubt, such 100% requirement shall be satisfied if an acquiring Person directly or indirectly acquires 100% of the aggregate voting power of all outstanding Voting Securities of the Company even if the consideration payable to Stockholders includes equity securities of such acquiring Person).

"**Competitor**" means any of the Persons identified in Schedule 2 hereto or any controlled Affiliate of any of such Persons, in each case together with their respective successors and assigns.

"**Consulting Services Agreements**" means each of (i) the Amended and Restated Consulting Services Agreement, dated as of May 11, 2017, among Jaguar I, PPD Development, L.P. and Carlyle Investment Management L.L.C. in the form attached as <u>Exhibit A-1</u> and (ii) the Amended and Restated Consulting Services Agreement, dated as of May 11, 2017, among Jaguar I, PPD Development, L.P. and Hellman & Friedman L.P. in the form attached as <u>Exhibit A-2</u>.

"**Continuing Ownership Percentage**" means, with respect to any Stockholder or group of Stockholders, as of the time of determination, a fraction (expressed as a percentage) the numerator of which is the aggregate number of Shares held of record and Beneficially Owned by such Stockholder or group of Stockholders (in each case, together with their Permitted Transferees) at such time, and the denominator of which is the aggregate number of Shares held of record and Beneficially Owned by such Stockholder or group of Stockholders immediately after the Closing Date (as adjusted for stock splits, combinations, reclassifications and similar transactions).

"**control**" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or any other means.

"**Controlled Entity**" means any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise controlled by the Company.

"**Debt Financing Agreements**" means any bond, note, loan or other agreement under which the Company or any of its Subsidiaries has borrowed money or otherwise incurred any indebtedness together with all guarantees, security agreements, indentures and other agreements relating to any of the foregoing.

"**Deferred Payment Date**" means the Deferred Payment Date (as defined in the Merger Agreement).

"**Director**" means any member of the Company Board (other than any advisory, honorary or other non-voting member of the Company Board).

"**Eligible Financial Investor**" means each Financial Investor that is not an

Affiliate of the Prospective Selling Stockholder; provided, that, in the case of the Blue Spectrum Entities and the GIC Entities only, such Financial Investor shall only constitute an Eligible Financial Investor if and only to the extent a Sponsor Investor exercises its right of first refusal pursuant to Section 4.3.

"**Employee Repurchase Arrangement**" means any agreement, plan or arrangement pursuant to which the Company or any of its Subsidiaries has the right to repurchase or redeem the capital stock or other equity securities of any employee, director or consultant of the Company or any of its Subsidiaries, whether in connection with the termination of the employment of, or receipt of services from, such employee, director or consultant or otherwise.

"**Encumbrance**" means any mortgage, deed of trust, lien, pledge, charge, security interest, claim or other encumbrance or any kind or character.

"**Equity Commitment Letters**" means the Equity Commitment Letters (as defined in the Merger Agreement).

"**Equity Securities**" means any Capital Stock or any securities exchangeable or excisable for, or convertible into, any Capital Stock.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor federal statute thereto, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Sponsor Equityholder**" means (i) in the case of the Carlyle Entities, any equityholder of TC Group, L.L.C. or any of its Affiliates that is not (A) an individual who serves in a position of officer, director, employee, consultant or advisor of TC Group, L.L.C. or any of its Affiliates or (B) an entity that is wholly owned by individuals referred to in the foregoing clause (A) and/or family members of any such individual and (ii) in the case of the H&F Entities, any equityholder of Hellman & Friedman LLC or any of its Affiliates that is not (A) an individual who serves in a position of officer, director, employee, consultant or advisor of Hellman & Friedman, LLC or any of its Affiliates or (B) an entity that is wholly owned by individuals referred to in the foregoing clause (A) and/or family members of any such individual.

"**Fair Market Value**" means, as of a given date, the fair market value as determined in good faith by the Company Board, provided that if the Company enters into any agreement with a Manager modifying the definition of Fair Market Value with respect to such Manager for purposes of this Agreement such modification shall govern to the extent required by such agreement.

"**Financial Investor**" means any of (i) the Carlyle Entities, (ii) the H&F Entities, (iii) the Blue Spectrum Entities or (iv) the GIC Entities.

"**Financial Investor Group**" means (i) the Carlyle Entities, taken together, (ii) the H&F Entities, taken together, (iii) the Blue Spectrum Entities, taken together or (ii) the GIC Entities, taken together.

041945-0274-16469-Active.21575798.1
CONFIDENTIAL                    MENNINGER_SUPP000510

"**FINRA**" means the Financial Industry Regulatory Authority, Inc.

"**GIC Board Representation Number**" means the following number as applicable from time to time:

(i) one (1) if the GIC Entities, collectively, hold of record and Beneficially Own at least 5% of the outstanding Shares, or

(ii) zero (0), if the condition in clause (i) above is not satisfied.

"**GIC Entities**" means each of the Initial GIC Investor and the GIC Entities' Permitted Transferees that hold of record and Beneficially Own any Shares or Options from time to time.

"**GIC Investor**" means the Initial GIC Investor (or such other GIC Entity as may be designated by the Initial GIC Investor from time to time).

"**H&F Board Representation Number**" means the following number as applicable from time to time:

(i) three (3), if the H&F Entities, collectively, hold of record and Beneficially Own at least 30%, of the outstanding Shares,

(ii) two (2), if the H&F Entities, collectively, hold of record and Beneficially Own less than 30%, but at least 15%, of the outstanding Shares,

(iii) one (1), if the H&F Entities, collectively, hold of record and Beneficially Own less than 15%, but at least 7.5%, of the outstanding Shares, or

(iv) zero (0), if the H&F Entities, collectively, hold of record and Beneficially Own less than 7.5% of the outstanding Shares,

provided, however, that, notwithstanding anything to the contrary herein, the H&F Board Representation Number shall not be reduced pursuant to the foregoing clauses (i), (ii) or (iii) if (x) the Continuing Ownership Percentage of the H&F Entities is no less than the Continuing Ownership Percentage of the Carlyle Entities and (y) the reduction in such H&F Board Representation Number as determined pursuant to such applicable clause would result in the H&F Board Representation Number being equal to the Carlyle Board Representation Number.

"**H&F Entities**" means each of the Initial H&F Entities and the H&F Entities' Permitted Sponsor Transferees that hold of record and Beneficially Own any Shares or Options from time to time.

"**H&F Equity Commitment Letter**" means the Equity Commitment Letters of the Initial H&F Entities.

"**H&F Independent Director**" means any H&F Designated Director or H&F

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000511

Nominee who the H&F Sponsors identify in writing to the Carlyle Sponsor as not being an investment professional employed by, or a partner or member of, a management entity affiliate of the H&F Entities.

"**H&F Sponsors**" means, collectively, HFCP VII (or such other H&F Entity as may be designated by HFCP VII from time to time) and HFCP VIII (or such other H&F Entity as may be designated by HFCP VIII from time to time); provided, that, for the purposes of Section 2.1:

> (i) if three (3) individuals are to be designated or nominated as directors (but not, for the avoidance of doubt, as Independent Directors) by the H&F Sponsors, then (x) each of the H&F Sponsors shall have the right to so designate or nominate one (1) individual and (y) the H&F Sponsors shall jointly have the right to so designate or nominate one (1) individual,

> (ii) if two (2) individuals are to be designated or nominated as directors (but not, for the avoidance of doubt, as Independent Directors) by the H&F Sponsors, then each of the H&F Sponsors shall have the right to so designate or nominate one (1) individual, or

> (iii) if (x) one (1) individual is to be designated or nominated as a director (but not, for the avoidance of doubt, as an Independent Director) by the H&F Sponsors or (y) any individual is to be designated or nominated as an Independent Director by the H&F Sponsors or mutually designated or nominated as an Independent Director by the Sponsor Investors, then the H&F Sponsors shall jointly have the right to so designate or nominate such individual.

"**Independent Director**" means any Director who is not (i) affiliated with or employed by (x) any Financial Investor, (y) any Affiliate of any Financial Investor or (z) other than as a Director, the Company or any of its Subsidiaries or (ii) employed by any Portfolio Company of (x) any Sponsor Investor having the right to designate such Director or (y) any of such Sponsor Investor's Affiliates.

"**Interim Period**" means the time period that commences on the Closing Date and ends on the Deferred Payment Date.

"**IPO**" means the consummation of an underwritten initial Public Offering of Shares (whether a primary or a secondary offering) pursuant to a Registration Statement under the Securities Act, including any Qualifying IPO.

"**Law**" means any statue, law, regulation, ordinance, rule, injunction, order, decree, directive or any similar form of decision of, or determination by, any governmental or self-regulatory authority.

"**LTM EBITDA**" means Consolidated EBITDA (as defined in the Credit Agreement, dated as of August 18, 2015, by and among Jaguar Holding Company II, Pharmaceutical Product Development, LLC, Jaguar I, each lender from time to time party thereto and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent, Collateral Agent and

an L/C Issuer, as amended by that certain Amendment No. 1, dated as of May 31, 2016, and that certain Amendment No. 2, dated as of November 10, 2016, and, to the extent approved in writing by all Sponsors, any further amendments, supplements and other modifications, refinancings and replacements from time to time after the date thereof) during the twelve (12) consecutive month period ending on the last day of the last full calendar month that ended before the measurement date.

"**Manager**" means (i) the Initial Managers, (ii) any employee, consultant or Independent Director who becomes a record holder and Beneficial Owner of any Shares or Options and (iii) their respective direct or (through another Permitted Transferee) indirect Permitted Transferees that hold any Shares or Options from time to time.

"**Manager Group**" means each Manager, for so long as he, she or it holds Shares or Options, and any of his, her or its direct or (through another Permitted Transferee) indirect Permitted Transferees that hold Shares or Options.

"**Material Contract**" means any (i) master services agreement that is reasonably expected to result in an annual revenues to the Company and its Subsidiaries of at least $20 million or (ii) any contract providing for a capital commitment by the Company or any of its Subsidiaries to any private equity, venture capital or other investment fund entity.

"**Non-Voting Common Stock**" means the non-voting common stock, par value $0.01 per share, of the Company.

"**Options**" means any options, warrants or other rights to subscribe for, purchase or otherwise acquire Shares granted by the Company or any of its Subsidiaries.

"**Parties**" means the Company, CP VI Holdings, the Initial Carlyle Entities, the Initial H&F Entities, the Initial Blue Spectrum Investor, the Initial GIC Investor, the Initial Managers and any other Persons who become parties to this Agreement pursuant to a Joinder Agreement from time to time.

"**Permitted Co-Investor Transferee**" means, with respect to any Sponsor Investor, any co-investment vehicle Affiliate of such Sponsor Investor formed primarily for the purpose of facilitating investments in the Company (other than any AIV/Parallel Vehicle or CP VI Holdings). For the avoidance of doubt, it is understood that "Permitted Co-Investor Transferee" shall not include any co-investment vehicle formed to directly or indirectly transfer economic, dispositive or other direct or indirect ownership interests in the Company or any of its Subsidiaries in circumvention of the transfer restriction provisions herein.

"**Permitted Estate Planning Vehicle**" means, with respect to any Manager, (i) a trust or custodianship the beneficiaries of which may include only the Applicable Employee and the individuals identified in clause (ii) (A) of the definition of "Permitted Transferee" and with respect to which the Applicable Employee is the sole trustee or custodian or (ii) any limited liability company or partnership (A) with respect to which all of the outstanding equity interests are held of record and Beneficially Owned solely by the Applicable Employee and the individuals identified in clause (ii)(A) of the definition of "Permitted Transferee" and (B) with respect to which such Applicable Employee is the sole manager or managing member (if a

12

limited liability company) or the sole general partner (if a limited partnership) and otherwise has the sole power to direct or cause the direction of the management and policies, directly or indirectly, of such limited liability company or partnership, whether through the ownership of voting securities, by contract or otherwise.

"**Permitted Sponsor Transferee**" means, with respect to any Sponsor Investor, any (i) private equity investment fund Affiliate (i.e. a private equity fund that, together with its AIV/Parallel Vehicles is organized to invest in multiple Portfolio Companies) of such Sponsor Investor (including any AIV/Parallel Vehicle), other than (x) any Permitted Co-Investor Transferee and (y) in the case of the Carlyle Fund Entities, any Carlyle Co-Investor Entity, (ii) general partner of any such private equity investment fund Affiliate, (iii) direct or indirect parents of any such general partner, (iv) direct or indirect wholly owned subsidiaries of any such general partner or direct or indirect parent, (v) other investment vehicle that is (A) an Affiliate of such Sponsor Investor and (B) directly or indirectly wholly-owned by (I) one or more Persons referred to in clauses (ii) through (iv) of this definition and/or (II) one or more officers, directors, partners, employees, members, stockholders, consultants, advisors or associates of any such Persons and/or (III) CP VI Holdings for as long as it is a Carlyle Entity (provided that if the percentage of the investment, if any, in such other vehicle by Excluded Sponsor Equityholders, in the aggregate, out of the total investments in such vehicle exceeds the percentage investment in TC Group, L.L.C. or Hellman & Friedman, LLC, as applicable, by Excluded Sponsor Equityholders, in the aggregate (such excess, the "**Excess Percentage**"), then a fraction (equal to the Excess Percentage) of the Shares held by such vehicle shall be considered held by a Permitted Co-Investor Transferee, instead of a Permitted Sponsor Transferee) or (vi) CP VI Holdings so long as it is a Carlyle Entity. For the avoidance of doubt, it is understood that "Permitted Sponsor Transferee" shall not include any (x) Portfolio Company of a Sponsor Investor or any of their respective Affiliates or (y) any co-investment vehicle or other special purpose vehicle formed to directly or indirectly transfer economic, dispositive or other direct or indirect ownership interests in the Company or any of its Subsidiaries in circumvention of the transfer restriction provisions herein.

"**Permitted Transferee**" of a Person means (i) in the case of a Sponsor Investor, any Permitted Sponsor Transferee of such Sponsor Investor and, solely in the case of a Carlyle Entity (and in such case solely to the extent set forth in <u>Section 4.2</u>) any Permitted Co-Investor Transferee of such Sponsor Investor, (ii) in the case of a Manager, (A) the Applicable Employee with respect to such Manager and the spouse and lineal descendents (including adopted) of such Applicable Employee, (B) the conservators, guardians, executors, administrators, testamentary trustees, legatees or beneficiaries of such Applicable Employee or any Person set forth in the immediately foregoing clause (A) or (C) a Permitted Estate Planning Vehicle, or (iii) in the case of a Financial Investor (other than any Sponsor Investor), any (A) Affiliate of such Financial Investor whose ultimate Beneficial Ownership is substantially similar to that of such Financial Investor or (B) any private equity fund managed or majority owned by such Financial Investor (or any Person set forth in the immediately foregoing clause (A)) that is branded with the name "GIC" (if such Financial Investor is a GIC Entity) or "ADIA" (if such Financial Investor is a Blue Spectrum Entity).

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including any governmental authority.

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000514

"**Plan Asset Regulations**" means the regulations issued by the U.S. Department of Labor at Section 2510.3-101 of Part 2510 of Chapter XXV, Title 29 of the Code of Federal Regulations, or any successor regulations.

"**Portfolio Company**" means, with respect to (i) any Sponsor Investor, any operating portfolio company (or holding company thereof) in which such Sponsor Investor (if it is an investment fund) or one or more of its investment fund Affiliates at such time, directly or indirectly, has an equity investment or otherwise controls and (ii) with respect to any Financial Investor (other than a Sponsor Investor), any operating portfolio company (or holding company thereof) in which such Financial Investor or one of its Affiliates, directly or indirectly, has an equity investment or otherwise controls.

"**Public Offering**" means a public offering of Shares pursuant to a Registration Statement declared effective under the Securities Act.

"**Qualifying IPO**" means the consummation of an underwritten initial Public Offering pursuant to a Registration Statement under the Securities Act (other than on Form S-4, S-8 or a comparable form under the Securities Act) that includes a primary offering of Shares by the Company for aggregate gross proceeds received by the Company of at least $400 million (or, if otherwise agreed in writing by all Sponsors, any higher or lower amount).

"**Recapitalization Transaction**" means any transaction or series of related transactions in which one or more classes of securities issued by the Company or any of its direct or indirect Subsidiaries are, in whole or in part on a pro rata basis among all holders of such securities, converted into, or exchanged for, securities in another form issued by the Company, any of its direct or indirect Subsidiaries, any newly formed parent and/or any affiliated Person.

"**Restricted Shares**" means any Shares that are subject to vesting in connection with the continued employment with, or provision of services to, the Company or any of its Subsidiaries.  Such Shares will cease to constitute Restricted Shares upon vesting.

"**Restrictive Covenant Breach**" means the material breach by a Manager of any confidentiality, non-competition, non-solicitation, or similar restrictive covenant contained in any written agreement between such Manager and the Company or any subsidiary thereof; provided, however, that no Restrictive Covenant Breach will be deemed to have occurred unless the Company (or Subsidiary of the Company that is party to the applicable agreement) has provided such Manager written notice, with reasonable specificity, of the alleged breach, and Manager has not fully cured such alleged breach within ten (10) Business Days following delivery of such written notice.

"**Rule 144**" means Rule 144 under the Securities Act (or any analogous successor provision).

"**Same Terms and Conditions**" means the same price and otherwise on the same terms and conditions (and with respect to any consideration to be paid to any Stockholder with respect to, arising out of, or in connection with the Transfer (excluding any amounts payable under any Consulting Services Agreement that is in addition to the consideration paid to such Stockholder as payment for, or distribution on, its Shares), such same terms and conditions shall

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000515

mean that each Stockholder shall receive such Stockholder's pro rata share (based on the number of Shares held by such Stockholder included in the applicable transaction) of such consideration); provided, however, that (a) any price paid for Options will be subject to reduction for the applicable exercise price, (b) except as otherwise required by any agreement between the Company and a Manager with respect to his or her Shares or Options, subject to the prior written consent of all Sponsors (other than with respect to any rollover of Equity Securities by management or employees of the Company and its Subsidiaries in connection with such transaction, which shall not require any such consent), the form of consideration paid to any Stockholder (other than a Financial Investor) may be different so long as the different forms of consideration have the same Fair Market Value as of the date of approval by the Company Board of the applicable definitive agreement, (c) the Sponsor Investors may receive (and, if either a Carlyle Entity or an H&F Entity shall be entitled to so receive, then the H&F Entities and the Carlyle Entities, respectively, also shall be so entitled to receive), even if not offered to the other Stockholders, rights to appoint members of the board of directors or similar governing body of the purchaser or any of its Affiliates, or any other governance rights (including board observer rights), (d) the Blue Spectrum Entities and GIC Entities may receive (and, if either a Blue Spectrum Entity or a GIC Entity shall be entitled to so receive, then the GIC Entities and the Blue Spectrum Entities, respectively, also shall be so entitled to receive), even if not offered to the other Stockholders, rights to appoint members of the board of directors or similar governing body of the purchaser or any of its Affiliates, or any other governance rights (including board observer rights), (e) the Sponsor Investors may receive (and, if either a Carlyle Entity or an H&F Entity shall be entitled to so receive, then the H&F Entities and the Carlyle Entities, respectively, also shall be so entitled to receive), even if not offered to the other Stockholders, rights to Transfer any securities received in such transaction not given to the other Stockholders so long as the other Stockholders are permitted to Transfer their securities on a pro rata basis with the Sponsor Investors, (f) the Blue Spectrum Entities and GIC Entities may receive (and, if either a Blue Spectrum Entity or a GIC Entity shall be entitled to so receive, then the GIC Entities and the Blue Spectrum Entities, respectively, also shall be so entitled to receive), even if not offered to the other Stockholders, rights to Transfer any securities received in such transaction not given to the other Stockholders so long as the other Stockholders are permitted to Transfer their securities on a pro rata basis with the Blue Spectrum Entities and GIC Entities and (g) Stockholders holding shares of Non-Voting Common Stock may receive non-voting securities in such transaction.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute thereto, and the rules and regulations of the SEC promulgated thereunder.

"**Shares**" means shares of Common Stock (including any Restricted Shares).

"**Sponsor**" means each of (i) the Carlyle Sponsor and (ii) the H&F Sponsors.

"**Sponsor Fund Entity**" means any of (i) the Carlyle Fund Entities or (ii) the H&F Entities.

"**Sponsor Investor**" means any of (i) the Carlyle Entities or (ii) the H&F Entities.

15

"**Sponsor Investor Group**" means (i) the Carlyle Entities, taken together, or (ii) the H&F Entities, taken together.

"**Stockholders**" means, collectively, the Financial Investors, the Managers and such other Persons, if any (other than the Company and its respective successors and assigns), that from time to time become a party hereto.

"**Subsidiary**" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership), or (ii) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"**Tag-Along Pro Rata Portion**" means, with respect to an Eligible Tag-Along Stockholder, a number of Shares equal to (i) the number of Shares Beneficially Owned by such Stockholder, multiplied by (ii) a fraction, the numerator of which is the aggregate number of Shares proposed to be Transferred by the Stockholder Sellers in the transaction subject to the applicable Sale Notice, and the denominator of which is the aggregate number of Shares Beneficially Owned by such Stockholder Sellers (including all members of their Sponsor Investor Group).

"**Transfer**" means, in respect of any Shares or any legal, economic or beneficial interest in such Shares, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of (by operation of law or otherwise), either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, Encumbrance or similar disposition thereof (by operation of law or otherwise); provided that the transfer of limited partnership interests, limited liability company interests or other equity interests in (i) any of the Sponsor Investors or (ii) any direct or indirect parent entity with respect to any such Sponsor Investor, in each case, by any Person that is not an Affiliate of such Sponsor Investor, shall not constitute a Transfer for purposes of this Agreement.

"**Voting Common Stock**" means the voting common stock, par value $0.01 per share, of the Company.

"**Voting Securities**" means at any time shares of any class of Capital Stock or other securities of the Company or any of its Subsidiaries (including, for the avoidance of doubt, Voting Common Stock) that are then entitled to vote generally in the election of Directors and not solely upon the occurrence and during the continuation of certain specified events, and any securities convertible into or exercisable or exchangeable for such shares of Capital Stock or other securities.

16

Section 1.2      *Other Defined Terms*.   The following terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
|------|---------|
| Accepting Participation Stockholder | Section 6.2(a) |
| Action | Section 8.1 |
| Adverse Disclosure | Section 5.1(b) |
| Applicable Shares | Section 10.1(a) |
| Approved Sale | Section 9.2(c) |
| Approved Sale Proposal | Section 9.2(c) |
| Automatic Shelf Registration Statement | Section 5.1(b) |
| Blue Spectrum Designated Director | Section 2.1(b)(i)(C) |
| Blue Spectrum Holder | Section 5.1(a) |
| Blue Spectrum Nominee | Section 2.1(c)(i) |
| Buyer | Recitals |
| Call Right | Section 10.1(a) |
| Carlyle Default | Section 2.3(a) |
| Carlyle Designated Director | Section 2.1(b)(i)(A) |
| Carlyle Holder | Section 5.1(c) |
| Carlyle Nominee | Section 2.1(c)(i) |
| Carlyle Qualifying IPO Request | Section 9.1(b) |
| Carlyle VI | Preamble |
| Cause | Section 10.7(a) |
| CEO | Section 2.1(b)(i)(E) |
| Code | Section 10.7(b) |
| Company | Preamble |
| Consultant | Section 10.7(c) |
| Contingent Sale Exercise Notice | Section 4.7(b) |
| Contingent Sale Right | Section 4.7(a) |
| Contingent Sale Right Holder | Section 4.7(a) |
| Corporate Entity | Section 2.5(b)(vi) |
| CP VI Coinvestment A | Preamble |
| CP VI Coinvestment B | Preamble |
| CP VI Holdings | Preamble |
| Cure Period | Section 4.7(a) |
| Defaulting Sponsor | Section 4.7(a) |
| Demand Delay | Section 5.3(a)(ii) |
| Demand Holder | Section 5.3(a) |
| Demand Period | Section 5.3(c) |
| Demand Registration | Section 5.3(a) |
| Drag-Along Notice | Section 4.5(a) |
| Drag-Along Right | Section 4.5(a) |
| Drag-Along Sellers | Section 4.5(a) |
| Dual Track Process | Section 9.1(a) |
| Eligible Tag-Along Stockholder | Section 4.4(a) |
| Eligible Take-Down Holder | Section 5.1(e) |

17

Employee ............................................................................................... Section 10.7(d)

Employee Equity Arrangement ............................................................ Section 2.3(c)(vii)

Exigent Circumstances Purchasers ...................................................... Section 6.4

Financial Investor Holder ..................................................................... Section 5.1(f)

Funding Default ..................................................................................... Section 4.7(a)

GIC Designated Director ..................................................................... Section 2.1(b)(i)(D)

GIC Holder............................................................................................. Section 5.1(g)

GIC Nominee ......................................................................................... Section 2.1(c)(i)

H&F Company Sale Request ................................................................ Section 9.1(a)

H&F Default ........................................................................................... Section 2.3(a)

H&F Designated Director ..................................................................... Section 2.1(b)(i)(B)

H&F Designated Independent Director ............................................. Section 2.1(b)(i)(F)

H&F Dual Track Request ...................................................................... Section 9.1(a)

H&F Holder ............................................................................................ Section 5.1(f)

H&F Nominee ......................................................................................... Section 2.1(c)(i)

H&F Qualifying IPO Request ............................................................... Section 9.1(a)

H&F Request for Liquidity ................................................................... Section 9.1(e)

HFCP VII ............................................................................................... Preamble

HFCP VII Executives ........................................................................... Preamble

HFCP VII Parallel ................................................................................ Preamble

HFCP VII Parallel-A ............................................................................ Preamble

HFCP VIII............................................................................................... Preamble

HFCP VIII Associates .......................................................................... Preamble

HFCP VIII Executives .......................................................................... Preamble

HFCP VIII Parallel ............................................................................... Preamble

HFCP VIII Parallel-A ........................................................................... Preamble

Holder ..................................................................................................... Section 5.1(i)

Holders ................................................................................................... Section 5.1(i)

Holdings.................................................................................................. Recitals

Indemnification Sources ...................................................................... Section 8.2

Indemnified Liabilities ......................................................................... Section 8.1

Indemnified Party.................................................................................. Section 5.7(c)

Indemnifying Party ............................................................................... Section 5.7(c)

Indemnitee-Related Entities ................................................................ Section 8.2

Indemnitees ............................................................................................ Section 8.1

Initial Blue Spectrum Entities ............................................................. Preamble

Initial Carlyle Entities .......................................................................... Preamble

Initial GIC Entities ............................................................................... Preamble

Initial H&F Entities............................................................................... Preamble

Initial Managers .................................................................................... Preamble

In-Kind Distribution............................................................................. Section 4.1(f)

Investment Bank .................................................................................... Section 9.2(a)

IPO Registration Statement................................................................. Section 9.3(a)

Jaguar I................................................................................................... Recitals

Joinder Agreement ............................................................................... Section 4.1(d)

Jointly Indemnifiable Claims............................................................... Section 8.2

18

Liquidity Sponsor ......................................................................................... Section 9.1(e)
Litigation ................................................................................................... Section 11.8(a)
Manager Group Representative ...................................................................... Section 11.14
Manager Side Agreements ............................................................................. Section 3.1(e)
Marketed Take-Down Notice ...................................................................... Section 5.2(d)(iii)
Marketed Underwritten Shelf Take-Down ................................................... Section 5.2(d)(iii)
Merger ................................................................................................................ Recitals
Merger Agreement ............................................................................................... Recitals
Merger Sub .......................................................................................................... Recitals
Non-Corporate Entity ................................................................................. Section 2.5(b)(vii)
Offer Shares .................................................................................................. Section 4.4(a)
Offering Memorandum .................................................................................... Section 9.2(b)
Parent Stockholder ........................................................................................ Section 1.3(d)
Participating Stockholder Seller ...................................................................... Section 4.5(a)
Participation Closing ......................................................................................... Section 6.3
Participation Notice ........................................................................................... Section 6.1
Participation Portion ...................................................................................... Section 6.9(a)
Participation Securities .................................................................................. Section 6.9(b)
Participation Stockholder ............................................................................... Section 6.9(c)
Participation Subsidiary ................................................................................. Section 6.9(d)
Participation Undersubscription ...................................................................... Section 6.2(a)
Post 6 Year Liquidity Request .......................................................................... Section 9.1(c)
Post-Closing Issuance .................................................................................... Section 6.9(e)
Post-Closing Syndication Period ......................................................................... Section 4.2
Post-Closing Syndication Transfer ...................................................................... Section 4.2
Post-IPO Period .............................................................................................. Section 2.1(c)
Pre-Closing H&F Entities ...................................................................................... Preamble
Pre-IPO Period ............................................................................................... Section 2.1(b)
Pro Rata Take-Down Share ...................................................................... Section 5.2(d)(ii)(C)(1)
Proceeding .............................................................................................. Section 2.3(c)(xxiv)
Proposed Transferee ...................................................................................... Section 4.4(a)
Prospective Selling Stockholder .......................................................................... Section 4.3
Prospective Subscriber ................................................................................... Section 6.1(a)
Prospectus ...................................................................................................... Section 5.1(j)
Qualifying IPO Determination .......................................................................... Section 9.1(c)
Recapitalization Notice ................................................................................... Section 4.6(b)
Recapitalization Percentage ............................................................................ Section 4.6(b)
Record Holder Stockholder .............................................................................. Section 1.3(d)
register ........................................................................................................... Section 5.1(k)
registered ....................................................................................................... Section 5.1(k)
Registrable Securities ....................................................................................... Section 5.1(l)
registration ..................................................................................................... Section 5.1(k)
Registration Expenses ..................................................................................... Section 5.1(m)
Registration Statement .................................................................................... Section 5.1(k)
Rejected Sale Proposal .................................................................................... Section 9.2(d)
Reorganization Merger ......................................................................................... Recitals

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000520

Repurchase Note ...................................................................................... Section 10.4
Repurchase Period ................................................................................ Section 10.1(a)
Repurchase Price ..................................................................................... Section 10.3
Request for Liquidity ............................................................................... Section 9.1(e)
Restricted Shelf Take-Down ............................................................... Section 5.2(d)(ii)(A)
Restricted Shelf Take-Down Notice .................................................... Section 5.2(d)(ii)(A)
Restricted Take-Down Participation Notice ......................................... Section 5.2(d)(ii)(B)
Restricted Take-Down Selling Holders ............................................... Section 5.2(d)(ii)(A)
Right of First Refusal Notice ................................................................ Section 4.3(b)
ROFR Acceptance Notice ........................................................................ Section 4.3(b)
ROFR Notice Period ............................................................................... Section 4.3(b)
ROFR Undersubscription Notice ............................................................. Section 4.3(b)
Sale Notice ............................................................................................... Section 4.4(a)
Sale Process Determination ...................................................................... Section 9.1(c)
Sale Proposal ............................................................................................ Section 9.2(b)
Section 2.3(b) Termination Date .............................................................. Section 2.3(b)
Service Provider ...................................................................................... Section 10.7(e)
Shelf Holder ............................................................................................. Section 5.2(a)
Shelf Percentage ....................................................................................... Section 5.1(n)
Shelf Period ............................................................................................. Section 5.2(b)
Shelf Registration Statement ................................................................... Section 5.1(o)
Shelf Suspension ...................................................................................... Section 5.2(c)
Shelf Take-Down ..................................................................................... Section 5.1(p)
Shelf Take-Down Percentage .......................................................... Section 5.2(d)(ii)(A)
Sponsor Designated Independent Directors ...................................... Section 2.1(b)(i)(F)
Sponsor Holder ........................................................................................ Section 5.1(q)
Sponsor Investor Seller(s) ........................................................................ Section 4.5(a)
Spousal Consent ....................................................................................... Section 3.2(g)
Stockholder Sellers ................................................................................... Section 4.4(a)
Tag-Along Right .................................................................................... Section 4.4(c)(i)
Tag-Along Sale Period ........................................................................... Section 4.4(c)(i)
Tag-Along Sellers .................................................................................... Section 4.4(b)
Tag-Along Shares ..................................................................................... Section 4.4(b)
Tag-Along Stockholder ............................................................................ Section 4.4(b)
Take-Down Tagging Holders ............................................................ Section 5.2(d)(ii)(A)
Termination of Service ............................................................................. Section 10.7(f)
Third Party Holder ................................................................................... Section 5.1(r)
Third Party Shelf Holder ......................................................................... Section 5.2(a)
VCOC Stockholder ................................................................................... Section 2.6(a)
Well-Known Seasoned Issuer ................................................................... Section 5.1(s)

Section 1.3      *Other Definitional and Interpretation Provisions.*

(a)      The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article and Section references are to this Agreement

unless otherwise specified.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)     Notwithstanding anything herein to the contrary, for all purposes of this Agreement, during the Interim Period, all Shares to be issued on the Deferred Payment Date to the H&F Entities and the Carlyle Entities pursuant to the H&F Equity Commitment Letter and the Carlyle Equity Commitment Letter shall be deemed, including for the purposes of determining the Continuing Ownership Percentage of such Sponsor Investors, as applicable, to have been issued to, and held of record (except with respect to Carlyle VI, CP VI Coinvestment A and CP VI Coinvestment B) and Beneficially Owned by, such Sponsor Investors at the Closing and at all times during the Interim Period; provided, however, that (i) for the avoidance of doubt, when determining the Same Terms and Conditions as applied to any Shares that are to be (but have not yet been) purchased by one or more Sponsor Investors on the Deferred Payment Date, the terms applicable to such Shares may take into account the fact that the applicable purchase price has not yet been paid for such Shares and (ii) for the purposes of determining the number of Shares held by Carlyle Fund Entities relative to any Post-Closing Syndication Transfer, any Shares Transferred to a Carlyle Co-Investor Entity will be deemed held by such Carlyle Co-Investor Entity (and not a Carlyle Fund Entity).

(d)     Notwithstanding anything herein to the contrary, when one Stockholder (the "**Parent Stockholder**") indirectly holds an economic or beneficial interest in Shares through another Stockholder that directly holds the Shares (the "**Record Holder Stockholder**") then:

(i)     The number of Shares deemed Beneficially Owned by the Parent Stockholder will be deemed to be equal to the number of Shares that would be distributed to such Parent Stockholder if the Record Holder Stockholder (and any intermediate holding entities) were to distribute all of the Shares held by such Record Holder Stockholder to such Record Holder Stockholder's (and any such intermediate holding entities') holders of Equity Securities;

(ii)     Subject to the proviso in the definition of "Transfer," any direct or indirect (including by issuance of Equity Securities), sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition (by operation of law or otherwise), either voluntarily or involuntarily, of Equity Securities of such Parent Stockholder, or the entry into any contract, option or other arrangement or other understanding with respect to any of the foregoing, shall be deemed to be a Transfer of a proportionate number of Shares held by the relevant Record Holder Stockholder;

(iii)     The Record Holder Stockholder and not the Parent Stockholder will (A) to the extent applicable, be considered the Eligible Financial Investor and be entitled to exercise the rights of an Eligible Financial Investor pursuant to Section 4.3 (subject to the right of such Eligible Financial Investor to assign its actual right to purchase to its Parent Stockholder(s)); (B) be the Eligible Tag-Along Stockholder for purposes of Section 4.4, Participating Stockholder Seller for purposes of Section 4.5 or Holder entitled to exercise

registration rights under Article V, as applicable; (C) have the obligation to exchange or convert Shares in any Recapitalization Transaction effected pursuant to Section 4.6; and (D) be the Participation Stockholder for purposes of Article VI (subject to the right of such Participation Stockholder to assign its actual right to purchase to its Parent Stockholder(s)) and (E) be considered the Financial Investor (if applicable) and entitled to exercise the rights of a Financial Investor pursuant to Article X (subject to the right of such Financial Investor to assign its actual right to purchase to its Parent Stockholder(s));

(iv)     In the event of any Transfer as a result of the application of Section 1.3(d)(ii) above, the Eligible Tag-Along Stockholders pursuant to Section 4.4 or Participating Stockholder Sellers pursuant to Section 4.5, as applicable, will have the right to directly Transfer Shares in such transaction solely to the extent such Eligible Tag-Along Stockholders or Participating Stockholder Sellers, as applicable, would have such right with respect to a direct Transfer to such transferee by the Record Holder Stockholder of the same number of Shares deemed transferred pursuant to Section 1.3(d)(ii); and

(v)     Unless otherwise agreed by the Sponsor Investors, any sale of Shares pursuant to Section 9.2 will be a direct sale of Shares by the Record Holder Stockholder.

## ARTICLE II

## CORPORATE GOVERNANCE

Section 2.1     *Boards of Directors.*

(a)     *Board Size.*  Unless each of the Sponsors otherwise agree in writing, the Company and the Stockholders shall take such action, including any stockholder votes or written consents in lieu thereof, as may be necessary to cause the Company Board to consist of up to eleven (11) Directors, with the Company Board consisting of the following individuals immediately after the Closing: (i) Stephen H. Wise and Ram Jagannath (each of whom is an initial Carlyle Designated Director); (ii) Allen Thorpe and P. Hunter Philbrick (each of whom is an initial H&F Designated Director); (iii) Pascal Heberling (who is the initial Blue Spectrum Designated Director); (iv) W. Bradley Yale (who is the initial GIC Designated Director); (v) the CEO as of the Closing; and (vi) Jeffrey Kindler (who is the initial H&F Designated Independent Director).  Any changes in the size or composition of the Company Board after the Closing will be subject to the provisions of this Section 2.1 and, except for the changes expressly provided for herein, will require written approval by both Sponsors; provided that, for as long as the Blue Spectrum Investor or the GIC Investor, as applicable, is entitled to designate a Director to the Company Board, (x) any increase in the size of the Company Board to more than 11 Directors will require written approval by both the Blue Spectrum Investor and the GIC Investor and (y) any change to the right of the Blue Spectrum Investor or the GIC Investor to designate an Blue Spectrum Designated Director or a GIC Designated Director will require written approval of the Blue Spectrum Investor or the GIC Investor, respectively.

(b)     *Board Representation During Pre-IPO Period.*  From the Closing until an IPO (the "**Pre-IPO Period**"), unless each of the Sponsors and, with respect to clause (C)

below, the Blue Spectrum Investors and, with respect to clause (D) below, the GIC Investors, otherwise agree in writing:

(i)        Each Stockholder agrees that it, he or she will vote, or execute a written consent in lieu thereof with respect to, all of the Voting Securities held of record by it, him or her or cause all of the Voting Securities over which it, he or she has voting control to be voted, or cause a written consent in lieu thereof to be executed, to elect and, during such period, to continue in office a Company Board consisting, in each case, solely of the following individuals:

(A)        a number of individuals designated by the Carlyle Entities equal to the Carlyle Board Representation Number, as applicable from time to time (with each of such individuals being designated by the Carlyle Sponsor and/or such other Carlyle Entities as the Carlyle Sponsor shall from time to time designate in writing to the Company) (each, a "**Carlyle Designated Director**");

(B)        a number of individuals designated by the H&F Entities equal to the H&F Board Representation Number, as applicable from time to time (with each of such individuals being designated by the H&F Sponsors and/or such other H&F Entities as the H&F Sponsors shall from time to time designate in writing to the Company) (each, an "**H&F Designated Director**");

(C)        an individual designated by the Blue Spectrum Entities, if the Blue Spectrum Board Representation Number, as applicable from time to time, is greater than zero (with such individual being designated by Blue Spectrum Investor and/or such other Blue Spectrum Entities as Blue Spectrum Investor shall from time to time designate in writing to the Company) (the "**Blue Spectrum Designated Director**");

(D)        an individual designated by the GIC Entities, if the GIC Board Representation Number, as applicable from time to time, is greater than zero (with such individual being designated by GIC Investor and/or such other GIC Entities as GIC Investor shall from time to time designate in writing to the Company) (the "**GIC Designated Director**");

(E)        the individual then serving as the chief executive officer of the Company (the "**CEO**"); and

(F)        three Independent Directors (with (x) one of such Independent Directors being designated by the H&F Sponsors and/or such other H&F Entities as the H&F Sponsors shall from time to time designate in writing to the Company (the "**H&F Designated Independent Director**") and (y) two of such Independent Directors being mutually agreed upon and designated by the H&F Sponsors (and/or such other H&F Entities as the H&F Sponsors shall from time to time designate in writing to the Company) and the Carlyle Sponsor (and/or such other Carlyle Entities as the Carlyle Sponsor shall from time to time designate in writing to the Company) (the "**Sponsor Designated Independent**

23

**Directors**"); provided, however, that, subject to the provisions of this Section 2.1(b)(i)(F), if at any time the H&F Board Representation Number does not exceed the Carlyle Board Representation Number, then all three Independent Directors shall be Sponsor Designated Independent Directors and shall be mutually agreed upon and designated by the H&F Sponsors (and/or such other H&F Entities as the H&F Sponsors shall from time to time designate in writing to the Company) and the Carlyle Sponsor (and/or such other Carlyle Entities as the Carlyle Sponsor shall from time to time designate in writing to the Company); provided, further, that, if at any time, either of the H&F Board Representation Number or the Carlyle Board Representation Number is two (2) and the other is one (1) or less, then all three Independent Directors shall be designated by the Sponsor (and/or such other H&F Entities or Carlyle Entities as the H&F Sponsors or the Carlyle Entities, as applicable, shall from time to time designate in writing to the Company) to which such higher director designation number relates.

(ii)      If, from time to time, the Carlyle Board Representation Number, the H&F Board Representation Number, the Blue Spectrum Board Representation Number or the GIC Board Representation Number shall decrease, the Carlyle Entities, the H&F Entities, Blue Spectrum Entities or GIC Entities, as applicable, and the Company shall take all necessary action to cause the applicable number of Carlyle Designated Directors or H&F Designated Directors or the Blue Spectrum Designated Director or GIC Designated Director, as applicable, to resign or be removed immediately and the Stockholders and the Company shall take all necessary action to cause the number of directors on the Company Board to be reduced accordingly.  Except as provided above, during the Pre-IPO Period, (w) the Carlyle Entities, the H&F Entities, the Blue Spectrum Entities and the GIC Entities shall have the exclusive right to appoint and to remove, in each case at any time and from time to time, each of the Carlyle Designated Directors, the H&F Designated Directors, the Blue Spectrum Designated Directors and the GIC Designated Directors, respectively, (x) subject to the provisos to Section 2.1(b)(i)(F), the H&F Entities shall have the exclusive right to appoint and to remove, in each case at any time and from time to time, the H&F Designated Independent Director, (y) subject to the second proviso to Section 2.1(b)(i)(F), the H&F Entities and the Carlyle Entities (acting together) shall have the exclusive right to appoint and to remove, in each case at any time and from time to time, each of the Sponsor Designated Independent Directors and (z) the H&F Entities or the Carlyle Entities (as applicable) shall have the exclusive right to appoint and to remove, in each case at any time and from time to time, all three of the Independent Directors when contemplated by the second proviso to Section 2.1(b)(i)(F), in each case, as well as the exclusive right to fill any and all vacancies created by reason of death, removal or resignation of such designees, and the Stockholders and the Company shall take all necessary action to cause the Company Board to be so constituted.

(c)      *Board Representation During Post-IPO Period*.  From and after an IPO (the "**Post-IPO Period**"), unless both Sponsors otherwise agree in writing (provided that the Sponsors shall not agree to eliminate the right of the Blue Spectrum Investor or GIC Investor to nominate the Blue Spectrum Nominee or GIC Nominee, respectively, unless the rights of the

24

Carlyle Sponsor and the H&F Sponsors to nominate the Carlyle Nominees and H&F Nominees are also eliminated):

(i)  The Carlyle Entities will have the right to nominate a number of individuals for election to the Company Board equal to the Carlyle Board Representation Number (with each of such individuals being nominated by the Carlyle Sponsor and/or such other Carlyle Entities as the Carlyle Sponsor shall from time to time designate in writing to the Company) (each, a "**Carlyle Nominee**"), the H&F Entities will have the right to nominate a number of individuals for election to the Company Board equal to the H&F Board Representation Number (with each of such individuals being nominated by the H&F Sponsors and/or such other H&F Entities as the H&F Sponsors shall from time to time designate in writing to the Company) (each, an "**H&F Nominee**"), the Blue Spectrum Entities will have the right to nominate an individual for election to the Company Board if the Blue Spectrum Board Representation Number is greater than zero (with such individual being nominated by Blue Spectrum Investor and/or such other Blue Spectrum Entities as Blue Spectrum Investor shall from time to time designate in writing to the Company) (the "**Blue Spectrum Nominee**"), and the GIC Entities will have the right to nominate an individual for election to the Company Board if the GIC Board Representation Number is greater than zero (with such individual being nominated by GIC Investor and/or such other GIC Entities as GIC Investor shall from time to time designate in writing to the Company) (the "**GIC Nominee**").

(ii)  For so long as the Carlyle Entities, the H&F Entities, the Blue Spectrum Entities or the GIC Entities have the right to nominate any Carlyle Nominee, any H&F Nominee, any Blue Spectrum Nominee or any GIC Nominee, respectively, in connection with each election of Directors, the Company shall nominate each such Carlyle Nominee, H&F Nominee, Blue Spectrum Nominee or GIC Nominee, as the case may be, for election as a Director as part of the slate that is included in the proxy statement (or consent solicitation or similar document) of the Company relating to the election of Directors, and shall provide the highest level of support for the election of each such Carlyle Nominee, H&F Nominee, Blue Spectrum Nominee or GIC Nominee, as the case may be, as it provides to any other individual standing for election as a Director as part of the Company's slate of Directors.  For so long as the Carlyle Entities, the H&F Entities, the Blue Spectrum Entities or the GIC Entities have the right to nominate any Carlyle Nominee, any H&F Nominee, any Blue Spectrum Nominee or any GIC Nominee, respectively, the Company shall not nominate a number of nominees for any election of Directors that exceeds the number of Directors to be elected, unless such Financial Investor Group has otherwise agreed in writing.

(iii)  If, from time to time during the Post-IPO Period, the Carlyle Board Representation Number, the H&F Board Representation Number, the Blue Spectrum Board Representation Number or the GIC Board Representation Number shall decrease, the Carlyle Entities, the H&F Entities, the Blue Spectrum Entities or the GIC Entities, as applicable, and the Company shall take all necessary action to cause the applicable number of Carlyle Nominees or H&F Nominees or the Blue Spectrum Nominee or GIC Nominee, as applicable, to resign or be removed immediately.  Subject to the immediately foregoing sentence, in the event that a Carlyle Nominee, an H&F Nominee,

25

the Blue Spectrum Nominee or the GIC Nominee shall cease to serve as a Director for any reason (including any removal thereof), the Carlyle Entities, the H&F Entities, the Blue Spectrum Entities or the GIC Entities, respectively, shall have the right to appoint another Carlyle Nominee, an H&F Nominee, an Blue Spectrum Nominee or a GIC Nominee, respectively, to fill any vacancy resulting therefrom.  For the avoidance of doubt, it is understood that the failure of the stockholders of the Company to elect any Carlyle Nominee, any H&F Nominee, any Blue Spectrum Nominee or any GIC Nominee shall not affect the right of the Carlyle Entities, the H&F Entities, the Blue Spectrum Entities or the GIC Entities, as applicable, to designate the Carlyle Nominees, the H&F Nominees, the Blue Spectrum Nominee or the GIC Nominee, as the case may be, for election pursuant to this Section 2.1(c) in connection with any future election of Directors.

(iv)     Each Stockholder that holds, or otherwise has voting control over, Voting Securities shall vote or cause to be voted all of such Voting Securities in favor of each Carlyle Nominee, H&F Nominee, Blue Spectrum Nominee and GIC Nominee nominated in accordance with this Section 2.1(c).  Each Stockholder agrees that, (A) if and for so long as the Carlyle Entities are entitled to nominate one or more Carlyle Nominees pursuant to this Section 2.1(c) and such Stockholder is then entitled to vote for the removal of any such Carlyle Nominee, such Stockholder will not vote in favor of the removal of any such Carlyle Nominee unless requested in writing by the Carlyle Entities, (B) if and for so long as the H&F Entities are entitled to nominate one or more H&F Nominees pursuant to this Section 2.1(c) and such Stockholder is then entitled to vote for the removal of any such H&F Nominee, such Stockholder will not vote in favor of the removal of any such H&F Nominee unless requested in writing by the H&F Entities, (C) if and for so long as the Blue Spectrum Entities are entitled to nominate an Blue Spectrum Nominee pursuant to this Section 2.1(c) and such Stockholder is then entitled to vote for the removal of such Blue Spectrum Nominee, such Stockholder will not vote in favor of the removal of such Blue Spectrum Nominee unless requested in writing by the Blue Spectrum Entities, and (D) if and for so long as the GIC Entities are entitled to nominate a GIC Nominee pursuant to this Section 2.1(c) and such Stockholder is then entitled to vote for the removal of such GIC Nominee, such Stockholder will not vote in favor of the removal of such GIC Nominee unless requested in writing by the GIC Entities.

(d)     *Subsidiary Boards*.

(i)     For so long as both the Carlyle Entities and the H&F Entities have the right to designate or nominate at least one Director pursuant to this Section 2.1, if any H&F Designated Director or Carlyle Designated Director serves on the board of directors (or equivalent governing body) of any Subsidiary of the Company, then unless otherwise agreed by the Sponsors, the Company shall cause such board of directors (or equivalent governing body) to be comprised of the same members as the Company Board.

(ii)     For so long as (A) the Blue Spectrum Entities have the right to designate or nominate one Director pursuant to this Section 2.1, if any H&F Designated Director or any Carlyle Designated Director serves on the board of directors (or equivalent governing

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000527

body) of any Subsidiary of the Company, then, the Company shall offer to the Blue Spectrum Investor to include the Blue Spectrum Designated Director on such board of directors (or equivalent governing body) and at the request of the Blue Spectrum Investor, the Company shall cause such board of directors (or equivalent governing body) to include the Blue Spectrum Designated Director and (B) the GIC Entities have the right to designate or nominate one Director pursuant to this Section 2.1, if any H&F Designated Director or any Carlyle Designated Director serves on the board of directors (or equivalent governing body) of any Subsidiary of the Company, then, the Company shall offer to the GIC Investor to include the GIC Designated Director on such board of directors (or equivalent governing body) and at the request of the GIC Investor, the Company shall cause such board of directors (or equivalent governing body) to include the GIC Designated Director.

(e)     *Other Board of Directors Matters*.

(i)     The Company shall reimburse the directors for all reasonable out-of-pocket expenses incurred in connection with their attendance at meetings of the Company Board and any committees thereof, including travel, lodging and meal expenses.

(ii)     The Company shall obtain, for each director designated or nominated by a Financial Investor Group, customary director and officer indemnity insurance on commercially reasonable terms as determined by the Company Board and that is reasonably acceptable to each Sponsor Investor Group that is then entitled to designate or nominate at least one director.

(iii)     In addition to any other indemnification rights that the directors have pursuant to the certificate of incorporation and the bylaws (or equivalent governing documents) of the Company, each person designated or nominated by a Financial Investor Group to serve on the Company Board in accordance with this Section 2.1 shall have the right to enter into, and the Company agrees to enter into, an indemnification agreement in a form consistent with indemnification agreements customarily entered into between companies and their independent board members.

Section 2.2     *Board Committees*.   The Company Board shall establish an Audit Committee and a Compensation Committee and any other committee of the Company Board that may be formed upon the approval of the Company Board and in compliance with Section 2.3, with such powers and rights as are determined by the Company Board, and with such composition as is determined by the Company Board; provided that, (a) until such time as the Carlyle Entities are no longer entitled to designate or nominate any directors pursuant to Section 2.1, to the extent permitted by Law and the rules of any stock exchange on which the Shares may be listed, the Carlyle Entities shall be entitled to appoint at least one member to each committee of the Company Board, (b) until such time as the H&F Entities are no longer entitled to designate or nominate any directors pursuant to Section 2.1, to the extent permitted by Law and the rules of any stock exchange on which the Shares may be listed, the H&F Entities shall be entitled to appoint at least one member to each committee of the Company Board and (c) if and for so long as both the Carlyle Entities and the H&F Entities are entitled to designate or nominate directors to the Company Board pursuant to Section 2.1, the Carlyle Entities and the

H&F Entities, respectively, shall be entitled to appoint the same number of directors to each committee of the Company Board; provided, however, that if the H&F Board Representation Number is three and the Carlyle Board Representation Number is one, the H&F Entities may designate one additional member to each committee of the Company Board. Until such time as the Blue Spectrum Entities and GIC Entities are no longer entitled to designate or nominate any directors pursuant to Section 2.1, the Blue Spectrum Investor (if the Blue Spectrum Board Representation Number is at least one) and the GIC Investor (if the GIC Board Representation Number is at least one) (x) shall be entitled to receive copies of any materials sent by the Company to the members of any committee of the Company Board in connection with meetings of such committee in the same manner and at the same times as to members of such committee, in each case, if the Carlyle Entities or the H&F Entities have appointed a member to such committee but the Blue Spectrum Investor (if the Blue Spectrum Board Representation Number is at least one) and the GIC Investor (if the GIC Board Representation Number is at least one) has not appointed a member to such committee; provided that, at the request of a majority of the members of any such committee, the Company shall be entitled to redact portions of any materials delivered to the Blue Spectrum Investor or the GIC Investor, as applicable, pursuant to this sentence when and to the extent that such majority determines in good faith that (i) such redaction is reasonably necessary to preserve attorney-client privilege with respect to a matter or to protect highly confidential proprietary information or (ii) there exists, with respect to any such materials, an actual or potential conflict of interest between the Blue Spectrum Investor or the GIC Investor, as applicable, and the Company, and (y) shall be entitled to appoint at least one member to any executive committee (or any committee delegated functions customarily delegated to an executive committee) of the Company Board.

Section 2.3    *Acts of the Boards and Approval Rights.*

(a)    The approval of any action to be taken by the Company Board (except in connection with (x) any determinations made by the Company Board pursuant to, and in accordance with, Article IX, (y) a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5 or (z) any registration or Shelf Take-Down requested by a Sponsor Holder pursuant to Article V) shall require directors of the Company Board having a majority of the votes of the directors of the Company Board then in office, which majority must include (1) at least one Carlyle Designated Director (during the Pre-IPO Period) or Carlyle Nominee (during the Post-IPO Period), in either case other than a Carlyle Independent Director, if the Continuing Ownership Percentage of the Carlyle Entities is no less than 50% (provided, however, that if any Transfer by a Carlyle Entity is subject to Section 4.3, this clause (1) shall not apply with respect to any determination by the Company Board regarding whether the Company should exercise its rights pursuant to Section 4.3 in connection with such Transfer) and (2) at least one H&F Designated Director (during the Pre-IPO Period) or H&F Nominee (during the Post-IPO Period), in either case other than an H&F Independent Director, if (x) prior to an IPO, no other Stockholder and its Permitted Transferees own of record in the aggregate a larger number of Shares than the aggregate number of Shares owned of record by the H&F Entities and (y) after an IPO, the H&F Entities hold of record and Beneficially Own at least 15% of the issued and outstanding Shares (provided, however, that if any Transfer by an H&F Entity is subject to Section 4.3, this clause (2) shall not apply with respect to any determination by the Company Board regarding whether the Company should exercise its rights pursuant to Section 4.3 in connection with such Transfer). Notwithstanding the foregoing, (A) in the event of

any Funding Default by any of the Initial Carlyle Entities (a "**Carlyle Default**") all decisions relating to the exercise by the Company of any rights or remedies under, or taking other actions with respect to, such Carlyle Equity Commitment Letter shall be determined solely by the GIC Designated Directors, the Blue Spectrum Designated Directors and, provided that no H&F Default has occurred, the H&F Designated Directors, (B) in the event of any Funding Default by any of the Initial H&F Entities (an "**H&F Default**") all decisions relating to the exercise by the Company of any rights or remedies under, or taking other actions with respect to, such H&F Equity Commitment Letter shall be determined solely by the GIC Designated Directors, the Blue Spectrum Designated Directors and, underline(provided) that no Carlyle Default has occurred, the Carlyle Designated Directors and (C) the Company shall take any actions that are mandated in accordance with clause (A) or (B).

(b)     Each of the Stockholders hereby acknowledges and agrees that prior to the Section 2.3(b) Termination Date, (i) each H&F Designated Director and each Carlyle Designated Director shall have a number of votes equal to the greater of (A) one (1) and (B) (1) the sum of (x) one (1) plus (y) the aggregate number of votes of all members of the Company Board that are not H&F Designated Directors or Carlyle Designated Directors, divided by (2) the number of H&F Designated Directors and Carlyle Designated Directors and (ii) the Blue Spectrum Designated Director, the GIC Designated Director, the CEO and the Independent Directors shall have one (1) vote per director.  On and after the Section 2.3(b) Termination Date, each member of the Company Board shall have one (1) vote per director.  For the purposes of this Agreement, "**Section 2.3(b) Termination Date**" means the earlier of (i) consummation of an IPO and (ii) such time as (A) the aggregate of the H&F Board Representation Number and the Carlyle Board Representation Number is less than three (3) and (B) the number of Shares owned of record by the H&F Entities is less than the aggregate number of Shares owned of record by another Stockholder and its Permitted Transferees.

(c)     Without limiting any other matters that may be considered, or that may be required by law to be considered, by the Company Board, the Company shall not take or commit to take, or cause or allow any of its Subsidiaries to take or commit to take, any of the following actions (except in connection with (x) a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5 or (y) any registration or Shelf Take-Down requested by a Sponsor Holder pursuant to Article V) without the prior approval(s) of the Company Board (provided, however, that, subject to applicable law, in lieu of approval by the Company Board, any such approval may be obtained by either (1) a vote or written consent in favor of such matter by the majority of the votes of the members of any committee of the Company Board if such applicable majority vote or consent includes (in each case, so long as the applicable ownership threshold described in Section 2.3(a) is satisfied) at least one such Carlyle Designated Director and at least one such H&F Designated Director or (2) the prior written consent of all Sponsors (provided that in the case of any approval obtained by the prior written consent of all Sponsors, the Company shall promptly notify the GIC Investor and the Blue Spectrum Investor of such approval and the material details of the underlying matter so approved); provided, further, that, in the event that an action has inadvertently been taken or committed to be taken in respect of which the prior approval(s) of the Company Board was required but not obtained, then such action may be ratified by the Company Board):

CONFIDENTIAL

MENNINGER_SUPP000530

(i)      any increase or decrease in the size of the Company Board other than as expressly provided for in Section 2.1;

(ii)      the selection of a chairman of the Company Board;

(iii)      the creation of any committees of the Company Board or delegation or any modification of any powers, duties or responsibilities of any of the committees of the Company Board, in each case other than as expressly provided for in Section 2.2;

(iv)      the amendment of, or change to or waiver of the provisions of any of the certificate of incorporation, by-laws or equivalent constituent documents of the Company (other than the amendments contemplated by Section 9.3 in connection with any IPO);

(v)      the approval of the Company's annual budget (including capital plans), strategic, operating or business plan, and any material amendments of any of the foregoing;

(vi)      the hiring, appointment, approval of retention, termination, demotion or change (including a change in responsibilities) of, or the taking of any other action that would reasonably be expected to constitute "good reason" or any similar concept under any employment, severance, change of control or similar agreement or benefit plan with respect to, the chief executive officer, the chief financial officer, the chief operating officer, the chief medical officer, any other principal officer or any officers with substantially equivalent responsibilities and the approval or modification of any employment, severance, change of control or similar agreements entered into with any of such executives or officers;

(vii)      (A) the adoption of any equity incentive plan or other employee stock option or equity plan or agreement (each, an "**Employee Equity Arrangement**") or any material amendment thereto, (B) the authorization or grant of any awards under, or the acceleration of the vesting of shares under any Employee Equity Arrangement, except for any acceleration of vesting that occurs automatically pursuant to the terms of any awards previously approved pursuant to this Section 2.3(c)(vii) and (C) the entering into, or material amendment of, any Employee Repurchase Arrangement;

(viii)      (A) the appointment or removal of a Person as the auditor of the Company or (B) any material change to the accounting methods or policies of the Company other than as is required to comply with generally accepted accounting principles or applicable law;

(ix)      (A) the declaration or payment of dividends or distributions of any kind (other than dividends or distributions to the Company or any of its wholly-owned subsidiaries), (B) the acquisition, repurchase, redemption or retirement for value of any Capital Stock or other Equity Securities of the Company or any of its Subsidiaries that is not wholly owned (including pursuant to any Employee Repurchase Arrangement) and (C) the consummation of any Recapitalization Transaction;

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000531

(x)      the granting of rights to require the Company or any of its Subsidiaries to register securities for sale under the Securities Act of 1933;

(xi)      the entering into of any agreement (or any amendment thereof) or transaction, directly or indirectly, between (x) the Company and its Subsidiaries and (y) any Stockholder or any such Stockholder's Affiliates (other than the Company and its Subsidiaries) or Portfolio Companies, in each case other than (1) purchases, leases and sales of products and services entered into in the ordinary course of business and negotiated on an arm's length basis by the management or other employees of the Company or any of its Subsidiaries, (2) except as required by clause (vi) of this Section 2.3(c), employment and/or related agreements entered into with a Stockholder who is also an officer of the Company or any of its Subsidiaries, (3) payments and other actions pursuant to the Consulting Services Agreements as in effect on the date of the Closing (or, if and to the extent any amendments thereto has been approved by all Sponsors, as amended from time to time), provided, that any payments pursuant to Section 3(b) of any Consulting Services Agreement must be approved by all Sponsors, (4) any issuance of Shares or Options or any Employee Equity Arrangement, (5) any dividend or re-purchase, redemption or retirement of Equity Securities permitted by this Article II, (6) any pro rata payment on any indebtedness of the Company or any of its Subsidiaries and (7) any payments made pursuant to the Merger Agreement;

(xii)      the entering into or developing of any material new line of business or the cessation of, or material change in, any existing (at the applicable time) material line of business;

(xiii)      the entering into, the amendment of or modification of, in any material respect, any Material Contract;

(xiv)      the entering into, or the material amendment or modification of, any joint venture by the Company or any of its Subsidiaries;

(xv)      any transaction or series of related transactions that would result in the Transfer of Shares representing at least 50% of the voting power of the Company or any of its Subsidiaries, other than (A) by a Stockholder to a Permitted Transferee thereof or (B) pursuant to the exercise by either Sponsor of its rights under Section 4.5 or Article IX;

(xvi)      an IPO or other initial public offering of the equity securities or equity interests of the Company or any of its Subsidiaries;

(xvii)      the acquisition, disposition or licensing, in any single transaction or series of related transactions, of assets or other rights having a value, or for a purchase price, in excess of $25 million, whether through merger, consolidation, share exchange, business combination or otherwise, in each case other than the purchase, sale and/or license of equipment, supplies, products and/or services in the ordinary course of business;

(xviii)      any sale, transfer or other disposal of, or the granting of any Encumbrance over, all or substantially all of the assets, interests or stock of the Company and its

31

MENNINGER_SUPP000532

Subsidiaries, taken as a whole, or the amalgamation, consolidation, merger, share exchange or entry into business combination by the Company with another Person (other than any amalgamation, consolidation, merger, share exchange or other business combination solely among the Company and/or any of its wholly-owned Subsidiaries), other than pursuant to the exercise by either Sponsor of its rights under Section 4.5;

(xix)   other than (x) as set forth in a written policy approved pursuant to Section 2.3(a) or (y) transactions solely among the Company and/or any of its wholly owned Subsidiaries, (A) the incurrence or assumption (including by way of acquisition) of any indebtedness (including financial leases) in a transaction or series of related transactions in excess of an aggregate of $25 million; (B) the guarantee, endorsement or otherwise as an accommodation becoming responsible for the material obligations of any other Person (provided that any of the Company or its Subsidiaries may provide cross-guarantees for any indebtedness approved in accordance with this Section 2.3(c)(xix)); (C) the entering into of any agreement or series of related agreements under which it would be entitled to incur indebtedness in the future in excess of $25 million; (D) the entering into or effecting of any transactions or series of related transactions involving the issuance by the Company or any of its Subsidiaries of any debt securities, including rights to acquire debt securities, in an aggregate amount in excess of $25 million for all such matters described in this Section 2.3(c)(xix); (E) the optional prepayment, redemption, repurchase or retirement for value of any existing indebtedness in excess of $25 million or (F) the material amendment or modification of any existing document governing in excess of $25 million of indebtedness of the Company or any of its Subsidiaries;

(xx)   the reclassification of any existing, or the creation of any new, class or series of Capital Stock of the Company, and except for the issuance of awards approved pursuant to Section 2.3(c)(vii), the authorization or issuance of any Capital Stock of the Company or any of its Subsidiaries (except any creation and/or issuance to the Company or any of its wholly-owned Subsidiaries and any related authorization);

(xxi)   the creation of, or authorization of the creation of, or the holding of any Capital Stock or in, any Subsidiary that is not a wholly-owned Subsidiary of the Company, in each case other than in any transaction approved pursuant to Section 2.3(c)(xvii);

(xxii)  the determination of targets under employee (whether cash or equity) incentive plans and the aggregate amounts payable to employees under such plans;

(xxiii) in connection with (A) any financing for which Company Board approval is required pursuant to Section 2.3(c)(xix) or (B) any transaction for which Company Board approval is required pursuant to Section 2.3(c)(xvii), the appointment of or execution of any engagement or commitment letter or similar or related agreement with, any financial or investment banking advisor;

(xxiv) the initiation, settlement or compromise of any litigation, arbitration, investigation or administrative or similar proceeding (each, a "**Proceeding**") or series of

MENNINGER_SUPP000533

related Proceedings reasonably expected to involve consideration payable by or to the Company or any of its Subsidiaries in excess of $5 million or to result in the Company or any of its Subsidiaries becoming subject to a limitation on the operation of its business that is material to the Company and its Subsidiaries, taken as a whole;

(xxv)   any liquidation, dissolution, recapitalization, reorganization or any similar transaction in each case by the Company;

(xxvi)  any voluntary bankruptcy, assignment for the benefit of creditors, consent to the appointment of a custodian, receiver trustee or liquidator with similar powers with respect to property or any similar transaction by the Company or any "significant subsidiary" of the Company, as defined under Section 1-02(w) of Regulation S-X; and

(xxvii) any other action required by Law to be taken by the stockholders of the Company.

(d)      Subject to <u>Section 2.3(a)</u>, if a director is absent or wishes to recuse himself or herself from the approval of any action to be taken by the Company Board or any committee thereof, such director may appoint an alternate director or give a proxy to another director of his or her choosing in accordance with, and to the extent permitted by, applicable law.

(e)      This <u>Section 2.3</u> shall terminate (i) at such time as neither the approval of at least one Carlyle Designated Director nor the approval of at least one H&F Designated Director is required pursuant to <u>Section 2.3(a)</u>, (ii) upon an IPO if requested in writing by all Sponsors or (iii) upon a Qualifying IPO if requested in writing by either Sponsor after the underwriter or underwriters in connection with the Qualifying IPO shall have advised the Company and the Sponsors that the survival of <u>Section 2.3</u> after the Qualifying IPO would reasonably be expected to adversely impact the marketing of the Qualifying IPO.

Section 2.4      *Applicability of Preceding Provisions*.  In the event of an IPO, the Financial Investors shall work together in good faith, after consultation with the managing underwriters for such IPO and outside counsel, to agree upon any revisions to any provisions of <u>Section 2.1</u>, <u>Section 2.2</u> and <u>Section 2.3</u> of this Agreement and any provisions of the Consulting Services Agreements, in each case, to take effect at the time of consummation of such IPO, to the extent such revisions are (a) advisable in order to facilitate the marketing of the IPO or (b) necessary under applicable law and the rules of the principal stock exchange or inter-dealer quotation system on which the Shares are then traded or listed.  The parties to this Agreement agree to take such action as may be necessary to amend this Agreement and the Consulting Services Agreements to give effect to such revisions as so agreed by all Sponsors.

Section 2.5      *Financial Investor Consent Rights*.

(a)      If (x) the approval of at least one Carlyle Designated Director is not required pursuant to <u>Section 2.3(a)</u> and the Carlyle Board Representation Number is at least one or (y) the approval of at least one H&F Designated Director is not required pursuant to <u>Section 2.3(a)</u> and the H&F Board Representation Number is at least one, then the Company shall not take or commit to take, and shall not cause or allow any of its Subsidiaries to take or commit to take, any of the following actions (except in connection with (x) a Company Sale or

MENNINGER_SUPP000534

other Change of Control Transaction executed pursuant to <u>Section 4.5</u> and, if applicable, <u>Article IX</u> or (y) any registration or Shelf Take-Down requested by a Sponsor Holder pursuant to <u>Article V</u> or effected pursuant to <u>Section 9.3</u>) without the prior written consent of the Carlyle Sponsor (if the Carlyle Board Representation Number is at least one) and the H&F Sponsors (if the H&F Board Representation Number is at least one); <u>provided</u>, <u>however</u>, that if any Transfer by a Carlyle Entity or an H&F Entity is subject to <u>Section 4.3</u>, no consent shall be required of the Carlyle Sponsor or H&F Sponsors, respectively, with respect to any determination by the Company Board regarding whether the Company should exercise its rights pursuant to <u>Section 4.3</u> in connection with such Transfer:

(i)     the amendment of, or change to or waiver of the provisions of the certificate of incorporation or by-laws of the Company (excluding (A) any increase in authorized Capital Stock available for issuance, (B) the creation of any new class or series of Capital Stock or and (C) the amendments contemplated by <u>Section 9.3</u> in connection with an IPO);

(ii)     the acquisition, repurchase, redemption or retirement for value of any Capital Stock or other Equity Securities of the Company or any of its Subsidiaries that is not wholly owned (other than (x) to the extent approved by the Company Board pursuant to any Employee Repurchase Agreement or (y) pursuant to which the Sponsor Investors participate on a pro rata basis based on their relative ownership of Shares);

(iii)     the entering into of any agreement (or any amendment thereof) or transaction, directly or indirectly, between (x) the Company and its Subsidiaries and (y) any Stockholder or any such Stockholder's Affiliates (other than the Company and its Subsidiaries) or Portfolio Companies, in each case other than (1) purchases, leases and sales of products and services entered into in the ordinary course of business and negotiated on an arm's length basis by the management or other employees of the Company or any of its Subsidiaries, (2) employment and/or related agreements entered into with a Stockholder who is also an officer of the Company or any of its Subsidiaries, (3) payments and other actions pursuant to the Consulting Services Agreements as in effect on the date of the Closing (or, if and to the extent any amendments thereto has been approved by all Sponsors, as amended from time to time), <u>provided</u>, that any payments pursuant to Section 3(b) of any Consulting Services Agreement must be approved by all Sponsors, (4) any issuance of Shares or Options or any Employee Equity Arrangement, (5) any dividend with respect to Equity Securities, (6) any repurchase, redemption or retirement of Equity Securities permitted by this <u>Section 2.5</u>, (7) any pro rata payment of indebtedness of the Company or any of its Subsidiaries or any other transaction solely to the extent involving any indebtedness of the Company or its Subsidiaries incurred or issued under an agreement of the Company and/or any of its Subsidiaries and held by any Financial Investor or an Affiliate (without giving effect to clause (i) of the definition thereof) of any Financial Investor; <u>provided</u> that the majority of the indebtedness incurred or issued under such agreement is then held by Persons not affiliated with such Financial Investor and such Financial Investor and any Affiliate (without giving effect to clause (i) of the definition thereof) of such Financial Investor that holds such indebtedness is treated in the same manner as all other holders of such indebtedness, (8) any payments

041945-0274-16469-Active.21575798.1
CONFIDENTIAL                                                                              MENNINGER_SUPP000535

made pursuant to the Merger Agreement, and (9) any issuance of Participation Securities in accordance with Article VI;

(iv)     the entering into or developing of any material new line of business;

(v)     the acquisition, disposition or licensing, in any single transaction or series of related transactions, of assets or other rights (including investments in, or other contributions to, any joint venture or similar business alliance) having a value, or for a purchase price, in excess of $150 million, whether through merger, consolidation, share exchange, business combination or otherwise, in each case other than the purchase, sale and/or license of equipment, supplies, products and/or services in the ordinary course of business;

(vi)     any incurrence, assumption (including by way of acquisition) or guarantee of indebtedness for borrowed money (collectively, an "incurrence") that would result in aggregate outstanding indebtedness for borrowed money of the Company and its Subsidiaries, after giving pro forma effect to the incurrence of such indebtedness for borrowed money and the application of the net proceeds therefrom as if the additional indebtedness for borrowed money had been incurred, and the application of the net proceeds therefrom had occurred, at the beginning of the applicable twelve (12) consecutive calendar month period in which LTM EBITDA is to be calculated, being in excess of five times (5.0x) LTM EBITDA;

(vii)     any liquidation, dissolution, recapitalization, reorganization or any similar transaction in each case by the Company; and

(viii)     any voluntary bankruptcy, assignment for the benefit of creditors, consent to the appointment of a custodian, receiver trustee or liquidator with similar powers with respect to property or any similar transaction by the Company or any "significant subsidiary" of the Company, as defined under Section 1-02(w) of Regulation S-X.

(b)     The Company shall not take or commit to take, and shall not cause or allow any of its Subsidiaries to take or commit to take, any of the following actions (except, in the case of clauses (i) through (iii) of this Section 2.5(b), in connection with a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5 and, if applicable, Article IX) without the prior written consent of the Blue Spectrum Investor (if the Blue Spectrum Entities continue to hold of record and Beneficially Own Shares) and the GIC Investor (if the GIC Entities continue to hold of record and Beneficially Own Shares); provided, however, that (x) if any Transfer by a Blue Spectrum Entity or a GIC Entity is subject to Section 4.3, no consent shall be required of the Blue Spectrum Investor or GIC Investor, respectively, with respect to any determination by the Company Board regarding whether the Company should exercise its rights pursuant to Section 4.3 in connection with such Transfer and (y) the Company shall provide at least thirty (30) days' written notice to the Blue Spectrum Entities and the GIC Entities prior to consummating any transaction described in clauses (iv) through (xi) of this Section 2.5(b) for which the consent of the Blue Spectrum Investor or the GIC Investor is not required:

                                                                 MENNINGER_SUPP000536

(i)    the amendment of, or change to or waiver of the provisions of (A) the certificate of incorporation or by-laws of the Company (excluding (1) any increase in authorized Capital Stock available for issuance, (2) the creation of any new class or series of Capital Stock, <u>provided</u>, that the Company complies with <u>Article VI</u> with respect to the issuance of any such new class or series of Capital Stock or (3) the amendments contemplated by <u>Section 9.3</u> in connection with an IPO (<u>provided</u>, that in connection with such IPO, each Share of each class or series of Capital Stock held by the GIC Investors or the Blue Spectrum Investors, as applicable, is treated the same as each Share of the same class or series of Capital Stock held by the Sponsor Investors)) that (x) adversely affects the Blue Spectrum Entities in a manner different than such amendment affects the Sponsor Investors unless the Blue Spectrum Investor has provided its prior written consent to such amendment or (y) adversely affects the GIC Entities in a manner different than such amendment affects the Sponsor Investors unless the GIC Investor has provided its prior written consent to such amendment or (B) the Merger Agreement;

(ii)    the acquisition, repurchase, redemption or retirement for value of any Capital Stock or other Equity Securities of the Company or any of its Subsidiaries from any Sponsor Investor (other than (x) in accordance with <u>Section 4.3</u>, (y) if such acquisition, repurchase, redemption or retirement for value is made for the same type and amount of consideration (or, if applicable, the same ability to elect the same type of consideration) per Share on a pro rata basis from the Blue Spectrum Entities or the GIC Entities (as applicable), on the Same Terms and Conditions as such Sponsor Investor, or (z) pursuant to which the Blue Spectrum Entities or the GIC Entities (as applicable) are provided the opportunity to participate on the Same Terms and Conditions on a pro rata basis based on their relative ownership of Shares);

(iii)    the entering into of any agreement (or any amendment thereof) or transaction, directly or indirectly, between (x) the Company and its Subsidiaries and (y) any Sponsor Investor or any such Sponsor Investor's Affiliates (other than the Company and its Subsidiaries) or Portfolio Companies, in each case other than (1) purchases, leases and sales of products and services entered into in the ordinary course of business and negotiated on an arm's length basis by the management or other employees of the Company or any of its Subsidiaries with Portfolio Companies of a Sponsor Investor or its private equity investment fund Affiliates, (2) payments and other actions pursuant to the Consulting Services Agreements as in effect on the date of the Closing and in the form approved pursuant to <u>Section 11.11</u> (or, if and to the extent any amendments thereto has been approved by the Blue Spectrum Investor and the GIC Investor as amended from time to time), provided, that any payments pursuant to Section 3(b) of any Consulting Services Agreement must be approved by all Financial Investors, (3) any dividend with respect to Equity Securities, (4) any repurchase, redemption or retirement of Equity Securities not prohibited by <u>Section 2.5(b)(ii)</u>, (5) any pro rata payment of indebtedness of the Company or any of its Subsidiaries or any other transaction solely to the extent involving any indebtedness of the Company or its Subsidiaries incurred or issued under an agreement of the Company and/or any of its Subsidiaries; <u>provided</u> that the majority of the indebtedness incurred or issued under such agreement is then held by Persons not affiliated with such Sponsor Investor and such Sponsor Investor and any Affiliate (without giving effect to clause (i) of the definition thereof) of such Sponsor Investor that

36

holds such indebtedness is treated in the same manner as all other holders of such indebtedness, (6) any payments made pursuant to the Merger Agreement, (7) any issuance of Participation Securities in accordance with Article VI, and (8) the consummation of the transactions provided for under the H&F Equity Commitment Letter and the Carlyle Equity Commitment Letter;

(iv)    the effecting of any distribution, purchase, merger, consolidation, reorganization, activity or other similar action which would reasonably be expected to result in the Blue Spectrum Entities or the GIC Entities, or any direct or indirect owner of the Blue Spectrum Entities or the GIC Entities, (A) incurring any income that is effectively connected with the conduct of a U.S. trade or business within the meaning of the Code (including Section 897 thereof), (B) having a permanent establishment in the United States or (C) engaging in any "commercial activity" as defined in Section 892(a)(2)(i) of the Code or (D) receiving any equity securities of any Subsidiary of the Company unless the Blue Spectrum Entities or GIC Entities, as applicable, will benefit from covenants substantially similar to those contained clauses (iv) through (xi) of this Section 2.5(b) and Section 7.6 in respect of such securities;

(v)    the consummation of any transaction or the taking of any other action that would result in the Blue Spectrum Entities or the GIC Entities, as applicable, owning of record Voting Securities or Shares representing 25% or more of (A) the aggregate voting power of all outstanding Voting Securities of the Company or (B) the outstanding Shares, in each case, except to the extent the Blue Spectrum Entities or the GIC Entities, as applicable, exceed such 25% threshold as a result of (1) their acquisition of Shares pursuant to Section 4.3, (2) their acquisition of Participation Securities pursuant to Article VI, (3) their acquisition of Applicable Shares pursuant to Article X or (4) their election to not participate in the acquisition, repurchase, redemption or retirement for value of any Capital Stock or other Equity Securities of the Company or any of its Subsidiaries that is consented to or permitted pursuant to clause Section 2.5(b)(ii);

(vi)    the distribution by the Company to the holders of Shares of Equity Securities in any Subsidiary of the Company, or the distribution or conveyance pursuant to clause (vii) or (ix) of this Section 2.5(b) of Equity Securities in any entity that is treated as a corporation for U.S. federal income tax purposes (a "**Corporate Entity**") unless the Blue Spectrum Entities or the GIC Entities, as applicable, will benefit from covenants substantially similar to those contained in clauses (iv) through (xi) of this Section 2.5(b) and Section 7.6 in respect of such securities;

(vii)    the distribution by the Company to the holders of Shares of any Equity Securities in a partnership or an entity that is treated as a pass-through entity for U.S. federal income tax purposes (a "**Non-Corporate Entity**") unless the Blue Spectrum Entities or the GIC Entities, as applicable, are provided the opportunity (A) to receive cash equal to the Fair Market Value of such Equity Securities in the Non-Corporate Entity in lieu of receiving such Equity Securities or (B) for such Equity Securities to be held by a Corporate Entity, and, in the case of this clause (B), either (1) such Corporate Entity is either distributed or conveyed to the Blue Spectrum Entities and/or the GIC Entities, as applicable, or (2) the Blue Spectrum Entities and/or the GIC Entities, as

37

applicable, are given the opportunity to form such Corporate Entity prior to such distribution of such Equity Securities in the Non-Corporate Entity;

(viii)   the distribution by the Company to the holders of Shares of any Equity Securities in an entity that results in the Blue Spectrum Entities or the GIC Entities, as applicable, owning of record a higher percentage of the Equity Securities of the entity with respect to which Equity Securities were distributed than the percentage of the outstanding Shares owned of record by the Blue Spectrum Entities or the GIC Entities, as applicable, immediately prior to such distribution unless such higher percentage results from the voluntary election of the Blue Spectrum Entities and/or the GIC Entities to receive such higher percentage;

(ix)   notwithstanding anything in Section 4.4 or Section 4.5 to the contrary, the receipt as consideration by the Blue Spectrum Entities or the GIC Entities, as applicable, of any Equity Securities in a Non-Corporate Entity as a result of a Transfer executed pursuant to Section 4.4 or a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5 unless the Blue Spectrum Entities and the GIC Entities are provided the opportunity (A) to receive cash equal to the Fair Market Value of such Equity Securities in the Non-Corporate Entity in lieu of receiving such Equity Securities or (B) for such Equity Securities to be held by a Corporate Entity and, in the case of this clause (B), either (1) such Corporate Entity is either distributed or conveyed to the Blue Spectrum Entities and/or the GIC Entities, as applicable, or (2) the Blue Spectrum Entities and/or the GIC Entities, as applicable, are given the opportunity to form such Corporate Entity prior to such receipt of such Equity Securities in the Non-Corporate Entity;

(x)   notwithstanding anything in Section 4.4 or Section 4.5 to the contrary, the receipt by the Blue Spectrum Entities or the GIC Entities, as applicable, of any Equity Securities (A) pursuant to a distribution by the Company or (B) as consideration as a result of a Transfer executed pursuant to Section 4.4 or a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5, in each case, in a Corporate Entity whose Equity Securities are not publicly traded unless the Blue Spectrum Entities or GIC Entities, as applicable, (1) will benefit from covenants substantially similar to those contained in clauses (iv) through (xi) of this Section 2.5(b) or Section 7.6 in respect of such securities or (2) are provided the opportunity to receive cash equal to the Fair Market Value of such Equity Securities in the Corporate Entity in lieu of receiving such Equity Securities; and

(xi)   notwithstanding anything in Section 4.4 or Section 4.5 to the contrary, the receipt by the Blue Spectrum Entities or the GIC Entities, as applicable, of any direct interest in real estate, operating assets or other property as consideration as a result of a Transfer executed pursuant to Section 4.4 or a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5 that would, in each case, violate the covenants contained in clause (iv) of this Section 2.5(b) if such interest was distributed by the Company to the Blue Spectrum Entities and/or the GIC Entities, as applicable; and

(xii)   the entering into of any stock sale, merger, business combination, recapitalization, consolidation, reorganization, restructuring, redemption or other transaction prior to the Deferred Payment Date that would result in a Transfer of Shares in violation of Section 4.1(h).

(c)   If, due to the H&F Board Representation Number or the Carlyle Board Representation Number being zero, the prior written consent of the H&F Sponsors or the Carlyle Sponsor, as applicable, is no longer required pursuant to the terms of Section 2.5(a), then the Company shall not take or commit to take, and shall not cause or allow any of its Subsidiaries to take or commit to take, any of the following actions (except in connection with a Company Sale or other Change of Control Transaction executed pursuant to Section 4.5 and, if applicable, Article IX) without the prior written consent of the H&F Sponsors (if the H&F Entities continue to hold of record and Beneficially Own Shares) and the Carlyle Sponsor (if the Carlyle Entities continue to hold of record and Beneficially Own Shares); provided, however, that if any Transfer by an H&F Entity or a Carlyle Entity is subject to Section 4.3, no consent shall be required of the H&F Sponsors or Carlyle Sponsor, respectively, with respect to any determination by the Company Board regarding whether the Company should exercise its rights pursuant to Section 4.3 in connection with such Transfer:

(i)   the amendment of, or change to or waiver of the provisions of the certificate of incorporation or by-laws of the Company (excluding (A) any increase in authorized Capital Stock available for issuance, (B) the creation of any new class or series of Capital Stock, provided, that the Company complies with Article VI with respect to the issuance of any such new class or series of Capital Stock or (C) the amendments contemplated by Section 9.3 in connection with an IPO (provided, that in connection with such IPO, each Share of each class or series of Capital Stock held by the H&F Entities is treated the same as each Share of the same class or series of Capital Stock held by the Carlyle Entities)) that (x) adversely affects the H&F Entities in a manner different than such amendment affects the Carlyle Entities unless the H&F Sponsors have provided their prior written consent to such amendment or (y) adversely affects the Carlyle Entities in a manner different than such amendment affects the H&F Entities unless the Carlyle Sponsor has provided its prior written consent to such amendment;

(ii)   the acquisition, repurchase, redemption or retirement for value of any Capital Stock or other Equity Securities of the Company or any of its Subsidiaries from any Sponsor Investor (other than (x) in accordance with Section 4.3, (y) if such acquisition, repurchase, redemption or retirement for value is made for the same type and amount of consideration (or, if applicable, the same ability to elect the same type of consideration) per Share on a pro rata basis from each other Sponsor Investor, on the Same Terms and Conditions as such Sponsor Investor or (z) pursuant to which all Sponsor Investors are provided the opportunity to participate on the Same Terms and Conditions on a pro rata basis based on their relative ownership of Shares); and

(iii)   the entering into of any agreement (or any amendment thereof) or transaction, directly or indirectly, between (x) the Company and its Subsidiaries and (y) any Sponsor Investor or any such Sponsor Investor's Affiliates (other than the Company

and its Subsidiaries) or Portfolio Companies, in each case other than (1) purchases, leases and sales of products and services entered into in the ordinary course of business and negotiated on an arm's length basis by the management or other employees of the Company or any of its Subsidiaries with Portfolio Companies of a Sponsor Investor or its private equity investment fund Affiliates, (2) payments and other actions pursuant to the Consulting Services Agreements as in effect on the date of the Closing and in the form approved pursuant to Section 11.11 (or, if and to the extent any amendments thereto has been approved by the Sponsor Investors, as amended from time to time), provided, that any payments pursuant to Section 3(b) of any Consulting Services Agreement must be approved by all Financial Investors, (3) any dividend with respect to Equity Securities, (4) any repurchase, redemption or retirement of Equity Securities not prohibited by Section 2.5(c)(ii), (5) any pro rata payment of indebtedness of the Company or any of its Subsidiaries or any other transaction solely to the extent involving any indebtedness of the Company or its Subsidiaries incurred or issued under an agreement of the Company and/or any of its Subsidiaries; provided that the majority of the indebtedness incurred or issued under such agreement is then held by Persons not affiliated with such Sponsor Investor and such Sponsor Investor and any Affiliate (without giving effect to clause (i) of the definition thereof) of such Sponsor Investor that holds such indebtedness is treated in the same manner as all other holders of such indebtedness, (6) any payments made pursuant to the Merger Agreement, (7) any issuance of Participation Securities in accordance with Article VI, and (8) the consummation of the transactions provided for under the H&F Equity Commitment Letter and the Carlyle Equity Commitment Letter.

(d)       This Section 2.5 shall terminate on an IPO.

Section 2.6       *VCOC Stockholders*.

(a)       With respect to each Sponsor Investor and each Affiliate thereof that directly or indirectly has an interest in the Company, in each case that is intended to qualify as a "venture capital operating company" as defined in the Plan Asset Regulations (each, a "**VCOC Stockholder**"), for so long as the VCOC Stockholder, directly or through one or more conduit subsidiaries, continues to hold any Shares, in each case without limitation of or prejudice to any of the rights provided to any of the Sponsor Investors hereunder, the Company shall, with respect to each such VCOC Stockholder:

(i)       Provide such VCOC Stockholder or its designated representative with the following:

(A)       the right to visit and inspect any of the offices and properties of the Company and its Subsidiaries and inspect and copy the books and records of the Company and its Subsidiaries, as the VCOC Stockholder shall reasonably request;

(B)       within a reasonable time after they become available, consolidated balance sheets of the Company and its Subsidiaries as of the end of each of the first three (3) quarters of each fiscal year of the Company, and consolidated statements of income and cash flows of the Company and its

MENNINGER_SUPP000541

Subsidiaries for the period then ended, in each case prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments; and

(C)    within a reasonable time after they become available, a consolidated balance sheet of the Company and its Subsidiaries as of the end of each fiscal year of the Company, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the year then ended, prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, together with an auditor's report thereon of a firm of established national reputation.

(ii)    Make appropriate officers and Directors available periodically and at such times as reasonably requested by such VCOC Stockholder for consultation with such VCOC Stockholder or its designated representatives with respect to matters relating to the business and affairs of the Company and its Subsidiaries;

(iii)    Give such VCOC Stockholder, if such VCOC Stockholder does not at such time have the right to designate or nominate one or more Directors pursuant to Section 2.1, the right to designate one (1) non-voting board observer who will be entitled to attend all meetings of the Company Board, participate in all deliberations of the Company Board and receive copies of all materials provided to the Company Board; provided that such observer shall have no voting rights with respect to actions taken or elected not to be taken by the Company Board; provided, further, that Company Board shall be entitled to exclude such observer from such portions of any of its meetings to the extent (x) such observer's presence would be reasonably likely to result in the waiver of attorney-client privilege, (y) there exists, with respect to any such materials, an actual or potential conflict of interest between such VCOC Stockholder and the Company or (z) the removal of such observer is required under applicable law or the rules of any stock exchange applicable to the Company;

(iv)    Provide such VCOC Stockholder or its respective designated representatives with such other rights of reasonable consultation which such VCOC Stockholder's counsel may reasonably determine to be reasonably necessary under applicable legal authorities promulgated after the date hereof to qualify its investment in the Company as a "venture capital investment" for purposes of the Plan Assets Regulation.

(b)    The Company agrees to consider, in good faith, the recommendations of each VCOC Stockholder or its designated representative in connection with the matters on which it is consulted as described above, recognizing that the ultimate discretion with respect to all such matters shall be retained by the Company.

(c)    In the event the Company ceases to qualify as an "operating company" (as defined in the Plan Asset Regulations), then the Company and each Stockholder will consider in good faith taking all reasonable action necessary to provide that the investment (or at least 51%

41

of the investment valued at cost) of each VCOC Stockholder shall continue to qualify as a "venture capital investment" (as defined in the Plan Asset Regulations).

Section 2.7  *No Transfer of Rights*.  The provisions of this <u>Article II</u> (other than <u>Section 2.6</u>) may not be assigned or otherwise conveyed by any Financial Investor other than (a) to its Permitted Transferees or (b) with the prior written consent of all Sponsors; <u>provided</u>, <u>however</u>, that after (x) the fourth (4th) anniversary of the Closing (in the case of the H&F Entities), (y) the sixth (6th) anniversary of the Closing (in the case of the Carlyle Entities) or (z) at any time prior to an IPO, in the case of the Blue Spectrum Entities and the GIC Entities, if any Financial Investor Group Transfers all of the Shares held of record and Beneficially Owned by such Financial Investor Group to one Person, or group of Affiliates, in accordance with this Agreement, such Financial Investor Group may Transfer all its rights under this <u>Article II</u> to such Person or group of Affiliates in connection with such Transfer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1  *Representations and Warranties of the Company*.  The Company represents and warrants to each of the other parties to this Agreement as follows:

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement and to perform its obligations under this Agreement.

(b)  The execution, delivery and performance of this Agreement by the Company has been duly and validly authorized by all necessary action, and no other proceedings on the part of the Company are necessary to authorize the execution and delivery of this Agreement.

(c)  This Agreement has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by each other party, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to creditors' rights generally, and (ii) limitations on the availability of specific performance or injunctive relief or other equitable remedies.

(d)  Other than any consents that have already been obtained, no consent, waiver, approval, authorization, exemption, registration or license is required to be made or obtained by the Company in connection with its execution and delivery of this Agreement.

(e)  The Company has not granted, and is not a party to, any proxy, voting trust or other agreement that is inconsistent with or conflicts with any provision of this Agreement except for any letter agreements entered into with Managers that may modify certain terms and conditions of this Agreement as it applies to such Managers (the "**Manager Side Agreements**").

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000543

Section 3.2     *Representations and Warranties of the Stockholders*.   Each of the Stockholders, severally and not jointly, represents and warrants to each of the other parties to this Agreement as follows:

(a)     If such Stockholder is not an individual, such Stockholder is an entity duly formed, validly existing and in good standing under the laws of its jurisdiction of formation, and has all necessary power and authority to enter into this Agreement and to perform its obligations under this Agreement.

(b)     If such Stockholder is not an individual, the execution, delivery and performance of this Agreement by such Stockholder has been duly and validly authorized by all necessary action, and no other proceedings on the part of such Stockholder are necessary to authorize this Agreement or the performance of such Stockholder's obligations under this Agreement.

(c)     This Agreement has been duly executed and delivered by such Stockholder, and, assuming due authorization, execution and delivery by each other party hereto, constitutes a legal, valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, subject to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to creditors' rights generally, and (ii) limitations on the availability of specific performance or injunctive relief or other equitable remedies.

(d)     As of the date hereof, such Stockholder is either (i) the Beneficial Owner and record holder of the Shares set forth next to its, his or her respective name (x) on Schedule 1 hereto or (y) in the case of each Initial Manager only, the books and records of the Company or (ii) in the case of each Sponsor Investor only, has entered into an agreement to be issued such number of Shares set forth next to its respective name on Schedule 1 hereto at the Deferred Payment Date (or, in the case of CP VI Holdings and the Initial Carlyle Entities, Carlyle VI has entered into an agreement to be issued such number of Shares set forth next to CP VI Holdings's name on Schedule 1 hereto at the Deferred Payment Date, and Carlyle VI has assigned to CP VI Holdings the right to purchase such Shares).

(e)     Such Stockholder has not granted and is not a party to any proxy, voting trust or other agreement that is inconsistent with or conflicts with any provision of this Agreement except for the Manager Side Agreements.

(f)     Other than any consents that have already been obtained, no consent, waiver, approval, authorization, exemption, registration or license is required to be made or obtained by such Stockholder in connection with its execution and delivery of this Agreement.

(g)     If such Stockholder is married, he or she has delivered to the other parties hereto a duly executed copy of a Spousal Consent in the form attached hereto as Annex B ("**Spousal Consent**").

(h)     Such Stockholder acknowledges, understands and agrees that Affiliates of the Sponsors will receive certain fees relating to their on-going provision of services to the

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000544

Company or its Subsidiaries, and expense reimbursement and other rights under the Consulting Services Agreements.

(i)     If such Stockholder is CP VI Holdings or an Initial Carlyle Entity, (i) such Stockholder is not a Permitted Co-Investor Transferee, in whole or in part, of any of CP VI Holdings or the other Initial Carlyle Entities and (ii) as of the date hereof, all of the limited partnership interests of CP VI Holdings are held by the Initial Carlyle Entities.

(j)     If such Stockholder is an Initial H&F Entity, such Stockholder is not a Permitted Co-Investor Transferee, in whole or in part, of any of the other Initial H&F Entities.

## ARTICLE IV

## TRANSFER RESTRICTIONS

Section 4.1     *General Limitations on Transfers.*

(a)     *Transfers Generally*.   No Stockholder shall Transfer any Shares or Options held or Beneficially Owned (whether as of the date of this Agreement or subsequently acquired) by such Stockholder, unless such Transfer is made in accordance with the requirements of this Article IV, as may be applicable.

(b)     *Transfer Books*.  The Company shall not record upon its books any attempted Transfer of Shares or Options held or Beneficially Owned by any Stockholder to any other Person, except Transfers in accordance with this Agreement, and any attempted Transfer not in accordance with this Agreement shall be null and void *ab initio*.

(c)     *Securities Laws Matters*.   Notwithstanding any other provision of this Agreement, no Stockholder shall Transfer any Shares or Options unless (i) the Transfer is effected pursuant to an effective registration statement under the Securities Act and in compliance with any other applicable federal securities laws and state securities or "blue sky" laws or (ii) the transferor shall have furnished the Company with such evidence as shall be reasonably acceptable to the Company to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and under any applicable state securities or "blue sky" laws and that the Transfer otherwise complies with any other applicable federal securities laws and state securities or "blue sky" laws and such representations and covenants of the transferor as are reasonably requested by the Company to ensure compliance with any applicable federal securities laws and state securities or "blue sky" laws.  Without the prior written consent of all Sponsors, except in connection with a registration pursuant to Article V, no Stockholder can make any Transfer of Shares or Options that would cause the Company to become required to file periodic reports with the SEC under Section 13 or Section 15(d) of the Exchange Act (or that, either immediately or with the passage of time assuming no further Transfers of Shares or Options, would prevent the suspension of such a reporting requirement) or to register any class of securities under Section 12(g) of the Exchange Act.

(d)     *Obligations of Transferees*. Except (w) a Transfer of Shares to a Permitted Transferee that involves a direct or indirect Transfer of an interest in the Stockholder but not a direct Transfer of Shares by such Stockholder, (x) Transfers of Shares as part of or in connection with a Company Sale or other Change of Control Transaction pursuant to Section 4.5, (y) sales of Shares pursuant to a registration statement under the Securities Act or (z) following an IPO and subject to Section 4.1(f), under Rule 144 or in an In-Kind Distribution, no Transfer of Shares or Options (other than to the Company or its Subsidiaries or any Stockholder) that would be otherwise permitted pursuant to this Agreement shall be effective unless (i) the transferee shall have executed an appropriate document (a "**Joinder Agreement**") substantially in the form attached hereto as Annex A or otherwise in form and substance reasonably satisfactory to the Company confirming that (A) the transferee takes such Shares or Options, as applicable, subject to all the terms and conditions of this Agreement to the same extent as its transferor was bound by and entitled to the benefits of such provisions and (B) the Shares shall bear legends, substantially in the forms required by Section 4.7, and (ii) such Joinder Agreement shall have been delivered to and approved by the Company prior to such transferee's acquisition of Shares or Options, as applicable, which approval shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, a Manager may not Transfer any Options at any time (whether before or after the Applicable Transfer Date) to any Person (for the avoidance of doubt, this sentence does not apply to Shares acquired upon exercise of Options).

(e)     *Transfers to Company Competitors*.  Prior to an IPO, no Financial Investor shall Transfer any Shares or Options to a Competitor without the prior consent of both (i) the Company Board in accordance with the provisions of Section 2.3(a) and (ii) any Sponsor that is not an Affiliate of such Financial Investor, in each case unless such Transfer is made pursuant to a Company Sale or other Change of Control Transaction in accordance with Section 4.5 and Article IX, as applicable.

(f)     *Restrictions on Transfers by the Sponsor Investors*.  The Sponsor Investors shall not Transfer any Shares or Options to any other Person (other than (x) any Transfer to Permitted Transferees effected in compliance with Section 4.2 or (y) any Transfer to any Participation Stockholder pursuant to Section 6.4 if and to the extent such Sponsor Investor is an Exigent Circumstances Purchaser), without the prior written consent of all Sponsors, if such Transfer occurs prior to the earlier to occur of (i) the fourth anniversary of the Closing, in the case of the H&F Entities, or the sixth anniversary of the Closing, in the case of the Carlyle Entities, and (ii) the first anniversary of an IPO.  Notwithstanding anything to the contrary set forth in this Agreement, in no event shall any Sponsor Investor be permitted to Transfer any Shares pursuant to Rule 144 or to effect any distribution or similar Transfer of Shares to its partners, members, stockholders or other equityholders or beneficiaries (an "**In-Kind Distribution**") without the prior written consent of all Sponsors unless and until either the H&F Board Representation Number or the Carlyle Board Representation Number is zero (0).  If and to the extent any Sponsor Investor requests in connection with a Transfer of Shares or Options by such Sponsor Investor that is in compliance with the foregoing provisions of this Section 4.1(f), the Company shall make members of the Company's management available to meet with prospective transferees, provide for the reasonable inspection of the Company's facilities and reasonable access to the Company's financial information and other books and records by prospective transferees, and ensure the cooperation of the Company's counsel and independent public accountants with any such prospective transferee, all at the cost and expense of such

Sponsor Investor and subject to reasonable limitations as to timing of any such inspection and access and, pursuant to confidentiality agreements reasonably acceptable to the Company, the preservation of the Company's privileged and confidential information.

(g)    *Restrictions on Transfers by Stockholders Other than Sponsor Investors Prior to the Applicable Transfer Date*.  Prior to the Applicable Transfer Date, the Managers, the Blue Spectrum Entities and the GIC Entities shall not Transfer any Shares or Options to any other Person without the prior written consent of all Sponsors, other than Transfers of Shares (i) to Permitted Transferees pursuant to an in compliance with Section 4.2, (ii) to any other Person pursuant to and in compliance with Section 4.4, Section 4.5, Section 4.6 or Section 4.7, (iii) in a Public Offering pursuant to and in compliance with Article V, (iv) pursuant to and in compliance with any Employee Repurchase Arrangement or (v) in the case of the Blue Spectrum Entities or the GIC Entities only and subject to the right of first refusal set out in Section 4.3, to any Person that is reasonably acceptable to the Sponsors if and only to the extent that the continued ownership of Shares by the Blue Spectrum Entities or the GIC Entities would (x) adversely impact any of the Blue Spectrum Entities' or the GIC Entities', or any of the Blue Spectrum Entities' or the GIC Entities' direct or indirect owners' (as applicable) qualification for benefits under Section 892 of the Code or (y) solely as a result of the continued ownership of the Shares, require any of the Blue Spectrum Entities, or any of their direct or indirect owners, to file an income tax return outside of the Emirate of Abu Dhabi or any of the GIC Entities, or any of their direct or indirect owners, to file an income tax return outside of the Republic of Singapore.

(h)    *Restrictions on Transfers by Sponsor Investors Prior to the Deferred Payment Date*.  Without the prior written consent of each of the Blue Spectrum Investor and the GIC Investor, except for any Transfer pursuant to Section 4.2, none of the Sponsor Investors will Transfer any of their Shares (including by way of stock sale, merger, business combination, recapitalization, consolidation, reorganization, restructuring, redemption or other transaction), in each case, prior to the Deferred Payment Date in a transaction that would result in an internal rate of return of less than 20% to the Blue Spectrum Entities and the GIC Entities on Shares they would or may sell in such transaction if they exercised their tag-along rights under Section 4.4; provided, that if a Funding Default occurs, the foregoing reference to the Deferred Payment Date shall be replaced with the date that is the later of (y) the expiration date of the period during which the Contingent Sale Exercise Notice may be delivered and (z) if a Contingent Sale Exercise Notice has been delivered, the date on which the purchase of the Shares subject to such Contingent Sale Exercise Notice is required to be consummated in accordance with Section 4.7(b).

Section 4.2    *Permitted Transfers*.    Subject only to the restrictions in Section 4.1 and this Section 4.2, any Stockholder may Transfer Shares to any Permitted Transferee, in whole at any time or in part from time to time; provided, however, that, if at any time after such a Transfer of Shares by a Stockholder to a Person that is, at such time, a Permitted Transferee, such Person ceases to be a Permitted Transferee of such Stockholder (except as a result of (i) a bona fide restructuring of (x) The Carlyle Group or any one or more business segments or business lines thereof, if such Stockholder or Person is a Carlyle Entity or (y) Hellman & Friedman LLC or any one or more business segments or business lines thereof, if such Stockholder or Person is an H&F Entity, in each case, including any restructuring in connection with an initial public offering or (ii) following any such restructuring contemplated

by clause (i), any change of control of any public company that controls such Stockholder or such Person that, as a result of such prior restructuring, is not a change of control of such Person or such Stockholder, respectively), such Person shall transfer such Shares to such Stockholder or a Permitted Transferee of such Stockholder (or, subject to the written consent of all Sponsors, the Company or any other Sponsor Investor) for cash consideration equal to the Fair Market Value of such Shares (or such other consideration (if any) to which such Person and such Stockholder agree); provided, further, that at no time shall the aggregate number of holders of Shares by (1) the Blue Spectrum Entities or the GIC Entities as applicable, exceed twenty (20) at any one time or (2) any Manager Group exceed three (3) at any one time or, in each case, such larger number to which the Company and all Sponsors shall consent in writing (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, without the prior written consent of all Financial Investors, (x) no Carlyle Entity may Transfer any Shares to any Permitted Transferee (other than a Permitted Sponsor Transferee) of such Carlyle Entity unless, in the case of each such Transfer (a "**Post-Closing Syndication Transfer**"), (i) such Transfer is completed by no later than the Deferred Payment Date (such period, as applicable, the "**Post-Closing Syndication Period**"), (ii) the only consideration payable by the transferee in respect of such Post-Closing Syndication Transfer is an amount equal to (A) the number of Shares transferred pursuant to such Post-Closing Syndication Transfer, multiplied by (B) $27.086 (as proportionately adjusted for any stock split, reverse stock split or similar event with respect to the Shares occurring after the Closing), which consideration is effected by the assumption by such transferee of the liability of the Carlyle Entity to fund the Deferred Commitments (as defined in the Equity Commitment Letter of such Carlyle Entity) of such Carlyle Entity on the Deferred Payment Date pursuant to the terms of such Carlyle Entity's Equity Commitment Letter), (iii) the investors providing equity financing to such Permitted Transferee are effectively paying on a pass through basis $27.086 per Share (as proportionately adjusted for any stock split, reverse stock split or similar event with respect to the Shares occurring after the Closing) for their equity investment in the transferee, and (iv) immediately after giving effect to (A) such Post-Closing Syndication Transfer, (B) all other Post-Closing Syndication Transfers during the Post-Closing Syndication Period, (C) the acquisition of Shares by the Carlyle Fund Entities in connection with the funding of their Deferred Commitments, and (D) the number of Shares that would be distributed to Permitted Co-Investor Transferees if all of the Shares owned by CP VI Holdings were to be distributed to the holders of its Equity Securities immediately after such Post-Closing Syndication Transfer, the Carlyle Fund Entities hold of record and Beneficially Own at least 25,843,610 Shares (as proportionately adjusted for any stock split, reverse stock split or similar event with respect to the Shares occurring after the Closing); provided, however, that, in the event that a Carlyle Entity offers to Transfer any Shares to (1) the Blue Spectrum Entities in a Post-Closing Syndication Transfer (including, for the avoidance of doubt, by offering Equity Securities in the transferee of the liability of the Carlyle Entity to fund the Deferred Commitments), it must offer to Transfer a proportionate number of Shares (based on the relative ownership of Shares by the Blue Spectrum Entities and the GIC Entities at the time) on substantially equivalent terms and conditions to the GIC Entities in such Post-Closing Syndication Transfer and (2) the GIC Entities in a Post-Closing Syndication Transfer (including, for the avoidance of doubt, by offering Equity Securities in the transferee of the liability of the Carlyle Entity to fund the Deferred Commitments), it must offer to Transfer a proportionate number of Shares (based on the relative ownership of Shares by the GIC Entities and the Blue Spectrum Entities at the time) on substantially equivalent terms and conditions to

the Blue Spectrum Entities in such Post-Closing Syndication Transfer, and (y) no H&F Entity may Transfer any Shares to any Permitted Transferee other than a Permitted Sponsor Transferee.

Section 4.3 *Right of First Refusal.* Prior to an IPO, in the event that a Stockholder shall propose to Transfer any Shares (each, a "**Prospective Selling Stockholder**") to any Person (other than (i) a Permitted Transferee pursuant to and in compliance with Section 4.2, (ii) pursuant to and in compliance with Section 4.5, Section 4.6 or Section 4.7 (iii) pursuant to and in compliance with any Employee Repurchase Arrangement, (iv) pursuant to and in compliance with Section 6.4 if and to the extent such Stockholder is an Exigent Circumstances Purchaser, (v) in a Transfer approved in advance and in writing by all Sponsors or (vi) pursuant to and in compliance with Section 4.4 if and to the extent such Stockholder is a Tag-Along Stockholder), the Company and, if the Company does not exercise such right, each Eligible Financial Investor, in each case shall have a right of first refusal with respect to such proposed Transfer, which right shall be exercised in accordance with the provisions of this Section 4.3.

(a) With respect to any such proposed Transfer of Shares, the Prospective Selling Stockholder shall offer to the Company and, if and only to the extent the Company elects not to accept such offer, the Eligible Financial Investors (by simultaneous written notice to the Company and the Eligible Financial Investors) the option to purchase the Shares proposed to be Transferred at the same price and upon the same terms and conditions as are specified in a bona fide written offer from the proposed transferee.

(b) The notice to the Company and the Eligible Financial Investors ("**Right of First Refusal Notice**", which, for the avoidance of doubt, shall be simultaneously sent to the Blue Spectrum Investor and the GIC Investor) shall include the price, form of consideration and any other material terms and conditions, and the identity of the Person to whom such Prospective Selling Stockholder is proposing to Transfer such Shares, including the identity of any Person controlling such proposed Transferee (if known by the Prospective Selling Stockholder), and whether the prospective Transferee has expressed a willingness to purchase less than all of the Shares proposed to be Transferred on such terms. Upon the written request from the Company or an Eligible Financial Investor within five (5) Business Days of delivery of the Right of First Refusal Notice, such Prospective Selling Stockholder shall use commercially reasonable efforts to provide such other information as is reasonably requested by the Company or such Eligible Financial Investor (which information shall also be provided to the Blue Spectrum Investor and the GIC Investor). To exercise its right to purchase the Shares proposed to be Transferred, the Company or any of the Eligible Financial Investors shall within ten (10) Business Days after receipt of the Right of First Refusal Notice (such period of days, the "**ROFR Notice Period**") give written notice to the Prospective Selling Stockholder identifying the number of such Shares it agrees to purchase (a "**ROFR Acceptance Notice**"); provided, that if any Eligible Financial Investor chooses to submit a ROFR Acceptance Notice, such Eligible Financial Investor shall notify the Blue Spectrum Investor and the GIC Investor, following which the Blue Spectrum Entities and the GIC Entities shall have an additional five (5) Business Day period in which to deliver a ROFR Acceptance Notice. In the event that, as of such date, the Company and the Eligible Financial Investors, collectively, fail to notify the Prospective Selling Stockholder of their agreement in writing to purchase all of the Shares proposed to be Transferred, the Prospective Selling Stockholder shall provide notice of such shortfall to the Company and the Eligible Financial Investors (which shall include the Blue Spectrum Entities and the GIC Entities

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000549

if a Sponsor Investor delivered a ROFR Acceptance Notice, regardless of whether any Sponsor Investor delivers a ROFR Undersubscription Notice), and if they wish to purchase all or any portion of the Shares comprising such shortfall, the Company and the Eligible Financial Investors shall within two (2) Business Days of receipt of such notice provide written notice to the Prospective Selling Stockholder identifying the number of Shares comprising such shortfall that it agrees to purchase ("**ROFR Undersubscription Notice**").  In the event that the Company or any Eligible Financial Investor fails to deliver (x) a ROFR Acceptance Notice to the Prospective Selling Stockholder within the ten (10) Business Day period (or the additional five (5) Business Day period applicable to the Blue Spectrum Entities and the GIC Entities), the Company or such Eligible Financial Investor, as applicable, shall be deemed, subject to Section 4.3(c), to have waived its right of first refusal with respect to such Shares (other than in the event of a ROFR Undersubscription Notice) and (y) if applicable, a ROFR Undersubscription Notice to the Prospective Selling Stockholder within the two (2) Business Day period, the Company or such Eligible Financial Investor, as applicable, shall be deemed, subject to Section 4.3(c), to have waived its right to purchase any portion of any shortfall with respect to such Shares.  The delivery by the Company or an Eligible Financial Investor of a ROFR Acceptance Notice or a ROFR Undersubscription Notice shall constitute an irrevocable commitment, subject to the terms of this Section 4.2, by the Company or such Eligible Financial Investor, as applicable, to purchase such Shares set forth in its ROFR Acceptance Notice and, if applicable, ROFR Undersubscription Notice on the terms set forth in the Right of First Refusal Notice and the closing of such purchase shall take place at the offices of the Company (or at any other place as may be agreed by the Company, any Eligible Financial Investors that are purchasing Shares in such Transfer and the Prospective Selling Stockholder) on a date specified by the Company and any Eligible Financial Investors that are purchasing Shares in such Transfer, which date shall be within fifteen (15) Business Days after the expiration of the ROFR Notice Period (subject to extension to the extent necessary to obtain required government approvals or clearances); provided, however, that, if the Company and the Eligible Financial Investors, collectively, elect to purchase more than all of the Shares proposed to be Transferred, the Company and each Eligible Financial Investor electing to purchase any Shares shall be deemed to have irrevocably committed to purchase the number of such Shares allocated to it as follows (in each case until the full number of Shares proposed to be Transferred has been allocated), (I) first, to the Company, up to the number of Shares set forth in its ROFR Acceptance Notice, if any, (II) second, to the Eligible Financial Investors delivering ROFR Acceptance Notices, up to the number of Shares set forth in their respective ROFR Acceptance Notices, allocated pro rata in proportion to the number of Shares held by such Eligible Financial Investors, respectively, (III) third, to the Company, up to the number of Shares set forth in its ROFR Undersubscription Notice, if any, and (IV) fourth, to the Eligible Financial Investors delivering ROFR Undersubscription Notices, up to the number of Shares set forth in their respective ROFR Undersubscription Notices, allocated pro rata in proportion to the number of Shares held by such Eligible Financial Investors, respectively.  If the terms of the proposed Transfer include the Transfer of the Shares for consideration other than cash, the Company and any Eligible Financial Investors that are purchasing Shares in such Transfer will have the right to exercise their rights hereunder by purchasing such Shares for cash in an amount equal to the fair market value of such proposed consideration in the reasonable opinion of an independent third party bank appointed by mutual consent of the Prospective Selling Stockholder, the Company and the Eligible Financial Investors that are purchasing Shares in such Transfer, as applicable

49

(whose reasonable fees and expenses in connection with the services described above shall be paid by the Company).

(c)     If the Company and the Eligible Financial Investors elect not to purchase any Shares proposed to be Transferred, or elect to purchase less than all of the Shares proposed to be Transferred, (i) the Prospective Selling Stockholder may accept the offers of the Company and the Eligible Financial Investors (if any) and, at the option of the Prospective Selling Stockholder, sell the remaining Shares proposed to be Transferred to the Person (or an Affiliate thereof) specified in the Right of First Refusal Notice or (ii) if the Person specified in the Right of First Refusal Notice is unwilling to purchase less than all of the Shares proposed to be Transferred on the terms offered by such Person as set forth in the Right of First Refusal Notice, the Prospective Selling Stockholder may sell all (but not less than all) of such Shares to such Person (or an Affiliate thereof), provided that, in each case, such sale is made (x) within 120 days after the date of such Right of First Refusal Notice (subject to extension to the extent necessary to obtain required governmental approvals or clearances), at a price and upon terms and conditions not more favorable to such transferee than those that were specified in the Right of First Refusal Notice (y) in compliance with Section 4.4 if applicable to such sale.

Section 4.4     *Tag-Along Rights.*

(a)     Sale Notice.  If, at any time (A) prior to an IPO or (B) (except with the prior written consent of all Financial Investors) prior to the first anniversary of an IPO, any Sponsor Investor Group (the "**Stockholder Sellers**") proposes to Transfer any of the Shares held by such Stockholder Sellers (other than any Transfer of Shares (i) to any Permitted Transferee pursuant to and in compliance with Section 4.2, (ii) to the Company or to any Eligible Financial Investor pursuant to and in compliance with Section 4.3, (iii) pursuant to and in compliance with Section 4.5, Section 4.6 or Article V or (iv) pursuant to and in compliance with Section 6.4 if and to the extent such Stockholder making such Transfer is an Exigent Circumstances Purchaser), then the Stockholder Sellers shall first give written notice (the "**Sale Notice**") to each of the Stockholders who are not part of that Sponsor Investor Group (each such other Stockholder, an "**Eligible Tag-Along Stockholder**"), stating that the Stockholder Sellers desire to make such Transfer, referring to this Section 4.4, specifying the number of Shares proposed to be Transferred by the Stockholder Sellers (the "**Offer Shares**"), and specifying the price, the form of consideration, name and description of the proposed Transferee (including, to the extent known by the Stockholder Sellers, the controlling Persons of such Transferee) (the "**Proposed Transferee**"), the other material terms pursuant to which such Transfer is proposed to be made and, if the form of consideration is not solely cash payable in immediately available funds or cash equivalents, to the extent reasonably requested by any Eligible Tag-Along Stockholder that is a Financial Investor, sufficient financial and other information in order for such Eligible Tag-Along Stockholders to reasonably evaluate the consideration proposed to be delivered.  Upon the written request by any Eligible Tag-Along Stockholder that is a Financial Investor within five (5) Business Days of delivery of the Sale Notice, the Stockholder Sellers shall use commercially reasonable efforts to provide such other information related to the Proposed Transferee and/or proposed Transfer, as is reasonably requested by such Eligible Tag-Along Stockholder.

(b)     *Tag-Along Election.*  Within ten (10) Business Days of the date of receipt of the Sale Notice, each Eligible Tag-Along Stockholder that desires to participate in such

Transfer (any Eligible Tag-Along Stockholder that exercises such right, a "**Tag-Along Stockholder**" and, together with the Stockholder Sellers and all other Persons that are exercising contractual or other rights to Transfer Shares in such transaction, the "**Tag-Along Sellers**") shall deliver to the Stockholder Sellers and to the Company a written notice stating how many Shares such Eligible Tag-Along Stockholder elects to Transfer (subject to the following sentences of this Section 4.4(b), such Tag-Along Stockholder's "**Tag-Along Shares**").    Subject to this Section 4.4, such Tag-Along Stockholder may Transfer up to a number of Shares equal to its, his or her Tag-Along Pro Rata Portion to such Proposed Transferee on the Same Terms and Conditions as the Stockholder Sellers and subject to the same indemnification (on a several and not joint basis) as the Stockholder Sellers.  An election pursuant to the first sentence of this Section 4.4 shall constitute an irrevocable commitment, subject to the terms of this Section 4.4, including Section 4.4(c), by the Tag-Along Stockholder making such election to sell such Tag-Along Shares to the Proposed Transferee if the sale of Offer Shares to the Proposed Transferee occurs on the terms set forth in the Sale Notice.  Such terms shall include a maximum number of Shares such Proposed Transferee is willing to purchase, and, in the event that the Proposed Transferee is not willing to acquire all the Shares offered, each Tag-Along Seller shall be cut back pro rata based on the number of Shares such Tag-Along Seller offered to sell in accordance with the terms of Section 4.4(a) or this Section 4.4(b), as applicable, or, in the case of each Tag-Along Seller other than the Stockholder Sellers and the Tag-Along Stockholders, in accordance with such Tag Along Seller's contract or other right to Transfer.  With respect to any Shares for which a Tag-Along Stockholder holds exercisable and vested but unexercised Options, to the extent that such Shares are to be sold pursuant to this Section 4.4, such Tag-Along Stockholder must exercise the relevant Option (which exercise may be conditioned upon the closing of the Transfer pursuant to this Section 4.4 and which may include an exercise effected on a "net exercise" basis to the extent permitted by the terms of such Option) and transfer the relevant Shares (rather than the Option), in each case, net of any amounts required to be withheld by the Company in connection with such exercise.  Notwithstanding anything to the contrary set forth in this Agreement, in no event may any Stockholder Transfer any Restricted Shares pursuant to this Section 4.4.

        (c)     *Rights to Transfer*.

        (i)     *Third-Party Sale; Tag-Along Buyer*.  The Stockholder Sellers may not consummate any Transfer that is subject to the provisions of this Section 4.4 unless the Proposed Transferee purchases, within 120 days of the date of the Sale Notice (subject to extension to the extent (x) necessary to obtain required governmental approvals or clearances or (y) approved in writing by all Sponsors) (the "**Tag-Along Sale Period**"), simultaneously with the purchase of Shares from the Stockholder Sellers, all of the Tag-Along Shares (subject to the cutback in Section 4.4(b)) on the Same Terms and Conditions, which terms and conditions include the same price as set forth in the Sale Notice and otherwise are not materially less favorable than those set forth in the Sale Notice (the "**Tag-Along Right**"); provided, however, if, prior to consummation, the terms of such proposed Transfer shall change with the result that the per share price shall be different (by more than a de minimis amount) than the per share price set forth in the Sale Notice or the other terms and conditions shall be materially more or less favorable to any Tag-Along Stockholder than those set forth in the Sale Notice (including, for the avoidance of doubt, a material portion of the cash consideration being changed to non-

cash consideration, or vice versa), the acceptance by each Tag-Along Stockholder shall be deemed to be revoked, and it shall be necessary for a separate Sale Notice to be furnished, and the terms and provisions of this Section 4.4 separately complied with, in order to consummate such Transfer pursuant to this Section 4.4.  For purposes of the preceding sentence, the price received by the Stockholder Sellers shall be deemed to include all compensation of any nature and type as is received by the Stockholder Sellers in respect of the Offer Shares (for the avoidance of doubt, any payments made pursuant to the Consulting Services Agreements shall not be deemed to be compensation in respect of the Offer Shares).  If at the end of the Tag-Along Sale Period, the Transfer has not been completed, the Sale Notice shall be null and void and each Tag-Along Stockholder shall be released from such Tag-Along Stockholder's obligation in connection with the Sale Notice and it shall be necessary for a separate Sale Notice to be furnished and the terms and provisions of this Section 4.4 separately complied with, in order to consummate such proposed Transfer pursuant to this Section 4.4.

(ii) *Sale Agreement*.  Each Tag-Along Stockholder agrees to cooperate in consummating such Transfer, including by (A) becoming a party to the sale agreement and all other appropriate related agreements on the Same Terms and Conditions as the Stockholder Sellers, (B) delivering, at or before the consummation of such Transfer, the stock certificates for such Shares, duly endorsed, or with stock (or equivalent) powers duly endorsed, for transfer with signature guaranteed, free and clear of any Encumbrances, with any stock (or equivalent) transfer tax stamps affixed, against delivery of the applicable consideration, and (C) voting or consenting in favor of such transaction (to the extent a vote or consent is required), in each case, on the Same Terms and Conditions as the Stockholder Sellers, and taking any other commercially reasonable necessary or appropriate action in furtherance thereof, including the execution and delivery of any other appropriate agreements, certificates, instruments and other documents.

(iii) *Costs and Expenses*.  Each of the Tag-Along Sellers shall be severally responsible for its proportionate share (apportioned pro rata based on the number of Shares the Tag-Along Sellers are Transferring in such transaction) of the third-party expenses of the Transfer incurred by the Sponsor Investors in connection with such Transfer (except to the extent paid or reimbursed by the Company or the Proposed Transferee) and liabilities for indemnification with respect to breaches of representations and warranties made in connection with such Transfer by the Company or any of its Subsidiaries or by the Tag-Along Sellers with respect to the Company, any of its Subsidiaries or any of the Company's or its Subsidiaries' businesses, and shall also include amounts paid into escrow or subject to holdbacks, and amounts subject to post-closing purchase price adjustments; provided, however, that all such obligations are on a several and not joint basis to the Tag-Along Sellers based on the number of Shares Transferred by the Tag-Along Sellers in such Transfer.  The foregoing notwithstanding, (A) the amount of such obligations and liabilities for which each Tag-Along Seller shall be responsible shall not exceed the consideration actually received by such Tag-Along Seller in such Transfer, (B) a Tag-Along Seller shall not be required to make any representations or warranties in connection with such Transfer except with respect to such Tag-Along Seller, the ownership of and title to its Shares and Options, its

organization, its authority and its absence of conflicts and consents, (C) a Tag-Along Seller shall not be responsible for any indemnification obligations and liabilities (other than through escrow or holdback arrangements if the breaching Tag Along Seller indemnifies the other Tag Along Sellers for such liabilities) for breaches of representations and warranties and related escrow or holdback claims made by any other Tag-Along Seller with respect to such other Tag-Along Seller's (1) ownership of and title to its, his or her Shares, (2) organization, (3) authority or (4) absence of conflicts and consents and any other matter concerning such other Tag-Along Seller, or for breaches of any covenant specifically relating to a Stockholder made by any other Tag-Along Seller, and (D) no Tag-Along Investor that is a Financial Investor shall be required in connection with such Transfer to (x) be subject to any restrictive covenant that the Sponsor Investors are not also subject to or (y) enter into any (1) covenant or agreement not to solicit or hire employees (unless such covenant or agreement (A) excludes portfolio companies of such Financial Investor, except where such Financial Investor directs, encourages or facilitates such solicitation or hiring and (B) excludes general solicitations (e.g., newspaper advertisements and hiring fairs) not targeted at specific employees) or (2) covenant not to compete.  All costs and expenses incurred by the Company or its Subsidiaries in connection with the proposed Transfer pursuant to this <u>Section 4.4</u> (whether or not consummated), including all attorneys' fees and expenses, all accounting fees and charges and all finders, brokerage or investment banking fees, charges or commissions, will be paid by the Company or its Subsidiaries.  Except as otherwise set forth in this <u>Section 4.4(c)(iii)</u>, any costs and expenses incurred by or on behalf of any or all Tag-Along Sellers in connection with any proposed Transfer pursuant to this <u>Section 4.4</u> (whether or not consummated) will be borne by the applicable Tag-Along Seller.

(iv)    *Securities Law Considerations*.  Notwithstanding anything to the contrary in this <u>Section 4.4</u>, in the event the consideration to be paid for Shares that are to be sold pursuant to this <u>Section 4.4</u> includes any securities, and the receipt thereof by a Tag-Along Stockholder would require under applicable law (a) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities where such registration or qualification is not otherwise required for the Transfer pursuant to this <u>Section 4.4</u> by the Stockholder Sellers, or (b) the provision to any Tag-Along Stockholder of any specified information regarding the Company or any of its Subsidiaries, such securities or the issuer thereof that is not otherwise required to be provided for such Transfer pursuant to this <u>Section 4.4</u> by the Stockholder Sellers, then (x) if such Tag-Along Stockholder is not a Financial Investor, such Tag-Along Stockholder shall not have the option to sell Shares in such proposed Transfer pursuant to this <u>Section 4.4</u>, and (y) if such Tag-Along Stockholder is a Financial Investor and the Proposed Transferee is not willing to effect such registration or provide such information, such Tag-Along Stockholder shall have the option to sell Shares in such proposed Transfer and receive in lieu of such securities cash in an amount equal to the Fair Market Value of such Shares as of the date such securities otherwise would have been issued.  In such event, the Stockholder Sellers shall have the right, but not the obligation, to cause to be paid to such Tag-Along Stockholder in lieu of such securities, against surrender of the Shares which would have otherwise been sold by such Tag-Along Stockholder to the Proposed Transferee in the proposed Transfer, an amount

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000554

in cash equal to the Fair Market Value of such Shares as of the date such securities otherwise would have been issued in exchange for such Shares.

(v)     *No Liability*. Notwithstanding any other provision contained in this Section 4.4, there shall be no liability on the part of the Company or the Stockholder Sellers in the event that any Transfer of Offer Shares pursuant to this Section 4.4 is not consummated, except to the extent that the Company has failed to comply with Section 4.4. The decision whether to effect a Transfer subject to this Section 4.4 shall be in the sole and absolute discretion of the Stockholder Sellers.

Section 4.5     *Drag-Along Right.*

(a)     *Exercise*. If, at any time prior to an IPO, (i) all the Sponsors propose in writing that a Change of Control Transaction (whether or not such Change of Control Transaction is an Approved Sale Proposal) structured as a Transfer of Shares (including any Transfer of Shares effected pursuant to a merger, consolidation or other business combination) be effected or (ii) an Approved Sale Proposal involving a Change of Control Transaction is approved pursuant to Section 9.2(c) and is structured as a Transfer of Shares (including any Transfer of Shares effected pursuant to a merger, consolidation or other business combination) and, after such approval pursuant to Section 9.2(c), either Sponsor delivers a request in writing to the Company and the other Sponsor that such Approved Sale Proposal be consummated pursuant to this Section 4.5, such Sponsor (together with the other members of its Sponsor Investor Group) or Sponsors (together with the other members of their respective Sponsor Investor Groups), as the case may be (the "**Sponsor Investor Seller**(s)"), shall have the right (a "**Drag-Along Right**"), exercisable upon fifteen (15) Business Days' prior written notice ("**Drag-Along Notice**") to the other Stockholders (any such other Stockholder that is subject to such Drag-Along Right, a "**Participating Stockholder Seller**" and, together with the Sponsor Investor Seller(s) and all other Persons that otherwise are Transferring Shares in connection with such Transfer, the "**Drag-Along Sellers**"), to require each of them to sell a number of Shares equal to (A) the total number of Shares held by such Participating Stockholder Seller, multiplied by (B) a fraction (1) the numerator of which is the number of Shares such Sponsor Investor Seller or Sponsor Investor Sellers, as the case may be, and their Affiliates Transfer in such Change of Control Transaction and (2) the denominator of which is the total number of Shares held by such Sponsor Investor Seller or Sponsor Investor Sellers and their Affiliates, to the proposed Transferee in such Change of Control Transaction on the Same Terms and Conditions as the Sponsor Investor Seller or Sponsor Investor Sellers, as the case may be, in connection with such Change of Control Transaction; provided, however, that if required pursuant to the terms of any outstanding Options or such Change of Control Transaction, such Participating Stockholder Sellers must exercise the relevant Option (which may include an exercise effected on a "net exercise" basis to the extent the Stockholder's option agreement or such Change of Control Transaction provides for such exercise) and transfer the relevant Shares rather than the Option (in each case, net of any amounts required to be withheld by the Company in connection with such exercise); provided, further, that, notwithstanding anything to the contrary set forth herein, in any event the Company shall be permitted to cause outstanding Options to be treated in such Change of Control Transaction in any manner as permitted by their terms, including any applicable Employee Equity Arrangements; provided, further, that with respect to any Restricted Shares, to the extent any such Restricted Shares would not, by the express terms of the grant

54

thereof, automatically vest and cease to be Restricted Shares upon consummation of such Change of Control Transaction, the Company may segregate the aggregate amount of Change of Control Transaction consideration attributable to such Restricted Shares, and the Company (or its successor) shall release the applicable amounts of such Change of Control Transaction consideration to the holders of such Restricted Shares upon the satisfaction of the vesting criteria applicable thereto following such Change of Control Transaction (or, upon the failure of such vesting criteria to be satisfied, such consideration shall be released and paid as provided in the agreement governing such Change of Control Transaction).  For purposes of the preceding sentence, the price received by a Sponsor Investor Seller shall be deemed to include all compensation of any nature and type as is received by the Sponsor Investor Seller(s) in respect of their Shares being Transferred in the Change of Control Transaction.  If at the end of the 180th day after the date of delivery of the Drag-Along Notice (subject to extension to the extent (x) necessary to obtain required governmental approvals or clearances or (y) approved in writing by all Sponsors) the Transfer has not been completed, the Drag-Along Notice shall be null and void and each Participating Stockholder Sellers shall be released from such Participating Stockholder Seller's obligation in connection with the Drag-Along Notice and it shall be necessary for a separate Drag-Along Notice to be furnished, and the terms and provisions of this Section 4.5 separately complied with, in order to consummate such proposed Transfer pursuant to this Section 4.5.

(b)     *Financial Investor Rollover Right*.  Notwithstanding anything in this Section 4.5 to the contrary, if (and only if) following the consummation of a proposed Change of Control Transaction pursuant to this Section 4.5 a majority of the aggregate voting power of all outstanding Voting Securities of (x) in the case of clause (i) of the definition of "Change of Control Transaction", the purchaser or (y) in the case of clause (ii) of the definition of "Change of Control Transaction", the Company or its successor, will be held of record directly or indirectly by one or more Sponsor Investor(s) and/or Person(s) who are Permitted Transferees or Portfolio Companies of any Sponsor Investor, the Blue Spectrum Entities, collectively, and the GIC Entities, collectively, must be provided, respectively, the right in such Change of Control Transaction to (1) exchange or convert such number of Equity Securities of the Company held by such Financial Investor Group into Equity Securities of the purchaser or new parent holding company of the Company, as applicable, or (solely in the case of a Change of Control Transaction described in clause (ii) of the definition thereof) to retain such Equity Securities of the Company and/or (2) if there is a purchaser or new parent holding company, at their option, purchase for cash such number of Equity Securities in such purchaser or new parent holding company of the Company, as applicable, (which purchase may be affected by any member of the Financial Investor Group or Permitted Transferee of such Financial Investor Group) that in the case of clause (1) and/or (2), results in (A) the percentage of outstanding Shares or the common equity of the Company, the purchaser or the new parent holding company, as applicable, owned of record by such Financial Investor Group being at least as large as the percentage of the outstanding Shares owned of record by such Financial Investor Group immediately prior to such Change of Control Transaction and (B) in the event of such exchange, conversion or purchase, such Financial Investor Group having the rights and obligations as an equityholder of the Company, the purchaser or such new parent holding company, as applicable, that are no less favorable in any material respect to such Financial Investor than its rights and obligations under this Agreement and the certificate of incorporation and bylaws of the Company.  Any purchase of shares of any such purchaser or new parent holding company (including by conversion or

exchange of the Equity Securities of the Company) shall be made at the same purchase price per share as is being paid by the Sponsor Investors or their Permitted Transferees in such transaction.

(c)     *Sale Agreement*.   With respect to any Change of Control Transaction approved by the Company Board or for which a Drag-Along Notice is delivered in accordance with Section 4.5, each Stockholder agrees to cooperate in consummating such Change of Control Transaction, including by (A) becoming a party to the sale agreement and all other appropriate related agreements on the Same Terms and Conditions as the Sponsor Investor Sellers, (B) delivering, at or before the consummation of such Change of Control Transaction, the stock certificates for such Shares, duly endorsed, or with stock (or equivalent) powers duly endorsed, for transfer with signature guaranteed, free and clear of any Encumbrances, with any stock (or equivalent) transfer tax stamps affixed, against delivery of the applicable consideration, (C) voting or consenting in favor of such transaction (to the extent a vote or consent is required) and (D) waiving any appraisal or dissenters' rights with respect to the Change of Control Transaction, in each case, on the Same Terms and Conditions as the Sponsor Investor Sellers, and taking any other necessary or appropriate action in furtherance thereof, including the execution and delivery of any other appropriate agreements, certificates, instruments and other documents.

(d)     *Costs and Expenses*.   Each Drag-Along Seller shall be severally responsible for its proportionate share (apportioned pro rata based on the number of Shares the Drag-Along Sellers are Transferring in such Change of Control Transaction) of the third-party expenses of the Change of Control Transaction incurred by the Sponsor Investors in connection with such Change of Control Transaction (except to the extent paid or reimbursed by the Company or the Transferee(s) in connection with the Change of Control Transaction) and liabilities for indemnification with respect to breaches of representations and warranties made in connection with such Change of Control Transaction by the Company and its Subsidiaries or by the Drag-Along Sellers with respect to the Company, any of its Subsidiaries or any of the Company's or its Subsidiaries' businesses, and shall also include amounts paid into escrow or subject to holdbacks, and amounts subject to post-closing purchase price adjustments; provided, however, that all such obligations are on a several and not joint basis to each Drag-Along Seller based on the number of Shares Transferred by such Drag-Along Seller in such Change of Control Transaction. The foregoing notwithstanding, (A) the amount of such obligations and liabilities for which each Drag-Along Seller shall be responsible shall not exceed the consideration actually received by such Drag-Along Seller in such Change of Control Transaction, (B) a Drag-Along Seller shall not be required to make any representations or warranties in connection with such Change of Control Transaction except with respect to such Drag-Along Seller, the ownership of and title to its Shares and Options, its organization, its authority and its absence of conflicts and consents, (C) a Drag-Along Seller shall not be responsible for any indemnification obligations and liabilities (other than through escrow or holdback arrangements if the breaching Drag-Along Seller indemnifies the other Drag-Along Sellers for such liabilities) for breaches of representations and warranties and related escrow or holdback claims made by any other Drag-Along Seller made with respect to such other Drag-Along Seller's (1) ownership of and title to its Shares and Options, (2) organization, (3) authority or (4) absence of conflicts and consents and any other matter concerning such other Drag-Along Seller, or for breaches of any covenant specifically relating to a Stockholder made by any other Drag-Along Seller, and (D) no Drag-Along Seller that is a Financial Investor shall be required in

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000557

connection with such Change of Control Transaction to (x) be subject to any restrictive covenant that the Sponsor Investors are not also subject to or (y) enter into any (1) covenant or agreement not to solicit or hire employees (unless such covenant or agreement excludes (A) portfolio companies of such Financial Investor, except where such Financial Investor directs, encourages or facilitates such solicitation or hiring and (B) general solicitations (e.g., newspaper advertisements and hiring fairs) not targeted at specific employees) or (2) covenant not to compete.  All costs and expenses incurred by the Sponsor Investors (other than transfer or other taxes) or the Company in connection with the proposed Change of Control Transaction pursuant to this Section 4.5 (whether or not consummated), including without limitation all attorneys' fees and expenses, all accounting fees and charges and all finders, brokerage or investment banking fees, charges or commissions, will be paid by the Company or its Subsidiaries.  Any other costs and expenses incurred by or on behalf of any or all Participating Stockholder Sellers in connection with any proposed Transfer pursuant to this Section 4.5 (whether or not consummated) will be borne by such Participating Stockholder Seller(s), as applicable.

(e)    *Power of Attorney*.  Each Participating Stockholder Seller (other than any Sponsor Investor) hereby constitutes and appoints each Sponsor Investor Seller, with full power of substitution, as such Participating Stockholder Seller's true and lawful representative and attorney-in-fact, in such Participating Stockholder Seller's name, place and stead, to execute and deliver any and all agreements that the Sponsor Investor Seller(s) who requested such Change of Control Transaction reasonably believe are consistent with this Section 4.5, and such Sponsor Investor Seller shall provide a copy of such agreements to such Participating Stockholder Seller within five (5) Business Days of execution, provided, however, that failure to deliver such documents within such time period shall not impair or affect the validity of such agreements. The foregoing power of attorney is coupled with an interest and shall continue in full force and effect notwithstanding the subsequent death, incapacity, bankruptcy or dissolution of any Participating Stockholder Seller.

(f)    *Securities Law Considerations*.  Notwithstanding anything to the contrary in this Section 4.5, in the event the consideration to be paid for Shares that are to be sold pursuant to this Section 4.5 includes any securities, and the receipt thereof by a Participating Stockholder Seller would require under applicable law (i) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities where such registration or qualification is not otherwise required for the Transfer pursuant to this Section 4.5 by the Sponsor Investor Seller(s), or (ii) the provision to any Participating Stockholder Seller of any information regarding the Company or any of its Subsidiaries, such securities or the issuer thereof that is not otherwise required to be provided for such Transfer pursuant to this Section 4.5 by the Sponsor Investor Seller(s), then (x) unless otherwise agreed to by the Company and the Sponsor Investors, if such Participating Stockholder Seller is not a Financial Investor, such Participating Stockholder Seller shall not have the option to sell Shares in such proposed Transfer pursuant to this Section 4.5, and (y) if such Participating Stockholder Seller is a Financial Investor and the Proposed Transferee is not willing to effect such registration or provide such information, such Participating Stockholder Seller shall have the option to sell Shares in such proposed Transfer and receive in lieu of such securities cash in an amount equal to the Fair Market Value of such Shares as of the date such securities otherwise would have been issued.  In such event, the Sponsor Investor Seller(s) shall have the right, but not the obligation, to cause to be paid to such Participating Stockholder Seller in lieu of such

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000558

securities, against surrender of the Shares which would have otherwise been sold by such Participating Stockholder Seller to the Proposed Transferee in the proposed Transfer, an amount in cash equal to the Fair Market Value of such Shares as of the date such securities otherwise would have been issued in exchange for such Shares.

(g)     *No Liability*.   Notwithstanding any other provision contained in this Section 4.5, there shall be no liability on the part of the Company or any Sponsor Investor Seller in the event that any Change of Control Transaction pursuant to this Section 4.5 is not consummated, except to the extent that the Company has failed to comply with this Section 4.5, for any reason whatsoever.  The decision whether to effect a Change of Control Transaction pursuant to this Section 4.5 shall be in the sole and absolute discretion of the Sponsor Investor Seller(s).

Section 4.6        *Recapitalization Transactions.*

(a)     Each Stockholder hereby agrees, if requested by the Company Board at any time prior to an IPO, to exchange or convert all or any portion of the Shares held by such Stockholder in any Recapitalization Transaction, in each case in the manner and on the terms set forth in this Section 4.6.  Notwithstanding anything in this Section 4.6 to the contrary, this Section 4.6 shall not be applicable to Options, which shall instead be governed by the Employee Equity Arrangements applicable to the Options with respect to any Recapitalization Transaction.

(b)     The Company shall furnish a written notice (the "**Recapitalization Notice**") to each Stockholder at least ten (10) Business Days prior to the consummation of any Recapitalization Transaction.  The Recapitalization Notice shall set forth the principal terms and conditions of the proposed Recapitalization Transaction, including (i) the number of Shares to be exchanged or converted in the Recapitalization Transaction, (ii) the percentage of Shares owned by each of the Stockholders that are to be exchanged or converted by the Stockholders (the "**Recapitalization Percentage**"), (iii) the new form of securities to be received upon exchange or conversion of such Shares and (iv) the proposed or reasonably anticipated conversion or exchange date.  If the Recapitalization Transaction described in such Recapitalization Notice is consummated, each Stockholder shall: (x) be bound and obligated to convert or exchange the Recapitalization Percentage of such Stockholder's Shares on the Same Terms and Conditions as the other holders of Shares, (y) except as provided in Section 4.6(c), shall receive the same securities per Share exchanged or converted and (z) be obligated to execute a shareholders agreement with terms that are substantially equivalent to the terms of this Agreement; provided, that, notwithstanding anything to the contrary herein, shares of Non-Voting Common Stock may be exchanged or converted into non-voting securities while shares of Voting Common Stock are exchanged or converted into voting securities.  If at the end of the 120th day after the date of delivery of the Recapitalization Notice (subject to extension to the extent (x) necessary to obtain required governmental approvals or clearances or (y) approved in writing by all Sponsors) the Recapitalization Transaction has not been completed, the Recapitalization Notice shall be null and void, each Stockholder shall be released from such Stockholder's obligation under the Recapitalization Notice and it shall be necessary for a separate Recapitalization Notice to be furnished and the terms and provisions of this Section 4.6(b) separately complied with, in order to consummate such proposed Recapitalization Transaction pursuant to this Section 4.6.  The right of a holder of unvested Restricted Shares to receive securities upon conversion or exchange

58

of such unvested Restricted Shares pursuant to this <u>Section 4.6(b)</u> shall be subject to the vesting and other terms of such unvested Restricted Shares.

(c)     In the event the receipt of securities to be received in exchange for, or upon conversion of, Shares in a proposed Recapitalization Transaction pursuant to <u>Section 4.6</u> by a Stockholder would require under applicable law (i) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities where such registration or qualification is not otherwise required for the Recapitalization Transaction or (ii) the provision to any Stockholder of any specified information regarding the Company or any of its Subsidiaries, such securities or the issuer thereof that is not otherwise required to be provided for the Recapitalization Transaction by the Company, then, at the election of the Company Board, such Stockholder (if not a Financial Investor) shall not have the right to exchange or convert Shares in such proposed Recapitalization Transaction and, in such event, the Company shall have the right to cause to be paid to such Stockholder in lieu thereof, against surrender of the Shares at the closing of the Recapitalization Transaction that would have otherwise been exchanged or converted by such Stockholder in the Recapitalization Transaction, an amount in cash equal to the Fair Market Value of such Shares as of the effective date of the Recapitalization Transaction.

(d)     Each Stockholder shall, at the Company's expense, take or cause to be taken all such actions as may be necessary or reasonably desirable in order expeditiously to consummate any Recapitalization Transaction and any related transactions, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments and otherwise cooperating with the Company in connection with such Recapitalization Transaction; <u>provided</u> that no Stockholder shall be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless such Stockholder is already subject to service in such jurisdiction and except as may be required by the Securities Act.  Without limiting the generality of the foregoing, each Stockholder agrees to (i) execute and deliver such agreements as may be reasonably specified by the Company or the Sponsors (including a shareholders agreement with terms that are substantially equivalent (to the extent reasonably practicable) to the terms of this Agreement, taking into account any change in the legal form of the issuer of the securities into which the Shares are being converted or exchanged), (ii) deliver, at or before the consummation of such Recapitalization Transaction, the stock certificates for such Shares, duly endorsed, or with stock (or equivalent) powers duly endorsed, for transfer with signature guaranteed, free and clear of any Encumbrances, with any stock (or equivalent) transfer tax stamps affixed, against delivery of the applicable consideration, (iii) vote or consent in favor of such Recapitalization Transaction (to the extent a vote or consent is required) and (iv) waive any appraisal or dissenters' rights with respect to the Recapitalization Transaction.  Each Stockholder (other than the Sponsor Investors) hereby constitutes and appoints each Sponsor, or any of them, with full power of substitution, as such Stockholder's true and lawful representative and attorney-in-fact, in such Stockholder's name, place and stead, to execute and deliver any and all agreements that the Sponsor reasonably believe are consistent with this <u>Section 4.6</u>, and such Sponsor shall provide a copy of such agreements to such Stockholder within five Business Days of execution, <u>provided</u>, <u>however</u>, that failure to deliver such documents within such time period shall not impair or affect the validity of such agreements.  The foregoing power of attorney is

MENNINGER_SUPP000560

coupled with an interest and shall continue in full force and effect notwithstanding the subsequent death, incapacity, bankruptcy or dissolution of any Stockholder.

(e)     The closing of a Recapitalization Transaction to which this Section 4.6 applies shall take place (i) on the proposed conversion or exchange date, if any, specified in the Recapitalization Notice (provided in each case that all material authorizations, orders, consents and approvals of any federal, state, local or foreign governmental or regulatory authority, agency, commission, or court legally required for the closing of such Recapitalization Transaction shall have been obtained and be in effect) or (ii) if no proposed transfer date was specified in the Recapitalization Notice, at such time as the Company shall specify by reasonable notice to each Stockholder.

Section 4.7     *Contingent Sale Right.*

(a)     *Contingent Sale Right.*  Subject to the terms of this Section 4.7, if any Sponsor Investor (a "**Defaulting Sponsor**") fails for any reason to fund the full amount of its Deferred Commitment (as defined in such Sponsor Investor's Equity Commitment Letter) on the Deferred Payment Date pursuant to the terms of such Sponsor Investor's Equity Commitment Letter (without taking into account or giving any effect to any termination thereof or amendment, supplement, modification or waiver thereto not effected in accordance with Section 11.6(c)) then, each of the GIC Entities and the Blue Spectrum Entities (each a "**Contingent Sale Right Holder**") will have the option (the "**Contingent Sale Right**") to sell its Shares to the Defaulting Sponsor(s) on the terms set forth in this Section 4.7 unless (x) such failure to fund is a de minimis failure with an amount not funded by the applicable Sponsor Investor's Sponsor Investor Group not exceeding $1,000 of such Sponsor Investor Group's Deferred Commitments or (y) the amount of the shortfall which constitutes such Defaulting Sponsor's Funding Default (as defined below) is funded within five (5) Business Days of the Deferred Payment Date (the "**Cure Period**").  The Contingent Sale Right shall be exercised only once by each Contingent Sale Right Holder and (i) in the case of the GIC Entities, collectively by all the GIC Entities in respect of all Shares held by all such GIC Entities and (ii) in the case of the Blue Spectrum Entities, collectively by all the Blue Spectrum Entities in respect of all Shares held by all such Blue Spectrum Entities.   A failure by a Sponsor Investor to fund as specified in this Section 4.7(a) shall constitute a "**Funding Default**" by such Sponsor Investor.  Each Defaulting Sponsor may assign any of its obligations under this Section 4.7 to any of its Permitted Transferees; provided, that any such assignment shall not relieve such Defaulting Sponsor of any liability in respect of such obligation unless such obligation has been fulfilled.

(b)     *Exercise of Contingent Sale Right.*  Each Contingent Sale Right Holder may exercise the Contingent Sale Right by irrevocable written notice to the Defaulting Sponsor(s) (the "**Contingent Sale Exercise Notice**") delivered within 30 days after the end of the Cure Period.  If the Contingent Sale Right is exercised by a Contingent Sale Right Holder, the purchase by the Defaulting Sponsor(s) of all the Shares held by the Contingent Sale Right Holders constituting such Contingent Sale Right Holder's Financial Investor Group shall take place on the date that is fifteen (15) Business Days after delivery of the Contingent Sale Exercise Notice (provided in each case that all material authorizations, orders, consents and approvals of any federal, state, local or foreign governmental or regulatory authority, agency, commission, or court legally required for the closing of such purchase of Shares shall have been obtained and be

in effect).  In such event, the Defaulting Sponsor(s) shall purchase the Shares subject to the Contingent Sale Exercise Notice on a pro rata basis (based on the relative amount of the funding shortfall of the Defaulting Sponsors at the time of delivery of the Contingent Sale Exercise Notice).  A Contingent Sale Right Holder shall (i) deliver, at or before the consummation of the purchase of Shares pursuant to such Contingent Sale Right, the stock certificates for such Shares, duly endorsed, or with stock (or equivalent) powers duly endorsed, for transfer with signature guaranteed, free and clear of any Encumbrances, with any stock (or equivalent) transfer tax stamps affixed, against delivery of the applicable consideration (in each case, to the extent such certificates have been issued to the Contingent Sale Right Holders) or a lost stock affidavit in lieu thereof, (ii) not be required to make any representations or warranties in connection with the exercise of such Contingent Sale Right except, with respect to such Contingent Sale Right Holder, the ownership of and title to its Shares, its organization, its authority and its absence of conflicts and consents, and (iii) at the consummation of the purchase of Shares pursuant to such Contingent Sale Right, provide each Defaulting Sponsor with an unconditional and irrevocable release, to the fullest extent permitted by applicable law, from all liability with respect to any claim or cause of action (whether in contract or tort) that may be based upon, arise out of or relate to the Funding Default.  Each Defaulting Sponsor shall use reasonable best efforts to obtain all material authorizations, orders, consents and approvals of any federal, state, local or foreign governmental or regulatory authority, agency, commission, or court legally required for the closing of such purchase of Shares.

(c)     *Purchase Price*.  The purchase price payable by a Defaulting Sponsor in respect of each Share purchased upon exercise of the Contingent Sale Right shall be (i) equal to (x) $27.086 (as proportionately adjusted for any stock split, reverse stock split or similar event with respect to the Shares occurring after the Closing), plus (y) interest thereon at a rate of 20% per annum accruing from the Closing Date through to the date that the purchase price is paid under this Section 4.7 and (ii) payable in cash by wire transfer of immediately available funds to an account or accounts designated by the Contingent Sale Right Holder.

(d)     *Joint and Several Liability*.  All of the Carlyle Entities shall be jointly and severally liable for the obligations upon each of them under this Section 4.7.  All of the H&F Entities shall be jointly and severally liable for the obligations of each of them under this Section 4.7.

Section 4.8     *Additional Provisions Relating to Restrictions on Transfers.*

(a)     *Legends*.  Each outstanding certificate representing Shares shall bear legends reading substantially as follows:

(i)     THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ISSUED IN A TRANSACTION THAT WAS NOT REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS.

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000562

(ii)    THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN A STOCKHOLDERS AGREEMENT, DATED AS OF MAY 11, 2017, AS AMENDED, RESTATED OR SUPPLEMENTED FROM TIME TO TIME, COPIES OF WHICH MAY BE OBTAINED FROM THE ISSUER WITHOUT CHARGE UPON REQUEST. NO TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE TERMS OF SUCH AGREEMENT.

(b)    *Copy of this Agreement*. A copy of this Agreement shall be filed with the corporate secretary of the Company, and kept with the records of the Company, and shall be made available for inspection by any holder of Shares at the principal executive offices of the Company.

(c)    *Termination of Legend Restrictions*. The legend required pursuant to Section 4.8(a)(i) shall be removed from any certificates representing Shares following the written request of the holder thereof to the Company if (a) in the opinion of counsel with respect to federal U.S. securities laws (reasonably acceptable to the Company) or such other evidence as shall be reasonably acceptable to the Company, the restriction described in such legend is no longer required in order to assure compliance with the Securities Act and the state securities or "blue sky" laws, or (b) such Shares have been sold pursuant to an effective registration statement under the Securities Act or transferred pursuant to Rule 144 in accordance with the terms of this Agreement.  The legend required pursuant to Section 4.8(a)(ii) shall be removed from any certificates representing any particular Shares following the written request of the holder thereof to the Company if, in the reasonable judgment of the Company, the provisions of this Agreement are no longer applicable to such Shares or this Agreement shall have terminated in accordance with its terms.  Whenever a holder shall be entitled to removal of one or both legends required pursuant to Section 4.8(a), the holder thereof shall be entitled to receive from the Company, without expense (other than applicable transfer taxes, if any, if such unlegended Shares are being delivered and transferred to any Person other than the registered holder thereof), new certificates for a like number of Shares not bearing the relevant legend(s) set forth in Section 4.8(a).

## ARTICLE V

## REGISTRATION RIGHTS

The Company hereby grants to each of the Holders (as defined below) the registration rights set forth in this Article V, with respect to the Registrable Securities (as defined below) owned by such Holders.

Section 5.1    *Certain Definitions*.  As used in this Article V and elsewhere in this Agreement:

(a)    "**Adverse Disclosure**" means public disclosure of material non-public information that, in the Company Board's good faith judgment, after consultation with outside counsel to the Company, (i) would be required to be made, or incorporated by reference, in any Registration Statement filed with the SEC by the Company so that such Registration Statement

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000563

or report would not be materially misleading; (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement or report; and (iii) the Company has a bona fide business purposes for not disclosing publicly.

(b)    "**Automatic Shelf Registration Statement**" shall have the meaning set forth in Rule 405 (or any successor provision) of the Securities Act.

(c)    "**Blue Spectrum Holder**" means any Blue Spectrum Entity or any assignee to whom any Blue Spectrum Entity has transferred rights pursuant to Section 5.9.

(d)    "**Carlyle Holder**" means any Carlyle Entity or any assignee to whom any Carlyle Entity has transferred rights pursuant to Section 5.9.

(e)    "**Eligible Take-Down Holder**" means, except as provided in clause (E) of Section 5.2(d)(ii), (i) with respect to any Restricted Shelf Take-Down consummated prior to the Applicable Transfer Date specified in clause (ii) of the definition thereof, each Shelf Holder other than the Financial Investor Holder that delivers the Restricted Shelf Take-Down Notice for such Restricted Shelf Take-Down and (ii) with respect to any Restricted Shelf Take-Down consummated on or after the Applicable Transfer Date specified in clause (ii) of the definition thereof, each Financial Investor Holder other than the Financial Investor Holder that delivers the Restricted Shelf Take-Down Notice for such Restricted Shelf Take-Down.

(f)    "**Financial Investor Holder**" means any (i) Blue Spectrum Holder, (ii) Carlyle Holder, (iii) GIC Holder or (iv) H&F Holder.

(g)    "**GIC Holder**" means any GIC Entity or any assignee to whom any GIC Entity has transferred rights pursuant to Section 5.9.

(h)    "**H&F Holder**" means any H&F Entity or any assignee to whom any H&F Entity has transferred rights pursuant to Section 5.9.

(i)    "**Holder**" (collectively, "Holders") means any Stockholder (and any transferee pursuant to Section 5.9 below) holding Registrable Securities, securities exercisable or convertible into Registrable Securities or securities exercisable for securities convertible into Registrable Securities.

(j)    "**Prospectus**" means the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including post-effective amendments, and all other material incorporated by reference in such prospectus.

(k)    "**register**", "**registered**" and "**registration**" means a registration effected pursuant to a registration statement filed with the SEC (the "**Registration Statement**") in compliance with the Securities Act, and the declaration or ordering by the SEC of the effectiveness of such Registration Statement.

(l)    "**Registrable Securities**" means, as of any date of determination, (x) Shares (other than Restricted Shares) held by a Holder or Third Party Holder, in each case, whether now held or hereafter acquired, including as a dividend or other distribution with respect

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000564

to, or in exchange or in replacement of, Shares, (y) Shares as of such date then currently issuable upon the conversion, exchange or exercise of any Option, warrant, right or other Equity Security that is held by a Holder or Third Party Holder, and (z) Shares as of such date then currently issuable as a dividend or other distribution with respect to, or in exchange or in replacement of, such Shares; provided, however, that Shares shall cease to be treated as Registrable Securities if (i) a Registration Statement covering such Shares has been declared effective by the SEC and such Shares have been disposed of pursuant to such effective Registration Statement unless such Shares are acquired and held by a Stockholder who is an affiliate (within the meaning of Rule 144) of the Company, (ii) a Registration Statement on Form S-8 (or any successor form) covering such Shares is effective and either (A) the Holder thereof is not an Affiliate of the Company or (B) such Registration Statement on Form S-8 (or any successor form) covers resales by the Holder thereof, (iii) such Shares are sold pursuant to Rule 144 or 145 (or any analogous successor provision) promulgated under the Securities Act, to the extent new certificates for such Shares not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent disposition of such Shares shall not require registration of such Shares under the Securities Act, (iv) such Shares cease to be outstanding or (v) (A) the Holder thereof, together with its, his or her Permitted Transferees, Beneficially Owns (excluding any securities covered by clause (ii) of the proviso set forth in this definition of "Registrable Securities") less than one percent (1%) of the Shares that are outstanding at such time and (B) such Shares are eligible for resale without volume or manner-of-sale restrictions and without current public information pursuant to Rule 144 as set forth in a written opinion letter to such effect, addressed, delivered and acceptable to the Company's transfer agent and the affected Holder (which opinion may assume that such Holder (and any predecessor holder of such Shares) is and has not been an Affiliate of the Company except with respect to any control determined to be established under this Agreement), as reasonably determined by the Company, upon the advice of counsel to the Company.  For the avoidance of doubt, it is understood that, with respect to any Registrable Securities for which a Holder holds vested but unexercised Options, to the extent that such Registrable Securities are to be sold pursuant to this Article V, such Holder must exercise, convert or exchange the relevant Option (which may include an exercise effected on a "net exercise" basis to the extent permitted by the terms of such Option) and transfer the relevant underlying Shares that are Registrable Securities rather than the Option (in each case, net of any amounts required to be withheld by the Company in connection with such exercise, conversion or exchange).  For the purposes of this Agreement, the number of Registrable Securities held by any Holder or Third Party Holder as of any date includes the number of Shares currently issuable (as contemplated by clause (y) or (z) above) with respect to any Option, warrant, right or other Equity Security held by such Holder or Third Party Holder as of such date.  Any Equity Securities received by a Stockholder pursuant to Section 4.6 shall be deemed to be "Shares" for purposes of the definition of "Registrable Securities".

(m)     "**Registration Expenses**" means any and all expenses incident to performance of or compliance with Article V, including (a) all SEC and stock exchange or trading system or FINRA registration, listing and filing fees and any other fees associated with such filings, (b) all fees and expenses of complying with securities or "blue sky" laws (including reasonable fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities), (c) all rating agency fees, (d) all printing, duplicating, messenger and delivery expenses, (e) the fees and disbursements of counsel for the Company and its Subsidiaries and of the Company's and its Subsidiaries' independent public

041945-0274-16469-Active.21575798.1
CONFIDENTIAL                                              MENNINGER_SUPP000565

accountants, including the expenses of any special audits and/or "comfort" letters required by or incident to such performance and compliance, (f) if applicable, the reasonable fees and disbursements of one counsel retained by the Demand Holder initiating a Demand Registration, (g) the reasonable fees and disbursements of one counsel and accountant retained by the Stockholders (such counsel and accountant to be chosen by the Stockholders (other than, in the case of any such Demand Holder, the Stockholders who are such Demand Holders or any Affiliates of such Stockholders) by vote of a plurality of the Registrable Securities of such Stockholders being registered) as a group in connection with each such registration, (h) with respect to any registration in which a Sponsor is participating, if neither clause (f) nor clause (g) includes the reasonable fees and disbursements of one counsel retained by such Sponsor, then the reasonable fees and disbursements of one counsel retained by such Sponsor, (i) any fees and disbursements of underwriters customarily paid by issuers or sellers of securities and the reasonable fees and expenses of any special experts retained in connection with the requested registration, including any fee payable to a qualified independent underwriter within the meaning of the rules of the FINRA, (j) internal expenses of the Company and its Subsidiaries (including all salaries and expenses of its officers and employees performing legal or accounting duties) and (k) securities acts liability insurance (if the Company or any of its Subsidiaries elect to obtain such insurance or the underwriters so require) but, in all cases, excluding underwriting discounts and commissions and transfer taxes, if any.

(n) "**Shelf Percentage**" means, with respect to any Shelf Registration Statement, the greater of the following at the time of the initial filing of such Shelf Registration Statement: (i) the fraction, expressed as a percentage, determined by dividing the number of Registrable Securities (if any) that the Carlyle Holders request to be registered on such Shelf Registration Statement by the total number of Registrable Securities Beneficially Owned as of the date of such initial filing by the Carlyle Holders and (ii) the fraction, expressed as a percentage, determined by dividing the number of Registrable Securities (if any) that the H&F Holders request to be registered on such Shelf Registration Statement by the total number of Registrable Securities Beneficially Owned as of the date of such initial filing by the H&F Holders.

(o) "**Shelf Registration Statement**" means a Registration Statement of the Company filed with the SEC on Form S-3 or on Form S-1 for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act (or any similar rule that may be adopted by the SEC) covering the Registrable Securities, as applicable.

(p) "**Shelf Take-Down**" means any offering or sale of Registrable Securities by a Shelf Holder pursuant to a Shelf Registration Statement.

(q) "**Sponsor Holder**" means any (i) Carlyle Holder or (ii) H&F Holder.

(r) "**Third Party Holder**" means any holder (other than a Holder) of Shares who exercises contractual rights, or is otherwise permitted by the Company, to participate in a registered offering of Shares.

(s) "**Well-Known Seasoned Issuer**" shall have the meaning set forth in Rule 405 (or any successor provision) of the Securities Act.

Section 5.2          *Shelf Registration*.

(a)          *Filing*.  Subject to the Company's rights under <u>Section 5.2(c)</u> and the limitations set forth in <u>Section 5.2(d)</u>, the Company shall (i) use its reasonable best efforts to file and cause to be effective on the first anniversary of an IPO, or if such day is not a Business Day, on the first Business Day thereafter, a Shelf Registration Statement with the SEC (which, unless all Sponsor Holders request otherwise, shall be designated by the Company as an Automatic Shelf Registration Statement if the Company is a Well-Known Seasoned Issuer at the time of filing such Shelf Registration Statement with the SEC), (ii) promptly (but in any event no later than fifteen (15) days prior to the filing of such Shelf Registration Statement) give written notice of the anticipated date of the filing of such Shelf Registration Statement to all other Financial Investor Holders and (iii) promptly (but in any event no later than eight (8) days prior to the filing of such Shelf Registration Statement) give written notice of the anticipated date of the filing of such Shelf Registration Statement (including the Shelf Percentage applicable to such Shelf Registration Statement) to all Holders other than the Financial Investor Holders.  The Company further agrees to use its good faith efforts to provide advance notice as soon as reasonably practicable to the Financial Investor Holder(s) of its intention to file a Shelf Registration Statement; <u>provided</u>, <u>however</u>, the Company shall not be obligated hereby to provide any such advance notice and, if provided, such advance notice shall not be binding in any respect.  Such Shelf Registration Statement will permit or facilitate the sale and distribution of (x) all or such portion of the Registrable Securities the Financial Investor Holder(s) joining in such registration as are specified in a written demand received by the Company within ten (10) Business Days after such written notice is given to such Financial Investor Holder(s) pursuant to clause (ii) above, (y) all or such portion of the Registrable Securities of any Holder or Holders (other than the Financial Investor Holders) joining in such registration as are specified in a written demand received by the Company within five (5) Business Days after such written notice is given to such other Holders pursuant to clause (iii) above (such amount not in any event to exceed for any such Holder (other than the Sponsor Holders) the Shelf Percentage applicable to such Registration Statement multiplied by the number of Registrable Securities held by such Holder as of the date of such initial filing) (each such Holder, a "**Shelf Holder**") and (z) all or such portion of the Shares of any Third Party Holder that joins in such registration (each such Third Party Holder, a "**Third Party Shelf Holder**"); <u>provided</u>, <u>however</u>, that if the Company is permitted by applicable law, rule or regulation to add selling stockholders and/or additional Registrable Securities to a Shelf Registration Statement without filing a post-effective amendment, or if the applicable Shelf Registration Statement is an Automatic Shelf Registration Statement and the Company is a Well-Known Seasoned Issuer, a Holder may request the inclusion of such Holder's Registrable Securities (such amount, in the case of any Holder other than a Sponsor Holder, together with all other Registrable Securities of such Holder registered at any time on such Shelf Registration Statement not in any event to exceed the Shelf Percentage of the total Registrable Securities held by such Shelf Holder as of the date of the applicable initial filing) in such Shelf Registration Statement at any time or from time to time, and the Company shall add such Registrable Securities to the Shelf Registration Statement as promptly as reasonably practicable, and such Holder shall be deemed a Shelf Holder.  If, on the date of any such demand, the Company does not qualify to file a Shelf Registration Statement, then the provisions of <u>Section 5.3</u> hereof shall apply instead of this <u>Section 5.2</u>.

(b)    *Continued Effectiveness*.  Except as otherwise agreed by all Sponsors, the Company shall use its reasonable best efforts to keep each Shelf Registration Statement filed pursuant to Section 5.2(a) hereof continuously effective under the Securities Act (including by filing and having declared effective an additional Shelf Registration Statement if the then effective Shelf Registration Statement is not permitted to be used pursuant to Rule 415(a)(5) under the Securities Act) in order to permit the Prospectus forming a part thereof to be usable by the Shelf Holders until the earlier of (i) the date as of which all Registrable Securities registered by such Shelf Registration Statement have been sold pursuant to such Shelf Registration Statement or have otherwise ceased to be Registrable Securities and (ii) such shorter period as all of the Sponsor Holders may agree with the Company in writing (such period of effectiveness, the "Shelf Period").

(c)    *Suspension of Filing or Registration*.  If the Company shall furnish to the Sponsor Holders that have requested inclusion of Registrable Securities in such Shelf Registration Statement, a certificate signed by the Chief Executive Officer or equivalent senior executive of the Company, stating that the filing, effectiveness or continued use of a Shelf Registration Statement would require the Company to make an Adverse Disclosure, then the Company shall have a period of not more than sixty (60) days after the receipt of such certificate or such longer period as such Sponsor Holders shall consent to in writing, within which to delay the filing or effectiveness (but not the preparation for filing and effectiveness) of such Shelf Registration Statement or, in the case of a Shelf Registration Statement that has been declared effective, to suspend the use by Shelf Holders of such Shelf Registration Statement (in each case, a "**Shelf Suspension**"); provided, however, that, unless consented to in writing by all Sponsors, the Company shall not be permitted to exercise more than two (2) Shelf Suspensions pursuant to this Section 5.2(c) and Demand Delays pursuant to Section 5.3(a)(ii) in the aggregate, or aggregate Shelf Suspensions pursuant to this Section 5.2(c) and Demand Delays pursuant to Section 5.3(a)(ii) of more than an aggregate of ninety (90) days, in each case, during any twelve-month (12) period.  The Company shall deliver a copy of such certificate to each of the Shelf Holders and each Shelf Holder shall keep confidential the fact that a Shelf Suspension is in effect and such certificate and its contents for the permitted duration of the Shelf Suspension or until otherwise notified by the Company; provided, however, that each Shelf Holder may disclose such information to Persons and in circumstances to whom and in which, as applicable, Section 7.2 would permit disclosure of the terms of this Agreement.  In the case of a Shelf Suspension that occurs after the effectiveness of the Shelf Registration Statement, the Shelf Holders agree to suspend use of the applicable Prospectus for the permitted duration of such Shelf Suspension in connection with any sale or purchase of, or offer to sell or purchase, Registrable Securities, upon receipt of the certificate referred to above.  The Company shall immediately notify the Shelf Holders upon the termination of any Shelf Suspension, and (i) in the case of a Shelf Registration Statement that has not been declared effective, shall promptly thereafter file the Shelf Registration Statement and use its reasonable best efforts to have such Shelf Registration Statement declared effective under the Securities Act and (ii) in the case of an effective Shelf Registration Statement, shall amend or supplement the Prospectus, if necessary, so it does not contain any untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading prior to the expiration of the Shelf Suspension and furnish to the Shelf Holders such numbers of copies of the Prospectus as so amended or supplemented as the Shelf Holders may reasonably request. The Company agrees, if necessary, to supplement or make amendments to the Shelf Registration

67

Statement if required by the registration form used by the Company for the Shelf Registration Statement or by the instructions applicable to such registration form or by the Securities Act or the rules or regulations promulgated thereunder or as may reasonably be requested by the Shelf Holders of a majority of the Registrable Securities then outstanding.

(d)     *Shelf Take-Downs*.

(i)     *Right to Initiate and Participate in Shelf Take-Downs*.   Except as otherwise provided in this Section 5.2(d)(i), (A) prior to the expiration of the Applicable Transfer Date specified in clause (ii) of the definition thereof, a Shelf Take-Down may be initiated only by a Financial Investor Holder.   After the expiration of the Applicable Transfer Date specified in clause (ii) of the definition thereof, a Shelf Take-Down may be initiated by any Shelf Holder; provided that, subject to the terms and limitations of this Article V, only one or more Financial Investors may initiate a Marketed Underwritten Shelf Take-Down pursuant to Section 5.2(d)(iii) or request that a Shelf Take-Down be effected by means of an underwritten offering pursuant to Section 5.2(d)(iv) and, provided, further, that none of the GIC Holders or Blue Spectrum Holders (as applicable) may initiate a Shelf Take-Down if any of the GIC Holders or Blue Spectrum Holders, respectively, have participated in any sale of Registrable Securities pursuant to this Article V during the prior six months. Except with respect to Restricted Shelf Take-Downs to the extent provided by Section 5.2(d)(ii) and Marketed Underwritten Shelf Take-Downs, no Shelf Holder initiating a Shelf Take-Down shall be required to permit the offer and sale of Registrable Securities by any other Shelf Holder in connection with such Shelf Take-Down.

(ii)     *Restricted Shelf Take-Downs*.

(A)     Subject to clause (E) below, with respect to each Shelf Take-Down (other than a Marketed Underwritten Shelf Take-Down) that is initiated by a Financial Investor Holder (a "**Restricted Shelf Take-Down**"), such Financial Investor Holder shall provide written notice (a "**Restricted Shelf Take-Down Notice**") of such Restricted Shelf Take-Down to the Company and each Eligible Take-Down Holder with respect to such Restricted Shelf Take-Down as far in advance of such Restricted Shelf Take-Down as shall be reasonably practicable in light of the circumstances applicable to such Restricted Shelf Take-Down, which Restricted Shelf Take-Down Notice shall set forth (I) the total number of Registrable Securities expected to be offered and sold in such Restricted Shelf Take-Down, (II) the expected plan of distribution of such Restricted Shelf Take-Down, (III) the fraction, expressed as a percentage, determined by dividing the number of Registrable Securities anticipated to be sold by such Financial Investor Holder in such Restricted Shelf Take-Down by the total number of Registrable Securities held by such Financial Investor Holder (the "**Shelf Take-Down Percentage**"), (IV) an invitation to each Eligible Take-Down Holder to elect (Eligible Take-Down Holders who make such an election being "**Take-Down Tagging Holders**" and, together with such Financial Investor Holder, and all Third Party Shelf Holders that exercise a contractual or other right to Transfer Shares in connection with such Restricted Shelf Take-Down, the

MENNINGER_SUPP000569

"**Restricted Take-Down Selling Holders**") to include in the Restricted Shelf Take-Down Registrable Securities held by such Take-Down Tagging Holder and registered on such Shelf Registration Statement and (V) the action or actions required (including the timing thereof) in connection with such Restricted Shelf Take-Down with respect to each Eligible Take-Down Holder that elects to exercise such right (including the delivery of one or more stock certificates representing Registrable Securities of such Eligible Take-Down Holder to be sold in such Restricted Shelf Take-Down).   For the avoidance of doubt, it is understood that the Restricted Shelf Take-Down Notice need not include the price per Registrable Security or the other terms and conditions with respect to payment for the Registrable Securities to be sold in such Restricted Shelf Take-Down. Each Financial Investor Holder further agrees to use its good faith efforts to provide advance notice as soon as reasonably practicable to the other Financial Investor Holders that are Eligible Take-Down Holders of such first Financial Investor Holder's intention to deliver a Restricted Take-Down Notice; provided, however, that no Financial Investor Holder shall be obligated hereby to provide any such advance notice and, if provided, such advance notice shall not be binding in any respect.

(B)     Subject to clause (E) below, upon delivery of a Restricted Shelf Take-Down Notice, each Eligible Take-Down Holder may elect to sell Registrable Securities in such Restricted Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by such Financial Investor Holder, by sending an irrevocable written notice (a "**Restricted Take-Down Participation Notice**") to such Financial Investor Holder within the time period specified in such Restricted Shelf Take-Down Notice (which shall be no sooner than five (5) days after such Sponsor Holder's delivery of the applicable Restricted Shelf Take-Down Notice), indicating its, his or her election to sell up to the number of Registrable Securities in the Restricted Shelf Take-Down specified by such Eligible Take-Down Holder in such Restricted Take-Down Participation Notice (subject to the limitations in Section 5.2(d)(ii)(C) and, if applicable, Section 5.2(d)(iv)).   Following the time period specified in such Restricted Shelf Take-Down Notice, each Take-Down Tagging Holder that has delivered a Restricted Take-Down Participation Notice shall be permitted to sell in such Restricted Shelf Take-Down on the terms and conditions set forth in the Restricted Shelf Take-Down Notice, concurrently with such Financial Investor Holder and the other Restricted Take-Down Selling Holders, the number of Registrable Securities calculated pursuant to Section 5.2(d)(ii)(C).   For the avoidance of doubt, in the event that a Restricted Shelf Take-Down contemplates the distribution of Registrable Securities by means of an underwritten offering, it is understood that in order to be entitled to exercise its, his or her right to sell Registrable Securities in a Restricted Shelf Take-Down pursuant to this Section 5.2(d)(ii), each Take-Down Tagging Holder must comply with Section 5.2(d)(iv).

MENNINGER_SUPP000570

(C)     Subject to clause (F) below, each of the Restricted Take-Down Selling Holders shall be entitled to sell in the Restricted Shelf Take-Down a number of Registrable Securities calculated as follows:

(1)     first there shall be allocated to each Restricted Take-Down Selling Holder a number of Registrable Securities equal to the lesser of (A) the maximum number of Registrable Securities such Restricted Take-Down Selling Holder has elected to sell in the Restricted Shelf Take-Down in its, his or her Restricted Shelf Take-Down Notice or Restricted Take-Down Participation Notice and (B) the number of Registrable Securities determined by multiplying (x) the number of Registrable Securities subject to the Restricted Shelf Take-Down by (y) a fraction the numerator of which is the number of Registrable Securities held by such Restricted Take-Down Selling Holder and the denominator of which is the total Registrable Securities held by all Restricted Take-Down Selling Holders (the "**Pro Rata Take-Down Share**"); and

(2)     any remaining Registrable Securities subject to the Restricted Shelf Take-Down shall be allocated to the Restricted Take-Down Selling Holders that elected to sell in excess of their Pro Rata Take-Down Share, pro rata to such Restricted Take-Down Selling Holders based upon such Restricted Take-Down Selling Holders' relative Pro Rata Take-Down Shares (subject, in the case of each Restricted Take-Down Selling Holder, to the maximum number of Registrable Securities contemplated in Section 5.2(d)(ii)(C)(1)(A)), or as such Restricted Take-Down Selling Holders may otherwise agree in writing among themselves.

(D)     Notwithstanding the delivery of any Restricted Shelf Take-Down Notice, all determinations as to whether to complete any Restricted Shelf Take-Down and as to the timing, manner, price and other terms of any Restricted Shelf Take-Down shall be at the sole discretion of the initiating Financial Investor Holder.  In furtherance of this Section 5.2(d)(ii), each of the Financial Investors agrees to reasonably cooperate with each of the Eligible Take-Down Holders (as applicable from time to time) to establish notice, delivery and documentation procedures and measures to facilitate such Eligible Take-Down Holder's participation in future potential Restricted Shelf Take-Downs pursuant to this Section 5.2(d)(ii).

(E)     Anything in this Section 5.2(d) to the contrary notwithstanding, any Restricted Shelf Take-Down must involve the offer and sale by the Financial Investor Holders initiating such Restricted Shelf Take-Down of Registrable Securities having a reasonably anticipated net aggregate offering price (after deduction of underwriter commissions and offering expenses) of at least $75,000,000 unless such Restricted Shelf Take-Down is for all of the Registrable Securities then held by such Financial Investor Holders and their Permitted Transferees (in which case there is no minimum other than the inclusion of all of such Registrable Securities).

(iii)    *Marketed Underwritten Shelf Take-Downs*.  Subject to clauses (D) and (E) below, if the Company shall receive from a Financial Investor Holder a written notification (a "**Marketed Take-Down Notice**") that a Shelf Take-Down by such Financial Investor Holder contemplates the distribution of Registrable Securities by means of an underwritten offering that will involve a customary "road show" (including any "electronic road show") or other substantial marketing efforts by the underwriter or underwriters over a period of at least 48 hours (a "**Marketed Underwritten Shelf Take-Down**"), the Company will:

(A)    promptly (but in no less than ten (10) Business Days prior to the expected date of consummation of such Marketed Underwritten Shelf Take-Down) give written notice of the proposed Marketed Underwritten Shelf Take-Down to all other Shelf Holders; and

(B)    use its reasonable best efforts to effect such Marketed Underwritten Shelf Take-Down as soon as practicable as will permit or facilitate the sale and distribution of all or such portion of such Financial Investor Holders' Registrable Securities as are specified in such Marketed Take-Down Notice, together with all or such portion of the Registrable Securities registered on such Shelf Registration Statement of any other Shelf Holders joining in such Marketed Underwritten Shelf Take-Down as are specified in a written notice received by the Company within ten (10) Business Days after such written notice is given by the Company pursuant to Section 5.2(d)(iii)(A), in each case except as set forth in Section 5.2(d)(iv) below.

(C)    Each Financial Investor Holder further agrees to use its good faith efforts to provide advance notice as soon as reasonably practicable to the other Financial Investor Holders that are Shelf Holders of such first Financial Investor Holder's intention to deliver a Marketed Take-Down Notice; provided, however, that no Financial Investor Holder shall be obligated hereby to provide any such advance notice and, if provided, such advance notice shall not be binding in any respect.

(D)    Anything in this Section 5.2(d) to the contrary notwithstanding, any Marketed Underwritten Shelf Take-Down must involve the offer and sale by the Financial Investor Holders initiating such Restricted Shelf Take-Down of Registrable Securities having a reasonably anticipated net aggregate offering price (after deduction of underwriter commissions and offering expenses) of at least $100,000,000.

(E)    Anything in this Section 5.2(d) to the contrary notwithstanding, (1) the GIC Holders (collectively) shall only be entitled to initiate a total of one Marketed Underwritten Shelf Take-Down or one Demand Registration in aggregate, (2) the Blue Spectrum Holders (collectively) shall only be entitled to initiate a total of one Marketed Underwritten Shelf Take-Down or one Demand Registration in aggregate and (3) the GIC Holders and the Blue

71

Spectrum Holders cannot deliver a Marketed Take-Down Notice or a written demand for Demand Registration prior to the second anniversary of the IPO.

(iv)     Underwriting.  If a Financial Investor Holder delivering a Restricted Shelf Take-Down Notice or a Marketed Take-Down Notice intends to distribute the Registrable Securities in such Shelf Take-Down by means of an underwritten offer, it shall so advise the Company and the Eligible Take-Down Holders in such Restricted Shelf Take-Down Notice or the Company in such Marketed Take-Down Notice, as applicable (and, in the case of a Marketed Take-Down Notice, the Company shall include such information in the written notice referred to in Section 5.2(d)(iii)(A)).  In such event, the right of any Shelf Holder to participate in such Shelf Take-Down pursuant to this Section 5.2(d) shall be conditioned upon such Shelf Holder's participation in such underwriting and the inclusion of such Shelf Holder's Registrable Securities in the underwriting to the extent provided herein.  The Sponsors (and if the Financial Investor Holder initiating such offering is an Blue Spectrum Holder or a GIC Holder, such Holder) will cooperate in good faith to mutually select the underwriter or underwriters for such offer; provided that, a Sponsor will not be entitled to participate in the selection of the underwriter or underwriters unless the Restricted Take-Down Selling Holders include at least one member of such Sponsor's Sponsor Investor Group.  The Company shall, together with all holders of Registrable Securities of the Company proposing to distribute Registrable Securities through such underwriting, enter into an underwriting agreement in customary form with such underwriter or underwriters, and each Shelf Holder participating in such underwriting shall perform its obligations under such underwriting agreement. Notwithstanding any other provision of this Section 5.2(d), if the underwriter or underwriters shall advise the Company and the Financial Investor Holders participating in such Shelf Take-Down that marketing factors (including an adverse effect on the per share offering price) require a limitation of the number of Shares to be underwritten, then the Company shall so advise all Shelf Holders participating in such Shelf Take-Down pursuant to this Section 5.2(d), and the number of shares of Registrable Securities that may be included in the underwriting shall be allocated in the following manner:  first, among the Shelf Holders participating in such Shelf Take-Down on a pro rata basis based on the total number of Registrable Securities held by such Holders, and second, among any Third Party Shelf Holders that are exercising a contractual or other right to dispose of Shares in such underwriting thereof and the Company on a pro rata basis based on the total number of Shares held by such Third Party Shelf Holders or proposed to be offered by the Company.  No Registrable Securities or other Shares excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration.

Section 5.3     *Demand Registration*.

(a)     *Financial Investor Holders' Demand for Registration*.  If, (i) after the earlier of (x) the first anniversary of the IPO and (y) such other date as may be agreed in writing by all Sponsors, the Company shall receive from one or more of the Sponsor Holders or (ii) after the second anniversary of the IPO, the Company shall receive from one or more of the Blue Spectrum Entities or the GIC Entities (as applicable, the Sponsor Holders, together with, subject to the limitations in this Section 5.3, the Blue Spectrum Entities and the GIC Entities, each a

"**Demand Holder**") a written demand that the Company effect any registration (a "**Demand Registration**") of Registrable Securities of such Holders having a reasonably anticipated net aggregate offering price (after deduction of underwriter commissions and offering expenses) of at least $100,000,000, the Company will:

> (i)      promptly (but in any event no less than ten (10) days prior to the date such registration becomes effective under the Securities Act) give written notice of the proposed registration to all other Holders; and

> (ii)      use its reasonable best efforts to effect such registration as soon as practicable as will permit or facilitate the sale and distribution of all or such portion of such Demand Holders' Registrable Securities as are specified in such demand, together with all or such portion of the Registrable Securities of any other Holders joining in such Demand Registration as are specified in a written demand received by the Company within five (5) days after such written notice is given by the Company pursuant to Section 5.3(a)(i) (provided, that such period for responding shall be ten (10) Business Days if the distribution of Registrable Securities in connection therewith will be by means of an underwritten offering that will involve a customary "road show" (including any "electronic road show") or other substantial marketing efforts by the underwriter or underwriters over a period of at least 48 hours), except as set forth in Section 5.3(b) below; provided that the Company shall not be obligated to file any Registration Statement or other disclosure document pursuant to this Section 5.3 (but shall be obligated to continue to prepare such Registration Statement or other disclosure document) if the Company shall furnish to such Demand Holder and the Sponsors a certificate signed by the Chief Executive Officer or equivalent senior executive of the Company, stating that the filing or effectiveness of such Registration Statement would require the Company to make an Adverse Disclosure, in which case the Company shall have an additional period (each, a "**Demand Delay**") of not more than sixty (60) days (or such longer period as may be agreed upon by such Demand Holder) within which to file such Registration Statement; provided, however, that the Company shall not exercise more than two (2) Demand Delays pursuant to this Section 5.3(a)(ii) and Shelf Suspensions pursuant to Section 5.2(c) in the aggregate, or aggregate Demand Delays pursuant to this Section 5.3(a)(ii) and Shelf Suspensions pursuant to Section 5.2(c) of more than an aggregate of ninety (90) days, in each case, during any twelve-month (12) month period. The Company shall deliver a copy of such certificate to each of the Holders and such Holders shall keep confidential the fact that a Demand Delay is in effect and the certificate referred to above and its contents for the permitted duration of the Demand Delay or until otherwise notified by the Company; provided, however, that each Shelf Holder may disclose such information to Persons and in circumstances to whom and in which, as applicable, Section 7.2 would permit disclosure of the terms of this Agreement.

Each Financial Investor Holder further agrees to use its good faith efforts to provide advance notice as soon as reasonably practicable to the other Financial Investor Holder(s) of such first Financial Investor Holder's intention to deliver to the Company a Demand Registration notice; provided, however, that no Financial Investor Holder shall be obligated hereby to provide any such advance notice and, if provided, such advance notice shall not be binding in any respect.

(b) *Underwriting*. If the Demand Holder intends to distribute the Registrable Securities covered by its demand by means of an underwritten offer, it shall so advise the Company as part of its demand made pursuant to this <u>Section 5.3</u>, and the Company shall include such information in the written notice referred to in <u>Section 5.3(a)(i)</u>. In such event, the right of any Holder to participate in such registration pursuant to this <u>Section 5.3</u> shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. The Sponsors (and, if the Demand Holder is a Financial Investor Holder other than a Sponsor Investor, such Demand Holder) will cooperate in good faith to mutually select the underwriter or underwriters for such offer; provided that, a Sponsor will not be entitled to participate in the selection of the underwriter or underwriters unless at least one member of such Sponsor's Sponsor Investor Group proposes to include its Registrable Securities in such offering. The Company shall, together with all holders of Registrable Securities of the Company proposing to distribute their securities through such underwriting, enter into an underwriting agreement in customary form with the underwriter or underwriters selected by the Demand Holder and reasonably satisfactory to the Company, and each Holder participating in such underwriting shall perform its obligations under such underwriting agreement. Notwithstanding any other provision of this <u>Section 5.3</u>, if the underwriter shall advise the Company and the Sponsors (and, if the Demand Holder is a Financial Investor other than a Sponsor Investor, such Demand Holder) participating in such underwritten offering that marketing factors (including an adverse effect on the per share offering price) require a limitation of the number of shares to be underwritten, then the Company shall so advise all Holders of Registrable Securities that have requested to participate in such offering, and the number of shares of Registrable Securities that may be included in the registration and underwriting shall be allocated in the following manner (except as all Sponsors (and, if the Demand Holder is a Financial Investor other than a Sponsor Investor, such Demand Holder) otherwise may agree in writing): *first*, among the Holders participating in such underwritten offering on a pro rata basis based on the total number of Registrable Securities held by such Holders, and *second*, among any Third Party Holders that are exercising a contractual or other right to dispose of Shares in such underwriting thereof and the Company on a pro rata basis based on the total number of Shares held by such Third Party Holders or proposed to be offered by the Company. No Registrable Securities or other Shares excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration or proposed to be offered by the Company.

(c) *Effective Registration*. The Company shall be deemed to have effected a Demand Registration if the Registration Statement pursuant to such registration is declared effective by the SEC and remains effective for (x) not less than one hundred eighty (180) days (or if such Registration Statement relates to an underwritten offering, such longer period as, in the opinion of counsel for the underwriters, a prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer) or until the Holder or Holders have completed the distribution relating thereto or (y) for such longer period as may be prescribed herein (the applicable period, the "**Demand Period**").

(d) *Right to Terminate or Withdraw a Demand Registrations*. A Demand Holder may withdraw its Registrable Securities from a Demand Registration at any time prior to the effectiveness of the applicable Registration Statement. Upon delivery of a notice by the Sponsors (and, if the Demand Holder is a Financial Investor other than a Sponsor Investor, such

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000575

Demand Holder) participating in such Demand Registration to the following effect, the Company shall cease all efforts to secure effectiveness of the applicable Registration Statement. In addition, any other Holder that has requested its Registrable Securities be included in a Demand Registration pursuant to Section 5.3(a)(ii) may withdraw its Registrable Securities from a Demand Registration at any time prior to the effectiveness of the applicable Registration Statement.

(e)     *Limitation on Certain Demand Holders*.  Notwithstanding anything to the contrary in this Agreement, (x) under no circumstances shall the Company be obligated to effect a Demand Registration by any Blue Spectrum Entity or GIC Entity prior to the two year anniversary of the IPO and (y) the right of the Blue Spectrum Holders and the GIC Holders to request a Demand Registration is subject to clause (E) of Section 5.2(d)(iii).

Section 5.4     *Piggyback Registration*.

(a)     *Registrations*.  If at any time or from time to time (including in an IPO if (and only if) any of the Sponsor Investors are selling Registrable Securities in such IPO), the Company shall determine to register any of its Equity Securities, either for its own account or for the account of security holders (other than (1) in a registration relating solely to employee benefit plans, (2) a Registration Statement on Form S-4 or S-8 (or such other similar successor forms then in effect under the Securities Act), (3) a registration pursuant to which the Company is offering to exchange its own securities for other securities, (4) a Registration Statement relating solely to dividend reinvestment or similar plans, (5) a Shelf Registration Statement pursuant to which only the initial purchasers and subsequent transferees of debt securities or preferred stock of the Company or any of its Subsidiary that are convertible or exchange for Shares and that are initially issued pursuant to Rule 144A (or any analogous successor provision) and/or Regulation S (or any analogous successor provision) promulgated under the Securities Act may resell such notes or preferred stock and sell the Shares into which such notes may be converted or exchanged, (6) a registration pursuant to Section 5.2 or Section 5.3 hereof or (7) in an IPO if (and only if) none of the Sponsor Investors are selling any Registrable Securities in such IPO), the Company will:

(i)     promptly (but in no event less than ten (10) days before the effective date of the relevant Registration Statement) give to each Holder written notice thereof; and

(ii)     include in such registration (and any related qualification under state securities laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests made within five (5) days after receipt of such written notice from the Company by any Holder or Holders, except as set forth in Section 5.4(b) below (provided, that such period for providing a written request shall be ten (10) Business Days if the distribution of Registrable Securities in connection therewith will be by means of an underwritten offering that will involve a customary "road show" (including any "electronic road show") or other substantial marketing efforts by the underwriter or underwriters over a period of at least 48 hours).

The Company further agrees to use its good faith efforts to provide advance notice as soon as reasonably practicable to the Financial Investor Holders of its intention to deliver a notice

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000576

pursuant to clause (i); provided, however, that the Company shall not be obligated hereby to provide any such advance notice and, if provided, such advance notice shall not be binding in any respect.  Notwithstanding the foregoing, this Section 5.4 shall not apply to any Holder with respect to any such registration unless one or more of the Sponsor Investors elect to participate in such registration.

(b)     Underwriting.  If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 5.4(a)(i).  In such event the right of any Holder to participate in such registration pursuant to this Section 5.4 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to distribute their Registrable Securities through such underwriting, together with the Company and the other parties distributing their securities through such underwriting, shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company, and each Holder participating in such underwriting shall perform its obligations under such underwriting agreement.  Notwithstanding any other provision of this Section 5.4, if the underwriters shall advise the Company that marketing factors (including, without limitation, an adverse effect on the per share offering price) require a limitation of the number of shares to be underwritten, then the Company may limit the number of Registrable Securities to be included in the registration and underwriting, subject to the terms of this Section 5.4.  The Company shall so advise all Holders of Registrable Securities that have requested to participate in such offering, and the number of shares of Registrable Securities that may be included in the registration and underwriting shall be allocated in the following manner: *first*, to the Company and *second*, to the Holders and any Third Party Holders exercising a contractual or other right to dispose of Registrable Securities in such underwriting on a pro rata basis based on the total number of Shares held by such Persons.  No such reduction shall reduce the securities being offered by the Company for its own account to be included in the registration and underwriting.  No Registrable Securities or other Shares excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration.  Notwithstanding anything to the contrary herein, the Sponsors acting together may mutually waive the rights of Holders under this Section 5.4 to include any Registrable Securities in a registration so long as none of the Sponsor Investors include Registrable Securities in such registration.

(c)     *Right to Terminate or Withdraw a Registration*.  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 5.4 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration.

Section 5.5     *Expenses of Registration*.  All Registration Expenses incurred in connection with all registrations effected pursuant to Section 5.2, Section 5.3 or Section 5.4, shall be borne by the Company.  For the avoidance of doubt, it is understood that the Company shall not be required to pay stock transfer taxes or underwriters' discounts or selling commissions relating to Registrable Securities.

MENNINGER_SUPP000577

Section 5.6      *Obligations of the Company*.   Whenever required under this Article V to effect the registration or offering of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)      prepare and file with the SEC a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective and keep such Registration Statement effective for (x) not less than one hundred eighty (180) days (or if such Registration Statement relates to an underwritten offering, such longer period as, in the opinion of counsel for the underwriters, a prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer) or until the Holder or Holders have completed the distribution relating thereto or (y) for such longer period as may be prescribed herein;

(b)      prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection with such Registration Statement as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such Registration Statement in accordance with the intended methods of disposition by sellers thereof set forth in such Registration Statement;

(c)      permit any Holder that (in the good faith reasonable judgment of such Holder) might be deemed to be a controlling person of the Company to participate in good faith in the preparation of such Registration Statement and to cooperate in good faith to include therein material, furnished to the Company in writing, that in the reasonable judgment of such Holder and its counsel should be included;

(d)      furnish to the Holders such numbers of copies of the Registration Statement and the related Prospectus, including all exhibits thereto and documents incorporated by reference therein and a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(e)      in the event of any underwritten public offering of Registrable Securities, enter into and perform its obligations under an underwriting agreement and any related agreements, in usual and customary form, with the managing underwriter(s) of such offering;

(f)      notify each Sponsor Holder (and, in connection with any Demand Registration for which the Demand Holder is a Financial Investor other than a Sponsor Investor, such Demand Holder) of Registrable Securities covered by such Registration Statement as soon as reasonably possible after notice thereof is received by the Company of any written comments by the SEC or any request by the SEC or any other federal or state governmental authority for amendments or supplements to such Registration Statement or such prospectus or for additional information;

(g)      notify each Holder of Registrable Securities covered by such Registration Statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in such

Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(h)     notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably practicable after notice thereof is received by the Company of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or any order by the SEC or any other regulatory authority preventing or suspending the use of any preliminary or final prospectus or the initiation or threatening of any proceedings for such purposes, or any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(i)     use its reasonable best efforts to prevent the issuance of any stop order suspending the effectiveness of any Registration Statement or of any order preventing or suspending the use of any preliminary or final prospectus and, if any such order is issued, to obtain the withdrawal of any such order as soon as practicable;

(j)     make available for inspection by each Holder including Registrable Securities in such registration, any underwriter participating in any distribution pursuant to such registration, and any attorney, accountant or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, as such parties may reasonably request, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(k)     use its reasonable best efforts to register or qualify, and cooperate with the Holders of Registrable Securities covered by such Registration Statement, the underwriters, if any, and their respective counsel, in connection with the registration or qualification of such Registrable Securities for offer and sale under the securities or "Blue Sky" laws of each state and other jurisdiction of the United States as any such Holder or underwriters, if any, or their respective counsel reasonably request in writing, and do any and all other things reasonably necessary or advisable to keep such registration or qualification in effect for such period as required by Section 5.2(b) and Section 5.3(c), as applicable; provided that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or take any action which would subject it to taxation or service of process in any such jurisdiction where it is not then so subject;

(l)     obtain for delivery to the Holders of Registrable Securities covered by such Registration Statement and to the underwriters, if any, an opinion or opinions from counsel for the Company, dated the effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to such holders or underwriters, as the case may be, and their respective counsel;

(m)     in the case of an underwritten offering, obtain for delivery to the Company and the underwriters, with copies to the Holders of Registrable Securities included in such

78

registration, a cold comfort letter from the Company's independent certified public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the managing underwriter or underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement;

(n)     use its reasonable best efforts to list the Registrable Securities covered by such Registration Statement with any securities exchange or automated quotation system on which the Shares are then listed;

(o)     provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

(p)     cooperate with Holders including Registrable Securities in such registration and the managing underwriters, if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold, such certificates to be in such denominations and registered in such names as such Holders or the managing underwriters may request at least two (2) Business Days prior to any sale of Registrable Securities;

(q)     use its reasonable best efforts to comply with all applicable securities laws and make available to its Holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder; and

(r)     in the case of an underwritten offering, cause the senior executive officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the underwriters and otherwise to facilitate, cooperate with and participate in each proposed offering contemplated herein and customary selling efforts related thereto.

Section 5.7     *Indemnification*.

(a)     The Company will, and does hereby undertake to, indemnify and hold harmless each Holder of Registrable Securities and each of such Holder's officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries, affiliates and agents and each Person, if any, who controls such Holder, within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, with respect to any registration, qualification, compliance or sale effected pursuant to this Article V, and each underwriter, if any, and each Person who controls any underwriter, of the Registrable Securities held by or issuable to such Holder, against all claims, losses, damages and liabilities (or actions in respect thereto) to which they may become subject under the Securities Act, the Exchange Act, or other federal or state law arising out of or based on (A) any untrue statement (or alleged untrue statement) of a material fact contained in any Registration Statement, Prospectus, offering circular, free writing prospectus or other document incident to any such registration, qualification, compliance or sale effected pursuant to this Article V, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein

79

not misleading, (B) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification, compliance or sale, or (C) any failure to register or qualify Registrable Securities in any state where the Company or its agents have affirmatively undertaken or agreed in writing that the Company (including pursuant to Section 5.6(k)) that the Company (the undertaking of any underwriter in connection with any such offering of Registrable Securities being attributed to the Company) will undertake such registration or qualification on behalf of the Holders of such Registrable Securities (provided that in such instance the Company shall not be so liable if it has undertaken its reasonable best efforts to so register or qualify such Registrable Securities) and will reimburse, as incurred, each such Holder, each such underwriter and each such director, officer, trustee, employee, partner, manager, member, stockholder, beneficiary, affiliate, agent and controlling person, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission made in reliance and in conformity with written information furnished to the Company by such Holder or underwriter expressly for use therein.

(b)    Each Holder (if Registrable Securities held by or issuable to such Holder are included in such registration, qualification, compliance or sale pursuant to this Article V) does hereby undertake (severally and not jointly) to indemnify and hold harmless the Company, each of its officers, directors, employees, stockholders, affiliates and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, each underwriter, if any, and each Person who controls any underwriter of the Registrable Securities covered by such a Registration Statement, and each other Holder, each of such other Holder's officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries, affiliates and agents and each Person, if any, who controls such Holder within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such Registration Statement, Prospectus, offering circular, free writing prospectus or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse, as incurred, the Company, each such underwriter, each such other Holder, and each such officer, director, trustee, employee, partner, manager, member, stockholder, beneficiary, affiliate, agent and controlling person of the foregoing, for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, Prospectus, offering circular, free writing prospectus or other document, in reliance upon and in conformity with written information relating to such Holder furnished to the Company by such Holder expressly for use therein; provided, however, that the aggregate liability of each Holder hereunder shall be limited to the proceeds (after underwriting discounts and commissions) received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. It is understood and agreed that the indemnification obligations of each Holder pursuant to any underwriting agreement entered into

80

in connection with any Registration Statement shall be limited to the obligations contained in this Section 5.7(b).

(c)       Each party entitled to indemnification under this Section 5.7 (the "**Indemnified Party**") shall give notice to the party required to provide such indemnification (the "**Indemnifying Party**") of any claim as to which indemnification may be sought promptly after such Indemnified Party has actual knowledge thereof, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be subject to approval by the Indemnified Party (whose approval shall not be unreasonably withheld) and the Indemnified Party may participate in such defense at the Indemnifying Party's expense if representation of such Indemnified Party would be inappropriate due to actual or potential differing interests between such Indemnified Party and any other party represented by such counsel in such proceeding; and provided, further, that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Article V, except to the extent that such failure to give notice materially prejudices the Indemnifying Party in the defense of any such claim or any such litigation.  An Indemnifying Party, in the defense of any such claim or litigation, may, without the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement if and only if it (i) includes as a term thereof the giving by the claimant or plaintiff therein to such Indemnified Party of an unconditional release from all liability with respect to such claim or litigation and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party, and provided that any sums payable in connection with such settlement are paid in full by the Indemnifying Party.

(d)       In order to provide for just and equitable contribution in case the indemnification contemplated by Section 5.7(a) or Section 5.7(b) is prohibited or limited by law, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and such Party's relative intent, knowledge, access to information and opportunity to correct or prevent such actions; provided, however, that, in any case, (i) no Holder will be required to contribute any amount in excess of the proceeds (after underwriting discounts and commissions) received by such Holder upon the sale of the Registrable Securities giving rise to such contribution obligation and (ii) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of fraudulent misrepresentation.  The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section 5.7(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in this Section 5.7(d).  For the avoidance of doubt, it is understood that if and to the extent indemnification is available under this Section 5.7, the Indemnifying Parties shall indemnify

81

MENNINGER_SUPP000582

each Indemnified Party to the full extent provided in <u>Section 5.7(a)</u> and <u>Section 5.7(b)</u> hereof without regard to the provisions of this <u>Section 5.7(d)</u>.

(e)     The indemnities and contribution provided in this <u>Section 5.7</u> shall survive the transfer of any Registrable Securities by such Holder.

Section 5.8     *Information by Holder*.  The Holder or Holders of Registrable Securities included in any registration shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holder or Holders as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this <u>Article V</u>.

Section 5.9     *Transfer of Registration Rights*.   The rights contained in <u>Section 5.2</u>, <u>Section 5.3</u> or <u>Section 5.4</u> hereof to cause the Company to register the Registrable Securities may be assigned or otherwise conveyed by a Holder pursuant to a Transfer of Shares or Options solely if and to the extent such Transfer is permitted under <u>Article IV</u>.  Any assigned or conveyance in derogation of the foregoing shall be null and void ab initio.

Section 5.10     *Delay of Registration*.  No Holder shall have any right to obtain, and hereby waives any right to seek, an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this <u>Article V</u>.

Section 5.11     *Limitations on Subsequent Registration Rights*.  The Company shall not, without the prior written consent of all Sponsors, enter into any agreement with any holder or prospective holder of any Equity Securities of the Company that would allow such holder or prospective holder to (a) require the Company to effect a registration or (b) include any Shares in any registration filed under <u>Section 5.2</u>, <u>Section 5.3</u> or <u>Section 5.4</u> hereof, unless, in each case, under the terms of such agreement, such holder or prospective holder may include such Shares in any such registration only to the extent that the inclusion of such Share will not diminish the amount of Registrable Securities that are included in such registration.

Section 5.12     *Rule 144 Reporting*.  With a view to making available to the Holders the benefits of certain rules and regulations of the SEC that may permit the sale of the Registrable Securities to the public without registration, the Company, following an IPO, agrees to use its reasonable best efforts to:

(a)     make and keep current public information available, within the meaning of Rule 144, at all times after it has become subject to the reporting requirements of the Exchange Act;

(b)     file with the SEC, in a timely manner, all reports and other documents required of the Company under the Securities Act and Exchange Act (after it has become subject to such reporting requirements); and

(c)     so long as a Holder owns any Registrable Securities, furnish to such Holder forthwith upon request a written statement by the Company as to its compliance with the reporting requirements of said Rule 144 (at any time commencing ninety (90) days after the

effective date of the first registration filed by the Company for an offering of its Securities to the general public), the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company and such other reports and documents as a Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such Securities without registration.

Section 5.13    *"Market Stand Off" Agreement*.  Each Holder hereby agrees that during such period (which period shall in no event exceed (x) in the case of an IPO, one hundred eighty (180) days or (y) otherwise, ninety (90) days, in each case, subject to any customary "booster shot" and other extensions determined reasonably and in good faith to be advisable because of the release of earnings or other material information about the Company) following the effective date of a Registration Statement of the Company filed under the Securities Act with respect to an IPO or any registration in which any Sponsor Holder is participating (or with respect to which all Sponsors agree in writing that this Section 5.13 should apply) (or, if later in the case of an Marketed Underwritten Shelf Take-Down, the date the underwriting agreement for such Marketed Underwritten Shelf Take-Down is entered into) as requested by the Company or any underwriter or underwriters of such underwritten offering, such Holder and its Affiliates shall not, to the extent requested by the Company and/or any underwriter, sell, pledge, hypothecate, transfer, make any short sale of, loan, grant any option or right to purchase of, or otherwise transfer or dispose of (other than to donees who agree to be similarly bound), or enter into any transaction which is designed to, or might reasonably be expected to, result in the disposition of (whether by actual disposition or effective economic disposition due to cash settlement or otherwise), any Shares, Options or other securities exercisable or exchangeable for, or convertible into, Shares, in each case held by it at any time during such period, except for Shares included in such registration; provided that any release from such agreement shall be effected among the Holders on a pro rata basis according to the Shares then Beneficially Owned by them.  Each Holder agrees that it shall deliver to the underwriter or underwriters of any offering to which clause (i) or (ii) is applicable a customary agreement reflecting its agreement set forth in this Section 5.13.

Section 5.14    *Termination of Registration Rights*.  The rights of any particular Holder to cause the Company to register Registrable Securities under Section 5.2, Section 5.3 or Section 5.4 hereof shall terminate as to any Holder on the date such Holder no longer holds any Registrable Securities.

## ARTICLE VI

## RIGHT OF PARTICIPATION

Section 6.1    *Offer*.  Subject to Section 6.4 and Section 6.8, not less than twenty (20) Business Days prior to the consummation of any Post-Closing Issuance, a notice (the "**Participation Notice**") shall be furnished by the Company to each Participation Stockholder, which Participation Notice shall include:

(a)    the principal terms and conditions of the proposed Post-Closing Issuance, including (i) the number of Participation Securities to be included in the Post-Closing Issuance,

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000584

(ii) the price per unit of the Participation Securities (as applicable), including a description of any non-cash consideration sufficiently detailed to permit valuation thereof, (iii) the proposed manner of distribution, (iv) the name and address of the Person or Persons to whom the Participation Securities will be issued, if known (the "**Prospective Subscriber**") and (v) if known, the proposed date of Post-Closing Issuance; and

(b)     an offer by the Company or, as applicable, its Subsidiary to issue, at the option of each Participation Stockholder to such Participation Stockholder such portion of the Participation Securities to be included in the Post-Closing Issuance as may be requested by such Participation Stockholder (not to exceed such Participation Stockholder's Participation Portion of the total number of Participation Securities to be included in the Post-Closing Issuance), on the same terms and conditions and at the same price per unit, with respect to each Participation Security issued.

Section 6.2     *Exercise*.

(a)     *General*.     Each Participation Stockholder desiring to accept the offer contained in the Participation Notice shall accept such offer by furnishing a written notice of such acceptance to the Company within ten (10) Business Days after the date of delivery of the Participation Notice specifying the number of Participation Securities (not to exceed such Participation Stockholder's Participation Portion of the total number of Participation Securities to be included in the Post-Closing Issuance) that such Participation Stockholder desires to purchase (each Participation Stockholder furnishing such a notice in compliance with this sentence, an "**Accepting Participation Stockholder**").     Each Participation Stockholder who does not accept such offer in compliance with the above requirements, including the applicable time periods, shall be deemed to have waived all of such Participation Stockholder's rights to participate in such Post-Closing Issuance, and the Company or, as applicable, its Subsidiary shall thereafter be free to issue Participation Securities in such Post-Closing Issuance to the Prospective Subscriber and any Accepting Participation Stockholders, at a price no less than the price set forth in the Participation Notice and on other principal terms and conditions not substantially more favorable to the Prospective Subscriber than those set forth in the Participation Notice, without any further obligation to such non-accepting Participation Stockholder pursuant to this Article VI with respect to such Post-Closing Issuance, subject to Section 6.2(c).     In the event that one or more Participation Stockholders do not elect to purchase their full Participation Portions of such Post-Closing Issuance (such aggregate shortfall, the "**Participation Undersubscription**"), the Company shall deliver to each Accepting Participation Stockholder a written notice thereof not later than twelve (12) Business Days after the date of delivery of the Participation Notice setting forth the Participation Undersubscription, and each Accepting Participation Stockholder may furnish a written notice to the Company no later than fifteen (15) Business Days after the delivery of the Participation Notice specifying the number of the Participation Undersubscription that such Accepting Participation Stockholder desires to purchase (with any oversubscription with respect to the Participation Undersubscription being allocated pro rata to such Accepting Participation Stockholders delivering such written notice based upon such Accepting Participation Stockholders' relative Participation Portions).     If, prior to consummation, the terms of such proposed Post-Closing Issuance shall change with the result that the price shall be less than the minimum price set forth in the Participation Notice or the other principal terms shall be substantially more favorable to the Prospective Subscriber than

those set forth in the Participation Notice, it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this <u>Article VI</u> separately complied with, in order to consummate such Post-Closing Issuance pursuant to this <u>Article VI</u>.

(b)    *Irrevocable Acceptance.*  The acceptance of each Accepting Participation Stockholder shall be irrevocable except as hereinafter provided, and each such Accepting Participation Stockholder shall be bound and obligated to acquire in the Post-Closing Issuance on the same terms and conditions and at the same price per unit with respect to the Participation Securities as such Accepting Participation Stockholder shall have specified in such Accepting Participation Stockholder's written commitment.

(c)    *Time Limitation.*  If at the end of the 120th day after the date of the effectiveness of the Participation Notice the Company or, as applicable, its Subsidiary has not completed the Post-Closing Issuance, each Accepting Participation Stockholder shall be released from such holder's obligations under the written commitment, the Participation Notice shall be null and void, and it shall be necessary for a separate Participation Notice to be furnished to all Participation Stockholders, and the terms and provisions of this <u>Article VI</u> separately complied with, in order to consummate such Post-Closing Issuance pursuant to this <u>Article VI</u>.

Section 6.3    *Closing.*  The closing of a Post-Closing Issuance that is subject to a Participation Notice (the "**Participation Closing**") shall, subject to the satisfaction or waiver by the Company of the conditions to closing, take place (i) at the proposed time and on the proposed date of the Post-Closing Issuance, if any, set forth in the Participation Notice and (ii) if no proposed time or closing date was specified in the Participation Notice, at such time and date, as applicable, as the Company shall specify by notice to each Accepting Participation Stockholder, and in each case, at such place as the Company shall specify by notice to each Accepting Participation Stockholder, provided in each case that (x) such closing date shall not be less than twenty (20) Business Days after the date of the applicable Participation Notice and (y) all material authorizations, orders, consents and approvals of any federal, state, local or foreign governmental or regulatory authority, agency, commission, or court legally required for the closing of such Post-Closing Issuance shall have been obtained and be in effect.   At any Participation Closing, each Accepting Participation Stockholder shall be delivered the certificates or other instruments evidencing the Participation Securities to be issued to such Accepting Participation Stockholder, registered in the name of such Accepting Participation Stockholder or such holder's designated nominee, free and clear of all Encumbrances (other than any restrictions on Transfer as set forth in <u>Article IV</u> of this Agreement or as applicable under federal and state Securities laws), with any transfer tax stamps affixed, against delivery by such Accepting Participation Stockholder of the applicable consideration.

Section 6.4    *Exigent Circumstances.*  Notwithstanding any provision hereof to the contrary, if the Company or any of its Participation Subsidiaries elects to issue Participation Securities other than in compliance with <u>Section 6.1</u> through <u>Section 6.3</u>, which the Company or such Subsidiary may elect to do only with the prior approval of the Company Board and only if the Company Board determines that there are exigent circumstances, the Company shall give notice to the Participation Stockholders within ten (10) Business Days after the issuance of such Participation Securities.  Such notice shall set forth the principal terms and conditions of the issuance, including the purchase price of the Participation Securities, the date

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000586

on which such Participation Securities were issued and the identities and addresses of the Persons to whom the Participation Securities were sold (the "**Exigent Circumstances Purchasers**"). Each Participation Stockholder shall have ten (10) Business Days after the date the Company's notice is given to elect, by giving notice to the Company and the Exigent Circumstances Purchasers, to purchase from the Exigent Circumstances Purchasers up to the number of Participation Securities that such Participation Stockholder would otherwise have had the right to purchase pursuant to Section 6.2 had the Company or such Subsidiary complied with the provisions of Section 6.1 through Section 6.3 in connection with the issuance of such Participation Securities, under the terms and conditions set forth in the Company's notice pursuant to this Section 6.4. The closing of sales from the Exigent Circumstances Purchasers to the Participation Stockholders pursuant to this Section 6.4 shall occur within thirty (30) Business Days of the date notice is given to the Participation Stockholders (subject to extension to the extent necessary to obtain required governmental approvals or clearances). The Company may at its election, in accordance with this Section 6.4, (i) require that the Participation Stockholders purchase their allocated share of Participation Securities in a secondary sale from the Person or Persons who initially acquired such Participation Securities, (ii) have the Participation Stockholders purchase their allocated share of Participation Securities from the Company or its Subsidiary (as applicable) and have the net proceeds of such sale used to repurchase Participation Securities from the Person or Persons who acquired Participation Securities prior to the delivery of the Participation Notice (which repurchase shall be made at cost plus reasonable interest), (iii) have the sale of Participation Securities to Participation Stockholders be incremental to the sale of Participation Securities prior to the delivery of the Participation Notice or (iv) use any one or more of clauses (i) through (iii) inclusive, provided that the Company must structure such sale to the Participation Stockholders in such a manner that each Participation Stockholder has the opportunity to purchase up to the same aggregate number or principal amount of Participation Securities as it could have purchased had (1) the Participation Notice been delivered prior to completion of such Post-Closing Issuance and (2) the same aggregate number or principal amount of Participation Securities been issued as the aggregate number or principal amount of Participation Securities that are issued prior to and after the delivery of the actual Participation Notice (net of any Participation Securities repurchased pursuant to clause (ii) above).

Section 6.5  *Expenses.*  All costs and expenses incurred by the Company and its Subsidiaries in connection with any proposed Post-Closing Issuance of Participation Securities (whether or not consummated), including all attorney's fees and charges, all accounting fees and charges and all finders, brokerage or investment banking fees, charges or commissions, shall be paid by the Company and its Subsidiaries. In connection with such proposed Post-Closing Issuance of Participation Securities (whether or not consummated), the Company shall pay the fees and out-of-pocket expenses of a single law firm for all Participating Stockholders (if any) that are H&F Entities, a single law firm for all Participating Stockholders (if any) that are Carlyle Entities, a single law firm for all Participating Stockholders (if any) that are Blue Spectrum Entities and a single law firm for all Participating Stockholders (if any) that are GIC Entities. Any other costs and expenses incurred by or on behalf of any Participation Stockholder in connection with such proposed Post-Closing Issuance of Participation Securities (whether or not consummated) shall be borne by such holder.

Section 6.6  *Securities Law Matters.*  Notwithstanding anything to the contrary set forth in this Article VI, a Participation Stockholder shall not be entitled to participate

86

in a Post-Closing Issuance pursuant to this <u>Article VI</u> unless at the time of such Post-Closing Issuance the Company shall be reasonably satisfied that (i) the issuance to such Participation Stockholder is exempt from any and all registration, qualification or other similar legal requirements under the laws or regulations of any non-United States jurisdiction applicable to such Participating Stockholder, (ii) such Participation Stockholder is an "accredited investor" as defined in Regulation D of the Securities Act or the Post-Closing Issuance, after giving effect to the participation of such Participation Stockholder therein, would satisfy the requirements of any other exemption from registration available at such time under the Securities Act with respect to such Post-Closing Issuance and (iii) an exemption from registration or qualification under any state securities laws or foreign securities laws applicable to such Post-Closing Issuance due to the participation of such Participation Stockholder therein would be available with respect to such Post-Closing Issuance, in the case of clauses (ii) and (iii), without the provision to any Participation Stockholder of any information regarding the Company or any of its Subsidiaries or such Securities that is not otherwise required to be provided for such Post-Closing Issuance.

Section 6.7    *Further Assurances.*  Each Accepting Participation Stockholder shall reasonably cooperate with the Company in connection with the consummation of each Post-Closing Issuance pursuant to this <u>Article VI</u>.

Section 6.8    *Excluded Transactions.*  The provisions of this <u>Article VI</u> shall not apply to Post-Closing Issuances by the Company or any of its Subsidiaries as follows:

(a)    any Post-Closing Issuance, in each case to the extent approved by the Company Board, to officers, employees, directors or consultants of the Company and its Subsidiaries who are not Affiliates (without giving effect to clause (i) of the definition thereof) of the H&F Entities or Carlyle Entities in connection with such Person's employment or consulting arrangements with the Company or any of its Subsidiaries or the service of such person as a director;

(b)    any Post-Closing Issuance, in each case (x) to the extent approved by the Company Board and (y) except where such Post-Closing Issuance is to a Sponsor Investor or its Affiliates (without giving effect to clause (i) of the definition thereof), (i) to the applicable seller(s) in connection with any business combination or acquisition transaction involving the Company or any of its Subsidiaries, (ii) to the joint venture or strategic partnership or alliance counterparty or counterparties in connection with any joint venture or strategic partnership or alliance, (iii) of Equity Securities to one or more Persons in connection with the incurrence or guarantee of indebtedness by the Company or any of its Subsidiaries that is a bona fide debt financing of the Company or any of its Subsidiaries or (iv) to any other Person (or any Affiliate of such a Person) that has or is entering into a strategic or commercial relationship with the Company or any of its Subsidiaries or provides other strategic or commercial benefits to the Company or its Subsidiaries as determined in good faith by the Company Board;

(c)    any Post-Closing Issuance pursuant to an IPO;

(d)    any Post-Closing Issuance in connection with any stock split, stock dividend or recapitalization approved by the Company Board (so long as all holders of the same

MENNINGER_SUPP000588

class or series of Equity Securities are treated equally with all other holders of such class or series of Equity Securities);

(e) any Post-Closing Issuance by any Subsidiary of the Company to the Company and/or any other wholly-owned Subsidiary of the Company;

(f) any Post-Closing Issuance in connection with a Change of Control Transaction;

(g) any Post-Closing Issuance in connection with the consummation of the transactions provided for under the H&F Equity Commitment Letter and the Carlyle Equity Commitment Letter; and

(h) any Post-Closing Issuance upon the exercise of any Option, warrant or similar right, or the exercise of any conversion or exchange right under any Equity Security (for the avoidance of doubt, it is understood that the initial issuance of such Equity Security shall be subject to the provisions of this Article VI unless such issuance is otherwise described in one of the prior clauses of this Section 6.8).

Section 6.9 *Certain Definitions.* As used in this Article VI:

(a) "**Participation Portion**" shall mean, for each Participation Stockholder, as of the date of the relevant Participation Notice, the product of (i) the total number or aggregate principal amount of Participation Securities proposed to be issued by the Company in the Post-Closing Issuance as set forth in the Participation Notice, and (ii) a fraction, the numerator of which is the aggregate number of outstanding Shares held by such Participation Stockholder as of the date of the relevant Participation Notice and the denominator of which is the total number of outstanding Shares as of the date of the relevant Participation Notice.

(b) "**Participation Securities**" shall mean the number and type of debt securities or Equity Securities proposed to be sold by the Company or one of its Participation Subsidiaries in the applicable Post-Closing Issuance.

(c) "**Participation Stockholder**" shall mean each Financial Investor and any other Stockholder whom the Company has designated as a Participation Stockholder for purposes of the applicable Post-Closing Issuance.

(d) "**Participation Subsidiary**" shall mean each Subsidiary of the Company that is (i) wholly-owned by one or more of (A) the Company, (B) one or more Subsidiaries of the Company and (C) one or more Stockholders or (ii) offering Equity Securities to offerees that include any Financial Investor.

(e) "**Post-Closing Issuance**" shall mean any issuance of Equity Securities (and, if and only if a portion of such issuance will be acquired by any Sponsor Investor or such Sponsor Investor's Affiliates (without giving effect to clause (i) of the definition thereof) at such time, any issuance of debt securities) of the Company or any of its Participation Subsidiaries after the Closing. For the purposes of this Article VI, debt securities shall include indebtedness

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000589

for money borrowed pursuant to credit agreement, note or other agreement regardless of whether such agreements would otherwise be considered a security.

Section 6.10 *Transfer of Rights.* The rights of any Participation Stockholder may be assigned or otherwise conveyed by such Participation Stockholder pursuant to any Transfer of Shares by such Participation Stockholder pursuant to, and in compliance with, Article IV.

Section 6.11 *Termination.* Upon an IPO, this Article VI shall terminate and be of no further force and effect.

## ARTICLE VII

## OTHER COVENANTS

Section 7.1 *No Voting or Conflicting Agreements.* No Stockholder shall enter into or agree to be bound by any voting trust with respect to any Shares or Options, nor, at any time, shall any Stockholder enter into any stockholder agreements or arrangements of any kind with any Person with respect to any Shares or Options (other than agreements with the Company entered into in respect of grants of securities under Employee Equity Arrangements approved by the Company Board), in either case to the extent inconsistent with the provisions of this Agreement. The foregoing prohibition includes agreements or arrangements with respect to the acquisition, disposition or voting of Shares or Options inconsistent with the provisions of this Agreement. No Stockholder shall act, at any time, for any reason, as a member of a group or in concert with any other Persons in connection with the acquisition, disposition or voting of Shares or Options in any manner that is inconsistent with the provisions of this Agreement.

Section 7.2 *Confidentiality.* The terms of this Agreement shall be confidential and no party to this Agreement shall disclose to any Person not a party to this Agreement any of the terms of this Agreement or any other confidential information concerning any of the Financial Investors obtained pursuant to this Agreement, other than (a) to its employees, auditors, investors, Affiliates, partners, creditors, advisors, counsel or any rating agencies that are reviewing securities or loans issued by such Stockholder, in each case, to the extent such disclosure reasonably relates to the administration of the investment represented by the Shares and who agree to keep such information confidential, (b) as may be required by applicable law (including under the Securities Act or the Exchange Act), this Agreement, or exchange listing requirements, (c) in connection with any litigation among the parties hereto, (d) to negotiate and effect a Transfer permitted under this Agreement, (e) to any governmental authority having jurisdiction to regulate the business of such party or an affiliate of such party, or (f) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests.

Section 7.3 *Access and Information Rights.* Prior to an IPO, so long as any Financial Investor Group continues to hold of record and Beneficially Own (i) in the case of clause (a), in the aggregate at least 5% of the outstanding Shares and (ii) in the case of clauses (b), (c), (d) and (e), any outstanding Shares, the Company shall deliver to each Financial Investor within such Financial Investor Group (a) the access described in Section 2.6(a)(i)(A), (b) the

information described in Section 2.6(a)(i)(B) and Section 2.6(a)(i)(C) within any applicable time periods provided therein, (c) a copy of the reporting package delivered to the lenders under any Debt Financing Agreements promptly following delivery of such package to the applicable lenders, (d) solely to the extent prepared by the Company for all of the Sponsor Investors, consolidated unaudited monthly financial statements of the Company and any other monthly financial reporting package of the Company, on the earlier of (x) five (5) Business Days after the date on which the Board has approved such consolidated unaudited monthly financial statements and (y) fifteen (15) days after the end of each calendar month and (e) such other information as such Financial Investor believes reasonably appropriate to comply with the SEC or other legal requirements relating to the Beneficial Ownership, directly or indirectly, by such Financial Investor or its Affiliates and their respective members, officers and employees of equity securities of the Company or any controlling person or subsidiary thereof.

Section 7.4    *Expense Reimbursement*.   Without duplication of any reimbursement rights under the Consulting Services Agreements, after the Closing, the Company will, and will cause its respective Subsidiaries to, pay directly or reimburse, or cause to be paid directly or reimbursed, the Financial Investors and each of their respective Affiliates the actual and reasonable out-of-pocket costs and expenses incurred by the Financial Investors and their respective Affiliates in connection with the monitoring of their investments in the Company, or in order to make SEC and other legally required filings relating to the ownership, directly or indirectly, of equity securities of the Company, its controlling persons or its subsidiaries by any Financial Investor or its Affiliates, including (a) fees and actual and reasonable out-of-pocket disbursements of any independent professionals and organizations, including independent accountants, outside legal counsel or consultants retained by such Financial Investors or any of their Affiliates, (b) reasonable costs of any outside services or independent contractors such as financial printers, couriers, business publications, on-line financial services or similar services, retained or used by such Financial Investors or any of their respective Affiliates and (c) transportation, word processing expenses or any similar expense not associated with their or their Affiliates' ordinary operations; provided, however that this Section 7.4 shall no longer apply to any Financial Investor or any of its Affiliates after such time as such Financial Investor, together with its Affiliates, ceases to hold of record and Beneficially Own at least 5% of the outstanding Shares.  All payments or reimbursement for such expenses will be made by wire transfer in same-day funds to the bank account designated by the relevant Financial Investor or Affiliate thereof promptly upon or as soon as practicable following request for reimbursement and delivery to the Company of any supporting documentation reasonably requested by the Company.

Section 7.5    *Notice of Secondary Debt Purchases*.  In the event that any Financial Investor or any of its Subsidiaries that is not a Portfolio Company acquires debt securities of, or loans to, the Company or any of its Participation Subsidiaries after the Closing on the secondary market, such Financial Investor shall give written notice of such acquisition to each of the other Financial Investors within three (3) Business Days of the settlement of such acquisition

Section 7.6    *Corporation Status*.   Unless all of the Financial Investors otherwise agree in writing, the Company shall not make an election to be treated as an entity other than a Corporate Entity unless it is wholly-owned by another Corporate Entity.

# ARTICLE VIII

# INDEMNIFICATION

Section 8.1    *Indemnification of Financial Investors*.  The Company will, and will cause their respective Subsidiaries to, jointly and severally, indemnify, exonerate and hold the Financial Investors and each of their respective partners, stockholders, members, Affiliates, directors, officers, fiduciaries, managers, controlling Persons, employees and agents and each of the partners, stockholders, members, Affiliates, directors, officers, fiduciaries, managers, controlling Persons, employees and agents of each of the foregoing (collectively, the "**Indemnitees**") free and harmless from and against any and all liabilities, losses, damages and costs and out-of-pocket expenses in connection therewith (including reasonable attorneys' fees and expenses) incurred by the Indemnitees or any of them before or after the Closing (collectively, the "**Indemnified Liabilities**"), arising out of any action, cause of action, suit, litigation, investigation, inquiry, arbitration or claim by any Person (other than the Company or any of its Subsidiaries) against any Indemnitee (each, an "**Action**") arising directly or indirectly out of, or in any way relating to, (i) any actual or alleged fiduciary or similar duties to the Company, any of its Subsidiaries (including Jaguar I) or their respective current or former stockholders arising from such Financial Investor's, or its Affiliates' ownership of Shares or other securities of the Company or any of its Subsidiaries or such Financial Investor's, or its Affiliates' control or ability to influence the Company or any of its Subsidiaries (other than any such Indemnified Liabilities (x) to the extent such Indemnified Liabilities arise out of any breach of this Agreement by such Indemnitee or its Affiliates or other related Persons or the breach of any fiduciary or other duty or obligation of such Indemnitee to its direct or indirect equity holders, creditors or Affiliates or (y) to the extent such control or the ability to control the Company or any of its Subsidiaries derives from such Financial Investors' or its Affiliates' capacity as an officer or director of the Company or any of its Subsidiaries) or (ii) the business, operations, properties, assets or other rights or liabilities of the Company or any of its Subsidiaries.  The Company will, and will cause its Subsidiaries to, jointly and severally, reimburse any Indemnitee for all reasonable costs and expenses (including reasonable attorneys' fees and expenses and any other litigation-related expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any Action for which the Indemnitee would be entitled to indemnification under the terms of this Article VIII, or any action or proceeding arising therefrom, whether or not such Indemnitee is a party thereto. The Company or its Subsidiaries, in the defense of any Action for which an Indemnitee would be entitled to indemnification under the terms of this Article VIII, may, without the consent of such Indemnitee (which consent shall not be unreasonably withheld), consent to entry of any judgment or enter into any settlement if and only if it (i) includes as a term thereof the giving by the claimant or plaintiff therein to such Indemnitee of an unconditional release from all liability with respect to such Action and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnitee, and provided that any sums payable in connection with such settlement are paid in full by the Company and/or its Subsidiaries.  Notwithstanding anything to the contrary set forth herein, in no event shall the Company or any of its Subsidiaries have any liability to any Indemnitee for any Indemnified Liabilities arising from any failure of the Company or any of its Subsidiaries to agree to any conditions, restrictions, obligations or requirements in connection with applicable antitrust laws,

except to the extent such failure arises in connection with a transaction in which the Company or any of its Subsidiaries is a party and, with respect to any antitrust filing or approval for such transaction, does not involve the failure of such Indemnitee or one or more of its applicable Financial Investors or their Affiliates to properly and timely make any such required filing, or provide accurate and not misleading information to, any governmental antitrust authority.

Section 8.2     *Jointly Indemnifiable Claims*.  The Company acknowledges and agrees that the Company shall, and to the extent applicable shall cause its Subsidiaries to, be fully and primarily responsible for the payment to the Indemnitee in respect of Indemnified Liabilities in connection with any Jointly Indemnifiable Claims (as defined below), pursuant to and in accordance with (as applicable) the terms of (i) the Delaware General Corporation Law, as amended, (ii) the certificate of incorporation, as amended, of the Company, (iii) the bylaws, as amended, of the Company, (iv) any director indemnification agreement, (v) this Agreement, (vi) any other agreement between the Company or any Subsidiary and the Indemnitee pursuant to which the Indemnitee is indemnified, (vii) the laws of the jurisdiction of incorporation or organization of any Subsidiary of the Company and/or (viii) the certificate of incorporation, certificate of organization, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or other organizational or governing documents of any Subsidiary of the Company ((i) through (viii) collectively, the "**Indemnification Sources**"), irrespective of any right of recovery the Indemnitee may have from any corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (other than the Company, any of its Subsidiaries or the insurer under and pursuant to an insurance policy of the Company or any of its Subsidiaries) from whom an Indemnitee may be entitled to indemnification with respect to which, in whole or in part, the Company or any of its Subsidiaries may also have an indemnification obligation (collectively, the "**Indemnitee-Related Entities**").  Under no circumstance shall the Company or any of its Subsidiaries be entitled to any right of subrogation or contribution by the Indemnitee-Related Entities and no right of advancement or recovery the Indemnitee may have from the Indemnitee-Related Entities shall reduce or otherwise alter the rights of the Indemnitee or the obligations of the Company or any of its Subsidiaries under the Indemnification Sources.  In the event that any of the Indemnitee-Related Entities shall make any payment to the Indemnitee in respect of indemnification with respect to any Jointly Indemnifiable Claim, (x) the Company shall, and to the extent applicable shall cause the Controlled Entities to, reimburse the Indemnitee-Related Entity making such payment to the extent of such payment promptly upon written demand from such Indemnitee-Related Entity, (y) to the extent not previously and fully reimbursed by the Company and/or any of its Subsidiaries pursuant to clause (x), the Indemnitee-Related Entity making such payment shall be subrogated to the extent of the outstanding balance of such payment to all of the rights of recovery of the Indemnitee against the Company and/or any of its Subsidiaries, as applicable, and (z) Indemnitee shall execute all papers reasonably required and shall do all things that may be reasonably necessary to secure such rights, including the execution of such documents as may be necessary to enable the Indemnitee-Related Entities effectively to bring suit to enforce such rights.  The Company and Indemnitee agree that each of the Indemnitee-Related Entities shall be third-party beneficiaries with respect to this Section 8.2, entitled to enforce this Section 8.2 as though each such Indemnitee-Related Entity were a party to this Agreement.  The Company shall cause each of the Controlled Entities to perform the terms and obligations of this Section 8.2 as though each such Subsidiary was a party to this Agreement.  For purposes of this Section 8.2, the term "**Jointly Indemnifiable Claims**" shall be

92

broadly construed and shall include any Indemnified Liabilities for which the Indemnitee shall be entitled to indemnification from both (1) the Company and/or any of its Subsidiaries pursuant to the Indemnification Sources, on the one hand, and (2) any Indemnitee-Related Entity pursuant to any other agreement between any Indemnitee-Related Entity and the Indemnitee pursuant to which the Indemnitee is indemnified, the laws of the jurisdiction of incorporation or organization of any Indemnitee-Related Entity and/or the certificate of incorporation, certificate of organization, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or other organizational or governing documents of any Indemnitee-Related Entity, on the other hand.

Section 8.3    *Non-Exclusive Right*.    The rights of any Indemnitee to indemnification this <u>Article VIII</u> will be in addition to any other rights any such Person may have under any other Section of this Agreement (including <u>Section 5.7</u>) or any other agreement or instrument (including the Consulting Services Agreements) to which such Indemnitee is or becomes a party or is or otherwise becomes a beneficiary or under law or regulation or under the certificate of incorporation or bylaws (or equivalent governing documents) of the Company or any of its Subsidiaries.

## ARTICLE IX

## COMPANY SALE OR QUALIFYING IPO

Section 9.1    *Request for Liquidity*.

(a)    Subject to the terms and conditions of this <u>Article IX</u> and subject to the H&F Entities being a Liquidity Sponsor at the time of delivery of the relevant Request for Liquidity, (i) at any time on or after the second anniversary of the Closing and prior to the earlier of the sixth anniversary of the Closing and the consummation of an IPO, the H&F Entities may deliver a written notice to the Company and the Carlyle Entities requiring that the Company and the Stockholders pursue a Qualifying IPO in accordance with this <u>Article IX</u> (such notice, an "**H&F Qualifying IPO Request**") and (ii) at any time on or after the fourth anniversary of the Closing and prior to the earlier of the sixth anniversary of the Closing and the consummation of an IPO, in addition to its rights under clause (i), the H&F Entities may deliver a written notice to the Company and the Carlyle Entities (A) requiring that the Company and the Stockholders pursue a Company Sale in accordance with this <u>Article IX</u> (such request, an "**H&F Company Sale Request**") or (B) that the Company and the Stockholders simultaneously pursue both a Qualifying IPO and a Company Sale (a "**Dual Track Process**" and such request, an "**H&F Dual Track Request**").  In the event that the H&F Entities deliver an H&F Request for Liquidity pursuant to this <u>Section 9.1(a)</u>, unless all Sponsors otherwise determine in writing at any time thereafter, the Company and the Stockholders will, subject to <u>Section 4.5</u>, <u>Section 9.2</u> and <u>Section 9.3</u>, use their respective reasonable best efforts to consummate a Company Sale or Qualifying IPO (as applicable) as soon as reasonably practical pursuant to this <u>Article IX.</u>

(b)    Subject to the terms and conditions of this <u>Article IX</u> and subject to the Carlyle Entities being a Liquidity Sponsor at the time of delivery of the relevant Request for Liquidity, at any time on or after the fifth anniversary of the Closing and prior to the earlier of the sixth anniversary of the Closing and the consummation of an IPO, the Carlyle Entities may

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000594

deliver a written notice to the Company and the H&F Entities requiring that the Company and the Stockholders pursue a Qualifying IPO in accordance with this Article IX (such notice, (a "Carlyle Qualifying IPO Request").  In the event that the Carlyle Entities deliver a Carlyle Qualifying IPO Request, unless all Sponsors otherwise determine in writing at any time thereafter, the Company and the Stockholders will, subject to Section 9.2 and Section 9.3, use their respective reasonable best efforts to consummate a Qualifying IPO as soon as reasonably practicable pursuant to this Article IX.

        (c)      Subject to the terms and conditions of this Article IX, at any time on and after the sixth anniversary of the Closing and prior to an IPO, any Liquidity Sponsor may deliver a written notice to the Company and the other Liquidity Sponsor requiring that the Company and the Stockholders pursue a Company Sale or a Qualifying IPO in accordance with this Article IX (such request, a "**Post 6 Year Liquidity Request**").  In the event that a Post 6 Year Liquidity Request is delivered in accordance with this Section 9.1(c), then, unless all Sponsors otherwise determine in writing, (x) the Company Board shall within thirty (30) days of such delivery approve (a) the commencement of the process for a Company Sale as contemplated by Section 9.2 (a "**Sale Process Determination**") and/or (b) the commencement of the process for a Qualifying IPO in the manner contemplated by Section 9.3 (a "**Qualifying IPO Determination**") (for the avoidance of doubt, unless all Sponsors otherwise determine in writing, the Company Board will have the right to determine to pursue a Dual Track Process) and (y) subject to the terms of Section 4.5, Section 9.2 and Section 9.3, the Company and the Stockholders will use their respective reasonable best efforts to consummate either a Company Sale or a Qualifying IPO (consistent with any Sale Process Determination and/or Qualifying IPO Determination) as soon as reasonably practicable pursuant to this Article IX.

        (d)      Anything in this Section 9.1 to the contrary notwithstanding, no Liquidity Sponsor may deliver a Request for Liquidity at such time if any Liquidity Sponsor has delivered a Request for Liquidity during the six (6) month period immediately prior to such time or if the Company and the Stockholders are continuing to pursue a Qualifying IPO and/or a Company Sale in accordance with this Article IX pursuant to a prior Request for Liquidity; provided, that, anything in this Section 9.1 to the contrary notwithstanding, (i) in the event that the H&F Entities deliver an H&F Company Sale Request on or after the fifth anniversary of the Closing then the Carlyle Entities may at any time no later than 30 days after delivery of such H&F Company Sale Request deliver a Carlyle Qualifying IPO Request (and in such event the Company and the Stockholders will, subject to the terms of Section 9.2 and Section 9.3, pursue a Dual Track Process) and (ii) in the event that the Carlyle Entities deliver a Carlyle Qualifying IPO Request on or after the fifth anniversary of the Closing then the H&F Entities may at any time no later than 30 days after delivery of such Carlyle Qualifying IPO Request deliver an H&F Dual Track Request (and in such event the Company and the Stockholders will, subject to the terms of Section 9.2 and Section 9.3, pursue a Dual Track Process).  For the avoidance of doubt, it is understood that in no event may a Liquidity Sponsor or an Affiliate or Portfolio Company of such Liquidity Sponsor be a counterparty to a Company Sale pursuant to this Article IX unless agreed to by all Sponsors.  Unless all of the Sponsors otherwise determine in writing, prior to the sixth anniversary of the Closing, any IPO will only be effected if initiated pursuant to this Section 9.1.

(e)      For the purposes of this Article IX, at any time, with respect to a Qualifying IPO or Company Sale or any request or determination with respect thereto, a Sponsor is a "**Liquidity Sponsor**" if (i) in the case of the Carlyle Sponsor, such Sponsor, together with the other members of its Sponsor Investor Group, has a Continuing Ownership Percentage of no less than 50% or (ii) solely in the case of the H&F Sponsors, no other Stockholder and its Permitted Transferees own of record in the aggregate a larger number of Shares than the aggregate number of Shares owned of record by the H&F Entities.  As used in this Article IX, a "**Request for Liquidity**" means any of an H&F Qualifying IPO Request, an H&F Company Sale Request, an H&F Dual Track Request, a Carlyle Qualifying IPO Request or a Post 6 Year Liquidity Request and an "**H&F Request for Liquidity**" means any of an H&F Qualifying IPO Request, an H&F Company Sale Request or an H&F Dual Track Request.  Reference to a "Stockholder" in this Article IX shall, in the case of each Manager, be a reference to such Manager in his or her capacity as a holder of Shares and not in his or her capacity as an officer or director of the Company or any of its Subsidiaries.

Section 9.2      *Process for Company Sale.*

(a)      The process with respect to any potential Company Sale shall, subject to the terms of this Section 9.2, be under the direction and control of the Company Board.  Within thirty (30) days of (w) a Sale Process Determination pursuant to Section 9.1(c), (x) the delivery to the Company of an H&F Company Sale Request or an H&F Dual Track Request pursuant to Section 9.1(a), (y) the delivery to the Company of a written notice from all Sponsors requesting the commencement of the process contemplated by this Section 9.2 or (z) unless all Sponsors otherwise agree in writing, the determination by the Company Board to terminate or suspend a Qualifying IPO process pursuant to Section 9.3(b), the Company (under the direction of the Company Board) shall retain, and enter into customary engagement letters with, one or more independent nationally (in the U.S.) recognized investment banking firms (the "Investment Bank"") to assist the Company in connection with a potential Company Sale; provided, that, notwithstanding anything herein to the contrary, if the process for a Company Sale has been commenced pursuant to a H&F Company Sale Request or an H&F Dual Track Request pursuant to Section 9.1(a), the H&F Entities and Carlyle Entities shall have the right to together select the Investment Bank and agree its terms of retention provided that if agreement is not reached in respect of such identity and terms of retention within thirty (30) days of the delivery of such H&F Company Sale Request or H&F Dual Track Request (as applicable), the Company Board shall determine the identity and terms of retention of the Investment Bank.  All fees and expenses payable to the Investment Bank will be paid by the Company or the counterparty to any Company Sale.

(b)      The Company shall ensure that the Investment Bank shall, as soon as is reasonably practicable and in no event later than thirty (30) days after its retention, prepare and deliver to the Company and the Sponsors such offering memorandum or confidential information memorandum as shall be customary for the sale of companies in businesses similar to that of the Company (the "**Offering Memorandum**").  Subject to the direction of the Company Board, the Investment Bank shall have the authority to (i) solicit and evaluate proposals to consummate a Company Sale (each a "**Sale Proposal**") and (ii) hire agents, appraisers, and other professionals for and on behalf of the Company in connection therewith, and shall promptly present each Sale Proposal received by it to the Company Board and the Sponsors.  Each of the Company and the

MENNINGER_SUPP000596

Sponsors shall cooperate with the Investment Bank and use its reasonable best efforts to procure and develop Sale Proposals, including, in the case of the Company, by making members of the Company's management available to meet with prospective purchasers, providing for the inspection of the Company's facilities and access to the Company's financial information and other books and records by prospective purchasers, and ensuring the cooperation of the Company's counsel and independent public accountants with the Investment Bank and any such prospective purchasers, all subject to reasonable limitations as to timing of inspection and access and, pursuant to confidentiality agreements reasonably acceptable to the Company, the preservation of the Company's privileged and confidential information.  Sale Proposals will be evaluated by the Company Board upon substantial completion of the Investment Bank's efforts to procure and develop Sale Proposals.

(c)     A Sale Proposal shall constitute an "**Approved Sale Proposal**" if such Sale Proposal is approved (i) by all Sponsors in their sole discretion by written notice to the Company, (ii) by the H&F Entities in their sole discretion by written notice to the Company and the Carlyle Sponsor at any time after the fourth anniversary of the Closing and prior to the fifth anniversary of the Closing, provided, however, that without the prior written consent of the Carlyle Entities, no Sale Proposal approved pursuant to this clause (ii) shall constitute an Approved Sale Proposal unless all H&F Entities participate in such Change of Control Transaction, pro rata based on the relative number of Shares held by such H&F Entities, (iii) by both (x) the H&F Entities in their sole discretion and (y) the Company Board, by written notice to the Carlyle Sponsor at any time on or after the fifth anniversary of the Closing and prior to the sixth anniversary of the Closing or (iv) unless the H&F Sponsor and the Carlyle Sponsor otherwise agree, at any time on or after the sixth anniversary of the Closing, by the Company Board by written notice to all Sponsors.  A Company Sale to be effected pursuant to an Approved Sale Proposal shall constitute an "**Approved Sale**." Each of the Sponsors shall have the right to participate in any negotiations with the prospective purchasers in connection with such Approval Sale Proposal.  Notwithstanding the foregoing, a Sale Proposal shall not constitute an Approved Sale Proposal unless such Approved Sale Proposal entitles all Financial Investors to the Same Terms and Conditions with respect to their Shares.  The Company shall enter into such agreements providing for an Approved Sale as shall be required under the terms of the Approved Sale Proposal.

(d)     A Sale Proposal shall constitute a "**Rejected Sale Proposal**" in the event that such Sale Proposal is rejected (i) by all Sponsors by written notice to the Company, (ii) at any time prior to the sixth anniversary of the Closing, by the H&F Entities in their sole discretion by written notice to the Company and the Carlyle Sponsor or (iii) unless the H&F Sponsors and the Carlyle Sponsor otherwise agree, at any time on or after the fifth anniversary of the Closing, by the Company Board by written notice to all of the Sponsors; provided, that, between the fifth and sixth anniversary of the Closing, if the H&F Entities inform the Company in writing that they want to accept a Sale Proposal then the Company Board cannot reject such Sale Proposal pursuant to the foregoing clause (iii) unless the Company Board simultaneously resolves to pursue a Qualifying IPO in accordance with Section 9.3 (in which event the Company and the Stockholders will use their respective reasonable best efforts to consummate a Qualifying IPO pursuant to Section 9.3 as soon as reasonably practicable after such suspension or termination).  The Company and the Investment Bank shall not pursue (and the Company shall not enter into) any Rejected Sale Proposal.

041945-0274-16469-Active.21575798.1
CONFIDENTIAL                                                                MENNINGER_SUPP000597

(e)     Notwithstanding anything to the contrary in this <u>Section 9.2</u>, any Company Sale process may be terminated or suspended by (i) all Sponsors in their sole discretion by written notice to the Company, (ii) the H&F Entities in their sole discretion by written notice to the Company and the Carlyle Sponsor at any time prior to the sixth anniversary of the Closing and (iii) unless all Sponsors otherwise determine in writing, the Company Board at any time on or after the fifth anniversary of the Closing; <u>provided</u>, <u>however</u>, that unless all Sponsors otherwise agree in writing, if the Company Board shall terminate or suspend a Company Sale process pursuant to this <u>Section 9.2(e)</u>, the Company and the Stockholders will use their respective reasonable best efforts to consummate a Qualifying IPO pursuant to <u>Section 9.3</u> as soon as reasonably practicable after such suspension or termination.

Section 9.3      *Process for Qualifying IPO*.

(a)     In the event of (v) an H&F Qualifying IPO Request or an H&F Dual Track Request, (w) a Carlyle Qualifying IPO Request, (x) a Qualifying IPO Determination, (y) the delivery to the Company of a written notice from all Sponsors requesting the commencement of the process contemplated by this <u>Section 9.3</u> or (z) unless all Sponsors otherwise agree in writing, the determination by the Company Board to terminate or suspend a Company Sale process pursuant to <u>Section 9.2(d)(iii)</u> or pursuant to <u>Section 9.2(e)</u>, the Company and the Stockholders will use their respective reasonable best efforts to complete a Qualifying IPO as soon as reasonably practicable, including (a) promptly (and in any event, no later than ninety (90) days after such request) filing a Form S-1 (or other applicable Registration Statement) relating to such Qualifying IPO (the "**IPO Registration Statement**") with respect to such number of Shares as is recommended by the managing underwriter or underwriters to be offered for sale in the IPO Registration Statement allocated among the Company and the Stockholders in accordance with <u>Section 5.4(b)</u>, (b) amending the Company's certificate of incorporation (or equivalent governing document) (i) to increase its authorized capital to permit the issuance and sale of such number of Shares as is recommended by the managing underwriter or underwriters to be offered for sale by the Company in such IPO Registration Statement and no more than such number of Shares as is recommended by the managing underwriter or underwriters to be offered for sale by any stockholders of the Company that have registration rights with respect to their equity securities of the Company and (ii) to include terms customarily included in the certificate of incorporation (or equivalent governing document) of an entity effecting an initial public offering, (c) causing the IPO Registration Statement to be declared effective promptly under the Securities Act and any applicable "Blue Sky" laws and (d) listing the Shares on a stock exchange that is determined by the Company Board.  The Company Board shall have the right to select the managing underwriter or underwriters to administer the offering and the Company shall enter into an underwriting agreement with such underwriters and perform its obligations thereunder. The process with respect to such potential Qualifying IPO shall be under the direction and control of the Company Board.

(b)     Notwithstanding anything to the contrary in this <u>Section 9.3</u>, any Qualifying IPO process pursuant to this <u>Section 9.3</u> may be terminated or suspended by (i) all Sponsors in their sole discretion by written notice to the Company (ii) by the H&F Entities in their sole discretion at any time prior to the fifth anniversary of the Closing and (iii) unless all Sponsors otherwise determine in writing, by the Company Board at any time on or after the fifth anniversary of the Closing; <u>provided</u>, <u>however</u>, if the Company Board shall terminate or suspend

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000598

the Qualifying IPO process pursuant to this <u>Section 9.3(b)</u>, then unless all Sponsors otherwise determine in writing at any time thereafter, the Company and the Stockholders will use their respective reasonable best efforts to consummate a Company Sale pursuant to <u>Section 9.2</u> as soon as reasonably practicable after such suspension or termination.

Section 9.4    *Legal Costs and Expenses*.   All reasonable fees and disbursements of counsel to any of the Financial Investors or the Company and its Subsidiaries in connection with this <u>Article IX</u> (whether or not any Sale Proposal becomes an Approved Sale Proposal and whether or not any Approved Sale or Qualifying IPO is consummated) will be borne by the Company and its Subsidiaries.

<div align="center">

**ARTICLE X**

**RIGHT TO REPURCHASE SHARES HELD BY MANAGERS**

</div>

Section 10.1    *Call Right.*

(a)    Except as otherwise agreed to by the Sponsors and a Manager, with respect to all Shares and all other Equity Securities held by a Manager ("**Applicable Shares**"), as applicable, (i) in connection with any Termination of Service, during the period beginning on the date of a Termination of Service of such Manager's Applicable Employee and ending on the first anniversary of the later of (a) the date of such Termination of Service or (b) as applicable, the date of the last exercise, exchange or conversion of any portion of any Options or other Equity Securities held by the Manager, or (ii) in connection with any Restrictive Covenant Breach, during the period beginning on the date of such Restrictive Covenant Breach and ending on the first anniversary of such date (as applicable, the "**Repurchase Period**"), the Company and, to the extent provided by <u>Section 10.6</u>, the Sponsor Investors shall have the option (the "**Call Right**") to repurchase the Manager's Applicable Shares on the terms and subject to the conditions set forth in this <u>Article X</u>.  The Call Right may be exercised more than once and for some or all of the Applicable Shares held by the Manager.

Section 10.2    *Exercise of Call Right*.   The Company shall exercise the Call Right (if so elected) by written notice to the Manager within the Repurchase Period, specifying a date within such period on which the Call Right shall be exercised and the number of Shares as to which the Call Right is being exercised.  Upon such notification, the Manager shall promptly surrender to the Company any certificates representing the Shares being purchased, together with a duly executed stock power for the transfer of such Shares to Company, free and clear of any Encumbrances.  Except as provided below, upon the Company's receipt of the certificates from the Manager, the Company shall deliver to him, her or it payment of the Repurchase Price (as defined below) for the Shares being purchased.

Section 10.3    *Repurchase Price*.   The purchase price payable by the Company upon exercise of the Call Right (the "**Repurchase Price**") will be as follows:

(a)    In the event of any Termination of Service other than a Termination of Service by the Company for Cause, the Fair Market Value, as of the date the Call Right is being exercised, of the Shares with respect to which the Call Right is being exercised; and

<div align="center">98</div>

(b)      In the event of any Termination of Service by the Company for Cause, or in connection with any Restrictive Covenant Breach, the lesser of (i) the Fair Market Value, as of the date the Call Right is being exercised, of the Shares with respect to which the Call Right is being exercised and (ii) the aggregate purchase price paid for such Shares by the Manager's Applicable Employee, as proportionately adjusted for any splits, reverse stock splits, combinations, recapitalizations or similar transactions (which price shall be zero for any Shares that were formerly Restricted Shares).

Section 10.4      *Repurchase Notes*.  In the sole discretion of the Company Board, the Company may pay the Repurchase Price in cash, check or by issuing a promissory note (a "**Repurchase Note**") to Manager in the amount of the Repurchase Price.  The Repurchase Note shall (a) bear simple interest at the prime rate as published in The Wall Street Journal on the date such payment is due and owing from such date to the date such payment is made and (b) have such other reasonable terms and conditions as may be determined by the Company.   All payments of interest accrued under the promissory note shall be paid only at the date of payment by the Company of the principal amount of such promissory note.

Section 10.5      *Extension of Repurchase Period*.   Notwithstanding anything herein to the contrary, no payment shall be made under this Article X if such payment (or the direct or indirect distribution to the Company by its Subsidiaries of the cash necessary to make such payment) would (i) cause the Company or its Subsidiaries to violate any applicable law, or any rights or preference of preferred stockholders of the Company, (ii) violate the terms of any banking agreement or loan or other financial covenant of any indebtedness of the Company or its Subsidiaries or (iii) in the good faith judgment of the Company's Board of Directors, be reasonably likely to result in the Company or its Subsidiaries not retaining sufficient restricted payment capacity under the terms of any credit agreement, indenture, note or other operative agreement relating to indebtedness of the Company or its Subsidiaries to permit interest payments with respect to the Debt Financing (as defined in the Merger Agreement) to be paid entirely in cash, in each case, regardless of when such agreement, loan, financial covenant, indebtedness, indenture, note or operative agreement was created, incurred or assumed.  Any payment under this Section that would cause such violation or default shall result in an extension of the Repurchase Period, in the sole discretion of the Company, until such payment shall no longer cause any such violation or default and at which time the Call Right may be exercised.

Section 10.6      *Exercise of Call Right by Financial Investors*.   If, at any time prior to the expiration of the Repurchase Period, the Company shall determine not to exercise a Call Right pursuant to this Article X, then, unless all Sponsor Investors have waived their rights under this Section 10.6, the Company shall promptly notify the Financial Investors of such determination.  In such event, the Sponsor Investors and, if and only to the extent a Sponsor Investor exercises such Call Right pursuant to this Section 10.6, the Blue Spectrum Entities and the GIC Entities shall have a pro rata right (based on the relative ownership of Shares by the Financial Investors at the time of delivery of such notification by the Company) to exercise such Call Right pursuant to the terms and conditions of this Article X in the same manner as would apply to the Company.

Section 10.7      *Certain Definitions*.  For the purposes of this Agreement:

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000600

(a)      "**Cause**," with respect to a Manager, means "Cause" (or any term of similar effect) as defined in such Manager's employment agreement with the Company or any of its Subsidiaries if such an agreement exists and contains a definition of Cause (or term of similar effect), or, if no such agreement exists or such agreement does not contain a definition of Cause (or term of similar effect), then Cause shall mean: (i) the Manager's (or the Applicable Employee's or, to the extent in the same Manager Group, any other Manager's) unauthorized use or disclosure of confidential information or trade secrets of the Company or any of its Subsidiaries or any material breach by the Manager (or the Applicable Employee or, to the extent in the same Manager Group, any other Manager) of a written agreement between any such Manager or the Applicable Employee, on the one hand, and the Company or any of its Subsidiaries, on the other hand, including without limitation a material breach of any employment, confidentiality, non-compete, non-solicit or similar agreement; (ii) the Manager's (or the Applicable Employee's or, to the extent in the same Manager Group, any other Manager's) commission of, indictment for or the entry of a plea of guilty or nolo contendere by the Manager (or the Applicable Employee or, to the extent in the same Manager Group, any other Manager) to, a felony under the laws of the United States or any state thereof or any crime involving dishonesty or moral turpitude (or any similar crime in any jurisdiction outside the United States); (iii) the Manager's (or the Applicable Employee's or, to the extent in the same Manager Group, any other Manager's) negligence or willful misconduct in the performance of the Manager's (or the Applicable Employee's or, to the extent in the same Manager Group, any other Manager's) duties or the Manager's (or the Applicable Employee's or, to the extent in the same Manager Group, any other Manager's) willful or repeated failure or refusal to substantially perform assigned duties; (iv) any act of fraud, embezzlement, material misappropriation or dishonesty committed by the Manager (or the Applicable Employee or, to the extent in the same Manager Group, any other Manager) against the Company or any of its Subsidiaries; or (v) any acts, omissions or statements by the Manager (or the Applicable Employee or, to the extent in the same Manager Group, any other Manager) which the Company determines to be materially detrimental or damaging to the reputation, operations, prospects or business relations of the Company or any of its Subsidiaries.

(b)      "**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

(c)      "**Consultant**" means any Person (excluding any Sponsor Investor or any Affiliate thereof), including any advisor, engaged by the Company or a parent or subsidiary of the Company to render bona fide services to such entity.

(d)      "**Employee**" means any person, including officers and Directors, employed by the Company (within the meaning of Section 3401(c) of the Code) or any parent or subsidiary of the Company.

(e)      "**Service Provider**" means an Employee, Consultant or Director.

(f)      "**Termination of Service**" means the date the Manager's Applicable Employee ceases to be a Service Provider.

# ARTICLE XI

# MISCELLANEOUS

Section 11.1     *Amendment and Waiver*.

(a)     This Agreement may be amended or modified, in whole or in part, at any time pursuant to an agreement in writing executed on behalf of each of the Company and the Sponsors; provided, that the following additional consents shall be required for any of the following amendments or modifications to this Agreement (in each case, except to the extent that such amendment occurs only upon the consummation of a Change of Control Transaction in compliance with the terms of Section 4.5):

(i)     Any amendment or modification of this Agreement that adversely and disproportionately affects the GIC Entities or the Blue Spectrum Entities relative to the Sponsor Investors shall require the consent of, to the extent that the GIC Entities are so adversely affected, the GIC Investor, and, to the extent that the Blue Spectrum Entities are so adversely affected, the Blue Spectrum Investor;

(ii)     Any amendment or modification of this Agreement that by its express terms adversely and disproportionately affects the GIC Entities or the Blue Spectrum Entities relative to any other Stockholder shall require the consent of, to the extent that the GIC Entities are so adversely affected, the GIC Investor, and, to the extent that the Blue Spectrum Entities are so adversely affected, the Blue Spectrum Investor;

(iii)     Any amendment or modification to any of the following Articles or Sections shall require the consent of the GIC Investor and/or the Blue Spectrum Investor (as applicable) if such amendment or modification adversely affects any right granted to the GIC Entities or the Blue Spectrum Entities under such Article or Section or modifies in an adverse manner any restriction on or obligation of such Financial Investor under such Section; Article II, Article IV, Article V, Article VI, Section 7.3, Section 7.5, Section 7.6, Article VIII and this Section 11.1;

(iv)     Any amendment or modification to the conditions under which the GIC Entities or the Blue Spectrum Entities rights set forth in this Agreement terminate shall require the consent of, to the extent that the GIC Entities are so adversely affected, the GIC Investor, and, to the extent that the Blue Spectrum Entities are so adversely affected, the Blue Spectrum Investor; and

(v)     Any amendment or modification of this Agreement that creates a new obligation of or restriction on the GIC Entities or the Blue Spectrum Entities shall require the consent of, to the extent that such obligation or restriction is created in respect of the GIC Entities, the GIC Investor, and, to the extent that such obligation or restriction is created in respect of the Blue Spectrum Entities, the Blue Spectrum Investor, other than any amendment or modification to address a change in applicable law; provided, that the foregoing shall not apply to any obligation or restriction created pursuant to the terms of

any Equity Securities purchased by such Financial Investor following the Closing Date (as defined in the Merger Agreement).

(b)     Notwithstanding anything to the contrary in <u>Section 11.1(a)</u>, in addition to other amendments or modifications authorized herein, amendments or modifications may be made to this Agreement from time to time by the Sponsors and/or the Company Board without the consent of any Stockholder (other than the Sponsors), (i) to correct typographical or ministerial errors, (ii) to add or delete any provision of this Agreement required to be added or deleted in order to comply with, or avoid a violation of, applicable law (provided that such changes will be made in a manner that has the least impact on the rights and obligations of the Financial Investors hereunder) or (iii) to establish the economic terms of a new class or series of Equity Securities of the Company that dilutes the Shares proportionately (in each case, that does not otherwise expressly change the rights and obligations of the Financial Investors hereunder).

(c)     Notwithstanding any to the contrary in <u>Section 11.1(a)</u>, but subject to <u>Article IV</u>, any addition of a transferee of Shares as a party hereto pursuant to <u>Section 4.1</u> shall not constitute an amendment hereto.

(d)     Any amendment or modification affected in accordance with this <u>Section 11.1</u> shall be effective and binding on the Company and each Stockholder. Prompt written notice of any amendment to this Agreement shall be given to all Stockholders.  No waiver of any breach of any of the terms of this Agreement shall be effective unless such waiver is made expressly in writing and executed and delivered by the party against whom such waiver is claimed. Any failure by any party at any time to enforce any of the provisions of this Agreement shall not be construed as a waiver of such provision or any other provisions hereof and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

Section 11.2     *Severability*.   If any provision of this Agreement shall be declared by any court of competent jurisdiction to be illegal, void or unenforceable, all other provisions of this Agreement, to the extent permitted by law, shall not be affected and shall remain in full force and effect. Upon any such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

Section 11.3     *Entire Agreement; Third Party Beneficiaries*.   Except as otherwise expressly set forth herein, this Agreement, together with the several agreements and other documents and instruments referred to herein or annexed hereto, embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way. Without limiting the generality of the foregoing, to the extent that any of the terms hereof are inconsistent with the terms of any other agreement among the parties, the terms of this Agreement shall govern; <u>provided</u>, that if the terms hereof are inconsistent with the terms of a Manager Side Agreement, the terms of such Manager Side Agreement shall govern with respect to the Manager that is party to such Manager Side Agreement. Except for <u>Section 2.1(d)</u>, <u>Section 2.6</u>,  <u>Section 5.7</u>,  <u>Section 7.4</u>,  <u>Article VIII</u>,  <u>Section 11.14</u>,  <u>Section 11.16</u>,  and this

102

Section 11.3 (which will be for the benefit of the applicable Persons set forth therein, and any such Person will have the rights provided for therein), this Agreement does not create any rights, claims or benefits inuring to any Person that is not a party hereto, and it does not create or establish any third party beneficiary hereto.

Section 11.4    *Successors and Assign; Assignments*.    Except as otherwise provided in this Agreement to the contrary, this Agreement shall be binding upon and inure to the benefit of the Stockholders, their distributees, heirs, legal representatives, executors, administrators, successors and permitted assigns.  The rights and obligations hereunder shall not be assignable without the prior written consent of all the Sponsors, except as otherwise expressly set forth herein subject, in each case, to the limitations contained herein; provided that, (i) except as otherwise expressly set forth herein, a party may assign this Agreement in whole or in part to its Permitted Transferees in connection with any Transfer of Shares to such Permitted Transferees in compliance with Section 4.2 (for the avoidance of doubt, it is understood that in no event may any rights under this Agreement that specifically apply only to one or more Carlyle Fund Entities under this Agreement be assigned in whole or in part to any Carlyle Co-Investor Entity) (ii) notwithstanding anything herein to the contrary, a Sponsor Investor may assign to any other member of its Sponsor Investor Group any rights hereunder as an Eligible Financial Investor under Section 4.3, as an Eligible Tag-Along Stockholder under Section 4.4, as a Participating Stockholder Seller pursuant to Section 4.5, as a Defaulting Sponsor under Section 4.7 (provided such assignment is effected in compliance with the terms thereof), as a Holder under Article V or as a Participation Stockholder under Article VI and (iii) notwithstanding anything herein to the contrary, a Blue Spectrum Entity or a GIC Entity may assign to its Permitted Transferees its right to receive any non-cash property upon the consummation of any action pursuant to clauses (iv) through (xi) of Section 2.5(b).    Any assignment of rights or obligations in violation of this Section 11.4 shall be null and void.

Section 11.5    *Counterparts*.    This Agreement may be executed in separate counterparts each of which shall be an original and all of which taken together shall constitute one and the same agreement.

Section 11.6    *Remedies.*

(a)    Each party hereto acknowledges that monetary damages would not be an adequate remedy in the event that each and every one of the covenants or agreements in this Agreement is not performed in accordance with its terms, and it is therefore agreed that, in addition to and without limiting any other remedy or right it may have (but subject to the limitations set forth in Section 5.10), the non-breaching party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically each and every one of the terms and provisions hereof. Each party hereto agrees not to oppose the granting of such relief in the event a court determines that such a breach has occurred, and to waive any requirement for the securing or posting of any bond in connection with such remedy.

(b)    All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative,

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000604

and the exercise or beginning of the exercise of any thereof by any party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such party.

(c)     Each Sponsor Investor confirms and agrees for the benefit of the Company and the other Financial Investors that (i) it will fund the full amount of its Deferred Commitments on the Deferred Payment Date pursuant to the terms of such Sponsor Investor's Equity Commitment Letter and (ii) in the event that it fails to fund any amount of such Deferred Commitments, each of the Company and the Financial Investors shall have the right to enforce such Sponsor Investor's obligation to fund such amount pursuant to the applicable Equity Commitment Letter.  The Company confirms and agrees for the benefit of the Blue Spectrum Entities and the GIC Entities that it (i) will comply with its obligations under the Equity Commitment Letters and (ii) will not amend, supplement, modify or terminate, or waive any provision of, the Equity Commitment Letters without the prior written consent of the GIC Investor and the Blue Spectrum Investor.

Section 11.7     *Notices*.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, telecopied or emailed (upon telephonic confirmation or written confirmation (other than an automatically generated written reply) of receipt), on the first Business Day following the date of dispatch if delivered by a recognized next day courier service, or on the third Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid; provided, however, that any notice to the Blue Spectrum Investors may not be sent by registered or certified mail.  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

(a)     If to the Company:

c/o Pharmaceutical Product Development, LLC
929 North Front Street
Wilmington, NC  28401
Attn:  Judd Hartman
Fax:  (910) 558-6600
E-mail:  judd.hartman@ppdi.com

with a copy (which shall not constitute notice) to:

The Carlyle Group
520 Madison Avenue
New York, NY  10022
Attn:  Stephen Wise
Fax:  (212) 813-4888
E-mail:  steve.wise@carlyle.com

and

Hellman & Friedman LLC
One Maritime Plaza, 12th Fl.
San Francisco, California 94111

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000605

Attn:  Arrie Park
Fax:  (415) 788-0176
E-mail:  apark@hf.com

and

Latham & Watkins LLP
555 11th Street, NW, Suite 1000
Washington, DC  20004
Attn:  Daniel T. Lennon; David I. Brown
Fax:  (202) 637-2201
E-mail:  daniel.lennon@lw.com; david.brown@lw.com

and

Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, California  94304
Attn:  Rich Capelouto
Fax:  (650) 251-5002
E-mail:  rcapelouto@stblaw.com

(b)      If to any of the Carlyle Entities:

c/o The Carlyle Group
520 Madison Avenue
New York, NY  10022
Attn:  Stephen Wise
Fax:  (212) 813-4888
E-mail: steve.wise@carlyle.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
555 11th Street, NW, Suite 1000
Washington, DC  20004
Attn:  Daniel T. Lennon; David I. Brown
Fax:  (202) 637-2201
E-mail:  daniel.lennon@lw.com; david.brown@lw.com

(c)      If to any of the H&F Entities:

c/o Hellman & Friedman LLC
One Maritime Plaza, 12th Fl.
San Francisco, California 94111
Attn:  Arrie Park
Fax:  (415) 788-0176
E-mail:  apark@hf.com

105

MENNINGER_SUPP000606

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, California  94304
Attn:  Rich Capelouto
Fax:  (650) 251-5002
E-mail:  rcapelouto@stblaw.com

(d)      If to any of the Blue Spectrum Entities:

c/o Blue Spectrum ZA 2015, L.P.
Willow House
Cricket Square
George Town
Grand Cayman, KY1-1107
Attn:  The Directors of Procific, acting in its capacity as general partner of Blue
          Spectrum ZA 2015, L.P.
Fax:  (+1345) 949 8460
E-mail: private.equity@adia.ae

with a copy (which shall not constitute notice) to:

Private Equities Department
Abu Dhabi Investment Authority
211 Corniche St
PO Box 7106
Abu Dhabi
UAE
Fax: +971 2 415 2557
E-mail: private.equity@adia.ae

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
27 Floor, Al Sila Tower
Abu Dhabi Global Market Square
Abu Dhabi
UAE
Attn:  Mr. Gamal Abouali
Fax:  +971 2 412 1899
E-mail:  gabouali@cgsh.com

(e)      If to any of the GIC Entities:

c/o GIC

106

MENNINGER_SUPP000607

280 Park Ave, 9th Floor
New York, NY 10017
Attn:  W. Bradley Yale and Paul Yun
Fax:  (212) 856-2438
E-mail:  bradyale@gic.com.sg; paulyun@gic.com.sg

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attn:  Anthony J. Norris
Fax:  (212) 596-9090
E-mail:  anthony.norris@ropesgray.com

(f)    If to any of the Managers or any of the other Stockholders who become a party to this Agreement, to the address, facsimile number or email address set forth below its, his or her name on the signature page hereto or on the applicable Joinder Agreement

Section 11.8    *Governing Law; Consent to Jurisdiction.*

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to conflict of laws principles to the extent they would result in the application of any other Law).  The parties hereto agree that any suit, action or proceeding ("**Litigation**") seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal court located in the State of Delaware or any Delaware state court. Each of the parties hereto hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any such Litigation, the defense of sovereign immunity, any claim that it is not personally subject to the jurisdiction of the aforesaid courts for any reason, other than the failure to serve process in accordance with this Section 11.8(a), that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable law, that the Litigation in any such court is brought in an inconvenient forum, that the venue of such Litigation is improper, or that this Agreement, or the subject matter hereof, may not be enforced in or by such particular courts and further irrevocably waives, to the fullest extent permitted by applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction.

(b)    Each of the parties hereto irrevocably consents to the service of process out of any of the aforementioned courts in any such Litigation by the mailing of copies thereof by registered mail, postage prepaid, to such party at its address set forth in this Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail.

107

(c)    The parties hereto each expressly acknowledge that the foregoing waivers are intended to be irrevocable under the laws of the State of Delaware and of the United States of America; provided that consent by the parties hereto to jurisdiction and service contained in this Section 11.8 is solely for the purpose referred to in this Section 11.8 and shall not be deemed to be a general submission to said courts or in the State of Delaware other than for such purpose.

Section 11.9    *Waiver of Jury Trial*.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 11.9.

Section 11.10    *Headings*. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.11    *Consulting Services Agreement.*    Each Stockholder acknowledges and approves the Consulting Services Agreements, in the respective forms attached hereto as Exhibits A-1 and A-2, and the fees and other amounts to be paid thereunder.

Section 11.12    *Termination*.  This Agreement shall terminate only (i) by written consent of the Carlyle Sponsor, the H&F Sponsors, the Blue Spectrum Investor and the GIC Investor or (ii) upon consummation of a Change of Control Transaction.  Termination of this Agreement shall not relieve any party for the breach of any obligations under this Agreement prior to such termination.   Notwithstanding any such termination of this Agreement, Section 2.1(e),  Section 4.4(c)(iii),  Section 4.5(d),  Section 5.5,  Section 5.7,  Section 6.5, Section 7.4, Section 9.4, Section 11.16 and Article VIII shall survive any termination of this Agreement or the expiration or termination of any such provision.

Section 11.13    *Subsequent Acquisition of Shares*.  Any Shares or Options acquired subsequent to the date hereof by a Stockholder (including pursuant to any Employee Equity Arrangement) shall be subject to the terms and conditions of this Agreement and such securities shall be considered to be "Shares" or "Options," respectively, as such terms are used herein for purposes of this Agreement.

Section 11.14    *Manager Group Representatives*.  With respect to each Manager Group, the Applicable Employee (in such capacity, the "**Manager Group Representative**") for such Manager Group shall act as, and each member of such Manager Group hereby designates and appoints (and each Permitted Transferee of each such member of such Manager Group is hereby deemed to have so designated and appointed) such Manager Group Representative, as the sole representative of such Manager Group under this Agreement, with sole power and authority to exercise all rights of the members of the such Manager Group hereunder and to perform all such acts as are required, authorized or contemplated by this Agreement to be performed by any member of such Manager Group under this Agreement, including delivering any notice or granting any waiver or consent hereunder.  The other parties hereto are and will be entitled to rely on any action so taken or any notice given by such Manager Group Representative and are and will be entitled and authorized to give notices only to such Manager Group Representative for any notice contemplated by this Agreement to be given to any member of such Manager Group.  Each member of a Manager Group hereby acknowledges and agrees that the rights of the members of such Manager Group under this Agreement shall be exercised only by the Manager Group Representative with respect to such Manager Group on behalf of such members and no such members shall be separately entitled to exercise any such rights or to take any action required, authorized or contemplated by this Agreement by any member of such Manager Group. Each member of a Manager Group further acknowledges that the foregoing appointment and designation shall be deemed to be coupled with an interest and shall survive the death or incapacity of such member.  In the event of the death or permanent disability of the Applicable Employee for such Manager Group, a successor Manager Group Representative may be chosen by a majority of the Shares Beneficially Owned by the members of such Manager Group, provided that notice thereof is given by such new Manager Group Representative to the Company.  Without limiting the generality of the foregoing, with respect to each Manager Group, each member of such Manager Group hereby irrevocably makes, constitutes and appoints (and each Permitted Transferee of such member is hereby deemed to have so made, constituted and appointed) the Applicable Employee of such Manager Group (and each successor to such Manager Group Representative) the true and lawful attorney-in-fact of such member (or such Permitted Transferee), with full power and authority, for, on behalf of and in the name of such member (or such Permitted Transferee) to execute and deliver on behalf of such member (or such Permitted Transferee) any and all instruments, agreements, notices, consents and other documents that are necessary or advisable to exercise the rights and perform the acts contemplated by this <u>Section 11.14</u>.

Section 11.15    *Aggregation of Shares*. All Shares Beneficially Owned by a Financial Investor Group or a Manager Group shall be aggregated together for purposes of determining the rights or obligations of any member of such Financial Investor Group or Manager Group, or application of any restrictions to any member of such Financial Investor Group or Manager Group, under this Agreement, in each instance in which such right, obligation or restriction is determined by any ownership threshold.  Within (i) each Sponsor Investor Group, the applicable Sponsor, (ii) the Financial Investor Group comprised of the Blue Spectrum Entities, the Blue Spectrum Investor, (iii) the Financial Investor Group comprised of the GIC Entities, the GIC Investor, and (iv) each Manager Group, the applicable Manager Group Representative, in each case, may allocate the ability to exercise any rights of the members of such Financial Investor Group or Manager Group under this Agreement (including any rights to sell shares as an Eligible Tag-Along Stockholder, a Drag-Along Seller or as a Participating

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000610

Stockholder Seller or any rights to purchase Shares or Participation Securities pursuant to Section 4.3, Article VI or Article X and any right to sell Registrable Securities pursuant to Article V) in any manner among the members of such Financial Investor Group or Manager Group that such Sponsor, Blue Spectrum Investor, GIC Investor or Manager Group Representative, respectively, sees fit.

Section 11.16 *No Third Party Liability*.  This Agreement may only be enforced against the named parties hereto.  All claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the entities that are expressly identified as parties hereto; and no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of any party hereto (including any Person negotiating or executing this Agreement on behalf of a party hereto), unless party to this Agreement, shall have any liability or obligation with respect to this Agreement or with respect any claim or cause of action (whether in contract or tort) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including a representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement).

Section 11.17 *Consents, Approvals and Actions*.

(a)      If any consent, approval or action of the Carlyle Entities is required at any time pursuant to this Agreement, such consent, approval or action shall be deemed given if the record holders of a majority of the Shares held of record by the Carlyle Entities at such time provide such consent, approval or action in writing at such time.

(b)      If any consent, approval or action of the H&F Entities is required at any time pursuant to this Agreement, such consent, approval or action shall be deemed given if the record holders of a majority of the Shares held of record by the H&F Entities at such time provide such consent, approval or action in writing at such time.

(c)      If any consent, approval or action of the Blue Spectrum Entities is required at any time pursuant to this Agreement, such consent, approval or action shall be deemed given if the record holders of a majority of the Shares held of record by the Blue Spectrum Entities at such time provide such consent, approval or action in writing at such time.

(d)      If any consent, approval or action of the GIC Entities is required at any time pursuant to this Agreement, such consent, approval or action shall be deemed given if the record holders of a majority of the Shares held of record by the GIC Entities at such time provide such consent, approval or action in writing at such time.

(e)      If any consent, approval or action of the Managers is required at any time pursuant to this Agreement, such consent, approval or action shall be deemed given if the record holders of a majority of the Shares held of record by the Managers at such time provide such consent, approval or action in writing at such time.

041945-0274-16469-Active.21575798.1
CONFIDENTIAL

MENNINGER_SUPP000611

Section 11.18     *No Partnership*.  Nothing in this Agreement and no actions taken by the parties under this Agreement shall constitute a partnership, association or other co-operative entity between any of the parties or constitute any party the agent of any other party for any purpose.

111

MENNINGER_SUPP000612

# Summary of the Stockholders Agreement

The following is a general summary of the material terms of the Stockholders Agreement. This summary does not describe each of the provisions of the Stockholders Agreement and, accordingly, you should read the Stockholders Agreement carefully and in its entirety. Capitalized terms used herein but not otherwise defined will have the meanings assigned to such terms in the Stockholders Agreement. In the event of any conflict between this summary and the terms of the Stockholders Agreement, the terms of the Stockholders Agreement will control. Unless otherwise indicated, all section references contained herein refer to sections of the Stockholders Agreement.

For purposes of this summary, (i) the term "Carlyle Entities" refers to those affiliates of Carlyle that hold Company shares or options from time to time, (ii) the term "H&F Entities" refers to those affiliates of H&F that hold Company shares or options from time to time, (iii) the term "GIC Entities refers to those affiliates of GIC that hold Company shares or options from time to time, (iv) the term "Blue Spectrum Entities" refers to those affiliates of ADIA that hold Company shares or options from time to time, (v) the term "Sponsor Investors" or "Sponsors" refers collectively to the Carlyle Entities and the H&F Entities, (vi) the term "Financial Investors" refers collectively to the Sponsor Investors, the GIC Entities and the Blue Spectrum Entities, (vii) the term "Manager" refers to employees, consultants or independent directors that hold Company shares or options (and their permitted transferees) from time to time, and (viii) the term "Stockholders" refers collectively to the Financial Investors and the Managers.

## 1.    Board Representation and Action

The Board consists of up to eleven (11) directors and, subject to certain restrictions, may be increased or decreased by the Sponsors. Of such directors (subject to certain restrictions) up to:

- Three (3) directors are designated by H&F.

- Two (2) directors are designated by Carlyle.

- One (1) director is designated by GIC.

- One (1) director is designated by Blue Spectrum.

- One (1) independent director is designated by H&F.

- Two (2) independent directors are mutually agreed upon and designated by the Sponsors.

- One (1) director is the CEO.

The number of directors designated by H&F, Carlyle, GIC and Blue Spectrum, as the case may be, generally will be reduced consistent with the respective ownership positions of the H&F Entities, the Carlyle Entities, the GIC Entities and the Blue Spectrum Entities (as applicable) at that time.

MENNINGER_SUPP000613

Subject to limited exceptions, Board action requires the majority vote of directors, which majority must include: (i) at least one (1) Carlyle director for as long as Carlyle owns 50% or more of its initial equity stake in Eagle I and (ii) at least one (1) H&F director if (x) prior to an initial public offering ("**IPO**"), no other stockholder group owns more shares than H&F or (y) post-IPO, H&F owns at least 15% of the shares.

## 2.      Financial Investor Consent Rights

In addition to Board approval requirements (including, currently, one Carlyle Designated Director and one H&F Designated Director) for several actions of Eagle I as set forth in Section 2.3 of the Stockholders Agreement, the prior written approval of (i) the Carlyle Sponsor and the H&F Sponsor is also required for certain fundamental actions of Eagle I, as set forth in Sections 2.5(a) and 2.5(c) of the Stockholders Agreement and (i) the GIC Investor and the Blue Spectrum Investor is also required for certain fundamental actions of Eagle I, as set forth in Section 2.5(b) of the Stockholders Agreement.

## 3.      Restrictions on Transfer

Under the Stockholders Agreement, prior to the Applicable Transfer Date (i.e. the date following an IPO determined by the Board to be the Applicable Transfer Date with respect to the Managers), no Manager may transfer Shares or Options without the prior written consent of all Sponsors except for (i) transfers occurring in a public offering pursuant to registration rights included in the Stockholders Agreement, (ii) transfers effected pursuant to the exercise of Drag-Along Rights (discussed below) by the Sponsor Investors, (iii) transfers effected pursuant to the exercise of Tag- Along Rights (discussed below), (iv) transfers effected with respect to recapitalization transactions, (v) certain transfers to family members, trusts, heirs and certain estate planning vehicles and (vi) transfers pursuant to any Employee Repurchase Arrangement.

## 4.      Right of First Refusal

Subject to limited exceptions set out in Section 4.3 of the Stockholders Agreement, prior to an IPO, transfers of Shares by Stockholders (if such transfers are approved by the Sponsors) are subject to a right of first refusal of Eagle I or if Eagle I does not exercise, the Financial Investors (but in the case of the GIC Entities and the Blue Spectrum Entities only, solely to the extent a Sponsor Investor exercises) on a pro rata basis.

## 5.      Tag-Along Rights

Prior to the first anniversary of an IPO, in the event that any Sponsor Investor Group (the "**Stockholder Sellers**") proposes to transfer Shares to certain third party purchasers (the "**Proposed Transferee**"), then any Stockholder will have the right to participate in such transfer on a pro rata basis (the "**Tag-Along Right**") on the same terms and conditions as the Stockholder Sellers (any such Stockholder exercising a Tag-Along Right, a "**Tag-Along Seller**").  In the event that the terms of the sale to the Proposed Transferee become materially less favorable to a Tag- Along Seller (including a decrease in the per share price relative to the per share price in the Sale Notice), then the acceptance by the Tag-Along Seller of the offer in the Sale Notice shall be deemed revoked.  With respect to any Shares for which a Tag-Along Seller holds exercisable and vested but unexercised Options, to the extent that such Shares are to be sold pursuant to the Tag-

Along Rights, such Tag-Along Seller must exercise the relevant Option and transfer the relevant Shares (rather than the Option).

6.      **Drag-Along Rights**

Prior to an IPO, in the event that (i) the Sponsor Investors propose to transfer Shares to a third party purchaser (and such transaction or series of transactions constitutes a Change of Control Transaction) or (ii) an Approved Sale Proposal involving a Change of Control Transaction is approved pursuant to Section 9.2(c) of the Stockholders Agreement and the Sponsors exercise their rights pursuant to Section 4.5 of the Stockholders Agreement, then the applicable Sponsors will have the right (a "**Drag-Along Right**") to require each Stockholder to sell to such third party purchaser, on the same terms and conditions as apply to the Sponsor Investors exercising their Drag-Along Rights, that number of Shares equal to (i) the total number of Shares held by such Stockholder multiplied by (ii) a fraction, (A) the numerator of which is the total number of Shares to be sold by the Sponsor Investors in connection with such transaction or series of related transactions and (B) the denominator of which is the total number of the Shares collectively held by the applicable Sponsor Investors.  If required pursuant to the terms of any outstanding Options or the transaction giving rise to the Drag-Along Rights, each Stockholder must exercise the relevant Option and transfer the relevant Shares rather than the Option.  Notwithstanding the foregoing, Eagle I shall be permitted to cause outstanding Options to be treated pursuant to the transaction giving rise to the Drag-Along Rights in any manner as permitted by the terms on which such Options were granted.

7.      **Registration Rights**

    a. **Demand Registration**

At any time after (i) May 11, 2019, H&F may initiate and (ii) May 11, 2022 either Sponsor may initiate, in each case, Company efforts to consummate an IPO.  In addition, after (i) the earlier of the first anniversary of the IPO and such other date agreed upon by the Sponsors, the Sponsor Investors may and (ii) the second anniversary of the IPO, the GIC Entities and Blue Spectrum Entities may, in each case, request that Eagle I register all or any part of the registrable securities of Eagle I held by the Financial Investors in an underwritten public offering and Eagle I will use its best efforts to register such all securities, subject to certain restrictions; <u>provided</u>, that, (x) in the case of the GIC Entities and Blue Spectrum Entities, such request may only be exercised once by each such Financial Investor and (y) each registration pursuant to each such request should have a reasonably anticipated net aggregate offering price (after deduction of underwriter commissions and offering expenses) of at least $100 million.

    b. **Piggyback Registration**

If Eagle I at any time proposes to register any of its Equity Securities under the Securities Act (including in an IPO if, and only if, any of the Sponsor Investors are selling registrable securities in such IPO) and the registration form to be used may also be used for the registration of registrable securities owned by the Stockholders of Eagle I, Eagle I will give written notice to each Stockholder, who will then, subject to certain restrictions, have the right to request that any registrable securities held by such stockholder be included in the registration.  To the extent the

registrable securities included in the registration is limited (including if the underwriters advise Eagle I that marketing factors require a limitation), the number of securities to be included in the registration shall be allocated first to Eagle I and second to the Stockholders on a pro rata basis.

**8.      Indemnification**

Subject to certain limitations, Eagle I agrees to indemnify, to the extent permitted by law, each Stockholder participating in a registration pursuant to the Stockholders Agreement, the officers, directors, employees and similar persons of such stockholder and each person that controls such stockholder from liabilities resulting from certain untrue statements of material facts, omissions of material facts or violations of applicable laws. Subject to certain limitations, each Stockholder participating in a registration pursuant to the Stockholders Agreement agrees to indemnify, to the extent permitted by law, Eagle I, its directors, officers, employees and similar persons and each person that controls Eagle I from liabilities resulting from certain untrue statements of material facts in any registration statement, prospectus or preliminary prospectus, or any amendment thereof or omissions of material facts if such untrue statement is made in or such omission is omitted from any information furnished to Eagle I in writing by such Stockholder and stated to be expressly for use therein.

**9.      Rights to Repurchase Securities held by Managers**

In the event that (i) a Manager's employment is terminated, or (ii) a Manager materially breaches a restrictive covenant to which he/she is bound, Eagle I will have the right, in each case, but not the obligation, to repurchase any Shares or Equity Securities (including Options) of the Manager for up to one year following such termination (or, in the case of Options exercised for Shares, for up to one year after such exercise) or such breach. The purchase price in connection with such repurchase will be the fair market value of the Shares at the time of repurchase, unless the termination is for cause or the Manager materially breaches a restrictive covenant, in which case the repurchase price will be the lesser of the fair market value at the time of repurchase or the price paid to acquire the Shares. The Sponsors Investors, and only if the Sponsor Investors exercise, the GIC Entities and the Blue Spectrum Entities, have the right to repurchase a pro rata portion of such Shares of the Manager if Eagle I does not exercise its right to repurchase. The repurchase price may be paid in the form of cash, check or a promissory note with such terms as described in the Stockholders Agreement. Additionally, payment of the repurchase price may be delayed under certain circumstances as further described in the Stockholders Agreement, such as if such payment would violate the terms of, or negatively impact Eagle I's ability to make cash payments under, its existing debt.

**10.     Preemptive Rights**

Upon any issuance of new securities by Eagle I, subject to certain exceptions, each Financial Investor will have the right to purchase their pro rata share of such new securities.

**11.     Termination**

The Stockholders Agreement will terminate only (i) by written consent of the Financial Investors or (ii) upon the consummation of a Change of Control Transaction.

## 12.    Amendments

The Stockholders Agreement may be amended in a writing signed by Eagle I and the Sponsors; provided, that the consent of GIC and ADIA is needed (except if in connection with an exercise of Drag-Along Rights) if: (i) an amendment adversely and disproportionately affects them relative to the Sponsors, (ii) an amendment expressly adversely and disproportionately affects them relative to any other stockholder, (iii) there is any adverse amendment to the rights, restrictions on or obligations of GIC and ADIA under the "Corporate Governance",  "Transfer Restrictions", "Registration Rights", "Right of Participation", "Access and Information Rights", "Notice of Secondary Debt Purchases", "Corporation Status", "Indemnification" and "Amendment and Waiver"  sections of the Stockholders Agreement, (iv) there is an adverse amendment to the conditions under which GIC's or ADIA's rights in the Stockholders Agreement terminate and (v) an amendment creates a new obligation of or restriction on GIC or ADIA.  Prompt written notice of any amendment must be given to all Stockholders.

MENNINGER_SUPP000617

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Stockholders Agreement, dated as of May 11, 2017 and as it may be amended, restated or supplemented from time to time in accordance with its terms (the "**Stockholders Agreement**"), by and among (i) Eagle Holding Company I; (ii) Carlyle Partners VI Holdings II, L.P., Carlyle Partners VI, L.P., CP VI Coinvestment A, L.P. and CP VI Coinvestment B, L.P., (iii) Hellman & Friedman Capital Partners VII, L.P., Hellman & Friedman Capital Partners VII (Parallel), L.P., HFCP VII (Parallel-A), L.P., H&F Executives VII, L.P., Hellman & Friedman Capital Partners VIII, L.P., Hellman & Friedman Capital Partners VIII (Parallel), L.P., HFCP VIII (Parallel-A), L.P., H&F Executives VIII, L.P. and H&F Associates VIII, L.P., (iv) Blue Spectrum ZA 2015 L.P.; (v) Clocktower Investment Pte Ltd.; and (vi) any other Persons who became parties to the Stockholders Agreement pursuant to its terms.  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Stockholders Agreement.

By executing and delivering this Joinder Agreement to the Stockholders Agreement, the undersigned hereby (i) adopts and approves the Stockholders Agreement and agrees, effective commencing on the date hereof and as a condition to the undersigned's becoming the transferee or recipient of Shares or Options, to be bound by and to comply with the provisions of the Stockholders Agreement applicable to a Manager, in the same manner as if the undersigned were an original signatory to the Stockholders Agreement and (ii) acknowledges and agrees that the terms of the Stockholders Agreement constitute "Proprietary Information" (as such term is defined in the Proprietary Information and Inventions Agreement).

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the ____ day of _____, 2017.


NAME OF STOCKHOLDER**:**        _____


Signature: _____

Print Name: _____

Print Title: _____

Address: _____

_____

_____

Fax:    _____

E-mail: _____

**EAGLE HOLDING COMPANY I**
**2017 EQUITY INCENTIVE PLAN**
**STOCK OPTION AGREEMENT**

**GRANT NOTICE**

Unless otherwise defined herein, the terms defined in the Eagle Holding Company I 2017 Equity Incentive Plan, as the same has been or may be amended from time to time in accordance therewith (the "Plan"), shall have the same defined meanings in this Stock Option Agreement, which includes the terms in this Grant Notice (the "Grant Notice"), Appendix A attached hereto, and Appendix B attached hereto (collectively, the "Agreement").

You have been granted an Option to purchase Shares, subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Name of Optionee: | Lisa A. Menninger |
| Total Number of Shares Subject to the Option: | 25,660.00 |
| Exercise Price per Share | $27.086 |
| Grant Date: | July 24, 2017 |

Vesting Commencement Date: May 11, 2017

| | |
|---|---|
| Type of Option: | Non-Qualified Stock Option |
| Final Expiration Date: | 10th anniversary of Grant Date |
| Vesting Schedule: | This Option will vest and become exercisable in accordance with the vesting schedule set forth in Appendix A, depending on the classification of the Option as follows: |

| | | |
|---|---|---|
| | Time Options: | 12,830.00 Shares Subject to the Option |
| | Performance Options: | 12,830.00 Shares Subject to the Option |

Your signature below indicates your agreement and understanding that this Option is subject to all of the terms and conditions contained in the Agreement (including this Grant Notice and <u>Appendix A</u> and <u>Appendix B</u> to the Agreement) and the Plan. **ACCORDINGLY, PLEASE BE SURE TO READ ALL OF <u>APPENDIX A</u> AND <u>APPENDIX B</u>, WHICH CONTAIN THE SPECIFIC TERMS AND CONDITIONS OF THIS OPTION.**

**OPTIONEE**

**EAGLE HOLDING COMPANY I**

Lisa A. Menninger

Name: B. Judd Hartman
Title:  EVP General Counsel and
        Chief Administrative Officer

*[Signature Page to Stock Option Agreement]*

CONFIDENTIAL

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Stockholders Agreement, dated as of May 11, 2017 and as it may be amended, restated or supplemented from time to time in accordance with its terms (the "**Stockholders Agreement**"), by and among (i) Eagle Holding Company I; (ii) Carlyle Partners VI Holdings II, L.P., Carlyle Partners VI, L.P., CP VI Coinvestment A, L.P. and CP VI Coinvestment B, L.P., (iii) Hellman & Friedman Capital Partners VII, L.P., Hellman & Friedman Capital Partners VII (Parallel), L.P., HFCP VII (Parallel-A), L.P., H&F Executives VII, L.P., Hellman & Friedman Capital Partners VIII, L.P., Hellman & Friedman Capital Partners VIII (Parallel), L.P., HFCP VIII (Parallel-A), L.P., H&F Executives VIII, L.P. and H&F Associates VIII, L.P., (iv) Blue Spectrum ZA 2015 L.P.; (v) Clocktower Investment Pte Ltd.; and (vi) any other Persons who became parties to the Stockholders Agreement pursuant to its terms.  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Stockholders Agreement.

By executing and delivering this Joinder Agreement to the Stockholders Agreement, the undersigned hereby (i) adopts and approves the Stockholders Agreement and agrees, effective commencing on the date hereof and as a condition to the undersigned's becoming the transferee or recipient of Shares or Options, to be bound by and to comply with the provisions of the Stockholders Agreement applicable to a Manager, in the same manner as if the undersigned were an original signatory to the Stockholders Agreement and (ii) acknowledges and agrees that the terms of the Stockholders Agreement constitute "Proprietary Information" (as such term is defined in the Proprietary Information and Inventions Agreement).

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the 29 day of Aug. , 2017.

NAME OF STOCKHOLDER:   Lisa A. Menninger

Signature: Lisa A. Menninger

Print Name: Lisa A. Menninger

Print Title: ED, Lab, GCL

Address: 8 Waterford Circle
Dighton, MA 02715

Fax: _____

E-mail: lisa @ vectorforest.com