```
1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3    _____

4    LISA MENNINGER,

5         Plaintiff,                    Civil Action No.
                                        1:19-cv-11441-LTS
6         v.

7    PPD DEVELOPMENT, L.P.,

8         Defendant.

9    _____

10

11       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                            JURY TRIAL
13                            Day 1

14

15

                        Monday, March 20, 2023
16                          9:02 a.m.

17

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 13
22   One Courthouse Way
     Boston, Massachusetts

23

     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com

25
```

1                        **A P P E A R A N C E S**

2

     On behalf of the Plaintiff:
3
         HARTLEY MICHON ROBB HANNON, LLP
4        BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
         155 Seaport Boulevard
5        2nd Floor
         Boston, Massachusetts  02210
6        (617) 723-8000
         phannon@hmrhlaw.com
7        hwatson@hmrhlaw.com

8

9    On behalf of the Defendant:

10       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
         BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11       One Boston Place
         Suite 3500
12       Boston, Massachusetts  02108
         (617) 994-5700
13       rachel.mandel@ogletreedeakins.com
         patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25

1          **<u>TABLE OF CONTENTS</u>**

2

3          **TRIAL WITNESSES**

4

5    On behalf of the Government:                          <u>Page</u>

6    LISA A. MENNINGER

7          By Mr. Hannon                                   163

8

9

10                      **EXHIBITS**

11

12                                                    <u>Admitted</u>

13   Number 3                                             171

14

15

16

17                   **MISCELLANEOUS**

18

19                                                       <u>Page</u>

20   Preliminary Instructions by the Court               122

21   Opening Statement by the Plaintiff                   139

22   Opening Statement by the Defendant                   149

23

24

25

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE DEPUTY CLERK:  The United States District Court

4  for the District of Massachusetts is now in session, the

5  Honorable Leo T. Sorokin presiding.

6        THE COURT:  Please be seated.

7        THE DEPUTY CLERK:  Today is Monday, March 20, 2023,

8  and we're on the record in civil case number 19-11441, Lisa

9  Menninger vs. PPD Development, LP.

10        And would counsel please identify themselves for

11  the record.

12        MR. HANNON:  Good morning, Your Honor, Patrick

13  Hannon, along with Hampton Watson, on behalf of Dr.

14  Menninger, who is here with us as well.

15        THE COURT:  Good morning.

16        Good morning, Dr. Menninger.

17        MS. MANDEL:  Good morning, Your Honor.  Rachel

18  Mandel and Patrick Curran on behalf of Defendant PPD, and

19  with us is Deborah Ballweg of PPD.

20        THE COURT:  Good morning.

21        Good morning, Ms. Ballweg.

22        All right.  Anything to discuss?

23        MR. HANNON:  Nothing -- well, before I say

24  "Nothing," so just to note for the Court, at Thursday's

25  pretrial, we had noted there might be some objections to some

1    of the deposition transcript testimony for Mr. Mekerri early

2    this week.  We decided not to press those objections with

3    respect to Mr. Mekerri, which is why we didn't submit

4    anything for the Court to look at that.

5            THE COURT:  Perfect.

6            MR. HANNON:  And then, Your Honor, I'd also raised

7    an issue regarding jury instructions, whether or not we had

8    any separate instructions for federal versus state.  We filed

9    something this morning on that.

10           THE COURT:  I just saw you filed it, and I haven't

11   had a chance to really think about it, but I'll just tell you

12   what -- since I think you noted some differences on certain

13   issues between state law and federal law, and I didn't have a

14   chance to really dig into that yet.

15           But you can look at that, Ms. Mandel, and think

16   about it.

17           And in a big-picture way, what I was thinking about

18   would be assuming that I agree in the end that there is this

19   difference, like, between state law, and I think it was on --

20   partially on causation, and partially on adverse action, that

21   there are a couple ways you can think about -- or we can

22   think about addressing that in the jury instructions, short

23   of having a whole thing about the federal -- and a whole --

24   like one way to do it is -- I guess there's three ways.  One

25   is just instruct them on whatever is the lower standard, and

1    have that bind both.  You might not want -- the defendants

2    might want to do that, might not want to do that, and that's

3    fine.  That's just a choice.

4            The second way to do it is we could just ask like

5    two causation questions.  Another way for me to do it is I

6    could instruct on, like, the whole federal claim, have

7    questions on that, and say here's the state law claim, but

8    it's the same.  There's four elements, they're all the same,

9    except and these -- and then just there's not too much more

10   in the instructions, and then we could have separate, you

11   know, on the verdict form, separate questions, so something

12   like that.

13           All right.  Anything else?

14           MR. HANNON:  That's all, Your Honor.

15           THE COURT:  And so today, we'll pick the jury,

16   we'll go, I think, until 4:00.  Possibly -- I think probably

17   just 4:00.  It's tough for jurors to go more than two hours,

18   in my experience, and pay attention, and so if we're going to

19   take a break after two hours, then why are we going to go to

20   4:30.

21           And so your first witness will be?

22           MR. HANNON:  Dr. Menninger.

23           THE COURT:  Dr. Menninger.  All right.  And what --

24   did you have anything else you wanted to go over, Ms. Mandel?

25           MS. MANDEL:  No, Your Honor.  I let Ms. Belmont

1      know that there may be an issue that we need to resolve prior

2      to tomorrow about one of the contested exhibits, but some of

3      that will depend on what we hear from Mr. Hannon about who he

4      plans to call tomorrow.

5              THE COURT:  All right.  And did you all resolve how

6      you want to handle the sort of scheduling of either witnesses

7      who both of you want to call, if you will, quote, call, or

8      the witnesses who might not be available until next week?

9              MR. HANNON:  So in terms of figuring out witness

10     availability, I think we're -- I was able to move one witness

11     around to this week.  So my expectation is we're probably

12     going to be good this week and not run out of witnesses.

13             THE COURT:  Meaning you'll be able to do all the

14     people you want to call.  And then on Monday, you'll call the

15     people who are basically from -- that they accepted service

16     for, who will be available next week.

17             MR. HANNON:  There's one other witness who is not

18     available this week, a third party.  She had a family issue.

19     So we have her penciled in for Monday morning at 9:00 a.m.

20     this week.  But, again, my expectation depends on how quickly

21     we go, but I'm hopeful that we're not going to run out of

22     witnesses this week.

23             THE COURT:  Okay.

24             MS. MANDEL:  And Your Honor, just on that note,

25     given this information about a witness that may be pushed

1    over to Monday, it is possible that we might want to raise

2    going a full day on Monday, if it turns out that it's going

3    to look like a very full day, because we also have witnesses

4    coming in from out of town, who we had scheduled tentatively

5    for Monday, so it's something that we can look at as the week

6    progresses, but I just wanted to raise the --

7            THE COURT:  Going next Monday all day meaning to

8    accommodate those people, so they don't have to stay over.

9            MS. MANDEL:  Yes.  And we can -- as we figure out

10   how this week plays out, I think we can address that further,

11   but I wanted to --

12           THE COURT:  So what I was planning to tell the --

13   that's helpful, first of all, because I like to give the

14   jurors advanced notice if they're going to stay in the

15   afternoon.

16           Is it still -- what I was going to tell them, and

17   tell me now if I shouldn't say this, was that the lawyers

18   have promised me that the case will get to the jury no later

19   than next Friday.  Getting to the jury means no later, in my

20   mind, than 3 or 4 o'clock Friday of next week, and then

21   retiring to deliberate, figuring that, you know, two hours of

22   that Friday would be taken up, at least, by two hours of

23   closing argument and charge.

24           Is that realistic?  Should I say that?  Are you

25   comfortable with me saying that to them?

1          MS. MANDEL:  I still think that is realistic.  I
2    just think we've had a little bit of shuffling around of how
3    that looks, and that certainly might require doing a full day
4    at least next Monday, but I still think that would work best,
5    given the witnesses who are coming from out of town.
6          MR. HANNON:  And, yes, I'm very confident we'll be
7    done a week from Friday.
8          THE COURT:  Okay.  All right.  So I will tell them
9    we'll go 9:00 to 4:00 today, 9:00 to 1:00 every day, except
10   next Monday, because there's -- there might be out-of-state
11   witnesses, and it's possible we'll need to go all day just to
12   accommodate all them.  That will be 9:00 to 1:00, and 2:00 to
13   4:00.  And that all the other days will be 9:00 to 1:00,
14   they'll get it by next Friday, and then next Friday, or the
15   day -- or whenever they get it, I'll expect them to stay all
16   day for the deliberations and thereafter.  Okay.
17         Kellyann, do you know when?
18         THE DEPUTY CLERK:  They said between 9:30 and 9:45.
19         THE COURT:  Okay.  And do either of -- how long are
20   you going to be on openings?
21         MR. HANNON:  I'd say 15 to 20 minutes, Your Honor.
22         THE COURT:  Okay.
23         MS. MANDEL:  Same here, Your Honor.
24         THE COURT:  Okay.  All right.
25         MR. HANNON:  And maybe just one other thing,

1    Your Honor.  We had had discussion on Thursday at the

2    pretrial regarding some additional company names.

3              THE COURT:  Oh, right.

4              MR. HANNON:  And I apologize, I don't -- I should

5    have drafted something up to give to you.  I can do that on

6    the a piece of paper now and --

7              THE COURT:  You can just say the names, if you

8    want.

9              MR. HANNON:  That works, too.

10             Bristol Myers Squibb, GlaxoSmithKline.

11             THE COURT:  Wait.  Slow down.

12             Bristol Myers Squibb.

13             MR. HANNON:  GlaxoSmithKline, Gedeon Richter.

14             THE COURT:  That's a company, not a person?

15             MR. HANNON:  Correct.

16             THE COURT:  Yes.

17             MR. HANNON:  Clario, C-l-a-r-i-o, and Quest

18   Diagnostics.

19             THE COURT:  And these are companies -- it's not

20   whether they heard of them.  It's that they either worked for

21   them or have done business with them?  That's really what

22   we'd be looking for for those companies?

23             MR. HANNON:  I think that's good enough, yeah,

24   Your Honor.

25             THE COURT:  All right.  Okay.  And then if they

 1    came up, it would really be a question of do they have

 2    anything to do with PPD's lab business?

 3                 MR. HANNON:  I think that's right.  We're just

 4    going to be asking them what their involvement is, and I

 5    think, from that involvement, we'll be able to tell whether

 6    or not --

 7                 THE COURT:  That would be -- right.  So a Bristol

 8    Myers Squibb's salesperson, who goes to the hospitals in the

 9    West Coast, would come up, and we'd be done with him or her.

10                 MR. HANNON:  I think that's right.

11                 THE COURT:  Okay.  All right.

12                 Make sense to you, Ms. Mandel?

13                 MS. MANDEL:  Yes, Your Honor.  I think some of

14    these, from our standpoint, seem a little far afield, but if

15    we're going to ask the follow-up questions and make the

16    determination, that seems harmless.

17                 THE COURT:  All right.  Fine.

18                 And what time did you say?  9:30 or 9:45?

19                 THE DEPUTY CLERK:  Yeah.

20                 THE COURT:  Okay.  Then why don't you -- well,

21    we'll stand in recess and just be around.  And Ms. Belmont

22    will let you know when -- rather than us reconvening and

23    sitting here in silence with each other for 20 minutes,

24    she'll just let you know when they're coming -- when there's

25    a five minutes, so that you'll have notice that they're

1    coming up, and we'll reconvene.  So that we're here before

2    they come in.

3            All right.  Stand in recess.  Thank you.

4            (Court in recess at 9:12 a.m.

5            and reconvened at 9:41 a.m.)

6            THE COURT:  Whenever you're ready, Jim.

7            MR. MCALEAR:  Thank you, Your Honor.

8            (The venire enters the courtroom.)

9            THE COURT:  Good morning, ladies and gentlemen.  My

10   name is Leo Sorokin.  I'm one of the judges here at the

11   federal court.  And in a few moments, we're going to be

12   picking from among you a group of people to serve as jurors

13   in the case that we have slated for trial here today.  And

14   along the way, I'll tell you about how we're going to pick

15   the jurors, and I'll tell you about the case and the schedule

16   and all of those things that you're wondering about.  But

17   before we get to that, I want to talk to you briefly about

18   jury service.  And I know that it's something that some

19   people dread and -- but it is one of the most fundamental

20   parts of our system of justice in the United States.  And I

21   know that each of you probably has a job or school to attend

22   or family responsibilities to deal with, or any number of

23   other ways that you were planning to spend today before you

24   were called to the federal courthouse for jury service.  And

25   I'm probably not overstating it to say that I doubt very many

1    of you this morning, when you were having breakfast, were

2    thinking, wow, can't wait to go to the federal court for jury

3    service.  Just what I really wanted to do this Monday

4    morning.  And so I understand that.  You have your own lives

5    and your own things that you want to do in your life, and

6    your own things that you need to do, and your obligations,

7    and the like.  But you, nonetheless, came today.  And just by

8    coming here today, you have already begun to do something,

9    not for yourself, but for your country.  And I know that

10   sounds like an overstatement, but it's not.  It's the truth.

11   And so on behalf of the Court, I thank you for coming.

12          Each of you is a citizen of the United States, and

13   as a citizen, we have both rights and responsibilities.  One

14   of the rights we have is the right to a jury trial.  Our

15   constitution guarantees that every person in the United

16   States has the right to a trial by an impartial jury of his

17   or her peers, to resolve disputes that arise with other

18   people or companies.  And that right means that, in every

19   civil case, and the case that we have here today is a civil

20   case, the question of whether the person bringing the lawsuit

21   has proven his or her claims against the defendant is

22   determined by a fair and impartial cross-section of citizens

23   drawn from the community, people like yourselves, each of

24   whom brings his or her own individual perspective and life

25   experience to your jury service.

1    But with that right to a jury trial, a right which

2    we all have, comes a related responsibility.  We have all the

3    responsibility to serve on a jury.  And by serving on juries,

4    we give life to the guarantee in the constitution, to the

5    right -- to the constitutional right to an impartial jury of

6    citizens drawn from all walks of life.  And without citizens

7    like yourselves, willing to honor their responsibility to

8    serve on a jury, courts like this court would be unable to

9    ensure that the Constitution's promise of a jury trial is

10    fulfilled for every citizen.  That is why jury service

11    applies to every citizen, and that is why it is so important,

12    and that's why you're here today.

13    So first, I'd like to ask each of you to promise to

14    do something, not really for me, but for your country, and

15    for every person in it, including the parties to this case.

16    And what I'm asking you to promise is simply to try to be

17    willing to serve as a fair and impartial juror in this case,

18    if that's something that you're able to do.

19    Is that something that you can each promise?

20    (Affirmative responses.)

21    THE COURT:  Okay.  Thank you.

22    So let me tell you first who is here, who works for

23    the Court, and then we'll go through the jury selection

24    process.

25    Ms. Belmont is what's called my courtroom deputy

1    and she's responsible for -- if you're on the jury, she'll be

2    managing the jury, and bringing them in and out of the

3    courtroom.  She keeps track of all the exhibits, she swears

4    in all the witnesses, and she does a variety of other things

5    not in the courtroom to keep this case and other cases

6    running on track.

7         To my left, your right, is Ms. Lopez here.  You see

8    her typing away.  Ms. Lopez is a court reporter.  She takes

9    down everything that's said in the courtroom.  You might

10   think that if you're on the jury, oh, good, we'll get a

11   transcript.  We don't have to remember anything.  Uh-uh.  It

12   doesn't have to work that way.  We won't have -- it takes a

13   lot of time and effort for Ms. Lopez to transform the notes

14   that she's taking into a final transcript, so if you're on

15   the jury, you won't have that, because it won't be done.  And

16   so if you're on the jury, you'll need to pay attention to

17   what happens in the court room, and that's why there's a

18   number of people on the jury, because it's your collective

19   memory that helps to remember everything that happened.

20        Further to my left, you see three young women, and

21   they are my law clerk and interns, who help me do what I do.

22   My law clerk and the interns are people in law school who

23   also help me do what I do, and they're also learning.  So

24   they're here for those purposes.

25        So in a minute, Ms. Belmont -- or now, maybe,

1    Ms. Belmont, why don't you administer the oath to the jurors.

2              THE DEPUTY CLERK:  Jurors, if you can please stand

3    and raise your right hand.

4              (The venire was duly sworn.)

5              THE COURT:  Please be seated.

6              So ladies and gentlemen, that oath is just an oath

7    to promise to tell the truth.  What's going to happen now --

8    let me give you an overview of what we're going to do between

9    now and when we're done with jury selection.

10             First, I'm going to ask you a series of questions.

11   And when I ask you a question, if the answer is yes, hold up

12   your juror number that you each have, and wait until I say

13   your number.  When I say your number, it means I have noted

14   that you said yes to that question.  And so that's part one.

15   I'll just ask a series of those questions.  All right?  And

16   the purpose of those questions is, some of them, I'll need to

17   ask you follow-up questions that are about the schedule and

18   about the case, whether you could be fair in this particular

19   case.  And there's no problem saying yes, and in any event,

20   that's part one.

21             Then when we're done with asking that, Ms. Belmont

22   will take you all into an adjacent courtroom, and you'll just

23   be able to sit there, read, talk to each other, whatever you

24   want to do.  And I'll call into the courtroom, in here,

25   anybody who said yes to a question, to ask some follow-up

1    questions.  And the purpose of that, for example, the

2    schedule, maybe the schedule is a problem for you for some

3    reason about the case, and I'll find out about that, and

4    we'll talk about that.

5         So that's part 2.  And at the end of that process,

6    maybe some of you will get excused, because this isn't a jury

7    that you can serve on because of schedule or some other

8    reason.  And otherwise, when we're done with that process,

9    I'll bring all of you back into the courtroom.  And then from

10   those people in the courtroom, who haven't been excused,

11   we'll pick the jury.  And we'll put people in the jury box,

12   and I might ask you to say just what you do for work, and

13   then the next stage is the lawyers have an opportunity, if

14   they wish, to strike individual people on their own.

15        And so we'll go through that process.  It doesn't

16   take too long.  And when we're done with that, we have a

17   jury.  And then everybody else, I'll send you -- I don't

18   think we have another trial today, so we'll send you

19   downstairs to go on your way.  And then we'll begin the

20   trial, and those of you who are on the jury, I'll then have

21   more explanations for you.

22        And just so you understand, that's the process.

23   And let me tell you why I put you all in another courtroom.

24   We used to do this at sidebar, and you'd all sit here, and

25   the problem with you all sitting here is you have to be

1    quiet.  And, like, if I were you, I wouldn't really like

2    that.  And so if you go in another courtroom, you can read,

3    you can talk to each other.  It's a little freer.  And then

4    the person who comes in here, it's a little easier -- it's

5    the last of our COVID precautions, it's like we're all

6    farther away from each other, and it works better.

7            So that's the process.  All right?

8            So first, let me tell you about this case.  This is

9    a civil case.  The plaintiff in a civil case is the person

10   bringing the lawsuit.  In this case, the plaintiff is

11   Dr. Lisa Menninger.  The defendant is the party being sued.

12   Here, the defendant is a company called PPD Development, LP,

13   which I will refer to as PPD for short.  Dr. Menninger is a

14   former employee of PPD.  PPD hired Dr. Menninger in August

15   2015 to work as the executive director of its global central

16   labs based in Kentucky.  In January of 2018, Dr. Menninger

17   disclosed to PPD that she suffered from social anxiety

18   disorder and panic disorder, and she requested that PPD

19   provide her with accommodations for those conditions.

20           She alleges that, thereafter, PPD failed to provide

21   her with reasonable accommodations for her medical condition,

22   discriminated against her on the basis of her condition, and

23   retaliated against her for requesting accommodation.

24           Dr. Menninger further alleges that PPD's actions

25   severely exacerbated her preexisting medical conditions,

1    caused her to develop major depression, and ultimately render

2    her unable to work.  She seeks to recover for the lost wages

3    and emotional distress that she alleges that she suffered as

4    a result of PPD's alleged actions.

5         PPD denies Dr. Menninger's allegations.

6         At the conclusion of the case, the jury will

7    resolve this dispute.

8         So, first, do any of you know me or any of the

9    court staff that I have pointed out?  No.

10        All right.  So as I've said, the plaintiff, or the

11   person bringing the lawsuit is Dr. Menninger, and she is

12   represented by two lawyers, one of whom is Mr. Hannon.

13        Mr. Hannon, if you'd introduce your client and your

14   co-counsel.

15        MR. HANNON:  Sure thing.  Good morning.  My name is

16   Patrick Hannon, I'm with a law firm called Hartley Michon

17   Robb Hannon.  That's my colleague, Hampton Watson, and this

18   is our client, Lisa Menninger.

19        THE COURT:  All right.  Thank you.  Do any of you

20   know, or are you related to Dr. Menninger?  No.

21        And do any of you know the two attorneys

22   representing Dr. Menninger or are any of you related to them?

23   No.

24        All right.  And have you ever been employed by or

25   done business with either of the lawyers or their law firm?

1    No.

2              All right.  The defendant, I said, is PPD

3    Development.  That's a company.  And they are represented by

4    Attorney Mandel and her colleagues.  And Attorney Mandel, if

5    you'd introduce them and your client representative.

6              MS. MANDEL:  Good morning, I'm Rachel Mandel with

7    the law firm Ogletree Deakins Nash Smoak & Stewart.  Here

8    with my partner Patrick Curran and our paralegal Miranda

9    Almand, and we are here, as well, with Deborah Ballweg from

10   PPD.

11             THE COURT:  All right.  Do any of you know PPD,

12   Bellweg, or have you done business with PPD?  No.

13             Do any of you know Ms. Mandel or her colleagues or

14   have you related to them or have you done business with their

15   law firm?  No.  All right.

16             Next, I want to read to you, first, a list of

17   people who may testify in this case, and then I will ask you

18   if you are related to or know any of these possible

19   witnesses:

20             Deborah Ballweg of Hollandale, Wisconsin;

21   Christopher Fikry, F-i-k-r-y, of Wilmington, North Carolina;

22   Christopher Clendening, C-l-e-n-d-e-n-i-n-g, of Cleeves,

23   Ohio; Brent McKinnon of Pittsburg, Texas; Chad St. John of

24   Liberty Township, Ohio; Hacene Mekerri, M-e-k-e-r-r-i, of

25   Singapore; Tonya Hart of Bend, Oregon; Mason Menninger of

1  Bend, Oregon; Dr. Marianna Kessimian, K-e-s-s-i-m-i-a-n, of

2  Providence, Rhode Island; Dr. Martin Kelly, of Westport

3  Point, Massachusetts; William Scally of Newburyport,

4  Massachusetts; Dr. Alicia Burbano, B-u-r-b-a-n-o, of

5  Albuquerque, New Mexico; Dr. Paul Summergrad of Newton,

6  Massachusetts; and Bruce Jonas of Nesconset, New York.

7          Do any of you know any of these witnesses or are

8  you related to them?

9          All right.  Number 4.  Thank you juror number 4.

10  Thank you.

11          Next I'm going to read you a list of companies, and

12  at the end, I'm going to ask you whether you -- these are

13  companies that you may hear testimony about, and so if you

14  work for any of these companies or if you do business with

15  these companies, not if you've heard of them.  Okay?  Not if

16  you once purchased their product, but if you've actually done

17  business with them in a different way, or if you're employed

18  by them, then raise your hand.

19          Bristol Myers Squibb, GlaxoSmithKline, Gedeon

20  Richter, Clario, or Quest Diagnostics.

21          All right.  So I have juror number 9, juror number

22  10, juror number 11, juror number 19 -- I have 9, 10, and 11.

23  Juror number 21, juror number 27, juror number 38, and juror

24  number 44.  Okay.

25          All right.  Have any of you heard or read anything

1     about this case, or do you know anything about the case,

2     other than what I've told you?

3                Juror number 29.

4                Do you have any interest in the outcome of this

5     case?  No.

6                If you look around, just at each other, do you

7     see -- do you think you know what any -- anyone else in the

8     jury pool?  No.  All right.

9                Have you, a close family member, or a close friend

10    ever been -- worked in the field of psychology, psychiatry,

11    or social work?

12               All right.  That's juror number 18, juror number 6,

13    juror number 36, juror number 21, juror number 4, juror

14    number 24, juror number 26, juror number 32.

15               Okay.  Have you, a family member, or a close friend

16    ever been fired from a job for reasons that you believe were

17    unfair or discriminatory, been accused of discriminating or

18    retaliating against someone in the workplace, been involved

19    in an investigation at work, either as a -- as management, a

20    witness, or employee, or requested an accommodation for a

21    disability at your workplace?

22               Juror number 18, juror number 21, juror number 6,

23    juror number 9, juror number 44.  Okay.

24               Have any of you ever worked in a supervisory

25    position, where you received or considered an employee's

1    request for accommodation of their disability?

2            Juror number 3, juror number 6, juror number 21,

3    juror number 38, juror number 40, juror number 25, juror

4    number 30.

5            Have any of you formed an opinion about this case,

6    either based on things that you knew or heard before coming

7    here today, or based on what I've told you so far?  No.

8            THE DEPUTY CLERK:  6.

9            THE COURT:  Oh, 6.  All right.  Sorry.

10           Anyone else?  No.

11           All right.  Have any of you expressed an opinion

12   about this case, or has anyone expressed an opinion to you

13   about this case?  No.

14           Are you aware of any bias, prejudice, or other

15   reason that would make it difficult for you to serve as an

16   impartial judge of the facts of this case?

17           All right.  Juror number -- juror number 6, juror

18   number 21, juror number 22, juror number 26, juror number 27,

19   and juror number 31.

20           Is there anything about the facts or the parties in

21   this case that might make it difficult for you to be fair and

22   impartial?  Only raise your hand as to this question -- if

23   you raised your hand to the last question, you don't need to

24   raise your hand to this question, but if you didn't to the

25   last question and if it's yes, then tell me.

1              All right.  So juror number 19, juror number 25,

2      and juror number 15.

3              Is there anything about the fact that the plaintiff

4      is seeking money damage for her suffering and losses that

5      might make it difficult for you to fairly and impartially

6      decide this case?

7              Juror number 20.  Okay.

8              Jurors must decide cases based solely on the

9      evidence presented in the courtroom.  Jurors may not consult

10     the Internet.  Jurors may not investigate any matter relating

11     to this case in any way.

12             Will any of you have any difficulty following that

13     principle of law?  No.

14             It is for jurors to decide what the facts are in

15     the case and to return a verdict applying the law as the

16     Court explains it.  Jurors in this case will have to follow

17     the law as I describe it, whether or not the jurors

18     personally agree with the law.

19             Will any of you have difficulty following that

20     legal principle?  No.

21             Have you, a family member, or a close friend ever

22     made a claim for or been a witness in a lawsuit similar to

23     this one or any civil lawsuit?  No.

24             THE DEPUTY CLERK:  18.

25             THE COURT:  Juror number 18.  Okay.

1            Have any of you served in any court as a juror in a

2    criminal or civil case, or as a member of a grand jury, and

3    such service might make it difficult for you to serve as a

4    fair and impartial juror in this case?  No.

5            Do any of you have any difficulty hearing?

6            All right.  Juror number 14 and juror number 23 and

7    juror number 26.  I'm sorry, there was one more besides juror

8    number 26, in response to the hearing question, I have juror

9    number 23 and juror number 14.  Was there anyone else?  No.

10   Okay.

11           Do any of you have any difficulty understanding the

12   English language?

13           Juror number 16.

14           Anyone else?  No.

15           Do any of you have any physical disability or are

16   any of you taking any medication that might affect your

17   ability to concentrate or sit comfortably during the course

18   of the trial?

19           Juror number 6, juror number 23, juror number 26.

20   Okay.  All right.

21           Let me tell you about the schedule in this case.

22   So the schedule will be as follows:  Today, we'll go from

23   now, and the jury will go until 4 o'clock today, with a lunch

24   break, and so forth.  Each day thereafter, the trial will

25   be -- will start promptly at 9:00 a.m., and will end each day

1    at 1:00 p.m.  So 9:00 to 1:00, so you'll have your afternoons

2    for work or life or whatever else.  We'll follow that

3    schedule for the whole trial.

4            The jury will receive this case for deliberations,

5    the lawyers have promised me, no later than Friday of next

6    week.  So this week and next week.  So two weeks.  And the

7    jury will receive the case no later than Friday of next week.

8            You should expect, if you're on the jury during the

9    trial, we'll start every day promptly at 9:00 a.m.  this week

10   we'll finish every day by 1:00 p.m.  When I say 1:00 p.m., I

11   mean 1:00.  I won't keep you until 1:15 or 1:30.  It will be

12   1 o'clock each day.

13           Next week, it's possible on Monday that we would go

14   from 9:00 to 1:00 and 2:00 to 4:00, because on that Monday,

15   there will be some witnesses who are coming from out of

16   state, and we might go a little longer, so that they don't

17   have to stay overnight in Boston.  But the other days next

18   week will be 9:00 to 1:00 each day.  And once you receive the

19   case for deliberations, then I would ask you to stay all day

20   until you complete -- until you reach a verdict.

21           So with that, that's the schedule that the Court --

22   that each day, and that's the duration of this trial.

23           So I'm about to ask you about whether this would be

24   a serious hardship, and to give you an idea about what I mean

25   by serious hardship, the fact that you have a job that you'll

1    miss to serve on the jury is not normally a hardship.

2    Everyone has a responsibility to serve on a jury when called,

3    no matter whom they are.  A scheduling conflict rarely

4    constitutes a hardship.  Meetings or appointments that can be

5    changed, postponed, or sometimes missed are not hardship.

6    Scheduling hardship is only if it's something that is out of

7    the ordinary that conflicts with the trial schedule that

8    can't be postponed.

9            I'll give you two, three examples that are

10   automatic, pretty much.  Your wedding is this coming weekend,

11   no problem, you're out.

12           You have a prepaid vacation with nonrefundable

13   tickets, no problem.

14           You have nonelective surgery, you're out.  Okay.

15           Those are the kinds of things.

16           So with those reminders and caveats in mind, does

17   the schedule for this case pose a serious hardship for any of

18   you?

19           All right.  Juror number 1, juror number 4, juror

20   number 17, juror number 18, juror number 20, juror number 6,

21   juror number 37, juror number 25, juror number 28, juror

22   number 31, juror number 32, juror number 46.  All right.

23           Last question.  Is there anything that I have not

24   asked you about that might make it difficult for you to

25   decide this case fairly and impartially, based on the

1    evidence presented in court and the context of the Court's
2    instructions to you on the law?
3                    Juror number 26.
4                    Anyone else?  No.
5                    Okay.  So we're done with the first part.
6                    Second part I told you about, all of you are going
7    to go in another courtroom right next door.  Talk about
8    anything that you want except this case.  And I'll be calling
9    you in one by one to talk to me.
10                   So you understand, no one will serve on the jury
11   who raised their hand in response to a question, unless
12   they've spoken with me individually.  It will always happen
13   before you're put in the jury box as a possible juror.  So
14   don't worry about that in terms of how we do the process.
15                   So I'd ask all of you, except juror number 1,
16   because I have to talk to you, so you might as well to stay
17   here, to go in the other room with Ms. Dore.  All right.
18                   (The venire exits the courtroom.)
19                   (Juror number 1 present.)
20                   THE COURT:  And juror number 1, if you'd come up to
21   the witness box, right there.  Yes.  Just have a seat.
22                   You can remove that, as long as you speak loudly.
23                   You said you had a scheduling issue.  Tell me what
24   that is.
25                   THE JUROR:  I'm sorry?

```
1            THE COURT:  You said you have a scheduling issue?
2            THE JUROR:  I have a scheduling and my mother's on
3   hospice.
4            THE COURT:  I'm sorry, I couldn't hear you.
5            THE JUROR:  My mother's on hospice.
6            THE COURT:  Oh, I'm sorry.
7            THE JUROR:  And I do have a travel.  I don't have a
8   car.  I borrowed a car today.
9            THE COURT:  I see.  Where do you live?
10           THE JUROR:  Newburyport, Mass.
11           THE COURT:  Oh, I see.  All right.
12           THE JUROR:  I mean, I can come in, but I'd have to
13   take the bus if I got selected.
14           THE COURT:  And would that get you here?
15           THE JUROR:  That would take me into South Station.
16           THE COURT:  Right.  And could you do that to get
17   here by 9:00 a.m.?
18           THE JUROR:  Depending on -- I would have to see
19   what time it left in the morning.  I'm not sure what the
20   schedule is.
21           THE COURT:  Is your mother at hospice at home with
22   you?
23           THE JUROR:  No, she's in a nursing home, in the
24   hospice care right now.
25           THE COURT:  In or near Newburyport?
```

```
1              THE JUROR:  I'm sorry?
2              THE COURT:  In or near Newburyport?
3              THE JUROR:  It's in Newburyport.
4              THE COURT:  Well, let me just ask you, in terms of
5    the schedule, I guess the question that I'd really ask just
6    you, and I'll follow what you tell me, do you feel like given
7    that your mom's in hospice, you could be here -- I understand
8    if something happens in the course of the two weeks, that's
9    different.  I'm not asking you for a promise about that.  But
10   do you think you could -- it's an important case to
11   Dr. Menninger, it's an important case to PPD.  And so do you
12   think while -- if you were on the jury, you could be here and
13   be here each day and concentrate, and given the situation
14   you're in right now, or do you feel like, honestly, this
15   isn't the time for you?
16             THE JUROR:  It would be very hard.
17             THE COURT:  Okay.  Fine.  I think I will excuse you
18   from service on this jury.  All right.
19             THE JUROR:  Thank you.
20             THE COURT:  I wish you good luck with your mother.
21             Ma'am, you just have to get your card from
22   Ms. Belmont.
23             Number 3.
24             (Juror number 1 not present.)
25             (Juror number 3 present.)
```

```
 1                THE COURT:  If you'd come right in to the witness
 2   box.  Yeah, you can put your things down or bring them with
 3   you, whatever you prefer.
 4                Good morning.
 5                THE JUROR:  Good morning.
 6                THE COURT:  So you answered yes to one question, I
 7   think, about having worked in a position as a supervisor
 8   where you received a request for accommodation?
 9                THE JUROR:  Yes.
10                THE COURT:  Can you tell me about that?
11                THE JUROR:  I worked as a manager at a bank, and
12   one of my employees had some kind of condition -- I let HR
13   deal with it, but whatever this person requested, I would
14   just vet it through HR.
15                THE COURT:  All right.  And anything about that
16   experience -- how did that experience work out for you?
17                THE JUROR:  For me, personally.  Fine.  I tried to
18   be as accommodating to the person.  He wasn't terminated, but
19   he left on his own --
20                THE COURT:  Accord.
21                THE JUROR:  His own means and terms and such.
22                THE COURT:  I see.  Right away or some time later?
23                THE JUROR:  He worked for me for maybe, like, six
24   months or so, and you know, he made his conditions aware to
25   us maybe within a month of hiring.  And again, towards the
```

```
 1    six month, he left --
 2                THE COURT:  He decided he wanted to leave.
 3                THE JUROR:  Yeah.
 4                THE COURT:  And did any lawsuit or claim or
 5    settlement arise from that?
 6                THE JUROR:  Not that I'm aware of.  HR wouldn't
 7    have told me if that would have been the case, anyways.  At
 8    least I don't think they would have.
 9                THE COURT:  I see.  Do you feel like you could be
10    fair and impartial in this case?
11                THE JUROR:  Yes.
12                THE COURT:  Okay.  Do either of you have any
13    follow-up questions?
14                THE JUROR:  Just briefly.
15                MR. HANNON:  Just briefly.  Was there any claim or
16    allegation by the employee that you had acted improperly at
17    all?
18                THE JUROR:  I don't believe so, no.
19                MR. HANNON:  That's all I got.
20                THE COURT:  All right.  Anything?
21                MS. MANDEL:  No, thank you.
22                THE COURT:  All right.  Thank you very much.
23                (Juror number 3 not present.)
24                THE COURT:  Just a reminder, I assume you don't
25    have a challenge to this person, but if you want to make a
```

1    challenge for cause, do it before the next person gets in the

2    box.

3            MR. HANNON:  I'll make a challenge for cause,

4    Your Honor, just for the record.  I think he has life

5    experience that's directly on par with this, and despite his

6    attestation that he thinks he would be able to set aside his

7    own biases, he doesn't necessarily know the facts of this

8    case, and I think that once he does, it's going to mirror his

9    own personal life experience too greatly.

10           THE COURT:  That's overruled.  I think his

11   experience was -- I mean, that he had an experience with

12   someone who made an accommodation, he -- he heard about it,

13   he passed it on to HR.  As far as he was aware, there was no

14   allegation that he did anything wrong.  There was no claim.

15   The person didn't make any allegation against him.  He was

16   not aware of any claim or allegation against the company, so

17   he has some knowledge and experience with it, but not very

18   much.  And he seemed to me to think that he could be fair

19   and -- he said he could be fair and impartial.  And I don't

20   see any reason why He can't be.  So your objection is noted

21   for the record.

22           Sam, next.

23           (Juror number 4 present.)

24           THE COURT:  Good morning.

25           THE JUROR:  Good morning.

```
 1              THE COURT:  I think you said yes to a couple of
 2   questions.  I'll start with the schedule question.
 3              THE JUROR:  Yes.
 4              THE COURT:  Tell me about the schedule issue for
 5   you?
 6              THE JUROR:  Next Thursday my husband and I were
 7   leaving for California, because he's having an ablation done,
 8   a cardiac ablation the following week, so two weeks after --
 9   because he wanted to see --
10              THE COURT:  So you're going on vacation next
11   Thursday?
12              THE JUROR:  Yeah.
13              THE COURT:  Okay.  I'll excuse you from -- and you
14   want to do it because he's then coming back to have some sort
15   of medical procedure and you want to do it before --
16              THE JUROR:  Cardiac ablation, yeah.
17              THE COURT:  Okay.  Fine.  I will excuse you from
18   this case.
19              THE JUROR:  Okay.  Thank you.
20              (Juror number 4 not present.)
21              THE COURT:  Sam, juror number 6.
22              (Juror number 6 present.)
23              THE COURT:  Right up here in the witness box.
24              Good morning.
25              THE JUROR:  Good morning.
```

```
 1              THE COURT:  So you answered yes to a number of
 2    questions.  I'll start with the last one, the schedule.
 3              THE JUROR:  Oh, yeah.  I'm not sure this will
 4    count, but I have my own business, a private practice.
 5              THE COURT:  Therapy practice?
 6              THE JUROR:  Yes, that's right.  So it would be a
 7    significant financial hardship for me to serve for two weeks.
 8              THE COURT:  You see patients when and how often?
 9    Every day 9:00 to 5:00.
10              THE JUROR:  Pretty much.  9:00 to 5:00, 10:00 to
11    6:00, yeah.
12              THE COURT:  I see.  Okay.  So you'd have to -- like
13    to do this, some people would miss appointments and some
14    people you would have to reschedule like until later hours,
15    essentially, if you could?
16              THE JUROR:  That's correct, yes.
17              THE COURT:  Okay.
18              THE JUROR:  But for many of them likely would not
19    be seen for some of those days.
20              THE COURT:  And most of your patients, are you
21    seeing them three times a week, once a week, once a month.
22              THE JUROR:  Most of my patients, in my private
23    practice, are weekly.
24              THE COURT:  Do you work other than in your private
25    practice?
```

1              THE JUROR:  I do.  I work in a clinic, an HIV

2    clinic, part time.

3              THE COURT:  And do you do that -- what's the

4    schedule for that?

5              THE JUROR:  That is 8:45 to 5:00, every day, or for

6    three days a week, Monday, Tuesday, Wednesday.

7              THE COURT:  So Monday, Tuesday, Wednesday, you are

8    in the clinic and Thursday, Friday, you see patients in

9    private practice.

10             THE JUROR:  Yeah.  Wednesday, Thursday, Friday, I'm

11   in my private practice.  That's correct.

12             THE COURT:  Okay.  We'll circle back to that in a

13   minute.

14             You also said that physical disability or a

15   medication that might make it hard to sit?

16             THE JUROR:  That's right.  I have ADHD.  I have a

17   very hard time sitting still and paying attention.

18             THE COURT:  All right.  And what do you do during

19   the therapy hour to sit still?

20             THE JUROR:  Shockingly, I'm able to focus much

21   easier when I'm with my clients.

22             THE COURT:  So here, the schedule is 9:00 to 1:00.

23   We usually take a break at 11:00 for about 15 or 20 minutes,

24   and then we come back.  So it's sort of two hours and then

25   call it an hour and three quarters.  And sitting in the jury

1    box right across from you.  And then during that time, you're

2    free to, whenever you want, stand up and stretch, during

3    questions, answers.  That's totally fine.  And then there are

4    a couple of days, today we'll probably go -- we'll go until

5    4:00, and there might be one other day where we come back in

6    the afternoon, and we'll do 2:00 to 4:00.  Knowing yourself

7    and knowing that your ability to focus and sit still, that

8    kind of schedule, how would that be?

9          THE JUROR:  I think it would be challenging, but

10   maybe I could manage it.

11         THE COURT:  Okay.  You said yes to a number of

12   other questions, essentially, some related to -- well, you're

13   a therapist, you obviously answered that question.  And you

14   had experience with considering a request for an employee for

15   an accommodation?

16         THE JUROR:  Uh-huh.  That's right.

17         THE COURT:  Tell me about that.

18         THE JUROR:  I as a supervisor at an eating disorder

19   residential program, and so I would review any of the

20   employees that I worked with, that were my supervisees, if

21   they had requests for disability accommodations.

22         THE COURT:  And did any of them have such requests?

23         THE JUROR:  Yes.

24         THE COURT:  And what happened with those requests?

25         THE JUROR:  Most of the time I would review them

1   with the clinical director and I would often advocate for

2   them to be approved.

3            THE COURT:  And did any of those result -- did

4   anyone ever say you did anything wrong in those, any of the

5   employees?

6            THE JUROR:  No.

7            THE COURT:  Did any of them ever result in either

8   litigation or complaints?

9            THE JUROR:  No.

10           THE COURT:  Anything about that experience that you

11  think might affect your ability to be fair and impartial in

12  this case?

13           THE JUROR:  I do.  Because I feel very strongly

14  about people receiving their disability benefits and

15  receiving accommodations.

16           THE COURT:  Would you be able to -- well, that's

17  what the law is, right, the fact that anybody who's disabled

18  is entitled to a reasonable accommodation.

19           THE JUROR:  That's right.

20           THE COURT:  But the question often is is the

21  person -- there is a number of elements to that, is the

22  person disabled, is the accommodation reasonable, or does the

23  accomodation impose an undue burden, and what are the

24  essential features of the job.  And would you be able to

25  listen to the evidence on all of those issues and make a fair

 1   and impartial determination, or would your sort of view that

 2   people should be entitled to sort of the accommodation that

 3   their disability merits, sort of fast track you toward, oh,

 4   well, somebody claims a disability, so they must be right?

 5          THE JUROR:  I would have a very hard time

 6   considering the other side, I think, in the situation, in any

 7   situation such as this.

 8          THE COURT:  Okay.  All right.  I think I'm going to

 9   excuse you, both for that and given the hit that your income

10   would take and the nature of your practice.

11          THE JUROR:  Thank you.  I very much appreciate

12   that.

13          THE COURT:  I'll excuse you from service on this

14   jury.  Have a nice day.

15          (Juror number 6 not present)

16          THE COURT:  I have the next juror who answered yes

17   to a question is juror number 9.  Is that what you all have?

18          MR. WATSON:  Excuse me?

19          THE COURT:  I have juror number 7 and 8 did not

20   raise their hand.

21          MR. WATSON:  That agrees with my notes, Your Honor.

22          MS. MANDEL:  Mine, as well.

23          THE COURT:  All right.  So juror number 9, right,

24   Sam?

25          MS. DORE:  Yes.

```
 1                  (Juror number 9 present.)

 2            THE COURT:  Good morning.

 3            THE JUROR:  Good morning.

 4            THE COURT:  You answered yes to the question of

 5      knowing somebody who had been fired or who had been accused

 6      of discrimination or involved in an investigation or had

 7      requested an accommodation.  Tell me about that.

 8            THE JUROR:  I was fired, not for discrimination.

 9            THE COURT:  What were you fired for?

10            THE JUROR:  It's a little complicated.

11            THE COURT:  What did they say and what did you say?

12      If there's a disagreement as to the reason.

13            THE JUROR:  They said that I acted inappropriately

14      in the workplace.  I did not.

15            THE COURT:  Okay.  What kind of accusation of

16      inappropriateness?

17            THE JUROR:  I was a sales director, and there was a

18      cultural and language misunderstanding, and they believed

19      that I said something that I didn't say.  It was in Eastern

20      France, 25 years ago.

21            THE COURT:  It was in eastern France?

22            THE JUROR:  25 years ago.

23            THE COURT:  That's where you were working.  Oh, I

24      see.  All right.

25                  So 25 years ago, you were a sales director.  You
```

1  had a conversation with someone who was a subordinate?

2          THE JUROR:  Yes.

3          THE COURT:  And the -- the subordinate said you

4  said something and told some higher up, or somebody else in

5  the company that you said something.  You didn't say that

6  particular thing, but it arose out of, in your view, a sort

7  of language and cultural misunderstanding, and the company,

8  in any event, fired you for it, something like that?

9          THE JUROR:  Similar, but different, yes.

10          THE COURT:  How different?

11          THE JUROR:  I didn't actually address the person

12  that was in front of me.  There were three people in the

13  room.  I said something to myself and it was misunderstood

14  what I said.

15          THE COURT:  I see.

16          THE JUROR:  And what I had meant.  And I was fired

17  for cause.

18          THE COURT:  Okay.  And anything about that

19  experience that you think would make it -- that was a long

20  time ago -- anything about that experience that would make it

21  difficult for you to be fair and impartial in this case?

22          THE JUROR:  At the time, I was fired for cause and

23  lost the equivalent of about $50,000 and had to go find a

24  job, living in a foreign place.  So, maybe, yeah, it was

25  probably another question that you had asked that I needed to

1    answer, as well.

2              THE COURT:  No problem.  So I'm just asking you now

3    whether you think that, like, thinking about that experience,

4    do you feel like you could listen to the evidence in this

5    case from Dr. Menninger and listen to it and fairly and

6    impartially evaluate whether she has proven her claims or

7    not?

8              THE JUROR:  Yes.  I mean, I can listen and fairly

9    and evaluate.  That was a very personal and deep --

10             THE COURT:  Sure.

11             THE JUROR:  -- experience.  But that was 25 years

12   ago, and I've seen a lot in life.

13             THE COURT:  And do you think that you could be --

14   listen to the evidence and -- as to PPD, listen to the

15   evidence, all of the evidence, and be fair and impartial in

16   rendering judgment as to them, too.

17             THE JUROR:  I would have to.

18             THE COURT:  I know you would have to, but I guess

19   my question is whether you could.

20             THE JUROR:  Yes.

21             THE COURT:  Okay.  So you don't feel like that

22   experience that you had would be sort of a thumb-on either

23   side?

24             THE JUROR:  That was my experience.

25             THE COURT:  Right.  Okay.

```
1              You also answered yes to the question about, I
2      think, knowing some of the companies.
3              THE JUROR:  Yes.  We deal with GSK,
4      GlaxoSmithKline.
5              THE COURT:  In the work you have now?
6              THE JUROR:  Correct.  Customer work.
7              THE COURT:  And how do you -- what do you do with
8      them?
9              THE JUROR:  We provide packaging equipment.
10             THE COURT:  For, like, their products?
11             THE JUROR:  Yes.
12             THE COURT:  Do you ever deal with their laboratory
13     business?
14             THE JUROR:  No.
15             THE COURT:  Okay.  Do either of you have any
16     follow-up questions?
17             MR. HANNON:  Nothing here, Your Honor.
18             THE COURT:  Anything for you, Ms. Mandel?
19             MS. MANDEL:  Nothing here.  Thank you.
20             THE COURT:  All right.  Thank you very much.
21             (Juror number 9 not present.)
22             THE COURT:  Yes?  He's gone.
23             MS. MANDEL:  Your Honor, we object for cause.  The
24     answer that juror number 9 gave to the question about whether
25     he could be impartial as to PPD, he said I would have to,
```

1   versus the answer he gave with regard to Dr. Menninger, which

2   was simply yes, and that it indicates that there is some kind

3   of bias in his view of the two parties.

4            THE COURT:  What do you think, Mr. Hannon?

5            MR. HANNON:  I would disagree with that.  I think

6   the overall impression was the witness was communicating to

7   the Court that whatever past life experience that he had a

8   very, very long time ago, that he would put that aside.

9            THE COURT:  I'm inclined to overrule the objection

10  for cause, because I did think that while it clearly was a

11  significant personal experience, it's -- the facts are very

12  different than in this case.  And he seemed to understand

13  that and seemed to understand the difference between what

14  happened to him and what happened here, but I'll think about

15  the point you make about the way he answered the questions.

16  I'll just reserve on juror number 9.

17            (Juror number 10 present.)

18            THE COURT:  Good morning.

19            THE JUROR:  Good morning.

20            THE COURT:  You answered yes to knowing some of the

21  companies, I think.

22            THE JUROR:  Yes.

23            THE COURT:  Which one?

24            THE JUROR:  Bristol Myers Squibb.

25            THE COURT:  And what's your -- how do you know

1  them, or what do you do with them?

2          THE JUROR:  My firm, Spencer Thomas Group, provides

3  human capital management consulting services, and we have an

4  active MSA where we provide payroll and HR across North

5  America, as well as globally.

6          THE COURT:  So what units do you deal with at that

7  company?

8          THE JUROR:  In regards to payroll, so they -- they

9  have a -- well, we have provided services in regards to how

10 they process their payroll, in terms of the system itself.

11 So we would be doing system improvements, as well as

12 providing back filling of resources during a stressful time

13 for them, where, basically, putting more bodies at work to

14 help them out.

15         THE COURT:  In the payroll unit?

16         THE JUROR:  Yes.

17         THE COURT:  You don't work with the labs.

18         THE JUROR:  No, I do not work with the labs.

19         THE COURT:  Okay.  Either of you have any follow-up

20 questions?

21         MR. HANNON:  Nothing here, Your Honor.

22         MS. MANDEL:  Nothing here, Your Honor.

23         THE COURT:  Thank you.

24         (Juror number 10 not present.)

25         (Juror number 11 present.)

```
 1            THE COURT:  Good morning.

 2            THE JUROR:  Good morning.

 3            THE COURT:  So you answered yes to the question

 4   about knowing or working with some of those different

 5   companies whose names I read to you.

 6            THE JUROR:  Yes.  I'm a field service engineer and

 7   a lot of my clients are BMS, GSK.  I work for a biotech

 8   company.

 9            THE COURT:  And what do you do with those other

10   companies?

11            THE JUROR:  I install equipment at their sites, and

12   I go in and do preventive maintenance, trainings.

13            THE COURT:  All right.  Would these be at

14   manufacturing facilities; not at the labs?

15            THE JUROR:  I work in labs, as well, the GNP Labs,

16   as well.  Our machines enhance the drug-making process at

17   these pharmaceutical companies.

18            THE COURT:  All right.  Anything about that that

19   would make it difficult for you to be fair and impartial in

20   this case?

21            THE JUROR:  No.

22            THE COURT:  All right.  And as far as you know,

23   you've never worked with Dr. Menninger or PPD's labs?

24            THE JUROR:  No.

25            THE COURT:  Okay.
```

```
 1              Either of you have any follow-up?
 2              MR. HANNON:  Nothing here, Your Honor.
 3              MS. MANDEL:  Nothing here, Your Honor.
 4              THE COURT:  All right.  Thank you.
 5              (Juror number 11 not present.)
 6              (Juror number 14 present.)
 7              THE COURT:  Good morning.  Come right up here.  Hi.
 8              So you answered yes to the hearing question?
 9              THE JUROR:  Yes.
10              THE COURT:  So did you have any difficulty hearing
11      my questions?
12              THE JUROR:  I heard about half to three quarters of
13      what you said earlier when we were sitting in here.  I've
14      lost about a third of it.  I was able to surmise a lot of
15      what you said by the words I heard in between, the connecting
16      words, which is why I was able to answer the hearing
17      question, because I heard "hearing."  But I did lose a lot.
18      And I didn't hear anybody's name, but I knew I did not
19      recognize any of them --
20              THE COURT:  All right.
21              THE JUROR:  -- when they spoke.
22              THE COURT:  And what is the nature of your hearing
23      difficulty?
24              THE JUROR:  I have hearing loss.  I wear hearing
25      aids.  And right now they're at a level where I got them as
```

1    high as I could, on my app on my phone, which is downstairs,

2    without having all the other sounds bombard me, all of that

3    paper wrestling back there sounded like thunder claps going

4    on where I was having a hard time hearing people speak.

5         THE COURT:  So let me ask you this, then.  It would

6    be a little different when you're on the jury.  So when

7    you're on the jury, there would be two differences, I think.

8    One would be that there generally isn't any other noise in

9    the courtroom.

10        THE JUROR:  Thank goodness.

11        THE COURT:  And so we speak only one person at a

12   time.

13        THE JUROR:  Uh-huh.

14        THE COURT:  And so that often helps.  So that's one

15   difference.

16        The second difference is that generally the witness

17   and I and the lawyers speak -- is it different now than --

18        THE JUROR:  Oh, yeah, I can hear you so much better

19   now.

20        THE COURT:  So the second difference is, I will

21   make sure that everybody speaks into their microphone.  So

22   what often happens, even for people who don't have a hearing

23   problem, is a particular witness -- the witnesses sit where

24   you're sitting, they might sit back, maybe they're quiet, and

25   so then I will tell them move the microphone forward, and

1    speak up.

2              And all you have to do, if you're in the jury, is

3    raise your hand and boom.  No problem.

4              THE JUROR:  Oh, good.  Because that was one of my

5    biggest fears coming.  I said what if I don't hear

6    everything?  How am I going to make a decision?

7              THE COURT:  Right.  So your job as a juror is

8    simply to raise your hand if you can't hear everything.  My

9    job as the Judge and everyone else -- is to make sure

10   everyone speaks loudly enough.  So if you're not hearing it,

11   that's not your fault, that's our fault, or my fault, and so

12   I will make -- and we'll have people repeat things, whatever.

13   So as long as you can hear me now through the microphone, no

14   problem.

15             THE JUROR:  Through the microphone, I have no

16   problem with you.

17             THE COURT:  Okay.  Great.  All right.  Then I think

18   you'll be good.

19             THE JUROR:  All right.

20             THE COURT:  Great.  Thank you.

21             (Juror number 14 not present.)

22             (Juror number 15 present.)

23             THE COURT:  Good morning.

24             THE JUROR:  Good morning.

25             THE COURT:  If I have it right, you answered yes to

1    the question about there was something about this case that

2    might make it difficult for you to be fair and impartial.

3            THE JUROR:  Yes.

4            THE COURT:  Tell me about that.

5            THE JUROR:  So currently I'm an engineer and a

6    supervisor at a large defense contractor.  So not necessarily

7    specifically a case like this, but instances where people

8    might have circumstances where they can't do their job as

9    advertised, so I certainly have a -- have an opinion on kind

10   of how, from a supervisor's perspective, kind of how that --

11   how that conversation might go.  And obviously, there's two

12   sides, but you know, the company might not necessarily have

13   an obligation to make accommodations for someone,

14   necessarily, although it might be in their interest, that is

15   outside of the role as advertised.

16           THE COURT:  So I guess the question is this.

17   Dr. Menninger was an employee of PPD.

18           THE JUROR:  Uh-huh.

19           THE COURT:  She made a disclosure to them about

20   certain conditions and requested certain accommodations.  And

21   she's suing, alleging the things that I described to you.

22   And the company denies that they did anything wrong.  Their

23   position is they responded properly, and her position is they

24   didn't.  And that's, in a nutshell, what the case is about.

25   And the question really is the fact that you've been a

1    supervisor, the fact that you've heard such things doesn't

2    necessarily disqualify you, because we want people from a

3    range of experiences.  On the other hand, what I'd like to

4    know is whether you can, first, listen to Dr. Menninger's

5    evidence and arguments, and fairly and impartially evaluate

6    them in the case.

7              Or are you going to be thinking, you know, I sit at

8    Raytheon all day long, and there's -- like I've had Jill came

9    to me, or Jane came to me, or whomever, and I didn't believe

10   them, and that, like, totally colors -- and you're not really

11   going to listen and make an individual decision about

12   Dr. Menninger's case?

13             THE JUROR:  Yeah, I think that -- you know, I

14   guess, as it's laid out, if those accommodations were laid

15   out beforehand, prior to kind of the whole being agreed upon

16   and what have you, then that certainly would change my

17   perspective on things.

18             THE COURT:  I guess my question, though, is like

19   whether you think you could fair -- like you could listen to

20   this evidence in this case and, under the instructions as I

21   give it to you, and decide this case, based on that -- first,

22   like, in the sense of knowing yourself, okay, and all you've

23   done, if you were Dr. Menninger's brother, okay, and knew she

24   had this case, and you know yourself and you thought you were

25   going to be on the jury, would you feel like she's going to

1    get a fair shake from you on the jury.  And a fair shake is

2    someone who listens to all the evidence, and decides that

3    based on what happens in the courtroom, as opposed to coming

4    in with a sort of preconception about whatever it is.  And I

5    guess my first question, I have another one, but the first

6    one is whether in that role, would you, knowing yourself,

7    feel like, oh, no, you, juror number 15, would be -- would

8    look at yourself and say, oh, yeah, I could give her a fair

9    shake and be fair to her.

10             THE JUROR:  I think I could do that.  And I think a

11   lot hinges on the initial agreement between the company and

12   the person kind of started off.  But, yes, I could listen to

13   the evidence and --

14             THE COURT:  And do you feel like if you were, you

15   know, brother of the company, so to speak, if such a thing

16   exists, but -- or you'd also would be -- could be fair to the

17   company?

18             THE JUROR:  Yes.

19             THE COURT:  Do you feel like you would be, like --

20   do you feel like you're in the middle, or do you feel like

21   you're sort of leaning one way?  Honestly.

22             THE JUROR:  Maybe so.  Again, I think it really

23   depends on how the -- how the role was put out there.  And

24   again, if she was able -- if she disclosed kind of these

25   needs and wants that she had going into the role, and that

1    was agreed upon, and the company reneged later and said, you

2    know, I don't remember that, or whatever the case is, then

3    certainly that would kind of change my perspective.

4              Otherwise, I think if you go in to a role and you

5    can no longer do that, regardless of whatever reasons, then

6    the company doesn't necessarily require themselves to

7    accommodate them.

8              THE COURT:  What do you do if the company changes

9    the role and the person discloses, as opposed to the person

10   hadn't disclosed at the beginning, and so they disclose

11   later.  Does that change it?

12             THE JUROR:  Yes.

13             THE COURT:  And what about if the company changes

14   the role?

15             THE JUROR:  I think if they change the role, then,

16   yeah, that certainly changes things.

17             THE COURT:  Okay.  Either of you have follow-up

18   questions?

19             MR. HANNON:  I do, Your Honor.

20             But what if the fact scenario were that the

21   employee went into the role, did not disclose her disability,

22   and then after they were already in the role, then disclosed

23   and asked for accommodation, under that fact scenario, would

24   you have a hard time giving them a sort of fair shake, as the

25   judge said?

1           THE JUROR:  I probably would.

2           MR. HANNON:  That's all I have.

3           THE COURT:  Anything for you, Ms. Mandel?

4           MS. MANDEL:  No, thank you.

5           THE COURT:  All right.  Thank you very much.

6           (Juror number 15 not present)

7           MR. HANNON:  Judge, I challenge for cause.  I think

8    the --

9           THE COURT:  I'm going to allow that.  I just don't

10   think that -- he has such a strong.  It's evident to me that

11   he has a strong feeling about these things based on his

12   experience and particularly with respect to if they didn't

13   disclose at the beginning and our case is not a disclosure at

14   the beginning, and I don't think -- that's not my

15   understanding of the law that you're necessarily required to

16   disclose at the beginning, in order to get a reasonable

17   accommodation.  And so I think it's -- it's too much -- he

18   has too strong a view about a particular way it should go.

19   So he's excused for cause.  That is allowed.

20           Number 16.

21           (Juror number 16 present.)

22           THE COURT:  This is juror number?

23           MS. DORE:  16.  I'm going to pole juror number 5.

24           THE COURT:  Yes, that's perfect.

25           So you have trouble understanding English?

1          THE JUROR:  I'm not 100 percent confident about

2     that.  I will say most of the time, I can understand English,

3     but occasionally, like I watch a movie a few days ago for

4     Avatar, I found that some of the English I do not understand.

5          THE COURT:  Okay.  Did you understand all of my

6     questions?

7          THE JUROR:  Yes, I understand.

8          THE COURT:  And how long have you -- English was

9     not your first language?

10         THE JUROR:  Yes.  Correct.  Yeah.  English was not

11    my native language.

12         THE COURT:  And when did you learn English?  How

13    old were you?

14         THE JUROR:  I come to the United States in -- when

15    I was about 29 years old.  I start to learn English in my

16    college and also high school, middle school years, but those

17    times, I was in China, and so it's most of -- most of the

18    time it's just reading and writing.  And so about listening

19    and speaking, I really started to learn after I come to the

20    United States.

21         THE COURT:  And how long have you been in the

22    United States?  About.

23         THE JUROR:  Yeah, it's about 23 years.  Let's

24    see -- no, 24 years.

25         THE COURT:  Do you feel -- and your work as an

1    engineer, I take it, you spend a fair amount of time speaking

2    to people in English.

3            THE JUROR:  Typically, that's not a problem for me,

4    yeah.

5            THE COURT:  Okay.  Do you feel like, based on the

6    questions that I asked you, you said you understood all of

7    that?

8            THE JUROR:  Yeah, I would say 95 percent, I

9    understand.  Some -- the only times maybe I was not paying

10   attention or maybe I was not seated in the front row or

11   something like that.

12           THE COURT:  Okay.

13           Either of you have any follow-up questions.

14           MR. HANNON:  Nothing here.

15           MS. MANDEL:  Nothing here, Your Honor.

16           THE COURT:  All right.  Thank you.

17           (Juror number 16 not present.)

18           MS. DORE:  I got juror number 5.

19           THE COURT:  Yes.

20           So juror number 5 did not raise his hand to any

21   questions, but he told Ms. Dore that he should have.  And so

22   I don't know what it is, but we'll speak to him.

23           (Juror number 5 present.)

24           THE COURT:  Hi.  Come on in.  Come right up here.

25           What did you want to bring to my attention?

```
 1              THE JUROR:  So I do work for a biotech that
 2     collaborates with GSK, GlaxoSmithKline.
 3              THE COURT:  Okay.  And what kind of work does your
 4     company do with GSK?
 5              THE JUROR:  So we develop drugs and we do that by
 6     doing computational analysis and GlaxoSmithKline pays us to
 7     do computational analysis to potentially identify other
 8     drugs.
 9              THE COURT:  So you don't work with labs?
10              THE JUROR:  With what?  Lab.
11              THE COURT:  Labs?  Testing labs?
12              THE JUROR:  No.
13              THE COURT:  Okay.  Do either of you have any
14     follow-up questions?
15              MS. MANDEL:  No, Your Honor.
16              MR. HANNON:  Yes, if I may.
17              Does your work involve any analysis or review of
18     data generated by laboratory analysis?
19              THE JUROR:  Yes.  Within the company, but not from
20     outside labs.
21              MR. HANNON:  So your lab.
22              THE JUROR:  We are a research organization, so we
23     do a lot of analysis.
24              MR. HANNON:  Okay.  Thank you.
25              THE COURT:  Thank you.  Thank you for bringing that
```

```
 1   up.
 2                 (Juror number 5 not present.)
 3                 THE COURT:  Sam, number 17.
 4                 (Juror number 17 present.)
 5                 THE COURT:  Right up here.  Good morning.
 6                 THE JUROR:  Good morning.
 7                 THE COURT:  So you answered yes to the scheduling
 8   question.
 9                 THE JUROR:  Yes.  I run a private daycare, and
10   after COVID, for me to shut down, these parents have nowhere
11   to --
12                 THE COURT:  So you run the -- are you the --
13                 THE JUROR:  I'm the sole proprietor and the only
14   person and I'm licensed for eight children.  It's a family
15   home child care.
16                 THE COURT:  Oh, okay.
17                 THE JUROR:  So seven of the parents, because I have
18   one opening, will not have child care.
19                 THE COURT:  So what did you do today?
20                 THE JUROR:  They were all notified when I was
21   notified.
22                 THE COURT:  I see.  Okay.  I understand.  So if you
23   come here -- what are your hours?
24                 THE JUROR:  7:40, my first two arrive and then
25   7:15, until 4 o'clock.
```

```
1                THE COURT:  So if you come here, no -- you close.

2                THE JUROR:  I close.

3                THE COURT:  And then if you close, no income,

4    because you only make money when they come.

5                THE JUROR:  Correct.  Although my contracts cover

6    me, because this is like the fourth time I've been called for

7    three days.

8                THE COURT:  They cover you for three days --

9                THE JUROR:  Right.

10               THE COURT:  -- in terms of pay.

11               THE JUROR:  Correct.

12               THE COURT:  But not in terms of the dislocation to

13   the parents.  They suffer that.

14               THE JUROR:  Yes.

15               THE COURT:  But after three days, you don't get

16   paid.

17               THE JUROR:  Correct.

18               THE COURT:  Okay.  I'll excuse you from this jury.

19               THE JUROR:  Okay.

20               (Juror number 17 not present.)

21               (Juror number 18 present.)

22               THE COURT:  That new economy makes it harder and

23   harder to pick jurors.  It makes it harder to pick people who

24   run their own thing like that.

25               Good morning.
```

```
 1                    THE JUROR:  Good morning.
 2                    THE COURT:  So you answered yes to a number of
 3          questions.  I'll start with the scheduling question.
 4                    THE JUROR:  Yeah.
 5                    THE COURT:  Tell me about that.
 6                    THE JUROR:  Two main things.  One I have a skin
 7          check for skin cancer that I tried to reschedule, and they're
 8          scheduling out until August, and I have a few things of
 9          concern.
10                    THE COURT:  When is that appointment?
11                    THE JUROR:  Tomorrow.
12                    THE COURT:  What time?
13                    THE JUROR:  2:00, so that wouldn't be too much of a
14          problem.
15                    THE COURT:  Where?
16                    THE JUROR:  In Newburyport.
17                    THE COURT:  It's in Newburyport at 2:00?
18                    THE JUROR:  Yeah.
19                    THE COURT:  I mean, you'll be out at 1:00.
20                    THE JUROR:  I could drive the speed limit there.
21                    Second is, I'm a keynote speaker next weekend at an
22          event in --
23                    THE COURT:  When is the event?
24                    THE JUROR:  It's Friday morning.
25                    THE COURT:  Oh, what kind of a -- like a work
```

1    event?

2              THE JUROR:  Yeah.

3              THE COURT:  And you're the main speaker?

4              THE JUROR:  Correct.  And I'm a professor and I

5    would be missing 21 classes in the next two weeks, and

6    doable; problem is it would be a lot to manage and we teach

7    in person.  So those are three things, schedulingwise, that

8    came up.

9              THE COURT:  Okay.  And you also answered yes to the

10   question about a civil lawsuit or a lawsuit similar to this

11   one?

12             THE JUROR:  Well, my mom, actually, was -- I went

13   to court with her when I was younger because the car sales

14   people miss -- tried to resell her her car engine and so we

15   went to civil court in Connecticut.  And then also I was

16   wrongly accused of stealing and misappropriating funds at a

17   job when I was younger and was fired for that.  So long ago,

18   but it made an impact.

19             THE COURT:  And the job -- I take it the one with

20   your mom has nothing -- wouldn't affect you in this case, at

21   all.

22             THE JUROR:  No, but it happened, so I raised my

23   hand.

24             THE COURT:  Yeah.  And in terms of the job one,

25   that was a long time ago?

```
 1                    THE JUROR:  Yeah.

 2                    THE COURT:  And did they -- they accused you and

 3        fired you?

 4                    THE JUROR:  Uh-huh.

 5                    THE COURT:  Did they sue you, or no?

 6                    THE JUROR:  No, it was in a restaurant.

 7                    THE COURT:  Oh, I see.  So that was sort of -- in

 8        terms of -- between you and them, that was the end of it?

 9                    THE JUROR:  Correct.

10                    THE COURT:  I see.  And anything about that

11        experience that would make it hard for you here in this case?

12                    THE JUROR:  It left an impression, to be falsely

13        accused.

14                    THE COURT:  Yeah.

15                    THE JUROR:  So it left an impression.  I mean, I

16        can say that I would divorce myself from that.

17                    THE COURT:  What's the keynote event?

18                    THE JUROR:  The keynote event is --

19                    THE COURT:  Yeah.

20                    THE JUROR:  -- I'm speaking at a professional

21        development day for the staff at Northern Essex Community

22        College on risk.

23                    THE COURT:  On risk?

24                    THE JUROR:  Uh-huh.

25                    THE COURT:  What kind of risk?
```

```
 1            THE JUROR:  Emotional risk and recovery from the
 2   COVID situation with the college student campus and
 3   professors and their wellbeing.  I actually work in the
 4   mental wellbeing space, so that also might be something.
 5            THE COURT:  I see.  So that's -- you're giving the
 6   keynote address at that event?
 7            THE JUROR:  Yeah.
 8            THE COURT:  And that's this Friday or next Friday?
 9            THE JUROR:  Next Friday morning.
10            THE COURT:  Next Friday morning at what time?
11            THE JUROR:  That is at 8:30.
12            THE COURT:  I see, and about how many people do you
13   think attend that event?
14            THE JUROR:  I think 75.
15            THE COURT:  Uh-huh.  And how long has it been
16   planned?
17            THE JUROR:  Oh, a couple of weeks.  I spoke
18   previously, so they asked me to come back.
19            THE COURT:  Okay.  And anything about your -- what
20   about your work in the mental health space?
21            THE JUROR:  I am trained as a psychologist and work
22   as a psychologist in the therapeutic realm, and also in
23   sports psychology.  I have a current business that is
24   WholeHealth Sport, where we teach coaches and athletes to
25   advocate for their mental health and mental wellbeing in the
```

1    sports space.  We certify people in mental health first aid.

2    So I'm a trainer for mental health first aid and then I also

3    work in the corporate space as a wellbeing coach.

4          THE COURT:  And do you think any of that would make

5    it hard for you to be fair and impartial for either side in

6    this case?

7          THE JUROR:  To be honest, it might, the advocacy

8    piece, because there's been such a -- trying to change the

9    narrative on mental health in the world and in the sport

10   space, in particular, and in the work space.  And one other

11   thing that I didn't raise my hand for was I'm not a

12   supervisor, but as a professor, I have to respond to requests

13   for accommodation very frequently, and certainly much more

14   since COVID.  And so I know it's not a monetary exchange, but

15   it's a combination for classes, for assignments, et cetera,

16   et cetera.

17         THE COURT:  Okay.  Either of you have any follow-up

18   questions?

19         MR. HANNON:  Nothing here.  Thank you.

20         MS. MANDEL:  Nothing here, Your Honor.

21         THE COURT:  All right.  Thank you very much.  Let

22   me talk to the lawyers for a minute.

23         (Juror number 18 not present.)

24         THE COURT:  You're objecting?

25         MS. MANDEL:  Yes, Your Honor.

```
 1              THE COURT:  I think I'm inclined to excuse her, in
 2   part for schedule -- it's going to be really hard for her to
 3   get to Newburyport for her doctor's appointment.  It's going
 4   to be -- to me, the event is on the cusp, her keynote
 5   address, they probably could get someone else, but it's
 6   planned, it's reasonably big.  It has a lot of people.  So
 7   the schedule gives me -- I think I'm inclined to -- and given
 8   her -- what her own acknowledged, I don't think I could be --
 9   have a certain advocacy perspective, so I excuse her for
10   cause.
11              So we'll see number 19, Sam.
12              (Juror number 19 present.)
13              MS. MANDEL:  Your Honor, can we move the microphone
14   a bit closer to the chair?
15              THE COURT:  Yeah, I'll tell the next juror.
16              MS. MANDEL:  I'm having a hard time hearing.
17              THE COURT:  No problem.
18              Good morning.  Have a seat, and pull the microphone
19   up close.  There you go.
20              So you answered yes to the question about, if I
21   have it right, there's something about this case that might
22   make it difficult for you to be fair and impartial?
23              THE JUROR:  Yeah.
24              THE COURT:  What is it?
25              THE JUROR:  It sounds like it's a lot about social
```

1    anxiety, and I deal with that myself.

2              THE COURT:  You, yourself, suffer from that?

3              THE JUROR:  Yeah.

4              THE COURT:  Okay.  And do you think that you could

5    be -- so how do you think that would affect you in terms of

6    resolving this case?

7              THE JUROR:  Your Honor, I don't -- you know, you

8    really put yourself in the seat of that person, you know,

9    because you feel like you're --

10             THE COURT:  You feel like it's you.

11             THE JUROR:  Yeah.  Yeah.

12             THE COURT:  Okay.  All right.  Okay.  I'll excuse

13   you from this case.

14             THE JUROR:  Okay.

15             THE COURT:  Thank you for telling me.

16             THE JUROR:  Yeah.

17             (Juror number 19 not present.)

18             MR. HANNON:  I'm sorry, Judge, just before the next

19   juror, I was going to ask why he wasn't asked whether or not

20   he could put that aside.

21             THE COURT:  I'll bring him back, if you want.

22             MR. HANNON:  Please.

23             THE COURT:  Afterwards, I'll tell you why I didn't,

24   but it's a fair point.  I felt like it was such a strong

25   identification, it would be difficult for him to separate.

```
 1      That's why I didn't ask, but it's a fair point.
 2              (Juror number 19 present.)
 3              THE COURT:  My apologies for bringing you back.
 4      Just one or two more things that I wanted to ask you.
 5              THE JUROR:  Yeah.
 6              THE COURT:  So do you think you could be fair and
 7      impartial in this case?
 8              THE JUROR:  You know, I -- I think so, you know.
 9              THE COURT:  I can't hear you.
10              THE JUROR:  Yeah.  I think so, yeah.
11              THE COURT:  Do you feel like you suffering -- or
12      your description of your condition being one of the
13      conditions that Dr. Menninger put out, would give you such an
14      identification with her that it might be difficult for you to
15      separate that, to evaluate the case fairly and impartially
16      for both sides?
17              THE JUROR:  I -- you know, I just think I would be
18      able to look at it fairly.  I just -- you know -- yeah.
19              THE COURT:  Let me ask you this way.  Suppose you
20      were -- suppose the defendant, PPD, the company, was your
21      sibling's company, or, you know, somebody close to you, and
22      knowing yourself.  And you were thinking about them, would
23      you say to them, oh, juror number 19 could be fair and
24      impartial to you.  He'll give you a fair shake, listen to
25      everything.  Or would you say, hmm, his experience is so
```

1    strong, and his identification, or whatever else with the

2    plaintiff is such that he won't be able to be fair?  Knowing

3    yourself.

4         THE JUROR:  Yeah, I, you know, just try to -- I

5    think I would be impartial and fair.  I would try to approach

6    things that way.

7         THE COURT:  Okay.  So you feel like -- you feel

8    like you can comfortably -- you could comfortably listen to

9    all the evidence, and if you believe that Dr. Menninger has

10   not proven her claim or claims that the company discriminated

11   against her based on her social anxiety or panic disorder and

12   that they didn't retaliate against her, that you would then

13   comfortably rule for the defendant?

14        THE JUROR:  Yeah.  Yeah.

15        THE COURT:  That wouldn't pose any discomfort?

16        THE JUROR:  No.

17        THE COURT:  And if you felt like she proved her

18   claims, one or both of her claims, then you could comfortably

19   rule for her?

20        THE JUROR:  Yes.

21        THE COURT:  Any hesitation either way?

22        THE JUROR:  No.  No.

23        THE COURT:  Okay.  Any follow-up questions?

24        MR. HANNON:  No, Your Honor.

25        THE COURT:  Any for you, Ms. Mandel?

```
 1              MS. MANDEL:  No, Your Honor.
 2              THE COURT:  All right.  Why don't you step outside
 3     for a minute.  Let me talk to the lawyers.  Thank you.
 4              (Juror number 19 not present.)
 5              THE COURT:  Go ahead.
 6              MS. MANDEL:  Your Honor, I'm concerned that the
 7     juror gave two different sets of answers.  He said, during
 8     the first set of questioning, that he would feel like it was
 9     him and it would be hard to separate himself.  And then he
10     gave a different set of answers just now, so there --
11              THE COURT:  He said that the first time he was in
12     here?
13              MS. MANDEL:  He said it would feel like it was him.
14     So this is somewhat conflicting.  So, if nothing else, it
15     shows that there is some inner conflict there.  Which I
16     assume the basis for Your Honor's original decision to excuse
17     him.
18              THE COURT:  Well, the original decision was, yes, I
19     felt like his -- the proximity of his condition, the
20     similarity of his condition to Dr. Menninger's and the risk
21     or the potential for self-identification, as sort of that's
22     me, as opposed to being more neutral, coming at it more
23     neutrally, that's why I excused him originally.
24              What do you say, Mr. Hannon?
25              MR. HANNON:  I think there's risk of
```

1    self-identification on both sides and we've had supervisory

2    employees here who have suggested some -- that they've had

3    experiences, and we've taken them at their words.  And I

4    think we have to be very, very careful that just because this

5    individual has a mental health issue that we're not somehow

6    discounting the assurances that they provide regarding

7    their --

8              THE COURT:  No, I don't think -- I agree with that.

9    And I don't think it's that he has a mental health issue, I

10   think it's that he has the -- he describes himself as having

11   the same condition -- the very same condition, and that's the

12   risk of self-identification, I think.  I mean, it depends on

13   the supervisor.  I don't think that it's an automatic

14   exclusion because he has a mental health condition, for sure,

15   or even potentially the same.

16             I think I'm still -- I mean, he did say he could be

17   fair and impartial, but he gives me pause that the

18   self-identification, that seems -- that's sort of similar to

19   the supervisor I excused, who is like -- had a certain view

20   of how -- he had it -- it wasn't self-identification,

21   exactly, but he had a sort of rubric that he thought about it

22   in that didn't seem open.

23             So I think, on balance, given that, those answers,

24   despite his assurances, I think I'm going to excuse him for

25   cause, for that reason.  I think it's too close, given what

1    he said the first time.

2              Juror number 20.

3              (Juror number 20 present.)

4              THE COURT:  Good morning.

5              THE JUROR:  Good morning.

6              THE COURT:  So you answered yes to two questions,

7    one was the scheduling question.  Tell me about that.

8              THE JUROR:  Yes, sir.  I'm a full-time pilot, I

9    travel internationally and domestically.  My schedule comes

10   out 30 days in advance.  Right now I know my schedule through

11   April 3rd.  I don't know what my schedule will be after that.

12   So I spend eight days at home and usually 20 days a month

13   abroad.

14   Q.  And so what does the trial do to you this week or next

15   week?

16             THE JUROR:  Right now I'm home day 3.  I'm

17   scheduled to depart Sunday.

18             THE COURT:  And couldn't that be rearranged?

19             THE JUROR:  I work for a small company.  We have

20   about 15 pilots.  It probably could be done.  It's a

21   California company.  I'm not really too sure of the policy.

22   I'm sure it could be done, but --

23             THE COURT:  Okay.  And then you also answered yes

24   to the question that there was something about the fact that

25   the plaintiff is seeking money damages.

1           THE JUROR:  Right.

2           THE COURT:  What about that?

3           THE JUROR:  I guess my premise for that is just

4    from what I heard, based on what the trial is about,

5    preexisting conditions, to me, maybe I've already made up my

6    mind on the way the outcome of the trial might be.  Just a

7    preexisting condition to me is a condition that probably you

8    could -- there are other ways of, instead of monetary

9    compensation to determine whether or not somebody -- the

10   outcome -- it shouldn't have a bearing on the trial, whether

11   there's a guilty or nonguilty on monetary.  A reward at the

12   end shouldn't have anything to do with it.

13          THE COURT:  Well, so, the jury decides -- there's

14   two parts to every case.  Really, one part is what we call,

15   in a civil case, liability.  So the plaintiff bears the

16   burden to establish liability; that is, that the defendant

17   did something under the law wrong.  It's not criminal, or

18   anything like that, but did something -- so, for example,

19   here, the claim is that she was discriminated against based

20   on a disability, or retaliated against for asking for

21   accommodations.  Both of which, if proven, would be -- each

22   would be a violation of law.  So that would be her burden.

23   If she proves -- if she doesn't prove that to the jury,

24   that's the end.  That is, if she doesn't prove her claims.

25   If she proves one or all of her claims, then the jury would

1    be tasked to determining what damages she's proven.  And

2    so -- and then the jury would decide what damages she has

3    proven by a preponderance of the evidence.

4              And so the question of damages is separate from the

5    question of liability, but it follows.  If there is

6    liability, then you consider that question.

7              THE JUROR:  Correct.

8              THE COURT:  So is there something about the fact

9    that, if she proves liability, that she would be seeking

10   damages that would make it hard for you to be fair and

11   impartial?

12             THE JUROR:  Yeah, I think seeking damages would --

13   shouldn't necessarily come from the company, but it probably,

14   you know, with regards to mental illness, it probably should

15   be something that, whether it's a state or federal funding

16   programs, that provide help for people like that.

17             THE COURT:  Well, I guess the way damages work

18   under the law would be, for example, if you were -- you fly

19   your plane with your hands, right?

20             THE JUROR:  Correct.

21             THE COURT:  Not with your feet.

22             THE JUROR:  Both, actually.

23             THE COURT:  Both.  All right.  Both feet?

24             THE JUROR:  Yes.

25             THE COURT:  Okay.  And you wear glasses.

```
 1              THE JUROR:  I do.
 2              THE COURT:  But that's okay for flying?
 3              THE JUROR:  It is for the type of flying we do.
 4    You have to have corrected vision to 20/20.
 5              THE COURT:  Vision.  Right.  Okay.
 6              So suppose your vision declined a little bit and
 7    you needed stronger glasses, but it was within the scope of
 8    being able to do your job.
 9              THE JUROR:  Yes.
10              THE COURT:  And you asked them to accommodate you
11    and to let you continue to fly with your stronger glasses.
12              THE JUROR:  All right.
13              THE COURT:  What I'm describing is not this case.
14              THE JUROR:  Sure.
15              THE COURT:  And they terminated you, because they
16    said no, we're not -- they terminated you.  You might sue
17    them, because you said they didn't accommodate you and you
18    would have to prove that you were discriminated against under
19    the law, and that you could do the essential features of the
20    job, and the accommodation you're asking for is reasonable,
21    or so forth, whatever.  And if you prove your claim and you
22    prove the elements of your claim, then you would seek
23    damages, you might ask for damages, and the damages might be
24    that -- and you got -- so they terminated you and you were
25    out of work for a period of time, and then you got a job for
```

1    another company, flying a plane, making similar money.

2            THE JUROR:  Sure.

3            THE COURT:  But your claim for damages might be,

4    for example, the amount of money that you didn't earn during

5    that period of time.  There are other kind of damages you

6    could and might claim.  But that wouldn't -- you might get

7    unemployment, maybe, but you might not, depending on the

8    rules and how that applies to people getting fired.  But

9    that's what your claim would be and the law recognizes and

10    allows for that.  That's provided for.  There are all sorts

11    of circumstances.

12            So I guess that's what you're uncomfortable with.

13    You feel like because it's a disability, the person should

14    get it from the federal government or the state government,

15    or something, but not from the private employer.

16            THE JUROR:  Yeah.  That would be my feeling.  And

17    what you just described, there are other avenues for --

18    because we're talking about pilots, where you become an

19    instructor, where your vision -- where you're actually

20    outside of a cockpit.  You're in an environment where you're

21    actually doing instruction.  So there are always avenues to

22    compensate for, you know, if you can't meet certain

23    requirements.

24            THE COURT:  All right.  Any questions for either of

25    you?

```
 1                MR. HANNON:  No, Your Honor.

 2                MS. MANDEL:  No, Your Honor.

 3                THE COURT:  Okay.  Why don't you step outside for a

 4    minute, sir.

 5                THE JUROR:  Sure.

 6                (Juror number 20 not present.)

 7                MR. HANNON:  I do challenge for cause.

 8                THE COURT:  I'm going to excuse him for cause.  He

 9    clearly doesn't agree with the system that we have.

10                Juror number 21.

11                (Juror number 21 present.)

12                THE COURT:  Have a seat right in the box and just

13    pull the microphone close to you.

14                So one of the questions you answered yes to was you

15    thought you had a bias or prejudice or some other reason that

16    might make it hard to be fair and impartial in this case?

17                THE JUROR:  That's true.

18                THE COURT:  What is that?

19                THE JUROR:  Well, I'm a special education teacher

20    and I have experience with -- of both personal and with

21    providing students with accommodations.  I -- early in my

22    career, I was let go from two different jobs, one of which I

23    was in line to get accommodations for for paperwork.  And it

24    didn't work out for me.  I got let go before the

25    accommodations went into effect.  And then a second job I
```

1    had, I had only been there on a temporary basis, and a parent

2    came forth and said -- made comments that I had submitted

3    letters to her in which I misspelled words incorrectly, which

4    is part of my learning disability, and that was the only

5    reason I was given as to why I was let go from that position.

6            THE COURT:  And do you feel like that would make it

7    hard for you to be fair and impartial in this case?

8            THE JUROR:  Yes.  Yes.  Yes.

9            THE COURT:  You don't feel like you could listen to

10   the company's evidence fairly; you feel like you would sort

11   of have a thumb on the scale?

12           THE JUROR:  I would feel like, yeah.  Yeah.

13           THE COURT:  Either of you have any follow-up

14   questions?

15           MR. HANNON:  No, Your Honor.

16           MS. MANDEL:  I just have one follow-up question,

17   Your Honor.

18           THE COURT:  Sure.

19           MS. MANDEL:  You mentioned that you have experience

20   with providing students with accommodations?

21           THE JUROR:  I do.

22           MS. MANDEL:  Did any of those students requesting

23   accommodations request accommodations in connection with

24   anxiety disorders?

25           THE JUROR:  Absolutely, yes.

```
 1              MS. MANDEL:  And what about panic disorders?

 2              THE JUROR:  Panic disorders?  I feel, as a board

 3    certified analyst, I believe both of them fall in line

 4    together.

 5              MS. MANDEL:  Thank you.

 6              THE COURT:  All right.  Thank you very much.

 7              (Juror number 21 not present.)

 8              THE COURT:  I'm going to excuse him for cause.  He

 9    said that he can't be fair.

10              Next juror, 22.

11              (Juror number 22 present.)

12              THE COURT:  Hi.

13              THE JUROR:  Hi.

14              THE COURT:  Just pull the microphone close to you.

15              THE JUROR:  I'm sorry?

16              THE COURT:  Pull the microphone close to you.

17              THE JUROR:  Okay.  Sorry.

18              THE COURT:  No problem.

19         So I think you answered yes to one question, just

20    that you thought there might be a reason you couldn't be fair

21    and impartial.  Can you tell me about that?

22              THE JUROR:  Well, Your Honor, don't ask me why, but

23    situations like this make me very nervous.  I couldn't sleep

24    last night.  I couldn't have breakfast this morning.  I went

25    to the wrong court and -- sorry.  And my hands are sweaty.
```

1     I'm all fidgety and I just can't control it.

2           THE COURT:  So just being here.

3           THE JUROR:  Right.  Makes me very, very nervous and

4 uncomfortable.

5           THE COURT:  We're so nice, though.

6           THE JUROR:  Yes, but it's just me.  It's just my

7 reactions.  I can't control it.

8           THE COURT:  I see.  Okay.  What do you do for work?

9           THE JUROR:  I'm a secretary.

10           THE COURT:  Where?

11           THE JUROR:  Revere Schools.

12           THE COURT:  And how is that?

13           THE JUROR:  Good.

14           THE COURT:  Okay.  But you just feel like -- but

15 you got here.  You managed to get here on time, even though

16 you went to the wrong court.

17           THE JUROR:  I did.

18           THE COURT:  Some people go to the right court and

19 can't get here on time.  So you're ahead of them.

20           THE JUROR:  And I left the phone, just like

21 everyone -- like I was on the letter, so I did what --

22 previous to arriving this morning, they were like, you have a

23 cell phone, I was like, no, I read the letter, and I left it

24 at home.

25           THE COURT:  Uh-huh.  So do you feel like that now

```
1    that you've been here that you could serve?
2              THE JUROR:  No, I'm over here shaking.  My hands
3    are sweating.  I just can't.
4              THE COURT:  Okay.  All right.
5              Do either of you have any questions that you wish
6    to ask this juror?
7              MR. HANNON:  No, Your Honor.
8              MS. MANDEL:  No, Your Honor.
9              THE COURT:  All right.  I'll excuse you from
10   service.  No problem.
11             (Juror number 22 not present.)
12             THE COURT:  Must be all of you intimidating her,
13   because it wasn't me.  She said I was nice.
14             (Juror number 23 present.)
15             THE COURT:  Hi, how are you doing?
16             THE JUROR:  I'm well.  How are you?
17             THE COURT:  Good.
18             If I have it right, you answered yes to the
19   questions about difficulty hearing, and maybe difficulty
20   sitting during the trial.
21             THE JUROR:  Yes.  So I was just, like in November,
22   diagnosed with MS, and I'm having a hard time adapting to it.
23   And I have like three lesions on my brain, so every once in
24   awhile, I can't pick up what's being said, and I have trouble
25   seeing, but moreover, the thing that I'm most nervous about
```

1    is having to go to the bathroom, because when I have to go, I

2    have to go.

3              THE COURT:  So let me tell you a little more about

4    the schedule and see if it might work for you.

5              THE JUROR:  Sure.

6              THE COURT:  So we start at 9:00 and the jury would

7    come in at 9:00 and sit there.  And we go from 9:00 to 11:00,

8    it's for two hours.  And then we take a break for about 15

9    minutes and the jury goes back to a conference room right

10   behind -- right back here.

11             THE JUROR:  Sure.

12             THE COURT:  And there's bathrooms there just for

13   the jurors and there's coffee and refreshments.  And there's

14   a 15, sometimes 20-minute break.  Come back into the

15   courtroom say 11:20.  11:15, 11:20.  And then we go to

16   1 o'clock and then we break.  Most days, almost every day,

17   we'll be done at 1 o'clock.

18             Today and next Monday, maybe, after an hour break

19   for lunch, we'll resume from 2:00 to 4:00.  So that's the

20   time period we'll be sitting, but at the same time, anyone

21   needs a drink of water, needs to go to the bathroom, for any

22   reason, whether they have MS that makes them go to the

23   bathroom, or they just need to go to the bathroom.  Just

24   raise your hand and we'll take a break and so --

25             THE JUROR:  It could be an embarrassing situation,

```
1   which is what I'm trying to avoid, because I don't
2   necessarily have control over --
3               THE COURT:  So you might not have a warning.
4               THE JUROR:  That's my biggest fear.  Yes, sir.  And
5   I still am trying to adapt to this whole thing, because it's
6   so new.
7               THE COURT:  Uh-huh.
8               THE JUROR:  So that's -- I would -- it would be
9   extremely emasculating if --
10              THE COURT:  Yeah, yeah.  So you might not be in a
11  situation where you would have enough advanced notice, so to
12  speak, to raise your hand and walk out with everyone else.
13              THE JUROR:  Correct.  And the other thing that
14  happens, too, is if I go into the bathroom, I could be there
15  for some time, because that urge doesn't necessarily leave,
16  whether something is happening or not happening, and it's --
17              THE COURT:  It's fine.  I'll excuse you from
18  service in this jury.
19              THE JUROR:  Thank you.
20              THE COURT:  No problem.  Good luck with the
21  diagnosis.
22              THE JUROR:  Thank you very much.
23              (Juror number 23 not present.)
24              (Juror number 24 present.)
25              THE COURT:  Did 24 answer yes to a question?
```

```
1              MR. CURRAN:  Worked in psychology.

2              THE COURT:  That's what I thought.  Okay.

3              Juror number 24?  All right.

4              Good morning.

5              THE JUROR:  Good morning.

6              THE COURT:  How are you today?

7              THE JUROR:  I'm doing well, thanks.  How are you?

8              THE COURT:  Good.  So you answered yes to you or

9     someone close to you working in psychology or psychotherapy

10    or social work?

11             THE JUROR:  Yes.

12             THE COURT:  Tell me about that.

13             THE JUROR:  My daughter will have her -- she'll be

14    a licensed social worker in May.  So she's been in the field

15    of social work, getting her master's in social work.

16             THE COURT:  Congratulations.

17             THE JUROR:  Yeah.  Thank you.  I'm proud of her.

18             THE COURT:  Anything about that that might affect

19    you in this case?

20             THE JUROR:  I don't think so.  It's kind of -- she

21    works with adolescents and a couple hospital settings, but I

22    don't -- it doesn't sound related, but --

23             THE COURT:  Okay.  Any follow-up questions?

24             MR. HANNON:  No, Your Honor.

25             MS. MANDEL:  Just two follow-up questions.
```

1          Does your daughter work with people who have either

2     anxiety or panic disorder?

3          THE JUROR:  Anxiety.

4          MS. MANDEL:  And has your daughter talked to you

5     about the process of being diagnosed or treated with anxiety.

6          THE JUROR:  Not specifically.  Generally, you know,

7     she might run groups, but I don't know the specifics of how

8     she works with them, really.  I know she -- she kind of --

9     she actually gets upset that I don't know more about what she

10    does, but she will generally say, oh, I did this group, or I

11    may have had to have, you know -- she had a difficult, you

12    know, patient one day, but nothing about specifically how

13    like the day-to-day or, you know, what she does with them

14    specifically.  If that answers your question.

15         MS. MANDEL:  Thank you.

16         THE COURT:  Okay.  Thank you.

17         THE JUROR:  Okay.  Thanks.

18         (Juror number 24 not present.)

19         THE COURT:  Just to pause for a second, where we

20    are.

21         So I have from the first page --

22         Hold on one second, Sam.

23         Just from the first page, I have I cleared juror

24    numbers 2, 3, 5, 7, 8, 11 -- 10, 11, and 12, which is eight

25    jurors.  And I reserved on the for-cause challenge as to

1    juror number 9.  So that's eight jurors.

2            And then I have, on the second page, that I cleared

3    juror numbers 13, 14, 16, and 24, which is four more jurors.

4    So I have that we've cleared 12 jurors right now, and have

5    one person that I've reserved on.  And everyone else has been

6    excused.

7            Are we both on the same page with that?

8            MR. WATSON:  Your Honor, what was the number 15?

9            THE COURT:  Oh, I'm sorry.  I read that wrong.  Let

10   me say that over.  On the second page, I cleared juror number

11   13, juror number 14, juror number 16, and juror number 24.

12   Those are the four cleared jurors from the second page, if I

13   have that right.

14           MR. HANNON:  That's what I have.

15           MS. MANDEL:  That's what we have, as well.

16           THE COURT:  Okay.  Fine.  All right.  So next is

17   juror number 25.

18           (Juror number 25 present.)

19           THE COURT:  Good morning.

20           THE JUROR:  Good morning.

21           THE COURT:  So tell me about the scheduling issue,

22   first.

23           THE JUROR:  I am a senior tax manager at KPMG and

24   my biggest deadline of the entire year is next week.

25           THE COURT:  Oh.  Right.  Okay.

 1              THE JUROR:  I have about 500 K-1s to deliver next

 2      week.

 3              THE COURT:  Not next week.  We have more than next

 4      week.  Next week is not April 15th.

 5              THE JUROR:  It's March 31st and that's when K-1s

 6      expire.  Their investors are expecting their final K-1s.  I

 7      have no movement of that date.

 8              THE COURT:  I understand.  That's different.  I'll

 9      excuse you.

10              Good luck.

11              THE JUROR:  That's it?

12              THE COURT:  That's it.

13              THE JUROR:  Oh, thank you.

14              THE COURT:  I would expect that this is a difficult

15      time for you.

16              THE JUROR:  I haven't slept in weeks.  Thank you,

17      have a good day.

18              THE COURT:  You, too.

19              (Juror number 25 not present.)

20              THE COURT:  Next.

21              (Juror number 26 present.)

22              THE COURT:  Good morning.  Come forward to the

23      witness box.

24              Hi.  You raised your hand to several questions, one

25      of which was that there was something else that I didn't ask

1    about, that might make it difficult for you to be fair and

2    impartial.

3             THE JUROR:  Yeah, I have some trauma in courtrooms

4    because of a court incident where I lost my brother, so I

5    just have a hard time being in courtrooms.

6             THE COURT:  What happened?  If you can talk about

7    it.

8             THE JUROR:  It was a custody battle over my dad and

9    my stepmother and it was the last time I've ever -- I ever

10   got to see him was in the courtroom.

11            THE COURT:  So one of -- your dad lost custody of

12   your brother?

13            THE JUROR:  Yeah.

14            THE COURT:  To your stepmother?

15            THE JUROR:  Yeah.

16            THE COURT:  How old -- how many years ago was that?

17            THE JUROR:  It was five years ago.

18            THE COURT:  I see.  How old is your brother now or

19   was he then?

20            THE JUROR:  He's turning 14 on April 3rd.

21            THE COURT:  I see.

22            THE JUROR:  I haven't seen him since he was 8 or 9.

23            THE COURT:  I see.  That must be very hard.

24            THE JUROR:  Uh-huh.

25            THE COURT:  You understand that didn't happen in

1  this courthouse?

2          THE JUROR:  I know.

3          THE COURT:  And different kind of case here.

4          Do you think you'd be able to listen to the

5  evidence and focus, like bring your full focus and attention

6  when you're in the courtroom to the case, and when you're

7  deliberating to the case?

8          THE JUROR:  I also -- I do have an auditory

9  processing disorder, so I have a really hard time listening

10  and understanding things, if things aren't written down on

11  paper for me.  So I don't know if that will affect things.

12          THE COURT:  So a lot of the -- during the two weeks

13  of trial, while there will be a lot of -- a fair number of

14  documents, right?  There will be a lot of testimony that will

15  be very important, people sitting right where you're sitting

16  in the witness chair, testifying, answering questions and

17  speaking.  And you won't have what they say in writing.  And

18  that's not the only evidence in the case.  That's one big

19  piece of the evidence and one important part.  Do you feel

20  like you could listen and take in that evidence and evaluate

21  it?

22          THE JUROR:  No, not really.

23          THE COURT:  Okay.

24          Any questions for either of you?

25          MR. HANNON:  No, Your Honor.

```
1                MS. MANDEL:  No, Your Honor.

2                THE COURT:  Okay.  I'll excuse you from service in

3      this jury.

4                THE JUROR:  Okay.  Thank you.

5                (Juror number 26 not present.)

6                (Juror number 27 present.)

7                THE COURT:  Right up here in the witness box, sir.

8      Right here.  Have a seat right there and just pull the

9      microphone close to you.

10               So you answered yes to, first, the question about

11     knowing some of the companies?

12               THE JUROR:  Quest Diagnostics has done my blood

13     work.

14               THE COURT:  All right.  But you don't do business

15     with them?

16               THE JUROR:  I don't do business with them.

17               THE COURT:  Okay.  Fine.  That's no problem at all.

18     The case won't affect anything about that.

19               You also said, I think, yes to the question that

20     there might be a reason you couldn't be fair?

21               THE JUROR:  I have two members of my family that

22     have been clinically diagnosed with anxiety and depression.

23     I feel that I can be fair, though.

24               THE COURT:  So you've had this experience with

25     these two family members.
```

```
1                THE JUROR:  Excuse me.

2                THE COURT:  You have these two family members who

3     have been so diagnosed, right?  Are they in your immediate

4     family?  Are they cousins?

5                THE JUROR:  One is a niece and one is a

6     sister-in-law.

7                THE COURT:  All right.  And have you had a lot of

8     discussion with them about their anxiety or depression?

9                THE JUROR:  My niece.

10                THE COURT:  All right.  And is there anything about

11     that -- you think you could be, first of all, fair -- just

12     sort of sit fairly and impartially in this case?

13                THE JUROR:  I do.

14                THE COURT:  And do you feel like you could be fair

15     and listen to the evidence, and if Dr. Menninger proved her

16     case --

17                THE JUROR:  I do.

18                THE COURT:  And do you feel like you could listen

19     to it, and if she didn't prove her case, you'd vote for the

20     defendant?

21                THE JUROR:  Excuse me, Your Honor?

22                THE COURT:  If you listened to all of the evidence,

23     and you evaluated it fairly, and she hadn't proved her case?

24                THE JUROR:  Yes, I feel I can.

25                THE COURT:  All right.  And you feel like you can
```

```
 1    listen to the evidence from the defendant and evaluate that
 2    fairly and impartially?
 3              THE JUROR:  Yes.
 4              THE COURT:  All right.  In other words, you could
 5    treat the two of them, and call it the way you see it, sort
 6    of fairly, without putting a thumb either way?
 7              THE JUROR:  Exactly.
 8              THE COURT:  Okay.  Do either of you have follow-up
 9    questions?
10              MR. HANNON:  Nothing here.
11              MS. MANDEL:  Your Honor, I do.
12              In your conversations with your niece about her
13    anxiety disorder or depression, have you --
14              THE JUROR:  I can't hear you.  I'm sorry.
15              MS. MANDEL:  Is this better?
16              THE JUROR:  Okay.  Go ahead.
17              MS. MANDEL:  In your conversations with your niece
18    about her anxiety or depression, have you spoken with her
19    about whether she has asked for an accommodation from school
20    or from work for those conditions?
21              THE JUROR:  No.
22              MS. MANDEL:  Thank you.
23              THE COURT:  All right.  Thank you very much.
24              THE JUROR:  Thank you.
25              (Juror number 27 not present.)
```

```
 1              (Juror number 28 present.)

 2              THE COURT:  Right up here in the witness box.  Good

 3    morning.

 4              THE JUROR:  Good morning.

 5              THE COURT:  So you answered yes I think to the

 6    scheduling question.

 7              THE JUROR:  I did.  I have an 87-year-old mother

 8    who is determined to maintain her independence and she relies

 9    on me to facilitate that.

10              THE COURT:  Does she live near or with you?

11              THE JUROR:  Excuse me?

12              THE COURT:  Does she live with or near you?

13              THE JUROR:  I live in Haverhill.  She lives up in

14    Laconia, New Hampshire.

15              THE COURT:  And so what would it mean for you, if

16    you're on this jury, in terms of what it does in terms of

17    your ability to support her?

18              THE JUROR:  She just relies on me for everything.

19    She has vision and hearing problems.  She can't drive and she

20    relies on me to get to her appointments.

21              THE COURT:  What do you do when you're at work?

22              THE JUROR:  I have her Friday, Saturday, Sunday,

23    and Monday.  And I try to get her through three more days

24    until I can get back there on Friday.

25              THE COURT:  I see.  So every Friday and Monday,
```

```
 1    you're up in New Hampshire?
 2              THE JUROR:  I am.
 3              THE COURT:  All right.  I will excuse you from this
 4    jury.
 5              THE JUROR:  Thank you.
 6              THE COURT:  You're welcome.
 7              THE JUROR:  Is that it?
 8              THE COURT:  That's it.
 9              (Juror number 28 not present.)
10              (Juror number 29 present.)
11              THE COURT:  Right up here in the witness box, sir.
12    Hi.
13              THE JUROR:  Hi.  Thank you, Your Honor.
14              THE COURT:  No problem.  So you raised your hand to
15    having heard or read something about this case?
16              THE JUROR:  Yes.  I was curious to see what courts
17    and cases were available, so I looked at the calendar, and I
18    did put the case number into a web search, and I would -- I
19    think I probably read the first page of the plaintiff --
20              THE COURT:  The complaint.
21              THE JUROR:  -- but not more than that.
22              THE COURT:  Okay.  And do you feel like you can put
23    that out -- if you're on the jury, just decide the case based
24    on what you hear in the courtroom, and not whatever you read
25    on that page.
```

```
 1              THE JUROR:  I did.  However, I've been thinking,
 2    because we had time to think, and a couple questions I almost
 3    raised my hand.
 4              THE COURT:  You can tell me about those things.
 5              THE JUROR:  Yeah.  So regarding your first
 6    question, yes, I don't think -- I mean, you provided more
 7    information than what I read.  I just wanted to know if it
 8    was a criminal case or what was happening in court.
 9              THE COURT:  And you understand, if you're on the
10    jury, no independent research.
11              THE JUROR:  I understand, yes.
12              THE COURT:  You could do that?
13              THE JUROR:  Yes.
14              THE COURT:  Okay.  You said that there were some
15    other things that -- well, you were thinking about, maybe you
16    should have raised your hand.  What are those things?
17              THE JUROR:  Well, for example, there was a question
18    about employment with Bristol Myers Squibb.
19              THE COURT:  Oh, Bristol Myers Squibb.  Yeah.
20              THE JUROR:  I haven't, but my wife worked for seven
21    years with them, and she still is looking for opportunities
22    to get back in, go for interviews and things like that.  She
23    recently did that.  I haven't -- with regards to the question
24    about accommodation, I haven't asked for accommodation, but
25    my son has a disability at school, and he has accommodations,
```

1    and our oldest daughter is going through the process to help

2    them, more time for answering questions and, you know --

3            THE COURT:  What kind of disabilities do your

4    children have?

5            THE JUROR:  Well, my younger one is more behavior

6    driven to ADHD with different modalities, and my older

7    daughter, probably the same.  I did have my -- unfortunately,

8    our middle son passed away due to a significant disabilities,

9    a medical condition many years ago, like ten years ago.  So

10   although I haven't requested accommodations, I'm familiar

11   with accommodations for close family members, and I felt that

12   although it didn't mean that I could raise my hand because it

13   wasn't me, I thought like I wanted to share it.

14           THE COURT:  Do you feel like you could be fair and

15   impartial to both sides in this case?

16           THE JUROR:  I think I can.  I mean, my job is

17   performing audits and leading a group of quality auditors.

18   So I'm being asked to do that every day in my job, right, I

19   need to be fair.  But I just wanted to share that with the

20   Court, so --

21           THE COURT:  All right.  And you also answered yes

22   to the question about having a physical disability or taking

23   medication that might make it hard?

24           THE JUROR:  No, it was probably 26 -- I do suffer

25   for general anxiety because of damaging my ear, tinnitus, but

1    it doesn't affect my job --

2              THE COURT:  Doesn't affect your hearing?

3              THE JUROR:  No.

4              THE COURT:  And here, Dr. Menninger told her

5    company that one of her disabilities was anxiety disorder,

6    social anxiety disorder.  Is there anything about your own

7    experience that might make it difficult for you to be fair

8    and impartial in this case?

9              THE JUROR:  No, again, it's cause by ringing in my

10   ear, and obviously that, while I get used to that, it caused

11   a lot of anxiety.  You know, and it's common, tinnitus, for

12   other people or people that listen to a lot of music.  I

13   mean, I feel like I can do the job, if you ask me to.  I just

14   wanted to just mention those elements.

15             THE COURT:  Thank you.

16             Questions for either of you?

17             MR. HANNON:  Just briefly.  So you mentioned your

18   wife, you say she's involved with GSK?

19             THE JUROR:  No, Bristol Myers Squibb.  It was one

20   of the companies that was mentioned, I think, right?

21             THE COURT:  Yes.

22             THE JUROR:  She used to work for them.

23             MR. HANNON:  Okay.  When did she stop working for

24   them?

25             THE JUROR:  She worked in Puerto Rico plant back

1  in -- I forget, probably around 1999 to 2006 or '07 or '08,

2  just by the time our sick son was born and --

3  MR. HANNON:  And -- I'm sorry.  I cut you off.  And

4  she was a quality manager in that plant?

5  THE JUROR:  She supervised the manufacturing

6  packaging line.  She became like the engineer technical

7  service for the manufacturing process at some point.  And

8  right now, she's a quality manager, but not at Bristol Myers

9  Squibb.

10  MR. HANNON:  Okay.  Understood.  All right.  Thank

11  you.

12  THE COURT:  Ms. Mandel, anything?

13  MS. MANDEL:  Nothing, Your Honor.

14  THE COURT:  All right.  Thank you very much.

15  (Juror number 29 not present.)

16  (Juror number 30 present.)

17  THE COURT:  Good morning.  Right up there on the

18  witness box.  And just have a seat and pull the microphone

19  close to you.

20  So I think you answered yes to the question about

21  having worked as a supervisor where you received or

22  considered a request for an accommodation?

23  THE JUROR:  I am a supervisor.  So in my job, and

24  I've been doing this for about 15 years, there have been a

25  couple of occasions where I have been asked and made

1    accommodations for people, and it ranged from anything from

2    we built out a wellness room for nursing mothers, to people

3    who had kids that had different schedules, especially when

4    COVID came up.  So I've been -- yeah, I've made

5    accommodations in the past.

6              THE COURT:  All right.  Anything about that

7    experience that might make it difficult for you to fairly and

8    impartially evaluate this case?

9              THE JUROR:  I don't think so.  No.  I can see it

10   from both sides, and as a manager, as long as the work is

11   getting done, then I've had no issues with making those

12   accommodations.

13             THE COURT:  Okay.  Do either of you want to ask

14   follow-up questions?

15             MR. HANNON:  Just briefly.  So in your past

16   experiences, was there ever an occasion where someone

17   complained about the way that you had handled a request for

18   accommodation?

19             THE JUROR:  No, not that I recall.

20             MR. HANNON:  That's all.  Thank you.

21             THE COURT:  Any question for you?

22             MS. MANDEL:  No, Your Honor.

23             THE COURT:  All right.  Thank you.

24             (Juror number 30 not present.)

25             (Juror number 31 present.)

```
1                    THE COURT:  Good morning.

2                    THE JUROR:  Good morning.

3                    THE COURT:  So you answered yes both to the

4       schedule question and that there might be a reason that it

5       would be hard for you to serve fairly and impartially?

6                    THE JUROR:  Yes.

7                    THE COURT:  Tell me about both of those.

8                    THE JUROR:  So in the line of my work, I do work

9       with PPD.

10                   THE COURT:  What do you do with PPD?

11                   THE JUROR:  Yeah, I mean, I work for a biotech

12      company, and we use them.

13                   THE COURT:  To do laboratory testing?

14                   THE JUROR:  Yes.

15                   THE COURT:  Okay.  Have you ever worked with

16      Dr. Menninger?

17                   THE JUROR:  No.  Not directly.

18                   THE COURT:  And have you heard of her name before?

19                   THE JUROR:  No, I haven't.

20                   THE COURT:  How about the Global labs in Kentucky,

21      their lab in Kentucky.

22                   THE JUROR:  No, I work with the labs in Virginia

23      based.

24                   THE COURT:  So that's what caused you -- you're

25      just worried about that, or you wanted to raise it.
```

 1              THE JUROR:  Yes.

 2              THE COURT:  Do you feel like you could be fair

 3     or -- how much business do you do or how much work do you do

 4     with PPD?

 5              THE JUROR:  A lot.  We work on clinical trials, so

 6     we use them.  They're one of our big lab vendors.

 7              THE COURT:  So would you say that you're

 8     interacting with someone from PPD every week?

 9              THE JUROR:  Yes.

10              THE COURT:  Okay.  All right.  Any follow-up

11     questions for either of you?

12              MR. HANNON:  Do you know who the head of the --

13     well, actually, I'm going to ask a different question.  Do

14     you know if you work with PPD's Global Central Labs?

15              THE JUROR:  I believe so, yes.

16              THE COURT:  And do you know who leads that?

17              THE JUROR:  I don't.  I just have a contact of a

18     project manager that I work with directly.

19              MR. HANNON:  Okay.  And that's all I have.  Thank

20     you.

21              THE COURT:  Anything you want to ask?

22              MS. MANDEL:  Yeah, just briefly.

23              Based on your work with PPD, do you have any

24     opinions about the company one way or another?

25              THE JUROR:  Yeah, actually, I do.  Just from the

1    quality of the type of work I've seen coming from them, we've

2    had issues with them before.  So I do.

3                    THE COURT:  Okay.  Thank you.  I'll excuse you.

4                    THE JUROR:  Thank you.

5                    (Juror number 31 not present.)

6                    THE COURT:  Do either of you want me to make a

7    record about that, or do you both agree?

8                    MR. HANNON:  I concur, Your Honor.

9                    THE COURT:  What did you say?

10                   MR. HANNON:  I concur.

11                   THE COURT:  And you?

12                   MS. MANDEL:  As do we.

13                   (Juror number 32 present.)

14                   THE COURT:  Okay.

15                   Right up here in the witness box.

16                   THE COURT:  Good morning.

17                   THE JUROR:  Good morning.  How are you?

18                   THE COURT:  Good.  How are you?

19                   THE JUROR:  Doing well, thanks.

20                   THE COURT:  So you answered yes to both the

21   question about you or a family member or a friend being in

22   psychiatrist, psychologist, or social worker, as well as a

23   scheduling issue?  So why don't you tell me about those two

24   issues.

25                   THE JUROR:  Good friend that's a psychiatrist, also

1   some mental health in the family, so very familiar with a few

2   kind of professionals that we've looked with a larger family

3   matter.

4            THE COURT:  And the scheduling issue?

5            THE JUROR:  Scheduling issue, not a set thing.  I

6   work in sales, so a good portion of my kind of compensation

7   is tied to the work that I do.  So that's a big part of it.

8   And also, a tech company that's going through some fairly

9   significant layoffs, so being a performance-based individual,

10  definitely a little bit of concern around being out of the

11  office for --

12           THE COURT:  Is most of the work, the sales that you

13  do in person, by Zoom, by phone?

14           THE JUROR:  Zoom and in person.  It's mixed mostly.

15  I would say mostly Zoom, but there's a portion that's

16  in-person, as well.

17           THE COURT:  Okay.  Well, I'll just ask you

18  honestly, like we'll be done -- except for today and next

19  Monday, during the trial, like the rest of this week, next

20  week, you'll be done at 1 o'clock.  That gives you the

21  afternoon -- I understand it's not the same as being there

22  all day, but it gives a meaningful amount of time.  And I'll

23  just ask you, do you feel like if this were your case, if you

24  were one of the parties, you would want everyone on the jury

25  to be focused, right?

1          THE JUROR:  Yeah.

2          THE COURT:  So do you feel like the sort of

3   performance-based compensation, the worry about what's going

4   on in the tech world and/or at your company, would be such

5   that you could put that and say, no, I can focus, and I can

6   do this, or would you feel like that's going to be in the

7   back of your mind, and you know, you wouldn't be able to

8   really give it -- if you were them -- if you were a party to

9   this case, you wouldn't necessarily want you on the jury?

10          THE JUROR:  There's definitely a little bit of a

11   concern, just for layoffs and stressors going on right now,

12   that's a little bit at the forefront of my mind, but if I was

13   chosen, I would do my best to dedicate my time to it.

14          THE COURT:  And does your good friend, the

15   psychiatrist, talk to you about his or her work?

16          THE JUROR:  Yeah, not in overly depth.  I mean, I'm

17   familiar with a lot of that and what goes on to a day-to-day.

18          THE COURT:  And the experience with mental health

19   and family, any of that have to do with social anxiety

20   disorder or panic disorder?

21          THE JUROR:  Social anxiety disorder, panic

22   disorder, yeah.

23          THE COURT:  Was that someone close to you?

24          THE JUROR:  Myself, actually.

25          THE COURT:  Okay.  And you suffer from that?

1          THE JUROR:  Yeah, from -- in my past, yeah, not

2     currently, but in the past, yeah.

3          THE COURT:  And do you feel like you could judge

4     this case fairly and impartially?

5          THE JUROR:  I would say so.  I think it's something

6     that's personal to me, but I still would honor to not -- be

7     nonbiased in the situation.

8          THE COURT:  What was the last point?

9          THE JUROR:  I would choose to be nonbiased.

10          THE COURT:  That you could listen to

11     Dr. Menninger's evidence and PPD's evidence, and if you felt

12     like she hadn't proved that she had a disability, or she

13     hadn't proved some other element of her claim, then you could

14     rule against her, no problem?

15          THE JUROR:  Yeah.  Correct.  Yeah.

16          THE COURT:  And if you felt like she had proved her

17     claim, one or more of her claims, you could rule in her

18     favor, no problem.

19          THE JUROR:  Correct, yeah.

20          THE COURT:  And you feel like you could -- if you

21     were PPD, you would feel like you could give PPD a fair

22     shake?

23          THE JUROR:  Yes.

24          THE COURT:  And same for Dr. Menninger?

25          THE JUROR:  Correct, yeah.

```
 1              THE COURT:  Okay.  Either of you have follow-up
 2    questions?
 3              MR. HANNON:  Nothing here.
 4              MS. MANDEL:  In connection with the social anxiety
 5    disorder that you mentioned that you've had in the past, have
 6    you ever asked for an accommodation at school or work in
 7    connection with that?
 8              THE JUROR:  I have, yes.  Not at work, but at
 9    school.
10              MS. MANDEL:  How long ago did that take place?
11              THE JUROR:  Eight years ago, probably.
12              MS. MANDEL:  And did the school grant your request
13    for an accommodation?
14              THE JUROR:  No, they did not.
15              MS. MANDEL:  Do you have an opinion now about the
16    school's decision not to grant that accommodation request?
17              THE JUROR:  I do, yeah.
18              MS. MANDEL:  What is that opinion?
19              THE JUROR:  I think it was unfairly with the school
20    at the time.  Yeah, there was definitely some hard feelings
21    at that point.  So, yeah.
22              MS. MANDEL:  Thank you.
23              THE COURT:  What did you request?
24              THE JUROR:  I requested six months, a semester, off
25    of school for anxiety situation.
```

1          THE COURT:  Just asked to take time off of school.

2          THE JUROR:  Correct.  Yeah.

3          THE COURT:  And then be able to return to school

4     right where you were.

5          THE JUROR:  Yeah.  And a pardon for exams, as well.

6          THE COURT:  And -- I'm sorry, what was the other

7     part?

8          THE JUROR:  A pardon for, like, final exams or like

9     what we have, end of midterms kind of deal, like that.

10          THE COURT:  Oh.  So it was like partway through the

11     semester.

12          THE JUROR:  Yeah, it was partway through the

13     semester.

14          THE COURT:  So ask them to be able to return in the

15     middle of the semester when you come back?

16          THE JUROR:  Yeah.  Correct.

17          THE COURT:  And they said, "No.  If you leave, you,

18     you leave and you come back" --

19          THE JUROR:  Come back on your own accord, but the

20     exams, we're not going to give you extra time or things like

21     that.  So it wasn't granted at the time.

22          THE COURT:  I see.  Okay.  And did you go back

23     there?

24          THE JUROR:  I did go back there, yeah.  Yeah, yeah.

25          THE COURT:  And do you feel like you could listen

1    here to this evidence about Dr. Menninger's and PPD's

2    response and independently and fairly evaluate it?

3                 MS. MANDEL:  I do, yeah.

4                 THE COURT:  Any other follow-up for either of you?

5                 MR. HANNON:  No, Your Honor.

6                 MS. MANDEL:  No, Your Honor.

7                 THE COURT:  All right.  Why don't you step outside.

8    Thank you.

9                 THE JUROR:  Okay.  Thank you.

10                (Juror number 32 not present.)

11                MS. MANDEL:  Your Honor, I have two concerns about

12   juror number 32.  One is that, according to his own

13   statements, he would be distracted because of his work

14   issues; and the other is that he said that he feels that it's

15   unfair that his school denied him a request for an

16   accommodation for a disability that's identical to the one at

17   issue in this case.

18                MR. HANNON:  May I respond?

19                THE COURT:  Yes.

20                MR. HANNON:  Last one first:  not identical at all.

21   Very, very different in terms of the accommodations and the

22   factual circumstances here.  He gave no indication that he

23   thought that that was going to, in any way, cause him any

24   kind of bias.

25                He didn't raise his hand to that question.  We only

1    stumbled upon that when we found out that he had suffered

2    from some of these mental health conditions.  So I don't

3    think that there's any merit to that.

4            In terms of the distracted, we all have lives

5    outside of the courtroom.  Everyone suffers from distractions

6    or other obligations.

7            THE COURT:  You do?

8            MR. HANNON:  I do.

9            And not to downplay the seriousness of his

10   concerns, I respectfully suggest it's not a basis for

11   excluding from the jury.

12           THE COURT:  I'm going to overrule it for these two

13   reasons.  One, I thought on balance, his statement about the

14   concern about layoffs and the like was -- it's there.  It's

15   not zero, but he persuaded me that he would sufficiently be

16   able to focus, and he could put it aside.  And everybody does

17   have lives or other considerations outside or didn't seem so

18   strong that he couldn't serve.  And with respect to the

19   other, I think it's sufficiently different, and he seemed

20   quite comfortable with the idea that he could rule either

21   way, he could listen to the evidence for Dr. Menninger, he

22   could listen to the evidence for PPD.  If she doesn't prove

23   her case, he's comfortable ruling against her, and ruling for

24   PPD, so I'm going to overrule that objection.

25           Just pause for a minute.  I think that gives us 19

1    jurors, because the next three didn't raise their hand.  I

2    think that's enough, because we seat 12.  Even if we seat 12,

3    you each have three strikes.  That's 18.  That gives us one

4    extra.

5            Before we bring them back in, I just have to go

6    back to resolve juror number 9.  Your respective positions,

7    just remind me again what your positions are and what you're

8    urging me to do.

9            MS. MANDEL:  Your Honor, juror number 9 is the

10   juror who said, when asked if he could -- I don't remember

11   the exact wording, Your Honor, but if he could, I think, find

12   in Dr. Menninger's favor.

13           THE COURT:  He's the juror who was fired in France,

14   25 years ago.

15           MS. MANDEL:  Yes.  And he gave what we heard as

16   unequal answers about being able to find for each party.  So

17   he said that he would be able to, in Dr. Menninger's favor,

18   and he said he would have to with regard to PPD's position in

19   the case.  And so it came across as unequal answers, implying

20   bias.

21           THE COURT:  What do you say, Mr. Hannon?

22           MR. HANNON:  I'm fine having him struck.

23           THE COURT:  Fine.  I'll excuse him for cause.

24           So Sam, juror number 9 is excused for cause.  And

25   we'll pause here.  We'll bring everyone back in and we'll --

1           MR. HANNON:  May we -- sorry to jump in.  I'm

2    advised we need a bathroom break on my side.

3           THE COURT:  Sure.  So why don't we do this.  We'll

4    take a couple minutes' bathroom break, and then we'll bring

5    the -- after they come back in, then we'll bring everyone

6    back in.

7           MS. DORE:  Is 32, is he now being excused or is he

8    staying?

9           THE COURT:  32 is not being excused, he's cleared.

10   33, 34, and 35 are cleared.  I'm stopping there because I

11   think we'll get the jury out of those.  But don't send --

12   since there's no other trials, no need to send them all

13   downstairs yet.

14          Okay.  So we'll stand in recess.  We'll return in

15   five minutes and then we'll come back and then we'll bring

16   them all back in.

17               (Court in recess at 12:04 p.m.

18               and reconvened at 12:13 p.m.)

19          THE COURT:  Please be seated.

20          Bring the jurors in.  They can come and sit

21   wherever.

22          MS. DORE:  Okay.

23               (The venire enters the courtroom.)

24          THE COURT:  All right.  Please be seated.

25          So ladies and gentlemen, we've now finished the

1    second part I told you about, jury selection questions, and

2    then I talked to people individually.  And now we're going to

3    go to the third part, where we pick the jury from among some

4    of you.  So if I call your name -- or your number, rather,

5    not your name.  I'll be calling your numbers, then come

6    forward and sit in the seats in the jury box, and then we'll

7    do the third part, which should run pretty quickly.

8            So juror number 2, if you would sit in the first

9    seat, in the first row here.  And juror number 3, if you

10   would sit in the next seat.  And juror number 5, in the

11   seat -- the third seat.  And juror number 7, if you'd sit in

12   the fourth seat.  Juror number 8, in the fifth seat, and

13   juror number 11, in the sixth seat in the first row.

14           And juror number 12, if you'd come forward and sit

15   in the second row, in the second -- the --

16           Ms. Belmont, will you show her the seat?

17           THE DEPUTY CLERK:  Yes.

18           THE COURT:  Thank you.

19           Juror number 13, if you would be in the next seat,

20   the second seat in the third row -- the second row, I mean.

21   And juror number 14, the third seat in the back row.  And

22   juror number 16, if you'd go to the fourth seat.  Juror

23   number 24, if you'd go to the fifth seat.  And juror 27, if

24   you would go to the next seat in the second row.

25           All right.  And if we just -- some of you we've

1    spoken with already, but some of you we haven't.  And so if

2    we just start going down the line, starting with you, juror

3    number 2, just say what you do for work; or if you formerly

4    work, you don't work now, what you formerly did for work; if

5    you live with a spouse, or partner, or significant other,

6    something of that nature, what that person does or did work

7    for work.

8                THE JUROR:  I work for three financial advisors at

9    UBS Financial Services.  I take care of my mom.  She's 88.

10   And I have four daughters and five grandchildren.

11               THE COURT:  Wow.  Good for you.

12               THE JUROR:  I work at Brookline Bank as a branch

13   manager.  I live at home with my wife and three-year-old

14   daughter.  My wife is in marketing for e-textbooks.

15               THE JUROR:  I work for a biotech company.  I lead a

16   team doing computational analysis.  I don't have a wife.

17               THE JUROR:  I'm a physical therapist.  I work in a

18   public school system.  And I live with my two sons, 17 and

19   12.

20               THE JUROR:  I am a nurse practitioner, and I work

21   at the Brigham.  I live with my mom, my husband, and my

22   nephew.

23               THE JUROR:  I'm a field service engineer for a

24   biotech company.  My wife is a nurse.

25               THE JUROR:  I work at a biotech company,

1    manufacturing medical devices.  I work in a clean room lab.

2           THE JUROR:  Medical device company, specifically

3    artificial intelligence, based out of South Korea.  I live at

4    home with my wife and four children.  She works for a

5    recruiting company.

6           THE JUROR:  Retired schoolteacher.  Husband is a

7    retired electrical manufacturer.

8           THE JUROR:  I work for a scientific equipment

9    company.  My wife is a software engineer.  I have two

10   children -- we have two children.

11          THE JUROR:  I am currently a photographer and

12   formerly was an attorney, but had a large gap of time.  It's

13   been many years since I practiced.  My husband works for Bank

14   of America, and we have three children who don't live with

15   us.

16          THE JUROR:  I am a jeweler.  My wife works for the

17   Archdioceses of Boston as an administrative secretary.

18          THE COURT:  Thank you.  All right.

19          Counsel, I'll give you a moment.

20          (The following discussion held at the bench.)

21          THE COURT:  All right.  You go first, Mr. Hannon.

22          MR. HANNON:  Number 3.

23          THE COURT:  All right.  Juror number 3 is struck by

24   the plaintiff.

25          What about you?

```
1              MS. MANDEL:  14.

2              THE COURT:  Juror number 14 is struck by the

3    defendant.

4              Anyone else you want to strike?

5              MR. HANNON:  Number 5.

6              MS. MANDEL:  We'll strike number 8.

7              THE COURT:  Number 8.

8              Anyone else you want to strike?

9              MR. HANNON:  Number 13.

10             THE COURT:  Number 13.  That's your third and last

11   strike.

12             MR. HANNON:  I know.

13             THE COURT:  Anyone else you want to strike?

14             MS. MANDEL:  No.

15             THE COURT:  So one thing.  So I realized that I

16   made a mistake when I was calling during my typical practice.

17   I skipped juror number 10.  That was inadvertent.  Okay.

18   They were cleared.  And I usually go in order.  I didn't.

19             Since you were both, I assume, thinking that the

20   next juror I called would be -- after 27, I'm inclined to

21   keep going and not call number 10 right now.

22             Is that fine with both of you?

23             MR. HANNON:  That's fine.

24             THE COURT:  In order, I assume you were

25   thinking ahead --
```

```
 1              MR. HANNON:  I was.

 2              THE COURT:  If we come around, if we get to the end

 3    of the cleared people, and I want one more to get 12, then I

 4    will go to juror number 10.

 5              MS. MANDEL:  Okay.

 6              THE COURT:  All right.  So 3, 5, and 13 for you.

 7              And 14 and 8 for you, leaving one more strike.

 8    Okay.

 9              (Bench conference concluded.)

10              THE COURT:  Okay.  If I call your number, come

11    forward, see Ms. Belmont, she'll give you your card, and

12    you'll go downstairs.

13              Juror number 3, juror number 5, juror number 8,

14    juror number 13, and juror number 14.

15              Okay.  Juror number 29, if you would take the

16    second seat in the first row.

17              Juror number 30, if you would take the third seat

18    in the first row.

19              Juror number 32, if you would take the fifth seat

20    in the first row.

21              Juror number 33, if you would take the empty seat

22    in the second row, closest to me.

23              Juror number 34, if you would take the next empty

24    seat.

25              And that's it.
```

```
 1              Those of you who are new to the jury box, if you
 2      would just say -- answer the same question that I posed to
 3      the other jurors before.
 4              Starting with you.  Yes, sir.
 5              THE JUROR:  My name is is Yrimia Herrera.  I'm a
 6      senior quality audit, care, and compliance manager for
 7      Bristol Myers Squibb.  As I mentioned before, auditing and
 8      compliance is the world that I spend my time in.
 9              My wife is a quality manager for a medical device
10      company here in Massachusetts, as well.  She's right now
11      mostly in handling.
12              I supervise employees.
13              We had three kids, one of them deceased.  The other
14      two are 14 and 9, just recently.
15              THE JUROR:  I work in the commercial real estate
16      field.  I manage a region for First American Title Insurance
17      Company.  My husband is a fourth grade teacher in Boston.  We
18      live with our 18-year-old, soon-to-be-college-going daughter.
19              THE JUROR:  Chandler Rodriguez.  I work in software
20      sales for Salesforce.  And I live by myself.
21              THE COURT:  You're next, yes, sir.
22              THE JUROR:  I'm a commercial truck driver.  I
23      deliver propane for the largest propane company in Canada.
24              My wife is an AP manager for the City of
25      Gloucester, and we live with two children.
```

1          THE COURT:  Thank you.

2          THE JUROR:  Hello.  My name is Tracey.  I'm a

3  career counselor at Bridgewater State University.  My husband

4  is a police officer with Bridgewater Police Department.  We

5  have two kids, one 13 and one 17 -- one 16.

6          THE COURT:  Thank you.

7          All right.  I'll give you a moment, Counsel.

8          (The following discussion held at the bench.)

9          THE COURT:  Anybody you want to strike?

10         MS. MANDEL:  29.

11         THE COURT:  Okay.  So that's the last strike.  And

12  so the person who replaces 29 will be number 35, because

13  that's where we stopped at clearing people.  Okay?  All

14  right.

15         So I'll have that person answer the question, and

16  then we'll be done.

17         (Bench conference concluded.)

18         THE COURT:  All right.  Juror number 29, if you'd

19  come forward and see Ms. Belmont.

20         And juror number 35, if you'd come forward and take

21  that empty seat, the one in the first row right here.  Yes.

22  Thank you.

23         And if you'd just answer the question everybody

24  else answered.

25         THE JUROR:  My name is Edward Crowley.  I'm a

1    enterprise software salesmen.  My wife is a head coach for

2    Boston College women's hockey team.  And we have one daughter

3    who's nine years old.

4              THE COURT:  Okay.  All right.  Anything else,

5    counsel.

6              MR. HANNON:  Nothing here, Your Honor.

7              MS. MANDEL:  Nothing here, Your Honor.

8              THE COURT:  All right.  So for those of you in the

9    audience, thank you very much.  You're not going to be needed

10   for service on this jury.  I want to thank you very much for

11   your patience with us this morning, you spending the time and

12   waiting, and it's very helpful.  We didn't need to reach all

13   of you, but your willingness to serve is very important, so

14   you're excused.  Ms. Dore and Ms. Belmont will give you your

15   cards and you can go downstairs to the jury office.

16             So ladies and gentlemen, let me explain what will

17   happen the rest of the day and I will have some more

18   information.  So you are the jury in this case.  And so,

19   Ms. Belmont -- what's going to happen now is, in a moment,

20   Ms. Belmont will administer the oath to you as jurors.  And

21   then we'll take a break for five minutes, you'll take all of

22   your stuff and you'll go into the -- she'll show you where

23   the jury room is, and you can get set up in there.  You'll

24   come back.  We'll do --- and then I will have some

25   preliminary instructions for you about jury service and the

1    like, and depending what time it is, and how long that takes,

2    we'll probably then break for lunch for an hour, and I'll

3    talk to you about that.  And then you'll come back for two

4    hours, 2:00 to 4:00, but done by 4:00, and we'll have opening

5    statements and some evidence.  And then we'll break for the

6    day.  And I'll give you a little more -- you pretty much know

7    what the schedule is, but I'll go over it with you again.

8              All right.  So Ms. Belmont, if you'd swear the

9    jury.

10             THE DEPUTY CLERK:  Jurors, if you could please

11   stand and raise your right hands.

12             (The jury was duty sworn.)

13             THE COURT:  All right.  Thank you.

14             So all rise for the jury, we'll take a brief break

15   right now, so Ms. Belmont can show you the jury room.

16             (The jury exits the courtroom.)

17             THE COURT:  So my thought for the schedule is this:

18   That they'll come back and I'll give them preliminary

19   instructions, and then let's break for lunch.  And if it's

20   before 1:00, we'll break early.  We'll take an hour for

21   lunch, we'll come back, and then you can go openings.  And

22   then we don't have to break up the openings, and then you can

23   do the openings and go right to evidence, and maybe we get a

24   little more than two hours, depending on how long it goes.

25             Does that make sense to both of you?

```
 1              MR. HANNON:  Yes, it does.

 2              MS. MANDEL:  Yes, Your Honor.

 3              THE COURT:  On the preliminary instructions, one --

 4     so I've often had the habit of repeating the summary that I

 5     read to the venire as sort of a summary of the case.  I'm not

 6     really sure the utility of that.  I'm happy to do it, I have

 7     it.  I can skip it, make it slightly shorter.  If you want me

 8     to say it, I'll say it.  If you both agree that I can skip

 9     it, I'll skip it.

10              MR. HANNON:  I'm happy to defer to you, Your Honor.

11              MS. MANDEL:  Likewise.

12              THE COURT:  All right.  Then I'll see.  I may skip

13     it.  I'll see how it goes, just to make it shorter.  All

14     right.

15              Unless you need a break, I say we just wait here,

16     so we can jump right in, as soon as Ms. Belmont's ready.

17              (Pause.)

18              THE COURT:  This is why six-person juries are

19     faster.

20              If you all could pick, how many people would you

21     pick?  Six, eight, ten?

22              MR. HANNON:  20.  The more the merrier.

23              THE COURT:  More the merrier.  20.

24              How about you?

25              Forget 20, since we're never going above 12.
```

1          MS. MANDEL:  I think somewhere between 6 and 12,
2    just for efficiency purposes.
3          THE COURT:  Like eight, you would be fine with
4    eight, or ten.
5          In state court, are you mostly getting six person
6    or 12, or somewhere in between?  In civil cases.
7          MR. HANNON:  I'm told they're still doing six, and
8    I'm told that the primary motivating factor is cost, because
9    they're saving a fortune on lunches.
10         THE COURT:  They give lunch every day?
11         MR. HANNON:  Or whatever the cost is.
12         THE COURT:  Just like the juror fee and --
13         MS. MANDEL:  And throughout COVID, things have
14   gotten really complicated, so mostly six, I think, yeah.
15         THE COURT:  If this were COVID, I would have
16   done -- during the COVID, well, if we had them, when we had
17   them, sort of in the emergent, I would have done six, or
18   maybe seven in this case, because it's two weeks.  But I
19   think there's a value of a little bigger than six, it's just
20   a group dynamics, you get a bigger group, it's a little
21   better decision process.  I can't prove that, but --
22         (The jury enters the courtroom.)
23                **PRELIMINARY INSTRUCTIONS BY THE COURT**
24         THE COURT:  All right.  You can move down one.
25   Exactly right.  Basically, you got it, if you sit in that

1    seat in the second row, and you sit in that seat in the first

2    row, everyone follows from that.

3            All right.  So just a reminder, I'm going to give

4    you some preliminary instructions now, and then we'll break

5    for lunch for an hour.  I'll tell you about that at the end

6    and have some suggestions for you.  And then we'll come back

7    and we'll hear testimony until 4 o'clock, and then we'll stop

8    at 4:00, and I'll go over, again, the schedule.

9            So these instructions that I'm about to give you

10   will give you a basic framework for considering the evidence

11   as you hear it during the trial.  So the first thing that's

12   going to happen in the trial, after lunch, are the opening

13   statements.  The plaintiff will go first because the

14   plaintiff has the burden of proof, and then the defendant

15   will go.  And opening statements are not evidence.  They're

16   purpose is simply to help you understand what the parties

17   expect the evidence to be.

18           After we're done with opening statements, the

19   plaintiff will start calling witnesses and putting on

20   evidence.  And the plaintiff will present its case, and when

21   she's done presenting her case, at some point you'll hear her

22   lawyer say "the plaintiff rests."  And that means that

23   they're done presenting their case.

24           And then the defendant will be able to present any

25   witnesses -- or additional evidence or witnesses that they

1    wish to present, and when they're done, they'll say the

2    defendant rests.  Typically that's the end of the evidence.

3    And when we're done with that, then we'll have closing

4    arguments.  And you'll hear from the two lawyers about

5    closing arguments, and then I'll give you final instructions

6    on the law and a verdict form.  The final instructions on the

7    law will be much more detailed than what I'm going to give

8    you now, and they'll explain all of the things that you need

9    to determine in order to figure out if the plaintiff proves

10   her claims or not.  And the verdict form will be the

11   questions that you answer.  And the questions are typically

12   yes, no, or an amount of money, but they'll pair with the

13   instructions.  So that's what's to come.  All right.

14        So in terms of your job, it's the duty -- it's your

15   job, and yours alone, to decide from the evidence what the

16   facts are.  It is my job to decide what the law is and to

17   explain the law to you.

18        You will hear the evidence, decide what the facts

19   are, and then apply the law I give you to those facts.  You

20   must follow the law as I explain it, whether you agree with

21   it or not.

22        You will decide this case on the evidence before

23   you and the law as I give it to you.

24        Sometimes jurors are curious about whether I

25   believe certain witnesses or about how I think the case

1    should be decided.  My opinion, if I have one, and I

2    certainly do not have one now, is not relevant at all.  It is

3    your role, not mine, to decide those issues.  You should not

4    interpret anything I may say or anything I may do during the

5    trial as indicating what I think about a witness or what I

6    think your verdict should be.

7              The plaintiff -- this is a civil case, as I told

8    you.  I'm not going to explain the brief summary of the case

9    again, because you heard that this morning.  And the lawyers

10   will give you their explanation of the case in -- a little

11   later today when you hear their opening statements.

12             But the plaintiff, Dr. Menninger in this case, has

13   the burden of proving her claims to you by a preponderance of

14   the evidence.  This is a less rigorous standard than proof

15   beyond a reasonable doubt, a standard you've probably heard

16   of and which applies in criminal cases.  Here, Dr. Menninger

17   has the burden of convincing you, in light of all the

18   evidence, that her claims are more likely true than not.

19             If you find that Dr. Menninger meets this burden,

20   you must return a verdict in her favor.  If Dr. Menninger

21   fails to meet this burden, then your verdict must be for the

22   defendant.

23             I expect the evidence in this case will include

24   witness testimony, documents and other things received as

25   exhibits, and any facts which the parties have agreed are

1    true.

2              As to exhibits, things that come into evidence, you

3    will have those in the jury room during your deliberations.

4    What you won't have is a transcript of the testimony.

5              There are legal rules that control what you may

6    consider as evidence.  When a lawyer asks a question or

7    offers something as evidence, and the lawyer on the other

8    side thinks it is not permitted by the rule of -- rules of

9    evidence, that lawyer may object.  This simply means that the

10   lawyer is asking me to decide whether the rules of evidence

11   allow you to consider the challenged information.

12             It may be necessary for me to discuss the issue

13   with the lawyers privately, either by having a conference

14   over there, what we call the sidebar -- where you saw me with

15   the lawyers a couple times during jury selection -- while

16   you're in the courtroom, or by calling a recess.  I will do

17   my best to keep those conferences to a minimum or zero.

18             The purpose of those conferences is usually so that

19   I can make a decision on the rules of evidence.  We're not

20   keeping things from you to frustrate you, and we do our best

21   to try to have those discussions before 9:00 a.m., when

22   you're hearing evidence, and today after 4:00, or most other

23   days after 1 o'clock when you're done, so that we -- your

24   time that you give us, you're here listening to evidence,

25   rather than sitting there, watching us talk to each other.

1    So I can't promise you that it will never happen, but we're

2    doing our best to try to minimize that.

3              There are certain things that are not evidence.

4    Statements and arguments by lawyers are not evidence.

5    Questions by lawyers, standing alone, are not evidence.  The

6    question and the answer, taken together, are the evidence.

7              Objections are not evidence.  If I sustain an

8    objection -- in other words, if I agree with the lawyer

9    objecting -- you must ignore the question or exhibit and must

10   not try to guess what the answer might have been or what the

11   exhibit might have contained.

12             Anything that I strike or tell you to disregard is

13   not evidence and must not be considered.

14             Anything you hear about this case outside of the

15   four walls of this courtroom is not evidence.  You must

16   decide this case based only on what you see and you hear in

17   the courtroom.

18             In deciding what the facts are, you may have to

19   decide what testimony you believe and what testimony you do

20   not believe.  You may believe all, some, or none of what any

21   witness says.  It is entirely up to you.

22             I will give you suggestions at the end of the trial

23   for how to go about assessing witness credibility.

24             Two ensure fairness, all of you must obey the

25   following rules during the trial.  First, do not make up your

1     mind about what the verdict should be until after you have

2     gone to the jury room to decide the case, and you and your

3     fellow jurors have discussed the evidence.  Keep an open mind

4     until then.

5             Second, do not talk among yourselves about this

6     case or about anyone involved with it until the end of the

7     case, when you go to the jury room to decide on your verdict.

8             You should feel free to get to know one another and

9     to talk about other matters, like the weather or your

10    families.  Anything but this case.

11            Third, do not talk with anyone else about this case

12    or about anyone who has anything to do with it until the

13    trial has ended.  Anyone else includes members of your family

14    and your friends.  You may tell them that you are a juror,

15    but do not tell them anything about this case until after you

16    have been discharged by me at the end of the trial.

17            Fourth, do not discuss this case in any way, in any

18    electronic forum, or form.  You may not talk about the case

19    in an e-mail, a text message, Twitter, Facebook, any other

20    social media site, or in any other online forum.

21            Fifth, do not let anyone talk to you about the case

22    or about anyone who has anything to do with it.  If someone

23    should try to talk to you, please report it to me

24    immediately.

25            Sixth, during the trial, do not speak to any of the

1    parties, the lawyers, or witnesses involved in this case.  It

2    is important not only that you do justice in this case, but

3    that you give the appearance of doing justice.  And if

4    someone saw you talking to someone involved in this case,

5    even if you were just being polite, it might arouse suspicion

6    or call into question your impartiality, so don't do it.  If

7    one of the lawyers or the parties or witnesses does not speak

8    to you when you pass in the hall or ride in the elevator,

9    they are not being rude.  They are not permitted to talk to

10   you for the same reason I'm instructing you not to talk to

11   them.

12       Seventh, don't read any news stories or articles

13   about the case or anyone involved with it or any radio or TV

14   reports or anything like that.

15       Eighth, no independent research.  That means no

16   googling the people, the parties, the claims, the

17   information, the evidence, nothing.  Don't do any other kind

18   of internet research.  Don't conduct any independent research

19   of any kind about the parties, the claims, or the law.

20   Everything that you need will be provided for you right here

21   in the courtroom.

22       Finally, during the course of the trial, if you

23   have any kind of a problem, let me know right away, so that I

24   can take care of it.  If a lawyer steps between you and the

25   witness, so you can't see the witness, raise your hand, and

1    we'll have the lawyer move.

2            If you cannot hear a witness, raise your hand, and

3    we'll have that witness repeat his or her answer.

4            If you need a glass of water or a short break for

5    any reason, let us know, and we'll take care of that.

6            If you need to communicate to me when we're not in

7    court, just give a note to Ms. Belmont or the court security

8    officer to give to me.

9            The rules are important, so please follow them.

10           You'll be allowed to take notes during the trial.

11   It may come as a shock to you that there was a point in time

12   in our country's history where jurors were not allowed to

13   take notes, but it's pretty conventional now that jurors can

14   take notes.  So you have notebooks that you can use to do

15   that.  A couple of cautions about notes.  You are not

16   required to take notes and you can choose not to do so.  If

17   you take notes, don't allow your note-taking to distract you

18   from listening to the witnesses and listening carefully.

19   It's important that you observe and listen to each of the

20   witnesses.

21           Take your notebooks to the jury room at each

22   recess.  You cannot take them home or anywhere else outside

23   the courtroom.

24           Ms. Belmont will collect them at the end of each

25   day.  No one will look at them.  They'll be returned to you

1   the next morning, and when the case is over, we'll destroy

2   your notes without reading them.

3          During the trial, you will be permitted to ask

4   questions of the witnesses, if you wish, that are not posed

5   by the lawyers.  If, during the examination of a witness, you

6   have a question that you would like that witness to answer,

7   write that question down on a piece of paper and raise your

8   hand.  Ms. Belmont will grab the question, the piece of paper

9   from you.  I'll take a look at it.  I will review it, to be

10  sure that it's something that the -- that I think the witness

11  might be able to answer within the rules of evidence, and

12  then I'll provide it, either way, to the lawyers.  And

13  either -- just so you understand, they might ask the question

14  right away, it may be a topic they're coming to, and they

15  might think that reaching that question would be better in

16  the presentation of evidence a little later, so they might

17  get to it later, if they do that.  If it's a question that

18  for some reason I think can't be answered, after I confer

19  with the lawyers, then I'll explain to you why it can't be

20  answered, just so you know.

21          You should not draw any inference from the fact

22  that a question you wrote down was not posed during an

23  examination or -- and draw no inference from which lawyer

24  posed the question.  That doesn't make any difference and you

25  shouldn't draw a conclusion one way or the other from that.

```
 1              As I told you before, no transcript from Ms. Lopez,
 2    because it takes too long to prepare one.  So listen
 3    carefully to the witnesses.
 4              That's all I have for preliminary instructions from
 5    you.
 6              So what we're going to do now is we'll take a break
 7    for lunch and ask you to return -- it's five of 1:00, so I
 8    ask you to return at five of 2:00, so we can start.  We'll
 9    start at five of 2:00 and we'll go until 4 o'clock.  We'll
10    have opening statements and witness testimony.
11              So a couple of suggestions to you in terms of
12    lunch.  One, you can do --
13              Did you already talk to them about this?
14              THE DEPUTY CLERK:  No.
15              THE COURT:  Okay.  You can go downstairs, we have a
16    cafeteria in the second floor.  You're welcome to go
17    downstairs to the cafeteria.  You can eat in the cafeteria,
18    you can bring your lunch -- the jury room is yours.  You can
19    bring your lunch up and eat it in the jury room if you wish.
20    You can go out.  There are a variety of restaurants and fast
21    food of all sorts in the neighborhood.  You can go avail
22    yourself of that.  I make no specific recommendations, but
23    there are plenty there.  I just ask you to come back to be
24    ready to go at five of 2:00, because we can't do anything
25    unless we have everybody.  So one person missing, we all
```

1    wait.

2              So I think that's it.  All right.  All rise for the

3    jury.

4              Ms. Belmont reminds me about your phone.  So you

5    probably checked your phone when you came in today at the

6    front desk.  So I allow jurors to have their phones, not in

7    the courtroom.  So you can bring them in --

8              Will they be able to do it now, for the afternoon?

9              THE DEPUTY CLERK:  They should be able to.

10             THE COURT:  So if you want, you can go downstairs

11   now and collect your phone from where you checked it in, and

12   you can have it with you.  And then when you come into the

13   courtroom, just leave it in the jury room.  And it will be

14   fine in the jury room.  You can't have it in the courtroom.

15   And you'll have it there when you leave.

16             And each day you can do that, you can bring it in.

17   You should be all set with security.  If they have any

18   issues, you tell them that I you're in a jury trial before me

19   and that I allowed it.  And if they have any questions, they

20   should call me or Ms. Belmont.  And then so you should be all

21   set to bring it in each day.  And then just leave it in the

22   jury room.

23             And at the end, just so you know -- I'll explain

24   this again later -- but during deliberations, you won't be

25   able to have it in the jury room when you deliberate.  And

1    we'll have an envelope for each of you.  You'll drop it in

2    the envelope.  We'll put all the envelopes in a box, and

3    we'll have a court employee sitting outside of the jury room

4    with the box.  You won't have to worry about it; no one will

5    look at it.  But they'll be right there.

6            All right.  So we'll take the recess.  You know,

7    we'll just start at 2 o'clock.  That will be fine.  See you

8    at 2 o'clock.  Thank you.

9            (The jury exits the courtroom.)

10           THE COURT:  Anything before we break?

11           MR. HANNON:  No, Your Honor.

12           MS. MANDEL:  No.

13           THE COURT:  All right.  See you at 2 o'clock for

14   opening statements.  Thank you.

15           (Court in recess at 1:00 p.m.

16           and reconvened at 2:02 p.m.)

17           THE COURT:  So if we have all the jurors, just

18   bring them in.

19           THE DEPUTY CLERK:  Okay.

20           (Jury present.)

21           THE COURT:  All right.  Ladies and gentlemen, we're

22   ready to begin.  We'll start with the opening statement from

23   the plaintiff's lawyer.

24           Mr. Hannon.

25           MR. HANNON:  Thank you, Your Honor.

1               **OPENING STATEMENT BY THE PLAINTIFF**

2       MR. HANNON:  Good afternoon.

3         This is a case about fear.  Ever since Lisa

4 Menninger was a little girl, she suffered from fear, a very

5 specific type of fear, which she came to later know in life

6 is called social anxiety disorder.

7         When she was little, it manifested in ways in terms

8 of how she would react with other kids.  When she was in

9 school, it manifested in ways in terms of how she learned.

10 As she got older, it manifested in different ways, and she

11 came to eventually learn that she had social anxiety

12 disorder.

13         But notwithstanding the fact that she suffered from

14 this fear, she did well.  She went to medical school.  She

15 became a pathologist.  She got high-ranking roles at various

16 organizations, which ultimately brought her to PPD, a

17 laboratory company where she was the -- essentially the sort

18 of medical director for its four Global labs.  And you're

19 going to hear that she did that job very well.

20         But her success wasn't without difficulty.  You're

21 going to hear that, in the course of her educational studies,

22 in the course of her professional studies, that on occasion,

23 she would run into activities that happened to implicate her

24 disability, particularly public speaking and social

25 interactions.  That's the sort of core of her particular

1    phobia.

2              And you'll hear that she was able to do these

3    things, that she was able to give presentations.  She was

4    able to do public speaking.  But it was really, really hard;

5    that in the run-up to do it, she would be having all sorts of

6    physical symptoms in terms of stomach issues and all sorts of

7    fright and all these various sort of physical manifestations.

8              And then when she actually did it, she was able to

9    do it, in part, because later in life she went and saw a

10   psychiatrist and she got a prescription.  And between the

11   prescription and in between simply sort of simply going

12   through these things, she was able to do these things.  In

13   fact, you're going to hear she was able to do these things

14   remarkably well, so much so that people didn't even realize

15   that she had social anxiety disorder or that doing these

16   activities caused these kinds of problems for her.

17             Part of that success, as I mentioned, came at PPD.

18   But in December of 2017, something changed.  At the end of

19   December, Dr. Menninger, she was supposed to have an

20   end-of-the-year performance review with her supervisor named

21   Hacene Mekerri.  This is sort of a very critical meeting that

22   you're going to hear a lot about over the next two weeks.

23   You might hear it referred to as the 360 meeting.

24             I'm going to use that term because, while

25   Dr. Menninger thought she was going there to get her

1    end-of-the-year performance review, she didn't get that.

2    What happened instead was Mr. Mekerri started with some

3    feedback from a 360 review, meaning where he had solicited

4    feedback from some of her colleagues, some of the people that

5    reported up to her.

6            Now, you're going to hear that that -- that that

7    review was generally positive; that there was some

8    constructive criticism provided to Dr. Menninger, but there

9    was also lots of very positive things said as well.  And

10   Dr. Menninger's takeaway from that conversation wasn't that

11   there was anything wrong with her performance; quite the

12   opposite.  You're going to hear that during that

13   conversation, during that 360 review in the end of

14   December 2017, Mr. Mekerri said that he was so impressed with

15   Dr. Menninger, he wanted her to do more.  And the more that

16   he wanted her to do were exactly the types of activities that

17   she had so much trouble doing because of her social anxiety

18   disorder; that he wanted her to start doing presentations in

19   front of clients; that he wanted her to become more -- more

20   visible, get more involved in the sales and presentations and

21   all of that.

22           Mr. Mekerri did that because he didn't know,

23   because he thought that Dr. Menninger had done, on those few

24   occasions that she had done it, she had done it really well.

25   This was a sign of Dr. Menninger's good performance, not any

kind of poor performance.

But Dr. Menninger knew at that point -- she knew the difficulties that she had encountered throughout her life doing these activities.  She knew how draining it was on her when she had to go through these things, when she had to medicate, when she knew about how taxing it was in the lead-up.  So she was confronted with a difficult choice: Does she stay silent and suffer, or does she raise her hand and tell them about her disability?

You're going to a hear that she chose the latter, and you're going to hear that she did that, despite a great deal of fear; fear that if she did that, that if she told them about her limitations, if she told them how difficult this was for her, that they were going to reject her; that they were going to see her as somehow broken or somehow less than she was; that they were no longer going to see her as the brilliant medical director they used to see her as, and they'd see her as something else.

She raised her hand.  She said, "I have a disability," and she asked for an accommodation.  She asked that if they were going to change her role, that they just take into account the fact that these things are really hard for her; try to limit the social presentations, try to limit these new things they were talking about as much as possible; that if they had to do it, that try to come up with a plan,

1      try to work with her, try to work with her doctors so it

2      wouldn't be so taxing, so it wouldn't be so difficult.

3             And you're going to hear Dr. Menninger did all the

4      right things in making this request.  They asked her for a

5      doctor's note.  She went out and got a doctor.  She hadn't

6      even being seeing a doctor at that time.  She was -- she was

7      in control.  But she needed a note, so she went and saw a

8      doctor.  She got the note.  They asked for additional

9      information concerning some suggested accommodations the

10     doctor might provide.  She gave them those, too.  You're

11     going to hear Dr. Menninger did all the right things.

12            Now, part of this accommodation process involved

13     trying to figure out what these new tasks were; what were

14     these additional things that Mr. Mekerri had sort of alluded

15     to in the December 2017 360 meeting.  And you're going to

16     hear that, although in December he had said that they were

17     going to talk about it and come up with something, that

18     didn't quite happen.  And so as Dr. Menninger is submitting

19     her doctor's notes and trying to convey to PPD that she has

20     this disability, she still doesn't quite know what these new

21     tasks are.  And you're going to hear that that results in

22     Mr. Mekerri providing Dr. Menninger a list of five items, and

23     we're going to refer to those five items as buckets.

24            And throughout the course of this trial, you're

25     going to see these buckets and this email, and there's going

1    to be lots of testimony and discussion about them.  I won't

2    get into all of them now, but just, forewarned, we'll be

3    talking about those five buckets.

4         So Dr. Menninger gets the five buckets.  You'll

5    hear she takes it to her wonderful doctor.  You'll hear her

6    wonderful doctor very thoughtfully proposes some ideas of

7    things that PPD can do that maybe allows Dr. Menninger to

8    contribute to these new things without implicating her

9    disability.

10        And you're going to hear, several days later, that

11   Dr. Menninger got back a response from PPD's HR, and you're

12   going to see that what they said in their initial response

13   was, "Okay.  We'll accommodate bucket 1.  We'll somewhat

14   accommodate bucket 5.  We're not going to accommodate buckets

15   2 through 4, but we're happy to talk."

16        It wasn't the answer that Dr. Menninger was

17   necessarily hoping for, but they offered to talk.  And on

18   February 28th of 2018, Dr. Menninger, she went to

19   Highland Heights, which is where the central lab was located,

20   the sort of corporate part of it at least, and she was going

21   to have a meeting.  She was going to have a meeting with her

22   boss, Hacene Mekerri, and the primary HR contact, someone

23   named Chad St. John.  So a meeting with Mekerri and St. John.

24   And this meeting took place on February 28, 2018.  This is

25   going to be another sort of important meeting you're going to

1   hear an awful lot about today.

2          And you're going to hear that Dr. Menninger went

3   into that meeting expecting to talk about her request for

4   accommodation, to talk about how they can work together, how

5   they can find a way to make sure that she's not overburdened,

6   that they can do whatever they can to lessen the stress and

7   the pain and the discomfort that she feels.

8          It was a very different meeting.  From the outset,

9   the conversation wasn't about how she could do her job; the

10  conversation was about getting her out of the company.  Right

11  away, they approached Dr. Menninger with options.  The

12  options were she could take a package, an exit.  She could do

13  some short-term consulting.  The option they didn't provide

14  was she could keep on doing her job.

15         As the meeting progressed, Dr. Menninger pleaded,

16  she begged them, "I can do this job.  I have a disability.  I

17  can do this job.  I've been doing this job."

18         And you're going to hear time and again her pleas

19  and her cries fell on deaf ears.  Over and over again they

20  insisted to her, "No, no, no.  Your doctor says you can't do

21  this job.  This isn't good for you."

22         And she said over and over again, "I can do it.  If

23  we can just talk about those other buckets, if we can just

24  talk about what you actually mean by buckets 2 and 3 and 4,

25  we can figure something out.  There's lots of things that

1      fall in those buckets I can still do."

2            The meeting ended with an agreement to meet next

3      day.  And the very next morning, Dr. Menninger, she sent

4      Mr. Hacene and Mr. St. John an email.  And she repeated

5      exactly what she said in the meeting.  She said, "I like my

6      job.  I don't want a package.  I don't want an exit.  I just

7      want to do my job and I can do it.  All we need to do is talk

8      about what's in buckets 2, 3, and 4."

9            And they canceled the meeting.  And they told

10     Dr. Menninger that they were going to look into it and they'd

11     circle back with her, and for two weeks she waited.  And when

12     she came back -- when they came back and they gave her a

13     response, you're going to see they didn't answer what was in

14     buckets 2, 3, and 4.  You're going to see this was the start

15     of various communications from PPD which just don't match up

16     with the questions that are being asked.  You're going to see

17     these are very suspicious communications that don't seem

18     actually part of a conversation that she's in, that seemed to

19     constantly avoid the question that she's asking, constantly

20     take the words of her doctors, spin them, and suggest that

21     she can't do her job, over and over again.

22           And there was more.  After this February 28, 2018,

23     meeting, you're going to hear that all of a sudden, PPD went

24     on a hiring spree.  That for all this time, Dr. Menninger, in

25     her role as the medical director of the lab, had been urging,

1    trying to get them to hire additional, qualified people,

2    people with PhDs, people with specialties, people that can

3    help cover all of these different benches within the

4    organization.

5         And she'd had trouble doing that, getting PPD to

6    make that investment.  But when she disclosed her disability,

7    all of a sudden, they were willing to invest.  And they made

8    these hires without consulting her.  They started cutting her

9    out of the decision-making.  It started looking like, to

10   Dr. Menninger, like they were trying to replace her, like

11   they were preparing for her to leave.

12        And meanwhile, she saw how they were going to do

13   it.  In the weeks that followed, her boss, Hacene Mekerri,

14   his tone completely changed.  Prior to disclosing her

15   disability, he thought Dr. Menninger walked on water.  You're

16   going to hear Mr. Mekerri's words, you're going to hear his

17   description of Dr. Menninger.  You're going to hear he

18   thought she was brilliant, but after she disclosed her

19   disability, his treatment of her changed dramatically.

20        He began to blame her for issues within the lab,

21   issues within labs that happened all the time, issues that at

22   her level, way, way above what actually transpired in the

23   lab.  She clearly had no responsibility for in terms of being

24   able to stop.  And you're going to hear about the way he

25   provided this criticism, that previously -- he'd been

1    supportive of her, previously he'd been -- he sort of

2    exhibited to her that he trusted her opinion, and all of a

3    sudden, she was accusatory.  All of a sudden, he was

4    suggesting to her that her performance wasn't good enough.

5    You're going to hear it was a drastic, drastic change.

6            And with all Dr. Menninger saw happening around her

7    after the February 8th meeting, after being cut out of the

8    decisions, after the change in tone from her supervisor, she

9    had a feeling of what was going on, that they were trying to

10   make things hard on her, that they were trying to make her

11   quit, or they were trying to build a record, a written

12   record, that would justify terminating her.

13           And you're going to hear that she's seeing emails

14   during this time, emails that are copying HR.  Emails that

15   follow a familiar pattern to Dr. Menninger because it's the

16   same pattern you're going to hear that HR had counseled her

17   to follow when she had a problem employee in her

18   organization.  Dr. Menninger had gone from being brilliant to

19   being a problem employee, and it happened drastically.

20           You're going to hear that these developments had a

21   very, very significant impact on Dr. Menninger's health.

22   Again, I mentioned earlier that, prior to disclosing her

23   disability, Dr. Menninger, she wasn't even treating with a

24   therapist.  She -- she had a prescription from a therapist

25   she had seen a while back, but it wasn't -- it wasn't a

1    situation where she needed constant care then.

2              Over the course of the events that I've described,

3    things changed dramatically.  She began having lots of panic

4    attacks and you'll hear about lots of other sort of physical

5    symptoms she was suffering as well, that the sort of pressure

6    they were trying to exude on her, it did exactly what they

7    wanted.  It made her life extremely difficult.

8              And you're going to hear Dr. Menninger had one last

9    hope.  As she saw all around her all what was happening, as

10   she saw what the scheme was, what they were trying to do, she

11   complained to HR.  And she said it out loud, "I'm being

12   targeted."

13             And you're going to hear that PPD said, "We take

14   these allegations very seriously, and we're going to have an

15   independent investigation done and make sure this isn't

16   happening in our company."

17             And you're going to hear that that independent

18   investigator was Deborah Ballweg.  And you're going to hear

19   that, after a couple of weeks, Ms. Ballweg came back to

20   Dr. Menninger and said, "Nope, nothing there.  I looked.  No

21   one's trying to push you out.  This is just normal routine

22   business stuff.  It's all in your head."

23             And you're going to hear that was sort of the

24   last -- the last straw for Dr. Menninger.  You're going to --

25   you're going to hear that at that point, she had

1   suffered -- she developed a major depressive disorder, you're

2   going to hear that it was difficult for her to kind of

3   function, and you're going to hear that she started thinking

4   about killing herself.

5       It was so bad that, at the end of May, her doctor

6   told her, "No more.  You're not going back to work."  And she

7   took a medical leave on June 2, 2018, in order to enroll in a

8   partial hospitalization program, and you're going to hear

9   that she's not been able to return to work ever since.

10      The evidence will also show that Dr. Menninger has

11  tried desperately to get better.  You're going to hear that

12  she has sought treatments consistently.  She has taken many,

13  many medications, of all different dosages.  And you're going

14  to hear why she tries to get better:  because she has a

15  14-year-old child who she worries about, who she worries

16  about how her own illness impacts her child.

17      It might be very easy hearing this story to think

18  maybe it's all in her head, right?  Maybe -- maybe she

19  imagined it all.  Maybe -- maybe she misperceived things.

20  But you're going to see that she saw things exactly right.

21      You're not going to have to take my word for it or

22  Dr. Menninger's word for it.  You're going to take PPD's word

23  for it.  You're going to see in their own internal

24  communications, ones they never thought were going to see the

25  light of day, that they acknowledged after she disclosed her

1    disability, they didn't want her anymore.

2              You're going to see them talking about how what

3    they wanted to do was they want to gently work her out.  They

4    want to get her to take a package.  You're going to see them

5    communicating internally, asking questions like, "When is she

6    exiting?"  And you're going to see the evidence that this was

7    not a company trying to make this work for Dr. Menninger.

8    This was a company trying to drive her out.

9              Everything she perceived, everything she felt, it

10   really happened.  And you're going to hear the architect, or

11   one of the architects of that entire scheme, was Deborah

12   Ballweg, the alleged independent investigator.

13             Now, over the next couple of weeks, you'll hear a

14   lot of evidence from a lot of different witnesses.  I don't

15   have time to go over all of it, but I just wanted to make two

16   additional points before I leave you for now in terms of the

17   sort of general conduct of the trial.

18             First is, as you hear a lot of evidence and you

19   hear a lot of argument, I'd suggest that one of the things as

20   jurors you have to do is try to connect the dots.  You'll

21   hear evidence of something that happens on one day, and maybe

22   evidence that something happens three weeks later, and so

23   forth, and trying to figure out how do these different events

24   connect.

25             And in a few moments, I'm expecting you're going to

1    hear from PPD's counsel, and that they're going to provide

2    you various additional dots, and they're going to suggest you

3    that they connect to tell a different story.

4            You won't know until the end of the trial how to

5    connect those dots.  And you're going to hear a lot of

6    evidence over the two weeks, but I just ask you to keep in

7    mind that when you hear the evidence, one of the fundamental

8    questions is:  Does the story make sense?  Do those dots

9    actually connect in the way that they're suggesting that they

10   do?  And I ask that as you listen to the evidence and listen

11   to the various events that unfolded here, you keep that

12   question in mind.

13           The last thing I want to say is related to the

14   first thing that I said.  When I started my opening, I told

15   you this is a case about fear.  It's not just about

16   Dr. Menninger's fear.  It's also about the fear that people

17   sometimes have with respect to disabilities.  It's about the

18   fear that people sometimes have when you see somebody with a

19   physical defect or you see somebody or hear somebody about

20   having some kind of a mental health problem or something like

21   that.

22           Disabilities can be scary.  But I submit to you

23   that in your role as fact-finders, that you guys have all

24   agreed that you can put aside that fear yourselves and focus

25   on the evidence and on the law.  And if you do that and if

1    you put aside your fear and focus on the evidence and the

2    law, then I'm going to come back to you at the end of the

3    case and I'm going to ask you to find in favor of

4    Dr. Menninger.

5            Thank you.

6            THE COURT:  Thank you, Mr. Hannon.

7            Ladies and gentlemen of the jury, I remind you that

8    opening statements are just that.  They're statements, but

9    they're not evidence.

10           Ms. Mandel.

11                **OPENING STATEMENT BY THE DEFENDANT**

12           MS. MANDEL:  Good afternoon, members of the jury.

13   My name is Rachel Mandel, and my partner Patrick Curran and I

14   represent PPD in this lawsuit.

15           We believe the evidence will tell a very different

16   story from what you've just heard.  PPD serves customers,

17   usually pharmaceutical companies, to help them develop new

18   medicines.  PPD's work includes running labs around the world

19   to test for customers' clinical trials.  In order to do that,

20   PPD operates what are called Global Central Labs, which is a

21   set of labs in four countries around the world.

22           The main PPD central lab location and the only one

23   in the United States is in Highland Heights, Kentucky.  That

24   lab runs test on medical samples, like you might give at the

25   doctor's office or with a laboratory company, entrusted to

1    PPD by its customers and then returns the results so that its

2    customers can use that data to help it make medicines.

3         PPD needs to make sure that the lab has certain

4    types of accreditations or stamps of approval that its

5    customers require.  In August of 2015, PPD hired the

6    plaintiff in this lawsuit, Dr. Lisa Menninger, to work as its

7    executive director of labs.  This is a leadership role that

8    involves overseeing the technical work of the lab and talking

9    to customers about what's happening on a day-to-day basis.

10        PPD was happy to have found Dr. Menninger, who was

11   highly regarded and appeared qualified for the leadership

12   role based on her comparable experience at her most recent

13   job.  Dr. Menninger is a medical pathologist, a doctor; and

14   with her credentials, PPD could make sure that it had the

15   right oversight in the Highland Heights lab and others for

16   its necessary accreditation.

17        PPD paid for Dr. Menninger to relocate to the

18   Highland Heights area -- she actually lived just over the

19   border in Ohio -- for this position.

20        Dr. Menninger worked in the PPD laboratory building

21   in Highland Heights on a daily basis.  She had an office in

22   the administrative area and spent time in the administrative

23   area with other leaders of the company as well as on the lab

24   floor with the people doing the testing on the samples.

25        In addition to her technical oversight, as an

1    executive working with customers and other leaders, the

2    essential functions of her job, which you will see in her job

3    description from the time she was hired included "excellent

4    communication and interpersonal skills, participation in

5    business development activities, frequent interaction with

6    other people, including PPD employees and outside

7    representatives, participation and presentation at regular

8    meetings, responding to customer issues, responding to

9    audits, presenting budgets to senior management, and

10   excellent marketing and negotiation skills."

11          Dr. Menninger's job description also described

12   frequent travel, both in the United States and

13   internationally, and the requirements included spending

14   70 percent of her time onsite at the lab in Highland Heights

15   with availability by phone and computer the rest of the time.

16          When Dr. Menninger had worked for PPD for about a

17   year and a half in late 2016, she was told by her manager,

18   Hacene Mekerri -- I apologize, she told her manager Hacene

19   Mekerri that her daughter needed to change schools because

20   she was being bullied.  Dr. Menninger asked Mr. Mekerri if

21   she could relocate to Massachusetts along with her husband

22   and daughter so that her daughter could attend a private

23   school in Rhode Island.

24          Even though Dr. Menninger's job was in

25   Highland Heights Kentucky, Mr. Mekerri was incredibly

1    supportive of Dr. Menninger and wanted to help her in any way

2    he could, so he said, yes to that fact, yes to that request,

3    despite the fact that she held a leadership position that

4    required regular attendance in Highland Heights.

5         Both other leaders and human resources personnel at

6    PPD questioned whether this was really a good idea.  But

7    Mr. Mekerri decided to accommodate Dr. Menninger's request so

8    that she could move to Massachusetts for her daughter's needs

9    and largely work remotely.

10        Mr. Mekerri did say that Dr. Menninger would need

11   to travel back to Highland Heights on a regular basis in

12   addition to her other travel so that she could meet all of

13   her job requirements.  PPD even committed to paying for this

14   travel, despite the fact that the move was for personal

15   reasons.

16        Dr. Menninger remained at Highland Heights for

17   several months, and then with Mr. Mekerri's blessing, she and

18   her company and her family relocated to Dighton,

19   Massachusetts, in June 2017.  Despite the arrangement between

20   Mr. Mekerri and Dr. Menninger after she moved, Dr. Menninger

21   traveled to Highland Heights during the remainder of 2017

22   only twice.  This was not in line with Dr. Menninger's

23   commitment, and it posed a problem under the accreditation

24   rules.

25        In November 2017, after living in Massachusetts for

1    several months, Dr. Menninger reported to Mr. Mekerri that

2    she was feeling overwhelmed by her job duties.  Now that she

3    was living far away and was no longer around every day for

4    face-to-face conversations, Dr. Menninger was less involved

5    in customer meetings, business development, and her

6    leadership needs.  Many of Dr. Menninger's co-workers

7    expressed concern about her effectiveness and her ability to

8    lead while working remotely.

9            In late 2017, Mr. Mekerri talked to Dr. Menninger

10   about this.  As you heard, there was a 360 meeting where

11   Dr. Menninger received some of this feedback, and Mr. Mekerri

12   encouraged Dr. Menninger to become more involved with

13   colleagues and customers, including through social

14   interactions and presentations.

15           Mr. Mekerri explained that these parts of

16   Dr. Menninger's job were always part of her responsibilities,

17   and they were especially important now that the lab was in

18   growth mode.  Mr. Mekerri also agreed that he would take the

19   lead on hiring and recruiting to lessen the load on

20   Dr. Menninger and allow her to focus on priority areas.

21           Two-and-a-half years into the job, in January 2018,

22   after Mr. Mekerri had told Dr. Menninger that she would need

23   to be more focused on intrapersonal interactions, both with

24   physical presence in Highland Heights and with customers,

25   Dr. Menninger told Mr. Mekerri for the first time by email

1    that she had mental health challenges that would make it hard

2    for her to do some of the things that Mr. Mekerri had told

3    her were required.

4           Mr. Mekerri was traveling at the time, but he

5    immediately responded and said, "Let's set up a time to

6    talk."  When they talked, Mr. Mekerri was actually still

7    traveling, so he said, "Let's talk again soon," but he

8    suggested that he would connect Dr. Menninger with human

9    resources so that she could obtain more support and

10   assistance with -- with what she had just revealed about a

11   disability.

12          Mr. Mekerri connected Dr. Menninger with Chad

13   St. John, a human resources director, who quickly sent

14   Dr. Menninger information about available paperwork that she

15   could fill out for disability accommodations and other

16   services that she could avail herself of.

17          After those initial communications, Dr. Menninger

18   had her first evaluation with a psychiatrist named

19   Dr. Marianna Kessimian.  And you'll hear from Dr. Kessimian

20   during this trial.  After that one evaluation, Dr. Kessimian

21   diagnosed Dr. Menninger with agoraphobia, social anxiety

22   disorder, and generalized anxiety disorder.

23          A few days later, Dr. Menninger sent a disability

24   accommodation request form to Mr. St. John in human resources

25   saying that her psychiatrist recommended that she avoid or

1    minimize any social interaction or public speaking.

2         Dr. Menninger's psychiatrist, Dr. Kessimian,

3    submitted a form, as well, explaining that Dr. Menninger's

4    condition was chronic and any need for her to increase social

5    interaction or public speaking would increase her anxiety and

6    worsen her symptoms.  And it would make it difficult, if not

7    impossible, for her to do her job.  Those were

8    Dr. Kessimian's exact words.

9         Dr. Kessimian's note also said that if

10   Dr. Menninger would need to have any social interaction or do

11   any public speaking, it needed to be planned together with

12   her doctor.

13        Mr. St. John reviewed these forms that were

14   submitted, and he was concerned that they were vague with

15   regard to what Dr. Menninger actually could and could not do

16   that was required of her job.  He was also concerned because

17   many of the things mentioned in these forms are standard

18   parts of an executive director leader role and were

19   increasing because of the lab's growth.  Mr. St. John quickly

20   reached out to Dr. Menninger to ask for additional

21   information, including which specific tasks she could or

22   could not do.

23        Dr. Menninger essentially repeated back what was on

24   the forms and said that she could not provide more detail.

25        Mr. St. John wanted to help Dr. Menninger, and so

1    he asked Mr. Mekerri to provide additional information about

2    what the executive director role entailed.  Mr. Mekerri then

3    prepared a detailed list with the five buckets that you heard

4    Mr. Hannon speak about, listing out what the job tasks were,

5    how many people Dr. Menninger might have to be speaking to

6    when performing the job tasks described in those buckets, and

7    how often they may occur.

8         In response to this, Dr. Kessimian, who is

9    Dr. Menninger's psychiatrist, explained that Dr. Menninger

10   had endured these types of work events and presentations in

11   the past, but only with intense discomfort and the use of a

12   sedative medication, which came along with serious side

13   effects, including impaired attention and concentration.

14        She also said that, in the weeks leading up to

15   social interactions and speaking engagements, Dr. Menninger

16   experienced insomnia, panic attacks, gastrointestinal

17   problems, and weight loss.

18        In Dr. Kessimian's words, Dr. Menninger could not

19   tolerate public speaking and socializing and that it was as

20   if her vocal cords and brain became paralyzed, while her

21   blood pressure, heart rate, and breathing all increased.  As

22   a result, she recommended that any job requirements that

23   called for speaking publicly or even interacting with other

24   people would require Dr. Menninger to have a surrogate or a

25   reader speak on her behalf.

1          She also said that Dr. Menninger should have a

2     surrogate in place for all customer visits and business

3     development events -- critical parts of her job -- and she

4     recommended that Dr. Menninger adjust her travel to be mostly

5     to the Brussels, Belgium, lab location, instead of the

6     Highland Heights, where her main office was.

7          PPD was surprised by the extreme nature of these

8     requests, especially considering that Dr. Menninger held an

9     executive level position that required regular face-to-face

10    interaction with colleagues and customers.

11         However, Mr. St. John and Mr. Mekerri determined

12    that PPD would work with Dr. Menninger to have someone else

13    present on her behalf at senior leadership meetings, town

14    hall meetings, and they would cut her travel expectation by

15    half.

16         Mr. St. John and Mr. Mekerri then met with

17    Dr. Menninger to talk about this.  Mr. St. John explained

18    that the other items requested by Dr. Kessimian were

19    challenging because they meant Dr. Menninger could no longer

20    performance major parts of her job.

21         Because it was not clear how Dr. Menninger could

22    remain an executive director without performing these

23    critical job tasks, Mr. St. John asked Dr. Menninger if she

24    would like to consider moving into a consultant role or

25    looking at an exit package.

1              Dr. Menninger's response confused Mr. St. John and

2      Mr. Mekerri even more.  She said she could continue to do her

3      job without any accommodations, which was surprising, given

4      the serious problems her doctor had said would occur if she

5      did perform these tasks, including that she could not even

6      tolerate these activities.

7              Over the next couple of weeks into March 2018,

8      Mr. St. John explained again why PPD could not accommodate

9      some of these requested things, including eliminating social

10     interaction.  He suggested again that Dr. Menninger work with

11     her doctor to recommend a different accommodation that would

12     allow her to still perform her job.

13             Unfortunately, Dr. Menninger was still not

14     satisfied and would not accept that PPD could not

15     significantly change her executive level job to eliminate

16     most interpersonal interaction.

17             In the meantime and unrelated to discussions about

18     Dr. Menninger's requested accommodations, some quality issues

19     arose in the lab that Mr. Mekerri and others needed to

20     address.  Some of the same concerns that Mr. Mekerri had

21     spoken about with Dr. Menninger in 2017 before Dr. Menninger

22     had told Mr. Mekerri or anyone at the company that she had a

23     disability.

24             These -- there were discussions about how to

25     improve things in the lab and specifically about

1    Dr. Menninger's lab leadership.  These discussions were
2    simply about improving the functioning of the lab and
3    customer service, and Dr. Menninger was not disciplined in
4    any way.
5            When Dr. Menninger understood that PPD would not
6    fundamentally change her leadership job to remove all
7    interpersonal interaction, in April 2018 she complained to
8    Mr. St. John that she felt that Mr. Mekerri was treating her
9    differently because she told him she had a disability.
10           Mr. St. John took Dr. Menninger's complaint very
11   seriously and immediately referred it to his boss within
12   human resources, Deborah Ballweg.  Ms. Ballweg immediately
13   did a thorough investigation into Dr. Menninger's complaint,
14   beginning first by speaking with Dr. Menninger to understand
15   what her concerns were.
16           Ms. Ballweg spoke with many witnesses as part of
17   her investigation, as you'll hear during this trial, and she
18   ultimately found that Mr. Mekerri had not treated
19   Dr. Menninger unfairly and she reported this back to
20   Dr. Menninger carefully and thoughtfully.
21           Much to PPD's surprise, though, Dr. Menninger
22   almost immediately went out on medical leave starting June 3,
23   2018.  PPD fully accommodated that leave and let her know
24   that they remained open to having her back to work, welcoming
25   her to let them know what accommodations they might be able

1    to offer to -- that would allow her to do her executive level

2    role.

3          Dr. Menninger continued to resist returning; and,

4    ultimately, she remained out on medical level for almost

5    eight months, during which time she and her family relocated

6    to New Mexico.

7          After that lengthy leave, Dr. Menninger did not

8    return to work at PPD; rather, she began to receive long-term

9    disability benefits and ultimately government Social Security

10   benefits.  Dr. Menninger has not returned to work in any

11   capacity for the last five years.  She now lives in Oregon

12   with her husband and daughter near her other family, and she

13   has no plans to apply for new employment.

14         Dr. Menninger is claiming that PPD discriminated

15   and retaliated against her after she disclosed her disability

16   for the first time in January 2018.  She's also claiming that

17   Mr. Mekerri became more critical of her and required her to

18   do more interpersonal communication only after he learned of

19   her disability, even though she told her doctor very clearly

20   that he put in place those requirements earlier in 2017.

21         She is even claiming that PPD tried to push her out

22   of her job in spring 2018, but the evidence will show clearly

23   that Mr. Mekerri began working with Dr. Menninger to increase

24   her presence in the lab and focus on customer communication

25   in 2017 and that those were reasonable requirements given

1    that her job really required her to be in Highland Heights,

2    Kentucky, carrying out those tasks.

3           Certainly, neither Mr. Mekerri nor anyone else at

4    PPD wanted Dr. Menninger to leave the company.  In fact, PPD

5    hoped that she would return from her medical leave, and they

6    did not put in place a permanent replacement for the

7    executive director role for some time.

8           Dr. Menninger is also claiming that PPD did not do

9    enough with its investigation into her complaints in

10   April 2018, which she claimed was retaliation.  The evidence

11   will show, though, that Ms. Ballweg did a complete and

12   unbiased investigation, looking into each concern raised by

13   Dr. Menninger and finding that there was just no indication

14   she had been treated unfairly.

15          Dr. Menninger is also claiming that she is now

16   fully disabled and has been unable to work in any capacity

17   for the last five years, and that, in fact, PPD bears full

18   responsibility for the fact that she did not work during this

19   time.  The evidence will show that Dr. Menninger has not

20   actually been unable to work in any capacity during that

21   time, and that even if she was, it was not due to anything

22   that PPD did during that short time window between January

23   and June 2018.

24          She also claims again that she will not work again

25   in any capacity and that she is fully disabled for the rest

1    of her working life and that PPD bears full responsibility

2    for this fact.  The evidence will show, though, that

3    Dr. Menninger is able to work, but that, even if she is not,

4    it was not caused by anything that PPD did during that short

5    time period.

6         The evidence will show that PPD, through

7    Mr. St. John, Mr. Mekerri, Ms. Ballweg, and others, only

8    supported Dr. Menninger and did everything they could do to

9    help her remain in her job and succeed.  This started when

10   PPD accommodated Dr. Menninger by allowing her to move almost

11   a thousand miles away from her home lab to -- so her daughter

12   could attend a different school, and PPD was similarly

13   accommodating after Dr. Menninger revealed her own

14   disability.

15        When Dr. Menninger and her doctor told PPD that she

16   could not do significant portions of her job, including most

17   communication with company leaders and critical customers,

18   PPD still tried to work with her to understand how they could

19   help her continue in her role as executive director.

20        You will see and hear from Deborah Ballweg, Chad

21   St. John, several other PPD witnesses who will describe this

22   story in detail.  You will also hear the testimony of Hacene

23   Mekerri.

24        The evidence will show that PPD never stopped

25   supporting Dr. Menninger and they stood with their arms wide

1   open for her return, even when she was out of work for eight

2   months.  Surely this is not evidence of discrimination or

3   retaliation and, therefore, we will ask you, the jury, to

4   return a ruling in PPD's favor.  Thank you for your time.  We

5   appreciate you being here for this trial.

6            THE COURT:  Thank you, Ms. Mandel.

7            I remind you, ladies and gentlemen, opening

8   statements can be helpful, but they are not evidence.

9            Mr. Hannon call your first witness.

10           MR. HANNON:  Yes, Your Honor.  The plaintiff calls

11   Lisa Menninger to the stand.

12           THE DEPUTY CLERK:  Ms. Menninger, Dr. Menninger, if

13   you can please stand and raise your right hand.

14           (Witness duly sworn.)

15           THE DEPUTY CLERK:  Can you please state your full

16   name, and spell your last name for the record.

17           THE WITNESS:  Lisa Anne Menninger,

18   M-e-n-n-i-n-g-e-r.

19           THE DEPUTY CLERK:  Thank you.

20           THE COURT:  Have a seat.

21           Go ahead, Mr. Hannon.

22           MR. HANNON:  Thank you.

23

24

25

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | **LISA A. MENNINGER**                                        |
| 2   | having been duly sworn, testified as follows:               |
| 3   | **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**             |
| 4   | BY MR. HANNON:                                               |
| 5   | **Q.**  Ms. Menninger, could you start by telling the jury how |
| 6   | old you are?                                                 |
| 7   | **A.**  I am 54 years old.                                   |
| 8   | **Q.**  And where do you currently live?                     |
| 9   | **A.**  I live in Portland, Oregon.                          |
| 10  | **Q.**  For how long have you lived there?                   |
| 11  | **A.**  Approximately two years in Portland and one year in Bend. |
| 12  | **Q.**  And why did you move there?                          |
| 13  | **A.**  I moved there because my mom and my sister and my    |
| 14  | brother-in-law lived there, and I needed additional support. |
| 15  | I was struggling at the time.                                |
| 16  | **Q.**  Do you live with anyone?                             |
| 17  | **A.**  I live with my husband, Mason; and my child, Maya.   |
| 18  | **Q.**  And how old is Maya?                                 |
| 19  | **A.**  Maya is 14.                                          |
| 20  | **Q.**  Are you currently employed?                          |
| 21  | **A.**  No.                                                  |
| 22  | **Q.**  When was the last time you worked?                   |
| 23  | **A.**  My last employment was with PPD, and that was -- that |
| 24  | employment was terminated by PPD in February 2019.          |
| 25  | **Q.**  Can you just briefly describe for the jury what your role |

1  was at PPD?

2  **A.**  I was the executive director for laboratory operations

3  for our Global Central laboratories, which were located in

4  Singapore, Shanghai, Highland Heights, and Belgium.

5  **Q.**  And was there any particular qualification you needed for

6  that role?

7  **A.**  You needed to be a medical doctor.  You needed to have

8  regulatory certifications.  In my case, I was a board

9  certified clinical pathologist.  So the different regulatory

10  agencies have different requirements and -- yeah, it's

11  doctoral level, plus additional requirements.

12  **Q.**  Okay.  We'll get into some of that in a moment.  But

13  first, could you just generally describe for the jury your

14  educational background, please.

15  **A.**  I graduated from college, from Aurora University, with a

16  BA in biology.  Then I went to grad school for a year in

17  New Mexico.

18          And it was about that time that -- actually my mom,

19  she said, "You know, one time you had considered medical

20  school.  Why did that change?"  And we had a discussion about

21  it, and I decided to move back to live with my mom to finish

22  my requirements to apply to medical school.

23  **Q.**  Let me pause you there.  When was that?

24  **A.**  Oh, gosh.  I believe that was around 2007.

25  **Q.**  Okay.  And did you go to medical school?

1   **A.**   I'm sorry.  1997.  I'm really bad with dates.

2   **Q.**   No worries.

3   **A.**   1997.

4   **Q.**   And did you go to medical school?

5   **A.**   Yes.

6   **Q.**   And where did you go to medical school?

7   **A.**   Saba University School of Medicine.

8   **Q.**   Okay.  And after you completed medical school, did you do

9   any -- any postgraduate medical training?

10   **A.**   Yes.  Then, after you graduated from medical school, you

11   pick a specialty and apply to residency programs.  So I

12   completed my first year of residency at the University of

13   Missouri, Kansas City in anatomic and clinical pathology.

14   Then I decided that I want to just specialize in strictly

15   clinical pathology, so I transferred to a program that had a

16   clinical pathology only option, and that was at Virginia

17   Commonwealth University in Richmond, Virginia.

18   **Q.**   And what did you do after that?

19   **A.**   I was recruited back to Kansas City and asked to work as

20   a staff pathologist for St. Luke's Health System in

21   Kansas City, where I had previously done some of my pathology

22   electives.

23   **Q.**   And did you accept that position?

24   **A.**   Yes.

25   **Q.**   And just generally, what were your duties and

1    responsibilities there?

2    **A.**   I was a staff pathologist for the core hospital.

3    There -- there were four of us, four pathologists, and then

4    we -- we had other hospitals as part of the health system, so

5    we divided those up between us and covered those laboratories

6    as their laboratory medical director.  I also served as the

7    laboratory director for the St. Luke's cancer institute,

8    which was located in the main hospital.

9    **Q.**   At some point, did you leave St. Luke's?

10   **A.**   Yes.

11   **Q.**   And when was that?

12   **A.**   2010.

13   **Q.**   And where did you go?

14   **A.**   I went to Clinical Reference Laboratory.

15   **Q.**   Where was that?

16   **A.**   That was in Lenexa, Kansas.

17   **Q.**   And what was your role there?

18   **A.**   I was laboratory director for the general and the

19   clinical trials laboratories.

20   **Q.**   At -- at some point, you joined PPD; is that right?

21   **A.**   Yes.

22   **Q.**   Could you explain for the jury how you came to join PPD?

23   **A.**   I had been working at Clinical Reference Laboratory for

24   over five years and was happy.  I wasn't really looking for

25   another job, but I reported directly to the CEO, so I knew

 1    there was -- there was really nowhere else to go up.

 2               I was contacted by a recruiter and wasn't really

 3    taking it seriously at the time because that -- a lot of

 4    doctors are frequently contacted by recruiters.  But I

 5    listened to what she described as the role, and the benefit

 6    package, the compensation and the opportunities for career

 7    advancement were much more significant than what I had at

 8    CRL.  So I made the decision to apply, and I was interviewed

 9    and ultimately hired for that position.

10    Q.   And when did you join PPD?

11    A.   I joined PPD in August of 2015, the very end of August.

12    Q.   And did I hear correctly that one of your

13    responsibilities at PPD concerned oversight of its Global

14    Central Labs?

15    A.   That's correct.

16    Q.   Now, were you the only person that had oversight of the

17    Global Central Labs?

18    A.   I was the only medical doctor who had oversight of the

19    laboratory operations of those four Global laboratories.

20    Q.   Were there other functional areas that other people had

21    responsibility over?

22    A.   Yes.

23    Q.   And could you describe for the jury what those were?

24    A.   There was the project management department.  They were

25    responsible for managing the client's studies while they

1   perform them.

2           At the time, I was hired, there was a group called

3   "technical operations."  They were responsible for setting up

4   all the requirements of the study in the computer system so

5   that they knew what supplies had to be sent out to different

6   sites and just -- to make sure -- set up all the logistics

7   that would be required for the study.

8           There was the data management department.  They

9   were responsible for all the data being transmitted back to

10  the client.  I know I'm blanking.

11          Then we had -- we had individuals in place,

12  globally, who were like site heads for the Belgium lab and

13  the labs in Asia.  Asia was unique in that their local

14  regulatory requirements required that they had a local

15  medical doctor serve as the medical director on their

16  certificates.

17          However, those doctors did not work for PPD and

18  they were not involved in the oversight of those

19  laboratories.  It was just like -- to fulfill -- to fulfill

20  the local regulatory requirement.

21          The reason for that was that we treated our four

22  laboratories like they were one so -- so that if you sent

23  your specimen to Belgium and then sent that same specimen to

24  our lab in Shanghai, that the results would be comparable.

25  **Q.**  Understood.

1          And I should have asked this earlier, but can you

2   explain for the jury what -- what PPD actually did back at

3   the time you worked for them?

4   **A.**   They are -- they were a clinical research organization.

5   They had different sections.  The -- part of the company that

6   I worked for was the laboratories, and then the laboratories

7   were also further broken down into types of laboratories.  So

8   there were strictly research laboratories, an analytical

9   laboratory, a laboratory that did, like, vaccine research.

10          And the laboratories that I covered were the ones

11   that actually did patient testing.  So we -- we did testing

12   on the samples of the participants enrolled in the clinical

13   trials.

14   **Q.**   Okay.  And I think you mentioned earlier that you needed

15   to be a medical doctor to fulfill your role; is that right?

16   **A.**   Yes.  The laboratories that I covered were, essentially,

17   equivalent to the type of laboratories you would see in a

18   hospital.  So there were some situations where you could be a

19   PhD clinical chemist and cover that particular section of the

20   lab, but you couldn't cover hematology, for example.  Or

21   there were some situations where you could be a PhD doctoral

22   level scientist and cover molecular, but you could not cover

23   the other sections in the laboratory.

24          So as a clinical pathologist, I was able to cover

25   the majority of the sections in the laboratory in addition to

1   providing medical significance of the results.

2   **Q.**  Understood.

3           And in addition to being a medical doctor, did you

4   also have to have various certifications?

5   **A.**  Yes.  There were a lot.  I -- I was board certified in

6   pathology.  I also needed to hold a medical license in the

7   state that I practiced.  So I had previously practiced in

8   Kansas and Missouri, so I had state licensures there.  I had

9   to obtain a license in Kentucky when I took the job at PPD.

10          Also laboratories need to be certified by CLIA.

11  That's a government standard, or a CLIA deemed laboratory or

12  organization.

13          So most clinical laboratories are accredited by the

14  College of American Pathologist.  There are a few states that

15  if -- if you're going to perform testing on samples that come

16  from those states, you also have to hold certification for

17  those states.

18  **Q.**  Okay.  I'm going to show you a document here on the

19  screen in front of you.  And just for the record, this is

20  Exhibit 3.  And I'm showing you here the fourth page of

21  Exhibit 3.

22          And do you recognize this?

23  **A.**  Yes.

24  **Q.**  And what is this?

25  **A.**  This is my CV that I submitted before I worked at PPD.

1           MR. HANNON:  Ms. Belmont, I believe this is in

2     evidence.

3     BY MR. HANNON:

4     Q.  I'm sorry, you said this is --

5           THE COURT:  Exhibit 3 is an agreed-to exhibit?

6           MR. HANNON:  Yes, correct.

7           THE COURT:  All right.  So it's admitted, if it

8     isn't already.

9           (Exhibit No. 3 admitted into evidence.)

10    BY MR. HANNON:

11    Q.  So you said this was a CV from what --

12          THE COURT:  I'm sorry.

13          In the back row, you have your own monitors, if you

14    want, between the seats.  You can pop them up out of those

15    armrests.  Then you won't have to squint.  We can pull them

16    out for you if you need help.

17          (Pause in proceedings.)

18          THE COURT:  Go ahead.

19          MR. HANNON:  Thank you.

20    BY MR. HANNON:

21    Q.  So I'm sorry; from what point in time was this, was this

22    CV?

23    A.  This was -- this was the CV that I had updated.  I'm

24    trying to see -- oh, once I -- once I was working at Clinical

25    Reference Laboratory.

1    **Q.**   Okay.  So this was -- this was just prior to joining PPD?

2    **A.**   Yes.

3    **Q.**   Okay.  And if we turn to the second page there at the

4    top, you see the section captioned "Professional License and

5    Certification"?

6    **A.**   Yes.

7    **Q.**   And does that accurately describe the professional

8    licenses and certifications you held at the time?

9    **A.**   Yes.

10   **Q.**   I want to direct your attention to the -- about

11   two-thirds of the way down that list, there's one that says

12   "Clinical Laboratory Improvement Amendments" and then

13   "(CLIA)."

14            Do you see that?

15   **A.**   Yes.

16   **Q.**   Can you explain for the jury what that is?

17   **A.**   That is a requirement by the US government for clinical

18   laboratories.  It is regulatory standards that laboratories

19   must follow to ensure that you're providing high quality

20   results in testing and that you have qualified individuals in

21   your laboratory to perform the testing.

22            CLIA will give deemed status to certain

23   professional organizations, such as the College of American

24   Pathologists.  But usually, in addition to having College of

25   American Pathologists certification, you still need to have a

1    CLIA certification and meet that requirement.

2    **Q.**   And then below that section, there's a section for

3    professional associations.  Do you see that?

4    **A.**   Yes.

5    **Q.**   And does that accurately reflect the association, the

6    professional associations you were involved with at the time?

7    **A.**   Yes.  Based on those dates.

8    **Q.**   Okay.  So when you -- when you actually joined PPD, can

9    you explain for the jury what your day-to-day

10   responsibilities were like?

11   **A.**   PPD solely focused on clinical trials, so my job heavily

12   consisted of planning, reviewing, and approving validations

13   of new testing that we brought in our laboratory, and that

14   was based on requiring -- or requests from our clients, what

15   kind of testing they wanted.

16           There was a lot of esoteric testing, so we were

17   constantly validating, and I was constantly reviewing

18   technical documents that only I was authorized to approve.

19   **Q.**   And when you say "validate," what do you mean by that?

20   **A.**   A validation is testing that you perform if you're going

21   to bring a new test into the laboratory.  So to give an

22   example, if you wanted to do blood sugar testing, and it

23   wasn't set up in your laboratory yet, you would have to run

24   samples using the kit that you planned to use to show that

25   the tests performed according to specifications that were

1    acceptable before reporting out patient results.

2    **Q.**   Besides these validations that you described, what else

3    did you do?

4    **A.**   I also frequently would consult with clients and project

5    managers by phone, by email.  Any time they had questions

6    about the results, the testing, you know, could -- asking if

7    we could do certain types of testing, asking for medical

8    clarification about particular results, a lot of times they

9    would give me more information related to clinical history

10   that would help me, you know, give them more -- help them

11   with their consultation.

12        I also was responsible for the labs' staff to make

13   sure that we had qualified lab staff based on the CAP and

14   CLIA requirements in our laboratories.  There are -- the

15   requirements are that the med techs doing the actual testing

16   at the bench, they also need to go through certain levels of

17   education and certifications to perform that testing.

18        Then I was also responsible for things like quality

19   control.  At my level, I reviewed the monthly metrics.

20   Quality control started with -- like, the med tech at the

21   bench was the first line to make sure, okay, the -- the

22   testing -- the reagents are running as they should, the

23   instruments are running as they should, and the person

24   performing the testing is performing it as they should.

25        And then those quality metrics went up the line

1    based on levels, so then the next line would be the

2    supervisor would review and then the associate director or

3    director or manager.  And then I was provided with monthly

4    metrics to review our quality control to make sure that there

5    weren't any issues or -- and follow up on any issues.  We had

6    a quality control program for each individual lab.

7            In addition, though, since we had four Global

8    laboratories that we treated as, like, one, we sent specimens

9    to the four different laboratories, and we all made sure that

10   we were getting comparable results within -- within the

11   limits of acceptability.

12           I also oversaw quality management functions for the

13   laboratory.  So in the beginning of each year, we would set

14   metrics, determine metrics that we wanted to follow, and

15   evaluate those during the year to see if we needed to make

16   any changes to any of our processes in the laboratory.  I was

17   responsible for reviewing and improving all standard

18   operating procedures, so we had procedures for every assay.

19   I mean, we had procedures, which we called it SOPs, for

20   everything.  So usually those would be initially written and

21   drafted by like a lead technician or a supervisor.  Sometimes

22   those got passed around between the Global supervisors,

23   because, like I said, we acted as one lab.  we wanted to make

24   sure that we were globally all following the same procedure.

25           And then ultimately, finally, it would come through

1    the system for me to review and approve, and I could reject

2    or I can approve -- sometimes I rejected it because there

3    were certain parts of it that were not acceptable, and I

4    would suggest changes and edits.

5    **Q.**   Did you ever directly supervise the technicians in the

6    labs that were doing the work?

7    **A.**   No, like I said, the laboratory has different sections

8    and the different sections have a supervisor.  So the

9    supervisor was responsible for managing and supervising the

10   actual med techs at the bench.  And we even further had the

11   med techs divided into different levels so you had like an

12   entry-level med tech, a mid-level, and a lead med tech, and

13   they had different levels of responsibility based on their

14   experience.

15   **Q.**   I'm going to ask you to look at another document here.

16   This is Joint Exhibit 378.  Let me see if I can enlarge that

17   a bit.

18            Do you recognize this document?

19   **A.**   Yes.

20   **Q.**   And what is it?

21   **A.**   This was when I was on site in Highland Heights for the

22   State of New York CAP inspection.  And the office that I was

23   working in at the -- at the time I was working late, after

24   hours, trying to catch up on a lot of tasks that I had to do

25   before leaving for the day.

1    And so Hacene stopped in the office, and I had my
2    Outlook calendar and tasks lists opened.  And he said, "How
3    are you doing?"  You know, it was dark, it was late.  And I
4    said -- I pointed to the Outlook task list, and I said, "I'm
5    overwhelmed."
6    And -- and he was kind of surprised like, "Well,
7    what do you do?  Like, what things are you working on?"  And
8    I was not surprised that Hacene was not familiar with what a
9    clinical pathologist does.  That was not his background.  His
10   background was in data management.
11   So he really didn't understand or know what I did
12   from a technical or medical standpoint, all the day-to-day,
13   like, validations and consults and answering emails and, you
14   know, the things I described previously.
15   Q.  Let me stop you there for a moment.  I don't know if this
16   has been said yet.  Can you tell the jury who the person is
17   you just described to us as Hacene?
18   A.  Hacene was my manager.
19   Q.  Okay.  And the last name is Mekerri?
20   A.  Yes.
21   Q.  Okay.  So you -- you have that interaction with
22   Mr. Mekerri you just described.  And how, if at all, does
23   that relate to the email we're looking at here?
24   A.  He was curious about what -- what I did as part of my
25   day-to-day job.

1          And he's -- so he -- he asked can I, like, make a

2     little table to show him what I actually did, because,

3     apparently, he didn't know.  So I did that, and I sent it to

4     him.  And then I never heard anything more.  He didn't reply,

5     and we never -- he never came up again.

6     **Q.**  So this email is November 28, 2017; is that right?

7     **A.**  Yes.

8     **Q.**  Okay.  And just looking at the first page of the

9     attachment, we can walk through these.  So the first item you

10    have listed here is "emails."  What -- what kinds of emails

11    are you referring to there?

12    **A.**  All different kinds -- emails from my direct reports

13    related to odd questions; emails from project managers with

14    questions from clients; emails about setting up different

15    meetings for the week, meeting invites.  You know, just -- it

16    could be about anything and everything.

17    **Q.**  Next item, "meetings."  What types of meetings were you

18    referring to this there?

19    **A.**  I was involved in Global supervisor meetings with my

20    team.  Also, we had senior leadership meetings that were

21    every two weeks.  If there was a specific request from a

22    client and we wanted to discuss whether it was something we

23    could set up in our lab, we would pull in the appropriate

24    members of different departments and have a meeting about

25    that.

1          So it really depended on -- yeah.  There were

2    just -- there were all kinds of meetings.  We had quarterly

3    quality management meetings.  We had one-on-one meetings with

4    our direct reports.  Yeah, just any time there was anything

5    that needed to be discussed related to what was going on in

6    the central lab.  Some of them were regular standing

7    meetings.  Some of them were specific to, like, a project

8    that we were working on or some other related issue.

9    **Q.**  Okay.  Turning to the next line.  So that reference, in

10   part, the -- the validation plans you referenced earlier?

11   **A.**  Yes.

12   **Q.**  And besides validation plans, what else -- what else is

13   included in that third line there?

14   **A.**  We did stability studies to make sure that the specimens

15   were stored appropriately during transit.  Like if they

16   needed to be at a refrigerated or frozen temperature, so we

17   would do those studies in-house that to show that, yes, the

18   studies were still valid at this temperature.  I would sign

19   off on all of those.

20          I am kind of blanking right now about the test

21   maps.  I suspect those were, like -- yeah:  I'm sorry.  It

22   was so long ago.  I'm not sure exactly what I was referring

23   to there.

24   **Q.**  Pass.  We'll come back to that.

25   **A.**  Okay.

1    **Q.**   "Technical memos"?

2    **A.**   Technical memos were if there was a change to an assay or

3    an instrument, we would write technical memos to update our

4    clients.  I would -- used to write those or have one of my

5    direct reports draft and then clean it up and finalize it.

6    **Q.**   Going to the next line, it references "analytical

7    investigations."  Can you tell us what that refers to?

8    **A.**   If we had any indication based on our quality control

9    samples that a particular assay or instrument wasn't

10   performing according to our specification, we would do an

11   investigation to resolve what was going on before we would

12   actually resume patient testing.

13   **Q.**   And then the reference to "CAP/Alt PT"?  Do you know what

14   that is?

15   **A.**   Yep.  That's a requirement that you run in your

16   laboratory proficiency testing as another level to ensure

17   that your instruments and assays are performing according to

18   standards.

19           Most clinical laboratories participate in College

20   of American Pathologists proficiency testing program.  So

21   every quarter, they'll send out unknown samples, and you have

22   to run them and then report the results that you get back.

23   And then later they send you a report showing whether or not

24   you passed.

25   **Q.**   Okay.  And the next item, "linearity," what's that refer

1    to?

2    **A.**  Linearity is basically to show that your -- for certain

3    assays, that it's -- it's linear.  Like if you increase the

4    quantity of the substrate, you see that on your -- you get

5    the straight line.  So it's kind of like, you know, two,

6    four, six, eight.  You want to make sure that you get as

7    straight a line as possible to show that the assay is linear

8    for tests that have that kind of curve.

9    **Q.**  The next item, "GLASS," what's that?

10   **A.**  That was the quality control program that we created

11   ourselves to make sure that our four Global laboratories

12   performed results that were comparable.

13   **Q.**  Moving to the next item, "shipping condition, test cases,

14   and validation docs."  What is that?

15   **A.**  That was -- they would test the containers that the

16   specimens were shipped in to make sure that they remained at

17   the temperature, the required temperature that they needed to

18   be in so that if the specimen was supposed to be frozen at a

19   certain degree, that those containers did, in fact, keep the

20   specimen frozen at that particular temperature.  And I had to

21   review and sign off on those.

22   **Q.**  Next item, "SOP review and approval," what's that?

23   **A.**  That was what I was referring to earlier, procedures for

24   everything we did in the laboratory.  And those would be

25   written usually by, like, a lead tech, a supervisor, and then

1  they would go through a chain, a hierarchy, until they would

2  finally get to me.  And I would review and determine whether

3  or not they were acceptable.  And if I approved them, then

4  they went on and the staff were trained on them.  And if I

5  rejected them, I put in comments and suggested edits and

6  explained why they needed to be changed.

7  **Q.**  Next line, "Safety minutes review/lab KPIs."  What's

8  that?

9  **A.**  It's required that you review safety metrics monthly to

10  make sure that, you know, the eye wash station's working,

11  there's no electrical hazards, things like that.

12          So we had a safety officer and safety team, and

13  they would provide safety minutes for me to review to make

14  sure that there were no safety concerns for the laboratory.

15          And lab KPIs is key performance indicators.  Those

16  were that quality metrics that we set up at the beginning of

17  the year and that I received quarterly to review, to look for

18  any concerning trends or shifts indicating, like, a reagent

19  problem or any kind of issue with the testing and in any one

20  of our laboratories.

21  **Q.**  Okay.  I'm just going to take a break from this document

22  for a little bit.  We can come back to some of those other

23  duties in a little bit.

24          But I'm going to ask you this question now:  As of

25  November 2017, what if any duties had you been asked to

1    perform relative to business development?

2    **A.**   I was asked to -- sometimes they would -- well, they

3    would consult with me if a client wanted a particular assay

4    set up in our laboratory, and we would evaluate if it made

5    sense strategically, if we had enough volume, or did it make

6    more sense to send it out to a reference laboratory?

7            So most of the time, it was, can we get this type

8    of testing?  Do we have the right compliance, the right

9    certifications in our lab to perform this type of testing?

10   If not, we would have to send it out to another laboratory

11   that had that certification.

12   **Q.**   And was there any group within PPD that specifically had

13   the responsibility for business development?

14   **A.**   Yes.  It was a large group, and my -- I had a peer who

15   was also an executive director who oversaw that group.  So

16   lots of times, you know, we would informally chat about

17   strategy and -- yeah.

18   **Q.**   Now, at some point in time, did you -- did you come to

19   learn that business development might become a larger part of

20   your responsibilities at PPD?

21   **A.**   Yes, the end of December 2017.

22   **Q.**   And from whom did you learn that?

23   **A.**   Hacene Mekerri, my manager.

24   **Q.**   And what was the context in which that issue came up?

25   **A.**   He -- he said that he would like to make some changes to

1    my role in 2018 to make me more visible in front of clients,

2    and he specifically mentioned formal presentations, like

3    formal PowerPoint presentations to pharmaceutical clients.

4    **Q.**  And what was your reaction?

5    **A.**  I became extremely anxious.

6    **Q.**  Why?

7    **A.**  Because I have social anxiety and social anxiety

8    disorder, and I knew that giving formal presentations like

9    that would cause severe panic attacks.

10            Also, I knew that I needed to medicate to give

11   those presentations.  And, you know, there's -- there's

12   anticipatory panic when you know those things are coming up,

13   so that's stressful; and there's, like, recovery after you go

14   through those presentations.

15            Basically, it allowed me to give what Hacene

16   considered excellent presentations of the few slides I had

17   done, but the medication masked the external symptoms.

18   Inside I was panicking.  The medication hid that from the

19   audience.

20   **Q.**  Well, we'll get back to that in a moment, but when --

21   when did you first begin to suffer from social anxiety

22   disorder?

23   **A.**  I've had it my entire life.

24   **Q.**  And while you were growing up, did anyone else in your

25   family exhibit any signs of any kind of medical health issue?

1    **A.**   Yes.  My dad had mental health issues.  I did not know

2    exactly at the time what he was diagnosed with, and then --

3    but on my mom's side, my mom and my grandmother had anxiety.

4    **Q.**   And while you were growing up, how -- how did your social

5    anxiety disorder impact you?

6    **A.**   Well, as a child, in school, I was terrified to ever be

7    called on by the teacher, terrified to ever raise my hand.  I

8    was afraid if I would be asked to read out loud in class.

9    Usually, on the playground, I would just go find a spot and

10   hang out by myself.  Yeah.  I was teased.

11           It was hard.  Back then, in the '70s, you know, I

12   don't even know if social anxiety disorder was an official

13   condition.  It was just considered that I was extremely shy.

14   And I had teachers who would refer to my condition on report

15   cards, but I don't think anybody really knew what it was or

16   what to call it.

17   **Q.**   And as you grew older and pursued your educational

18   studies, did your social anxiety disorder continue to impact

19   you?

20   **A.**   Yes.

21   **Q.**   And in what kinds of contexts?

22   **A.**   Definitely with public speaking.  I always felt awkward

23   in social situations.  I did not get panic attacks in social

24   situations.  But I felt uncomfortable.  And when I got home,

25   I was exhausted.  I was relieved to just, like, be by myself

1  with my cat.

2          But, yes, if I had to give a presentation like I

3  did throughout medical school and residency, I needed to

4  take -- I was taking Valium, which was prescribed to me by

5  different doctors at the time, in order to deal with the

6  shaky voice and the panic attacks, essentially.

7  **Q.**  And -- and you mentioned a panic attack.  Can you

8  describe for the jury what a panic attack feels like to you?

9  **A.**  Some are worse than others, but in general, my breathing

10  becomes very rapid.  My heart rate becomes very rapid.  I

11  start sweating.  I get shaky.  My voice gets shaky.

12  Sometimes I'm unable to talk if it's really bad, and I

13  just -- I'll have tears come down my face.  And it's very

14  scary.

15          I get GI distress, which is embarrassing because

16  then I feel like I have to go to the bathroom; and, you know,

17  I'm, like, embarrassed by that.  And the more the symptoms

18  escalate, it just makes me panic more and more.  So it's just

19  this awful spiral of, like, the symptoms just keep

20  escalating, and you can't stop it.

21          And it's like feeling trapped, and sometimes you

22  feel like you have like an out-of-body experience, and you

23  are just, like, not even aware of what's going on around you.

24  So that's what it was like without medication, or what --

25  what it is like.

**Q.**  And talking about your time at PPD, you indicated that
there were times at PPD you would engage in activities that
you had to medicate for; is that right?

**A.**  Yes.

**Q.**  Okay.  And did I hear you right, those were -- those were
essentially presentations and things of that sort?

**A.**  Yes.  Very rare.  We would usually have, like, two town
hall meetings a year.  They were supposed to be quarterly;
but, usually, they only happened a couple of times, so I was
asked to present a few slides at two of those.

And I was asked to present a few slides at a couple
of the senior leadership team meetings.  And then on -- on
occasion, when our chief operating officer was coming to
visit, I was also asked to present a few slides, but didn't
actually present that time because we ran out of time, and
they needed to get -- start the lab tour.

**Q.**  Besides those activities you just described, up until
December of 2017, were there any other responsibilities that
you had at PPD that caused you panic attacks?

**A.**  No.

**Q.**  As of December 2017, had you told anyone at PPD about
your social anxiety disorder?

**A.**  No.

**Q.**  Why not?

**A.**  There's a stigma with mental illness, and I was afraid

1    that people would view me as defective and that that might

2    hurt my career opportunities, my job.  I think that's why

3    most people, or a lot of people, with these disorders do not

4    communicate it.

5    **Q.**  And you mentioned fear of losing your job.  Was your job

6    important to you?

7    **A.**  Oh, absolutely.  We made the decision when our child was

8    born that Mason would be a stay-at-home dad, and I would be

9    the sole financial provider for our family.

10            So for the prior over ten years, since 2006, Mason

11   was not working.  He was a stay-at-home dad.  He did get

12   involved in kind of -- I hate to say, like, geeky, technical

13   projects that I didn't understand and were way over my head.

14   But, you know, he did -- he had his own little projects that

15   he worked on; but he also stayed at home and, you know, would

16   take Maya to school and things like that.

17            And we made that decision because my income was

18   much higher than what he was able to make as a software

19   developer.

20   **Q.**  So December of 2017, when you're -- when you have the

21   discussion with Mr. Mekerri you described a few minutes ago,

22   had you, as of that time, typically received annual

23   performance reviews?

24   **A.**  Yes.  Yes.  At PPD?

25   **Q.**  Yes, at PPD.

1    **A.**   Yes.

2    **Q.**   All right.  And generally speaking, what do you recall

3    about the substance of those reviews?

4    **A.**   The first review I got at the end of 2015, I had been

5    reporting to David Johnston temporarily because my initial

6    boss left, and it was a great review.  He was really

7    impressed by how fast I was able to get a global validation

8    project completed that had been stalled for many, many, many

9    months.

10             So he was very impressed.  We got along great.  A

11   lot of times, he would reach out to me and say, "Hey, do you

12   want to join me?  I'm watching this Webex," and I think that

13   caused a little friction with my -- my initial boss at the

14   time.  But David Johnston had a lot of trust in me and gave

15   me a really good review.

16   **Q.**   So I'm going to show you here Joint Exhibit 57.  And can

17   you tell the jury what this is?

18   **A.**   This is my performance review from 2015 from David

19   Johnston.

20   **Q.**   Okay.  And I'll turn to the second page here, and I'll

21   try to enlarge the top of it a little bit here.  Do you see

22   the top section, the second page, it has a goal there.  Do

23   you see that?

24   **A.**   Yes.

25   **Q.**   And can you tell the jury how -- what, just generally

1  speaking, the practice was in terms of establishing goals at

2  PPD?

3  **A.**   Generally, you would establish goals at the beginning of

4  the year, but since I was coming in -- you know, I was hired

5  at the end of August, I quickly developed these goals upon

6  being hired.  And then these are goals that are used to

7  measure your performance midyear and at the end of the year.

8  **Q.**   Okay.  And so there -- looks -- strike that.

9         So it looks like part of the system is the employee

10  provides a rating, and then the manager provides a rating?

11  Is that what we're looking at?

12  **A.**   Yes.  So the employee has the ability to pull this up in

13  the performance management system where they can look at the

14  goals that they've set for themselves and provide

15  documentation as to how they met that goal or -- or if it was

16  a midyear review, are they on target in meeting that goal,

17  where they're at -- basically, supportive comments to

18  describe how you're -- how you're going on reaching that

19  goal.

20  **Q.**   Okay.  And so if you look at the first goal here, do you

21  see that Mr. Johnston, he rated you fully effective?

22  **A.**   Yes.

23  **Q.**   And was -- was part of your responsibilities at PPD to

24  provide these reviews for people that you managed?

25  **A.**   Yes.

1    **Q.**  And did you have an understanding in terms of what a --

2    what a three fully effective rating sort of meant?

3    **A.**  Yes.  That was -- that was the bulk, I think, of what

4    most people received at PPD.  That meant you're a good

5    employee, you're doing -- doing a good job, and, you know, no

6    issues, really.

7    **Q.**  And let me scroll down to the second goal here.  It looks

8    like Mr. Johnston rated you as highly effective?

9    **A.**  Yes.

10   **Q.**  Do you see that?

11   **A.**  This --

12   **Q.**  And based upon your experience at PPD, what's your

13   understanding of the significance of that?

14   **A.**  Yeah.  Like I said, this is -- he was really impressed

15   that I was able to get this global validation project

16   completed in the short time that I was there.  Yeah.  So I

17   went, you know, above and beyond to get that done, pushed a

18   lot of people to work really hard and did not take no as an

19   answer.

20         And, you know, I said -- set deadlines and said

21   we're going to meet these deadlines.  And I took very large

22   validations home with me every weekend so I could make sure

23   that we would get this project done.

24   **Q.**  And if you look at the next page here, you see another

25   goal here, and it looks like that's another highly effective

1    rating from Mr. Johnston.  Do you see that?

2    **A.**   Yes.

3    **Q.**   Do you recall what that -- what that goal was?

4    **A.**   Yes.  When I started at PPD, we needed to identify if

5    there were any regulatory and -- compliance gaps.  Coming

6    from a large independent laboratory and a hospital

7    laboratory, I was able to identify those right away.  And I

8    brought that to Chad's attention, to several people's

9    attention, saying that we should not be reporting out results

10   from an area that I am not qualified to oversee, from a

11   regulatory standpoint.

12           So I said that we need to -- at this point, we were

13   kind of borrowing people from one of the Richmond labs who

14   qualified to oversee molecular, and then they -- he reached

15   out to get the New York certification.  And that was the same

16   with flow cytometry.  Eventually, the person from molecular,

17   I think, was abruptly let go, so we were just instantly not

18   in compliance again.

19           And the person from flow was more -- he worked in

20   the Richmond laboratory primarily where they did measure

21   research-based-type testing and wasn't as familiar, I guess,

22   as clinical flow cytometry is done in, like, hospital labs

23   and clinical laboratories.

24           So we had a compliance gap there as well, and I

25   identified that and said that, you know, we need to find

1    people either within PPD that can qualify or hire someone

2    externally at -- either as a consultant or a permanent hire.

3    **Q.**   Okay.  And then, just to look at the -- well, the bottom

4    of that page, that was another highly effective rating; is

5    that right?

6    **A.**   Yes.

7    **Q.**   Okay.  And then -- turning to the next page, page 4 here,

8    you see there's a rating there for decision-making.  Do you

9    see that?

10    **A.**   Yes.

11    **Q.**   All right.

12    **A.**   Yes.

13    **Q.**   And can you tell us what Mr. Johnston rated you on that?

14    **A.**   A rating of five, exceptional, which is the highest

15    rating.

16    **Q.**   Okay.  Now, this was Mr. Johnston.  Did you ever receive

17    a rating from -- I'm sorry -- a performance review from

18    Mr. Mekerri?

19    **A.**   Yes.

20    **Q.**   And was that the following year?

21    **A.**   Yes.

22    **Q.**   Okay.  I'm now going to show you Joint Exhibit 58.  Let

23    me get back to the first page.  Sorry.

24            And can you tell us what this is?

25    **A.**   This is my 2016 performance review by Hacene Mekerri.

1    **Q.**  Okay.  And if you -- do you recall generally what the --

2    what the overall message was of this rating to you?

3    **A.**  I was rated as highly effective.  He had positive things

4    to say.  I can't remember what the focus was, without looking

5    at my goals, of 2016, but --

6    **Q.**  Okay.  Let's -- let's -- the second page here, can you

7    see a goal here listed as "Collaborate with lab data

8    management and finance so establish and standardize global

9    lab metrics for test volumes, supply costs, and

10   revenue-generated per tests/test category."

11              Do you see that?

12   **A.**  Yes.

13   **Q.**  And how did Mr. Mekerri rate you for that?

14   **A.**  Highly effective.

15   **Q.**  And you see that there are some notes then beneath the

16   rating.  What was your understanding as to why the reason why

17   there's a space for notes there?

18   **A.**  Everyone at PPD is trained thoroughly on how to complete

19   their -- complete their performance reviews, work through the

20   performance management system.  And there's tutorials that

21   you have to go through and watch and -- that are required.

22              And so as part of that, it's -- as part of that

23   training, it's -- you need to document to support your

24   rating.  So you can't just put in a number; you have to

25   support it with evidence.  And the employee has to do that

1    for themselves, and then their manager does it after, and

2    then you have a formal performance review where you go

3    through it together.

4    **Q.**   Okay.  Looking at the second goal there, it says,

5    "Category:  Superior performance."  Do you see that one?

6    **A.**   Yes.

7    **Q.**   And what was your rating there?

8    **A.**   Highly effective.

9    **Q.**   And then the next page, do you see "Category:  Continuous

10   Improvement"?

11   **A.**   Yes.

12   **Q.**   And what was Mr. Mekerri's rating of you for that?

13   **A.**   Highly effective.

14   **Q.**   And then the -- scrolling down, the next category,

15   "People and Culture," do you see that?

16   **A.**   Yes.

17   **Q.**   What was Mr. Mekerri's rating of you there?

18   **A.**   Highly effective, even though I rated myself as lower

19   than that.

20   **Q.**   Going to the next page, you see there's a category,

21   "Organizational Awareness"?

22   **A.**   Yes.

23   **Q.**   How did Mr. Mekerri rate you for that?

24   **A.**   Highly effective.

25   **Q.**   Do you see the next category, Decision-Making?

1   **A.**   Yes.

2   **Q.**   How did he rate you for that?

3   **A.**   Highly effective.

4   **Q.**   All right.  Going back to the -- actually, strike that.

5          In -- at some point in 2017, had you and your

6   family moved?

7   **A.**   Yes.

8   **Q.**   And why was it that you had relocated?

9   **A.**   Hacene and I had a conversation in his office, and I

10   brought up the idea.  I said, "Look" -- well, at this time,

11   he already knew about all the issues that were going on with

12   my child at school with the bullying and that it was -- I

13   mean, he saw me in tears at one point and was, like, "You can

14   go and talk to the head of the school, whatever you need to

15   do." So I -- I kept him informed about that.  We were really

16   close colleagues.

17          And so I brought up the idea of trying to find a

18   different school for Maya because I was really concerned

19   about, as a child, the amount of depression that they were

20   exhibiting.  I was worried about the impact that would have

21   on them later in life.

22          So I asked Hacene would there be a possibility that

23   I could go remote so that I could move my child into a school

24   where they wouldn't be bullied, that they felt safe?  And at

25   the time, he -- he had one direct report who he brought up,

and it was, like, "Oh, yeah.  Like Michelle Dockhorn, she's remote, so I don't have any problem with it; but I want to run it by David Johnston," who he was reporting to at the time.

And then we also agreed that it would be positive because it would allow me to more equally travel to the four different laboratories that I was responsible for.  I was hired to oversee four laboratories and had only been to China and Singapore once and to the Brussels lab, I think, a few times at that point.  So I was really happy about the idea that I could more equally cover the four Global laboratories that I oversaw.

And, yeah, we knew it wasn't going to be anything immediate.  We decided that -- he said we should talk to Chad, and we all worked together for a few months to try to come up with, like, an organizational structure so -- that showed how we would bring in some additional scientific expertise.  We decided that we would bring in someone who could be the CAP director and the New York stakeholder director for Highland Heights.

I would remain as the CAP director for the Belgium lab.  Like I said, in Asia, their requirements were that they had local doctors on their certificates.  And the individuals that we hired would report to me, and these were primarily PhD-level candidates that could cover the areas where I had

1    identified that we had compliance gaps.

2             So -- yeah.  I forgot the rest of your question.

3    **Q.**  No worries.

4    **A.**  Sorry.

5    **Q.**  I'll ask another one.

6             So at some point, was a decision made that you

7    would be permitted to work remotely?

8    **A.**  Yes.

9    **Q.**  Okay.  And do you recall who was involved in making that

10   decision?

11   **A.**  I know Hacene got permission from David Johnston, and he

12   also -- I had a call with Jerry Williams, and we also

13   presented -- once Chad and Hacene and I came up with our

14   proposed org chart, that was one of the few presentations I

15   gave at the senior leadership team meeting to show them the

16   new structure that we proposed and that we were going to be

17   recruiting for these individuals to cover these areas.  And

18   that's why it was one of my primary goals in 2017.

19   **Q.**  So now I'm going to show you Joint Exhibit 392.  And

20   looking at the top, do you see this as an email from Chad

21   St. John?

22   **A.**  Yes.

23   **Q.**  Can you tell the jury who Mr. St. John is?

24   **A.**  He was the director of human resources of the

25   Highland Heights lab; and then I think later that expanded to

1    cover more of the laboratories, but basically the lab

2    director -- I mean, the lab director -- the human resources

3    director for the Global Central Labs.

4    **Q.**  And if I can direct your attention here to the second

5    paragraph of the email, you see it begins, "Lisa has also

6    shared"?

7    **A.**  Yes.

8    **Q.**  And then if you look at the second sentence, it reads,

9    "No concerns regarding her physical move have been expressed

10   or detected at this time."

11            Do you see that?

12   **A.**  Yes.

13   **Q.**  Was that accurate?

14   **A.**  Yes.

15   **Q.**  And subsequent to -- subsequent to this email, were you,

16   during your employment at PPD, ever advised that there were

17   any concerns concerning your -- your remote work status?

18   **A.**  No.

19            THE COURT:  I'm going to stop you there,

20   Mr. Hannon.

21            So, ladies and gentlemen of the jury, it's

22   four o'clock.  We're going to stop for the day.  Don't

23   discuss the case among yourselves.  Don't discuss with anyone

24   else.  Don't do any independent research.

25            I know that the Seaport is probably not where you

```
 1    ordinarily come for work, so tomorrow morning, like today, is
 2    sort of a different commute for you.  So do your best to try
 3    to organize yourself, figure it out and get here so you're in
 4    the jury room, ready to go at nine o'clock, because we hope
 5    to start right on time, but we can't start without everybody
 6    who is already here.
 7              So thank you very much for your attention.  Have a
 8    nice evening.
 9              All rise for the jury.
10              JUROR:  So tomorrow, we are -- we are --
11              THE COURT:  9:00 to 1:00 tomorrow.  One o'clock --
12    done tomorrow.  Exactly.
13              (Jury not present.)
14              THE COURT:  Okay.  Anything for any of you before
15    we stand in recess?
16              MR. HANNON:  Nothing here, Your Honor.
17              MS. MANDEL:  Just -- just one real quickly.
18              I'm not sure, in terms of that exhibit issue, if
19    we're going to need have it resolved before tomorrow, the one
20    contested exhibit that I mentioned regarding Ms. Ballweg.
21              MR. HANNON:  Sure.
22              MS. MANDEL:  Timing -- I don't know if that's a
23    today issue, if you want to hold it till tomorrow.
24              MR. HANNON:  We can tackle it in the morning,
25    maybe.
```

```
 1              THE COURT:  I'm happy to see you at 8:30.  If
 2   there's something you want me to read tonight, you can tell
 3   me what it is and give it to me.
 4              MS. MANDEL:  Can we just --
 5              MR. HANNON:  Go for it.
 6              THE COURT:  You can sit down there or back at the
 7   table, whichever you prefer.  You don't have to remain
 8   standing.
 9              Okay.  So this is Exhibit D- 530.  I'll read this.
10   And I take it there's evidentiary disputes about it?
11              MR. HANNON:  Correct.  I believe my only objection
12   was to hearsay.
13              Is that right?  This was --
14              THE COURT:  You plan -- Ms. Mandel, you plan to
15   offer this?
16              MS. MANDEL:  We do.
17              THE COURT:  And your objection, essentially, is
18   hearsay?
19              MR. HANNON:  Yes.  Is that the -- is that the --
20              THE COURT:  Dated May 2, 2018, complaint of
21   discriminatory behavior and disability discussion with Lisa
22   Menninger -- am I saying your name, correct?  I'm not sure
23   I'm --
24              DR. MENNINGER:  It is Menninger.
25              THE COURT:  Menninger.  I'm sorry.
```

1          DR. MENNINGER:  No.

2          MR. HANNON:  I just learned it two days ago, so no

3     worries.

4          THE COURT:  By Ballweg?

5          MR. HANNON:  Yes.  Just hearsay is all, Your Honor.

6          THE COURT:  Okay.  I'll read it.  We'll talk about

7     it tomorrow at 8:30 as well as anything else.

8          Have a good day.  We'll see you tomorrow.  Thanks.

9          THE DEPUTY CLERK:  Court's in recess.

10          (Court in recess at 4:04 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **C E R T I F I C A T I O N**

3

4           I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Rachel M. Lopez                    March 20, 2023

11    /s/ Robert W. Paschal

12

13

14    _____        _____

15    Rachel M. Lopez, CRR                   Date

16    Robert W. Paschal, CRR, RMR

17    Official Court Reporters

18

19

20

21

22

23

24

25