1           UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3    _____

4    LISA MENNINGER,

5         Plaintiff,                    Civil Action No.
                                        1:19-cv-11441-LTS
6         v.

7    PPD DEVELOPMENT, L.P.,

8         Defendant.

9    _____

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                        JURY TRIAL
13                        Day 2

14

15

                   Tuesday, March 21, 2023
16                       8:35 a.m.

17

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 13
22   One Courthouse Way
     Boston, Massachusetts

23

     Robert W. Paschal, CRR, RMR
24   Official Court Reporter
     rwp.reporter@gmail.com

25

1                   **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

       HARTLEY MICHON ROBB HANNON, LLP
4      BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
       155 Seaport Boulevard
5      2nd Floor
       Boston, Massachusetts  02210
6      (617) 723-8000
       phannon@hmrhlaw.com
7      hwatson@hmrhlaw.com

8

9  On behalf of the Defendant:

10     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
       BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11     One Boston Place
       Suite 3500
12     Boston, Massachusetts  02108
       (617) 994-5700
13     rachel.mandel@ogletreedeakins.com
       patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

1               **TABLE OF CONTENTS**

2

3               **TRIAL WITNESSES**

4

5    On behalf of the Plaintiff:                          <u>Page</u>

6     LISA A. MENNINGER

7          By Mr. Hannon                                    32

8

9

10                  **EXHIBITS**

11

12                   None

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S
2              (In open court.)
3              THE DEPUTY CLERK:  Today is Tuesday March 21, 2023,
4      and we are on the record in Civil Case Number 19-11441, Lisa
5      Menninger versus PPD Development L.P.
6              And would counsel please identify themselves for
7      the record.
8              MR. HANNON:  Good morning, Your Honor.  Patrick
9      Hannon for the plaintiff.
10             THE COURT:  Good morning.
11             MS. MANDEL:  Good morning, Rachel Mandel and
12     Patrick Curran for the defendant.
13             THE COURT:  Good morning.
14             MS. MANDEL:  Good morning.
15             THE COURT:  Okay.  I read that document.  Just tell
16     me briefly, Ms. Mandel, what you're offering it for.
17             MS. MANDEL:  Your Honor, one of the issues in this
18     case is whether the company did a sufficient investigation
19     into Dr. Menninger's complaint that she was being
20     discriminated against, and Deborah Ballweg conducted that
21     investigation, and these are her notes from the
22     investigation.
23             They will not be offered for the truth of the
24     statements that are cited by other people, but, rather,
25     Ms. Ballweg's state of mind in conducting and concluding
```

1    various things in the investigation.  And so these notes --

2              THE COURT:  To show that she didn't do a sham --

3              MS. MANDEL:  Exactly.  And what her real-time notes

4    were about her impressions at that time.

5              THE COURT:  Anything to say about that?

6              MR. HANNON:  These don't do any of that.  These

7    aren't handwritten notes.  These are documents prepared in

8    memo form.

9              And we would submit that they very much are being

10   offered for the truth of the matter asserted that this is the

11   information that she was told and she was -- gathered and the

12   conclusions that she made.

13             THE COURT:  Well, it's -- I guess there's couple of

14   different parts.  First of all, all of those things in here

15   that are -- the interview -- there's a series of memos,

16   right?  Each one is a memo about an interview of a particular

17   person who worked for the company, right?

18             As to the memo with respect to the interview with

19   your client, I think that's admissible because all of her

20   statements would be statements of a party opponent and

21   those -- she's recording at the time what she says.  This is

22   her written -- written record of what your client says.  What

23   your client said to her is admissible as a statement of a

24   party opponent.

25             To the extent it's another level of hearsay because

1    she wrote it down, I still think that it's -- I don't see how

2    that changes the -- I mean, she can certainly get up on the

3    witness stand and testify to all of these things that your

4    client said, and she could testify that she wrote them all

5    down, and she could testify she wrote a memo to herself.  So

6    I don't really see why she couldn't introduce the memo,

7    especially given an issue as to whether an adverse action is

8    the investigation.

9            So it's really the other -- well, the other memos

10   write about each memo.  It's about a different person, and

11   that analysis that I just described doesn't apply to the

12   other memos because the others aren't interviews with party

13   opponents.

14           MR. HANNON:  You're right about all the other

15   people besides Dr. Menninger, that they've got double hearsay

16   problems there.

17           With respect to the hearsay issue regarding

18   Dr. Menninger, you're correct that at the -- at the bottom

19   level of this sort of pole here, that her statements are not

20   hearsay; however, the memorandum which purports to say what

21   she had said, it is hearsay.  And the hearsay rule doesn't

22   allow someone, in anticipation of litigation, to create a

23   self-serving memo that says, I was told this and I was told

24   this and I was told this, which is what this is.  And the

25   hearsay rule excludes this.

```
 1              THE COURT:  So here's the issue about that, though.
 2       If I remember right from the summary judgment, one of the
 3       issues for trial is whether the -- whether a sham
 4       investigation is an adverse action, and so all of this
 5       information is her investigation.
 6              And so if you take it apart, I think -- and you'll
 7       tell me what is wrong with this.  One, she could get up on
 8       the witness stand and say, "As part of my investigation on
 9       May 2nd, I interviewed the plaintiff.  I asked her the
10       following questions, and she told me the following things."
11       And she could testify to all that, everything that was said
12       to her, and everything she did.
13              And she could say, the next thing I did in my
14       investigation is then I followed up, and I interviewed the
15       following -- however many people it is.  And as to each one,
16       I asked them generally about the issues -- my summary of what
17       I read, the issues that were raised by the plaintiff.  And so
18       I asked Mr. St. John -- is it Mr. -- Mr. St. John the
19       following -- you know, I asked him this and he told me this,
20       and I think she's entitled to say and then at the end I came
21       to these conclusions, because that's what's challenged,
22       right?  She could say at the beginning, "I came to these on
23       conclusions.  Here's how I got there.  I talked to these
24       people, I asked them these questions.  I did it because I was
25       told this."
```

1                She could do all that, right?

2                MR. HANNON:  Correct.

3                THE COURT:  And so why can't she -- and she could

4        say, "I wrote it all down."

5                MR. HANNON:  She certainly may.

6                THE COURT:  And she could say, "I wrote it down

7        contemporaneously."

8                MR. HANNON:  She could say that.

9                THE COURT:  And she could say, "I wrote each -- as

10       to each interview, I wrote a memo and -- about each person,

11       and I listed the topics.  I talked to them, and I wrote a

12       summary of what I said, what I thought they said to me, or

13       what I thought was the salient or material or relevant things

14       they told me."

15               MR. HANNON:  She could say all of those things.

16               THE COURT:  And so what you're objecting to is the

17       actual document?

18               MR. HANNON:  The actual document, as well as the

19       foundation in terms of any potential hearsay exception.  So,

20       for example, there's an exception to past recollection

21       recorded.  If she were to testify that at the time I was

22       conducting these interviews I took notes, I don't recall

23       specifically what was written, that's a hearsay exception.

24       Then it comes in.

25               THE COURT:  And it comes in only to read it all; it

1    doesn't come in to go -- as an exhibit.

2              MR. HANNON:  You're right.  You're right.

3              But there's a necessary predicate, as Your Honor

4    has pointed out, is that if we're going to go down that path

5    for a potential exception, there needs to be a foundation

6    that these things are done contemporaneously and --

7              THE COURT:  For -- right.  For that -- to read

8    it -- to read it to the jury, and then it would come in for

9    the truth.

10             MR. HANNON:  Correct.

11             THE COURT:  And -- but here what I understand

12   Ms. Mandel to be saying is, "Judge, I'm not at the moment

13   anticipating trying" -- we'll she's not saying she's not

14   anticipating, but she's at least saying, "My first argument

15   for it is not to offer it for the truth at all, but as part

16   of the whole testimony that I just outlined that I -- that

17   you agree that they can elicit.  I also want to introduce

18   these as her state of mind to prove she did all these things.

19             "I think that -- in other words, like, all of the

20   things that I described, the back-and-forth, that all comes

21   in for the statements told to her when she testifies."

22             Ms. Ballweg -- am I saying your name right?

23             MS. BALLWEG:  Yes.

24             THE COURT:  Are -- are the statements attributed to

25   Mr. St. John or whomever else, those statements are really --

```
1   are they coming in for the truth in the testimony?
2               MR. HANNON:  I submit that they are, that to your
3   point, she can simply testify, "I spoke to these people.
4   Here's what they told me."  This is -- this is -- this is
5   about having evidence that corroborates --
6               THE COURT:  So you think if she says on, "May 4th,
7   as part of my" --
8               You know, "What did you do?  What did you do next,
9   after you talked to the plaintiff, for your investigation?"
10              "On May 4th, I interviewed Mr. St. John."
11              "What did he tell you?"
12              "He told me that Hacene shared that he discussed
13  lab issues with Lisa during their one-to-one meetings, but
14  Chad -- I think -- Chad was not involved with those
15  discussions."
16              She says that.  She could testify to that, right?
17              MR. HANNON:  Correct.
18              THE COURT:  And you're saying, "That statement that
19  Chad said to me" -- Ms. Ballweg -- "on May 4th when I
20  interviewed him, quote, 'Hacene shared that he discussed lab
21  issues with Lisa during their one-to-one meetings, but Chad
22  was not involved with those discussions,'" that statement
23  comes in for the truth?
24              MR. HANNON:  Comes in for the truth that he said it
25  to her.
```

1              THE COURT:  Okay.

2              MR. HANNON:  It doesn't come in for the truth

3     that -- that that -- that Chad's telling the truth, right?

4              THE COURT:  Right.  Right.  It comes in for the

5     effect on the state of mind.  It comes in for Ms. Ballweg

6     saying -- it comes in for the fact that Ms. Ballweg is

7     saying, "This is what Chad told me," and she's asserted that,

8     and they can evaluate that in the ordinary course.

9              And that's in for the truth that she's asserting he

10    said it to her, and that he said these things to her; and the

11    purpose of what he said to her is not for the truth of what

12    he said, but for its effect on her.

13             MR. HANNON:  Correct.

14             THE COURT:  And that's the same purpose she's

15    offering the document.

16             MR. HANNON:  No.  I don't think that's right.  You

17    don't get to make your own evidence, right?  So a witness in

18    anticipation of litigation --

19             THE COURT:  Well, hold on.  She says she's offering

20    it for that purpose.

21             MR. HANNON:  She does, yes.

22             THE COURT:  And so you're saying, even though she

23    says that, that either their real purpose is, or even if

24    their real purpose isn't the truth, that it has that effect

25    on the jury?

 1              MR. HANNON:  Correct.  There is no -- there is no

 2    additive layer -- if all they're trying to accomplish is what

 3    the effect was on Ms. Ballweg, this adds nothing.  To your

 4    point, Ms. Ballweg can get up on the stand and she can say

 5    all those things and they can --

 6              THE COURT:  But it's something to the

 7    investigation, though, because if you do an investigation and

 8    you write everything -- and you write -- if you do an

 9    investigation and you interview the people and you have a

10    series of interviews between May 2nd and May 18th, you

11    interview, what, four or five people, and then -- and you

12    don't write it down and memorialize it, and then you come to

13    your conclusions, all of the things being equal, that's a

14    less thorough or careful investigation than if you write

15    things down as you go.

16              Now, you could -- they can elicit that she wrote

17    things down, but why can't they prove to the jury that they

18    did write things down by showing it to them?

19              MR. HANNON:  Well, I think the --

20              THE COURT:  I hear the risk of the truth, right,

21    that they're in for the truth.  But I guess the other two

22    things I'm thinking about, just to cut to the chase, and then

23    I'll hear from you is one is, all these witnessing are

24    testifying, right?  So, like, your client's testifying.  Chad

25    St. John, she's testifying?

```
 1              MR. HANNON:  Correct.
 2              THE COURT:  Hacene Mekerri is testifying by
 3     deposition.
 4              MR. HANNON:  Correct.
 5              THE COURT:  Andy Supp, is he testifying?
 6              MS. MANDEL:  No.
 7              THE COURT:  All right.  Brent Mann?
 8              MR. HANNON:  No.
 9              MS. MANDEL:  Brent Mann is not, no.
10              THE COURT:  And Deborah -- Ms. Ballweg is
11     testifying.
12              So there's two -- aren't -- both of those are much,
13     much shorter in what they have to say.  They -- I assume
14     they're more peripheral people, generally, in the case?
15              MS. MANDEL:  (Nods head.)
16              THE COURT:  So, one, they're all testifying.  I
17     assume they're going to be asked about this, what they told
18     her.  And, two, I'm happy to give the jury a cautionary
19     instruction explaining that, like, what it's relevant for,
20     which is that she did an investigation and part of the
21     question is what was -- how to evaluate that investigation,
22     and these are in for what she says she learned and did.
23     Anyway, that's what I'm wondering about.
24              Given all that, like, what are you worried about?
25              MR. HANNON:  What I'm worried about is this is a
```

1    self-serving document created by the defendant, recognizing

2    that litigation is likely, and in which they -- they

3    essentially create evidence, and what they want to do is they

4    want to have a -- that piece of evidence that they created

5    for that purpose, and they want to be able to, you know,

6    focus on --

7              THE COURT:  Here's what I'm --

8              MR. HANNON:  Rather than having the jury focus on

9    the testimony of the witnesses that comes out in the ordinary

10   course, they want to give them a cheat sheet that just

11   provides them the things that they wanted to highlight and

12   the things they wanted to say.

13             THE COURT:  So here's the thing that I'm struggling

14   with.  If there was not a challenge to the investigation, I

15   would totally agree with you.  Okay?  Because these things

16   that are discussed, which I think is what the issue you're

17   driving at, are relevant for two purposes, the topics of what

18   these people told Ms. Ballweg.

19             One purpose they're relevant for is what -- the

20   effect on her and her state of mind and the investigation,

21   right?  And you agree with that because you agree that she

22   can testify to all that, that's relevant, and that's

23   admissible.

24             The other point that is these things blend.  A lot

25   of them bleed over into the topics, the things those -- I'll

1    call them witnesses, speaking with Ms. Ballweg -- are

2    relevant to the -- to the claims of discrimination or

3    retaliation even if there was no challenge to the

4    investigation, right?

5              So, for example, one of the things that's discussed

6    in these memos and in the investigation is whether or not

7    what happened with your client's authority over hiring and

8    recruiting and particularly how did that play out as to one

9    or two hires, right?  They talk about that.  That's part of

10   your claim of discrimination, that they cut her out of that,

11   right?

12             MR. HANNON:  Correct.

13             THE COURT:  And it's -- and testimony about that in

14   a -- testimony from witnesses or admissible nonhearsay

15   documents are admissible on that topic.

16             And if there was no -- if this investigation had

17   been done, but there was no challenge to the investigation, I

18   agree with you.  It wouldn't be -- this would be hearsay

19   and -- I think it would be hearsay and I think it wouldn't be

20   fair to admit it because, like, just let the witnesses

21   testify.  And the fact that they looked into it and wrote it

22   down, well, that's fine, but that's not -- you know, but

23   here, one of the -- the other way it's admissible or

24   relevant, or the other issue of relevance, is the very

25   challenge to the investigation.

1          And if it were a case just about the investigation

2     and there were no claim for discrimination, I think it

3     would -- that's what I'm thinking about, it goes to her state

4     of mind.  That's why I'm thinking about it, just to be honest

5     with both of you.  That's why I haven't resolved it.  That's

6     why I'm going back and forth, because I'm thinking whether I

7     should admit it for that reason.

8          And I see what you're worried about is the bleed

9     over to the other side, right?  That they'll take this and

10    look at it as the truth on the discrimination issue, right?

11         MR. HANNON:  Right.  And, I mean, I would suggest

12    that, even if it's admitted on that side that you're

13    considering, that there still needs to be the necessary

14    foundation laid in terms of when these documents were

15    created --

16         THE COURT:  Well, yes.  I'm not admitting it now,

17    for sure.  You have to lay the foundation that it was written

18    at the time, because if it wasn't, if it was written after

19    May 18th, for example, I think that's when the last one is

20    when -- seems to be the findings.  If it was written, you

21    know -- I'm not saying it was, but if it were written a month

22    ago, then, obviously, it's not -- doesn't go -- well, you

23    might want it, then, and -- but I'm -- I'm assuming that

24    likely she has that foundation.

25         Yes?

1          MS. MANDEL:  I just wanted to add, Your Honor,

2     that, in fact, I believe that Mr. Hannon intends to admit

3     today a set of notes taken by Dr. Menninger, which were her

4     handwritten notes from a slightly earlier time period, and

5     he'll have to lay a similar foundation and, of course, we'll

6     have an opportunity to cross-examine Dr. Menninger about how

7     and why she wrote these notes and if anyone directed her to

8     do so and, of course, Mr. Hannon will have that opportunity

9     when Ms. Ballweg is on the stand.  There's absolutely nothing

10    in evidence to indicate that Ms. Ballweg did write these

11    notes in anticipation of litigation or outside her normal

12    investigation practice, and that's something Mr. Hannon will

13    have an opportunity to cross-examine her on, which will

14    address these issues that Mr. Hannon has raised but for which

15    there is no basis for belief at this point.

16          MR. HANNON:  Can I just say one thing in response

17    to that?

18          THE COURT:  Of course.

19          MR. HANNON:  So just with respect to

20    Dr. Menninger's handwritten notes, there's been no objection

21    to those, so those are a joint exhibit.

22          And with respect to the opportunity for

23    cross-examination, certainly we'll have that opportunity; but

24    in order to get over the hearsay hump, the certain necessary

25    evidentiary predicates, they're going to have to jump through

1    in order to establish the sort of basic foundation that the

2    jury can use this for the reason that they claim they want to

3    use it for.  I don't say that to be difficult.  I'm not

4    trying to make this hard on opposing counsel.

5          THE COURT:  Well, I think the foundation for that

6    is these were written at the time, which is not related to

7    the recorded-recollection exception, but just the fact that

8    what makes them relevant or potentially relevant to the -- to

9    rebut the claim of a sham investigation is that all -- A,

10   that she testifies that all this actually happened.  I mean,

11   I'm assuming she's likely to testify to that, but that is a

12   predicate to the testimony, that she did it, and that she

13   talked to these people, that she talked to the people then

14   rather than a year later; and that she -- and to the

15   documents coming in, that she wrote them, if they come in,

16   that she wrote them then, rather than later.

17         I think those are all predicate foundations to

18   offering them for her -- for -- as to -- to overcome the --

19   to allow them to come in as to her state of mind and to make

20   them relevant to rebutting the sham investigation claim.  But

21   I'm assuming you anticipate you can lay that foundation,

22   right, Ms. Mandel?

23         MS. MANDEL:  I do, Your Honor.

24         And I would just add that, to the extent that there

25   is any sort of instruction around the use or reliance on

1    these notes, that specific to these notes, I just ask that

2    that be extended as well to any notes that are introduced as

3    evidence in this trial because they would all have the same

4    potential issue.

5         THE COURT:  So two things.  I'm inclined --

6    assuming you lay this foundation -- to allow this in to rebut

7    the -- the claim of sham investigation, because I think that

8    proving that you wrote it down is an extra fact that beyond

9    just your state of mind and what you were told, and having it

10   in front of the jury that you did write it down as opposed to

11   just you say you wrote it down is an extra fact, and you're

12   entitled to have to rebut.

13        But that said, I agree with you, Mr. Hannon, that

14   the statements other than your client's that are reported in

15   here are only admissible for their effect on -- that this is

16   Ms. Ballweg's understanding of what was said to her, and its

17   effect on her state of mind and what kind of investigation

18   she did.  And if you request it, I'm prepared to give a

19   cautionary instruction just like that as a limitation.

20        As to -- maybe to -- insofar as what you're asking,

21   Ms. Mandel, is every time notes of any sort come in, no, I'm

22   not going to give a cautionary instruction, because I'm not

23   sure a cautionary instruction will apply to every kind of

24   note.

25        If -- but to reframe it, if there are other things,

1    whether they're joint exhibits or contested exhibits, that

2    are raised that they're -- their reason for admissibility is

3    nontruth of the matter, that, like, its purpose is nontruth

4    of the matter asserted.  It's the state of mind, for example,

5    or reflects some other nontruth purpose that allows them to

6    be in and you're concerned that -- that a jury could read

7    them for the truth, I'm perfectly prepared to -- just ask me,

8    and I'm assuming that that's the reason they're in, or that

9    makes sense, that I would give a cautionary instruction for

10   them too.

11        So I don't know about the notes, like, for what

12   purpose they're being offered, for example, and so I'm not

13   saying I wouldn't.  I just don't -- not all notes -- some

14   notes might be admissible for -- like, if you're offering her

15   notes, they're in for the truth.

16        MS. MANDEL:  Understood.  And we can revisit that,

17   I imagine, later today.

18        THE COURT:  I'm not saying those notes he's

19   offering, not you.

20        MS. MANDEL:  Yes.

21        THE COURT:  And so I assume they're not in on that

22   basis.

23        Okay.  Anything else on that?

24        MR. HANNON:  So I -- I appreciate the Court's

25   analysis and likely ruling.  Just to save my rights, I would

1   expect I -- I can just object --

2           THE COURT:  I think what you can do is this.

3   Just -- after Ms. Mandel lays the foundation that we've

4   discussed and she offers it as we both anticipate, both those

5   things will occur, then you can stand up and just say, Judge,

6   for the reasons already noted, I object and alternatively

7   request an cautionary instruction if you do.

8           I'm assuming you will?

9           MR. HANNON:  Request a cautionary instruction?

10          THE COURT:  Yes.

11          MR. HANNON:  I think so.  I need to think through

12  what the wording would be of it.

13          THE COURT:  I think -- well, that's why I'm

14  bringing it up, only because, like -- what I would likely say

15  is something like this, but I haven't written this down.

16  Ladies and gentlemen of the jury, you know, I admitted --

17  overruled -- you know, ladies and gentlemen, what you'll see

18  here is a series of memos that Ms. Ballweg has mentioned in

19  her testimony, and each reports on an interview.  Each

20  describes an interview with a different person who worked for

21  PPD, and in the memo summarizes certain statements from that

22  person she spoke with.  And those are -- as to the plaintiff,

23  you may -- because she's under -- as the plaintiff, you can

24  consider those for truth of the matter asserted; that is, you

25  consider those as truth.  But as to all the others, you may

1    only consider them as to their -- they're not in for that is,

2    in fact, what the person said.  It is in for that is what

3    Ms. Ballweg understood the person to say, and it's in for the

4    effect on Ms. Ballweg, her state of mind, and on -- and

5    what -- and her investigation.  And you may well hear

6    testimony on those topics of -- of all those witnesses

7    when -- from some or all those people on the witness stand in

8    one form or another, and that would be on the truth.

9         And then I might give them a little explanation

10   about the hearsay rule, and we want to hear from people on

11   the witness stand, but there are two exceptions:  one is

12   statements of the plaintiff, or party opponents -- not the

13   plaintiff, party opponents -- and the other is state of mind

14   sometimes and -- something like that.

15        Anything -- that fine or generally or anything

16   about that?

17        MR. HANNON:  I think it's more accurate to say that

18   the document can be considered for the limited purpose of

19   assessing the -- not sure what the word is -- thoroughness,

20   appropriateness, good faith nature of the --

21        THE COURT:  How about assessing whether they

22   conducted a sham investigation or not?

23        MR. HANNON:  Right.

24        THE COURT:  Because that's her claim, right?

25        MR. HANNON:  Right.  And not whether any of the

1  statements in there are --

2          THE COURT:  All right.  I'll just say "limited

3  purpose of assessing whether PPD conducted a sham

4  investigation."  Period.  Or anything else?  There's -- this

5  is admitted for the limited purpose of assessing whether PPD

6  conducted a sham investigation.

7          MR. HANNON:  I think that does it, yes.

8          THE COURT:  Okay.  Fine.

9          All right?

10          MS. MANDEL:  Your Honor, if I may, I think that

11  that is slightly too limited when we're also admitting them

12  for the purposes of assessing Ms. Ballweg's state of mind,

13  which is --

14          THE COURT:  Well -- and Ms. Ballweg's state of mind

15  in performing the investigation?

16          MS. MANDEL:  I think especially given that sham

17  investigation is somewhat of a term of art.

18          THE COURT:  Okay.

19          MS. MANDEL:  And, Your Honor, more immediately, I

20  think that the -- before that comes up, these handwritten

21  notes, which I think are -- you know, I think if there's

22  going to be a limiting instruction around Ms. Ballweg's

23  notes, such a limiting instruction should apply as well to

24  Dr. Menninger's notes.  And that will be a more immediate

25  issue, I believe.

```
 1              THE COURT:  What's the purpose of those notes?
 2     These are notes she wrote?
 3              MR. HANNON:  Correct.
 4              THE COURT:  And what's the purpose of those notes?
 5              MR. HANNON:  Every valid inference the jury can
 6     draw from it.  And there's been no objection to these being
 7     offered for the truth, and, therefore, they're admissible for
 8     the truth and therefore there's no -- there's no grounds for
 9     a limiting instruction.
10              MS. MANDEL:  Your Honor, that -- we've just now
11     discussed there's going to be a limiting exception around
12     other notes, and so I think it's only balanced to apply such
13     an instruction to these notes as well.  And so this is sort
14     of a newly raised resolution to the issues around notes.  And
15     so I think it's appropriate to apply them to the handwritten
16     notes that contain statements, for example, quoting things
17     that Dr. Menninger believes Mr. Mekerri said.  That's just an
18     example.  And I just think it would be appropriate to balance
19     that instruction on both sides.
20              And so if a statement that is allegedly quoted in
21     these notes --
22              THE COURT:  Other than agreed to, why are they
23     admissible?
24              MR. HANNON:  They're admissible because they --
25     they demonstrate that these are her -- they confirm her
```

1    recollection of the events and her recollection of these

2    conversations; and that is a -- that's a significant issue in

3    terms of whether or not she's recalling these things

4    accurately.

5            THE COURT:  You mean to rebut an allegation or to

6    fabricate that it arose later?

7            MR. HANNON:  Not so much fabrication, but given her

8    health situation, certainly her ability to accurately recall

9    and accurately perceive -- perception, I would suggest, may

10   be the important one.  Right?  In terms of whether or not her

11   perception of the events that were taking place is actually

12   what was going on.  And to the extent that the --

13           THE COURT:  So here's what I'm going to do.  One,

14   it's all agreed to, so I'm not sure I'm going to give a

15   limiting instruction.  Let me see what the evidence is.  And

16   I understand that you want a limiting instruction.  And what

17   you want is they're not in for the truth but for her state of

18   mind and the fact that she wrote it down at the time.

19           Is that what you want?

20           MS. MANDEL:  Correct.

21           THE COURT:  I'll think about that.  I'm not sure

22   about that, given that it's all agreed, I'm not sure I want

23   to go down the road of revisiting what to do about all the

24   agreed exhibits.  I'm hoping to narrow rather than broaden

25   the scope of issues to resolve.

1            I think that this is a little bit different because
2    this is -- this document, because I don't see how this
3    document could come in for the truth of the matter asserted.
4    I mean, you could all agree, but it isn't a truth document.
5    You might all agree because it's just not that important, the
6    differential, potentially -- I'm not saying it isn't but,
7    like, that's why you would agree.
8            And so I'll think about it and we'll see.  I think
9    we should get the jury.
10           MS. MANDEL:  Your Honor, if I may, there are just
11   two additional items that I wanted to raise before the jury
12   comes in.  Just to renew an issue that we raised in one of
13   our motions in limine, which was denied without prejudice to
14   revisit, the one regarding things already decided on summary
15   judgment, based on testimony that Mr. Hannon elicited from
16   Dr. Menninger yesterday, we have reason to believe that
17   doctor -- Mr. Hannon may be headed in the direction of trying
18   to elicit testimony about the 2017 performance review, which
19   was already ruled on in summary judgment as not evidence of
20   retaliation.  I mean, that piece was completely resolved.
21           And the other is the -- the separation itself in
22   February of 2019, which was also ruled on in summary judgment
23   and given statements made both by Dr. Menninger on her direct
24   yesterday and Mr. Hannon during his opening, we believe that,
25   in fact, these are items that Mr. Hannon is trying to present

1    to the jury as specific --

2            THE COURT:  So I think two different things, two

3    things.  One is the legal arguments are out that I ruled on

4    summary judgment and which means you can't -- I don't expect

5    Mr. Hannon to do this, but -- just to make it crystal clear,

6    you can't argue them in closing.  If you choose to argue them

7    in closing, I will explain in the jury instructions

8    specifically that these particular arguments that you made

9    are -- are limited as a matter of law, and they may not

10   decide, they may not find liability on that basis.  I'm

11   confident you won't do that and -- but you can't do that.

12   That's the ruling.  You can appeal after it's over, and if

13   I'm wrong, I'm wrong; but when it's out, it's out.

14           But I think that, like, the sum amount of evidence

15   just like the -- the 2017, she got a review, she got this, it

16   still, in some sense, might have relevance for other issues.

17           So I'm not -- like I'm not sure that -- I didn't

18   see Mr. Hannon going, by -- by whatever they discussed about

19   the reviews, going to a place that -- making the argument.  I

20   still think it's, at least within his own in the context and

21   relevance, generally, and I'm not sure about -- you know, I

22   don't know how much he's going into the separation.

23           But that's my general thought, that there's, like,

24   facts, and then there -- and then if the facts have relevance

25   to anything, they could have relevance to their arguments, a

1    certain amount of context, but just you got reviewed, and

2    here's where you were in evaluating, reviews that are

3    relevant, or something.  You can put them in some context of

4    what happened historically.

5              That's -- I assume that's what you're doing,

6    Mr. Hannon?

7              MR. HANNON:  It is, Your Honor.

8              MS. MANDEL:  I mean, I think it has the tendency on

9    both of those issues to be confusing to the jury.  I mean, we

10   heard during Mr. Hannon's opening yesterday, he said that

11   Dr. Menninger was fired with sort of, you know, a bit of

12   dramatic flair there.  I think that this has the tendency to

13   confuse the jury about whether her separation eight months

14   later is potentially something that they should be

15   considering as an adverse action, number one.

16             And number two, on the perform --

17             THE COURT:  So I'm going the tell them what are the

18   adverse actions they can -- I think what I'm likely to tell

19   them in the jury instructions is these are -- like, you have

20   to find an adverse action, and there are this many adverse

21   actions in play.  And the ones I'll identify I think are the

22   ones in the summary judgment decision.  I mean, if the

23   evidence proved another adverse action that hadn't been

24   discussed at summary judgment in some way, I'm sure

25   Mr. Hannon would tell me.  I wouldn't expect that he would be

```
 1    asleep at the switch.  So he would tell me that.  And you
 2    would tell me why there isn't sufficient evidence or
 3    whatever.
 4            But as to the ones that are out, they're out.  I'm
 5    going to identify those.  So I think that's the way those
 6    will get resolved.
 7            MS. MANDEL:  Okay.  And we just reserve the ability
 8    to re-raise this when it comes to instructions --
 9            THE COURT:  You don't have to -- you raise whatever
10    you want when you want.
11            MS. MANDEL:  Thank you.
12            THE COURT:  Go get the jury.
13            MR. HANNON:  I'm just going to go get my client.
14    She's out in the hall.
15            THE COURT:  Sure.
16            (Pause in proceedings.)
17            THE COURT:  Have a seat.  We're missing one juror.
18            (Pause in proceedings.)
19            THE COURT:  Just for your information, we're
20    waiting --
21            We've been waiting for one the whole time,
22    Kellyann?
23            THE DEPUTY CLERK:  Yes.
24            THE COURT:  The one we've been waiting for the
25    whole time, it's Juror Number 11 in Seat 6, last seat, in the
```

1    first row.

2              My general perspective on this is I'm often willing

3    to give people one -- in a civil case, one pass.  Like, it's

4    hard to get to the Seaport.  They're not used to coming

5    here -- within limits.  We're not waiting, for example, until

6    ten o'clock.  At some point, we're going to go, and I'll just

7    discharge the juror.  We don't need 12.

8              The question is what do you want me to do if

9    they're not here at -- think about -- because at 9:15, we're

10   starting to lose a lot of time.  So at 9:15 --

11             Have we heard from the juror?

12             THE DEPUTY CLERK:  I'm checking with jury right

13   now.  They haven't said anything.

14             (Pause in proceedings.)

15             THE COURT:  Okay.  We're checking now to see if

16   we've heard from the person, but if we haven't, do you have a

17   view?

18             MR. HANNON:  The plaintiff is fine with discharging

19   the juror.

20             MS. MANDEL:  We are as well.

21             THE COURT:  Let's go.  Go get the jury.

22             (Jury present.)

23             THE COURT:  Morning, ladies and gentlemen.

24             I trust you have followed my instruction, don't

25   discuss the case among yourselves, don't discuss it with

1    anyone else, don't do any independent research.  Good.

2              All right.  So you might notice that there's 11,

3    rather than 12 of you.  So let me explain.  As I told you

4    yesterday, we try to start on time.  Tuesdays as -- are

5    always -- and we start jury trials almost always on Mondays.

6              And Tuesdays are always a hard day a little bit

7    because people -- it's the first time, really, you're getting

8    organized to get here and on time and all of that.  So we

9    wait, and that's why we've waited a little bit.

10             But we can't wait forever.  It's not, like -- it's

11   not a reflection on the person.  It's just we can't wait

12   forever because we're all here.

13             And, remember, I told you at the beginning that the

14   lawyers promised me you would have the case by next Friday;

15   but that promise is predicated on the idea that from 9:00 to

16   1:00 we're taking evidence each day.  If we're not taking

17   evidence -- that's what they were assuming and counting on,

18   and then you're all counting on the schedule.

19             So we're proceeding without the juror who is

20   absent.  I just discharged them from the jury.  It's not,

21   like -- you know -- it's -- there's no consequences to that

22   person.  And it happens sometimes, and sometimes it happens

23   through, you know, despite the best efforts of the juror that

24   there -- you know, something comes up -- happens to them that

25   they can't -- you know how hard it is to get here depending

1  on where you're coming from.

2          So no one should draw any conclusions from that.  I

3  really appreciate that you were all here on time and ready to

4  go, and so we -- we continue.  All right?

5          And I just ask that, as we go forward each day, you

6  do your best to be here on time; and if, for some reason,

7  something comes up, there's an accident on the highway, the

8  train or the subway, the T stopped, let me know Ms. Belmont

9  know or let jury know where you are and how long it's taking.

10  And then that helps us a lot if we know that.  All right?

11          So I remind you, Dr. Menninger, that you remain

12  under oath.

13          And, Mr. Hannon, you can continue.

14          MR. HANNON:  Thank you, Your Honor.

15                      **LISA A. MENNINGER**

16      having been previously duly sworn, testified as follows:

17      **CONTINUED DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

18  BY MR. HANNON:

19  **Q.**  Ms. Menninger, during your testimony yesterday, we

20  touched upon a meeting in late December 2017 with

21  Mr. Mekerri.  Do you recall that meeting?

22  **A.**  Yes.

23  **Q.**  Okay.  And am I right that's the meeting where

24  Mr. Mekerri had mentioned to you this -- this desire to have

25  you become more visible and do those sorts of things?

1    **A.**  Yes.

2    **Q.**  Okay.  Going into that meeting, what was your

3    understanding as to what the purpose of the meeting was?

4    **A.**  The purpose was -- I was scheduled to have my

5    end-of-the-year performance review.

6    **Q.**  And during the course of that meeting, did he actually

7    provide your performance review?

8    **A.**  No.

9    **Q.**  But was there any -- any discussion at that meeting other

10   than the talk of these new tasks he wanted you to consider?

11   **A.**  Yes.

12   **Q.**  And what was the other subject?

13   **A.**  He provided some 360 feedback that was overall positive,

14   and then we also discussed, because of the challenges we were

15   having recruiting individuals to fill certain roles, of

16   having one of my direct reports act in the interim in that

17   role, and he asked me to reach out to HR to discuss that

18   further.

19   **Q.**  Okay.

20   **A.**  But he was supportive of that plan.

21   **Q.**  So just backing up a little bit, you said 360.  What --

22   can you explain to the jury what you mean by 360?

23   **A.**  At that time, it was an optional additional activity that

24   you could do as part of the performance review process where

25   you would seek feedback from people who work closely with the

1    individual.  So it was treated as, like, a supplement to our

2    formal performance review process.

3    **Q.**  And I'm going to have you look at a document here in just

4    a moment.  So I'm going to show you Joint Exhibit 377 and

5    I'll stall for a moment while the TV screens come out.

6            So I'm going to show you here the second -- excuse

7    me.  Didn't mean to do that.  One second here.  Pressed the

8    wrong button.  I'm sorry.

9            Okay.  So we're back now looking at Joint

10   Exhibit 377, and I want to direct your attention to, not the

11   email at the top, but -- actually, strike that.  I do want to

12   look at the email at the top.

13           Can you tell us who Brent McKinnon is?

14   **A.**  At the time he was executive director for quality

15   assurance for the Global Central Labs.

16   **Q.**  And how did his position relate to yours, if at all?

17   **A.**  We were considered peers as part of the senior leadership

18   team for the Global Central Labs.  He was not someone I

19   interacted with frequently.  Usually it was just when he

20   would hold quarterly quality management meetings and -- as

21   part of our biweekly senior leadership team meetings.

22   **Q.**  Okay.  And to your knowledge, did Mr. McKinnon, did he

23   also report up to Mr. Mekerri?

24   **A.**  No, he didn't -- did not.

25   **Q.**  Okay.  So I want to direct your attention to the section

1    below.  You see there there's a bullet that says "Lisa

2    Menninger."

3              Do you see that?

4    **A.**  Yes.

5    **Q.**  Okay.  And I'm just going to try to enlarge that a little

6    bit without messing this up.  All right.  That's as far as

7    I'm going to go.

8              And you see there in the first line, he indicates

9    that his feedback regarding you was mixed?

10   **A.**  Yes.

11   **Q.**  Okay.  If I can look -- direct your attention here to the

12   statements about -- I'll cull this out here.  One second.

13             And you see there there's a sentence, in the second

14   line that reads, "She has been dismissive of repetitively

15   raised concerns regarding the lack of bench level

16   supervision."

17             Do you see that?

18   **A.**  Yes.

19   **Q.**  Okay.  Was -- was that accurate feedback as of

20   December 2017, from your perspective?

21   **A.**  Not at all.

22   **Q.**  And can you explain to the jury why -- why that was

23   wrong?

24   **A.**  Hacene and Chad and I had been working very hard

25   throughout all of December -- or all of 2017 to recruit

1    individuals and to actually bring in more scientific

2    expertise to provide bench supervision.  So, you know,

3    that -- that was one of my goals, and that's why I had

4    concern when one of those positions was put on hold.

5    **Q.**   Okay.  Well, we'll talk about that in a few moments.

6    But, then turning your attention to the rest of that

7    sentence, he continues on, "Since her decision to relocate,

8    she has been lackadaisical toward her time on-site in US

9    lab."

10                Do you see that?

11   **A.**   Yes.

12   **Q.**   Was that accurate feedback as of December 2017?

13   **A.**   Not at all.

14   **Q.**   And can you explain to the jury why not?

15   **A.**   The fourth quarter of 2017, I was traveling every month

16   extensively.  I -- I went to the Highland Heights lab in the

17   US twice for two inspections, and then I also traveled to

18   Belgium for two of my regularly scheduled visits there.  So I

19   was traveling extensively.

20   **Q.**   And part of that travel had included the US lab in

21   Highland Heights; is that right?

22   **A.**   Yes.

23   **Q.**   And can you tell the jury what the purpose of that visit

24   had been?

25   **A.**   There were two visits.  One visit was for a CAP 15189

1    inspection.  That's based on the ISO standards of quality for

2    medical laboratories.  It's not a required certification, but

3    a lot of laboratories were striving to attain it because it

4    signified that your lab was, like, going above and beyond the

5    quality standards that were required by our regulatory

6    agencies.  So I was on site for that inspection in September,

7    I believe.

8    Q.  And with respect to your travel that you had done

9    subsequent to relocating, had Mr. Mekerri been aware of all

10   of that as of December 2017?

11   A.  I don't quite follow your question.

12   Q.  No worries.  I can ask a better one.  You mentioned

13   before that you had done significant traveling after -- in

14   the fourth quarter of 2017; is that right?

15   A.  Yes.

16   Q.  Was Mr. Mekerri aware of all that traveling you had done?

17   A.  Yes.

18   Q.  Okay.  So when you met with Mr. Mekerri in December of

19   2017 to discuss the 360 feedback, did he express to you any

20   of these concerns that we saw from Mr. McKinnon concerning

21   being dismissive about supervision or being lackadaisical

22   toward your time on site?

23   A.  No.

24   Q.  Did -- did Mr. Mekerri share with you any -- any

25   criticisms or constructive feedback as part of this 360

1   review process?

2   **A.**   Yes.

3   **Q.**   And what do you recall about that?

4   **A.**   I recall that it was generally overall positive.  He

5   complimented me on -- well, it sounded like he was reading

6   from the 360 papers, but he complimented me on my

7   professionalism and said that I was supportive.  As far as

8   constructive feedback, he mentioned that someone had

9   mentioned indecisive or decision-making, and I remember being

10  really surprised by that.

11  **Q.**   And why did that surprise you?

12  **A.**   Because as part of my role, I have to make multiple

13  decisions every single day.  There are decisions that have to

14  be made by a pathologist or someone who is qualified at the

15  regulatory level that I served under.

16  **Q.**   Now, with respect to the types of decisions that you had

17  to make in your role, did it sometimes require some time for

18  you to make those decisions?

19  **A.**   Yes.  I always wanted to make sure that my decisions were

20  compliant and I wanted to make sure that -- sometimes it

21  took, you know, research.  I had to do a literature review to

22  make sure that I had the latest information depending on, you

23  know, what the question was.  So I tried to be as timely as I

24  could, but I wanted to be accurate and compliant as well.

25  **Q.**   I'm going to show you agreed Exhibit 373.  And you see

1    here this is an email from Poluru Reddy?

2    **A.**   Yes.

3    **Q.**   How is my pronunciation?

4    **A.**   Poluru, or you can just say Dr. Reddy.

5    **Q.**   Okay.  And who is Dr. Reddy?

6    **A.**   Dr. Reddy is one of the candidates I hired in 2017 to act

7    as our director of our molecular laboratory.  This had

8    previously been a compliance gap because you need an

9    individual who was at the doctoral level to serve in this

10   role, and they need to have specific certification in

11   molecular.

12   **Q.**   And I think I heard you say earlier this morning that

13   part of this 360 meeting we've been discussing in

14   December 2017 concerned an organizational change; is that

15   right?

16   **A.**   Yes.

17   **Q.**   And did that change involve Dr. Reddy?

18   **A.**   Yes.

19   **Q.**   And what -- what was that change?

20   **A.**   We talked about having Dr. Reddy serve as the interim CAP

21   inspector for the US laboratory because of all the challenges

22   we were having in recruiting for that position.  He worked at

23   that location, was on site daily, and had significant

24   experience performing CAP inspections himself.  He also had a

25   significant amount of clinical chemistry experience, and I

1    believe, also, was trained in that area, in toxicology.

2    **Q.**  And had you proposed that Dr. Reddy fulfill that role?

3    **A.**  Yes, on an interim basis.

4    **Q.**  And why was it just interim?

5    **A.**  There were still certain areas of the laboratory that he

6    couldn't cover and we were still recruiting for.

7    **Q.**  I'm going to show you now Joint Exhibit 375.  And the top

8    of the page indicates this is an email from Lorraine

9    McNamara.  Can you see that?

10   **A.**  Yes.

11   **Q.**  Can you tell the jury who Lorraine McNamara is?

12   **A.**  Lorraine was the director of the Belgium laboratory and

13   she reported directly to me.

14   **Q.**  And can you --

15   **A.**  At this time, she also was acting as a director for the

16   US lab supervisors, because that role had been vacated in the

17   spring of 2017.

18   **Q.**  I'd like to start with the first bullet of Ms. McNamara

19   feedback here.

20           And you see in the first sentence, she ends, "I

21   have to say, with Lisa, I believe she has brought a level of

22   quality to the lab that we have never had before."

23           Do you see that?

24   **A.**  Yes.

25   **Q.**  And then in the next sentence, she concludes that, "We as

1    a global lab are the most compliant we have ever been."

2              Do you see that?

3    **A.**   Yes.

4    **Q.**   Okay.  In the context of a lab environment, can you

5    explain to the jury what it means to be compliant?

6    **A.**   There are thousands of regulatory standards that we need

7    to follow for CAP, CLIA, and any states, like New York.  So

8    to be compliant is to ensure that you are following those

9    regulations and -- yeah.

10   **Q.**   Okay.  And with respect to being compliant, were there

11   also periodic inspections of the labs in order to test its

12   compliance?

13   **A.**   Yes.  So the College of American Pathologists performed

14   inspections every two years.  State of New York was a little

15   bit inconsistent.  I think it was because of staffing issues

16   and resources.  So that, I think, was supposed to be every

17   two years, but it a lot of times ended up being, like, every

18   three or four.

19   **Q.**   And when you say that the State of New York was

20   inconsistent, do you mean that their inspectors were

21   inconsistent in terms of how frequently they would come out?

22   **A.**   Yes.

23   **Q.**   Okay.  And as a general matter, when you served as

24   executive director at PPD, how did it fair in these

25   inspections?

1    **A.**   We did very well.  I was very pleased in 2017 because we

2    had multiple global inspections, and we did very well, and we

3    were complimented by the inspectors about the high quality of

4    all of our labs that were inspected.

5    **Q.**   So -- so after receiving the 360 feedback from

6    Mr. Mekerri, did you have any impression that he was dis- --

7    that he was dissatisfied with your job performance in any

8    way?

9    **A.**   No.

10   **Q.**   But was there anything about that conversation that did

11   concern you?

12   **A.**   Yes.

13   **Q.**   And what was that?

14   **A.**   This is when he brought up making -- wanting to make some

15   changes to my role going forward in 2018 to make it more

16   visible, in particular, in front of clients, large

17   pharmaceutical clients.  And he mentioned giving formal

18   PowerPoint presentations and I had concerns about that.

19   **Q.**   And I think you shared with us yesterday that those

20   concerns related to your health; is that right?

21   **A.**   Yes, my conditions.

22   **Q.**   Okay.  So did you at some point -- actually, strike that.

23            During the -- during the call -- I'm sorry.  During

24   the 360 meeting with Mr. Mekerri, did you say anything then

25   in response to his suggestion about changing your role?

1    **A.**   Yes.  I told them -- I told him that those types of

2    presentations make me anxious and he tried to reassure me and

3    be very encouraging.  He's like, "I've seen your CV.  It's

4    super impressive.  I've seen you present slides.  You do an

5    excellent job" and yeah, just trying to reassure me and

6    encourage me that there's no reason to be anxious.

7    **Q.**   Did you at some point make the decision to tell

8    Mr. Mekerri about your health condition?

9    **A.**   Yes.

10   **Q.**   And why was it you decided to do so?

11   **A.**   Because of that discussion, I -- I feared that I might

12   have to give frequent presentations and be highly visible in

13   front of clients, which is not something I had done up until

14   that point.

15   **Q.**   And what, if any, concern did you have as to how that

16   would impact you if you had to do so?

17   **A.**   I knew it would trigger panic attacks.

18   **Q.**   I'm going to show you Joint Exhibit 366.  So there's two

19   emails on this page.  I want to direct you to the email at

20   the bottom.  And so is this an email from you to Mr. Mekerri

21   on January 11, 2018?

22   **A.**   Yes.

23   **Q.**   Okay.  Just looking at the first sentence of your note,

24   you say, "It was great catching back up with you this week

25   after the holidays."  Do you see that?

1  **A.**  Yes.

2  **Q.**  Okay.  Had there been any mention in that -- in that

3  meeting of these potential changes to your role?

4  **A.**  I don't recall.

5  **Q.**  Okay.  But can you tell the jury why it was that you sent

6  this email to Mr. Mekerri?

7  **A.**  It was based on him suggesting that he wanted to make

8  changes to my role to make it more visible and give formal

9  presentations in front of clients, both internal and

10  external; and they wanted to put scientific expertise out in

11  front of clients.  That was not something that I had been

12  doing as part of my job up until that point.

13  **Q.**  Okay.  Looking at the -- that's not helpful.

14      Looking at the last sentence of the first

15  paragraph, you write, "This is very difficult for me to

16  discuss, as it's not something I openly share with others."

17      Do you see that?

18  **A.**  Yes.

19  **Q.**  What did you mean by that?

20  **A.**  There is a stigma in our society for people who have

21  mental illness, and I did not want to be viewed as defective.

22  I did not want to risk career advancement opportunities or

23  lose my job because of it.

24  **Q.**  Looking at the second paragraph, the one that begins, "I

25  have a generalized anxiety disorder," if I can turn your

1    attention to the last sentence, you write, "I've received

2    treatment in the past and continue to take medication as

3    needed when my panic attacks become severe."

4           Do you see that?

5    **A.**  Yes.

6    **Q.**  Was that an accurate statement?

7    **A.**  Yes.

8    **Q.**  And how long had it been since you had last actually been

9    involved in therapy, or some other kind of formal treatment?

10   **A.**  I had a doctor in Kansas City who prescribed Valium and

11   he knew that I was accepting this job in Highland Heights;

12   and so he gave me enough refills, because he knew that I

13   didn't need to take it frequently.  And so I had a

14   prescription with refills to take as needed, but like I said,

15   it was rare that I ever had to present and take Valium.

16   **Q.**  And what -- when was it you had moved from

17   Highland Heights to Massachusetts?

18   **A.**  It was in August of 2015.

19   **Q.**  Okay.  And in the time period between August -- I'm

20   sorry.  Did you say August of 2015?

21   **A.**  Yes.

22   **Q.**  Okay.  When was it that you had moved to Massachusetts?

23   **A.**  It was the end of June 2017.

24   **Q.**  Okay.  In between June of 2017 and the date of this email

25   on January 11, 2018, had you needed to seek any medical

1    treatment related to your health condition?

2    **A.**   No.

3    **Q.**   Looking at the next paragraph, you begin, "As you've

4    seen, my medical condition has not prevented me from

5    accomplishing the essential functions of my job."

6              Do you see that?

7    **A.**   Yes.

8    **Q.**   And was that an accurate statement as of January 2018?

9    **A.**   Yes.

10   **Q.**   Looking at the -- the next paragraph, you begin, "I am,

11   of course, open to discussing whatever ideas you have for my

12   role."

13             Do you see that?

14   **A.**   Yes.

15   **Q.**   As of January 2018, what, if any, expectation did you

16   have as to a discussion with Mr. Mekerri concerning his idea

17   for changing your role?

18   **A.**   He had mentioned that we would have a discussion more

19   after the holiday -- after the holidays.  This was -- yeah,

20   right -- right before Christmas.

21   **Q.**   Okay.  And did that -- had that conversation taken place

22   as of January 11th?

23   **A.**   No, it had not.

24   **Q.**   So at some point, did you -- well, strike that.

25             Besides your email we just looked at to Mr. Mekerri

1  concerning your health condition, did you subsequently

2  provide PPD any additional information concerning your health

3  condition?

4  **A.**  Yes.  Chad St. John, who is our HR director, gave me some

5  forms for me to fill out and for my doctor to fill out, and

6  so I submitted my forms back to HR.

7  **Q.**  Okay.  So you said part of those forms had to be

8  completed by a doctor; is that right?

9  **A.**  Yes.

10  **Q.**  And did you have to do anything in order to get a doctor

11  to fill out those forms?

12  **A.**  I had to find a doctor that had an opening, because it

13  was very hard to find someone who had an opening after we

14  moved.  And so I made an appointment with a doctor once I

15  found an opening.

16  **Q.**  Thank you.  And who was that doctor?

17  **A.**  That was Dr. Kessimian.

18  **Q.**  Okay.  And do you recall how you found Dr. Kessimian?

19  **A.**  First, I looked at my insurance policy and called all the

20  doctors that were covered and none of them had openings.

21  And -- and I believe I found Dr. Kessimian through an

22  Internet search of psychiatrists in that area.

23  **Q.**  And was she actually located in Massachusetts?

24  **A.**  No.  She was located in Providence, Rhode Island, which

25  is where Maya went to school.

1    **Q.**  Okay.  And I'm not sure we covered this yesterday.

2    Where -- where was your actual home located in Massachusetts?

3    **A.**  It was located in Dighton, Massachusetts, which is about,

4    I think, a 30-minute drive to Providence.

5    **Q.**  I'm going to show you Joint Exhibit Number 18.  And we're

6    looking at the first page of Joint Exhibit 18.

7          Do you recognize what this is?

8    **A.**  Yes.

9    **Q.**  And what is it?

10    **A.**  I believe this was my first appointment, so notes from my

11    doctor from my first appointment.

12    **Q.**  Okay.  And in the first -- actually, strike that.

13          So the top of the page reflects January 22, 2018.

14    Is that consistent with your recollection in terms of when

15    this first appointment with Dr. K took place?

16    **A.**  Yes.  That was the earliest I could get an appointment.

17    **Q.**  Okay.  That's all right.  I think I just referred to

18    Dr. Kessimian as Dr. K.  If I do that, will you know who I'm

19    referring to?

20    **A.**  Yes.

21    **Q.**  Okay.  In the first line of the notes here, you'll see it

22    begins "presenting complaint."

23          Do you see that?

24    **A.**  Yes.

25    **Q.**  Okay.  And it references an end-of-the-year review.  Do

1    you see that?

2    **A.**  Yes.

3    **Q.**  Do you know what that's referring to?

4    **A.**  Yes.  I -- I told Dr. K that I was supposed to have an

5    end-of-the-year review and that my supervisor at the time had

6    suggested changes to my role that I knew would cause panic

7    attacks and implicate my disability.

8    **Q.**  And looking at the substance here of Dr. K's note -- let

9    me highlight -- the beginning with the highlighted section

10   there, she writes "She is able to fulfill her job

11   responsibilities within these limitations, but recently she

12   was given this feedback and her worries began to spiral."

13           Do you see that?

14   **A.**  Yes.

15   **Q.**  Okay.  And was that accurate?

16   **A.**  Yes.

17   **Q.**  And in terms of the feedback that's being referenced

18   there, do you see a few lines above, she notes that at the

19   end-of-the-year review, you were encouraged to be more

20   visible and do more public speaking.  Do you see that?

21   **A.**  Yes.

22   **Q.**  Okay.  And is that what you were referring to earlier in

23   terms of what Mr. Mekerri had expressed to you?

24   **A.**  Yes.

25   **Q.**  Just one more line here.  Further below, she writes, "She

1    is able to fulfill her job" -- I'm sorry.  I already covered

2    that one.  We don't need to do again.

3            Let me show you page 2 here.  So here's the second

4    page of Dr. K's notes from this visit.  And you see there, in

5    the section for "Safety," Dr. K writes, "Denies current or

6    past suicidal ideation."

7            Do you see that?

8    **A.**   Yes.

9    **Q.**   Okay.  Was that true as of January 22, 2018?

10   **A.**   Yes.

11   **Q.**   Is it still true today?

12   **A.**   No.

13   **Q.**   Turn to page 3.  I've highlighted there the paragraph

14   beginning "Psychiatric ROS."

15           Do you see that?

16   **A.**   Yes.

17   **Q.**   And it references "denies depression"?  Do you see that?

18   **A.**   Yes.

19   **Q.**   Were you depressed as of January 22, 2018?

20   **A.**   No.

21   **Q.**   Has that changed since then?

22   **A.**   Yes.

23   **Q.**   So you mentioned that one of the reasons for your visit

24   to Dr. K was to get some forms completed; is that right?

25   **A.**   Yes.

1   **Q.**  Okay.  And to your knowledge, did Dr. K prepare those

2   forms?

3   **A.**  Yes.

4   **Q.**  I'm showing you here Joint Exhibit 47.  And can you tell

5   the jury what this is?

6   **A.**  This is an email from my doctor to Chad St. John.

7   **Q.**  Okay.  And do you see Dr. K in her note to Mr. St. John

8   writes, "Per our conversation, the forms are attached"?

9   **A.**  Yes.

10  **Q.**  Okay.  Let's look at the first form that's attached here.

11  Do you see it's captioned "request for accommodation" and

12  then in parentheses "to be completed by a healthcare

13  provider"?

14  **A.**  Yes.

15  **Q.**  Okay.  Where did this form come from?

16  **A.**  From PPD, specifically from Chad.

17  **Q.**  Okay.  And looking at the information contained in this

18  form from Dr. K, you'll see here Question 5,

19  "request information concerning conditions or limitations

20  interfering with your ability to perform the essential

21  functions of your job."

22          Do you see that?

23  **A.**  Yes.

24  **Q.**  Okay.  And in the second sentence, Dr. K writes, "This

25  disability significantly interferes with Lisa's ability to

1 perform major life activities, such as thinking,

2 concentrating, communicating and working."

3    Do you see that?

4 **A.** Yes.

5 **Q.** Okay.  And it goes on to say "Lisa is most effective in

6 social situations and when she is required to speak in front

7 of others."

8    Do you see that?

9 **A.** Yes.

10 **Q.** And then it goes on to note that you reported that you

11 had historically fulfilled the essential functions of your

12 job without accommodation; is that right?

13 **A.** Yes.

14 **Q.** Okay.  But that you frequently suffered from anxiety and

15 other somatic symptoms triggered by social interactions and

16 public speaking incident to your job.  Do you see that?

17 **A.** Yes.

18 **Q.** Okay.  Was all that true?

19 **A.** Absolutely.

20 **Q.** Okay.  And then it goes on, "Lisa's supervisor recently

21 identified potential changes to her role involving more

22 public speaking and social interactions."

23    Do you see that?

24 **A.** Yes.

25 **Q.** Does that -- does that accurately reflect what you had

1  told Dr. Kessimian in January of 2018?

2  **A.**  Yes.

3  **Q.**  And was it true?

4  **A.**  Yes.

5  **Q.**  Looking here at the third page, you see here Question

6  Number 7.  I've highlighted the start.  It asks, "If the

7  employee cannot perform the essential job functions of his or

8  her job, or access a benefit of employment, what

9  accommodations would you recommend which could allow the

10  employee to better perform his or her job functions?"

11         Do you see that question?

12  **A.**  Yes.

13  **Q.**  Okay.  And you see Dr. K recommended that any social

14  interaction or public speaking incident to your role be

15  minimized to the extent possible.  Do you see that?

16  **A.**  Yes.

17  **Q.**  Okay.  As of January 2018, were you looking to

18  fundamentally change your job at PPD?

19  **A.**  Not at all.  I was extremely happy.  I was hoping I

20  could, you know, stay with the company until retirement.

21  **Q.**  Were you looking to be excused from doing the things that

22  you did at PPD on a day-to-day basis?

23  **A.**  No.

24  **Q.**  And now looking at the next paragraph, you see here Dr. K

25  writes, "To the extent that social interactions and/or public

1   speaking is deemed necessary for Lisa's job, I recommend that

2   a plan be developed for these activities in consultation with

3   me or another qualified healthcare provider."

4           Do you see that?

5   **A.**  Yes.

6   **Q.**  Okay.  As of January 2018, was it -- was it in any way

7   helpful to -- to know or have a sort of plan in terms of when

8   these activities were going to be coming up?

9   **A.**  Can you repeat the question?

10  **Q.**  Sure.  No worries.

11          Was having such a plan something that you thought

12  would be helpful for you in dealing with the impact of your

13  health condition?

14  **A.**  Yes, because with my condition, I have a lot of

15  anticipatory anxiety when I don't know what the plan is going

16  to be.  And in this case, I didn't know what Hacene had in

17  mind as far as changes to my role.

18  **Q.**  And would have having -- would have having additional

19  information been helpful for you in terms of managing your

20  anxiety?

21  **A.**  Yes.

22  **Q.**  I'm now going to show you Joint Exhibit 201.  And

23  starting here at the top, is this an email from Mr. St. John

24  to you?

25  **A.**  Yes.

1   **Q.**  Okay.  I actually want to start with the message below

2   that -- actually a couple messages below.  So you'll see, at

3   the bottom of the first page here of the exhibit, there's an

4   email from Mr. St. John to you.  Do you see that?

5   **A.**  Yes.

6   **Q.**  Okay.  So I'm just going to turn the page here so we can

7   see that, the bottom of that email here.  So here's the

8   second page.  And do you see Mr. St. John asked, "What are

9   the specific expectations that Hacene shared with you for

10  2018 that you believe that you cannot or limitedly perform?"

11  Do you see that?

12  **A.**  Yes.

13  **Q.**  Okay.  And as of that point in time, the date of this

14  email, were you able to answer that question?

15  **A.**  No.  I told Chad that he had not given me any specific

16  expectations.  He had just talked in general terms, and Chad

17  seemed very surprised by that.

18  **Q.**  But just to back up half a step, so between the 360

19  meeting in December of 2017 and this email exchange with

20  Mr. St. John, had Mr. Mekerri provided you any additional

21  detail concerning these ideas for potentially changing your

22  role?

23  **A.**  No.

24  **Q.**  Now, I'll flip back to the first page of the exhibit

25  here.  And do you see here your response to Mr. St. John's

1    email which you sent on February 4, 2018?

2    **A.**  Yes.

3    **Q.**  Okay.  And just looking at the first paragraph here of

4    what you wrote, I'm not going to take the time to read it

5    into the record, but is all that information accurate?

6    **A.**  Yes.

7    **Q.**  So your email is February 4, 2018.  Subsequent to this

8    email, do you recall receiving any information from

9    Mr. Mekerri concerning the changes he was considering making

10   to your role?

11   **A.**  No.

12   **Q.**  Okay.  Did he provide any response in terms of any sort

13   of inquiry made in that respect?

14   **A.**  I don't believe so.  I don't know of all the emails that

15   existed.

16   **Q.**  Sure.  Let me ask you a more specific question.  Do you

17   recall Mr. Mekerri sharing with you a list of buckets of

18   expected future responsibilities?

19   **A.**  Yes.

20   **Q.**  Okay.  And do you recall when that was provided?

21   **A.**  I don't recall the exact date, but it was sometime in

22   February 2018, I believe.

23   **Q.**  So I'm going to show you Joint Exhibit 350.  And do you

24   recognize this email?

25   **A.**  Yes.

1    **Q.**   Okay.  And can you tell the jury what it is?

2    **A.**   These are the -- the buckets, the five buckets that he

3    created.  And this -- this was, I believe, in response to

4    Chad's request that he provide more specifics for my doctor

5    to suggest some accommodations.

6    **Q.**   Okay.  Now, these buckets, did -- were these sort of a

7    summary of what your role was as of February 2018 at PPD?

8    **A.**   No.

9    **Q.**   Okay.  Were any of these buckets reflective of things

10   that you had sometimes done while at PPD?

11   **A.**   Yes.  There are some things in here that were regular

12   parts of my day or week that I did regularly without issue.

13   There were some things that I did rarely, like present a

14   couple of slides, I think, during two town halls.

15          I had never been on a client site meeting, but I

16   had been available by phone to answer any technical questions

17   a few times.  A lot of times, they would ask for a lab

18   representative who had expertise in the area of testing that

19   the client was interested in to be present by Webex just to

20   answer any of their technical questions that the sales team

21   couldn't answer.

22   **Q.**   Looking at the last sentence of Mr. Mekerri's email, he

23   writes -- or actually the last sentence of the first

24   paragraph, you see there, it begins, "As you already know"?

25   **A.**   Yes.

1    **Q.**   Okay.  He writes, "The percentage/scope of interactions,

2    internal or external, is increasing in 2018 due to the needs

3    of the business and our aggressive commercial goals."

4              Do you see that?

5    **A.**   Yes.

6    **Q.**   Okay.  So looking at the first bucket, there are --

7    there's a -- there's a black bullet and then two white

8    bullets.  Do you see those?

9    **A.**   Yes.

10   **Q.**   And you see the second bullet there concerns frequency?

11   **A.**   Yes.

12   **Q.**   Okay.  And in terms of frequency of that item, he writes

13   biweekly, monthly, and/or quarterly.  Do you see that?

14   **A.**   Yes.

15   **Q.**   Okay.  What -- what had been the frequency of your

16   participation in SLT presentations, town hall, and COO/EVP

17   meetings as of February 2018?

18   **A.**   I presented, I think, two to three slides on two or three

19   occasions at an SLT meeting, which I presented two times

20   at -- at two of our town halls just a couple of slides.  I --

21   I prepared some slides for a COO visit, but we ran out of

22   time for me to present my slides, so I didn't actually

23   present at that meeting.

24   **Q.**   Okay.  And then looking at the -- at the second bullet,

25   it says "client bid offense, issue resolution calls,

1   HH/client site meetings, phone."  Do you see that?

2   **A.**  Yes.

3   **Q.**  Okay.  Does -- does that all describe one activity, or is

4   that a whole bunch of activities lumped together?

5   **A.**  That's a whole bunch of activities lumped together.

6   **Q.**  Okay.  So let's just sort of separate them out a little

7   bit, for the jury's sake, so they can understand what we're

8   talking about.

9         Client bid defense.  Do you know what that is?

10  **A.**  That's typically when the sales team would go on when

11  they were trying to get studies awarded to PPD.

12  **Q.**  Okay.

13  **A.**  And they would give presentations about the company and

14  our Global Central laboratories and capabilities and things

15  like that.

16  **Q.**  And as of February 6, 2018, had you ever been involved in

17  client bid defense before?

18  **A.**  Not in person.  I was on the phone, I think, one or two

19  times to answer any technical questions.  I don't believe --

20  I know on one occasion there were no technical questions that

21  came up for me; and possibly on one, I answered one -- one or

22  two questions.

23  **Q.**  Did that activity cause you any panic attacks?

24  **A.**  No.

25  **Q.**  Was that kind of activity in terms of -- that you just

1  described, was that the type of activity that implicated your

2  health condition?

3  **A.**  No, not when I was just in my office by Webex answering

4  questions.

5  **Q.**  The next item is issue resolution calls.  Can you tell us

6  what that activity is?

7  **A.**  That was any time a client had an issue with something

8  going on with the Global Central laboratories.  It could have

9  been any of the four laboratories, and we would set up calls

10  with them to discuss the issue, and that was a frequent part

11  of my job.

12  **Q.**  And did that cause you panic attacks?

13  **A.**  No.

14  **Q.**  Next item, HH/client site meetings.  Do you see that?

15  **A.**  Yes.

16  **Q.**  Okay.  Do you know what that refers to?

17  **A.**  It's a little bit confusing.  Most of our site meetings

18  at Highland Heights were just routine audits from clients

19  that our QA department coordinated and usually a lab

20  supervisor would be present.

21  **Q.**  Had you participated in those client site meetings prior

22  to February 6, 2018?

23  **A.**  No, I hadn't.  I was told I did not need to be there.

24  **Q.**  Was that the type of activity that, under some

25  circumstances, might have caused you panic attacks?

1    **A.**  No, I don't think so.

2    **Q.**  Okay.

3    **A.**  I mean, yeah, I wouldn't have been giving presentations.

4    It was just, like, auditors coming in, auditing certain

5    portions of our lab.

6    **Q.**  Mr. Mekerri identified that item here in this -- in this

7    bucket list.  Did you know whether or not you would be

8    required to provide presentations as part of that activity

9    going forward?

10   **A.**  No.

11   **Q.**  Were you concerned that you might be?

12   **A.**  Yes.  Like I said, there were -- it was confusing because

13   there's different types of client site meetings.  It could be

14   just a group of auditors or it could be, like, maybe a new

15   client that we're trying to establish business with, but I

16   had not been involved in those previously.

17   **Q.**  And then lastly, it identifies "phone."  As of

18   February 2018, were you frequently using the phone?

19   **A.**  Yes.

20   **Q.**  Okay.

21   **A.**  Phone and email.

22   **Q.**  And was speaking to people on the phone, incident to your

23   job responsibilities, was that something that caused you

24   panic attacks?

25   **A.**  No.

1    **Q.**   Okay.  So can you explain for the jury what -- what, if

2    anything, about this bullet caused you concern about

3    Mr. Mekerri's stated goal of making you more visible?

4    **A.**   Just if it involved, like, going to give a formal

5    PowerPoint presentation, speaking, yeah, to large groups of

6    people in a formal presentation.  But it doesn't look like

7    that -- anything in that bucket included that.

8    **Q.**   But then you see in the bullet below, he writes,

9    "Attendees/audience:  up to 50 attendees."  Do you see that?

10   **A.**   Yes.

11   **Q.**   Okay.  Turning to the next -- the next bullet there,

12   "technical sales presentation, internal and external," do you

13   see that?

14   **A.**   Yes.

15   **Q.**   Okay.  And do you have an understanding as to what that

16   bullet refers to?

17   **A.**   I know what the internal ones are, but I never

18   participated in an external technical sales presentation.

19   **Q.**   Tell us about your involvement in internal technical

20   sales presentations as of February 2018.

21   **A.**   I participated in one and, basically, it was just to

22   update the sales team what new assays we might be bringing up

23   in the laboratory.  It was to give them, you know, just an

24   update on, like, our -- anything new and innovative that we

25   were doing.

1    **Q.**  Okay.  And had that been something that you'd had

2    difficulty doing due to your health situation?

3    **A.**  Yes.  I did have to take medication for that.

4    **Q.**  Okay.  And then with respect to the external technical

5    sales presentations, did I hear you right that you'd never

6    been involved with that previously?

7    **A.**  Correct.

8    **Q.**  Okay.  And then the reference to HH/client site meetings

9    in this bullet, do you have an understanding as to what that

10    means?

11    **A.**  Not really.

12    **Q.**  How about the reference to "phone"?  Do you know what

13    that means?

14    **A.**  Not really.  I mean, it was repeated from the bullet

15    above, so I wasn't sure exactly.

16    **Q.**  Okay.  Turning to the next item on the -- on the list,

17    the fourth -- the fourth bucket, so to speak, it says, "For

18    customer visits, lunch/dinner and social interactions may

19    occur," and then in parentheses, "(expected 60 to 80 percent

20    of the time) in order to build business relationships."

21           Do you see that?

22    **A.**  Yes.

23    **Q.**  What's your understanding as to what that refers to?

24    **A.**  My understanding that would be going out to lunch and

25    dinner with clients, which I had -- I don't think I had ever

1    actually done that with actual clients.

2    **Q.**   Did that give you any concern?

3    **A.**   I'm uncomfortable in social situations like that because

4    it's not professional and to my job, and it's challenging

5    with my condition of having social anxiety disorder.  I did

6    not get panic attacks, but I was very uncomfortable and very

7    fatigued afterwards.

8    **Q.**   Okay.  And the last bullet there, you see there ti says

9    "travels up to 30 percent."

10            Do you see that?

11   **A.**   Yes.

12   **Q.**   Okay.  You mentioned earlier that you had -- you traveled

13   extensively in the fourth quarter of 2017.  Do you recall

14   that testimony?

15   **A.**   Yes.

16   **Q.**   Was travel, in general, was that in any way difficult for

17   you because of your disability?

18   **A.**   No.

19   **Q.**   So you received this, this list of buckets from

20   Mr. Mekerri.  Actually, before we do that, let me -- let me

21   point you to the attachment here.  You see at the top of the

22   page, it refers to an attachment.  Do you see that there?

23   **A.**   Yes.

24   **Q.**   Okay.  And let me turn your attention here to the second

25   page of the exhibit.  And does that appear to be a copy of

1   your job description as of that date?

2   **A.**  Yes.

3   **Q.**  Okay.  And prior to the February 2018 email we just

4   looked at for Mr. Mekerri, had you been familiar with your

5   job description?

6   **A.**  Yes.

7   **Q.**  Okay.  Did this job description accurately describe what

8   you actually did for PPD?

9   **A.**  No.  I would say it was very broad, so partly, but it was

10   written so broadly that it could cover multiple different

11   departments for individuals at the ED level.

12   **Q.**  Okay.  And at any time, did you have any discussion with

13   representatives from PPD concerning the broadness of this

14   description?

15   **A.**  Yes.

16   **Q.**  And who did you have that discussion with?

17   **A.**  I had discussions with Chad St. John, possibly also Kathy

18   Dick --

19   **Q.**  Okay.

20   **A.**  -- who worked in the QA department.

21   **Q.**  With respect to your discussion with Mr. St. John,

22   what -- what, if anything, did he share with you about the

23   sort of general nature of this job description?

24   **A.**  He said that there had been an effort, I think, a few

25   years back -- I'm not sure how long ago -- at the corporate

1    level to standardize the job descriptions based on the level,

2    based on the employee's level.

3    **Q.**   And when you say the "employee's level," what do you mean

4    by that?

5    **A.**   So, for example, this is executive director, labs, and so

6    anybody who was at the executive director level working in

7    the labs, regardless of what particular business unit, they

8    have the same job description, was my understanding from

9    Chad.

10   **Q.**   Okay.  So going back to the first page of the exhibit,

11   you could get this email from Mr. Mekerri.  What did you do

12   with it?

13   **A.**   I gave it to my doctor.

14   **Q.**   Why?

15   **A.**   So that she could suggest some potential accommodations.

16   Yeah.  And return it to Chad.

17   **Q.**   Was that something that Chad had asked you to do?

18   **A.**   Yes.

19   **Q.**   I'm going to show you now Joint Exhibit 180.  And can you

20   tell the jury what this is?

21   **A.**   My doctor provided some education about my disorder just

22   to help them understand what it's like for someone who has

23   social anxiety disorder and panic disorder and so she was

24   just trying to be helpful and educate them.  Then she tried

25   to suggest some potential accommodations based on the buckets

1  that were provided.

2  **Q.**  Okay.  As of the date that Dr. Kessimian provided this to

3  PPD, were -- were any of the things that Dr. Kessimian

4  proposed, were any of these things that you believe that you

5  needed in order to continue doing your job?

6  **A.**  No.

7  **Q.**  Did you think that they would be helpful in terms of

8  making it easier to do your job given the fact that you --

9  you had your health condition?

10  **A.**  Yes.

11  **Q.**  Did you ever express to anyone at PPD that you would be

12  unable to perform your job if they didn't do all of the

13  things that Dr. Kessimian proposed?

14  **A.**  No.

15  **Q.**  Now, at some point in time, you received a response from

16  PPD to Dr. Kessimian's proposal; is that right?

17  **A.**  Yes.

18  **Q.**  I'm going to show you Joint Exhibit 182.  And do you see

19  here this is an email from Mr. St. John to you copying

20  Mr. Mekerri on February 26, 2018?  Do you see that?

21  **A.**  Yes.

22  **Q.**  Okay.  And can you tell the jury where you were when you

23  received this?

24  **A.**  I was in the airport.  I was on my way to the

25  Highland Heights lab.

1  **Q.**  And why were you headed to Highland Heights?

2  **A.**  We were having a town hall.  A lot of senior leadership

3  members were coming in.  It was also a visit for me to, I

4  thought, discuss my performance review with Hacene and also

5  to discuss potential accommodations that might be available

6  based on my condition.

7  **Q.**  And you see here in the first paragraph, Mr. St. John

8  writes, "Hacene has confirmed that he is okay to accommodate

9  points 1 and 5" -- I think it was something I said "points 2,

10  3, 4 below" --

11        THE COURT:  Don't feel bad.  It's a school group.

12  And they had ten minutes to watch court for ten minutes or

13  so, and that's the ten minutes they had.

14        MR. HANNON:  Understood.

15  BY MR. HANNON:

16  **Q.**  Let me ask the question again since I distracted myself.

17  **A.**  Okay.

18  **Q.**  Mr. St. John writes, "Hacene has confirmed that he okay

19  to accommodate points 1 and 5.  Points 2, 3, 4, below are

20  critical for your level and for growth of the business.

21  Hacene is happy to discuss this further of course to make

22  sure this is understood."

23        Do you see that?

24  **A.**  Yes.

25  **Q.**  What, if any, expectation did you have concerning having

1    a further discussion after you received this email?

2    **A.**  I thought we were going to have a further discussion once

3    I was on site.

4    **Q.**  And was there a particular day that that further

5    discussion was scheduled for?

6    **A.**  Once I got there, it was scheduled two days later on

7    February 28th.

8    **Q.**  What time of day did the meeting take place?

9    **A.**  I believe it was early afternoon.

10   **Q.**  And do you recall where it was?

11   **A.**  It was in Hacene's office.

12   **Q.**  And who was present?

13   **A.**  Myself, Hacene, and Chad.

14   **Q.**  Tell us how the meeting started.

15   **A.**  I sat down and I opened up my laptop to have the email

16   that Chad had sent me that I received in the airport, and I

17   thought we were going to discuss that.  Chad immediately

18   started the meeting off by proposing two options to me.

19   Suggesting a potential exit package or a temporary consulting

20   role that would last for maybe, like, a month or a couple

21   months.  And he said it would be until they could find

22   somebody who could replace me who had my qualifications.

23           And I was in shock.  I became very emotional.  I

24   replay this meeting over and over, because I'm still in shock

25   by it.  I couldn't believe that they wanted to get rid of me.

1    **Q.**  Let me just stop you there.  Did Mr. St. John indicate to

2    you why it was that they were proposing these two options

3    that you referenced?

4    **A.**  He kept insisting that the recommended accommodations

5    that my doctor provided were restrictions, and I kept, over

6    and over, correcting him, telling him they're not

7    restrictions.  These are just -- you know, we were

8    brainstorming, trying to come up with creative

9    accommodations, given my condition.  And he wouldn't believe

10   me.  He said, no, they're restrictions.  So it was very

11   upsetting to me.

12   **Q.**  Was there any discussion at this meeting as to whether or

13   not you were able to actually continue doing your job?

14   **A.**  Yes.  It was -- well, it was Hacene and Chad's belief

15   that I couldn't because they thought these were all

16   restrictions.  And I -- I, basically, pleaded with them and

17   said, no, this is not accurate.  This is not factual.  There

18   are a lot of things on this list that I do as part of my job

19   routinely without issue.  And I never said that I could not

20   do other things.  I just -- for some tasks such as formal

21   PowerPoint presentations, I had to take Valium.

22   **Q.**  Did you ask Mr. Mekerri and Mr. St. John any -- to

23   provide you any information during the course of this

24   meeting?

25   **A.**  Yes.  I was -- I was crying.  I was scared and I was

1    panicking, and I was pleading with them to -- could -- can we

2    just talk about the tasks, the specific tasks that fell under

3    those buckets that they said they could not accommodate?  And

4    I explained that there were things listed in those buckets

5    that I did every day weekly without any issue, and could we

6    just break out specific tasks in those buckets that they

7    believed I couldn't perform.

8             And they said they could not.  They would not go

9    into further detail.

10   **Q.**  Just to be clear, Dr. Menninger, did they say they could

11   not, or did they say they would not?

12   **A.**  I believe they said they would not.  They said at our

13   level, we don't -- I can't remember the exact wording, but

14   "We won't go into additional detail."

15   **Q.**  You mentioned before that you were scared in this

16   conversation.  Can you explain to the jury why you were

17   scared?

18   **A.**  I -- I'm -- I was the sole financial provider for our

19   family and I had a young child.  And I didn't know how we

20   were going to survive.  I -- my job and my pay from my job

21   paid for everything, our house, my child's school, food.  If

22   that was abruptly just cut off and I was let go, we had no

23   way to survive.

24            And as a mom, I was devastated.  I felt like, "I

25   can't do this to my child."  I was really scared.  I thought

1    we were going to be homeless on the streets and I didn't know

2    what to do.

3    **Q.**   Did you take notes during the course of this meeting?

4    **A.**   No, I did not.  I was in panic and shock.

5    **Q.**   Did you write notes --

6    **A.**   And --

7    **Q.**   I'm sorry.  Go on.  Were you done?

8    **A.**   I was just pleading with Hacene and Chad to have a

9    conversation with me about the specific tasks.  I felt like I

10   was begging for my life, for the survival of my family.  I

11   don't believe I was capable, in that state, taking notes

12   during that meeting.

13   **Q.**   Did you subsequently write down notes from the meeting?

14   **A.**   Yes.  Right after the meeting, I went back to my office,

15   and I wrote down everything I could remember.

16   **Q.**   Okay.  I'm going to show you Joint Exhibit 21.

17           I apologize for the legibility.  It will get better

18   when I zoom in on particular things, but just to orient the

19   jury, do you know what this -- what this exhibit is?

20   **A.**   These are my handwritten notes from a one-on-one call I

21   had with Hacene on January 8th.

22   **Q.**   Okay.  And is this a -- is this a sort of compilation of

23   handwritten notes from various conversations that you had

24   beginning January 8th and continuing thereafter?

25   **A.**   With Hacene?

1   **Q.**  Yes.

2   **A.**  Yes.

3   **Q.**  Okay.  I'm going to turn you to the 21st page of this

4   exhibit and just -- ease of reference here, you see in the

5   bottom right-hand corner this has a number that ends 1162.

6   Do you see that?

7   **A.**  Yes.

8   **Q.**  Okay.  So that's where we are.  And I direct your

9   attention to the top of that page.  The top left corner, can

10  you -- can you read for the jury what that says?

11  **A.**  "My notes right after 2/28 meeting with Chad and Hacene."

12  **Q.**  Okay.  And just in some of the -- some of the handwriting

13  here is a little bit challenging at times.  Can you -- can

14  you read the first paragraph there of what you wrote,

15  beginning --

16  **A.**  I -- I was frantic when I was writing this.  I kept --

17  "consulting/exit package as options (no details) medical

18  leave?  Kept stating that categories are part of the job

19  description.  I stated that I could perform all the

20  responsibilities in the categories, just formal PowerPoint

21  presentations would trigger panic attacks.  Dinners,

22  et cetera, would not."

23         I used a lot of shorthand.  Do you want me to

24  continue?

25  **Q.**  Please.  And the next paragraph.

1    **A.**   "They stated that they did not want me to do something

2    that was against what my doctor stated that I could do.  And

3    I said that she did not state that I could not do these

4    things, that we wanted to find creative ways to accommodate.

5    And they stated that they did not want me to be medicated

6    for -- and for something to happen."

7    **Q.**  And turning to the next paragraph.

8    **A.**   "They wanted to speak face to face again before I left,

9    stated that we were just having a discussion and that nothing

10   had been decided.  I asked if they would list the specific

11   tasks that are expected within the categories, as an example,

12   PowerPoint presentations, as lumping everything together

13   isn't factual in terms of what I'm able to do without

14   triggering panic attacks.

15           "Hacene stated that he would not want me to affect

16   my health or go against my doctor by having to medicate to

17   get through presentations.  They brought up other activities,

18   like large client calls, groups, unplanned and unexpected,

19   all of which I stated would not cause panic attacks if it

20   didn't involve a formal presentation and that I current do

21   and can do without any issue.

22           "Then Hacene said the business is bigger than all

23   of us.  I like you as a person.  It's not personal."  I was

24   crying through this.

25           "I stated that I do not want to leave PPD."

1    **Q.**  I'll turn to the next page.

2    **A.**  "I also stated that there are things I do that other

3    executive directors don't do and vice versa, even though we

4    all have the same job description.

5          "Hacene asked me to consider the options that Chad

6    presented.  They stated they're not trying to force me out

7    and they stated that they did not want to hurt my

8    reputation."

9          Which kind of caught me off guard, because I -- I

10   didn't know what that meant.

11   **Q.**  So you mentioned -- or you just read a moment ago here on

12   this page that "Hacene asked me to consider the options that

13   Chad presented."

14         What was your understanding as to the options they

15   were referring to?

16   **A.**  The exit package and the consulting arrangement.

17   **Q.**  Was staying --

18   **A.**  And the --

19   **Q.**  Was staying in your role an option presented by them

20   during this meeting?

21   **A.**  No.

22   **Q.**  And was there a -- was there a meeting scheduled to -- to

23   have a follow-up conversation?

24   **A.**  We were supposed to have a follow-up conversation the

25   next day.

1  **Q.**  I'm going to show you Joint Exhibit 332.

2         Can you tell the jury what this is, please?

3  **A.**  This is an email that I sent the next day, the morning

4  before we were scheduled to have a follow-up meeting.

5  **Q.**  And can you tell the jury why you sent it?

6  **A.**  I was -- I was terrified.  I was -- I sent it because I

7  was afraid they were trying to force me out of my job.  And

8  I -- I basically pleaded with them, can we just have a

9  conversation about the specific tasks that may or may not

10  implicate my disability and any, like, accommodations or

11  creative solutions that we might be able to come up with to

12  perform those?

13         And I -- I reiterated that I could perform all my

14  job functions with or without accommodation.  It's just more

15  challenging to perform certain tasks.  But even those tasks,

16  I do -- even though I had rarely done them in the past, I did

17  them very well.

18  **Q.**  Tell the jury how they responded.

19  **A.**  Chad sent an email canceling the meeting and I think he

20  said he was going to consider what I wrote.

21  **Q.**  I'm going to show you Joint Exhibit 333.  Was that

22  Mr. St. John's response?

23  **A.**  Yes.

24  **Q.**  Do you recall what the -- what the next email

25  communication was that you received from Mr. St. John?

1   **A.**   I think it was a couple weeks later.

2   **Q.**   I'm going to show you Joint Exhibit No. 176.

3           THE COURT:  If it's not obvious by now, ladies and

4   gentlemen, the numbers of the exhibits have no evidentiary

5   significance, and you shouldn't draw any conclusions from the

6   facts that something's number 1 or 100, there's a blank

7   potentially in the exhibit numbers or it's a bigger number or

8   lower number.  They're numbered mostly for the convenience

9   and various ways that come up in the course of the case that

10  doesn't have any significance.  So don't draw any

11  significance as to why they're in sequence or not in

12  sequence, because there really is no significance.

13          Go ahead, Mr. Hannon.

14          MR. HANNON:  Thank you, Your Honor.

15  BY MR. HANNON:

16  **Q.**   So, Dr. Menninger, was this the response you see -- you

17  received to your March 1st email we just looked at?

18  **A.**   Yes.

19  **Q.**   Okay.  And between March 1st and March 12th, the date of

20  this email, had you received any other response?

21  **A.**   No.

22  **Q.**   You had mentioned before that a lot of your anxiety or at

23  least some of your anxiety is anticipatory.  Did I hear that

24  right?

25  **A.**   That's correct.

1    **Q.**  How, if at all, did Mr. St. John's delay in responding

2    impact you?

3    **A.**  I started to have severe and frequent panic attacks.  I

4    was scared.  I was terrified for my family and for our

5    survival.  I didn't know what was going on.  And -- yeah.

6    Anticipating what they might come back with, I just -- you

7    know, I was just waiting and scared and very symptomatic.

8    **Q.**  And in terms of what you were waiting for, did I hear you

9    right that part of what you were waiting for was the

10   additional information you had asked for regarding buckets 2,

11   3, and 4?

12   **A.**  Yes.

13   **Q.**  And when you received Mr. St. John's response on

14   March 12, 2018, did he give you that information?

15   **A.**  No.

16   **Q.**  Let's look at Mr. St. John's email a little bit closer

17   here.  So in the second -- in the second paragraph, he

18   begins, "I thought it would be helpful to attach a copy of

19   your job description above for your reference."

20           Do you see that?

21   **A.**  Yes.

22   **Q.**  Okay.  Was that in any way responsive to the information

23   you had asked Mr. St. John to provide?

24   **A.**  Not at all.

25   **Q.**  Why not?

1    **A.**   Because I had asked about breaking out the specific tasks

2    in those buckets that we were discussing during the meeting.

3    That was not part of my job description.  Those were not on

4    my job description.

5    **Q.**   And then you see Mr. St. John concludes, "Please take

6    another look at the job description, discuss it with your

7    healthcare provider, and let us know if there are other

8    accommodations that would allow you to perform the essential

9    functions of your job as outlined above."

10              Do you see that?

11   **A.**   Yes.

12   **Q.**   Was that in any way helpful to you?

13   **A.**   I was extremely distressed because they implied that I

14   couldn't perform the essential functions of my job, when I

15   never said -- I never said that.  I -- in fact, I said the

16   opposite and always have been able to perform the essential

17   functions of my job.

18              Yeah, this email, it just made me -- it made me

19   feel worse.  It made me feel like they were trying to force

20   me out.

21   **Q.**   Did you respond back to Mr. St. John?

22   **A.**   Yes.

23   **Q.**   I'm going to show you Joint Exhibit 141.  And just -- let

24   me scroll to the second page here.  And so on the bottom of

25   the second page here, is this the email from Mr. St. John we

1    were just looking at?

2    **A.**   Yes.

3    **Q.**   Okay.  And then if we scroll back, does this reflect your

4    response?

5    **A.**   Yes.

6    **Q.**   Okay.  And looking at the section here I've just

7    highlighted in the second paragraph, you write, "As I've

8    stated previously, I am capable of performing all of my

9    responsibilities with or without accommodation.  There are,

10   however, certain types of tasks (e.g., formal group

11   presentations) that are challenging due to my disability and

12   I'd ask that you consider possible reasonable accommodations

13   with respect to those tasks."

14          Do you see that?

15   **A.**   Yes.

16   **Q.**   The comment "as I've stated previously," what were the

17   previous occasions you were referring to?

18   **A.**   During the meeting and also the previous email I sent

19   after the meeting.

20   **Q.**   As of this date, had you ever communicated to anyone at

21   PPD that you were incapable of performing your

22   responsibilities at PPD?

23   **A.**   No.

24   **Q.**   Turning to the next paragraph, which I'll highlight here,

25   and then looking at the second sentence there, you write, "In

1    my last email to you on March 1st, I noted that those

2    categories are very broad and asked that you and/or Hacene

3    identify the specific tasks that might fall within those

4    categories.  As I explained in my March 1st email, that

5    information is necessary in order to have a productive

6    dialogue regarding which specific tasks implicate my

7    disability and what reasonable accommodations may be

8    available with respect to those tasks."

9           Do you see that?

10   **A.**  Yes.

11   **Q.**  As of March 24, 2018, had that information been provided

12   by PPD?

13   **A.**  No.

14   **Q.**  Turning to the next paragraph, it begins, "In any event,

15   based on my one-to-one with Hacene this past week, it does

16   not appear that there are any activities or events in the

17   near future that would implicate my disability.  Given this,

18   and how extremely busy we all are, it might make sense to

19   table this discussion until a particular task arises.

20   Dealing with these issues in context, I think, might make

21   this whole issue seem less daunting and help us all engage in

22   a more meaningful dialogue."

23          Do you see that?

24   **A.**  Yes.

25   **Q.**  Why did you write that?

1  **A.**  I thought that they wouldn't continue to keep targeting

2  me.  I thought that my job wouldn't be at risk, but I just

3  wanted the targeting to stop.

4  **Q.**  We'll talk about the targeting in a moment; but, first,

5  if I could direct you back to the bottom of the first page,

6  where you mentioned "it does not appear that there are any

7  activities or events in the near future that would implicate

8  my disability."

9          Do you see that?

10  **A.**  Yes.

11  **Q.**  Was that accurate as of March 24, 2018?

12  **A.**  Yes.

13  **Q.**  So between December of 2017, when Mr. Mekerri raises this

14  suggestion of -- of new responsibilities, and March of --

15  March 24, 2018, had that actually happened?

16  **A.**  No.  When I was on site, he asked me if I could prepare

17  some slides for him to present, which I did.  He -- he didn't

18  end up presenting them.  My supervisors volunteered to

19  present them.  But -- yeah.  That was it.

20  **Q.**  You mentioned feeling targeted, and I want to back up to

21  that.  Do you -- do you have a sense of when it was that

22  you -- you first began to feel like you were being targeted

23  by PPD?

24  **A.**  It was right after that meeting on March 28th.

25  **Q.**  Did you say March or February 28th?

1    **A.**   February 28th.  Sorry.

2    **Q.**   And was there anything that happened shortly after that

3    meeting that contributed to your belief that you were being

4    targeted?

5    **A.**   Yes.  Well, first, Chad, when he brought up, like, a

6    potential consulting or a temporary consulting role, he

7    mentioned, "Of course, we wouldn't do that until we had

8    somebody that could replace you."

9          Then a couple days later, I received a text message

10   from my direct report, Dr. Reddy, and he said in -- they made

11   offers to two doctoral candidates, two pathologists,

12   essentially.

13         And I -- I was shocked.  I thought they are moving

14   extremely fast, trying to get me out and replace me.  I mean,

15   the fact that they immediately made an offer to two

16   pathologists, and it took all of 2017 for us to try to

17   recruit candidates for positions that we had open, made me

18   feel very threatened.

19   **Q.**   I'm going to show you Joint Exhibit 41.  Do you recognize

20   this?

21   **A.**   Yes.

22   **Q.**   Tell the jury what it is.

23   **A.**   This is the text message that I received from Dr. Reddy

24   when I was in the airport going home.

25   **Q.**   And her text messages, it references a consensus meeting.

1  Do you see that?

2  **A.**  Yes.

3  **Q.**  Tell the jury what a consensus meeting is in this

4  context.

5  **A.**  A consensus meeting is usually a group of senior leaders

6  in the lab that discuss a potential candidate who we are

7  looking to hire at a high level.  And everybody interviews

8  that candidate, and then they provide rankings and feedback

9  about whether they feel that's a good candidate to hire.

10  **Q.**  And prior to disclosing your health condition to PPD,

11  were you -- were you typically involved in consensus meetings

12  for individuals like -- like the candidates referenced here?

13  **A.**  Yes, absolutely.  I mean, especially if it was somebody

14  who was supposed to report directly to me.  I did not get

15  involved in meetings at the lower level, at the bench tech

16  level.  The supervisors and -- usually the supervisors got

17  involved in those.

18         But at this level, I mean, this was one of the

19  positions -- or these were positions that I was trying to

20  recruit for all of 2017 and I was just completely shut out.

21  I didn't find out -- no one told me anything.  I find out

22  through a text from my direct report, and I was just shocked

23  by how fast they were moving.

24         MR. HANNON:  Your Honor, I'm about to go to another

25  section, if you want to take our morning break now.

```
 1              THE COURT:  Sure.  All right.
 2              Ladies and gentlemen, we'll take the morning break
 3    now.
 4              All rise for the jury.
 5              (Jury not present.)
 6              THE COURT:  We stand in recess.  We'll resume at
 7    11:20.
 8              How much longer do you think you'll have on direct?
 9              MR. HANNON:  Probably about another hour, would be
10    my best guess.
11              THE COURT:  So probably finish a little before
12    one o'clock?
13              MR. HANNON:  Yeah.
14              THE COURT:  Okay.  I take it you'll be more than
15    whatever time is left?
16              MS. MANDEL:  On cross?  Yes.
17              THE COURT:  Okay.
18              (Court in recess at 11:06 a.m.
19              and reconvened at 11:21 a.m.)
20              THE COURT:  You can go get the jury.
21              (Pause in proceedings.)
22              (Jury present.)
23              THE COURT:  Go ahead, Mr. Hannon.
24              MR. HANNON:  Thank you, Your Honor.
25
```

BY MR. HANNON:

**Q.**   Dr. Menninger, what was your relationship like with Mr. Mekerri after that February 28, 2018, meeting?

**A.**   He was tough and accusatory, very cold, disrespectful, did not trust me or appear to have trust in me.  It was scary to me because it was completely opposite from our previous relationship.

**Q.**   And could you describe for the jury what your relationship with Mr. Mekerri had been like before you disclosed your disability?

**A.**   Yes.  When Mr. Mekerri was hired, we were both somewhat new, like within the same year being hired.  And so we treated each other more like colleagues and he was very warm and compassionate.  When we'd talk about our families, he'd ask about Maya, my child.

He would have me, like, proofread emails that he was going to send to others in the company, make sure his grammar was correct or that it made sense.  He'd ask for my medical advice, you know, just very warm and friendly.  And I really -- I really liked him as a boss.  I -- it was nice to have someone that I felt like I could collaborate with as we worked toward our goals.  And that changed drastically after that February 28th meeting.

**Q.**   I'm going to show you Joint Exhibit Number 49.  And you see here this is an email from Mr. Mekerri to Mr. St. John on

1    March 29, 2018; is that right?

2    **A.**   Yes.

3    **Q.**   Okay.  And the subject is "1:1 Lisa."  Do you see that?

4    **A.**   Yes.

5    **Q.**   And before getting into the opening paragraph, I want to

6    look at the second paragraph here.  Do you see the sentence

7    that begins, "Prior to that 1:1, the latest conversation was

8    on site the week of February 26th."

9              Do you see that?

10   **A.**   Yes.

11   **Q.**   And then he concludes that paragraph writing, "No other

12   conversation took place from February 28th to March 26th."

13             Do you see that?

14   **A.**   Yes.

15   **Q.**   Is that consistent with your recollection that there was

16   a period of time where you and Mr. Mekerri didn't talk?

17   **A.**   Yes.

18   **Q.**   And now, looking at the first paragraph, he references

19   the content of his one-on-one with you.  Do you see that?

20   Let me help you out.

21   **A.**   Yes.

22   **Q.**   Not a trick question.  He purports to tell Mr. St. John

23   what he had spoken with you during the one-to-one.  Do you

24   see that?

25   **A.**   Yes.

1  **Q.**  Okay.  And so the first thing he items is structure

2  changes.  Do you see that?

3  **A.**  Yes.

4  **Q.**  Do you know what that refers to?

5  **A.**  I believe that was when he was making me aware of

6  bringing on Noreen -- and I'm sorry, I can't pronounce her

7  last name -- but she was essentially hired to replace the

8  associate director who had left back in the spring of the

9  previous year.  I was completely left out of that decision,

10  so this was to replace one of my previous direct reports.

11  **Q.**  Okay.  And the person who replaced your previous direct

12  report, her name was Noreen?

13  **A.**  Yes.

14  **Q.**  And when she was hired, did -- did she continue to report

15  to you?

16  **A.**  No.  They made -- the reporting structure was that she

17  reported directly to Hacene, with a dotted line to me.

18  **Q.**  And then there's a reference here to a pathologist.  Do

19  you have an understanding as to who that refers to?

20  **A.**  I believe that was Brent Mann, someone who I had

21  previously screened by phone and determined did not have the

22  necessary qualifications, expertise to invite on site for an

23  interview.

24  **Q.**  And had you been involved in Mr. Mann's -- Director

25  Mann's interview?

1   **A.**   No.   I was not invited or asked, which was contrary to

2   what I -- what I discussed with Hacene regarding hires,

3   especially hires of people who were going to be part of my

4   business unit and report directly to me.  Of course, I would

5   be involved in making that decision.

6            The other reason is because these are very

7   technical positions, and we were trying to fulfill specific

8   compliance gaps.  This was not Hacene's area of expertise.

9   He came from a background of data management.  So I was very

10  concerned, as were all the supervisors and the director in

11  the Belgium lab.  Honestly, they were furious.

12  **Q.**   Okay.  Well, let's just focus on what you observed for

13  the time being.  So going back to the exhibit, it references

14  laboratory client issues.  Do you see that?

15  **A.**   Yes.

16  **Q.**   Okay.  And prior to 2018 -- actually, strike that.  Let's

17  start here.  There's a reference here to a Brussels data

18  entry QA issue.  Do you see that?

19  **A.**   Yes.

20  **Q.**   Do you have an understanding as to what that refers to?

21  **A.**   Yes.

22  **Q.**   And could you please describe that for the jury.

23  **A.**   That was an employee who intentionally did not follow the

24  SOP, the standard operating procedure; and as a result, it

25  caused errors in the results to a particular client.  And

1    that individual was terminated because of it, because of the

2    intentional nature of it.

3    **Q.**  Now, had -- had the Global Labs at PPD, had it

4    encountered issues with respect to testing problems prior to

5    2018?

6    **A.**  Yes.

7    **Q.**  And was there any kind of formal system in place for

8    identifying and resolving those issues?

9    **A.**  Yes.  We had a formal quality management program, which

10   consisted of a CAPA process where you perform a formal

11   investigation, root cause analysis, put in corrective action,

12   preventive action; and those were coordinated by our

13   QA department.

14          And then they would work with someone, like if it

15   were a laboratory issue, someone at, usually, like, the

16   supervisor level or maybe a lead med tech to perform the

17   investigation, write up the documentation in the CAPA.  And

18   then that eventually had to be signed off by somebody at the

19   director level.

20          If the director level wasn't filled for some

21   reason, then it would go up to the next level.  So on some

22   occasions, I would sign off because my direct report had left

23   the company at that point for that -- for -- yeah.

24          In this case, actually, this was in Brussels, in

25   Belgium.  So we did have a lab director on site, and I

1  believe she signed off on the -- the CAPA report.

2  **Q.**  Let me just pause you there for a moment, if I may.

3  CAPA, is that an acronym for something?

4  **A.**  Yes, it stands for corrective action, preventive action.

5  **Q.**  Okay.  And is that -- is that something you or PPD

6  invented?

7  **A.**  No.

8  **Q.**  Where does that come from?

9  **A.**  That comes from the quality management world.  It's used

10  in all different kinds of industries.

11  **Q.**  And prior to joining PPD, had you had experience in that?

12  **A.**  Yes.  I had had a lot of experience in it, especially

13  related to medical laboratories.

14  **Q.**  Okay.  And with respect to this, this process that you've

15  described, was that a process that would just include people

16  within your organization, or was that sort of cross

17  functional?

18  **A.**  This one was specific to the lab.  It was an error made

19  by a lab tech, but it was in one of our Global Labs, so our

20  site head was also involved.  Lorraine, my direct report in

21  Belgium, myself, and the supervisor for this particular

22  section worked very closely together every day trying to

23  resolve the issue, address the client's concerns, and we went

24  above and beyond reviewing data to make sure that there were

25  no other impacts, other than what had happened here.

1    **Q.**   Okay.  And then the other matter referenced here in this

2    parenthetical in the exhibit we're looking at, it says "BMS

3    sponsor, wrong conversion factor."

4         Do you see that?

5    **A.**   Yes.

6    **Q.**   Do you have an understanding as to what that refers to?

7    **A.**   Yes.  That was an updated assay that was put into the

8    lab.  I should say an updated version of an existing assay.

9    And when it was set up in the system by our IT department,

10   they did not perform the end-to-end testing that normally

11   would be performed, and as a result, the wrong conversion

12   factor from the previous version of that assay, I think, was

13   used instead of the one that should have been.

14        It only affected that one particular assay.  And I

15   personally spoke to that client, made sure that everything

16   was corrected, and we resolved the issue.  But this was --

17   this was an example of an error from our IT department.

18   **Q.**   And you mentioned before the CAPA process for identifying

19   investigating and so forth.  Was that also followed for that

20   issue, as well?

21   **A.**   Yes.

22   **Q.**   Okay.  And had issues of -- of the type that you've just

23   described, had those occurred prior to 2018?

24   **A.**   Yes.

25   **Q.**   And was there anything different about the way that

1   Mr. Mekerri approached the problems that happened in 2018

2   versus how he approached the problems in 2017?

3   **A.**   Yes.  He did not typically get involved in, like, when a

4   quality issue was submitted, unless it was something that was

5   critical, impactful.  But it was rare that he would get

6   involved.  It was usually -- if it was a major issue, it was

7   something that was handled within the senior leader of that

8   particular department.

9          In 2018, I felt like he was scrutinizing every

10  issue and going out of his way to document.  This was not

11  something that he typically ever did before.

12  **Q.**   And just going back to the exhibit that we're looking at

13  here, he references a one-to-one with you on March 26th.  Do

14  you recall anything about his -- about his tone or his --

15  his -- his demeanor in that meeting?

16  **A.**   Very cold, just harsh, accusatory.  I -- yeah.  It

17  honestly just frightened me because I felt like he's trying

18  to make a case to force me out of the company now based on

19  performance since I didn't accept their options from that

20  February 28th meeting.

21  **Q.**   And was that the only one-to-one where Mr. Mekerri gave

22  you that impression?

23  **A.**   No.  It was every one-to-one that we had following that

24  meeting until I went on leave, and it seemed like his tone

25  became more harsh as the meetings went on.  I don't mean

1    within the same meeting, but as the months progressed.

2    **Q.**   And how did that impact you?

3    **A.**   I was terrified.  I thought I was being forced out of the

4    company.  And to me, it felt clear they were going out of

5    their way to document, to scrutinize everything that I did

6    without even performing an investigation, in my cases, as to

7    what the cause of these issues were.

8              And it was also new for him to document.  Hacene

9    rarely documented or responded to emails or would get

10   involved in things like this; and now, all of a sudden --

11   yeah.  And, in fact, most of our one-on-ones before this were

12   canceled by him.

13   **Q.**   I'll show you another document here.  This is going to be

14   Joint Exhibit Number 50, and it's a multipage document.  I'd

15   like to start on the -- on the third page here towards the

16   bottom.

17             Do you see here there's an email from Mr. Mekerri

18   to you on April 11, 2018?  Do you see that?

19   **A.**   Yes.

20   **Q.**   Okay.  And Mr. Mekerri, he begins his note, "As discussed

21   yesterday, I would like to adapt your goals for 2018 as I am

22   concerned with the recent lab issues" and then in parens, he

23   put "Gedeon Richter, BMS, and NGSP."

24             Do you see that?

25   **A.**   Yes.

1  **Q.**  Okay.  And just so -- so first, just for clarity, BMS,

2  that was the IT issue you mentioned a bit ago; is that right?

3  **A.**  Yes.  It was from lack of performing end-to-end testing.

4  There was also a component where the lab tech was confused

5  because the wrong conversion factor was in there.

6  **Q.**  Okay.  Gedeon Richter, what was that?

7  **A.**  That was the issue that happened in the Belgium lab where

8  the med tech intentionally did not follow the SOP for manual

9  entry of results.

10         And there were a few instruments that had not yet

11  been interfaced to the computer system, meaning that the

12  results would go directly from the instrument to our

13  reporting system, and it requires someone to manually enter.

14  That was something we always had concern about because

15  there's always risk of transcription errors, but it was not a

16  priority.

17         But in this case, you know, we had a good updated

18  procedure in place, but this particular tech intentionally

19  did not follow it, which is what led to the error.

20  **Q.**  And they were terminated; is that right?

21  **A.**  Yes.

22  **Q.**  There's a reference to NGSP.  Can you tell us what that

23  is?

24  **A.**  That's a program that certifies testing of hemoglobin

25  A1C.  So it's like a proficiency testing program.  And it's

1   specific to that one assay.  So they send you unknown

2   samples.  You run them on your analyzer, and then you report

3   the results back.

4           This was another area that was not interfaced yet.

5   It was not a priority for our IT team to interface

6   proficiency testing samples because they weren't client

7   samples.  So there was a mislabeling issue by one of the

8   techs, which caused us not to pass.  It was insignificant in

9   that -- I mean, I actually personally knew the person who

10  runs the NGSP program.  She sent us a new batch of samples.

11  We tested them, they were fine, and our certification wasn't

12  impacted at all.

13  **Q.**  Was that an error that you could have prevented?

14  **A.**  That was not something I could have personally prevented,

15  no.  That was something that happens at the bench level.

16  **Q.**  And just so the jury understands, how many levels are

17  there between the bench level and you in the PPD

18  organization?

19  **A.**  I believe it starts as low as the lab assistant, and that

20  might have two different levels, and then there's three

21  different levels of med techs.  And these are all based on

22  experience.

23          And then they report to a supervisor for their

24  particular laboratory section.  And then the supervisor

25  reports to an associate director or, in some cases, like in

1    Belgium, the director, because Lorraine was promoted.  And
2    then they would -- the directors will report to me.
3    **Q.**   Okay.  And while you were at PPD, did you ever do
4    actually any supervision of the actual lab techs doing the
5    work?
6    **A.**   Not supervision, no.
7    **Q.**   Okay.
8    **A.**   I would do some walk-throughs when I was on site at the
9    various laboratories.  But I wasn't responsible for
10   supervising the med techs.  There would be no possible way to
11   do that, especially when you're overseeing four global
12   laboratories.  I mean, if you cloned me, that would still be
13   impossible.
14   **Q.**   Okay.  In this email we're looking at here, Mr. Mekerri's
15   note to you on April 11, 2018, he begins, "As discussed
16   yesterday."
17             Do you see that?
18   **A.**   Yes.
19   **Q.**   No worries.  Do -- do you recall that discussion at all?
20   **A.**   Yes.
21   **Q.**   Okay.  And what, if anything, do you recall about it?
22   **A.**   I was terrified.
23   **Q.**   Okay.  Do you recall what about the conversation that
24   made you terrified?
25   **A.**   His expectations were unrealistic, impossible for anybody

1   to meet.  I mean, if you expect someone to never make an

2   error when you're the sole medical director of four medical

3   laboratories around the globe, there's no possible way that I

4   can have my eye on -- and it wasn't my job to be the

5   supervisor of, you know, people performing the testing on the

6   bench.

7           So the fact that he expected there to be no errors

8   and for me to prevent that from happening was an impossible

9   goal to meet.  And I don't believe he had that same goal for

10  all the other departments that would have issues and submit

11  it as part of our quality management process.

12  **Q.**  Well, you say that you thought he had the expectation

13  that you were going to prevent these issues from occurring in

14  the future.  Did he -- did he tell you that?

15  **A.**  I'm sorry; can you repeat the question?

16  **Q.**  Sure.  You indicated that he wanted you to prevent the

17  lab from having -- having issues in the future; is that

18  right?

19  **A.**  Yes.

20  **Q.**  Okay.  And is that -- is that what he told you in the

21  one-to-one?

22  **A.**  Yes.

23  **Q.**  Based upon your experience in labs, is that -- is that

24  possible?

25  **A.**  That is completely impossible.  There's no way.  There is

1    not one pathologist I am familiar with -- I mean that's why

2    you create quality metrics so that you can event quality

3    events and track them and make changes to your systems to

4    make process improvements and things like that.

5           And the other thing about quality events is they're

6    not supposed -- reporting quality events are not supposed to

7    be treated as punitive.  And that's based on a global

8    standard for quality management of medical laboratories,

9    because then that risks people being afraid to report them if

10   they think they're going to be punished for it.  And that

11   defeats the whole purpose of having a strong quality

12   management program.

13   **Q.**  I'm going to show you Exhibit 50 again here.  And I want

14   you to take a look here at the second sentence of what

15   Mr. Mekerri wrote, where he writes, "I need your full

16   attention and dedication to resolve them and be more

17   proactive to prevent any further issues."

18          Do you see that?

19   **A.**  Yes.

20   **Q.**  What did you understand that to mean?

21   **A.**  He was blaming me for all -- all the issues that were

22   coming up and implying that they were my fault.

23   **Q.**  As of April 11, 2018, were you being proactive to prevent

24   lab issues from occurring?

25   **A.**  Oh, absolutely.  That's ongoing, every day, all the time.

1  **Q.**  And --

2  **A.**  I mean, that's -- that's why you run quality control

3  samples for all your assays through the instruments.  That's

4  why you perform proficiency testing.  It's why you do all of

5  the other quality processes.  That's being proactive to

6  prevent issues.

7  **Q.**  And you see here Mr. Mekerri in his email, he has -- I'll

8  flip to the next page -- so he has two numbered paragraphs.

9  Do you see those there?

10  **A.**  Yes.

11  **Q.**  Okay.  And what was your reaction to reading those two

12  items?

13  **A.**  Again, terrified about the expectation of eliminating lab

14  issues -- that's not possible -- and eliminating all client

15  complaints.  I mean, yeah, these are unrealistic,

16  unachievable goals.  We already had process improvements in

17  place, and I believe later I describe, I gave examples of

18  what some of those were.

19        Yeah, these were things we were already doing.  We

20  were already upgrading our SOPs when needed and, you know, I

21  said that's evidenced by the different revision numbers.

22  Every time you update an SOP, it gets an updated revision

23  number.  And all of those come to me for final approval.  So

24  I was constantly reviewing those and approving or sending

25  them back, rejecting for further edits.

1          And yeah, people management goals, at the beginning

2     of every single year, we all set up goals.  We work with the

3     lab supervisors to set up goals for their specific areas and

4     we create metrics, so we can met- -- we can measure areas

5     where we might think we need to improve from a quality

6     standpoint or just raise the bar.

7          And so we set those up with the supervisors in the

8     beginning of the year, and then those quarterly metric

9     reports come to me for review and sign-off so I can look for

10    any systemic trends or areas of concern.

11    **Q.**  Okay.  So did you respond to Mr. Mekerri's email?

12    **A.**  Yes.

13    **Q.**  And so let's back up here in this exhibit, turn to the

14    first page of the exhibit, and so this is the first page of

15    the exhibit.  And is this your email response to Mr. Mekerri?

16    **A.**  Yes.

17    **Q.**  Okay.  And so with respect to the second paragraph here,

18    you -- you address the issues that he had -- he had raised in

19    his email; is that right?

20    **A.**  Yes.

21    **Q.**  Okay.  Was all that accurate?

22    **A.**  Yes.

23    **Q.**  Okay.  And with respect to the second paragraph here, the

24    ones -- the one that begins, "While errors such as these," do

25    you see that?

1  **A.**  Yes.

2  **Q.**  Why did you write that?

3  **A.**  Because he implied that I was not proactively trying to

4  minimize and prevent errors.  And I wanted him to know what

5  we actually were doing that was proactively in place.

6  **Q.**  And did you -- did you provide him any information on

7  that front in terms of what you -- what you were doing?

8  **A.**  I -- I provided the information in the email.  I gave

9  examples of projects that we were working on and things that

10  we do to proactively prevent error.

11  **Q.**  And were you looking for any sort of guidance from

12  Mr. Mekerri in terms of what he wanted to do differently?

13  **A.**  Yes.  I was looking for some clarification after I

14  described, you know, this is what we already do every day and

15  what in addition was he looking for from me to do above and

16  beyond what we already had in place.

17  **Q.**  Okay.  So I'm not going to go through all of these,

18  but -- but what begins there with paragraph 1(a) and what

19  continues through on the third page here, 2(c), is that all

20  you describing for him in sort of detail exactly what's

21  already being doing in these respects?

22  **A.**  Yes.

23  **Q.**  Okay.  And then, looking at your conclusion here, you ask

24  him for any suggestions as to how you can improve your

25  performance, do you see that?

1    **A.**   Yes.

2    **Q.**   And you note that you'll do your best to achieve whatever

3    goals he thinks are appropriate for 2018; is that right?

4    **A.**   Yes.

5    **Q.**   Is that how you really felt at the time?

6    **A.**   Absolutely.

7    **Q.**   Do you recall how Mr. Mekerri responded?

8    **A.**   He was very disappointed in me for sending -- for writing

9    that and sending that email to him.

10   **Q.**   Is that what he told you?

11   **A.**   I think in his email he mentions that he was disappointed

12   and -- yeah.

13   **Q.**   I'm going to show you Joint Exhibit 301.  And does this

14   appear to be an email back from Mr. Mekerri a little over a

15   week after the email we just looked at from you?

16   **A.**   Yes.

17   **Q.**   Do you see there he begins, "I am very surprised and

18   somehow disappointed by your response."

19          Do you see that?

20   **A.**   Yes.

21   **Q.**   How did you react to that?

22   **A.**   I just felt like it was a continuation of the harsh tone

23   that he had been using and a continuation of trying to force

24   me out of the company.

25   **Q.**   And do you see here, he writes, "You have changed the

1    discussion to one regarding current performance."  Do you see

2    that?

3    **A.**   Yes.

4    **Q.**   Did you believe that was true?

5    **A.**   No.

6    **Q.**   Why not?

7    **A.**   I had continuously tried to have discussions with him

8    about specific SMART goals that I could set up for 2018, and

9    the reason I responded with what I said was because he had a

10   belief that I was not doing those things.  So I wanted to

11   provide examples of the things that I currently was doing

12   that he had a belief that I wasn't.

13   **Q.**   You mentioned SMART goals.  Is SMART -- is that an

14   acronym for something?

15   **A.**   Yes.

16   **Q.**   How many of those that you can get right?

17   **A.**   I'm going to try.  So it's -- the goals should be

18   specific; they should be measure -- measurable; attainable;

19   they should be relevant; and they should be timely.

20   **Q.**   And the use of SMART goals, was that something you did or

21   was that something PPD did?

22   **A.**   That was something that we were instructed to do as part

23   of our HR training on setting goals, is to make SMART goals.

24   **Q.**   And prior to disclosing your disability, had Mr. Mekerri

25   worked with you in establishing goals that were compliant

1    with this SMART system?

2    **A.**   He definitely had worked with me to establish my goals

3    for the year, because he had to approve those.

4           I don't recall if the SMART goal system was in

5    place when I was hired.  I think that was something that was

6    implemented possibly in 2017.  I know they made some updates

7    to their performance management system, and there were

8    several trainings on that from HR in the form of Webex, in

9    the form of calls with Chad.  And so we were all required to

10   be trained on, you know, how to set goals, how to set SMART

11   goals, among other things.

12   **Q.**   Understood.  So looking at the section here, you'll see

13   Mr. Mekerri, he has a section that begins, "If it is helpful,

14   however, I will give you a couple of examples of issues that

15   I have noted (and raised to you) before."

16          Do you see that?

17   **A.**   Yes.

18   **Q.**   All right.  Let's dig into those a little bit.  So the

19   first one he has here, that's Gedeon Richter.  Do you see

20   that?

21   **A.**   Yes.

22   **Q.**   Okay.  And you'll see here he begins referencing an

23   executive summary that he had asked for from you.  Do you see

24   that?

25   **A.**   Yes.

1  **Q.**  And you'll see here that he says that you did not take

2  the lead on that.  Do you see that?

3  **A.**  I -- yes.

4  **Q.**  Okay.  Was that true?

5  **A.**  No.  I did that summary by myself, last minute, when

6  asked on a Friday night.  So I spent the whole weekend doing

7  it.  And then, of course, I ran it by others who were

8  involved in this investigation to get their input; and most

9  all of the input was very positive, because I'm extremely

10  meticulous and wanted to produce a clear, concise,

11  professional report.

12  **Q.**  Now, had you been the one who distributed that report

13  after it was done?

14  **A.**  I shared it with Hacene.  He only had criticisms of

15  certain parts that he asked that I change.  And then I asked,

16  "Okay.  Should I send this to Chris Fikry?" his boss.

17          And he said, "No, I -- I would prefer that Els

18  sends it" -- Els was the site head in Belgium -- because she

19  had been interacting more with him.  And I was a little upset

20  about that, because I worked very hard on that report.  And I

21  was very involved in this investigation, working very, very

22  closely with the team.  Yeah.

23  **Q.**  Let me show you Joint Exhibit 320.  And can you tell the

24  jury what this is?

25  **A.**  This is an email from Hacene to me about the executive

1    summary.

2    **Q.**   Okay.  This was the one that he -- he said you had not

3    taken the lead on?

4    **A.**   Yeah, this is the one where he said to let Els send it on

5    my behalf.

6    **Q.**   How did that make you feel that Mr. Mekerri subsequently

7    alleged that you had not taken the lead on that project?

8    **A.**   I was upset because I worked very hard on it, and I kind

9    of felt like I was being tested, you know, being thrown a

10   very complex report put together on a Friday night, which I

11   did with no complaint, and I did a very good job and got a

12   lot of positive feedback from the directors and QA.  And what

13   I got from Hacene was criticism on certain points and, oh, by

14   the way, have Els -- have it come from Els.  So, yeah, it was

15   upsetting.

16   **Q.**   Okay.  I'm going to direct you back to the email we were

17   looking at a moment ago.  So this is Joint Exhibit 301.  I'll

18   put that back up on the screen for you.

19           You'll see here he has -- he has a statement

20   concerning an issue involving GSK.  Do you see that?

21   **A.**   Yes.

22   **Q.**   Okay.  In the third sentence, he writes, "Apparently, you

23   claim you were not informed that some samples were discarded

24   by mistake, which impacted the client."  Do you see that?

25   **A.**   Yes.

1   **Q.**   Okay.  Did you believe that was -- that was a fair

2   comment from Mr. Mekerri?

3   **A.**   This issue had just been raised and I was not contacted

4   yet by QA who responded right after saying, you know, we're

5   pulling things together.  At this point, an investigation had

6   not even started.

7         And the other thing was my direct report,

8   Dr. Reddy, was hired to be the, from a regulatory standpoint,

9   director of molecular diagnostics, because that's not an area

10  that I'm qualified to standard under our regulatory

11  standards.

12        I was surprised, felt kind of attacked by Hacene

13  directing this to me and not even including our director of

14  molecular diagnostics, who, from a regulatory standpoint,

15  would be the one that would address this with his team.  And,

16  yeah, I did ask to loop him in, and -- and they did a great

17  job.

18  **Q.**   In terms of the -- the time for this to come to your

19  attention, was there -- was there a standard process, so to

20  speak, based upon CAPA in terms of how that -- how that

21  information flowed?

22  **A.**   Yeah.  As part of the quality-management system -- and I

23  apologize.  This is five years ago for me.  But there's a

24  formal way that you document an event or an issue, and then

25  there's a series of steps that you follow and a series -- a

 1    specifically level of individuals that get involved for those

 2    areas and put in their documentation.  And it keeps going

 3    down through that CAPA process until ultimately it's reviewed

 4    by someone at the director level.

 5           For critical issues, that's when the senior leaders

 6    usually also get involved and will jump on calls with

 7    clients, discuss what happened, keep an open dialogue with

 8    them about what we're doing to resolve the issue, and then

 9    offer to present them with the CAPA report when it's

10    complete.

11    **Q.**  And Mr. Mekerri, he continues on, "At one point, I

12    learned there was a client meeting last week where the PPD

13    lab representative was a supervisor with very limited

14    experience with PPD."

15           Do you see that?

16    **A.**  Yes.

17    **Q.**  Was that true?

18    **A.**  He was our molecular supervisor who had a significant

19    amount of experience in molecular, which is why he was hired,

20    and was close to the issue that happened and so was able to

21    explain the details of what was going on.  He was not -- he

22    had not worked for a long time with PPD, but he definitely

23    knew his stuff when it came to molecular.  Yeah.  So, yeah,

24    that was not inappropriate to have him on the call.

25    **Q.**  And then you see that Mr. Mekerri continues after that,

1    he writes, "This is your job -- to handle these situations --

2    to lead the laboratory operation by integrating operational

3    processes, business development, research, and development

4    and quality assurance."

5         Do you see that?

6    **A.**   Yes.

7    **Q.**   Prior to your -- your disclosure of your disability,

8    had -- had Mr. Mekerri expressed that view that, whenever

9    there were any kind of lab problems, that you had to swoop in

10   and handle them yourself?

11   **A.**   No.

12        MS. MANDEL:  Objection.

13        THE COURT:  Overruled.

14   BY MR. HANNON:

15   **Q.**   Did you think that was a realistic expectation?

16   **A.**   No.

17   **Q.**   Did you respond to this email from Mr. Mekerri?

18   **A.**   I believe so.  I'm sorry; I don't recall.

19   **Q.**   No worries.

20        I'm going to show you exhibit Number -- joint

21   Exhibit Number 300.  Tell the jury what this is.

22   **A.**   This is -- this is, in fact, a follow-up email from me to

23   Hacene after I received that previous email from him.

24   **Q.**   Okay.  And in the third and fourth sentence of that first

25   paragraph, you write, "As such, I was not trying to change

1    the conversation.  I just wanted to make sure we were on the

2    same page as to what the issues are and what I am doing to

3    address them.  I thought that would be the most productive

4    way of discussing goals and ensuring that I'm addressing

5    whatever concerns you have."

6            Do you see that?

7    **A.**  Yes.

8    **Q.**  Was that true?

9    **A.**  Yes.

10   **Q.**  Okay.  And then in your note, you go on to -- to address

11   the examples he provided regarding Gedeon Richter and GSK.

12   Do you see that?

13   **A.**  Yes.

14   **Q.**  Okay.  And you can just take a moment and just review --

15   you don't need to read it out loud, but if you can just

16   review the information there that you wrote regarding Gedeon

17   Richter and let us know if that is all accurate.

18   **A.**  Yes, that's accurate.

19   **Q.**  And particularly that last sentence, "This is the same

20   type of teamwork that I have employed throughout my tenure as

21   executive director."

22           Was that true?

23   **A.**  Yes.

24   **Q.**  Prior to disclosing your disability, had Mr. Mekerri ever

25   criticized you for utilizing that type of teamwork?

1    **A.**  No.

2    **Q.**  Directing your attention to the next paragraph, again,

3    I'm not going to read it out loud -- you can just read that

4    to yourself -- but my question is if that's accurate.

5    **A.**  That's accurate.

6    **Q.**  I just have one more for you, the paragraph that follows.

7    If you can read that to yourself and let me know if that's

8    accurate as well.

9    **A.**  Yes, that's accurate.

10   **Q.**  Subsequent to the -- to the back-and-forth we've seen in

11   these emails, did Mr. Mekerri provide you any sort of

12   substantive response to what you've written here?

13   **A.**  Can you repeat that or rephrase it?  I'm not quite sure I

14   understood.

15   **Q.**  Let me ask you a question in English this time.  In terms

16   of the dialogue surrounding the changes he wanted for your

17   goals, did he ever provide you further clarification in terms

18   of what he wanted you to do or how he expected you to achieve

19   that?

20   **A.**  No.

21   **Q.**  And can you describe for the jury what, if any, position

22   Mr. Mekerri took regarding that conversation?

23   **A.**  He said that was my responsibility, which is what I had

24   tried to do by creating SMART goals.

25   **Q.**  Did Mr. Mekerri ever tell you that he -- that his

1  expectation wasn't that you were going to eliminate all lab

2  issues?

3  **A.**  I don't recall.

4  **Q.**  Was it -- was it your understanding up until the time

5  that you -- that you stopped working at PPD that it was

6  Mr. Mekerri's expectation that, to succeed in your role, you

7  were going to have to eliminate all lab issues?

8  **A.**  Yes.

9  **Q.**  How did -- how did this dialogue with Mr. Mekerri

10  concerning his expectations impact your health?

11  **A.**  My health deteriorated rapidly.  I wasn't able to sleep.

12  I was having multiple panic attacks a day.  I was taking an

13  antidepressant because I was afraid for my family's survival.

14  I was afraid I was going to lose my job.  I was also taking

15  benzodiazepines prescribed by my doctor.  She prescribed

16  them, a microdose, to try to keep me stable throughout the

17  day.

18       I -- I stopped leaving the house.  I was afraid to

19  leave the house.  So I worked with my doctor to gradually try

20  to just like go to the mailbox and take small steps.

21       I had multiple panic attacks every day.  I would

22  wake up in the middle of the night having panic attacks and

23  just have to breathe through them, and as far as those, you

24  know, it was sweating, shaking, rapid heart rate, rapid

25  breathing.

1          I also had significant GI distress, which, for me

2    especially, is embarrassing as someone who has social anxiety

3    disorder.  I was losing weight.  My doctor was becoming

4    concerned about that.

5          And I -- I felt suicidal.  I didn't want to live

6    anymore.  I felt like I let my family down and I just felt

7    like a failure.  I felt like the world would be better off

8    without me, and I just could not endure that kind of trauma

9    repeatedly.  I just could not -- I couldn't -- I couldn't

10   endure it anymore.

11         And my doctor was concerned for my safety and so

12   she recommended that I take an immediate leave and enter a

13   partial hospitalization program.  So that's what I did, but I

14   mostly just felt really like I let my family down because I

15   was their sole provider, and I didn't know how we were going

16   to survive.

17         And I had worked so hard at PPD, putting in extra

18   hours, just -- you know, I really liked my job.  And I just

19   felt like I was just thrown out and how are we going to

20   survive?  How am I going to -- how am I going to get food for

21   my child to eat?  How are we going to pay the mortgage?

22   She's going to have to leave the school that she finally felt

23   safe at and wasn't bullied and made some friends, and I had

24   to explain that I could no longer pay for that.

25         I'm -- I'm -- I'm still really struggling and I

1   just don't want to risk ever going through this kind of

2   trauma again.  But I don't -- I don't want to hurt my family

3   and I feel stuck because I feel trapped that I have to carry

4   this pain and the trauma, but I don't want to hurt my family.

5          And I spoke to my therapist and he said it's really

6   hard when you're still in the middle of the trauma; and I've

7   been in the middle of the trauma for over five years, just

8   constantly not knowing what's going to happen to us.  And,

9   you know, hearing about people getting shot and stabbed and

10  raped on the streets and -- like, I shouldn't have brought a

11  child in this world if I couldn't protect them.

12         And if it were just me, I would probably just take

13  my life because, like, the pain is, like, too much for me.

14  And I just don't want to hurt my family.

15  **Q.**  Doctor, had you ever felt that way prior to disclosing

16  your disability?

17  **A.**  No.

18  **Q.**  You mentioned the partial hospitalization.  Do you recall

19  when that was?

20  **A.**  Yeah.  That was in July of 2018, after I went on medical

21  leave.

22  **Q.**  And do you recall when you had gone on the medical leave?

23  **A.**  I believe it was June 3rd, 2018.

24  **Q.**  Was there a reason between the gap in time between the

25  medical leave and when you did the hospitalization, the

1   partial hospitalization program?

2   **A.**   It was based on when they had an opening for the

3   particular program that my doctor recommended that I enter.

4   **Q.**   Okay.  I -- sorry.  I need to back up a little bit just

5   to cover a couple of additional things here that I don't want

6   to leave out.

7        So before you -- before you took your leave from

8   PPD, do you recall communicating to anyone at PPD's human

9   resources your concerns about the way you were being treated

10  by Mr. Mekerri?

11  **A.**   Yes.  I contacted our director of HR, Chad St. John.

12  **Q.**   Okay.  And I want to show you Joint Exhibit Number 21.

13  These are handwritten notes again.  I'm just going to show

14  you the page for reference here.  It has the number, on the

15  bottom right-hand corner, Menninger1178.  Do you see that?

16  **A.**   Yes.

17  **Q.**   Okay.  And there's no date on that, but directing your

18  attention here to the section that begins, "I kept trying to

19  steer the discussion back."

20        Do you see that?

21  **A.**   Yes.

22  **Q.**   Do you have a recollection of -- of what these notes

23  reflect?  Meaning --

24  **A.**   Yes.

25  **Q.**   -- what the conversation with a particular person, a

1   particular place?

2   **A.**   I believe it was with Chad, and it was around, you

3   know -- I just kept asking can -- can we talk about the

4   specific tasks that you would like me to perform going

5   forward with the change that Hacene wanted to make to my

6   role?

7           And they just wouldn't tell me.  They -- they just

8   kept referring me to my performance -- or my job description

9   and twisting my doctor's words and --

10   **Q.**   I'll direct your attention to a little bit ahead in this

11   note here, so the page with the number 1180 on it, and I want

12   to direct your attention to the section here.  Can you read

13   what that says?

14   **A.**   "I felt targeted by Hacene after disclosing my

15   disability."

16   **Q.**   And did you recall indicating to Mr. St. John during the

17   course of this meeting how that -- how that targeting was

18   impacting you?

19   **A.**   Yeah -- yes.  I stated I'm not doing well as a result of

20   what's transpired since I disclosed my -- my disability.

21   **Q.**   And if you look at the bottom here, can you tell us what

22   that says?

23   **A.**   I -- I restated that I can perform all of the essential

24   functions of my job with or without accommodation.

25   **Q.**   Was -- and did you believe that to be true?

1  **A.**  Yes.

2  **Q.**  And I'm flipping ahead a little bit here.  So this is the

3  page 1182, in the bottom right-hand corner.  And -- I'm

4  sorry.  One more page -- two more pages ahead.

5          So this is page 1184 of Exhibit 21.  And I want to

6  direct your attention to what you wrote at the top of the

7  page here.  Can you tell us what that says?

8  **A.**  Yes.  I -- I also mentioned that I was concerned about

9  confidentiality and asked if anyone other than Chad, Hacene,

10  and Deb knew about my disability.  And Chad said that he had

11  not disclosed to others and that that would be a violation.

12  **Q.**  When you asked that question, did you -- did you have any

13  suspicion that other people had been told?

14  **A.**  I did have that suspicion.

15  **Q.**  Why?

16  **A.**  I felt like I was being treated differently by other

17  colleagues and it made me wonder if they -- like, who knew

18  what, what was happening.

19  **Q.**  But Mr. St. John assured that that hadn't been disclosed,

20  right?

21  **A.**  Yes.  And he -- he was adamant.  He said that would be a

22  violation.

23  **Q.**  I'm going to direct your attention to Joint Exhibit 174.

24  Do you see here at the top, this is an email from Chad

25  St. John to Chris Clendening on February 14, 2018?  Do you

1    see that?

2    **A.**   Yes.

3    **Q.**   So this was before the February 28th meeting you

4    described earlier, right?

5    **A.**   Yes.

6    **Q.**   Was this also before the discussion with -- you had with

7    St. -- that you had with Mr. St. John where he assured you

8    that it hadn't been disclosed to others?

9    **A.**   Yes.

10   **Q.**   Okay.  Who was Mr. St. John emailing here?

11   **A.**   One of my peers.  Chris Clendening was ED overseeing

12   project management and another department that originally was

13   called "tech ops," and they changed the name.  I don't

14   remember what it is, but it is basically where they set up

15   all of the initial parameters for a clinical trial study that

16   we're going to perform.

17   **Q.**   Is Mr. Clendening, is he a medical doctor, to your

18   knowledge?

19   **A.**   No.

20   **Q.**   Okay.  And if we look at the attachment here, from the

21   third page, do you recognize this?

22   **A.**   Yes.

23   **Q.**   What is it?

24   **A.**   This is the education that my doctor provided to Chad.

25   **Q.**   And did that include the accommodations that she was

1    proposing?

2    **A.**  Yes.

3    **Q.**  Besides the meeting notes that we just looked at, do you

4    recall sharing with Mr. St. John in writing that you had

5    concerns that Mr. Mekerri was targeting you?

6    **A.**  Yes.

7    **Q.**  Okay.  And we're going to look at that.  That's going to

8    be Joint Exhibit Number 261.  And so there's two emails on

9    the page.  I want to look at the one on the bottom half.  And

10   is this an email from you to Mr. St. John on April 17, 2018?

11   **A.**  Yes.

12   **Q.**  Okay.  And you reference -- sorry.  You begin, "Your note

13   below does not provide any clarification."

14           Do you see that?

15   **A.**  Yes.

16   **Q.**  Do you know what clarification you're referring to there?

17   **A.**  Clarification about the specific tasks that Hacene wanted

18   to -- the changes he wanted to make to my role.

19   **Q.**  And in your middle paragraph here, you mention

20   Mr. Mekerri targeting you; is that right?

21   **A.**  Yes.

22   **Q.**  Okay.  And if we can look at the last sentence, you

23   write, "I don't want to assume the worst, but it looks like

24   he's trying to build a case against me -- like you previously

25   coached us to do when dealing with a 'problem' employee."

1        Do you see that?

2   **A.**  Yes.

3   **Q.**  What does that refer to?

4   **A.**  Chad -- Chad would coach us as leaders -- for example,

5   one of my direct reports had issues, and so he coached me on

6   documenting and following our process of going on a

7   performance improvement plan, which was a plan that you

8   developed with the employee to try to resolve the issues.

9        And, yeah, so Chad used to coach us on, you know,

10  you've got to document and document, document, document.

11  **Q.**  And was the advice to document, document, document, was

12  that for high-performing employees?

13  **A.**  No.  That was for problem employees.  I mean, you also --

14  he also emphasized that you need to document as part of our

15  performance review process on those forms; but in this

16  context, it was if someone is a problem employee, you need to

17  document what -- what you're observing, what's happening.

18  You need to have evidence.

19  **Q.**  Evidence for what?

20  **A.**  Evidence for putting them on a performance improvement

21  plan and, ultimately, terminating their employment if -- if

22  they don't improve.

23  **Q.**  I want to direct your attention to the top of that -- on

24  that exhibit.  You see Mr. St. John forwards your email to

25  Deborah Ballweg.  Do you see that?

1   **A.**   Yes.

2   **Q.**   Okay.  And that's Ms. Ballweg sitting in the chair to

3   your left?

4   **A.**   Yes.

5   **Q.**   Okay.  Were you at some point contacted by Ms. Ballweg in

6   connection with this email?

7   **A.**   Yes.

8   **Q.**   Okay.  And what do you recall about -- about that?

9   **A.**   I recall that, after I disclosed to Chad my complaints

10  about Hacene targeting me and excluding me from hiring

11  individuals who would report to me, and some other matters,

12  after disclosing my disability, he denied it, but he said he

13  would have someone else from HR perform an investigation that

14  would be fair and impartial.

15  **Q.**   And was it your understanding that Ms. Ballweg was the

16  person who was going to conduct that fair and impartial

17  investigation for PPD?

18  **A.**   That's what I eventually learned.

19  **Q.**   Okay.  And who did you learn that from?

20  **A.**   I don't recall who told me, but I think Deb and I had a

21  call so that I could, I guess, communicate what had been

22  transpiring since I disclosed my disability.

23  **Q.**   Okay.  And when you -- when you spoke with Ms. Ballweg,

24  did -- did you tell her about everything that you had been

25  experiencing?

1  **A.**  It probably didn't include everything, but I tried to

2  tell her the core things that were going on.

3  **Q.**  And by the core things, what are you referring to?

4  **A.**  I -- I was being shut out of the hiring and

5  decision-making process for employees that would eventually

6  report to me.  I was being blamed for issues before there was

7  even any investigation performed and called out in front of

8  my peers and had HR copied on those emails, even though that

9  was never usually done, because HR was not involved in our

10  operations issues.

11        There were a couple of occasions where Hacene

12  mentioned a sales meeting and said, "Oh, I'll forward the

13  invite.  You don't go to that one?"

14        I said, "No.  I didn't even know it existed."

15        And he said, "Okay.  I'll forward it to you."  So

16  on two different occasions, he said that, and so I

17  communicated to Deb that I never received that.

18        I'm trying to remember, and I'm blanking right now

19  of -- I know there were more issues that I communicated.

20  It's hard to remember everything without my notes and I'm

21  pretty -- yeah.

22  **Q.**  No worries.

23        Did you communicate anything about your belief that

24  Mr. Mekerri was targeting you?

25  **A.**  Yes.  Yes.  Since that -- oh, the meeting.  I

1    communicated about the February 28th meeting where I thought

2    we were going to talk about potential creative ways we may

3    accommodate certain tasks that they had in mind for changing

4    my role.  And I communicated that, at the start of that

5    meeting, right at the start, Chad presented me with an exit

6    package option or a temporary consulting role.

7              But, of course, they didn't want me to leave right

8    away because they wanted to make sure they had somebody in

9    place who had the regulatory requirements that I had, which I

10   found insulting.  So I mentioned that.

11             I'm having a hard time.  I'm blanking.

12   **Q.**  No worries.  Let me ask the question this way.  When you

13   met with Ms. Ballweg to describe for her the treatment that

14   you'd received ever since disclosing your disability, did you

15   intentionally withhold any information from her?

16   **A.**  No.

17   **Q.**  Okay.  And did she ask you to provide any -- any

18   documentation surrounding the concerns that you had?

19   **A.**  Yes.

20   **Q.**  Okay.  And did you provide that to her?

21   **A.**  Yes.

22   **Q.**  Okay.  How many times did you speak with Ms. Ballweg?

23   **A.**  I believe it was three times.

24   **Q.**  Okay.  And in terms of the first two, am I right those

25   were essentially her asking you questions and getting

1  information?

2  **A.**   Yes.  I believe the first one was.  I think the second

3  one was kind of, like, a status of where we -- where they

4  were at with the investigation.  And then the third one was

5  the conclusion of the investigation.

6  **Q.**   Okay.  Do you recall when that -- when that third

7  discussion took place?

8  **A.**   I think that was late May.

9  **Q.**   Do you know where you were?

10  **A.**   I'm sorry; can you repeat that?

11  **Q.**   Do you know where you were when this conversation took

12  place?

13  **A.**   I was working in my home office.

14  **Q.**   And was this -- was this a planned call?

15  **A.**   I believe so.

16  **Q.**   Okay.  And -- and what do you remember about what

17  happened during that call?

18  **A.**   Deb communicated that she found no evidence of

19  discrimination or retaliation and I -- I just felt hopeless.

20  I felt like this was my last chance of trying to save my job,

21  protect my family, and that they were succeeding in trying to

22  force me out.

23  **Q.**   Why didn't you just quit?

24  **A.**   I couldn't quit.  I had to provide for my family and I

25  loved my job.  I felt like the purpose of what we were doing

1   was important and we were helping patients.  And it was in a

2   different way from how I was able to do that in a hospital

3   environment, but we were helping people.  I -- it gave me

4   purpose.  And so I liked -- I liked my job.

5          But, also, I was the sole provider for my family,

6   and that was an intentional decision that we made when our

7   child was born so that my husband could be a stay-at-home

8   dad.  He -- he's an engineer and software developer and so he

9   does a lot of stuff on computers anyway.  And so a lot of the

10  stuff he wanted to do, he was able to do from home.

11         And he really likes -- he loves children, so --

12  he's a great dad.  And he wanted me to pursue my career

13  because I had been working so hard up to this point to become

14  a clinical pathologist.

15  **Q.**  Did you take pride in your job?

16  **A.**  I did.  I worked really hard.  Very hard.  I always would

17  put in extra hours and work on weekends.  And, you know, I'm

18  not the type of person who is just going to, like, coast.

19  That's not my personality.  I -- I want to do the best job I

20  can.

21         And I had -- I kind of have a reputation for having

22  expectations of raising the bar on quality and compliance,

23  like, we're not cutting corners.  And people knew that about

24  me, because I felt like this is extremely important.  This

25  specimen is somebody's life and we need to treat it like it's

1    a person.

2    **Q.**   Since you left PPD, have you returned to work?

3    **A.**   No.

4    **Q.**   Why not?

5    **A.**   I'm -- I'm still -- I'm still struggling.  I'm -- my

6    health is getting worse.  I was diagnosed with PTSD.  I have

7    some okay days, but I have a lot of nightmares.  I have a lot

8    of fear.  I have a lot of lack of trust.  I can't imagine

9    putting myself in a situation where I would risk this

10   happening to me again.

11          I don't think my body has any more room for trauma

12   or pain, and I'm trying the best I can.  I've -- I've tried I

13   can't even tell you how many different medications.  I tried

14   medications together that ended up giving me a

15   life-threatening condition, and I then had to stop

16   immediately.

17          I've tried exercise.  I've -- I go to therapy every

18   week.  I've tried probably every benzodiazepine out there.

19   My doctors work closely with me to -- to try to help me get

20   better and -- and I'm still trying, but I'm in the middle of

21   the trauma.

22          And my therapist said -- he actually went and did

23   some research on people who have been, like, in sustained

24   trauma for long periods of time and said that it's really

25   hard to focus on healing when you're just trying to get

1    through the trauma.  So it's been a lot about just focus on

2    the present, just focus on getting through this day.  And so

3    I will set little, mini goals for myself for the next day and

4    just, like, okay, I made it through another day.  And maybe

5    I'm getting one step closer to this nightmare being over.

6            But I don't know if I'm going to be able to

7    experience happiness again.  I don't know what the statistics

8    are on that.  I -- I just want my family to be okay and

9    happy.  I just -- this is so unfair to my child.  And I

10   really just want -- I want them to have a happy life.

11           And I also want -- I've been trying to set the

12   example that it's not okay to be discriminated against or

13   retaliated against, no matter how big or powerful the company

14   or person may be.  It's not right.  And I'm trying to be

15   strong enough to set that example and she has been such an

16   inspiration to help me continue to fight.

17           But it has been hard.  It has been -- I mean,

18   there's days when I'm just curled up in the fetal position in

19   bed and I cannot get out of bed because of fear.  It's hard

20   to trust anyone.  I don't know who I can trust.  I feel like

21   everyone's out to hurt me, whether it's intentional or not.

22   And so I just don't want to even put myself in the position

23   where that might happen.

24   **Q.**  Let me pause you there.  You mentioned nightmares.

25   **A.**  Yes.

1    **Q.**  How, if at all, has your experience with PPD resulted in

2    literal nightmares, if at all?

3    **A.**  I have recurring frequent nightmares most every single

4    night, and the majority of them involve people I work with at

5    PPD.  And it always -- it's always a situation where I feel

6    trapped or I'm trying to hide or get away.  And at one point,

7    I -- I had a nightmare where I felt, in my nightmare, my

8    former boss was friends with Putin and I was being threatened

9    that if I don't drop this case, he's going to have Putin

10   poison me.  It's just bizarre things like that.

11            And then sometimes I'm just -- like now, I'm, like,

12   if I had a nightmare, at least I know I got some sleep,

13   because it's really hard to function when you can't sleep,

14   too.

15   **Q.**  What medications are you currently on?

16   **A.**  I'm currently taking fluoxetine, which the common name is

17   Prozac; clonazepam, which is -- is a benzodiazepine sedative,

18   I take that twice a day.

19            Lately, I've been having to take a lot of

20   Pedialyte, because I've been having a lot of GI distress, and

21   I've lost a lot of weight.

22   **Q.**  How much do you weigh today?

23   **A.**  I don't have a scale.  I think I'm probably close to

24   90 pounds.

25   **Q.**  And how much did you weigh at the time that you disclosed

1   your disability to PPD?

2   **A.**  I was probably around 120.

3   **Q.**  Do you believe that you're capable of working now given

4   your condition?

5   **A.**  I need to get through the trauma and focus on healing.

6   Right now, I am too traumatized to trust that this -- that I

7   won't get hurt like this again.  And I'm not sleeping and I'm

8   not able to go out of the house by myself.  Mason drives me

9   everywhere.  I will only go -- usually to doctors

10  appointments and occasionally we'll take Maya someplace, like

11  a conference that they're interested in.

12          But I will not go myself and I'm uncomfortable.  I

13  usually try to find a corner where I can just sit and, like,

14  work on a puzzle on my phone or something.  Otherwise, I

15  don't leave the house.

16          THE COURT:  I think we'll -- are you done -- I

17  don't want -- are you done with your answer?  I don't want

18  to --

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Do you have more, or are you

21  done?

22          MR. HANNON:  Very, very briefly, but obviously --

23  it's one o'clock, so --

24          THE COURT:  Fine.

25          All right.  So, ladies and gentlemen, it's

1    one o'clock.  We're going to break for the day.  Don't

2    discuss the case among yourselves.  Don't discuss with anyone

3    else.  Don't do any independent research.

4            I'll see you tomorrow morning we'll resume at

5    9 a.m. tomorrow again, 9:00 to 1:00.  Thank you for your

6    attention.  Have a good day.

7            All rise for the jury.

8            (Jury not present.)

9            THE COURT:  You can all be seated.

10           Anything to discuss before we break?

11           MS. MANDEL:  Not from our side, Your Honor.

12           THE COURT:  See you tomorrow at 8:30.

13           Just think about where we are in terms of

14   schedule -- I'm not ready to update the jury, obviously, on

15   the schedule, but I just remind you all to think about that,

16   see where we are, hopefully stay on track.

17           All right.  Have a good afternoon.  Thank you very

18   much.  See you tomorrow.

19           (Court in recess at 1:02 p.m.)

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 21st day of March, 2023.

/s/ ROBERT W. PASCHAL

_____
Robert W. Paschal, CRR, RMR
Official Court Reporter