1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3     _____

4     LISA MENNINGER,

5          Plaintiff,                        Civil Action No.
                                             1:19-cv-11441-LTS
6          v.

7     PPD DEVELOPMENT, L.P.,

8          Defendant.

9     _____

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                              JURY TRIAL
13                              Day 3

14

15
                        Wednesday, March 22, 2023
16                            8:30 a.m.

17

18

19

20
      John J. Moakley United States Courthouse
21    Courtroom No. 13
      One Courthouse Way
22    Boston, Massachusetts

23
      Rachel M. Lopez, CRR
24    Official Court Reporter
      raeufp@gmail.com
25

1                    **A P P E A R A N C E S**

2

    On behalf of the Plaintiff:
3
        HARTLEY MICHON ROBB HANNON, LLP
4       BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
        155 Seaport Boulevard
5       2nd Floor
        Boston, Massachusetts  02210
6       (617) 723-8000
        phannon@hmrhlaw.com
7       hwatson@hmrhlaw.com

8

9   On behalf of the Defendant:

10      OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11      One Boston Place
        Suite 3500
12      Boston, Massachusetts  02108
        (617) 994-5700
13      rachel.mandel@ogletreedeakins.com
        patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## TABLE OF CONTENTS

## TRIAL WITNESSES

On behalf of the Government:                                    Page

 LISA A. MENNINGER

          By Mr. Hannon                                    13

          By Ms. Mandel                                    31


## EXHIBIT


None

1                        **P R O C E E D I N G S**

2                   (In open court.)

3                   THE DEPUTY CLERK:  The United States District Court

4       for the District of Massachusetts is now in session, the

5       Honorable Leo T. Sorokin presiding.

6                   THE COURT:  Please be seated.

7                   THE DEPUTY CLERK:  Today is Wednesday, March 22,

8       2023, and we're on the record in civil case number 19-11441,

9       Lisa Menninger versus PPD development, LP.

10                  And would counsel please identify themselves for

11      the record.

12                  MR. HANNON:  Good morning.  Patrick Hannon and

13      Hampton Watson for the plaintiff.

14                  MS. MANDEL:  Good morning, Your Honor, Rachel

15      Mandel and Patrick Curran for defendant, PPD.

16                  THE COURT:  Good morning.  Okay.  Anything to

17      discuss?

18                  MR. HANNON:  Possibly.  I meant to ask opposing

19      counsel a question this morning, but I'll just raise it now,

20      and I apologize for not having raised it separately

21      beforehand.

22                  During the deposition of Dr. Menninger, an issue

23      came out concerning a prior arrest for driving under the

24      influence, which I don't think has any relevance and is not

25      in any way possibly admissible, but I just figured we should

```
 1    confirm that's not going to be raised during her
 2    cross-examination.
 3              MS. MANDEL:  Unless something were to come up
 4    during her direct, which would somehow...
 5              THE COURT:  So far has anything come up?
 6              MS. MANDEL:  Not so far, Your Honor.
 7              THE COURT:  Okay.
 8              MR. HANNON:  Not an issue then.
 9              THE COURT:  Okay.  Fine.  If you decide that you
10    think that it has -- you think it should come up, then raise
11    it at sidebar before you bring it up, and then we can talk
12    about it.
13              MS. MANDEL:  Understood, Your Honor.
14              THE COURT:  Sounds like it's a nonissue.
15              MR. HANNON:  Again, apologies for not clearing that
16    ahead of time.
17              THE COURT:  Anything else for you?
18              MR. HANNON:  No, Your Honor.
19              THE COURT:  Anything for you?
20              MS. MANDEL:  We just wanted to talk about
21    scheduling a little bit.  I know we had talked about whether
22    Monday the 27th would be a day that would make sense to go
23    the full day.  And I just -- I know that Mr. Hannon has let
24    us know that one of his witnesses is going to be testifying
25    on Monday that we didn't originally think would be.  That's
```

1    Dr. Kissimian.  We, ourselves, have between Monday and

2    Tuesday, that's when four of our out-of-town witnesses are

3    going to be here, so I just thought it would be a good time

4    to sort of discuss the planning of that.

5            THE COURT:  So you have how much longer?  Two

6    minutes with your client?

7            MR. HANNON:  23 minutes, Your Honor.

8            THE COURT:  23.

9            MR. HANNON:  23.

10           THE COURT:  Wow.  I'm going to count.

11           MR. HANNON:  I know.  Start the clock.

12           THE COURT:  Okay.  All right.  So then you'll be

13   done at 9:23.  And then you're going to cross her.  And then

14   I take that -- that will be more than 23 minutes, I'm

15   anticipating.

16           MS. MANDEL:  It is more than 23 minutes,

17   Your Honor.  I can't say to the minute exactly how long.

18           THE COURT:  All right.  No problem.  So after -- do

19   you expect we'll be done with her today?

20           MS. MANDEL:  I think there's a good possibility.

21   It's hard to say for sure, but it's a good possibility.

22           THE COURT:  Okay.  Okay.  So if we're done with her

23   today, then either way, who's next?

24           MR. HANNON:  Ideally, we'll be reading in

25   Mr. Mekerri's transcript.  I say ideally.  We're still trying

1   to work out some logistics in terms of getting our respective

2   support staff to get a sort of comprehensive transcript that

3   you can just read.  So assuming that they're able to tackle

4   that before we're done with Dr. Menninger, we'll do that.  If

5   we're not able to get that done, then I'd proceed with

6   Ms. Ballweg.

7           THE COURT:  Okay.  And how long will that be?

8           MR. HANNON:  Ms. Ballweg?

9           THE COURT:  For you?

10          MR. HANNON:  I would expect between an hour and two

11  hours.

12          THE COURT:  Okay.  So -- and then if you do

13  Mekerri, then tomorrow, whenever that's done, you would then

14  go to Ballweg?

15          MR. HANNON:  Correct.  And I expect the read on for

16  Mekerri is, likewise, between and hour and two hours.

17          THE COURT:  So then after Ms. Ballweg, who comes

18  next?

19          MR. HANNON:  After Ms. Ballweg, it will depend a

20  bit on --

21          THE COURT:  So Ms. Ballweg -- between Mekerri and

22  Ms. Ballweg, that takes all of tomorrow, if we -- if we

23  finish the plaintiff today.  If we finish the plaintiff at

24  1 o'clock, it sounds like that's probably all of tomorrow,

25  those two witnesses.

1          Does that sound right?

2          MS. MANDEL:  Sounds about right, Your Honor.

3          THE COURT:  Okay.  Then who comes next?

4          MR. HANNON:  So we've got three witnesses to fill

5    these last two days.  So one is going to be Dr. Summergrad,

6    our psychiatrist expert.  Another is going to be Mr. Jonas,

7    our economics expert, and then the last is going to be

8    Tonya Hart, the -- Dr. Menninger's sister.  The sister is

9    going to be short, between, you know, 30 minutes and an hour,

10   probably closer to 30 minutes.  Mr. Jonas --

11         THE COURT:  She's a damage witness, primarily?

12         MR. HANNON:  Correct.  Mr. Jonas should be brief,

13   as well.  Again, between 30 and an hour.  Dr. Summergrad I

14   expect will be a little bit longer, between like an hour and

15   two hours.

16         THE COURT:  So we won't -- even if we finish the

17   plaintiff today, we won't finish all of them on Friday?

18         MR. HANNON:  I think there's a very good chance

19   that Dr. Summergrad will have to carry over to next week.

20         THE COURT:  And then the only other witness you

21   have is the treating physician?

22         MR. HANNON:  The only other ones that I've got

23   control of.  Again, the folks they're producing are on our

24   list as well.

25         THE COURT:  Okay.  And how long is the treating

1    physician?

2              MR. HANNON:  Between like an hour and two hours,

3    probably closer to an hour.

4              THE COURT:  And then who else will you be calling?

5              MS. MANDEL:  Your Honor, we'll be calling Chris

6    Clendening, who's coming from Ohio, and Chris Fikry, who's

7    also coming out of town, and Chad St. John and Brent

8    McKinnon, all who are coming from out of town.  And then we

9    have our economic expert and our psychiatric expert.

10             THE COURT:  How long for each of the four of them

11   on the direct?

12             MS. MANDEL:  I would say for Chris Clendening and

13   Chris Fikry, our questioning is probably about an hour each.

14   A little hard to say, but about an hour each.  Chad St. John,

15   somewhere between one and two hours.  And Brent McKinnon,

16   somewhere between 30 minutes and an hour.

17             THE COURT:  Okay.  And you're equivalent with them?

18             MR. HANNON:  Less on each of those.

19             THE COURT:  Okay.  So that's a day and a half.  A

20   day for the direct, half a day.  Something like that.

21             And then you have two experts?

22             MS. MANDEL:  We have two experts, Your Honor.

23             THE COURT:  So we just -- it sounds like we just

24   finish in time.

25             MS. MANDEL:  Your Honor, just one more thing.

1    There's another deposition transcript, as well, which is for

2    Dr. Menninger's husband.  It's certainly much shorter.  The

3    entire transcript is much shorter than Mr. Mekerri's, so by

4    definition, it can't take as long, but we haven't slotted

5    that in, either.

6                MR. HANNON:  I forget to mention that, as well, but

7    it will be brief.

8                THE COURT:  So in terms of circling back to the

9    original question, which was what -- afternoon, that's really

10   what you're raising, I think.

11               MS. MANDEL:  That's right.  And I know that we --

12               THE COURT:  You talked about -- putting aside what

13   I told the jury, what do you think makes the most sense?

14               MS. MANDEL:  Well, I -- you know, being

15   conservative about the timing and given that things this week

16   so far have taken a little longer than initially anticipated,

17   my inclination would be to say that Monday going the full day

18   would make sense so that we can all keep our commitment to

19   the jury.  That also would -- everyone else is coming in from

20   out of town -- not everyone, but all the people next week are

21   coming in from out of town, so it also seems most respectful

22   to their schedules to us to sort of --

23               THE COURT:  I don't have a problem going Monday all

24   day.  I have told the jury that they should anticipate that.

25               MS. MANDEL:  The other thing, Your Honor, is that

1    it is a long day, right, to sit and listen to testimony until

2    4 o'clock, and so we can sort of -- we may end a bit before

3    4 o'clock on Monday, but just to have the afternoon, I think,

4    would be useful.

5           THE COURT:  Right.  Okay.  I think that, given what

6    you're telling me about the schedule and where we are, I

7    think that makes sense.  I think probably what I'll do is

8    tell them at the end of today that -- well, I'll check with

9    you at the break, but I think what I'm planning to say to

10   them, unless you tell me to do it this way -- unless you tell

11   me to do something different at the break, what I'm going to

12   tell them at the end of the day is tomorrow -- we are on

13   track.  We promised to get you the case by next Friday.

14   We're on track for that, we so far anticipate, you know, it's

15   going along, and we think that's correct.  Tomorrow will be

16   9:00 to 1:00, like I told you, Friday will be 9:00 to 1:00,

17   like I told you.  Monday, as I told you, we're going to sit

18   in the afternoon.  We have some --

19           Some of the out-of-town witnesses will be

20   testifying Monday?

21           MS. MANDEL:  Yes.

22           THE COURT:  All right.  So I'll say some of them --

23   we have some out-of-town witnesses.  It makes it easier, so

24   we go 9:00 to 1:00, and 2:00 to 4:00 on Monday.  We should

25   expect that.  And then every other day 9:00 to 1:00 until you

1    get the case, and just give them an update like that, I'm

2    sure they'll like that.  Okay.  That's fine.

3            Anything else?

4            MR. HANNON:  Nothing here.

5            MS. MANDEL:  Nothing here.  Thank you.

6            THE COURT:  Okay.  Then I'll come back out at a

7    couple minutes before 9:00.  See you then.

8            (Court in recess at 8:41 a.m.

9            and reconvened at 9:01 a.m.)

10           THE COURT:  All right.  Go get the jury.

11           MR. HANNON:  Can I have Dr. Menninger get on the

12   stand?

13           THE COURT:  Yes.  Go right ahead.

14           (The jury enters the courtroom.)

15           THE COURT:  All right.  Good morning, ladies and

16   gentlemen.  I trust everyone followed my instruction, don't

17   discuss the case among yourselves, don't does it with anyone

18   else, and no independent research.  Good.

19           All right.  So we resume.  Dr. Menninger's on the

20   witness stand, so we'll resume with her direct examination by

21   Mr. Hannon.

22           And I remind you, you remain under oath.

23           Go ahead.

24           MR. HANNON:  Thank you, Your Honor.

25                          **LISA A. MENNINGER**

1    having been previously duly sworn, testified as follows:

2    **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

3    BY MR. HANNON:

4    **Q.**  Dr. Menninger, while you were employed at PPD, how were

5    you compensated?

6    **A.**  I had an annual salary and annual bonus, and I had stock

7    options, stock.  And sometimes we would have additional spot

8    bonuses, depending on how the company was doing.

9    **Q.**  And did you have other benefits, like health insurance

10   and things like that?

11   **A.**  Yes.  For my entire family.

12   **Q.**  Okay.  And what was for your entire family?  The health

13   insurance?

14   **A.**  Yes.

15       MR. HANNON:  I'd like to direct your attention to

16   Joint Exhibit Number 14.  And I'd like to show this to the

17   jury.

18   BY MR. HANNON:

19   **Q.**  And Dr. Menninger, can you tell the jury what this is?

20   **A.**  This is the compensation statement for 2018.

21   **Q.**  Okay.  And looking at the top right-hand corner here,

22   does this show what your base salary was going to be,

23   effective April 1, 2018?

24   **A.**  Yes.

25   **Q.**  And to the best of your recollection, is that number

1    there, the $270,581.78, is that accurate?

2    **A.**  Yes.

3    **Q.**  Okay.  And this shows that you're -- am I right that this

4    shows that your salary the prior year had been lower?

5    **A.**  Yes.

6    **Q.**  And was it -- was it typical during your employment at

7    PPD to get annual raises?

8    **A.**  Yes.

9    **Q.**  And then I think you mentioned a moment ago that part of

10   your compensation included an annual bonus; is that right?

11   **A.**  Yes.

12   **Q.**  Okay.  Did you receive a bonus every year that you worked

13   at PPD?

14   **A.**  Yes.

15   **Q.**  And does this document accurately reflect the bonus that

16   you received for your work in 2017?

17   **A.**  Yes.

18   **Q.**  And then you also mentioned spot bonuses.  Under what

19   circumstances during your employment at PPD did you earn spot

20   bonuses?

21   **A.**  There were, I believe, occasional times in 2016 where the

22   company gave certain executives additional bonuses, I think

23   based on how the company was performing.

24            I was also given an additional salary increase at

25   the end of 2015, after I started.

1    **Q.**  Okay.  I'm now going to direct your attention to Joint

2    Exhibit 33.  And does this document reflect the stock options

3    that you held at the time of your termination?

4    **A.**  Yes.

5    **Q.**  Okay.  And were you able to keep those options after you

6    were terminated?

7    **A.**  No, I was not.

8    **Q.**  Okay.  Now, the document here -- look in the far right

9    here.  It shows a cost to exercise.  Was it your

10    understanding that's what it would have cost you at the time

11    of your separation in order to exercise your stock options?

12    **A.**  Yes.

13    **Q.**  And did you?

14    **A.**  No.  I -- we couldn't afford to.

15    **Q.**  Okay.  During the course of your employment, were any

16    representations made to you by PPD concerning the -- the

17    value of your stock options?

18    **A.**  Yes.  It was recorded.

19    **Q.**  And did they -- did they make any representations to you

20    in terms of under what circumstances those options would

21    become valuable?

22    **A.**  Yes.  If the company underwent a restructuring, or if

23    they went from private to public, then those stock options

24    would be available to be cashed out for us, which happened

25    under one circumstance while I was working there.

1    **Q.**  So there had been a prior restructuring at some point

2    during your term at PPD; is that right?

3    **A.**  That's correct.

4    **Q.**  Okay.  And -- but with respect to the options that you

5    held at the time of your termination, do you know if,

6    subsequent to your termination, PPD went public?

7    **A.**  Yes, they did.

8    **Q.**  Okay.  And have you seen any press releases issued by PPD

9    concerning any acquisition of the company?

10   **A.**  Yes, I have.

11   **Q.**  Okay.  And based upon those -- that press release, how

12   was PPD acquired?

13   **A.**  They were acquired by Thermo Fisher Scientific.

14   **Q.**  When?

15   **A.**  I believe it was the end of 2020.

16   **Q.**  Okay.  And did that press release indicate how much PPD

17   was acquired for?

18   **A.**  Yes.

19   **Q.**  How much?

20   **A.**  For 17.4 billion.

21   **Q.**  I'm now going to show you Joint Exhibit 59.  So is this

22   your performance review for 2017?

23   **A.**  Yes.

24   **Q.**  Okay.  Now, you recall testifying previously that you had

25   expected to be talking about your performance review at the

1    end of 2017, in that 360 meeting; is that right?

2    **A.**  Yes.

3    **Q.**  Okay.  Were you actually provided your performance review

4    at that time?

5    **A.**  No.

6    **Q.**  Okay.  Did Mr. Mekerri ever actually provide you your

7    performance review?

8    **A.**  Not for 2017.

9    **Q.**  At some point in time, did you see this performance

10   review?

11   **A.**  Yes.

12   **Q.**  And when did you see it?

13   **A.**  I saw it late January 2018, once Chad told me that it was

14   available in the system for me to view.

15   **Q.**  And was that after you had disclosed your disability to

16   PPD?

17   **A.**  Yes.

18   **Q.**  I'm going to direct your attention to the -- just to the

19   second to the last page of the exhibit.  And do you see here,

20   under, "Overall performance," it reflects an overall rating

21   of "fully effective"?

22   **A.**  Yes.

23   **Q.**  Okay.  And is it your understand that was your rating for

24   the 2017 calendar year?

25   **A.**  Yes.

1    **Q.**   Now, there was some areas in which Mr. Mekerri had rated

2    you lower than fully effective; is that right?

3    **A.**   Yes.

4    **Q.**   So I'm showing you here the second page of the document,

5    and if you could see, there's a "Goal" here.  Could you tell

6    the jury what that refers to?

7    **A.**   Yes.  That was my goal to recruit and hire global

8    scientific technical directors at the Ph.D. or MD level.  And

9    this was to address compliance gaps that we had in certain

10   areas.

11   **Q.**   And looking here, to the right side here, this was your

12   rating for the year, for that particular goal; is that right?

13   **A.**   Yes.

14   **Q.**   And the comment that you wrote there, is that -- is that

15   all accurate?

16   **A.**   Yes.

17   **Q.**   Okay.  And you mentioned here -- and I'll highlight it --

18   that there had been a time where one of the positions that

19   you were supposed to recruit for had been put on hold; is

20   that right?

21   **A.**   Yes.

22   **Q.**   Okay.  And who had put it on hold?

23   **A.**   I'm not sure.  Someone higher than my level.

24   **Q.**   Okay.

25   **A.**   I was never told specifically who.

1  **Q.**  Had Mr. Mekerri informed you that that role had been put

2  on hold?

3  **A.**  No.  I believe it was one of the recruiters.

4  **Q.**  Was Mr. Mekerri aware, to your knowledge, that that

5  position had been put on hold?

6  **A.**  Yes.

7  **Q.**  Was that something that you and he had spoken about?

8  **A.**  Yes.  I believe it came up during -- yes.  I asked him

9  about it, what the status was.  We, at that time, had an

10  excellent candidate, who I thought would be -- who we all

11  thought would be perfect for the role.  And so I continuously

12  asked about the status of that candidate.

13  **Q.**  One of the things you also cite here in your note, you

14  see there's a highlighted section, you note that "Feedback

15  from the recruitment team is that we are not competitive for

16  qualified candidates, based on salary and location."

17          Do you see that?

18  **A.**  Yes.

19  **Q.**  And what do you mean by that?

20  **A.**  There were other locations around the country that MD,

21  Ph.D. level scientists preferred to work.  And also, in those

22  locations, they paid higher salary.

23  **Q.**  Directing your attention to the third page of the

24  document.  You see here the goal at the top of the page, the

25  category being, "Enhanced commercial and operational

1  excellence."  Do you see that?

2  **A.**  Yes.

3  **Q.**  Okay.  And if I can direct your attention to the note

4  there from Mr. Mekerri.  Do you see that he

5  writes, "Validations complete.  Work with"?

6  **A.**  Yes.

7  **Q.**  Okay.  What was your reaction when you saw that?

8  **A.**  He had not performed my performance review.  It looked

9  like he stopped mid sentence.

10  **Q.**  Okay.  And if you look here at the goal below, do you see

11  he has -- he has no comments there?

12  **A.**  Yes.

13  **Q.**  And if we turn to the next page, the goal there, again,

14  he has no comments?

15  **A.**  Yes.

16  **Q.**  And then turning to the next page, do you see he has a --

17  he has an area in which he rated you, "Sometimes effective."

18           Do you see that?

19  **A.**  Yes.

20  **Q.**  And he provided no comments?

21  **A.**  Correct.

22  **Q.**  Did you ever ask Mr. Mekerri to give you the feedback

23  concerning his ratings for you in 2017?

24  **A.**  Yes.

25  **Q.**  And what did he say?

1    **A.**   He said he would schedule a meeting for us to discuss.

2    **Q.**   And did he?

3    **A.**   He did schedule a meeting.

4    **Q.**   And did you discuss?

5    **A.**   No.  He canceled it and said -- well, he said that he

6    would rather reschedule it for when I was on site, face to

7    face.

8    **Q.**   And when did you expect that would be?

9    **A.**   When I was on site, the same time I had the meeting --

10   let's see, when I was on site February 27th, I think, through

11   March 2nd.

12   **Q.**   And did the conversation happen while you were on site?

13   **A.**   No.

14   **Q.**   Prior to relocating to Massachusetts, you worked in the

15   same complex as the Highland Heights lab; is that right?

16   **A.**   Yes.

17   **Q.**   Was your work space physically located where the actual

18   testing was done?

19   **A.**   No.

20   **Q.**   Okay.  And are you familiar with an area of the lab known

21   as "The Pit"?

22   **A.**   Yes.  A little bit.  That was a term that was before my

23   time.

24   **Q.**   Okay.

25   **A.**   We did not refer to it as "The Pit" after I started.

1    **Q.**   Okay.  And what was your understanding as to what "The

2    Pit" referred to?

3    **A.**   The downstairs area, a certain -- yeah.

4            We were doing a lot of remodeling at the time and

5    so names were changing depending on the lab area.

6    **Q.**   Okay.  But in terms of the area where the actual testing

7    was done, did you on occasion visit that area?

8    **A.**   Yes.

9    **Q.**   Every day?

10   **A.**   No.

11   **Q.**   Why not?

12   **A.**   There -- there was no way I would have time.  I -- I had

13   many other responsibilities that I had to complete, and a lot

14   of technical documents to review, e-mails to respond to,

15   phone calls, meetings, things like that.

16   **Q.**   Do you have any estimate of how often you would visit the

17   actual area where the testing was conducted when you worked

18   in Highland Heights?

19   **A.**   I would try to go visit, you know, make face-to-face

20   contact with the lab staff at the bench on a weekly basis,

21   but that was not always possible depending on my schedule.

22   **Q.**   And when you visited that area, were you doing so in

23   order to supervise the work that was being done?

24   **A.**   No, that would be the supervisor's responsibility.

25   **Q.**   Okay.  When you relocated to Massachusetts, was there any

1    kind of discussion concerning an expected frequency of how

2    often you would travel back to Highland Heights?

3    **A.**   No.

4    **Q.**   Was it your understanding that that was left to your

5    discretion?

6    **A.**   Yes.  There was a -- a conversation about dividing my

7    time more equally amongst the four labs that I oversaw.

8    **Q.**   Was that a conversation you had with Mr. Mekerri?

9    **A.**   Yes.

10   **Q.**   Up until the time that you -- you left PPD -- well,

11   strike that.

12            Up until the time that you took your medical leave

13   from PPD, had anyone at PPD ever suggested to you that your

14   remote working status was a problem?

15   **A.**   No.

16   **Q.**   Had anyone ever suggested to you that your remote status

17   was causing issues with respect to your performance?

18   **A.**   No.

19   **Q.**   Had anyone suggested to you that your remote status was

20   causing any issues with respect to the lab?

21   **A.**   No.

22   **Q.**   I'm going to show you Joint Exhibit Number 180.

23            Actually, I'm not going to show you Exhibit 180.  I

24   lied.  Apologies.

25            Do you recall your testimony previously about the

1    proposed accommodations from Dr. Kissimian with respect to

2    those buckets Mr. Mekerri had identified?

3    **A.**  Yes.

4    **Q.**  And you reviewed the accommodations proposed by

5    Dr. Kissimian?

6    **A.**  Yes.

7    **Q.**  From your perspective and your experience performing your

8    role and working at PPD, did you believe that those

9    accommodations were reasonable?

10   **A.**  Yes, for the changes that Hacene was proposing broadly to

11   my role.

12   **Q.**  And based upon your observations and your experience,

13   were those all things that PPD could have done to help you do

14   your job?

15   **A.**  Yes.

16   **Q.**  Are you aware of any reason why PPD could not have

17   provided those accommodations to you?

18   **A.**  No.

19   **Q.**  Last -- last section here.  You talked yesterday about

20   the -- what you did after you took your medical leave from

21   PPD, and I just wanted to try to fill in a couple of blanks

22   for the jury, if we could.

23        So after you took your medical leave, you did

24   the -- the partial hospitalization program at Butler

25   Hospital; is that right?

1    **A.**  Yes.

2    **Q.**  Do you recall when you completed that?

3    **A.**  It was some time in July 2018.

4    **Q.**  And after you completed that, can you describe for the

5    jury what your health status was like then?

6    **A.**  I was -- I pretty much went back to my baseline of how I

7    was doing before I entered, because I was not doing well.

8    **Q.**  Had the program at Butler Hospital helped for at least

9    some period of time?

10   **A.**  Eventually.  At first I was pretty scared to go, because

11   of the group therapy nature of some of it.  But, yes, it felt

12   like a safe space that I could escape, you know, the pain of

13   what was going on in my life with PPD.

14   **Q.**  And after leaving the program at Butler Hospital, did you

15   continue your treatment with Dr. Kissimian?

16   **A.**  Yes.

17   **Q.**  And at some point in time did you move?

18   **A.**  Yes.

19   **Q.**  Why did you move?

20   **A.**  I had my office in -- I had an office in our basement of

21   our home, and it started to trigger severe panic, so I just

22   flat out refused to go back down in the basement.  My husband

23   brought my computer up to the bedroom.  Because of the

24   association I was making, it was very difficult for me.

25         Also, we can no longer afford to keep our child in

1    private school, and we were living in a more rural area of

2    Massachusetts, and we were concerned -- considering the

3    history with Maya and the challenges that they had in school

4    about sending -- sending them to public school.

5    **Q.**   Okay.  Where did you move to?

6    **A.**   We moved to Albuquerque, New Mexico.

7    **Q.**   And was there anything about Albuquerque in particular

8    that was -- you thought might be beneficial?

9    **A.**   Yeah.  I -- well, the cost of living was much cheaper and

10   we were really stressed about finances.  Also, I had spent a

11   year there as a grad student, and there's a lot of open

12   space.  There were a lot of places where I felt like I could

13   escape to on my own and be just surrounded by nature.  I

14   could go on a trail and just escape from the trauma of what

15   was going on.  That's all I recall.

16   **Q.**   That's fine.

17           And while you were in New Mexico, did you continue

18   your medical treatment?

19   **A.**   Yes.

20   **Q.**   And did you get a new doctor out there?

21   **A.**   Yes.

22   **Q.**   And who was that?

23   **A.**   Dr. Burbano.

24   **Q.**   And with Dr. Burbano, did you continue therapy sessions?

25   **A.**   Yes, I continued appointments.

1    **Q.**  Okay.  And you continued medications?

2    **A.**  Yes.

3    **Q.**  Particularly when you were treating with Dr. Burbano, was

4    there some sort of frequent efforts to sort of adjust your

5    medications?

6    **A.**  Yes.  She was concerned about the tolerance I could build

7    up with Prozac, and so added an additional medication in the

8    same class to try to prevent that from happening.

9    **Q.**  And the work you did with Dr. Burbano, in terms of the

10   medication and the sessions and being out in more of a

11   natural environment, did all of that solve your health

12   issues?

13   **A.**  No.  I had good days and I had bad days.  But, you know,

14   so sometimes I would be out on a trail by myself and, you

15   know, it just felt like an escape.  But then I'd come home

16   and I'd have days where I couldn't get out of bed.  So it

17   depended.

18   **Q.**  And what, if any, side effects did you suffer from the

19   medications you were receiving?

20   **A.**  When we added the additional medication to Prozac, I

21   believe it was a -- a newer medication.  I think it was

22   called VIIBRYD, I ended up getting what's called serotonin

23   syndrome, which can be life threatening, and that was pretty

24   scary.

25   **Q.**  Besides that situation, have you also incurred other side

1    effects from the various medications you've been on?

2    **A.**   Yes.   Depending on the medication.

3    **Q.**   Okay.   And what kinds of side effects have you had?

4    **A.**   If I was on a benzodiazepine or a sedative, I could be

5    off balance, so I have balance issues.   Depending on the dose

6    that you're taking, you shouldn't drive or operate heavy

7    machinery or anything.   It made me feel extremely tired.

8    Sometimes I had to take -- lay down and take naps in the

9    middle of the day.   Some of the medications caused insomnia,

10   so I had trouble falling asleep and sometimes that would take

11   hours.   Then when I would fall asleep, I'd frequently have

12   nightmares, wake up in the middle of the night, and have

13   trouble falling asleep again.   So it was just extremely

14   difficult to have a regular sleeping schedule.

15   **Q.**   And do any of those symptoms that you've described, do

16   they persist to this day?

17   **A.**   Yes.

18   **Q.**   Which ones?

19   **A.**   Definitely the sleeping disturbance and the nightmares.

20   Feeling off balance.   I'm still -- with the clonazepam, when

21   I take it during the daytime, I take it twice a day, I, you

22   know, sometimes will have to like stop myself and try to

23   catch my balance.   It makes me tired, hard to concentrate.

24   It's also difficult with benzodiazepines, because that's

25   another medication you can build up a tolerance to.   So it's

1    effective at a certain dose for a while, but then eventually

2    you have to start increasing the dose to have the same

3    effect.  And you can only do that so much and then it stops

4    working or becomes dangerous.  So there's careful management,

5    experimentation with the doctors on that.

6    **Q.**   Do you still live in New Mexico?

7    **A.**   No.  I currently live in Oregon.

8    **Q.**   And when did you move to Oregon?

9    **A.**   I moved to Oregon in the spring of 2020.

10   **Q.**   Why?

11   **A.**   My mom and my sister and brother-in-law all had moved to

12   Bend, and at that time, I felt like I needed closer family

13   support.  And the pandemic was starting and we just felt like

14   it would be better to be closer to family and it would be

15   helpful for us to have that support and not be so isolated.

16   **Q.**   And are you still receiving medical treatment in Oregon?

17   **A.**   Yes.

18   **Q.**   By who?

19   **A.**   I'm forgetting last names.  I see a therapist weekly,

20   Andrew, and I can't pronounce his last name.  And then I also

21   see a nurse practitioner remotely from Texas, who specializes

22   in mental health.  And she does my medication management.

23   **Q.**   You mentioned that, in connection with your medical leave

24   from PPD, that you had had some suicidal ideations; is that

25   right?

1    **A.**   Yes.

2    **Q.**   Have those recurred at all since your departure from PPD?

3    **A.**   Yes.

4    **Q.**   Any sense of how frequent?

5    **A.**   A lot.

6    **Q.**   When was the last one?  Go ahead.

7    **A.**   It happened a couple days before I came here.

8    **Q.**   And what were you thinking about?

9    **A.**   I just didn't think I could do this.  I wanted to kill

10   myself.

11   **Q.**   And did you actually think about anything you would do in

12   connection with taking your own life?

13   **A.**   I -- yeah.  I've always, in the back of my mind, had a

14   plan.

15   **Q.**   And what did that plan involve?

16   **A.**   It involved overdosing on medication.

17   **Q.**   Have you thought at all about what your suicide note

18   would say?

19   **A.**   I had a night recently, I think in February, where I was

20   struggling to go to sleep, and my brain just decided, okay,

21   let's -- what would a draft suicide note look like to my

22   child.  And that was very difficult, because I didn't want to

23   hurt -- I didn't want to hurt Maya, but I couldn't stop my

24   brain from, you know, playing that out.

25           MR. HANNON:  That's all I have, Your Honor.

1          THE COURT:  All right.  Thank you.

2          Cross-examination, Ms. Mandel.

3          So the way it works, ladies and gentlemen,

4   Mr. Hannon called the witness, he examines.  And then there

5   will be cross-examination by the other side.  And then

6   there's an optional second round, so then Mr. Hannon will get

7   the chance, if he wishes -- it's not required, but he can,

8   and it usually often happens, and the lawyer asks a second

9   set of questions, but it's not -- it's limited to what was

10  discussed on cross-examination.  So it gets narrower.  And

11  then Ms. Mandel will have a chance for recross.  And that,

12  too, is limited.  So if Mr. Hannon asked no questions -- had

13  no redirect, then there would be no recross.  And if he had

14  one question, then Ms. Mandel can ask follow-up, but only on

15  the topics that he asked about, that were implicated by that

16  one question.  So it gets narrowed.

17          Go ahead.

18          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19  BY MS. MANDEL:

20  **Q.**  Good morning, Dr. Menninger.

21  **A.**  Good morning.

22  **Q.**  As you might recall, I'm Rachel Mandel.  I'm going to ask

23  you some questions.

24          You may recall that you testified on Monday that

25  before you worked at PPD, you were a laboratory director at a

1    company called Clinical Reference Laboratory; is that right?

2    **A.**   Yes.

3    **Q.**   And let's pull up your resume.  Let's look at Exhibit 54.

4    This is the resume that you submitted to PPD when you applied

5    for employment there; is that right, Dr. Menninger?

6    **A.**   Yes.  This -- that's correct.

7    **Q.**   And the most recent professional experience that you had

8    listed was the job that you held at Clinical Reference Lab;

9    is that right?

10   **A.**   Yes.

11   **Q.**   And you began working there in 2010, right?

12   **A.**   Yes.

13   **Q.**   Right?  And then you moved over to PPD in 2015?

14   **A.**   Yes.

15   **Q.**   So fair to say it was five years at Clinical Reference

16   Lab?

17   **A.**   Yes.

18   **Q.**   And that company was in Kansas; is that right?

19   **A.**   Yes.

20   **Q.**   And then looking down a little bit farther on your

21   resume, it looks like before that you had been working as a

22   clinical pathologist at a hospital system in Kansas?

23   **A.**   Yes.

24   **Q.**   In your hospital position at St. Luke's Health System,

25   that's the one from 2006 to 2010, you were on the medical

```
 1   staff of seven hospitals; is that right?
 2   A.  Yes.
 3   Q.  And that was all part of one hospital system, but within
 4   that St. Luke's system; is that right?
 5   A.  Yes.
 6   Q.  So did you -- did you go to all seven hospitals on a
 7   regular basis?
 8   A.  No.
 9   Q.  Where did you do your work for that hospital system
10   position?
11   A.  We had -- we had four pathologists, so we divided the
12   different hospitals up.  And so there was the core main
13   hospital, Saint Luke's Hospital, in Kansas City, Missouri.
14   And then we kind of divided them up based on, like, where we
15   lived.  So I covered Saint Luke's South.  I also covered
16   Wright Memorial Hospital, which was more rural.  And then
17   Saint Luke's Cancer Institute, which was within Saint Luke's
18   Hospital.
19   Q.  Can you explain for us what type of work did you do at
20   Saint Luke's?
21   A.  At the main hospital, I primarily covered the hematology
22   section.  And then we would back each other up.  So if
23   somebody was on vacation, we might cover the blood bank or
24   chemistry, things like that.
25                I'm sorry, I just blanked and lost -- can you
```

1    repeat the rest of your --

2    **Q.**   And I know, this was a long time ago.  For those of us

3    who aren't pathologists, can you explain what you did

4    day-to-day working in the hospital system?

5    **A.**   Yes.  So okay, day-to-day, that was primarily what I was

6    doing in Saint Luke's Hospital.  Then I had one day that I

7    went to Saint Luke's South that I was the medical laboratory

8    director of, and I would visit with the director and

9    supervisors there, go over any technical documents that we

10   needed to have reviewed and signed off by the medical

11   director, any SOPs, things like that.  So I would do that

12   once a week.

13            And then I went to Wright Memorial Hospital, which

14   was more rural, once a month.  And similar activities to what

15   I just described.

16   **Q.**   Did any of this work involve meeting with patients?

17   **A.**   No.

18   **Q.**   Did you actually review and report on the pathology

19   results that came back into the labs?

20   **A.**   Yes.  In --

21   **Q.**   And did you -- I'm sorry, go ahead.

22   **A.**   It depended on the test.

23   **Q.**   Sure.  Who did you report those results to?

24   **A.**   To other doctors in the health system.

25   **Q.**   And it's safe to say that those doctors would report the

1   results to the patients?

2   **A.**   Um --

3   **Q.**   As far as you know?

4   **A.**   Yes.  Or they would chart them in their notes, you

5   know -- I didn't observe that, so I'm not sure exactly, but

6   usually they get charted in the notes and, yeah, those

7   doctors will act on the results as part of their treatment.

8   **Q.**   Understood.  And at some point, you left the hospital

9   system and you went to -- I think you called it CRL for

10  short?

11  **A.**   Yes.

12  **Q.**   And that was sort of a change in direction as a doctor,

13  to go into industry; is that right?

14  **A.**   Yes.  We had been providing some consulting work to them

15  prior and so we -- we already had a little bit of a

16  connection with them.

17  **Q.**   With CRL?

18  **A.**   Yes.

19  **Q.**   Was that -- going from a hospital system into the CRL

20  job, was that a more dependable schedule for you?

21  **A.**   It was.  I had just had a baby, and in the hospital

22  environment, I was on call 24 hours a day, seven days a week.

23  So that was challenging, having a baby.

24           I was told that CRL was looking for a permanent lab

25  director, and I thought that would be a better fit for my

1   family.

2   **Q.**   And that position was also in Kansas; is that right?

3   **A.**   Yes.

4   **Q.**   So you didn't have to relocate for that job?

5   **A.**   No.

6   **Q.**   And I believe you testified earlier this week that you

7   reported straight to the CEO of CRL?

8   **A.**   Yes.

9   **Q.**   Do you remember like approximately how big a company CRL

10  was at that time?

11  **A.**   Maybe -- I used to know this.  I want to -- I want to say

12  maybe like 10,000.  We had a -- we had a laboratory in the

13  UK, as well.  I can't remember specifically.

14  **Q.**   And you were the only medical director there; is that

15  right?  I'm sorry, I used the wrong term.  Laboratory

16  director.

17  **A.**   We hired somewhere else to cover the laboratory in the

18  UK.

19  **Q.**   So you were the only laboratory director in the United

20  States, then?

21  **A.**   We also had a Ph.D. director who was getting close to

22  retirement, but he was still working on staff and had

23  transferred a lot of his responsibilities to me as he was

24  kind of like winding down his career.

25  **Q.**   And looking at the responsibilities that you had at CRL,

1    the first one listed here, that first bullet point says you

2    provided directorship for the general and clinical trials

3    laboratories; is that right?

4    **A.**  Yes.

5    **Q.**  So were those multiple laboratories that you were

6    directing?

7    **A.**  Yes.  Those were two different laboratories at that time.

8    **Q.**  And the second bullet is, "Ensures an effective quality

9    management program."  So does that mean that you were

10   overseeing quality?

11   **A.**  I was not over seeing the quality assurance department,

12   but I was over seeing lab quality and ensuring that we were

13   meeting our regulatory standards.

14   **Q.**  So a sort of bigger picture overseeing?

15   **A.**  Yeah.

16          MS. MANDEL:  Thanks, Miranda.

17   BY MS. MANDEL:

18   **Q.**  And then the next bullet point down says, "Interacts with

19   international, national, and state regulatory agencies for

20   laboratory related matters"?

21   **A.**  Yes.

22   **Q.**  And you were the main contact for those agencies because

23   you were the regulatory head, right?

24   **A.**  No.  Those were usually coordinated by the quality

25   assurance department, but I held the licensure because it

1   needed to be held by a medical director or a Ph.D. -- a

2   qualified Ph.D. director.

3   **Q.**   And you -- the next bullet down, you provide a

4   consultation with clients regarding the ordering of

5   appropriate tests?

6   **A.**   Yes.

7   **Q.**   And that was in drafting with CRL's clients, right?

8   **A.**   I'm sorry, can you repeat that?

9   **Q.**   That was interacting with CRL's clients?

10  **A.**   Usually not directly with the clients.  Usually it was

11  with other employees who worked in CRL.  If it was the

12  clinical trials laboratory, it was usually the project

13  managers that I was interacting with.  And if it was the

14  general laboratory, they did a lot of life insurance testing,

15  so I was working -- I was getting questions from, basically,

16  the sales team from the life insurance portion of the

17  company.

18  **Q.**   Understood.  Let's jump down to the last bullet point,

19  under the CRL entry on your resume.  It says, "Responsible

20  for oversight of laboratory data communication and

21  appropriate patient result reporting."

22  **A.**   Yes.

23  **Q.**   And who were you doing those communications and reporting

24  with?

25  **A.**   That refers to making sure that the results that are

1    coming off the instrument are appropriate -- appropriately

2    reported to our laboratory computer system and then

3    appropriately transferred to the clients.

4    **Q.**   To make sure the clients get the right information at the

5    end of the day?

6    **A.**   Yes.  And of course, that was a multidisciplinary group

7    of people who made sure that all happened correctly,

8    including the IT department.  And we had people who oversaw

9    data management, things like that.

10   **Q.**   Understood.  Let's jump to -- let's jump to Exhibit 20.

11          Dr. Menninger, do you recall at the time that you

12   were living in Kansas, you had a doctor named Michael

13   Everson?

14   **A.**   Yes.

15   **Q.**   And I apologize with everybody that we're going to have

16   to contend with Dr. Everson's handwriting.  And I'm going to

17   rely on you, Dr. Menninger, because you may be able to

18   interpret it a little better than the rest of us.

19          Let's actually look at --

20          MS. MANDEL:  We're going to look at, Miranda,

21   page 1139.

22   BY MS. MANDEL:

23   **Q.**   Dr. Everson is a psychiatrist in Kansas; is that right?

24   **A.**   Yes.

25   **Q.**   And you treated with him for some time while you were

1    living in Kansas, right?

2    **A.**  Yes.

3    **Q.**  Let's look --

4           MS. MANDEL:  Miranda, let's go back -- yup.  There

5    we go.

6    BY MS. MANDEL:

7    **Q.**  This looks like a note from Dr. Everson, from the dates

8    7/30, July 30th, 2015.  Do you see that, Dr. Menninger?

9    **A.**  Yes.

10   **Q.**  And I know you testified earlier this week that you had

11   some ongoing prescriptions for Valium that you kind of kept

12   with you over time.  Is it safe to say that Dr. Everson is

13   the person who was prescribing it for you?

14   **A.**  Yes.

15   **Q.**  And it indicates here, under encounter details, it says

16   "Valium, five milligrams."  That's what you were talking

17   about, right?

18   **A.**  Yes.

19   **Q.**  Okay.  And looking down at the -- you see where it

20   says, "History of present difficulties"?

21   **A.**  Yes.

22   **Q.**  And Dr. Everson noted -- fortunately, here we don't have

23   to worry about the handwriting -- that you had anxiety at the

24   time, right?  You had it since childhood?

25   **A.**  Correct.

1 **Q.** And that you were using Valium. And "PRN" means as

2 needed, right?

3 **A.** Yes.

4 **Q.** Okay. And Dr. Everson noted you were in a lot of stress

5 at work. So at that time it was during your CRL job, right?

6 **A.** Yes.

7 **Q.** Okay. And that you were going to move to a new job.

8 That was referring to you taking the position at PPD in

9 Kentucky, right?

10 **A.** Yes.

11 **Q.** And then Dr. Everson also noted you had been off Celexa

12 for a year or more. Celexa is an antianxiety and

13 anti-depression medication?

14 **A.** Yes. And I was taking it for anxiety.

15 **Q.** And you also noted that you didn't use the Valium much,

16 but you used it for presentations, right?

17 **A.** Yes. But I didn't actually have to give any

18 presentations at CRL.

19 **Q.** But you did have work stress at CRL that Dr. Everson was

20 noting here, right?

21 **A.** I had stress -- I had stress about taking on a new

22 position, and so I think it's a little bit misworded. But I

23 was letting him know that I was going to be taking a new

24 position, and I had some anxiety around that.

25                MS. MANDEL: Thanks, Miranda. We can close out of

1    that one.

2    BY MS. MANDEL:

3    **Q.**  I know you testified earlier this week that PPD recruited

4    you in 2015; is that right?

5    **A.**  Yes.

6    **Q.**  Did PPD fly you out to Kentucky to interview with folks

7    there?

8    **A.**  Yes.

9    **Q.**  Do you remember how many people you interviewed with when

10   you were hired at PPD?

11   **A.**  I don't remember the precise number.

12   **Q.**  More than five?  Fewer than five?

13   **A.**  Probably more than five.

14   **Q.**  Once you took the position as executive director at PPD,

15   did PPD pay for you to move from Kansas to closer to Highland

16   Heights?

17   **A.**  Yes.

18   **Q.**  And you didn't live exactly in Highland Heights, right?

19   **A.**  No.  I lived in Cincinnati, which is right across the

20   border.

21   **Q.**  So it's like a short drive from Highland Heights?

22   **A.**  Yes.

23   **Q.**  And you relocated in the summer of 2015 with your family,

24   right?

25   **A.**  It was in August.

1  **Q.**  When you started at PPD in Highland Heights, you were

2  going into the lab building five days a week, right?

3  **A.**  Yes.

4  **Q.**  And I know there were other lab locations that you have

5  talked about this week.  We've heard about Brussels and

6  Shanghai; is that right?

7  **A.**  Yes.

8  **Q.**  But you were primarily working on a day-to-day basis in

9  Highland Heights?

10  **A.**  Yes.  But I was hired to oversee all four global

11  laboratories.

12  **Q.**  Understood.  If you can, Dr. Menninger, let's paint a

13  picture of what this building was like in Highland Heights.

14  It's one building that has a lab and an administrative area;

15  is that right?

16  **A.**  Yes.  There was a laboratory.  There were two different

17  floors that we had different lab sections on.  And then there

18  was an administrative area where offices and cubicles and

19  things like that were set up.

20  **Q.**  And in your executive role, you had an office; is that

21  right?

22  **A.**  Yes.

23  **Q.**  And was it in sort of a row, or an area with other

24  offices?

25  **A.**  Yes.  It was set up as, like, a perimeter of private

1    offices, kind of in a square, and then cubicles in the

2    middle.

3    **Q.**   Those external offices that were in a square, those were

4    other executives who were also working in the administrative

5    building?

6    **A.**   Not everyone was an executive, but primar- -- I guess

7    somewhat.

8    **Q.**   And Mr. Mekerri's office, when he began at PPD, was also

9    located in that area; is that right?

10   **A.**   Yes.

11   **Q.**   And I know you testified, he traveled some, and you

12   traveled some.  But when you were both in Highland Heights,

13   fair to say you did see each other on a regular basis?

14   **A.**   We did.  He traveled extensively, so I didn't see him

15   very much or know when he was going to be there, but when he

16   was there, yes, I interacted with him.

17   **Q.**   And thinking back to what the world was like before

18   COVID, did people tend to leave their doors open in that

19   administrative area, or was it kind of more of a closed-door

20   setting?

21   **A.**   No, we left our doors open.  Unless -- unless we were

22   having a private conversation with someone.

23   **Q.**   Understood.  Understood.  And you testified earlier this

24   morning that you visited the lab space, I think you called it

25   "The Pit," whenever you could, right?

1    **A.**  I did not call it "The Pit."  I referred to the

2    individual lab sections.  And when I started, there was a lot

3    of construction going on.  We were building out new spaces,

4    upgrading areas.  So "The Pit" was more of an old term that I

5    did not use.

6    **Q.**  Understood.  And as part of that sort of upgrading and

7    building out, I understand there are areas that are another

8    sort of lab term, they are benches; is that right?

9    **A.**  Yes.

10   **Q.**  Are the benches specific to a customer, a certain type of

11   testing?  Like how are those benches divided up?

12   **A.**  Well, first the lab is divided up into lab sections,

13   based on the type of testing that's being performed.  And

14   then the benches are referring to the specific tests that are

15   performed in that section.  So every -- all the sections have

16   primarily lab benches.

17   **Q.**  And I think earlier this week, you used an example of a

18   blood sugar test, right?

19   **A.**  I believe so.

20   **Q.**  Would that be an example of something that would be

21   performed on a specific bench?

22   **A.**  That was performed in the chemistry section, on an

23   analyzer.  So a large instrument.  It wasn't really a

24   bench-type test.

25   **Q.**  Okay.  And I'm going to expose my own scientific

1    ignorance on that one.

2           So in each bench would have lab techs that were

3    actually working with the samples, right?

4    **A.**  Correct.

5    **Q.**  And then overseeing their actual work with samples would

6    be a supervisor?

7    **A.**  Well, there were -- there were more levels, actually, in

8    between that.  There were different levels of med techs, and

9    then there was a lead med tech, and then there was a

10   supervisor.  And the supervisor oversaw different sections of

11   the laboratory.

12   **Q.**  So multiple benches would kind of lead up to one

13   supervisor.

14   **A.**  Yes.  If it -- yes.  Sometimes.  Like chemistry, primary,

15   was large, automated instruments.  It wasn't really benches.

16   But other laboratories -- or other sections of the

17   laboratories were primarily more benches than manual-type

18   testing.

19   **Q.**  And who did those supervisors report to?

20   **A.**  They reported to either -- when I started, they reported

21   to an associate director.  I was told there was another level

22   below that, as a manager, but that wasn't a position that was

23   filled.

24          In the Brussels lab, they also reported to an

25   associate director, who was later promoted to director.

1  **Q.**  Were the associate directors that you saw during the time

2  that you worked at PPD, were they medical doctors like you

3  are?

4  **A.**  No.

5  **Q.**  So if the associate director or below them, the

6  supervisors had questions about the medical details of tests,

7  who did those questions go to?

8  **A.**  It depended on the question.  You know, if it was

9  something related to the testing and the instrumentation,

10  that was something that they were trained on and had their

11  own certifications that they had to maintain.

12         If it was something related to, like, medical

13  doctor level, then, yes, it would come to myself or it would

14  go to another doctor who was specialized in an area that I

15  could not cover.

16  **Q.**  And I understand that one of the things was a little more

17  medical, was something called reference ranges; is that

18  right?

19  **A.**  Yes.

20  **Q.**  And reference ranges are, like, the normal range for a

21  test result; is that right?

22  **A.**  Correct.

23  **Q.**  So like on the blood sugar example, and I'm going to use

24  wrong numbers, but let's say that it's like okay for your

25  blood sugar to be between zero and ten.  That's the reference

1   range.  And it's above that or below that, it's a problem.

2   And I know my numbers don't -- is that right?

3   **A.**   Correct.

4   **Q.**   Okay.  And reference ranges was an area where the lab

5   needed to consult with you, because you were the doctor,

6   right?

7   **A.**   Yes.  I had to approve all the reference ranges.

8   **Q.**   And it was important to the customers that those correct

9   reference ranges be used, because that's how they sort of

10  figured out if what they were doing in medicine development

11  was working, right?

12  **A.**   Yes.  But reference ranges are established by each

13  laboratory, based on the instrumentation reagents, et cetera,

14  that they're using.  And also you have to take into

15  consideration the population that you're testing.  For

16  example, pediatric reference ranges would not necessarily be

17  the same as adults.

18  **Q.**   Understood.  And I think we're probably quite sure that

19  someone who's not a doctor wouldn't be able to talk

20  accurately about that.

21        Let's look at the job description for the executive

22  director of labs role?

23        MS. MANDEL:  Miranda, can you bring up 398, please.

24        And I apologize, Dr. Menninger, just a little bit

25  of a delay to bring up the exhibit.  I'm a little less tech

1  savvy in that regard.

2          THE COURT:  I'm sorry, what exhibit number did you

3  say, Ms. Mandel?

4          MS. MANDEL:  398.

5          THE COURT:  3-9-8?

6          MS. MANDEL:  Yes.

7          THE COURT:  Thank you.

8          MS. MANDEL:  A little tech delay.  Sorry.  There we

9  go.  Thanks, Miranda.

10  BY MS. MANDEL:

11  Q.  Dr. Menninger, you probably recall we looked at your job

12  description earlier this week.  This was the job description

13  that you had during the entirety of the time you worked at

14  PPD; is that right?

15  A.  I believe so.  We had to update them yearly, and -- or

16  sign off and make sure there were no changes.  But, yes, this

17  looks accurate.

18  Q.  And sure, that was one of the things, as the executive

19  director of labs, that you worked with the company on, right?

20  A.  Yeah, I -- I didn't so much work on it, other than I just

21  had to review and sign off that I had reviewed it.

22  Q.  Sure.  Understood.

23          MS. MANDEL:  And Miranda, can we just make it a

24  little bit bigger.  I know my eyes -- I don't know if it's my

25  eyes are hard to read it.  Thank you.

1    BY MS. MANDEL:

2    **Q.**  Dr. Menninger, at the top it says, "ED of labs."  That

3    refers to the executive director of labs, right?

4    **A.**  Yes.

5    **Q.**  And during the time that you worked at PPD, you were the

6    only executive director of labs, right?

7    **A.**  No, that's not correct.  I think they used the same job

8    description to describe anyone who was an executive director

9    level for the Global Central Laboratories, even if it was a

10   different, like -- if you were executive director of the

11   Global Central Labs, but you oversaw project management, I

12   was told that the job description was the same as this.

13   **Q.**  So for the folks who worked at this executive level, this

14   was the job description?

15   **A.**  Yes.

16   **Q.**  Am I understanding that correctly?

17   **A.**  That's what I was told.

18   **Q.**  Okay.  And let's look at the specific job tasks that are

19   on here.  We're going to test our eyes a little bit.

20           If we look down at the, "Supporting business

21   development," it's the second bullet point next to "Essential

22   function."

23           Do you see that document here?

24   **A.**  Yes.

25   **Q.**  And it says, "Support business development in obtaining

1    new customers and maintaining relationships."

2              Do you see that?

3    **A.**   Yes.   Uh-huh.

4    **Q.**   And this is something that you worked on, isn't it?

5    **A.**   I worked with the executive director of business

6    development on this particular bullet.

7    **Q.**   Okay.  And that involved answering customer questions, if

8    they had questions about the lab capabilities or things like

9    reference ranges, right?

10   **A.**   That usually went to a different department, if it was

11   something related to reference ranges.

12   **Q.**   Well, what about things what the lab could do, you know,

13   just like the types of testing you could run?

14   **A.**   Yes.

15   **Q.**   That's something that you could answer?

16   **A.**   We would have frequent conversations about the type of

17   testing that we could perform, based on the regulatory

18   certifications that we held.

19   **Q.**   And that was something that you would answer questions on

20   behalf of PPD to new customers about, right?

21   **A.**   I would.  It wouldn't usually go directly to me first.

22   It would usually go to our scientific affairs department.

23   And if there was something that they could not answer, then

24   they would reach out to me.  Usually by e-mail.

25   **Q.**   Understood.

1          So they sort of screened for the questions that

2     required your level of input; is that right?

3     **A.**  Yes.

4     **Q.**  Okay.  And you also made yourself regularly available to

5     answer questions about the lab studies that were being done

6     for customers; is that right?

7     **A.**  The testing portion.

8     **Q.**  Sure.  The part that actually went to the medical tests,

9     right?

10    **A.**  Yes.

11    **Q.**  And if we look at the next bullet point, it

12    says, "Perform financial reviews, establish operating budget,

13    and develop forecasts maximizing operating profit, provide

14    business updates to senior leadership."

15         And you did that on a regular basis, right?

16    **A.**  Yes.

17    **Q.**  And if we look at the next -- the next bullet down, it

18    says, "sets operational standards, goals and directs

19    implementation of laboratory goals and policies, oversees

20    resource allocation."

21         And that's something that you did in connection

22    with the operations folks, right?

23    **A.**  Yes.

24    **Q.**  Performs -- next bullet down is "Performs administrative

25    responsibilities, including HR functions, personnel

1    development, facilities management, writing SOPs and PDs."

2             And I know you talked earlier this week about the

3    writing up of the standard operating procedures, right?

4    **A.**  Yes.

5    **Q.**  And you also worked on overseeing -- I know you've talked

6    about some of the folks working in the lab and your reports.

7    And you helped carry out the sort of human resources

8    functions and personnel development for those people, right?

9    **A.**  Yes.  And it also involved -- they had to submit a

10   requisition any time they wanted to hire someone that

11   needed -- I needed to review it and make sure it was

12   justified and approved.  And then I specifically was involved

13   in the higher level employees that we recruited and hired.

14   **Q.**  And you met regularly with the company's senior

15   leadership team, right?

16   **A.**  Yes.  We had bi-weekly meetings.

17   **Q.**  And those were in-person, Dr. Menninger?

18   **A.**  It was a combination of in-person and people calling in.

19   Because we're a global laboratory, so we had people calling

20   in from the different global locations.

21   **Q.**  Sure.  And this sort of like mothership of the lab

22   locations in the US, it was Highland Heights, because that

23   was the only US location, right?

24   **A.**  Highland Heights was the only US location, yes.  But we

25   treated all four laboratories as equal.  I would say Highland

1   Heights had the highest volume of testing.

2   **Q.**   Looking at the bullet point that we were just -- that we

3   were just reviewing, the one that says, "Perform

4   administrative responsibilities, including HR functions"?

5   **A.**   Yes.

6   **Q.**   You did regular trainings for the lab staff, right?

7   **A.**   That came in different formats.  Sometimes we brought

8   people in.  Sometimes we had to get sponsors that would come

9   in and train on a new product, or assay, or instrument that

10  they had.  So we had different individuals who would do

11  training.  Sometimes it would be one of my direct reports who

12  would train on a specific area, and sometimes it would be

13  things like continuing education, where they would watch a

14  webinar, or like a presentation presented by the College of

15  American Pathologists, things like that.

16  **Q.**   So a mix of things that you needed to do to keep the lab

17  up to date with whatever they needed to be aware of?

18  **A.**   Yes.

19  **Q.**   And one of your responsibilities, if we go to the last

20  bullet, under essential functions, is to oversee quality

21  assurance and quality control aspects of the lab, to ensure

22  compliance with regulatory standards.

23          Do you see that?

24  **A.**   Yes.

25  **Q.**   And I know that you talked a lot this week about the

1    regulatory roles, things like, I think, CAPA and CLIA; is

2    that right?

3    **A.**   Yes.

4    **Q.**   And those regulatory requirements came with certain

5    quality assurance obligations, right?

6    **A.**   Yes.

7    **Q.**   And that fell within what you did, right?

8    **A.**   Yes.  Some of it.  The portion that related to the lab,

9    but quality assurance also covers any ancillary departments

10   that support the lab.

11   **Q.**   Sure.  And if we look down lower, lower down on the page,

12   the last kind of box, it says, "Liaison."  Do you see that,

13   Dr. Menninger?

14   **A.**   Oh, yes.

15   **Q.**   And there it says that the requirement was "to interact

16   frequently with internal personnel and outside

17   representatives at various levels."

18            Do you see that?

19   **A.**   Yes.

20   **Q.**   "Participates and may present at meetings with internal

21   and external representatives"?

22   **A.**   Yes.

23   **Q.**   And that's all the kind of stuff that you've just been

24   describing, right?  The training and the --

25   **A.**   No, this is -- this is different.

1    **Q.**   Okay.  So how is this different?  What types of things

2    did this involve?

3    **A.**   This would not be considered, like, an essential function

4    to my job.

5    **Q.**   Right.  And this is listed.  I see.  It's listed in a

6    different box called "liaison," right?

7    **A.**   Right.  I -- it's written very broadly.  But, yeah, so I

8    would interact with our internal company personnel, and

9    occasionally outside representatives or clients.  I never

10   presented at any meetings, other than one time I presented a

11   few slides at our internal sales meeting.  And on two other

12   occasions, I presented like two to three slides for a town

13   hall presentation.

14   **Q.**   And town halls, Dr. Menninger, that's a bigger meeting

15   within the company, right?

16   **A.**   It's a meeting within all the GCL labs, just to give them

17   high-level updates on what we're doing and the different

18   areas.

19   **Q.**   And when you say GCL, I know that's Global Central

20   Laboratories, but I just want to make sure that we're -- the

21   jury understands.

22          So that's Global Central Labs?

23   **A.**   Yes.

24   **Q.**   And that would be the Brussels, Shanghai, Singapore, and

25   the Highland Heights locations; is that right?

1   **A.**  Yes.

2   **Q.**  And let's pop out of that box, and I want to focus your

3   attention, Dr. Menninger, a little farther --

4          MS. MANDEL:  I'm sorry, Miranda, not out of the

5   exhibit.  Just -- thank you.

6   BY MS. MANDEL:

7   **Q.**  Under the "summarized purpose" of the position, at the

8   top of the page.  At the end of that statement, it says, "Up

9   to 30 percent travel."

10          Is that right?

11  **A.**  Yes.

12  **Q.**  And you did travel from Highland Heights, or from your

13  home in Cincinnati, to the other lab locations on occasion;

14  is that right?

15  **A.**  Yes.

16  **Q.**  And, in fact, you needed to visit the Belgium lab, I

17  think it was three times a year; is that right?

18  **A.**  Yes.

19  **Q.**  And that was some type of regulatory requirement?

20  **A.**  Yes.  -- well, not the three times necessarily, but we

21  had to have a procedure that defined the frequency.

22  **Q.**  Understood.  So that there was assurance that there would

23  be an executive director of labs on site with some

24  regularity?

25  **A.**  Uh-huh.

1          MS. MANDEL:  Okay.  And let's go -- Miranda, can we

2     switch to the next page of the job description, please.

3     BY MS. MANDEL:

4     **Q.**  And this is the second page of your job description from

5     when you were the executive director of labs; is that right,

6     Dr. Menninger?

7     **A.**  Yes.

8     **Q.**  And I know that you've testified about this earlier this

9     week, but I just wanted to make sure that we're clear.  If

10    you look under education and experience, this position

11    required someone with a Ph.D. or an MD -- that's what you

12    have, right?

13    **A.**  Correct.

14    **Q.**  And the other option is a DRPH.  What's that?

15    **A.**  I think that's a doctor of pharmacy, but I don't think

16    that would qualify, based on the regulatory standards that

17    I'm familiar with.

18    **Q.**  And during the time that you were at PPD, it was really

19    the MD level that --

20    **A.**  MD or Ph.D. level in a specific section.

21    **Q.**  Okay.  And the -- underneath that, it talks about

22    previous experience that's necessary; is that right?

23    **A.**  Yes.

24    **Q.**  And that was, in your case, based on the time that you

25    had spent at CRL, right?  That was about five years.  And

1    before that, you had worked in clinical laboratories at the

2    Saint Luke's system, right?

3    **A.**   Yes.

4    **Q.**   Okay.  And then let's -- let's look at the next page of

5    the job description, as well.  Under, "Working conditions and

6    environment."

7          Do you see that at the top of the page,

8    Dr. Menninger?

9    **A.**   Yes.

10   **Q.**   And it says that the work is performed in an office or

11   laboratory and/or clinic environment.  Do you see that?

12   **A.**   Yes.

13   **Q.**   And then frequently drives to site locations, travels

14   within the United States, occasionally internation travel?

15   **A.**   Yes.

16   **Q.**   And that's what you were doing at this time when you were

17   hired, right, you were driving to Highland Heights.  At times

18   you were flying to Brussels as needed; is that right?

19   **A.**   Yes.

20   **Q.**   And I believe in 2016, you did fly to Shanghai to visit

21   that lab; is that right?

22   **A.**   Yes.  And Singapore.

23   **Q.**   And to Singapore.  Okay.

24          And my understanding is that Shanghai and

25   Brussels -- there were sort of different requirements in the

1    different countries for what the lab director really had to

2    do to be on site; is that right?

3    **A.**   In Asia they had local regulations that required the

4    doctors who were on their laboratory directorship be local.

5    So there were different doctors listed on their certificates,

6    but for the purpose of performing testing, I would oversee

7    that.

8    **Q.**   Okay.  Understood.

9             Looking down under the -- the "physical

10   requirements" of your job, skipping the first two which

11   really had to do more with the really truly physical

12   requirements.  If we look at the one, it's about I think

13   seven down, it says, "Ability to communicate complex

14   information and ideas."

15            Do you see that?

16   **A.**   I'm having a hard time finding it.

17   **Q.**   That's why I'm trying to -- I think it's the seventh

18   bullet point down.

19   **A.**   Okay.  Yes.

20   **Q.**   Do you see that?

21   **A.**   Yes.

22   **Q.**   And then under that is "frequently interacts with others,

23   relates sensitive information to diverse groups, internally

24   and externally."

25            Do you see that?

1   **A.**   Yes.

2   **Q.**   And that sensitive information might be things like

3   results of testing or those reference ranges that we talked

4   about; is that right?

5   **A.**   Correct.

6   **Q.**   Okay.  And then if we look down at the -- at the last two

7   bullets, the second to last one says, "Performing a wide

8   range of complex tasks as dictated by variable demands and

9   changing conditions."

10          Do you see that?

11  **A.**   Yes.

12  **Q.**   "And the ability to perform under stress."

13          Do you see that?

14  **A.**   Yes.

15  **Q.**   And the last bullet point there is "Regular and

16  consistent attendance."

17  **A.**   Yes.

18  **Q.**   Okay.  And let's look at the last page.  It's actually an

19  addendum to the job description.  And this is -- if you look

20  down at the last revision date, it says this was added in

21  2013, right?

22  **A.**   Yes.

23  **Q.**   And this was -- you started working at the company in

24  2015.  So this was before that time?

25  **A.**   Yes.

1   **Q.**  And there are some specific requirements under -- it

2   says, "Under additional specific job responsibilities, serve

3   as the laboratory director for New York State accreditation."

4   **A.**  Correct.

5   **Q.**  And I know we've heard this week a couple of mentions of

6   New York State, and it's a little confusing, of course,

7   because you were working in Kentucky, but can you explain why

8   New York State had any relevance here?

9   **A.**  If you perform testing on any samples that come from the

10  State of New York, you have to have New York State

11  accreditation.

12  **Q.**  And so that was a specific requirement that PPD was

13  making sure that they had in place so that they could get

14  samples flown in from New York, right?

15  **A.**  Yes.

16  **Q.**  Okay.  And did you have the -- the credentials that were

17  necessary for PPD to be able to get that New York State

18  accreditation?

19  **A.**  I had some.  There are multiple different areas and I

20  covered a lot of them, but there were some that we did not

21  have coverage.  And those were the positions where I

22  identified compliance gaps and we were trying to hire to

23  address that.

24  **Q.**  Sure.  And I know you talked earlier this week about the

25  need to hire out to make sure that PPD was in compliance

1    there.

2    **A.**  Yes.

3    **Q.**  The -- the second bullet point there says, "Spend

4    70 percent of time on site and be available 30 percent of the

5    time by telephone or computer, as needed."

6             Do you see that?

7    **A.**  Yes.

8    **Q.**  Okay.  And on site, when you were hired, was in Highland

9    Heights at the lab location?

10   **A.**  Yes.

11   **Q.**  Okay.  Thank you.

12            Dr. Menninger, you testified a few moments ago that

13   you did need to visit the Belgium lab location with some

14   regularity, right?

15   **A.**  Yes.

16   **Q.**  And who set the travel schedule for how often you went to

17   Belgium?

18   **A.**  I worked with my direct report, who is the lab director

19   in Belgium, and we kind of set that schedule based on, like,

20   if there was an inspection coming up or, you know -- we tried

21   to space it out throughout the year, but sometimes because of

22   other obligations, you know, there were a couple visits

23   crammed together really fast and -- yeah, but we -- I set it

24   with my direct report.

25   **Q.**  Your direct report that was in Belgium?

1    **A.**   Yes.

2    **Q.**   Okay.  And when you went to Belgium, you worked on site

3    with that direct report?

4    **A.**   Yes.

5    **Q.**   And there was a lab building sort of like the one in

6    Highland Heights, but located in Brussels?

7    **A.**   Yes.

8    **Q.**   On one trip you took to Belgium, you ran a 10K race; is

9    that right?

10   **A.**   On the weekend, there were, I believe, three employees

11   who were planning to run it from the Brussels lab, and they

12   asked me if I would like to join.  So with some hesitancy, I

13   agreed.

14   **Q.**   Well, I think you're being humble, because you are a

15   runner, right?

16   **A.**   I'm not a runner anymore.

17   **Q.**   But you were at that time?

18   **A.**   Just a little.

19   **Q.**   Well, a little?

20   **A.**   I'm not a very good runner.

21   **Q.**   And when you visited the Belgium lab, I know you

22   mentioned there were inspections?

23   **A.**   Yes.

24   **Q.**   And dealing with inspections and audits, that was part of

25   your role as lab director?

1    **A.**   Not the routine client audits, but definitely the

2    inspections.

3    **Q.**   That was like a regulatory inspection, right?

4    **A.**   Right.

5    **Q.**   And that's when the regulatory agency would send someone

6    to look at what was actually physically being done in the

7    lab?

8    **A.**   Yes, that's correct.   That was usually done by the

9    College of American Pathologists.

10   **Q.**   And in Belgium, was that also done --

11   **A.**   Yeah.   Yes.   They did international inspections.

12   **Q.**   And that required a lab director to be on site when they

13   were doing the inspection?

14   **A.**   Yes.   Usually.   I have been in inspections where there

15   have been exceptions to that, but usually, yes, the lab

16   director is on site.

17   **Q.**   How long does one of these inspections last?

18   **A.**   Usually they last just one day, sometimes two.   It

19   depends on how big the lab is and how many inspectors there

20   are.

21   **Q.**   And can you describe for the jury what would happen

22   during one of these inspections?

23   **A.**   Well, CAP has a number of regulatory --

24   **Q.**   CAP?

25   **A.**   Yes.   CAP is short for College of American Pathologists.

1    They have a number of -- thousands of regulatory standards,

2    and they're divided up into sections.  So usually what would

3    happen is they would bring a team out, and there would be an

4    inspector that would inspect that particular -- one

5    particular section.  And so they would usually meet with the

6    supervisor of that section, and they would go through the

7    standards and make sure that we were compliant.

8    **Q.**  And if -- safe to say that if PPD didn't have all the

9    things in place that were needed, you might lose that

10   accreditation from CAP?

11   **A.**  No.  It is rare -- I mean, like I said, there are

12   thousands, over 2,000 standards, so it's rare for any

13   laboratory to have a CAP inspection and nothing be found.

14   So, no, that's not the -- that's not how it usually works.

15   There's a process where you respond.  There's a summation

16   conference at the end of the inspection, where they report

17   their findings, and there's different levels of the findings.

18   And then you address them accordingly within usually a month.

19   **Q.**  And then everything would be okay, and the lab could

20   continue to function?

21   **A.**  Right.  And then they update your certification for

22   another two years.

23   **Q.**  Okay.  Dr. Menninger, you spoke earlier this week about

24   moving from the Highland Heights area -- I know you were

25   living in Cincinnati, moving to the East Coast.  Do you

1  recall that?

2  **A.**  Yes.

3  **Q.**  And at some point in 2016, you told Mr. Mekerri, who was

4  your manager, that your daughter was having difficulty in

5  school; is that right?

6  **A.**  On multiple occasions we had those conversations.

7  **Q.**  And multiple times from the time Mr. Mekerri started as

8  your manager until the spring of 2016; is that right?

9  **A.**  I believe it was fall of 2016.

10  **Q.**  I'm sorry, fall of 2016.  Okay.  And so safe to say that

11  you were pretty honest with Mr. Mekerri about the challenges

12  that your daughter was having at that time?

13  **A.**  Yes.  We had -- we had a really great relationship and

14  it -- you know, we would talk to each other about our

15  families and personal things.  And he -- he was very

16  compassionate and understanding and, yeah, seemed to really

17  care about my family and my child.

18  **Q.**  In 2016, how old was your daughter at that time?

19  **A.**  I think around 8 or 9.  Eight maybe.

20  **Q.**  So that would be elementary school at that time, right?

21  **A.**  Yes.

22  **Q.**  And I know this must be hard to talk about.  Around that

23  time, you told Mr. Mekerri that she was being bullied in

24  school; is that right?

25  **A.**  Yes.

1    **Q.**  Can you describe a little bit more about what was

2    happening with your daughter in school at that time that

3    caused you to be concerned?

4    **A.**  It started -- I want to say it continued to escalate to

5    much more concerning episodes, but there was tripping,

6    targeting during PE, like intentionally trying to throw the

7    ball to hit her.  And there were some kids who would describe

8    violent acts that they would do to characters that she really

9    loved and watched on television that was very distressing to

10   her.

11          And so we initially tried to address it with the

12   teacher, and then also the physical education teachers, but

13   things kept escalating.  And Maya became extremely depressed

14   and we became very concerned.  So eventually, we went to

15   speak to the head of the school.  We were very concerned

16   about the impact that this was going to have on them growing

17   up, you know, building self-esteem and -- it was just painful

18   to watch as a mom.  You want to protect your child.  So,

19   yeah.

20   **Q.**  And I'm sorry to have to ask you about that.  I know that

21   was difficult.

22          I think you testified earlier this week that

23   Mr. Mekerri had been accommodating for you to go and have

24   meetings with the school, as you've just described; is that

25   right?

1    **A.**   Yeah.   I mean my husband and I went once to meet with --

2    usually we would do it on, like, off hours, but at PPD, I

3    mean, I was working nights, weekends.   Since we were a global

4    lab and we were on different time zones, it was kind of like

5    you always had your phone and your laptop with you.   So yes,

6    I would say, okay, we were -- take an hour for me to go to

7    the school and speak with the head.

8    **Q.**   And at some point in 2016, you talked to Mr. Mekerri

9    about the idea of possibly moving so that your daughter could

10   go to a different school; is that right?

11   **A.**   Yes.

12   **Q.**   And around that time, you and your husband started to

13   look at what school would be best for Maya; is that right?

14   **A.**   Yes.

15   **Q.**   Can you explain where you looked for schools that would

16   work for your daughter?

17   **A.**   We looked all over the -- the entire country.

18   **Q.**   And what type of school were you looking for in

19   particular?

20   **A.**   I was just looking for a place -- Maya is a very creative

21   child and I was just looking for a place that had a school

22   with diversity, a lot of opportunities to participate in

23   creative activities, and schools that look like, you know --

24   Maya and I would look at websites together and I would see

25   what Maya's reaction was.   And based on some of the clubs

1  they had and the activities.  And so that's how we -- that's

2  how we looked for schools, basically.

3  **Q.**  And anything in the US was sort of on the possibility

4  list, right?

5  **A.**  Yes.

6  **Q.**  And you ultimately found out about a school in Rhode

7  Island called The Wheeler School; is that right?

8  **A.**  Yes.

9  **Q.**  And how did you and your family learn about The Wheeler

10  School?

11  **A.**  It was doing an internet search.

12  **Q.**  An internet search?

13  **A.**  Uh-huh.

14  **Q.**  And you described a few moments ago that you kind of

15  gauged your daughter's reaction as you looked at schools

16  online.  What jumped out to you or your family about The

17  Wheeler School?

18  **A.**  Maya was extremely excited after looking at their website

19  and what they had to offer.  And you know, it was really nice

20  for us to see her smile and be excited about a place.  So,

21  yeah, it was one of the schools at the top of our list that

22  we considered.

23  **Q.**  And that's -- that's a private school in Rhode Island; is

24  that right?

25  **A.**  Yes.

1    **Q.**  And the school that your daughter had been at in

2    Cincinnati, was that a public school or a private school?

3    **A.**  It was also a private school.

4    **Q.**  And at some point in this time period in 2016,

5    Dr. Menninger, you told Mr. Mekerri that you found a school

6    that you thought your daughter should go to; is that right?

7    **A.**  I'm not sure if it was in 2016 or 2017 when we found that

8    school, but I mentioned that we found a school that we were

9    going to take Maya to visit.

10    **Q.**  And did you let Mr. Mekerri know that it was in Rhode

11    Island?

12    **A.**  I believe so, yes.

13    **Q.**  And after you visited the school, you and your family

14    decided that that's where your daughter would go; is that

15    right?

16    **A.**  We had to apply and wait to see if Maya would be

17    accepted.  And then I let Hacene know that she was accepted

18    and he was very happy for me.  And so I confirmed that that

19    was where we were going to relocate.

20    **Q.**  And you didn't move to Rhode Island; is that right?

21    **A.**  No.  It was a little bit too expensive for us around The

22    Wheeler School, so we found a house a little further out.

23    And like I said, my husband was a stay-at-home dad, so he

24    would drive Maya to school and pick them up.

25    **Q.**  And so you moved -- well, you started to make

1    arrangements to move to Dighton, Mass.; is that right?

2    **A.**   Yes.

3    **Q.**   And you told Mr. Mekerri that this was your plan.  And

4    how did he respond to you?

5    **A.**   I think he was excited for me.  He even had to write --

6    he wrote a letter for me for, you know, the house that we

7    were purchasing, because I had to show evidence that I was

8    still employed.  And, yeah, he actually was like if there's

9    any furniture that you need to set up your office, just let

10   me know.  And I said, no, it's fine.  I don't need that.  We

11   can handle that ourselves.  So just very supportive.

12   **Q.**   And at this time, thinking back to that administrative

13   area in the Highland Heights location, where you said there

14   were offices around the periphery, were you aware of any

15   other folks working in those offices, executives or others,

16   who moved to different locations and worked from there for

17   personal reasons?

18   **A.**   I'm not sure I'm understanding what you're asking.

19   **Q.**   Understood.  I'll try to ask that question better.

20           You described a little earlier this morning,

21   Dr. Menninger, that the kind of administrative area in the

22   Highland Heights building, where you sat with other

23   executives and other folks who oversee different parts of the

24   lab business; is that right?

25   **A.**   Yes.

1    **Q.**  At the time that you were making arrangements to move to

2    the East Coast, were you aware of anyone else who was kind of

3    working in that area, who was making the move to live

4    somewhere else for personal reasons?

5    **A.**  No one at that time, but there were other executive

6    directors at my level who were already working remote.

7    **Q.**  As of 2016?

8    **A.**  Yes.

9    **Q.**  And who was working remotely as of 2016, to your

10   knowledge?

11   **A.**  Michelle Dockhorn.  She was our executive director of lab

12   partnerships.  They kind of managed our large, high profile

13   clients, and she lived in Kansas, City.

14          And then Caroline Mackie, who was the executive

15   director for business development.  And she lived in

16   Charlotte, North Carolina.

17          At that time, Michelle Dockhorn was reporting to

18   Hacene, as well, and so when I said, you know, I want to

19   throw out this option about what's going on with Maya, he

20   actually brought up, well, yeah, Michelle's remote.  So he

21   didn't have a problem with it at all.  He just wanted to run

22   it by the person that he was reporting to at the time, who

23   was David Johnston, who also was fine with it.

24   **Q.**  So Mr. Mekerri generally was supportive of his employees

25   working from where they needed to work from, as long as they

1    could get their job done; is that right?

2    **A.**  I can't speak to his opinion about other employees.  I

3    wouldn't --

4    **Q.**  At least from what you experienced, though?

5    **A.**  I suppose.  I don't know.

6    **Q.**  Did Mr. Mekerri tell you that he was receiving push back

7    from other people about the idea of you relocating to

8    Massachusetts?

9    **A.**  No.

10    **Q.**  And I know that you mentioned that Mr. Mekerri offered to

11    get you whatever furniture you would need for your home

12    office in Dighton; is that right?

13    **A.**  Yes.

14    **Q.**  And you set up a home office in your basement there?

15    **A.**  Yes.  We actually had a -- a built-out, finished area

16    specifically for that purpose.

17    **Q.**  And PPD did provide you with things like computer

18    monitors, a docking station, so that you could set up your

19    home office and be able to continue your work seamlessly,

20    right?

21    **A.**  Yeah.  They -- they shipped two monitors and a docking

22    station.  It might have been the same docking station that I

23    was using in Highland Heights, but I already had my laptop

24    and I already had my cell phone.

25    **Q.**  And once you moved to Dighton, BPD paid for your travel

1    back to Highland Heights whenever you needed to be there,

2    right?

3    **A.**   Yes.

4    **Q.**   Even though you moved for personal reasons, PPD still did

5    that.

6    **A.**   They did that for anyone who had to travel for business

7    purposes.

8    **Q.**   And just to be clear on the dates, Dr. Menninger, you

9    actually moved to Dighton, it was June 2017; is that right?

10   **A.**   Yes.

11   **Q.**   And that was your daughter finished out the school year

12   in Cincinnati, and then you relocated?

13   **A.**   Yes.

14   **Q.**   So for the rest of 2017, from June to December of 2017,

15   fair to say you only made the trip back to Highland Heights

16   twice; is that right?

17   **A.**   In July, we were waiting for all of our stuff to arrive,

18   and then in August, I took some PTO, because I had to take --

19   I had to take my 10-year recertification board exam.  So I

20   took some PTO because I knew I needed some time to study for

21   that.

22          After that, I was extensively traveling, every

23   month.  I went to Highland Heights in September, and I turned

24   around and I went to Belgium, and then I turned around and I

25   went back to Highland Heights, and then I turned around and

1    went back to Belgium in December.  So there was frequent

2    travel that last quarter -- quarter of 2017.

3    **Q.**   So again, looking at the period after you moved in

4    June 2017, through December, it was two trips to Highland

5    Heights and two trips to Belgium.  Do I have that right?

6    **A.**   Yes.

7    **Q.**   And I know we looked a few moments ago at that

8    requirement in the ED of labs description to be on site

9    70 percent of the time; is that right?

10   **A.**   Yes.  That was for the position that was to be

11   permanently located on site in Highland Heights, the position

12   we were recruiting for.

13   **Q.**   And at that time, there wasn't someone else filling that

14   position, right?

15   **A.**   There wasn't because that position was put on hold.  But

16   before that, early in the spring, we found an excellent

17   candidate that everyone loved, super-qualified, and the

18   thought was that -- well, I think we actually did make an

19   offer.  And I don't know all the details of why it wasn't

20   accepted, but I think it had something to do with salary.

21   And then so, unfortunately, that candidate, who we all

22   thought was going to take that position, then right after

23   that, they put the position on hold, so I couldn't recruit

24   for it.

25   **Q.**   And Dr. Menninger, in 2018, the first half of 2018,

1    before you went on medical leave, you made one trip to

2    Highland Heights; is that right?

3    **A.**  Yes.

4    **Q.**  And in that first half of 2018, any international trips

5    to the other labs?

6    **A.**  No.

7    **Q.**  Let's look back at an exhibit that we looked at earlier

8    this week.

9           MS. MANDEL:  Miranda, can we bring up 378, please.

10   BY MS. MANDEL:

11   **Q.**  Dr. Menninger, you may recall looking at this exhibit

12   earlier in the week.  I think you -- you explained that this

13   is a list of responsibilities that you were doing that you

14   created for Mr. Mekerri in November of 2017; is that right?

15   **A.**  Yes.

16   **Q.**  And this was -- your cover e-mail is what you see in

17   front of you.  This is the cover e-mail where you attached a

18   list of your responsibilities that you were handling; is that

19   right?

20   **A.**  Yes.

21   **Q.**  And I just want to look at a few parts of this where we

22   didn't really focus on on Monday.  And I -- I just want to

23   clarify, you put this list together on your own, right?

24   **A.**  Yes.

25   **Q.**  Okay.  Let's look at the first page of the chart of work

1  tasks.  And you may recall, we looked at this the other day.

2  You first talked about your number of e-mails you were

3  handling; is that right?

4  **A.**  Yes.

5  **Q.**  And then looking down at the next item was meetings.  And

6  I know you've talked this morning a fair amount about the

7  meetings that you were having.  And you said this was about

8  four hours a day, on average?

9  **A.**  Yes.  You know, it was -- it depends on the week.

10  **Q.**  Sure.  I mean, there was some variability, I'm assuming?

11  **A.**  Yeah.

12  **Q.**  And then if we go down, there's a pretty big square that

13  says, "SciTech projects"?

14  **A.**  Yes.

15  **Q.**  And one of the things listed under there is -- well, it

16  says "SciTech projects and questions requiring lab director

17  input and approval."

18          And you give some examples of what those are,

19  right?

20  **A.**  Yes.

21  **Q.**  And you were the lab director giving that input, right?

22  **A.**  Yes.

23  **Q.**  And if we look over at how much time that was taking,

24  that's about one to two hours a day that you were spending

25  that time doing the input on?

**A.**  Yes.

**Q.**  And then if we look down at the next -- the next box,
where it says, "Internal/external technical consultations"?

**A.**  Yes.

**Q.**  And I think this is some of what you talked about this
morning, right?  Those technical consults?

**A.**  Yes.  This was -- yes.

**Q.**  And this was something you were doing daily, as well?

**A.**  Frequently.  Maybe not every day.

**Q.**  Sure.  And can you just explain, so internal versus
external, can you explain what the difference was?  You know,
what counted as an internal consultation and what was an
external one?

**A.**  Usually the internal consultations were with like a
project manager.  And the external were with clients or
another group that was kind of between the client and the
laboratory.

**Q.**  And I want to pause, actually, on client, Dr. Menninger,
because I think, you know, the jury might not understand
exactly what that means as part of the PPD lab business.

When you say "client," those are the folks who are
engaging PPD to help them with their work, right?

**A.**  Yes.  It is primarily pharmaceutical companies.

**Q.**  So to break this down, to be a little bit more granular,
if a pharmaceutical company is developing a new medicine,

1    they would need to run lab tests to see how patients are

2    responding to the medicine; is that right?

3    **A.**   Our laboratory primarily focused on safety testing.  So

4    we weren't necessarily doing all of their research based

5    testing.  That would go to other laboratories.  This was

6    primarily to make sure that, you know, the -- what they were

7    developing was not harming the patient in some way.

8    **Q.**   So the tests --

9    **A.**   It was testing that you would typically run in a hospital

10   laboratory.

11   **Q.**   But PPD worked directly with the customers to do the

12   testing and report the results back to the customers, without

13   the hospital --

14   **A.**   Yes.

15   **Q.**   Understood.  So PPD wasn't doing any of its own work or

16   testing.  Right?  It was on all on behalf of customers?

17   **A.**   Unless there was a new assay that we wanted to bring in.

18   So, for example, if it was a test that we previously sent out

19   to another lab to perform because we didn't have a high

20   volume, and then all of a sudden we got a study with a very

21   high volume, we would develop that test in our lab, instead

22   of sending it out.

23   **Q.**   And just for the benefits of the jury, an assay is -- can

24   you explain what an assay is?

25   **A.**   It's a laboratory test.

1    **Q.**  And I know that you testified earlier this morning about

2    there being some build out construction going on in the

3    Highland Heights.  I think it was towards the earlier part of

4    your employment; is that right?

5    **A.**  Yes.  It was going on at the start of my employment, but

6    it was also going on throughout.  It was going -- we had a

7    significant build out of a state of the art molecular

8    laboratory in 2017.

9    **Q.**  And that was to add new capabilities for new types of

10   testing that PPD could do in Highland Heights, right?

11   **A.**  Yes.  And that was why I was specifically recruiting for

12   a director for the molecular lab.

13   **Q.**  Because molecular is like its own thing that needs a

14   expert, right?

15   **A.**  It requires additional qualifications, yes.

16   **Q.**  So looking back at what you were explaining what you

17   spent your time on on a daily basis, when you said

18   internal/external technical consultation, the external

19   computation, you used the term clients, those were folks who

20   were hiring PPD to run the testing, the safety testing for

21   medicines, right?

22   **A.**  Yes.  For the most part.

23   **Q.**  Okay.  Thank you.

24          And then let's also look at the next page of

25   this -- this list you made.  We didn't look at this on

1  Monday, but let's look at the next page.

2           So here you listed out, Dr. Menninger, other daily,

3  weekly, monthly activities.  Do you see that?

4  **A.**  Yes.

5  **Q.**  And there are a lot of things on the list, but if we look

6  down to sort of just below the halfway point, one of the

7  things listed is direct reports.  And 1:1 is like a one on

8  one, right?

9  **A.**  Yes.

10  **Q.**  And that would be a one on one meeting with your direct

11  reports?

12  **A.**  Yes.

13  **Q.**  And you would do performance reviews of your reports,

14  right?

15  **A.**  Yes.

16  **Q.**  And coaching, as well, right?

17  **A.**  Yes.

18  **Q.**  And what types of coaching did you do for your reports,

19  Dr. Menninger?

20  **A.**  For example, if I had a particular employee that I was

21  getting complaints about, I would coach them on whatever the

22  particular issue was.  I had a complaint that one of my

23  direct reports did not have a great communication style and

24  so I did some coaching on that.  But it was basically

25  coaching on areas where they might be able to improve or it

1    could be coaching on, you know, say they had a goal to

2    advance in their career, and what steps might they take to

3    pursue that.

4    **Q.**   And you would -- you would do that coaching as part of

5    those one on one meetings that you had?

6    **A.**   Yes.  But also sometimes in addition, if it was -- if I

7    felt like it needed to be done immediately.

8    **Q.**   You would take the employee aside and talk to them about

9    those issues?

10   **A.**   Yes.

11   **Q.**   Let's switch gears and bring up -- let's?

12            MS. MANDEL:  Your Honor, is this -- would you like

13   to break?

14            THE COURT:  I think keep going.  I think we'll go a

15   little bit longer.  We'll take the break more like 11:15 or

16   so.

17            MS. MANDEL:  Perfect.  Thank you.

18            Let's switch to Exhibit 80.  This is Joint

19   Exhibit 80.

20   BY MS. MANDEL:

21   **Q.**   Dr. Menninger, this is a series of e-mails, and you see

22   Chad St. John's name, and Mr. Mekerri, who we've heard about,

23   as well.  And Brent McKinnon is one of the folks on here.  I

24   believe you testified earlier this week, but let's just

25   remind the jury, who's Brent McKinnon?

1    **A.**  He was the executive director for quality assurance.

2    **Q.**  So based on your understanding, Mr. McKinnon was

3    responsible for making sure that the quality level was where

4    it needed to be for customers and for all of those

5    accreditation standards; is that right?

6    **A.**  He coordinated the quality assurance activities.  I

7    wouldn't say he was directly responsible for them.

8    **Q.**  Understood.  Let's look -- if we look in the -- zoom into

9    the middle of the page, there's an e-mail that Brent McKinnon

10   sent to Mr. Mekerri.  And it looks like he copied Mr. St.

11   John in HR; is that right?

12   **A.**  Yes.

13   **Q.**  And Mr. McKinnon sent this e-mail on October 11, 2017.

14   So and just for context, Dr. Menninger, this is after you had

15   moved to Massachusetts, right?

16   **A.**  Yes.

17   **Q.**  Okay.  And Mr. McKinnon said, "Good afternoon, Hacene,"

18   and that's Hacene McCarry, "hope your EU trip is going well"

19   the EU is the European Union, right?

20   **A.**  Yes.

21   **Q.**  Okay.  "I wanted to follow-up with our discussion

22   regarding on site time for the US lab director."

23            And at this point, you were the US lab director; is

24   that right?

25   **A.**  Yes.  But I think he was referring to -- he knew we were

1    hiring for this position and it looks like he was asking for

2    any updates.

3    **Q.**   Okay.  And then he says -- and we'll look at the below

4    e-mail, it says, "Below Kathy has highlighted this concern

5    for Lisa."

6              And fair to say that that's referring to you,

7    Dr. Menninger?

8    **A.**   Yes.

9    **Q.**   "Following research specific to NYS."

10             That's that New York state standard that you

11    described earlier?

12    **A.**   Yes.

13    **Q.**   "And therefore, I wanted to let you know I know we are

14    active on the recruiting front, but this can turn out to be a

15    significant issue with the NYSDOH."

16             Is that New York State Department of health?

17    **A.**   Yes.

18    **Q.**   "Inspection which is about a month away."

19             Is that right?

20    **A.**   Yes.

21    **Q.**   And I know you talked about inspections, but when those

22    regulatory inspections happened, that was when whatever lab

23    it was needed to be able to show everything was in compliance

24    and sort of dotting the Is and crossing the Ts, right?

25    **A.**   Yes.

1  **Q.**  And so it sounds like Mr. McKinnon here was expressing

2  concern about whether that would be possible, given this

3  upcoming inspection by New York; is that right?

4  **A.**  I think this was a concern that Kathy, his direct report,

5  had.

6  **Q.**  And let's look at that.  So underneath Mr. McKinnon's

7  e-mail, is another e-mail.  This is October 11th that same

8  day, in 2017.  And this is an e-mail from Kathy Dick.  And

9  you said Kathy Dick was Mr. McKinnon's report on the quality

10  side?

11  **A.**  Yes.

12  **Q.**  It's an e-mail from Kathy Dick and it actually went to

13  you and to Lorraine McNamara.

14        Who is Lorraine McNamara?

15  **A.**  She was the lab director of the Belgium lab and she was

16  the acting interim director, who was overseeing the US lab

17  supervisors, while -- because our associate director had left

18  that position in the spring.

19  **Q.**  And this was what you were describing earlier, like that

20  kind of open position that was covered on an interim basis?

21  **A.**  This was -- this was one of them.

22  **Q.**  And then there was also a copy of the e-mail went to

23  Mr. McKinnon, right?

24  **A.**  Yes.

25  **Q.**  And let's look up -- so this is an e-mail where Kathy

1    Dick said to you and to Lorraine, the middle paragraph is, "I
2    do have a concern as we approach New York state inspection,
3    the standard as written has the expectation that a full time
4    lab director, serving as the primary CQ holder."
5            What is CQ, Dr. Menninger?
6    **A.**  I do not remember what that stands for, but basically
7    it's referring to you have a primary director for the New
8    York certification, and then you have CQ holders for
9    different sections, because it's -- usually -- usually you
10   don't have one person who is an expert in all of the
11   sections.
12   **Q.**  Understood.  And New York had a ton of requirements,
13   right?
14   **A.**  They had a lot of different areas where they had CQ
15   holders.
16   **Q.**  And then this paragraph goes on.  It says, "The standard
17   does provide a statement that time on site should be defined
18   in the lab director job description, which is written as
19   70 percent of the time being on site."
20           Do you see that?
21   **A.**  Yes.
22   **Q.**  And then it says that the JD, the job description, and
23   the standard are attached.  And we looked at those today and
24   saw that 70 percent, right?
25   **A.**  Correct.

1    **Q.**  "And this was required as an outcome of our previous New

2    York state inspection."

3               Do you see that?

4    **A.**  Yes.  I do.

5    **Q.**  And the next paragraph says, "While we can certainly show

6    evidence of lab director support through IM. "

7               That's instant message; is that right?

8    **A.**  Yes.  But the document changed.

9               MS. MANDEL:  Yeah.  We're just going to blow up

10   that bottom paragraph.

11              Thanks, Miranda.

12   BY MS. MANDEL:

13   **Q.**  "Through IM, email, phone, et cetera, we are currently

14   out of compliance with the standard and the job description."

15              Do you see that?

16   **A.**  Yes.  But that's not accurate.  It wasn't a New York

17   standard.  I think this was a concern Kathy Dick had, based

18   on an inspection that happened with her, prior to me joining

19   PPD.

20   **Q.**  And the next sentence, Ms. Dick does talk about in the

21   past New York state to push back on the way this was being

22   covered, right?

23   **A.**  Right.

24   **Q.**  And the last sentence, Ms. Dick said the New York profile

25   still had you listed as being on site Monday through Friday,

1    8:00 to 5:00, right?

2    **A.**   Right.

3    **Q.**   And at this time, you weren't on site, because you were

4    working from Massachusetts the majority of the time, right?

5    **A.**   Yes.  This was a concern for me, as well, because this is

6    the position that was put on hold, and I had a candidate that

7    met all of these requirements that we wanted to hire, and

8    then, all of the sudden, they put the position on hold.  So I

9    couldn't hire to fill that position.

10            Regardless, we had an excellent State of New York

11   inspection.

12   **Q.**   And before we get there, back to that e-mail from

13   Mr. McKinnon, and this was just a little bit later on

14   October 11, 2017, you see Mr. McKinnon was forwarding on this

15   concern to both Mr. Mekerri and Mr. St. John to make them

16   aware of the concern, right?

17   **A.**   Yes.  It's a little bit small, hard to read.

18   **Q.**   Yup.  And we can make that middle section bigger again.

19            MS. MANDEL:  Thanks Miranda.

20   BY MS. MANDEL:

21   **Q.**   And this is where Mr. McKinnon e-mails both Mr. Mekerri

22   and Mr. St. John.  And again, this is October 11, 2017.  And

23   it says Kathy -- and that's Kathy Dick, right?  Highlighted

24   this concern to Lisa -- and Lisa is referring to you, right?

25   **A.**   Yes.

1    **Q.**  Okay.  Thank you.

2              Now, I want to look back at Joint Exhibit 377,

3    which is one that we looked at earlier this week.  And now we

4    have this additional context from Mr. McKinnon, before he

5    provided this 360 feedback to Mr. Mekerri.  Is that right?

6    **A.**  Yes.

7    **Q.**  So -- and we looked at this earlier this week, but

8    this -- Mr. McKinnon sent this e-mail a few weeks later.

9    This is November 29, 2017.

10   **A.**  Yes.

11   **Q.**  And it begins, the e-mail he says, "Hi, Hacene" -- that's

12   Mr. Mekerri.  "Thanks for the opportunity to provide my

13   input.  See below."

14             Do you see that?

15   **A.**  Yes.

16   **Q.**  And there are a number of people listed below, and I know

17   we talked about this a little bit earlier this week, but 360

18   input, that is when different folks in the company could

19   provide their input about having worked with various people;

20   is that right?

21   **A.**  Yes.

22   **Q.**  And so you didn't report to Mr. McKinnon and he didn't

23   report to you, right?

24   **A.**  Correct.

25   **Q.**  But you did report to Mr. Mekerri; is that right?

1   **A.**   Yes.

2   **Q.**   And as you've described, your role in quality did have

3   some kind of overlap at times with Mr. McKinnon's role,

4   right?

5   **A.**   Yes.  At a high level.

6   **Q.**   And so fair to say that Mr. Mekerri was reaching out to

7   people who did interact with you and others to get that

8   input, right?

9   **A.**   Yes.  But I rarely interacted with Brent McKinnon.  I

10  interacted more with his direct reports.

11  **Q.**   Understood.  Let's blow up the section about the 360

12  feedback that Mr. McKinnon gave regarding you, Dr. Menninger.

13  And this is what we looked at the other day, as well.

14       So this is -- again, this is just a few weeks that

15  Mr. McKinnon had forwarded that e-mail from Kathy Dick,

16  right?

17  **A.**   I believe so.  I don't remember the date on the last

18  e-mail.

19  **Q.**   And Mr. McKinnon said, "My feedback with Lisa" -- and

20  that's your, right -- "is mixed, as you and I have

21  discussed."

22       Right?

23  **A.**   Yes.  That's what it says.

24  **Q.**   And then it says, "While I feel that Lisa is technically

25  strong, and a nice person, she has not demonstrated the

1    leadership strength that I would expect.  Lisa has been very

2    indecisive on numerous, important matters."

3              And then he lists out what those things are.  Do

4    you see that?  "Lab training, competency, documentation, and

5    supervisor responsibilities."

6    **A.**   I do see that.

7    **Q.**   "That had resulted in lingering compliance concerns

8    raised by internal auditors, SLT peers" -- wait, SLT, is that

9    senior leadership team?

10   **A.**   Yes.

11   **Q.**   "And customers.  She has been dismissive of repetitively

12   raised concerns regarding the lack of bench level

13   supervision, and since her decision to relocate, she has been

14   lackadaisical toward her time on site in the US lab; this

15   style has led to an environment where lack of accountability

16   is prevalent and overall disrespect for leadership decisions

17   persist."

18             Do you see that?

19   **A.**   Yes.

20   **Q.**   And at this point, Dr. Menninger, this is November of

21   2017, right?

22   **A.**   Yes.

23   **Q.**   And I think based on your testimony from earlier this

24   week, we have established that that was about -- about two

25   months before you told PPD or Mr. Mekerri that you had a

1  disability; is that right?

2  **A.**  I -- I told them I had a disability on December -- around

3  January 11, 2018.

4  **Q.**  So this is a couple months before that?

5  **A.**  Approximately.

6          MS. MANDEL:  Yeah, thanks, Miranda.  We can close

7  out of that.

8  BY MS. MANDEL:

9  **Q.**  And you testified earlier this week, Dr. Menninger, that

10  Mr. Mekerri told you in December of 2017 that he wanted to

11  increase certain parts of your role.  Right?  Social

12  interactions, different types of visibility?

13  **A.**  He said that he was considering some changes to my role

14  in 2018, and that we would discuss those further after the

15  holidays.

16  **Q.**  So this is before the holidays, in December of 2017,

17  Mr. Mekerri told you that he was thinking about these

18  changes.

19  **A.**  Not changes, just -- well, yeah, additional things that

20  he had in mind for my role.  And he gave an example of

21  presentations to clients.

22  **Q.**  And Mr. Mekerri described at that time, I think you

23  testified, additional visibility.  Is that right?

24  **A.**  I believe so.

25  **Q.**  And when Mr. Mekerri told you this in December of 2017,

1   what did you understand additional visibility to mean?

2   **A.**   Well, he -- he gave me an example of formal PowerPoint

3   presentations in front of pharmaceutical clients.

4   **Q.**   And was this discussion that you had with Mr. Mekerri in

5   December 2017, was that an in-person conversation?

6   **A.**   No.   That was by phone.

7   **Q.**   Because you were not in Highland Heights.  You were in

8   Dighton at that time; is that right?

9   **A.**   Correct.

10  **Q.**   Okay.  And I know that you -- you testified earlier this

11  week that at various points you prepared slides, PowerPoint

12  slides, for different purposes?

13  **A.**   Rarely, yes.

14  **Q.**   So at this point, you had some experience doing slides on

15  behalf of the lab business, and Mr. Mekerri was talking about

16  kind of growing that part of what you were doing?

17  **A.**   I had done a few slides internally, but never for

18  clients.

19  **Q.**   And I know you just testified a few moments ago, then it

20  was -- it was after the holidays, on January 11th, that you

21  told Mr. Mekerri that you wanted to let him know about a

22  disability that you had?

23  **A.**   Yes.  And it was because of what he brought up in that

24  December meeting.

25  **Q.**   So in December, Mr. Mekerri told you about wanting to

1    kind of increase your visibility in certain ways, and because

2    of that, you wanted to let him know that you had a

3    disability?

4    **A.**   I wanted to let him know, because he gave me the

5    impression that he wanted me to give large and formal

6    presentations in front of pharmaceutical clients, and I knew

7    what impact that would have on me and actually mentioned at

8    the time that that would make me anxious, and he responded

9    with, you know, oh, but your CV is so impressive.  I've seen

10   you present.  You do such an excellent job.  And, yeah, that

11   was the extent of it, but I was anxious because of that

12   potential change in my role.

13              THE COURT:  Sure.  Break here.

14              Ladies and gentlemen.  Take the morning break.

15              All rise for the jury.

16              (The jury exits the courtroom.)

17              THE COURT:  I'll find out what that is when they

18   come back.

19              That was not 23 minutes.

20              MR. HANNON:  I owe you minutes, Your Honor.

21              THE COURT:  You're in phase two or ten, no matter

22   what.  I would have given you that amount of time, because it

23   was only said you said 23 minutes because you were so

24   confident.  That makes me worry about Friday.  So just so

25   we're clear, you have to make next Friday, unless

```
1    something -- unless there's a snowstorm or something like
2    that.  I leave it to all of you to figure out your timing
3    with that in terms of -- did I tell them -- did they raise a
4    thing about Monday?
5               THE DEPUTY CLERK:  Uh-uh.
6               THE COURT:  Okay.  I'll tell them at the end of the
7    day, about the schedule, and we're on track.
8               So we'll resume at 11:30.  Thanks.
9               (Court in recess at 11:16 a.m.
10              and reconvened at 11:30 a.m.)
11              THE COURT:  You can go get the jury.
12              (The jury enters the courtroom.)
13              THE COURT:  You can proceed, Ms. Mandel.
14   BY MS. MANDEL:
15   Q.  Dr. Menninger, you started to see a new psychiatrist in
16   the -- towards the end of January 2018; is that right?
17   A.  Yes.
18   Q.  And that was Dr. Marianna Kissimian?
19   A.  That's correct.
20   Q.  She is located in Providence or she was located in
21   Providence?
22   A.  Yes.
23   Q.  And going back to sort of prepandemic times, you saw her
24   in person, in an office?
25   A.  Yes.  Most of the time.
```

1    **Q.**   Most of the time.

2            And when you first went to see Dr. Kissimian, in --

3    I believe it was January 22, 2018, is that right?

4    **A.**   I lost the --

5    **Q.**   Yeah, we'll look at that exhibit in a minute, but it was

6    around January 22, 2018?

7    **A.**   I believe so.  I don't have the date memorized.

8    **Q.**   Understood.  We're going to look at those notes.

9            And you reported to Dr. Kissimian that you were

10   concerned about how you would respond with anxiety about

11   things that PPD was asking you to get more involved in; is

12   that right?

13   **A.**   I told her about the changes to my role that Hacene

14   brought up and my -- my concerns with how that would affect

15   my condition.

16   **Q.**   And that's what prompted you to go see Dr. Kissimian at

17   that point?

18   **A.**   Yes.  I also had some documentation that I needed to get

19   filled out for HR.

20   **Q.**   That was accommodation paperwork for HR?

21   **A.**   Yes.

22   **Q.**   Dr. Menninger, even though Mr. Mekerri told you about

23   these changes that he was planning or, you know, kind of

24   adjustments that he wanted to make to your role in December

25   of 2017, he never actually implemented any of those changes,

1  correct?

2  **A.**  That's correct.

3  **Q.**  Dr. Menninger, I also want to be clear, no one at PPD

4  ever said anything negative about any of your disabilities.

5  Isn't that right?

6  **A.**  That's correct.  But it was confidential.

7  **Q.**  Yes.  I understand that.  But you didn't hear anyone say

8  anything that was negative, expressed negative views about

9  your anxiety or anything like that, right?

10  **A.**  No, there was no one else who knew, other than HR and

11  Hacene.

12  **Q.**  And I also want to clarify, PPD never put you on any sort

13  of performance improvement plan; is that right?

14  **A.**  That's correct.

15  **Q.**  And you never, throughout your employment, received any

16  kind of written discipline or anything like that, right?

17  **A.**  That's correct.

18  **Q.**  You mentioned a couple moments ago that you went through

19  some accommodation paperwork after you told PPD about your

20  anxiety; is that right?

21  **A.**  Yes.  I've followed up with Chad to find out if there

22  were any forms or a particular process that I needed to

23  follow.

24  **Q.**  And "Chad" is Chad St. John in HR?

25  **A.**  Yes.

1  **Q.**  And I know we saw his name earlier today, but he was the

2  HR director that the folks in Highland Heights worked with on

3  a daily basis for any HR needs; is that right?

4  **A.**  Yes.

5  **Q.**  Within a few days of you telling Mr. Mekerri about your

6  anxiety on January 11th, Mr. St. John reached out to you to

7  discuss accommodation paperwork, correct?

8  **A.**  That's correct.

9  **Q.**  And I know that was a long time ago, so let's pull up

10  that communication.

11        MS. MANDEL:  Miranda, I apologize, we're going to

12  start with Joint Exhibit 407.

13  BY MS. MANDEL:

14  **Q.**  So this is an e-mail, Dr. Menninger, that's dated

15  January 15, 2018, from Chad St. John to you.  Do you see

16  that?

17  **A.**  Yes.

18  **Q.**  And again, it was January 11th that you told Mr. Mekerri

19  that you had anxiety?

20  **A.**  Yes.

21  **Q.**  Let's just go through this e-mail.  So starting at the

22  top, Mr. St. John said, "I spoke with Hacene," that's Hacene

23  Mekerri?

24  **A.**  Yes.

25  **Q.**  He said, "I fully appreciate the sensitivity in the

1   information that you have disclosed" -- and actually, he

2   refers back to that January 11th date.  Do you see that?

3   **A.**  Yes.

4   **Q.**  You -- you inform Mr. Mekerri of your limitation.  And

5   then below that -- and then he actually also said that

6   eluded -- and maybe that was meant to say alluded to a need

7   for an accommodation to be able to perform the essential

8   functions of your job.  Do you see that?

9   **A.**  Yes.

10  **Q.**  And beneath that, Mr. St. John explained that PPD

11  complies with the Americans with Disabilities Act and wants

12  to support you so that you can continue to perform your job

13  duties; is that right?

14  **A.**  Yes.

15  **Q.**  And then Mr. St. John explained the process is

16  interactive and he looked forward to having this conversation

17  with you.

18          MS. MANDEL:  Let's just go up a little bit,

19  Miranda.  Sorry about that.

20  BY MS. MANDEL:

21  **Q.**  And then he explains further, "PPD has a formal process

22  that will allow us to identify or substantiate your

23  disability limitations and effective accommodations.  And

24  then he explained that, to start the process, there are two

25  forms that would be needed, and one is a request for

1  accommodation form that would be completed by you, and the

2  other is a physician statement."

3          Is that right?

4  **A.**  Correct.

5  **Q.**  And then Mr. St. John explained that the second form was

6  to be completed by your doctor, "Please take your job

7  description" -- which he attached, "to your medical provider,

8  and review how your medical condition might affect your job

9  functions."

10          Do you see that?

11  **A.**  Yes.

12  **Q.**  And he explained that the form would include information

13  for your doctor regarding what major life activities are

14  limited, and he explained this accommodation process; is that

15  right?

16  **A.**  Yes.

17  **Q.**  And then going down further, Mr. St. John explained how

18  long you had to return the form, that you had 15 days to get

19  it back, although he also explained that, you know, you might

20  get -- you could get more time.

21          And let's look at the paragraph that begins, "I

22  have also included EAP information."

23          Do you see that, Dr. Menninger?

24  **A.**  Yes.

25  **Q.**  Do you recall what EAP is?

1    **A.**   I believe it was -- stood for employee assistance

2    program.

3    **Q.**   And then Mr. St. John said, "I can certainly share FMLA

4    and STD."  Is that Family Medical Leave Act and short-term

5    disability information?

6    **A.**   Yes, I see that.

7    **Q.**   "If you need to pursue those avenues."  And then he says,

8    "please let me know if you have any questions."

9              And then let's look at what those attachments are.

10             MS. MANDEL:  So if we look at the next couple of --

11   Miranda, that's look at pages 24 to 27.

12             So these are in the attachments.

13             And I think, Miranda, the Bates number 24.  Thank

14   you.

15   BY MS. MANDEL:

16   **Q.**   So this is that physician's statement for accommodation,

17   and it was a blank -- a blank version of that form.  Is that

18   right, Dr. Menninger?

19   **A.**   Yes.

20             MS. MANDEL:  And then, Maria, can we -- let's just

21   scroll down and look at the other -- the following couple of

22   pages.

23   BY MS. MANDEL:

24   **Q.**   And this request for accommodation form continues to be

25   completed by your doctor; is that right?

1    **A.**   Correct.

2    **Q.**   And this is what you described taking to Dr. Kissimian

3    when you first went to see her on January 22nd, is that

4    right?

5    **A.**   That's correct.

6          MS. MANDEL:   Okay.   And Miranda, can we go to Bates

7    number 28, please.

8    BY MS. MANDEL:

9    **Q.**   So this is that EAP paperwork.   This is information about

10   what you said was the employee assistance program; is that

11   right, Dr. Menninger?

12   **A.**   It looks like it.   I actually never opened it up.

13   **Q.**   You didn't open this attachment?

14   **A.**   No.

15   **Q.**   Do you see it says, "What can my EAP and work life

16   services benefit do for me"?

17          This is kind of in the middle of the page.

18   **A.**   Yes.

19   **Q.**   And it says, "You may be struggling with stress at work,

20   seeking financial or legal advice, or coping with the death

21   of a loved one."

22          Do you see that?

23   **A.**   Yes.

24   **Q.**   And then it lists out things that this EAP program can

25   help with, and it includes depression, anxiety, stress, down

1   below it includes living with chronic health conditions, it

2   includes child care.  Do you see that?

3   **A.**  Yes.

4   **Q.**  And since you didn't open this, Dr. Menninger, is it fair

5   to say that you didn't pursue any of these services?

6   **A.**  No.  I felt my condition was more serious than what the

7   EAP could address.

8   **Q.**  Although in fairness, you didn't know, because you didn't

9   open the document; is that right?

10  **A.**  No.  But I knew about the EAP program.

11  **Q.**  You were aware of it.  And then after Mr. St. John sent

12  you all of this information, that's when you went to see

13  Dr. Kissimian, and that was a week later, on January 22nd?

14  **A.**  Yes.

15  **Q.**  And you took the paperwork from Mr. St. John to

16  Dr. Kissimian?

17  **A.**  I either handed to her, or I'm emailed it.  I don't

18  remember which.

19  **Q.**  And after you gave that paperwork to Dr. Kissimian, both

20  Dr. Kissimian and you filled out your different portions of

21  the paperwork; is that right?

22  **A.**  Yes.

23         MS. MANDEL:  Let's look at Joint Exhibit 47,

24  please, Miranda.

25  BY MS. MANDEL:

1    **Q.**  So this first -- the first page here is an e-mail from

2    Dr. Kissimian to Chad St. John.  And this was sent on

3    January 31, 2018; is that right?

4    **A.**  Yes.

5    **Q.**  And Dr. Kissimian said, "Chad, per our conversation, the

6    forms are attached."  So at this point, it seems like Mr. St.

7    John and Dr. Kissimian had already talked?

8    **A.**  Yes.

9    **Q.**  And there are the attachments.  This was the physician

10   form that Dr. Kissimian sent back.  Let's look at that.

11            MS. MANDEL:  Can we go to the next page, please.

12   Thanks, Miranda.

13   BY MS. MANDEL:

14   **Q.**  So this is the same form that we saw in blank, this is

15   the one that Dr. Kissimian filled out and sent back to

16   Mr. St. John; is that right?

17   **A.**  Yes.

18   **Q.**  And it's a little hard to tell exactly what Dr. Kissimian

19   wrote in, but you can see, under number 3, it says, "What is

20   the impairment?"

21            Do you see that?

22   **A.**  Yes.

23   **Q.**  And Dr. Kissimian listed panic disorder with agoraphobia,

24   social anxiety, generalized anxiety disorder.

25            Do you see that?

**A.**   Yes.

**Q.**   Dr. Menninger, can you explain in laymen's terms what agoraphobia is?

**A.**   It's a fear of places or situations that might trigger a panic attack.

**Q.**   And it's specific to situations being around other people, right?

**A.**   No, I'm -- not necessarily.  I'm not a psychiatrist, so I don't know the precise definition, but I don't think it is specific to being around other people.  I think it's just anything that you would anticipate could cause a panic attack, like place or situation.

**Q.**   Okay.  And these were -- these were conditions that, as you understood, you had been dealing with up until this point, but you had not told PPD about; is that right?

**A.**   Yes.  I had never actually been diagnosed with panic disorder with agoraphobia before this.  But I knew I had panic attacks and I was diagnosed with social anxiety disorder and generalized anxiety disorder.

**Q.**   And in the next question, it says, "Is the impairment permanent, long term, or temporary?"

And then it says, "If it is not permanent, what is the expected duration of impairment?"

And then Dr. Kissimian responded "Impairment is long term with a chronic course."

1          Do you see that, Dr. Menninger?

2     **A.**  Yes.

3     **Q.**  And that's when Dr. Kissimian was explaining that this

4     wasn't going to go away.  Is that right?

5     **A.**  That's correct.

6     **Q.**  And if we look down in the next, number five, this is

7     where Dr. Kissimian explained how the diagnoses that she

8     listed above would affect your work situation in particular,

9     right?  Do you see that, number 5?

10    **A.**  Yes.  I don't --

11         THE COURT:  Yes, you see number 5, or yes to the

12    other question?

13         THE WITNESS:  Yes, I see number 5.

14         MS. MANDEL:  You see number 5.  Okay.

15         THE WITNESS:  It's very small now.

16         MS. MANDEL:  Yeah, I think Miranda was just going

17    to blow that back up.  I think she was highlighting that so

18    that you would be able to see a little bit more clearly.

19    BY MS. MANDEL:

20    **Q.**  Can you see that now, Dr. Menninger?

21    **A.**  Yes.

22    **Q.**  Okay.  And this specifically, this question is about --

23    it says, "What condition or limitation is or are interfering

24    with the employee's ability to perform the essential

25    functions of his or her job?" And it says, "Based on the

1    attached job profile."

2              Do you see that?

3    **A.**  Yes.

4    **Q.**  So keeping your job profile in mind, Dr. Kissimian wrote

5    down below, "Lisa suffers from panic disorder with

6    agoraphobia, social anxiety disorder, and generalized anxiety

7    disorder."

8              Do you see that, that's the first sentence?

9    **A.**  Yes.

10   **Q.**  "This disability significantly interferes with Lisa's

11   ability to perform major life activities, such as thinking,

12   concentrating, communicating, and working.  Lisa is most

13   affected in social situations when she is required to speak

14   in front of others.  Despite these limitations, Lisa reports

15   that she has historically fulfilled the essential functions

16   of her job without accommodation.  However, she frequently

17   suffers from anxiety and other somatic symptoms triggered by

18   social interactions and public speaking incident to her job."

19             Do you see that?

20   **A.**  Yes.

21   **Q.**  And let me ask you -- and I understand that you're not a

22   psychiatrist, Dr. Menninger, but when you read this, do you

23   understand what somatic symptoms are?

24   **A.**  Yes.

25   **Q.**  That's kind of like a physical reaction; is that right?

1    **A.**  Yes.

2    **Q.**  And then it goes on to say, "Further, Lisa's supervisor

3    recently identified potential changes to her role involving

4    more public speaking and social interactions.  This has

5    caused Lisa to experience increased anxiety with somatic

6    symptoms, including diarrhea, heart racing, sweatiness,

7    increased respiratory rate."

8          Do you see that, as well?

9    **A.**  Yes.

10    **Q.**  And you would agree that this is what Dr. Kissimian wrote

11    in response to any questions about how this would impact

12    work; is that right?

13    **A.**  Yes.

14    **Q.**  Now, let's look at number 6, which kind of straddles two

15    pages.  In this question, Dr. Kissimian was responding to

16    what, if any, of your job functions you would have trouble

17    performing, based on your job description; is that right?  Do

18    you see that, the question, number 6, based on conditions,

19    limitations?

20    **A.**  Yes.  I just need a second to read it.

21    **Q.**  Of course.  Of course.

22          Have you seen that question now, number 6?

23    **A.**  Yes.

24    **Q.**  Okay.  And then Dr. Kissimian wrote, "Lisa's disability

25    makes it extremely difficult for her to engage in public

1    speaking and social interactions.  While Lisa has been able

2    to tolerate these types of activities to the extent that

3    they've been necessary for her job, they often cause her to

4    suffer from anxiety and other somatic symptoms.  Any changes

5    of her role that increase the need for public speaking and/or

6    social interaction will increase her anxiety and worsen her

7    somatic symptoms which will make it substantially more

8    difficult, if not impossible for Lisa to perform her job."

9            Do you see that?

10   **A.**  Yes.

11   **Q.**  Okay.  And then let's look down at how Dr. Kissimian

12   fills out the rest of the form.

13           So the next -- the next one is a question about

14   what accommodation Dr. Kissimian would recommend that would

15   allow you to perform your job.  Do you see that?  It says if

16   the employee cannot perform the essential job functions --

17           THE COURT:  I think it would be helpful if you blew

18   it up, just because it's hard to read.  It's pretty small.

19           MS. MANDEL:  Thank you.

20   BY MS. MANDEL:

21   **Q.**  Do you see where it says, "If the employee cannot perform

22   the essential functions"?

23   **A.**  Yes.

24   **Q.**  Number 7.  Okay.  And then it says, "What accommodations

25   would you recommend which could allow the employee to better

1  perform his or her job functions?  Please specify."

2          Do you see that?

3  **A.**  Yes.

4  **Q.**  And Dr. Kissimian wrote, "Given Lisa's disability, I

5  recommend that any social interaction or public speaking

6  incident to her role be minimized to the extent possible.

7  Additionally, I recommend that her role not be changed to

8  require any increased speaking or social interactions."

9          Then she additionally said, "To the extent that

10  social interactions and/or public speaking is deemed

11  necessary for Lisa's job, I recommend that a plan be

12  developed for these activities in consultation with me or

13  another qualified healthcare provider."

14          Do you see that?

15  **A.**  Yes.

16  **Q.**  And at this point in January of 2018, Dr. Kissimian was

17  the only psychiatrist that you were seeing; is that right?

18  **A.**  Yes.

19  **Q.**  Okay.  And then again, in the next -- the next section,

20  number 8, the question says, "How would you recommend an

21  accommodation improve the employee's job performance?"

22          And Dr. Kissimian wrote, "Given Lisa's disability,

23  I recommend that any social interaction or public speaking

24  incident to her role be minimized to the extent possible."

25          And then it says again, "Additionally, I recommend

1    that her role not be changed to require any increased public

2    speaking or social interaction."

3          And then repeating again, that, to the extent they

4    were necessary, a recommendation that a plan be developed in

5    consultation with her; is that right?

6    **A.**   Yes.

7    **Q.**   And then number 9, "What restrictions, if any, do you

8    place on the employee's ability to perform the functions of

9    the job?"

10         Do you see that?

11   **A.**   Yes.

12   **Q.**   And Dr. Kissimian wrote, "Social interactions and public

13   speaking should be minimized as much as possible.  To the

14   extent Lisa is required to engage in social interactions

15   and/or public speaking, these activities should be planned in

16   consultation with her medical provider, in hopes of minimized

17   Lisa's anxiety and somatic symptoms."

18         Do you see that?

19   **A.**   Yes.

20   **Q.**   And then down below, Dr. Kissimian signed -- I think

21   that's probably her name, that chicken scratch; is that

22   right?

23   **A.**   I believe that's her signature.

24   **Q.**   And then she signed it on January 31st of 2018; is that

25   right?

1   **A.**   Yes.

2   **Q.**   Okay.  And then you also submitted the employee form at

3   the same time, or around the same time; is that right,

4   Dr. Menninger?

5   **A.**   Yes.

6         MS. MANDEL:  Miranda, can we bring up joint

7   Exhibit 220, please.

8   BY MS. MANDEL:

9   **Q.**   Dr. Menninger, this is a handwritten form that you filled

10   out; is that right?

11   **A.**   Yes.

12   **Q.**   And at the bottom of the page, we see it has -- that's

13   your signature?

14   **A.**   Yes.

15   **Q.**   Thankfully, much easier to read.

16         And that's January 30th, right, so the day before?

17   **A.**   Yes.

18   **Q.**   And you filled out that you were authorizing disclosure

19   of your health information from Dr. Kissimian; is that right?

20   **A.**   Yes.

21         MS. MANDEL:  Okay.  And let's -- let's go down to

22   Bates number 1382, please, Miranda.

23   BY MS. MANDEL:

24   **Q.**   And I understand there's a lot of typewritten language on

25   the page, but where there are answers that are typed in, did

1    you type those yourself, Dr. Menninger?

2    **A.**   I assume so.  It was a long time ago.  I can't really

3    remember.  But, yes, I think I filled it out on the computer.

4    **Q.**   Okay.  And you -- you indicated here, on the third line

5    down, that your work location was remote --

6               MS. MANDEL:  Oh, actually, Miranda, let's go back

7    to -- thank you.

8    BY MS. MANDEL:

9    **Q.**   You said your work location was remote; is that right?

10   **A.**   Yes.

11   **Q.**   And that's because you were -- you had relocated to

12   Dighton at that point and you were working out of your home

13   office most of the time?

14   **A.**   Yes.

15   **Q.**   Okay.  And then down below, the question says, "Describe

16   the nature of your impairment, and its expected duration"?

17   **A.**   Yes.

18   **Q.**   And you wrote in, "I've been diagnosed with panic

19   disorder with agoraphobia, social anxiety disorder, and

20   generalized anxiety disorder."

21   **A.**   Yes.

22   **Q.**   And you said you're not aware of a cure for these

23   conditions but you're seeking treatment to minimize and

24   alleviate symptoms?

25   **A.**   Yes.

1    **Q.**  And that was the treatment with Dr. Kissimian that you

2    were talking about?

3    **A.**  Yes.

4    **Q.**  Okay.  And then the next question is what specific

5    accommodation are you requesting.

6    **A.**  Yes.

7    **Q.**  And you typed in, "My psychiatrist has recommended that

8    any social interaction and/or public speaking incident to my

9    job be minimized or avoided as much as possible"?

10    **A.**  Correct.

11    **Q.**  And that was consistent with what Dr. Kissimian wrote on

12    her form; is that right?

13    **A.**  Yes.

14    **Q.**  "Further, she has recommended that my role not be changed

15    in a manner that would require increased social interactions

16    and/or public speaking."

17           That's also consistent with what Dr. Kissimian had

18    written?

19    **A.**  Yes.

20    **Q.**  "To the extent that these activities are deemed

21    necessary, my psychiatrist has recommended that a plan be

22    developed with her assistance for these activities in the

23    hopes of minimizing my anxiety or other symptoms."

24           Do you see that?

25    **A.**  Yes.

 1   **Q.**  And again, you're referring to Dr. Kissimian as the
 2   doctor who would have input on that?
 3   **A.**  Yes.
 4   **Q.**  Okay.  And then the last question on that page
 5   is, "Describe how the impairment is interfering with your
 6   ability to perform your essential job functions."
 7          Do you see that?
 8   **A.**  Yes.
 9   **Q.**  Okay.  And it references a job description, as well?
10   **A.**  Yes.
11   **Q.**  And you wrote in, "I believe that I am able to perform
12   the essential functions of my job without accommodation, as I
13   have been doing so for years.  However, social interactions
14   and public speaking often trigger anxiety, panic attacks, and
15   other symptoms of my condition.  These make it difficult for
16   me to perform my job and interfere with my personal life, as
17   well."
18   **A.**  That's correct.
19   **Q.**  Okay.  And so you signed this form and you sent it to
20   Mr. St. John; is that right?
21   **A.**  Yes.
22   **Q.**  And after that, Mr. St. John reached out to you to
23   discuss further; is that right?
24   **A.**  Yes.  I don't know the exact date.
25          MS. MANDEL:  Well, let's look at -- let's bring

1    up -- let's actually bring up Joint Exhibit 62, please,

2    Miranda.  And I know that we've looked at this -- maybe just

3    blow it up a little, Miranda, because it's a little hard to

4    read.

5    BY MS. MANDEL:

6    **Q.**  We'll start with the e-mail on the bottom, the first

7    e-mail on the page.  So the first e-mail --

8            MS. MANDEL:  I'm sorry, Miranda, can you make it a

9    tiny bit smaller, so we can just see who it came from.  Thank

10   you.

11   BY MS. MANDEL:

12   **Q.**  This e-mail came from Mr. St. John.  It went to you.  And

13   this was -- so we're like two days after you had returned

14   that -- that disability paperwork.  Does that make sense?

15   **A.**  Yes.

16   **Q.**  Okay.  And Mr. St. John said, "Hope your Friday is going

17   well."

18           He said, "I need your assistance as we continue the

19   dialogue around exploring reasonable accomodation.  What are

20   the specific expectations that Hacene shared with you for

21   2018 that you believe you cannot or limitedly perform?"

22           And then he says, "Your physician only indicates

23   that public speaking and social interaction be minimized.  To

24   the extent that public speaking and social interaction

25   is 'Deemed necessary' and that a plan be developed with your

physician."

So this is kind of working back what you and Dr.
Kissimian had explained?

**A.**  Yes.

**Q.**  "I would like to understand, from your physician's
perspective, in writing, the specific limits or maximum
percentage related to the specific expected duties.  Public
speaking and social interactions were the only items
specified in your physician's paperwork."

Do you see that?

**A.**  Yes.

**Q.**  And then he explained that this was going to be critical
in this process of kind of going through the accommodation
process.

**A.**  Yes.

**Q.**  Okay.  And then let's go to the top of this page and you
wrote back two days later, on February 4th.  This is from you
to Mr. St. John?

**A.**  Yes.

**Q.**  And you explained, you said, "Hacene and I had a general
discussion concerning changes he's considering making to make
my role more visible.  He didn't get into specifics, but
suggested this might include increased client visits, social
interactions, and presentations" and you say internal and
external?

1    **A.**   Yes.

2    **Q.**   "That's what prompted my initial email with him regarding

3    my disability.  We were supposed to have a follow-up

4    conversation to discuss specifics and I wanted him to

5    understand my situation, so that we could try to figure this

6    out together.  That conversation still hasn't happened, so I

7    can't provide you much additional detail at this point."

8              Is that right?

9    **A.**   Yes.

10   **Q.**   And then you asked Mr. St. John, just for clarification,

11   about what else he might need from your doctor, right?

12   **A.**   Yes.

13   **Q.**   Okay.  So we've looked -- this week we've reviewed I

14   think what Mr. Hannon has referred to as buckets of job

15   tasks; is that right?

16   **A.**   Yes.

17             MS. MANDEL:  Let's bring up Joint Exhibit 350,

18   please, Miranda.

19   BY MS. MANDEL:

20   **Q.**   This is this e-mail that Mr. Mekerri drafted talking

21   about what those buckets are; is that right?

22   **A.**   Yes.

23   **Q.**   So this was an e-mail from a couple of days later, now

24   we've gotten to February 6th, where Mr. Mekerri wrote to you,

25   with a copy to Mr. St. John, right?

**A.**   Yes.

**Q.**   And he explained, this is a one-on-one follow-up about the executive director role that's the subject, right?

**A.**   Yes.

**Q.**   And I know you had a one-on-one with him in December of 2017, where he had talked about what that additional visibility might be; is that right?

**A.**   Broadly, yes.  We discussed presentations for pharmaceutical clients.

**Q.**   And you'd agree, wouldn't you, that this is now -- it's a follow-up about what those specifics are?

**A.**   No.  I think this is based on a one-on-one we had just prior to, like -- yeah, this was -- this was based on a one on one that we had in 2018, not based on the December meeting.

**Q.**   Okay.  So you had another one-on-one some time in the first month of 2018?

**A.**   Yes.  I believe so.  I -- I would have to look at my notes.

**Q.**   Okay.  And, in fact, Mr. Mekerri does refer to having had a discussion with you of some type the day before; is that right?

**A.**   That makes sense.  That was probably the one-on-one.

**Q.**   And Mr. Mekerri in his follow-up says, "As per our conversations, I'm happy to explore potentially reasonable

1    accommodations, depending on the details that your physician

2    will provide.  I am listing below the specific duties within

3    the job description, along with the expectations to reach the

4    business goals.  As you already know, the percentage scope of

5    interactions, internal or external, is increasing in 2018 due

6    to the needs of the business and our aggressive commercial

7    goals."

8              Do you see that?

9    **A.**  Yes.

10   **Q.**  And then there are five bullet points below?

11   **A.**  Yes.

12   **Q.**  The first one is "SLT presentations."

13             Is SLT, that's the senior leadership team

14   presentations?

15   **A.**  Yes.

16   **Q.**  And "town hall COO/EVP meeting"?

17   **A.**  Yes.

18   **Q.**  COO is chief operating officer?  Is that --

19   **A.**  Yes.

20   **Q.**  And EVP is executive vice president?

21   **A.**  Yes.

22   **Q.**  And then beneath that, Mr. Mekerri provides some detail

23   about how many people might be there and how often they would

24   take place; is that right?

25   **A.**  Yes.

1   **Q.**  And so for the SLT presentations, which he lists, he says

2   up to -- well, actually for the whole category, up to 500

3   employees.  And then he says they would happen bi-weekly,

4   monthly, or quarterly, right?

5   **A.**  Yeah, the frequency and the number of employees depends

6   on the particular meeting.  The SLT meetings are very small

7   and you know, may involve, like, ten people.

8   **Q.**  And those are the ones that you testified earlier would

9   happen like on a bi-weekly basis?

10  **A.**  Yes.

11  **Q.**  And then there were really the big town halls which were

12  like all over the world and that was the bigger group?

13  **A.**  That was the bigger group, yes.

14  **Q.**  And then the next -- the next bullet point is, "Client

15  bid defense, issue resolution calls, Highland Heights client

16  site meetings, phone calls."

17          And it says, "Frequency:  Once a month at a minimum

18  for clients.  Attendees and audience:  Up to 50 attendees."

19          Right?

20  **A.**  Yes.

21  **Q.**  And actually just let's go back on the first bullet.  I

22  know you testified earlier today that you had already been

23  doing -- participating in those meetings, the SLT

24  presentations and the town halls, right?

25  **A.**  On rare occasions, I had to present at those meetings.

1   **Q.**  But you did attend those meetings?

2   **A.**  Yes.

3   **Q.**  Okay.  And I -- on the second bullet, you testified

4   earlier today about how you would be involved as needed with

5   presenting information to new customers?

6   **A.**  Are you -- what document are you referring to?

7   **Q.**  I'm talking about what your testimony has been so far

8   about providing some information to new customers about

9   things like reference ranges or what was happening in the

10  lab?

11  **A.**  Yes.  Usually through business development, an individual

12  or a project manager.  But yes.  Most of the time, my

13  interaction with clients was once their studies were already

14  underway.

15  **Q.**  And that's when they had questions about the reference

16  ranges or things like that?

17  **A.**  Right.

18  **Q.**  Then the third bullet is technical sales presentation,

19  internal and external, Highland Heights client site meetings,

20  and phone.  And it lists out frequency will be monthly or

21  quarterly as needed.  And then it said potentially up to 100

22  attendees?

23  **A.**  Yes.

24  **Q.**  And then the fourth bullet says for customer visits,

25  lunch and dinner and social interaction may occur?

1    **A.**   Yes.

2    **Q.**   That was about 60 to 80 percent of the time.

3             Do you see that?

4    **A.**   Yes.

5    **Q.**   In order to build business relationships.

6    **A.**   Yes.

7    **Q.**   And then finally is a bullet point that repeats what

8    we've seen in the job description, which was travel up to

9    30 percent.

10   **A.**   Yes.

11   **Q.**   Okay.  And then Mr. Mekerri said let me know if you need

12   further details.  I'm happy to provide them.  I'll do my best

13   to support you.

14   **A.**   Yes.

15   **Q.**   Okay.  And then after Mr. Mekerri sent you this list with

16   those five buckets, Dr. Kissimian sent a response; is that

17   right?

18   **A.**   Yes.

19   **Q.**   Let's look at that response from Dr. Kissimian.

20           MS. MANDEL:  Miranda, can we bring up Joint

21   Exhibit 433, please.

22   BY MS. MANDEL:

23   **Q.**   So this is an e-mail that's dated a few days later,

24   February 14th of 2018, from Dr. Kissimian to Chad St. John,

25   right?

1   **A.**  Yes.

2   **Q.**  And Dr. Kissimian said, "Chad, I've attached a document

3   providing psycho education on social anxiety disorder, as

4   well as recommended reasonable accommodations for Lisa."

5           Do you see that?

6   **A.**  Yes.

7           MS. MANDEL:  And let's go to the next page, please,

8   Miranda.

9   BY MS. MANDEL:

10  **Q.**  So this is the attachment that Dr. Kissimian sent; is

11  that right?

12  **A.**  Yes.

13  **Q.**  Okay.  And so the first few paragraphs, Dr. Kissimian is

14  just providing information about what your anxiety disorder

15  does; is that right?

16  **A.**  Yes.

17  **Q.**  Okay.  And let's?

18          MS. MANDEL:  Miranda, can we just increase the size

19  of that page a little bit and then we can go through it.

20  BY MS. MANDEL:

21  **Q.**  "Social anxiety disorder."  And that was one of your

22  diagnoses at that time?

23  **A.**  Yes.

24  **Q.**  "Lisa's difficulty with socializing and public speaking

25  is not a manifestation of shyness.  Social anxiety disorder

1    is a neurobehavioral disorder with biological and genetic

2    risk factors that lead to physical, behavioral, and cognitive

3    symptoms, which are pernicious and chronic in nature.

4            "In the past Lisa endured these work events and

5    presentations with intense discomfort and with the use of a

6    sedative. "

7            And let me just pause there for a minute,

8    Dr. Menninger.  Is Valium, like you talked about earlier, is

9    that a sedative?

10   **A.**  Yes.

11   **Q.**  "The sedative did help take the edge off, but also came

12   with side effects, including impaired attention,

13   concentration, short-term memory deficits, lethargy."

14           Lethargy is like exhaustion?

15   **A.**  Yes.

16   **Q.**  "And an extended length of time for her to return to her

17   cognitive baseline to complete the more analytical and

18   medical facets of her work.

19           "It is also important to note that the weeks

20   leading to the expected speaking engagement or social event

21   resulted in insomnia, panic attacks, GI discomfort, and

22   weight loss."

23           Do you see that, Dr. Menninger?

24   **A.**  Yes.

25   **Q.**  And in the next, Dr. Kissimian said, "A concrete way of

1    thinking about this disability is that her brain and body are

2    not able to tolerate public speaking engagements and

3    socializing, and it is as if her vocal cords and brain become

4    paralyzed while her blood pressure, heart rate, and breathing

5    all increase.  And it is for all of the above reasons that I

6    am recommending the following reasonable accommodations."

7         Do you see that?

8    **A.**   Yes.

9    **Q.**   And then she says, "Below are reasonable accommodations

10   for Lisa, so that she can continue to be a productive and

11   healthy member of your team."

12         And below that, this is the same language from

13   Mr. Mekerri's e-mail, but instead of a bullet, it now has a

14   number one.  Right?  But it's that same language that

15   Mr. Mekerri had listed out about SLT presentations, town

16   hall, COO and EVP meeting.  Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  Thank you.

19         MS. MANDEL:  And Miranda, can we -- let's look at

20   those items one through five a little bit larger, please.

21   Thank you.  And can we just go up to one, first.  Thank you.

22   BY MS. MANDEL:

23   **Q.**   So for number 1, this is the S LT presentations, the town

24   hall.  Under reasonable accommodation, you would agree,

25   Dr. Menninger, that the language that was added here by

1    Dr. Kissimian was where it says "reasonable accommodation,"

2    right?

3    **A.**  Yes.

4    **Q.**  Okay.  It says, "reasonable accommodation, responsible

5    for all slides, handouts, presentation material with

6    necessary information, but will require a reader to be -- to

7    present to the group or can be -- prerecord the audio/video,

8    and it can be played at the meeting.  Available for questions

9    via e-mail after the meeting."

10             Do you see that?

11   **A.**  Yes.

12   **Q.**  And did you understand this to mean that Dr. Kissimian

13   was saying you would write the material, but someone else

14   would present it to the senior leadership team, to town

15   halls, to the executives.  Is that right?

16   **A.**  We were just brainstorming creative ways that we could,

17   you know, accommodate, potentially, if needed.  It didn't

18   necessarily have to be this.  This was just an example.

19   **Q.**  No, and I understand this.  But this was creative and it

20   says that you wouldn't actually do the presenting, right?

21   **A.**  Not in person.

22   **Q.**  Okay.  Well, let's go down to number 2.  Number 2, this

23   is the language that Hacene had drafted about client bid

24   defenses, issue resolution, calls.  Do you see that?

25   **A.**  Yes.

1    **Q.**   And then Dr. Kissimian's language falls right beneath

2    that, "Reasonable accommodations available via e-mail, text,

3    remote videoconferencing for representative of the client,

4    one to two person audience maximum."

5              And that's compared to what Mr. Mekerri had said,

6    which was up to 50 people, right?  Do you see under number

7    two, it says up to 50?

8    **A.**   Yes.

9    **Q.**   Okay.

10             "If it is a site meeting, surrogate or reader with

11   all necessary information, realtime access to me will be

12   available."

13             Do you see that?

14   **A.**   Yes.

15   **Q.**   And this is maybe a little confusing, because it says "to

16   me," and Dr. Kissimian was writing this, but I'm assuming the

17   "me" there is you, Dr. Menninger; is that right?

18   **A.**   Yes.

19   **Q.**   Okay.  Because you put this together with Dr. Kissimian;

20   is that right?

21   **A.**   No.  Dr. Kissimian put this together.

22   **Q.**   Okay.  The next item, the next bullet is number 3, client

23   site meetings.

24   **A.**   Yes.

25   **Q.**   And Dr. Kissimian added the language that says

1    "reasonable accommodation," is that right?

2    **A.**  Yes.

3    **Q.**  It says reasonable accommodation would like a surrogate

4    to attend -- and just a surrogate is someone instead of you,

5    right?

6    **A.**  Yes.

7    **Q.**  Okay.  "But will be responsible for all problem solving,

8    ideas for resolution, e-mail communicated to me a few days

9    before the anticipated visit."

10              Do you see that?

11   **A.**  Yes.

12   **Q.**  The next item is technical sales presentation, internal

13   and external.  And it says, i.e., internal sales meeting.

14   And it says client site meetings, phone.  Do you see that?

15   **A.**  Yes.

16   **Q.**  And I think it's a little hard to read, but I think

17   before client site, it's HH, and that's Highland Heights; is

18   that right?

19   **A.**  I think so.

20   **Q.**  I know it's a little hard to read.  And it's underneath

21   that, Dr. Kissimian added the language that says, "Reasonable

22   accommodation"?

23   **A.**  Yes.

24   **Q.**  It says, "Excuse from sales presentations, but, again,

25   will provide any necessary data information for the reader or

1    surrogate to have at their disposal."

2         Do you see that?

3    **A.**   Yes.

4    **Q.**   And then number five, it says, "For customer visits,

5    lunch, dinner, and social interactions may occur."

6         Do you see that?

7    **A.**   Yes.

8    **Q.**   And then this is -- it gets kind of -- what Dr. Kissimian

9    wrote gets kind of bumped up.  It says surrogate -- that's

10   where her language begins, right?

11   **A.**   Which number are you -- oh, yes.

12   **Q.**   Yeah, this one is a lot harder, because it kind of gets

13   all bunched together.  But it's under number 5, the sort of

14   end of the second line.  That's where Dr. Kissimian's second

15   recommendation is added in; is that right?

16   **A.**   Yes.

17   **Q.**   And the accommodation that Dr. Kissimian recommended is

18   "Surrogate, as this is not her strength, skill set, and her

19   disability will flare with significant impairment.  She has

20   able to build business relationships in a more behind the

21   scenes fashion, and would like to brainstorm other potential

22   avenues, where she can add value, as she does understand that

23   this is an important part of the business."

24        Do you see that?

25   **A.**   Yes.

1  **Q.**  Okay.  And then number 6, below, this is where it says

2  travel, this is where we talk about the up to 30 percent that

3  came from your job description; is that right?

4  **A.**  Yes.

5  **Q.**  And Dr. Kissimian listed out as reasonable accommodation,

6  "When possible, traveling to Brussels, versus stateside."

7          Do you see that?

8  **A.**  Yes.

9  **Q.**  And stateside means like within the United States?

10  **A.**  Yes.

11  **Q.**  And that meant going to the Brussels lab, instead of

12  going to Highland Heights; is that right?

13  **A.**  Yes.

14  **Q.**  And that's because you specifically were finding it

15  really stressful to go to Highland Heights; is that right?

16  **A.**  Not totally.

17  **Q.**  Okay.  So --

18  **A.**  We were -- we were hiring -- as I mentioned earlier, we

19  were in the process of hiring an MD or Ph.D. qualified

20  candidate to serve as the lab director for the Highland

21  Heights lab.

22          I was still going to remain the CAP director for

23  the Belgium lab.  So it made sense that I would visit the

24  Belgium lab more at that point.

25  **Q.**  You had reported that it was especially stressful for you

1   to go to Highland Heights, which was your home lab, right?

2   **A.**  It was also a more stressful environment.  There was more

3   interdepartmental conflict.  Also, I was the only female

4   executive director there on site, so it -- with my condition,

5   it was a little bit intimidating, and I was concerned,

6   especially, you know, after disclosing my disability.

7   **Q.**  And so for you at this time, it was -- it was easier to

8   fly to Brussels?

9   **A.**  Yes.

10  **Q.**  In response to this communication from Dr. Kissimian,

11  Mr. Mekerri and Mr. St. John said that PPD would actually

12  accommodate you for a couple of these items; is that right?

13  **A.**  Yes.  But they changed the criteria for the fifth bullet.

14  **Q.**  Well, let's bring up that response.

15          MS. MANDEL:  Miranda, can we please bring up Joint

16  Exhibit 421.  Thank you.

17  BY MS. MANDEL:

18  **Q.**  This is an e-mail, Dr. Menninger, from Chad St. John to

19  you?

20  **A.**  Yes.

21  **Q.**  And it copied Mr. Mekerri, and I guess Mr. St. John sent

22  a copy to himself.

23          And Mr. St. John wrote to you, "Hacene has

24  confirmed that he is okay to accommodate points 1 and 5."  So

25  let's look below to what that was.  This is some highlighted

1    language, which is -- it's a little bit hard to see, it's

2    sort of grayed out, and it has a little asterisk under number

3    1.  And it says, "The accommodated expectation will now be to

4    include a designee."

5              Do you see that?

6    **A.**  Yes.

7    **Q.**  And you understand that that was PPD's response to you

8    about how they would -- they would be able to meet the

9    accommodation that was recommended by Dr. Kissimian, right?

10   **A.**  Yes.

11   **Q.**  And then the next item says, "Client bid defendants,

12   issue resolution calls," that same language we've seen a few

13   times now, right?

14   **A.**  Yes.

15   **Q.**  And it says, "The expectation is for Lisa to participate

16   in client bid defense issue resolution calls" -- and again,

17   HH is Highland Heights, right?

18   **A.**  Yes.

19   **Q.**  "Client site meetings, phone," and it says it's critical

20   for the business, right?

21   **A.**  Yes.

22   **Q.**  Okay.  Number 3, the technical sales presentation,

23   internal/external category, it says -- and the language that

24   Mr. St. John and Mr. Mekerri had added is where it says

25   "Lisa's participation."

1         Do you see that?

2   **A.**  Yes.

3   **Q.**  Okay.  "Lisa's participation as a Central Labs technical

4   leader is imperative in gaining perspective client's trust to

5   obtain new business."

6         Do you see that?

7   **A.**  Yes.

8   **Q.**  And then number four, customer visits, lunch/dinner and

9   social interactions?

10  **A.**  Yes.

11  **Q.**  And that's the one where Dr. Kissimian had said that you

12  should be excused from those interactions all together; is

13  that right?

14  **A.**  I believe she also said, Or brainstorm additional ideas.

15  **Q.**  And Mr. St. John and Mr. Mekerri said, "Lisa's

16  participation as a Central Labs technical leader is

17  imperative in gaining perspective client's trust to obtain

18  new business."  Right?

19  **A.**  Yes.

20  **Q.**  Okay.  And then on the next e-mail down -- I mean, not

21  the next e-mail, the next number down, it says number 5, and

22  it says travel up to 30 percent.  Again, that's the number

23  from your job description.  It says, "The accommodated

24  expectation will now be up to only 15 percent."  Right?

25  **A.**  Yes.

1    **Q.**   Okay.  And you understood that this was the response that
2    PPD was providing to what Dr. Kissimian had recommended; is
3    that right?
4    **A.**   Yes, except for number 5 wasn't really accurate, based on
5    what Dr. Kissimian wrote.
6    **Q.**   Well, Dr. Kissimian had written that your travel up to
7    30 percent to the extent possible should be international
8    travel, not to Highland Heights; is that right?
9    **A.**   To the Belgium lab, yes.
10   **Q.**   And specifically here, PPD was saying they would just cut
11   the travel expectation by half, right?
12   **A.**   Yes.  But I didn't have any issues with travel.  In fact,
13   I looked forward to making more frequent visits to the Global
14   labs.
15   **Q.**   And in fact, during this time period, you had been
16   looking at some upcoming trips to Brussels and to Shanghai, I
17   think coming up in the spring and summer following, right?
18   **A.**   Definitely to Brussels.  I don't think I had anything
19   firmly set for Asia -- for Singapore or Shanghai.
20   **Q.**   Okay.  And you actually -- you reported to Dr. Kissimian,
21   after receiving this response, that you thought that PPD's
22   response was promising, right?
23   **A.**   Where is that from?
24            MS. MANDEL:  Yeah, let's bring up Dr. Kissimian's
25   notes about that.

```
 1              Miranda, can we bring up Joint Exhibit 18, please.
 2   And let's look at Bates number 671, please.  Thank you.
 3   BY MS. MANDEL:
 4   Q.  This is an -- at the top it says it's a psychiatric
 5   follow-up visit.  This was Dr. Kissimian.  And it says, "DOS"
 6   is that date of service, as far as you know, Dr. Menninger?
 7   A.  I think that's DOB for date of birth.
 8   Q.  Oh, that's right.  Yeah, I do see where it says DOB.  But
 9   two items below that, do you see where it says "DOS"?
10              THE COURT:  Top of the page.
11              MS. MANDEL:  It's like --
12              THE COURT:  Maybe you can blow it up.
13              THE WITNESS:  Yes.  Sorry.  Yes.
14   BY MS. MANDEL:
15   Q.  Okay.  And let's look under, "History of present
16   illness," and it says, "Continues to isolate at home and
17   hardly leave her family."
18              Do you see that that is as of February 6th of 2018?
19   A.  Yes.
20   Q.  And it says, "Today introduced the concept of CBT."
21              Is that cognitive behavioral therapy?
22   A.  Yes.
23   Q.  Okay.  Did you do cognitive behavioral therapy with
24   Dr. Kissimian?
25   A.  We -- yes, we did both therapy and medication management.
```

1  **Q.**  So that was part of your treatment that you were doing

2  with Dr. Kissimian?

3  **A.**  We were experimenting with different things.

4  **Q.**  Okay.  And you noted -- it says, "She was able to speak

5  with both HR and her boss regarding the document for

6  accommodations."

7          Do you see that?

8  **A.**  Yes.

9  **Q.**  "And their response was promising"?

10  **A.**  Okay.  This was -- yes.  Yes.

11  **Q.**  Okay.

12  **A.**  This was before the meeting.

13  **Q.**  So this was after the company had given you information

14  about those five buckets, and after Dr. Kissimian had

15  provided back her recommended accommodations, right.  And at

16  that point you thought that things were promising?

17  **A.**  I did.  That was before I got the response on

18  February 26th, at the airport.

19  **Q.**  Because when you were flying back to Highland Heights?

20  **A.**  Yes.

21  **Q.**  Okay.  And it says, in the same paragraph, Dr. Menninger,

22  it says that at that point, you were isolating at home and

23  hardly leaving your family?

24  **A.**  Yes.

25  **Q.**  And I know you were just talking about being at the

1    airport and flying to Highland Heights, that was the one

2    visit you made to Highland Heights in 2018, right?

3    **A.**  Yes.  Hacene wanted me to time it with when the town hall

4    was going to occur.

5    **Q.**  And at that point, you had been isolating at home with

6    your family for some time?

7    **A.**  Since disclosing my disability.

8    **Q.**  So you had been pretty much at home with your family from

9    January to the end of February?

10   **A.**  Well, I was working in my office downstairs.  But, yes.

11   **Q.**  But physically, you weren't leaving the house?  That's

12   what I mean.

13   **A.**  Correct.

14   **Q.**  Okay.  And you were able to get on to a plane and fly to

15   Highland Heights at the end of February?

16   **A.**  I was and I had a panic attack.

17   **Q.**  Was that in the airport?

18   **A.**  No.  That was when I was at home.

19   **Q.**  Leading up to the trip?

20   **A.**  Yes.

21   **Q.**  How did you manage that panic attack?  I mean, like

22   deal -- cope with the fact that you were having a panic

23   attack?  Did you use medication for that?

24   **A.**  I was crying.  My husband was hugging me and trying to

25   console me and tell me it would be okay, because I was

1    scared.  I didn't know what to expect.  At this point, I had

2    not heard anything in terms of a response to the suggestions

3    that Dr. Kissimian had provided, so I was -- I was very

4    nervous.

5    **Q.**  Let's look at your later communication with Mr. St. John

6    and Mr. Mekerri about these accommodations that Dr. Kissimian

7    had drafted on your behalf.

8            MS. MANDEL:  Let's look at Joint Exhibit 141,

9    please, Miranda.

10   BY MS. MANDEL:

11   **Q.**  So let's look at your e-mail, which is at the bottom of

12   the page.  This was an e-mail that you wrote on March 24,

13   2018.

14   **A.**  Yes.

15   **Q.**  So this is, at this point, about a month after you had

16   the panic attack around that travel, right?  Is that right?

17   You were just describing having a panic attack before going

18   to Highland Heights towards the end of February of 2018, and

19   now we're in March of 2018.  About a month later, right?

20   **A.**  Correct.

21   **Q.**  Okay.  And you wrote this e-mail to Mr. St. John and

22   you -- if we -- you said you're writing to follow-up on his

23   e-mail regarding disability and potential need for reasonable

24   accommodation.

25            In the next paragraph you say, "I appreciate you

1   taking the time to highlight portions of my job description.

2   I am familiar with the essential functions of my position and

3   I'm not requesting any changes to those functions."

4           Do you see that?

5   **A.**   Correct.

6   **Q.**   Okay.  And you said, "I am capable of performing all of

7   my responsibilities, with or without accommodation."

8   **A.**   Yes.

9   **Q.**   Okay.  And then you said, "There are, however, certain

10  types of tasks, like formal group presentations, that are

11  challenging to my disability, and I'd ask that you consider

12  possible reasonable accommodations."

13          Do you see that?

14  **A.**   Yes.

15  **Q.**   Okay.  And in the next paragraph, you kind of remind them

16  how -- or you remind Mr. St. John, how that discuss had led

17  to Mr. Mekerri identifying three broad categories of duties

18  and responsibilities for which he believed that no

19  accommodation was possible.  That's those two, three, four

20  buckets?

21  **A.**   Yes.

22  **Q.**   Okay.  And then if we look down below, you said, "In any

23  event, based on my one-on-one with Hacene this past week..."

24          So referring to a recent meeting with Mr. Mekerri?

25  **A.**   Yes.

1    **Q.**   "It does not appear that there are any activities or

2    events in the near future that would implicate my disability.

3    Given this, and how extremely busy we all are, it might make

4    sense to table this discussion until a particular task

5    arises."  Is that --

6    **A.**   Yes.

7    **Q.**   Okay.  And then you said, "Dealing with these issues in

8    context, I think, might make this whole issue seem less

9    daunting and help us engage in a more meaningful dialogue."

10   **A.**   Yes.

11   **Q.**   Did Dr. Kissimian help you write that e-mail?

12   **A.**   No.

13   **Q.**   Did anyone help you write that e-mail, Dr. Menninger?

14   **A.**   Yes.

15   **Q.**   And who helped you write that e-mail?

16   **A.**   My attorney.

17   **Q.**   Oh, okay.  And then the last kind of small paragraph, you

18   said you remain confident that we can work through this

19   together.  Right?

20   **A.**   Yes.

21          MS. MANDEL:   Okay.  We can close out of that.

22   Thanks, Miranda.

23   BY MS. MANDEL:

24   **Q.**   Dr. Menninger, I understand that you currently receive

25   Social Security Disability benefits from the federal

1    government every month; is that right?

2    **A.**  Yes.

3             MS. MANDEL:  Let's bring up joint Exhibit 440,

4    please, Miranda.

5    BY MS. MANDEL:

6    **Q.**  Dr. Menninger, this is -- at the top, it says this is

7    "disability determination for Social Security pain and other

8    symptoms."

9             Do you see that?

10   **A.**  Yes.

11   **Q.**  And it has your name and it has a blocked out Social

12   Security number.  Do you see that?

13   **A.**  Yes.

14   **Q.**  Do you -- and it has a lot of handwritten notes.  Do you

15   recognize this as a form that you filled out?

16   **A.**  Yes.

17   **Q.**  And this was when you applied for government Social

18   Security benefits in January of 2019; is that right?

19   **A.**  The application was submitted much earlier.  This was a

20   supplemental document that was sent to me to fill out.  The

21   application started earlier, by a company called Genex, that

22   worked with UNUM, which was the company's disability

23   provider.

24   **Q.**  So -- and let's back up to give a little more context to

25   the jury on that.

1                 So you've testified so far this week that in June

2       of 2018, you went out on a leave from your position at PPD;

3       is that right?

4       **A.**   Yes.

5       **Q.**   And at the beginning of that leave, you had a number of

6       days -- a good number of days of PTO, paid time off, that you

7       were able to use to receive full pay?

8       **A.**   Yes.  We had, like, an executive bank that I was able to

9       be paid from.

10      **Q.**   Okay.  And then once you were done using that executive

11      bank of time, you -- you utilized short-term disability

12      benefits for pay; is that right?

13      **A.**   That's correct.

14      **Q.**   And then that transitioned, after a time, to what's

15      called long-term disability to provide you with pay?

16      **A.**   Yes.  That's correct.  But the short-term disability only

17      covered up to 60 percent of my pay.

18      **Q.**   Right.  It's not full pay.  But it has some tax benefits;

19      is that right?

20      **A.**   I'm sorry.  I didn't hear your question.

21      **Q.**   It has some kind of tax benefits, right?  Like the way

22      that that's taxed, instead of your pay?

23      **A.**   I don't know.

24      **Q.**   That's right.  I know this was a long time ago.  We don't

25      have to get into --

1   **A.**   I don't know if there's tax benefits.  I received a W-2,
2   so I had to report it and pay taxes.
3   **Q.**   Of course.  Of course.  And so as part of getting those
4   long-term disability benefits, part of that process was also
5   applying for government Social Security Disability benefits;
6   is that right?
7   **A.**   Yes.  That was a requirement by UNUM.
8   **Q.**   And UNUM was the company that was administering the long
9   term disability benefits for PPD?
10   **A.**   The short term and the long term, yes.
11   **Q.**   And you were describing a few moments ago, this form is a
12   supplement that was part of your application to receive those
13   government benefits?
14   **A.**   I received this form late.  I was already in Albuquerque,
15   so it was -- it was probably months after the initial
16   application had been submitted by Genex.  So this was just
17   maybe the final, like, documentation they needed before
18   making their decision and it had to be filled out by me.
19   **Q.**   And just for some context, because you referred to moving
20   to Albuquerque, that was during your medical leave in
21   December of 2018 that you moved to Albuquerque, New Mexico?
22   **A.**   Yes.  It was at the end of December 2018.
23   **Q.**   Okay.  And at which point you were still on medical
24   leave?
25   **A.**   Yes.

1    **Q.**   Okay.  So now we have some more context for this form.

2              MS. MANDEL:  Miranda, can we jump to Bates

3    page 891, please.

4    BY MS. MANDEL:

5    **Q.**   And while Miranda is helping us with that, Dr. Menninger,

6    you testified that you filled out this form, right?

7    **A.**   Yes.

8    **Q.**   That's your handwriting?

9    **A.**   Yes.

10   **Q.**   Okay.

11             MS. MANDEL:  I think that's 690.  That's -- it

12   should be 891.

13             THE COURT:  Is this the page you want, or a

14   different page?

15             MS. MANDEL:  This is not the page I wanted.  Okay.

16   That's okay.  We can find that and come back to it.

17             So Miranda, let's get back out of that.  We'll come

18   back to it.

19   BY MS. MANDEL:

20   **Q.**   Dr. Menninger, before January 2018, you had seen

21   therapists at various points?

22             THE COURT:  Maybe you should take this down.  There

23   you go.  Okay.  Go ahead.

24   BY MS. MANDEL:

25   **Q.**   Is that right, Dr. Menninger?

1  **A.**  Can you repeat the question?

2  **Q.**  Before January 2018, you had worked with therapists at

3  different points, right?

4  **A.**  No.  Psychiatrists.

5  **Q.**  I'm sorry, yes.  You had worked with psychiatrists at

6  various points?

7  **A.**  In Kansas -- I'm just blanking out on his name.  The one

8  we were talking about earlier.

9  **Q.**  Sure.  That was Dr. Everson?

10  **A.**  Yes.

11       MS. MANDEL:  Okay.  And let's -- let's pull up --

12  Miranda, can we pull up, again, P-18, or Joint 18?

13  BY MS. MANDEL:

14  **Q.**  And this is the first -- the notes of the first visit

15  that you had with Dr. Kissimian, in January of 2018, right?

16  **A.**  Yes.

17  **Q.**  And this is, you would agree, Dr. Kissimian's description

18  of what she learned from you during that first visit, right?

19  **A.**  Yes.

20       MS. MANDEL:  Okay.  Let's -- let's jump to the next

21  page, please, Miranda.

22  BY MS. MANDEL:

23  **Q.**  So under, "Family History" this was a family history that

24  you told Dr. Kissimian during this first visit in January of

25  2018?

1  **A.**  Yes.

2  **Q.**  It talks about your mother and your grandmother with

3  severe anxiety disorders.  Do you see that?

4  **A.**  Yes.

5  **Q.**  And it says that your mother cannot order for herself at

6  a restaurant?

7  **A.**  Yes.

8  **Q.**  Okay.  And then it also says your father was

9  involuntarily hospitalized for erratic and violent behavior?

10  **A.**  Yes.

11  **Q.**  "Denied substance abuse history."  That was for your

12  father, right?

13  **A.**  Yes.

14  **Q.**  Was unemployed throughout your life, and there was

15  schizophrenia on that side of the family, as well.

16  **A.**  Yes.

17  **Q.**  Do you see that?  Okay.

18          And then under "Developmental History," it's your

19  understanding this is like referring back to your childhood?

20  **A.**  Correct.

21  **Q.**  And it says, "Remembers mother as caring but timid and

22  distant at times and feeling she knew the motions of being

23  maternal but did not feel genuine.  Father she remembers as

24  unpredictable, volatile, and scary.  Remembers in the middle

25  of the night, he would come into the bedroom that she shared

1    with her sister" --

2            That's your sister, Tonya; is that right,

3    Dr. Menninger?

4    **A.**  Yes.

5    **Q.**  -- "put on the light, and lecture them about something

6    that was irrelevant that was hard to follow.

7    **A.**  Yes.

8    **Q.**  "Mother did leave her father and moved back to her

9    hometown of Appleton, Wisconsin, to live with her

10   grandparents.  But then they reconciled, and he" --

11           And the "he" is your father?

12   **A.**  Yes.

13   **Q.**  -- "came back to only continue with the rages, violence,

14   and unpredictability"?

15   **A.**  Yes.

16   **Q.**  Do you see that?

17   **A.**   (Nods head.)

18   **Q.**  And then down below, it refers to your family situation

19   at that time, which was your husband, Mason, and your

20   daughter, Maya; is that right?

21   **A.**  Yes.

22   **Q.**  It also says that you at that time felt most connected

23   with your sister, Tonya, your husband, and your daughter?

24   **A.**  Yes.

25   **Q.**  Is that right?

1    **A.**   That's correct.

2          MS. MANDEL:   Let's go to the next page, please,

3    Miranda, 665.

4    BY MS. MANDEL:

5    **Q.**   So under "Panic and Social Phobia," it's like kind of

6    second paragraph in, do you see where it says that, "Lisa

7    remembers, as young as three or four, dreading school,

8    especially fear of being called on to answer a question"?

9    **A.**   Yes.

10   **Q.**   "If she was called on, her body and voice would shake,

11   and this experience was both physically and mentally painful

12   and exhausting"?

13   **A.**   Yes.

14   **Q.**   "This has continued into adulthood, and even at small

15   meetings when she needs to present three or four slides, the

16   physical sensations of anticipatory dread set in as well as

17   diarrhea, heart racing, sweatiness, and increased respiratory

18   rate."

19          Do you see that?

20   **A.**   Yes.

21   **Q.**   "Modifying Factors."  Is it your understanding that that

22   refers to things that kind of help make things a little

23   better?

24   **A.**   Yes.

25   **Q.**   And it says that, "Being with family and being inside

1    your home"?

2    **A.**   Correct.

3    **Q.**   Okay.  And then down below, where it says, "Psychiatric

4    ROS," do you have an understanding about what "ROS" means?

5    **A.**   It stands for review of -- systems -- review of systems.

6    **Q.**   So this is like your overall psychiatric health at that

7    time?

8    **A.**   Yes.

9    **Q.**   Okay.  And this is January of 2018, January 22nd, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And it goes through -- it says "Denies depression,

12   mania, psychosis," but it says, "but does have some intrusive

13   thoughts of saying the right word, editing and re-editing all

14   emails before sending and looking for grammar or spelling

15   mistakes."

16              Do you see that?

17   **A.**   Yes.

18   **Q.**   And down below, right beneath that it says, "eating

19   disorder behavior."  You and your family are vegan; is that

20   right?

21   **A.**   Yes.

22   **Q.**   It says, "Weighs herself daily and has committed to

23   remaining the same weight, working with a trainer over the

24   Internet to gain strength and to compete in ultra long power

25   walking."

1    **A.**  Yes.  It's not totally accurate, the way it's worded, but

2    yes.

3    **Q.**  But you would agree these are Dr. Kissimian's impressions

4    from that first -- from that first appointment, right?

5    **A.**  Yes.

6    **Q.**  And then it lists out trauma, and it says, "Witnessed

7    domestic violence as a child, father holding a knife to her

8    mother's throat.  Also, father committed to the psychiatric

9    ward several times secondary to violent/unpredictable

10   behavior, and remembers always having to walk on eggshells

11   and never knowing what version of her father she would get."

12            Do you see that paragraph?

13   **A.**  Yes.

14   **Q.**  And then a couple of lines down, it says -- whoops -- it

15   says, "Past psychiatric history:  Outpatient level of care,

16   trial of Celexa, which she stopped."  And that was, I believe

17   you said earlier today, when we looked at the notes from

18   Dr. Everson, that that is a medication that's used for

19   anxiety and sometimes depression?

20   **A.**  Yes.

21   **Q.**  Which you stopped, "secondary to weight gain and also

22   feeling emotionally blunted, unknown dose or time on

23   medication."

24            And so she was noting that you had stopped this

25   trial of Celexa because you were concerned that you were

1    gaining weight on it?

2    **A.**   It wasn't as much gaining weight, it was more -- it just

3    made me feel like I couldn't experience like extreme

4    happiness or extreme sadness.   I was just kind of there and

5    that was the primary reason.

6    **Q.**   And so Celexa hadn't been like a good way for you to

7    manage your anxiety symptoms.   Is that a fair statement?

8    **A.**   That's fair.

9           MS. MANDEL:   And let's look at the next page, 666,

10   please, Miranda.   Yeah.   Thank you.   And can you just

11   increase the size of that a little bit, please.   Thank you.

12   BY MS. MANDEL:

13   **Q.**   And again, this is from that first initial visit in

14   January of 2018.   And under where it says -- it says, "Mood

15   fight or flight."   Do you see that?

16   **A.**   Yes.

17   **Q.**   Okay.   And it says, "affect nervous" and then a couple

18   lines down, it says, "thought content, public speaking fears.

19   Fears about saying the right word, fears about being around

20   others, prefers to avoid anxiety provoking activities

21   overvalued ideas about weigh."

22          Do you see that?

23   **A.**   Yes.

24   **Q.**   And then a couple lines down, Dr. Kissimian describes

25   what types of panic symptoms you have; is that right?

1    **A.**  Yes.

2    **Q.**  You see where it says, "Panic perceptions, difficulty

3    breathing, choking sensation, unpleasant feeling of

4    anticipation or threat, fear of losing control or dying."

5    **A.**  Yes.

6    **Q.**  And this was based on your description to Dr. Kissimian

7    in January of 2018 about what you experienced when you had

8    panic?

9    **A.**  Yes.

10   **Q.**  And then looking down at the -- under "assessment and

11   plan" and again, this is January of 2018, it

12   says, "49-year-old Caucasian female with a history of GAD."

13           Is that generalized anxiety disorder, as far as you

14   know?

15   **A.**  Yes.

16   **Q.**  "Panic with agoraphobia and social anxiety disorder.

17   Presents for her initial psychiatric evaluation after her

18   baselines high anxiety started to spiral when, at work, it

19   was suggested that she be more visible and have more of a

20   public presence."

21           Do you see that?

22   **A.**  Yes.

23   **Q.**  "Currently feeling fight or flight" and that's that

24   feeling of like you either need to leave the situation or do

25   something to sort of help yourself?

1   **A.**   It's not a feeling of -- yeah, you need to run away or

2   fight to survive.

3   **Q.**   And Dr. Kissimian was reporting that that's how you were

4   feeling in January of 2018, right?

5   **A.**   Yes.

6   **Q.**   And that's -- it says because you were having

7   catastrophic thinking about you potentially causing your

8   family becoming homeless and you were having this thought in

9   January of 2018?

10   **A.**   Yes.

11   **Q.**   And then Dr. Kissimian repeated, as well, some of that

12   family history, including "type 2 trauma, secondary to

13   father's volatile behavior, and witnessing domestic violence

14   between her parents."

15          Do you see that?

16   **A.**   Yes.

17   **Q.**   And then in the last full paragraph on the page, it

18   begins, "Social," and it has a colon.  Do you see that?

19   **A.**   Yes.

20   **Q.**   And it talks about you being a pathologist, and then

21   later in that paragraph, it says, "Concern for excessive

22   accommodation where all of her needs are met and she is not

23   asked or required to leave the house."

24   **A.**   Yes.

25   **Q.**   And you testified a few moments ago that, from that time

1    until the end of February, you really weren't leaving the

2    house.

3    **A.**   Correct.

4    **Q.**   And, in fact, since then, you've spent most of your time

5    in your house; is that right?

6    **A.**   It's been back and forth.  There's been times where,

7    like, usually when I move some place new and no one knows me,

8    then I would be okay to go for walks.  But once I feel like

9    I'm noticed, then I want to stay in the house.

10   **Q.**   And that's why you've tended towards places that are a

11   little bit more rural and a little less neighborhood based,

12   right?

13   **A.**   No.  No.  Actually, I feel better when I'm in crowds of

14   strangers, because it makes me feel like I'm not being

15   noticed.

16   **Q.**   Let's look at the notes from your next visit with

17   Dr. Kissimian, on February 2nd.

18          MS. MANDEL:  Can we jump to page 668, please,

19   Miranda?  Thank you.

20   BY MS. MANDEL:

21   **Q.**   So this is your next appointment with Dr. Kissimian,

22   about ten-ish days later; is that right?

23   **A.**   Yes.

24   **Q.**   Okay.  And this is the point at which you and

25   Dr. Kissimian had just provided that accommodation paperwork

1    to PPD; is that right?

2    **A.**  Shortly afterwards, yes.

3    **Q.**  And it says, "Chief complaint."  It says, "I am just

4    worried all the time.  I wake up with my heart already

5    beating fast, thinking about how I have to see the other

6    people that I work with at the end of the month after handing

7    in those letters to HR."

8            Do you see that?

9    **A.**  Yes.

10   **Q.**  And then it notes below that since your last visit, you

11   were continuing to isolate in your home and hardly leave your

12   family; is that right?

13   **A.**  Yes.

14   **Q.**  And then going down a couple of paragraphs, it says,

15   "Spoke at length about her experience in the work

16   environment, where she feels that she is more introverted and

17   analytical.  She is being criticized for things that are

18   unchangeable."

19           Do you see that?

20   **A.**  Yes.

21   **Q.**  "Has difficulty advocating for herself, and has already

22   resigned to defeat in the corporate culture"?

23   **A.**  Yes.

24   **Q.**  And you would agree, Dr. Menninger, that this is before

25   you had any meetings with Mr. St. John and Mr. Mekerri to

1    review what was in the accommodation paperwork, right?

2    **A.**  Yes.  I was fearful about getting a response and -- after

3    disclosing my disability.  And the -- the statement that I

4    made about being introverted and analytical in the corporate

5    culture was the corporate culture in general, not specific to

6    PPD.  I was referring to my introverted nature and analytical

7    nature, which is why I picked the field of pathology.

8              MS. MANDEL:  Miranda, we can get out of that

9    exhibit.  Thank you.

10   BY MS. MANDEL:

11   **Q.**  Dr. Menninger, I know we talked a little bit about you

12   being a runner at times.  You began running ultra marathons

13   in 2017, right?

14   **A.**  I wouldn't say I was actually running.  I was more

15   walking, seeing how long I could walk until, yeah, I couldn't

16   anymore, like during a 24-hour period.

17   **Q.**  And for the jury's benefit, can you tell us what an ultra

18   marathon is?

19   **A.**  I believe it's anything defined as longer than a marathon

20   distance.

21   **Q.**  So -- and a marathon is 26.2 miles, right?

22   **A.**  Yeah.  Yes.  An ultra marathon also can be time based, so

23   like a 24-hour race, where you just go as long as you can.

24   **Q.**  And sometimes you did those running, sometimes walking;

25   is that right?

1    **A.**  At that time, yeah, I -- I wasn't a serious runner.  I'm

2    not a good runner.  I just -- it was almost like a form of

3    meditation for me.  It was calming, something I could do by

4    myself.  And in a way, it just gave me strength.

5    **Q.**  You did one of those ultra marathons when you were in

6    Rhode Island -- or in Rhode Island, when you were living in

7    Massachusetts; is that right?

8    **A.**  Yes.  That was a 24 hour race, so you could stop,

9    basically, whenever you felt like you had to.

10   **Q.**  And then you did two additional ones the next year, in

11   2018?

12   **A.**  Yes.  The same race, again.  And then 100K distance.  And

13   I was trying to use walking at that time as a form of

14   therapy, just to be outside, be calm, be by myself, and just

15   cope with what was going on.

16   **Q.**  And part of running an ultra marathon and walking an

17   ultra marathon, you need like people to basically help you on

18   the way; is that right?

19   **A.**  Usually the runners will be like a crew, but there's also

20   aid stations with volunteers set up.  So you can get food and

21   water and things like that.

22   **Q.**  And your husband, and sometimes your sister, would do

23   what's called crewing for you when you did these races?

24   **A.**  Yes.

25   **Q.**  And you also -- I know you said that you did that same

1    ultra marathon in Rhode Island, I think it was two years in a

2    row, right, 2017 and 2018?

3    **A.**   Correct.

4    **Q.**   And then you did one in Arizona in 2018, as well?

5    **A.**   Yes.

6    **Q.**   And actually, that one in Arizona, I think you did in

7    2018 and 2019, again?

8    **A.**   I tried.  I attempted.  I was not successful in 2019.

9    **Q.**   And you also did one in Colorado in 2019; is that right?

10   **A.**   Yes.

11   **Q.**   And some of those ultra marathons have more than 600

12   people competing in them; is that right?

13   **A.**   The one in Arizona.

14   **Q.**   That's a big one?

15   **A.**   Yeah.

16             THE COURT:  We'll stop here.

17             Ladies and gentlemen of the jury, just a schedule

18   update and a reminder.  So we're on track on the schedule

19   that I told you.  I have confirmed with the lawyers and you

20   should anticipate that Monday -- that Monday we'll go in the

21   afternoon.  So tomorrow, 9:00 to 1:00, Friday, 9:00 to 1:00,

22   nothing on Saturday, nothing on Sunday.  Monday, 9:00 to

23   1:00, break for lunch, 2:00 to 4:00.  And then Tuesday, back

24   to the 9:00 to 1:00 schedule.

25             And then so thank you for your attention, don't

 1    discuss the case among yourselves, don't discuss with anyone

 2    else.  Keep an open mind.  No independent research.  All rise

 3    for the jury.

 4              (The jury exits the courtroom.)

 5              THE COURT:  See you at 8:30, or is there no need?

 6    I'm happy to do it, if there's any --

 7              MR. HANNON:  If we could do 8:45, it would be

 8    better for me.

 9              THE COURT:  I'm happy to do 8:45, unless there's

10    something to talk about.

11              MS. MANDEL:  I think, at most, we would be talking

12    about the procedure with the deposition read-in, but I don't

13    think that's going to --

14              THE COURT:  It won't take very long.  All right.

15    8:45.  I'll see you then.  Have a good day.

16              (Court in recess at 1:02 p.m.)

17

18

19

20

21

22

23

24

25

1            **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4            I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13                      Dated this 22nd day of March, 2023.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20      _____
                Rachel M. Lopez, CRR
21              Official Court Reporter

22

23

24

25