<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   LISA MENNINGER,

 5         Plaintiff,                        Civil Action No.
                                             1:19-cv-11441-LTS
 6         v.

 7   PPD DEVELOPMENT, L.P.,

 8         Defendant.

 9   _____

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                              JURY TRIAL
13                             Day 4

14

15
                        Thursday, March 23, 2023
16                           8:47 a.m.

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Robert W. Paschal, CRR, RMR
24   Official Court Reporter
     rwp.reporter@gmail.com
25
</pre>

1

**A P P E A R A N C E S**

2

On behalf of the Plaintiff:

3

    HARTLEY MICHON ROBB HANNON, LLP
4
    BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
    155 Seaport Boulevard
5
    2nd Floor
    Boston, Massachusetts  02210
6
    (617) 723-8000
    phannon@hmrhlaw.com
7
    hwatson@hmrhlaw.com

8

9

On behalf of the Defendant:

10

    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11
    One Boston Place
    Suite 3500
12
    Boston, Massachusetts  02108
    (617) 994-5700
13
    rachel.mandel@ogletreedeakins.com
    patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25

<u>**TABLE OF CONTENTS**</u>

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                     <u>Page</u>

 LISA MENNINGER

          By Ms. Mandel                                    14

          By Mr. Hannon                                    52

          By Ms. Mandel                                    64

 DEBORAH BALLWEG

          By Mr. Hannon                                    69

**EXHIBITS**

None

**P R O C E E D I N G S**

1
2          (In open court at 8:47 a.m.)

3          THE COURT:  I see all counsel.  You don't have to

4   identify yourselves.  I know who you are.

5          Okay.  Other than Monday to Tuesday, anything else

6   to talk about?

7          MR. HANNON:  Nothing for the plaintiff, Your Honor.

8          MS. MANDEL:  Nothing for us, Your Honor.  Just want

9   to talk about schedule.

10          THE COURT:  Okay.  So in terms of Monday to

11   Tuesday, I have a few things -- let me see if I can work out,

12   because I have a Monday -- I think Monday the whole afternoon

13   is free.  So for me, it's easy.  Tuesday, I have all these

14   various proceedings, so I need to move them.  I think I can

15   do that, but Kellyann is looking into that.  So we'll have a

16   better idea maybe at the break about that.

17          Assuming we do that, I'll tell the jury -- I mean,

18   it's a little bit different for them, but they knew they were

19   going to come in afternoons, so I'm okay.  I don't have a

20   problem with that.  And I take it, it works better for, given

21   where we are and given the out-of-court -- the out-of-state

22   witnesses, scheduling for them?

23          MS. MANDEL:  Your Honor, we have two different

24   concerns.  One is working with our out-of-state witnesses and

25   we're working on seeing if they can change flights, family

```
 1    obligations, and things like that.  The other piece is, of
 2    course, maintaining our commitment to the jury about the
 3    schedule and so --
 4              THE COURT:  Do you think we should do Monday and
 5    Tuesday afternoon, or are you saying --
 6              MS. MANDEL:  Yes, Your Honor.
 7              THE COURT:  -- switch Monday to Tuesday?
 8              MS. MANDEL:  So we understand from Mr. Hannon, you
 9    know, his schedule has sort of been bumped back into Monday,
10    and that was a day we thought we were going to have our
11    witnesses going up, so, yes, it is our proposal that we would
12    do --
13              THE COURT:  Monday and Tuesday?
14              MS. MANDEL:  Both, yes.
15              And the other thing I would just put out there, I
16    cannot say for sure that this would work for our witnesses,
17    but we can try to make it work, if it's -- if it's the case
18    that Tuesday doesn't work for the Court, you know, perhaps
19    Monday and Wednesday would at least still allow us to work
20    with the commitment we've made to the jury, just if -- I
21    mean, I think Tuesday would be better for the witnesses, but
22    we could do our best Monday and Wednesday, as well.
23              THE COURT:  Wednesday is not -- Tuesday is better
24    than Wednesday.
25              MS. MANDEL:  And that's consistent with the
```

1    schedule we already have the witnesses on anyway, so that may

2    work better.

3              THE COURT:  Okay.  I see.  So you want to -- you

4    want to add another afternoon?  Okay.

5              So assuming I can work out the schedule, which I

6    think I can, or I -- really, I think Kellyann can -- I'll do

7    that; but I think that what the two of you need to do is be

8    mindful of the fact that I can't just -- there are -- I can't

9    just add afternoons generally, like this -- tomorrow or

10   Wednesday, Thursday, and I'm not going to.  I can't because I

11   do have -- I relied on sort of our discussion in scheduling,

12   and so it's -- I can move things around, and Tuesday is

13   not -- shouldn't be that hard to move.

14             But there are other things, like what I have

15   Wednesday, I can't move.  And so there are other things that

16   are harder.

17             And, second, we sort of made a promise to the jury.

18   And, you know, you could all spend -- the amount of time for

19   trial is not a science.  I understand that.  But it's also --

20   like, you have to make choices.  And so what I'd say is I'll

21   add this and I'll explain to the jury and I won't -- I won't

22   drive -- I won't lay either of you under the bus, so to

23   speak.  I will just simply explain it's taking a little

24   longer than we all anticipated, and so we're going to add

25   that.

```
 1              But I don't think -- we can't add more.  I'm not
 2       going to add more, is really my point.  So they have to get
 3       it then, I think, because there's nothing terribly unusual
 4       that we're -- that I'm seeing.  And I understand it's going
 5       more slowly.  And, obviously, Dr. Menninger is the most
 6       important witness in the case, probably, for both of you, in
 7       some ways, even though I know your case doesn't rest upon
 8       her, but you have your own evidence.
 9              But I think we really need to keep going with that.
10       And we don't know what scheduling issues it would pose for
11       the jury if they go into the following week, because we
12       didn't ask them.
13              MS. MANDEL:  And with regard to the afternoon
14       schedules, simply a question, Your Honor -- you know, I think
15       that before the jury is charged, there are still some -- some
16       open issues.  I know we had discussions at the pretrial
17       conference and then Mr. Hannon had a filing.
18              Is it Your Honor's plan to have, you know, an
19       afternoon conference next week prior to charging?
20              THE COURT:  Charge conference, you mean?
21              MS. MANDEL:  Yes.
22              THE COURT:  Oh, of course.  One, you're entitled
23       under the rules to a charge conference, and I'm going to
24       follow all the rules; but, two, yes.  So I'm working on the
25       jury instructions as we speak.  We're close to having a draft
```

1    of the final instructions and the verdict form.

2          My usual practice is to try to, for example -- I'm

3    not saying it's going to work exactly this way, but as a

4    general matter model, if we're going to the jury on Friday,

5    on Wednesday, before I left the building, I would try to

6    docket and draft verdict form and draft instructions so you

7    can have them.  And then Thursday, sometime in the afternoon,

8    we would have a charge conference.  Gives you some

9    opportunity to read them, you have them in writing.

10         Then I would take whatever it is you said.  It

11   could be like the last trial, the two of you, where the last

12   trial, they read it and they said -- they each said, "Judge,

13   we have nothing."  And so I'm not anticipating that, but hope

14   springs eternal.

15         And in any event, then I would take and resolve,

16   either with you or afterwards, depending on what the nature

17   of the issues were, and then issue the final ones hopefully

18   Thursday night so you'd know what they say before closing

19   arguments on Friday.

20         MS. MANDEL:  Thank you.  So Thursday afternoon is

21   the likely time for the charge conference?

22         THE COURT:  I think so.

23         MS. MANDEL:  Okay.

24         THE COURT:  There's a little variation on this one

25   because it's a longer case, and so we're ahead of the curve a

```
1    little bit.  And I don't -- I mean, honestly, there's some
2    differences in focus between the two of you, but I don't
3    think there's any great differences on what actually the
4    elements of the claims are.
5           And so I'm just trying to express it -- and so,
6    like, I'll just tell you what I would expect to hear from
7    you.  You can tell me whatever you want, but based on your
8    submissions, the kinds of things I'd expect to hear are,
9    "Judge, you know, we'd like to add this sentence in here," a
10   little more focus, or you know, things like that, rather
11   than, you know, "Judge, there's another element to the
12   plaintiff's claim you didn't include" -- there might be, but
13   I don't think so -- and then what the verdict form will look
14   like.
15          I did have one question, why did you want
16   allocation of the damages across the claims?
17          MS. MANDEL:  Patrick, this might be something you
18   can explain.
19          THE COURT:  You can think about it, if you want.
20   You don't have to tell me right now.  I'll tell you what:
21   You can think about it, and if you have an answer at some
22   point tomorrow or Monday, tell me, because I'll just tell you
23   my thought is there's no point to doing that because, I mean,
24   I get the idea, but the problem is this.  The way I see this
25   is that there could be damages.  I could see how there could
```

1   be damages, depending on what they determine.  It's only

2   relevant if they find liability on more than one claim.

3         There could be damages that are attributable to

4   only one claim, no matter what, because like they find

5   liability on this date and liability on the other claims

6   later, so the in-between damages obviously could only be on

7   the first claim.

8         But then for damages afterwards, it could be that

9   they think the damages arise from both, and it could be that

10  they would assess the damages even if they're only liable on

11  one, but asking them would you assess these damages over here

12  only for one of the two, or both, or like the number of

13  permutations and scenarios and all of that is only so that if

14  there's liability on two or more claims.  And if the appeals

15  reverses on one but not the other claim, that then

16  conceivably you wouldn't have to retry, that seems like so

17  many different permutations.  It doesn't make sense, too

18  complicated.

19         MS. MANDEL:  And I think, you know, obviously we

20  can discuss this.

21         THE COURT:  So I'm just sharing that with you.

22  That's my reaction to, like, why I'm not likely to allocate

23  across the claims.  That's different than, yes, it's my

24  intention as you both suggest, like, back pay, front pay,

25  emotional stress, different damage questions like that.

 1                  MS. MANDEL:  And I think just, you know,

 2      preliminarily, the -- the things that need to be shown for

 3      discrimination and retaliation are a little bit different,

 4      and so just kind of, you know, dividing those up, to the

 5      extent, in our view, an appealable issue if there were a

 6      plaintiff's verdict.  I just want to be able to sort of

 7      address those separately.

 8                  THE COURT:  That's different.  That's your breaking

 9      up instead of Mr. Hannon has one question, essentially, did

10      we win the claim?  A little more artfully put, but -- and

11      you're -- have, like, seven questions or five or whatever,

12      each a different thing.

13                  And I understand why you asked for that.

14                  I understand why you asked for that.

15                  I don't have a question about why you're asking

16      that way.  I was just talking about just sort of the

17      allocation of damages across the claims.  I view the two --

18      that those are separate issues.

19                  MS. MANDEL:  Yeah, and we can certainly get into it

20      down the line.  I just think, you know, generally speaking,

21      it was our view that it was helpful to have that --

22                  THE COURT:  Right.  I guess all I'm saying is think

23      about, if you can articulate to me a reason why it would

24      actually be helpful and practical and not -- I will tell you

25      that the last jury I had that they made a request -- it's

1    more of me than you, but apropos of this -- they said,

2    "Judge, you know" -- one of the people on the jury who was

3    reasonably educated -- I don't recall how educated, but

4    past -- well past high school, said, "Judge, you know, the

5    statistics are that most Americans are at the fifth grade

6    literacy level, and it would be our suggestion that you write

7    your jury instructions at that level.  And with all due" --

8    they didn't put it quite this way, but -- "With all due

9    respect, you didn't -- you wrote it at a substantially higher

10   level."

11          I -- if I could -- if I were capable of writing it

12   at -- as clearly as -- so that it would be at a fifth grade

13   level, I would, but I'm not sure I'm that good a writer.  And

14   I don't think you should expect these to be that clear and

15   that simple.

16          But that is -- so the -- with respect to, like, the

17   allocation question, it seemed -- I thought about it, but it

18   seems so complicated to explain the different ways that I

19   have to answer the question.  If you can think of a way to

20   explain it clearly and a good reason to do it, I'm all ears.

21   I'm happy to hear it and -- but at the moment like, in my

22   draft, I'm not, because I think it's too complicated.  I'm

23   already violating the fifth grade principle without that.

24          MS. MANDEL:  Understood.  Thank you.

25          THE COURT:  All right.  One thing I'll just tell

1   you --

2           Do you want to get -- do you know where your client

3   is?

4           MR. HANNON:  Yeah.  She's out in the hall.  May I

5   grab her or do you want to make the comment first?

6           THE COURT:  I'm talking about the causation

7   question.  My thought is what I'm doing is -- and if you have

8   a different idea, you can tell me about it later, but right

9   now I'll tell you what I'm thinking about it.  I'm not having

10  a whole separate federal claim and a whole separate state law

11  claim.  I'm just saying, I think on Count 1, that that

12  causation issue doesn't arise, if I remember right, so it's

13  just like the federal Massachusetts law, and explain it and

14  there will be one question, or set of questions about that,

15  and it will control both.

16          On count -- the other two claims, theories, there

17  is a difference.  The causation matters.  And so I'm saying,

18  you know, there's federal and state law or -- and we'll have

19  a separate -- like, we'll explain it all together, because

20  all the other elements are the same.  But we'll explain --

21  but causation is different.  Here's federal.  Here's state.

22  And we'll have either two, if we do -- if I follow

23  Mr. Hannon's model, we'd have two questions for the claim, a

24  Massachusetts claim and a federal claim.

25          And if we follow your model, we have a bunch of

1    questions, but we'll have two separate causation questions.

2    That's how I'm breaking it out.  That's -- so it seems that

3    requires them to make separate decisions, explains them

4    separately, but limits the amount of verbiage.

5              MR. HANNON:  Makes sense.

6              THE COURT:  You should go get your client.

7              MR. HANNON:  Thank you.

8              (Jury present.)

9              THE COURT:  Everybody follow the instruction, no

10   discussion with yourselves, no discussion with anyone else,

11   no independent research?  Good.

12             All right.  So we resume.  Dr. Menninger is on the

13   witness stand.

14             I remind you you remain under oath.

15             And you can go ahead, Ms. Mandel.

16             MS. MANDEL:  Thank you.

17                        **LISA MENNINGER**

18      having been previously duly sworn, testified as follows:

19      **CONTINUED CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

20   BY MS. MANDEL:

21   **Q.**  Good morning, Dr. Menninger.

22   **A.**  Good morning.

23   **Q.**  Let's start this morning by looking back at an exhibit

24   that we looked at yesterday, Exhibit 59.  This is your 2017

25   performance review; is that right?

1   **A.**  Yes.

2   **Q.**  And if you look at where -- it says the review period was

3   the calendar year of 2017, right?

4   **A.**  Yes.

5   **Q.**  And in right beneath that, it says "due date was

6   December 31, 2017."  Do you see that?

7   **A.**  Yes.

8   **Q.**  And we're going to -- let's just jump to the second page

9   of that document.  We're going to take a quick look.  You

10  testified yesterday about your year end comments about hiring

11  scientific directors.  Do you recall that?

12  **A.**  Yes.

13  **Q.**  And we're just going to look very briefly at

14  Mr. Mekerri's year-end comments, which are on the left side

15  of the page.  And I think it's probably meant to say "lack of

16  scientific expertise."  Do you see that?

17  **A.**  Yes.

18  **Q.**  To Global Central Labs, that's the GCL, right?

19  **A.**  Correct.

20  **Q.**  And the right beneath that, Mr. Mekerri said -- Hacene --

21  and that's Mr. Mekerri's first name, is Hacene?

22  **A.**  Yes.

23  **Q.**  Okay.  "Hacene to connect with recruitment to bring

24  pathologist in-house."  Is that right?  Do you see that?

25  **A.**  Yes.

1    Q.  And beneath that, it says, "Molecular director in place."

2    And as far as you understand, was that referring to the

3    director, medical director specific -- or the lab director

4    with specific knowledge of molecular chemistry, I think you

5    called it yesterday; is that right?

6    A.  Yes.  Dr. Reddy.

7    Q.  That was Dr. Reddy.  Okay.  And to your memory, Dr. Reddy

8    was already in place as the molecular director at that time?

9    A.  Yes.

10   Q.  Okay.  Thank you.

11           MS. MANDEL:  Miranda, we can take that one down.

12           Let's pull up Joint Exhibit 38, and this is going

13   to test our eyes a little bit, but I think we'll be able to

14   see the key parts.

15   BY MS. MANDEL.

16   Q.  Dr. Menninger, this is a check that you received from

17   PPD; is that right?

18   A.  I'm not sure what this is in reference to.

19   Q.  Well, I -- let's look down at the -- we can look at the

20   bottom part of the page.  Do you see it says, "JP Morgan

21   Chase" and has a bank symbol towards the bottom?

22   A.  Yes.  I believe this was sent directly to my attorney.

23   Q.  Was sent to your attorney, Mr. Hannon; is that right?

24   A.  Yes.

25   Q.  And it's a check for about $27,645; is that right?

1    **A.**   Yes.

2    **Q.**   And do you see that it's made out to you and that it was

3    from PPD?

4    **A.**   Yes.

5    **Q.**   And this is returning money to you after you did not

6    exercise your stock options; isn't that right?

7    **A.**   That's incorrect.

8    **Q.**   Well, can you explain what -- what this check was for,

9    then, please?

10   **A.**   I had purchased stock.  I was given the option to invest

11   in the company at the same time that I was awarded additional

12   stock options.  So I had purchased stock, and upon my

13   termination, they forced -- forcibly bought the stock back.

14   And this check is for that, for the stock that I owned.

15   **Q.**   And returning your money to you at that point?

16   **A.**   Yes.

17   **Q.**   Let's now pull back up Exhibit 433, another one we looked

18   at yesterday.  You'll recall, Dr. Menninger, this is the

19   letter that Dr. Kessimian, your psychiatrist, sent to PPD on

20   February 14, 2018.  Do you recall that?

21   **A.**   Yes.

22   **Q.**   And we looked at it in some detail yesterday.

23           MS. MANDEL:  Let's -- let's go to the -- the next

24   page of the document, please, Miranda.

25

1    BY MS. MANDEL:

2    **Q.**   If we look at the paragraph about two-thirds of the way

3    down the page that starts with "a concrete way of thinking of

4    this disability?" -- do you see that?

5    **A.**   Yes.

6    **Q.**   And the end of that paragraph, do you see where it says,

7    "And for all of the above reasons, I recommended the

8    following reasonable accommodations"?

9    **A.**   Yes.

10   **Q.**   And then just below that, Dr. Kessimian wrote, "Below are

11   reasonable accommodations for Lisa so that she can continue

12   to be a productive and healthy member of your team."

13           Do you see that?

14   **A.**   Yes.

15   **Q.**   And I believe you testified yesterday that you thought

16   Dr. Kessimian was -- was brainstorming here about some things

17   that PPD might be able to do.  Do you recall that?

18   **A.**   Yes.  I was having weekly appointments with Dr. Kessimian

19   at that point, so I knew that that was the intent.

20   **Q.**   And I understand that, in your understanding, that was

21   the intent.  Can you please tell us where in Dr. Kessimian's

22   letter she referred to this as brainstorming about ideas

23   versus instructing on reasonable accommodations that she

24   thought you needed?

25   **A.**   I believe the specific brainstorming was mentioned in one

1    of the bullets.

2    **Q.**   Well, and we can certainly look at the -- so you mean the

3    bullets on that bucket, buckets 1 through 5?

4    **A.**   Correct.  But I know that she definitely did not state

5    that these are restrictions.

6    **Q.**   So let's just take another quick look at those buckets.

7    The first one is in front of the screen, right, in front of

8    us on the screen; is that right?

9    **A.**   Yes.

10   **Q.**   And here, Dr. Kessimian uses the language "reasonable

11   accommodation" before the suggestions; is that right?

12   **A.**   Where are you referring to?

13   **Q.**   The last paragraph on the page, you testified yesterday

14   that was Dr. Kessimian's language that she added here, right?

15   **A.**   Yes.

16          MS. MANDEL:  And then let's -- let's jump to the

17   next page of this, please, Miranda.

18   BY MS. MANDEL:

19   **Q.**   And looking at the second bullet, where it says Number 2,

20   Dr. Kessimian again wrote "reasonable accommodations" and

21   then listed out the request; is that right?

22   **A.**   Yes.

23   **Q.**   And then if we look at Number 3, again, Dr. Kessimian's

24   language was "reasonable accommodation," would you agree?

25   **A.**   Yes.

1           MS. MANDEL:  And then let's scroll down a little
2    bit, Miranda, to see Numbers 4 and 5.
3    BY MS. MANDEL:
4    **Q.**  For Number 4, again, Dr. Kessimian's language was to say
5    "reasonable accommodation."  Do you see that?
6    **A.**  Yes.
7    **Q.**  And then for Number -- Number 5 and it's actually --
8    that's the one about the customer visits, lunch, dinner, and
9    social interactions.  This is -- we discussed yesterday that
10   Dr. Kessimian's language begins where it says "surrogate,
11   this is not her strength/skill set."  Do you see that?
12   **A.**  Which -- which bullet are you on?
13   **Q.**  Where it says Number 5.
14   **A.**  Yes.  I see -- I see that.
15   **Q.**  And the -- the only place that I see the word
16   "brainstorm" here is about other ways that you could engage
17   in business relationships that didn't involve social
18   interactions; isn't that right?
19   **A.**  Can you repeat your question?
20   **Q.**  Sure.  So if --
21          THE COURT:  It would be better -- not whether you
22   see it, Ms. Mandel, but whether it's in the document.
23   BY MS. MANDEL:
24   **Q.**  Number 5, do you see where it says, "for customer visits,
25   lunch/dinner and social interactions may occur"?

1   **A.**  Yes.

2   **Q.**  And then it says, after that, "expected 60 to 80 percent

3   of the time"?

4   **A.**  Yes.

5   **Q.**  And then it says, "In order to build business

6   relationships."

7   **A.**  Correct.

8   **Q.**  And that was the language that Mr. Mekerri had drafted,

9   right?

10  **A.**  Correct.

11  **Q.**  And then Dr. Kessimian's language starts after that,

12  where it says "surrogate," correct?

13  **A.**  Yes.

14  **Q.**  So Dr. Kessimian wrote "surrogate, as this is not her

15  strength/skill set and her disability will flare with

16  significant impairment"; is that right?

17  **A.**  Yes, that's what she wrote.

18  **Q.**  And then after that, Dr. Kessimian wrote, "She is able to

19  build a business relationship in a more behind-the-scenes

20  fashion"?

21  **A.**  Yes.

22  **Q.**  "And would like" -- it seems like it's missing the word

23  "to" -- "brainstorm other potential avenues where she can add

24  value."

25  **A.**  Yes.

1    **Q.**  And then in Number 6, on the travel bucket,

2    Dr. Kessimian's language is "reasonable accommodation -- when

3    possible, traveling to the Brussels site versus stateside."

4           Do you see that?

5    **A.**  Yes.

6    **Q.**  Okay.  And, Dr. Menninger, aside from the use of the word

7    "brainstorm" in Number 5, did you see in the document any

8    other place where Dr. Kessimian used the word "brainstorm"?

9    **A.**  Not the word "brainstorm."  These were just suggested

10   accommodations per Chad St. John's request, but I explained

11   to Chad during the meeting that these were not doctor -- my

12   doctor's restrictions.  There were no restrictions that she

13   provided.

14   **Q.**  Dr. Menninger, after you provided this letter -- or

15   actually Dr. Kessimian provided this letter, you never

16   provided another letter from Dr. Kessimian that said that you

17   did not need these accommodations, did you?

18   **A.**  I -- I received an email.  I was waiting for a response

19   from PPD after Dr. Kessimian sent this, and I received an

20   email in the airport when I was on my way to

21   Highland Heights, so that was the first time I saw a response

22   to -- to this.

23           I assumed that, since I was on site, we were going

24   to have a discussion around these suggested accommodations.

25   **Q.**  And my question is a little bit different, Dr. Menninger.

1    You didn't provide another letter from Dr. Kessimian or

2    another doctor at any point that said you did not have the

3    need for the accommodations that were listed in the letter

4    that's up in front of us; isn't that right?

5    **A.**   Dr. Kessimian was my only psychiatrist/physician at the

6    time.

7    **Q.**   And she never wrote another follow-up letter after this

8    saying that you didn't need these accommodations; isn't that

9    right?

10   **A.**   We were waiting for follow-up discussion with PPD.  This

11   was to start the conversation around potential

12   accommodations.  At this point, I did not know the specific

13   new task or frequency of those tasks that Hacene had

14   suggested for 2018.  So my assumption and my doctor's

15   assumption was that we were going to have further

16   conversations around that.  But she did -- she did her best

17   to provide recommendations with the information she had at

18   the time.

19   **Q.**   And this is the last letter that Dr. Kessimian sent to

20   PPD with regard to what would -- what her view was of your

21   need for reasonable accommodation; isn't that right?

22   **A.**   I'm not -- I don't recall.  I -- I did have a

23   conversation with --

24              THE COURT:  That answers the question, then.  All

25   she's asking you is whether -- if I recall correctly, the

1    question is whether there was another letter from

2    Dr. Kessimian.  If you don't recall whether there was another

3    letter or not, you've answered the question.

4                THE WITNESS:  Okay.

5                THE COURT:  I understand there may be more behind

6    that that you're thinking about, but that's exactly the

7    purpose of two -- back-and-forth.

8                The lawyers ask -- the hard thing about being a

9    witness, what you don't get to do -- this is true for

10   Dr. Menninger and every witness -- witnesses don't get to

11   come into the courtroom and simply tell you whatever it is

12   they want to tell you.  Lawyers ask questions; the witnesses

13   answer questions.

14               And the very reason we have a back-and-forth is

15   because Mr. Hannon may think there's a follow-up.  Sometimes

16   the follow-up questions are, "Why?"  And he might ask that

17   and those come on the next round.

18               Go ahead.  Next question.

19               MS. MANDEL:  Miranda, we can take that one down,

20   please.  Thank you.

21   BY MS. MANDEL:

22   Q.   Dr. Menninger, the other day we looked at some

23   handwritten notes that you had taken.  Do you recall that?

24   A.   Briefly.  I've looked at a lot of documents, but if -- if

25   you pull them up, I can --

1    **Q.**   Sure.  And we're going to do that.

2            Did you take notes after every conversation that

3    you had with Mr. Mekerri throughout the time you worked at

4    PPD?

5    **A.**   The majority of our meetings, our one-on-one meetings,

6    were canceled, or Hacene was traveling.  And I didn't know if

7    he was going to be in the office or not, so --

8            THE COURT:  She just asked whether you took notes

9    after each meeting or not.

10           THE WITNESS:  No.

11   BY MS. MANDEL:

12   **Q.**   You did take notes of some conversations in the sort of

13   early 2018 time period; isn't that right?

14   **A.**   Yes.

15   **Q.**   Did anyone instruct you to take those notes?

16   **A.**   My attorney.

17   **Q.**   Let's look back very briefly at just one part of those

18   notes.  That's Exhibit 21.

19           THE COURT:  Do you have a paper copy up there?  You

20   can use --

21           MS. MANDEL:  --

22           THE COURT:  You can also use the ELMO with a paper

23   copy.

24           MS. MANDEL:  That's what I was going to use.

25           (Pause in proceedings.)

BY MS. MANDEL:

**Q.** Dr. Menninger, this is Exhibit 21, which we looked at the other day. I'm going to show you just one part of that. This is part of those notes, and that's your handwriting; is that right?

**A.** Yes.

**Q.** And at the top of the page, it says 1/15/18, so January 15, 2018; is that right?

**A.** Yes.

**Q.** It says, "notes from recording"?

**A.** Yes.

**Q.** Did you record your conversation with Mr. Mekerri on January 15th?

**A.** Yes.

**Q.** And you actually recorded three different phone calls with Mr. Mekerri during this time period; isn't that right?

**A.** Yes.

**Q.** And you didn't ask Mr. Mekerri for permission to do that; is that right?

**A.** That's correct.

**Q.** And you didn't tell him that you were recording the conversations; is that right?

**A.** That's right.

**Q.** And were you aware at the time that that was a violation of Massachusetts law?

1           MR. HANNON:  Objection.

2           THE COURT:  Sustained.

3    BY MS. MANDEL:

4    **Q.**  Dr. Menninger, we talked briefly yesterday about your

5    receipt of government Social Security benefits.  Do you

6    recall?

7    **A.**  Yes.

8    **Q.**  And we're going to put up Joint Exhibit 440.  And you

9    testified yesterday about completing some additional

10   paperwork in connection with that application in early 2019;

11   is that right?

12   **A.**  Yes.  Genex submitted the application, and then this was

13   sent to me.  This form was sent to me by Social Security.

14   **Q.**  And Genex is the company that helped you with that

15   process; is that correct?

16   **A.**  Yes.

17   **Q.**  Let's jump to the part of the document called your

18   function report.

19          MS. MANDEL:  And let's look at page 891, please,

20   Miranda.

21   BY MS. MANDEL.

22   **Q.**  And you filled out this form; is that right,

23   Dr. Menninger?

24   **A.**  Yes.

25   **Q.**  And I just want to look down at the question that says --

1    it's Number 5, under section B.  Do you see that?

2    **A.**  Yes.

3    **Q.**  It says, "How do your illnesses, injuries, or conditions

4    limit your ability to work?"

5    **A.**  Yes.

6    **Q.**  And that's your handwriting there?

7    **A.**  Yes.

8    **Q.**  And you wrote, "I cannot interact with other people now

9    (in person, by phone or computer) without experiencing

10   extreme panic attack and anxiety symptoms."

11           Do you see that?

12   **A.**  Yes.

13   **Q.**  And then below that, you describe the course of your day

14   at that time, which is early 2019; is that right?

15   **A.**  Yes.

16   **Q.**  And you described things like sending your daughter off

17   to school, reading, eating, running, and walking, sometimes

18   watching a television show; is that right?

19   **A.**  Yes.

20           MS. MANDEL:  Miranda, let's, please, jump to

21   page 895.

22   BY MS. MANDEL:

23   **Q.**  And this is right after you had moved to Albuquerque,

24   New Mexico; is that right?

25   **A.**  Yes.

1  **Q.**  On this page of the form that you filled out for Social
2  Security, under "hobbies and interests," you describe hiking
3  and running in the mountains?  Do you see that?
4  **A.**  Yes.
5  **Q.**  And right -- right beneath that, you say, "Now that I'm
6  in NM" -- is that New Mexico?
7  **A.**  Yes.
8  **Q.**  -- "I'm trying to get outside to run, walk four to five
9  days a week.  The houses are not close together and I don't
10  have to worry about being forced into conversation with
11  people."
12          Did you write that?
13  **A.**  Yes.
14  **Q.**  And that accurately reflected how you were feeling at the
15  time?
16  **A.**  Yes.
17          MS. MANDEL:  Thanks, Miranda.  We can take that
18  down.
19  BY MS. MANDEL:
20  **Q.**  If you'll excuse me, I want to ask a little bit about
21  your weight, which you talked about earlier this week.
22  **A.**  Yes.
23  **Q.**  And, Dr. Menninger, I understand that your weight has
24  fluctuated somewhat overtime; is that right?
25  **A.**  Yes.

1    **Q.**  Let's look at -- we'll look at a few sort of data points

2    on that.  We'll look at Dr. Kessimian's note from February 2,

3    2018.  And this is in -- part of Joint Exhibit 18.  So you

4    this -- this says DOS, that's the date of service, right?

5    **A.**  Yes.

6    **Q.**  And this is Dr. Kessimian's note, right?

7    **A.**  Yes.

8    **Q.**  And this is February 2, 2018, which is just shortly after

9    you told PPD that you had a disability; is that right?

10   **A.**  Yes.

11   **Q.**  Let's look down at the bottom of that page.  It has

12   some -- some basic vital information about you.

13   **A.**  Yes.

14   **Q.**  And you'd agree, wouldn't you, that it says, weight,

15   126 pounds?

16   **A.**  Yes.

17   **Q.**  Then let's -- just to get another data point, we'll look

18   at notes from your psychiatrist in New Mexico -- that was

19   Dr. Burbano?

20   **A.**  Yes.

21   **Q.**  -- from May of 2019.  This is in Joint Exhibit 23.  And

22   this is -- this is part of that note from Dr. Burbano; and,

23   again, it lists some vitals.  And this is from May 2019, and

24   if you look under where it says "vitals, 2:02 p.m.," it has

25   your weight at 124 pounds.  Do you see that?

1    **A.**  Yes.

2    **Q.**  And that was from spring 2019, right?

3    **A.**  Yes.

4    **Q.**  And then let's look at -- we'll get another data point.

5    Let's look at a note from July of 2020.

6              MS. MANDEL:  That's on Bates page 6 of that

7    document, Miranda.  Thank you.

8    BY MS. MANDEL:

9    **Q.**  And this is on July 31, 2020, so a little more than a

10   year later.  It has some more vitals at the bottom of the

11   page, and it lists your weight there as 122 pounds --

12   **A.**  Yes.

13   **Q.**  -- is that right?  Okay.  Thank you.

14             I also wanted to ask a little bit more about your

15   history of taking some medications, Dr. Menninger.

16             MS. MANDEL:  Let's, please, bring up Exhibit 20.

17   BY MS. MANDEL:

18   **Q.**  If you recall, these are the notes from Dr. Everson and

19   Dr. Everson was your psychiatrist from when you lived in

20   Kansas before you relocated for the PPD job, right?

21   **A.**  Yes.

22             MS. MANDEL:  Okay.  So we're going to look at some

23   handwritten notes on Bates 1137, please, Miranda.

24   BY MS. MANDEL:

25   **Q.**  And this is where our eyes are really going to have to do

1   our work.  This -- it looks like this is Dr. Everson's

2   progress note from November 5, 2012, right?

3   **A.**  Yes.  I believe that's a "2."

4   **Q.**  It looks like.  I understand it's not --

5   **A.**  It might be 11.  I'm not positive.

6   **Q.**  In any event, you would agree that it's from a few years

7   before you began working at PPD; is that right?

8   **A.**  Yes.

9   **Q.**  Okay.  And Dr. Everson refers to your course of Valium,

10  it looks like, and I know you testified that Dr. Everson had

11  prescribed Valium to you for some time; is that right?

12  **A.**  Yes.

13  **Q.**  Beneath that, Dr. Everson also referred to what I believe

14  says Celexa and Ambien; is that right?

15  **A.**  Yes.

16  **Q.**  And those were also medications Dr. Everson was

17  prescribing to you as of about 2012, it could have been 2011;

18  is that right?

19  **A.**  Yes.

20  **Q.**  Okay.  And then beneath that, where it says "Comments,"

21  it says, I believe, "more SEs."  Is that more side effects?

22  **A.**  Yes.  I believe so.

23  **Q.**  "To the medications."  It looks like it has an up arrow

24  before the word "headaches"; is that right?

25  **A.**  Yes.

1    **Q.**  And it says more stress?

2    **A.**  I'm not sure what that word is.

3    **Q.**  Understood.

4    **A.**  But increased headaches.

5    **Q.**  And more of something?

6    **A.**  Yes.

7    **Q.**  Could be stress?

8    **A.**  Possibly.

9    **Q.**  Okay.  And then the next line says "off most of the

10   medications for a long time."  Do you see that?

11   **A.**  Yes.

12   **Q.**  And then it has that squiggle, which is about eight

13   months; is that right?

14   **A.**  Yes.

15   **Q.**  And then it looks like it says, "generalized anxiety

16   symptoms return, so back to Celexa"?

17   **A.**  Yes.

18   **Q.**  And it says, "She does feel better on Celexa," at the

19   end, I think; is that right?

20   **A.**  I can't see the complete bottom.

21   **Q.**  And the document itself --

22   **A.**  Yes.

23   **Q.**  -- is a black line.  That's what we have, but it looks

24   like just above that black line, it says she does feel better

25   on Celexa, right?

1    **A.**   Yes.

2    **Q.**   Okay.  And, again, this is from that 2011/2012 time

3    period, right?

4    **A.**   Yes.

5    **Q.**   Okay.  Dr. Menninger --

6              MS. MANDEL:  We're going to look back at Joint

7    Exhibit 18 please, Miranda.

8    BY MS. MANDEL:

9    **Q.**   Yesterday we talked about your participation in a

10   number of ultra marathons in 2017, 2018, and 2019; is that

11   right?

12   **A.**   Yes.

13   **Q.**   Can you explain to the jury what an ultra walk is?

14   **A.**   It's a -- it's -- there's not technically something

15   called an "ultra walk."  It's -- in ultra marathons, because

16   the distance is so long, there's a lot of walking involved.

17   Most people don't run the whole thing.

18   **Q.**   So is it something longer than a marathon that you walk

19   some of instead run?

20   **A.**   I did mostly walking.

21   **Q.**   So ultra walks are also these 24-hour competitive races

22   where you do a lot of walking?

23   **A.**   Yes.

24             MS. MANDEL:  Okay.  Let's look at page 8702,

25   please, Miranda.

1    BY MS. MANDEL.

2    **Q.**   And this is one of Dr. Kessimian's notes.  This is from

3    May 25, 2018, and this is shortly before you started medical

4    leave; is that right?

5    **A.**   Yes.

6    **Q.**   And where it says "history of present illness," do you

7    see that?

8    **A.**   Yes.

9    **Q.**   It says, "Since last visit, continues to isolate at home

10   and again uses the appointment to motivate her to leave the

11   house"?

12   **A.**   Yes.

13   **Q.**   Right?  And, again, at this point, you were for the most

14   part staying at home, right?

15   **A.**   I'm sorry.  Can you repeat the question?

16   **Q.**   Sure.  At this point in May of 2018, you were for the

17   most part staying in your home?

18   **A.**   Yes.

19   **Q.**   And then there's a statement about a conversation you had

20   with your lawyer.  After that, it says, "She has also decided

21   to finally take some leave in the beginning of June to see

22   her friends at the ultra walk"?

23   **A.**   Yes.

24   **Q.**   And, in fact, you did begin a leave of absence from PPD

25   the following week at the beginning of June, correct?

1    **A.**   Correct.  I had scheduled PTO, actually, before that from

2    PPD, so this was planned prior to taking medical leave.

3    **Q.**   While we're on this May 25, 2018, note from

4    Dr. Kessimian, let's look at the next page.

5              MS. MANDEL:  The next page.  Thanks.

6              Sorry, I think it's actually one -- one page

7    further, Miranda.

8              Yep.  Thank you.

9    BY MS. MANDEL:

10   **Q.**   So under the plan, and this is what Dr. Kessimian would

11   write at the end of every appointment about sort of what's

12   coming up and what you're going to be doing, right?

13   **A.**   Yes.

14   **Q.**   And there are a few things listed.  Number 5 is "continue

15   art therapy."  At this time, you were participating in

16   art-based therapy; is that right?

17   **A.**   Yes.

18   **Q.**   And how long did you do that program for?

19   **A.**   I was doing that in Dr. Kessimian's office.

20   **Q.**   So that was part of her care?

21   **A.**   Yes.

22   **Q.**   And it also lists on Number 6, it says "CBT"?

23   **A.**   Yes.

24   **Q.**   And that was you testified yesterday was the cognitive

25   behavioral therapy?

1   **A.**  Yes.

2   **Q.**  And you were continuing with that at this point?

3   **A.**  Yes.

4   **Q.**  Number 7 says, "Coordination and communication with

5   lawyer continues."  What's your understanding of what that

6   meant?

7   **A.**  I was communicating with my attorney.

8   **Q.**  Let's --

9   **A.**  This -- I was afraid at this point that I was being

10  forced out of my job because of my disability, and so that's

11  what Number 7 refers to.

12  **Q.**  You said earlier this morning that you had been

13  communicating with -- with a lawyer already as of

14  January 2018.  When is the first time that you began speaking

15  with a lawyer about your employment at PPD?

16  **A.**  I believe it was after the December meeting with Hacene,

17  where we went over the proposed changes to my role.

18  **Q.**  Let's -- let's look back, actually, at the appointment

19  you had the week before this with Dr. Kessimian.  Let's look

20  at the notes from the May 18, 2018 appointment.

21          MS. MANDEL:  And, Miranda, that's 699.

22  BY MS. MANDEL:

23  **Q.**  This is the -- the date of service says 5/18/18?

24  **A.**  Yes.

25  **Q.**  Okay.  And if you look down where it says, "throughout

1  the week, completed several art therapy assignments."

2  **A.**  I'm trying to -- oh.  Yes, I see that.

3  **Q.**  So you were continuing with your art therapy at this

4  point?

5  **A.**  Yes.  I was also trying to do some art at home.

6          MS. MANDEL:  Okay.  And let's -- let's go down to

7  the bottom of that page, please, Miranda.  A little bit --

8  let's just visualize the whole -- the whole page for a

9  second.

10  BY MS. MANDEL:

11  **Q.**  If you look at the biggest paragraph that's visible in

12  front of us right now, it starts with "mood" and has a colon.

13  Do you see that?

14  **A.**  Yes.

15  **Q.**  And at the bottom of that paragraph, Dr. Kessimian wrote

16  on -- about your May 18th appointment, "Has started to search

17  for new jobs and verbalize values to work with in arts and

18  help those that are marginalized at times by society."

19          Do you see that?

20  **A.**  Yes.

21  **Q.**  What types of jobs were you searching for at that time?

22  **A.**  At that time, I had a significant fear of being fired,

23  and so I was looking at potential positions at Rhode Island

24  School of Design in Providence.

25  **Q.**  And that would have been an art-spaced-type position?

1    **A.**   I was just seeing what types of positions they had open.

2    **Q.**   If we look at the bottom of that page, after it says0

3    "daughter and husband doing well," it says, "Safety:

4    Suicidal ideation has resolved."  Do you see that?

5    **A.**   Yes.

6    **Q.**   Let's pull up Dr. Kessimian's notes from a week later.

7    You were seeing her weekly at this point, right?

8    **A.**   Yes.  And I can't recall the date on this one.

9    **Q.**   Sure.  Sure.  This one was the May 18th one, so we'll

10   jump to the one that was from June 8th, a couple weeks later?

11   **A.**   Okay.

12          MS. MANDEL:  And, Miranda, that's 709, please.

13   Thank you.

14   BY MS. MANDEL:

15   **Q.**   And your medical leave from PPD began on the first week

16   of June, right?  It was June -- June 3rd; is that right?

17   **A.**   Yes.

18   **Q.**   So we'll look at Dr. Kessimian's note from June 8th,

19   which was a few days after that.  And under "history of

20   present illness," it refers to you being on medical leave?

21   **A.**   Yes.

22   **Q.**   And then it says, again, you applied for several jobs at

23   this point?

24   **A.**   Yes.

25   **Q.**   What types of jobs had you applied for at that point?

1    **A.**   I believe it -- they were all at -- at Rhode Island
2    School of Design.
3    **Q.**   Yeah, that's a bit of a mouthful.
4          And down -- down below, a little bit lower on that
5    page, it says, "Safety:  Denies suicidal ideation."  Do you
6    see that?
7    **A.**   Yes.
8    **Q.**   And you testified, I believe it was yesterday, that you
9    spent some time in the Butler Hospital partial hospital
10   program, and that was in early July of 2018; is that right?
11   **A.**   Yes.
12   **Q.**   Okay.  Let's look at Dr. Kessimian's notes from right
13   after that.
14          MS. MANDEL:  This is Bates 715, Miranda.
15   BY MS. MANDEL:
16   **Q.**   This is from -- it says date of service is 7/13/18?
17   **A.**   Yes.
18   **Q.**   And under history of present illness, Dr. Kessimian noted
19   that, "Since last visit, completed the partial program at
20   Butler."  Do you see that?
21   **A.**   Yes.
22   **Q.**   And this is referring to -- this is right when you left
23   that program, and then you went back to Dr. Kessimian for
24   additional treatment; is that right?
25   **A.**   Yes.

1   **Q.**  And then underneath that, Dr. Kessimian said, "She had

2   severe panic symptoms and a panic attack in group.  She was

3   expected to report on her weekend."  Do you see that?

4   **A.**  Yes.

5   **Q.**  Okay.  And then under that paragraph, it says, "No

6   medication changes were made during her treatment.  Continues

7   on current medication regimen and overall has noticed

8   improvement"?

9   **A.**  Yes.

10  **Q.**  And then, again, under "Safety," it says, "Denies

11  suicidal ideation" again?

12  **A.**  Yes.

13          MS. MANDEL:  Thank you, Miranda.  We're done with

14  that one for now.

15  BY MS. MANDEL:

16  **Q.**  Dr. Menninger, recently, in Oregon, you enrolled at

17  Portland State University to take a film class; is that

18  right?

19  **A.**  I applied, but I didn't actually go through with it.

20          MS. MANDEL:  Let's bring up Joint Exhibit 27,

21  please, Miranda.

22  BY MS. MANDEL:

23  **Q.**  Portland State University is near your home in Oregon?

24  **A.**  Yes.

25  **Q.**  And you're currently doing regular therapy with a group

1    called Mindful Therapy Group; is that right?

2    **A.**  Yes.

3            MS. MANDEL:  Okay.  Let's pull up Bates 420,

4    please, Miranda.

5    BY MS. MANDEL:

6    **Q.**  How often do you have therapy now with the Mindful

7    Therapy Group?

8    **A.**  I see my therapist once a week, and I see the nurse

9    practitioner once a month.

10   **Q.**  And the nurse practitioner is for medication management?

11   **A.**  Yes.

12   **Q.**  And the weekly therapist is for talk therapy?

13   **A.**  Yes.

14           MS. MANDEL:  Okay.  Miranda, can we just make

15   that -- thank you.

16   BY MS. MANDEL:

17   **Q.**  And this is your progress note from that weekly therapy

18   for September 7, 2022; is that right?

19   **A.**  Yes.

20   **Q.**  And this is, really, just a few months ago, right?

21   **A.**  Yes.

22   **Q.**  Underneath where it says "D" and a colon, do you see

23   that?  It's at the bottom of what we're looking at?

24   **A.**  Yes.

25   **Q.**  It says, "Lisa reports today from her home in Portland,

1    Oregon in a neutral to anxious mood.  Describes feeling

2    encouraged enough over the last week to enroll in PSU" -- is

3    that the Portland state University?

4    **A.**  Yes.

5    **Q.**  To take a class?

6    **A.**  Yes.

7    **Q.**  And then the therapist said he endorsed that this was a

8    "constructive way to spend the time she has before her court

9    case."  Do you see that?

10   **A.**  Yes.

11   **Q.**  And so you testified that -- you applied for the course

12   at Portland State?

13   **A.**  Yes.

14   **Q.**  So let's -- let's look down below, the next substantive

15   comment says, "Lisa made a jump in progress this week as

16   evidenced by her enrollment at PSU.  She plans to take a

17   course on film study and hope to document her struggle."

18   **A.**  Yes.

19   **Q.**  Do you see that?

20           "This is progress as she's moving away from being

21   reactive to the elements toward proactive towards making

22   meaning of her struggles."

23   **A.**  Yes.

24   **Q.**  But is it your testimony that you did not pursue the

25   class at PSU?

1    **A.**   That's correct.

2    **Q.**   You've also talked to your current therapist and I

3    believe it's Andrew Drwenski; is that right?

4    **A.**   Yes.  I'm not sure how to pronounce his last name.

5    **Q.**   You've talked to him about ways to return to work; isn't

6    that right?

7    **A.**   Early on in therapy, yes.

8    **Q.**   Let's look at some of the notes about that.

9            MS. MANDEL:  Miranda, can we please pull up

10   Bates 278.

11   BY MS. MANDEL:

12   **Q.**   This is Mr. Drwenski's notes from a visit in November of

13   2021; is that right?

14   **A.**   Yes.  I believe this was right about the time I started

15   seeing him for the first time.

16   **Q.**   Okay.  And at this time, in November of 2021, it says,

17   "Suicide assessment, denies any current suicidal thought,

18   plan, or intent."  Do you see that?

19   **A.**   Yes.

20           MS. MANDEL:  And let's -- let's go down a little

21   bit more on that page, please, Miranda.  Let's go down to the

22   next page, 278, please.

23   BY MS. MANDEL:

24   **Q.**   So under the progress note where Mr. Drwenski wrote his

25   impressions and thoughts from the visit, do you see that?

1   **A.**   Yes.

2   **Q.**   It says "progress notes."  Okay.

3           It says, "Lisa presents today as feeling somewhat

4   disappointed and the results of her psych eval not giving

5   much context.  This writer" -- and that's referring to

6   Mr. Drwenski, is that right?  Is that your understanding?

7   **A.**   Yes.

8   **Q.**   -- "was concerned that this evaluation would likely be

9   helpful, but not the cure of some of the issues she was

10  concerned about."

11          And then it says, "Discussed future goals,

12  including find ways to make meaningful decisions regarding

13  her treatment and finding ways to explore career options."

14  **A.**   Yes.

15  **Q.**   Do you see that?

16          As a matter of fact, you haven't explored ways to

17  return to work as a medical pathologist; is that right,

18  Dr. Menninger?

19  **A.**   That's correct.

20  **Q.**   Have you tried to return to work as a pathologist even

21  working fully from home?

22  **A.**   No.  I don't think that's possible.

23  **Q.**   Have you looked into returning to work as a pathologist

24  reviewing charts for an insurance company?

25  **A.**   No.  Right -- right now, things related to my past career

1    are extremely triggering and that's why I -- I try to avoid

2    any associations that will trigger my PTSD.

3    **Q.**   And you haven't looked at returning to a job like you had

4    at the St. Luke's Hospital system in Kansas for many years;

5    is that right?

6    **A.**   That's right.

7    **Q.**   Where when did you last apply for a job of any type,

8    Dr. Menninger?

9    **A.**   It probably was the RISD one that we just talked about.

10   **Q.**   The ones in the arts field, to teach at the Rhode Island

11   School of Design?

12   **A.**   Yes.

13   **Q.**   Let's look at -- in this same exhibit with your notes for

14   Mindful Support Services --

15            MS. MANDEL:   Let's look at Bates 291, please,

16   Miranda.

17   BY MS. MANDEL:

18   **Q.**   This is another note.   This is from someone named

19   Dominique Wilson that's also at Mindful Support Services?

20   **A.**   Yes.   She's the nurse practitioner.

21   **Q.**   And this is the nurse practitioner who you explained is

22   part of your current treatment plan; is that right?

23   **A.**   Yes.

24   **Q.**   Okay.   And is -- is Dominique Wilson someone that you've

25   been seeing on a somewhat regular basis -- and I see

1    "seeing."  I understand it's by telehealth -- but since you

2    moved to Portland?

3    **A.**  Yes.  She's actually based in Texas.

4    **Q.**  Okay.  And the note that's in front of us is a progress

5    note from December of 2021.  Looking down at the chief

6    complaint or presenting problem, do you see that?

7    **A.**  Yeah.  Yes.

8    **Q.**  And the last sentence of that paragraph "denies" -- and I

9    think "SI" is suicidal ideation thoughts; is that right?

10   **A.**  Yes.

11   **Q.**  And immediately before that, in listing out a number of

12   things, one of the things that Ms. Wilson lists is -- right

13   at the end of that sentence, it says "paranoid," and then it

14   says "regarding pending legal case"; is that right?  It's,

15   like, 2½ lines up from the end of that paragraph.

16   **A.**  Yes.

17   **Q.**  And let's look at -- we'll look at another data point in

18   the Mindful Support Services notes.

19          MS. MANDEL:  Miranda, can we pull up 414, please.

20   BY MS. MANDEL:

21   **Q.**  This is also from Dominique Wilson, the nurse

22   practitioner.  Do you see that?

23   **A.**  Yes.

24   **Q.**  And the visit date for this one is September 6, 2022.  Do

25   you see that?

1    **A.**   Yes.

2    **Q.**   And if we look at the -- --

3            MS. MANDEL:   If we can scroll down a tiny bit,

4    Miranda, so we can see the chief complaint or presenting

5    problem paragraph.

6    BY MS. MANDEL:

7    **Q.**   Where it says "history of presenting illness," it says,

8    "Ms. Lisa reported, 'I just signed up to take some college

9    classes in person.   I want to study film.'"

10            Do you see that?

11   **A.**   Yes.

12   **Q.**   And this is in quotes, right?   This is something that you

13   said to Ms. Wilson?

14   **A.**   I -- I believe so.   I assume I said some -- something to

15   that effect.

16   **Q.**   Okay.   And, again, at the last sentence of this

17   paragraph, it says, "She denies" -- and, again, "SI" is

18   suicidal ideation; is that right?

19   **A.**   Yes.

20   **Q.**   And there's that same language in the previous sentence.

21   It look you includes on the list of history of presenting

22   illness, and it include paranoid, and then in parentheses, it

23   says "regarding pending legal case."   Do you see that?

24   **A.**   Yes.

25   **Q.**   Thank you.

1              MS. MANDEL:  Thanks, Miranda.  We're all set with

2     that one.

3     BY MS. MANDEL:

4     **Q.**  Dr. Menninger, in Oregon, do -- you live near your mom

5     and sister, I think you said?

6     **A.**  Yes.  They live in Bend, Oregon, which is where we first

7     moved to.  My family is now in Portland.

8     **Q.**  So you and your husband and your child live in Portland?

9     **A.**  Yes.

10    **Q.**  And your mom and your sister live in Bend?

11    **A.**  Yes.

12    **Q.**  And for those of us who are a little more East Coast

13    knowledgeable, can you just tell us how far is it from Bend

14    to Portland?

15    **A.**  I believe it's about a three hours' drive.

16    **Q.**  When did you move from Bend to Portland?

17    **A.**  We moved after our one year lease was up.

18    **Q.**  How often do you see your mom in a typical month?

19    **A.**  I think I've seen her maybe once in the past year.

20    **Q.**  And how often do you see your sister in a typical month?

21    **A.**  I've seen her a few times this year.  Maybe less.  It was

22    difficult with the pandemic.

23    **Q.**  Dr. Menninger, your daughter, how old is your daughter

24    now?

25    **A.**  Fourteen.

1    **Q.**  And what -- what type of school does your daughter

2    currently go to?

3    **A.**  She is homeschooling right now.

4    **Q.**  How long has your daughter been homeschooling for?

5    **A.**  We attempted two days at a public school when we moved to

6    Portland, and that was extremely triggering, and so we've

7    been homeschooling since then.

8    **Q.**  And if we think about we're now in March 2023, did your

9    daughter stop going to school in person when the pandemic

10   began in March 2020?

11   **A.**  Yes.  She was attending remotely.

12   **Q.**  And then at some point in the interim, you and your

13   husband switched to homeschooling her?

14   **A.**  Once Maya started eighth grade, when we moved to Portland

15   in 2000- -- or seventh grade was all remote due to the

16   pandemic, so Maya was attending remote from home.

17   **Q.**  Who primarily does your daughter's homeschooling?  Is

18   that you?  Your husband?

19   **A.**  We meet with Maya daily, and we're focusing right now on

20   a math placement exam that they need to pass in order to

21   start taking college courses at the local community college.

22   So that's what we're focusing on right now.

23   **Q.**  And when you say "we," that's you and your husband?

24   **A.**  Yes.

25   **Q.**  And so both of you are managing the homeschooling

1    together?

2    **A.**   The math tutorials placement practice courses are on the

3    computer, so there's not really a lot -- there's not really

4    anything we do other than we make sure she's doing these on a

5    regular basis.

6    **Q.**   In a typical week, let's say in 2023, how often are you

7    leaving your home?

8    **A.**   Just for doctors appointments, typically.

9    **Q.**   And, Dr. Menninger, aside from interacting with your

10   doctors or your healthcare treaters and your husband and your

11   daughter, how often are you interacting with other people on

12   a weekly basis?

13   **A.**   I -- I interact with my sister pretty frequently by text.

14   **Q.**   So aside from texting with your sister, medical

15   appointment interactions, and interactions with your husband

16   and your daughter, any other typical person-to-person

17   interactions that you're having?

18   **A.**   No.  I have a hard time trusting people right now, so --

19   and I've had a lot of stress and so, no, I don't really leave

20   the house except for doctors appointments or to take Maya

21   somewhere.

22   **Q.**   Your husband and your daughter are currently back in

23   Oregon; is that right?

24   **A.**   Yes.

25   **Q.**   You -- you flew here to be in Boston for the trial; is

1    that right?

2    **A.**  Yes.

3    **Q.**  And did anyone fly with you?

4    **A.**  No.

5    **Q.**  During the course of this trial, Dr. Menninger, are you

6    currently staying in a hotel in the Boston area?

7    **A.**  Yes.

8    **Q.**  And is anyone staying there with you?

9    **A.**  No.

10             MS. MANDEL:  Thank you, Dr. Menninger.

11             I have no more questions at this time.

12             THE COURT:  All right.  Any redirect?

13             MR. HANNON:  Yes, Your Honor.

14             THE COURT:  Not required.

15             MR. HANNON:  May I proceed?

16             THE COURT:  Yes.

17             **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

18    BY MR. HANNON:

19    **Q.**  Dr. Menninger, are you faking it?

20    **A.**  I'm sorry; I didn't hear your last word.

21    **Q.**  Are you faking it?

22    **A.**  Am I faking what?

23    **Q.**  Your medical condition.

24    **A.**  Absolutely not.

25    **Q.**  All the drugs that you take on a daily basis, do you do

1  that because you want to win this lawsuit?

2  **A.**  Absolutely not.

3  **Q.**  The 36 pounds that you've lost since your first visit to

4  Dr. K in 2018, have you lost those because you want money?

5  **A.**  No.  It -- I'm suffering from the physical symptoms of

6  that.

7  **Q.**  Do you think about killing yourself every day?

8  **A.**  Not every day, but frequently.

9  **Q.**  And when you disclosed your disability to PPD in 2018,

10  did you do that because you wanted money?

11  **A.**  No.  I had a great salary and benefits at the time.  I

12  was afraid.

13  **Q.**  And when you had that February 28th meeting in 2018 and

14  they suggested a package, did you indicate you wanted it?

15  **A.**  No.  I -- I told them that I love my job, and I didn't

16  want to leave PPD, and could we just, you know, brainstorm

17  about some creative potential accommodations, if they were

18  even needed.

19  **Q.**  I want to follow up on a few other points raised by PPD

20  in their examination of you.  So one of the documents that

21  you looked at yesterday was your job description.  Do you

22  recall that?

23  **A.**  Yes.

24  **Q.**  Okay.  And you recall at the top of your job description,

25  it said "ED labs"?

1    **A.**  Yes.

2    **Q.**  Okay.  And I think you testified that it was your

3    understanding that other -- other peers, of course, had that

4    same job description?

5    **A.**  Yes.  That's what I was told by Chad St. John.

6    **Q.**  I'm going to show you Joint Exhibit Number 17.  It's a

7    little bit too bright.  Apologies for that.

8            Do you recognize what this is?

9    **A.**  Yes.  It looks like an organizational chart.

10   **Q.**  Okay.  And if you look down here on the company's

11   organizational chart -- and just to -- just to clarify, this

12   would be the organizational chart for the folks that reported

13   up to Mr. Mekerri, right?

14   **A.**  Yes, at that time.

15   **Q.**  Okay.  And you see there that on the organizational

16   chart, it identified you as "ED labs"?

17   **A.**  Yes.

18   **Q.**  And if we scroll over to the left here, you see it also

19   identifies Chris Clendening as ED labs, right?

20   **A.**  Yes.

21   **Q.**  Was Chris Clendening a medical doctor?

22   **A.**  No.

23   **Q.**  Did Chris Clendening have the same duties and

24   responsibilities as you at PPD?

25   **A.**  No.

1   **Q.**  Els -- I'm sorry; how do you pronounce her last name?  Or

2   Els.  I'm sorry.

3   **A.**  Els.

4   **Q.**  And you see there it identifies Els as ED labs; is that

5   right?

6   **A.**  Yes.

7   **Q.**  Okay.  Did Els have the same duties and responsibilities

8   as you did at PPD?

9   **A.**  No.

10   **Q.**  What was Els's role?

11   **A.**  Els was the site head of the Belgium lab.

12   **Q.**  You were asked on cross-examination about the

13   difficulties that your daughter had prior to your move to

14   Massachusetts.  Do you recall that testimony?

15   **A.**  Yes.

16   **Q.**  How was she doing when you moved?  Or I should say, how

17   was she doing after you moved?

18   **A.**  She was thriving after a few months at the school.  You

19   know, it took a little bit of time to get used to the new

20   school, but doing very well and loved the school.

21   **Q.**  Did any kind of bullying issues with respect to your

22   daughter play any role whatsoever in the deterioration of

23   your health condition in 2018?

24   **A.**  Can you repeat that question?

25   **Q.**  Sorry.  It was a long one.

1          Did anything about your daughter being bullied, did

2     that contribute at all to your deteriorating health condition

3     in 2018?

4     **A.**   No.

5     **Q.**   You were asked questions on cross-examination about work

6     travel you did in 2018.  Do you recall those questions?

7     **A.**   Yes.

8     **Q.**   The -- the work travel that you -- that you did in 2018,

9     was -- was that done and planned in consultation with

10    Mr. Mekerri?

11    **A.**   Yes.

12    **Q.**   Did he ever ask you to do more work travel in 2018 than

13    you did?

14    **A.**   Yes.

15    **Q.**   And what was that?

16    **A.**   It was for July and August, I believe.

17    **Q.**   So that was travel that would have happened if you had

18    remained working at PPD; is that right?

19    **A.**   Yes.

20    **Q.**   And at the time of your medical leave in June of 2018,

21    did you, in fact, have additional work travel planned in the

22    future?

23    **A.**   Yes.

24    **Q.**   I'm going to show you Joint Exhibit Number 80.

25          Now, I'm going to show you Joint Exhibit Number 80.

1   So you recall this was a document we looked at yesterday on

2   cross-examination?  Do you see that?

3   **A.**  Yes.

4   **Q.**  Okay.  So this was the email communication concerning

5   the -- the requirements for the New York State standards; is

6   that right?

7   **A.**  Yes.

8   **Q.**  Okay.  And as you talked about yesterday, in the bottom

9   email here on this page, Kathy Dick, she expressed her view

10  concerning what certain requirements were relative to

11  New York State; is that right?

12  **A.**  Yes.

13  **Q.**  Did you agree with her assessment?

14  **A.**  For the role that was going to be filled permanently, but

15  not for me at that time.

16  **Q.**  Okay.  And do you see there, in Mr. McKinnon's email, the

17  middle of the page, he expressed concerned that this might

18  negatively impact the upcoming New York State inspections.

19  Do you see that?

20  **A.**  Yes.

21  **Q.**  Was he right?

22  **A.**  No.

23  **Q.**  What happened at the New York State inspection?

24  **A.**  It went extremely well, and the inspector was highly

25  complimentary toward the staff, the quality of our lab, and

1    me as the director.

2    **Q.**   And was that -- when was that?

3    **A.**   That was in November.

4    **Q.**   And was the subject that's addressed here in this email

5    communications here on this exhibit, was this in any way

6    brought up by Mr. Mekerri at your 360 meeting in December of

7    2017?

8    **A.**   No.

9    **Q.**   And if you look here at the top of the page, you'll see

10   this is an email from Brent McKinnon to Chad St. John on

11   March 8, 2018.  Do you see that?

12   **A.**   Yes.

13   **Q.**   Are you aware of any communications concerning the

14   subject between October 2017 and March 8, 2018?

15   **A.**   No.

16   **Q.**   Do you have any understanding as to why all of a sudden

17   on March 8, 2018, Mr. McKinnon is forwarding this email to

18   Mr. St. John?

19   **A.**   I had no idea.

20   **Q.**   We looked yesterday, I'm not going to show it to you

21   again, but we looked yesterday at the initial forms that you

22   and Dr. Kessimian had submitted in connection with your

23   accommodation request.  Do you recall those?

24   **A.**   Yes.

25   **Q.**   Okay.  And you identified in those forms, am I right,

1    that it was in some way difficult for you to perform your job

2    because of your disability; is that right?

3    **A.**   Yes.

4    **Q.**   Was that new?

5    **A.**   No.

6    **Q.**   Had -- had it -- had those challenges you faced, had

7    those been the same challenges that you faced since you

8    started at PPD?

9    **A.**   Yes.

10   **Q.**   Had they prevented you from doing a good job?

11   **A.**   No.

12   **Q.**   You were also asked on cross-examination about concerns

13   you had about traveling to Highland Heights after you

14   disclosed your disability.  Do you recall that?

15   **A.**   Yes.

16   **Q.**   And what, if anything, about disclosing your disability

17   made it more difficult for you to travel to Highland Heights?

18   **A.**   I was concerned about how I might be viewed by others.

19   **Q.**   The people that you had disclosed your disability to,

20   where did they work?

21   **A.**   In Highland Heights.

22   **Q.**   On cross-examination, you were also shown another copy of

23   your -- right? -- you were shown the 2017 performance review.

24   Do you recall that?

25   **A.**   Yes.

1  **Q.**  And opposing counsel, she pointed out that it had been

2  due on December 31, 2017; is that right?

3  **A.**  Yes.

4  **Q.**  Did you receive it then?

5  **A.**  No.  And I -- there were multiple due dates.  There were

6  many due dates prior to that as well.

7  **Q.**  And the first time you saw that review, was that before

8  or after you disclosed your disability?

9  **A.**  That was after.

10  **Q.**  How long after?

11  **A.**  I didn't see it until almost the end of January --

12  **Q.**  And --

13  **A.**  -- of --

14  **Q.**  I'm sorry.  Go ahead.

15  **A.**  Of 2018.

16  **Q.**  Had anyone at PPD even told you that it was available for

17  review prior to the end of January 2018?

18  **A.**  I kept checking, myself, because I didn't know what was

19  going on.  And eventually, I had a call with Chad St. John at

20  the end of January, and he told me that it's in system, and I

21  can view it.

22  **Q.**  Okay.  And in terms of you looking for it, is it -- is it

23  right that that review was going to partially determine what

24  your bonus was; is that right?

25  **A.**  Yes.  Bonus and salary increase.

1  **Q.**  Okay.  You were asked on cross-examination as to whether

2  or not Dr. Kessimian ever provided PPD a letter saying that

3  your reason -- that the accommodations that she proposed were

4  not needed to perform the essential functions of your job.

5  Do you recall that question?

6  **A.**  Yes.

7  **Q.**  Did PPD ever ask you for that letter?

8  **A.**  I don't quite understand what you're asking.

9  **Q.**  No worries.

10       Dr. Kessimian, she never provided PPD with a letter

11  that explicitly said, "Even if you don't give Dr. Menninger

12  these accommodations, she can still do her job," right?

13  **A.**  Right.

14  **Q.**  Okay.  Did PPD ever ask for that letter?

15  **A.**  No.

16  **Q.**  You were asked on cross-examination about seeking legal

17  advice.  Why -- why was it that you decided to seek legal

18  advice?

19  **A.**  I was terrified of disclosing my condition.  I didn't

20  know what would happen.  I thought I would be viewed as --

21  yeah, I -- viewed differently, viewed as defective and even

22  maybe lose my job.

23  **Q.**  Had you done, yourself, any sort of internet research

24  prior to seeking legal advice in connection with that

25  disclosure?

1    **A.**   Yes.  I wanted to see if there were any protections for

2    employees who had similar or same conditions that I had.

3    **Q.**   And did that research lead you to believe that you did?

4    **A.**   Yes.  I discovered that my conditions, in fact, are

5    considered a disability under the ADA.

6    **Q.**   And then you were asked some questions about the timing

7    of your request for medical leave in early June 2018.  Did

8    you request medical leave because you wanted to go walk an

9    ultra marathon?

10   **A.**   No.

11   **Q.**   I'm going to show you Joint Exhibit Number 18 again.  So

12   this is Dr. Kessimian's notes.  And I'm just going to direct

13   your attention to the -- so this is the 44th page of the

14   exhibit, and just for the record, it has the bottom in the

15   bottom right-hand corner that says 706.

16         And if you look up here at the top, the date of

17   service, that would be June 1, 2018; is that right?

18   **A.**   Yes.

19   **Q.**   So that's about a week after the note that the PPD's

20   lawyer just directed you to?

21   **A.**   I'm sorry; I can't remember what you directed me to.

22   **Q.**   No worries.  We'll skip the math.

23   **A.**   Okay.

24   **Q.**   And if you could, just look at where it says "chief

25   complaint."  And could you read that for the jury?

1    **A.**  "I just can't do it anymore.  I am not sleeping, eating.

2    I am having thoughts about ending my life, but I wouldn't do

3    it because of Maya and Mason."

4    **Q.**  And if we look at the -- the next page -- I'm sorry --

5    two pages ahead in terms of Dr. K's plan, do you see there

6    she writes, "Number 1, safety -- recommended immediate

7    medical leave starting on Monday 2/2 to level of anxiety and

8    safety issues, monitor GI distress and appetite."

9              Do you see that?

10   **A.**  Yes.

11   **Q.**  Does that accurately reflect what Dr. Kessimian

12   recommended to you based upon this visit?

13   **A.**  Yes.

14   **Q.**  Did you follow her advice?

15   **A.**  Yes.

16   **Q.**  And you were asked questions on cross-examination about a

17   potential class at Portland State University.  Do you recall

18   that?

19   **A.**  Yes.

20   **Q.**  Okay.  Did you ever actually attend that?

21   **A.**  No.

22   **Q.**  Why not?

23   **A.**  I was afraid.

24   **Q.**  Do you want to get better?

25   **A.**  Absolutely.

1   **Q.**  Why?

2   **A.**  Because I want my family to be happy again and I feel

3   like -- I feel like it's my fault that Maya's had to endure

4   five years of hardship.  And I want to be there to see who --

5   who she becomes in life and I don't want to feel pain and

6   fear all the time.

7               MR. HANNON:  That's all I have.

8               THE COURT:  All right.  Recross?

9               **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

10  BY MS. MANDEL:

11  **Q.**  I just have a couple more questions, Dr. Menninger.

12              You spoke a few moments ago about your 2017

13  performance review and when you had an opportunity to review

14  that in January of 2018.  Do you recall?

15  **A.**  Yes.

16  **Q.**  And you have no knowledge yourself of when Mr. Mekerri

17  actually completed his portion of that review; isn't that

18  right?

19  **A.**  I -- it didn't look like it was ever completed.

20  **Q.**  Well, and I -- and I understand that that's your view,

21  but I just want to be clear.  My question is a little bit

22  different.  You have no knowledge, yourself, of when

23  Mr. Mekerri did his portion of the review; isn't that right?

24  **A.**  That's correct.

25  **Q.**  Thinking back to your communications and Dr. Kessimian's

1    communications with PPD with Mr. St. John, and with the

2    company in that January, February, March time period in 2018,

3    you were just asked a question about whether you were asked

4    for a follow-up letter from Dr. Kessimian.  Do you recall

5    that?

6    **A.**  Yes.

7    **Q.**  And I want to direct your attention to Joint Exhibit 419.

8    We're going to just -- for simplicity, put it up here in

9    front of you this way.

10                This is an email.  At the top of the page, you can

11   see this was sent from Mr. St. John to you on March 12, 2018.

12   Do you see that?

13   **A.**  Yes.

14   **Q.**  And -- well, now I want to blow up the text a little bit

15   more.

16                In this email, Mr. St. John said to you, "Dear

17   Lisa, thank you for your email.  We appreciate the ongoing

18   dialogue regarding your request for accommodation and want to

19   get back to you on those requests."

20                Do you see that?

21   **A.**  Yes.

22   **Q.**  And Mr. St. John went through a number of things that

23   were required as part of your job and what PPD's view was of

24   that.

25                I just want to specifically direct your attention

1    to the very last paragraph before Mr. St. John signs off.  He

2    says, "Please take another look at your job description,

3    discuss it with your healthcare provide," and that was

4    Dr. Kessimian, right?

5    **A.**  Yes.

6    **Q.**  "And let us know if there are other accommodations that

7    would allow you to perform the essential functions of your

8    job as outlined above."

9         Do you see that?

10   **A.**  Yes.

11   **Q.**  And after you received this email from Mr. St. John, you

12   never provided another letter from Kessimian to PPD about any

13   kind of accommodations; isn't that right?

14   **A.**  I was not asked for a letter.  I was asked to discuss

15   with her, which I did.  And it was mischaracterizing it

16   because it was saying that would allow me to perform the

17   essential functions of my job, and that was not an issue for

18   me.

19   **Q.**  And just to simplify the question maybe, Dr. Menninger,

20   after you received this email from Mr. St. John, in fact,

21   after your February letter from Dr. Kessimian, you never

22   provided any other communication to PPD from

23   Dr. Menninger [*sic*] about --

24            THE COURT:  Dr. -- Menninger or from Dr. --

25            MS. MANDEL:  Thank you, Your Honor.

1    BY MS. MANDEL:

2    **Q.**   From Dr. Kessimian about what accommodations might help

3    you do your job; isn't that right?

4    **A.**   We requested specific tasks that they --

5              THE COURT:  She's just asking you --

6              THE WITNESS:  Okay.

7              THE COURT:  -- I think whether after the

8    February 26th letter from Dr. Kessimian -- if I recall -- is

9    the question just whether another letter was provided from

10   Dr. Kessimian?

11             MS. MANDEL:  Yes.  And if I may, Your Honor, I

12   think it was, actually, like, February 14th was the letter

13   from Dr. Kessimian, but, yes.  Yes.

14             THE COURT:  Ask the question again.

15   BY MS. MANDEL:

16   **Q.**   After Dr. Kessimian provided the letter that we've looked

17   at a few times in mid-February of 2018, there were no other

18   letters or communications from Dr. Kessimian to PPD, either

19   from her or from you, that you provided to PPD; isn't that

20   right?

21   **A.**   There were no letters from Dr. Kessimian.

22   **Q.**   And nor from any other doctor?

23   **A.**   Correct.

24             MS. MANDEL:  Okay.  Thank you.

25             THE COURT:  As in no more questions?

```
 1                 MS. MANDEL:  No more questions at this time.
 2                 THE COURT:  Okay.  Thank you very much.
 3                 MR. HANNON:  I have nothing further, Your Honor.
 4                 THE COURT:  That's good, because there is no more.
 5                 MR. HANNON:  I know.
 6                 THE COURT:  Right.  It doesn't matter whether you
 7     want another round, but I'm glad you don't.  There's only two
 8     rounds, never more than two.
 9                 Dr. Menninger, you can step down.  Thank you -- and
10     return to counsel table.  Thank you very much.
11                 Next witness, Mr. Hannon.
12                 MR. HANNON:  Deborah Ballweg.
13                 (Witness duly sworn.)
14                 THE DEPUTY CLERK:  And can you please state your
15     full name and spell your last name for the record.
16                 THE WITNESS:  Deborah Ballweg, B-a-l-l-w-e-g.
17                 THE DEPUTY CLERK:  Thank you.
18                 THE COURT:  Please be seated.
19                 Go ahead, Mr. Hannon.
20                 MR. HANNON:  I have some binders I'm likely to use.
21     May I approach the bench?
22                 THE COURT:  Sure.
23                 MR. HANNON:  May I approach the witness?
24                 THE COURT:  Yes.
25
```

1          **DEBORAH BALLWEG**

2          having been duly sworn, testified as follows:

3          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

4     BY MR. HANNON:

5     **Q.**   Good morning, Ms. Ballweg.

6     **A.**   Good morning.

7     **Q.**   How are you currently employed?

8     **A.**   Currently employed as a VP of human resources at

9     Thermo Fisher Scientific.

10    **Q.**   Okay.  And for how long have you held that role?

11    **A.**   Since 2020.

12    **Q.**   What -- what happened in 2020 that caused you to become

13    the vice president of human resources at Thermo Fisher?

14    **A.**   A restructure within our HR function.

15    **Q.**   Was there also an acquisition around that time?

16    **A.**   No.

17    **Q.**   Okay.  At some point, PPD was acquired by Thermo Fisher;

18    is that right?

19    **A.**   That's correct.

20    **Q.**   Okay.  And when was that?

21    **A.**   That was in December of 2022.

22    **Q.**   Okay.

23    **A.**   2021.  Sorry.

24    **Q.**   Okay.  So how long was it between Thermo Fisher's

25    acquisition of PPD and when you became an official

1    Thermo Fisher employee?

2    **A.**   About 18 months.

3    **Q.**   Okay.  And when you were -- your last position at PPD,

4    that was vice president of human resources, right?

5    **A.**   Correct.

6    **Q.**   And for how long had you been in that role?

7    **A.**   How long was I vice president?

8    **Q.**   Yes.

9    **A.**   I'm currently a vice president.

10   **Q.**   Sure.  My question was vice president of human resources

11   at PPD.

12   **A.**   From April of 2020 until the acquisition by Thermo Fisher

13   in December of 2021.

14   **Q.**   Okay.  So you actually were promoted in April 2020; is

15   that right?

16   **A.**   That is correct.

17   **Q.**   And prior to April of 2020, you had served as -- was it

18   executive director --

19   **A.**   That's correct.

20   **Q.**   -- of human resources?

21   **A.**   Yes.

22   **Q.**   Okay.  And that was the position that you held in April

23   of 2018; is that right?

24   **A.**   That is correct.

25   **Q.**   Okay.  When did you first join PPD?

1    **A.**   In October of 1994.

2    **Q.**   Okay.  And what was your position when you first joined?

3    **A.**   I believe it was a human resource representative.

4    **Q.**   And so your career at PPD ranged how many years?

5    **A.**   28 plus.

6    **Q.**   And during those 28 plus years at PPD, were those all

7    within HR?

8    **A.**   Yes.

9    **Q.**   In your role as executive director of HR at PPD, part of

10    your responsibilities included conducting workplace

11    investigations; is that right?

12    **A.**   That's correct.

13    **Q.**   Okay.  And when we say a "workplace investigation," can

14    you explain to the jury what that means?

15    **A.**   So in HR, our function is really to ensure that our

16    employees and managers work together effectively.  Our role

17    is a support function to make sure that we provide

18    opportunities to express concerns.  So when employees and

19    managers or employees and employees aren't able to

20    effectively communicate, our role would be to help facilitate

21    or investigate in situations where it may be necessary.

22    **Q.**   So would one example of a workplace investigation that

23    you'd be responsible for include claims of discrimination?

24    **A.**   Correct.

25    **Q.**   Claims of retaliation?

1    **A.**  Correct.

2    **Q.**  At some point in time in your work at PPD, did you come

3    to know Dr. Lisa Menninger?

4    **A.**  I did, yes.

5    **Q.**  And how did you know Dr. Menninger?

6    **A.**  Dr. Menninger was hired at our central lab facility I

7    believe in 2015.  An employee of mine, Chad St. John, would

8    have worked directly with her.  And in my routine visits to

9    that site, I would have been introduced to Dr. Menninger.

10   **Q.**  Okay.  And at some point in time, you learned that

11   Dr. Menninger had made a complaint concerning the way she was

12   being treated at PPD; is that right?

13   **A.**  That's correct.

14   **Q.**  Okay.  And do you recall when it was that this complaint

15   came to your attention?

16   **A.**  The complaint came in early 2018.

17   **Q.**  Do you recall if it was in April of 2018?

18   **A.**  I believe that's accurate, yes.

19   **Q.**  Okay.  And what -- well, strike that.

20          You recall that at that time, Dr. Menninger, she

21   complained that she was being mistreated by her boss, Hacene

22   Mekerri; is that right?

23   **A.**  That's -- yes.

24   **Q.**  She alleged that Mr. Mekerri was attempting to force her

25   out of her job?  Is that right?

1    **A.**   No.  She indicated that she felt she was being treated

2    unfairly because she disclosed her disability.

3    **Q.**   Okay.  Did she indicate what she thought the intent was

4    of that treatment?

5    **A.**   She felt it was unfair and she just wanted it to stop.

6    **Q.**   You learned of this complaint from Mr. St. John; is that

7    right?

8    **A.**   That's correct.

9    **Q.**   And Mr. St. John, do you recall he actually forwarded you

10   an email reflecting this concern from Dr. Menninger?

11   **A.**   That's accurate.

12   **Q.**   Okay.  And at that point in time, you -- you decided to

13   conduct an investigation; is that right?

14   **A.**   That's correct.

15   **Q.**   Okay.  Now, you -- you had conducted many investigations

16   in the past, hadn't you?

17   **A.**   I have, yes.

18   **Q.**   Okay.  And but more -- more specifically, as of that

19   point in time, you had extensive experience conducting

20   investigations, right?

21   **A.**   Correct.

22   **Q.**   You had received training regarding how to go about

23   conducting investigations?

24   **A.**   We did, yes.  Or I did, yes.

25   **Q.**   Okay.  And some of that training had actually happened as

1    recently as 2016, correct?

2    **A.**  Correct.

3    **Q.**  Some of that was provided by in-house counsel at PPD?

4    **A.**  Yes.

5    **Q.**  Some of that training was also provided by outside

6    counsel, right?

7    **A.**  That's correct.

8    **Q.**  In fact, the same law firm that represents PPD here

9    today, correct?

10   **A.**  Yes.

11   **Q.**  Okay.  And you -- you understood as of April 2018 that,

12   whoever did the investigation, needed to be impartial, right?

13   **A.**  Absolutely.

14   **Q.**  Okay.  Needed to be objective?

15   **A.**  Yes.

16   **Q.**  Needed to be a person who themselves was not involved in

17   the situation being investigated, correct?

18   **A.**  Intimately involved in the information that would have

19   been provided in the investigation, correct.

20   **Q.**  So you're saying that if they were involved, but they

21   weren't intimately involved, it would be okay for them to

22   serve as an investigator?

23   **A.**  "Involved" is a complex word.  I mean, awareness of the

24   situation, that's fine.  Involved, no.

25   **Q.**  How about working behind the scenes to draft the email

1    communications that were being complained about?  Would that

2    be the type of involvement that, from your perspective, would

3    disqualify someone from serving as an investigator?

4    **A.**  Again, I think that's a gray area.  I think if, the

5    review of emails is really to say, "Contextually, does this

6    align with the process, or am I following, you know, company

7    standard or protocol?" to me that would be -- that would be

8    fine.

9            If they're, basically, having knowledge of the

10   situation and responding as if they were the first person or

11   involved directly in that -- in that situation, then I think

12   that would be inappropriate.

13   **Q.**  So you believe some level of involvement by the

14   investigator into the issue being investigated is okay?

15   **A.**  Again, it really depends on what "involvement" is defined

16   as.

17   **Q.**  Okay.  Well, you had been involved for several months,

18   prior to beginning your investigation, into Dr. Menninger's

19   request for accommodation, hadn't you?

20   **A.**  I had been aware of the situation.

21   **Q.**  Okay.  Let's -- let's see when you became aware.  So I'm

22   going to direct you to Joint Exhibit Number 60.  And if you

23   look -- we'll start at the top of the page here.  So you see

24   this is an email to you from Chad St. John on January 15,

25   2018.  Do you see that?

1    **A.**  Yes.

2    **Q.**  Okay.  And this is an email to you and Jerry Williams,

3    right?

4    **A.**  Correct.

5    **Q.**  Can you tell the jury who Jerry Williams is?

6    **A.**  At the time, Jerry Williams was my manager.

7    **Q.**  Okay.  And if we looked down below here, we'll see this

8    was what Mr. St. John was forwarding to you was an email he

9    had sent to Dr. Menninger, right?

10   **A.**  Yes.

11   **Q.**  Okay.  And this was an email from Mr. St. John requesting

12   certain information from Dr. Menninger concerning her

13   disability and need for accommodation, right?

14   **A.**  That's correct.

15   **Q.**  Okay.  And -- well, strike that.

16            All right.  Now let's look at Joint Exhibit 223,

17   and so this was an email the very next day from Mr. St. John

18   to Mr. Williams, copying you.  Do you see that?

19   **A.**  Yes.

20   **Q.**  Okay.  And if we look below, he's -- he's forwarding to

21   you Dr. Menninger's response to his prior email, right?

22   **A.**  Yes.

23   **Q.**  Okay.  And his message to you here is -- at the top of

24   the page is, "I will continue to keep you posted," right?

25   **A.**  Well, it's intended to Jerry.  I was just in copy.

1    **Q.**   Okay.  But he did continue to keep you posted after this

2    email, right?

3    **A.**   Periodically, yes.

4    **Q.**   I'm going to show you now Joint Exhibit 213.  And so this

5    here is an email from Mr. St. John to you and Mr. Williams on

6    January 24, 2020 [*sic*].  Do you see that?

7    **A.**   Again, to -- Jerry copied to me.

8    **Q.**   Okay.  Is that an important distinction, from your

9    perspective?

10   **A.**   It is.  Generally, when you're on the copy line, it's --

11   if you have time, it's an awareness.  It's not something

12   that's, like, your immediate responsibility or actionable.

13   **Q.**   Okay.  So is it your testimony that you weren't -- you

14   weren't closely monitoring the situation as of January 24,

15   2018?

16   **A.**   I was aware, but I wasn't involved.

17   **Q.**   Okay.  And you see here that Mr. St. John, he provides an

18   update noting that "Nothing specific from Lisa, but that she

19   had an appointment to see her doctor on Monday afternoon of

20   this week."  Do you see that?

21   **A.**   I do.

22   **Q.**   Okay.  Now, are you aware that, at some point in time,

23   Dr. Menninger was provided an email from Mr. Mekerri that

24   contained five buckets of activities.  You've seen that

25   email, right?

1    **A.**  I have, yes.

2    **Q.**  Okay.  And you're aware as to why that email was provided

3    to Dr. Menninger, right?

4    **A.**  Yes.

5    **Q.**  Okay.  You're aware that Mr. Mekerri had told

6    Dr. Menninger that he was considering some changes to her

7    role in December of 2017, right?

8    **A.**  I believe Mr. Mekerri was highlighting the essential

9    functions of her job and the focus on specific ones, but not

10   changing her job.

11   **Q.**  So you don't think that the buckets related to new

12   activities?

13   **A.**  I believe the buckets were a further definition of the

14   major accountabilities of her role.

15   **Q.**  Were they new activities?

16   **A.**  They fell within the boundaries of the major

17   accountabilities of her role.

18   **Q.**  I'm asking a slightly different question.  I'm not asking

19   if they fell within the umbrella.  I'm asking whether these

20   were new activities that she had not actually been performing

21   up to that date.

22   **A.**  I don't think I can comment on what she was or was not

23   performing in her role, but they would have fell under that

24   umbrella or the buckets of the job description, the major

25   accountabilities of her role.

1    **Q.**   Okay.  So you don't know if she had been performing those

2    tasks or not?

3    **A.**   Correct.

4    **Q.**   Okay.  But you do know that that -- those buckets, that

5    those came in response to a request by Mr. St. John; is that

6    right?

7    **A.**   I'm sorry; a request of Mr. St. John for?

8    **Q.**   For Mr. Mekerri to provide those buckets?

9    **A.**   Correct.

10   **Q.**   Okay.  I'm going to show you here Joint Exhibit 193.

11             And we'll start at the top here.  So this is an

12   email from Mr. St. John on February 5, 2018, right?

13   **A.**   Correct.

14   **Q.**   And now you've moved to the to line and Mr. Williams has

15   moved to the cc line; is that right?

16   **A.**   Yes.

17   **Q.**   Would I be right to interpret that that your involvement

18   at this point has increased?

19   **A.**   Awareness, yes.

20   **Q.**   I asked about involvement.

21   **A.**   Situational.

22   **Q.**   Okay.  Had there been some discussion as of this point

23   noting that you were going take the lead here and

24   Mr. Williams was going to fall back?

25   **A.**   Not that I recall.

1  **Q.**  And Mr. St. John, he's forwarding you an email, right?

2  **A.**  Yes, he is.

3  **Q.**  Okay.  Let's look at the email he forwarded you.  And in

4  the second sentence, which I'll try to highlight, he writes,

5  "Please be specific bucketing any new duties and existing

6  duties that may have an increase beyond previous levels

7  expected in the role as the CL business continues to grow."

8  Do you see that?

9  **A.**  I do.

10  **Q.**  Okay.  And am I right it's your understanding that this

11  was the email from Mr. St. John that prompted Mr. Mekerri to

12  create the five buckets?

13  **A.**  Yes.

14  **Q.**  Okay.  I'm going to show you Joint Exhibit 180 now.  And

15  starting at the top, this is an email from Mr. St. John on

16  February 14, 2018, right?

17  **A.**  Yes.

18  **Q.**  Okay.  And, again, you're in the to line?

19  **A.**  Correct.

20  **Q.**  Mr. Williams is the cc?

21  **A.**  Yes.

22  **Q.**  And he writes, "Deb, FYI, we can now explore if the

23  recommended accommodations by her physician are reasonable

24  for the business."  Do you see that?

25  **A.**  Yes.

1    **Q.**  And this was an email in which Mr. St. John was, just to

2    turn to the next page, he attaches the communication from --

3    or at least one of the communications from Dr. Kessimian,

4    right?

5    **A.**  Yes.

6    **Q.**  Okay.  So you received this on February 14, 2018?

7    **A.**  Yes.

8    **Q.**  Okay.  I'm going to show you Joint Exhibit 172.  And

9    starting at the top, this is an email from Mr. St. John to

10   you on February 21, 2018.  Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  And it's to you?

13   **A.**  Yes.

14   **Q.**  And now Mr. Williams, he's not even cc'd, right?

15   **A.**  Correct.

16   **Q.**  Okay.  Did something happen to cause Mr. Williams to no

17   longer be cc'd, to your knowledge?

18   **A.**  Not to my knowledge.

19   **Q.**  Okay.  And Mr. St. John, he writes in the second

20   paragraph -- well, I'm not going to read it, but just the

21   last sentence, it reads, "I will continue to keep you

22   posted."  Do you see that?

23   **A.**  I do.

24   **Q.**  Okay.  And he thereafter did continue to keep you posted,

25   right?

1    **A.**  As an FYI, yes.

2    **Q.**  He was only keeping you posted as an FYI?

3    **A.**  In many cases, yes.

4    **Q.**  I'm going to show you Joint Exhibit 277.  And starting at

5    the top here, this is an email from you to Mr. St. John on

6    February 22, 2018, correct?

7    **A.**  Yes.

8    **Q.**  And this is in response to that email we just looked at,

9    right?

10   **A.**  Yes.

11   **Q.**  And after thanking him, you write, "Can I suggest you (HR

12   generally takes the lead on these given the risk factor)

13   draft a response on his behalf and have him review."

14        Do you see that?

15   **A.**  Yes.

16   **Q.**  What did you mean by "risk factor"?

17   **A.**  So I was generally giving Chad feedback about the process

18   and the risk factor -- it's a sensitive topic.  We want to

19   make sure that we're making sure we're taking care of our

20   employees in any situation and helping our managers draft

21   sensitive documents.

22   **Q.**  Anything else?

23   **A.**  No.

24   **Q.**  I'm going to show you Joint Exhibit Number 192.  And the

25   top of the page, an email from Mr. St. John to you.  Do you

1    see that?

2    **A.**   Yes.

3    **Q.**   And now this is February 26, 2018, right?

4    **A.**   Yes.

5    **Q.**   Okay.  And looking at the -- just at the bottom of the

6    page, you see Mr. St. John, on February 23, 2018, wrote to

7    you, "Please let me know your thoughts on this draft so that

8    we can send a final version to Lisa soon."

9            Do you see that?

10   **A.**   I do.

11   **Q.**   Okay.  And do you know what the draft is that he's

12   referring to?

13   **A.**   I -- it's not attached.  I don't -- I don't know.

14   **Q.**   Didn't mean to be a trick question.

15           Let me turn to the next page.  You see here on the

16   next page, we have here, this is -- this is a draft email

17   from Mr. Mekerri responding to Dr. Menninger's requests for

18   accommodation, right?

19   **A.**   Yes.

20   **Q.**   Okay.  And this is what Mr. St. John was asking you to --

21   to review, correct?

22   **A.**   Yes.

23   **Q.**   And you did review it, right?

24   **A.**   Yes.  I said I was good with the draft.

25   **Q.**   Okay.  So you -- you approved it, right?

1    **A.**  Yes.

2    **Q.**  Okay.  Showing you Joint Exhibit 186.  Can you tell the

3    jury what this is?

4    **A.**  An email from Chad to me with an attached license

5    coverage grid.

6    **Q.**  Okay.  And this email was sent to you on February 28,

7    2018, right?

8    **A.**  Yes.

9    **Q.**  Now, that's a -- that's a date that you've heard a bit

10   about so far in this trial, haven't you?

11   **A.**  Yes.

12   **Q.**  You heard Dr. Menninger's testimony earlier that was

13   the -- that was the meeting with Mr. St. John and Mr. Mekerri

14   where they presented her the options she described?

15   **A.**  Yes.

16   **Q.**  Okay.  Now, you -- you have taken the position that

17   you -- you did not know that February 28th meeting was --

18   strike that.

19          Did you know as of February 28, 2018, that

20   Mr. Mekerri and Mr. St. John were planning to meet with

21   Dr. Menninger?

22   **A.**  No.

23   **Q.**  Did you know that they were planning to speak to her

24   about options for her to exit the company?

25   **A.**  No.

1   **Q.**  Well, let's look at what Mr. -- Mr. St. John wrote in

2   this email of that same date.  First, in the first sentence,

3   he uses the phrase "I mentioned to you yesterday."  Do you

4   see that?

5   **A.**  Yes.

6   **Q.**  Okay.  Am I right that the day before February 28th, on

7   February 27th, you and Mr. St. John had had a conversation;

8   is that right?

9   **A.**  It appears so, yes.

10  **Q.**  Okay.  You say that it appears so.  Are you not sure if

11  that conversation took place?

12  **A.**  We had many conversations.  I don't recall the exact

13  conversation with Chad.

14  **Q.**  Okay.  And he indicates that, in the meeting on

15  February 27th, he had mentioned to you a license coverage

16  grid.  Do you see that?

17  **A.**  I do.

18  **Q.**  Okay.  And, in fact, that's what's -- turn to the third

19  page here -- that's what's attached to the document.  Do you

20  see that?

21  **A.**  Yes.

22  **Q.**  Okay.  And you were aware, weren't you, that at least one

23  of the purposes of this -- well, actually, strike that.

24          He also told you how this had been developed,

25  right?

1    **A.**   By our QA department, yes.

2    **Q.**   Okay.  And in particular, Kathy Dick, right?

3    **A.**   Correct.

4    **Q.**   Okay.  And you understood that at least part of the

5    reason that this licensure grid had been created was in case

6    Dr. Menninger left the company, right?

7    **A.**   No, that's not accurate.

8    **Q.**   Let's look here at the bottom.  In the second to last

9    paragraph, Mr. St. John writes to you, "All of this is good

10   contextual information as work with delicately working Lisa

11   out, since we need to have her for coverage until someone

12   else is in the seat and ready and eligible for taking on the

13   various licensures."

14           Did I read that correctly?

15   **A.**   Yes.

16   **Q.**   Ms. Ballweg, the reference to Lisa is a reference to

17   Dr. Menninger --

18   **A.**   Correct.

19   **Q.**   -- isn't that right?  Yes?

20   **A.**   Yes.

21   **Q.**   Now, I'm going to show you Joint Exhibit 167.  So this is

22   an email from Mr. St. John to you the very next day, right?

23   **A.**   Yes.

24   **Q.**   And he writes, "Deb, I wanted to discuss the conversation

25   that Hacene and I had yesterday."  Do you see that?

1    **A.**   Yes.

2    **Q.**   Okay.  And you see that he had drafted a response that he

3    wanted you to look at, right?

4    **A.**   Yes.

5    **Q.**   Okay.  And you had -- you had already spoken to

6    Mr. St. John about what had happened the day before in his

7    meeting with Dr. Menninger, right?

8    **A.**   I had, yes.

9    **Q.**   You had -- you had spoken to him as you were driving

10   home; is that right?

11   **A.**   That is correct.

12   **Q.**   And -- and your account of that conversation is that

13   Mr. St. John told you that Dr. Menninger told him that she

14   couldn't do her job, right?

15   **A.**   No.  My recollection of the conversation was Hacene and

16   Dr. Menninger and Chad were talking about the accommodations

17   PPD could provide, and Lisa's -- and her doctor didn't

18   outline what those were.

19         And so the discussion was a continuation of, "Lisa,

20   what can PPD do to help you?" to which Lisa replied, "I can

21   do my job."  There was no real interactive discussion about

22   her disability and what accommodations she needed to perform

23   her duties.

24         And so the conversation escalated.  It was a

25   continual discussion:  "We really want to help you.  Your

1    doctor says you can't do these things.  How can we help you?"

2           Lisa is saying, "I can do my job," but yet we have

3    this document where her doctor says, "You cannot perform, you

4    know, these factors of your job."

5           And so Chad's recollection is that, at some point

6    in the conversation, Lisa kept saying, "What if I can't do my

7    job?  What if I can't do my job?"

8           And it came to a point where Chad was, like -- it

9    was a nonproductive discussion, and he says, "Well, I'm not

10   sure what we can do.  Perhaps we can offer you a consulting

11   opportunity or, you know, a package."  But it was very

12   premature to have that conversation.

13   **Q.**  Ms. Ballweg, you know that's not true, right?

14   **A.**  That is absolutely the truth.

15   **Q.**  Ms. Ballweg, you had seen the day before that

16   Mr. St. John was planning to delicately work Lisa out, right?

17   **A.**  The day before the -- the conversation --

18   **Q.**  Can you please answer my question.  You had seen the day

19   before that he wanted to delicately work her out, yes?

20   **A.**  There's context to that.

21   **Q.**  I'm not asking for the context.  I'm asking for what you

22   saw.  You saw that he wanted to delicately work her out, yes?

23   **A.**  With context, yes.

24   **Q.**  Okay.  And the next day -- I'm sorry -- later that day,

25   he reported back to you concerning that conversation, right?

1    **A.**   Correct.

2    **Q.**   Okay.  And one of the things he told you about that

3    conversation was that Dr. Menninger had questions, right?

4    **A.**   The way Chad relayed it to me is there was

5    back-and-forth.  I wasn't there.  He didn't tell me what she

6    had questions or that I recall him telling me that.

7    **Q.**   Okay.  So you don't recall him telling you that she had

8    questions regarding the items listed in buckets 2, 3, and 4?

9    **A.**   During that specific phone call, no.  It was just Chad

10   saying it was an unproductive conversation.

11   **Q.**   Let's look at the email that Mr. St. John sent you the

12   next day.  And in this draft email, he writes -- I think this

13   is the third sentence, strictly speaking -- "Additional

14   detail would only present the opportunity to select items in

15   each bucket you believe you can or can't do."

16          Do you see that?

17   **A.**   I do.

18   **Q.**   Okay.  You know what that refers to, right?

19   **A.**   Those are Mr. St. John's words.  I don't know what he's

20   referring to.

21   **Q.**   Well, if we turn to the next page, you'll see that

22   Mr. St. John's message here is forwarding you a message from

23   Dr. Menninger, right?

24   **A.**   Yes.

25   **Q.**   Okay.  And this was the message that she had sent to him

1    and Mr. Mekerri after that February 28th meeting, right?

2    **A.**  Yes.

3    **Q.**  And you see that she had wrote to him -- maybe written,

4    apologize for the grammar -- "As I stated during our

5    conversation, while I greatly appreciate your agreement to

6    provide accommodations with respect to items 1 and 5 on

7    Hacene's list of duties/responsibilities, I need some

8    additional detail regarding items 2, 3, and 4.  As we

9    discussed, I think there are many tasks that could fall

10   within those items that would not implicate my disability."

11              Do you see that?

12   **A.**  I do.

13   **Q.**  And you see she continues on that, If they can be more

14   specific regarding those tasks, she writes, "I think we can

15   have a more productive dialogue regarding which specific

16   tasks implicate my disability and what reasonable

17   accommodations may be available with respect to those

18   specific tasks."

19              Do you see that?

20   **A.**  Yes.

21   **Q.**  Was that information ever provided to Dr. Menninger?

22   **A.**  I don't think I'm in a position to confirm that.  I --

23   Chad was the one taking the lead on the accommodation.  The

24   conversations he had with Hacene and Lisa, I was -- wasn't

25   there for those.

1   **Q.** Ms. Ballweg, didn't you conduct an investigation as to

2   whether or not PPD had properly handled Dr. Menninger's

3   request for accommodation?

4   **A.** No. I conducted an investigation that Dr. Menninger felt

5   she was being treated unfairly by her boss, Hacene Mekerri.

6   **Q.** You conducted an investigation in -- it was spring of

7   2018, right?

8   **A.** Yes.

9   **Q.** Did anyone else at PPD conduct an investigation in spring

10  of 2018 concerning complaints made by Dr. Menninger?

11  **A.** No.

12  **Q.** You recall that, prior to bringing this litigation,

13  Dr. Menninger had first started by filing a complaint at the

14  Massachusetts Commission Against Discrimination, yes?

15  **A.** I don't -- I probably should know that, but I don't

16  recall that.

17  **Q.** No worries. There's a binder in front of you. If you

18  could turn to the fourth tab, please. Do you recognize this

19  document?

20  **A.** I don't think so.

21  **Q.** If you turn to the eighth page, there's something there

22  you might recognize.

23  **A.** Yes. My signature.

24  **Q.** Whose signature?

25  **A.** My signature.

1  **Q.**  Okay.  And in that signature, you're providing a

2  verification, yes?

3  **A.**  Yes.

4  **Q.**  You are attesting, looking at the third line, you write,

5  "To the extent that I have personal" -- well, let me back up

6  for a second.

7         What you're attesting to is the accuracy of the

8  facts contained in this document to which you have personal

9  knowledge, right?

10 **A.**  Yes.

11 **Q.**  And you are affirming, under the penalty of perjury, that

12 such facts are true and correct, yes?

13 **A.**  I'm sorry.  Could you say that again?

14 **Q.**  You are affirming under the pain and penalty of perjury

15 that such facts are true and correct?

16 **A.**  They are true and correct.

17 **Q.**  Okay.  That was an oath to tell the truth?

18 **A.**  Yes.

19 **Q.**  Same oath you gave today, right?

20 **A.**  Correct.

21 **Q.**  Turn to page 4 of the document, please.

22        The second to last paragraph begins, "In late

23 spring 2018."  Do you see that?

24 **A.**  Yes.

25 **Q.**  Okay.  Please read along silently as I read out loud:

1    "In late spring 2018, Dr. Menninger complained that she felt

2    the company had not properly handled her accommodation

3    requests.  The company conducted a prompt and thorough

4    investigation and determined that, while Dr. Menninger did

5    not receive all of the specific accommodations that she had

6    demanded, the company had reasonably and appropriately

7    accommodated her disability, and there was no evidence of

8    discriminatory or retaliatory treatment."

9          Did I read that right?

10   **A.**  Yes.

11   **Q.**  Ms. Ballweg, you never actually conducted that

12   investigation, did you?

13   **A.**  Yes, I did.

14   **Q.**  Okay.  So it's your testimony now that you did

15   investigate whether or not Dr. Menninger has received proper

16   treatment with respect to her accommodations?

17   **A.**  Yes.

18   **Q.**  Okay.  Going back to the email we were just at a moment

19   ago, despite conducting that prompt and thorough

20   investigation, you never actually determined whether or not

21   Dr. Menninger was provided the additional detail she wanted

22   for buckets 2, 3, and 4?

23   **A.**  There were ongoing discussions between Chad, Hacene, and

24   Lisa about the buckets of information.

25   **Q.**  And my question, ma'am, is after your prompt and thorough

1    investigation, were you able to conclude whether or not the

2    information she asked for was ever provided?

3    **A.**   Sorry.  I'm just thinking.

4    **Q.**   Take your time.

5    **A.**   So during the investigation -- well, perhaps we'll get to

6    that.

7             The process of the accommodation request was at a

8    point where it was still an interactive discussion.  There

9    was no movement, no information from her doctor to move us

10   forward, so no more information had been presented by either

11   side, by Lisa and her doctor or PPD.

12   **Q.**   Okay.  So you've determined in your prompt and thorough

13   investigation that PPD never provided the additional detail

14   regarding items 2, 3, and 4 that she had requested in the

15   meeting on February 28th, correct?

16   **A.**   It was an ongoing discussion.  They hadn't provided it at

17   that point.

18   **Q.**   They had not provided it at what point?

19   **A.**   At the point of my investigation.

20   **Q.**   Your investigation in May?

21   **A.**   April.

22   **Q.**   Okay.  So as of April, PPD still hadn't provided the

23   information Dr. Menninger reflected here was asking for back

24   on March 1st, yes?

25   **A.**   It was still an ongoing process, so it was not submitted.

1    It was not provided by either party.

2    **Q.**   Okay.  And you knew why PPD didn't provide that

3    information, right?

4    **A.**   No.

5    **Q.**   Well, Mr. St. John told you, didn't he?

6    **A.**   No.

7    **Q.**   Let's look back at the first page.  When he wrote to

8    you -- or when he wrote in this draft email that "Adding

9    additional detail would only present the opportunity to

10   select items in each bucket you believe you can or can't do,"

11   you understood what he was referring to, right?

12   **A.**   No.  I wasn't part of those conversations.

13   **Q.**   In your prompt and thorough investigation, did you ask

14   him?

15   **A.**   Again, at the point of the accommodation request, there

16   was uncertainty of can my -- can Dr. Menninger do her job,

17   can she not do her job?  Are there accommodations she needs

18   to perform the essential functions of her job?  How can we

19   accommodate that?  Our intent was really to try to work with

20   Dr. Menninger on how we can help her perform her job.

21           But on the one hand, she said she could; the other,

22   she said she couldn't.  It was an ongoing conversation.

23   **Q.**   Ms. Ballweg, Mr. St. John told you that what he wanted to

24   pursue was an exit strategy; isn't that right?

25   **A.**   That is not accurate.

1  **Q.**  So in response to the email that we just looked at, you

2  decided that you needed to get some legal advice, right?

3  **A.**  Not in -- no.

4  **Q.**  Okay.  Lisa Noecker, she was in-house counsel for PPD at

5  the time, right?

6  **A.**  That's correct.

7  **Q.**  And specifically, she was the one that handled issues

8  concerning requests for accommodation?

9  **A.**  She handled employment concerns, yes.

10  **Q.**  Okay.  And that included requests for accommodations?

11  **A.**  Yes.

12  **Q.**  In fact, Ms. Noecker, she'd been one of the attorneys

13  that did that training on investigations we talked about

14  earlier, right?

15  **A.**  Yes.

16  **Q.**  Okay.  I'm going to show you Joint Exhibit 167.  Oh,

17  excuse me.  We were just looking at 167.

18          I'm going to show you Joint Exhibit 65.  And this

19  is an email exchange between you and Mr. St. John on March 5,

20  2018.  Do you see that?

21  **A.**  Yes.

22  **Q.**  And now Mr. Williams, he's now back on the cc line; is

23  that right?

24  **A.**  Yes.

25  **Q.**  Do you have an understanding as to why that was?

1    **A.**  I don't.

2    **Q.**  Okay.  I'm going to direct your attention to the third

3    page of the document.  And just for the record, this has, in

4    the bottom right-hand corner, the number ending 3951.  Do you

5    see here, on March 15th -- I'm sorry -- March 5, 2018, at

6    10:44 a.m., you had sent Mr. St. John an email copying

7    Mr. Williams, yes?

8    **A.**  Yes.

9    **Q.**  And you begin, after thanking Chad, you write, "I have

10   not sent to Lisa Noecker yet."  Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  And that refers to a package of information that

13   you had asked Mr. St. John to prepare in order to send on to

14   Attorney Noecker; is that right?

15   **A.**  Yes.

16   **Q.**  Okay.  And that package of information, it related to

17   Dr. Menninger?

18   **A.**  It did, yes.

19   **Q.**  Okay.  And specifically her request for accommodation,

20   yes?

21   **A.**  Correct.

22   **Q.**  Okay.  And Mr. St. John, he put that package together,

23   right?

24   **A.**  I believe so, yes.

25   **Q.**  Okay.  And you then transmitted that information to

1   Attorney Noecker, yes?

2   **A.**  Well, as of this email, I hadn't sent it to Ms. Noecker.

3   **Q.**  But you recall, subsequent to this, when you got the

4   package, you made sure it had all the information it needed,

5   right?

6   **A.**  I don't recall sending it to Lisa Noecker.

7   **Q.**  Okay.  I'm going to show you Joint Exhibit 87.  And this

8   is an email from Mr. St. John to you on March 7, 2018.  Do

9   you see that?

10  **A.**  Yes.

11  **Q.**  Let's just scroll down to the middle of the page.  You

12  write to Mr. St. John, "Sorry to come back to this again.

13  Now, could you please ensure the attached form is completed

14  in entirety with any pertinent attachments added?  I will

15  then send this doc and attachments to Lisa N. for review

16  before our discussion today."

17          Do you see that?

18  **A.**  I do.

19  **Q.**  And then he responds, and his response includes a number

20  of attachments; is that right?

21  **A.**  Yes.

22  **Q.**  Okay.  And those attachments, those reflect the

23  information you asked him to gather?

24  **A.**  Correct.

25  **Q.**  Okay.  And I direct your attention to one of those

1    attachments.  So this is the 14th page of the document, Bates

2    ending in 4078.  Can you tell the jury what this is?

3    **A.**  It's a form, part of the accommodation process.

4    **Q.**  Well, the top, it says, "Use the below information to

5    summarize information to be sent to Legal."  Do you see that?

6    **A.**  Yes.

7    **Q.**  Okay.  So this was gathering information to provide to

8    in-house counsel?

9    **A.**  Yes.

10   **Q.**  And the reference to HRG, is that human resources group?

11   **A.**  Human resources generalist.

12   **Q.**  Very good.  And the human resources generalist in this

13   instance was Chad St. John?

14   **A.**  Correct.

15   **Q.**  So this was Chad St. John completing this document, yes?

16   **A.**  Yes.

17   **Q.**  Let's look at what he wrote.  Moving to the second to

18   last -- I'm sorry -- the last page of the document, so the

19   bottom right-hand corner has "4083" on it.  Let's look at

20   what he was looking for.

21          In the bullet request for accommodation pending for

22   which HR generalist is asking for help, he wrote, "HR is

23   requesting guidance in responding to Lisa and assisting us

24   with potential options as we seek a path forward to an exit

25   strategy with consultancy as an element (or others options

1    not being considered now) to protect the business and the CL

2    licensure requirements."

3             Do you see that?

4    **A.**   I see that.

5    **Q.**   Okay.  You know what the word "exit" means?

6    **A.**   Leaving the organization.

7    **Q.**   You know what the word "strategy" means, right?

8    **A.**   Yes.

9    **Q.**   It's a way to make it happen.

10   **A.**   There's -- many ways of strategy in exiting the

11   organization take place.

12   **Q.**   And if we look at the bullet below, Mr. St. John, he

13   explained why he wanted an exit strategy, right?

14   **A.**   I'm sorry; was there a question?

15   **Q.**   There was.  In this bullet, he explained to you why he

16   wanted an exit strategy, right?

17   **A.**   It appears so.

18   **Q.**   He believed that Lisa Menninger could no longer do her

19   job.

20   **A.**   I believe he is indicating concern with her ability to

21   help grow the business and hit targets.

22   **Q.**   You're right.  That's a better description.  And he

23   reiterates in this note, just above, that it would be --

24   prefeed -- I think he means preferred.  "To package this

25   employee while also allowing them to consult to protect the

1  CL licensure requirements that Lisa holds."  Do you see that?

2  **A.**  I see that.

3  **Q.**  Okay.  And you know what "package" means in this context,

4  right?

5  **A.**  It can mean a various number of things.

6  **Q.**  You know he meant an exit package, right?

7  **A.**  Again, there's all -- there's many different packages.

8  **Q.**  Okay.

9          THE COURT:  I'm going to pause you here,

10  Mr. Hannon, and take the morning break.

11          All rise for the jury.

12          (Jury not present.)

13          THE COURT:  Super crisp redirect, Mr. Hannon, and

14  super crisp and to the point recross, Ms. Mandel.  We have

15  examinations like that, then we'll easily get done by next

16  Friday.

17          MR. HANNON:  We'll do our best.

18          THE COURT:  But I'll tell them -- my plan is to

19  tell them at one o'clock when I let them go that we're on

20  track, but we're going to need that Tuesday, but no other

21  afternoons.  Make sense?

22          MS. MANDEL:  I'm sorry; Monday and Tuesday?

23          THE COURT:  Yes, Monday and Tuesday.  When I say

24  "Tuesday," I mean adding, yes.  But I'm not planning on

25  adding anything else absent snowstorms or unforeseen events.

```
 1          That's -- you're both on board with that?
 2                    MR. HANNON:  Yes, Judge.
 3                    MS. MANDEL:  Yes.
 4                    THE COURT:  Okay.  All right.  Take the break.
 5      We'll resume at 11:30.
 6                    (Court in recess at 11:16 a.m.
 7                    and reconvened at 11:30 a.m.)
 8                    THE COURT:  One minor -- I just want to bring up
 9      with you that a juror just raised with Ms. Belmont and -- so
10      the juror who sits in seat 9, which is the second seat in the
11      back row closest to me, part of his job is he delivers
12      propane, I think you might remember.  And he can do -- be on
13      call from 5:00 or 7 p.m. till 7 a.m. the next morning.  And
14      sometimes when he's on call, he's on call, and he has a
15      beautiful night's sleep.  And some nights when he's on call,
16      there could be ten calls or one call, or whatever, and he can
17      be out.  And he wanted to ask Ms. Belmont whether or not he
18      could do it or not.
19                    My inclination, tell me what you think, if you
20      agree, or if you have something different you propose, is
21      just at the end of the day, whether we have Ms. Belmont talk
22      to him and tell him I think he's free to do that if he wants
23      to.  Like we don't control what happens to them when they're
24      not in the courtroom, that's perfectly fine to do, but we
25      expect that he's able to be here and pay attention and use
```

1    his good judgment about that and I don't -- is that -- anyone

2    have any thoughts about that?

3            MR. HANNON:  That's fine here.

4            MS. MANDEL:  That's fine from our end.  I guess I

5    would just ask if Ms. Belmont can confirm, if that does

6    happen, that he affirmatively states that he is able to be

7    awake and pay attention to what is happening.

8            THE COURT:  I think I would have him -- Ms. Belmont

9    tell him that it's fine to do, but our expectation is that he

10   needs to be able to be awake and attuned and attentive during

11   the trial, and if at any point, he can't be, he should tell

12   us.  But I'm not going as to ask him to affirm each morning

13   that --

14           MS. MANDEL:  Understood.  Understood.

15           THE COURT:  Yes.  But I'll have her -- as long as

16   you're both fine with her doing that at the end of the day,

17   that's how I would handle it.

18           Fine.  Okay.  Great.  You can go get the jury,

19   Ms. Belmont.  And after 1:00, will you --

20           THE DEPUTY CLERK:  Yes.

21           (Jury present.)

22           THE COURT:  Please be seated.

23           Go ahead, Mr. Hannon.

24   BY MR. HANNON:

25   Q.  So, Ms. Ballweg, after learning that Mr. St. John was

1  looking for an exit strategy with respect to Dr. Menninger,

2  did you tell him that was inappropriate?

3  **A.**  Well, I know it to be inappropriate.  I don't know if I

4  told him that.

5  **Q.**  But you knew it was inappropriate?

6  **A.**  At this stage, yes.

7  **Q.**  Why?

8  **A.**  The interactive dialogue, discussions with Dr. Menninger,

9  had not resolved.

10 **Q.**  But you're not sure if you told that to Mr. St. John?

11 **A.**  I don't recall.

12 **Q.**  Any reason why you wouldn't have?

13 **A.**  No.

14 **Q.**  But you did pass along this request to Ms. Noecker,

15 didn't you?

16 **A.**  Chad sent the documents.  I indicated in my email that I

17 was going to send them.  I don't recall if I actually sent

18 them.

19 **Q.**  I'm going to show you Joint Exhibit 65.  And you see this

20 is an email exchange between yourself and Mr. St. John?

21 **A.**  Yes.

22 **Q.**  Okay.  And you see in your message to Mr. St. John, on

23 March 5, 2018, you had told him, "Will definitely have a path

24 forward for Lisa M. this week before you travel -- before

25 your travel."  Yes?

**A.**   Yes.

**Q.**   And you subsequently reported back to him concerning that path forward, didn't you?

**A.**   I don't recall.

**Q.**   Well, did you report back to him that PPD needed to answer Dr. Menninger's questions concerning buckets 2, 3, and 4?

**A.**   Again, the process was ongoing.  There was discussion between Dr. Menninger and Chad and Hacene about Dr. Menninger's accommodations.  There was uncertainty about what those were.  It was an ongoing process.

**Q.**   Sure.  I'm not asking what -- about the ongoing process. I'm asking you about your actions in response to his inquiry. And did you tell Mr. St. John that PPD needed to respond and answer Dr. Menninger's questions regarding buckets 2, 3, and 4?

**A.**   I would have encouraged Mr. St. John to continue with the process.

**Q.**   That wasn't quite my question, though.  My question is specific to answering Dr. Menninger's questions regarding buckets 2, 3, and 4.  Did you tell Mr. Johnson -- Mr. St. John to provide those answers?

**A.**   I -- I don't recall.

**Q.**   The path forward for Dr. Menninger that was decided upon by PPD was to build a record that would either get her to

1    quit or provide a basis for firing her; isn't that right?

2    **A.**   No.   The path forward for Dr. Menninger was to try to

3    help her any way we possibly could.

4    **Q.**   Except answering her questions regarding buckets 2, 3,

5    and 4?

6    **A.**   It was an interactive process.

7    **Q.**   I'm going to show you Joint Exhibit 271.   So you see

8    here, this is an email with Mr. St. John forwarding you an

9    email; is that right?

10   **A.**   Yes.

11   **Q.**   This is February 26, 2018?

12   **A.**   March 26th.

13   **Q.**   Excuse me.   Thank you.

14           March 26, 2018?

15   **A.**   Yes.

16   **Q.**   Okay.   And he forwarded you an email from Lisa Menninger,

17   right?

18   **A.**   Correct.

19   **Q.**   Okay.   I'm just going to scroll to the first message in

20   this chain, which is here on March 12, 2018.   Do you see

21   that?

22   **A.**   Yes.

23   **Q.**   Okay.   So this was the email that Mr. St. John wrote to

24   Dr. Menninger in response to her March 1st email; is that

25   right?

1    **A.**   Yes, I believe so.

2    **Q.**   Okay.  And this was an email that he had worked on with

3    you?

4    **A.**   No, I don't believe Chad and I worked on it.  I would

5    have looked at the process, but I don't believe I recall

6    editing this for Chad.

7    **Q.**   Sure.  I didn't ask if you edited it; I asked if you

8    reviewed it.  Did you?

9    **A.**   Possibly.  I -- I -- there was a lot of exchanges.  I --

10   I don't recall specifically this one.

11   **Q.**   Okay.  When you conducted your prompt and thorough

12   investigation, did you -- did you review this email then?

13   **A.**   So during the prompt and thorough investigation, I met

14   with Dr. Menninger to outline why she felt that she was being

15   treated unfairly by her manager.

16   **Q.**   Not my question, ma'am.

17   **A.**   And she outlined a few areas that I looked into.

18   **Q.**   Sure.

19   **A.**   If you would have taken me to this email, I would have

20   reviewed it.

21   **Q.**   Not my question, though.  Did you review this email in

22   the course of your prompt and thorough investigation?

23   **A.**   I don't believe so, no.

24   **Q.**   Okay.  But you did review it at some point, right?

25   **A.**   Possibly.

1   **Q.**  Well, this is an email that -- this is an email chain
2   that Mr. St. John forwarded to you, right?
3   **A.**  Yes.
4   **Q.**  With a note, "We will want to discuss this further,"
5   right?
6   **A.**  Yes.
7   **Q.**  Okay.  This was an important issue, right?
8   **A.**  Yes.
9   **Q.**  And addressing this kind of important issue, that was an
10  important part of your job, right?
11  **A.**  It's highly likely that Chad and I did discuss this, yes.
12  **Q.**  And one of the things that Dr. Menninger had noted in her
13  email that was forwarded to you was reiterating her requests
14  for those -- information concerning those -- those three
15  items, right?
16  **A.**  Correct.
17  **Q.**  Okay.  And Mr. St. John's prior email, it hadn't actually
18  provided any detail concerning those three buckets, had it?
19  **A.**  I believe there were others, but not this one.
20  **Q.**  Excuse me?
21  **A.**  I believe there were other emails that provided the
22  buckets, but not this particular one.
23  **Q.**  Okay.  This email didn't actually answer her question
24  regarding the additional detail for buckets 2, 3, and 4; is
25  that right?

1   **A.**   Again, it's just asking for Dr. Menninger to go back to

2   her doctor and have more conversations about the

3   accommodations she needed to do her job.

4   **Q.**   So it did not answer the questions that Dr. Menninger had

5   asked back on March 1st, yes?

6   **A.**   I'm not sure that was the intent of the email.

7   **Q.**   That's fine.  I'm not asking what the intent was:  I'm

8   asking if you agree with me that it didn't actually --

9   **A.**   It didn't include any further information about the

10  buckets, no.

11  **Q.**   Okay.  And, in fact, as of this time, Mr. St. John had

12  been instructed not to provide that information; isn't that

13  right?

14  **A.**   I wasn't involved in conversations that he would have had

15  with Hacene about the particular details of Dr. Menninger's

16  role, so I don't know if Chad was instructed by Hacene or

17  not.

18  **Q.**   Well, during this time, you were -- you were interacting

19  directly with Lisa Noecker concerning Dr. Menninger's

20  accommodation request; isn't that right?

21  **A.**   I believe, at some point, the documents were probably

22  forwarded to doctor -- to Lisa Noecker.

23  **Q.**   Okay.  And you were, essentially, serving as a go-between

24  between Ms. -- I'm sorry -- Attorney Noecker and Mr. St. John

25  and Mr. Mekerri, yes?

1    **A.**   In an oversight position, yes.

2    **Q.**   And I'm going to show you Joint Exhibit 69.  No, that's

3    the wrong one.  So this is a March 28th email between -- the

4    top here -- it's an email from Mr. St. John and Mr. Mekerri.

5    Do you see that?

6    **A.**   Yes.

7    **Q.**   Okay.  And you see he is forwarding an email chain

8    between himself and you, right?

9    **A.**   Yes.

10   **Q.**   Okay.  Let me turn to the second page here.  In terms of

11   what you had forwarded there, what you had forwarded there

12   was something written by Attorney Noecker; is that right?

13   **A.**   Yes.

14   **Q.**   Back to the first page here, Mr. St. John is instructing

15   Hacene to add some details to the details he has discussed

16   with Lisa in their one-to-ones.  Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  And then, in the last sentence, he writes, "Can

19   you please" -- "Can you please reply before tomorrow morning

20   since Deb and I need to review it and send it on the [*sic*]

21   Lisa N."  Do you see that?

22   **A.**   Yes.

23   **Q.**   Do you agree with me "Lisa N." is Lisa Noecker?

24   **A.**   Yes.

25   **Q.**   I'm now showing you Exhibit Number 142, Joint

1    Exhibit 142.  And this is a meeting invite for Mr. St. John;
2    is that right?
3    **A.**  It's just an email.
4    **Q.**  Okay.  Well, you see it has -- it has a proposed date and
5    time.  Do you see that there?
6    **A.**  Oh, yes.  Yes.
7    **Q.**  Okay.  So this is Mr. St. John looking to schedule a call
8    to speak with you, right?
9    **A.**  Yes.
10   **Q.**  Regarding the -- the email below from Dr. Menninger,
11   correct?
12   **A.**  To discuss the next steps, yes.
13   **Q.**  Okay.  And do you recall that meeting?
14   **A.**  I don't specifically recall that meeting.
15   **Q.**  Now, at some point in this back-and-forth, Mr. Mekerri
16   received some -- some advice from human resources, didn't he?
17   **A.**  I'm not sure what advice he would have received.
18   Specifically?
19   **Q.**  Advice regarding documenting performance criticisms of
20   Dr. Menninger.
21   **A.**  Any time in our role as HR, we would certainly encourage
22   managers to, you know, be very clear and transparent with
23   your employees about opportunities, challenges, just so we
24   can provide clarity and work together to resolve challenges.
25   And we would encourage documentation in those situations,

1    yes.

2    **Q.**  But in this particular situation, Mr. Mekerri was

3    encouraged to start documenting performance issues relative

4    to Dr. Menninger; isn't that right?

5    **A.**  I think Mr. Mekerri was encouraged to document throughout

6    his entire time with the organization.

7    **Q.**  And before Dr. Menninger disclosed her disability, he

8    never did.

9    **A.**  In 2017, through her performance review, he was

10   documenting.

11   **Q.**  We'll talk about the performance review in just a few

12   minutes.  Aside from that, he wasn't documenting alleged

13   performance issues of Dr. Menninger's prior to her disclosure

14   of her disability, right?

15   **A.**  He may or may not have.  I don't know the answer to that.

16   **Q.**  You didn't look at that when you conducted your prompt

17   and thorough investigation?

18   **A.**  One of the issues -- the issues that Lisa Menninger

19   raised around why she felt harassed or treated differently by

20   her manager was about her performance review.  Her

21   performance review was conducted in 2017 before she disclosed

22   her disability.

23   **Q.**  Hang on.  Your testimony is that she complained to you

24   about her performance review?

25   **A.**  She felt it was unfair that her performance review was

1    incomplete and she had a poor rating.

2    **Q.**   It wasn't a poor rating, was it, Ms. Ballweg?

3    **A.**   It was not.

4    **Q.**   It was a good rating, wasn't it?

5    **A.**   It was a great rating.

6    **Q.**   What she complained to you was that, after she disclosed

7    her disability, that her boss started treating her

8    differently, right?

9    **A.**   Yes.

10   **Q.**   What she complained to you was that, after she disclosed

11   her disability, it seemed like he was going out of his way to

12   criticize her, right?

13   **A.**   And one of the indications she cited for me to

14   investigate was her 2017 performance review.

15   **Q.**   One of, yes?

16   **A.**   Correct.

17   **Q.**   Not the only one, right?

18   **A.**   No.

19   **Q.**   One of the other instances that she complained about was

20   that it looked like he was going out of his way to provide

21   documentation of her alleged performance concerns, yes?

22   **A.**   No.

23   **Q.**   We'll get back to that, but for the time being, I'm

24   showing you here Exhibit -- Joint Exhibit 49.  And I realize

25   you're not a recipient of this email, but you see this is an

1   email from Mr. Mekerri to Mr. St. John on March 29, 2018.  Do

2   you see that?

3   **A.**   Yes.

4   **Q.**   Okay.  And he begins his email by saying, "As requested."

5   Do you see that?

6   **A.**   Yes.

7   **Q.**   Okay.  Is it your understanding that at or around this

8   time, Mr. St. John had requested that Mr. Mekerri begin

9   documenting his conversations with Dr. Menninger?

10  **A.**   I'm not sure what Chad would have -- through coaching, he

11  would have asked Hacene to, you know, document all of his

12  employees' conversations where it would be developmental or

13  opportunistic.

14  **Q.**   Okay.  So you're not sure if there had been a recent

15  request made specific to Dr. Menninger?

16  **A.**   I'm not aware of this email and I'm not aware of what the

17  intended request was about.

18  **Q.**   I'm going to show you Joint Exhibit 148.  Can you see

19  here Mr. St. John, he is forwarding you an email exchange he

20  had with Mr. Mekerri?  Do you see that?

21  **A.**   Yes.

22  **Q.**   Okay.  And he does -- he sends this to you on April 3,

23  2018?

24  **A.**   Yes.

25  **Q.**   Okay.  In terms of what Mr. St. John had written to

1   Mr. Mekerri, that's at the bottom of the page here, right?

2   **A.**  Yes.

3   **Q.**  Okay.  And you see here, Mr. St. John, he's providing

4   Mr. Mekerri some -- some coaching regarding documentation of

5   Dr. Menninger, yes?

6   **A.**  Yes.

7   **Q.**  Okay.  And in the -- in the second sentence, he writes,

8   "It will" -- I guess missing the word "be" -- "critically

9   important to follow up on your discussions with Lisa with

10  documentation to your manager file and to Lisa directly."

11         Do you see that?

12  **A.**  Yes.

13  **Q.**  Now, that -- that was an effort to create documentation

14  concerning Mr. Mekerri's alleged performance concerns, yes?

15  **A.**   In any situation, we would want to document in hopes that

16  we could provide clarity to our employees for performance

17  improvement, for growth.  This is Chad encouraging Hacene to

18  document for Lisa and anyone else who would have been having

19  performance issues.

20  **Q.**  Wasn't this about achieving an exit strategy?

21  **A.**   At the end of the day, we truly want to provide

22  opportunities for our employees.  In regards to

23  Dr. Menninger, it was very confusing.  Her doctor's

24  indicating she has limitations, or she has accommodation

25  requests.  It was uncertain as to the path forward in her

1    role, holding the licensure for this organization to conduct

2    the work that they do.

3           There was an attempt to -- there was a desire to

4    ensure we had the ability to protect the business.

5    **Q.**  Is that a yes?

6    **A.**  Could you restate the question, please?

7    **Q.**  Wasn't this a strategy -- strike that.

8           Wasn't this part of PPD's exit strategy?

9    **A.**  No.

10   **Q.**  I'm going to show you Joint Exhibit 265.  And I want to

11   start at the first message here on this list, on this email

12   chain, excuse me.  So we have here an email from Chris Fikry.

13   Can you tell the jury who that is?

14   **A.**  Dr. Fikry is or was the lab leader.  He had

15   responsibilities for all of the Global Labs, where Hacene

16   Mekerri had responsibilities for just the Global Central Lab

17   and reported to Dr. Fikry.

18   **Q.**  So he's Mr. Mekerri's boss?

19   **A.**  Correct.

20          THE WITNESS:  Bless you.

21          THE COURT:  Thank you.

22   BY MR. HANNON:

23   **Q.**  And you see here on April 11, 2018, Mr. Fikry writes,

24   "What's timing on Lisa Menninger's exit?"  Yes?

25   **A.**  Yes.

1    **Q.**   Okay.  Now, he writes that to Jerry Williams, right?

2    **A.**   Yes.

3    **Q.**   That's your boss?

4    **A.**   Yes.

5    **Q.**   Okay.  And we see here Mr. Williams, he forwards the

6    email to you, right?

7    **A.**   Yes.

8    **Q.**   Okay.  And he didn't ask you what Mr. Fikry was talking

9    about, did he?

10   **A.**   No.

11   **Q.**   He didn't say, "What -- what exit?"

12   **A.**   No.

13   **Q.**   He asked, "Where is Chad on this one?"  Right?

14   **A.**   Yes.

15   **Q.**   You'd agree that, as of this time, you would have kept

16   Mr. Williams apprised of what Mr. St. John was doing in

17   relation to Dr. Menninger, yes?

18   **A.**   In what respect.

19   **Q.**   All of them.

20   **A.**   Jerry would have had a general sense of, again, the

21   accommodation requests, the uncertainty.

22   **Q.**   Looking up to your response, again, you don't -- you

23   don't express any -- any surprise by Mr. Fikry's question, do

24   you?

25   **A.**   Well, I interpreted Mr. -- or Dr. Fikry's question --

1   **Q.**  We'll get to that in a second.  We'll just take it

2   step-by-step, if we may.  You didn't express any surprise

3   about Dr. Fikry's question, did you?

4   **A.**  I responded based on my interpretation of what

5   Dr. Fikry's question was about.

6   **Q.**  And let's look at your response.  You begin by saying

7   that, "Hacene gave her some tough feedback on a recent issue

8   and" -- is that follow-up?

9   **A.**  Yes.

10  **Q.**  -- "with email."

11              So your understanding as of this time was that

12  Mr. Mekerri was giving Dr. Menninger tough feedback; is that

13  right?

14  **A.**  Yes, on a recent issue.

15  **Q.**  How does tough feedback, in your mind, differ from just

16  feedback?

17  **A.**  I believe in this assistance, it was a GSK issue, and it

18  was at a level it was raised to Dr. Fikry's attention.  And

19  it required -- well, because of the -- the corporate

20  visibility of the issue with a key client, that it was tough

21  feedback -- great client.  The issues that were raised were

22  conducted in the lab that Dr. Menninger sat on top of.

23  **Q.**  You had told Mr. Mekerri to be tough with Dr. Menninger,

24  hadn't you?

25  **A.**  No.

1   **Q.**   You understood that Dr. Menninger had an anxiety

2   disorder, right?

3   **A.**   Social anxiety, yes.

4   **Q.**   Okay.  And you understood that because Dr. Menninger had

5   such a great rating for 2017, you couldn't just fire her,

6   right?

7   **A.**   From an HR perspective, there is a process to follow to

8   ensure that the risk to the organization is mitigated.  At

9   the end of the day, we, again, try to do whatever we can to

10  support our employees, to provide them fair treatment, to

11  help them develop and grow in situations where people are

12  given tough feedback, it's how we coach them, how do we help

13  them, how do we help them improve and move forward?

14  **Q.**   Okay.  Back to my question, though.  You knew that with a

15  rating of 3, you couldn't just fire her, right?

16  **A.**   It wouldn't be appropriate.

17  **Q.**   But if she quit, that would mitigate the risk, wouldn't

18  it?

19  **A.**   Well, anyone can leave their employment at any time.

20  **Q.**   And here at the bottom of what you wrote to Mr. Williams,

21  where you write, "Unless she self-selects . . ."  Do you see

22  that?

23  **A.**   Yes.

24  **Q.**   What does "self-select" mean?

25  **A.**   Voluntarily leave her job.

1  **Q.**  Now, with respect to the tough feedback that

2  Dr. Menninger was being provided, you were -- you were

3  actually involved in drafting some of that, weren't you?

4  **A.**  I don't believe so, no.

5  **Q.**  Were you reviewing it before it went out?

6  **A.**  Possibly.

7  **Q.**  You're not sure?

8  **A.**  I -- I don't recall.

9  **Q.**  Was Attorney Noecker reviewing that tough feedback before

10  it went out?

11  **A.**  I -- I don't recall that either.

12  **Q.**  Was it typical for in-house counsel to review feedback

13  regarding performance issues before it was sent to a

14  client -- I'm sorry -- an employee?

15  **A.**  On occasion?  It would be appropriate, yes.

16  **Q.**  In this email we just saw from Mr. Fikry, Mr. Williams

17  wasn't the only person he was asking about -- about

18  Dr. Menninger's exit, was he?

19  **A.**  I believe he asked Chad as he visited the site.

20  **Q.**  It was something Dr. Fikry cared about, right?

21  **A.**  In terms of the financial health of the business,

22  Dr. Fikry had a vested interest in knowing if we had risk of

23  leaders leaving the organization, or being on a leave of

24  absence, or not being able to fulfill their job

25  responsibilities.

1   **Q.**   He didn't want someone with a mental health disorder

2   leading his lab, correct?

3   **A.**   That is incorrect.

4   **Q.**   Did you ask him why he was so interested in

5   Dr. Menninger's exit?

6   **A.**   Again, Chris Fikry, Dr. Fikry, had interest to protect

7   his business.  His interest is purely to ensure that he had

8   continuity of one of the larger pieces of his labs.

9   **Q.**   Didn't ask you that.  Did you ask Dr. Fikry why he was so

10  interested in knowing about the timing of Dr. Menninger's

11  exit?

12  **A.**   No, I don't recall asking him that.

13  **Q.**   Did you ever consider that maybe he was actually

14  motivated by some kind of discriminatory animus?

15  **A.**   No.

16  **Q.**   When you conducted your prompt and thorough

17  investigation, you didn't look into that, did you?

18  **A.**   No.

19  **Q.**   I'm going to show you now Joint Exhibit 118.  And you

20  recognize this email, yes?

21  **A.**   Yes.

22  **Q.**   And this is -- if we look at the -- the subject line,

23  this is some back-and-forth regarding a -- strike that.

24          The subject line includes "1:1 follow-up and

25  goals."  Do you see that?

1    **A.**   Yes.

2    **Q.**   And if we look a little bit further on, this chain starts

3    here on the fourth page with an email from Mr. Mekerri to

4    Dr. Menninger.  Do you see that?

5    **A.**   Yes.

6    **Q.**   Okay.  And this concerns him adapting Dr. Menninger's

7    goals; is that right?

8    **A.**   Yes.

9    **Q.**   Okay.  Now, you were aware that Mr. Mekerri was going to

10   send that email, weren't you?

11   **A.**   Chad may have mentioned it, but I'm not 100 percent

12   certain I was aware.

13   **Q.**   Okay.  You understood that this -- that this was part of

14   the efforts to document alleged performance deficiencies with

15   respect to Dr. Menninger, right?

16   **A.**   No.

17   **Q.**   Well, you see here that Dr. Menninger, she provides a

18   very extensive response here to Mr. Mekerri's email, right?

19   **A.**   Yes.

20   **Q.**   Okay.  And backing up here to the first page -- sorry.

21   My fingers got in the way.  Backing up to the first page, you

22   see that Mr. Mekerri, he had drafted up a response to

23   Dr. Menninger's emails; is that right?

24   **A.**   Yes.

25   **Q.**   Okay.  And then, moving up, you see that Mr. St. John, he

1    had drafted a different email, or at least a sort of revised

2    email for Mr. Mekerri to send, right?

3    **A.**   Yes.

4    **Q.**   And you see he -- he sends this to you and he asks you

5    whether or not you agree; is that right?

6    **A.**   Yes.

7    **Q.**   Okay.  So he was asking for your -- for your input with

8    respect to this message, correct?

9    **A.**   Yes.

10   **Q.**   Okay.  Let's look at Joint Exhibit 119.  And this is an

11   email from Mr. St. John to you on April 18, 2018, right?

12   **A.**   Yes.

13   **Q.**   Okay.  And this one's from a slightly -- this one's

14   regarding a slightly different topic than we just looked at,

15   correct?

16   **A.**   Yes.

17   **Q.**   Okay.

18   **A.**   Uh-huh.

19   **Q.**   So -- but he sends you another draft, this time a draft,

20   it looks like, addressing Dr. Menninger's accommodation

21   requests, correct?

22   **A.**   Yes.

23   **Q.**   Okay.  And, again, he asks you, "Let me know your

24   thoughts," right?

25   **A.**   Yes.

1    Q.  I'm going to show you what's been marked as Joint

2    Exhibit 67.  And we see at the top of the page this is an

3    email from Mr. St. John to you on April 20, 2018, yes?

4    A.  Yes.

5    Q.  Okay.  And he's responding to an email that you had sent

6    earlier that day?

7    A.  Yes.

8    Q.  And you had written to Mr. St. John, "FYI . . . Could you

9    possibly work on a revised draft from Hacene to Lisa before

10   you head out for your terrific vacation?  I can have Hacene

11   respond with his while you are out and then you can use your

12   vacation as reason for the delay . . . Thanks."

13            Do you see that?

14   A.  Yes.

15   Q.  Okay.  Do you know what that refers to?

16   A.  A response to Dr. Menninger from Hacene.

17   Q.  Okay.  And when you write, "I can have Hacene respond

18   with his while you are out," what are you indicating there?

19   A.  Having Hacene take a look at this information and review

20   it while Chad's not in the office.

21   Q.  Were you intending to tell Mr. Mekerri to send an email?

22   A.  I wasn't intending to tell him -- I wasn't intending to

23   have him send an email, no.

24   Q.  I now show you Joint Exhibit Number 73.  That's an email

25   from you to Mr. Mekerri on April 25, 2018, yes?

1    **A.**  Yes.

2    **Q.**  And you write to Mr. Mekerri here in the second line,

3    "Below is the email response Lisa Noecker drafted for you to

4    reply to the latest exchange between you and Lisa Menninger."

5             Do you see that?

6    **A.**  Yes.

7    **Q.**  Okay.  Am I right, Ms. Ballweg, that this email, the one

8    that you're providing to Mr. Mekerri to send, this was an

9    email that Dr. Menninger asked you to investigate?

10   **A.**  Again, when I recall my conversation with Dr. Menninger

11   about why she felt she was being treated differently by her

12   manager, quality became one of the issues.  Gedeon Richter

13   was one of a few clients she indicated, but I don't believe

14   she recalled this specific email or called it out.  It was

15   she was being held to a different quality standard than every

16   other leader within the central lab.

17   **Q.**  Well, she sent you a number of emails when you began your

18   conversation, correct?

19   **A.**  Yes.

20   **Q.**  Was this one of the emails she sent you?

21   **A.**  I just don't recall.  It -- I don't recall.

22   **Q.**  Would you agree that if this was one of the emails that

23   she asked you to investigate, it would have been

24   inappropriate for you to conduct the investigation?

25   **A.**  No, because I wasn't involved.  At this point I was the

1    conduit between Chad having worked with Hacene on goals for

2    2018 for Dr. Menninger.

3    **Q.**   You're the conduit between whom?

4    **A.**   Sorry.  Between Lisa Noecker and Hacene.  And, obviously,

5    Chad was out on vacation.  I was filling in to help move this

6    process along.  I wasn't involved in the details.  I wasn't

7    involved with discussing with Hacene what the goals would be

8    for 2018.  That would all have been conducted between Chad

9    and Hacene.

10   **Q.**   So when you did your investigation, did you investigate

11   Lisa Noecker?

12   **A.**   No.

13   **Q.**   Why not?

14   **A.**   Again, in the investigation, Dr. Menninger pointed to, I

15   believe, seven incidents that she cited as support for why

16   she felt she was being treated unfairly.  And all seven of

17   those were thoroughly investigated.  If Lisa Noecker's name

18   would have been attached to any of those, from an

19   inappropriateness or as an individual who had information

20   about that situation, I would have had a conversation with

21   Lisa Noecker.

22   **Q.**   Well, you were having conversations with Lisa Noecker,

23   right?

24   **A.**   It was a challenging time.

25   **Q.**   Fair enough.  Challenging or not, you were having

1    conversations throughout this time with Lisa Noecker, right?

2    **A.**   And Chad and I were both having conversations

3    periodically with Lisa Noecker, yes.

4    **Q.**   And Lisa Noecker, she was the one pulling the strings

5    with respect to all of these different communications, wasn't

6    she?

7    **A.**   She was helping craft responses.

8    **Q.**   I'm now showing you Joint Exhibit 76.  I just direct your

9    attention to the bottom of the page.  Does that look like

10   it's an email from Mr. St. John to you on April 26, 2018?

11   **A.**   Yes.

12   **Q.**   And he's asking you whether or not there's any feedback

13   from Lisa Noecker on a response for him to send to Lisa

14   Menninger.  Do you see that?

15   **A.**   Yes.

16   **Q.**   Okay.  And then, in your response, you tell him, "I have

17   Lisa N's edited email for you to send; however, I need you to

18   wait until Monday."

19            Do you see that?

20   **A.**   I do.

21   **Q.**   Why did you need him to wait until Monday?

22   **A.**   I don't -- I don't know.

23   **Q.**   Going to show you Joint Exhibit Number 70.  And is

24   this -- is this the email with you forwarding him

25   Ms. Noecker's response and again asking him to hold off until

1    next week?

2    **A.**   It looks like it, yes.

3    **Q.**   Now I'm going to show you Joint Exhibit Number 71 --

4    excuse me.  That was -- we already looked at that one.

5            All right.  So let's look at Joint Exhibit

6    Number 115.  And you see here this is an email Mr. St. John

7    sent to you on April 28, 2018; is that right?

8    **A.**   Yes.

9    **Q.**   Okay.  And he's forwarding you a message he'd received

10   from Dr. Menninger?

11   **A.**   Yes.

12   **Q.**   And she complains that Hacene's -- I'm sorry --

13   Mr. Mekerri's treatment of her is getting worse?

14   **A.**   Yes.

15   **Q.**   She complains that he's mischaracterizing things?

16   **A.**   Yes.

17   **Q.**   She complains he's looking for any excuse possible to

18   criticize her leadership?

19   **A.**   Yes.

20   **Q.**   She complains that he never treated her like this before

21   she told him about her disability?

22   **A.**   Yes.

23   **Q.**   She states that her panic attacks are increasing and he's

24   making it really hard for her to do her job.  Do you see

25   that?

1    **A.**   Yes.

2    **Q.**   Okay.  Were you concerned when you read that?

3    **A.**   Very concerned that an employee would feel this way and I

4    certainly wanted to do whatever I could to assist her.

5    **Q.**   As of this point in time, did you have any personal

6    opinion as to whether or not what Dr. Menninger claimed here

7    was true or not?

8    **A.**   No.

9    **Q.**   Well, you see her message there starts, "See attached."

10   Do you see that?

11   **A.**   Yes.

12   **Q.**   And if we go and look at the attachment, you see here

13   this is -- this is an email chain regarding the one-to-one

14   follow-up and goals; is that right?

15   **A.**   Yes.

16   **Q.**   Okay.  And looking here at these -- the second page of

17   the attachment, so page 7 of the exhibit, in the bottom

18   right-hand corner, it has the Bates 867.  This chain included

19   an email that Mr. Mekerri had sent to Dr. Menninger, right?

20   **A.**   Yes.

21   **Q.**   And that was -- that was an email that you had -- you had

22   signed off on, correct?

23   **A.**   I believe I had awareness of.  I don't know if I signed

24   off on it.

25   **Q.**   You're not sure if you had an opportunity to provide

1    comment?

2    **A.**  Perhaps.

3    **Q.**  Is this the same email that Lisa -- that you had

4    forwarded to Mr. Mekerri telling him that it came from Lisa

5    Noecker?

6    **A.**  Yes.  Yes, it is.

7    **Q.**  So when you got this email, going back to the first page,

8    you've got -- you've got a complaint here from Dr. Menninger

9    in this email on the first page, right?

10   **A.**  Yes.

11   **Q.**  Okay.  You understood that she was attaching that email

12   chain because it related to her complaint, right?

13   **A.**  Yes.

14   **Q.**  And it included an email that you had told Mr. Mekerri to

15   send, yes?

16   **A.**  Hacene and Chad worked on the email.  I helped move it

17   along when Chad was on vacation.

18   **Q.**  And you were the one ultimately who told Mr. Mekerri to

19   send it, yes?

20   **A.**  I'm not sure if it was myself or Chad.  I believe it was

21   Chad.  Chad sent it.  Chad sent to it Hacene.

22   **Q.**  After receiving this April 27, 2018, you decided to

23   conduct an investigation; is that right?

24   **A.**  Yes.

25   **Q.**  Okay.  Now, to be clear, there were other people within

1    human resources who could have done this investigation,

2    right?

3    **A.**   Yes.

4    **Q.**   Okay.  But the decision was made that it was going to be

5    you?

6    **A.**   Correct.

7    **Q.**   Okay.  And in conducting your investigation, you didn't

8    actually interview any of Mr. Mekerri's other direct reports,

9    did you?

10   **A.**   Again, conducting an investigation -- really wanting to

11   look at the concerns that the employee has.

12   **Q.**   Okay.

13   **A.**   In those concerns, if it was important to talk with other

14   members to gain perspective, to find more information about

15   those particular situations, I would have.  But there's also

16   a confidentiality piece where you want to make sure you're

17   not talking with all sorts of people across the organization

18   who don't have direct knowledge of that situation to ensure

19   confidentiality for the individual.

20   **Q.**   So that's a no, you did not speak to any of --

21   **A.**   In the investigation, there was no reason to talk with

22   others based on the issues that Dr. Menninger had raised.

23   **Q.**   So that's a no, you didn't speak to any of these other

24   direct reports?

25   **A.**   No, I did not.

1   **Q.**  Did you understand that oversight of the Global Central

2   Labs was a shared responsibility amongst different

3   departments?

4   **A.**  Say that again.

5   **Q.**  Did you understand that oversight of the Global Central

6   Labs was a shared responsibility by various different

7   departments?

8   **A.**  Yes.

9   **Q.**  Okay.  And you understood that part of Dr. Menninger's

10  complaint was that she was being blamed for errors happening

11  within the lab, right?

12  **A.**  Yes.

13  **Q.**  Okay.  And in your investigation, you saw that, indeed,

14  Mr. Mekerri, was blaming Dr. Menninger for errors happening

15  in the lab, right?

16  **A.**  Mr. Mekerri were pointing out that there were errors

17  increasing in the lab, and that Dr. Menninger, as the leader

18  of the lab, ultimately had held accountable to the quality

19  output of the lab, not blaming her, but holding her

20  accountable to ensure that quality is enhanced.

21  **Q.**  What's the different between blaming a person and holding

22  them accountable?

23  **A.**  Blaming an individual would be punitive.  Holding someone

24  accountable would be saying, "Please put together a proposal

25  to enhance quality across this organization."

1    **Q.**  Did Mr. Mekerri ever say that?

2    **A.**  He adjusted the 2018 goal around quality in order to

3    raise the level of quality across the laboratory.

4    **Q.**  Not my question.  Did he say to Dr. Menninger,

5    "Dr. Menninger, could you please work on a plan to improve

6    quality?"

7    **A.**  I'm not sure what Mr. Mekerri said to Dr. Menninger.

8    **Q.**  You didn't find it out in your investigation?

9    **A.**  I investigated the level of quality errors occurring

10   within the lab.  Mr. Mekerri was holding all of his leaders

11   accountable to a higher level of quality.

12   **Q.**  Well, that's what Mr. Mekerri told you, right?

13   **A.**  As did our quality assurance executive director.

14   **Q.**  Who is not a member of Mr. Mekerri's team, right?

15   **A.**  He didn't need to be a member of team.  He's the quality

16   leader for that laboratory.

17   **Q.**  Right.  But Mr. Mekerri, he wasn't -- he wasn't holding

18   him accountable for it, right?

19   **A.**  Well, the nature of his job, he's held accountable to

20   high quality.

21   **Q.**  Not by Mr. Mekerri, right?

22   **A.**  By his boss, but right, no.

23   **Q.**  Who is not Mr. Mekerri, right?

24   **A.**  Correct.

25   **Q.**  Mr. Mekerri is responsible for holding his own direct

1    reports accountable, right?

2    **A.**   Yes.

3    **Q.**   And besides speaking to Mr. Mekerri, you did nothing to

4    determine whether or not the way he was treating

5    Dr. Menninger was similar to how he was treating his other

6    direct reports, did you?

7    **A.**   Mr. Mekerri was treating all of his leaders the same in

8    terms of the quality expectation of that operation.  There

9    were quality issues that were escalating in the

10   laboratory-based business.

11   **Q.**   Could you answer my question, please?

12   **A.**   Please ask the question again.

13   **Q.**   You didn't do anything besides talk to Mr. Mekerri to

14   determine whether or not he was treating his other direct

15   reports the same way he was treating Dr. Menninger?

16   **A.**   I talked to the quality assurance director, executive

17   director, Brent McKinnon.

18   **Q.**   Was Brent McKinnon involved in Mr. Mekerri's one-on-ones

19   with his direct reports?

20   **A.**   Brent McKinnon was involved in leadership team meetings

21   where Mr. Mekerri set the expectation to the entire

22   leadership team, of which Dr. Menninger and her colleagues

23   were all there.  The expectation from Mr. Mekerri was we are

24   going to raise the level of quality across this organization.

25        Brent was a partner with Mr. Mekerri in saying,

1    "Here's what I see from a quality perspective."  He provided

2    metrics and data that said quality across the lab needs to

3    improve, across all of central lab needs to improve.

4    Q.   That wasn't my question, though.  My question is whether

5    or not he had any information concerning what was conveyed in

6    Mr. Mekerri's one-to-ones with his other direct reports.  And

7    he didn't have that information, right?

8    A.   I don't -- Brent and Hacene could have talked about that.

9    I -- no, I did not ask that question, but it doesn't mean

10   they didn't talk about it.

11   Q.   Okay.  And in your role, you hadn't seen any email

12   communications where Mr. Mekerri was treating his other

13   direct reports the way he was treating Dr. Menninger in April

14   and May of 2018, had you?

15   A.   There were emails sent to the entire team, again, raising

16   the level of quality.

17   Q.   That wasn't quite my question, though.  And let me -- let

18   me ask an even better one.

19           So we've looked at email correspondence where you

20   were this go-between in terms of emails between Dr. Menninger

21   and Mr. Mekerri, right?

22   A.   Yes.

23   Q.   Some of those concerned addressing lab issues, right?

24   A.   Yes.

25   Q.   Okay.  Some of those concerned changing goals, right?

1    **A.**   Yes.

2    **Q.**   Were you getting those same email communications

3    concerning Mr. Mekerri's other direct reports?

4    **A.**   No.

5    **Q.**   Were you aware of Mr. Mekerri provided his other direct

6    reports any, in your words, "tough feedback"?

7    **A.**   There was tough feedback.  There were discussions around

8    the state of the business.  In 2018, the business was in

9    growth mode, and there was a level of expectation for all the

10   leaders to do whatever it took to sell our business, to work

11   with clients, to reinforce the quality output of our -- of

12   our organization to routine customers for repeat business.

13   There was just a level of expectation that was raised with

14   everybody.

15   **Q.**   I asked about tough feedback?

16   **A.**   It could be tough feedback, yes.

17   **Q.**   Were you made aware of specific instances where

18   Mr. Mekerri was providing tough feedback to his other direct

19   reports the way he was doing it to Dr. Menninger?

20   **A.**   The business development team was getting tough feedback

21   about their commercial strategy.

22   **Q.**   We're not talking about business development.  We're

23   talking about Hacene Mekerri.

24   **A.**   Hacene Mekerri was giving tough feedback to our business

25   development team about the strategy of selling our business

1    for 2018.

2    **Q.**  Right.  But was he -- are you aware of any instances of

3    him providing tough feedback to his other direct reports

4    concerning these lab issues the way he was doing it to

5    Dr. Menninger?

6    **A.**  Well, the lab issues fall under Dr. Menninger, so giving

7    tough feedback to other leaders around lab issues wouldn't be

8    appropriate.

9    **Q.**  Well, some of these other leaders, they were in charge of

10   other areas where these lab issues were occurring, right?

11   **A.**  The lab issues occur in the lab.

12   **Q.**  Yes.  And Mr. Mekerri's other direct reports also had

13   responsibility for lab oversight, right?

14   **A.**  You asked earlier -- there's project management.  There

15   are data management.  There are other functions that -- that

16   are not laboratory-based functions.  Those are the -- those

17   are the colleagues to Dr. Menninger.  She's the lab leader.

18   **Q.**  Some of those functions were where these problems were

19   occurring, right?

20   **A.**  No.  They were occurring within the laboratory.

21   **Q.**  Some were IT issues?

22   **A.**  Is that a question?

23   **Q.**  Yeah.

24   **A.**  There were IT components that impacted the laboratory

25   testing, yes.

1    **Q.**   Great.   Some were project management issues?

2    **A.**   The data provided, again, accountability for all the

3    departments to focus on quality.   The biggest area of impact

4    was lab, wasn't project management, it wasn't IT, it wasn't

5    data management.   It was the laboratory-based businesses.

6    **Q.**   My question was where the problems were coming from.

7    Some of the problems were coming from project management,

8    yes?

9    **A.**   Problems were occurring across the board, yes.

10   **Q.**   Okay.   And in a lab like this, problems happen all the

11   time, right?

12   **A.**   I'm not a laboratory-based person.   I --

13   **Q.**   Okay.   But you would agree with me that problems like

14   this, it would be impossible to eliminate them, right?

15   **A.**   In our industry, the only thing -- we don't manufacture

16   anything.   The only thing we have at the end of the day is

17   data, which makes our people our number one asset to our

18   organization.

19          If we don't have quality in everything we do and

20   integrity in how we do the testings and create that data, we

21   are not a successful business.   So quality has got to be top

22   of mind in every function across our business.

23          And Mr. Mekerri was attempting to raise that level

24   of quality to sell more, to strengthen our business in 2018,

25   to ensure that we could, you know, take care of our

1    employees.  Everyone was held accountable to that same

2    expectation.

3    Q.  Ms. Ballweg, eliminating lab errors is impossible, isn't

4    it?

5    A.  To have zero errors when there's human interaction,

6    likely, is very difficult, yes.

7    Q.  Not very difficult, Ms. Ballweg.  It's impossible, right?

8    A.  I'm not a scientific person.  I -- I assume some day

9    there will be automation.  There will be ways to reduce human

10   error.  But, again, to strive to minimize that, to strive for

11   zero, yes, it's what we should all do in our industry.

12   Q.  Do you recall being deposed in this matter?

13   A.  It was a long day, many years ago, but yes.

14   Q.  Okay.  And you recall testifying at your deposition that

15   you recognize that eliminating all lab errors was impossible?

16   A.  Again, long day, lots of testimony.  Could -- or lots of

17   questions.  Do you mind --

18               THE COURT:  You asked if she recalls whether she

19   said that?

20               MR. HANNON:  Correct.

21               THE COURT:  That's all, whether you recall whether

22   you said that.

23               THE WITNESS:  I don't.

24               MR. HANNON:  Okay.

25

1    BY MR. HANNON:

2    **Q.**   You understood that Mr. Mekerri was telling Dr. Menninger

3    that his expectation for her was to prevent future lab

4    errors; is that right?

5    **A.**   To minimize errors, to enhance the quality of the lab,

6    yes.

7    **Q.**   Okay.  Did she communicate to you what she told us this

8    week that he was telling her that she needed to eliminate all

9    errors?

10   **A.**   What she communicated to me was that she was being held

11   accountable more so than anybody else around quality.  And

12   she was treated differently due to the -- Gedeon Richter and

13   the other quality issues that occurred in 2017.

14   **Q.**   Okay.  Let me ask you a bit of a slightly different

15   version of this question.  Would you agree with me that it

16   would have been inappropriate for Mr. Mekerri to tell

17   Dr. Menninger that his expectation going forward would be no

18   more lab errors?

19   **A.**   I don't think it would be inappropriate.  When we set

20   goals, we set stretch goals.  We don't always strive for

21   better.  Again, at the end of the day, all we have is our

22   quality and our data.  If we don't strive for perfection,

23   then we can't look our clients in the eye and say, "We've

24   done the best for you that we possibly can."

25   **Q.**   Are you familiar with the SMART acronym?

1   **A.**  Yes.

2   **Q.**  And tell us what that stands for.

3   **A.**  SMART acronyms are goals.  They're specific, they're

4   measurable, achievable, relevant, and time based.

5   **Q.**  And back in 2018 when -- this time period we're talking

6   about, was it PPD's policy to use SMART goals?

7   **A.**  It wasn't a policy.  It was more of a practice.

8   **Q.**  And the third one you mentioned, the A, what was that

9   again?

10  **A.**  Accountable?

11  **Q.**  Achievable?

12  **A.**  Achievable.  Sorry.

13  **Q.**  Meaning it's something that you can actually do, right?

14  **A.**  Yes.

15  **Q.**  Okay.  In the course of your investigation, you weren't

16  working alone, were you?

17  **A.**  When you say "alone," no, I conducted the investigation

18  myself.

19  **Q.**  Lisa Noecker, she was also involved, yes?

20  **A.**  No, she was not.

21          (Pause in proceedings.)

22          THE COURT:  Next question, Mr. Hannon?

23          MR. HANNON:  One moment just to find this document.

24  Apologies.

25

1    BY MR. HANNON:

2    **Q.**  Let's start here, Ms. Ballweg.  Part of your

3    investigation included interviewing Mr. Mekerri; is that

4    right?

5    **A.**  Yes.

6    **Q.**  And one of the subjects that you interviewed him

7    concerning was that February 28, 2018 meeting with

8    Dr. Menninger, correct?

9    **A.**  Yes.

10   **Q.**  And you understood during the course of your

11   investigation that one of the issues that you were

12   investigating was -- was what occurred at that meeting,

13   right?

14   **A.**  Yes.

15   **Q.**  And Mr. Mekerri, in your interview, he denied the account

16   by Dr. Menninger; is that right?

17   **A.**  He didn't recall the exchange, but recalled the topic

18   being raised by Chad.

19   **Q.**  Did you ask him whether or not part of the goal of that

20   will meeting was to gently work Dr. Menninger out?

21   **A.**  No.

22   **Q.**  Would that have been material to your investigation if

23   you had learned in that meeting that Mr. Hacene and

24   Mr. St. John were trying to gently work Dr. Menninger out?

25   **A.**  At the time, it was, again, interactive discussion with

```
 1    Dr. Menninger.  It was -- we didn't understood what her
 2    accommodation requests were.
 3              THE COURT:  I think he's just asking how it would
 4    matter to the investigation.
 5              Is that the question?
 6              MR. HANNON:  Yes, Your Honor.
 7              THE WITNESS:  I'm sorry; how -- what?
 8              THE COURT:  Whether that fact would have mattered,
 9    been material, I think was his question, to the
10    investigation.
11              THE WITNESS:  If Mr. Mekerri was trying to work
12    Dr. Menninger out of the organization, was the question, if
13    it was material?
14    BY MR. HANNON:
15    Q.  If he admitted to that when you interviewed him as part
16    of your investigation, would that have been a material fact?
17    A.  It would have been, yes.
18    Q.  Why?
19    A.  Because that would have been an unfair treatment to
20    Dr. Menninger.
21    Q.  If Mr. -- and you also interviewed Mr. St. John as part
22    of your investigation, right?
23    A.  That's correct.
24    Q.  And if Mr. St. John in the course of your investigation
25    admitted to you that part of the purpose of that
```

1    February 28th meeting with Dr. Menninger was pursuit of an

2    exit strategy, that would have been material to your

3    investigation, right?

4    **A.**   When I talked to Chad, the information that he shared

5    was -- again, it was a confusing time.  We didn't know what

6    Dr. Menninger was asking for.  In the discussion on

7    March 28th, it was an escalation of Lisa asking, "What if I

8    can't do my job?  What if I can't do my job?"

9           The premise of that meeting was to have this

10   interactive dialogue.  It was in no way a means to eliminate

11   her job or move her out of the organization.

12   **Q.**   To be fair, Ms. Ballweg, that's what you were

13   investigating, whether or not the purpose of the meeting was

14   to move her out of the organization, right?

15   **A.**   Was unfair treatment by her manager.

16   **Q.**   Well, not just her manager, but also human resources,

17   right?

18   **A.**   Her manager.

19   **Q.**   Okay.  So you didn't care whether or not Mr. St. John had

20   done anything wrong?

21   **A.**   Of course.  And, again, the investigation -- we're doing

22   our best for Dr. Menninger to say these are the situations

23   she brought forward.  Does the -- does the information show

24   that she's been treated differently because of her

25   disability?

1    **Q.**  So back to the question I asked a few minutes ago.  If,

2    in your interview of Mr. St. John, he had told you that, yes,

3    part of what we were trying to do in that February 28th

4    meeting was -- was an exit strategy for Dr. Menninger, would

5    that have been material to your investigation?

6    **A.**  Yes.

7    **Q.**  Why?

8    **A.**  Because at that point, we were working with Dr. Menninger

9    on how can we accommodate her, accommodate her in her job.

10   **Q.**  Okay.  Now, at some point in time, you wrote up a report

11   of your investigation in this matter, right?

12   **A.**  Yes.

13   **Q.**  And when you wrote up that report, you didn't make any

14   mention of the fact that you were aware that, on March 1st --

15   or, rather, subsequent to the 2/28 meeting -- Mr. St. John

16   was asking for an exit strategy, did you?

17   **A.**  That was a couple-part question.  Could you ask that

18   again, please?

19   **Q.**  Yeah, let me ask a slightly better one.

20          We saw earlier in that package that Mr. St. John

21   had put together for Lisa Noecker, he had requested there a

22   exit strategy for Dr. Menninger, right?

23   **A.**  Yes.

24   **Q.**  You didn't make any mention of that in your report,

25   right?

1  **A.**  No.

2  **Q.**  Okay.  We also saw earlier that, on the same day that

3  that meeting happened on February 28th, you'd gotten that

4  email from Mr. St. John about the -- about the licensure

5  grid, right?

6  **A.**  Yes.

7  **Q.**  And we saw in that email that you got that day, he had

8  made reference to gently working Lisa out, right?

9  **A.**  Again, context, but that's what it said.

10  **Q.**  Okay.  You didn't -- you didn't put that in your written

11  report of your investigation, did you?

12  **A.**  No.

13  **Q.**  I'm now going to show you Joint Exhibit Number 74.  And

14  I'm going to start here on the second page.  And so this is

15  an email from you to Chad St. John on May 22, 2018, yes?

16  **A.**  Yes.

17  **Q.**  And you're advising him that you're giving Dr. Menninger

18  feedback on the outcome of your investigation, right?

19  **A.**  Correct.

20  **Q.**  Turn to the first -- next page.  It says, "Good luck,

21  Deb."  Do you see that?

22  **A.**  Yes.

23  **Q.**  And then that's your response right there that's

24  highlighted, correct?

25  **A.**  Yes.

1   **Q.**   What would you call that emoji?

2   **A.**   Surprise?

3   **Q.**   Prior to PP- -- sorry, prior to Thermo Fisher's

4   acquisition of PPD, did you have any stock options?

5   **A.**   Yes.

6   **Q.**   And when -- let me ask a slightly different question I

7   meant to ask first.  Prior to PPD going public, did you have

8   stock options?

9   **A.**   Yes.

10  **Q.**   Okay.  And were those -- did you receive money in

11  exchange for those options when PPD went public?

12  **A.**   I did, yes.

13  **Q.**   How many options did you have?

14  **A.**   I'm not sure exactly the number.

15  **Q.**   More than 10,000?

16  **A.**   It's -- there were some part of PPD and then some were

17  the -- when we were private -- or publicly traded and some I

18  converted to Thermo Fisher.  So prior to that, it wasn't

19  10,000.  It was probably maybe 7,000.

20  **Q.**   Do you recall how much you received for each of those

21  options?  I just mean individual option, not the whole batch.

22              THE COURT:  Yes?

23              MS. MANDEL:  Objection, Your Honor.  We may require

24  a very brief sidebar.

25              THE COURT:  How much more do you have of this

1    witness?

2         MR. HANNON:  Probably another maybe 10 minutes, but

3    might be 15 or 20.

4         THE COURT:  Why don't you move on to a different

5    topic, and then we talk about it without the jury, and then

6    you can circle back depending on what happens.

7         MR. HANNON:  Yep.

8    BY MR. HANNON:

9    **Q.**  So you've -- I want to talk a little bit about PPD's

10   policy regarding disabilities.  So in 2018, PPD, it had a

11   policy regarding accommodations; is that right?

12   **A.**  Practice more so than policy.

13   **Q.**  Okay.  Well, in your HR role, you were aware of the legal

14   obligation to provide accommodation; is that right?

15   **A.**  Yeah.  Yes.

16   **Q.**  And you had received training over the years concerning

17   what that legal obligation was?

18   **A.**  More so what our role is in, you know, conducting

19   discussions with our work force, but not the legal basis.

20   **Q.**  Okay.  Did you understand that, even if an employee could

21   do the essential functions of their job without

22   accommodation, that they might still be entitled to an

23   accommodation nonetheless?

24   **A.**  So they can do their job, but they need an accommodation?

25   At a -- yeah, we would have conversations with our employees

1    about that.  Sure.

2    **Q.**  My question is a little bit sort of more focused.  Were

3    you aware that, even an employee could do the essential

4    functions of their job without an accommodation, that there

5    might be instances where they would still be entitled to an

6    accommodation even though they can do their job without it?

7    **A.**  So I don't think I would be aware, because the situations

8    that we would get involved in from an HR perspective, there

9    would be a need for an accommodation.  "I cannot do this

10   piece of my job.  This is what I need to be accommodated to

11   do my job."  We would have the discussion around is it

12   reasonable, is it not?  So I guess perhaps I wasn't -- I

13   didn't come across a situation where that existed.

14   **Q.**  Okay.  Was it -- was it your belief, then, that if an

15   employee made a request for accommodation then that meant

16   they believed they couldn't perform the essential functions

17   of their job?

18   **A.**  It would -- yes.  The individual came forward with, "I

19   can't do my job.  Here's what I need to be accommodated," or

20   "I can't do a piece of my job."

21   **Q.**  So your understanding was, if they came forward and they

22   said, "I can do the essential functions of my job without an

23   accommodation," then they simply weren't entitled to one?

24   **A.**  No, I'm not saying that.  I'm just saying in the

25   situations that I've been involved in, the reasons we have

1    conversations with our employees and help them through it is

2    they come forward saying, "I have -- I have a disability.  I

3    have a need to be accommodated.  This is what I need from an

4    accommodation perspective based on what the duties are for my

5    job."

6              I'm unclear why someone would come forward and say,

7    "I can do my job, and I don't need an accommodation," but

8    then they do need an accommodation?  It's confusing.

9    Q.  Well, there might be people who can do the essential

10   functions of their job without accommodation --

11             THE COURT:  I think at this point it should be

12   focused to this case.

13             MR. HANNON:  Sure enough.

14   BY MR. HANNON:

15   Q.  Did you appreciate that, even though Dr. Menninger said

16   she could do the essential functions of her job without --

17   without an accommodation, that if there was a reasonable

18   accommodation available that would make it easier for her to

19   do her job without suffering as severe consequences from her

20   disability, that PPD had an obligation to provide it?

21   A.  Was I aware?  No.  Would we have entertained that?

22   Absolutely.

23   Q.  You mentioned a few moments ago that when you conducted

24   your investigation, that one concern you had was

25   confidentiality; is that right?

1   **A.**  Yes.

2   **Q.**  And you understood that, when dealing with a request for

3   accommodation, that it was important to maintain

4   confidentiality; is that right?

5   **A.**  Yes.

6   **Q.**  And can you tell the jury why you -- why you thought that

7   was important?

8   **A.**  Certainly sharing individuals' health concerns is

9   something we wouldn't want to disclose to just anyone.  It's

10  a private matter.  We want to make sure that there's

11  confidentiality around that and the comfort of people sharing

12  with HR or their managers in working through that disability

13  or the needs they have to perform their job.

14  **Q.**  And did I hear you right that that was part of the reason

15  why you had not interviewed Mr. Mekerri's other direct

16  reports?

17  **A.**  Again, this -- the information that Dr. Menninger

18  provided me that said, "This is why feel I'm being unfairly

19  treated," had it pointed to me having discussions with

20  others, I would have investigated that.  But the situations

21  that she brought forward didn't require that, so I did not

22  speak with other colleagues of Dr. Menninger.

23  **Q.**  And was part of your reluctance to do so confidentiality?

24  **A.**  Right.  I wouldn't want to share with people who really

25  didn't have to -- or had no knowledge of that information,

1    yes.

2    **Q.**  I'm going to show you Joint Exhibit 174.  Who is Chris

3    Clendening?

4    **A.**  In 2018, I believe he was the executive director of the

5    project management team for the Global Central Labs.

6    **Q.**  He was Dr. Menninger's peer, right?

7    **A.**  Correct.

8    **Q.**  Okay.  And did you see here that Mr. St. John is

9    forwarding -- and I'll show you the document he forwards --

10   documentation provided by Dr. Menninger concerning her

11   request for accommodation?

12   **A.**  Yes.

13   **Q.**  Okay.  Were you aware that Mr. St. John had shared that

14   with Mr. Clendening?

15   **A.**  I don't believe I was aware.

16   **Q.**  Okay.  Are you aware of any legitimate reason for

17   Mr. St. John to share that information with Mr. Clendening?

18   **A.**  There would have been a compelling reason for Chad to

19   share something confidential, so I'm assuming there is one,

20   but I'm not sure what it is.

21   **Q.**  Mr. St. John never -- never shared with you that he had

22   some compelling need to share that with Mr. Clendening?

23   **A.**  If he did, I just don't recall.

24   **Q.**  You knew that it would be unlawful to discriminate

25   against Dr. Menninger based upon her disability; is that

1    right?

2    **A.**   Unlawful to discriminate based on her disability?  Yes.

3    **Q.**   You knew that it would be unlawful to retaliate against

4    Dr. Menninger for requesting an accommodation?

5    **A.**   Yes.

6    **Q.**   You knew that part of PPD's obligations in responding to

7    Dr. Menninger's request for an accommodation was -- included

8    answering questions that she had about -- about her role?

9    **A.**   There's an interactive dialogue between the employee and

10   the employer that includes her physician, so it would have

11   been a combination of all of that.

12   **Q.**   And you knew that if that back-and-forth included

13   questions that the employee had about their role, that

14   answering those questions would be part of the interactive

15   dialogue, yes?

16   **A.**   Again, the employee knows their job best.  I think it's

17   reasonable for the employee to say, "These are my tasks.

18   This is what I need to be accommodated."

19   **Q.**   My question is a little bit different, though.  But if

20   the employee comes back and asks questions, you understood

21   there was a legal obligation on the part of PPD to answer

22   them, yes?

23   **A.**   I don't believe I knew there was legal obligation to

24   answer those questions.

25   **Q.**   I think I heard your testify earlier today that you

1    didn't think that Dr. Menninger specified what she was

2    requesting in terms of accommodations; is that right?

3    **A.**   Yes.

4    **Q.**   Okay.  Staying on this exhibit here we have on the

5    screen, you -- you've seen -- I believe the third page here.

6    You've seen this document before, right?

7    **A.**   Yes.

8    **Q.**   Okay.  And, in fact, this was something that Mr. St. John

9    had forwarded to you contemporaneously, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And you saw that there were, indeed,

12   accommodations proposed here by Dr. Menninger's doctor, yes?

13   **A.**   Yes.

14   **Q.**   Okay.  But you -- you weren't involved in the actual task

15   of determining whether or not any of these accommodations

16   were reasonable, were you?

17   **A.**   No.

18   **Q.**   There's been some testimony in this trial about the fact

19   that Dr. Menninger at some point in time began working

20   remotely.  Are you familiar with that fact, that she worked

21   remotely?

22   **A.**   Yes.

23   **Q.**   And, in fact, you'd been involved in the process by which

24   it was -- she was given permission to work remotely, right?

25   **A.**   No.  It was not -- it was not -- within my role or scope

1    to approve that.

2    **Q.**  Would you agree with me, ma'am, that if Mr. Mekerri was

3    concerned that Dr. Menninger's remote work status was causing

4    problems, that he could have revoked it?

5    **A.**  That's how we coach our leaders, yes.

6              THE COURT:  I'm going to stop you here, Mr. Hannon.

7              So, ladies and gentlemen of the jury, I want to

8    update you on the schedule.

9              Two things:  One, I told you we were going to sit

10   Monday afternoon.  We are going to do that.  We're a little

11   bit behind schedule and I apologize for that.  And it's -- to

12   get the case to you by Friday, which is what we are going to

13   do, it's going to require one more afternoon.  And so we're

14   going to do -- not only the Monday afternoon I told you

15   about, but we'll do Tuesday afternoon, too.  That will be the

16   only other afternoon that we are going to do.  So tomorrow

17   will be 9:00 to 1:00.  Monday and Tuesday will be 9:00 to

18   1:00 and 2:00 to 4:00 each of those two days.  Wednesday and

19   Thursday will be 9:00 to 1:00.  Friday you'll get the case.

20   You should anticipate staying all day Friday.

21             So that's the update on the schedule.  There won't

22   be any other changes absent a blizzard or other acts of

23   nature beyond our control.  So that's what the schedule is.

24             Don't -- one of you had a minor question about

25   something about the schedule outside work and Ms. Belmont has

1    an answer and will tell you.

2           If -- don't discuss the case among yourselves.

3    Don't discuss it with anyone else.  Don't do any independent

4    research.  Keep an open mind.  You haven't heard all the

5    evidence.  Thank you very much for your attention.

6           All rise for the jury.

7           (Jury not present.)

8           THE COURT:  Ms. Ballweg, you can stay there or step

9    down as you prefer.  I'm going to have a little discussion

10   with the lawyers.

11          First, just with respect to the schedule, I think

12   what all of you should think about, I'm really -- expect we

13   have to get it to the jury on Friday.  So I'm prepared to

14   continue to defer to all of you, the two of you, about all of

15   that; but I'm also, you know -- it occurs -- I could set time

16   limits.  I don't like doing that because you're both good

17   lawyers and I would prefer to leave it to all of you to work

18   out.  But I also think you have to be mindful of efficiently

19   proceeding and -- so that we can get it to the jury, which

20   means mapping out the time.

21          And one -- two little things, just observations,

22   not -- I don't mean -- you have a very hard job, both of you.

23   And I don't mean this in any way and I don't want you to take

24   it as a criticism.

25          You can be seated if you want, I'm sorry.

1           One is that, like, there's a certain amount of --

2    understandably and necessarily -- preliminarily foundation,

3    this email, someone got it, this or that.  But to the -- one,

4    try to dispense with that whenever it's really not necessary,

5    especially now, because the jury has -- this isn't the first

6    time a lot of these things are being shown to the jury.  So

7    you can speed through it.

8           They -- they now know who, like, Lisa N. is or, you

9    know, some of these things.  You don't -- they get that.  You

10   can skip, I think, those questions, and cover things once.

11   You don't need to sort of when you come to -- when there's a

12   related question about it, a different question, about

13   something you've already covered, you don't need to relay all

14   the foundation in the examination.

15          The other part you might think about, Ms. Mandel,

16   is just, with the computer stuff, I understand it's hard.

17   And -- but in each delay, in and of itself, is no big deal,

18   but what happens is the accumulation of them like -- I don't

19   know, sometimes it's the software.  Sometimes it's the

20   computer.  Sometimes it's -- I'm not going to sit here and

21   tell you that we have the latest and greatest system in the

22   world.  We have -- you know -- we are not Microsoft or

23   Google.

24          And -- but to the extent, you know, you can

25   eliminate those kinds of things, those 15 seconds multiplied

1    throughout a morning can add up to a lot of time, and I know

2    it's hard.  So I'm not criticizing you and I'm not

3    criticizing your assistant.  I know it's difficult.

4         But if you can, that also makes a big difference

5    and I'll tell you, one, it may -- it cuts out a lot of time.

6    It makes it more efficient.

7         The other is, in my experience, one thing I do is

8    talk to jurors after trials, not about the decision, but just

9    about if they have suggestions for that Court for us to do a

10   better job, if they have suggestions for the lawyers to do a

11   better job -- not different cases, but -- or different

12   evidence, but just the craft of lawyering, because I know

13   that there's less and less opportunities to try cases.

14        But one thing they bring up pretty much on their

15   own is they like things to go really fast, boom, boom, boom.

16   They like it to go boom, boom, boom with the technology.

17   Like, the exhibits pop up.  They like it to go boom, boom,

18   boom with the questions for, you know, both of you.  That's

19   just what they like.

20        They are -- it's not always -- I'm not saying that

21   expectation, which they have, is always realistic or one that

22   can be matched in -- and I'm not saying that -- but I am

23   saying for both of you to think about that, because that's

24   where, in my experience -- I don't have any information with

25   this jury -- but that's my experience from just about every

1    jury I've ever talked to.

2            And that too, like, can help sometimes just in

3    terms of getting to closing argument by next Friday, which is

4    what I want to do.  I don't mind if we get there earlier, but

5    I'm perfectly fine if we don't get there till Friday.

6            That leaves the issue you raised, your objection.

7    Are you going back to that or not?  Mr. Hannon?

8            MR. HANNON:  I'm sorry.  Yes.

9            THE COURT:  Yes.  Okay.  So what's the objection?

10           MS. MANDEL:  Your Honor, in the pretrial conference

11   last week, one of the motions in limine that we addressed

12   dealt with compensation information belonging to --

13           THE COURT:  Yeah, why is her -- like, the number of

14   options -- I mean, you didn't object at the time, but why is

15   the number of options she has -- you kind of circled away

16   from it when you said don't tell me how much you got total,

17   but why is her number of options relevant at all?

18           MR. HANNON:  There would be a few reasons.  So with

19   respect to the ones issued since the acquisition we talked

20   about last week, that would be one area where compensation of

21   some of these individuals might matter to the extent that

22   there's a question of kind of what's comparable.

23           THE COURT:  Well, but she's in HR.  She's got a

24   totally -- I guess my question to you would be this.  Right

25   now, I see that her salary, her options, her benefits, other

1    than the medical benefits, if you want to get into that,

2    because I would draw the inference that the medical benefits

3    made available at PPD were made available pretty similarly to

4    at least all management level employees in both management.

5          But the comp -- I have no idea whether Ms. Ballweg

6    is making ten X of what Dr. Menninger was making or one tenth

7    or anywhere in between, and I wouldn't expect there to be a

8    lot of correlations.  Same with stock options benefits.

9    Those kinds of things.  So it's like I don't see the

10   relevance.

11         MR. HANNON:  I'll save it for next week with a

12   better witness.

13         THE COURT:  Fine.  All right.  So that resolves

14   that.

15         MS. MANDEL:  And we may renew the objection.

16         THE COURT:  Renew -- and I guess the, like, first

17   thing I just ask, for the actual compensation that -- there

18   has to be some relevance and foundation that they could draw

19   an inference.

20         To me, I think the draw an inference from

21   Ms. Ballweg is making as to what Dr. Menninger was making is

22   beyond the scope of the jury.  It's not a reasonable

23   inference.

24         MR. HANNON:  Understood.

25         THE COURT:  Okay.  If you had a basis to draw the

1    inference, then we could talk about anything else, because

2    I'm not sure if that resolves it for you.

3              MS. MANDEL:  Your Honor --

4              THE COURT:  You can go right now.

5              MS. MANDEL:  The witnesses who are going to be here

6    next week, there's not someone who currently holds the

7    position that Dr. Menninger used to hold, even if we could

8    somehow establish those dots in time to show that this is

9    where Dr. Menninger would have been in, say, 2020, 2021,

10   2022, right.  Even if we could draw those inferences, and I

11   do maintain it would all be speculative, we're not going to

12   have a witness here who is exactly in the position that

13   Dr. Menninger --

14             THE COURT:  Here's what I suggest you do.  When you

15   think there's a witness who is coming who you think you are

16   going to be able the lay foundation for --

17             MR. HANNON:  Yeah.

18             THE COURT:  -- to draw that inference in which case

19   you want to ask the questions, let's meet at 8:30 that day or

20   give me a heads-up the day before, the day before the witness

21   is going to testify, so we can talk about it.  We can talk

22   about it and we can flesh out -- it may be that you get to

23   ask some foundation questions, and we'll see, but we'll have

24   an idea.

25             MR. HANNON:  I would -- I would suggest it's

 1    just -- just give me a shot to lay the foundation and I can
 2    ask the question, if you think I haven't gotten there, I
 3    haven't gotten there, and you'll sustain the objection.
 4            What I don't want to be in the position of is
 5    spotlighting my sort of strategy in terms of, you know, who
 6    I'm narrowing in on and exactly how I plan to sort of
 7    establish it, which then kind of gives the witness the
 8    advanced notice of --
 9            THE COURT:  I guess -- fair enough.  I guess what I
10    would say is this, I might want to hear from both of you a
11    little more about what kinds of connection might or might not
12    be sufficient even if we're not talking about specific
13    witnesses.
14            Because Ms. Ballweg, I just don't see it all.
15            MR. HANNON:  Understood.
16            THE COURT:  Yeah.  Okay.  Anything else for you,
17    Mr. Hannon?
18            MR. HANNON:  Nothing, Your Honor.
19            THE COURT:  Nothing for you?
20            MS. MANDEL:  No, thank you.
21            THE COURT:  Tomorrow -- so you have about how long
22    with Ms. Ballweg?
23            MR. HANNON:  22 minutes.
24            THE COURT:  Well, we're going to see.  Do you want
25    me to tell the jury 22 minutes?

```
 1              MR. HANNON:  It'll be -- it'll be quick.

 2              THE COURT:  Okay.

 3              MR. HANNON:  Bang, bang, bang.

 4              THE COURT:  And then you'll have how long with

 5   Ms. Ballweg?

 6              MS. MANDEL:  Somewhere between one and two hours.

 7   It's hard to --

 8              THE COURT:  So you have -- all right.  That's what

 9   I would expect.  A while.  So when we're done with

10   Ms. Ballweg, who we have tomorrow after that?

11              MR. HANNON:  We have Tonya Hart, who is

12   Dr. Menninger's sister.

13              THE COURT:  She's pretty quick?

14              MR. HANNON:  She is, yes.  She also is from out of

15   town and she's scheduled to fly back on Saturday.

16              THE COURT:  So I'm -- you're a half hour, I think,

17   with her?

18              MR. HANNON:  Yes, that's right.  Could we possibly

19   start with her?

20              THE COURT:  Hold on.

21              How long do you think you'll be with her?

22              MS. MANDEL:  I think no longer than a half hour.

23              THE COURT:  What time's her plane?

24              MR. HANNON:  On Saturday.

25              THE COURT:  Oh.  So we will take her for sure --
```

1    I'm prepared to take her out of order to accommodate and make

2    sure we get her done, be I think we should go further with

3    Ms. Ballweg, since we both -- like what you're both telling

4    me is even if we started with her at 12:00 or to be cautious,

5    you know, after the break, we could start with her after --

6    something like that, and we would get her done, and then I

7    think that would be better.

8               Okay.  But we'll do that.  Either way, we'll have

9    her done -- we'll -- we'll -- we can -- if we haven't done

10   with Ms. Ballweg at the break, we'll -- let's talk about it.

11   Maybe we'll start with her at 11:30.  Then we'll be done with

12   her and then we can resume.

13              And if we finish both of them, then what?

14              MS. MANDEL:  Then we get gold stars.

15              THE COURT:  Well, I'm prepared to give you verbal

16   gold stars if you do that, absolutely.  But then what

17   witness?

18              MR. HANNON:  Next up is our psychiatry expert,

19   Dr. Summergrad.

20              THE COURT:  Okay.  All right.  Okay.

21              Go ahead.

22              MS. MANDEL:  And I just -- now that we're going to

23   go the full day on Monday --

24              THE COURT:  Monday and Tuesday, that's what I told

25   them, I think.

```
 1              MS. MANDEL:  So Dr. Summergrad will otherwise be
 2      pushed to Monday morning, is my understanding.
 3              MR. HANNON:  Most likely.  We have a third-party
 4      witness, Dr. Kessimian, presently slotted for Monday.  So I
 5      need to reach out to her counsel and see if I can
 6      potentially --
 7              THE COURT:  How long is Summergrad?
 8              MR. HANNON:  I'm sorry?
 9              THE COURT:  How long is Summergrad?
10              MR. HANNON:  Probably two hours.
11              THE COURT:  Two hours for you?  He's the -- he's a
12      medical --
13              MR. HANNON:  Yeah.
14              THE COURT:  -- damage expert.
15              MR. HANNON:  One of the -- I mean, he's not the
16      financial expert, but --
17              THE COURT:  No, but I mean medical damage expert,
18      medical -- like, he's testifying to what her -- your client's
19      condition is and what -- his opinions about that?
20              MR. HANNON:  Yeah.
21              THE COURT:  Okay.  Two hours on direct?
22              MR. HANNON:  Yes.  Yep.
23              THE COURT:  Okay.  And -- I see.  And how long is
24      Kessimian?
25              MR. HANNON:  I think very short.  I would say maybe
```

1    half an hour.

2              THE COURT:  And how long are you with those two?

3              MS. MANDEL:  I think with Dr. Summergrad, our

4    estimate is approximately an hour.  And with Dr. Kessimian,

5    probably also an hour.

6              THE COURT:  So we'll finish both of them on Monday.

7    If you were two hours on direct, you're an hour, your -- your

8    three hours of direct, your two ours of cross, that's five

9    hours.  We have six hours, minus the break, so five hours and

10   45 minutes.  So that leaves 45 minutes, given what you've

11   established as your practice for super-focused, crisp

12   cross -- that was like a textbook example of a superb

13   redirect and superb recross.  We might finish both of them on

14   Monday.

15             Okay.  What time do you want to meet tomorrow?

16             MR. HANNON:  I'd like 8:45.

17             THE COURT:  I'm fine with 8:45 as long as you don't

18   think there's big issues.  It didn't sound like you

19   anticipate -- I mean, we've already heard from a lot of

20   Ms. Ballweg.

21             MS. MANDEL:  I think 8:45 is fine with us, as well.

22             THE COURT:  All right.  Fine.  I'll see you then.

23   Have a good night.

24             THE DEPUTY CLERK:  Court's in recess.

25             (Court in recess at 1:14 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Robert W. Paschal, Registered Merit Reporter and

5     Certified Realtime Reporter, in and for the United States

6     District Court for the District of Massachusetts, do hereby

7     certify that pursuant to Section 753, Title 28, United States

8     Code, the foregoing pages are a true and correct transcript

9     of the stenographically reported proceedings held in the

10    above-entitled matter and that the transcript page format is

11    in conformance with the regulations of the Judicial

12    Conference of the United States.

13

14                      Dated this 23rd day of March, 2023.

15

16

17

18

19                      /s/ Robert W. Paschal

20                      _____

21                      ROBERT W. PASCHAL, RMR, CRR
                        Official Court Reporter

22

23

24

25