1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3      _____

4      LISA MENNINGER,

5           Plaintiff,                        Civil Action No.
                                              1:19-cv-11441-LTS
6           v.

7      PPD DEVELOPMENT, L.P.,

8           Defendant.

9      _____

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                              JURY TRIAL
13                             Day 5

14

15

                         Friday, March 24, 2023
16                            8:46 a.m.

17

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom No. 13
       One Courthouse Way
22     Boston, Massachusetts

23

       Robert W. Paschal, CRR, RMR
24     Official Court Reporter
       rwp.reporter@gmail.com
25

1                    **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

       HARTLEY MICHON ROBB HANNON, LLP
4      BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
       155 Seaport Boulevard
5      2nd Floor
       Boston, Massachusetts  02210
6      (617) 723-8000
       phannon@hmrhlaw.com
7      hwatson@hmrhlaw.com

8

9  On behalf of the Defendant:

10     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
       BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11     One Boston Place
       Suite 3500
12     Boston, Massachusetts  02108
       (617) 994-5700
13     rachel.mandel@ogletreedeakins.com
       patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

1          **TABLE OF CONTENTS**

2

3          **TRIAL WITNESSES**

4

5     On behalf of the Government:                    <u>Page</u>

6     DEBORAH BALLWEG

7          By Mr. Hannon                                 5

8          By Ms. Mandel                                10

9     TONYA L. HART

10         By Mr. Hannon                               103

11         By Ms. Mandel                               126

12    DEBORAH BALLWEG, Continued

13         By Ms. Mandel                               142

14         By Mr. Hannon                               149

15

16

17                        **EXHIBITS**

18

19                                               <u>Admitted</u>

20    Number 450                                       48

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4  for the District of Massachusetts is now in session, the

5  Honorable Leo T. Sorokin presiding.

6          THE COURT:  Please be seated.

7          I see all counsel.

8          Anything to talk about?

9          MR. HANNON:  Nothing here.

10          MS. MANDEL:  Nothing here, Your Honor.

11          THE COURT:  Good.  All right.  Then I'll come back

12  at two minutes to 9:00.

13          I forget, who's on the -- oh, Ms. Ballweg is on the

14  witness stand, right?  Just when we come back, just have her

15  take the witness stand, so when we come in, we're ready to

16  go.

17          MS. MANDEL:  Will do.

18          THE COURT:  Great.  All right.  We'll stand in

19  recess.

20          (Court in recess at 8:47 a.m.

21          and reconvened at 8:59 a.m.)

22          THE COURT:  Kellyann, will you go get the jury.

23          I got my stopwatch today, Mr. Hannon; 22 minutes.

24          MR. HANNON:  Judge, you're going to be so

25  impressed.

```
1              THE COURT:  Oh, good.

2                  (The jury enters the courtroom.)

3              THE COURT:  Good morning, ladies and gentlemen.

4    Nobody discussed the case with anyone, among yourselves or

5    anyone else.  No independent research?  Or anything else?

6    Great.

7              All right.  We proceed.

8              I remind you, Ms. Ballweg, you remain under oath.

9              Mr. Hannon, go ahead.

10             MR. HANNON:  Thank you, Your Honor.
```

**DEBORAH BALLWEG**

having been previously duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

BY MR. HANNON:

**Q.**  Ms. Ballweg, do you know what gaslighting is?

**A.**  No, I don't believe I do.

**Q.**  You've never heard the term before?

**A.**  I've heard the term.  I just don't know what it means.

**Q.**  Did you try to convince Dr. Menninger that you were going

to conduct a thorough and impartial investigation with

respect to the concerns that she raised?

**A.**  That was my commitment to Dr. Menninger, yes.

**Q.**  And you indicated to her that if there was anything going

on in terms of any of this untreatment -- I'm sorry, any of

this mistreatment that she alleged, that you were going to

1  get to the bottom of it, right?

2  **A.**  That I would thoroughly investigate and the findings I

3  would look into for sure.

4  **Q.**  And if it was there, you were going to find it, right?

5  **A.**  I would weigh the information that was provided to me in

6  a fair and unbiased way.

7  **Q.**  And you understood that was important to her, right?

8  **A.**  That's an important part of the process, yes.

9  **Q.**  Well, but specific to Dr. Menninger, you knew that was

10  important, right?

11  **A.**  Of course.

12  **Q.**  And part of that was because you knew that she had mental

13  health issues, right?

14  **A.**  That she had disclosed a disability, correct.

15  **Q.**  Specifically mental health issues, right?

16  **A.**  Social anxiety, yes.

17  **Q.**  Okay.  And you knew she was very anxious about your

18  investigation, right?

19  **A.**  I'm not sure if she was anxious about the investigation.

20  **Q.**  Well, she frequently reached out to you to check in on

21  the status of the investigation, right?

22  **A.**  I believe Dr. Menninger and I had three conversations,

23  one at the onset of the investigation, one follow-up

24  conversation, where I had some questions, and then a third

25  discussion around the findings of the investigation.

1    **Q.**   Okay.  My question is a little bit different.  Did she

2    frequently contact you to get an update on the investigation?

3    **A.**   I don't recall.  She may have.  I don't recall.

4    **Q.**   I'm going to show you Joint Exhibit 242.

5            So this is an e-mail exchange between yourself and

6    Dr. Menninger; is that right?

7    **A.**   That's correct.

8    **Q.**   Okay.  And I'm just going to start here at the -- the

9    first message in this chain.  It's the fourth page is blank.

10   We go to the third page.  And so this starts with an e-mail

11   from you to Dr. Menninger, on May 2, 2018; is that right?

12   **A.**   Yes.

13   **Q.**   Okay.  Is this the first time that you reached out to her

14   to let her know that you were going to conduct an

15   investigation?

16   **A.**   Yes.

17   **Q.**   And, in fact, you and Dr. Menninger met on May 2nd,

18   correct?

19   **A.**   I believe we did, yes.

20   **Q.**   Okay.  So Dr. Menninger, she only had a few hours, in

21   terms of prepping to speak with you about your investigation?

22   **A.**   She had the opportunity to tell me if the time wasn't

23   convenient.

24   **Q.**   Yeah, that wasn't my question.

25           Did you just give her a few hours to prep for your

1   conversation?

2   **A.**   I -- I put a time out there.  If it wasn't convenient for

3   Dr. Menninger, she had the right to say it wasn't convenient

4   for her to prep for our discussion.

5   **Q.**   And in looking at the response up, you see here that on

6   May 8th, there's an e-mail from Dr. Menninger to you?  Do you

7   see that there?

8   **A.**   Yes.

9   **Q.**   And she's asking you how long the investigation is going

10  to take?

11  **A.**   Correct.

12  **Q.**   And looking at the next page -- excuse me -- looking now

13  at the second page of the document, there at the bottom, you

14  see Dr. Menninger sends a follow-up e-mail on May 8th, with

15  some additional information; is that right?

16  **A.**   Yes.

17  **Q.**   Okay.  And then you respond back to her the next day,

18  letting her know you still have to speak to some folks,

19  right?

20  **A.**   Correct.

21  **Q.**   And you indicate you're hoping to have a final conclusion

22  for her by Friday?

23  **A.**   Correct.

24  **Q.**   And then you see she follows up, and she thanks you, and

25  asks you if you have any additional questions?

1    **A.**   Yes.

2    **Q.**   And then, looking at the first page here, you say you

3    have some follow-up questions; is that right?

4    **A.**   Yes.

5    **Q.**   Okay.  And then, in fact, on May 15th, you and

6    Dr. Menninger met again; is that right?

7    **A.**   Yes.

8    **Q.**   Okay.  And she answered your questions?

9    **A.**   She did, yes.

10   **Q.**   And then on Friday, May 18th, you see she -- she followed

11   up with you again, asking if there's any update.  Do you see

12   that?

13   **A.**   Yes.

14   **Q.**   And that's what leads to your response on May 18, 2018;

15   is that right?

16   **A.**   Correct.

17   **Q.**   Okay.  So you -- you understood this was very important

18   to Dr. Menninger, right?

19   **A.**   Yes.

20   **Q.**   Okay.

21           MR. HANNON:  That's all I have, Your Honor.

22           THE COURT:  Okay.  Thank you.

23           Any redirect?

24           MS. MANDEL:  Yes, Your Honor.

25           THE COURT:  You don't have to.

|   |   |
|---|---|
| 1 | **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT** |
| 2 | BY MS. MANDEL: |
| 3 | **Q.**  Good morning, Deb. |
| 4 | **A.**  Good morning. |
| 5 | **Q.**  How are you doing? |
| 6 | **A.**  I'm okay.  Thanks. |
| 7 | **Q.**  Can you tell the jury where you live? |
| 8 | **A.**  I live in Hollandale, Wisconsin. |
| 9 | **Q.**  And as far as you understand, why is your position based |
| 10 | in Wisconsin? |
| 11 | **A.**  I was hired to support one of the labs; it was physically |
| 12 | located in Middleton, Wisconsin. |
| 13 | **Q.**  And that's near where you live? |
| 14 | **A.**  Correct. |
| 15 | **Q.**  Did Chad St. John used to report to you at PPD? |
| 16 | **A.**  He did, yes. |
| 17 | **Q.**  What years did Chad report to you? |
| 18 | **A.**  Chad started in the year 2013 and left in 2019, and he |
| 19 | reported to me for all of that time. |
| 20 | **Q.**  Did you and Chad ever work out of the same physical |
| 21 | location? |
| 22 | **A.**  No, we did not. |
| 23 | **Q.**  As far as you understand, why did you and Chad work in |
| 24 | different physical locations? |
| 25 | **A.**  So as HR professionals, we wanted to be able to have |

1    support at the larger sites within our organization, so that

2    we could be available to employees, to appreciate the

3    culture, to be there for coaching and counseling, just really

4    understand what's happening within the local location.

5    **Q.**  Can you explain the structure of HR support for the

6    Highland Heights Central Lab location in particular?  And

7    we're talking about the time period of, let's say, like 2015

8    to 2018.

9    **A.**  So Chad -- based on the site of the organization, Chad

10   was the sole HR practitioner for that site.  He would be

11   responsible for the full service HR support for the employees

12   and the managers at that location.

13   **Q.**  And what role did you play at that time with regard to

14   the Highland Heights Central Lab location?

15   **A.**  Because I sat in Middleton, my role was to support

16   Middleton's responsibilities, employees, and their

17   challenges, work with managers there.  And I had, as Chad

18   reported to me, oversight of that facility, but wouldn't be

19   involved in the day-to-day activities.

20   **Q.**  When did you first meet Dr. Menninger?

21   **A.**  I believe -- she started in 2015.  I would, as part of my

22   role, travel to various locations for leadership team

23   meetings, visiting with my employees.  And I believe I met

24   Dr. Menninger during one of those visits.  It was probably

25   late 2015, maybe early 2016.

**Q.**  And you recall meeting her -- do you recall meeting her
in person at that time?

**A.**  Yes, I do.

**Q.**  Did you have any involvement in the hiring of
Dr. Menninger?

**A.**  No, I did not.

**Q.**  Did you routinely provide day-to-day HR support in
connection with Dr. Menninger's position?

**A.**  No, I did not.

**Q.**  During the period of -- again, let's limit it to late
2016 to 2018, did you meet with Chad on a regular basis?

**A.**  We did, yes.

**Q.**  What was the structure of those meetings?

**A.**  They were generally routine meetings, what's happening
within the business, any concerns with the employees, the
culture, just a general where are we at from the state of the
business.

**Q.**  How often did those meetings occur?

**A.**  We met on a biweekly basis.

**Q.**  Were they by phone, video chat, some other format?

**A.**  This was before COVID, so we didn't have the technology
to do video chats, so it was really just by phone.

**Q.**  Do you recall the first time that Dr. Menninger's name
came up during one of those meetings with Chad?

**A.**  So she had started in, I think, the fall of 2015.  Her

1     name probably came up fairly frequent -- fairly soon

2     thereafter, just in the context of, as we onboard new

3     leaders, how are they feeling about their role, how are they

4     impacting their teams?  It would have been just how is she

5     onboarding and what's the impact to the team.

6     Q.   And what do you recall understanding about how that

7     onboarding and teamwork was going?

8     A.   Dr. Menninger, again, medical director, CAP CLIA for the

9     organization, important leader for our business.  Chad was

10    seeing early on her, perhaps, more timid approach to

11    leadership.  She -- again, when you come in, you want to make

12    sure that leaders are well established, that they're working

13    well with their employees, they're, you know, understanding

14    what the roles are and being there supporting and coaching.

15    Not that she wasn't doing some of that, she was just doing

16    that more from her office, she wasn't out, engaging with the

17    employees, just a little more behind-the-scenes-type leader.

18    Q.   And when you say -- I think you used the term "CAP CLIA"

19    for the organization.  And I understand you're not involved

20    in the medical or lab side, but what is your understanding of

21    what that means?

22    A.   So my understanding is for the Central Lab to be able to

23    conduct the business that they do, there has to be a licensed

24    medical director who reviews and releases results.  And

25    Dr. Menninger held those licensures to allow the business to

1    conduct the work that they did for clients.

2    **Q.**  And you testified just a moment ago about some of the

3    information you were learning early on from Chad.  Was this

4    typical of the type of information that Chad provided to you

5    during those, I think you called them the day-to-day, or the

6    one-on-ones that you had with Chad.  Was that typical of

7    those?

8    **A.**  Yes.  Yes it would be for all the leaders at central lab,

9    even financially what is the health of the business, just in

10   general the wellbeing and for our employee, our employees

11   feeling like they're being supported by their leaders, are we

12   creating a good environment, are we focused on their health

13   and wellbeing, are we focused on their development.  So, yes,

14   we would have those routine conversations about those types

15   of activities.

16   **Q.**  How did you respond when Chad gave you this update?  And

17   again, I think you said it was 2016?

18   **A.**  It was really just a coaching conversation.

19                MR. HANNON:  Objection.  Relevance.

20                THE COURT:  Overruled.

21                You can answer.

22                THE WITNESS:  Thank you.

23                It was really just a coaching opportunity, ensuring

24   that Chad would, you know, stay close to Dr. Menninger and

25   the team, and make sure that everybody felt that they were --

1  that their needs were being met, and we were focused on

2  contributing to the organization in an effective way.

3  BY MS. MANDEL:

4  **Q.**  Do you recall Chad bringing up those issues again with

5  you at any point?

6  **A.**  He did.  There was one manager within Dr. Menninger's

7  team that was a bit challenging, a bit of a difficult

8  personality, if you will.  And Chad brought up that he was

9  helping coach Dr. Menninger to work with this leader to

10  ensure that her employees felt, again, supported.

11  **Q.**  With what frequency do you recall this came up in your

12  conversations with Chad?

13  **A.**  I believe that the employees were feeling -- there was

14  anxiety.  There was concern about this leader and her

15  interaction with them.  So it was fairly frequently, just to

16  ensure that things were moving forward.

17  **Q.**  And when you say "This leader," are you referring to the

18  other manager that you mentioned?

19  **A.**  So this would have been a leader reporting directly to

20  Dr. Menninger, yes.

21  **Q.**  From your perspective, did you understand that these

22  concerns got to a point where they were fully resolved?

23  **A.**  Yes.  So this leader had actually left the organization,

24  so that particular situation resolved, yes.

25  **Q.**  Do you recall hearing Dr. Menninger's name come up in any

1  other context in your regular meetings with Chad?

2  **A.**  Yes, there was a discussion around Dr. Menninger's

3  pending relocation to Massachusetts.

4  **Q.**  Did Chad bring this up with you?

5  **A.**  Yes, he did.

6  **Q.**  When did Chad raise this?

7  **A.**  This would have been likely early, maybe, spring of 2017.

8  **Q.**  And given your HR role in the company, what was your

9  professional opinion of this relocation plan?

10  **A.**  It was concerning.  A very, you know, credentialed

11  individual, executive leader, who has responsibilities for a

12  large part of the business not being on sight, again, being

13  there to create the environment of development and learning

14  and ensuring that we responded to our clients, and just

15  general oversight on laboratory based activities, to not have

16  a lab leader there was concerning from an HR perspective, as

17  it would be with any other significant leader not being on

18  site.

19  **Q.**  Did you share this opinion with anyone?

20  **A.**  Chad and I talked about it.  I believe he was going to

21  coach or share that sentiment with Hacene, Dr. Menninger's

22  manager.  And I would have shared that with my manager, as

23  well.

24  **Q.**  Did you become aware at any point that Dr. Menninger did

25  relocate to Massachusetts?

1   **A.**   Yes, I did become aware of that.

2   **Q.**   How did you become aware of that change?

3   **A.**   Chad would have informed me.

4   **Q.**   And at that point, did you become concerned that

5   Dr. Menninger had actually made the move?

6   **A.**   Again, for the same reasons, yes, that there was lack of

7   leadership on site for a team who, again, she's fairly new to

8   the organization, making sure that there was both development

9   oversight, as well as technical oversight for that team.

10  **Q.**   Did you speak directly with Mr. Mekerri about those

11  thoughts?

12  **A.**   No, I did not.

13  **Q.**   Was there a reason that you didn't speak directly with

14  Mr. Mekerri about that?

15  **A.**   Again, the structure of our HR team, I -- my day-to-day

16  activities were truly focused on the Middleton location.

17  Chad's responsibility would be to, you know, the maintenance

18  and wellbeing of that team, so it would have been, you know,

19  Chad's responsibility to have those coaching discussions or

20  discussions with Hacene directly.

21  **Q.**   Deborah, are you familiar with something called a nine

22  box talent review process?

23  **A.**   Yes.

24  **Q.**   What does that mean?

25  **A.**   So a nine box is really a tool.

| | |
|---|---|
| 1 | THE COURT:  "Nine" or "non"? |
| 2 | THE WITNESS:  Nine. |
| 3 | THE COURT:  Nine, like the number nine. |
| 4 | THE JUROR:  Yeah.  Nine. |
| 5 | THE COURT:  Got it.  Go ahead. |
| 6 | THE WITNESS:  So the nine box is really a tool that |
| 7 | leaders use to look at our leadership strength within our |
| 8 | organization.  It's really a point in time document to say, |
| 9 | as we think about succession planning and development |
| 10 | opportunities, where do we see the leaders impacting our |
| 11 | business. |
| 12 | BY MS. MANDEL: |
| 13 | Q.  And did PPD begin to use this nine box analysis at some |
| 14 | point that you recall? |
| 15 | A.  They did, yes. |
| 16 | Q.  When was that? |
| 17 | A.  So the concept wasn't new, but within the laboratory |
| 18 | based businesses, we started using that, I believe it was |
| 19 | 2017 time frame. |
| 20 | Q.  Bringing up Joint Exhibit 401.  Do you see on the screen |
| 21 | in front of you, Deb, a document coming up with an e-mail? |
| 22 | A.  Yes. |
| 23 | Q.  Can you please describe the purpose of this December 20, |
| 24 | 2017, e-mail, on the first page of the document that came |
| 25 | from you? |

1   **A.**   Yes.   This was an e-mail to -- there's distinct labs and

2    each lab has a leader.   So it was an e-mail to these leaders,

3    indicating the procedure to complete nine boxes.   So we had,

4    you know, a point in time document concluded for that

5    particular year.   It was just a reminder that that was a

6    procedural expectation we had for the leaders.

7   **Q.**   Let's look at the second page of this document.   Is this

8    a nine box?

9   **A.**   This is the nine box, yes.

10   **Q.**   And can you just describe visually what we're looking at

11    on this page?

12   **A.**   So the nine box, again, when you look at the leadership

13    across a business unit, it's really where do we see people

14    who are going to continue to bring our business forward.   Who

15    are those that are, perhaps, high potential.   They're

16    creating your innovations for our organization.   But at the

17    end of the day, the nine box is used -- all of these leaders

18    are important to our business.

19          When you think about discretionary energy, at the

20    end of the day, when you have more time, where do we want to

21    invest in development opportunities for leaders.   Again,

22    those that are driving business forward, bringing innovative

23    and creative ideas.   So that was the purpose of the nine box,

24    to outline, who are those leaders that we want to spend time

25    developing them, providing opportunities.

1   **Q.**  And as of this time in 2017, do you see names on here of

2   people who reported to Hacene Mekerri?

3   **A.**  Yes.

4   **Q.**  Do you see them -- are they all showing up in the same

5   box?

6   **A.**  No, they are not.

7   **Q.**  What does it mean that Dr. Menninger is listed in the

8   bottom middle box, where it says, "Limited progress"?

9   **A.**  So by definition, again, a leader who is doing a great

10  job, performing, contributing to the organization, but

11  wouldn't have been viewed as a potential successor for Hacene

12  or another -- well, really for Hacene, as his direct report.

13  And, again, doing a good job, but not someone who is going to

14  be promoted or moving upward within the next cycle, which

15  would be the next year that we would evaluate this.

16  **Q.**  What is your understanding of the input process that

17  resulted in Dr. Menninger's placement in that particular box

18  in 2017?

19  **A.**  There would have been a discussion at the executive

20  leadership level, really, again, about aspirations, what are

21  these individuals aspire to do with their career, where are

22  they at from a development perspective?  And then there would

23  be data points from others who would work with that

24  individual to provide some data points and input.

25  **Q.**  Did Dr. Menninger's placement in that limited progress

1    box reflect her job performance in 2017?

2    **A.**   No.  Although performance is on the bottom axis,

3    performance is a factor, how are they performing in their

4    role, but it's not a performance indicator.

5    **Q.**   Did Dr. Menninger's placement in this limited progress

6    box have consequences for her continued employment as

7    executive director of labs?

8    **A.**   Absolutely not.  That was not the purpose of the nine

9    box.

10   **Q.**   And based on your recollection some years ago, based on

11   your recollection, do you see the names of other people who

12   reported to Mr. Mekerri in that limited progress box?

13   **A.**   I -- the only one that I'm not sure of who -- where he

14   reported is Michael Furlong.  All the others are not at the

15   Central Lab.

16   **Q.**   They're not the Central Lab at all?

17   **A.**   No.

18   **Q.**   Deb, do you recall at some point becoming aware that

19   Dr. Menninger requested a disability accommodation?

20   **A.**   Yes.

21   **Q.**   And how did you become aware of that?

22   **A.**   Chad would have informed me.

23   **Q.**   Would that have been in the course of one of those

24   routine updates that you described?

25   **A.**   Yes.

1   **Q.**  Deb, another e-mail is coming up on the screen in front

2   of you.  This is Joint Exhibit 280.

3           Do you recall receiving this e-mail from Chad on

4   January 31, 2018?

5   **A.**  Yes.

6   **Q.**  Do you know who the "Diane" is that's referenced in the

7   first line of Chad's e-mail?

8   **A.**  You know, there was a Diane in our compensation

9   department, but it wouldn't make sense to be her.  So I

10  really don't know who that Diane is.

11  **Q.**  What do you recall thinking when you received this e-mail

12  from Chad?

13  **A.**  Well, certainly concern for the wellbeing of one of our

14  employees.  But also, you know, Chad's statement, you know,

15  not very specific and vague, a bit concerning, but certainly

16  wanted to make sure that he worked with Dr. Menninger and

17  followed the process to have discussions around her

18  accommodation request.

19  **Q.**  Before this time in January of 2018, did you have any

20  knowledge that Dr. Menninger had a disability of any type?

21  **A.**  No.

22  **Q.**  Before this time, were you aware of any limitations on

23  Dr. Menninger's ability to perform her job as executive

24  director of labs?

25  **A.**  No.

1   **Q.**   In the 2018 time period, what was your typical

2   involvement in an accommodation discussion involving a

3   Central Labs employee?

4   **A.**   I wouldn't have been involved in that at all.

5   **Q.**   I'm sorry, you wouldn't have been involved?

6   **A.**   I would not have been involved.

7   **Q.**   Did Dr. Menninger ever reach out directly to you in this

8   January time period to discuss her accommodation request?

9   **A.**   No, she did not.

10   **Q.**   How often during the discussions did you and Chad have a

11   follow-up about the accommodation process with respect to

12   Dr. Menninger?

13   **A.**   A few times, just to ensure procedures were being

14   followed.

15   **Q.**   And was that your role as Chad's supervisor?

16   **A.**   Yes.   In situations where, again, an employee comes

17   forward, hears my accommodation, these are my job

18   expectations, you know, Chad could work through that.

19          This was a little bit different where it was a

20   little unclear as to what was really being asked.   So I

21   got -- you know, I coached him a little bit more.

22   **Q.**   Deb, we're now looking at Joint Exhibit 278, which is a

23   February 14, 2018 e-mail from Chad to you.

24          Do you recall receiving this e-mail from Chad?

25   **A.**   Yes.

1    **Q.**  And did you review the accommodation paperwork that Chad

2    forwarded with this e-mail?

3    **A.**  I would have cursorily looked at it, yes.

4    **Q.**  And why did you look at it in a cursory manner?

5    **A.**  Again, full confidence that Chad could handle, you know,

6    the accommodation process with Dr. Menninger.

7    **Q.**  After you received this e-mail on February 14th, did you

8    offer any opinion or thoughts about whether the recommended

9    accommodations from Dr. Menninger's physician were reasonable

10   for the business?

11   **A.**  No.  And I don't -- wouldn't have been in a position to

12   effectively state that.  I mean, Chad and Hacene know the

13   business better than I do.  They would be in a position to

14   have those conversations directly with Dr. Menninger.

15   **Q.**  Did you advise Chad about how to respond to e-mails or

16   how to word e-mails to Dr. Menninger as part of this

17   accommodation discussion?

18   **A.**  No, not -- no, not really.

19   **Q.**  When Chad had questions about how to deal with some of

20   the challenging parts of the discussion, did you weigh in?

21   **A.**  I would, yes.

22   **Q.**  And why was that?

23   **A.**  Again, it was -- it was a confusing time, not fully

24   understanding when Dr. Menninger said she could do her job,

25   but she needed the accommodations, just wanted to make sure

1    that we were clear in communicating to her at every -- at

2    every juncture.

3    **Q.**  Do you recall receiving this e-mail from Chad on

4    March 1st of 2018, a couple weeks later?

5    **A.**  Yes.

6    **Q.**  What was your understanding from your perspective of why

7    Chad would have sent you this draft e-mail to Dr. Menninger?

8           MR. HANNON:  I'm sorry, I don't believe the jury

9    has the document up on their screens.

10          THE COURT:  Oh, yes.

11          Kellyann, can you --

12          Thank you, Mr. Hannon.

13          Have it now?

14          THE JUROR:  (Affirmative responses).

15          THE COURT:  Go ahead.

16          THE WITNESS:  So Chad sent it to me for review,

17   going back to Dr. Menninger with here's what we are going to

18   accommodate, here's some accommodations we'll provide you,

19   and not -- or and stating that there were other

20   accommodations that were not going to be met.

21   BY MS. MANDEL:

22   **Q.**  And looking down at the draft e-mail that Chad sent to

23   you, did you have an understanding as to where the list of

24   job tasks had originated?  Where it had came from?

25   **A.**  Yes.  From Dr. Menninger's job description.

1    **Q.**  And there's -- it's a little hard to tell on this

2    document, but down below, there is -- underneath where it has

3    each number, like it says, Number 2, it says "Lisa's

4    physician e-mailed details."

5           Do you see that?

6    **A.**  I do.  Yes.

7    **Q.**  And then underneath each description, like "client bid

8    defense," for example, then it says "reasonable

9    accommodations," and it has language written in there?

10   **A.**  Yes.

11   **Q.**  Did you have an understanding about where that language

12   came from?

13   **A.**  My understanding is that came from Dr. Menninger's

14   physician.

15   **Q.**  Did you have an opinion about Chad's draft e-mail back to

16   Dr. Menninger that he sent to you here?

17   **A.**  I felt that it was fine.

18   **Q.**  From an HR standpoint, did you have an opinion about

19   whether it was okay to tell Dr. Menninger that PPD could not

20   accommodate certain things on this list, where it says "items

21   two, three, and four."

22   **A.**  So my understanding of the process is exactly that,

23   right.  It's an interactive process.  The employee indicates

24   here's what I need for an accommodation to do my job, and the

25   employer evaluates that.  Are these reasonable, are these not

1    reasonable.  And they continue to have that conversation.

2    But the employer truly has the ability to say no these are

3    not reasonable which to perform the essential tasks of your

4    job.

5    **Q.**  And based on your position in HR, did you understand that

6    these were parts of Dr. Menninger's job that had to be done?

7                MR. HANNON:  Objection.

8                THE COURT:  Overruled.

9                THE WITNESS:  Yes.  They were from her job

10   description.

11   BY MS. MANDEL:

12   **Q.**  As far as you understood, did the accommodation

13   discussion and process ever hit a completion point?

14   **A.**  No.

15   **Q.**  And why -- why is it that you think it never hit that

16   point?

17   **A.**  There was discussions where Dr. Menninger said, "I can

18   perform the functions of my job, with or without an

19   accommodation," but her doctor's notes were indicating that

20   she couldn't do certain tasks that could exacerbate her

21   condition.  So there was this unsure, you know, lack of

22   clarity about what it is that we as an organization needed to

23   provide to help Dr. Menninger.

24   **Q.**  And as far as you understood from your position, what was

25   PPD's goal throughout these discussions?

1    **A.**   Truly to help Dr. Menninger with her accommodated

2    requests, to perform the essential functions of her job.

3    **Q.**   As part of your discussions with Chad during this time

4    period in 2018, did you and Chad ever talk about whether

5    Dr. Menninger was on a path to leave her role at PPD?

6    **A.**   No.

7    **Q.**   Did you ever understand from anyone at PPD that there was

8    a plan to remove Dr. Menninger from her position?

9    **A.**   No.

10   **Q.**   In spring of 2018, did you understand that Central Labs

11   was looking to replace Dr. Menninger?

12   **A.**   Not to replace Dr. Menninger, but, as she had indicated,

13   there were gaps in regulatory obligations or licensure, and

14   there was attempt to fill those gaps, but not to replace

15   Dr. Menninger.

16   **Q.**   Again, based on your understanding from HR, why would

17   there be a need to fill those gaps?

18   **A.**   Again, from a licensure perspective, the type of testing

19   that we would conduct, needing to have a licensed individual

20   sign off on those results to send them to our clients.

21   **Q.**   And is that spring 2018 time period the only time that

22   these discussions have come up at PPD?  And I should say with

23   regard to Global Central Labs.

24   **A.**   I'm sorry, could you say that again?

25   **Q.**   Yeah, I didn't ask that well.

1          As far as you understand from an HR perspective, is

2     this the only time that Global Central Labs was looking at

3     how to make sure licensure was covered?

4     **A.**   I think it was an ongoing -- spring of 2018.  I believe

5     that was -- yes, the time that they were looking at coverage

6     of licensure.  Yes.

7     **Q.**   And why was that time when licensure was being discussed

8     so much?

9     **A.**   Again, it was unclear as to Dr. Menninger's expectations

10    around the accountability -- or the accommodation process.

11    We were unsure -- again, we were in this interactive process.

12    We weren't sure what Dr. Menninger needed from the

13    organization.

14    **Q.**   And from a licensure standpoint, understanding your role

15    is in HR, what did you understand about why Dr. Menninger's

16    plans mattered for licensure?

17    **A.**   Because if Dr. Menninger wasn't on site or wasn't at the

18    organization conducting business, that we would have an

19    inability to perform the testing to get the results to our

20    clients.

21    **Q.**   In front of you now should be Joint Exhibit 186.  Do you

22    recall a conversation with Chad St. John about licensure

23    coverage, as referenced at the outset of your e-mail here?

24    **A.**   Yes.

25    **Q.**   Did you have an understanding as to why there was a

1    discussion.

2              Is that back on the screen?

3    **A.**   Yes.

4    **Q.**   Did you have an understanding as to why there was a

5    discussion in this e-mail, if you look down at the -- it's

6    about two-thirds of the way down the page, there's a

7    paragraph that says "all of this is good contextual

8    information."  Do you understand why there was a discussion

9    there about delicately working Lisa out "since we need to

10   have her for coverage until someone else is in the seat."  Do

11   you understand why that language was part of this discussion

12   about license coverage?

13   **A.**   So Lisa wasn't on site at the Central Lab.  I think there

14   was concern about what does the licensure require in terms of

15   having on-site leadership.  And so, again, from an HR

16   perspective, we just needed to be aware that there was a gap,

17   and if there was a need, from a recruitment perspective, to

18   fill the gap.

19   **Q.**   And why was it important to fill that gap?

20   **A.**   Again, we couldn't conduct the work that we do if we

21   didn't have certified, licensed individuals signing off on

22   the work.

23   **Q.**   As discussions continued between Chad and Dr. Menninger,

24   did you and Chad have phone conversations to talk about the

25   best approach from an HR standpoint?

1    **A.**   I'm sorry.  Could you say that again?

2    **Q.**   Sure.

3           As conversations between Chad and Dr. Menninger

4    continued, did you and Chad have phone conversations about

5    the best approach from an HR perspective?

6    **A.**   Yes.

7    **Q.**   At any point in those discussions, did you support Chad

8    in consulting with PPD's legal department for advice?

9    **A.**   Yes.

10   **Q.**   Why was that?

11   **A.**   Again, it was a confusing time.  I'm not sure what

12   Dr. Menninger was, again -- I can do my job.  I don't need

13   accommodation.  Her doctor saying she needs an accommodation.

14   Just wanting to make sure that we are following the process

15   and providing as good of information back to Dr. Menninger as

16   possible.

17   **Q.**   You've worked at HR for a long time, as you previously

18   testified.  Why was this discussion and this situation

19   particularly confusing, from your perspective?

20   **A.**   Again, when we get involved in a request for

21   accommodation situations, an employee is provided their job

22   description.  They go to their attending physician.  They

23   have a conversation, here's my job.  The doctor and the

24   individual work on what are, you know, the accommodated needs

25   that the employer could provide.  They bring that to the

1    organization, HR, their manager, and the employee have this

2    conversation.  It's determined, are these reasonable?  Are

3    these not reasonable?  And it -- it's a pretty good

4    conversation and there's resolution.  There's a start,

5    there's a stop, and there's an interactive dialogue, and then

6    we make a determination, and we move forward.

7               In this situation, it just wasn't that

8    straightforward.

9    Q.  Moving forward from March to April, this is an e-mail

10   that Chad forwarded to you on April 10th.  If you look at

11   sort of the middle e-mail on this page.  And then you see

12   where you wrote back and you said, "I agree with your add.

13   Glad to see he's keeping it very compartmentalized."

14              Do you see that at the top?

15   A.  Yes.

16   Q.  What did you mean when you said to Chad "glad to see he

17   is keeping it very compartmentalized."?

18   A.  So certainly we want to be mindful of retaliation.  We

19   wanted to make sure that as Hacene is working to raise the

20   level of expectation for all of his leaders across Central

21   Lab for the year 2018, that we're very clear in communicating

22   this is not about, you know, your request for accommodation.

23   This is truly about helping the business become stronger in

24   the year 2018, and compartmentalizing those particular

25   situations.

1   **Q.**  And I believe you just said that Hacene was working to

2   raise the level for expectations for all leaders for 2018.

3   What do you mean by that?

4   **A.**  Again, 2018 was a year --

5          MR. HANNON:  Objection.  Lack of foundation.  It's

6   personal knowledge.

7          THE COURT:  Can you rephrase the question?

8   BY MS. MANDEL:

9   **Q.**  What was your understanding, Deb, as to what the lab's

10  expectations were for leaders in 2018?

11  **A.**  2018 was a growth year, and Hacene was asking all of his

12  leaders to step up, whether it was on the commercial end,

13  let's sell more, whether it was on the lab end, let's, you

14  know, raise awareness to what we do from a technology

15  perspective, to our data management team.  How can we

16  innovate our software to be swifter and faster to get the

17  results to our clients faster.  Every leader across the

18  business was asked to truly think about how we can help our

19  business grow and be stronger and more profitable for our

20  clients.

21  **Q.**  And when you say -- I think you said 2018 was a growth

22  time.  Why specifically 2018, as far as you know, from an HR

23  standpoint?

24  **A.**  Well, every year is a growth year, but Central Lab had

25  struggled from a commercial perspective, of selling of their

1    business.  I believe in 2017.  And the company always had

2    higher expectations year over year.  We were, at that point,

3    the executives were thinking about public -- becoming a

4    publically traded organization.  So I think just making sure

5    that our financial outlook was very strong in which to take

6    the company to a different level of -- from a shareholder

7    perspective, to a different level.

8    Q.   Deb, you should see Joint Exhibit 129 in front of you.

9    And this is Chad forwarding an e-mail to you.  And down

10   below, you see the e-mail that was being forwarded to you,

11   and this is an e-mail from Dr. Menninger, from April 17th?

12   A.   Yes.

13   Q.   And do you recall seeing this e-mail?

14   A.   I do.

15   Q.   Did anything that is in the correspondence that Chad

16   forwarded to you as an FYI, did anything concern you?

17   A.   Yes.  The language that Dr. Menninger used about, you

18   know, twisting words and feeling like she's being targeted.

19   Certainly I was concerned, first and foremost, for

20   Dr. Menninger, that she was feeling like she wasn't treated

21   fairly, and I felt like I wanted to certainly help her.

22   Q.   After you received this e-mail on April 17th, what were

23   your next steps?

24   A.   I determined that an investigation would be appropriate.

25   Q.   Did you make that determination on your own, Deb, to do

1    an investigation?

2    **A.**   Yes.

3    **Q.**   Did Dr. Menninger ask you to do an investigation?

4    **A.**   No, she did not.

5    **Q.**   Did Dr. Menninger ever ask you to conduct an

6    investigation in a certain way?

7    **A.**   No, she did not.

8    **Q.**   In your HR role, were you in a position of making a

9    determination about who would conduct an investigation when

10   an issue came up?

11   **A.**   Yes.

12   **Q.**   In this particular situation, after reviewing the e-mail

13   that Dr. Menninger had sent, what did you conclude about who

14   should do the investigation?

15   **A.**   Given the -- the organization's structure, the

16   departments that worked together, just general knowledge of

17   the laboratory space, I felt -- and being someone who wasn't

18   necessarily involved in the day-to-day activities at the

19   Central Lab, I felt that I could be that individual.

20   **Q.**   Did you consider whether you had been too closely

21   involved with any of the underlying facts or people to do an

22   unbiased investigation?

23   **A.**   Yes.

24   **Q.**   What went into that thought process for you?

25   **A.**   Again, you know, Chad being the direct HR contact for the

1  site would have, you know, conversations and knowledge and

2  his involvement and awareness in a way that I wouldn't have

3  been aware certainly played into that decision.

4  **Q.**  Is there a particular process or rule that you follow for

5  determining if you shouldn't be the one to do an

6  investigation?

7  **A.**  Certainly.  Again, if I felt that I had, you know, direct

8  knowledge, had been part of conversations, participating in

9  decision making, you know, if I was involved in any of those

10  types of activities, I would certainly excuse myself from the

11  investigation.

12  **Q.**  And as we've seen over the last couple of days, you did

13  have some knowledge and some involvement.  Did you consider

14  whether that involvement made you not the right person to do

15  this investigation?

16  **A.**  Certainly took that into consideration.  I -- you know, I

17  was overseeing some of the exchanges, coaching Chad.  But,

18  again, not being on site, not having direct conversations

19  with the individuals, understanding, you know, the climate

20  that existed at that particular lab, knowing the other -- all

21  the other departments inter -- you know, play together,

22  collaborate, I'm not aware of that not being at that site.  I

23  felt that I could continue to be a fair and impartial

24  investigator.

25  **Q.**  And is that something that you view as your role in HR,

1    to be a fair, unbiased investigator?

2    **A.**   Absolutely.

3    **Q.**   Have you ever been aware of an employee complaint and

4    determined that you would not be able to do an unbiased

5    investigation?

6    **A.**   Yes.

7    **Q.**   Looking back at your experience so far in HR, as you

8    recall, how many times has that happened in your support of

9    Central Labs?

10   **A.**   So over the course of my time with the company, I

11   conducted over thousands of investigations.  I could recall,

12   for Central Labs specifically, two unique cases where I would

13   have said I'm just not the right individual to be part of

14   this investigation.

15   **Q.**   Why did you determine, in those situations, that you were

16   not the person to do the investigation?

17   **A.**   My role with those situations was much like Chad.  I was

18   having daily conversations with these participants.  I was

19   coaching them.  One was a situation where they felt their

20   manager was being impartial -- or being partial to another

21   individual in the organization.  And I had been coaching up

22   that individual who felt they were not being treated fairly

23   by their manager, coaching her, helping her through this

24   situation.  So it wasn't appropriate for me to be part of

25   that investigation.

1    **Q.**  And what about -- what was the other situation?

2    **A.**  The other situation was a hotline complaint.  And as we

3    evaluated the hotline complaint, an individual male manager

4    was being -- harassing female employees.  And in that one, I

5    worked directly with the male manager frequently.  You know,

6    I would, again, coach and counsel him, you know, would be in

7    meetings with him and these females.  So again, I had up

8    front knowledge about the situation, the individuals that

9    were cited in the complaint.  I just felt it was

10   inappropriate for me to be part of that investigation.

11   **Q.**  How did you handle those situations after you made that

12   determination?

13   **A.**  So I would raise that to my manager and my manager would

14   work with other leaders from an HR perspective, and it was

15   reassigned to other individuals.

16   **Q.**  Did you perform those investigations?

17   **A.**  No, I did not.

18   **Q.**  You mentioned a few minutes ago that you've done all

19   sorts of -- I think you said a lot of investigations at PPD.

20   What types of investigations does that include?

21   **A.**  So certainly harassment, discrimination, even things --

22   back in -- over the course of my career with the

23   organization, you know, if employees got into a difficult

24   discussion with another colleague, those were raised as

25   complaints that were looked into.  If managers weren't

1    behaving the way employees felt they should be behaving, I

2    would get involved in those.  It was just a number of

3    different scenarios that I would definitely investigate.

4    **Q.**  Of those, how many investigations have involved employee

5    complaints of discrimination or harassment?

6    **A.**  Probably around 40 to 50.

7    **Q.**  Do you have a typical practice for how you perform that

8    type of investigation?

9    **A.**  Yes.

10   **Q.**  What is that practice?

11   **A.**  So would certainly meet with the employee, making --

12   having the concern, wanting to understand and appreciate,

13   from their perspective, what is it that they see, what's

14   happening?  What information do you have to support that

15   positioning?  And then it's -- it's not always a straight,

16   linear line.  It's a bit of a road -- curvy road, if you

17   will, looking into their -- into their concerns.  Every

18   concern that they would raise would be looked into.  If it

19   that included talking with other individuals, we would talk

20   with other individuals.  And certainly all under the guise

21   of, you know, confidentiality, ensuring anyone we spoke to

22   understood their role, their expectation, and that, you know,

23   they wouldn't necessarily find out the results at the end of

24   the day.  And then, you know, thoroughly investigate what the

25   employee brought forward, and then we make a very impartial

1    determination on the findings and then report that back to

2    the individual making the complaint.

3    Q.   And I believe you just mentioned confidentiality.  How

4    did confidentiality impact how you choose who to speak to in

5    an investigation?

6    A.   So we absolutely want to protect our employees.  We want

7    to make sure that we create an environment that employees

8    feel valued and want to come to work every day.  So you have

9    to weigh is the -- if it's an individual who has, you know,

10   key information, certainly we need to speak with that person.

11   If it seems ancillary or not key and critical, maybe a minor

12   detail that would expose the situation -- people love to

13   talk, so we really just want to make sure that at the end of

14   the day, we're speaking with individuals who truly have the

15   right information to share in investigating the concerns of

16   that employee.

17          And again, we ask for confidentiality, and I would

18   love to believe that everybody uses the confidentiality

19   clause, but I know people do like to talk, so we would be

20   very cautious in that investigation.

21   Q.   And as you look back on investigations that you've done

22   in the past, do you sometimes see things that you might have

23   done differently or different people that you would have

24   talked to?

25   A.   Certainly.  Possibly.  You know, when you give the

1    feedback to an individual, you know, what about this or what
2    about that?  And if it was significant, certainly we would
3    take a look at that.  But generally, by the time you conclude
4    the investigation, you're looking at the factors that the
5    employee felt contributed to their feeling.  It's an
6    exhaustive investigation.
7    **Q.**  And you also said a moment ago that you do investigations
8    in a prompt manner?
9    **A.**  Yes.
10   **Q.**  What is the importance, from your view, of being prompt
11   in the investigation?
12   **A.**  So employees -- coming forward, right?  We owe them a
13   swift investigation.  But we certainly don't want to
14   sacrifice swiftness for incompleteness.  So we certainly want
15   to find all the information in the situation for the employee
16   as swiftly as we possibly can.
17           We are a large, global, you know, high-performing
18   organization.  People are traveling, people are out of
19   office, people are with clients.  So it does depend on their
20   availability.  But as best we can, we try to move as swiftly
21   as we can.
22   **Q.**  Do you sometimes find that to be a tough balance, the
23   swiftness, the promptness, and the thoroughness?
24   **A.**  Yes.
25   **Q.**  In what way is that challenging?

1   A.   Again, we want to make sure that we do the right job for
2   our employees.  We want to make sure we investigate
3   thoroughly their concerns that they brought forward.  And in
4   search of that information, you know, sometimes it might
5   be -- we need to involve our IT department, and they have to
6   be back and look at records.  And sometimes things take
7   longer, but it's important to make sure you have the data
8   before you make the determination.
9   Q.   When you do investigations in your HR role, do you go in
10  with preconceived notions about how they should come out?
11  A.   Absolutely not.
12  Q.   With respect to your investigations at PPD into
13  complaints of discrimination, harassment, have you ever
14  concluded that the complaint was justified?
15  A.   Yes.  There's times where that has occurred.
16  Q.   Does making that conclusion that the complaint was
17  justified -- strike that.
18         When you've made the decision that the complaint
19  was justified, what have been your next steps in those
20  situations?
21  A.   So at the conclusion, the findings would indicate, you
22  know, if there's a concern or not.  I would, you know, work
23  with my manager or other departments as needed from a
24  corrective action perspective.  What would be necessary here
25  for this particular situation?  And they're all unique, so

1    it's not always a one-size-fits-all approach.  Sometimes

2    there's been retraining of leaders, there's been retraining

3    of employees.  There's been disciplinary actions, there's

4    been terminations at times.  So it's really dependent upon

5    the particular situation.

6    Q.   Turning now to the investigation involving

7    Dr. Menninger's complaint, can you please describe the

8    process that you followed after you received that e-mail from

9    Chad that we looked at?

10   A.   Yes.  So I reached out to Dr. Menninger, scheduled time

11   to chat with her, to appreciate and understand, you know,

12   what it is that she -- she saw that contributed to her

13   feelings, explained, you know, the process, the

14   confidentiality, and then started talking to the individuals

15   who had information about those concerns that she raised.

16   Q.   And who did you determine that you should speak to as

17   part of the investigation?

18   A.   So, again, Dr. Menninger had a series of these are why I

19   feel I am being treated unfairly by my manager.  I believe

20   one was being not included in bid defenses or business

21   development meetings.  There was -- she felt her 2017 review

22   was unfair.  She was treated differently with her review.

23   There was quality -- she was held to a higher standard with

24   quality.  She was being excluded from recruitment processes.

25   And so she outlined the situations that she felt were

1    inappropriate.

2           I started investigating each one individually.

3    **Q.**  And you reviewed documents as part of your investigation,

4    as well?

5    **A.**  Yes.  If the situation required, you know, supporting

6    documentation, I would absolutely ask for that and review

7    them.

8    **Q.**  And you described meeting with certain people.  Were

9    those in-person meetings?

10   **A.**  No, again, I was in Wisconsin.  The majority of these

11   folks -- of course, Lisa was home based at the time.  A lot

12   of these folks were in Highland Heights, so they were all via

13   phone.  And it was before COVID, so it was definitely a phone

14   conversation.

15   **Q.**  Who was the first person that you talked to as part of

16   that investigation?

17   **A.**  Dr. Menninger.

18   **Q.**  Did you meet with Dr. Menninger just that one time or

19   more than once?

20   **A.**  We met a few times.

21   **Q.**  Did you keep notes of your meetings and things you

22   learned during the investigation?

23   **A.**  Yes.

24   **Q.**  Did you take those notes yourself?

25   **A.**  So, from my practice, and following the process,

1    everybody has their own uniqueness, but in my process, when I

2    speak with the individual who's raising the concern, just as

3    a matter of just empathetic listening, I actually handwrite

4    the notes.  I listen and I write them.  When you're on the

5    phone, I don't want the typing in the background.  I don't

6    want it to appear like I'm not listening and engaged in the

7    conversation.  So with Dr. Menninger, I handwrote notes as

8    she was indicating her concerns.  But when I met with all the

9    other individuals, I typed, explained that I'm going to be

10   typing the notes, if you hear just, you know, background

11   noise, it's just because it's more expedient for me to type

12   notes when we talk.  So that was my process with

13   Dr. Menninger.

14   Q.   And with -- in your conversations with Dr. Menninger, did

15   you transcribe the handwritten notes into typewritten notes?

16   A.   I did, yes.

17   Q.   And how soon after your conversations with Dr. Menninger

18   did you do that?

19   A.   I don't recall specifically, but again, matter of my

20   practice, you have to memorialize them as soon as possible,

21   so -- and my handwriting is not great.  So I would type them

22   up either that day or generally by the next day.

23   Q.   And this was typical -- was this typical of your

24   investigation practice?

25   A.   Yes.

1  **Q.**  Is it safe to say that the notes that you have in

2  connection with this investigation, did you take them all in

3  that spring 2018 time period?

4  **A.**  Yes.

5          MR. HANNON:  Objection, Your Honor, this should not

6  be shown to the jury as of yet.

7          THE COURT:  As of yet?

8          MR. HANNON:  Right.  This hasn't been offered yet.

9  I believe she's just showing it to the witness to lay

10  foundation, but I just wanted to note this wasn't a joint

11  exhibit.

12          THE COURT:  Fine.  Go ahead.

13          So you understand, ladies and gentlemen of the

14  jury, what happens is things are displayed on all the

15  screens, so for you and for members of the public on that TV

16  over there, when they're in evidence.

17          When they're not yet in evidence, then they're just

18  typically talked about or sometimes a foundation is laid.

19  Say, for example, the obvious example is things that -- PPD

20  obviously has all sorts of business activities and meetings

21  that have nothing to do with Dr. Menninger in this case, or

22  even other divisions or whatever, and evidence like that, no

23  one is offering that evidence.  But if they did, it would be

24  excluded because it's not relevant.  It doesn't have anything

25  to do with this case.  Right?  And so only -- so there has to

1    be a foundation laid, that whatever the evidence is is

2    relevant to this case or relevant to the particular issues.

3    That example I gave you is sort of not one any lawyer would

4    bring up or offer, but just to give you an outlier idea.  So

5    that's what Mr. Hannon is referring to, that the exhibit

6    hasn't been admitted yet into evidence, so that's all.

7              Go ahead.

8              MS. MANDEL:  Thank you.

9    BY MS. MANDEL:

10   **Q.**  And Deb, as you just heard, we need to understand what

11   this document is.  And I believe you can see it on the screen

12   in front of you.

13   **A.**  Yes, I can.

14   **Q.**  Is that right?

15             So I'm going to show you a few different pages at a

16   time and ask you about them.  The first page has a date of

17   May 2nd?

18   **A.**  Yes.

19   **Q.**  2018.

20             And it reflects discussion with Dr. Menninger,

21   executive director of Central Lab?

22   **A.**  Yes.

23   **Q.**  And it says by Ms. Ballweg?

24   **A.**  Yes.

25   **Q.**  And this document, I'm just showing you the second page

1    of that.  Do you see that?

2    **A.**  Yes.

3            MR. HANNON:  Upon further reflection, I'm not going

4    to have any objection to this document being offered in, so

5    rather than do this twice and waste time, I'm happy to have

6    the document admitted into evidence.

7            THE COURT:  Fine.  You're offering it?

8            MS. MANDEL:  That's fine.  Yes.

9            THE COURT:  All right.  Then this document, I think

10   the entire set, yes.  The entire set is admitted.

11           All right.  You can show it to the jury, and you

12   don't need the foundation question.

13           So the foundation questions are why is it relevant,

14   what does it have to do with the case, but Mr. Hannon is not

15   objecting to the document, so it now has become an agreed to

16   and admitted exhibit, and it can be displayed to the jury.

17           We just need the -- do you have a number for it?

18           MS. MANDEL:  Yes, and I believe this will be 450.

19           MR. HANNON:  Correct.

20           THE COURT:  450 it is.  450 in evidence.  Go ahead.

21           (Exhibit No. 450 admitted into evidence.)

22   BY MS. MANDEL:

23   **Q.**  So Deb, I'm going to show you -- I'm going to go back.

24   We're a little farther ahead.

25           Okay.  So the first page of this document, again,

1   has a May 2, 2018 date.  Do you see that?

2   **A.**  Yes.

3   **Q.**  And I'm just going to show you -- this document has a

4   number of pages, but we're going to start with looking at the

5   first two pages, so that's the second -- I went too far

6   ahead.  So that's the second of those.  Do you see that?

7   **A.**  Yes.

8   **Q.**  So going back to the first page of this section, are

9   these the notes that you took after that -- or strike that.

10  Are these notes that you took in connection with that initial

11  conversation with Dr. Menninger?

12  **A.**  Yes.

13  **Q.**  And this is simply the typewritten version of those

14  notes?

15  **A.**  Correct.

16  **Q.**  And does this reflect a meeting that you had with

17  Dr. Menninger on May 2nd of 2018?

18  **A.**  Yes.

19  **Q.**  Can you describe for the jury what the purpose was of

20  that meeting on May 2nd with Dr. Menninger?

21  **A.**  Again, she had expressed in an e-mail to Chad that she

22  was feeling that Hacene was treating her differently.  And

23  this was my desire to do what I could to help Dr. Menninger,

24  met with her, and had her outline for me what were the issues

25  that contributed to her feeling that way.

1   **Q.**  And I see a number of items with numbers next to them.

2   **A.**  Yes.

3   **Q.**  What is that list of numbered items?

4   **A.**  These are the specific instances or issues that

5   Dr. Menninger pointed out that contributed to her feeling

6   like her manager was not treating her fairly.

7   **Q.**  And your notes here, this is a reflection of what you

8   learned from Dr. Menninger in that regard?

9   **A.**  Correct.  So the number one is the issue that she had

10  stated, which I, again, noted on our May 2nd discussion.  The

11  5/15 reference was a follow-up conversation I had after I

12  have conducted, you know, pieces of the investigation, there

13  were follow-up questions that I had for Dr. Menninger, so I

14  went back and asked her some additional questions.  So that

15  would be the 5/15 follow-up documentation.

16  **Q.**  So except where it says 5/15, these are notes of the

17  May 2nd meeting?

18  **A.**  Yes.

19  **Q.**  And where it says 5/15, did you add those notes after the

20  May 15th conversation with Dr. Menninger?

21  **A.**  That's correct.

22  **Q.**  So let's go through each of these.  Number one, it says,

23  "Work issues with Gedeon Richter, NGSP, BMS, and GSK.  Issues

24  are no more or less severe than historic issues, yet Hacene

25  has made them an issue;" and then it says semicolon

1  "e-mails"?

2  **A.**  Yes.

3  **Q.**  Can you explain what you learned from Dr. Menninger

4  during that May 2nd discussion about that particular concern?

5  **A.**  That there were -- that there were ongoing challenges

6  within the lab.  There were errors that were happening

7  throughout the course of her leadership, and that Hacene,

8  after she disclosed her disability, was raising these

9  concerns differently than he had historically.

10  **Q.**  And what did -- what did you understand -- you wrote --

11  where it says "e-mails," what was your understanding of what

12  that meant?

13  **A.**  That Lisa had provided e-mails in support of that.

14  **Q.**  And so does that reflect e-mails that you reviewed as

15  part of your investigation?

16  **A.**  Yes.

17  **Q.**  And immediately below that, there's a small letter (a),

18  and it has what I believe you testified was your addition in

19  light of a May 15th conversation?

20  **A.**  Correct.  I would have added information from the

21  follow-up conversation I had with Lisa.

22  **Q.**  And you say follow-up conversation.  What was the purpose

23  of the follow-up conversation?

24  **A.**  So as I was investigating and finding information that

25  related to is this a correct reflection?  Is she truly -- is

1    this truly occurring, there were questions that arose in

2    finding that data, and I wanted a follow-up question with

3    Lisa just to make sure that I was understanding her position,

4    and being able to clearly articulate and investigate her

5    concern.

6    **Q.**  And so does what appears in (a), under number one,

7    reflect what Dr. Menninger shared with you on May 15th in

8    connection with that first item?

9    **A.**  That's correct.

10   **Q.**  And just to go through that, it says, "Lisa indicated

11   that Hacene now will ask her in an accusatory way about

12   issues, like she did something wrong.  Lisa feels that Hacene

13   is going out of his way to document her performance and feels

14   the goals she has are impossible to meet."

15          Do you see that?

16   **A.**  Yes.

17   **Q.**  "Hacene, in response to GSK issue, sent her and Els an

18   e-mail asking them to be involved."

19          Do you see that, as well?

20   **A.**  Yes.

21   **Q.**  And that reflects what you learned at that time?

22   **A.**  That's what Lisa indicated, yes.

23   **Q.**  And then in number two below, this is the next item that

24   Dr. Menninger had indicated was a source of concern?

25   **A.**  Yes.  During that May 2nd meeting, this was the second

1    situation she felt was contributing to Hacene's change in

2    behavior.

3    **Q.**   And then this is -- you indicated, "Not invited to

4    participate in recruiting like in the past.  Hiring of

5    Patrick Mann to report to Lisa without her formally

6    interviewing, other interviews, Narine, not involved, but --

7    dotted line -- reporting relationship."

8    **A.**   Yes.

9    **Q.**   And that's what Dr. Menninger reported to you on May 2nd?

10   **A.**   Yes.

11   **Q.**   And then below that, where it has the number -- or the

12   letter (a), and it says 5/15, this is additional information

13   that you learned from Dr. Menninger; is that right?

14   **A.**   Correct.

15   **Q.**   And Dr. Menninger told you that Mr. Mekerri had a

16   conversation with her at the end of December?

17   **A.**   Yes.

18   **Q.**   And Dr. Menninger's recollection was about Dr. Menninger

19   having vetted candidates and then passing them along to

20   Mr. Mekerri.  Is that what you understand that to mean?

21   **A.**   Yes.

22   **Q.**   And number 3 below, it says, "New expectation to attend

23   bid defense and client visits."

24   **A.**   Yes.

25   **Q.**   "Is being asked to speak about topics that she's not

1    knowledgeable."

2    **A.**   Yes.

3    **Q.**   "Molecular, micro, and analytical pathology"?

4    **A.**   Correct.

5    **Q.**   And does this reflect what Dr. Menninger told you on

6    May 2nd was the source of concern?

7    **A.**   It does, yes.

8    **Q.**   And then beneath that, on -- with your 5/15 addition, do

9    you see that says, "Follow-up with Lisa."  And then it says,

10   "Lisa indicated she had a discussion with Hacene in November

11   about being overwhelmed."

12              And based on your recollection at this time, was

13   that referring to November of the previous year?

14   **A.**   November of 2017, yes.

15   **Q.**   "She sent Hacene a list of responsibilities, but there

16   was no follow-up by either her or Hacene."

17   **A.**   Yes.

18   **Q.**   "She feels that Hacene doesn't have an overall awareness

19   of what her job as lab director entails."

20   **A.**   Correct.

21   **Q.**   And as far as you knew, that time period of

22   November 2017, was that before or after Dr. Menninger had

23   disclosed a disability?

24   **A.**   That was before.

25   **Q.**   Number 4 below, it says, "Not invited to 2018

1    sales/marketing routine meetings.  Asked to have meeting

2    request forwarded but has not happened."

3    **A.**  Yes, another issue we talked about in the May 2nd

4    meeting.

5    **Q.**  And below that it says, "Town hall with Sharbaugh"?

6    **A.**  Sharbaugh was our chief operating officer.

7    **Q.**  "Not included in planning, no introduction while on

8    site."

9            Is that also reflecting something that

10   Dr. Menninger told you about on May 2nd?

11   **A.**  Correct.

12   **Q.**  And then on the next page, 2017, "No performance review

13   discussion, not much commentary in the review, but lower

14   ratings.  360 feedback with Hacene, but nothing more on

15   overall review from 2017."

16           Does that reflect information that Dr. Menninger

17   gave you on May 2nd?

18   **A.**  Yes.

19   **Q.**  And in, (a), beneath that, there's additional information

20   that Dr. Menninger provided; is that right?

21   **A.**  Correct.

22   **Q.**  And then the lest item is, "Discussion of exit package

23   and/or consulting role during review of accommodations."

24   **A.**  Correct.

25   **Q.**  And that's information that Dr. Menninger told you was

1    the basis of concern on May 2nd?

2    **A.**   That was the seventh concern, yes.

3    **Q.**   And in the first six that we've looked at, did you have

4    an understanding that those concerns related specifically to

5    Dr. Menninger's request for accommodation?

6    **A.**   No.

7    **Q.**   After you went through these concerns with Dr. Menninger

8    on May 2nd, what did you do next?

9    **A.**   Then I started the investigation.

10   **Q.**   And let's look at more notes.

11           These notes say May 4th, so that's two days later;

12   is that right?

13           THE COURT:   Yes.

14           THE WITNESS:   Two days later?

15   BY MS. MANDEL:

16   **Q.**   And that indicates that this was a discussion with Chad

17   St. John?

18   **A.**   Correct.

19   **Q.**   And did you take these notes, as well?

20   **A.**   I did, yes.

21   **Q.**   Can you explain the structure of the notes that we're

22   seeing on the page in front of us?

23   **A.**   So with Chad being the HR site -- the HR individual to

24   support the site, he would have knowledge of certain of these

25   items.  So I walked through each of Dr. Menninger's issues

1    that she had reported to me and asked for Chad's perspective.

2    So the numbers are all seven, and did he have information,

3    relevant information related to any of those seven.  So the

4    (a)s on here would be what Chad's response was to the

5    questions.

6    **Q.**  Can you take us through each of those and explain what

7    your notes reflect and what your recollection is of what you

8    learned?

9    **A.**  Sure.  So work issues -- number one, the work issues,

10   Chad said that, "Hacene had shared that he discussed

11   lab-related issues with Lisa during their one-on-one

12   meeting," but Chad had not been involved, so he could not

13   corroborate that they actually had happened.

14   **Q.**  So you understood that Chad was saying he didn't have

15   anymore information on that?

16   **A.**  Right.  Chad is saying Hacene actually discussed it,

17   according to the discussions him and Hacene had, but Chad did

18   not sit in on those one-on-ones where Hacene would have been

19   sharing that information directly with Lisa.

20   **Q.**  And understanding that your role is in HR and not working

21   in the lab, do you understand what Gedeon Richter, NGSP, BMS,

22   and G SK are?

23   **A.**  They're clients.

24   **Q.**  Clients of PPD's?

25   **A.**  Clients of the Central Lab.

1    **Q.**  And moving down to number two, can you explain what you

2    learned from Chad in connection with that?

3    **A.**  "So not invited to participate in recruiting events."  So

4    from Chad's perspective, Dr. Fikry was concerned about the

5    amount of time that it was taking to fill certain roles

6    within the lab, and shared with Chad that there was a

7    concerted effort to reduce Lisa's role in that process, based

8    on her specificity, the needs of the role.  And then Chad was

9    in that meeting, and -- where Dr. Fikry shared that and then

10   counselled Hacene to share that with Dr. Menninger directly.

11            Chad shared that Lisa had expressed high work loud,

12   and that Hacene felt that not involving her in recruiting

13   would be helping her workload issues.  And Hacene had

14   indicated that he had shared that directly with

15   Dr. Menninger.

16   **Q.**  The next item, number 3, "New expectation to attend bid

17   defense and client visits," and being asked to speak about

18   topics that she is not knowledgeable and it lists some

19   topics?

20   **A.**  And again, Chad -- yes.

21   **Q.**  What did you learn from Chad about that?

22   **A.**  Chad, in leadership team meetings, knew about it, but he

23   was not party to all the discussions.

24   **Q.**  Number four, "Not invited to 2018 sales/marketing routine

25   meetings.  Asked to have meeting request forwarded but has

1  not happened."

2  **A.**   Chad didn't have any knowledge of that.

3  **Q.**   What about number five, the town hall with -- and I'm

4  going to mispronounce it again --

5  **A.**   Sharbaugh.  So the town hall with Sharbaugh, the town

6  hall was one where we had -- Hacene had decided to bring in a

7  client to speak with the entire Global Central Lab

8  population.  It was a very purposeful and focused meeting,

9  and there were no introductions of our chief operating

10  officer to anyone who was in the Highland Heights office, and

11  Chad, who had attended that meeting, was saying that that was

12  how it played out.

13  **Q.**   And understanding that -- you said no formal intros for

14  anyone in your notes here, you've just expanded on that

15  further.  Did you -- do you have a memory of additional

16  information that you learned from Chad that's not necessarily

17  written verbatim in these notes?

18  **A.**   Yeah, I didn't type every single word that everybody

19  said, so, yeah, there would be, maybe, nuggets here or there

20  that would not exactly be included.

21  **Q.**   Number 6, it says, "2017, no performance review

22  discussion, not much commentary in the review, but lower

23  ratings."

24          Do you see that?

25  **A.**   Yes.

1    **Q.**  And then there's a note below with (a), it says "Chad,"
2    and then it explains what you learned.  Can you explain that?
3    **A.**  So again, Chad working with Hacene confirmed that Hacene
4    did talk to her about her performance, about her goals and
5    behaviors, but not in the exact review form itself.  No
6    formal conclusion to the review.
7    **Q.**  And number 7 is, "Discussion of exit package or
8    consulting role during the review of accommodations."  And
9    we'll flip to the next page to see what your notes say there,
10   where it says (a).  Can you explain to the jury what you
11   learned from Chad, what you recall learning from Chad about
12   that item?
13   **A.**  Yeah.  So when I asked Chad who was in the meeting
14   talking about accommodations for Dr. Menninger, he indicated
15   that the meeting was unproductive -- let me make sure I read
16   this -- that there didn't seem to be a good exchange of how
17   can we support you.  And again, it's not listed here, but the
18   way Chad described it to me directly was it was a back and
19   forth.  Lisa indicating, "I can do my job," but then having
20   doctor's notes that say she couldn't do certain things to
21   exacerbate her condition.  And it just kept going back and
22   forth and back and forth, and Lisa kept saying, you know,
23   "What if I can't do my job?  What if I can't do my job?"
24   Chad felt compelled to fill in the blank of, well, you know,
25   hypothetically maybe we could look into a consulting

1   agreement, like we did with Dr. Tadeo, or we could -- you

2   know, maybe an exit package, just trying to move the

3   conversation along, is how Chad described it.

4   **Q.**   You just mentioned Dr. Tadeo, is that where it says

5   "Frank Tadeo, consulting"?

6   **A.**   I'm sorry.  Yes.

7   **Q.**   And can you just explain for the jury what that means?

8   **A.**   So Dr. Frank Tadeo worked for an acquired business in

9   Pennsylvania.  The company decided to divest or sell that

10  piece of the business, but we wanted to retain the

11  intellectual knowledge that our employees are really, you

12  know, talented employees.  So Dr. Tadeo was asked to move to

13  our Virginia facility, where we were going to move the

14  vaccine testing.  And Dr. Tadeo decided he didn't want to

15  relocate, for whatever reason.  And of course, relocating to

16  the Virginia office was important to conduct work and set up

17  the vaccine lab and to be available to consult with our

18  employees.  We entered into a consulting agreement with

19  Dr. Tadeo.

20  **Q.**   In the last sentence of your notes here, Deb, it

21  says, "How can she service the licensure and still work

22  effectively?"

23  **A.**   Yeah.  Chad -- with Dr. Menninger holding our licensure

24  and, again, the uncertainty of what she needed from an

25  accommodation perspective, you know, she is our licensure

1    holder.  We are dependent upon her credentials to do the

2    business that we conduct.  And if she's unable to perform

3    certain key components of her job, how does that -- how does

4    that affect our organization?

5    **Q.**  Let's look at the next page of your notes.  These are

6    from May 7th.  And they say at the top, "Discussion with

7    Hacene Mekerri"?

8    **A.**  Correct.

9    **Q.**  And these are your notes?

10   **A.**  Yes, they are.

11   **Q.**  Did you have a conversation with Mr. Mekerri on May 7th?

12   **A.**  Yes, I did.

13   **Q.**  And like you did with the earlier notes, can you walk us

14   through what you discussed with Mr. Mekerri and what you

15   learned?

16   **A.**  Sure.  So the first one, you know, issues with clients,

17   Hacene confirmed he had discussions verbally with both

18   Dr. Menninger and her team about the challenges.  The current

19   issues happened close together and are very concerning.  They

20   are more severe than historical, in terms of impact to our

21   clients.  One led to an employee termination.  And a critical

22   event, which I believe the process required notifying senior

23   leaders of our -- senior executives of our organization when

24   critical events happen, asked her for an executive summary in

25   the corrections that she was making, specifically related to

1    those clients.

2          There was a new issue not raised in the past, which

3    was GSK, where samples actually got discarded.  Overall

4    business expectation.  You know, Hacene is setting overall

5    expectations for the entire business that we need to

6    eliminate or minimize all errors.  Lisa canceled the meeting

7    to discussed goals, rather sent a long e-mail.  Last week

8    Hacene had discussed goals with her, asked her to send -- or

9    sorry, "last week Hacene had discussed goals with her and

10   asked her to send Hacene revised goals, but nothing was sent

11   from Lisa."

12          So today, May 7, 2018, "asked if she can see other

13   goals at the ED level, her peers.  Willing to accommodate,

14   but she said, no, she didn't want to see them, because she

15   didn't want to have to share her own goals and would feel

16   uncomfortable sharing, so agreed not to disclose her

17   colleagues goals at the ED level, which was Clendening and

18   Els Pluymers.

19   **Q.**  Were Clendening and Els Pluymers, were those other

20   executive directors at the time?

21   **A.**  Yes, for Central Lab.

22   **Q.**  And looking back up to some of the earlier things that

23   you noted learning from Mr. Mekerri, it says one of the

24   issues -- after it says the more severe issue than

25   historically, one led to an employee termination?

1    **A.**   Yes.

2    **Q.**   And did you have an understanding if that was a

3    termination of someone in the lab's kind of sphere of

4    command?

5    **A.**   Yes, it would have been a lab individual who was

6    terminated because of their actions working on that

7    particular client were inappropriate.

8    **Q.**   The other -- the other thing, it says, "One new issue not

9    raised in the past, GSK, with discarded samples."

10           What else did you learn about that issue in

11   particular?

12   **A.**   GSK, significant client, not just for the Central Lab,

13   but for PPD in general --

14   **Q.**   Is that GlaxoSmithKline?

15   **A.**   Sorry.  GlaxoSmithKline.  Yeah.  Sorry.

16           Yeah, significant issue.  Samples are taken from

17   patients.  So when a sample is discarded, it's very

18   concerning.  You can't recover that sample.  It's just gone.

19   So again, not a normal error, not a typical error.

20           MR. HANNON:  Objection.

21           THE COURT:  What's the objection?

22           MR. HANNON:  There's no foundation as to any

23   personal knowledge of normal or -- actually, no foundation as

24   to how she got that knowledge.  Speculation.

25           THE COURT:  Overruled, but maybe you should lay a

1    little more foundation for it.

2    BY MS. MANDEL:

3    **Q.**   Deb, backing up a little bit on the GlaxoSmithKline --

4    maybe I should just call it GSK -- discarded sample issue.

5    Aside from your notes here and your meeting with Mr. Mekerri,

6    did you have occasion, within HR, to know about this

7    incident?

8    **A.**   I would, yes, when they are significant events, I would

9    be made aware from an HR perspective through discussions with

10   senior leaders in leadership team meetings, yes.

11   **Q.**   And when you say "significant events," can you explain

12   what a significant event is?

13   **A.**   So there are minor errors that occur in, you know,

14   manual -- manual interaction with conducting testing, you

15   know, wrong -- a wrong amount of solution goes in, what have

16   you.  But disposing of a sample is considered a -- you know,

17   is definitely a major -- a major and critical event in any

18   lab.

19   **Q.**   And over your years working in HR, supporting the lab's

20   business, have you come to be aware of -- I think you used

21   the term "major" or what was the --

22   **A.**   Critical event.

23   **Q.**   Critical event.  Have you come to become aware of other

24   critical events in the lab?

25   **A.**   Yes.

1  **Q.**  Do you recall what you learned in your HR role about this

2  particular critical event involving GlaxoSmithKline?

3  **A.**  So I learned about this from an HR perspective, because

4  again, not a -- a critical event, not typical, and it would

5  have included a discussion with HR about remediation.  How do

6  we -- how do we correct this?  How do we look at this

7  particular situation?  And also aware because, again, GSK, a

8  very large client, for not only the Central Lab, but for all

9  of PPD, there was, I believe, senior executives needed to

10  speak with members of GSK, to just make sure we're

11  maintaining that relationship, and reassuring them that we do

12  have a quality mind and we are continuing to work effectively

13  for their product.

14  **Q.**  And within your role in HR, being aware of this as a

15  critical event, as far as you know, was Dr. Menninger

16  disciplined in any way?

17  **A.**  No.

18  **Q.**  As far as you know, did Dr. Menninger receive any type of

19  warning in connection with this?

20  **A.**  No.

21  **Q.**  And looking again at the last -- the last sentence of

22  this paragraph of your notes, can you just explain what it

23  meant?  It says, "Didn't want to share her own, or would feel

24  uncomfortable sharing, so did not agree to disclose

25  Clendening and Pluymers' goals."  What you learned from

1    Mr. Mekerri about that?

2    **A.**   So Mr. Mekerri, again, based on the quality events was

3    looking to change goals.  We were seeing some issues coming

4    out of the lab, appearing to be a little more egregious than

5    historic, wanting to change goals for 2018 around quality,

6    and working -- giving that feedback to Lisa, or

7    Dr. Menninger, apologies -- her wanting to see goals from

8    other executive directors on what does that goal look like?

9    How is it worded?  And Hacene said, you know, I'm happy to

10   accommodate that.  I'm happy to share with you what their

11   goals are, but I would feel it would be fair for me to share

12   what your goals are, as well, so we can all be, you know,

13   aligned as a leadership team.  But Dr. Menninger didn't feel

14   comfortable sharing her goals, so it wasn't -- it wasn't

15   shared amongst the executive directors.

16   **Q.**   Number two -- and number two is just copying over the

17   concern that had been raised; is that right?

18   **A.**   Correct.

19   **Q.**   Number 2, you then, below, have information from

20   Mr. Mekerri; is that right?

21   **A.**   Correct.  So Hacene basically said, you know, obviously,

22   had no conscious effort to exclude her in the interview

23   process.  He indicated she had been involved and aware of the

24   candidates.  She was made aware of Patrick Mann's hiring, not

25   directly involved with hiring Narine or Patrick, but she

1   certainly was made aware, that Dr. Menninger expressed

2   concern about her workload, and that this was one area to

3   help her work/life balance.

4          He had a verbal conversation with Lisa about the

5   role in recruiting, and with her stating that she felt

6   overwhelmed, he took on the initiative to recruit for her.

7   **Q.**   And given what you learned from Mr. Mekerri here, did you

8   have any reason, from an investigation standpoint, to be

9   concerned that there was a problem like Dr. Menninger had

10  raised to you?

11  **A.**   On face value, Dr. -- or Mr. Mekerri, you know, he was --

12  he was empathetic to Dr. Menninger.  He -- you know,

13  empathetic to her situation, allowed her to move to

14  Massachusetts.  He -- you know, wanting to help her lessen

15  the workload.  This, on face value, made sense, but I didn't

16  take it at face value.  I certainly asked recruiters.  You

17  know, Chad concerned that Dr. Fikry is asking for this to

18  move along swifter.  So there was more data that said, you

19  know, Hacene is acting in the best interest of his employee

20  to be helpful, but others said, yeah, this is -- I assume

21  we're going to get to the others, too, but there were others

22  who said, yeah, that was exactly what was happening.

23  **Q.**   And just to be clear, when you said that Mr. Fikry had

24  said -- or Dr. Fikry said he wanted this to move more

25  swiftly.  What was it that you understood Dr. Fikry wanted to

1    move more swiftly?

2    **A.**   One particular role had been open for a number of months,

3    I believe for almost a year.  And he wanted that position to

4    be more swiftly filled.

5    **Q.**   Looking down at number three, again, this repeats

6    Dr. Menninger's concern.  In your notes below, you reflect

7    information that you learned from Mr. Mekerri; is that right?

8    **A.**   Correct.

9    **Q.**   And I'll flip to the next page when you're ready.  But

10   can you explain what is on the bottom of this page that you

11   learned?

12   **A.**   So, again, Hacene saying this is not a new -- so

13   attending bid defenses and client visits is not a new

14   expectation.  Perhaps it -- it -- you know, at her level she

15   needs to be involved in these activities to support the

16   growth of the business.

17            Chris Clendening, working directly with clients

18   weekly in his executive director role in project management.

19   The sales numbers were very low in 2017, commercial sales,

20   and high expectations for the entire organization of Central

21   Labs in 2017.

22   **Q.**   And can you explain a little bit more?  You said that

23   Chris Clendening was an executive director, as well?

24   **A.**   Correct.

25   **Q.**   And based on your role in HR, what did you understand at

1    that time that Chris Clendening's, like, sphere of

2    responsibility was?

3    **A.**  He was the executive director of project management, so

4    conducting the studies, and he, during this time period, was

5    working with clients directly.  He was traveling and meeting

6    with clients, visiting clients, you know, selling our

7    business, basically.

8    **Q.**  And why was that significant for you to note as part of

9    your response on number 3 about the new expectation?

10   **A.**  Again, not a new expectation for the role.  And if

11   Dr. Menninger felt that she was being treated differently

12   than others, you know, we have Chris Clendening doing it, so

13   it's not that she is being asked to do something that others

14   aren't doing, as well.

15   **Q.**  And so -- end of that page, it says, "Bringing in new."

16   And then let's flip to the next page.  And it

17   says, "Technologies in US/Europe APAC."  Do you see that?

18   **A.**  Yes.

19   **Q.**  "Asked her to understand these new capabilities and help

20   sell.  Revenues not on target yet, so need everyone pulling

21   their weight."

22          Can you explain what you understood Mr. Mekerri to

23   be saying in that part of your notes?

24   **A.**  Yes.  So part of the commercial effort to raise sales of

25   our business is to invest in new technologies.  And that was

1    happening both in our US and EMEA, or Europe and APAC

2    regions.  And certainly with Dr. Menninger's licensure and

3    knowledge, really needing her to, you know, be able to be in

4    a position to sell these new technologies, which could in

5    turn become a more solidified client base.  We could secure

6    more clients based on this new technology.

7    **Q.**  And what do you recall Mr. Mekerri explaining to you to

8    reflect in the last sentence of that paragraph that "revenue

9    is not on target yet"?

10   **A.**  So as a for-profit business, revenue is very important.

11   You sell your work.  Revenue turns into the work that you

12   perform, and then profitability is how well you do executing

13   that work in the streamlined fashion.  So revenue is really

14   the way that we measure, you know, success, financially, in

15   our business.  If we don't meet revenue targets, we are

16   unable to provide benefits and pay and bonuses and support

17   the company's desires to grow in research and development,

18   and investing in, you know, employees.  So it's very

19   important that revenue is a top of mind opportunity for

20   leaders to really, you know, sell our business and make us

21   profitable.

22   **Q.**  And after you learned this information from Mr. Mekerri

23   during your investigation and meeting with him, what did that

24   lead you, if anything, to conclude about the concerns

25   Dr. Menninger had raised?

**A.**   They are an essential function of her job.  Perhaps it
wasn't a focus during 2017, but it was certainly an ask to
focus for 2018.  It was a part of her job.  Hacene was asking
other leaders across the business to perform this same type
of activity, so it didn't -- it was not where she was being
treated differently from this ask of her boss.

**Q.**   Down below in the next item, number four, it says, "Not
invited to 2018 sales marketing routine meetings, asked to
have meeting requests forwarded, but that has not happened."

That was Dr. Menninger's concern, again, listed out
here?

**A.**   Correct.

**Q.**   And did you ask Mr. Mekerri about that?

**A.**   I did.  And the 2018 sales and marketing routine meetings
are hosted by Andrew Supp or Andy Supp, who at the time was
the commercial leader for Central Labs.  So it was his
meeting, his determination of the attendee list.  Hacene, who
is aware of those meetings, indicated that Dr. Menninger is
not included on the week's meeting, but she has three members
of her team who are invited, and his understanding is that he
would expect her direct reports to report back to her and the
team any significance from those meetings.

**Q.**   And in the last sentence, you note, "No request from her
to have her added."

**A.**   Right.  So Hacene indicated he hadn't received any

1    request from Dr. Menninger to attend those meetings.

2    **Q.**   Okay.  And back in the first sentence of that, that

3    little section, it says, "Andy Supp's meeting held biweekly,

4    marketing log call"?

5    **A.**   Yes.

6    **Q.**   What did you mean when you wrote that?  Or what did you

7    learn from Mr. Mekerri that led you to write that?

8    **A.**   So as Hacene described it, Lisa said none of the 2018

9    sales meetings/marketing routine meetings -- the marketing

10   routine meetings were called the marketing log call.  So it's

11   the same meeting.

12   **Q.**   It's referring to that same meeting that Dr. Menninger

13   had raised?

14   **A.**   Exactly.

15   **Q.**   Right.  In number five, the town hall concern?

16   **A.**   Yes.  So Hacene -- you know, again, like Chad said, there

17   were no formal introductions.  Mark is the representative

18   from Pfizer, another client of the Central Lab and PPD in

19   general.  Hacene introduced the client representative, but

20   there were no other formal introductions made.  So it didn't

21   exclude Dr. Menninger.

22   **Q.**   And just backing up, can you explain a little bit more

23   about what you understood the concern to be here in number

24   five, and then what you were trying to get from Mr. Mekerri

25   to understand more about it?

**A.**   So when discussing Dr. Menninger's concerns, she was
concerned that she was being excluded.  She was remote, I
believe, traveling back to Highland Heights to attend this
particular town hall, and that she wasn't introduced, she
wasn't -- introduced to either the audience or the members,
the participating members, Bill Sharbaugh, who's the chief
operating officer.  That was her concern about being treated
differently.  Her boss, Hacene, is saying that, as well as
Chad, that there were really no formal introductions made to
anyone during this town hall, and our visit by our COO, and
the representative from a client.

**Q.**   The next item, number six, about the 2017 -- the previous
year's performance review.  Can you explain what you learned
from Mr. Mekerri about this item?

**A.**   Hacene indicated that he did have a conversation with
Dr. Menninger.  He did not include an official document.  The
discussion went okay, but not an easy discussion, in his
opinion.

          He shared feedback that he gathered on a 360
review.  It was -- that was a good and constructive
discussion.  And he had gathered 360 feedback on not just
Dr. Menninger's direct reports, but others -- others of his
direct reports.

**Q.**   And did you understand from Mr. Mekerri when these
conversations happened that he was talking about?

1    **A.**   These conversations happened in 2017.

2    **Q.**   And did you have an understanding, based on your

3    discussion with Mr. Mekerri, about what it meant that it was

4    not an easy discussion?

5    **A.**   Again, I believe, based on some of the -- the client

6    quality challenges, the -- giving, you know, Dr. Menninger,

7    that feedback was not an easy discussion to have.

8    **Q.**   Number seven, "Discussion of exit package and/or

9    consulting role during review of accommodations."  Can you

10   explain what you learned from Mr. Mekerri during your

11   investigation about this item?

12   **A.**   So this was a meeting where Dr. Menninger was in Highland

13   Heights, attending with Chad and Hacene, to talk about

14   accommodations.  Through Hacene's perspective, they were

15   talking about her next step in the future of her role.  He

16   didn't recollect discussing a package or a new role.  He

17   recalls questioning her on what she wanted to do going

18   forward, what she wanted to do in terms of her

19   accommodations.  There was misalignment in agreeing on a path

20   forward.  There was a high level discussion on alternative

21   options, but the general direction -- general direction, but

22   nothing firm or specific to her, predicated on her or PPD not

23   being able to accommodate her.

24   **Q.**   In your role doing an investigation here, Deb, did you

25   have a concern about Dr. Menninger having one perspective

1   about what had happened during that conversation and

2   Mr. Mekerri and Mr. St. John having a different perspective

3   on what happened during that conversation?

4   **A.**   Yes.

5   **Q.**   Can you tell us more about that?

6   **A.**   So certainly in interactive dialogue discussions, it's

7   important for everybody to be aligned and understanding what

8   we're working towards.  And with misalignment, it's

9   concerning that, you know, both parties are not aware of our

10   next step and where we go forward.  And it's -- the lack of

11   clarity is definitely concerning.

12   **Q.**   And were you also concerned about just different

13   understandings by the people in the meeting about what

14   happened in the meeting, and especially Dr. Menninger's

15   concern that, you know, she had complained about what

16   happened in the meeting?  Did you have concerns about that?

17   **A.**   Yes.

18   **Q.**   Coming out of this meeting that you had with Mr. Mekerri

19   about what had happened, what did you think about those

20   different perspectives about what had happened in that

21   meeting?

22   **A.**   So Chad is saying there was, you know, discussion where,

23   you know, Dr. Menninger was, you know -- what happens if I

24   can't do my job?  What happens if I can't do my job?  Hacene

25   saying he doesn't have recollection of that.  We heard, you

1    know, Dr. Menninger's perspective that the meeting started

2    with options.  So it's like there's just so much confusion,

3    how do we move forward?  Very concerning that there were

4    three distinct perspectives coming out of that meeting and no

5    validation of what truly happened.

6    **Q.**  And as of this point, if we go back to May of 2018, in

7    your sort of official capacity, in your role in HR, did you

8    have any knowledge of a concerted plan to move Dr. Menninger

9    out of her position at that point?

10   **A.**  No.

11   **Q.**  And at any point did you become aware of a concerted plan

12   to move Dr. Menninger out of her position?

13   **A.**  There was discussions around -- again, Lisa's request for

14   accommodation, her being remote, this uncertainty about where

15   we go, uncertainty about, you know, coverage.  There was

16   concern for, certainly, however, whatever happens, do we have

17   coverage for our lab from a licensure perspective.

18   **Q.**  Let's look at the next page of your notes.  These are

19   from a few days later, on May 11th.  And these

20   say, "Discussion with Andy Supp."?

21   **A.**  Yes.

22   **Q.**  And it says, "executive director of BD Central Labs"?

23   **A.**  Yes.

24   **Q.**  And is BD business development?

25   **A.**  Business development.  The commercial team, the sales

1    team.

2    **Q.**   And this page of notes only has one area of concern that

3    had been raised, right?  It only has that number four?

4    **A.**   Correct.

5    **Q.**   Is that the only topic that you spoke about with

6    Mr. Supp?

7    **A.**   That's correct.

8    **Q.**   And why is that?

9    **A.**   Because all of the other issues that Dr. Menninger raised

10   were irrelevant to Andy's role.  Andy would have no

11   information or be able to contribute to any of those other

12   topics.  So it's specifically solely related to the sales

13   meeting that he is the -- the owner and the host of.

14   **Q.**   And can you describe what you learned from Mr. Supp

15   during your meeting with him?

16   **A.**   So Andy, you know, as the owner and facilitator of that

17   meeting, you know, he sends out the meeting requests.  So he

18   monitors the distribution list of who's the invitee list.

19   Apparently, it's a pretty large group, make sure that anyone

20   who's left the company is removed.  He periodically reviews

21   it to add new members as the organization grows and changes.

22   And he certainly wants to make sure that it's a value add for

23   everybody, so if there's multiple members from each team,

24   that he calls that out, as well.

25                He did -- he worked with the departments, including

1    managers, to determine the appropriate representation.  That

2    was a specific marketing and routine meetings for the annual

3    sales meeting in 2018.  Andy worked with Hacene to make sure

4    they had the best participants outlined and identified.

5    **Q.**  And let me just pause you right there, it says in

6    parenthesis, "(First week of March in WILM)."

7             What does that mean?

8    **A.**  First week of March in Wilmington, North Carolina, which

9    at the time was the corporate headquarters for PPD.

10   **Q.**  So your understanding is that this annual sales meeting

11   had taken place in Wilmington?

12   **A.**  Correct.

13   **Q.**  And that was in March of 2018?

14   **A.**  Correct.

15   **Q.**  Okay.  Thank you.  Go ahead.

16   **A.**  So in advance, Andy had worked with Hacene to determine

17   the best participants at that meeting.  They discussed

18   content and breakout sessions.  And I've attended the sales

19   meeting, so it's a meeting that talks about, you know, what

20   is our sales focus for this year, how do we go after more

21   clients, how do we make sure we solidify those that we

22   currently have in-house.  And then there's break outs.  We

23   have different divisions of PPD.  The labs would break out

24   and talk about lab related activities.  And it's like a topic

25   every year would be determined to be, you know, a critical

1    one for that particular sales year.  So Andy and Hacene

2    worked out what that particular breakout session would be and

3    who best to represent that.  And because it was based on new

4    technologies, Hacene and Andy determined that Chris

5    Clendening would be the best participant for that particular

6    breakout session.

7    **Q.**   And that was another executive director working within

8    the labs business?

9    **A.**   Correct.  So Chris Clendening attended the sales meeting

10   in 2018, just for the breakout session.  He didn't attend the

11   entire sales meeting.  And no one -- no other participants

12   from the Central Lab were participate -- had participated in

13   that meeting.

14   **Q.**   And just to be absolutely clear, because it's now sort of

15   coming out of the pandemic, did you have an understanding as

16   to whether this was an in-person meeting in March in

17   Wilmington, North Carolina?

18   **A.**   Yes.  Yes, they were -- yes.  Up until the pandemic, they

19   were all in person.

20   **Q.**   Okay.  And just to go back to that last sentence, no

21   others from Central Labs participated as key to the meeting,

22   or vetted as key to the meeting.  What was -- in your view of

23   doing the investigation, what was the significance of that

24   statement?

25   **A.**   Again, Lisa felt that she was being treated differently

1  by her manager, but in this case, she wasn't.  She was

2  considered to be a participant in these breakout sessions,

3  just like all the other leaders, based on the topic of this

4  year.  Chris Clendening was the subject matter expert to

5  participate in that and no other participants from Central

6  Lab participated, inclusive of Dr. Menninger.

7  **Q.**  And coming out of this discussion with Mr. Supp on May

8  11th, did you make any preliminary determinations about what

9  Dr. Menninger's concern had been with regard to being

10  excluded from that meeting?

11  **A.**  Yes.  So she wasn't excluded because of her disability.

12  She was excluded because she wasn't the subject matter expert

13  for that particular year, just like her colleagues, everyone

14  else was excluded because of -- you know, they weren't at the

15  subject matter experts that contributed to this meeting.  She

16  wasn't treated any differently than any other leader or

17  member of the Central Lab.

18  **Q.**  We'll jump to your next -- we'll jump to your next page

19  of notes.  Here it says, "Talking points by phone."  And

20  there's not a date or sort of introduction at the top of

21  these notes.  Are these also notes that you typed, Deb?

22  **A.**  No.  These notes were provided by our legal department.

23  **Q.**  Okay.  Are these notes that reflect a conversation that

24  you had with Dr. Menninger?

25  **A.**  These are the notes -- yes.  These are the talking points

1  that I shared with Dr. Menninger at the conclusion of the

2  investigation.

3  **Q.**  And these were -- were these talking points that you're

4  consulting as sort of an outline of that discussion?

5  **A.**  Correct.

6  **Q.**  Did they reflect information that you, yourself, had

7  learned during the investigation?

8  **A.**  Yes.  I had conducted the entire investigation and worked

9  with our legal department to draft the talking points.

10 **Q.**  And jumping to the next page of your notes, they're dated

11 May 15th?

12 **A.**  Yes.

13 **Q.**  And these were notes that you took, Deb?

14 **A.**  Correct.

15 **Q.**  And it says, "Discussion with Brent Mann, senior

16 recruiter."?

17 **A.**  Yes.

18 **Q.**  Can you just describe Brent Mann's role, as far as you

19 understood it at that point, in 2018?

20 **A.**  So Brent Mann was a -- or is a member of the human

21 resource team.  He -- his function or purpose is to recruit.

22 So he's a recruiter that supported our Central Lab business

23 at the time and was the one who was recruiting for the

24 specific roles that Dr. Menninger said she was excluded for.

25 **Q.**  And why did you speak to Mr. Mann?

**A.**   Again, Dr. Menninger feeling like she was excluded,
Hacene indicating that he had conversations with Lisa, with
Dr. Menninger.  But verbally discussing them, I wanted to,
again, ensure that the conversation actually did occur, so
it's another data point to say this actually occurred.

So I did bring Brent into the investigation, talked
about confidentiality, shared -- you know, very important for
him to share factually, honestly with me, and I would not be
getting back to him with any results, that this was just an
information sharing discussion.  When I talked to Brent, he
confirmed that there was a meeting in December of 2017,
between Hacene, Chad St. John, Brent Mann, the recruiter, and
Dr. Fikry.  It was mutually agreed that Hacene would become
the hiring manager and requirements for the opening would be
reviewed for better candidate alignment with business needs.
There was a slow process that had occurred previously.

After one year of the position being opened,
Dr. Fikry wanted Hacene to take it over to get it filled on a
swifter pace.  From Brent's vantage point, that Dr. Menninger
was selective about her candidates and sought to find the
perfect one at the expense of filling this important role.
Didn't evaluate the candidates from a learned skill, versus
one that necessary to hire.  And what that means is hiring a
candidate who you could spend time developing and coaching
and helping them develop skills, versus one that's inherently

1    exhibited by the candidate when they are hired.

2    **Q.**   And at the first line of those notes, it says, "Confirm

3    meeting occurred on December 12, 2017."

4            Why did you note that?

5    **A.**   Again, excuse me, Dr. Menninger was saying she was being

6    treated differently because of her accommodation request.

7    This meeting occurred well in advance of Dr. Menninger

8    disclosing her -- disclosing her need for accommodation.

9    **Q.**   Did you reveal to Brent Mann that Dr. Menninger had

10   brought forward a disability request?

11   **A.**   No.

12   **Q.**   In fact, did you reveal that to any of the people that

13   you spoke to in connection with this investigation?

14   **A.**   No.

15   **Q.**   Did Mr. Mann report to you in HR?

16   **A.**   No, he did not.

17   **Q.**   In your role in HR, did you share with the other spheres

18   of HR, such as recruiting, that Dr. Menninger had brought

19   forward a disability accommodation request?

20   **A.**   No.

21   **Q.**   When you spoke with Mr. Mann, did Mr. Mann say anything

22   that led you to believe that Mr. Mann was aware that

23   Dr. Menninger had made a disability accommodation request?

24   **A.**   No.

25   **Q.**   You say in the third and a half line, before the end, it

1  says, "Brent's opinion is that Lisa Menninger was overly

2  picky with candidates."?

3  **A.**  Yes.

4  **Q.**  Do you have a recollection, as you sit here, if "overly

5  picky" was a term that Mr. Mann used?

6  **A.**  Yes, that's what he would -- he used.

7  **Q.**  On the next page of your notes, these you took on

8  May 17th.  Is that accurate?

9  **A.**  Yes.

10  **Q.**  And it indicates discussion with Brent McKinnon?

11  **A.**  Yes.

12  **Q.**  And next to his name it says "ED QA."

13  **A.**  Executive director of quality assurance department.

14  **Q.**  And is Brent McKinnon someone else with whom you spoke as

15  part of your investigation?

16  **A.**  That's correct.

17  **Q.**  And you have just one of the issues raised by

18  Dr. Menninger is listed here in your notes?

19  **A.**  Correct.

20  **Q.**  Why did you discuss only one of the concerns with

21  Mr. McKinnon?

22  **A.**  Brent is our QA executive.  All the other issues that

23  Lisa, or Dr. Menninger, raised were irrelevant to Brent.  He

24  wouldn't have had any significant contribution to any of the

25  other situations.  So, again, protecting confidentiality,

1    making sure we just wanted to get the data around the

2    quality.  Brent had the best information for me to

3    investigate this particular issue that Dr. Menninger raised.

4    **Q.**  During your discussion with Mr. McKinnon on May 17th, did

5    you indicate to Mr. McKinnon that Dr. Menninger had revealed

6    a disability at any point?

7    **A.**  No.

8    **Q.**  Did you tell Mr. McKinnon at any point during this

9    meeting that Dr. Menninger had sought a disability

10   accommodation?

11   **A.**  No.

12   **Q.**  Did Mr. McKinnon say anything during this meeting that

13   led you to believe that Mr. McKinnon had any awareness of

14   those facts?

15   **A.**  No.

16   **Q.**  So you listed that concern number one?

17   **A.**  Yes.

18   **Q.**  And beneath that, you have some information noting what

19   you learned from Mr. McKinnon?

20   **A.**  Yes.

21   **Q.**  Can you describe for the jury what you learned from

22   Mr. McKinnon about this issue?

23   **A.**  So Brent indicated that there was a consistent

24   application minor, major, and critical events across

25   functions, meaning there were issues across the entire

1    organization, that currently there was a lack of

2    accountability by the business for all functions to really

3    work to closing those events timely.

4    **Q.**  Can you explain what that means, as far as you

5    understand, based on what McKinnon said to close events

6    timely?

7    **A.**  So to close an event, I believe, that they have to be

8    resolved in order to submit the results from the testing to

9    our clients.  If events remain open, it delays either getting

10   the results to our clients and/or concluding the testing in

11   which to, you know, bill our clients and be paid for that

12   particular work.  So these events are pretty important to be

13   timely closed.

14   **Q.**  And just to pause there for one moment, an event, what

15   type of event?

16   **A.**  It could be any error, any deviation, results don't --

17   results don't come in at the expected range.  Anything that

18   doesn't go according to our standard operating procedures or

19   an assay, the method in which you use to conduct that work.

20   **Q.**  Okay.  I'm sorry, so go ahead, please, walking us through

21   what you learned from Mr. McKinnon.

22   **A.**  So Brent confirmed that Hacene, through leadership team

23   meetings, is asking everyone across the Central Lab to give

24   closing of these events priority, and really working to close

25   them in a timely fashion, and that ongoing, there's going to

1    be quarterly meetings to discuss appropriate attention to

2    ensure that we keep an eye -- that they're keeping an eye on

3    closing these events timely.

4            Brent is -- indicated he is going to send e-mails

5    if he received this information and when.  Brent went on to

6    say that they were currently, with our larger client

7    GlaxoSmithKline, five CAPAs, corrective action, preventative

8    action, and that are categorized as major events within

9    central management and the lab groups.  And then Brent

10   expressed concern with the data in three specific categories.

11   **Q.**  And a couple lines up, you read that Mr. McKinnon is to

12   send you e-mails of who received this information and when.

13   And do you recall, Deb, if that actually happened?

14   **A.**  Yes, I believe he did send me the documents, yes.

15   **Q.**  And did you review those documents as part of your

16   investigation?

17   **A.**  Yes.

18   **Q.**  Okay.  And so then you said that Mr. McKinnon expressed

19   concern with data in certain categories?

20   **A.**  Correct.

21   **Q.**  Okay.  And just generally, what did you understand those

22   categories to be?

23   **A.**  Lack of accountability, holding employees accountable to

24   the timeliness of completing these events, lack of oversight,

25   and not acting with a sense of urgency within the

1    laboratory-based areas, leaders not necessarily doing rounds

2    and ensuring proper processes are followed while the testing

3    is being conducted, that he had shared that with Hacene

4    multiple times.  And then the third point was training was

5    not consistent or completed timely, and it's important to do

6    training because our clients can ask if our employees are up

7    to date with their learnings and their training, so it's

8    important to have the trainings completed timely, as well.

9    **Q.**  And did Mr. McKinnon indicate to you that these areas of

10   concern with the data in these three categories was something

11   specific to Dr. Menninger?

12   **A.**  No.  He was -- he was speaking to quality across all of

13   Central Lab, but also speaking to, you know, areas where he

14   saw concerns.  I mean, there's sample management had some

15   concerns, as well as the laboratory based groups, there was

16   concerns.

17   **Q.**  And in the last paragraph, can you explain what you

18   learned from Mr. McKinnon that you reflected there in your

19   notes?

20   **A.**  So as the quality assurance director, he's going to

21   continue, obviously, to raise awareness.  Brent doesn't

22   report into the business, he collaborates with the business

23   on the quality area.

24            He also cited that the current structure of the lab

25   group, where the Brussels leader reported it to

1    Dr. Menninger --

2    **Q.**  Is that Lorraine --

3    **A.**  Lorraine McNamara, sorry.  Lorrain McNamara, Brussels

4    site, had reported it to Dr. Menninger, and Narine -- I can't

5    pronounce her last name, either, reporting to Hacene is

6    causing concern that there's not, you know, an overall

7    unified direction for the overall lab business.

8    **Q.**  Did you make any initial conclusions about this

9    particular set of concerns after meeting with Mr. McKinnon on

10   May 17th?

11   **A.**  It certainly felt better that there was an expectation

12   for quality being raised across all of the Central Lab.  It's

13   not just targeted at the labs.  It felt better that, you

14   know, Brent is having conversations with Hacene, and everyone

15   is being held accountable to raising the level of quality

16   across their business.

17          THE COURT:  I'm going to pause you here and we'll

18   take the morning break.

19          Ladies and gentlemen, all rise for the jury.

20          (The jury exits the courtroom.)

21          THE COURT:  All right.  We'll resume in 15 minutes.

22          MR. HANNON:  Your Honor, we had spoken yesterday,

23   we might need to take a witness out of order.  We have Lisa

24   Hart, Dr. Menninger's -- I'm sorry, not Lisa Hart, Tonya

25   Hart, Dr. Menninger's sister.

```
 1              THE COURT:  Why don't we do that after the break
 2    when we come back.  And then we'll take her, and we'll pause
 3    Ms. Ballweg's testimony.  We'll finish her and then we'll
 4    resume with Ms. Ballweg.
 5              MS. MANDEL:  Your Honor, could we just -- this
 6    particular document.  Could we just finish looking at this
 7    particular document?
 8              THE COURT:  How many more pages are there?
 9              MS. MANDEL:  We're like the third-to-last page.
10    We're close.  I think that would just make a little more
11    sense, and then pause.
12              THE COURT:  Are the three pages long or short
13    pages?
14              MS. MANDEL:  They're not short, but I think that it
15    will just give us a more logical place to pause.
16              THE COURT:  I'll tell you what, you're like a half
17    our with her?
18              MR. HANNON:  Correct.
19              THE COURT:  And you're about a half hour with her?
20    So I'll let you do a little bit, and I'll keep an eye on the
21    clock, but before 12:00, I'm going to pause you anyway --
22    I'll either pause you at the earlier of when you're done with
23    the three pages, or a little before 12:00, just to be sure we
24    finish that witness before 1 o'clock.
25              MR. HANNON:  Very good.
```

1          MS. MANDEL:  Thank you.

2          THE COURT:  Okay.  We'll take a 15 minute break.

3          (Court in recess at 11:13 a.m.

4          and reconvened at 11:30 a.m.)

5          THE COURT:  Go get the jury.

6          You can be seated.

7          The witness we're taking out of order, I know it's

8    Dr. Menninger's sister.  What's her name again?

9          MR. HANNON:  Tonya Hart.

10          THE COURT:  Okay.

11          MR. HANNON:  I got that right?

12          MS. MENNINGER:  Yes.

13          (The jury enters the courtroom.)

14          THE COURT:  Go ahead, Ms. Mandel.

15          MS. MANDEL:  Thank you, Your Honor.

16    BY MS. MANDEL:

17    **Q.**  Deb, after you met with the witnesses in the

18    investigation that you described, did you make conclusions

19    about whether there was reason to be concerned about the

20    items that Dr. Menninger had raised?

21    **A.**  No, there was not concern.

22    **Q.**  So did you reach a conclusion on each of those items?

23    **A.**  Yes.  On each item, I reached a conclusion.

24    **Q.**  So on the -- and we'll look at some more notes in a

25    moment.  Did you communicate those results to Dr. Menninger?

1   **A.**   In summary form, yes.

2   **Q.**   When you say in summary form, what do you mean by that?

3   **A.**   So the talking points that we covered earlier were

4   provided to Dr. Menninger.

5   **Q.**   And did you keep notes of the conversation that you had

6   with Dr. Menninger?

7   **A.**   The May 15th one were included.

8   **Q.**   That was part of your investigation notes?

9   **A.**   Correct.

10  **Q.**   And then you met with -- did you meet with Dr. Menninger

11  another time to communicate results of what you learned in

12  the investigation?

13  **A.**   Yes.

14  **Q.**   And if you look at the next page of the exhibit that

15  should be in front of you, it has a date of May 18, 2018?

16  **A.**   Correct.

17  **Q.**   What do the notes from May 18th, 2018, that are in front

18  of you, what do they reflect?

19  **A.**   This is --

20  **Q.**   I asked that question badly.  So strike that.

21          Did you take the notes that are indicated on the

22  page in front of you on the screen?

23  **A.**   Yes, I did.

24  **Q.**   And are these notes of a conversation that you had on

25  May 18, 2018?

1    **A.**  Yes.

2    **Q.**  And who did you have this meeting with on May 18th?

3    **A.**  To Dr. Menninger.

4    **Q.**  You met with Dr. Menninger?

5    **A.**  I'm sorry, yes.  With Dr. Menninger.

6    **Q.**  Do the notes here -- and there are a couple more pages

7    that we'll look at, do they reflect what you communicated to

8    Dr. Menninger during that meeting?

9    **A.**  Yes.

10   **Q.**  And I just want to make sure that I have the order of

11   meetings right.  You said you met with Dr. Menninger three

12   times.  Was this the last of those meetings?

13   **A.**  No.  There was one additional meeting.  I believe --

14   excuse me -- to cover overall summary of findings.

15   **Q.**  And is that what happened on May 18th, the overall

16   summary of findings meeting?

17   **A.**  Yes, I believe so.

18   **Q.**  Okay.  So let's go through your notes here.  And first of

19   all, do your notes here accurately reflect what you discussed

20   with Dr. Menninger on May 18th?

21   **A.**  Yes.

22   **Q.**  And so, again, we see those numbered items.  Do those

23   reflect the concerns that you understood from Dr. Menninger

24   as part of her complaint?

25   **A.**  Yes.

1    **Q.**  And so under number 1, you have an (a) and a (b), it says
2    "findings and then communication to Lisa"?
3    **A.**  Yes.
4    **Q.**  And where it says (a) and (b), it looks like under each
5    number, do you see that?
6    **A.**  Yes.
7    **Q.**  And do the "findings" reflect what you learned during the
8    investigation?
9    **A.**  Correct.
10   **Q.**  And what does the "communication to Lisa" reflect?
11   **A.**  The information relayed to Dr. Menninger about the
12   investigation and the outcome.
13   **Q.**  And that was by you?
14   **A.**  By me.
15   **Q.**  Okay.  So let's go through each of these.  So under
16   number one, this is the work issues with Gedeon Richter,
17   NGSP?  That one?
18   **A.**  Correct.
19   **Q.**  And what did you have in the way of findings with regard
20   to that issue?
21   **A.**  So the data that I reviewed indicated that there were
22   major quality issues, were more than double from the middle
23   of 2017 to April of 2018 than the prior year of 2016 to 2017.
24   And then the GSK situation specifically raised to a level of
25   executives in Wilmington.

1    **Q.**   And then beneath that you indicate what you communicated

2    to Dr. Menninger.  Can you explain what that was?

3    **A.**   Correct.  So I explained all of that to Dr. Menninger,

4    plus with increased events and high visibility issues

5    certainly aligned with added involvement from Hacene.

6    Therefore, it was reasonable for her manager to be talking

7    with her and discussing issues because there was a higher

8    level -- increased number and higher visibility issues

9    occurring before and after the disclosure of her disability.

10   **Q.**   Beneath that is -- that's number two, where Dr. Menninger

11   had raised her concern about not being included in

12   recruiting; is that right?

13   **A.**   Correct.

14   **Q.**   And beneath that, you indicate findings and

15   communications to Dr. Menninger.  Can you explain what your

16   findings were with regard to that concern?

17   **A.**   So Hacene indicated that he communicated to Dr. Menninger

18   in December of 2017 that he would be the hiring manager for

19   the open position due to the discussion with Dr. Menninger on

20   being overwhelmed with her duties and responsibility, and

21   that he would be taking over that responsibility and that the

22   position -- the process of filling that was taking well over

23   a year, with no viable candidates.

24   **Q.**   And what did you communicate to Dr. Menninger about that

25   on May 18th?

**A.**   So I communicated that finding, plus additionally that during the follow-up discussion, that Dr. Menninger and I had on May 15th, she indicated to me that she had sent -- having sent Hacene a list of responsibilities in November, and at his request, after telling him that Dr. Menninger felt overwhelmed in her job, that he would become the hiring manager, and that this occurred in December for that currently open role.  And this all occurred prior to her raising awareness of her disability.

**Q.**   And the next item down, number three, "New expectation to attend bid defense and client visits."

What were your findings in that regard?

**A.**   Again, this is an expectation that was in her job description, so it wasn't a new expectation.  It might be a new focus for this coming year, but it certainly was not a new expectation.  And that Hacene had made it very clear sales numbers and revenues were low certainly in 2017.  He had high expectations for all of Central Lab leaders, including our business development team, which is inclusive of Dr. Menninger.  The go forward strategy, you know, to bring in the new technologies and that -- and that the need to understand these new technologies and to sell that is an expectation for all executive director lab roles across the business.

**Q.**   And we'll look at the next page now.  It says (b),

1  communication to Dr. Menninger, and then it says "Above

2  information."

3          Can you explain what that meant?

4  **A.**  So all of that was related to Dr. Menninger in that

5  discussion.

6  **Q.**  And then the next item down, number four, about not being

7  invited to the 2018 sales meeting.  So you have actually two

8  different sets of findings and then you summarize

9  communication.  Can you explain what you found and what you

10  communicated to Dr. Menninger?

11  **A.**  Right.  So the issue with number four that Dr. Menninger

12  raised, two parts to it.  There was the sales meeting issue,

13  as well as the marketing log meeting issue.  The finding on

14  the sales meeting, which was held in Wilmington in early

15  March was hosted by Dr. Fikry and his sales team.  Andy Supp,

16  business development leader, was the decision maker on the

17  attendee list, not Hacene.  And that Andy and Hacene

18  determined the focus of the breakout sessions, and again,

19  based on subject matter expert, Chris Clendening would attend

20  that particular piece.  So all of that was relayed to

21  Dr. Menninger.  The -- do we just keep going?

22  **Q.**  Please.  Please.

23  **A.**  The finding on the marketing log meeting, again, Andy

24  Supp was the owner of that meeting.  He determined attendees.

25  Andy vetted the attendee list, where there were multiple

1    participants from the same team, asked them to determine who

2    was best to represent their function, and that Lorraine

3    McNamara is currently a lab representative who works for

4    Dr. Menninger, so there's representation in that meeting for

5    the lab.

6              All of that was related to Dr. Menninger.  And

7    again, they're not run or determined by Hacene, so he wasn't

8    in the position to treat her differently because he wasn't

9    the owner or the deciding factor in those situations.  I

10   encouraged Dr. Menninger to reach out to Andy Supp if she

11   felt she wanted to attend routine meetings and/or work with

12   Lorraine on a process, if she didn't feel like she was

13   getting the pertinent information she needed from those

14   meetings, to certainly work with her employee, Lorraine

15   McNamara, to gain that information.  And then just reminded

16   her that the sales meeting in 2018 was driven by, not her

17   manager, but Dr. Fikry and our business development team.

18   And that they had determined the agenda and the attendees.

19   **Q.**  The next item was the town hall.  And what did you find

20   in that regard and what did you communicate to Dr. Menninger?

21   **A.**  So with the town hall, again, no formal meeting prior to

22   the town hall where any introductions were had.  It was

23   really a very focused meeting to share our client and that

24   presentation.  So I shared that with Dr. Menninger.  She

25   wasn't treated differently.  Nobody was introduced in that

1    meeting.

2    **Q.**   The next item down relates to the 2017 performance

3    review.  What were your findings in that regard and what did

4    you communicate to Dr. Menninger?

5    **A.**   So the discussion on Dr. Menninger's performance review

6    for the year 2017 occurred in the year 2017, in December.  It

7    focused on her 360 feedback, and -- which is part of the

8    basis of her year-end review.  The process, the discussion,

9    without seeing a review, and system forcing approval was also

10   conducted with two other colleagues.  The discussion ensuing

11   performance ratings occurred prior to raising an

12   accommodation request in January of 2018.  So she wasn't

13   treated differently than others.

14   **Q.**   And what did -- when you said this was conducted with two

15   other colleagues, what did that mean?

16   **A.**   So two other direct reports of Hacene at the time that

17   performance reviews needed to be moved forward to align with

18   our merit process, our compensation process, Dr. Menninger

19   and two other of her colleagues were also forced -- we had to

20   move them along in the process.  So she wasn't treated

21   differently in that process.  There were two others of her --

22   sorry -- there were two other of her colleagues that were

23   moved along, as well.

24   **Q.**   And in the last item, was the discussion of the "exit

25   package and/or consulting role."  And we'll have to go to the

1    next page for some of this, but at the bottom of this page,

2    under (a), it says findings.  Can you describe what you found

3    in this regard?

4    **A.**   So it -- the meeting was intended to be a working session

5    around work accommodations.  The conversation evolved to what

6    if I can't perform the duties of my job.  Chad had discussed

7    a hypothetical picture of what that might look like.  He

8    discussed to protect the business with the licensures needed,

9    potentially moving into a consulting role, and providing an

10   opportunity to seek alternative employment through an

11   arrangement, that was driven not by her manager, but by Chad.

12   **Q.**   And what was the significance, in your role as an

13   investigator, what was that significance to you?

14   **A.**   If Dr. Menninger felt that her manager was treating her

15   differently because of her disclosure of her disability, but

16   in this instance, the conversation or this information was

17   shared not by her manager, but by Chad St. John.

18   **Q.**   And we'll jump to the next page.  At the top of this

19   page, it indicates communication to Dr. Menninger.  And can

20   you explain what you communicated to Dr. Menninger?

21   **A.**   So all of what I just described, and then I shared that

22   when we had a discussion, a follow-up discussion on May 15th,

23   she asked me the same questions, what if I can't perform the

24   essential functions of my job.  If she's asking me what-if

25   type questions, she's going to get a what-if type response,

1    and that doesn't mean that that's the path forward at this

2    current moment, and shouldn't be translated that you're being

3    forced out of the organization.

4    **Q.**   And once you shared this information with Dr. Menninger,

5    did she have a response to you?

6    **A.**   She was disappointed.

7    **Q.**   And what did -- what specifically did she say that

8    indicated that she was disappointed?

9    **A.**   It certainly wasn't the outcome that she was hoping for.

10   I felt badly.  I mean, I wish that, you know, things would

11   have turned out differently for Dr. Menninger, but I couldn't

12   change the outcome of an investigation based on what she saw

13   that just wasn't there.

14            THE COURT:  Is that the end of that document?

15            MS. MANDEL:  That's the end of this document.

16            THE COURT:  Okay.

17            So Ms. Ballweg, if you can step down for a moment.

18            So we're going to pause Ms. Ballweg's testimony

19   right here, because we have an out-of-state witness, who the

20   plaintiff is going to call who we want to finish before

21   1 o'clock, so that person can get back on a plane and go

22   home.  So we're going to pause Ms. Ballweg's testimony.  It's

23   not done.  Just keep it paused.  Mr. Hannon will call the

24   next witness, and when we're done with that witness, we'll

25   resume with Ms. Ballweg.  We do that here, we do that a

1    variety of times just to accommodate people's schedule.

2              Go ahead.

3              MR. HANNON:  The plaintiff calls Tonya Hart.

4              THE COURT:  Go ahead, Ms. Hart.

5              And just take the notebook off the stand.

6              MR. HANNON:  Yes.

7              (The witness was duly sworn.)

8              THE DEPUTY CLERK:  And can you please state your

9    full name and spell your last name for the record.

10             THE WITNESS:  Tonya Louise Hart, and my date of

11   birth, is that what you said?

12             THE COURT:  No, you don't have to give your date of

13   birth.

14             We have rules about dates of birth and Social

15   Security numbers.  We keep them private.

16             Go ahead.

17                          **TONYA L. HART**

18        having been duly sworn, testified as follows:

19        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

20   BY MR. HANNON:

21   **Q.**  Could you please tell the jury who you are.

22   **A.**  Tonya Louise Hart, and I'm Lisa's sister.

23   **Q.**  Okay.  And are you Lisa's older sister or younger sister?

24   **A.**  Older sister.

25   **Q.**  How far apart?

1    **A.**   About a year.  12 months.  12 and a half months apart.

2    **Q.**   Where did you and Lisa grow up?

3    **A.**   The first half of our life, we grew up in Conyers,

4    Georgia, a suburb of Atlanta, from -- up until 1978.  Lisa

5    was ten years old at the time.

6    **Q.**   And where did you move after Conyers?

7    **A.**   We moved to Appleton, Wisconsin.

8    **Q.**   Who did you live with in Conyers?

9    **A.**   In Conyers, we lived with my mother and father.

10   **Q.**   And what was the reason for the move?

11   **A.**   My mom had pretty much had enough with just what was

12   happening with my father, who had some mental health issues,

13   and we -- she wanted to separate and move Lisa and I up to

14   Wisconsin to be closer to her family.

15   **Q.**   And prior to moving, had you, yourself, observed any of

16   your father's mental health issues?

17   **A.**   Yes.

18   **Q.**   And just broadly speaking, what kinds of actions had you

19   observed?

20   **A.**   Just violent outbursts, days of really, just, depression,

21   but learning later that he had schizophrenia, understanding

22   now his behaviors, what they were like.  But as a kid, I did

23   not understand that.  He was yelling at my mother, throwing

24   things in the house, throwing food across the kitchen.  Just

25   this was going on for years.  And at some point, my mother

1    just had enough and was scared for herself and my sister and

2    I.

3    **Q.**   Okay.  And I should have asked this question earlier,

4    what do you do for work?

5    **A.**   I'm a nurse case manager.

6    **Q.**   Okay.  And where do you work?

7    **A.**   Bend, Oregon.

8    **Q.**   And do you work in a hospital?

9    **A.**   I work from home, but we do go into the office one day a

10   week.  So telecommute.

11   **Q.**   Okay.  And for how long have you been a nurse?

12   **A.**   Since 2010.

13   **Q.**   And do you live in Bend?

14   **A.**   Yes.

15   **Q.**   For how long have you lived there?

16   **A.**   Since November of 2019.

17   **Q.**   And who do you live with?

18   **A.**   My husband.

19   **Q.**   Do you have any kids?

20   **A.**   Yes.

21   **Q.**   How many?

22   **A.**   I have two kids.  They're adults.  And one is in the Navy

23   and one lives in Denver, where we raised the boys.

24   **Q.**   Okay.  So you mentioned that you, your sister, and mother

25   moved.  Did you continue to live with Lisa and your mother up

1   until the time you went to college?

2   **A.**   Yes.  However, Lisa was an exchange student, so yes.  Up

3   until the time that I went to college in 1985, my sister was

4   an exchange student in Norway my freshman year in college.

5   **Q.**   Okay.  And did you and Lisa attend the same college at

6   some point?

7   **A.**   Yes.

8   **Q.**   And where did you both go to school at the same time?

9   **A.**   At the same time, we went to University of Wisconsin in

10  Stevens Point for two years, 1985 to 1987.  When Lisa got

11  back from Norway, she started college there in 1986, I

12  believe.  And then we both transferred to University of

13  Georgia in 1989.

14  **Q.**   And was that in part because you could get in-state

15  tuition there?

16  **A.**   Yes.  My dad still lived in Georgia, so we were able to

17  get in-state tuition.

18  **Q.**   And did you and Lisa live together when you were at

19  school in Georgia?

20  **A.**   We did, yes.

21  **Q.**   And subsequent to college, was there ever another time

22  when you and Lisa lived together?

23  **A.**   Prior to college.

24  **Q.**   After college?

25  **A.**   After, subsequent, yes.  Yes.  We lived in Chicago after

I graduated from college.  I moved to Chicago and we were

roommates for a year.

Q.  And you know that at some point Lisa decided to become a

doctor; is that right?

A.  Yes.

Q.  And during the time that Lisa attended medical school and

went through her other work to become a doctor, did you and

her remain close?

A.  Yes.

Q.  And just give the jury a sense of sort of what the

frequency of your interaction with Lisa was during that time?

A.  I think during that time, I was busy raising boys.  Lisa

was going to medical school, so our -- I would say once every

month, once every month and a half, sometimes it would be a

little bit longer, just depending on how busy she was with

her studies.

Q.  And you were aware that what Lisa's subsequent jobs were

in Kansas and -- I'm forgetting where else.  Do you recall

where else she worked?

A.  She was working in Overland Park, Kansas.  She did her

residency in Virginia, I believe.

Q.  Okay.  And did you and Lisa continue to stay in touch

with that same level of frequency?

A.  Yes.

Q.  Okay.  And did you learn at some point that Lisa was

1   going to work for PPD?

2   **A.**   Yes.

3   **Q.**   Okay.  And do you recall anything about Lisa's feeling

4   about taking on that new job?

5   **A.**   I recall that she was excited to start this job.  It was

6   a good opportunity.

7   **Q.**   Okay.  During the time of Lisa's various professional

8   jobs, up until the time that she joined PPD, did you notice

9   any change in her behavior or attitude or anything like that?

10  **A.**   No.

11  **Q.**   Since you first grew up with Lisa, was there anything

12  about Lisa that sort of stood out to you?

13  **A.**   Lisa, just growing up, I just remember her being really

14  shy, a little bit more withdrawn in family gatherings, going

15  to weddings, a funeral, just any big gathering where we had

16  to have interaction with our family, or extended family, I do

17  recall Lisa being a little bit more -- I was kind of more the

18  outgoing one, she definitely was more shy and harder for her

19  to make small talk, I guess, with her family.

20  **Q.**   And as you got older and pursued your professional

21  endeavors, did she ever share with anything -- prior to

22  joining PPD, about any kind of stress or anxiety she had?

23  **A.**   No.

24  **Q.**   Okay.  Now, at some point in time -- well, let me ask

25  this question first.

1          Did you know before Lisa joined PPD that she

2     suffered from social anxiety disorder?

3     **A.**   No.

4     **Q.**   Did Lisa ever share with you the fact that she was seeing

5     a doctor in Kansas to help her with her anxiety?

6     **A.**   Prior to PPD, no.

7     **Q.**   Did she tell you that before PPD?

8     **A.**   No.

9     **Q.**   How was it that you found out about Lisa's diagnosis?

10    **A.**   She told me after -- she told me that there was a meeting

11    that she had with her employer, with PPD, her supervisor and

12    an HR person, and about a month after that meeting, that's

13    when she disclosed this -- what happened with the meeting.

14    And somewhere in that early 2018 time frame, she also

15    disclosed that she -- her psychiatrist was -- had diagnosed

16    her with generalized anxiety disorder, social anxiety

17    disorder, and panic disorder.

18    **Q.**   What do you recall Lisa telling you about that meeting?

19    **A.**   She basically thought -- I mean, Lisa thought this was

20    a -- this is what she was telling me, that she's -- she went

21    to this meeting thinking that the meeting would be to discuss

22    accommodations for her in her role as a clinical pathologist,

23    but instead the meeting was more of a -- not a discussion of

24    that, but more just felt that she was being essentially

25    pushed out of the company.

1   Q.  And as Lisa was describing this event to you, what was

2   her demeanor?

3   A.  Just -- I just remember her being very -- sounding very

4   scared, just feeling really hopeless.  And I could hear the

5   tone in her voice, just very shaky and tearful, a lot of

6   crying, just -- yeah, she was devastated.  She was doing a

7   good job, but she felt -- she told me that her reviews were

8   good with PPD, and any annual reviews that she had, she

9   scored well on her reviews, and just like a physical

10  disability, her mental health disability, she just felt like

11  she should have some accommodations made for her in her role.

12  She was doing a good job in her role.

13  Q.  When you -- when you learned that your sister had been --

14  had been diagnosed with a disorder, did that surprise you?

15  A.  A little bit.  I mean, I always knew Lisa was Lisa.  Just

16  growing up, she was reserved and shy, and that was Lisa.  But

17  she was really successful as far as her studies and getting

18  through med school.  She was functioning and she was doing a

19  good job as a clinical pathologist for Saint Luke's medical

20  system, another job that she had after that with a clinical

21  reference laboratory.  And she functioned really well and did

22  her job really well.

23  Q.  Did you ever have the opportunity to observe Lisa as a

24  mother?

25  A.  Yes.

1    Q.   When was that?

2    A.   In 2008, when my niece, her daughter, Maya, was born.  My

3    husband and I did travel to Kansas City, or Overland Park,

4    Kansas, a suburb of Kansas City, and spent approximately a

5    week, I believe, there.  And then there were some subsequent

6    visits after that, where I traveled alone to Kansas -- or to

7    Overland Park.  And this was when Maya was -- I'm guessing

8    she was probably three years old at that time.  And so there

9    were other visits after that, as well.

10   Q.   And what, if anything, did you notice about Lisa's

11   ability to cope with the stresses of being a mother?

12   A.   She functioned -- from what I observed, functioned fine

13   taking care of her daughter.

14   Q.   Now, you mentioned that you had the call with Lisa after

15   her meeting with HR and her boss.  Subsequent to that call,

16   did the frequency of your communications with Lisa change at

17   all?

18   A.   Yes.  Our communications did increase after that.

19   Q.   And why was that?

20   A.   I was very, very worried about her, really concerned for

21   her wellbeing.  She was having multiple panic attacks a day

22   is what she was telling me.  This was also shared by her

23   husband, Mason, to me, in separate phone calls.  And she --

24   she voiced, as well as her husband, Mason, voiced to me that

25   she was struggling with severe depression, suicidal thoughts

1   at times and she couldn't leave the house.  She just -- very

2   scared.  I know any time I were to call her, I would always

3   have to give her a little warning, and just send her a text

4   message that "Is this a good time to call?"  She was just

5   really, really struggling.  She had a lot of days where she

6   just couldn't come out of her room.  Yeah.

7   **Q.**  Had you ever seen Lisa like that before in her life?

8   **A.**  No.

9   **Q.**  At some point in 2018, did you go to visit Lisa?

10  **A.**  Yes.

11  **Q.**  And when was that?

12  **A.**  It was in August of 2018.

13  **Q.**  And was that surrounding any sort of event?

14  **A.**  Yes.  Lisa had participated in an ultra marathon.

15  **Q.**  And did Lisa indicate to you at the time why she wanted

16  to do the ultra marathon?

17  **A.**  The marathon, it was a big, very challenging thing.  Of

18  course, it was an ultra marathon.  This was an outlet for

19  Lisa.  This was her therapy.  It was something that she could

20  push through physically to help her with the mental pain that

21  she was having surrounding these -- this event with PPD, this

22  meeting with PPD.  And her doctor also agreed that this would

23  be very beneficial for her and was in agreement that she

24  should pursue that and that running was her therapy.  And the

25  ultra marathon being a long event, but it was just a way that

1    she could push through something very difficult, and it

2    helped her to know that she could -- by doing that, she could

3    push through and keep going.

4    **Q.**  While you were out visiting for the -- in connection with

5    the ultra marathon, did you have an opportunity to talk with

6    Lisa's husband, Mason, about her condition?

7    **A.**  Yes.

8    **Q.**  And where did that conversation take place?

9    **A.**  It was at the -- we had taken Maya to swimming lessons,

10   and we were just sitting by the pool, and while Maya was

11   having her swim lesson, we just talked about how much Lisa is

12   struggling.  Mason shared with me the number of panic attacks

13   that she's been having daily, just very difficult for her to

14   function on a daily basis, significantly depressed, having

15   thoughts of self-harm on some days.  Very worrying for me.

16   **Q.**  Was Lisa present for that conversation?

17   **A.**  No.

18   **Q.**  So subsequent to that trip to Massachusetts, did you

19   continue to stay in regular contact with your sister?

20   **A.**  Yes.

21   **Q.**  And just generally speaking, what were your sort of

22   observations as you communicated with her?

23   **A.**  On -- some of the conversations were via text message,

24   some were phone calls.  Just on both, really, she just talked

25   about how difficult it was for her.  She also shared that

1    she's, you know, continuing to have these daily panic

2    attacks, difficulty sleeping.  She started requiring

3    medication, benzodiazepines, specifically Clonazepam to be

4    able to sleep.  She was having disturbing dreams involving

5    PPD.  Just really finding it difficult to have any happiness.

6              MS. MANDEL:  Your Honor, objection.  That's all

7    hearsay.

8              THE COURT:  What about that, Mr. Hannon?

9              MR. HANNON:  State of mind.  As long as it's a

10   present mental condition.

11             THE COURT:  Overruled.  As to what Dr. Menninger

12   told her.  That's what you're referring to?

13             MR. HANNON:  Correct.  Exactly.  Yes.

14   BY MR. HANNON:

15   **Q.**  At some point in time, did Lisa move closer to you?

16   **A.**  Yes.

17   **Q.**  When was that?

18   **A.**  She moved -- her family moved to Bend, Oregon in the

19   summer of 2020.

20   **Q.**  And did she tell you what her motivation was for moving

21   to Bend, Oregon?

22   **A.**  She told me so that she could be closer to family for

23   herself and for my niece, Maya.

24   **Q.**  And beside yourself, were there any other family members

25   in that area?

1    **A.**   My mother.

2    **Q.**   Okay.  And after Lisa moved to Bend, Oregon, what was the

3    sort of frequency with your contact with her?

4    **A.**   Well, we were in the middle of the pandemic, so we did go

5    over to their house, and we would visit on the patio outside.

6    But, again, we were -- it was my husband, myself, Maya,

7    Mason, her husband, and Lisa.  So it was just difficult to

8    get -- to talk about just what she was going through in that

9    scenario, in that situation, with just all of us present.

10            I would have to give her warning, when we're

11   driving there, we're ten minutes away, we're five minutes

12   away.  Lisa just had a lot of fear, a lot of panic.  And I

13   just had to give her a heads up that we're arriving, or the

14   same as when I would make a phone call, I had to give her a

15   heads-up and ask if it was okay that we come in or that we

16   were going to arrive in a few minutes, you know.

17   **Q.**   So just to clarify that, so say, for example, that you

18   were going to visit Lisa's family, would it -- would you feel

19   comfortable just showing up and ringing the doorbell?

20   **A.**   Absolutely not.

21   **Q.**   And if you wanted to talk to her on the phone, would you

22   feel comfortable just calling her?

23   **A.**   No.  No.

24   **Q.**   What would you do before you called her?

25   **A.**   I would send her a text message asking if it was okay.

1    And if I didn't get a response, then I figured she was just

2    sleeping or just -- I always -- I prefaced this with -- I

3    always told Lisa, if I send you a text message, please don't

4    feel that you have to respond to me.  I know that you're

5    struggling and that you're most important right now.  Not me.

6    **Q.**  You mentioned the communication with her husband Mason at

7    the swim practice.  Did you have any subsequent conversations

8    with Mr. Menninger concerning Lisa's safety?

9    **A.**  Yes.  Mason called me on several occasions, up until even

10   just a couple of months ago, approximately, that he was

11   really worried about her.  She's not coming out of her room.

12   She doesn't come down for dinner --

13             THE COURT:  Why is that admissible?

14             MR. HANNON:  Well, it's still state of mind in

15   terms of a person --

16             THE COURT:  But somebody's state of mind, but why

17   is that state of mind?

18             MR. HANNON:  Why is his state of mind?

19             THE COURT:  Right.  In other words, like usually

20   it's percipient witnesses.  Obviously, Dr. Menninger's state

21   of mind isn't -- is relevant an issue.  And so her

22   observations or statements about things of that nature come

23   in for that.  But why about -- what about -- third parties

24   commentary, why isn't that hearsay?

25             That's your objection, isn't it?

1          MS. MANDEL:  Yes, Your Honor.

2          MR. HANNON:  Well, his state of mind in terms of

3    whether or not he's worried is directly reflective of what he

4    was observing, just like if he were here testifying, "I was

5    really worried," you would let him testify that he was really

6    worried.

7          THE COURT:  That's because he would be here

8    testifying.

9          MR. HANNON:  Right.  But it's still the same

10   statement.  It's not a hearsay concern.

11         THE COURT:  It's an extra statement, because it's

12   the statements of this witness.

13         MR. HANNON:  But it's not hearsay.  It's the same

14   as him sitting in the box saying, "I was really scared," as

15   him telling her that he was really scared and then this

16   witness testifying to it.  It doesn't raise a hearsay issue.

17         THE COURT:  Why would his statement, when he's on

18   the witness stand, "I'm worried" be relevant?  He could say

19   the things he observed about her.  But why is his own state

20   of mind?  His own state of mind is not something that the

21   jury has to determine.

22         MR. HANNON:  Well, he can't necessarily testify to

23   what his wife told him, right?

24         THE COURT:  Well, he could.  That's his choice.

25         MR. HANNON:  No, it's spousal disqualification.

```
 1              THE COURT:  Now, she -- only if she objects --
 2              MR. HANNON:  It's a disqualification.  It's not a
 3     privilege.
 4              THE COURT:  I'm not sure about that.  You can never
 5     testify?
 6              MR. HANNON:  Disqualified.
 7              THE COURT:  But in any event, that has to do with
 8     marital communications.  Many of these things aren't marital
 9     communications.
10              MR. HANNON:  Discussions about self-harm and things
11     like that.  Those are --
12              THE COURT:  It depends where they happened.
13              MR. HANNON:  I'm pretty sure they weren't out in
14     public in front of people.
15              THE COURT:  But one might infer that, right?  But
16     in any event, his -- so you're saying that his --
17              Let me see you both at sidebar.
18              MR. HANNON:  Sure.
19              THE COURT:  I apologize for this, ladies and
20     gentlemen.  It's a little more complicated.
21              (Bench conference concluded.)
22              THE COURT:  It seems to me, one, sure -- what
23     you're saying is his state of mind, inferential, but from
24     which they can draw inference as to her condition.  But
25     ordinarily -- but his state of mind is not directly relevant.
```

1    His state of mind is only possibly relevance is that from

2    that they might be able to infer from his state of mind her

3    condition.  So that's a relevance issue.  And so but even if

4    he -- even if that -- even if that relevance is true, he

5    can -- and he can -- and assuming he could get up and say my

6    state of mind is, and presumably many of the things that he's

7    worried about are not marital privilege disqualification or

8    otherwise, she didn't come out of her room, she didn't do

9    this, she didn't do that.  Those are not marital privilege.

10   I don't think, or he's not disqualified from testifying about

11   those things.

12         But putting that aside, then what you're having her

13   do is this witness is saying that's what was reported to me,

14   so that's him saying to her, "I am worried."

15         MR. HANNON:  Correct.

16         THE COURT:  And now she's testifying as to what he

17   said to her.

18         MR. HANNON:  (Nods head.)

19         THE COURT:  And so that's -- I mean, that's an

20   extra layer.  Why isn't that -- why wouldn't -- like, whether

21   or not -- first of all, the preference would be to hear from

22   him, because he directly would say it.  And now we have the

23   jury has to determine, if I let it in, one, does she

24   accurately report it, what he said to her?  Is she being

25   truthful and all of the things.  But if she's reporting what

1    he said to her, then if she's accurately reporting, they have

2    to evaluate his perception, his state of mind, which they

3    don't have him for.  That's the concern I have, that whether

4    or not it's exactly hearsay, it's also the concerns of the

5    hearsay rule.

6           MR. HANNON:  Sure.  So those concerns have already

7    been addressed by the drafters of the hearsay rule, which

8    created the exception for state of mind.

9           THE COURT:  Let me get the rule.

10           Okay.  Go ahead.  So you're saying that the

11    statement of the declarant, the declarant being

12    Mr. Menninger, "I am worried," is the statement of

13    then-existing mental physical condition, and that that's not

14    excluded, whether or not the declarant is available as a

15    witness.

16           MR. HANNON:  Correct.  Now it creates the question

17    of relevance, and Your Honor made the distinction between it

18    being directly relevant versus being circumstantially

19    relevant, and there's no rule under the hearsay that makes it

20    only admissible when it's directly relevant.

21           THE COURT:  I understand.  That's a relevance --

22    that's a 403 or --

23           MR. HANNON:  Correct.

24           THE COURT:  But even if the declarant -- so the

25    declarant's statement of then-existing state of mind is not

1    hearsay, I agree with that.  But that doesn't mean anybody

2    can -- like if she told her, she told you, and you told

3    someone else told and someone else, that's not admissible the

4    9th time through.

5              MR. HANNON:  Correct.

6              THE COURT:  Right.  So you're saying it's only

7    admissible because she directly heard it?

8              MR. HANNON:  Correct.  From the declarant, yes.

9              THE COURT:  What do you say about that?

10             MS. MANDEL:  Your Honor is also limited to that one

11   present sense impression, not the sort of expanded version of

12   the story, right?  He utters a present sense impression to

13   her and she repeats that.  That's limited.

14             THE COURT:  That's not present sense.  I think it's

15   an existing.

16             MS. MANDEL:  I'm sorry, yes.  She's providing much

17   more.

18             THE COURT:  I think you do have to be careful with

19   that.  I think you're right, you get the statement, but I

20   think you don't get everything surrounding it.

21             MR. HANNON:  I think you're right.  Yes.

22             (Bench conference concluded.)

23             THE COURT:  Before you continue, Mr. Hannon, let me

24   just explain for the jury's benefit.

25             So ladies and gentlemen, there's a rule called --

1  we have a legal rule of evidence -- remember I decide

2  evidence, what's sort of admissible or not.  We have a legal

3  rule of evidence called hearsay.  The short version of

4  hearsay, if such a thing exists, is that the purpose of a

5  hearsay rule, generally, is that you should hear from people

6  who are what we call percipient or direct witnesses, the

7  people who saw -- you think of an auto accident, the people

8  who saw the accident, the people who heard the accident, the

9  live witnesses, rather than what people said to other people,

10  and then you can evaluate those people.

11           But like many rules, that rule has exceptions.  So

12  one of the exceptions that we've been discussing here is

13  that -- one of the exceptions is that a witness, here

14  Ms. Hart, can testify to a statement from someone who's not

15  before you right now, as to what that person's then-existing

16  state of mind.  So the example of Mr. Menninger saying "I'm

17  worried."  That's the state of his mental condition.  So she

18  can, under the rules of hearsay, even though he's not here

19  testifying to that right now, that is an exception to that

20  rule, and she can.  And that's why I'm going to allow that.

21  But there are two things that you should know about that.

22           One is that what -- and that's part of what we're

23  discussing is how far the -- and the rule doesn't allow this

24  witness to testify to all sorts of other circumstances, just

25  as to that.  There are other exceptions to the hearsay rule.

1    There's at least 20, maybe more.  So there could be other

2    things of that nature that come in.  But that -- that's what

3    we were discussing and trying to think through.

4              And the second thing that, to make clear to you.

5    Mr. Menninger's state of mind is not actually directly -- is

6    not directly relevant in this case.  You aren't deciding what

7    happened to Mr. Menninger.  He's not a party to this case.

8    He has no claims.  In that sense, his state of mind is

9    irrelevant.  Its only relevance in this case, at least so

10   far, is that if you determined that that -- whatever you

11   determine about his state of mind from that, you may be able

12   to draw reasonable inferences.  I'm not saying you should.

13   It's up to you to decide what inferences to draw, but the

14   reason it's being admitted is for you to consider whether,

15   from that, you would draw inferences about Dr. Menninger's

16   condition or state of mind.  So that's really what the focus

17   is, but that's why it's being offered, and that's an example

18   of circumstantial evidence.

19             Anything either of you want to address about that

20   before we continue?

21             MS. MANDEL:  No, thank you, Your Honor.

22             MR. HANNON:  Good explanation.

23             THE COURT:  Thank you.  Go ahead.

24   BY MR. HANNON:

25   Q.  Ms. Hart, so just to kind of get back where we were, I

1    think I had asked you about subsequent conversations with

2    Lisa's husband.  And just to make the question a bit crisper

3    here, so we're staying within the rules, subsequent to the

4    in-person discussion you mentioned earlier, have you had

5    subsequent conversations where Mr. Mason has shared with you

6    concerns that he was having concerning Lisa's health?

7    **A.**  Yes.

8    **Q.**  Okay.  And staying limited to that subject, Mr. Mason

9    expressing to you concerns he was having at that moment about

10   Lisa's health, what do you recall about those statements?

11   **A.**  I recall that Mason told me that he was very concerned

12   that she was not coming out of her room.  She was just not,

13   you know, coming out for even dinner, just really worried

14   that she just wasn't functioning, and really worried that she

15   had given up, worried that she might do something.  And he

16   was asking me for some help, any suggestions I have as far as

17   where I can take her -- or where he can take her if there's

18   an emergency.  And he was just feeling overwhelmed is what

19   he's telling me.  And I, in one of the phone calls, found

20   some facilities that he could have as a reference, if it came

21   to that point, where there was an emergency and he needed to

22   take her to a local ED, or a crisis stabilization center.  I

23   just provided those for him.  Really just trying to learn

24   what's happening.  At that point, there was several moments

25   in time, I guess, that Lisa couldn't really talk to anybody.

1     She wasn't --

2     **Q.**  Well, hang on.  Let me just stop you there for a moment.

3           You mentioned asking questions about where to take

4     Lisa for an emergency.  What kind of an emergency did you

5     understand this was around?

6     **A.**  That she was having thoughts to self-harm herself.

7     **Q.**  And did you, in fact, help Lisa's husband to come up with

8     a plan of what to do in the event that she harmed herself?

9     **A.**  Yes.  I gave them the names of some facilities, their

10    phone numbers, I provided all the information, addresses, if

11    it comes to that point, which it -- they were there already.

12    It could have been five minutes from that phone call.  It was

13    that bad, where he could take her if need be.

14    **Q.**  Okay.  Have you made any -- have you made any

15    observations -- let me ask a better question.

16          As of today, how frequently do you communicate with

17    Lisa?

18    **A.**  Weekly.  We communicate by text and phone call.  There's

19    been more recently she's not been up for actual phone calls

20    and just easier to do text messages, because she's just been

21    so withdrawn and stressed out about what's happening with

22    this trial.  But I check in with her daily to every other

23    day, just to see how she's doing.  I know how she's doing,

24    but it's just more so that she knows that I'm here for her,

25    however I can support her.

1    **Q.**  Has Lisa shared with you at all anything about her desire

2    to get better?

3    **A.**  She desperately wants to get better.

4    **Q.**  And what -- what has she told you with respect to that

5    issue?

6    **A.**  She told me that she desperately wants to get better for

7    her family, for Maya.  My niece, her daughter, also struggles

8    with depression and anxiety, has been diagnosed with that.

9    And she's very worried about her and how this is all

10   effecting Maya and her mental health, as well.

11   **Q.**  And over the last several years, have your observations

12   of what have Lisa has been doing in terms of treatment and

13   everything else, is that all consistent with that desire to

14   get better?

15   **A.**  Yes.

16                  MR. HANNON:  That's all I have, Your Honor.

17                  THE COURT:  All right.  Cross-examination.

18                  **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19   BY MS. MANDEL:

20   **Q.**  Good morning.

21   **A.**  Good morning.

22   **Q.**  I guess at this point we're good afternoon.

23                  I'm Rachel Mandel and I'm going to ask you some

24   questions, as well.

25   **A.**  Okay.

**Q.**  I understand that Bend is a few hours' drive from
Portland; is that right?

**A.**  Correct.

**Q.**  And Portland is where your sister lives?

**A.**  Correct.

**Q.**  Before today, when was the last time that you saw your
sister?

**A.**  Before today, the last time I saw Lisa was September of
last fall, last year.

**Q.**  September 2022?

**A.**  Correct.

**Q.**  And you recall, Ms. Hart, that at some point Lisa told
you that her doctor said she needed certain accommodations in
her job at PPD; is that right?

**A.**  Correct.

**Q.**  And Lisa told you that PPD said that they were not able
to meet some of those accommodations that her doctor said she
needed; is that right?

**A.**  What Lisa told me was that she went to a meeting with
PPD, and going into that meeting, she thought that there
would be a discussion to discuss accommodations for her job,
and instead it felt -- or she told me that it was more of a
meeting to give her an exit package.

**Q.**  And Lisa never told you what types of accommodations that
she had asked for from PPD; isn't that right?

1    **A.**   Correct.

2    **Q.**   You testified a few moments ago that -- actually, strike

3    that.

4          Starting in 2018, you started to have more regular

5    communication with your sister than you previously had; is

6    that right?

7    **A.**   Correct.

8    **Q.**   And at that time, your sister was living in

9    Massachusetts; is that right?

10   **A.**   Yes.

11   **Q.**   And you were living in Bend?

12   **A.**   No, not yet.  I was living in Denver, Colorado.

13   **Q.**   You were living in Denver.  Okay.  So before you moved to

14   your current home?

15   **A.**   Correct.

16   **Q.**   And at that point in 2018, how regularly were you seeing

17   your sister in person?

18   **A.**   Not regularly, because we lived on different ends of the

19   United States.  I had seen her in 2018 to help crew her race.

20   And prior to that, it had been several years.

21   **Q.**   Let's look at some text messages from that time period.

22          Ms. Hart, you should see some text messages showing

23   up on the screen; is that right?

24   **A.**   Yes.

25   **Q.**   And at the top, it says "Tonya ;" that's you, right?

1    **A.**  Yes.

2    **Q.**  And these are some text message, you may recall having

3    with your sister?  Is that right?

4    **A.**  Yes.

5    **Q.**  And you sent her some inspirational texts like an image

6    of Rosie the Riveter; is that right?

7    **A.**  Sorry.  Can you repeat that?

8    **Q.**  There's some inspiration texts with a picture on the

9    page?

10   **A.**  Yes.

11   **Q.**  And beneath that, that's where your sister, Lisa, wrote

12   back to you; is that right?

13   **A.**  Yes.

14   **Q.**  And she wrote, "I have an awesome doctor and an attorney

15   helping me.  Diagnosed with severe and chronic social anxiety

16   disorder, panic disorder, generalized anxiety disorder.

17   Lifelong, but getting worse."

18            Do you see that?

19   **A.**  Yes.

20   **Q.**  And your sister sent this to you in 2018, right?

21   **A.**  Yes.

22   **Q.**  And looking back earlier from this time when you and your

23   sister were roommates during college, which I believe you

24   mentioned just a bit ago, you had been aware at that time, as

25   well, that your sister had social anxiety and panic, correct?

1    **A.**   Back in college?

2    **Q.**   Yes, were you aware at that time?

3    **A.**   No.

4    **Q.**   Well, let's look at the next -- the next part of this

5    message.  This is from April of 2018.

6    **A.**   Yes.

7    **Q.**   And you wrote, "Just want to check in and see how you are

8    doing."  Is that right?

9    **A.**   Yes.

10   **Q.**   And at that point in April of 2018, your sister wrote

11   back and said, "Trying to in hang there.  It's been

12   challenging to get the panic attacks under control.  I

13   typically only leave the house to go to the doctor."

14            Do you see that?

15   **A.**   Yes.

16   **Q.**   And at this point, in April of 2018, you hadn't seen your

17   sister in person in some time; is that right?

18   **A.**   Correct.

19   **Q.**   It had been some years?

20   **A.**   2018.  I'm trying to recall.  My sister and her husband

21   and Maya had made a trip to Boulder, Colorado.  I can't

22   recall the dates of that, but Maya was still pretty young at

23   that time.  I just can't recall the year that that was.

24   **Q.**   But it was a good time before 2018?

25   **A.**   It was before 2018, yes.

1   **Q.**  And so fair to say at this point in 2018, you hadn't

2   observed, in person, what your sister's condition was at that

3   point?

4   **A.**  Correct.  It had been several years.

5   **Q.**  Let's look at -- well, actually, we'll pause on that for

6   a moment.  You testified just a bit ago, you said something

7   about crewing a race?

8   **A.**  Yes.

9   **Q.**  Is that right?  Can you explain what that means?

10  **A.**  Yes.  It was my first time doing it, so I was a little

11  bit of an amateur doing it.  But Lisa -- again, it was an

12  ultra marathon, so she had several laps that she would -- on

13  a course that she would run.  And when she came back to the

14  home area, where we all had our tents set up and supplies,

15  that's where I would meet her with -- an area where I could

16  refresh her water, her gels, a drink that she would use for

17  emergency, any snacks.  I'm trying to recall, change of

18  socks, whatever it needed -- needed -- whatever she needed to

19  have supplied to her to keep going.

20  **Q.**  And as far as you understand, is this something that is

21  typical when people compete in ultra marathons, to have

22  someone crew them?

23  **A.**  Yes.

24  **Q.**  And is that just given the length of the race and what's

25  involved in being there for so long?

1    **A.**  Correct.  Correct.

2    **Q.**  Let's look at another set of text messages from spring of

3    2018.  So the -- this is -- it says Saturday, May 26, 2018.

4    The part that's in sort of that turquoise color, that's from

5    Lisa to you; is that right, Ms. Hart?

6    **A.**  Yes.

7    **Q.**  Okay.  And Dr. Menninger said, "I spoke with my doctor

8    yesterday and she loved the idea of me still doing the ADU

9    race."  Is that the anchored down?

10   **A.**  Anchored Down Ultra.

11   **Q.**  Anchor Down Ultra marathon?

12   **A.**  Yes.

13   **Q.**  "As a form of therapy with no expectations.  Do you think

14   you could come and crew with Connor?  We will of course pay

15   for your flights."

16   **A.**  Yes.

17   **Q.**  Do you see that?  Is -- Connor is one of your sons?

18   **A.**  Yes.

19   **Q.**  Okay.  And so did you understand that this was your

20   sister inviting you to come out and crew for her for that?

21   **A.**  Yes.

22   **Q.**  And below it looks like you it said, "That sounds great"?

23   **A.**  Yes.

24   **Q.**  And Garret is another one of your sons?

25   **A.**  Yes.

1   **Q.**   Okay.  And you said, "I'll see if Connor can get off of

2   school and come with me."

3   **A.**   Yes.

4   **Q.**   And did you, in fact, go out to crew this race for

5   Dr. Menninger?

6   **A.**   Yes.

7   **Q.**   And that was in Rhode Island; is that right?

8   **A.**   The race was in Rhode Island, yes.

9   **Q.**   So you came out.  It was from Denver, at that point?

10  **A.**   Yes.

11  **Q.**   From Denver to Rhode Island to crew the race?

12  **A.**   They lived in Massachusetts, but very close to the race,

13  right.

14  **Q.**   And did Dr. Menninger actually pay for your flights to

15  come out?

16  **A.**   Yes.

17  **Q.**   And that was for you and Connor?

18  **A.**   No, that was just for myself.  Connor could not make it.

19  **Q.**   Okay.  And let's look at Dr. Menninger then -- Lisa

20  responded to you and said, "I would love that so much.  I'm

21  making some progress with my doctor and trying to accept my

22  authentic self.  I'm also looking forward to some time off

23  and a possible trip to the mountains."

24          Do you see that?

25  **A.**   Yes.

1  **Q.**  And this is in -- towards the end of May of 2018, right?

2  **A.**  Yes, I see a date on here.  It says June 7th.

3  **Q.**  Oh, so this is -- okay.  So the next message down is from

4  June 7th.  And then at that point, Dr. Menninger, Lisa, wrote

5  back to you, and said, "Just an update to let you know that

6  I've decided to start training again for the ADU as a form of

7  mental therapy while I'm on short-term disability."

8  **A.**  Yes.

9  **Q.**  And she says at the end, "Would love it if you could

10  still make the trip."

11  **A.**  Yes.

12  **Q.**  And then a couple of weeks later -- well, actually,

13  strike that.

14          You said you did, in fact, go out for the ultra

15  marathon?

16  **A.**  Yes.

17  **Q.**  Is that right?  And that was in August of 2018?

18  **A.**  Yes.

19  **Q.**  And at that point, did you stay with your sister and her

20  family in Dighton?

21  **A.**  Yes.

22  **Q.**  And then just -- is it, like, an overnight trip to go to

23  Rhode Island for the ultra marathon?  How does that work?

24  **A.**  I was there for a few days, but we commuted from their

25  home in Dighton, Massachusetts, to the race that morning.

1    **Q.**  And did you crew the race alone for your sister?  Did her

2    husband participate, as well?

3    **A.**  I essentially crewed it alone.  They did come the

4    following morning and -- so that I could get a little sleep,

5    you know, maybe 45 minutes, an hour, I can't remember, and

6    then they took over.

7    **Q.**  And in the context of your sister participating in that

8    anchor downs race, you witnessed her having some panic

9    symptoms at that time around the race; is that right?

10   **A.**  It was the day before the race was the first panic attack

11   that I witnessed.

12   **Q.**  And Dr. Menninger, your sister Lisa, went ahead and did

13   the race after having had that panic attack?

14   **A.**  The race was the following day.

15   **Q.**  The race was the following day and did she end up doing

16   the race?

17   **A.**  She did, yes.

18   **Q.**  And it's -- the race is like 24 hours in total, right?

19   **A.**  I can't recall exactly, but I think it is, yes.

20   **Q.**  And do you have a recollection as to whether Lisa

21   finished the race, like got through to the end?

22   **A.**  She -- I believe she finished her goal.  It wasn't -- I

23   can't remember what -- if it was -- I think it was 100K race.

24   I don't think she finished 100K, but she finished what was a

25   goal for herself and that was to cross the finish line.

1    **Q.**  And after that visit in August of 2018, when you crewed

2    that race, what was the next time that you saw your sister in

3    person?

4    **A.**  I believe my husband and I visited them, Lisa, Mason, and

5    Maya, in June of 2019.  We visited their home in Albuquerque,

6    New Mexico.

7    **Q.**  And that was after she relocated to Albuquerque?

8    **A.**  Yes.

9    **Q.**  And can you just describe, like, physically, what was

10   the -- was that home in a rural area?  In an urban area?

11   **A.**  I believe it was just outside of Albuquerque.  It was --

12   I can't remember the name of the -- of the area, no.

13   **Q.**  With like mountains and things around?

14   **A.**  Yes.  Uh-huh.  I think it was the Sandia Mountains is

15   what I'm recalling now.

16   **Q.**  And at that time in June of 2019, did you and Lisa spend

17   time outside together?

18   **A.**  Not alone with Lisa, but it was just to go outside and

19   look at the view that they had from the house.  It was just

20   really pretty and peaceful.

21   **Q.**  And when you say not alone with Lisa, you say it was the

22   whole family gathering?

23   **A.**  I believe Maya was with us and my husband and Mason were

24   inside.

25   **Q.**  Let's look at some additional text messages.  So this is

1  between you and your sister in February of 2019; is that

2  right?

3  **A.**  Yes.

4  **Q.**  And it looks like you reached out to your sister to ask

5  about how you stopped seeing her on Facebook; is that right?

6  **A.**  Yes.

7  **Q.**  And so you said, "Did you get off Facebook?  Everything

8  okay?"

9  **A.**  Yes.

10  **Q.**  So this is like between -- basically halfway between the

11  time you saw her in 2018 and the time you saw her in 2019.

12  Is that fair?

13  **A.**  Correct.

14  **Q.**  And then your sister explained to you that Facebook or

15  social media, it sounds like, was worsening her anxiety?

16  **A.**  Yes.

17  **Q.**  And then you also checked in.  You asked if there were

18  any updates about her job.  Do you see that below?  On

19  Saturday, February 2nd.

20  **A.**  Oh, yes, I see that now.

21  **Q.**  You see that.  Okay.

22          And then to see the full response, we're going to

23  go to the next page.  And then your sister responded to you

24  and said, "Thank you.  Maya is hanging in there with school

25  and hoping that she gets into the charter school."  Then she

1  told you that she was no longer working for PPD?

2  **A.**  Correct.

3  **Q.**  And she told you about her case against PPD; is that

4  right?

5  **A.**  Yes.

6  **Q.**  And at this point in 2019, how often would you say you

7  were communicating with your sister?

8  **A.**  I would say it varied, but at this point, maybe once

9  every week, couple of weeks.

10  **Q.**  But fair to say that this text message is the first you

11  understood about your sister not working anymore at PPD?

12  **A.**  This text message?

13  **Q.**  Yup, the green one in the middle of the page.

14  **A.**  Yes.  And as far as our communications, I mean, the text

15  messages were much more frequent than just once every week or

16  two weeks.  I'm referring to phone calls.

17  **Q.**  You would agree, though, that this text message in the

18  middle of the page, it sounds like this is the first time

19  that your sister was telling you that she was no longer

20  working at PPD; isn't that right?

21  **A.**  I believe so, yes.

22          MS. MANDEL:  If I may, Your Honor, I just want to

23  provide a document.

24          THE COURT:  Yeah, go ahead.

25          You don't have to do anything with that yet.

1   She'll tell you what she wants you to do.

2           THE WITNESS:  Okay.

3   BY MS. MANDEL:

4   **Q.**  Ms. Hart, you may recall that in August of 2020, you

5   provided sworn testimony in connection with this case?

6   **A.**  Yes.

7   **Q.**  Do you recall that?  And I asked you some questions at

8   that time?

9   **A.**  Yes.

10  **Q.**  Does that sound familiar?  And you recall at that time

11  you swore under oath to tell the truth?

12  **A.**  Yes.

13  **Q.**  Just like you've done today?

14  **A.**  Yes.

15  **Q.**  Okay.  And sitting in a binder in front of you is a copy

16  of the written transcript from that deposition?

17  **A.**  Okay.  Yes.

18  **Q.**  And I'm going to ask you to turn to -- there are four

19  pages of testimony on every single page.  I'm going to ask

20  you to turn to the page that says "page 32" at the top.

21  **A.**  Okay.

22  **Q.**  And actually, let's first go to the bottom of page 31,

23  which is -- it's kind of a funny set up, but it's down on the

24  left?

25  **A.**  Okay.  I see it.

1    **Q.**  And at that time when you testified under oath at your

2    deposition, I asked you, "Are you aware that Lisa suffers

3    from any other mental illnesses?"

4           Do you see that?  That's at the bottom of page 31?

5    **A.**  Oh, I do see.  Yes.

6    **Q.**  And at the top of page 32, that's your testimony where

7    you said, "I mean, I knew when we were roommates in college,

8    I knew she struggled with social anxiety at that time, I knew

9    she struggled with panic, not that I had witnessed at that

10   time."

11          Do you see that?

12   **A.**  Yes.

13   **Q.**  And does that refresh your memory about what you knew

14   about when you were roommates with Lisa in college, about

15   whether she had social anxiety or panic?

16         MR. HANNON:  I'll just object, Your Honor.  If

17   they're going to read the answer, it should be the full

18   answer and the question, as well.

19         THE COURT:  She read the question.

20         MR. HANNON:  Well, at least the full answer.

21         THE COURT:  But the full answer, fair enough.

22         Why don't you just read the full answer.

23   BY MS. MANDEL:

24   **Q.**  The rest of your answer was, "Lisa did tell me that her

25   psychiatrist had diagnosed, after this happened with PPD,

1    with panic disorder and generalized anxiety disorder, as well

2    as social anxiety disorder.  She also developed depression

3    and suicidal thinking, which I never saw any of that prior to

4    this meeting."

5            But Ms. Hart, does this refresh your recollection

6    about whether you had observed social anxiety and panic in

7    your sister at the time that you were roommates in college?

8    **A.**  At the time I didn't.  I just looked at it as she was

9    just not as comfortable in settings, for example, if we were

10   at a gathering together with friends.  I could see the

11   anxiety.  I never really knew of any diagnoses of social

12   anxiety or panic disorder at that time.  But I was -- I was

13   able to witness that she was uncomfortable and not as

14   outgoing in a group setting, especially if she had to make

15   small talk.

16   **Q.**  Well, that was your language at your deposition, right?

17   That you knew she had social anxiety and panic.  Isn't that

18   right?

19   **A.**  Yes.  I did go on to say I knew she struggled with some

20   panic, but not that I witnessed at the time.

21           MS. MANDEL:  Okay.  Thank you.  I have no further

22   questions at this time, Your Honor.

23           THE COURT:  Anything else?

24           MR. HANNON:  No, Your Honor.

25           THE COURT:  All right.  Ms. Hart, thank you very

1    much.  You're excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  Ms. Ballweg, once she steps down, you

4    can return to the witness box.

5              And Ms. Mandel, maybe you can retrieve the notebook

6    that you have for Ms. Hart.

7              So now we resume with Ms. Ballweg, where we were

8    before.

9              Go ahead when you're ready, Ms. Mandel.

10                       **DEBORAH BALLWEG**

11     having been previously duly sworn, testified as follows:

12        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT, Cont.**

13   BY MS. MANDEL:

14   **Q.**  Deb, in addition to the discussion that you testified

15   earlier that you had with Dr. Menninger about the results of

16   your investigation, did you send any written update to

17   Dr. Menninger about the outcome of the investigation?

18   **A.**  I believe I did, yes.

19   **Q.**  And up on the screen in front of you is an e-mail that

20   you sent, dated May 22nd of 2018?

21   **A.**  Yes.

22   **Q.**  Do you recall sending this e-mail to Dr. Menninger?

23   **A.**  Yes.

24   **Q.**  And in the first sentence, you said, "As we discussed by

25   phone today"?

1   **A.**   Yes.

2              THE COURT:   Hold on one second.

3              The screens aren't working.

4              THE DEPUTY CLERK:   Is this an exhibit?

5              THE COURT:   Is this an exhibit in evidence?

6              MS. MANDEL:   This is.   238.

7              THE COURT:  Sorry.  Now?  Good.

8              Why don't you repeat the question.

9              MS. MANDEL:   Thank you.

10  BY MS. MANDEL:

11  **Q.**   Deb, you said in the first sentence here, "As we

12  discussed by phone today"?

13  **A.**   Yes.

14  **Q.**   And do you recall if, on May 22nd, you had a phone call

15  with Dr. Menninger about the outcome of the investigation

16  that you conducted?

17  **A.**   Yes.

18  **Q.**   What happened during that phone call?

19  **A.**   Again, just relayed to Dr. Menninger the outcome of the

20  investigation, my findings.

21  **Q.**   After this phone call that you had and this e-mail that

22  you sent on May 22, 2018, what did you next become aware of

23  with regard to Dr. Menninger's employment at PPD?

24  **A.**   That she had -- her doctor had recommended she take a

25  leave of absence.

1    **Q.**  How long after that set of communications that you had

2    with Dr. Menninger did that happen?

3    **A.**  I believe it was about a week later.  I think it was

4    early June.

5    **Q.**  Deb, can you describe for the jury, how do you view your

6    role at PPD with HR?

7    **A.**  My role is a lot of things, but I guess foundationally my

8    role is one to really work with employees and managers on

9    resolving daily issues, complex issues, really being there to

10   make sure that our employees feel valued, that it's an

11   organization that supports their development, and that my

12   role is really to help ensure that the organization and

13   employees work together to achieve those goals.

14   **Q.**  Can you describe your mindset when you started the

15   investigation into Dr. Menninger's concerns in the spring of

16   2018?

17   **A.**  Certainly concerned that Lisa felt this way, or

18   Dr. Menninger felt this way, and wanted to ensure -- looked

19   into all of her concerns fairly, timely, but impartially, so

20   that I could conclude an investigation and give her some

21   findings.

22   **Q.**  And what was your mindset when you completed the

23   investigation and you saw that Dr. Menninger didn't seem

24   happy?

25   **A.**  Again, I felt concern for Lisa.  You know, the outcome of

1    the investigation certainly didn't, in my opinion, go the way

2    she had expected or wanted.  However, again, at the end of

3    the day, I felt badly for her, but I couldn't change the

4    outcome of the investigation based on the fact that she saw

5    things that just weren't there.

6    **Q.**   Throughout the process of supporting the business and

7    Chad during this time period, and in the spring of 2018 and

8    when you were conducting the investigation, what goals did

9    you have?

10   **A.**   Again, to work with the employees, to make sure that they

11   felt they had an AVENUE in which to turn to for assistance,

12   to ensure that they had a path forward in conducting, you

13   know, their day-to-day activities.

14            MS. MANDEL:  This is Joint Exhibit 446.

15   BY MS. MANDEL:

16   **Q.**   You testified a few moments ago that shortly after the

17   investigation that you did was concluded, Dr. Menninger went

18   out on a medical leave.  Is that accurate?

19   **A.**   That's accurate.

20   **Q.**   And this e-mail here is from Dr. Menninger to you and to

21   Chad St. John, saying, "My doctor has advised me to take

22   medical leave effective immediately.  Please let me know if

23   there are any specific forms that I need to have her fill

24   out."

25            Do you see that?

1    **A.**  Correct.

2    **Q.**  And as far as you recall, did Dr. Menninger, in fact,

3    take a medical leave beginning immediately after this e-mail?

4    **A.**  Yes, she did.

5    **Q.**  After Dr. Menninger went out on medical leave, which was

6    at this time, did you hold out hope that she would return

7    from her leave?

8    **A.**  Yes.

9    **Q.**  Did Dr. Menninger ever return from her leave to work at

10   PPD?

11   **A.**  No.

12   **Q.**  Did you have communications with Chad or with others

13   about the hope that Dr. Menninger would return to her

14   position from medical leave?

15   **A.**  Yes.

16   **Q.**  And just generally, what was the nature of those

17   conversations?

18   **A.**  Certainly wanting to make sure that we, you know, offered

19   Lisa the ability to come back, you know, avenues in which to

20   reach out to anyone within the organization, HR specifically,

21   and that we had desires for her to return to her job.

22            MS. MANDEL:  This is Joint Exhibit 90.

23   BY MS. MANDEL:

24   **Q.**  Let's look at these e-mails regarding Dr. Menninger's

25   leave.  Down below, at the bottom of this page, is an e-mail

1    that Chad sent to Dr. Menninger, saying, "Please do let us

2    know if there is an additional alternative accommodation that

3    we can offer."  And this is from November of 2018.  Do you

4    see that?

5    **A.**   Yes.

6    **Q.**   And then Chad goes on, "PPD maintains that it does not

7    engage in any discriminatory or otherwise unlawful conduct."

8              Do you see that?

9    **A.**   Yes.

10   **Q.**   As far as you know, did Dr. Menninger ever respond to

11   this listing any other accommodations that the company could

12   offer that would allow her to return to work?

13   **A.**   No.  She did not.

14   **Q.**   And if we look at the e-mail above that Dr. Menninger

15   wrote back to Chad, where she said, "Given my current

16   condition and PPD's continued refusal to take any action to

17   address the conduct that cause, she was unable to suggest any

18   possible accommodations that would allow me to return to

19   work."

20             Do you see that?

21   **A.**   Yes.

22   **Q.**   And again, after this e-mail, you're not aware -- are you

23   aware that Dr. Menninger ever came forward with any

24   additional accommodations that she was asking PPD to offer?

25   **A.**   No, she did not.

**Q.** As far as you know, how did Central Labs handle the need
for an executive director of labs during the time that
Dr. Menninger was out on leave?

**A.** I believe there was a consultant that was brought in to
cover the licensure, but there wasn't full-time coverage for,
again, the licensure that she held.

**Q.** At some point, did Dr. Menninger's leave come to an end?

**A.** It did, yes.

**Q.** Do you recall approximately when that was?

**A.** So from the time she left in June, until it was, I
believe, February 1st of 2019, the role was held open with
the hope and intention of bringing Dr. Menninger back to the
organization. Administratively, the role being open that
long, we needed to make a change. We needed to change
Dr. Menninger's status in the system and move forward.

**Q.** And when did that happen?

**A.** Her status was changed February 1st of 2019.

**Q.** Deb, after the start of the COVID-19 pandemic, did PPD
look at whether some roles could be made remote?

**A.** Yes.

**Q.** Was the executive director of labs position ever made
into a remote position?

**A.** No.

**Q.** Through 2020, did it remain an in-person role in Highland
Heights, Kentucky?

1    **A.**  Yes, it did.

2    **Q.**  And did that role, in your role as HR, as far as you

3    know, did that role require in-person interaction through

4    2020?

5    **A.**  Yes.

6    **Q.**  How about in 2021?  Was it an in-person role in Highland

7    Heights, Kentucky?

8    **A.**  Yes.

9    **Q.**  And how about in 2022?

10   **A.**  Yes.

11   **Q.**  And how about now?

12   **A.**  Yes.

13           MS. MANDEL:  Thank you, Deb.

14           I have no more questions at this time.

15           THE COURT:  All right.  Go ahead, Mr. Hannon.

16           **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

17   BY MR. HANNON:

18   **Q.**  Ms. Ballweg, did I hear you say that after Dr. Menninger

19   went out on leave, that PPD was holding out hope that she

20   would return?

21   **A.**  Yes.

22   **Q.**  I'm going to show you Joint Exhibit 229.

23           So this is a June 25th, e-mail exchange between

24   yourself and your boss, Jerry Williams, yes?

25   **A.**  Yes.

1    **Q.**  This is a few weeks after Dr. Menninger had gone out on

2    leave, correct?

3    **A.**  Correct.

4    **Q.**  Looking at the second page here, the e-mail chain begins

5    with an e-mail from Chris Fikry, yes?

6    **A.**  Yes.

7    **Q.**  Mr. Mekerri's boss?

8    **A.**  Yes.

9    **Q.**  Mr. Fikry wrote, "Any update on Lisa's transition?"

10          Do you see that?

11   **A.**  I do.

12   **Q.**  Did you tell Dr. Fikry that PPD was still holding out

13   hope that Dr. Menninger was going to return?

14   **A.**  Yes.  This was -- excuse me, this was referring to

15   transition of the licensure.  How do we protect our business?

16   **Q.**  Not my question, ma'am.

17          Did you tell Dr. Fikry, in late June of 2018, that

18   PPD was still holding out hope that Dr. Menninger would

19   return?

20   **A.**  I don't recall if I specifically said that to Dr. Fikry.

21   **Q.**  Let's take a look.  E-mail here on the first page, these

22   are your -- these are your draft responses back to

23   Dr. Fikry's questions, right?

24   **A.**  Yes.  It appears that way.

25   **Q.**  Okay.  So the -- the dark print, that's what Dr. Fikry

1  asked, and the light print, those are your draft responses,

2  right?

3  **A.**  Yes.

4  **Q.**  Okay.  And you wrote, "Lisa's leave of absence runs

5  through July 6th.  I anticipate her returning to work on

6  July 9th, but not 100 percent sure she won't extend, (gut

7  more than fact.)  She has a lawyer who's asked for employment

8  related documents.  Nothing official in terms of a complaint.

9  However, does open the door for conversations on

10 transitioning.  The traditional route requires her to return

11 to work, perform to level of expectation, be provided

12 feedback on where she falls short, then move forward with the

13 term request.  Again, her having an attorney who's made

14 contact with us will lead to a faster route of resolution."

15           Do you see that?

16 **A.**  Yes.

17 **Q.**  Did I hear you testify a few moments ago that

18 Dr. Menninger -- that you believe that she saw things that

19 weren't there?

20 **A.**  Based on my investigation of the seven areas, yes.

21 **Q.**  And that's what you told Dr. Menninger after your

22 investigation, right?

23 **A.**  I gave the feedback individually on all seven points,

24 yes.

25 **Q.**  And you told her that all of the things that she claimed

1    she was seeing, in terms of all the different treatment that

2    you thought she was getting, you told her that was all in her

3    head, right?

4    **A.**   No.  I pointed to evidence of why I felt she wasn't being

5    discriminated against in a point-by-point.

6    **Q.**   And that she was just imagining it, right?

7    **A.**   I pointed to evidence that said, "This is not factual."

8    I can't speak to what she felt.

9    **Q.**   Did you point to the evidence that was factual?

10   **A.**   Talking to Brent McKinnon about the QA stuff, talking to

11   the recruiter, talking to an e-mail support from Brent

12   McKinnon from a quality perspective.  There was data to

13   support the findings.

14   **Q.**   How about the memo from Mr. St. John in early March of

15   2018?

16   **A.**   Which memo?  Sorry.

17   **Q.**   The one he drafted in connection with seeking legal

18   advice.  Do you recall that memo?

19   **A.**   There's been a series of memos.

20   **Q.**   So your testimony here is you don't remember the memo

21   that we looked at yesterday concerning Mr. St. John seeking

22   legal advice?

23   **A.**   We've looked at a number of memos, but that one

24   particularly?  No, I did not look at.

25   **Q.**   My question is, do you remember that memo now?

1    **A.**  I do.

2    **Q.**  Okay.  Do you remember the words he used, in terms of

3    what the advice he was looking for from Ms. Menninger?

4    **A.**  Not specifically, but in general, yes.

5    **Q.**  Exit strategy, right?

6    **A.**  Yes.

7    **Q.**  Dr. Menninger, she didn't imagine that, right?

8    **A.**  The investigation pointed to the seven facts that she

9    raised.  I investigated those seven points.

10   **Q.**  Did you investigate Mr. St. John seeking an exit

11   strategy?

12   **A.**  No.

13   **Q.**  Now, part of Dr. Menninger's complaint to you concerned

14   Mr. St. John, didn't it?

15   **A.**  It concerned her manager treating her differently due to

16   her disclosure of her disability.

17   **Q.**  It only concerned Mr. Mekerri?

18   **A.**  She felt she was being targeted and harassed by her

19   manager.

20   **Q.**  Okay.  She also told you about the options that were

21   presented at the start of the February 28th meeting, right?

22   **A.**  Yes.  By her manager.

23   **Q.**  And to be clear, when you interviewed her, in connection

24   with your investigation, she told you the same story about

25   that meeting that she told this jury, right?

1   **A.**  I don't recall where -- when Dr. Menninger and I had the

2   conversation, where she felt that was communicated.  The fact

3   that it was communicated wasn't contested; it was -- I don't

4   recall if she said it was at the beginning or what point of

5   the conversation.

6   **Q.**  So you don't recall whether Dr. Menninger's account of

7   that meeting, that she told you during your investigation,

8   you can't tell us if that's the same account that she gave

9   this jury?

10  **A.**  I can honestly say that the conversation about a package

11  or consulting occurred in that conversation.  But I'm not

12  100 percent certain where in that conversation, nor do any of

13  the three in that conversation.

14          THE COURT:  I'm going to stop you here, Mr. Hannon.

15          So ladies and gentlemen of the jury, don't discuss

16  the case among yourselves, don't discuss it with anyone else,

17  don't do any independent research.  Have a nice weekend.

18  Remember Monday, 9:00 to 1:00, and 2:00 to 4:00, same on

19  Tuesday, 9:00 to 1:00, 2:00 to 4:00, and then we're back to

20  the 9:00 to 1:00.

21          Thank you very much for your attention.  All rise

22  for the jury.

23          (The jury exits the courtroom.)

24          THE COURT:  Okay.  See you-all Monday morning,

25  8:45, unless you think there's a reason to meet earlier.

1          MS. MANDEL:  8:45 works for us.

2          THE COURT:  All right.  See you then.  Have a good

3    weekend.  Safe travels, Ms. Hart.

4          (Court in recess at 1:02 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 24th day of March, 2023.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter