1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3    _____

4    LISA MENNINGER,

5         Plaintiff,                      Civil Action No.
                                          1:19-cv-11441-LTS
6         v.

7    PPD DEVELOPMENT, L.P.,

8         Defendant.

9    _____

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

13                        JURY TRIAL
                           Day 6

14

15

16               Monday, March 27, 2023
                      8:35 a.m.

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                      **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

        HARTLEY MICHON ROBB HANNON, LLP
4        BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
         155 Seaport Boulevard
5        2nd Floor
         Boston, Massachusetts  02210
6        (617) 723-8000
         phannon@hmrhlaw.com
7        hwatson@hmrhlaw.com

8

9   On behalf of the Defendant:

10        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
         BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11        One Boston Place
         Suite 3500
12        Boston, Massachusetts  02108
         (617) 994-5700
13        rachel.mandel@ogletreedeakins.com
         patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

1
2
<u>**TABLE OF CONTENTS**</u>

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                          <u>Page</u>

DEBORAH BALLWEG

    By Mr. Hannon                                          20

    By Ms. Mandel                                          52

MARIANNA I. KESSIMIAN

    By Mr. Hannon                                          60

    By Ms. Mandel                                          75

    By Mr. Hannon                                          147

PAUL SUMMERGRAD

    By Mr. Hannon                                          151

    By Mr. Curran                                          201

    By Mr. Hannon                                          259

    By Mr. Curran                                          266

**EXHIBITS**

None

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6          THE COURT:  Please be seated.

7          So before we talk about -- I know you want to talk

8    about those exhibits.  I've read those; I'm ready to talk to

9    you about it.

10          Before we do, I want to talk to you about the

11    schedule a little bit, and something that I'm thinking of

12    doing, and I want to see what you think.

13          So one, I've been, as you know, a little bit

14    concerned that we're not going to finish by Friday when we

15    promised the jury, and I'm more concerned about it than I was

16    before, because one of the -- one or more of the jurors, on

17    the way out Friday afternoon, said to Kellyann something

18    like, "We're going to be done on Friday, right?"  And the

19    feeling that was, like, we really want to be done on Friday.

20    And so that makes me think what -- or I looked over how much

21    time we have between now and Friday, how much trial time,

22    given each day, 9:00 to 1:00, Monday to Friday, figuring all

23    that's trial time, plus today 2:00 to 4:00, plus tomorrow

24    2:00 to 4:00, minus the 15 minute break.  And that leaves us

25    a little more than 22.75 hours.  So forgetting about this

1    three-quarters of an hour, because there could be slippage on

2    the break, and there could be slippage here or there, so at

3    least 22 hours.

4           So my thought was to say to each of you you have 11

5    hours and -- to present the rest of your cases, but I'm not

6    just doing it, I'm telling you, see what you think.

7           Any thoughts?

8           MR. HANNON:  That's fine on my end, Your Honor.

9           THE COURT:  I'll tell you how you would do it, too.

10   Go ahead.

11          MS. MANDEL:  It's okay with us, as well.

12          THE COURT:  Okay.  Then that's what we'll do.

13          And then what I'll do is when you're examining a

14   witness, that's your time.  So if you call the witness,

15   Mr. Hannon, on direct, that runs against your 11 hours, and

16   cross runs against your time.

17          Redirecting, it's you, Mr. Hannon, recross against

18   you, Ms. Mandel, and if you recall a witness, it's just

19   reverse.  If there's -- as general matter, there haven't been

20   many objections, and so we haven't spent a lot of time with

21   objections at sidebar, so I don't see that -- and neither of

22   you are the kind of lawyers who would be churning and making

23   objections to churn through the other person's time.  I only

24   say that because I have had that experience.  So if -- so

25   that's how I would do it.  And I'll keep you abreast of how

1    the time works, so you know where you are.

2           MS. MANDEL:  Your Honor, just one slight -- it's

3    not really a complication, but it's sort of a wrinkle in this

4    is there are two deposition transcripts that are going to be

5    presented, and at least on one of them, we've sort of jointly

6    agreed on a --

7           THE COURT:  I understand.  A whole bunch.  Why

8    don't you, as to those two, you could propose like how to

9    divide the total amount of time for them between the two of

10   you and I'll allocate it that way.  It seems fine.

11          MS. MANDEL:  Thank you.

12          THE COURT:  Okay.  You want to talk about these

13   exhibits or anything else?  I guess the first question that

14   would be helpful for me is who's proposing the exhibits and

15   who is objecting?

16          MS. MANDEL:  We are proposing the exhibits and he

17   is opposing them.  Mr. Hannon has objected.

18          THE COURT:  Okay.  So let's -- starting with number

19   48 -- so I guess let me tell you one general observation.  I

20   assume you want to examine -- all of these relate to

21   Dr. Kessimian.  Is that how you say her name?

22          MS. MANDEL:  That's right, Your Honor.  Yes.

23          THE COURT:  So I think as a general proposition,

24   unless there's something that you can explain to me,

25   Mr. Hannon, I think they're all fair game for

1    cross-examination of her.  Right?

2          MR. HANNON:  I guess one in particular, Your Honor,

3    there's a relevance concern here.

4          THE COURT:  Which one?

5          MR. HANNON:  Number 39.

6          THE COURT:  With Dr. Kissimian's response at the

7    top, or with --

8          MR. HANNON:  With Dr. Kissimian's response at the

9    top.  So there's this -- there's this bit about, "I'm going

10   to ask Chad," and that's misleading.  It -- I think -- well,

11   I don't understand what the -- what the purpose is of

12   offering this.  But I think there's a significant risk of

13   just confusion in terms of the timeline here.

14         THE COURT:  So I just say on that, I wouldn't rule

15   it out right now.  I hear your point, it might depend on what

16   the question was and what she said.  But as a general

17   proposition, I don't know if she's talking to Chad St. John

18   during this time or not.  If she were having conversations,

19   that might be relevant.  But I think all of that strikes me

20   as things that would be fair game for cross-examination, and

21   to be asked about and say didn't you write an e-mail that

22   said, or you could be impeached with that, or refreshed.  And

23   so the real -- and I understand your objection to be not to

24   any of that, subject to this possible timing relevance as to

25   that little bit, but really, that these aren't admissible as

1    exhibits.

2              MR. HANNON:  Correct.

3              THE COURT:  Okay.  So with that in mind, running

4    through them, why are they -- starting with number 48.

5              MR. HANNON:  Well, I should -- just to clarify,

6    Your Honor, I've been given some of the Court's other

7    rulings, I think the only objection that I'm going to press

8    here is just with respect to the document that I just

9    referenced, the Exhibit Number 39.

10             THE COURT:  Oh.  Okay.  And with respect to the top

11   part, as opposed to what Dr. Menninger wrote?

12             MR. HANNON:  Correct, yes.

13             THE COURT:  Right.  Why is that part -- so the rest

14   you're not objecting to?

15             MR. HANNON:  Correct.

16             THE COURT:  So why is that part admissible, the top

17   part on that, number 39.  That's the only one at issue.

18             MS. MANDEL:  Your Honor, Dr. Menninger, through

19   counsel, has certainly made an issue that we've had so far of

20   what types of communications PPD received with regard to

21   accommodation requests, what PPD's mindset may have been in

22   responding to those accommodation requests.  And the notion

23   of sort of where these kind of buckets came from, as

24   Mr. Hannon refers to them, is definitely an issue in this

25   case, and this e-mail from Dr. Kessimian absolutely goes to

 1   sort of where the idea of those buckets came from, what

 2   Dr. Menninger's treating physician's intention was in

 3   connection with the discussion of accomodation of those

 4   buckets and all of that is very relevant.  Frankly, it's sort

 5   of brought into issue by the plaintiff in this case.

 6            THE COURT:  Who's Patrick?

 7            MR. HANNON:  I'm sorry?

 8            THE COURT:  Who's Patrick?

 9            MR. HANNON:  That's me.

10            THE COURT:  Right.  Of course.  Sorry.  All right.

11            MR. HANNON:  That's why it's misleading is because

12   this has nothing to do with the buckets.  The buckets, as

13   we've seen, come from a whole separate e-mail chain between

14   Chad St. John, Mr. Mekerri, and Dr. Menninger.

15            THE COURT:  What's the date of the buckets e-mail?

16   February 6th?

17            MR. HANNON:  I believe it's February 6th.  Yeah.

18            THE COURT:  And did she ever have any -- as far as

19   you know, Ms. Mandel, did she have any communications with

20   Chad St. John directly?

21            MS. MANDEL:  Dr. Kessimian?

22            THE COURT:  Yeah.

23            MS. MANDEL:  Yeah.  In fact, there are some

24   exhibits that are already admitted in the case from

25   January 31st, February 14th.  Those are communications that

1      did go directly from Dr. Kessimian to Chad St. John.

2              THE COURT:  The ones we've seen.  But did she have

3      any phone calls with them?

4              MS. MANDEL:  I believe there was one phone

5      communication in this time period, as well, and this e-mail

6      is sort of right in that timeline.

7              THE COURT:  I guess I'd say the real issue is

8      relevance here.  I am just not sure until I hear her

9      testimony.  It doesn't strike me -- I'm missing the deep

10     significance of the document, either way, and it doesn't

11     strike me as -- there may be more significance to it than I

12     perceive, but -- you certainly can ask about communications

13     with Chad St. John and what she -- you know, I think that's

14     fair to discuss on examination.  Whether it's --

15             What you're really saying is it's not relevant,

16     Mr. Hannon, and if it is relevant, I should keep it under

17     403, because it is too confusing.  And the confusion goes

18     to -- the defendant wants to use it to say it is the source

19     of the buckets, and you say, well, it's too confusing.  I

20     can't -- like she's in the mix on the buckets, because she's

21     sent the document that we've all seen on January 31st and

22     then -- and responded to the bucket's e-mail.  Whether

23     that's -- and whether that's it, in the source of the

24     buckets, whatever that means, came from an effort by PPD to

25     drill down or whether there was some further communication or

1   what the significance of that is, I don't know.  I think I'd

2   have to just hear the testimony and see.

3   MR. HANNON:  I think you're right, because I think

4   there's sort of a necessary sort of predicate to make this

5   relevant, which would be that after that -- she reached out

6   to Chad St. John subsequent to this e-mail, and you're not

7   going to hear any evidence of that, is my expectation.  But

8   obviously, if you did hear that evidence, then I would agree

9   this would become relevant, because this would be reflective

10  of what that conversation was about.

11  MS. MANDEL:  Your Honor, the other question that

12  has come up repeatedly over the last week is whether

13  Dr. Menninger was able to do essential functions of her job,

14  by communicating that she was able to do essential functions,

15  and this e-mail also indicates that he treating physician

16  said we're seeking for her to work 100 percent remotely,

17  which is, you know, sort of yet another question in this

18  case, was that sought, would that have been reasonable, and

19  this e-mail goes directly to that point, as well.

20  THE COURT:  What about that?

21  MR. HANNON:  It doesn't.  That request was never

22  actually made.  What matters are the requests that were

23  actually made to that.

24  THE COURT:  And her state of mind is not relevant,

25  right?

| | |
|---|---|
| 1 | MR. HANNON: Dr. Kissimian's? |
| 2 | THE COURT: That's correct. |
| 3 | MR. HANNON: Yeah. |
| 4 | MS. MANDEL: Your Honor, we've had testimony and |
| 5 | we'll have more testimony about the company's, frankly, state |
| 6 | of confusion, about what was being asked for and whether it |
| 7 | was something that they could meet. And the treating |
| 8 | physician's state of mind in writing the accomodation |
| 9 | requests that were submitted to the company on February 14th |
| 10 | is absolutely relevant and should be considered by the jury |
| 11 | in trying to understand what the -- whether the company's |
| 12 | response -- |
| 13 | THE COURT: Why isn't it relevant to |
| 14 | Dr. Menninger's state of mind that her psychiatrist |
| 15 | said, "We're seeking 100 percent remote"? |
| 16 | MR. HANNON: To show what about her state of mind, |
| 17 | though. |
| 18 | THE COURT: To show that -- what about her state of |
| 19 | mind, Ms. Mandel? |
| 20 | MS. MANDEL: Again, the company -- we have a |
| 21 | company witness, we'll have more company witnesses talk about |
| 22 | the sort of confusion about what she was seeking and whether |
| 23 | it was something that the company could do. And this e-mail |
| 24 | here shows that the communications between Dr. Menninger and |
| 25 | the treating psychiatrist helped establish what that state of |

1    mind was for both of them, but what they were actually

2    seeking.

3              THE COURT:  I'll think about that.

4              And the rest you can admit because they're not

5    objected to and so they're admissible without objection.  And

6    number 39, I'll just decide this when it comes up.  We'll see

7    what the testimony is.

8              Anything else?

9              MR. HANNON:  Nothing here.

10             MS. MANDEL:  No.  Thank you.

11             THE COURT:  Okay.  Well, that was easy.  Four of

12   five.

13             All right.  Then we'll -- and today, who are the

14   witnesses today?  We have Ms. Ballweg still on the witness

15   stand?

16             MR. HANNON:  Yeah, we'll finish here.

17             THE COURT:  I can't remember.  You're examining?

18   You're doing your redirect.

19             MR. HANNON:  Redirect.

20             THE COURT:  All right.  How much longer do you

21   think you have with her?

22             MR. HANNON:  Um --

23             THE COURT:  You don't have to precise it down to

24   know --

25             MR. HANNON:  I know.  I'm going to say something in

```
 1    the 20-miinute range.

 2              THE COURT:  Okay.

 3              MR. HANNON:  But as quick as possible.

 4              THE COURT:  Yeah.

 5              MR. HANNON:  And then our next witness is going to

 6    be Dr. Kessimian.

 7              THE COURT:  And do you expect much recross?

 8              MS. MANDEL:  It's likely something similar.  It's a

 9    little hard to tell until we see --

10              THE COURT:  Okay.

11              And then, I'm sorry, after that, Mr. Hannon?

12              MR. HANNON:  Dr. Kessimian.  And then we have

13    Dr. Summergrad.

14              THE COURT:  Okay.  All right.  And that will take

15    us the rest of the day?

16              MR. HANNON:  Yes.

17              THE COURT:  Okay.  And then after that, you have --

18    who do we have tomorrow, or after them?

19              MR. HANNON:  Tomorrow will be a number of PPD

20    folks, kind of depending upon who's available when.

21              THE COURT:  Who are the PPD folks who are coming,

22    putting aside whether they can come tomorrow.

23              MS. MANDEL:  The ones who can be available, in

24    town, and available tomorrow, are Chad St. John and

25    Christopher Fikry.
```

1          THE COURT:  Okay.  So we have those two.  Other

2     witnesses coming are -- and then the other, Dr. Kelly, the

3     two damage experts, and the two depositions, Mason Menninger

4     and Hacene Mekerri.  Anyone else?

5          MS. MANDEL:  Well, on Wednesday, we'll have two

6     additional PPD witnesses here, that's Christopher Clendening

7     and Brent McKinnon, although I should have said in the

8     opposite order, because Brent McKinnon has a little bit of a

9     tighter travel schedule.

10          THE COURT:  Okay.  And any other witnesses in

11     total?  I'm just thinking about --

12          MR. HANNON:  I think we've covered all of them.

13          THE COURT:  Okay.  Two quick, legal questions,

14     since I have you.  One is, Ms. Mandel, do you agree that if a

15     person is disabled -- I'm just thinking about the jury

16     instructions.  It's an issue that I've been thinking about --

17     the person is disabled and the person can do their job --

18     let's say there's two essential functions to their job, (a)

19     and (b), and they can do those two essential functions

20     without an accommodation, but they do request an

21     accommodation, nonetheless, because it would, in Mr. Hannon's

22     words, reduce the difficulties of the stress of doing the

23     job.  And they want to -- and the accommodation is otherwise

24     reasonable, and there's no undue burden, just assume all of

25     that.  Is it then the company's obligation to provide that

1   accommodation?  And the reason I'm thinking about this,

2   I'm -- I'm thinking of explaining, and it's not a central

3   feature of the instructions, but it is part of the

4   instructions, that principle, and I wasn't sure where you

5   stood on that.

6         And you're not -- like you have all of your rights

7   later to object, I'm just trying to figure it out now.

8   That's why I'm bringing it up.

9         MS. MANDEL:  In a very general sense that -- I

10   would say yes, in a very general sense.  But I think the

11   nuance points are really important, right, like the weighing

12   of an undue burden on the employer, if it's a situation where

13   the employee is saying I can do all of the essential

14   functions of my job without the accommodation.  I think --

15   I'd have to think more about that nuanced piece.

16         THE COURT:  Okay.  All right.  And Mr. Mekerri no

17   longer works for PPD or Thermo Fisher?

18         MS. MANDEL:  That's right.

19         THE COURT:  Okay.  And do you, Mr. Hannon, have a

20   view on the -- it's not exactly a missing witness

21   instruction, but it's a cousin of a missing witness

22   instruction that they requested?

23         MR. HANNON:  Yeah, there's no basis for that.

24         THE COURT:  Okay.  Okay.  No basis in law or no

25   basis in fact?

1              MR. HANNON:  Both.

2              THE COURT:  Okay.  Why?

3              MR. HANNON:  We'll start with the fact.  I'm not

4      good with geography, but I think he lives thousands of miles

5      away.

6              THE COURT:  That would be fair.  Oregon.  I think

7      the record would establish right now that -- or a reasonable

8      inference from the record.  I'm not sure it's expressly

9      stated, but I think the understanding of everyone in the

10     courtroom is that he lives in Oregon with your client and

11     their daughter.

12             MR. HANNON:  Correct.  And obviously,

13     Dr. Menninger's here, he's there with their minor child.  So

14     drawing any kind of an inference from the fact that he hasn't

15     traveled across the country to testify because there's some

16     concern that he's going to say something bad isn't a

17     supportable inference.  Further, if he had something bad to

18     say, they would have discovered it at his deposition.  They

19     had a full and fair opportunity to question him, to elicit

20     any evidence, helpful or unhelpful.  So this is not the kind

21     of witness that a missing witness instruction or anything in

22     that family is appropriate.

23             THE COURT:  Okay.  And what do you say?

24             MS. MANDEL:  Mr. Mekerri is within the continental

25     United States and certainly had an opportunity to travel

```
 1   here, to be here, the same way that Dr. Menninger's sister
 2   was here.  I think that it's -- it is at least conceivable
 3   that the fact that Mr. Menninger did not travel here
 4   indicates something about an unwillingness to be here.
 5            THE COURT:  Well, one thing is sure, it says
 6   something.  Right?  I think if you asked Dr. Kessimian
 7   whether actions or inactions all mean something, sometimes a
 8   cigar is just a cigar, but it's always something.  And
 9   sometimes a no is just no, but sometimes a no is not a no.
10   So it means something, that's for sure.  Whether it means
11   something that's supports an inference is a different
12   question, whether I should instruct them is still a different
13   question.  I have no doubt it means something.  I'm not --
14   even Mr. Hannon is conceding in his argument that it means
15   something.  Right?  You're saying that it likely means
16   something else.
17            MR. HANNON:  It means he's afraid to fly.
18            THE COURT:  It could mean that.  That's a different
19   inference.  Right?  That's a different conclusion, as opposed
20   to he's there because they have a minor daughter, but it
21   means something.  I'm not saying that it means anything
22   that's relevant.
23            MR. HANNON:  And if they want to question him, we
24   can put him on Zoom.  I mean, he's not afraid to Zoom.  It's
25   not -- it's not an issue of him having anything bad to say,
```

1    it's a matter of him living thousands of miles away, and the

2    logistics of all of that.

3              THE COURT:  I see.  So even though he's not subject

4    to subpoena power, he would consent to Zoom testimony.

5              MR. HANNON:  Absolutely.

6              THE COURT:  Okay.  All right.  Well, that's

7    helpful.

8              Is there anything else that you want to say about

9    that, Ms. Mandel?

10             MS. MANDEL:  Not at this time, thank you.

11             THE COURT:  Okay.  I'll just think about that and

12   we'll see.

13             All right.  Why don't you -- we'll just -- I'm

14   going to stay here, but we'll stand in recess.  And we should

15   have Ms. Ballweg on the stand.  You should get your client,

16   so we're ready to go.

17             (Court in recess at 8:55 a.m.

18             and reconvened at 9:01 a.m.)

19             (The jury enters the courtroom.)

20             THE COURT:  Good morning, ladies and gentlemen.  I

21   hope you all had a nice weekend.  Nobody discussed the case

22   among yourselves, discussed it with anyone else, or did any

23   independent research?  Great.

24             So just before we get started, I know one or more

25   of you had a question about the schedule for Ms. Belmont

1    Friday afternoon after you were leaving.  So, yes, you will

2    receive this case no later than Friday afternoon for

3    deliberations.  Okay.  So -- and the schedule will be 9:00 to

4    1:00 today, 2:00 to 4:00 today, same tomorrow, back to 9:00

5    to 1:00, Wednesday and Thursday, Friday, 9:00 to 1:00, we'll

6    take a break for lunch and we'll -- you'll get the case

7    sometime in the afternoon.  I can't promise it will be at

8    2 o'clock, but you'll receive the case for deliberations

9    before 5:00 on Friday.

10           All right.  Go ahead, Mr. Hannon.

11           MR. HANNON:  Thank you, Your Honor.

12                       **DEBORAH BALLWEG**

13     having been previously duly sworn, testified as follows:

14      **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Continued**

15   BY MR. HANNON:

16   **Q.**  Good morning, Ms. Ballweg.  I'd like to begin by showing

17   you Joint Exhibit 450.

18           So Ms. Ballweg, this was a document that we looked

19   at last week, correct?

20   **A.**  Yes.

21   **Q.**  And the first page here, this was a typed up copy of your

22   notes from your conversations with Dr. Menninger; is that

23   right?

24   **A.**  Yes.

25   **Q.**  Okay.  The actual handwritten notes, you destroyed those;

1    is that correct?

2    **A.**   No, I did not.

3    **Q.**   Okay.  You still have those?

4    **A.**   Yes, I do.

5    **Q.**   Okay.  Do you have them here with you?

6    **A.**   No.

7    **Q.**   Do you know where they are right now?

8    **A.**   They're in my desk in Middleton, Wisconsin.

9    **Q.**   Did you review them prior to testifying in this matter?

10   **A.**   No.

11   **Q.**   Why not?

12   **A.**   I reviewed this document.

13   **Q.**   Okay.  So you believe that this document as a

14   comprehensive statement of the information that you learned

15   from Dr. Menninger in your investigation?

16   **A.**   Yes.

17   **Q.**   Let's look at the second page.  Here, the seventh item.

18   This concerns the events at the February 28, 2018, meeting,

19   right?

20   **A.**   Yes.

21   **Q.**   Okay.  That's all Dr. Menninger said?

22   **A.**   No.

23   **Q.**   And, in fact, part of what Dr. Menninger told you is that

24   when she was at that February 28, 2018, meeting, that Mr. St.

25   John and Mr. Mekerri, they weren't interested in talking

1  about her request for accommodations, right?

2  **A.** No, that's not accurate.

3  **Q.** She told you that all they wanted to talk about was her

4  separation from the company, right?

5  **A.** Dr. Menninger indicated they were discussing

6  accommodations, but they didn't receive any resolution.

7  **Q.** Well, she told you that Mr. Mekerri said that there were

8  not going to be any accommodations with respect to buckets

9  two through four, correct?

10 **A.** Correct.

11 **Q.** She told you that when she asked Mr. Mekerri for more

12 information regarding buckets two through four, he said he

13 wasn't going to provide it, right?

14 **A.** I wasn't in that conversation.

15 **Q.** I didn't ask what happened in the conversation. I asked

16 what Dr. Menninger told you about the conversation. She told

17 you that when she asked for more information regarding the

18 items in buckets two through four, that Mr. Mekerri refused

19 to tell her, correct?

20 **A.** I don't recall the exact way that she described it.

21 **Q.** Okay. Is that substantively what she told you?

22 **A.** She indicated that during the discussion, an exit package

23 or a consulting role was offered to Dr. Menninger.

24 **Q.** And she said no, I don't want that. I want my job.

25 Right?

1  **A.**  I was not part of the conversation.  I don't know what
2  was discussed.
3  **Q.**  You didn't ask Dr. Menninger?
4  **A.**  It was implied that she wanted to keep her job and we
5  were working towards resolution around what accommodations
6  she needed.
7  **Q.**  And during that meeting, she told you that she had asked
8  for more information concerning the items in buckets two
9  through four.  Yes?
10 **A.**  I don't recall if that's exactly how she stated it.
11 **Q.**  But substantively, that's what she told you, right?
12 **A.**  The way I recall the conversation is that Dr. Menninger
13 was meeting with Chad and her boss to talk about
14 accommodation requests.  During the conversation, there was a
15 point where there was no resolution, that Lisa -- that
16 Dr. Menninger was asking what if I can't do my job, what if I
17 can't do my job, and that's when Chad said, "Well,
18 hypothetically, we can look at an exit package or a
19 consulting arrangement."
20 **Q.**  That wasn't my question.  My question is about
21 Dr. Menninger's request for more information about the items
22 in buckets two through four.  Did Dr. Menninger tell you that
23 at the February 28, 2008 meeting, she asked for that
24 information?
25 **A.**  I don't recall.

1    **Q.**   Okay.  Let's look at what Mr. St. John told you.  I'm

2    going to show you Joint Exhibit 257.

3              MS. MANDEL:  Excuse me a second here.

4              Excuse me.  Joint Exhibit 87.

5    BY MR. HANNON:

6    **Q.**   So Ms. Ballweg, this is one of the e-mails that we looked

7    at on the first day of your testimony.  Do you recall this?

8    **A.**   Yes.

9    **Q.**   This is the e-mail that Mr. St. John sent you on March 7,

10   2018, that contained that packet of info to send to PPD's

11   lawyer; is that right?

12   **A.**   Yes.

13   **Q.**   Okay.  And this was just over a week after that

14   February 28th meeting had taken place, correct?

15   **A.**   Yes.

16   **Q.**   I'm showing you here the second to last page of the

17   exhibit.  And you see here, Mr. St. John provided a timeline

18   of events; is that right?

19   **A.**   Yes, it appears so.

20   **Q.**   Okay.  And you see here, Mr. St. John, he confirmed there

21   that Dr. Menninger had requested more information listed out

22   within the number two through four buckets, right?

23   **A.**   Yes.

24   **Q.**   Okay.  And you know that Mr. St. John and Mr. Mekerri,

25   they refused to provide that, right?

1    **A.**   It appears Hacene said that he provided sufficient

2    detail.

3    **Q.**   And they weren't going to answer anymore questions,

4    right?

5    **A.**   Well, I think they would have answered more questions,

6    but there would be no more accommodations made outside of

7    items of one and five.

8    **Q.**   But specifically her request for additional information

9    about buckets two through four, they weren't going to provide

10   that, right?

11   **A.**   I believe he felt he provided sufficient detail.

12   **Q.**   Okay.  Well, you also knew from Mr. St. John that they

13   didn't want to provide that information, right?

14   **A.**   Well, I don't want to speak for Mr. St. John, but the

15   process was iterative.  So it was a discussion about what

16   accommodations does Dr. Menninger need, and then if there was

17   more information from her physician, there would be

18   additional discussions around what other accommodations could

19   be provided.

20   **Q.**   Well, let's let Mr. St. John speak for himself then.

21   Let's turn to the next page.

22           Excuse me.  Back up to the page before.  This is

23   page 17 of the 19-page document.  You see here, we have --

24   this is the draft e-mail response that Mr. St. John had

25   written, right?

 1   **A.**   I believe so, yes.

 2   **Q.**   Okay.  And he notes in there, "Adding additional detail

 3   would only present the opportunity to select items in each

 4   bucket you believe you can or can't do."

 5          Do you see that?

 6   **A.**   Yes.

 7   **Q.**   That was the entire point of the interactive process,

 8   wasn't it?  To figure out what she could and couldn't do?

 9   **A.**   No.

10   **Q.**   Going back to your report here -- so again, this is joint

11   Exhibit 450.  I'll back up to the first page here.  So part

12   of this document reflects your conversation with

13   Dr. Menninger on May 2, 2018, right?

14   **A.**   Yes.

15   **Q.**   And some of it reflects a follow-up conversation you had

16   with her on May 15th, right?

17   **A.**   Yes.

18   **Q.**   Okay.  And it looks like for some of these items, you had

19   some follow-up questions for her on May 15th, right?

20   **A.**   Correct.

21   **Q.**   You didn't have any follow-up questions for her regarding

22   what happened at that February 28th meeting, did you?

23   **A.**   Because Chad confirmed, he was the one who indicated that

24   he discussed the exit package or consulting, not Hacene.  So

25   no follow-up questions were needed.

1    **Q.**  So you had no follow-up questions for Dr. Menninger; is

2    that right?

3    **A.**  Dr. Menninger was indicating that she was feeling

4    harassed by her manager, and in looking at this particular

5    situation, Chad St. John indicated he was the one who

6    mentioned it during that meeting on February 28th.

7    **Q.**  Well, let's talk about that in terms of what

8    Dr. Menninger's complaints were about.  I'm going to show you

9    Joint Exhibit 257.

10            And if we look in the middle of the page, this is

11    where you tell Mr. St. John that you're going to be following

12    up with a formal investigation, right?

13    **A.**  Correct.

14    **Q.**  Okay.  And that follow-up with a formal investigation,

15    that's in response to the e-mail he had forwarded you on

16    April 28th?

17    **A.**  I don't recall the date, but yes, it was an e-mail from

18    Chad.

19    **Q.**  Okay.  And that's the e-mail down below that we see here,

20    right?

21    **A.**  I just see the FYI.  I don't see the --

22    **Q.**  Okay.  Yeah, let's turn to the next page.  Let's see what

23    the e-mail actually was here.

24            So this reflects, at the top here, an e-mail from

25    Dr. Menninger, right?

1    **A.**   Yes.

2    **Q.**   Okay.  And she has some complaints regarding Mr. Mekerri?

3    **A.**   Correct.

4    **Q.**   Okay.  And below, you see here there's also an e-mail

5    from Dr. Menninger to Chad St. John; is that right?

6    **A.**   Yes.

7    **Q.**   Okay.  And in that e-mail, she has some complaints about

8    Mr. St. John, doesn't she?

9    **A.**   About Chad or Hacene?

10   **Q.**   About Mr. St. John.

11   **A.**   Specifically -- is that a question?  I'm sorry, what was

12   the question?

13   **Q.**   The question was whether or not Dr. Menninger had

14   complaints about Mr. St. John.

15   **A.**   She felt like he was twisting her doctor's words and

16   refusing to answer her questions.  Yes.

17   **Q.**   Did you investigate that?

18   **A.**   No.

19   **Q.**   Because you knew it was true, right?

20   **A.**   It wasn't -- I wasn't part of the conversation.  I had no

21   opinion either way.

22   **Q.**   Going back to Joint Exhibit 450.  So you -- you

23   identified a number of issues that you were looking into; is

24   that right?

25   **A.**   Yes.

1    **Q.**  Okay.  And as you said, you've excluded any complaints

2    that Dr. Menninger had with respect to Mr. St. John, right?

3    **A.**  Yes.

4    **Q.**  Okay.  And with respect to the first issues, first issue

5    listed here, Dr. Menninger had complained that she was being

6    subjected to increased scrutiny by Mr. Mekerri; is that

7    right?

8    **A.**  From a quality perspective, yes.

9    **Q.**  Okay.  Well, she was saying that he was being very

10   accusatory, right?

11   **A.**  Specifically around some quality issues that were

12   occurring in the lab, yes.

13   **Q.**  That his tone had changed, right?

14   **A.**  Yes.

15   **Q.**  That it felt like he was going out of his way to document

16   her performance; is that right?

17   **A.**  Yes.

18   **Q.**  She complained that the goals he was creating were

19   impossible to meet.

20   **A.**  Yes.

21   **Q.**  Okay.  You didn't investigate any of those things, did

22   you?

23   **A.**  I would have asked questions of Brent McKinnon about the

24   tone of Hacene's interaction with his leadership team, with

25   Chad.  I did ask about that, yes.

1   **Q.** Well, you didn't go back and ask Mr. Mekerri if these

2   allegations were true, did you?

3   **A.** I asked Mr. Mekerri, during our discussion, why would

4   Dr. Menninger feel this way?  What would have created this?

5   Did he, in any way, change his behavior or his interactive

6   style with Dr. Menninger?

7   **Q.** And it's your contention that that question is reflected

8   in your notes of your conversation with Mr. Mekerri?

9   **A.** No.

10  **Q.** So this right here, the items that is pointed to, those

11  were issues raised by Dr. Menninger on 5/15, right?

12  **A.** Yes.

13  **Q.** After 5/15, you did not go back and re-interview

14  Mr. Mekerri, did you?

15  **A.** It was awhile ago.  I don't recall.

16  **Q.** Well, if you had, there would be a note in this exhibit

17  reflecting that interview, right?

18  **A.** Possibly, yes.

19  **Q.** Okay.  And if there's no note reflected in an interview

20  of Mr. Mekerri after 5/15, it would be fair to assume that

21  interview didn't happen?

22  **A.** Or the data -- yes.  Probably.

23  **Q.** Now, you -- you knew as of this date that Mr. Mekerri was

24  making efforts to create a document trail of alleged

25  performance concerns with Dr. Menninger, right?

1    **A.**  I believe there were some performance issues that Hacene

2    was attempting to address with Dr. Menninger at the time,

3    yes.

4    **Q.**  He was being coached to document performance concerns,

5    yes?

6    **A.**  All managers are coached to document concerns.

7    **Q.**  Well, before Dr. Menninger disclosed her disability, you

8    hadn't been coaching him to document performance concerns

9    about her, had you?

10    **A.**  I wasn't coaching Hacene at all.

11    **Q.**  Not at all.

12          Let's take a look at Joint Exhibit 126.  This is an

13    e-mail exchange between yourself and Mr. St. John on

14    April 17, 2018?

15    **A.**  Yes.

16    **Q.**  And just to look at the second page -- well, actually,

17    strike that.

18          Let's look at the middle of the first page.  You

19    wrote, "Ask Hacene/draft response to be very specific about

20    how she didn't meet expectations."

21          Do you see that?

22    **A.**  Yes.

23    **Q.**  Those are your words.  Yes?

24    **A.**  Yes.

25    **Q.**  The "she" you're referring to there is Dr. Menninger?

1    **A.**  Yes.  And Chad is helping --

2    **Q.**  You've answered my question.  Thank you.

3           Ms. Ballweg, did you find your interview of

4    Dr. Menninger painful?

5    **A.**  I'm sorry, what was the word?  Painful?

6    **Q.**  Painful, yeah.

7    **A.**  No.

8    **Q.**  I show you now Joint Exhibit 244.  It's an e-mail from

9    you to Chad St. John on May 16, 2018, yes?

10   **A.**  Yes.

11   **Q.**  You write in the second sentence, "I had a 'painful'

12   follow-up with her yesterday."  Do you see that?

13   **A.**  I do.

14   **Q.**  That refers to your follow-up interview with

15   Dr. Menninger on May 15th, doesn't it?

16   **A.**  I was concerned about giving Dr. Menninger the feedback.

17   It was painful to me to have to go back and have a

18   conversation knowing that it wasn't the outcome that she had

19   intended.

20   **Q.**  Back to my question, this refers to your May 15th

21   conversation with Dr. Menninger; is that right?

22   **A.**  Yes.

23   **Q.**  You hadn't reached any findings as of May 15th, had you?

24   **A.**  That's correct.

25   **Q.**  Okay.  So the painfulness here, this wasn't a matter of

1   telling Dr. Menninger she was wrong, was it?

2   **A.**   No.  This was a follow-up, asking questions, after having

3   talked with other folks about the issues that she had raised.

4   **Q.**   And I now show you Joint Exhibit 301.  You have here an

5   e-mail exchange between Mr. Mekerri and Dr. Menninger, on

6   April 25, 2018.  Do you see it?

7   **A.**   Yes.

8   **Q.**   So this was some of the -- the back and forth that we

9   looked at previously, concerning his request that she adopt

10   her goals.  Right?

11   **A.**   Yes.

12   **Q.**   Okay.  And during that correspondence, he offered certain

13   criticisms of her handling of recent lab issues; is that

14   right?

15   **A.**   Yes.

16   **Q.**   Okay.  And during the course of this back and forth,

17   Dr. Menninger, she provided rebuttals to those criticisms,

18   right?

19   **A.**   She did, yes.

20   **Q.**   Okay.  And in the course of your investigation, you never

21   determined whether or not Dr. Menninger's rebuttals of those

22   accusations were correct, did you?

23   **A.**   I was looking at the treatment of her manager towards her

24   before she disclosed her disability and after, and the errors

25   that were indicated occurred before and after she disclosed

1   her disability.

2   **Q.**   Okay.

3   **A.**   That was what I was looking into.

4   **Q.**   My question is a little bit different.  Did you

5   investigate as to whether or not Dr. Menninger's rebuttals,

6   where she pointed out why the criticism she was facing wasn't

7   factual, was or was not accurate?

8   **A.**   In my opinion, investigating that didn't -- I

9   investigated whether there were error rates, more or less,

10  and if her manager was treating her differently.

11  **Q.**   Right.  But error rates don't tell the whole story,

12  right?

13  **A.**   But Dr. Menninger was asking for, you know, her

14  manager -- or was indicating her manager was treating her

15  differently before she disclosed her disability, versus

16  after, based on the quality of the laboratory.  The quality

17  of the laboratory was -- the quality was decreasing.

18  **Q.**   Back to my question, though.  In terms of Dr. Menninger's

19  rebuttals, where she pointed out why the criticism wasn't

20  factual, did you investigate whether or not Dr. Menninger's

21  rebuttals were correct?

22  **A.**   There probably was some discussion with Brent McKinnon

23  about some of the information in there.  But did I

24  specifically one by one?  No.

25  **Q.**   Well, here, let's look at it this way.  Let's start with

1  Joint Exhibit Number 313.  So you see here, this is an

2  April 17th e-mail from Dr. Menninger, where she goes on, and

3  she rebuts some of these criticisms, right?

4  **A.**  Yes.

5  **Q.**  Okay.  And at your deposition -- well, let's do it this

6  way.  If you can open up the binder in front of you to the

7  first tab, please.

8          And that's the cover of your deposition transcript,

9  yes?

10  **A.**  Yes.

11  **Q.**  And if you turn to page 179, line 24.  Are you there?

12  **A.**  Yes.

13  **Q.**  Please read along silently as I read aloud.

14          "QUESTION:  My question was whether or not anything

15  that Dr. Menninger wrote in the April 17, 2018, -mail to

16  Mr. Mekerri was wrong.

17          "ANSWER:  I didn't evaluate this issue to that

18  level.  I am not a technical person.  This would be for the

19  quality department to really investigate.  I can't dispute if

20  it's true or not true."

21          Did I read that right?

22  **A.**  Yes.

23  **Q.**  Going back to your interview notes.  So again, we have a

24  Joint Exhibit Number 450.  With respect to item 2 here on

25  this first page, you did find in your investigation, didn't

1   you, that it was Mr. Mekerri who had decided to exclude

2   Dr. Menninger from the interview process?

3   **A.**   Because of the December -- or November discussion where

4   Dr. Menninger felt overwhelmed, Hacene was taking over and

5   helping her, by assuming some of these responsibilities.

6   **Q.**   Well, my question specifically relates to interviews,

7   that it was Mr. Mekerri who decided not to have Dr. Menninger

8   involved in these interviews; is that right?

9   **A.**   Again, because he was helping her in the process.  He was

10  conducting the interviews on her behalf.

11  **Q.**   Item number 3 here relates to "new expectation to attend

12  bid defense and client visits."  Do you see that there?

13  **A.**   Yes.

14  **Q.**   Fair to say that you learned in your investigation that

15  Dr. Menninger had never previously attended bid defenses; is

16  that right?

17  **A.**   Yes.

18  **Q.**   You also learned that she had not previously been

19  directly involved in doing client visits as part of the sales

20  process, correct?

21  **A.**   I believe she had been involved with client visits.

22  **Q.**   That she had actually gone out and visited clients as

23  part of the sales process?

24  **A.**   No, but had been available as a consult during that

25  process.

1  **Q.**  Okay.  Great.  That's what she had done historically, but

2  you agree that she was being asked to do something different

3  now, right?

4  **A.**  Accountability of her job, but something that she hadn't

5  done historically.

6  **Q.**  Okay.  Something historically she hadn't been asked to

7  do, right?

8  **A.**  That's fair.

9  **Q.**  Okay.  But then with respect to item 4, Dr. Menninger

10 pointed out to you that she wasn't being invited to certain

11 sales and marketing meetings; is that right?

12 **A.**  Yes.  A routine marketing meeting.

13 **Q.**  And she pointed out to you that seemed odd, right?

14 **A.**  Yeah, just why wasn't she invited to that particular

15 meeting.

16 **Q.**  Especially if all of the sudden there was this claimed

17 need to have her directly involved in sales, right?

18 **A.**  Yes.

19 **Q.**  And when you went and you actually spoke to the business

20 development folks, right?

21 **A.**  Correct.

22 **Q.**  Andy Supp?

23 **A.**  Yes.

24 **Q.**  Head of business development?

25 **A.**  Yes.

1   **Q.**  And he told you that he didn't need Dr. Menninger

2   directly involved in those meetings, right?

3   **A.**  No.  Andy confirmed that there was a member of

4   Dr. Menninger's team on his routine marketing log calls.

5   **Q.**  And he cold you that he was perfectly satisfied with

6   that, right?

7   **A.**  I don't think he was satisfied or unsatisfied.  He said

8   there's a representative.  I'm assuming that they're talking.

9   If they're not, then, you know, I'm happy to add

10  Dr. Menninger.

11  **Q.**  But he didn't indicate that having Dr. Menninger there

12  was a significant need, right?

13  **A.**  Again, I don't think Andy had an opinion one way or the

14  other.  He said there's a representative from the lab.  If it

15  needs to be Dr. Menninger, then, you know, she can attend.

16  But he vetted the list to make sure there wasn't, you know, a

17  large -- too large of a group of folks at that meeting.

18  **Q.**  Now, let's look at the next page here, item number 6.

19  And this related to Dr. Menninger's 2017 performance review.

20  Right?

21  **A.**  Yes.

22  **Q.**  One of the things Dr. Menninger pointed out to you was

23  that it was odd that there wasn't much commentary in the

24  review, right?

25  **A.**  Yes.

**Q.**  Okay.  And she was right that there wasn't much
commentary in the review, right?

**A.**  That's correct.

**Q.**  Okay?  In fact, there were various spots where
Mr. Mekerri had not written anything, right?

**A.**  Yes.

**Q.**  And, in fact, there was one spot where it looked like he
stopped mid sentence, right?

**A.**  Yes.

**Q.**  Okay.  So she was right about that, correct?

**A.**  Well, when I think about a performance review, the end of
the year is when it's, you know, officially completed, but
the performance review occurs throughout the entire year, one
on one conversations, discussions.  It's an accumulation of
what you're discussing with that individual through the year.
So the end of the year is really just to finalize a full year
of discussion.

**Q.**  I'm not sure I understand that answer.  My question is
whether or not she was right that there was information --
I'm sorry, that if she was right that there was not much
commentary, and she was, wasn't she?

**A.**  Correct.

**Q.**  Okay.  And she also noted that Mr. Mekerri had never
actually gone through his ratings with her and explained why
he had those ratings, correct?

1    **A.**   Correct.

2    **Q.**   And that was true, as well, wasn't it?

3    **A.**   As with other employees that reported to him, yes.

4    **Q.**   Okay.  Now, before doing any investigation here, you

5    already had some personal knowledge concerning

6    Dr. Menninger's 2017 review, didn't you?

7    **A.**   In terms of forwarding it to completion, yes.

8    **Q.**   The day after Dr. Menninger disclosed her disability, you

9    advanced her performance review in the system, didn't you?

10   **A.**   And many others, yes.

11   **Q.**   To your knowledge, did Mr. St. John thereafter go in and

12   modify the review?

13   **A.**   No.

14   **Q.**   Would it surprise you if he did?

15   **A.**   No -- I mean, yes, it would surprise me if he -- the way

16   the system works is, when you advance it, it does not allow

17   for edits once it is to a completed form.

18   **Q.**   Let's turn to the next page here in this document.  These

19   are your notes of your conversation with Mr. St. John; is

20   that right?

21   **A.**   Yes.

22   **Q.**   Okay.  And one of the things that he -- you asked him

23   about was whether or not Mr. Mekerri was treating

24   Dr. Menninger any differently; is that right?

25   **A.**   Yes.

1    **Q.**   Okay.  And Mr. St. John, did he say anything to you about

2    the coaching he had been providing to Mr. Mekerri about

3    documenting performance deficiencies of Dr. Menninger?

4    **A.**   When we went through these specific issues, no.  But

5    through our one-on-ones, I would have been aware of that.

6    **Q.**   You already knew that he was coaching Mr. Mekerri to

7    provide tough feedback to Dr. Menninger, right?

8    **A.**   Coaching, yes.

9    **Q.**   Tough feedback, right?

10   **A.**   Feedback.

11   **Q.**   You already knew that there was an effort to turn up the

12   heat on Dr. Menninger, didn't you?

13   **A.**   Again, looking at her disability and her accommodation

14   requests separately from performance, it -- that was the

15   intent, to segregate the two, to ensure that we kept them

16   segregated.

17   **Q.**   Let's turn to the next page here of your interview notes

18   with Mr. St. John.  So this -- this is what you wrote down in

19   terms of the version of events from the February 28th meeting

20   that Mr. St. John relayed to you in the course of your

21   information; is that correct?

22   **A.**   That's correct.

23   **Q.**   Did I hear you correctly that, when being questioned by

24   PPD's lawyers, that you heard three different versions of

25   what happened at the February 28th meeting?

**A.**   Yes.

**Q.**   Okay.  You heard Dr. Menninger's version, right?

**A.**   Yes.

**Q.**   There's this version from Mr. St. John, right?

**A.**   Yes.

**Q.**   And then you heard a different version from Mr. Mekerri, right?

**A.**   Yes.

**Q.**   Did that indicate to you, Ms. Ballweg, that somebody was lying?

**A.**   I think lying is a strong word.  I think it was a -- it was a tense meeting.  It was unproductive.  Recollections were apparently different.

**Q.**   And it never occurred to you that maybe those different recollections were the result of someone being dishonest?

**A.**   No.  For what purpose?  I'm not sure why anyone would be dishonest in relaying -- and again, when we do the investigation, it's -- we really impel employees and managers to be direct and honest about what happened in that meeting.

**Q.**   Wasn't Mr. St. John direct and honest to you back in March, when he drafted those documents for in-house counsel?

**A.**   Chad was providing information.  We're a high -- PPD is a high performing organization.  There's initiatives where we spend time and energy investigating and providing information, but they don't all -- they're not all executed.

1    **Q.**  Why is there nothing in here in these notes of your

2    conversation with Mr. St. John about Dr. Menninger asking for

3    additional detail concerning buckets two through four?

4    **A.**  I don't believe Chad and I discussed it.

5    **Q.**  Why is there nothing in this note here about Mr. Mekerri

6    telling Dr. Menninger that there weren't going to be any

7    accommodations for buckets two through four?

8    **A.**  That had already been communicated to Dr. Menninger.

9    **Q.**  And Mr. St. John, he didn't mention that when you

10   interviewed him?

11   **A.**  No.

12   **Q.**  I'm going to turn your attention to the page in this

13   exhibit.  In the bottom right corner, it has 332.  And if you

14   look here, these are what you say are your notes with your

15   interview with Mr. McKinnon; is that right?

16   **A.**  Yes.

17   **Q.**  Okay.  You described these as notes.  Your discussion

18   with Mr. McKinnon was about an hour to an hour and 15

19   minutes, right?

20   **A.**  Yes.

21   **Q.**  Okay.  And in terms of what you wrote down from that,

22   it's just this one page; is that correct?

23   **A.**  Yes.

24   **Q.**  During the course of this interview, Mr. McKinnon didn't

25   tell you that Dr. Menninger was performing poorly, did he?

**A.**   Brent wouldn't have been in a position to make that observation.

**Q.**   So he didn't, right?

**A.**   It wasn't relevant to the investigation.

**Q.**   That's fine.  I'm just asking if he communicated that to you that there were problems with Dr. Menninger's performance.  And he didn't, did he?

**A.**   I wouldn't say performance.  I think he made a comment about leadership and feeling that the team, perhaps, lacked some leadership from a quality perspective.

**Q.**   Well, you said the other day that he was making comments regarding the various groups overseeing the lab, right?

**A.**   I'm sorry.  What was your question?

**Q.**   Sure.  His quality comments, those weren't specific to only Dr. Menninger, right?

**A.**   Correct.

**Q.**   He was saying that there were lots of areas for improvement, right?

**A.**   Correct.

**Q.**   Okay.  He didn't indicate to you that any of the recent lab problems had been attributable to anything that Dr. Menninger had or had not done, did he?

**A.**   Well, he recognizes that quality issues occur within the lab.  It's, again, oversight by the leadership team that really needs to be engaged and aware and overarching

1   providing guidance and counsel to the team.  That was his

2   comments.

3   **Q.**  And you had seen from Dr. Menninger's e-mail exchange

4   from Mr. Mekerri, all the different things she was doing in

5   that regard, right?

6   **A.**  Yes.

7   **Q.**  That she was providing oversight of the team?

8   **A.**  That's her statement, yes.

9   **Q.**  That she was making sure these things were properly

10  investigated?

11  **A.**  That's -- yes, that's what she said.

12  **Q.**  That she was doing all the things she was supposed to be

13  doing, right?

14  **A.**  That's what she asserted, yes.

15  **Q.**  And you never found that to be false, did you?

16  **A.**  I didn't look into those.

17  **Q.**  Looking here at the bottom of the page, do you see here

18  that Mr. McKinnon, he did note one specific problem relating

19  to the reporting structure for Narine -- I'm not even going

20  to try to pronounce that last name, but do you see that

21  there?

22  **A.**  Yes.

23  **Q.**  Now, that was an issue that you were familiar with,

24  right?

25  **A.**  Cursory.

1  **Q.**  Well, you had been involved in the decision to have

2  Narine report directly to Mr. Mekerri, weren't you?

3  **A.**  I suppose Chad would have made me aware along the way,

4  sure.

5  **Q.**  Well, you and Mr. St. John had actually met to discuss

6  how to explain that decision to Dr. Menninger, right?

7  **A.**  I don't recall.

8  **Q.**  I'll show you Joint Exhibit 154.

9          You see an e-mail there from Mr. St. John to

10  Mr. Mekerri, copying you?

11  **A.**  Yes.

12  **Q.**  Okay.  He begins it by saying, "I spoke with Deb."  Yes?

13  **A.**  Yes.

14  **Q.**  That's you?

15  **A.**  Yes.

16  **Q.**  Okay.  And then he goes on to describe the reporting

17  relationship for Narine, right?

18  **A.**  Yes.

19  **Q.**  Okay.  And then he provides some talking points in terms

20  of how to justify this to Dr. Menninger, right?

21  **A.**  I don't think justify, but communicate.

22  **Q.**  Who was Dr. Menninger's replacement?

23  **A.**  Dr. Basel Kashlan.

24  **Q.**  Do you recall when PPD first began recruiting

25  Dr. Kashlan?

1    **A.**  I wasn't involved in that.  I'm -- I'm not aware.

2    **Q.**  I'll show you Joint Exhibit 231.  I'm showing you here an

3    e-mail exchange between you and Mr. Williams.  Again,

4    Mr. Williams, that was your boss back at the time; is that

5    right?

6    **A.**  Yes.

7    **Q.**  And here in this June 4, 2018 exchange, you write to him

8    in response to the fact that Dr. Menninger had requested that

9    medical leave; is that right?

10   **A.**  I'm not sure what I was referring to there.

11   **Q.**  Okay.  Well, June 4th, that was two days after

12   Dr. Menninger had requested her medical leave.  Yes?

13   **A.**  Correct.

14   **Q.**  Okay.  And Mr. William's response includes, "How do we

15   cover and bridge until the new guy gets on board?"  Do you

16   see that?

17   **A.**  Yes.

18   **Q.**  The new guy he's referring to is Dr. Kashlan, isn't it?

19   **A.**  I don't know.

20   **Q.**  I'll show you Joint Exhibit 106.  You see this is a

21   June 1st e-mail from Mr. St. John to Jerry Williams, copying

22   you?

23   **A.**  Yes.

24   **Q.**  And you see that attachment there?

25   **A.**  Yes.

1    **Q.**  That's Basel Kashlan's resume, isn't it?

2    **A.**  Yes.

3    **Q.**  And am I right that while Dr. Menninger was on medical

4    leave, that PPD hired him to serve as an -- in an interim

5    position.  Isn't that right?

6    **A.**  I'm not sure of his employment details.  I know he was a

7    full-time employee or hired in -- I think it was June of

8    2019.

9    **Q.**  But he started well before that, right?

10   **A.**  I'm not sure what capacity, though.

11   **Q.**  Well, didn't PPD hire a doctor to come in and serve as an

12   interim replacement for Dr. Menninger?

13   **A.**  I believe so.

14   **Q.**  And wasn't that Dr. Kashlan?

15   **A.**  Again, as Dr. Menninger commented, there was gaps in

16   benches.  I'm not quite -- I don't recall exactly who was

17   hired when, to cover which benches.

18   **Q.**  You don't know who the medical doctor was in charge of

19   your lab?

20   **A.**  There was a consultant, Miriam Black, that had been used

21   historically, and she might have filled that gap.  I just --

22   I'm not sure if it was Miriam or when it was Basel, or

23   Dr. Kashlan.  I just don't recall.

24   **Q.**  You testified on your examination from PPD's counsel last

25   week that you thought Dr. Menninger's decision to relocate

1    was concerning.  Did I hear that right?

2    **A.**  Yes.

3    **Q.**  I'm going to show you Joint Exhibit 382.

4            It's an e-mail from Mr. St. John, on June 7th of

5    2017?

6    **A.**  Yes.

7    **Q.**  And Mr. St. John, he writes, "Lisa has also shared with

8    all the CL key stakeholders that she will be moving to the

9    Providence area/New England region for compelling personal

10   reasons the weekend of June 24th.  No concerns regarding her

11   physical move have been expressed or detected at this time."

12           Do you see that?

13   **A.**  Yes.

14   **Q.**  I'm going to show you Joint Exhibit 401.  So this is that

15   9-Box that we looked at on Friday.  Do you recall that?

16   **A.**  Yes.

17   **Q.**  And just for context, this was transmitted December 20,

18   2017, right?

19   **A.**  Yes.

20   **Q.**  Okay.  And as of December 2000 -- I'm sorry, December 20,

21   2017, am I right that Dr. Menninger's performance was right

22   on track?

23   **A.**  Yes.

24   **Q.**  You were asked some -- -- I'm sorry, you read us some

25   testimony last week concerning PPD's financial performance.

1    Do you know what PPD's revenue was in 2017?

2    **A.**   The overall company?

3    **Q.**   Yes.

4    **A.**   I don't recall.  It's a long while ago.

5    **Q.**   Would it be in the hundreds of millions?

6    **A.**   Not hundreds.  I don't recall.

7    **Q.**   How about 2018?  Was its revenue that year in the

8    hundreds of millions?

9    **A.**   I -- I don't recall 2018.

10   **Q.**   When it was acquired by Thermo Fisher, was for that

11   $17.4 billion?

12   **A.**   At the end of 2021, yes.

13   **Q.**   I now show you Joint Exhibit 186.

14           I lied.  I'm not going to show that to you.

15           Do you recall the testimony from Dr. Menninger's

16   sister on Friday?

17   **A.**   Yes.

18   **Q.**   And do you recall, there was a text message from

19   February 2nd, 2019, advising your sister that she no longer

20   worked at PPD?

21   **A.**   Yes.

22   **Q.**   Okay.  That was the day after Dr. Menninger's employment

23   at PPD had ended.  Am I right?

24   **A.**   What was the date again?  I'm sorry.

25   **Q.**   February 2nd.  She was terminated officially

1   February 1st, right?

2   **A.**   Administratively, her status changed February 1st of

3   2019.

4   **Q.**   So last document here.  I'm going to show you Joint

5   Exhibit 186.

6            So this is that e-mail exchanged we looked at a

7   couple of times between yourself and Mr. St. John on

8   February 28, 2018; is that right?

9   **A.**   Yes.

10  **Q.**   Okay.  And directing your attention here to the

11  highlighted portion, where Mr. St. John

12  references, "Delicately working Lisa out."

13           Did I hear you correctly when PPD's lawyer asked

14  you questions that you thought that was a reference to

15  Dr. Menninger's remote working status?

16  **A.**   It's -- yeah, to have coverage -- again, not knowing,

17  with the accommodation requests, you know, just wanting to be

18  in the position to ensure that there's coverage for the lab

19  to conduct business.

20  **Q.**   Sure.  My question is not about coverage.  My question is

21  specifically about forwards.  "Delicately working Lisa out."

22           What did you think that meant?

23  **A.**   Well, these are Chad's -- this is Chad's e-mail, but

24  again, coverage for the organization.

25  **Q.**   This was more than seven months after Dr. Menninger had

1    gone remote, right?

2    **A.**   What was the date of the e-mail again?

3    **Q.**   February 28, 2018.

4    **A.**   That timeline was correct, yes.  So --

5    **Q.**   She had been remote for a long time, right?

6    **A.**   And still working on filling the gaps that she identified

7    for the lab, yes.

8              MR. HANNON:  That's all I have, Your Honor.

9              THE COURT:  All right.  Recross.

10             **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

11   BY MS. MANDEL:

12   **Q.**   Good morning, Deb.

13   **A.**   Good morning.

14             THE COURT:  Go ahead.  Whenever you're ready.

15             MS. MANDEL:  Ms. Belmont, do I have -- oh, there we

16   go.

17   BY MS. MANDEL:

18   **Q.**   Deb, I'm pulling back up Joint Exhibit 450.  Do you see

19   that in front of you?

20   **A.**   I do, yes.

21   **Q.**   And these are the notes that you took in connection with

22   your investigation?

23   **A.**   Correct.

24   **Q.**   And this is -- on this first page, you've listed out the

25   first five of the concerns that you were looking into.  Do I

1    understand that correctly?

2    **A.**   That's correct.

3    **Q.**   If we look down at number -- numbers 3 and number 4, do

4    you see those?

5    **A.**   Yes.

6    **Q.**   As far as you understood when you were doing the

7    investigation, were these two different issues that had been

8    raised?

9    **A.**   Yes.

10   **Q.**   And can you explain, based on your understanding, what

11   the difference was between numbers 3 and 4?

12   **A.**   So bid defense and client visits.  A bid defense is

13   working with our clients to -- they're looking for a proposal

14   of the work that we can do.  And it's really defending the

15   quality of the work we do, the project, the cost.  So it's

16   really helping either prospective clients or existing clients

17   with new work appreciate and understand the scope of the

18   project.

19          Certainly part of Dr. Menninger's job description

20   is a key accountability.

21          And client visits, it's not uncommon for senior

22   leaders of the business to attend client calls, whether

23   traveling to their office, attending meetings while they're

24   on site.  It's done consistently across all the labs, Central

25   Labs, and it certainly is included in that, as well, in terms

1    of an expectation of our senior leaders sitting on top of

2    specifically lab based businesses.  Vastly different than a

3    marketing log call, which, the way I understand it, it's a

4    weekly or biweekly call where they walk through heres the

5    clients, here's the potential work that they can bring in.

6    It's a routine meeting.  Vastly different than a bid defense

7    or a client -- a client visit.

8            And then the sales meeting, again, just a specific,

9    once-a-year-meeting to bring the entire sales force together,

10   more like team building, and what is our focus and goal for

11   the next year, a little bit of education that goes along with

12   it.  And then for that particular year, breakout sessions to

13   talk about what specifically do we want to focus on with

14   three distinct labs within the organization, what

15   specifically do we want to focus on for this year, and kind

16   of carve out meetings, if you will, with specific people

17   talking about their specific area within PPD.  So four vastly

18   different things.

19   **Q.**  And you testified earlier that you consulted with

20   Mr. Andy Supp about number 4; is that correct?

21   **A.**  Correct.

22   **Q.**  And Mr. Supp's role, again, can you just explain what

23   that was?

24   **A.**  So Andy Supp -- excuse me -- is the executive director of

25   our business development team.  He would be the one hosting

1    those biweekly client log meetings with his team to make

2    sure, again, that we're following up on leads and we're

3    having an awareness of what new clients we might want to have

4    more discussions around.

5           And then the sales meeting, it was -- it's a sales

6    meeting.  So Andy was the one really coordinating the

7    meeting, bringing his team together, and being more of the

8    coordinator, if you will, of that particular meeting from a

9    Central Lab perspective.

10   **Q.**  And as far as you understood, Deb, did Andy Supp have any

11   relevant knowledge with regard to Mr. Mekerri's request that

12   Dr. Menninger attend bid defenses and client visits?

13   **A.**  I'm sorry.  Could you say that again?

14   **Q.**  Sure.  I'll ask that better.

15          Looking back at number 3, where Dr. Menninger had

16   raised concerns about Mr. Mekerri's expectations that she

17   attend bid defenses and client visits, as far as you

18   understood, was that something that Mr. Supp would have been

19   involved in at all?

20   **A.**  Yes.  Andy would be -- and his team would attend bid

21   defenses, as well as client visits.  But, again, not uncommon

22   for technical leaders to attend in addition to our business

23   development teams, again, to share technology, answer

24   questions.  But Andy would have been aware and involved in

25   both client visits and bid defenses.

1    **Q.**   Deb, can you tell the jury, what were your goals in doing

2    the investigation that you performed in May of 2018?

3    **A.**   Excuse me.

4             So whether Dr. Menninger or anybody else, the goal

5    of an investigation is, again, meet with the individual,

6    appreciate from their lens what it is that is, you know,

7    troublesome, bothersome to the individual, point by point, go

8    through and investigate, is there merit, is there anything

9    here that doesn't look right, doesn't feel right?  And as I

10   go through the investigation, is there any other information

11   or any other individuals who could provide documentation or

12   knowledge in which to make a fair assessment of the

13   situation?  And the same thing with Dr. Menninger's

14   situation.  I went through point by point.  You know, does

15   there -- is there an appearance of her manager treating her

16   differently because she disclosed her disability?

17            And in every one of those situations, there was

18   not -- there just wasn't proof that he was treating her

19   differently.  It's not -- at the end of the day, you know, as

20   leaders, we try to come to work with, you know, our game

21   face, but, you know, there's pressures.  The business was

22   going through a struggling time.  I mean, we all end up being

23   terse at times when we don't want to be.  Is that

24   problematic?  It's not nice, but it's not problematic.  It's

25   not nice.  It's just not nice.  But we don't know the whole

1   scenario of how people behave and what's going on with their

2   personal lives.

3         My goal really was to say was Dr. Menninger treated

4   differently after she disclosed her disability by her

5   manager.

6   **Q.**  And after you concluded your investigation and met with

7   all of these witnesses, what was your conclusion in that

8   regard?

9   **A.**  That she was not treated differently after she disclosed

10  her disability.

11  **Q.**  If Dr. Menninger had raised another complaint or concern

12  with you, would you have conducted another investigation?

13  **A.**  Yes.

14  **Q.**  I want to draw your attention back to Exhibit 244, which

15  you looked at a few moments ago.  And this is your e-mail

16  from May 16th at the top.  And we didn't look at the last

17  sentence of your e-mail there, where you said, "I will give

18  Hacene feedback, too.  We'll let you to know to also co-coach

19  him on his supervisory challenges.

20        Can you explain what you meant by that, Deb?

21        MR. HANNON:  Objection.  Beyond the scope.

22        THE COURT:  Overruled.

23        Go ahead.

24        THE WITNESS:  And I think I mentioned this when we

25  talked earlier about, you know, the amount of investigations

1    that I've done and how, at the conclusion, there are

2    opportunities for people to learn.  And so here, you know,

3    Hacene, in his leadership style, certainly could have been

4    more direct, could have been more communicative, could have

5    just, from a leadership perspective, approached the situation

6    better.  And our attempt is really to help leaders be the

7    best that they can be, help our employees to be the best they

8    can be.  So our role is to make sure that we give that

9    feedback, and encourage, you know, again, continuous

10   improvement in our desire to be, you know, great leaders.

11   **Q.**  And did you, in fact, provide that feedback to

12   Mr. Mekerri?

13   **A.**  I did, yes.

14   **Q.**  Was that in the same time period?

15   **A.**  It would have been after the conclusion of the

16   investigation, but I did, yes.

17   **Q.**  And you testified earlier about advising Mr. Mekerri to

18   keep performance discussions separate from disability

19   accommodation discussions.  Do you recall that?

20   **A.**  Yes.

21   **Q.**  And would you have advised any manager in that same

22   manner?

23   **A.**  Yes, absolutely.

24   **Q.**  And why is that, Deb?

25   **A.**  Again, we want to make sure that employees -- that

```
1    there's a fair process with each one, and there's -- you
2    know, and not an attempt to cross lines and confuse the
3    situations.  The more you can compartmentalize the issues,
4    the more clear it can be to the employee, as well as the
5    manager going through that situation.
6              MS. MANDEL:  Okay.  Thank you.  I have no more
7    questions.
8              THE COURT:  Okay.  Thank you.
9              You can step down, Ms. Ballweg.
10             Next witness.
11             MR. HANNON:  The plaintiff calls Dr. Marianna
12   Kessimian.
13             THE COURT:  All right.
14             MR. HANNON:  Your Honor, may I retrieve the binder
15   from the witness stand?
16             THE COURT:  Yes.  Of course.  Go ahead.
17             THE DEPUTY CLERK:  And if you can remain standing
18   and please raise your right hand.
19             (The witness was duly sworn.)
20             THE DEPUTY CLERK:  Can you please state your full
21   name and spell your last name for the record.
22             THE DEPUTY CLERK:  Sure.  Marianna Isabel
23   Kessimian, K-e-s-s-i-m-i-a-n.
24             THE COURT:  Go ahead, Mr. Hannon.
25             MR. HANNON:  Sure.  Thank you.
```

1       **MARIANNA I. KESSIMIAN**

2              having been duly sworn, testified as follows:

3          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

4    BY MR. HANNON:

5    **Q.**  Good morning, Doctor.

6    **A.**  Good morning.

7    **Q.**  A little bit of advice, you'll want to pull the

8    microphone a little bit close, and it actually works best

9    when you speak directly into it?

10   **A.**  Got it.

11   **Q.**  All right.  Great.  Would you please introduce yourself

12   to the jury?

13   **A.**  Hi, I'm Dr. Marianna Kessimian.  Nice to meet you.

14   **Q.**  And Doctor, what do you do for work?

15   **A.**  Oh, sure.  I'm an outpatient psychiatrist.

16   **Q.**  And where do you work?

17   **A.**  In Providence, Rhode Island.

18   **Q.**  Okay.  And do you know Dr. Menninger?

19   **A.**  I do.

20   **Q.**  And how did you come to know Dr. Menninger?

21   **A.**  She came to me as a patient.

22   **Q.**  Okay.  And do you know when that was?

23   **A.**  I believe it was January of 2017.

24   **Q.**  Okay.  Well, we'll look at some notes in a second and

25   talk about some dates.

1   **A.**   Sure.

2   **Q.**   But first, maybe you can talk a bit about your

3   background.  Where did you go to school?

4   **A.**   I graduated medical school from BU.

5   **Q.**   And when was that?

6   **A.**   That was in 2007.

7   **Q.**   Okay.  And did you do some kind of a residency or other

8   training afterwards?

9   **A.**   Yes.  I went to Brown University and I completed an adult

10   psychiatry residency training and a child and adolescence

11   fellowship after my adult training.

12   **Q.**   And when did you complete all of that?

13   **A.**   2013, I believe.

14   **Q.**   And what did you do after that?

15   **A.**   For three years, I worked at the Young Adult Behavioral

16   Health Life Span outpatient clinic, and then I transitioned

17   to private practice in 2017.

18   **Q.**   And where is your private practice?

19   **A.**   It's called Hartselle and Associates, and it's in

20   Providence, Rhode Island.

21   **Q.**   Do you have any kind of particular specialty or focus?

22   **A.**   I'm a generalist.  I have some expertise in eating

23   disorders in young adults, since I worked with them

24   specifically for three years, but I see all ages and all

25   diagnoses.

1    **Q.**   Very good.  Have you ever testified in court before?

2    **A.**   No.

3    **Q.**   Oh, and before we move on, are you being compensated in

4    any way for your testimony today?

5    **A.**   No.

6    **Q.**   And, in fact, are you appearing pursuant to a subpoena?

7    **A.**   I am.

8    **Q.**   Okay.  I'll try to make good use of your time.

9            So just to start here, I'm going to show you what

10   we refer to as Joint Exhibit 18.  And do you see here at the

11   top it says, "Initial psychiatric evaluation"?

12   **A.**   Oh, I had the wrong year.  Yes.

13   **Q.**   Okay.  And it references Dr. Menninger there, right?

14   **A.**   It does.

15   **Q.**   Okay.  Would this be the notes from your first meeting

16   with Dr. Menninger?

17   **A.**   Yes.

18   **Q.**   Yes?

19   **A.**   Yes.

20   **Q.**   Okay.  Great.  And if you just give the jury a little bit

21   of sense in terms of how you go about making notes in your

22   typical practice?

23   **A.**   Yes.  So during the session, I jot down some notes, and

24   then afterwards, I complete a thorough psychiatric

25   documentation of the initial evaluation.

1    **Q.**  Okay.  And I'll direct your attention to the first

2    section here of your note, you reference a, "Presenting

3    complaint."  Do you see that?

4    **A.**  I do.

5    **Q.**  Do you typically include some kind of a -- of a statement

6    like that in your notes?

7    **A.**  Typically, yes.

8    **Q.**  And what does that generally include?

9    **A.**  It includes what the patient kind of presented that day

10   as their reason for seeking care.

11   **Q.**  Okay.  And what -- what do you recall about your first

12   meeting with Dr. Menninger, if anything?

13   **A.**  It doesn't stand out.  I think it was a typical interview

14   and first meeting.  She answered all of my questions.  That's

15   really it.

16   **Q.**  Okay.  And this sort of description here in terms of what

17   she said to you, the best of your knowledge, would that all

18   accurately reflect what you and she discussed?

19   **A.**  Yes.

20   **Q.**  And you know here, in this paragraph that I've just

21   highlighted, you referenced that Dr. Menninger would like to

22   maintain her current job and responsibilities.

23           Do you see that?

24   **A.**  I do.

25   **Q.**  Okay.  Do you recall if that was one of the reasons why

1    she had come to see you that day?

2    **A.**   Could you repeat the question?  Sorry.

3    **Q.**   No worries.  Do you recall if that was one of the reasons

4    why she came to see you that day?

5    **A.**   Because she wanted to keep her current job and

6    responsibilities?

7    **Q.**   Yes.

8    **A.**   Yes.

9    **Q.**   Okay.  And do you recall getting involved in helping

10   Dr. Menninger submit some paperwork for an accommodation

11   request?

12   **A.**   I do.

13   **Q.**   All right.  Let me show you here Joint Exhibit 47.  And

14   is this an e-mail from you to Chad St. John?

15   **A.**   Yes.

16   **Q.**   And that's your e-mail address?

17   **A.**   It is.

18   **Q.**   Okay.  You begin, "Per our conversation, the forms are

19   attached."  Do you see that?

20   **A.**   I do.

21   **Q.**   Do you recall that conversation at all?

22   **A.**   Not specifically.

23   **Q.**   Okay.  I just want to direct your attention to the forms

24   that follow.  So you see the next page, it's captioned --

25   **A.**   Oh, yeah.

1  **Q.**  -- "Request for accommodation"?

2  **A.**  Uh-huh.

3  **Q.**  Did you complete this form?

4  **A.**  Yes.

5  **Q.**  Okay.  Did you complete it truthfully and honestly?

6  **A.**  I hope so.

7  **Q.**  Were you -- is it your practice to complete forms like

8  this truthfully and honestly?

9  **A.**  Yes.

10  **Q.**  Okay.  And here in Box 8, do you see there's a section

11  regarding recommended accommodations?  Do you see that?

12  **A.**  Yes.

13  **Q.**  Okay.  And one of your recommendations here was

14  that, "Any social of interaction or public speaking incident

15  to her role be minimized to the extent possible."

16          Do you see that?

17  **A.**  I do.

18  **Q.**  Okay.  And at the time, did you believe that that was

19  something that would have helped Dr. Menninger?

20  **A.**  I do.  I did.

21  **Q.**  And you also recommended that her role not be changed to

22  require any increased public speaking or social interactions.

23  Do you see that?

24  **A.**  I do.

25  **Q.**  Did you believe at the time that was something that would

1    help Dr. Menninger do her job?

2    **A.** Yes.

3    **Q.** And then in the next section, there's a recommendation

4    that a plan be developed for these activities, if they're

5    necessary, in consultation with you or another healthcare

6    provider.  Do you see that?

7    **A.** I do.

8    **Q.** Was that something else that you thought might help

9    Dr. Menninger do her job?

10   **A.** Yes.

11   **Q.** Okay.  And in terms of why those were necessary, in box

12   number 6 here, there's a statement that, "Lisa's disability

13   makes it extremely difficult for her to engage in public

14   speaking and social interactions.  While Lisa has been able

15   to tolerate these types of activities to the extent that they

16   have been necessary for --" next page.

17   **A.** Oh.  Okay.

18   **Q.** "-- her job, they often caused her to suffer from anxiety

19   and other somatic symptoms."  Do you see that?

20   **A.** I do.

21   **Q.** Okay.  With respect to your recommendation that social

22   interactions be limited and public speaking be limited, was

23   it your understanding that Dr. Menninger was incapable of

24   doing those things?

25   **A.** No.

1   **Q.**  Okay.  Was it your intent to convey to PPD that she was

2   incapable of doing those things?

3   **A.**  No.

4   **Q.**  During your phone call with Mr. St. John preceding this

5   e-mail, do you recall telling him that Dr. Menninger was

6   categorically unable to do those things?

7   **A.**  No.  I don't remember saying that.

8   **Q.**  Do you recall at some point submitting a more specific

9   accommodation suggestion?

10  **A.**  I think I did.  When I reviewed some of the e-mails, I

11  thought I saw a form filled out, so yes.

12  **Q.**  Okay.  I'm going to show you Joint Exhibit 180.

13  **A.**  Okay.  Yup.

14  **Q.**  Does this look familiar?

15  **A.**  It does.

16  **Q.**  Okay.  And you see here at the top, it

17  says, "Psychoeducation regarding disability and accommodation

18  requests."  Do you see that?

19  **A.**  I do.

20  **Q.**  Okay.  What are you referring to there by

21  "psychoeducation regarding disability"?

22  **A.**  There is a lot of data to support that educating

23  employers or teachers, organizations about mental illness and

24  how it manifests sometimes can help them figure out within

25  their own system how to support their employee or a student,

1    so on and so forth.  So that's what I mean by

2    "psychoeducation."

3    **Q.**  And did you provide psychoeducation?

4    **A.**  I hope so.  I think I wrote a little bit about social

5    anxiety disorder and how it can impact well-being and how

6    it's physically also impacting Lisa.  So yes.

7    **Q.**  And if I just highlight this section here, would I be

8    right that that was the sort of psychoeducation that you were

9    trying to --

10   **A.**  Yes.

11   **Q.**  Did Mr. St. John or anyone else from PPD ever reach out

12   to you to get more information concerning this

13   psychoeducation?

14   **A.**  No.

15   **Q.**  Would you have provided more if they had asked for it?

16   **A.**  Yes.  I've gone to school systems and had meetings and so

17   on and so forth, so yes.

18   **Q.**  Okay.  And when you say you've gone to school systems,

19   you mean like in connection with an accommodation request?

20   **A.**  Correct.

21   **Q.**  And then below, we'll see here some recommendations you

22   provided concerning possible accommodations?

23   **A.**  Correct.

24   **Q.**  Okay.  And were these things that you had sort of

25   brainstormed with Dr. Menninger in terms of, you know,

1  creative ideas that might be available?

2  **A.**  Yes.

3  **Q.**  Okay.  Was it your intention to convey to PPD that

4  Dr. Menninger would only do her job if she got these

5  accommodations?

6  **A.**  Absolutely not.

7  **Q.**  Do you see here at the end, you note, "I am available for

8  further discussion"?

9  **A.**  I do.

10  **Q.**  I'm going to take you back to your treatment notes, Joint

11  Exhibit 18.  Besides what's contained in these notes, do you

12  have a sort of independent recollection of much of your care

13  of Dr. Menninger?

14  **A.**  I have an overall recollection, yes.

15  **Q.**  Yeah?  What's your overall recollection?

16  **A.**  My overall recollection is she was very open and willing

17  to do the work to get better, including taking medications,

18  letting me talk to whoever I needed to talk to to help her

19  get better.  But she did start to decline and she needed more

20  support.  But in general, she was very committed to trying to

21  get better.

22  **Q.**  And in terms of that decline, do you recall what that

23  decline led to?

24  **A.**  I believe a hospitalization.

25  **Q.**  And I'm going to show you your notes here from a visit on

1    June -- June 1, 2018.  And just to orient us, the top of the

2    highlighted section, it says, "DOS."  Would that be date of

3    service?

4    **A.**  Yeah.

5    **Q.**  So that generally reflects the date that you saw the

6    person?

7    **A.**  Yeah.

8    **Q.**  Okay.  In terms of the chief complaint that day, you

9    write, "I just can't do it anymore.  I am not sleeping,

10   eating.  I am having thoughts about ending my life, but I

11   wouldn't do it because of Maya and Mason."

12           Do you see that?

13   **A.**  I do.

14   **Q.**  Okay.  Do you recall anything about Dr. Menninger's visit

15   on that occasion?

16   **A.**  I just recall that she was in distress.

17   **Q.**  And was it at that point in time that you recommended

18   that she seek more advanced treatment?

19   **A.**  Yes.

20   **Q.**  It was at the hospital program you referred to earlier?

21   **A.**  Yes.

22   **Q.**  Okay.  And I'm just going to direct your attention to the

23   third page of that note.  In terms of your plan.

24           First item, "Safety, recommend immediate medical

25   leave starting on Monday 2/2 to level of anxiety and safety

1    issues, monitor GI distress and appetite."

2              Do you see that?

3    **A.**  Yes.

4    **Q.**  Okay.  And medical leave, would that be a medical leave

5    from work that you recommended?

6    **A.**  Correct.

7    **Q.**  And was that a safety issue from your perspective?

8    **A.**  Yes.

9    **Q.**  When you first began treating Dr. Menninger back in

10   January of 2018, did you have any safety concerns about her

11   then?

12   **A.**  No.

13   **Q.**  Did she express to you at that time any suicidal

14   ideation?

15   **A.**  No.

16   **Q.**  Subsequent to this note that we've been looking at here

17   from June 1, 2018, do you recall being contacted by

18   Dr. Menninger's husband at some point?

19   **A.**  I do.

20   **Q.**  And do you recall him expressing a safety concern to you?

21   **A.**  I do.

22   **Q.**  And could you just tell the jury what, if anything, do

23   you recall about that.

24   **A.**  I recall Mason being concerned that she was making

25   statements about wanting to end her life.

1  **Q.**  And did you get on the phone and talk Dr. Menninger

2  through that?

3  **A.**  I did.

4  **Q.**  As you were treating Dr. Menninger through this decline

5  that you've referenced, were you aware that she was having

6  discussions with her employer about possible accommodations?

7  **A.**  I was aware there were discussions, yes.

8  **Q.**  Okay.  Did Dr. Menninger express to you frustration over

9  the way that her employer was responding to those requests?

10  **A.**  At times I do remember her being concerned about some of

11  the -- her words being -- and even my words kind of being

12  used in a way that didn't feel good.  But my memory is also

13  that a lot of our sessions were not necessarily about only

14  work.  That was not necessarily the focus of the time that we

15  spent together.

16  **Q.**  Sure.  And were you spending time trying to get her to do

17  activities that might help with her healing; is that correct?

18  **A.**  Correct.

19  **Q.**  Things like going out for a walk?

20  **A.**  Yes.  Some exposures, as we call them, yes.

21  **Q.**  Playing with her daughter in the driveway?

22  **A.**  Yes.

23  **Q.**  Okay.  And I think you said that Dr. Menninger, she

24  was -- she was trying hard with those things?

25  **A.**  She really was, yes.

1    **Q.**  I'm going to direct your attention here to Joint

2    Exhibit 136.  And I'm just going to show you -- this is an

3    e-mail that Dr. Menninger wrote to someone at her company and

4    I just want to point out something that she wrote here.

5    "While you keep saying that you are committed to engaging in

6    a dialogue with me, I feel like you just keep twisting my

7    doctor's words and refusing to answer any of my questions."

8            Do you see that?

9    **A.**  I do.

10   **Q.**  Do you recall Dr. Menninger sharing that concern with you

11   at any point during her treatment?

12   **A.**  What's coming to mind is I had sent this document about

13   different leadership styles to -- I think it was Chad.  And

14   part of the one of the leadership styles was -- and I had

15   said it's kind of more behind the scenes, someone who's a

16   little more pragmatic, a little more quiet, but kind of

17   supports leadership in a different way, than being

18   extroverted or being the face of whatever.

19           And then what I do remember is that somehow those

20   words kept coming up, if she was asked to do something, or is

21   that behind the scenes enough, or something along those

22   lines, and those aren't exact quotes, but somehow those words

23   were kind of being used to question whether she was able to

24   do things at work.  That's what I recall.

25   **Q.**  I'm now going to show you Joint Exhibit 19.

1    **A.**  Oh, yes.

2    **Q.**  And just to orient you here, I'm going to show you the

3    second page of the document.  And if you look here at the

4    bottom half?

5    **A.**  Yes.

6    **Q.**  You see there, it looks like this is a form that you

7    completed; is that right?

8    **A.**  Correct.

9    **Q.**  Okay.  And in the section above, under "Diagnostic

10   Impressions," there's a question about, "The patient has

11   conceptualized the following areas as barriers in returning

12   to work."  Do you see that?

13   **A.**  I do.

14   **Q.**  And you write, "Decline to accommodate, now with hostile

15   work environment."

16          Do you see that?

17   **A.**  I do.

18   **Q.**  And was the hostile work environment, is that what

19   Dr. Menninger had communicated to you?

20   **A.**  Yes.

21   **Q.**  Okay.  Do you have a specific recollection, all these

22   years later, of what that consisted of, or would you just

23   refer to your notes?

24   **A.**  I would probably refer to my notes.  I remember the

25   behind the scenes.  Oh, and I -- what was it -- I can't

1    remember.  There was something more to that, but it's not

2    coming to mind right now.

3    **Q.**  Okay.  That's all.

4

5               MR. HANNON:  That's all I have, Your Honor.

6               THE COURT:  Okay.  Cross-examination.

7               **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

8    BY MS. MANDEL:

9    **Q.**  Good morning, Dr. Kessimian.

10   **A.**  Good morning.

11   **Q.**  I'm Rachel Mandel.  I'm going to ask you some more

12   questions.

13               You treated Dr. Menninger in your practice in

14   Providence for about a year; is that right?

15   **A.**  That is.

16   **Q.**  From January of 2018 to early 2019; is that right?

17   **A.**  Correct.

18   **Q.**  And you saw her mostly in person in your Providence

19   practice?

20   **A.**  Correct.

21   **Q.**  And that was until Dr. Menninger relocated to New Mexico;

22   is that right?

23   **A.**  We might have had one or two virtual sessions, if she was

24   really struggling to leave her home, but then afterwards, we

25   had a few virtual sessions as she transitioned care to

1    New Mexico.

2    **Q.**   And you also talked on the phone and e-mailed with her

3    attorney, Patrick Hannon, during that time; is that right?

4    **A.**   A few times, yes.

5    **Q.**   You testified that you first met Dr. Menninger on January

6    22, 2018; is that correct?

7    **A.**   Yes.

8    **Q.**   And do you recall how Dr. Menninger first came to you as

9    a patient?

10   **A.**   I think she was just a self-referral.  That's all I

11   remember.

12   **Q.**   And when you first met her on January 22nd of 2018, she

13   told you herself that she had generalized anxiety disorder,

14   social anxiety, and panic; is that right?

15   **A.**   Yes.

16   **Q.**   And you took that seriously, because she, herself, is a

17   physician; is that right?

18   **A.**   Yes.

19   **Q.**   Can you explain what agoraphobia is?

20   **A.**   So agoraphobia is eventually you have so much fear about

21   leaving your home that you can end up pretty isolative and

22   staying mostly confined to your home.

23   **Q.**   And that's something that you additionally diagnosed

24   Dr. Menninger as having; is that right?

25   **A.**   Yes, she was struggling with that.

1    **Q.**  And that was, again, as of January of 2018?

2    **A.**  Correct.

3    **Q.**  And that was based on Dr. Menninger's reports to you that

4    she was having difficulty leaving her home at all at that

5    point?

6    **A.**  I wouldn't say at all, but it was increasingly difficult

7    for her, yes.

8    **Q.**  And Dr. Menninger reported to you that she was motivated

9    to seek treat because her symptoms were, in turn, impacting

10   her daughter; is that right?

11   **A.**  Correct.

12   **Q.**  Do you recall how old her daughter was at that time?

13   **A.**  I know she went to Wheeler School.  I want to say middle

14   school, but I could be wrong.  Maybe elementary.  I'm unsure.

15   **Q.**  And she also told you at that time that she already, as

16   of January of 2018, had what she called spiralling fears

17   about work; is that right?

18   **A.**  Correct.

19   **Q.**  And that was that she might lose her job, even as of

20   January of 2018?

21   **A.**  My recollection is that -- and this is from my note, as

22   well, she had an end-of-the-year review, and at that time,

23   there were public speaking requirements that were introduced,

24   that were maybe not excessive, but were high expectations

25   about the amount of public speaking.  And I did receive a

1    form to support what she was saying to me.  And she had

2    recently also gone virtual, because she had left where she

3    was living to support her daughter, who had been struggling

4    in school, I believe.  So she had a recent relocation, she

5    was remote.

6              And what was your question again?  Now I've lost

7    it.

8    Q.  That as of January of 2018, when Dr. Menninger first came

9    to you, she had reported fears of losing her job, and she --

10   A.  So she was -- her fear was, I believe, more about would

11   she be able to fulfill these new responsibilities without

12   becoming very ill and without needing a lot of medication to

13   get through these responsibilities was more how I remember

14   her talking about it.

15   Q.  And you had concerns about how she would handle leaving a

16   lot of medications?

17   A.  I don't understand the question.

18   Q.  Well, you testified a moment ago that Dr. Menninger

19   reported to you needing, I think you said, a lot of

20   medications to be able to do the things that were being asked

21   of her at work?

22   A.  No.  I -- I guess what I was just trying to say from the

23   history is that she had done public speaking engagements

24   previously.  However, had needed some medication to support

25   her through that.

1    But now as the requirement was increasing -- and

2    these medications are in and out in a day, people use them

3    for flying, people use them for public speaking.  These are

4    medications that we use for specific fears, right?  But if we

5    have to face that fear every day, or we don't even know when

6    that's going to come up, right, then the requirement for your

7    body to get through those is going to need more medication,

8    and sometimes even with medication, we're not going to be

9    able to do it.  So that's what I mean by that.

10   **Q.**  And so as of your meeting with Dr. Menninger, one of your

11   initial goals was how to work with her to navigate all of

12   this at work; is that right?

13   **A.**  That was part of my initial goal, yes.

14   **Q.**  And let's pull back up Joint Exhibit 18.  And this is

15   your initial psychiatric evaluation note from that first

16   appointment that you had with Dr. Menninger; is that right?

17   **A.**  Yes.  Yes.

18   **Q.**  And towards the end of that first paragraph of your

19   description of what you learned from Dr. Menninger, you noted

20   that Dr. Menninger had already met with a lawyer at this

21   point and, in fact, that that lawyer would work with you to

22   do paperwork for her employer; is that right?

23   **A.**  I don't --  "To provide."

24   **Q.**  It's the second to last sentence of that first big

25   paragraph?

1    **A.**   Yes, that's what I wrote.

2    **Q.**   And that lawyer that you were referring to there is

3    Patrick Hannon there; is that right?

4    **A.**   Yes.

5    **Q.**   And let's look -- let's go a couple pages in.  This is

6    still part of that note from your first appointment; is that

7    right?

8    **A.**   Uh-huh.

9    **Q.**   And you noted on your mental status exam notes, you said

10   at the top of the page that Dr. Menninger appeared as tearful

11   at times, measured, pale, thin, initially anxious; is that

12   right?

13   **A.**   Correct.

14   **Q.**   And again, that was your initial impression the very

15   first time you met with her; is that correct?

16   **A.**   Yes.

17   **Q.**   And in part, your impressions, based on your first

18   meeting with her, helped educate you about what your next

19   steps might be in treating her; is that right?

20   **A.**   Correct.

21   **Q.**   And helped inform how you handled that accommodation

22   paperwork that you noted earlier in your note; is that right?

23   **A.**   Can you connect those two again?

24   **Q.**   Yeah, you testified a moment ago about earlier in your

25   note, you said that you were going to work with Dr. Menninger

1    about her accommodation paperwork?

2    **A.**   Oh, sure.

3    **Q.**   And your impressions that you're looking at here helped

4    inform what you filled out in that paperwork; is that right?

5    **A.**   Yeah.

6    **Q.**   Looking down at -- lower on the page, you talk about,

7    under "assessment and plan," do you see that?

8    **A.**   I do.

9    **Q.**   And you noted that her baseline high anxiety -- can you

10   explain what baseline high anxiety is?

11   **A.**   So some of us, temperamentally, can be more risk averse,

12   can be more aware of potential dangers in our environment,

13   we're more introverted, less extroverted, less risk-taking,

14   and highly responsible would be another part of that.  So

15   baseline, she's already quite anxious, and she already had

16   some anxiety regarding her daughter's well-being that she was

17   coping with, as well as there was a lawyer in her life, and

18   there was financial responsibilities that she was coping with

19   and a recent move.  So all of those, at her baseline, she

20   already had a high level of anxiety.

21   **Q.**   And this -- this started to spiral, you noted, when it

22   was suggested that she would be more visible at work; is that

23   right?

24   **A.**   Correct.  Correct.

25   **Q.**   And this was connected to this fight or flight feeling

1  that you described next; is that right?

2  **A.**   Correct.

3  **Q.**   And this is what you described as catastrophic thinking;

4  is that right?

5  **A.**   Fight or flight is separate than catastrophic thinking.

6  **Q.**   Those are two separate things.  So those are two separate

7  feelings that you understood Dr. Menninger had at the time?

8  **A.**   Correct.

9  **Q.**   And the catastrophic thinking was, again, that fear that

10  you mentioned earlier in your note that she was spiralling

11  and feeling like she might lose her job as of January 2018?

12  **A.**   Correct.

13  **Q.**   Is that right?  Okay.  And beneath that you note

14  Dr. Menninger's earlier traits of her upbringing and her

15  family life; is that right?

16  **A.**   Correct.

17  **Q.**   And you note that had she had trauma secondary to her

18  father's volatile behavior and the domestic violence that she

19  had witnessed; is that right?

20  **A.**   Correct.

21  **Q.**   And this was relevant to sort of where she was coming

22  from and what was otherwise impacting her; is that right?

23  **A.**   Sure.

24  **Q.**   And then down below, at the bottom of that page is where

25  you list out the diagnoses that you had coming out of this

1    visit; is that right?

2    **A.**   Uh-huh.

3    **Q.**   And that was the panic disorder with agoraphobia which

4    you described?

5    **A.**   Yes.

6    **Q.**   Is that -- the social disorder and the generalized

7    anxiety disorder, which Dr. Menninger self-reported to you;

8    is that right?

9    **A.**   Correct.

10   **Q.**   In looking at -- actually, one second.

11           And looking back at this page, you noted under --

12   you noted under "Social," you said pathologists working in

13   the private sector, sole financial contributor and then you

14   noted that husband empathic understanding partner, concern

15   for excessive accommodation, all her needs are met, and she

16   is not asked or required to leave the house.  Do you see

17   that?

18   **A.**   I do.

19   **Q.**   And that was referring to your concern that, in fact, Dr.

20   Menninger's husband was sort of accommodating her pushback

21   against leaving the house; is that right?

22   **A.**   Correct.

23   **Q.**   And in your professional opinion at the time, what impact

24   did that have, Dr. Kessimian?

25   **A.**   On what, specifically?

1  **Q.**  Well, that was something that you noted as relevant in

2  her medical history or her psychiatric history.  So why did

3  you think that was something important to note?

4  **A.**  Well, just like everything is on a spectrum,

5  accommodation is also a spectrum.  And so in order to get

6  better, anxiety leads to avoidance many times.  There are

7  some vital functions we all have to do in life to just

8  survive.  One of those would be able to leave the house, get

9  medication, talk to other people.  And if those were all

10  going to be accommodated for Lisa because, I'm assuming, her

11  partner didn't want her to suffer and be in distress, that

12  would be problematic.  So that would be a focus of concern.

13  **Q.**  And that's something that you continued to work with

14  Dr. Menninger on; is that right?

15  **A.**  Correct.

16  **Q.**  And looking back at the previous page of your notes from

17  that January 22nd date, which you should have in front of

18  you, you also noted that Dr. Menninger had what you called

19  eating disorder behavior?

20  **A.**  Could you highlight it?

21  **Q.**  Yes.  That's about two-thirds of the way down.  The

22  paragraph begins "eating disorder behavior."  Do you see

23  that?

24  **A.**  Yes.

25  **Q.**  And you noted that Dr. Menninger weighed herself daily

1  and was committed to remaining the same weight.  Do you see

2  that?

3  **A.**  I do.

4  **Q.**  And she also at the time was competing in ultra long

5  power walking; is that right?  It's in the end of that same

6  paragraph?

7  **A.**  Yes.  Yeah.

8  **Q.**  And again, that's something that you thought was a

9  relevant part of her psychiatric history; is that correct?

10  **A.**  Correct.

11  **Q.**  And, in fact, you continued to be somewhat concerned

12  about the eating disorder behavior throughout her treatment;

13  is that right?

14  **A.**  I continued to be concerned about her weight throughout

15  our treatment, yes.

16  **Q.**  And then let's look at what you developed as the plan

17  during this visit.  You noted here on the last page of your

18  note from that initial visit, some medication changes that

19  you were considering, and then you said, "Support

20  accommodations at work so that public speaking is not a core

21  requirement;" is that right?

22  **A.**  Correct.

23  **Q.**  Or work responsibility;" is that correct?

24  **A.**  Correct.

25  **Q.**  And that's because you wanted to minimize those effects

1  that you had seen with the spiralling thoughts about work; is

2  that right?

3  **A.**  I think it's a little more complicated than that.  I

4  think she has social phobia and one of the core issues with

5  that illness is that public speaking, performance relating,

6  any interaction where criticism, scrutiny is at risk can

7  cause a cascade of physiological, behavioral issues for that

8  person.  And so if we could minimize that for her, in this

9  area, that would be ideal.

10  **Q.**  And coming out of this visit, you then filled out

11  documentation for Dr. Menninger to take back to her employer

12  at the end of January of 2018; is that right?

13  **A.**  I don't remember specifically.

14  **Q.**  Sure.  We'll look at that.

15  **A.**  Okay.

16  **Q.**  And in fact, you already looked at it earlier this

17  morning.

18  **A.**  Oh.  Okay.  Then yes.

19  **Q.**  This is an e-mail from you on January 31st, is that

20  right?

21  **A.**  Yes.

22  **Q.**  And this is the e-mail that you sent to PPD yourself; is

23  that right?

24  **A.**  Yes.

25  **Q.**  Okay.  And you indicated in your e-mail to Mr. St. John,

1   you said, "Per our conversation, the forms are attached" and

2   that's because you also had a phone conversation with Mr. St.

3   John; is that right?

4   **A.**   Yes.

5   **Q.**   And let's look at what you sent in this e-mail.

6           This is the form that you looked at a few moments

7   ago.  Do you recall?

8   **A.**   Yes.

9   **Q.**   And you explained in bold, in the middle of this page,

10   that Dr. Menninger has -- you listed out impairments, right?

11   You said panic disorder with agoraphobia --

12   **A.**   Yeah.

13   **Q.**   And social anxiety disorder and generalized anxiety

14   disorder?

15   **A.**   Correct.

16   **Q.**   And those were all diagnoses that you had endorsed as

17   part of your treatment in your visit earlier in January?

18   **A.**   Yes.

19   **Q.**   And then if we -- if we look down at the section under

20   number 5 -- well, let's actually, let's look at number 4

21   first.  You noted -- and it's a little harder to tell where

22   your writing begins, because it's not in bold, but you wrote

23   in that impairment is long term with a chronic course; is

24   that correct?

25   **A.**   Correct.

1  Q.  And that meant that it didn't have an end point that you

2  saw coming; is that right?

3  A.  Many of my illnesses are chronic in nature, and they ebb

4  and flow, according to certain stressors.  So it's just --

5  yes, the impairment is long term with a chronic course, but

6  that chronic course, there can be times where the symptoms

7  are less sever, times where they're more severe.  If there's

8  a stressor that's exacerbating those symptoms, they can

9  become more severe.  But, yes, it is a chronic condition.

10 Q.  And in fact, that's what you reported in your answer to

11 number four, about what the nature of this impairment was?

12 A.  Correct.

13 Q.  Okay.  And then let's look down at number five, with

14 regard to where you described what the conditions would

15 limit, or how they might interfere with Dr. Menninger's

16 performance of the essential functions of her job.

17          Is that your language below where it says, "Lisa

18 suffers from panic disorder."

19          Do you see that?

20 A.  Yes.

21 Q.  So you wrote, "Lisa suffers panic disorder with

22 agoraphobia, social anxiety disorder, and generalized anxiety

23 disorder.  This disability significantly interferes with

24 Lisa's ability to perform major life activities, such as

25 thinking, concentrating, communicating and working."

1    And you wrote that, as well, correct?

2  **A.**  Correct.

3  **Q.**  "Lisa is most effected in social situations and when she

4  is required to speak in front of others.  Despite these

5  limitations, Lisa reports that she has historically fulfilled

6  the essential functions of her job without accommodation.

7  However, she frequently suffers from anxiety and other

8  somatic symptoms triggered by social interactions and public

9  speaking incident to her job.  Further, Lisa's supervisor

10  recently identified potential changes to her role involving

11  more public speaking and social interactions.  This has

12  caused Lisa to experience increased anxiety with somatic

13  symptoms, including diarrhea, heart racing, sweatiness, and

14  increased respiratory rate."

15    And you wrote all of that?

16  **A.**  I did.

17  **Q.**  Yeah.  Somatic symptoms, Dr. Kessimian, that is what's

18  like a physical response to feelings of anxiety.  Is that

19  right?

20  **A.**  Correct.

21  **Q.**  And that would include things like gastrointestinal

22  distress, the sweatiness, the racing heart rate; is that

23  right?

24  **A.**  Correct.

25  **Q.**  And you wanted to explain that those were things that

1    Dr. Menninger experienced in connection with the diagnoses
2    that you had given her; is that right?
3    **A.**   Correct.
4    **Q.**   Looking below, at number six, and this spans two pages,
5    this is where you were asked to explain which essential job
6    functions Dr. Menninger would have trouble performing; is
7    that right?  And your language below says, "Lisa's disability
8    makes it extremely difficult for her to engage in public
9    speaking and social interactions.  While Lisa has been able
10   to tolerate these types of activities to the extent that they
11   have been --" oops.  "-- necessary for her job, they often
12   cause her to suffer from anxiety and other somatic symptoms.
13   Any changes to her role that increase the need for public
14   speaking and/or social interactions will increase her anxiety
15   and worsen he somatic symptoms which will make it
16   substantially more difficult, if not impossible for Lisa to
17   perform her job."
18            And you wrote that, as well?
19   **A.**   Correct.
20   **Q.**   And that was your response to Dr. Menninger reporting to
21   you that there were some additional needs for social
22   interaction and public speaking coming with her job; is that
23   right?
24   **A.**   And a -- yes.  Yes.
25   **Q.**   And the next question says, "If the employee cannot

1    perform the essential function of his or her job or access

2    --"

3              THE COURT REPORTER:  I'm sorry.  Can you please

4    slow down just a little bit.

5              MS. MANDEL:  Yes.  Sorry.  "If the employee cannot

6    perform the essential functions of his or her job, or access

7    a benefit of employment, what accommodations would you

8    recommend?"

9    BY MS. MANDEL:

10   **Q.**  Do you see that?

11   **A.**  Yes.

12   **Q.**  And you wrote in response, "Given Lisa's disability, I

13   recommend that any social interaction or public speaking

14   incident to her role would be minimized to the extent

15   possible.  Additionally I recommend that her role not be

16   changed to require any increased public speaking or social

17   interactions."

18             Do you see that?

19   **A.**  I do.

20   **Q.**  And so you were recommending that the changes that had

21   been proposed in December of 2017 not be put in place; is

22   that right?

23   **A.**  Correct.

24   **Q.**  To the extent that social interactions and/or public

25   speaking is deemed necessary for Lisa's job, I recommend that

1    a plan be developed for these activities, in consultation

2    with me or another qualified healthcare provider."

3         Is that right?

4    **A.**  Yes.

5    **Q.**  So essentially putting on the brakes for that type of

6    thing, unless you or someone like you were being consulted?

7    **A.**  Correct.

8    **Q.**  Okay.  And then you explained how the accommodations that

9    you were proposing would improve Dr. Menninger's job

10   performance in the next question.  Is that right?  In number

11   8?

12   **A.**  Yes.

13   **Q.**  And your response was, "Given Lisa's disability, I

14   recommend that any social interaction or public speaking

15   incident to her role be minimized to the extent possible."

16   So you repeated again what you had said a couple of times,

17   right?

18   **A.**  Yeah.

19   **Q.**  "Additionally, I recommend that her role not be changed

20   to require any increased public speaking or social

21   interactions."  And so again --

22   **A.**  Same thing.

23   **Q.**  -- you wanted to put the brakes on that.

24        "To the extent that social interactions and/or

25   public speaking is deemed necessary for Lisa's job, I

1    recommend that a plan be developed for these activities, in

2    consultation with me or another qualified healthcare

3    provider."

4            So, again, saying that if those things needed to be

5    done, I would have to consult or someone else like me would

6    have to consult in how that could be done; is that right?

7    **A.**   Correct.

8    **Q.**   Okay.  And then number 9, the question is what

9    restrictions, if any, are you placing on Dr. Menninger's

10   ability to do her job?  Is that right?

11   **A.**   Yes.

12   **Q.**   And in connection with this, you had reviewed the job

13   description, correct?

14   **A.**   I had reviewed the public speaking requirements.

15   **Q.**   Okay.  And your response was, "Social interactions and

16   public speaking should be minimized as much as possible.  To

17   the extent Lisa is required to engage in social interactions

18   and/or public speaking, these activities should be planned in

19   consultation with her medical provider, in hopes of minimize

20   Lisa's anxiety and somatic symptoms."

21   **A.**   Yes.

22   **Q.**   And this was in part because you had observed what you

23   believed were somewhat concerning somatic symptoms or

24   physical manifestations of Dr. Menninger's anxiety; is that

25   right?

1  **A.**  And what she reported to me was causing her distress.

2  **Q.**  And so you wanted to make sure that she wasn't in

3  situations that would increase her level of symptoms; is that

4  right?

5  **A.**  No.

6  **Q.**  Well, so why would you have recommended --

7  **A.**  So I do recommend outside of work that she actually do --

8  does engage in activities that increase her somatic symptoms.

9  Right?  So going out to the mailbox, trying to engage in

10  talking to people in her neighborhood.  So the treatment for

11  anxiety is not about avoiding everything that causes you that

12  increased anxiety.  What I deemed was -- which seemed outside

13  of the -- which seemed like an excessive amount of public

14  speaking, if I remember correctly.  And that's coming from

15  someone who does not work and does not know exactly how much

16  public speaking is required of her position, in particular.

17  But the public speaking requirement that I remember was quite

18  broad.  It was very general.  I believe the first line said

19  up to 500 people biweekly, monthly, or quarterly.  That was

20  like number one, and that can happen once or twice, and then

21  it went down to 50 to 100 people, and I can't remember the

22  rate.  And it went down again.  So it was the fact that the

23  amount of public speaking that was being requested was at

24  such an extreme rate that I felt that was going to be

25  detrimental and that she was going to have -- she was going

1    to be flooded with symptoms from her sympathetic nervous

2    system, that she would not be able to recover.  Because you

3    also have to remember that with social phobia, it's not just

4    about the presentation.  It's the days leading up to the

5    presentation.  It's thinking about how you're going to say,

6    what you're going to say, what is someone going to comment,

7    how am I going to respond?  And she is losing weight, she is

8    very profoundly distressed about this.  And if there is a

9    way -- and again, this is just from my own knowledge of

10   physicians, I'm not a pathologist, I'm a psychiatrist, but

11   again, in my mind, this amount of public speaking for a

12   pathologist, I was just kind of like, what else does she do

13   for her job?  Because you would have to just be prepping for

14   public speaking the whole time you're working, as far as I'm

15   concerned, with the amount of public speaking that was being

16   requested of her.

17          The other thing with anxiety is structuring

18   expectations does help mitigate symptoms.  So if there was a

19   little bit more clarity regarding the rate of public

20   speaking, how many people were going to be there, I do

21   believe Lisa would work towards doing something.  That was

22   how she presented to me.  And if I recall, she even

23   offered -- there was a -- I want to say Belgium, but I could

24   have the country wrong.  There was one cohort internationally

25   where she felt very comfortable with her peers and very

1   comfortable presenting.  And she even said I would be more

2   than willing to like continue that cohort.  It's really these

3   kind of US -- I think she said US labs, but, again, I am not

4   privy to PPE -- PPD, I don't even know their name, what they

5   do for their company.  But she was willing to kind of meet in

6   the middle and try to find ways so that she could still do

7   facets that felt comfortable, that felt doable, again, while

8   in treatment, while taking medication, while doing exposures,

9   but this did feel like an extreme expectation.  And that's

10  what I was trying to shift, not that she should never do

11  things that cause her anxiety because many things were

12  causing her anxiety.

13  **Q.**  Dr. Kessimian, to just draw your attention back to that

14  accommodation paperwork that you filled out, it should be on

15  the screen?

16          MS. MANDEL:  I'm seeing it here.  Is it?

17          THE COURT:  Yeah, I have it, too.  You're talking

18  about the nine-question form?

19          MS. MANDEL:  Okay.

20  BY MS. MANDEL:

21  **Q.**  You should now have it on the screen in front of you your

22  accommodation paperwork that you filled out for

23  Dr. Menninger; is that right?

24  **A.**  Yes.

25  **Q.**  And you see that you signed this on January 31, 2018?

1    **A.**   I do.

2    **Q.**   And that was, in fact, before you filled out additional

3    paperwork where you, at that point, were aware of certain

4    buckets of job responsibilities that listed out the number of

5    people and the frequency.  Isn't that right?

6    **A.**   Oh, that is true.  That is true.  Correct.

7    **Q.**   So at this point, you were acting based on your

8    understanding of what Dr. Menninger had described to you and

9    her job description, and your understanding of what a

10   pathologist might do; is that right?

11   **A.**   Yes.  And my understanding, also, of the illness.

12   **Q.**   Correct.  And your understanding of what a pathologist

13   might do, in part, comes from your own medical training; is

14   that right?

15   **A.**   Yes.

16   **Q.**   And your belief that a pathologist often does sort of

17   behind the scenes work; is that right?

18   **A.**   Well, they run a laboratory.  Right?  And so it's not

19   direct patient care.  It's not bedside care.  So it is more,

20   I would guess, like quantitative, qualitative types of care,

21   and running a staff in a lab.  Right?  Labs have to run

22   smoothly, I would assume, as well.

23   **Q.**   And this is based on your own assumptions and knowledge,

24   having gone to medical school yourself, right?

25   **A.**   Correct.

1    **Q.**  Let's look at your notes from your next visit with

2    Dr. Menninger.  This was from a couple of days later.  This

3    was from February 2nd of 2018; is that right?

4    **A.**  Uh-huh.  Yeah.

5    **Q.**  And at this visit, you noted that Dr. Menninger reported

6    to you, "I'm just worried all the time.  I wake up with my

7    heart already beating fast, thinking about how I have to see

8    the people that I work with at the end of the month after

9    handing in those letters to HR."

10           Do you see that?

11   **A.**  I do.

12   **Q.**  And this was Dr. Menninger's report simply at having

13   handed in documents asking for an accommodation; is that

14   right?

15   **A.**  Correct.

16   **Q.**  And you felt that it was significant to note this as her

17   chief complaint; is that right?

18   **A.**  Yes.

19   **Q.**  And that's because even having that initial interaction

20   with her employer was having this impact on her.  Isn't that

21   right?

22   **A.**  Can you repeat the question?

23   **Q.**  Yeah.  The reason that you noted this as Dr. Menninger's

24   chief complaint at this time was because even having had a

25   conversation and starting the conversation with PPD about the

1    need for an accommodation was having this impact on her.

2    Isn't that right?

3    **A.**   I noted it because it's what she said.

4    **Q.**   And looking down at the sort of middle part of that page,

5    you noted that you spoke at length about Dr. Menninger's

6    experience in the work environment, where she feels that

7    because she is more introverted and analytical, she is being

8    criticized for things that are unchangeable.  Do you see

9    that?

10   **A.**   Uh-huh.

11   **Q.**   And then you noted "has difficulty advocating for herself

12   and has already resigned to defeat in the corporate culture."

13          Do you see that?

14   **A.**   Yes.

15   **Q.**   And this was at just your second visit with

16   Dr. Menninger, a few days after she had told her employer

17   that she had an anxiety condition; is that right?

18   **A.**   I don't know what she specifically said to her employer.

19   **Q.**   Well, you provided an accommodation letter on January

20   31st, right?  We just looked at that?

21   **A.**   Yes.

22   **Q.**   And just two days later, at that point, you noted that

23   Dr. Menninger was having difficulty advocating for herself

24   and felt resigned to defeat at work, basically?

25   **A.**   Sure.  Yes.

1    **Q.**  And during this same time period, Dr. Kessimian, you were

2    having communications, yourself, with Patrick Hannon,

3    Dr. Menninger's attorney; is that right?

4    **A.**  I believe we e-mailed a couple of times and maybe talked

5    on the phone once.

6    **Q.**  Let's look at --

7              MS. MANDEL:  Before I bring up this Exhibit --

8              THE COURT:  Which one is this?

9              MS. MANDEL:  This is going to be --

10             THE COURT:  What exhibit number is it?

11             MS. MANDEL:  It's going to be -- the one that has

12    the BO on it.

13             Ms. Belmont, we may just have to bring it up.

14             THE COURT:  You can bring it up just for the

15    witness now.

16             MS. MANDEL:  Yeah.

17   BY MS. MANDEL:

18   **Q.**  Here we have some e-mails from starting on February 3rd

19   at the bottom, and at the top it's from February 4th.  Do you

20   see that?

21   **A.**  I do.

22   **Q.**  And this is an e-mail from you to Dr. Menninger, at the

23   top, on February 4th; is that right?

24   **A.**  Correct.

25   **Q.**  And actually, let's look, first, at the e-mail below.

1    Dr. Menninger forwarded to you an e-mail that she received

2    from Mr. St. John; is that right?

3    **A.**   Correct.

4              MR. HANNON:  Judge, I think it's just some

5    confusion from the jury in terms of why they can't see it.

6              THE COURT:  Because it's not yet in evidence.

7              Go ahead.

8              Thank you, Mr. Hannon.

9              Whenever I say it's just -- you can show it to the

10   witness or only the witness, that means it's not yet in

11   evidence.

12             Go ahead.

13   BY MS. MANDEL:

14   **Q.**   Dr. Kessimian, at the bottom of this page, you see that

15   Dr. Menninger had forwarded -- shown you an e-mail that she

16   had received from Mr. St. John; is that right?

17   **A.**   Yes.

18   **Q.**   And then up above that, she wrote to you, and there's

19   some discussion of having an appointment on an upcoming day;

20   is that right?

21   **A.**   Correct.

22   **Q.**   And then -- this is, again, on February 3rd,

23   Dr. Menninger reported to you that Mr. St. John had responded

24   to the forms that you had provided and she had provided at

25   the end of January; is that right?

**A.**   Could you repeat that question?  Sorry.

**Q.**   Sure.  The second paragraph of the February 3rd e-mail.
Do you see that in front of you?

**A.**   During our appointment yesterday?

**Q.**   Yes.

**A.**   Okay.

**Q.**   "During our appointment yesterday, Chad sent an e-mail
response to the forms that were submitted."  Do you see that?

**A.**   Yes.

**Q.**   And then Dr. Menninger reported to you "reading it
triggered an instant panic attack and made it hard for me to
focus on anything else for the rest of the day.  I copied and
pasted his e-mail below, and also forwarded it to Patrick for
guidance."

        Do you see that?

**A.**   I do.

**Q.**   "I realize that the thought of face-to-face interaction
with my US colleagues on any level is triggering a
significant amount of anxiety and panic that I've been trying
to avoid at all costs."

**A.**   Yes.

**Q.**   "As you mentioned yesterday, travel in and of itself does
not trigger panic, but visiting the US lab does.  The ideal
arrangement for me would be to interact with them on a remote
basis only once the interim US lab director is in place,

March 1st.  I don't know if they will allow this, however."

**A.**  Yes.

**Q.**  And this was, again, on February 3rd, a couple days after you sent that initial accommodation paperwork.  And Dr. Menninger was providing further context for you about how it really wasn't going to work for her to travel to the US location because of her fear of the symptoms that it was triggering; is that right?

**A.**  Correct.

**Q.**  And did you have awareness at this point, Dr. Kessimian, that Dr. Menninger's primary work location was in Highland Heights, Kentucky?

**A.**  I did not.

**Q.**  Because Dr. Menninger did not explain that to you?

**A.**  Or I may never have asked.

**Q.**  And then up above, you wrote an e-mail back to Dr. Menninger the next day; is that right?

**A.**  Yes.

**Q.**  And you set up another appointment, and then you explained that you were going to ask Mr. St. John, after you consulted with Patrick Hannon, if he could list what the specific expected duties were, so that you could talk with Dr. Menninger about a percentage; is that right?

**A.**  Correct.

**Q.**  And you testified a couple moments ago about your desire

1    to have a little bit more information about the number of

2    people who would be at meetings, and how much time they would

3    take up of Dr. Menninger's schedule; is that right?

4    **A.**   I just needed information to help make recommendations.

5    That's what I was looking for.

6    **Q.**   And you were trying to get that additional information --

7    **A.**   Correct.

8    **Q.**   -- from Mr. St. John, Dr. Menninger, and at the same

9    time, consulting with Dr. Menninger's attorney?

10   **A.**   Correct.

11   **Q.**   And then you said after that, another option would be to

12   ask -- another option would be to ask what percentage of your

13   job duties could remain remote, as we are seeking

14   100 percent?

15   **A.**   Yes.

16   **Q.**   And that's because you were advocating for Dr. Menninger

17   to be able to work 100 percent remotely and not go to

18   Highland Heights at all?

19   **A.**   So I didn't know about Highland Heights, so that didn't

20   play a role in it.  My understanding was she was mostly

21   remote, and considering she wasn't doing well, to continue to

22   ask for remote.

23   **Q.**   Because that would have allowed her not to have those

24   social interactions that were concerning to you?

25   **A.**   Well, that would have let her symptoms at least not

1    worsen as she continues to get treatment.

2    **Q.** Because it would have avoided the social interactions and

3    public speaking that concerned you; is that right?

4    **A.** Correct.

5    **Q.** And then the next paragraph you say, "I'm glad you're

6    listening to quiet."  What did that mean?

7    **A.** So there's a book, and it's written by a Harvard lawyer,

8    I think her first name is Susan, I can't remember her last

9    name.  And the title of the book is *Quiet: The Power of*

10   *Introverts in a World That Can't Stop Talking*.  So I do

11   recommend this book to many of my patients who struggle with

12   anxiety and struggle with speaking up and advocating for

13   themselves and understanding that there's strength sometimes

14   in not being the loudest one in the room.

15   **Q.** So you said, "And remember pace is important, and the

16   back and forth e-mails and questions."

17            And that was back and forth e-mails and questions

18   from PPD; is that right?

19   **A.** From PPD to Lisa, not with me.

20   **Q.** Yes.

21   **A.** Yes.

22   **Q.** And you said that was a good sign.  And good is in all

23   caps, right?  So you were pleased with that.  And they were

24   looking for more clarity and specifics?

25   **A.** Correct.

1  **Q.**  And then you ended the note by saying you would talk to

2  Patrick.  And that was Patrick Hannon?

3  **A.**  Correct.

4  **Q.**  Dr. Menninger's attorney?

5  **A.**  Yes.

6  **Q.**  The next day.  And then you would meet with Dr. Menninger

7  the next day after that, I think, which was a Friday?  Is

8  that right?

9  **A.**  It sounds like it.  Yes.

10  **Q.**  And you did, in fact, have that follow-up conversation

11  with her attorney the next day?

12  **A.**  You know, I don't recall, but I'm going to have good

13  faith that I did.

14  **Q.**  You have no reason to believe --

15  **A.**  Yes, thank you.

16  **Q.**  And during that follow-up conversation with Mr. Hannon,

17  in fact, you consulted about how you should word additional

18  requests to PPD; is that right?

19  **A.**  I don't recall that.

20  **Q.**  A couple of weeks later, or a few days later in February,

21  you received a list of specific job tasks that were required

22  for Dr. Menninger's work; is that right?

23  **A.**  For public speaking, yes.  That's the list I remember.

24  **Q.**  And that's what you were talking about --

25  **A.**  Yeah.

1  **Q.**  -- a few moments ago, with regard to what those speaking

2  and social interaction requirements would be?

3  **A.**  Correct.

4  **Q.**  Let's look at your response to that.

5          This is an e-mail from you to Chad St. John; is

6  that right?

7  **A.**  Yes.

8  **Q.**  And in this e-mail, you were the one sending this

9  information to Mr. St. John on Dr. Menninger's behalf.

10  **A.**  Correct.

11  **Q.**  Is that right?

12  **A.**  Yes.

13  **Q.**  And you testified a few moments ago that you -- you began

14  the document that you sent by providing I think it's called

15  psychoeducation?

16  **A.**  Correct.

17  **Q.**  Is that right?

18          And you would agree that this psychoeducation was

19  specific to Dr. Menninger.  It wasn't general.  It was really

20  about what she needed?

21  **A.**  Well, I would say social anxiety disorder is a

22  neural-behavioral disorder with biological and genetic risk

23  factors that lead to physical behavioral and cognitive

24  symptoms is general.  I would say it got more specific as the

25  paragraph went on.  And then, in general, I was trying to

1    give a concrete example of how to really think about it

2    physically, almost as if her vocal cords and her brain cannot

3    work with this type of exposure and the intensity of exposure

4    to this amount of public speaking.  So those are not specific

5    to Lisa.  Those are more general to people who struggle with

6    this disorder.

7               I think I became more specific when I tried to give

8    recommendations.

9    **Q.**  Well, in looking at the psychoeducation information that

10   you provided, really even in the first sentence, if you say

11   social anxiety disorder, you begin by talking about

12   Dr. Menninger in particular.  Do you see that?

13   **A.**  Yes.

14   **Q.**  And you would agree, wouldn't you, that throughout these

15   few paragraphs of information about psychoeducation, it was

16   in the context of Dr. Menninger's impairments that you had

17   diagnosed and your recommendations, correct?

18   **A.**  Correct.

19   **Q.**  And so you begin, in that first paragraph, by saying

20   "Lisa's difficulty with socializing and public speaking is

21   not a manifestation of shyness."

22   **A.**  Yes.

23   **Q.**  And then you say, "Social anxiety disorder is a

24   neural-behavioral disorder with biological and genetic risk

25   factors that lead to physical, behavioral, and cognitive

1  symptoms, which are pernicious and chronic in nature."

2  **A.**  Yes.

3  **Q.**  And the pernicious, that means -- I mean, these were

4  pretty serious?

5  **A.**  Correct.

6  **Q.**  And they were -- the symptoms were manifested in ways

7  that were serious and chronic, meaning they were not going to

8  be abating any time?

9  **A.**  That's not necessarily true.  Again, chronic does not

10  reflect symptom severity at a specific point in time or when

11  there's a specific exacerbating event or issue.  Chronic just

12  means that this is something that she has, she's going to

13  have it for a long time, but there are ways we manage chronic

14  illness, just like we manage asthma, allergies.  Right?

15  There's ways we can manage these things.

16  **Q.**  Sure and I'm not asking whether these are things that can

17  be managed?

18  **A.**  Oh.

19  **Q.**  It was chronic.  It was not going away, you know, say the

20  next day, the next week.  It was something that was sort of

21  there and not abating?

22  **A.**  Correct.

23  **Q.**  Okay.  And then the next paragraph, you explain, "In the

24  past, Lisa endured these work events and presentations with

25  intense discomfort and with the use of a sedative."

1       And this was as reported to you by Dr. Menninger,

2    correct?

3    **A.**   Correct.

4    **Q.**   "The sedative did help take the edge off, but also came

5    with side effects, including impaired attention,

6    concentration, short-term memory deficits, lethargy, and an

7    extended length of time to return to her cognitive baseline

8    to complete the more analytical and medical facets of her

9    work."

10       And you wrote that, as well, with regard to

11   Dr. Menninger, correct?

12   **A.**   Correct.

13   **Q.**   And this was in addition to your own -- based on your own

14   medical knowledge, also a reflection of what Dr. Menninger

15   had reported to you, given that you had just started treating

16   her, correct?

17   **A.**   Yes.

18   **Q.**   And when you noted the side effects of the medication,

19   those are things that you can see with sedative medications,

20   correct?

21   **A.**   Correct.

22   **Q.**   And the lethargy, in particular, lethargy is becoming

23   tired or droopy eyed; is that right?

24   **A.**   I mean, lethargy has a lot of definitions.  What I

25   remember in particular that Lisa reported, to the best of my

1    memory, is that it would take her a lot of recovery time

2    after taking the sedative.

3            So she could get through the event or the speaking

4    engagement, but then the recovery after that, she was quite

5    tired and drained after that.  And also the medicine,

6    depending on what sedative you're using, sometimes can still

7    be in your system.

8            THE COURT:  I'm going to pause you here.

9            Ladies and gentlemen, we'll take the morning break.

10           All rise for the jury.

11           (The jury exits the courtroom.)

12           THE COURT:  All right.  We'll resume at 11:30.

13           (Court in recess at 11:15 a.m.

14           and reconvened at 11:31 a.m.)

15           THE COURT:  Kellyann, you can go get the jury.

16           (The jury enters the courtroom.)

17           THE COURT:  Go ahead, Ms. Mandel.

18   BY MS. MANDEL:

19   **Q.**  Dr. Kessimian, you next described the symptoms that

20   Dr. Menninger had, leading up to any type of speaking role or

21   social event; is that right?

22   **A.**  Correct.

23   **Q.**  And you said it's important to note that the weeks

24   leading to the expected speaking engagement or social event

25   resulted in insomnia, panic symptoms, GI discomfort, and

1    weight loss?

2    **A.**  Correct.

3    **Q.**  And again, this was reported to you during your initial

4    appointment that you had with Dr. Menninger, correct?

5    **A.**  Yes.

6    **Q.**  You then said a concrete way to think of this

7    disability -- and this was your attempt to, I think as you

8    described, educate PPD about how Dr. Menninger's impairments

9    affected her in a very real way, correct?

10   **A.**  Yes.

11   **Q.**  Is that your her brain and body are not able to tolerate

12   public speaking engagements and socializing, and it is as if

13   her vocal cords and brain become paralyzed while her blood

14   pressure, heart rate, and breathing all increase, and it is

15   for all of the above reasons that I am recommending the

16   following reasonable accommodations."

17          And so again, this is where you wanted to make sure

18   PPD understood how tasks like public speaking or engaging in

19   social interaction physically impacted Dr. Menninger,

20   correct?

21   **A.**  Correct.  And I would add, I do recall that at some

22   point, Lisa reported that someone at work, and I don't know

23   who, said it's just shyness.  So that was another reason for

24   me to be very concrete in my description.

25   **Q.**  And it was actually Dr. Menninger reported that's

1    something that had been said to her from childhood; is that

2    right?

3    **A.**   Oh, that's not how I remembered it, but that could also

4    be true.

5    **Q.**   Let's look down at the bottom of this page.  This is

6    where you started to list out the accommodations that you

7    were requesting on Dr. Menninger's behalf; is that right?

8    **A.**   Correct.

9    **Q.**   And the first item says, "SLT presentations, town hall,

10   COO/EVP meeting."

11           Do you see that?

12   **A.**   I do.

13   **Q.**   And do you recall that this was a list that had been

14   provided by Dr. Menninger's employer and you were going to

15   respond to each of these; is that right?

16   **A.**   Yes.

17   **Q.**   And did you have an understanding at this time, Dr.

18   Kessimian, about what SLT presentations, town halls, COO/EVP

19   meetings were?

20   **A.**   No.

21   **Q.**   But you did, in response to this, write up reasonable

22   accommodations, correct?

23   **A.**   Correct.

24   **Q.**   Okay.  And then actually, below, it has the frequency

25   listed as well, in addition to the number of people who would

1  be present, right?

2  **A.**  Correct.

3  **Q.**  And you indicated earlier that you felt it would be

4  helpful for Dr. Menninger to know how often these things

5  might occur and how many people might be there; is that

6  right?

7  **A.**  Correct.

8  **Q.**  So this was providing that helpful information, correct?

9  **A.**  I struggle with the word "helpful."  It's providing me

10  information, but again, up to 500, to me, is so broad.  Does

11  that mean one to 500?  Frequency, biweekly, monthly and/or

12  quarterly?  That doesn't give me information.  That's --

13  that's a frequency I cannot define, actually.  So I question

14  how helpful this information was, other than the fact that it

15  was clear to me that she was going to be having to speak to

16  many people, very often.

17  **Q.**  And you'd agree, wouldn't you, that your response was to

18  list out what you felt would be a reasonable accommodation?

19  **A.**  Correct.

20  **Q.**  In light of this information?

21  **A.**  Correct.

22  **Q.**  And so let's look at what you wrote.  It's your language

23  where it says, "Reasonable accommodation" and has a dash,

24  right?

25  **A.**  Correct.

1    **Q.**  And you wrote, "Responsible for all slides, handouts,

2    presentation material, with necessary information, but will

3    require a reader to present to the group, or can prerecord

4    the audio/video and it can be played at the meeting."  And

5    let's look where it continues on in the next page "available

6    for questions via e-mail after the meeting."  Do you see

7    that?

8    **A.**  I do.

9    **Q.**  And this was your recommendation that actually

10   Dr. Menninger would prepare materials and someone else would

11   present them to these meetings of up to 500 people; is that

12   right?

13   **A.**  Yes.

14   **Q.**  And that's because you felt that this would keep her

15   healthy and keep her from experiencing those sort of severe

16   symptoms that you describe.  Is that right?

17   **A.**  Correct.

18   **Q.**  Okay.  So looking down below at the next item, and you

19   would agree that this was something that was also provided as

20   an explanation by PPD at the beginning of that paragraph 2;

21   is that right?

22   **A.**  Yes.

23   **Q.**  Where it says, "Client bid defense, issue resolution,

24   calls."  Did you have an understanding as to what "HH/client

25   site meetings" meant?

1    **A.**   Nope.

2    **Q.**   Because you didn't know at this time that Dr. Menninger's

3    primary work location was Highland Heights, Kentucky.  Is

4    that right?

5    **A.**   Correct.

6    **Q.**   "Phone."  And then it says, "Frequency, once a month at

7    minimum for client."  Do you see that?

8    **A.**   I do.

9    **Q.**   And then attendees/audience up to 50 attendees?

10   **A.**   Correct.

11   **Q.**   And that's, of course, a much smaller number than up to

12   500; is that right?

13   **A.**   But, again, the frequency would be once a month, it could

14   be daily, it could be twice a day.  Once a month, at a

15   minimum, for a client.  That was the information provided.

16   **Q.**   And so the fact that that type of interaction would be

17   requested of Dr. Menninger was concerning to you?

18   **A.**   Correct.

19   **Q.**   And so then you wrote the section beneath, where it says

20   "reasonable accommodations," and it has a dash?

21   **A.**   Correct.

22   **Q.**   "Available via e-mail, text, remote video, conferencing

23   for a representative of the client, one to two person

24   audience maximum."

25   **A.**   Uh-huh.

**Q.**   "If it is a site meeting, surrogate or reader with all necessary information, realtime access to me will be available."

Do you see that?

**A.**   Yes.

**Q.**   And did you draft this language or did Dr. Menninger draft this language?

**A.**   I'm realizing there's a mistype.  So Dr. Menninger and I did this together, because I clearly don't work where she works.  And so in order to have some reasonable accommodations, I needed some understanding of what her work responsibilities were and what she felt she could do.  And so I meant to say Dr. Menninger will be available, not me.  I will not be available for that.

But yes, she did help me with the accommodations, because I had to get from her perspective what she felt willing and able to do.

**Q.**   And she was the one with knowledge of what her job entailed, right?

**A.**   Right.  Yes.

**Q.**   And when you wrote "a surrogate or reader with all necessary information," do you see that?

**A.**   I do.

**Q.**   And a surrogate or reader meant someone else to do the actual presenting, correct?

1   **A.**   Correct.

2   **Q.**   And that would be, again, to sort of protect

3   Dr. Menninger from experiencing those terrible symptoms that

4   you described could happen with her anxiety?

5   **A.**   Yes.

6   **Q.**   The next item down, number 3, it says, "Client site

7   meetings"?

8   **A.**   Yes.

9   **Q.**   And did you, again, did you put together with

10   Dr. Menninger the language that says "reasonable

11   accommodation," and has a dash?

12   **A.**   I did.

13   **Q.**   "Would like a surrogate to attend, but will be

14   responsible for problem solving/ideas for resolution, if

15   e-mailed/communicated to me a few days before anticipated

16   visit."

17         And again, that "me," that's because Dr. Menninger

18   was writing this with you?

19   **A.**   Right.

20   **Q.**   And again, this refers to having a surrogate attend.  And

21   it was your intention that someone else would actually be

22   physically present for these meetings, correct?

23   **A.**   It was.

24   **Q.**   And again, to protect Dr. Menninger from those symptoms

25   that she would experience with the anxiety.

1    **A.**   Correct.

2    **Q.**   Looking down at the next item, number 4, technical sales

3    presentation, internal and external; i.e., internal sales

4    meeting.  And again, it says HH, that same abbreviation,

5    client site meetings and phone.

6    **A.**   Yes.

7    **Q.**   And you didn't have knowledge at this time as to what HH

8    referred to?

9    **A.**   I did not.

10   **Q.**   Because you didn't know that Dr. Menninger's main work

11   location was Highland Heights?

12   **A.**   Correct.

13   **Q.**   But Dr. Menninger was working on this with you?

14   **A.**   Yes.

15   **Q.**   And you, together, with Dr. Menninger, put together the

16   reasonable accommodation; is that right?

17   **A.**   Yes.

18   **Q.**   And it says, "Excused from sales presentations, but

19   again, will provide any necessary data information for the

20   reader or surrogate to have at their disposal."

21          Do you see that?

22   **A.**   I do.

23   **Q.**   And again, that's referring to someone else who's not

24   Dr. Menninger actually doing the in-person interaction part

25   of this; is that right?

1   **A.**   Yes.

2   **Q.**   And again, that was to protect Dr. Menninger from those

3   terrible symptoms; is that right?

4           MR. HANNON:   Objection as to the term "terrible."

5           THE COURT:   Overruled.

6   BY MS. MANDEL:

7   **Q.**   Down below, where it says number five, for customer

8   visits, do you see that?

9   **A.**   Yes.

10  **Q.**   This is for "customer visits, lunch, dinner, and social

11  interactions may occur, expected 60 to 80 percent of the

12  time, in order to build business relationships."

13  **A.**   Yes.

14  **Q.**   And then there's a dash.  Is that the language where you

15  and Dr. Menninger drafted, is that where it starts, where it

16  says "surrogate"?

17  **A.**   I believe so.

18  **Q.**   It says, "Surrogate, as this is not her strength/skill

19  set and her disability will flare with significant

20  impairment."

21  **A.**   Yeah.

22  **Q.**   That's your language, as well.

23           And significant impairment, is that -- that's

24  referring to those symptoms that you talked about previously,

25  correct?

1  **A.**  Correct.

2  **Q.**  And so a flare-up would be essentially a worsening of the

3  symptoms like the paralyzed vocal cords, and the GI symptoms

4  and things like that.

5  **A.**  So I want to be clear, her vocal cords will not be

6  paralyzed.  That was just a concrete example of how you could

7  imagine why she's not able to do those things, but more of

8  other symptoms such as tachycardia, sweating, feeling like

9  this is the end of the world, GI distress, all of those

10  symptoms, yes.

11  **Q.**  And the weight loss, as well?

12  **A.**  Well, the appetite gets suppressed, and then that can

13  lead to weight loss, yes.

14  **Q.**  And it was your opinion, as you were writing here, that

15  lunches and dinners, customer visits with social interactions

16  would bring on those worsening symptoms?

17  **A.**  Correct.

18  **Q.**  And that's why you recommended, as the reasonable

19  accommodation, that a surrogate or simply a different person

20  do this?

21  **A.**  Correct.

22  **Q.**  You also said that she's able to build business

23  relationships in a more behind-the-scenes fashion?

24  **A.**  Yes.

25  **Q.**  And that was based on your understanding of what a

1    pathologist might be able to do that didn't involve the

2    social interactions?

3    **A.**   Yes.  And it was also Dr. Menninger did mention that she

4    had mentored some colleagues, more on an individual basis,

5    and had gotten -- I don't remember the exact language.  I

6    just want to be clear, but had gotten some good feedback that

7    they really appreciated her feedback and her guidance.  And

8    so part of -- that's also what we talked about.

9    **Q.**   And you thought that was something that she could do

10   instead of interacting with the clients?

11   **A.**   Correct.

12   **Q.**   And then the last one is number 6, and it says, "Travels

13   up to 30 percent."  And it's your language where it says

14   "reasonable accommodation," slash -- or dash, right?

15   **A.**   Correct.

16   **Q.**   And you wrote, "When possible, traveling to the Brussels

17   site versus state side."

18   **A.**   Correct.

19   **Q.**   And again, at this point, you had no knowledge that

20   Dr. Menninger's main work location was actually in Kentucky,

21   correct?

22   **A.**   I did not, no.

23   **Q.**   And your recommendation that travel be more to Belgium,

24   instead of in the US, was based on Dr. Menninger telling you

25   that she had discomfort about going to the lab in the US,

1    correct?

2    **A.**   Well, that she felt more comfortable going.  So if they

3    needed her to do traveling up to 30 percent, and that was a

4    requirement, a job requirement, that what she felt would be a

5    good accommodation for her would be that the majority of the

6    traveling be to another site where she had some colleagues

7    that she felt comfortable with, she felt very comfortable

8    presenting there, and had history with them.  So that's kind

9    of more how I looked at it.  Because, again, we were trying

10   to come up with solutions, right?

11   **Q.**   And one of those solutions was limiting Dr. Menninger's

12   travel to Highland Heights?

13   **A.**   Correct.

14   **Q.**   And this was in the context of you looking at just trying

15   to maintain her position as 100 percent remote, I think, was

16   your language, correct?

17   **A.**   Well, if she was traveling, would she be 100 percent

18   remote?

19   **Q.**   Well, if you recall, we looked at an e-mail that you had

20   written about wanting to maintain 100 percent remote.  That

21   was part of the goal that you were discussing with

22   Dr. Menninger?

23   **A.**   At the time?

24   **Q.**   At the time.

25   **A.**   Right.  At the time.

 1    **Q.**  And let's -- just to remind ourselves, let's look back.

 2    You sent this e-mail on February 14th to Mr. St. John?

 3    **A.**  Okay.

 4    **Q.**  Is that right?

 5    **A.**  Yes.

 6    **Q.**  Okay.  Let's look at the context of how you came up with

 7    these accommodations.

 8              MS. MANDEL:  This is agreed Exhibit 451.

 9    BY MS. MANDEL:

10    **Q.**  Dr. Kessimian, this is an e-mail that you wrote to

11    Dr. Menninger on February 6, 2018, correct?

12    **A.**  Yes.

13    **Q.**  And this is between the time when you wrote the

14    accommodation, the initial accommodation documents on

15    January 31, and when you wrote the reasonable accommodation

16    request on February 14th.  This kind of falls in the middle;

17    is that right?

18    **A.**  Yes.

19    **Q.**  And in this e-mail, Dr. Menninger had forwarded some

20    information below, and then you wrote back and said to

21    Dr. Menninger, you said, "Lisa, this information is helpful

22    and gives us a starting point."

23              And as far as you recall, was that the information

24    listing out those job tasks that you had looked at?

25    **A.**  Yes.

1  **Q.**  "As far as those large presentations for over 100 people,

2  we are going to work with the lawyer" -- that was Patrick

3  Hannon?

4  **A.**  Yeah.

5  **Q.**  "Around you writing a presentation and having a surrogate

6  present the information."

7  　　　Do you see that?

8  **A.**  I do.

9  **Q.**  And so, again, you were explaining to Dr. Menninger that

10  you and she would work with her lawyer to have a surrogate do

11  those things instead, as an accommodation request, right?

12  **A.**  That's what it says, yes.

13  **Q.**  "Since you are the" -- and it looks like maybe there's a

14  typo here, "Since you" -- it's supposed to say, "You are the

15  one."  Would you agree?

16  **A.**  Yes.

17  **Q.**  "Who most intimately understands all the things you

18  already do, start brainstorming on how you can contribute in

19  a more behind-the-scenes fashion."

20  　　　And this was again you suggesting what you thought

21  of as more sort of classic pathologist work as something that

22  Dr. Menninger could suggest that she would be able to do?

23  **A.**  Could you repeat that one more time?

24  **Q.**  Sure.  You testified earlier about sort of your thought

25  about what a pathologist can do, you know, working behind the

1    scenes in a lab?

2    **A.**   I feel like my words are getting mixed up.

3              I testified that -- I think -- I was trying to

4    understand, from my understanding, Dr. Menninger had had --

5    had worked at this position for a couple of years.  I don't

6    know the exact timeline, and that she had good performance

7    reviews and was doing well, and then a new expectation of a

8    specially intense public speaking and social engagement

9    regimen was introduced, and at that time her symptoms

10   worsened, correct?  I mean, that's my understanding of the

11   timeline.

12             So I was referencing behind the scenes not about

13   the work that she does in the lab, but she had done something

14   for two years at this job, or however long she had the job,

15   that got her to the executive director lab position.  This is

16   my, again, my formulation just as a human being looking at

17   the information given to me.

18             So is there something that we can highlight that's

19   a little bit more behind the scenes, that doesn't have such a

20   social element, or a performance element that involves her

21   job responsibilities that we can put in here?  That's what I

22   meant by behind the scenes.

23   **Q.**   And as you testified, at this point, you didn't actually

24   even know where Dr. Menninger's main work location was; is

25   that correct?

1    **A.**   Yes, I do hear that in your questioning.  I would also

2    like to say, though, that my priority is not her work, it's

3    her health.  So as far as maybe there are details missing or

4    some kind of information that I didn't have the exact

5    information, I was working with her work, because this was a

6    specific stressor that I thought we could actually make some

7    in-roads so that her symptoms would get better.  So that was

8    my goal.  So I want to be clear about that.

9    **Q.**   Because you were trying to protect her from those

10   symptoms?

11   **A.**   I do take issue with the word "protect."  I'm not

12   anyone's protector.  I am their doctor.

13          So she has a diagnosis, a clinical syndrome that

14   causes impairment for many people, but is manageable, again,

15   with things that is we do for our health:  accommodations,

16   changes, switches, things that we can do.  So that's what --

17   I'm not trying to protect anyone from anything; I'm trying to

18   help them navigate how to best cope with an illness.

19   **Q.**   And you were trying to help Dr. Menninger cope to avoid

20   as frequent incidents of those symptoms that you listed; is

21   that correct?

22   **A.**   I'm trying --

23          Can you say that one more time?

24   **Q.**   You were trying to help Dr. Menninger navigate her job to

25   avoid those symptoms coming up, to the extent that that was

1    possible, correct?

2    **A.**   Correct.

3    **Q.**   Then after your statement about working in a more

4    behind-the-scenes fashion, in the next line you say, "We will

5    not send anything over until we run it by the lawyer."

6            And again, that was Dr. Menninger's lawyer that you

7    were also working with, Patrick Hannon, correct?

8    **A.**   Correct.

9    **Q.**   After the communication that you sent to PPD on

10   February 14th that we looked at, you e-mailed that

11   psychosocial education and the accommodations to

12   Mr. St. John.  Do you recall that?

13   **A.**   I do.

14   **Q.**   And after that, you didn't send Mr. St. John any other

15   letters about Dr. Menninger's ability to perform her work

16   tasks, did you?

17   **A.**   Not that I recall.

18   **Q.**   And you didn't have any other e-mail communications where

19   you sent any information to PPD about whether Dr. Menninger

20   could safely perform her job, correct?

21   **A.**   There was no communication.

22   **Q.**   You did, though, continue to work with her lawyer,

23   Patrick Hannon, and with Dr. Menninger, correct?

24   **A.**   Yes.  And but -- but I also want to clarify by "work with

25   her lawyer," I maybe e-mailed Patrick four times.  I never

1    met him before today.  And I think maybe we talked on the

2    phone, in summary, twice, maybe three times over the year.

3    **Q.**  It's your testimony that you e-mailed Mr. Hannon four

4    times?

5    **A.**  It was not often.  It was not daily.  It was not weekly.

6    I don't know the exact number.

7    **Q.**  And let's look at one of those e-mails that you wrote to

8    Mr. Hannon.  This is agreed Exhibit 452.

9    **A.**  Oh, right.

10   **Q.**  And this is an e-mail that you wrote to Mr. Hannon, dated

11   April 8th.  Do you see that?

12   **A.**  Uh-huh.

13   **Q.**  And so this is -- you sent that e-mail to Mr. St. John on

14   February 14th.  This is then April 8th, so a little bit after

15   that, right?

16   **A.**  So February, April -- right.

17   **Q.**  So a little less than two months later, right?

18   **A.**  Yes.

19   **Q.**  And let's read what you wrote to Mr. Hannon at this time.

20   You wrote, "Patrick, I am meeting with Lisa, and the recent

21   back and forth e-mails with Chad, as well as the denial of

22   certain accommodations, is taking a significant toll on her

23   both her physically and mentally, where we are considering

24   more intensive treatment.

25           "Although Lisa has a 30-day PTO" --

1          That's paid time off?  Is that your understanding?

2     **A.**  It is, yeah.

3     **Q.**  -- "in addition to a 22-day leave bank that is accessible

4     for paid leave, she is concerned that if she decides to use

5     this resource, it will be used against her as a sign that she

6     cannot fulfill her job requirements."

7          Do you see that?

8     **A.**  I do.

9     **Q.**  And that was based on what Dr. Menninger told you some

10    time prior to April 8th, right?

11    **A.**  Correct.

12    **Q.**  "Is this accurate, or is she protected?"

13         And then you next wrote, "Also, I am not sure how

14    to word this, so I was hoping for some advice.  Chad

15    continues to mention my phrase "behind-the-scenes

16    leadership" --

17         And that's that term that we saw in your last

18    e-mail?

19    **A.**  Correct.

20    **Q.**  -- "and then when rejecting the proposed accommodations,

21    remarking that Lisa is going against the advice of her doctor

22    if she continues to perform these functions."

23         And you wrote that, as well, correct?

24    **A.**  Yes.

25    **Q.**  And then the next paragraph you said, "I want to clarify

1  that, as a physician, I make recommendation, but I am not

2  intimately knowledgeable, just like when I do it for children

3  in school, about what is feasible for the system to

4  accommodate, and that we could come together to brainstorm.

5  I can make some time to attend a meeting.  I am available by

6  telephone or Internet platform.  I have also attached

7  articles about pragmatic leadership versus charismatic

8  leadership."

9          Do you see that?

10  **A.**  I do.

11  **Q.**  So in fact, those articles that you mentioned about

12  leadership before, those are things that you sent to

13  Mr. Hannon, correct?

14  **A.**  That's what it seems like, yes.

15  **Q.**  And neither Mr. Hannon nor Dr. Menninger invited you to

16  come to a meeting with PPD; is that right?

17  **A.**  No one invited me, no.

18  **Q.**  As far as the "behind the scenes" phrase, and then you

19  say "which I now regret, to date Lisa has remotely attended

20  or been available via Webex conference call or e-mail and

21  dialed in, and just hasn't formally presented.  It is her

22  understanding that this method has worked to date, instead of

23  a surrogate.  We were hoping for status quo and also an

24  understanding of her more pragmatic versus charismatic

25  visible style."

1              Do you see that?

2    **A.**  I do.

3    **Q.**  Okay.  And then you told Mr. Hannon you hope this helps

4    at the end of the e-mail, right?

5    **A.**  Yeah.

6    **Q.**  So you indicated in this last paragraph of the e-mail

7    that you now regretted writing that "behind the scenes"

8    language in your previous document that you sent to PPD,

9    correct?

10   **A.**  Yes, because I was concerned it was being misused.

11   **Q.**  But you testified just a few moments ago that you never

12   sent any follow-up letter or communication to PPD saying that

13   that actually wasn't what you meant to say, correct?

14   **A.**  Correct.

15   **Q.**  And then in this paragraph as well, you testified that

16   you were hoping for "status quo."  That was referring to

17   maybe there wasn't the need for a surrogate?

18   **A.**  Correct.

19   **Q.**  But, in fact, you never sent a follow-up letter or e-mail

20   to PPD saying that was the case, correct?

21   **A.**  Again, there was no communication between me and PPE or

22   whatever.  Yes.

23   **Q.**  Returning to your visits that you had with Dr. Menninger,

24   shortly after you sent that February 14th letter to PPD,

25   Dr. Menninger actually told you that HR and her boss had

1    responded in a promising manner.  Isn't that right?

2    **A.**  I'm -- is this on an e-mail or something?  Yes.  Then

3    yes.

4    **Q.**  And we can look at your notes, in fact.

5            Looking back at your notes from just after you sent

6    that information on February 14th, you'd agree that this was

7    your next appointment with Dr. Menninger on February 16th; is

8    that right?

9    **A.**  Yes.

10   **Q.**  And if you look at your language that you put in as your

11   notes after history of present illness --

12   **A.**  Uh-huh.

13   **Q.**  You noted that she, meaning Dr. Menninger, was able to

14   speak with both HR and her boss regarding the document for

15   accommodations.  Their response was promising?

16   **A.**  Yes.

17   **Q.**  So at this point, Dr. Menninger felt that things were

18   looking promising.  Isn't that right?

19   **A.**  That their response was promising.  Yes.

20   **Q.**  Let's look at your notes later on, from the same day.

21   Sort of a third of the way down, under "mental status exam,"

22   you say, "Thought content," and you say catastrophizing,

23   worse-case scenario, and many pessimistic thoughts."

24           Do you see that?

25   **A.**  I do.

1   **Q.**  And so even though, at this point, Dr. Menninger had

2   reported that HR and her boss had responded in a promising

3   manner, she was still having catastrophizing thoughts,

4   correct?

5   **A.**  Yes.  That's part of anxiety.

6   **Q.**  And at this point, in fact, even leaving the house at all

7   was a challenge for Dr. Menninger; is that right?

8   **A.**  I believe so.

9   **Q.**  And if we look at sort of the homework that you gave to

10   Dr. Menninger at this time, number 6, under "plan," her

11   homework was just to try to leave the house.  Isn't that

12   right?

13   **A.**  Correct.

14   **Q.**  Let's look at your notes from a couple of appointments

15   later.  These are your notes from the March 16th appointment

16   that you had with Dr. Menninger?

17   **A.**  Yes.

18   **Q.**  And in the second paragraph, you noted that

19   "Dr. Menninger continues to be assertive and proactive in her

20   discussions with work, regarding their desire for her to be

21   more visible and social."

22        Do you see that?

23   **A.**  I do.

24   **Q.**  "And their inability to think about another leadership

25   style that she would be able to provide that would also be

1    beneficial."

2            Do you see that?

3    **A.**   Correct.

4    **Q.**   And this is because you and Dr. Menninger were talking

5    about maybe other ways that she could work there as a

6    pathologist without doing some of these things that involved

7    social interaction, correct?

8    **A.**   Correct.

9    **Q.**   And again, under "homework," you set as a goal for

10   Dr. Menninger, just to get out to the driveway at that point;

11   is that right?

12   **A.**   Yes.

13   **Q.**   Let's go a couple of visits later.  This is when you saw

14   Dr. Menninger on March 30th?

15   **A.**   Yes.

16   **Q.**   And at this point you were treating with her about once a

17   week; is that right?

18   **A.**   I do -- I mean:  Yes.

19   **Q.**   And you noted in this note that Dr. Menninger still had

20   some work stresses, and you noted, as well, that she was

21   navigating some difficult client interactions; is that right?

22   **A.**   That's what I wrote, yes.

23   **Q.**   And did you have concerns about how those difficult

24   client interactions may be impacting her anxiety?

25   **A.**   I'm sure I did.

1    **Q.**  And based on your experience at this point, having

2    treated Dr. Menninger for about two months, why would it have

3    been concerning that she would have difficult client

4    interactions that may impact her underlying impairments?

5    **A.**  Could you repeat that question?

6    **Q.**  Sure.  At this point you had been treating Dr. Menninger

7    for about two months, right?

8    **A.**  Yes.

9    **Q.**  Why would it have been concerning to you that she would

10   have had difficult client interactions at work, based on what

11   you had observed of her symptoms at this point?

12   **A.**  Well, I think difficult interactions are hard for all of

13   us, so as her psychiatrists and therapists, I would have been

14   concerned.  And then in addition, if her diagnosis is the

15   social phobia disorder, and it's an interaction with another

16   person that didn't go well, that's going to be especially

17   hard for Dr. Menninger.

18   **Q.**  Because with her diagnoses, difficult interactions for

19   people are especially challenging; isn't that right?

20   **A.**  I wouldn't state it quite like that, no.

21   **Q.**  Well, why is it, then, that a difficult client

22   interaction would have been particularly concerning in

23   Dr. Menninger's case?

24   **A.**  Well, I think, again, it's a stressor that would impact

25   any of us in our work environment.  And so all I wrote,

1    actually, is work stressors remain, and she has recently

2    navigated some difficult client interactions.  So that's just

3    a statement of what -- of fact.

4    **Q.**  And let's look at what you gave Dr. Menninger as sort of

5    homework from this visit.  You suggested that

6    Dr. Menninger -- you said, "Shift from CBT therapy for panic

7    and social phobia to more art therapy"; is that correct?

8    **A.**  Correct.

9    **Q.**  And art therapy is something that you do as part of your

10   practice; is that right?

11   **A.**  I do.

12   **Q.**  And Dr. Menninger was doing a fair amount of art therapy

13   in her visits with you, correct?

14   **A.**  She was.

15   **Q.**  And you had seen that that had a beneficial effect for

16   her, correct?

17   **A.**  It was helpful in therapy, yes.

18   **Q.**  And you were suggesting that she do more of that to help

19   with her anxiety symptoms?

20   **A.**  I did.

21   **Q.**  Let's look at a couple of weeks later.  These are your

22   notes from an April 13, 2018, visit with Dr. Menninger?

23   **A.**  Yes.

24   **Q.**  And let's look again at the plan.  Again, you recommended

25   that Dr. Menninger continue art therapy, correct?

1   **A.**   I'm sure I did, yes.  Number 6.

2   **Q.**   That's number 6, yeah.

3         And number 8, you also noted "coordination and

4   communication with lawyer continues."  And that would refer

5   to coordination and communication with Patrick Hannon; is

6   that right?

7   **A.**   Correct.

8   **Q.**   And you have another note from this same day,

9   Dr. Kessimian?  Do you see that, also, 4/13/2018?

10  **A.**   Oh, that might be an error in documentation.  It would --

11  to be honest, I wouldn't write two notes in one day.

12  **Q.**   You would agree, though, that this was some time in April

13  of 2018?

14  **A.**   Most likely, yeah.

15  **Q.**   And you noted, it's actually in quotes, that

16  Dr. Menninger said to you, "I have found a sense of

17  empowerment in advocating for myself and my strengths, and I

18  am proud that my daughter is a witness to this."

19         Do you see that, Dr. Kessimian?

20  **A.**   I do.

21  **Q.**   And, in fact, Dr. Menninger was reporting to you how

22  good -- how empowered she felt having advocated on her own

23  behalf; is that right?

24  **A.**   Correct.

25  **Q.**   And this was having a positive impact on her daughter,

1  Maya?

2  **A.**  I'm not sure if it was having a positive impact on her

3  daughter, Maya.

4  **Q.**  But she at least was feeling good that her daughter got

5  to see this?

6  **A.**  Yes.

7  **Q.**  And this was in the context of her advocating for herself

8  in her position at PPD; is that right?

9  **A.**  Correct.

10 **Q.**  You do note, though, that she's continuing to isolate at

11 home.  Do you see that?

12 **A.**  Yes.

13 **Q.**  And that she was continuing to lean on her husband for

14 support?

15 **A.**  Correct.

16 **Q.**  Which you had noted, throughout her treatment, that you

17 had concerns that her husband was kind of overly

18 accommodating her need not to leave the house, correct?

19 **A.**  Yes.

20 **Q.**  And again, under "plan," you noted your recommendation

21 that she continue art therapy?

22 **A.**  Uh-huh.

23 **Q.**  And as far as you recall, that was continuing at this

24 time?

25 **A.**  She was doing it with me and at home.

1   Q.  And also under your plan, number 2, you wrote "support

2   accommodations at work so that public speaking is not a core

3   requirement or work responsibility."  Do you see that?

4   A.  Uh-huh.

5   Q.  So this was you and Dr. Menninger continuing to advocate

6   for this into April of 2018?

7   A.  Yes.

8   Q.  And then after that, you say, "e-mail both lawyer and

9   patient with some response ideas and also options for patient

10  to take leave."

11  A.  Yes.

12  Q.  And again, as we saw, even maybe ten or so days before

13  this, you and Mr. Hannon were already talking about whether

14  leave would be the next step, correct?  We looked at that

15  e-mail that you --

16  A.  Yes.

17  Q.  At some point in May of 2018, Dr. Menninger reported to

18  you that she was planning to pursue some type of legal action

19  against PPD; is that right?

20  A.  I don't remember specifically.

21  Q.  Let's look at your note from May 18, 2018.

22  A.  Okay.

23  Q.  And you see after -- describing to you some adjustments

24  in medication, you say, under "history of present illness,"

25  you noted that Dr. Menninger was continuing to isolate at

1    home and that she made some type of decision with her lawyer,

2    with Mr. Hannon, right?

3    **A.**   Correct.

4    **Q.**   And you say, "In a way, although there is sometimes

5    resolution, it has been somewhat helpful."

6    **A.**   Yes.

7    **Q.**   And in fact, this was kind of a point where things were

8    looking up a little bit for Dr. Menninger, correct?

9    **A.**   Correct.

10   **Q.**   And you noted, again, under your plan, you said number

11   seven, "coordination and communication with lawyer," and

12   again, that was with Mr. Hannon, correct?  That was

13   continuing?

14   **A.**   Yeah.  And again, to just be very clear, this was just

15   under the plan because we had had communications at points in

16   her treatment, but there was no regular communication with

17   the lawyer.

18   **Q.**   And let's look down under -- actually, towards the top of

19   this page, under "safety."  This was as of May 18th.  You

20   noted that Dr. Menninger denied suicidal ideation at that

21   point, right?

22   **A.**   Correct.

23   **Q.**   Let's look ahead -- this is -- this is your note from

24   June 8th of 2018.

25   **A.**   No, that must be -- when did she take medical leave?

1    That would be the accurate date.

2    **Q.**  And you noted, in fact, the end of your first

3    paragraph -- actually, let's go through the first paragraph.

4    You said "since last visit is on medical leave"?

5    **A.**  Yes.

6    **Q.**  And then you noted as well that Dr. Menninger had applied

7    to several jobs?

8    **A.**  Yeah.

9    **Q.**  And that was at your recommendation that she was applying

10   to jobs?

11   **A.**  I can't remember if I specifically recommended that, but

12   it did seem like this was going to be the next step, yes.

13   **Q.**  That it would be the next step to apply for a new job?

14   **A.**  Yeah, to think about what else would be a good fit.

15   **Q.**  And at the end of this paragraph, you noted that suicidal

16   ideation had resolved as of June 8th?

17   **A.**  Correct.

18   **Q.**  At some point, Mason Menninger, who is Dr. Menninger's

19   husband, reached out to you specifically because

20   Dr. Menninger had described having suicidal thoughts; is that

21   right?

22   **A.**  Correct.  I believe there's an e-mail, if you want the

23   exact date.

24          MS. MANDEL:  Yes.  And we are going to look at that

25   e-mail.  So we can look at that together.

1          This is agreed Exhibit 453.

2   BY MS. MANDEL:

3   **Q.**  You testified a little while ago when Mr. Hannon was

4   asking you questions about Mason Menninger contacting you

5   regarding Dr. Menninger's suicidal thoughts?

6   **A.**  Yes.

7   **Q.**  And this is an e-mail exchange between you and

8   Mr. Mekerri.  It says October 15th.  Would you agree that

9   this was October 15, 2018?

10  **A.**  Yes.

11  **Q.**  And in this -- the first e-mail at the top of the page,

12  Mr. Menninger wrote to you and said, "Thank you for reaching

13  out, her demeanor changed on the phone with you."

14  **A.**  Uh-hmm.

15  **Q.**  And you would agree that your interactions on the October

16  15th, it sounds like were phone and e-mail.  You didn't have

17  an in-person visit with Dr. Menninger, correct?

18  **A.**  Correct.

19  **Q.**  And Mr. Menninger, in the next sentence, said, "Lisa is

20  breakdown level emotional and very angry with me."

21  **A.**  Uh-huh.

22  **Q.**  And the long paragraph in the middle of the page, he

23  reported "We mostly had a conversation that looped over and

24  over."?

25  **A.**  Correct.

1 **Q.** And then if we skip ahead to the middle of the paragraph,

2 it says, "She then points out as evidence anything else that

3 I do that is not directly involved in the case against her

4 company."

5    Do you see that?

6 **A.** I do.

7 **Q.** And your understanding is that was referring to her case

8 against PPD?

9 **A.** (Nods head.)

10 **Q.** "I am the caretaker of the family, cooking, cleaning

11 shopping most of the stuff involving Maya, et cetera.  I also

12 have a new job, but I have no expectation that any of those

13 roles would shift to Lisa given our current situation."

14    Do you see that?

15 **A.** I do.

16 **Q.** And that was Mr. Menninger reporting to you his attempt

17 to sort of balance things with Dr. Menninger's expectations

18 regarding his involvement in her claim against PPD, correct?

19 **A.** Could you say that one more time?

20 **Q.** Sure.  So in this e-mail, Mr. Menninger was reporting to

21 you that Dr. Menninger got angry with him and, in fact,

22 expressed suicidal ideation after she felt he was doing

23 things that weren't specifically pushing forward her case

24 against PPD.  Isn't that right?

25 **A.** I just took it more as he was reaching out to me to

1  explain why Lisa had had an emotional breakdown.  That's kind

2  of how I was interpreting this information, his perspective.

3  **Q.**  And a couple of weeks later, Dr. Menninger reported to

4  you that she was able to participate in an ultra marathon,

5  correct?

6  **A.**  Correct.

7  **Q.**  And let's look at your note from that visit.  So this was

8  a couple weeks after you had heard from Mr. Menninger.  This

9  is your note from November 2, 2018?

10  **A.**  Correct.

11  **Q.**  And this is shortly before Dr. Menninger and her family

12  relocated to New Mexico, correct?

13  **A.**  I wasn't aware of that.

14  **Q.**  Underneath where it says, "History of present illness"?

15  **A.**  Correct.

16  **Q.**  It says, "Since last meeting was able to compete in an

17  ultra marathon with the support of her mother, daughter, and

18  husband."

19  **A.**  Uh-huh.

20  **Q.**  "Initially, her social phobia symptoms were severe, as

21  there was a large group of people at the start of the race,

22  which activated her symptoms, but as the race progressed, she

23  was able to find a solitary pace, and also continue to use

24  her coping mindfulness skills."

25        Do you see that?

1    **A.**  I do.

2    **Q.**  And at this point, you were seeing Dr. Menninger, or

3    treating her, you said, about every week?

4    **A.**  I don't remember the exact frequency, but we saw each

5    other often.

6    **Q.**  But this was about two weeks after that October 15th

7    e-mail from Mr. Menninger, correct?

8    **A.**  Okay.  Sure.

9              MS. MANDEL:  Thank you.  I have no more questions

10   at this time.

11             THE COURT:  Thank you.

12             Any redirect?

13             MR. HANNON:  Very briefly, Your Honor.

14             THE COURT:  Sorry, you're not done.

15             THE WITNESS:  Oh, more?

16             THE COURT:  There's two rounds.  So there's the

17   direct examination Mr. Hannon did of you and then the

18   cross-examination by Ms. Mandel, and then there's one more

19   round.  So now Mr. Hannon can ask about anything that

20   Ms. Mandel asked about.  And then if she wants -- of course,

21   it's not required.  Mr. Hannon doesn't have to ask you any

22   questions.  And if he does, it's not required that Ms. Mandel

23   ask you any more questions, but if she does, it's limited to

24   whatever he asks about.

25             THE WITNESS:  Got it.  Thank you.

1          THE COURT:  And then you're done.  And then can you

2    get up and leave.

3          MR. HANNON:  May I proceed, Your Honor?

4          THE COURT:  There's a reason that you went to

5    medical school and not law school.

6          Go ahead.

7          MR. HANNON:  Thank you.

8          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

9    BY MR. HANNON:

10   **Q.**  Dr. Kessimian, was Lisa's exercise routine, was that

11   something you spoke to her about during therapy?

12   **A.**  At times.

13   **Q.**  And did you have any view in terms of whether that was

14   helpful or not helpful to her?

15   **A.**  I think in general, exercise is seen as helpful for

16   health.

17   **Q.**  And I want to direct you to your treatment notes here.

18   This is joint Exhibit 18.  And I'm going to direct you here

19   to page ending in 671.

20          And you looked at this on cross-examination.  This

21   was your meeting note with Dr. Menninger on February 16,

22   2018; is that right?

23   **A.**  Yes.

24   **Q.**  And, if you know, is it fair to say that this reflects

25   some level of improvement for Dr. Menninger?

**A.**   Yes.

**Q.**   And she notes that her sleeping is getting better?

**A.**   Uh-huh.

**Q.**   Her extremes not as bad?

**A.**   Yes.

**Q.**   And as of this time, you had been providing her therapy; is that right?

**A.**   Correct.

**Q.**   You had also been -- you had also started medicating her; is that right?

**A.**   Yes.

**Q.**   And despite her fears, Dr. Menninger reported that she had been able to speak to both HR and her boss regarding the document for accommodations; is that right?

**A.**   Correct.

**Q.**   And I think we saw reference in a prior note that there was talk about Dr. Menninger concerning the importance of her advocating for herself; is that right?

**A.**   Correct.

**Q.**   Was that something that you urged her to do?

**A.**   Yes.

**Q.**   Why?

**A.**   Again, I think overall for general well-being, being able to define what we need and then ask for what we need, whether that's from employees, employers, our partner, so on and so

1    forth, is an important skill to have, and so I did encourage

2    her to advocate for herself.

3    **Q.**   If we look at the next note here, on March 9, 2018, she

4    describes for you here this business meeting in Cincinnati.

5    Do you see that there?

6    **A.**   I do.

7    **Q.**   And you see here at the end that she notes to you that

8    she was able to assert herself; is that right?

9    **A.**   Correct.

10   **Q.**   Was that something that, over the coming weeks and months

11   as you treated Dr. Menninger, you continued to suggest that

12   she should do?

13   **A.**   Yes.

14   **Q.**   You were asked a question on cross about any additional

15   information that you -- you could have provided to PPD.  Do

16   you know if Dr. Menninger offered at one point for you to

17   provide additional information if they wanted to see it?

18   **A.**   I don't remember specifically, but she never denied any

19   requests for any type of disclosure when I worked with her.

20   **Q.**   Okay.  And then just lastly, just in terms of the

21   buckets, which I -- well, just to clarify in terms of the

22   timing of those, I think you were shown a -- do you recall

23   seeing an internal e-mail on cross-examination --

24   **A.**   Uh-huh.

25   **Q.**   -- from early February, where you were contemplating

```
 1    reaching out to PPD to get more information?

 2    A.   I saw the -- this e-mail.

 3              Is that what you're saying?

 4    Q.   Well, let me ask you a better question.

 5    A.   Okay.

 6    Q.   So these are the buckets that you ultimately provided

 7    specific recommendations for?

 8    A.   Correct.  Correct.  I didn't know they were called

 9    "buckets."

10    Q.   That's my word.  Sorry about that.

11    A.   Oh.

12    Q.   But just to be clear, this was sent to Lisa on

13    February 6, 2018.  Do you see that?

14    A.   I do.

15              MR. HANNON:  Okay.  All right.

16              That's all I have, Your Honor.

17              THE COURT:  All right.  Any recross?

18              MS. MANDEL:  No, Your Honor.

19              THE COURT:  All right.  Thank you very much.  Now

20    you're excused.

21              Next witness?

22              MR. HANNON:  Your Honor, the plaintiff calls Paul

23    Summergrad.

24              THE COURT:  All right.

25              (The witness was duly sworn.)
```

1          THE DEPUTY CLERK:  Can you please state your full

2     name, and spell your last name for the record.

3          THE WITNESS:  Paul Summergrad, S-u-m-m-e-r-g-r-a-d.

4          THE COURT:  Go ahead, Mr. Hannon.

5          MR. HANNON:  Thank you, Your Honor.

6                         **PAUL SUMMERGRAD**

7          having been duly sworn, testified as follows:

8          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

9     BY MR. HANNON:

10    **Q.**  Could you please introduce yourself to the jury.

11    **A.**  Hi.  Nice to meet you.

12    **Q.**  Can you tell them a little bit about who you are and what

13    you do.

14    **A.**  I'm the -- my job is that I'm the Dr. Frances S. Arkin

15    professor and chairman of the department of psychiatry at

16    Tufts University School of Medicine and Tufts Medical Center

17    in Boston where I'm psychiatrist in chief.  And I'm also,

18    separately from that, a professor of psychiatry and professor

19    of medicine at Tufts University School of Medicine.

20    **Q.**  And we'll go a bit more into detail on your

21    qualifications in a moment, but first, just to orient the

22    jury, how did you become involved in this case?

23    **A.**  I believe you reached out to me at some point, I don't

24    remember exactly when, asking if I might be able to assist

25    with a matter.

1    **Q.**   Okay.  And were you asked to review certain facts and

2    details concerning this matter?

3    **A.**   Yes, I was.

4    **Q.**   Okay.  Are you being compensated for your time?

5    **A.**   Yes, I am.

6    **Q.**   And prior to today, have you ever served as a, sort of,

7    so to speak, expert witness before?

8    **A.**   Yes.  Occasionally.

9    **Q.**   Does this comprise a significant amount of your

10   profession?

11   **A.**   No.  It's a small percentage of my activity.

12   **Q.**   Okay.  So when did you -- well, strike that.

13           Could you please walk us through your educational

14   background?

15   **A.**   So I went to college at the State University of New York

16   at Buffalo, and then did premed work before medical school at

17   the University of Rochester.  And then went back to Buffalo

18   for medical school from 1974 to 1978.  Beginning in 1978 to

19   1981, I was what's called an internal medicine resident,

20   meaning I was training in general adult medicine at what was

21   then Boston City Hospital, but it's now known as Boston

22   Medical Center.

23           I then worked for a year at the Bedford Veterans

24   Administration Hospital as an internist from 1981 to '82, and

25   then from 1982 to '85, I was a psychiatry resident at

1   Massachusetts General Hospital, which is one of the Harvard

2   Medical School teaching hospitals.  And then I stayed on

3   faculty there for the next, approximately, 20 years.  I still

4   have a courtesy appointment at Mass General, but I don't

5   practice there or teach there.

6          And in addition, I've done what's called

7   psychoanalytic training at the Boston Psychoanalytic Society

8   and Institute.  That started around 1983 and I don't think I

9   actually finished until 2009.

10  **Q.**  Okay.  And in terms of actually working as a doctor, can

11  you walk us through that?

12  **A.**  Yeah.  I mean, I've worked as a doctor since, you know,

13  graduating from medical school.  I work under supervision as

14  a resident.  So I did a lot of general medical care, a lot of

15  acute neurologic care at Boston City Hospital, Boston Medical

16  Center.  And then continued doing a lot of medical related

17  care within the context of psychiatry, both while I was a

18  psychiatry resident, and then after my -- and beginning my

19  employment at Mass General.  So I worked at Mass General

20  initially as the assistant director of the inpatient service

21  for two years, and I also worked at what was then the Erich

22  Lindemann Mental Health Center, which had inpatient beds

23  under the Commonwealth of Massachusetts for two years, and

24  then in 1987, I became the director and chief of inpatient

25  psychiatry at Mass general.  I did that around until I guess

1  1998 or 1999 and then took on some additional

2  responsibilities across what was then called the Partners

3  Healthcare System.  Now it's called Mass General Brigham.

4          And in 2004, I continued to do clinical practice

5  throughout this time, taking care of patients, taking care of

6  inpatients, outpatients in the emergency room, supervising

7  other physicians when they do that.  And then from 2000 to

8  2004, approximately, 1999 to 2004, I was the chief of

9  psychiatry and the executive vice president for medical

10  affairs and chief medical officer as what's now known as

11  Mass. General Brigham Salem hospital.  So I was overseeing

12  the psychiatric services there.  And then I was recruited to

13  come to Tufts in 2004.

14          And I've continued to see patients throughout that

15  time.  I take care of people in my outpatient practice, a lot

16  of people who have anxiety disorders, mood disorders.  I've

17  written a lot about people who have medical illnesses and

18  psychiatric illnesses in the way they interact with each

19  other.  I have attended on the inpatient services, consult

20  services, emergency room, been on-call, backed up our

21  residents, supervised residents to this day throughout my

22  time at Tufts.

23  **Q.**  Okay.

24  **A.**  And as well as overseeing the doctors in my department.

25  **Q.**  Do you still see patients today?

1    **A.**   Yes, I do.

2    **Q.**   Okay.  And I think I heard you mention that some ever

3    your work has involved mood disorders.  Did I hear that

4    right?

5    **A.**   (Nods head.)

6    **Q.**   Yes?

7    **A.**   Yes, it has.

8    **Q.**   Okay.  You got to say it out loud.

9    **A.**   Yes.  I'm sorry.

10   **Q.**   No worries.

11           Can you explain what a mood disorder is?

12   **A.**   Yeah.  So psychiatric illnesses are divided up into

13   different kind of categories.  One of the classic categories

14   is disorders of mood.  So people can have various kinds of

15   changes in their normal mood, either where they're very

16   depressed, sad, morose, or, in some cases, people can feel

17   quite energized, activated, what is sometimes referred to as

18   mania or hypomania.  So those are the broad bucket of mood

19   disorders.

20           Sometimes people can have mood disorders because

21   they have a stroke.  Sometimes people can have mood disorders

22   because they have an endocrinologic disorder.  Sometimes it

23   can happen because they have a very strong family history of

24   some type of illness that has been -- with a combination of

25   other social or personal events, has led to the onset of

1    mood.

2           And that can also affect thinking.  It can also be

3    associated with anxiety symptoms.  And likewise, people can

4    have anxiety symptoms that are also associated with mood

5    disorders.

6           There's a lot of what we sometimes call

7    "co-morbidity" in psychiatric illness.  That's partially

8    because our diagnostic system is not as good as it needs to

9    be, and partially it's probably just the way we're built and

10   we're wired.

11   **Q.**  Would anxiety disorders fall within the umbrella of mood

12   disorders?

13   **A.**  No.  They're really separate disorders.

14   **Q.**  In treating patients, do you also have experience

15   treating patients with anxiety disorders?

16   **A.**  Yes, I do a lot.

17   **Q.**  Where would depression fall?  Would that fall in a mood

18   disorder?

19   **A.**  Depression really falls more as a mood disorder.  Anxiety

20   is really more an anxiety disorder.

21          There are certain disorders which used to be an

22   anxiety and now have kind of been carved out from that or

23   separated.  But there's a fair amount of overlap.  So, for

24   example, somewhere between 20 and 40 percent of people who

25   have anxiety disorders may develop mood disorders.  People

1    who have mood disorders may develop anxiety symptoms or may

2    have anxiety symptoms with them.  So you have to -- nature

3    doesn't always get cut at the joints with this.

4    **Q.**   I think I heard you mention that you also published

5    articles; is that right?

6    **A.**   Yes, I do.

7    **Q.**   And just generally speaking, in what types of subjects

8    have you been published?

9    **A.**   Everything from health system design, to onset of mood

10   disorders secondary to strokes, to strategic planning in

11   psychiatry, to the role of inflammation, inflammatory

12   disorders in the onset and development of psychiatric

13   illness; through things related to suicide and health system

14   design, hospital organization, the development of what are

15   so-called medical psychiatric units, which is similar to the

16   units that I both designed at Mass. General and also have

17   overseen at Tufts.

18   **Q.**   Okay.  And do you hold any certifications?

19   **A.**   Yes.

20   **Q.**   What certifications?

21   **A.**   So I'm board certified in internal medicine.  I'm board

22   certified in psychiatry.  I'm board certified in what's

23   called psychosomatic medicine or -- it's a subspecialty of

24   psychiatry, psychosomatics.  I was board certified in

25   geriatric psychiatry, but I let that certification lapse

1    because I really wasn't doing a lot of geriatric psychiatry

2    at the time when I would have had to take that exam again.

3    And I'm a graduate of the Boston Psychoanalytic Institute, so

4    I have whatever certification, they basically made me a

5    graduate analyst.

6    **Q.**   Okay.  And during your professional career, have you been

7    involved in any professional organizations or societies?

8    **A.**   Yes.  Several.

9    **Q.**   Which ones in the field of psychiatry?

10   **A.**   So I was very involved early in my career with the

11   Massachusetts Psychiatric Society and was president, I think,

12   1980 -- 1998 to 1999.  I was president of a group called the

13   American Association of Chairs of Departments in Psychiatry,

14   which is -- basically represents all the medical school

15   chairs in the United States and Canada.  I was president of

16   the American Psychiatric Association, which is the umbrella

17   organization for all psychiatry in the United States, from

18   2014 to 2015, and I'm currently the secretary for finances

19   and a member of the executive committee of the World

20   Psychiatric Association.

21   **Q.**   Okay.  Enough about you.

22            What, if anything, did you do to review the

23   information and facts relevant to this case?

24   **A.**   I reviewed medical records, materials that were sent to

25   me.  I reviewed some relevant psychiatric literature.  I also

1    had the opportunity to meet twice with Dr. Menninger via

2    Zoom, once in 2020 and once in 2022.

3    **Q.**  Okay.  And these types of sources of information, are

4    these the types of information that you would normally use in

5    your profession to reach conclusions concerning a person's

6    mental health?

7    **A.**  Yes.

8    **Q.**  Their abilities and capabilities?

9    **A.**  Yes.  I mean, and things that didn't come in here, I read

10    notes from people.  I didn't actually speak to those

11    practitioners.  So that might come in under ordinary clinical

12    practice.  There might be additional laboratory information

13    that wasn't in these records that would come in, in the

14    ordinary clinical practice, so -- but other than that, yes.

15    **Q.**  Okay.  I'm going to start by showing you here Joint

16    Exhibit 28.

17         And Dr. Summergrad, so this is a request for an

18    accommodation form here completed by Dr. Kessimian -- let me

19    pause.  I'm sorry.  Go ahead.

20    **A.**  It's not showing on the screen.

21    **Q.**  Excuse me, I didn't press the button.  My mistake.

22         So Dr. Summergrad, this is the request for

23    accommodation form that we looked at earlier today with Dr.

24    Kessimian and I want to walk you through some of these and

25    ask you some questions here.

1          So first, with respect to the first question in box

2     number 1 here, it asks, "Does the employee," here

3     Dr. Menninger, "have a physical or mental impairment that

4     substantially limits one or more major life activities; a

5     record or past history of such impairment; or being regarded

6     as having a disability without the consideration of

7     mitigating measures."

8          Do you see that?

9     **A.**  Yes, I do.

10    **Q.**  And do you see that Dr. Kessimian answered yes?

11    **A.**  Yes, I do.

12    **Q.**      `In your professional opinion, based upon your

13    experience and your review of the facts here, do you agree

14    with Dr. Kessimian?

15    **A.**  Yes, I do.

16    **Q.**  And with respect to the second box here, you see Dr.

17    Kessimian reflects that Dr. Menninger had a mental

18    impairment.  Do you see that?

19    **A.**  Yes.

20    **Q.**  And in your opinion, do you agree with that?

21    **A.**  Yes, that's correct.

22    **Q.**  Okay.  And then with respect to Dr. Menninger's mental

23    impairment, in your opinion, what was Dr. Menninger's mental

24    impairment as of the date that this form was completed on

25    January 31, 2018?

**A.**   So I think that she had, in my view at that point, two

mental impairments.  One was that she clearly had social

anxiety disorder and had had that since childhood.  And the

second was that she had panic disorder and then had that

since adolescence.

I was -- given the primacy of the social anxiety

disorder, I didn't add in generalized anxiety disorder.  I

thought that that was more, if you will, secondary to the

primary condition.  And the primary condition was and is

social anxiety disorder.

**Q.**   Okay.  Let's try to unpack that a little bit here.  What

is a disorder?

**A.**   So in general, in medicine, a disorder is a condition

usually accompanied by symptoms that tend to occur more

frequently together than not.  So, for example, if you have

heart disease, you may have shortness of breath, chest pain,

difficulty going upstairs, something like that.  Those kind

of things tend to track together.  They often have a specific

cause, although the cause may sometimes be unclear, like, for

example, fatigue, migraines.  There are many conditions where

we don't know exact causes, and they then have a natural

history course, a tendency to respond to conditions.  That's

the first part.

The second part is they have to cause suffering.

They have to cause disability, suffering.  Maybe not

1    disability exactly as you'd use it in an employment context,

2    but some degree of symptoms that are persistent and effect

3    people, even if at times those disorders go into remission.

4    Some disorders are acute.  They last for a short period of

5    time, a fever and an infection may come and go.  Some

6    disorders, hypertension, diabetes, asthma, many other

7    disorders, anxiety, can be chronic conditions, and some of

8    them are lifelong conditions.

9    **Q.**  And the mentioned social anxiety disorder.  Can you

10   explain to the jury what that is?

11   **A.**  So social anxiety disorder is a disorder that tends to --

12   it's associated with intense anxiety associated with certain

13   kinds of social or performance circumstances.  People with

14   social anxiety have difficulty introducing themselves to

15   other people, performing in front of different people, giving

16   a speech in front of other people.  They have -- they might

17   be viewed externally as being intensely shy or reclusive.

18   They have an intense fear, generally, of being exposed or

19   humiliated, so that if they're seen, they're worried that

20   something about them will be shown to be present which would

21   be embarrassing or humiliating.  Sometimes people are very

22   concerned, for example, about sweating.  Sometimes people are

23   very concerned about their gaze and somebody else noticing

24   that they're looking at them and that somehow people will be

25   aware of that.  It generally comes on in early adolescence.

1    It can come on as early as early childhood, so three, four,

2    five years of age.  It can often be seen in things like

3    separation anxiety, kids who have a hard time going off to

4    school.  So it's kind of at one extreme of a kind of

5    social -- people who are extraordinarily gregarious and love

6    to be in the public eye, and you have people who, at the

7    other extreme, really, really don't like that.  And

8    Dr. Menninger is in that extreme and that's why you'll find

9    people with social anxiety disorder.

10   **Q.**   You also mentioned panic disorder.  What is that?

11   **A.**   So panic disorder is -- panic attacks -- let me talk

12   about panic attacks and then I'll describe what panic

13   disorder is in that context.

14           People can have panic attacks due to a variety of

15   different disorders.  Panic attack is when you have a sudden

16   out-of-the blue of heart racing, shortness of breath,

17   lightheadedness, vertigo, fear, fear of going crazy, fear of

18   having some acute medical problem.  It is intense, lasts

19   somewhere per episode around 5 to 15 minutes, and can come on

20   out of the blue.

21           Sometimes people have multiple episodes like this,

22   but it's not clear what's provoking it.  Sometimes it is

23   clear, it can be seen in the context of something like a

24   social anxiety disorder.  Sometimes it's a setting of

25   something else that somebody else has, what we would call a

 1    phobia around, some stimulus in the environment that makes

 2    them really, really uncomfortable.  For some people, for

 3    example, it's being in shopping malls, elevators, bridges,

 4    tunnels, any place where they feel like their means of safe

 5    escape is limited.

 6              So panic disorder is when you have panic attacks,

 7    without it necessarily being clear what it occurs in relation

 8    to.

 9              Now, Dr. Menninger has anxiety and panic in

10    relation to social situations.  She also had an adolescence

11    that emerged as something that was also occurring somewhat de

12    novo, in other words, without a particular percipient.

13    **Q.**  In diagnosing disorders in general and more specifically

14    the ones that you've talked about, how does a psychiatrist

15    such as yourself go about doing that diagnosis?

16    **A.**  Well, hopefully carefully and you listen to people.  You

17    gather as much information as you can.  In general, you want

18    to hear directly from people both what is bringing them in to

19    see you and then what their history has been.  And you want

20    to make sure you don't get tunnel vision and just focus on

21    what it is that they're bringing.  You want to make sure you

22    go through the rest of their medical history, any other

23    psychiatric symptoms that you may or may not have had, have

24    they had episodes, for example, of head trauma, of

25    concussion, febrile seizures.  Have they had episodes of

1    other kinds of illnesses that could effect their brain or

2    some other part of their body that could produce other

3    symptoms, because people don't come to the doctor just with

4    their mental symptoms and they leave their body behind.  They

5    bring the whole thing with them and you have to make sure you

6    gather all of that.

7            Sometimes it depends on the circumstances.  You may

8    need to gather information from past medical records, from

9    people's families, if they'll give you permission to do that.

10   And other times, obviously, other medical records, laboratory

11   studies, et cetera.  So the imaging studies, you know, CT

12   scans, MRIs, et cetera.

13   **Q.**   Okay.  Let me just jump in there.  In reviewing the

14   information that you described, is there some kind of

15   diagnostic criteria that's regularly used by experts in your

16   field?

17   **A.**   Yeah, so that's generally either the diagnostic and

18   statistical manual of psychiatric disorders, which is now in

19   its fifth edition.  There's a slight edit, what's called a

20   text revision, that just came out.  But basically it's in its

21   fifth iteration.

22           People also will use the *International*

23   *Classification of Diseases*, which, in the US, is in its tenth

24   edition, and internationally, it's in its eleventh edition.

25   And those are very similar in terms of -- now, again, those

1    are not, in and of itself -- they're necessary and important

2    to kind of put things in certain kinds of groupings, but they

3    don't suffice for clinical examination and/or other kinds of

4    medical literature.

5    **Q.**   Understood.  And in reaching the diagnoses that you did

6    with respect to Dr. Menninger having social anxiety disorder

7    and panic disorder, did you rely at all upon the diagnostic

8    criteria set forth in the DSM?

9    **A.**   Yes, I did.

10   **Q.**   And just generally speaking, how -- how did the

11   diagnostic criteria and the DSM compare to the information

12   that you gathered in your --

13   **A.**   It's very, very, very close.  I mean, she has -- speaking

14   first about social anxiety disorder, she has many of the core

15   attributes and has had that since childhood, difficulty in

16   being in certain kinds of social situations.  Fear, anxiety,

17   intense anxiety, panic associated with them, remaining

18   somewhat distant from other kinds of settings where those

19   kinds of feelings would come about.  And in addition, you

20   know, particular concerns around performance and also

21   sweating.

22   **Q.**   Why do you mention sweating?

23   **A.**   Well, one of the things that Dr. Menninger would do when

24   she presented was that, for example, when she gave a

25   presentation at work, she would put Kleenex under her arms,

1    in her axilla, what we would call the armpits because she

2    would sweat and she didn't want that to be visible to other

3    people.  And that was a way of basically protecting her sense

4    of pride in a public situation and also preventing some of

5    her symptoms from being very visible.

6    **Q.**  And from your clinical perspective, did that factor ring

7    true in terms of your opinion?

8    **A.**  Yes, it did.

9    **Q.**  And why is that?

10   **A.**  It's one of the concerns -- it's a specific concern that

11   people have with social anxiety disorders around -- it around

12   sweating and it's around public appearance.  We all have

13   concerns about how we appear in public.  That's natural and

14   normal, even as -- and again, this is an extreme version of

15   that, in terms of its intensity.

16   **Q.**  Looking back here at the form completed by Dr. Kessimian,

17   you see here that she had included in her document, there's a

18   reference to agoraphobia and generalized anxiety disorder.

19   Do you see that?

20   **A.**  Yeah.

21   **Q.**  Do you disagree with that?

22   **A.**  It's not that she doesn't have some elements of

23   generalized anxiety.  Generalized anxiety disorder is -- you

24   know, it's where you're constantly a little bit of tense and

25   worried about things all the time.  I mean, you know, just

1    you're constantly a little bit on edge, but it doesn't cause

2    overwhelming kinds of anxiety.  It doesn't cause the kind of

3    physiologic symptoms, the heart racing, the shortness of

4    breath, the lightheadedness that I was describing.  And

5    generally, people, if they restrict activities, they do it a

6    little bit, they don't it to an extreme degree.  It's not

7    like what we would call, again, a phobic avoidance.

8              You know, there's some people, for example, who

9    won't travel over bridges.  That's their -- or they won't go

10   on to a plane.  But they can do other kinds of -- they can

11   talk -- they can talk in front of people.  So again, there

12   are specific kinds of elements.

13             And then in terms of -- is there something else in

14   relation?

15   **Q.**  Yes, I'm sorry.  I took away the highlight.  I'm sorry.

16   The generalized anxiety disorder?

17   **A.**  Yes, that's the generalized anxiety disorder.  So she has

18   some of those elements again.  I guess I'm a lumper rather

19   than a splitter.  That's a term we sometimes use in medicine,

20   do you put things under one diagnosis, or do you separate

21   them out.  So I don't think that's wrong, it's just not what

22   I would focus on.

23   **Q.**  Very good.  Directing your attention to further down here

24   in what Dr. Kessimian wrote, in the next sentence, she notes

25   that "the disability significantly interferes with Lisa's

1  ability to perform major life activities, such as thinking,

2  concentrating, communicating and working."

3          Do you see that?

4  **A.**  Yes, I do.

5  **Q.**  Do you agree with that?

6  **A.**  Yes.

7  **Q.**  In addition to the list there, how, if at all, do

8  Dr. Menninger's mental impairments impact the life activity

9  of breathing?

10  **A.**  So when people have -- is it okay if I expand a little

11  bit on anxiety and put that in context to breathing?

12  **Q.**  Sure.

13  **A.**  Well, anyway, anxiety is a normal thing, like pain.  We

14  have anxiety as a way of protecting us from danger.  So, you

15  know, life is filled with dangers.  If there's a car

16  careening towards you and you want to see it, you want to do

17  some -- you become very anxious and alert, so you activate

18  various parts of your nervous system, your sympathetic

19  nervous system, your stress reflexes, cortisol, et cetera, so

20  you can respond to danger.

21          And one of the things that we're most sensitive to

22  in the world is anything that affects our breathing, because

23  you don't breathe for a few minutes, you're going to die.

24  You know, the brain is intensely dependent on oxygen, and we

25  need to breathe in order to have oxygen.  The challenge is

1    that -- so what happens is with panic experiences of the kind

2    that Dr. Menninger has is one of the core cardinal elements

3    is you get an alarm.  The alarm system that goes off when you

4    can't breathe, but it goes off in response to other kinds of

5    stimuli.  So it's not going off because there's no oxygen.

6    It's going off because, again, different people, but in this

7    case social situations and social settings and then becomes

8    breathless.  So breathing becomes hard in those circumstances

9    and it may take some time to catch one's breath thereafter.

10   **Q.**  And these, the impact on breathing, thinking,

11   concentrating, communicating, working, were these -- were

12   these impacts that existed constantly, or were they more

13   episodic?

14   **A.**  No, they tend to be more episodic, although they can have

15   anticipatory elements, and they can have post-attack

16   elements.  So the anticipatory elements are if you knew that

17   every time you were walking down the street, a bear was going

18   to jump out of the woods, pretty soon you'd stop walking down

19   the street.  That's anticipatory anxiety.  And so people

20   begin to notice, "I'm having these attacks when I'm in, let's

21   say, I'm in an elevator."  People will avoid going in

22   elevators.  Or I'm having these attacks when people are

23   speaking, so they will avoid those kinds of things.  And if

24   you know you have to be in those settings, you kind of have

25   to gird your loins and get ready for what may feel like a

1    battle situation, a complex situation.

2         These episodes, for anybody, can make them feel

3    enervated, depleted.  They're very intense.  You're taking

4    your whole sympathetic nervous system and you're putting it

5    on to a kind of hyperdrive, and you're discharging it for 5,

6    15, 20, 25 minutes, and afterwards, people understandably

7    feel washed out.  So, yes, they're acute, they don't happen

8    all the time.  But they're not just the event, they're things

9    around the event, both before it and after it.

10   **Q.**  And with respect to Dr. Menninger in particular, were

11   there certain events or activities that triggered those

12   occurrences?

13   **A.**  Yes.

14   **Q.**  And what are they?

15   **A.**  I'm sorry?

16   **Q.**  What are they?

17   **A.**  So introducing herself to people that she wouldn't

18   otherwise know, especially if it was groups of people or a

19   range of people, but people that she otherwise was not

20   familiar with.

21        This goes back, actually, to childhood, even, you

22   know, introducing herself to playmates and kids at school

23   when she was very, very young.  And it also involves any

24   situation where she might be subject to being under public

25   awareness, public display, speaking, presenting herself,

1   where she'd be under the spotlight.  This is an anti --

2   people don't want to be under the spotlight.  They want to

3   kind of be hidden away.  They don't want to be seen in that

4   way.  And that's -- those are the kinds of things that would

5   generate this for people.

6   **Q.**  Looking here at -- still at Dr. Kessimian's note, she

7   reports, "Despite these limitations, Lisa reports that she

8   has historically fulfilled the essential functions of her job

9   without accommodation."

10          Do you see that?

11  **A.**  Yes, I do.

12  **Q.**  Is that in any way consistent with your opinion as to

13  Dr. Menninger's mental impairment?

14  **A.**  No, it isn't.

15  **Q.**  Can you please explain to us why?

16  **A.**  Because she found ways to -- she didn't request an

17  external accommodation.  She found ways of dealing with this.

18  Part of this was preparing herself.  Part of it was the

19  frequency or the infrequency with which she would do it.

20  Part of it was whether it was focused around people that she

21  knew, versus people that were strangers to her, or people

22  that she was just being introduced to.  And part of it was

23  use of small amounts of medication to help take the edge off

24  of the anxiety.

25  **Q.**  In your opinion, was it difficult for Dr. Menninger to

1   engage in every type of interpersonal interaction?

2   **A.**   No.  I don't think so.  Because there was certainly --

3   you know, with her family, that was not the case, with people

4   that she knew well.  When her activities were focused around

5   technical or professional activities that were close to her

6   expertise in terms of quality evaluation, laboratory

7   function, and others, that would -- that would not be as much

8   of an issue as, again, being introduced to a group of people

9   or having to be introduced to and speak to a group of people

10  that she didn't know.

11  **Q.**   And is that -- is that unusual for this type of mental

12  impairment?

13  **A.**   No, it's actually quite typical.

14  **Q.**   I'm now going to show you here exhibits -- strike that.

15  We'll get back to that.  I'll show this to you later, since

16  we're almost at lunch.

17          Would it be -- would it be inconsistent with your

18  opinion that Dr. Menninger's supervisors had historically

19  marked her as being an excellent collaborator?

20  **A.**   No.

21  **Q.**   Why not?

22  **A.**   Because, again, it would depend on the context, the

23  setting, the relationship, the duration, and the numbers of

24  individuals, and the kind of tasks that were associated with

25  that.  So, again, if there were things that were close to her

1    core skillset, or as a physician, if they were with a group

2    that she knew well, if they were within a small group that

3    was, again, known and trusted, she would be able to do those

4    things.  You know, and again, people, you know -- she was

5    able to utilize her skills and also, you know, it helps when

6    you can utilize your intellectual skills, you know, in a

7    particular set of tasks, and that helps, as well.

8    **Q.**  Were public speaking activities, were those particularly

9    difficult for Dr. Menninger?

10   **A.**  Yes, and they are classically for people who have social

11   anxiety disorder.  It's a hallmark of it.

12   **Q.**  Would that mean that it was impossible for Dr. Menninger

13   to engage in public speaking activities?

14   **A.**  No, it was possible, but with, again, a great deal of

15   preparation and strain and recovery time.

16   **Q.**  Would it at all be inconsistent with your opinion

17   concerning Dr. Menninger's mental impairment to learn that

18   when people at PPD saw her doing presentations, they thought

19   she was great?

20   **A.**  Not at all.

21   **Q.**  Why not?

22   **A.**  Because, again, if one is able to organize, again, within

23   a setting that is trusted, where there's enough time for

24   preparation -- but let me -- if I could, reasonable, by

25   analogy.  If somebody has heart disease, they may be able to

1    walk a block, or they may be able to walk a flight of stairs.

2    If you ask them to walk two or three flight of stairs, they

3    may not be able to do it.  So you have to know kind of what

4    the scope is and the range of what people are capable of

5    doing.  And again, within those settings and a lot of

6    preparatory time, she was able to do that, by all of their

7    reports, quite well.

8              MR. HANNON:  Your Honor, I'm switching on to

9    another topic.  Do you want me to stop?

10             THE COURT:  Keep going.  You have two more minutes.

11             MR. HANNON:  Okay.  Great.

12   BY MR. HANNON:

13   Q.  I'm going to show you Joint Exhibit 48.  And you recall,

14   this was one of the documents that we looked at today with

15   Dr. Kessimian?

16   A.  Yes.

17   Q.  Okay.  And have you -- is this one of the documents that

18   you reviewed in preparation for your work in this case?

19   A.  Yes, I have.

20   Q.  Okay.  And I'm going to look here at the second page.

21   And you see here, Dr. Menninger -- I'm sorry, Dr. Kessimian,

22   she has provided a number of proposed accommodations.  Do you

23   see those?

24   A.  Yes, I do.

25   Q.  Okay.  So we see one there on page 2 and then the

```
 1   rest there on --
 2              THE COURT:  I'll stop you here.
 3              MR. HANNON:  I knew it.
 4              THE COURT:  Yeah.  Good, you knew when it was going
 5   to be 1 o'clock.
 6              But look, we got the document in, he's ready to go,
 7   the jury recognizes the document.  When you return, you don't
 8   have to lay that foundation.  They'll be oriented.
 9              Ladies and gentlemen, so take a break for lunch,
10   1:00 to 2:00, we'll resume at 2 o'clock.  Thank you for your
11   attention.  Don't discuss the case among yourselves or with
12   anyone else.
13              All rise for the jury.
14              (The jury exits the courtroom.)
15              THE COURT:  All right.  So we'll resume at 2:00.
16   See you then.  Just before, so we can get the jury at 2:00.
17              And I'm going to give you that back, Mr. Hannon.  I
18   don't need that anymore.
19              MR. HANNON:  Thank you.
20              (Court in recess at 1:01 p.m.
21              and reconvenes at 1:59 p.m.)
22              THE COURT:  Please be seated.
23              Dr. Summergrad, you can take the witness stand.
24              Kellyann, you can go get the jury.
25              (Jury present.)
```

1        THE COURT:  Go ahead, Mr. Hannon.

2    BY MR. HANNON:

3    **Q.**  Dr. Summergrad, I would like to show you Joint

4    Exhibit 58.  This here is a copy of Dr. Menninger's 2016

5    performance review.  I just want to walk you through some of

6    the information on here and see how that compares to your

7    opinions.

8             I direct you here to the highlighted part with the

9    goal of, "To collaborate with lab, data management, and

10   finance to establish and standardize Global Lab metrics for

11   test volumes, supply costs and revenue generated per

12   test/test category."

13            Do you see that?

14   **A.**  Yes, I do.

15   **Q.**  And you note there that she was rated as "highly

16   effective"?

17   **A.**  Yes, I do.

18   **Q.**  Do you see there, it notes "excellent collaboration with

19   the GCL teams"?  Do you see that?

20   **A.**  Yes.  I do.

21   **Q.**  Okay.  Is that in any way inconsistent with your opinion

22   concerning Dr. Menninger's mental impairment?

23   **A.**  No, it isn't.

24   **Q.**  Okay.  The next one here, and you see part of the next

25   goal, the second sentence reads, "Work with SciTech team to

1    create validation plan upon instrument delivery to lab."

2              Do you see that?

3    **A.**  Yes.

4    **Q.**  You see there, again, she was rated "highly effective"

5    there, right?

6    **A.**  Yes.

7    **Q.**  And in terms of the -- excuse me -- in terms of the

8    comments by Mr. Mekerri, you see the second sentence reads,

9    "Lisa has been leading the effort successfully."

10             Do you see that there?

11   **A.**  Yes, I do.

12   **Q.**  Is that in any way inconsistent with your opinion of

13   Dr. Menninger's mental impairment?

14   **A.**  No, it isn't.

15   **Q.**  Next page here, see the goal I've highlighted:

16   "Collaborate with QA to identify and address GCL CAP/CLIA/NY

17   compliance and quality gap."

18             Do you see that there?

19   **A.**  Yes, I do.

20   **Q.**  Okay.  And do you see she was rated "highly effective"?

21   **A.**  Yes, I do.

22   **Q.**  Is that consistent with your opinion concerning

23   Dr. Menninger's mental impairment?

24   **A.**  Yes, it is.

25   **Q.**  Next goal, "Collaborate with task force and leadership

1    teams to clarify and redefine AP strategy and project plan,

2    identify gaps and propose solutions to meet client

3    expectations."

4              Do you see that?

5    **A.**  Yes, I do.

6    **Q.**  And, again, she was rated highly successful?

7    **A.**  Yes.  Highly effective.

8    **Q.**  I'm sorry.  Highly effective.  Thank you for correcting

9    me.

10             And you see the notes reflect the "AP task force

11   has been a great initiative for cross departmental

12   collaboration" and it goes on to say, "Lisa is exploring

13   collaboration with partner."

14             Do you see that?

15   **A.**  Yes, I do.

16   **Q.**  Is any of that inconsistent with your opinion concerning

17   Dr. Menninger's mental impairment?

18   **A.**  No, it isn't.

19   **Q.**  Going back to the document that we started before

20   lunch -- so this, again, is Joint Exhibit Number 48.  So this

21   was Dr. Kessimian's suggested accommodations; is that right?

22   **A.**  Yes.

23   **Q.**  Okay.  And you've -- you've reviewed these suggested

24   accommodations in the course of your work in this case?

25   **A.**  Yes, I have.

1    **Q.**   Okay.  And do you have an opinion as to whether or not

2    these accommodations would have assisted Dr. Menninger with

3    respect to the side effects of her mental impairment?

4    **A.**   Yes, I do.

5    **Q.**   And what's your opinion?

6    **A.**   I think it would have been helpful to her.

7    **Q.**   How so?

8    **A.**   To the extent that it would have placed some limits on

9    the number, the frequency, the exact role that she would

10   serve in, I think that it -- it would, obviously, depend upon

11   exactly what she was being asked to do at any given moment.

12   Based on the materials here, I think it would be helpful

13   because it would have put some parameters around that.

14   **Q.**   In your opinion, did Dr. Menninger need an accommodation

15   in order to continue doing her job?

16   **A.**   No, I don't think she did.

17   **Q.**   I'm now going to show you another document.  This one is

18   Joint Exhibit Number 28.  So this was the form we were

19   looking at earlier, right?

20   **A.**   Yes, it appears to be.

21   **Q.**   Okay.  And now I want to direct your attention to the --

22   the proposed accommodation in Box 7.  And do you see here

23   Dr. Kessimian's recommendation there that any social

24   interaction or public speaking incident to her role be

25   minimized to the extent possible?

1  **A.**  Yes, I see that.

2  **Q.**  Okay.  In your opinion, Doctor, would that have been an

3  accommodation that would have been helpful to Dr. Menninger

4  given her mental impairment?

5  **A.**  It would have been helpful, yes.

6  **Q.**  How so?

7  **A.**  Again, it would have limited the number, the intensity,

8  the roles that -- the frequency of these interactions in

9  these -- in these situations as proposed.

10  **Q.**  Directing your attention to the next sentence in that box

11  or button, Dr. Kessimian wrote, "To the extent that social

12  interactions and/or public speaking is deemed necessary for

13  Lisa's job, I recommend that a plan be developed for these

14  activities in consultation with me or another qualified

15  healthcare provider."

16      Do you see that?

17  **A.**  Yes, I do.

18  **Q.**  And in your opinion, would that -- would that have been

19  helpful to Dr. Menninger given the mental impairment that

20  you've talked about?

21  **A.**  Yes, it would be.

22  **Q.**  How so?

23  **A.**  Again, definition, clarity, understanding what elements

24  of her job were remaining the same or were changing, knowing

25  something about, again, the frequency and the extent of the

1  social interactions that would be required of public

2  speaking, all of that would allow her to both plan and be

3  helpful in the management of her day-to-day activities on her

4  job.

5  **Q.**  When you say it would have helped her plan, could you

6  help the jury understand why --

7  **A.**  So as I was -- mentioned earlier, the -- there's several

8  different phases to the response to social anxiety disorder.

9  One is the anticipatory phase, and this is true with many

10  anxiety disorders; a second is the actual event itself; and

11  then a third is the recovery phrase.

12         Knowing what the tasks were, how frequent they

13  were, who would be there, numbers of people that would be

14  there, et cetera, all of those would allow her both to

15  anticipate correctly and assess and also be able to manage

16  those events, as she had been managing various forms of

17  public speaking within her existing role, and then, also, to

18  recover from -- from the intensity of the anxiety that she

19  would likely have experienced and had experienced in similar

20  situations before.

21  **Q.**  And when you say it would have helped her manage, in your

22  opinion, what, if any, sort of coping mechanisms had

23  Dr. Menninger sort of developed to help her manage?

24  **A.**  Well, I think the first was knowing when things would

25  occur, knowing what role she would play, what role others

1   might play, whether she was presenting, whether somebody else

2   was presenting, and the numbers of individuals.  So all of

3   those things would allow her to set a framework around what

4   she was about to do.

5            And then, obviously, depending upon what those

6   things were, then it would define how she would experience

7   the actual event itself and the aftermath of the event.

8   **Q.**  Looking back here at Dr. Kessimian's suggestion, in your

9   opinion, was -- was a formal plan needed in order for

10  Dr. Menninger to -- to have some benefit from this planning

11  you've talked about?

12  **A.**  Can you help me understand what you mean by a formal

13  plan?

14  **Q.**  Sure.  Did there need to be a single comprehensive

15  document laid out that said with precise detail this will

16  happen then, this will happen then, this will happen then?

17  **A.**  I think it would depend on the set of circumstances and

18  the specifics that she was required to -- if, again, they

19  were modest, less likely; if they were more extensive, yes.

20  **Q.**  How about just additional communication with

21  Dr. Menninger concerning these expectations?  In your

22  opinion, would that have been helpful?

23  **A.**  It would have been extremely helpful to her.

24  **Q.**  Why?

25            MR. CURRAN:  Objection.

```
 1              THE COURT:  What's the objection?

 2              MR. CURRAN:  This is going into the area that

 3    Your Honor ruled on summary judgment.

 4              THE COURT:  What's the question, Mr. Hannon?

 5              MR. HANNON:  The question concerns increased

 6    communication.

 7              THE COURT:  I think, for context, it's overruled.

 8    You can answer.

 9              THE WITNESS:  So there are two different pieces of

10    this.  One piece goes to the kind of heart and deepest

11    experience of having social anxiety, which is fear of being

12    exposed and humiliated.

13              So anything that is experienced as potentially

14    exposing one or their disability -- their tendency to sweat,

15    their feeling that they may be talking in a way that's not

16    clear, stammering, feeling overwhelmed -- anything that would

17    help clarify that would both be useful in general -- in other

18    words, for the planning purposes -- but it would also reduce

19    the sense of self-criticism and self-recrimination that often

20    attends people who have social anxiety.

21              What do I mean by that?  People who have these

22    kinds of conditions, many people often feel like they should

23    be able to manage things.  "What's the matter with me that I

24    can't manage things?  People will see that I'm anxious or

25    that I'm stammering or that I'm sweating or that I'm looking
```

1  in an odd way."

2       And all of those things will help people feel

3  worse.  It intensifies their sense of self-criticism and

4  diminishes their sense of well-being in those -- in those

5  settings.

6       So communication has two functions here.  One is to

7  let people know, "We hear this.  We understand this.  We --

8  this is what we're expecting of you.  We're not holding back

9  this information from you or criticizing you for having a

10 condition; b, this is what we expect you to do."  Both of

11 those things would be helpful.

12 BY MR. HANNON:

13 Q.  I'm now going to show you Joint Exhibit 115.  And just to

14 orient you, this is an e-mail chain.  I'm going to direct you

15 to a specific portion of it.  Excuse me.

16      I direct your attention here to the bottom.  Can

17 you see here Dr. Menninger writes, starting in the second

18 sentence, "While you keep saying that you are committed to

19 engaging in a dialogue with me, I feel like you just keep

20 twisting my doctor's words and refusing to answer any of my

21 questions."

22      Do you see that there?

23 A.  Yes, I do.

24 Q.  Okay.  From a -- from the perspective of a psychiatrist

25 with knowledge of Dr. Menninger's mental impairment, is that

1    statement significant to you at all?

2    **A.**   Yes, it would be.  I mean, I think it would make most

3    people feel uncomfortable, but it certainly would make sure

4    with social anxiety in an important work situation feel

5    anxious and worried and concerned.

6    **Q.**   And directing your attention to the next sentence, she --

7    I'm sorry.  Skipping ahead to the last sentence, she writes,

8    "If we can talk about the specific tasks that Hacene wants me

9    to do, I feel like we can come up with some kind of a

10   solution that works."

11            Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   Okay.  And in your preparation for testifying, were you

14   aware that Dr. Menninger had made repeated requests for

15   additional information concerning items on certain buckets?

16   **A.**   Yes, I am.

17   **Q.**   And in your opinion, would providing that additional

18   detail that Dr. Menninger requested, would that, in and of

19   itself, help accommodate the impact of her disability?

20   **A.**   Yes.  I think it -- clarity and communication would have

21   helped her.

22   **Q.**   Are you aware that Dr. Menninger took a medical leave of

23   absence in early June of 2018?

24   **A.**   Yes, I am.

25   **Q.**   Okay.  And in the course of your work in this case, did

1    you make a determination as to how, if at all, her -- her

2    mental impairment had changed since January 2018 and when she

3    took her medical leave?

4    **A.**  Yes, I did.

5    **Q.**  And what is your opinion?

6    **A.**  So over the course of the spring, particularly as she

7    began to get more worried and concerned about her livelihood,

8    her work, and her ability to resolve the matters that she was

9    attempting to deal with, she began to develop symptoms of a

10   major depressive disorder.

11        And those symptoms included, by the time we got

12   to -- there were several.  She wasn't sleeping.  She wasn't

13   eating well.  She was increasingly worried in a different

14   kind of way, worried in a self-critical kind of stage.

15        She worried that she had put herself in a situation

16   where her livelihood was going to be affected and her family

17   was going to be affected.  And she became increasingly

18   suicidal and had substantial thoughts of self-harm.

19   **Q.**  You mentioned major depressive disorder.  What is major

20   depressive order?

21   **A.**  So within the broader category of mood disorders that I

22   talked about, there are depression, as a kind of general

23   category, as one of the two major categories, mania being the

24   other.

25        And within depression, there are a variety of

1    different kinds of depressive orders, and one of them is

2    called major depressive disorder, or major depression.  It

3    has certain elements and characteristics, and that's what I

4    believe she developed in the course of the late spring.

5    **Q.**   In your opinion, was it medically necessary for

6    Dr. Menninger to take leave from her employment in early June

7    2018?

8    **A.**   Yes.

9    **Q.**   Why?

10   **A.**   Because she was -- despite highly competent psychiatric

11   care and despite medication, she was getting worse, and she

12   was feeling increasingly unsafe and unwell; and she needed a

13   more sustained, engaged environment to support her through

14   that and to allow her to begin to regain some sense of floor

15   underneath her.

16   **Q.**   Now, Dr. Summergrad, in your opinion, did Dr. Menninger's

17   preexisting mental impairment, did that in any way contribute

18   to her development of major depressive disorder?

19   **A.**   Well, as I mentioned earlier, overlap between psychiatric

20   symptoms or syndromes is more common than not.  Certainly

21   with people who have anxiety disorder, somewhere between 20

22   and 40 percent of them will go on to develop depressive

23   disorders, major depression.

24          And so that is a risk factor.  It's a known risk

25   factor for the development of major depression, particularly

1 later in life.

2 **Q.** In your opinion, did PPD's actions play any role in

3 Dr. Menninger developing major depressive disorder?

4 **A.** Well, I think she felt like she didn't know where she was

5 headed.  She didn't have clarity in her mind about whether --

6 whether and in what way her job was changing.  I think she

7 felt in particular that -- that they were looking to have her

8 exit the organization, and I think she began to frankly beat

9 herself up somewhat around the fact that she had taken the

10 risk of exposing her disability.

11   And so I think she felt that, despite the fact that

12 it was important for her to disclose her disability, that it

13 led to reactions to her, which then made her feel even more

14 negatively towards herself.

15   And it was kind of like a -- you know, again, if a

16 core concern of social anxiety is a fear of being humiliated

17 or viewed negatively, and she began to feel like she was

18 experiencing that from the environment at work around her,

19 that kind of is confirmatory in a negative way for her,

20 rather than a positive way.

21 **Q.** And more specifically, how did those feelings that you

22 described in terms of the company wanting her to exit from

23 the company, how, if at all, did that play into her

24 underlying mental impairment?

25 **A.** Well, I think, again, it activated the very concerns she

1    had about being humiliated, and it also created real worries

2    about her financial well-being and the well-being of her

3    family and she's obviously very concerned about her family.

4    **Q.**  I heard you mention a moment ago something about

5    Dr. Menninger having disclosed her disability.  In your

6    opinion, was there anything about the fact of Dr. Menninger

7    telling her employer about her disability that was

8    significant here?

9    **A.**  I'm not sure what you mean by significant.

10   **Q.**  Well, in terms of her reaction when she subsequently had

11   those feelings of rejection.

12   **A.**  Well, I think that that, again, if a cardinal element

13   of -- of social anxiety is fear of being seen and exposed and

14   humiliated, and if one exposes oneself, one puts oneself in a

15   vulnerable situation -- so it's a risk.  And she was taking a

16   risk, not just a risk that was a risk in the normal course of

17   events, but a risk psychologically for her, as well.

18   **Q.**  Were you present for Dr. Menninger's sister's testimony

19   last week?

20   **A.**  I think I was for most of it.

21   **Q.**  Were you present when Ms. Hart noted that Dr. Menninger

22   hadn't previously shared her diagnosis with her?

23   **A.**  Yes.

24   **Q.**  Is that at all significant to you?

25   **A.**  Well, I think it's significant in a couple of ways.  One

is psychiatric illnesses in general and social anxiety in
particular are associated with a strong sense of shame, what
people sometimes call stigma.  There's external stigma, how
the world views oneself, and then there can also be internal
stigma, you know, a sense of why can't I do this, why can't I
manage this, why aren't I better in some ways, so, again, an
internal self-criticism.

          So the fact that she hadn't disclosed to her
sister, you know, is open to a number of different ways of
thinking of it.  One was, again, you know, not wanting to
disclose all of this.  The other is that I thought her sister
said something that was very important during that period of
her testimony, which was she described Dr. Menninger as being
shy and reclusive.  So she knew that she had these
attributes.  I think if you go back 40, 50, 60 years,
whatever the exact time frame is, you know, that we're
talking about, people's awareness about mental disorders,
people's ability to talk about them was much less in general.
So I think there are at least a couple of different ways of
understanding this.

          But, you know, people -- people even with their
family members hold things inside.  Not all of us tell
everything that's going on with ourselves.

Q.  In your opinion, the fact that Dr. Menninger had kept
this inside, did that increase the risk of what would happen

1    in the event that, when she disclosed this to PPD, they

2    rejected her?

3    **A.**   I think it's a reflection of the fact that this was an

4    area of great sensitivity to her and that she was taking a

5    risk in her mind.

6    **Q.**   Were you also present this morning for Dr. Kessimian's

7    testimony?

8    **A.**   Yes, I was.

9    **Q.**   Okay.  And did you hear Dr. Kessimian testify about

10   Dr. Menninger's concerns about traveling to the

11   Highland Heights location after disclosure of her disability?

12   **A.**   Yes, I did.

13   **Q.**   And in your opinion, is that consistent with the -- with

14   the testimony you just provided?

15   **A.**   Yes, in my opinion it is.

16   **Q.**   How so?

17   **A.**   The -- she had -- as I understand it, this was the

18   headquarters where she worked.  This was the -- or the

19   headquarters of the lab that she was -- and the element

20   within PPD that she was -- had responsibility for.

21           And these were the people to whom she had disclosed

22   her disability, so it's a concern that it might be more

23   anxiety-provoking than going to some place that -- where

24   people didn't know about this, it was neutral, and those kind

25   of issues would not be implicated.

1    **Q.**  If -- in your opinion, Doctor, if Dr. Menninger hadn't

2    suffered that sense of rejection from PPD that you've

3    described, would she have developed major depressive disorder

4    and required medical leave?

5    **A.**  I think it's significantly less likely.  It's possible

6    she still would have developed it, but I think it would be

7    less likely.  I think it added substantially to her stress,

8    her self-criticism, and her sense of hopelessness -- which is

9    by the way, again, a cardinal symptom of major depression.

10   **Q.**  What is?  The sense of hopelessness?

11   **A.**  Hopelessness.

12   **Q.**  You've indicated earlier that you've -- you've had an

13   opportunity to interview Dr. Menninger more recently; is that

14   right?

15   **A.**  Yes.

16   **Q.**  And when was that?

17   **A.**  It was in late 2022.

18   **Q.**  And was that to take an assessment concerning her sort of

19   current health?

20   **A.**  Yes, and just to see how she was doing currently.

21   **Q.**  Okay.  And just generally speaking, what, if any,

22   findings did you make based upon that evaluation?

23   **A.**  I thought that she was still very depressed, not as

24   depressed, perhaps, in terms of suicidal ideation as June of

25   2018, but nevertheless still having substantial difficulties,

1    both with anxiety, her mood, her sense of hopelessness about

2    the future; and that she had become really, in some measure,

3    not maybe completely, but significantly housebound, which had

4    occurred before, but really, it had the quality of this being

5    kind of solidified or becoming kind of crystallized into a

6    situation or a pattern of being and behavior that I was

7    worried, frankly, would be hard for her to break out of.

8    **Q.**   Have you reviewed Dr. Menninger's notes from her medical

9    treatment up until the time of your most recent examination?

10   **A.**   Yes.

11   **Q.**   Okay.  And in your opinion, has -- has Dr. Menninger

12   sought appropriate medical treatment in an effort to try to

13   get her life back on track, so to speak?

14   **A.**   Yes, I think she has.

15   **Q.**   And in the review of that medical treatment, anything

16   there that has in any way suggested to you that, to use a

17   term of art, Dr. Menninger is faking it?

18   **A.**   No.

19   **Q.**   In your opinion, as of when you recently evaluated

20   Dr. Menninger, do you believe that she was able to return to

21   work?

22   **A.**   Not -- not at the time I evaluated her, no.

23   **Q.**   Why not?

24   **A.**   I think that her -- her -- both her anxiety, her

25   secondary development of being more housebound and

1    agoraphobic, her persistent depressive symptoms, even though

2    some elements of them are a little bit better when she's on

3    the -- on her -- on the fluoxetine, all of those make that

4    too difficult for her to imagine going back into a work

5    situation at this point.

6    **Q.**   And in your opinion, since Dr. Menninger first started

7    her medical leave in January of 2018, has her condition

8    gotten better, worse, or stayed the same?

9    **A.**   I would say it's gotten worse to the extent that it is

10   more habitual now.  It's been going on for a relatively long

11   time.  And like anything else in life, patterns, habits,

12   styles that develop become harder to break the longer they go

13   on.  And so it doesn't mean it's impossible, but it makes

14   it -- you have to come back from a greater distance, if you

15   will.

16   **Q.**   In your review of the medical records, did you learn that

17   Dr. Menninger was diagnosed with post-traumatic stress

18   disorder?

19   **A.**   Yes.

20   **Q.**   Yes?

21   **A.**   Yes, I did learn that.

22   **Q.**   Do you agree with that diagnosis?

23   **A.**   No, I don't.

24   **Q.**   Why not?

25   **A.**   So she has certain -- has developed, as another important

1    part of her symptoms, has developed some symptoms that you

2    see within the spectrum of what's called post-traumatic

3    stress disorder.  In particular, she has -- she startles to

4    noise or unexpected activities.  I think you may have noted

5    that her sister mentioned that she texts her before she

6    calls.  That's a kind of -- you know, not to kind of startle

7    someone.

8          Secondly, she's had very disturbing dreams, and the

9    disturbing dreams are repetitive, and they are of --

10   consistently around work and work-related circumstances.

11         And one of the attributes of dreams that you see

12   with post-traumatic stress disorder is they represent pretty

13   nakedly; in other words, they're not disguised dreams where

14   you don't know quite where you are or what's going on.

15         This was at work where, you know, she's dealing

16   with the director of her program.  You know, she's fearful

17   that she's going to be -- she has to go hide.  She has to

18   run.  She fears that she's going to be hurt.

19         In some of her dreams, she mentions fears that

20   she's going to be reported to Vladimir Putin by the director

21   or someone else in the lab.  So these are very -- so that's a

22   second cardinal manifestation of post-traumatic stress

23   disorder.

24         So she has those, but what she lacks is she doesn't

25   have the diagnostic -- the way this diagnostic system is set

1    up, you have sometimes, like, A criteria and then B criteria.

2    And you can't quite get to B unless you have A, you know?  So

3    for example, if you have mania, you can't really have a manic

4    diagnosis if you don't have increased energy or increased

5    activity over, like, a seven-day period.  Then there are a

6    bunch of other subsidiary symptoms.

7            Likewise, with PTSD, you can't get to the other

8    symptoms to make the diagnosis unless you've got a

9    life-threatening fearful event that you went through,

10   generally, something where, you know, you've been shot at in

11   combat.  It's usually the direct experience of a

12   life-threatening event that's required to give you the

13   diagnosis of post-traumatic stress disorder.

14           Now, there are a lot of people who use that

15   language more loosely.  I don't -- I don't think that's the

16   right -- doesn't mean that the symptoms are not

17   significantly.  They're quite significant, but -- and that

18   they don't need to be treated, but it doesn't rise to the

19   level of giving her that as a diagnostic -- a diagnosis,

20   per se.

21   **Q.**  So just to clarify that, that last bit, Doctor, is

22   that -- in your opinion, are Dr. Menninger's PTSD-like

23   symptoms, are those any less painful of bothersome because of

24   the fact that she does not meet the diagnostic criteria?

25   **A.**   No, they are quite both bothersome and painful.

**Q.**   And --

**A.**   And just to add one other element that's important is --
is an avoidance of things that either directly represent or
symbolically represent where you felt traumatized.  So
somebody gets shot in a -- you know, in a grocery store.
They may avoid grocery stores, and they may avoid stores.
They may cross the street.  They may not go down the street
where there's a lot of, you know, shopping and those kinds of
things available.

       So for her, part of this -- again, it doesn't rise
fully to that level, but part of the -- part of what she
experiences is an avoidance of things that are reminiscent of
where she feels that she was traumatized.

**Q.**   Doctor, if Dr. Menninger tried really, really hard,
shouldn't she be able to go back to work?

**A.**   Say that again?

**Q.**   If Dr. Menninger tried really hard, shouldn't she be able
to overcome her fears and depression and go back to work?

**A.**   Yeah, that's a misnomer about psychiatric illness.  You
know, the notion that if you just pull yourself up by your
bootstraps, you know -- you know, at the risk of quoting
Abraham Lincoln in federal court, Lincoln suffered from
severe depression; and in 1841, he wrote his partner's
sister, Mary Speed, that "a tendency to melancholy," which
was the 19th Century word for depression, "is a misfortune,

1    not a fault."

2           So it's really important not to blame people when

3    they're going through these illnesses.  These are very real

4    illnesses, and in some cases, they can be life threatening.

5    **Q.**  And in your opinion, is the fact that Dr. Menninger has

6    not returned to work, is that somehow indicative that she's

7    not trying to get better?

8    **A.**  No, I don't think so.

9    **Q.**  In your opinion, do you believe that Dr. Menninger will

10   get better in the future?

11   **A.**  I don't know.  I can't -- it's -- I can't predict.  I

12   would hope so, but I don't know the answer to that.

13   **Q.**  Based upon your analysis, is there a significant risk

14   that she will never be able to return back to work?

15   **A.**  Yes, there's a significant risk.

16   **Q.**  And can you explain to the jury why that is?

17   **A.**  I think there are several things, some of which are kind

18   of psychiatric and some of which are common sense.  She has

19   developed a set of symptoms which are in a number of

20   different related categories, all of which have become

21   somewhat habitual.  I think you heard Dr. Kessimian talk

22   about how she was worried about her husband, Dr. Menninger's

23   husband, accommodating her too much; and, therefore, she was

24   prescribing certain kinds of activities, such as going out

25   walking.

1           Part of what we do when people have either

2    depression or anxiety in somewhat different ways is we do a

3    variety of things where we kind of, in a gradated way, expose

4    them to the things that they're either anxious about or

5    encourage what's called "behavioral activation."  Because

6    this has been going on for a long time and because this has

7    got both anxiety, mood, and some trauma-related symptoms, it

8    makes it more complicated.  So there's a lot of -- there's a

9    lot of things to come back from.

10          And then I think the other piece is -- I just

11   think, as a practical matter, one also has to deal with the

12   fact that being out of the work force for a number of years,

13   explaining that, you know, to people, figuring out what kind

14   of job you actually want to do, what your skills are, what

15   you're best able to do, so I think all of that, you know, as

16   she gets past some of these other things, if that's possible,

17   that's still another question that she's going to have to

18   deal with, which anyone who's been out of the work force for

19   a while would have to deal with.

20   **Q.**  What about Dr. Menninger's fear of rejection?  Is that

21   something else that might inhibit her future efforts to find

22   work?

23   **A.**  Certainly.  There's going to be apprehension and anxiety

24   that she has about putting herself forward.  Again, back to

25   the cardinal aspect of the -- the core of social anxiety is

1    fear of being rejected, fear of being seen, fear of being

2    seen in a negative way, fear of being humiliated.

3            So that was already in the mix a long time ago.

4    And she's had to, you know, over the course of her life, work

5    through that.  But that's now been accentuated by all these

6    sets of circumstances.

7            MR. HANNON:  That's all I have, Your Honor.

8            THE COURT:  All right.  Cross-examination.

9    **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

10   BY MR. CURRAN:

11   **Q.**  Good afternoon, Dr. Menninger -- Dr. Summergrad.

12   **A.**  Good afternoon.

13   **Q.**  Give me a second just to get set up here.

14           MR. CURRAN:  Your Honor, may I --

15           THE COURT:  Yes.

16           MR. CURRAN:  -- the witness and --

17           THE WITNESS:  Thank you, sir.

18   BY MR. CURRAN:

19   **Q.**  All right.  So, Dr. Summergrad, I think you expressed the

20   opinion that Dr. Menninger's medical condition has gotten

21   worse since she disclosed her disability to PPD?

22   **A.**  Yes.

23   **Q.**  Okay.  And that was in January of 2018?

24   **A.**  Yes.

25   **Q.**  And it's also your opinion that Dr. Menninger developed

1   major depressive disorder?  I think you testified to that

2   before?

3   **A.**   Yes.

4   **Q.**   And when did -- she developed that in the spring of 2018,

5   I think you said?

6   **A.**   I think that that's correct.

7   **Q.**   Okay.  So you didn't examine Dr. Menninger in

8   January 2018, correct?

9   **A.**   No, I did not.

10  **Q.**   In fact, you didn't meet her until August 7, 2020; is

11  that right?

12  **A.**   I'd have to look back to the dates on my interview, but

13  approximately then.

14  **Q.**   Okay.  Is it your recollection that your first meeting

15  with her was in 2020?

16  **A.**   That's correct.

17  **Q.**   Do you recall it being in August of 2020?

18  **A.**   I don't recall whether it was August or not.

19  **Q.**   Okay.  Well, you can take a look at the binder in front

20  of you.

21  **A.**   Uh-huh.

22  **Q.**   The first tab, I believe, is your report in this case.  I

23  think on page 1, it says when you met with Dr. Menninger.

24  **A.**   Yeah, it says August 7, 2020.

25  **Q.**   Okay.  So that was more than 2½ years after January 2018,

1 correct?

2 **A.**   That's correct.

3 **Q.**   And when you met with Dr. Menninger in August 2020, you

4 interviewed her for about two hours and 15 minutes; is that

5 right?

6 **A.**   That's correct.

7 **Q.**   Now, your interview with Dr. Menninger in August 2020,

8 that wasn't in person, correct?

9 **A.**   It was not, no.

10 **Q.**   It was conducted partly by Zoom and partly by telephone,

11 right?

12 **A.**   Yes.  I think at one point, the Zoom link went out and we

13 switched to telephone, but the majority of it was by Zoom.

14 **Q.**   Okay.  So in forming your opinion about Dr. Menninger's

15 health, mental health conditions and their progress in the

16 first few months of 2018, you relied on your interview with

17 her in 2020, as well as the medical records that you reviewed

18 and other documents?

19 **A.**   That would be correct.

20 **Q.**   All right.  And your opinion is based in part on what she

21 said to you in the August 2020 interview, correct?

22 **A.**   It would be, in part, correct.

23 **Q.**   In diagnosing patients in your own practice, you have to

24 rely on what they tell you, correct?

25 **A.**   I'm sorry?

1    **Q.**  In diagnosing patients in your own practice, you have to

2    rely on what they tell you, correct?

3    **A.**  In part.

4    **Q.**  Now, when you interviewed Dr. Menninger in August 2020,

5    she already filed this lawsuit, correct?

6    **A.**  I believe so.

7    **Q.**  Okay.  And her lawyers had hired you to provide an expert

8    opinion in the lawsuit.  That's why you were talking with

9    her, correct?

10   **A.**  I'm sorry.  I missed the last part of what you said.

11   **Q.**  Yeah.  Her lawyers had hired you to --

12            THE COURT:  You might want to lift the microphone,

13   see if it straightens up -- you're pretty tall.

14            MR. CURRAN:  Yeah, sorry.  I could --

15            THE COURT:  Just be louder.

16            MR. CURRAN:  Or I can just talk louder.

17            THE COURT:  There you go.

18            MR. CURRAN:  Yeah.  It's a little bit

19   uncomfortable.

20            THE COURT:  Stand up straight and just talk louder.

21   BY MR. CURRAN:

22   **Q.**  So her lawyers had hired you to interview her, right, in

23   connection with this lawsuit?

24   **A.**  They had hired me to provide an expert opinion to them.

25   **Q.**  Okay.  And you were interviewing -- interviewing her

1    specifically in connection with your effort to -- to develop

2    an expert opinion in this case, right?

3    **A.**   That's correct.

4    **Q.**   And she knew you were interviewing her for that purpose?

5    **A.**   Yes.  I made that clear.

6    **Q.**   Right.  And in evaluating what she was telling you during

7    your meeting with her in August of 2020, did you consider the

8    fact that the meeting was occurring in the context of her

9    lawsuit against PPD?

10   **A.**   Can you explain?  I'm not quite sure what that means.

11   **Q.**   So what I'm trying -- I'll try to ask a better question.

12   Did you consider the context in which you were interviewing

13   her and when you were evaluating what she told you in that,

14   you know, she was talking to you in connection with your

15   interview with her, in connection with this lawsuit?

16   **A.**   Yes, among other things.

17   **Q.**   Okay.  And how did that inform your opinion?

18   **A.**   She was, you know, a litigant in a lawsuit, but I was

19   nevertheless interviewing her to try to understand the nature

20   of the course and the current state of her mental disorders,

21   if any.

22   **Q.**   Okay.  Now, in forming your opinions about

23   Dr. Menninger's mental state and the progress of her

24   conditions in 2018, you also relied on medical records that

25   you received concerning Dr. Menninger, correct?

1   **A.**   That's correct.

2   **Q.**   So you were also relying on what she told those

3   therapists, right?

4   **A.**   Those physicians and other people, yes.

5   **Q.**   Right.  Did you speak with any of her physicians and

6   other people?

7   **A.**   No, I did not.

8   **Q.**   All right.  Now, in forming your opinion in this case,

9   did you speak with Dr. Menninger's husband?

10   **A.**   No, I did not.

11   **Q.**   And did you speak with any of her other relatives?

12   **A.**   No, I did not.

13   **Q.**   What was the name of Dr. Menninger's therapist in 2018?

14   It was Marianna Kessimian, right?  You were here for her --

15   **A.**   Her doctor -- her psychiatrist was Dr. Kessimian.

16   **Q.**   Right.  Sorry, I don't mean to denigrate her by saying

17   "therapist," it was just the word I was using.  I understand

18   that she's a medical doctor.

19           And Dr. Kessimian was at the time a medical doctor,

20   correct?

21   **A.**   Correct.

22   **Q.**   And you reviewed Dr. Kessimian's therapy notes from 2018?

23   **A.**   Her therapy, her medical evaluation notes, her clinical

24   notes.  They were not just therapy notes.

25   **Q.**   Okay.  I'm going to show you a document that we've marked

1    as Joint Exhibit 18 in this case, which I think you've seen

2    before.

3    **A.**   Uh-huh.

4    **Q.**   So this first page is Dr. Kessimian's notes from

5    January 22, 2018, correct?

6    **A.**   That's what it says, yes.

7    **Q.**   All right.  And you reviewed these in connection with

8    forming your opinion?

9    **A.**   Yes, I did.

10   **Q.**   Now, this is -- about -- in the first paragraph, about

11   two-thirds of the way down, there's a sentence that begins

12   "her overall daily level of anxiety."  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   All right.  And it reads, "Her overall daily level of

15   anxiety and somatic symptoms of anxiety has increased."  And

16   that's in January of -- of 2018, correct?

17   **A.**   Yes.

18   **Q.**   And the next paragraph, the second sentence reads, "Today

19   for her appointment is the first time in weeks she has left

20   her home."

21           Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   And she goes on to say, "She is married to an engineer,

24   who struggles with his own specific phobias, and he has taken

25   over all the family and childcare responsibilities."

1           Do you see that?

2    **A.**  Yes, I do.

3    **Q.**  And then, skipping down to the next sentence, its reads,

4    "After her appointment, she had planned to pick up her

5    nine-year-old daughter, Maya, from school; and her daughter

6    was excited and remarked that many of her peers do not

7    believe that she has a mommy because they have never seen

8    her."

9           Do you see that?

10   **A.**  Yes, I do see that.

11   **Q.**  All right.  And this is all Dr. Kessimian's notes from

12   January of 2018, correct?

13   **A.**  Yes.

14   **Q.**  And this was before PPD has, you know, denied her

15   accommodations, correct?

16   **A.**  I believe so, correct, but after she disclosed her

17   disability.

18   **Q.**  Okay.  So she had disclosed her disability at this point?

19   **A.**  Yes.

20   **Q.**  That was something she chose to do, correct?

21   **A.**  I believe -- I believe so, yes.

22   **Q.**  It wasn't something that PPD did to her?

23   **A.**  No.

24   **Q.**  Turning to the next page, do you see, under family

25   history there, about halfway down the page?

1    **A.**   Yes.

2    **Q.**   And it reads, "Mother and maternal grandmother with

3    severe anxiety disorders, mother cannot order for herself at

4    a restaurant," and it also says about her father,

5    "Involuntarily hospitalized for erratic and violent behavior,

6    denies substance abuse history, unemployed throughout Lisa's

7    life, schizophrenia on her father's side of the family."

8            Do you see that?

9    **A.**   Yes, I do.

10   **Q.**   Did you consider whether this family history played any

11   role in causing Dr. Menninger's mental health disorders?

12   **A.**   Well, certainly the mother and the grandmother, if it is

13   accurate that they had severe anxiety disorders, would put

14   her at increased risk, just genetically, for developing a

15   severe anxiety disorder.

16           Most of what we consider major psychiatric

17   illnesses have a greater likelihood to be occurring

18   genetically.  There's some what we would call a genetic

19   loading or a genetic propensity, and they vary.  It varies by

20   the type of disorder.

21   **Q.**   And a little further down, there's a sentence that reads,

22   under "developmental history," "mother did leave her father

23   and move them back to her hometown."

24           Do you see that?

25   **A.**   Yes.

1    **Q.**  "Then they reconciled and he came back to only continue

2    with rages and violence and unpredictability."

3            Do you see that?

4    **A.**  Yes.

5    **Q.**  Did you consider that as well?

6    **A.**  Yes, I did.

7    **Q.**  And do you know whether Dr. Menninger ever witnessed the

8    erratic and violent behavior by her father that's referred to

9    her?

10   **A.**  My understanding is she did see her father be violent

11   toward her mother.

12   **Q.**  In what way?

13   **A.**  I don't recall exactly the way that that would -- that

14   occurred, but I believe she was -- she did witness --

15   **Q.**  Okay.

16   **A.**  -- his behavior.

17   **Q.**  Okay.  Now, turning to the next page, at the top there,

18   in the second sentence, it reads, "She would rather avoid any

19   situation that calls for small talk, being social, meeting

20   new people, or even going to places where there could

21   potentially be a crowd and she would have to interact with

22   others."

23           Do you see that?

24   **A.**  Yes, I do.

25   **Q.**  And under "panic, social phobia," the next paragraph, she

1    talks about Lisa remembering as young as three or four

2    dreading school, especially fear of being called on to answer

3    a question.

4          "If she was called on, her body and voice would

5    shake, and this experience was both physically and mentally

6    painful and exhausting.  This has continued into adulthood

7    and even at small meetings when she needs to present three or

8    four slides."

9          Do you see that?

10   **A.**  Yes, I do.

11   **Q.**  You do?  Okay.

12   **A.**  Yes.  I do.

13   **Q.**  So these, again, these are all symptoms of Dr. Menninger

14   that predate any action by PPD, correct?

15   **A.**  Yes.

16   **Q.**  Skipping down a little bit to a paragraph that was

17   discussed during Dr. Kessimian's testimony, do you see the

18   paragraph beginning "eating disorder behavior"?

19   **A.**  Yes.

20   **Q.**  It says, "Eating disorder behavior, weighs herself

21   daily."

22          Do you see that?

23   **A.**  Yes.

24   **Q.**  So according to these notes, in January of 2018,

25   Dr. Menninger is already exhibiting an eating disorder?

1    **A.**   Yeah, I'm more skeptical of that terminology and that
2    conclusion.
3    **Q.**   Why is that?
4    **A.**   There are specific criteria for whether someone has an
5    eating disorder as opposed to certain kinds of eating
6    proclivities.  Being vegan is not an eating disorder,
7    exercising is not on eating disorder.  In order to have an
8    eating disorder, you need to have a set of other symptoms and
9    criteria and, again, while it's possible that she would meet
10   those criteria, that isn't established through these notes
11   and the part of the reason why I didn't give her that
12   diagnosis.
13   **Q.**   Okay.  And Dr. Kessimian was the one who was actually
14   meeting with her at this time, correct?
15   **A.**   Yeah.
16   **Q.**   And you, again, didn't meet her until 2018, correct?
17   **A.**   That's correct.
18   **Q.**   Did you ask her about her eating behavior in 2018 when
19   you spoke with her in 2020?
20   **A.**   I did not.
21   **Q.**   Oh, and then in the next paragraph, under "trauma," it
22   says "witnessed domestic violence as a child (father holding
23   a knife to her mother's throat)."
24   **A.**   Yeah, and I do recall reading that, now seeing that.
25   **Q.**   All right.  Did you consider whether this could be a

 1   cause of her mental health disorders?

 2   **A.**   It certainly -- it's certainly unlikely to have helped

 3   her mental health.

 4   **Q.**   Okay.

 5   **A.**   And it also may be a risk factor for -- for example, her

 6   developing major depression.

 7   **Q.**   Okay.  So it's something, again, that preexists her

 8   employment with PPD that could have contributed to her

 9   developing depression and --

10   **A.**   Well, it's certainly a vulnerability that she had.

11   **Q.**   Okay.  Could -- as a vulnerability, though, what's the

12   difference between a vulnerability and a contributing factor

13   in causing a condition?

14   **A.**   I'm not quite sure what -- I mean, it would depend on

15   what you mean by a contributing factor.

16   **Q.**   Something that contributes to --

17   **A.**   So the way I was using the term "vulnerability" here is,

18   just to be explicit, we don't know the nature of her father's

19   diagnosis.  There are various terms that are thrown around

20   here.  We know that he was violent and he was erratic and

21   didn't work.  We know that there's, by report, a family

22   history of schizophrenia, but, you know, lots of diagnoses

23   that get carried around in medical records, and particularly

24   from 50, 60 years ago, are inaccurate.  And that's been well

25   demonstrated in a number of studies.

1          So he may have had schizophrenia.  He may have had

2     other problems.  He had may have had manic-depressive illness

3     or some other disorder that could have put her at greater

4     risk.  I simply, as a medical professional, don't know the

5     role that that plays, and that's what I was talking about

6     vulnerability.

7          Clearly, also, witnessing trauma is a vulnerability

8     for anybody.

9     **Q.**  Yes, so putting aside whatever condition her father was

10    diagnosed with or may have had, you know, just witnessing

11    what she witnessed, as recorded here, increased the

12    likelihood that she would be -- later develop major

13    depressive disorder and other disorders?

14    **A.**  It could.  I'm not saying it did.

15    **Q.**  Okay.  All right.  So I just flipped to the next page

16    while you were talking.  Sorry.

17    **A.**  It's okay.

18    **Q.**  Under "social," near the bottom of the page, do you see

19    it, there's a paragraph that begins "Social:"?

20    **A.**  Yeah.

21    **Q.**  "Social:  Pathologist working in the private sector.

22    Sole financial contributor to the household.  Husband

23    empathetic and understanding partner.  Concern for excessive

24    accommodation to the point where all her needs are met and

25    she is not asked/required to leave the house."

```
 1              Do you see that?
 2   A.  Yes, I do.
 3   Q.  All right.  So this, again, was something about
 4   Dr. Menninger that existed in January 2018 before PPD did
 5   anything to deny her accommodations, right?
 6   A.  Well, this -- this note occurs in January of 2018, I
 7   believe.
 8   Q.  Correct.
 9   A.  Right.  So to the extent that her disclosure of her
10   disability -- again, as you point out, her decision to do
11   that, but, you know, it could have contributed to some of
12   this.  But, again, it sounds like it's preexisting.
13   Q.  Okay.  And it certainly preexists, you know, the -- her
14   submitting her request for accommodations, and it preexists
15   her -- the rejection of her request for accommodation, right?
16   A.  Yes, and it preexists her, you know, good performance
17   evaluations that she had at PPD, as was demonstrated earlier.
18   Q.  Right.  Okay.
19              Now, just beneath that, there's a word -- or a set
20   of sentences, beginning diagnosis.  Do you see that?
21   A.  Yep.  Yep.
22   Q.  And do you understand this to be Dr. Kessimian's
23   diagnosis of Dr. Menninger at this time?
24   A.  Yes.
25   Q.  All right.  So at this point, there's no diagnosis of
```

1  major depressive disorder, right?

2  **A.**  That's correct.

3  **Q.**  And that -- you agree with that?  There's -- she didn't

4  have a major depressive disorder at this point?

5  **A.**  She didn't appear to be at that point, no.

6  **Q.**  Okay.  Did you say she didn't appear to be?

7  **A.**  Didn't appear to be suffering from major depressive

8  disorder at that point.  Correct.

9  **Q.**  And now at the bottom of that page, there's the word

10  "plan," and then the plan appears on the next page.  Do you

11  see that?

12  **A.**  Uh-huh, yes.

13  **Q.**  Now, the first item on the plan is "start fluoxetine."

14  Sorry if I mispronounce that?

15  **A.**  No, you got it right.

16  **Q.**  Oh, good.  "5 milligrams for one week and increase to

17  10 milligrams daily if no side effects."

18  **A.**  Uh-huh.

19  **Q.**  What is the brand name of fluoxetine?

20  **A.**  It was historically known as Prozac.  It's now no

21  longer -- I mean, there is still branded Prozac, but it's

22  been generic for quite some time.

23  **Q.**  Okay.  And is Prozac or fluoxetine, is that prescribed

24  for social anxiety disorder?

25  **A.**  It's prescribed for a wide range of both anxiety

1    disorders and major depression.

2    **Q.**  All right.  But it's appropriately prescribed for anxiety

3    disorders?

4    **A.**  Yes, it is.

5    **Q.**  Okay.  All right.  Turning to the next treatment note,

6    this is for February 2, 2018.  Do you see that?

7    **A.**  Yes.

8    **Q.**  And you reviewed this in connection with forming your

9    opinion in this case?

10   **A.**  And, by the way, can I just add one other thing about the

11   fluoxetine?

12   **Q.**  Sure.

13   **A.**  So the fact that Dr. Kessimian -- whose notes, I think,

14   were spectacular -- started her at 5 milligrams a day is a

15   little unusual.  And it's likely that she -- again, most

16   people who start on this -- people take 20 million grams a

17   day.  People often start at 10 milligrams a day, unless

18   they're much older, geriatric persons or persons that are on

19   other medications that will cross-react.

20          Theirs is one exception where people tend to start

21   very low, and that's when people have anxiety disorders.  So

22   it leads me to think -- I don't know this for a fact, but my

23   inference is, my medical opinion would be, it would be likely

24   that she started that at a low dose that way along with the

25   Valium because she was concerned she was treating an anxiety

1    disorder, and there's a tendency for anxiety disorders to

2    require starting with very low doses.

3    **Q.**   Okay.  So the fact that it was a low dose contributes to

4    your belief that this was for -- prescribed for anxiety

5    disorders?

6    **A.**   Yes.

7    **Q.**   Okay.  All right.  So turning back to the February 2nd

8    note, the chief complaint there, Dr. Kessimian recorded, "I

9    am just worried all the time.  I wake up with my heart

10   already beating fast thinking about how I have to see the

11   people that I work with at the end of the month after handing

12   in those letters to HR."

13            Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   And then it says, "history of present illness, since last

16   visit continues to isolate at home and hardly leave her

17   family," right?

18   **A.**   Right.

19   **Q.**   So, again, these are things that are a part of her mental

20   health conditions in early February of 2018?

21   **A.**   Yes.

22   **Q.**   At this point, all that's happened is she's disclosed her

23   disability to people at work, but they have not rejected her

24   requests for accommodations yet?

25   **A.**   Well, for somebody with social anxiety, all that -- all

1    that she's done is disclosing her anxiety; that's a very big

2    deal.

3    **Q.**   Right.  Yeah, I'm sorry.  I didn't mean to minimize it.

4    My point was just that PPD hasn't done anything to her at

5    this point, correct?

6    **A.**   Not that I'm aware of.

7    **Q.**   Okay.  And based on your review of the documents that you

8    were provided, there was nothing that you saw in those

9    documents indicating that they had --

10   **A.**   Well, I'd have to go back and look at them specifically,

11   but you know, again, I don't recall something from that

12   period of time.

13   **Q.**   Okay.  All right.  Two paragraphs down from that, there's

14   a paragraph that begins "spoke at length."  Do you see that?

15   **A.**   Yes.

16   **Q.**   "Spoke at length about her experience in the work

17   environment where she feels that, because she's more

18   introverted and analytical, she's being criticized for things

19   that are unchangeable.  Has difficulty advocating for herself

20   and is already resigned to defeat in the corporate culture."

21        Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   So here she's talking about feeling that she's being

24   criticized for things that are unchangeable.  Do you see

25   that?

1    **A.**  Yes.

2    **Q.**  And she seems to be attributing that, not to

3    discrimination or retaliation or to rejection of her request

4    for accomodation, but to the fact that she's introverted and

5    analytical, right?

6    **A.**  Well, that's the way Dr. Kessimian phrased it in her

7    note.  I don't know directly what -- what exactly was

8    prompting those feelings.

9    **Q.**  Okay.  Well, they couldn't have been prompted by denial

10   of her accommodations, right?

11   **A.**  Or they could have been prompted by something else that

12   she either felt or was worried was changing in her

13   interactions with her colleagues or superiors.

14   **Q.**  My question was a little different.  It was they couldn't

15   have been -- these feelings couldn't have been prompted by

16   her -- denial of her accommodations, correct?

17   **A.**  No.  They were -- to the best of my knowledge, they were

18   not denied at that point.

19   **Q.**  And have you seen any documents or other evidence to

20   indicate that she was being subjected to any sort of

21   maltreatment by her superiors or co-workers at this point?

22   **A.**  Again, not that I recall.

23   **Q.**  Okay.  All right.  So flipping to the next page, at the

24   bottom, do you see under "diagnosis" there?

25   **A.**  Yes.

**Q.**  And so Dr. Kessimian didn't diagnose her with major
depressive disorder on February 2nd, correct?

**A.**  Correct.

**Q.**  Okay.  All right.  So this is the next note from
Dr. Kessimian on February 16, 2018.  Do you see that?

**A.**  Yes.

**Q.**  And under the history of her present illness, it says,
"Since last visit continues to isolate at home and hardly
leave her family."

Do you see that?

**A.**  Yes, I do.

**Q.**  So that's the same as the last two visits, right?

**A.**  No, I don't think so, actually.

**Q.**  Okay.  How is it different from what --

**A.**  So I think if you looked both at the chief complaint and
at the end of that paragraph, there are two pieces of
information that are quite important.  And --

**Q.**  My question is a little different and --

**A.**  Okay.

**Q.**  -- Mr. Hannon will have a chance to ask you questions
about that kind of stuff.  And you can certainly talk in
response to that.  But I -- you know, in order just to
preserve my time --

**A.**  Understood.

**Q.**  -- I would like you to focus on my question, which is,

1    under the "history of present illness," it says, "Since last

2    visit continues to isolate at home and hardly leave her

3    family."  That's the same as what she said at the last two

4    visits, correct?

5    **A.**  Yes.  That's not changed.

6    **Q.**  Okay.  And on the next page, under "diagnosis," the first

7    two are panic disorder with agoraphobia.  What is

8    agoraphobia, by the way?

9    **A.**  So agoraphobia is, the agora is -- I think it's a Greek

10   work that means "marketplace," and it literally means fear of

11   the marketplace, but it generally means fear of going out.

12   And it's either a fear of -- generally a fear of leaving the

13   house.

14   **Q.**  Okay.  And then "social anxiety disorder," and it goes on

15   to the next page, at the top, "generalized anxiety disorder."

16   Do you see that?

17   **A.**  Yep.

18   **Q.**  So still no major depressive disorder, right?

19   **A.**  Yep.

20   **Q.**  Now, this is the note from March 9th.  Again, under

21   "history of present illness:  She still continues to isolate

22   at home and hardly leave her family."

23             That's the same, right?

24   **A.**  Correct.

25   **Q.**  Oh.  Okay.  Sorry, I didn't hear what you said?

**A.**   Sorry.  I didn't -- I wasn't quite sure if there was a question there.

**Q.**   Oh, yeah.  There was.

And then the next sentence reads, "Did attend a business meeting in Cincinnati where she met with both Chad, HR representative, and her boss Hacene to discuss accommodations.  She was disappointed when they mentioned an exit package/consulting position as she likes her job and knows that she can do her job.  She was able to assert herself and is now in a waiting period."

So Dr. Kessimian doesn't say she was devastated or felt rejected by what happened at that meeting, right?  She says she was disappointed, at least according to these notes by --

**A.**   Well, according to these notes, and I think that's the critical --

**Q.**   Yeah, and Dr. Kessimian was there with her and speaking with her, right?

**A.**   Yes.

**Q.**   Do you have any reason to think that she wasn't accurately recording her impressions of what Dr. --

**A.**   I think, you know, these are not -- most medical notes are not veridical records.  They are not transcripts in the same way that might exist here.

**Q.**   Understood, but when -- you make medical notes like this?

1    **A.**  I hope I make good medical notes like this.  Yes.

2    **Q.**  You make an effort to make them accurately reflect --

3    **A.**  I do.

4    **Q.**  -- what you were told?

5    **A.**  I do.

6    **Q.**  So you wouldn't use a word like "disappointed," if what

7    your actual impression was devastated or broken or --

8    **A.**  Fair enough.

9    **Q.**  Okay.  And it goes on to say, "She was able to assert

10   herself and is now in a waiting period."

11           So it looks like, at least according to these

12   notes, again, Dr. Menninger took some positives from the

13   meeting in that she was able to assert herself, correct?

14   **A.**  That's what it sounds like.

15   **Q.**  Okay.  A little bit down, down about two-thirds of the

16   way down the page, there's a paragraph that begins, "Also

17   worries."  Do you see that?

18   **A.**  Uh-huh.

19   **Q.**  She, "Also worries about her social anxiety disorder

20   might be impacting her daughter, Maya.  About two years" --

21   "about two years stopped saying 'I love you' to her parents.

22   Not sure what this is about, but it is bothersome to her."

23           Do you see that?

24   **A.**  Uh-huh.

25   **Q.**  Did you consider whether this issue with Maya could have

1    caused or contributed to Dr. Menninger's mental health

2    conditions?

3    **A.**  I think her situation with her family was very important

4    to her.  I don't see that as being discontinuous from what

5    she had been experiencing previously over the last period of

6    time with her daughter or with her husband.

7    **Q.**  Okay.  And my question was a little different, though.

8    It is:  Did you consider it as part of what could have caused

9    her mental health conditions?

10   **A.**  You know, it wasn't the primary focus of what we

11   discussed.  I certainly was aware that they had moved because

12   of concerns about her daughter.  I recalled that after

13   reviewing some additional records.

14   **Q.**  Okay.  So you discussed her daughter, her relationship

15   with her daughter, when you met with her and --

16   **A.**  We really didn't -- we focused primarily on her

17   historical symptoms and what was going on at work and what

18   happened at work and what she did at work and the -- the

19   history of her major psychiatric conditions.

20   **Q.**  You had reviewed these notes before you met with

21   Dr. Menninger?

22   **A.**  I don't -- I can't say that with absolute certainty.  I

23   think so.  I would believe I did.

24   **Q.**  In any cases, you didn't ask her about this note?

25   **A.**  I don't recall asking her about that.  I didn't recall

1   asking her about her -- her daughter in this particular note,

2   no.

3   Q.   Do you recall asking her about her daughter at all?

4   A.   Just only to the extent that I know that she had a

5   daughter, and I listed -- I went through family history, and

6   I know that she had moved because of concerns about school.

7   Q.   So you didn't consider whether the issues with her -- any

8   issues with her daughter might have contributed to her mental

9   health conditions?

10  A.   I was trying to understand primarily where she fit

11  diagnostically.

12  Q.   So is the answer no?

13  A.   I didn't ask her about her daughter in that sense, no.

14  Q.   Okay.  All right.  So this is page 3 from those notes on

15  March 9, 2018.  So as of this date, Dr. Kessimian still has

16  not diagnosed Dr. Menninger with major depressive disorder,

17  right?

18  A.   Yes.

19  Q.   Flipping to the next note from March 16, under "History

20  of Present Illness," "Since her last visit, continues to

21  isolate at home and hardly leaves her family."

22          So that's unchanged.  She's still doing that since

23  January, right?

24  A.   Uh-huh.

25  Q.   "Has not been able to walk around her neighborhood, and

1    this was the goal for the last week, secondary to her social

2    anxiety symptoms and fears that, at this point, it has been

3    such a long time that her neighbors have seen her that they

4    will seek her out and ask questions."

5         Have I read that correctly?

6    **A.**   Yes.

7    **Q.**   Did you ask for how long it had been since her neighbors

8    had seen her?

9    **A.**   I did not.

10   **Q.**   Okay.  And do you know?

11   **A.**   I don't.

12   **Q.**   And we saw that in the notes for January 22nd that, as of

13   that date, Dr. Menninger hadn't left her home in weeks,

14   right?

15   **A.**   Yes, I did see that.

16   **Q.**   So is fair to assume that this isolation from her

17   neighbors predates her first visit with Dr. Kessimian?

18   **A.**   I think it's not unreasonable to assume that.

19   **Q.**   And, again, that was before her accommodations were

20   denied, correct?

21   **A.**   That's correct.

22   **Q.**   And flipping to page 3 again, under "diagnosis," there's

23   still no diagnosis of major depressive disorder, right?

24   **A.**   Correct.

25   **Q.**   This is the note from March 23, 2018.

1    **A.**   Yep.

2    **Q.**   "History of present illness:  Since last visit continues

3    to isolate at home and hardly leave her family."  That's

4    again no change, right?  Same change as January 2018?

5    **A.**   Yes.

6    **Q.**   Skipping down a bit, "Continues to have intrusive

7    thoughts about what her neighbors might be thinking of her,

8    preventing her from going outdoors, including that it's been

9    such a long time since she has been outside that they are

10   thinking about what is wrong with her."

11           So she continues to be unable to encounter her

12   neighbors, right?

13   **A.**   Yes.

14   **Q.**   And she confirms that's been going on for a long time,

15   correct?

16   **A.**   Yes.

17   **Q.**   And under diagnosis, again, she -- this time, she adds a

18   diagnosis of sleep disturbance.  Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   Okay.  But there's still no diagnosis of major depressive

21   disorder?

22   **A.**   No, although sleep disturbance can be an important

23   symptom of major depression.  There are other things that can

24   give you sleep disorder, as well.

25   **Q.**   What other things can give you sleep disorder?  Can --

1   **A.**   Being on -- being on a medication like fluoxetine can

2   give you a sleep disorder.

3   **Q.**   Can anxiety give you sleep disorder?

4   **A.**   Generally not the same way, no.

5   **Q.**   All right.  Skipping to the next note, March 30th.  She's

6   continuing to isolate at home and hardly leave her family,

7   correct?

8   **A.**   Yes.

9   **Q.**   And then after the blackouts there, it says, "Though, is

10  sad/frustrated that since coming out with her social anxiety

11  disorder, she's felt worse than she has ever -- than she has

12  ever had before, and now has doubts about her decision."

13           So it looks like she's attributing her feelings

14  to -- it doesn't look like she's attributing these feelings

15  to any -- what anything -- anything that -- any one at

16  work -- let me ask a different question, strike that.  It

17  doesn't look like she's attributing these feelings to

18  anything that anyone at work has done in response to her

19  disclosing her disorder, right?

20  **A.**   Well, based upon my review of the records and based on my

21  discussions with her, I think she felt that she was not

22  getting clear answers to a variety of issues that were of

23  concern to her, including the nature of her job description

24  or the accommodations that might or might not be forthcoming.

25  And I think that that caused her both to begin to feel worse,

1    but also begin to be self-critical about her decision to

2    reveal her illness.

3    **Q.**  Okay.  That's not what's reflected in these notes from

4    Dr. Kessimian, though, right?  Who saw her in --

5    **A.**  These notes don't discuss that.

6    **Q.**  Right.  They don't say anything about, you know,

7    frustration with not getting answers to --

8    **A.**  Yeah, it says work stressors remain and she's been

9    recently navigating some difficult client interactions, but

10   doesn't go into greater detail than that.

11   **Q.**  Did you consider the fact that -- or the possibility that

12   her worsening mental condition was due to the fact that she

13   felt self-conscious about having to disclose to others what

14   she -- that she had a mental health condition?

15   **A.**  I think that that is part of what -- what happened for

16   her.

17   **Q.**  Okay.  So that's part of what caused her worsening health

18   condition?

19   **A.**  Well, I think it was -- it was disclosing and then the

20   experience that she had of not being particularly -- she

21   didn't feel that people were being forthcoming with her about

22   the things that she had raised, and I think it -- it

23   intensified her feeling of doubt and self- --

24   self-recrimination.

25   **Q.**  Okay.  Under "Diagnosis" -- I flipped to two pages ahead.

1    Again, there's no diagnosis of major depressive disorder here

2    on March 30th?

3    **A.**   Correct.

4    **Q.**   This is the note for April 6th, "History of Present

5    Illness.  Since last visit, continues to isolate at home and

6    hardly leave her family."

7             Again, that's unchanged, correct?

8    **A.**   Yes.  But above that, it says, "I don't know how much

9    more I can handle without needing to go to the hospital,"

10   under her chief complaint.

11   **Q.**   Right.

12            And under -- a couple paragraphs down, under "Work

13   Stress," it says, "Work stressors remain, and she is recently

14   navigating some difficult client interactions."

15            You just pointed that out in the last note, right?

16   **A.**   Yeah.  And that seems to be continuing.

17   **Q.**   So it looks like she's talking about some difficult

18   client interactions, at least in part, right?

19   **A.**   It looks like that.

20   **Q.**   Yeah.  Did you ask her about those client interactions

21   when you spoke with her?

22   **A.**   We mainly diagnosed, again, from a diagnostic standpoint

23   and how her interactions with work were going.

24   **Q.**   Did you consider whether these difficult client

25   interactions may have caused her worsening mental health

1   condition?

2   **A.**   It -- I think that they all fall within the broad work

3   domain.

4   **Q.**   "The broad work domain."  So they're part of the broad

5   work domain that you think caused her worsening health

6   conditions?

7   **A.**   No.  I think that they're part of what she experienced in

8   a job which had a lot of responsibility and had challenges

9   associated with it.  I don't think it was the primary thing

10  that was driving her mood or -- or sense of well-being.

11  **Q.**   Why is that?

12  **A.**   Because she was -- she was worried about what the nature

13  of her job was going to be.  She was worried about how she

14  would be able to manage, given her disability and uncertain

15  set of changes that were not fully defined for her.  And she

16  was --

17  **Q.**   She was also worried about her difficult client

18  interactions, right?  Because that's what she told

19  Dr. Kessimian.

20  **A.**   You know, I can't speak to that beyond what's here in the

21  note.

22  **Q.**   Well, we know that she told Dr. Kessimian that, right?

23  **A.**   Yeah.  Understood.

24  **Q.**   And you didn't ask her about that, correct, when you

25  spoke with her?

1    **A.**   No.  We focused on other things.

2    **Q.**   So this is the last page of that note for April 6th, and

3    do you see the diagnosis there?

4    **A.**   Yeah.

5    **Q.**   And, again, there's no diagnosis of major depressive

6    disorder in April?

7    **A.**   That's correct.

8    **Q.**   This is the note for April 13th, first of two.  We'll get

9    to the second one in a minute.  Under "History of Present

10   Illness," the same, isolating at home, and she's saying she

11   uses this appointment to motivate her to leave the house.

12   This is basically unchanged since January of 2020 -- or 2018,

13   right?

14   **A.**   I'm sorry, say that again.

15   **Q.**   This is basically the same, unchanged since January of

16   2018?

17   **A.**   It's slightly different language there, but it's not

18   substantively changed.

19   **Q.**   Okay.  And the diagnosis on the last page of the notes,

20   again, no diagnosis of major depressive disorder, right?

21   **A.**   Correct.

22   **Q.**   All right.  So this is the second note.  You were here

23   when Dr. Kessimian was testifying this morning, correct?

24   **A.**   Yes.

25   **Q.**   And she testified that this was not April 13th, it was

1    some other date in April, right?

2    **A.**  Yes, I heard that.

3    **Q.**  All right.  Under "Chief Complaint," Dr. Kessimian

4    records, "I have found a sense of empowerment in advocating

5    for myself and my strengths, and I am proud that my daughter

6    is a witness to this."

7         Do you see that?

8    **A.**  Yes, I do.

9    **Q.**  So according to what she told Dr. Kessimian at this

10   point, this is April 6th -- or April -- some time in

11   April 2018, she's feeling a sense of empowerment and pride,

12   right?

13   **A.**  I'm sorry?  Say that again.

14   **Q.**  So as of sometime in April, whenever these notes were --

15   **A.**  Right.

16   **Q.**  -- she's feeling a sense of empowerment and pride,

17   correct?

18   **A.**  Yeah.  I think it's wonderful.

19   **Q.**  And you would agree that those are positive feelings?

20   **A.**  Yes.

21   **Q.**  And these aren't feelings she reported having back in

22   January 2018, correct?

23   **A.**  Not to Dr. Kessimian, no.

24   **Q.**  Okay.  Did she tell you she had them --

25   **A.**  No, she didn't.

1    **Q.**  Okay.  But she's continuing to isolate at home.  No
2    change in that since January of 2018, correct?
3    **A.**  Yes.
4    **Q.**  A couple of paragraphs down, "work stressors remain and
5    she's recently navigating some difficult client interactions
6    and boss interactions and has been complimented, but has also
7    had to take Valium."
8              Do you see that?
9    **A.**  Yes, I do.
10   **Q.**  When you met with Dr. Menninger did you ask her about her
11   having been complimented at this point?
12   **A.**  I don't think we discussed that, per se.
13   **Q.**  Okay.  A few paragraphs down, under "moot," it says,
14   "Mostly externally dictated.  Family life feels satisfied and
15   also slight glimmer and feeling more empowered at work."
16              Do you see that?
17   **A.**  Uh-huh, yes, I do.
18   **Q.**  And the next paragraph, "She reports two to three overt
19   panic attacks triggered by work, but none that were out of
20   the blue, which is an overall subtle improvement from her
21   initial evaluation."
22              Do you see that?
23   **A.**  Yes, I do.
24   **Q.**  So there's been some improvement, a subtle improvement,
25   but improvement with respect to her panic attacks since

1    January of 2018?

2    **A.**   Yeah, and there's a mention in earlier notes from

3    Dr. Kessimian about subtle improvement that she attributes

4    potentially to the fluoxetine.

5    **Q.**   Okay.  Do you recall where that was?

6    **A.**   Oh, it's several notes back.  It's several times, over

7    several notes.

8    **Q.**   Okay.  But here anywhere she didn't attribute it to the

9    fluoxetine?

10   **A.**   No, not here.

11   **Q.**   And here's the diagnosis again.  No diagnosis of major

12   depressive disorder?

13   **A.**   None.

14   **Q.**   All right.  So we're now about halfway through April 2018

15   and Dr. Kessimian has not diagnosed Dr. Menninger with major

16   depressive disorder, correct?

17   **A.**   She has not.

18   **Q.**   And Dr. Kessimian continued treating Dr. Menninger

19   through most of the rest of 2018; is that right?

20   **A.**   Yes, that's my understanding.

21   **Q.**   And you reviewed Dr. Kessimian's treatment notes for that

22   period?

23   **A.**   Yes, I did.

24   **Q.**   Do you know how many times approximately she treated

25   Dr. Menninger in --

1    **A.**  I would have to go back and add them up.

2    **Q.**  Okay.  More than 20?

3    **A.**  No, I don't know exactly.  It's -- I don't want -- I

4    don't want to guess at a number.

5    **Q.**  Okay.  Well, you were here this morning when, I think,

6    Dr. Kessimian testified that she was seeing Dr. Menninger

7    more or less weekly?

8    **A.**  At some point, it became weekly.  I don't think it was

9    weekly in the very beginning.

10   **Q.**  Okay.  Now, we're not going to go through all these

11   notes, I'm sure you'll be disappointed to hear, but would you

12   agree with me based on your review of all the notes that

13   Dr. Kessimian did not include major depressive disorder as a

14   diagnosis of Dr. Menninger in any of the other notes that she

15   took?

16   **A.**  I would have to look forward.  Clearly, there was concern

17   about worsening suicidality, you know, in the -- in the early

18   June period.  I don't recall.  I'd have to look to see in

19   that note whether or not she diagnosed her with any other

20   condition at that point.

21   **Q.**  Okay.  Well, I don't want to go through all the notes,

22   but is it fair to say that you -- you don't recall seeing a

23   diagnosis of major depressive disorder?

24   **A.**  I would have to look back at the notes specifically.

25   **Q.**  Okay.  Well, then here's the note for April 27, 2018.

1     Under "Chief Complaint," she says, "I'm only sleeping for

2     three hours per night, and now I'm waking up with panic

3     attacks from sleep.  Things just keep getting worse, and

4     sometimes, if it wasn't for Maya and Mason, I would just want

5     this all to end.  I don't want you to worry about me.  I know

6     I won't end my life, but this suffering at times is

7     unbearable."

8                Do you see that?

9     A.  Yeah, I do.

10    Q.  She doesn't say what's causing these feelings, correct?

11    A.  You mean in her chief complaint?

12    Q.  Yes.

13    A.  No.  She just describes what she's experiencing.

14    Q.  Okay.  Do you see anywhere else in this note where she

15    says --

16    A.  I would have to read through the whole note.

17    Q.  Can you take a quick scan through it and see if you see

18    anything?

19    A.  See where it says, "Glimmer of therapeutic efficacy," in

20    the third paragraph from the bottom, where she's talking

21    about fluoxetine.  That's a period in her earlier notes.

22    That's what I was referring to before.

23                Mood, six out of ten -- so, you know, again,

24    that -- I believe that's not terribly dissimilar to what she

25    described before.  The sleep disturbance certainly sounds

1  worse.

2  **Q.**  Okay.  I just flipped to page 2.

3  **A.**  Uh-huh.

4  **Q.**  Do you see anything on there that indicates that the

5  conditions she described in the first paragraph were caused

6  by anything in particular?

7  **A.**  Some passive suicidal ideation under "safety."

8  **Q.**  Right.  Well, my question was, do you see anything there

9  that indicates what caused these conditions?

10  **A.**  Nothing that caused them --

11  **Q.**  Okay.

12  **A.**  -- by cause -- or attribution of causation.

13  **Q.**  Okay.  You mentioned passive suicidal ideation.  What is

14  passive suicidal ideation?

15  **A.**  So suicidal ideation is a broad schema for psychiatrists.

16  It covers lots of different things.

17       Sometimes, people will describe the feeling that

18  they just don't want to be around anymore, but they wouldn't

19  do anything to actually end their lives; that, you know, if

20  God came and claimed them at night and they didn't wake up,

21  that would be all right with them.  That's what we call

22  passive suicide.  So it's a wish to die or a wish to be dead,

23  but not a wish to act on something.

24  **Q.**  Okay.  So that's passive suicidal ideation?

25  **A.**  That's correct.

1    **Q.**   Is there a nonpassive suicidal ideation?

2    **A.**   Yes.

3    **Q.**   What's that?

4    **A.**   Active suicidal ideation.  There is active suicidal

5    ideation in the setting of a formal intent or plan.  There's

6    command hallucinations to kill oneself.  There's all sorts of

7    different things.

8    **Q.**   So she denies an intent or plan, according to --

9    **A.**   That would be my inference from Dr. Kessimian's note.

10   **Q.**   And she says it, right?

11   **A.**   I'm sorry?

12   **Q.**   She says it in the second line, under "safety," "denies

13   intent" --

14   **A.**   Yeah, denies intent or plan.  That's correct.

15   **Q.**   Okay.  So this is the next page.  Diagnosis, again, no

16   major depressive disorder?

17   **A.**   Yep.

18   **Q.**   Here's the note from May 18, 2018.  You look down at the

19   bottom, under "safety, suicidal ideation has resolved."

20              Do you see that?

21   **A.**   Yeah, I saw that.

22   **Q.**   So whatever suicidal ideation she had reported in the

23   last note, that's been resolved now?

24   **A.**   Yes.

25   **Q.**   And this is the next month?

1    **A.**  Uh-huh.

2    **Q.**  All right.  And here, under "Diagnosis," again, no major

3    depressive disorder yet?

4    **A.**  No.

5    **Q.**  Okay.  All right.  So this is the note from May 25, 2018.

6    "Chief Complaint.  The internal investigation found no

7    evidence of discrimination."

8              Do you see that?

9    **A.**  Yes, I do.

10   **Q.**  Do you know what that refers to?

11   **A.**  Yes, I do.

12   **Q.**  What is that?

13   **A.**  That she -- there was an internal investigation that I

14   believe I was here for some of the testimony of your HR

15   director that reviewed this and didn't find evidence of

16   discrimination.

17   **Q.**  Okay.  And under "History of Present Illness," it says,

18   "Since last visit, continues to isolate at home and again

19   uses this appointment to motivate her to leave the house."

20              And that's similar to what we've seen --

21   **A.**  Yes.

22   **Q.**  -- in January, right?

23   **A.**  Yep.

24   **Q.**  A couple of sentences down in that paragraph, "She has

25   also decided to finally take some leave in the beginning of

1    June to see her friends at the ultra walk."

2              Do you see that?

3    **A.**  Which paragraph is that?

4    **Q.**  So it's the History of Present Illness paragraph.  It's

5    just the last sentence in that paragraph, right after the

6    blacked out --

7    **A.**  Yes, I see that.

8    **Q.**  So are you aware that she went out on medical leave in

9    early June 2018?

10   **A.**  Yes, I am.

11   **Q.**  So it looks like she was already planning to take some

12   leave, according to this note, correct?

13   **A.**  That's what it look like.

14   **Q.**  Okay.  Do you know whether she, in fact, did the ultra

15   walk in early June?

16   **A.**  I don't know.

17   **Q.**  Did you ask her?

18   **A.**  I don't recall.  I know she went into a partial

19   hospitalization program in early June.

20   **Q.**  She went into a partial hospitalization program in early

21   June?

22   **A.**  Yeah.  At Butler Hospital.

23   **Q.**  So that was early June?

24   **A.**  I believe so, correct.

25   **Q.**  And so she couldn't have probably done the ultra walk if

1    she was in the hospital, right?

2    **A.**   Don't know.

3    **Q.**   All right.  A couple paragraphs down, it says, "Work

4    stressors remain but with a resolution in sight."

5           Do you see that?

6    **A.**   Yes.

7    **Q.**   So this was after the internal investigation came back

8    and found no --

9    **A.**   Yes.

10   **Q.**   Okay.  A little down, "Mood, six out of ten, mostly

11   externally dictated.  Family life feels satisfied, but work

12   life remains stressful and a sense that she cannot trust

13   anyone and they are scanning her for fault at all times and

14   there's little appreciation of effort to understand what her

15   role is in the company, though being able to assert herself

16   has in some ways been helpful."

17          Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   Okay.  So, again, you know, she's asserting herself and

20   that's -- she's finding that helpful?

21   **A.**   Yes, and also notes that there's little appreciation of

22   or effort to understand what her role is in the company,

23   which has been stressful for her.

24   **Q.**   Right.  But she is continuing to work at it and assert

25   herself, it looks like --

1    **A.**   Uh-huh.

2    **Q.**   -- right?

3             All right.  Under -- in the last paragraph on that

4    page, after the blackout, there's a sentence that reads, "At

5    this time, discussed honestly that she has not utilized

6    higher levels of care of gold standard treatment, including

7    exposure, which is usually considered before disability is

8    granted."

9             Do you see that?

10   **A.**   Yes, I do.

11   **Q.**   What is "exposure"?

12   **A.**   So I think, if you remember Dr. Kessimian's testimony,

13   she was talking about how it -- if you have -- you have

14   something that causes you anxiety -- let's say it's -- it's

15   being outdoors or it's being in the presence of snakes or

16   something like that, or it might be, you know, other --

17   whatever the thing is.

18            What people do is they gently try to increase the

19   amount of time that people can spend in the presence of

20   what's called the phobic stimulus and teach people CBT,

21   relaxation, and other -- it's called "exposure."  Sometimes

22   with those -- obsessive compulsive disorder, it's called

23   "exposure and response prevention."  But it's a graduated

24   attempt to decondition whatever the things is that's a

25   particularly strong stimulus.

1   **Q.**   Is group therapy a form of exposure?

2   **A.**   No.  I mean, it could be for somebody with social

3   anxiety.  It's not generally used that way, no.

4   **Q.**   Okay.  But for someone with social anxiety, which is what

5   Dr. Menninger had, it could be, correct?

6   **A.**   It might be.  Again, I have not seen it used that way,

7   so --

8   **Q.**   Okay.  Do you know whether Dr. Menninger had done group

9   therapy at this point?

10   **A.**   I don't know.

11   **Q.**   Do you know whether she ever did?

12   **A.**   I believe she was in group programs when she was at

13   Butler.

14   **Q.**   Has she done it since she left Butler?

15   **A.**   I don't know.  I've not seen it in any of the records.

16   **Q.**   Do you know whether it helped her at Butler?

17   **A.**   You know, again, hard to know exactly what helped at

18   Butler.  She certainly had some benefit from being in a

19   structured environment, which is typically what happens for

20   most people when they're -- when they're pretty suicidal

21   or --

22   **Q.**   Did you review the Butler health records?

23   **A.**   Yes, I did.

24   **Q.**   And so you don't recall, though, whether it said that the

25   groom therapy was helpful to her?

1    **A.**   Not per se.  I don't think it was broken out way.

2    **Q.**   Okay.  So on the next page, under "safety," it says

3    "denies suicidal ideation"?

4    **A.**   Uh-huh, yep.

5    **Q.**   Do you see that?  So no suicidal ideation on May 25,

6    2018?

7    **A.**   Yep.

8    **Q.**   Again, this is after --

9    **A.**   Yep.

10   **Q.**   -- the internal investigation came back negative, right?

11           And, again, under "diagnosis," no -- still no

12   diagnosis of major depressive disorder --

13   **A.**   Yeah.

14   **Q.**   -- correct?

15           So this is the note for June 1, 2018.  Do you see

16   that?

17   **A.**   Yep.

18   **Q.**   So it seems like her mental health condition has declined

19   pretty drastically since May 25th.

20   **A.**   Yes.

21   **Q.**   She didn't have any suicidal ideation on May 25th?  We

22   just saw that, right?

23   **A.**   Yes.

24   **Q.**   And now she's got passive suicidal ideation --

25   **A.**   Yep.

1    **Q.**   -- no intents or plan.

2          And she was feeling good about asserting herself on

3    May 25th.  We just saw that, right?

4    **A.**   Yes.

5    **Q.**   So do you know what, if anything, happened between

6    May 25th and June 1st that caused this?

7    **A.**   You know, I don't recall exactly.  I mean, I -- I

8    wouldn't want to guess.  You know, there are so many records

9    I've reviewed, but I would -- I think that there was some

10   further discussion about an exit plan, but I don't -- I'd

11   have to go back and look at the records specifically.

12   **Q.**   You think there was a discussion and exit plan after

13   May --

14   **A.**   I don't recall exactly, so I'm not going to guess.

15   **Q.**   Okay.

16   **A.**   I don't -- I can't, as I'm sitting here, without

17   reviewing the records, tell you exactly what happened in that

18   period.  But she clearly got worse at that period.

19   **Q.**   Okay.  Anything else that happened after May 25th and

20   before June 1st?

21   **A.**   Not that I'm aware of.

22   **Q.**   Okay.  And have you seen anything to indicate that PPD

23   threatened to fire her or take any other action against her

24   during that period?

25   **A.**   I'd have to look back at the records.  Not that I recall.

1   **Q.**  Okay.  All right.  So she's in pretty bad shape on

2   June 1st, but the diagnosis still -- there's no diagnosis of

3   major depressive disorder by Dr. Kessimian, correct?

4   **A.**  Yeah.

5   **Q.**  June 8th, she's on medical leave at this point, right?

6   **A.**  Right.

7   **Q.**  And if you look under "history of present illness," the

8   last phrase there says, "Suicidal ideation has resolved."  Do

9   you see that?

10  **A.**  Yep.

11  **Q.**  It says she's eating okay?

12  **A.**  Uh-huh.

13  **Q.**  Do you see that?

14  **A.**  Yep.

15  **Q.**  Okay.  And then down below, under "safety," again, it

16  says "Denies suicidal ideation, no intents or plan"?

17  **A.**  Right.  But it also says, higher up, "Continues to find

18  it hard to feel hope.  Feels apathetic, worthless, and

19  despondent."

20  **Q.**  Right.  But no suicidal ideation?

21  **A.**  Not that she reports there, no.

22  **Q.**  And she's eating okay?

23  **A.**  Yeah.

24  **Q.**  Okay.  Do you have any reason to believe that she

25  reported it to Dr. Kessimian but Dr. Kessimian didn't --

1    **A.**   No, absolutely not.

2    **Q.**   Do you have any reason to believe that she had suicidal

3    ideation --

4    **A.**   No.

5    **Q.**   -- but didn't report it?

6    **A.**   No.  I trust Dr. Kessimian's notes.

7    **Q.**   And, again, under "diagnosis," no diagnosis of major

8    depressive disorder?

9    **A.**   Yep.

10   **Q.**   So I think you testified before that you thought that, in

11   early June of 2018, she went to Butler Hospital?

12   **A.**   Yes.

13   **Q.**   All right.  So this is the note for June 29th.  Under

14   "history of past illness," it says, "Since last visit, is on

15   medical leave.  Plans to start the partial program on

16   Monday."

17   **A.**   Late June.  Yeah.

18   **Q.**   Okay.  So it was late June, not early June?

19   **A.**   Yeah.

20   **Q.**   All right.  It says, "She is sleeping slightly better but

21   still anxious."  But she's sleeping better, right --

22   **A.**   Yep.

23   **Q.**   -- according to this note?  She's also eating okay.  Do

24   you see that?

25   **A.**   Yep.

1     **Q.**   "Suicidal ideation has returned, denies intent or plans."

2     So suicidal ideation is back now.  Do you see that?

3     **A.**   I see that under "safety" where it says "denies suicidal

4     ideation."

5     **Q.**   Right.  So it seems unclear here whether she has suicidal

6     ideation or not, right?

7     **A.**   Point to me the -- yes, suicidal ideation -- so it sounds

8     like there's a conflict between the first -- the history of

9     the present illness and the safety --

10     **Q.**   Right.

11     **A.**   Right.

12     **Q.**   So it's, at best, unclear whether she had suicidal --

13     **A.**   -- yeah.

14     **Q.**   -- ideation at this point?

15         And, again, under "diagnosis," the bottom of this

16     page and over on to the next page, nothing about major

17     depressive disorder?

18     **A.**   Mmm.

19     **Q.**   All right.  So this is a note for July 13, 2018.  "Since

20     last visit, completed the partial program at Butler.  She had

21     severe panic symptoms and a panic attack in group when she

22     was expected to report on her weekend.  As her turn

23     approached, she became tearful, started to hyperventilate,

24     and left the group" --

25         THE COURT REPORTER:  I'm sorry; if you could read

1    that --

2         MR. CURRAN:  Sorry.

3    BY MR. CURRAN:

4    **Q.**  -- "tearful, started to hyperventilate, and left the

5    group and was helped by her therapist in the program.  She

6    was able to return to the program and found existential

7    therapy as well as group therapy challenging and rewarding."

8         Do you see that?

9    **A.**  Yes.

10   **Q.**  Okay.  So it seems like the group therapy was helpful, at

11   least according to this note, right?

12   **A.**  I'm sorry; I couldn't hear what you said.

13   **Q.**  It seems like the group therapy was helpful, at least

14   according to this note?

15   **A.**  Yeah, helpful but also stressful.

16   **Q.**  Okay.  Well, it's supposed to be stressful, right, for

17   someone with anxiety?

18   **A.**  It depends.

19   **Q.**  It depends on what?

20   **A.**  It depends on what your therapeutic goals are.

21   **Q.**  What are the therapeutic goals -- what do you think the

22   therapeutic goals were at this point?  Or what --

23   **A.**  Well, I think the first therapeutic goal is to help her

24   feel comforted, secure, that people are listening to her,

25   that they're making sure that they understand what going on

1    with her, and that they're laying out a set of interventions

2    and treatments that are helpful.

3            You don't want to necessarily acutely make somebody

4    feel worse.  That may happen over the course of therapy, but

5    one needs to approach that very gingerly.  Just like if

6    you're a surgeon, you don't want somebody mashing on a hot

7    abdomen, you know, without going -- causing pain.  If there's

8    pain, you want to come to it, but you want to come to it very

9    gently.

10   **Q.**  So you disagree with the Butler Hospital psychiatrists

11   who had her do group therapy?

12   **A.**  You know, again, I'm not -- I'm not saying I disagree or

13   agree.  It's -- I'm just saying that a priority -- having

14   somebody panic in a group is not the kind of graduated

15   approach that I would want to see toward somebody with an

16   anxiety disorder like this.

17   **Q.**  Okay.  She found it rewarded, though, correct?

18   **A.**  That's what it says.

19   **Q.**  Right.  And under "safety" down below, it says "denies

20   suicidal ideations" --

21   **A.**  Yep.

22   **Q.**  -- "no intents or plans"?

23            And at the bottom of the next page, the diagnosis,

24   up to the next page, still nothing about major depressive

25   disorder?

1    **A.**   Yep.

2    **Q.**   So we could keep going through these.  I'm not going to

3    take everybody's time doing that.  But, again, you don't --

4    as you're sitting here today, you don't recall seeing any --

5    any diagnosis by Dr. Kessimian of major depressive disorder?

6    **A.**   I don't recall at the moment, no.

7    **Q.**   Okay.  And Dr. Kessimian was the medical doctor who was

8    caring for Dr. Menninger in 2018?

9    **A.**   Yes.

10   **Q.**   And you didn't see her until a couple years later?

11   **A.**   That's correct.

12   **Q.**   All right.  Now, in 2017, Dr. Menninger was living in the

13   Cincinnati area; is that correct?

14   **A.**   That's my understanding.

15   **Q.**   And she'd been living there since 2015?

16   **A.**   That's my understanding.

17   **Q.**   All right.  And is it your understanding that, in 2017,

18   she moved to Massachusetts?

19   **A.**   Yes.

20   **Q.**   And then, within a year or two after that, she moved to

21   Albuquerque, New Mexico; is that right?

22   **A.**   That's my understanding.

23   **Q.**   And then a year or two later, she moved again to

24   Oregon --

25   **A.**   Yes.

1   **Q.**   -- is that right?

2   So in forming your opinion in this case, did you

3   consider whether or to what extent all these moves could have

4   caused or contributed to Dr. Menninger's worsening health

5   condition?

6   **A.**   I certainly didn't think that it was primary or even -- I

7   think they were more reactions to circumstances that she was

8   in rather than a causal factor.

9   **Q.**   So they were motivated by responses to things, right?

10  **A.**   Well, I think she was -- was trying to find a set of

11  circumstances that she felt more comfortable in and

12  ultimately closer to family in Oregon.

13  **Q.**   Well, the move to Massachusetts wasn't to be closer to

14  family, right?

15  **A.**   I think that was for schooling-related issues for her

16  child.

17  **Q.**   And the move to New Mexico wasn't for family, right?

18  **A.**   I don't believe there was family in New Mexico.

19  **Q.**   Okay.  And putting aside the motivation for the moves,

20  could the effect of the moves have been isolating and caused

21  her conditions to worsen?

22  **A.**   I think it's unlikely.

23  **Q.**   Why is that?

24  **A.**   These conditions are -- have to some degree -- you know,

25  she's already had many of these symptoms over a long period

1    of time in her life.  And she wasn't particularly going out

2    and doing a lot of social things to start with, either in --

3    when she was in -- when she was in Massachusetts.

4              So I don't see that as being a primary concern.  I

5    think she was very concerned about her finances and her

6    support of her family and work.  I think those things were

7    very substantial to her, and I think she was pretty worried

8    about her -- her -- keeping her family stable.

9    **Q.**  Did you ask her whether she had a social network or a

10   group of friends in Cincinnati?

11   **A.**  We didn't -- we didn't discuss that.

12   **Q.**  Did you ask her whether she had a social network or group

13   of friends in Massachusetts?

14   **A.**  No.  We, again, focused primarily on her historic

15   symptoms and the work situation.

16   **Q.**  So you don't know as you're sitting here today whether

17   she had those things --

18   **A.**  I don't have great detail on that.

19   **Q.**  All right.  So then in March 2020, of course, we have the

20   beginning of the COVID-19 pandemic, right?

21   **A.**  Yes, we did.

22   **Q.**  And that continued for a few years and, officially, I

23   guess is still going on, right?

24   **A.**  Not for long, I gather.

25   **Q.**  Yeah, we've still got a couple weeks, I guess.

1          So in forming your opinion about the causes of

2   Dr. Menninger's conditions, did you consider whether or the

3   extent to which the pandemic could have caused or contributed

4   to her conditions?

5   **A.**   You know, I think the pandemic hasn't been good for most

6   people's conditions, but I don't see that, again, as primary

7   here.  I think this has been much more focused around the

8   change in her work environment and work circumstances.

9   **Q.**   Could it have been made it worse than it otherwise would

10  have been?

11  **A.**   The COVID-19 pandemic has made very little better for

12  anybody.

13  **Q.**   And did you consider that in forming your opinion as to

14  what the cause was?

15  **A.**   Yeah.  I didn't think it was a major factor.

16  **Q.**   Okay.

17  **A.**   She was already, as you noted, isolating quite a bit,

18  so --

19  **Q.**   So your -- in your director testimony, you referred to

20  post-traumatic stress disorder, correct?

21  **A.**   Yes, that I didn't think she had a diagnosis of

22  post-traumatic stress disorder.

23  **Q.**   Okay.  But you think that she has some symptoms?

24  **A.**   Oh, yeah, she definitely has some symptoms.

25  **Q.**   All right.  But in order to make a diagnosis of PTSD, you

1  would have to experience exposure or actual -- to actual or

2  threatened death or serious injury?

3  **A.**  Yeah.  That's the category A criteria.

4  **Q.**  All right.  Now, we saw before that in Dr. Kessimian's

5  records Dr. Menninger when she was a child, she witnessed

6  domestic violence, including seeing her father hold a knife

7  to her mother's throat?

8  **A.**  (Nods head.)

9  **Q.**  Would that qualify as an exposure to actual or threatened

10  death or serious injury for purposes of --

11  **A.**  You know, it certainly is a traumatic exposure and --

12  however, the period of time between that and the onset of her

13  symptoms is of such longer duration it's hard to attribute it

14  to that.

15          Secondly, her other symptoms that she had,

16  particularly in her dreams and some of the other symptoms I

17  mentioned, are much more related to work.  So I don't think

18  that helped her well-being seeing that.  I think that that's

19  pretty stressful.  But I don't think it puts the whole -- the

20  whole picture together.

21  **Q.**  All right.  Now, you testified that Dr. Menninger is

22  currently unable to work; is that right?

23  **A.**  Yes.

24  **Q.**  And you also testified that, in your opinion, there's a

25  significant risk that Dr. Menninger may be unable to work for

1   the rest of her expected work life?

2   **A.**   That's true.

3   **Q.**   When you say she's unable to work, in what type of job is

4   she currently unable to work?

5   **A.**   I don't think that she'd be able to -- be able to work in

6   most jobs, not being able to leave the house and not being

7   able to maintain a career that she's been trained for.

8   **Q.**   So she wouldn't be able to work in most jobs, or she

9   wouldn't be able to work in the career she's trained in?

10  **A.**   Well, she certainly can't work at present in the work

11  that she's been trained to do in her career.

12  **Q.**   Can she work at all, though?

13  **A.**   I don't think that she's -- I think that the level of her

14  anxiety, preoccupation, agoraphobia, other traumatic

15  symptoms, mood disturbance, all militate against her being

16  able to work currently.

17  **Q.**   Did you consider any other jobs besides the one that

18  she's been trained for or the one that she had at PPD that

19  she might be able to perform?

20  **A.**   You know, I'm not sure it's for me to make, you know,

21  vocational choices for anybody else, so --

22  **Q.**   Well, you're opining that she can't work, so

23  presumably --

24  **A.**   Yeah, I don't think that she can work anywhere near

25  the -- she can't get anywhere near, I think, the ability --

1    the things that she was trained to do.

2    **Q.**  All right.  But in any case, you can't say with certainty

3    that Dr. Menninger definitely won't be able to work again,

4    whether --

5    **A.**  No, and I've never said that.

6    **Q.**  Okay.  So, in your opinion, it's possible she may recover

7    or that her conditions may improve in the future to the

8    point --

9    **A.**  I would hope so, but I can't say that for any degree of

10   certainty.

11   **Q.**  But it's possible?

12   **A.**  It is possible.

13            MR. CURRAN:  I don't have any further questions at

14   this time.

15            THE COURT:  All right.  Any redirect?

16            MR. HANNON:  Yes, Your Honor.

17            May I proceed?

18            THE COURT:  Yes.

19            **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

20   BY MR. HANNON:

21   **Q.**  Dr. Summergrad, you were asked a number of questions on

22   cross-examination about possible causes of Dr. Menninger's

23   deteriorating health.  Do you recall those questions?

24   **A.**  Yes, I do.

25   **Q.**  What if any significance does the content of

1    Dr. Menninger's dreams have in trying to pinpoint what it is

2    that has caused her to be in the state that she is in?

3    **A.**  Well, again, it's -- they're very transparent.  They're

4    not terribly disguised.  She's at work.  She's in a work

5    situation.  She's interacting with leadership from her work.

6    She feels that she has to hide, that she feels she's under

7    physical and other threat and that she's going to be reported

8    to, among other people, Vladimir Putin, which doesn't exactly

9    sound encouraging.

10   **Q.**  Fair to say that President Putin did not charge her --

11   cause her decreased health?

12   **A.**  Not -- I doubt it.

13   **Q.**  You were also asked about your diagnosis of major

14   depressive disorder.

15   **A.**  Yeah.

16   **Q.**  And in connection with that, I'd like to draw your

17   attention to Joint Exhibit 25.  So I'm showing you here the

18   fourth page of Joint Exhibit 25, and -- I'm not showing you

19   anything because I haven't pressed the button.

20           I'm now showing you the first -- the fourth page of

21   Joint Exhibit 25.  And if you look here at the top, these

22   appear to be records from Butler Hospital?

23   **A.**  Yep.

24   **Q.**  And you see it reflects the treatment that she received

25   there in early July of 2018?

1    **A.**  Correct.

2    **Q.**  All right.  And if we look down here at the bottom, you

3    see here now she now has a diagnosis of major depressive

4    disorder.  Do you see that?

5    **A.**  Yeah.

6    **Q.**  Okay.

7    **A.**  I agree with that.

8    **Q.**  You were asked some questions on cross-examination about

9    Dr. Menninger's suicidal ideation.  Does a person with major

10   depressive disorder have to think about killing themselves

11   every single day?

12   **A.**  No.

13   **Q.**  Is it common for a person suffering from major depressive

14   disorder with suicidal ideation for those -- for those

15   thoughts to come and go over time?

16   **A.**  Yes.

17   **Q.**  Does -- does a person with major depressive disorder, do

18   they occasionally have okay days?

19   **A.**  Yes.

20   **Q.**  The various notes that you looked at reflecting

21   occasionally upticks in Dr. Menninger's mental health, is

22   that reflective to you that she wasn't developing major

23   depressive disorder?

24   **A.**  No.

25   **Q.**  Is that reflective to you that she was obtaining proper

1    medical care?

2    **A.**  Yes.

3    **Q.**  Is that reflective to you she was doing everything she

4    could to try to get better?

5    **A.**  Yes.

6    **Q.**  And, in fact, Doctor, prior to PPD denying

7    Dr. Menninger's requests for accommodations, she was showing

8    some improvement; is that right?

9    **A.**  Yes.

10   **Q.**  And let's take a look at that document that

11   Attorney Curran noted I could talk to you about on my

12   examination.  So I'm going to show you here Joint Exhibit

13   Number 18, and I'm going to show you the page that has 671 in

14   the bottom right-hand corner.

15   **A.**  Yep.

16   **Q.**  Okay.  And you see here that on February 16, 2018,

17   Dr. Menninger was reflecting some improvement; is that right?

18   **A.**  Yes.

19   **Q.**  Okay.  And is that -- is that consistent with your

20   overall opinion in this case?

21   **A.**  Yes, and the note where it says, in the history of the

22   present illness, she was able to speak to both HR and her

23   boss regarding the document for accommodations; their

24   response was promising.

25   **Q.**  And if we flip ahead here to the -- to the next entry, so

1    March 9, 2018 --

2    **A.**  Yeah.

3    **Q.**  -- so this would be after Dr. Menninger's meeting with HR

4    and her boss, right?

5    **A.**  Yes, on 2/28.

6    **Q.**  Okay.  And she notes that the -- the panic symptoms are

7    continuing?

8    **A.**  Yeah.

9    **Q.**  Okay.  And if you look at the plan from that treatment,

10   you'll see here that Dr. Kessimian made the decision to put

11   her homework on pause.

12   **A.**  Yep.

13   **Q.**  Do you see that?

14   **A.**  Yep.

15   **Q.**  And she notes that she's putting it on pause because of

16   the level of stress over the past week; is that right?

17   **A.**  Yep.

18   **Q.**  Now, if we look at the next entry here, Dr. Menninger is

19   showing that this week has been hard, especially after the

20   email from Chad.  Do you see that?

21   **A.**  Yes, I do.

22   **Q.**  Okay.  When a person like Dr. Menninger, with her mental

23   impairment, when they encounter some kind of event or

24   trigger, so to speak, does that necessarily impact them right

25   away, or might that kick in upon further reflection?

1    **A.**   It could be -- it could impact them right away.  It could

2    take some time to metabolize or even, you know, get

3    perspective on what's going on for them.

4    **Q.**   And --

5    **A.**   Not all of us figure out every stressor instantaneously

6    when it happens.

7    **Q.**   And if I could direct your attention here to the page on

8    the exhibit that ends 683, so this was the note from

9    March 30, 2018.  Do you see that?

10   **A.**   Uh-huh.

11   **Q.**   And so this is the note --

12   **A.**   Yep.

13   **Q.**   -- where she notes that it's -- that she's felt worse

14   than she has ever -- has before, and now has doubts about her

15   decision.

16   **A.**   Yep.

17   **Q.**   Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   Is -- is that consistent with the opinions that you've

20   given the jury today concerning the --

21   **A.**   Yes.

22   **Q.**   -- causation?

23   **A.**   Yes.

24   **Q.**   And can you -- can you explain why this -- this

25   self-doubt --

1    **A.**  So, again, to go back to, you know, the core concern,

2    which is being seen, exposed, humiliated as a core worry

3    within -- within social anxiety, she exposed herself and then

4    felt like she was basically getting a message about exit,

5    consultation, et cetera.

6          So she's having -- she's having doubts about

7    whether she did the right thing and feels -- feels

8    vulnerable, feels things have changed and feels that -- and

9    she doubts that maybe she shouldn't have exposed herself in

10    this way.

11    **Q.**  Do those -- do those expressions of self-doubt, does that

12    reflect to you that it actually was Dr. Menninger's fault?

13    **A.**  No.  It reflects the kind of self-doubt, the negative

14    kind of ideation and thoughts that occur both in the setting

15    of social anxiety or the development of an incipient major

16    depressive disorder, which is, again, I think part of what

17    was developing over the later spring.

18    **Q.**  I'm now going to direct you to the treating note that

19    ends in 695.  So you -- here, this is from 4/27/18.

20    **A.**  Yeah.

21    **Q.**  Do you see that?

22    **A.**  Yeah.

23    **Q.**  And would this be one of the lower low points that

24    Dr. Menninger encountered up to this point?

25    **A.**  Yes.

1    **Q.**  Okay.  And if you look at the bottom, when she talks

2    about -- Dr. Kessimian's note at the end, it includes that

3    Dr. Menninger had a sense that she "cannot trust anyone, and

4    they are scanning her for fault at all times."

5             Do you see that?

6    **A.**  Yes.

7    **Q.**  Okay.  And you see that was -- that was a reference to

8    her work life?

9    **A.**  Yes.

10   **Q.**  And is that consistent with the information that you

11   learned in your examination of Dr. Menninger that she was

12   feeling as though she was being targeted and rejected by her

13   employer?

14   **A.**  Yes.

15             MR. HANNON:  That's all I have, Your Honor.

16             THE COURT:  All right.  Any redirect -- recross?

17             MR. CURRAN:  Just a little bit, Your Honor.

18             **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19   BY MR. CURRAN:

20   **Q.**  All right.  Hello again, Dr. Summergrad.

21   **A.**  Hi.  How are you, sir?

22   **Q.**  Better.

23   **A.**  Good.

24   **Q.**  So Attorney Hannon had asked you some questions about the

25   dreams that Dr. Menninger's had?

1   **A.**  Mmm.

2   **Q.**  And you mentioned that one of them features

3   President Putin?

4   **A.**  Mmm.

5   **Q.**  That, obviously, has nothing to do with PPD, I assume,

6   correct?

7   **A.**  Not that I'm aware of.

8   **Q.**  Okay.  And --

9   **A.**  But it does -- it does show her level of fear and threat.

10   **Q.**  Right.  What does it suggest about what she's fearing?

11   **A.**  She's fearing danger.  I mean, she's worried that

12   she's -- you know, the dreams are she's at work.  She

13   mentions the director.  She fears that she feels she has to

14   run and hide because she's afraid she's going to be hurt in

15   some way.

16   **Q.**  Okay.  Now, you're aware, obviously, that about a year

17   ago, Russia invaded Ukraine, correct?

18   **A.**  Yes.

19   **Q.**  So there's been a lot of talk in the news about Putin and

20   the state of the world and how it's causing danger in the

21   world?

22   **A.**  Right.  I believe these predate that discussion -- that

23   invasion.

24   **Q.**  When did these dreams occur?

25   **A.**  Well, I think she -- as I recall, she reported them to me

1    in my first interview with her.

2    **Q.**   Did you note them in your first interview with --

3    **A.**   Mmm.

4    **Q.**   You noted that she had dreams about Vladimir Putin?

5    **A.**   Mmm.

6    **Q.**   Could you take a look at your book, the first tab there?

7            THE COURT:   Which page?

8    BY MR. CURRAN:

9    **Q.**   Can you show me where in the report you talk about her

10   having dreams about Vladimir Putin?

11   **A.**   I don't think I mentioned it in the report.

12   **Q.**   You didn't mention it in the report?

13   **A.**   No, I don't believe so.

14   **Q.**   Maybe I heard you wrong, but I thought you just testified

15   that you did put it in your report?

16   **A.**   I'm sorry?

17   **Q.**   I may have heard you wrong, but I thought you testified

18   that you did put it in your report?

19   **A.**   No, I didn't say I put it in my report.

20   **Q.**   What did you say?

21   **A.**   I said that she reported the dreams to me in my interview

22   with her.

23   **Q.**   But you didn't put that in your report?

24   **A.**   No, I did not.

25   **Q.**   All right.  So Mr. Hannon was asking you about some

1    questions about this treatment note from March 30, 2018?

2    **A.**   Mmm.

3    **Q.**   Do you recall that?  And he was pointing you to the part

4    right after the blocked out -- blacked out portion there

5    where it says "though is sad/frustrated that since 'coming

6    out' with her social anxiety disorder, she has felt worse

7    than she has ever have before and now has doubts about her

8    decision."

9            Do you see that?

10   **A.**   Yes, I do.

11   **Q.**   And I think you testified in response to Mr. Hannon's

12   questions that this has something to do with the way that she

13   was -- the way that PPD reacted to her disclosing her

14   disability?  Did you say that?

15   **A.**   Yes.

16   **Q.**   And what's the basis for that?

17   **A.**   That she felt that people around her had changed in their

18   behavior, that she felt that she wasn't -- she felt that she

19   was being distanced and not --

20   **Q.**   Nothing about that in this note, correct?

21   **A.**   No, there's nothing about that in this note.

22   **Q.**   And the note just talks about her feeling this way

23   because she had come out with her disability, correct?

24   **A.**   Correct.

25   **Q.**   Was it possible that she felt this way just because she

1  came out with disability and exposed herself?

2  **A.**   It's certainly -- it's certainly likely that that's a

3  part of what she -- again, social anxiety is associated with

4  fear of exposure, fear of being seen.

5  **Q.**   And so to say that it's based on the way people reacted

6  to it would be speculating based on this note, correct?

7  **A.**   Based on this note, it would be but there is other data.

8  **Q.**   Mr. Hannon was asking you some questions about -- or he

9  pointed you to some notes in February and early March where

10  someone -- early February, the notes suggested she was doing

11  better; and then in early March and later in March, there

12  were notes suggesting that she was doing worse.  Do you

13  recall that?

14  **A.**   Mmm.

15              THE COURT:  You have to say yes or no.

16              THE WITNESS:  Yes.  I'm sorry.  Yes.  Sorry.

17  BY MR. CURRAN:

18  **Q.**   So when you and I were talking, we took a look at this

19  note, which is the second April 13th note.

20  **A.**   Yes.

21  **Q.**   And so it appears like this is when she's doing better,

22  correct?

23  **A.**   Correct.

24  **Q.**   She's feeling a sense of empowerment?

25  **A.**   Yeah.

1   **Q.**  So fair to say she's improved since the March notes that

2   you were looking at?

3   **A.**  Yeah, this fluctuates.

4   **Q.**  Okay.  Now, I think you mentioned on direct that -- well,

5   that you were leaving Tufts's chairmanship in June?

6   **A.**  That's correct.

7   **Q.**  Do you know why that is?

8   **A.**  Yes.

9           MR. HANNON:  Objection.  Beyond the scope.

10          THE COURT:  Sustained.

11          MR. CURRAN:  That's all the questions I have,

12   Your Honor.

13          THE COURT:  All right.  Thank you very much.

14   You're excused.

15          THE WITNESS:  Thank you.

16          THE COURT:  Do you have another witness?

17          MR. HANNON:  The next would be a read-on, which

18   would take probably a couple minutes to set up.

19          THE COURT:  All right.  I'll let him off the hook,

20   and we'll leave a minute early.

21          So don't discuss the case among yourselves.  Don't

22   discuss it with anyone else.  Don't do any independent

23   research.  A reminder -- tomorrow, 9:00 to 10:00 and again

24   2:00 to 4:00.

25          Thank you very much for your attention.  Have a

1    nice day.

2              All rise for the jury.

3              (Jury not present.)

4              THE COURT:  What's next?

5              MR. HANNON:  We have to do the read-on.  We're

6    probably going to save that for later, but we'll jump into

7    the PPD folks that are here tomorrow.  We'll knock them out.

8    If we have any extra time, we'll move on to the read on.

9              THE COURT:  All right.  Anything else?

10             MS. MANDEL:  Not from our end.

11             THE COURT:  Okay.  See you tomorrow morning at 8:45

12   unless you send me things to review tonight.

13             Sounds good.

14             MR. HANNON:  Thank you.

15             THE COURT:  Thank you.

16             (Court in recess at 4:00 p.m.)

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2

3                I certify that the foregoing is a correct

4      transcript of the record of proceedings in the above-entitled

5      matter to the best of my skill and ability.

6

7

8

9      /s/ Rachel M. Lopez                    March 27, 2023

10     /s/ Robert W. Paschal

11

12

13     _____        _____

14     Rachel M. Lopez, CRR                   Date

15     Robert W. Paschal, CRR, RMR

16     Official Court Reporters

17

18

19

20

21

22

23

24

25