```
1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4    _____

5    LISA MENNINGER,

6            Plaintiff,                       Civil Action No.
                                              1:19-cv-11441-LTS
7         v.

8    PPD DEVELOPMENT, L.P.,

9            Defendant.

10   _____

11

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                         JURY TRIAL
                             Day 7
15

16
                      Tuesday, March 28, 2023
17                         9:03 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25
```

1                    **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

        HARTLEY MICHON ROBB HANNON, LLP
4       BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
        155 Seaport Boulevard
5       2nd Floor
        Boston, Massachusetts  02210
6       (617) 723-8000
        phannon@hmrhlaw.com
7       hwatson@hmrhlaw.com

8

9   On behalf of the Defendant:

10       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11      One Boston Place
        Suite 3500
12      Boston, Massachusetts  02108
        (617) 994-5700
13      rachel.mandel@ogletreedeakins.com
        patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

1 **TABLE OF CONTENTS**

2

3 **TRIAL WITNESSES**

4

5 On behalf of the Plaintiff:                                              <u>Page</u>

6 CHAD ST. JOHN

7          By Mr. Hannon                                                     5

8          By Ms. Mandel                                                    96

9 HACENE MEKERRI                                                           100

10 CHRISTOPHER FIKRY

11          By Mr. Hannon                                                  197

12          By Mr. Curran                                                  218

13          By Mr. Hannon                                                  226

14 MASON MENNINGER                                                         229

15

16

17                              **EXHIBIT**

18

19                              None

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            (In open court at 9:03 a.m.)
 3            THE COURT:  You can go get the jury.
 4            And who is the next -- oh, you're going to call the
 5    next witness, right?
 6            MR. HANNON:  Yes, Judge.
 7            THE COURT:  Okay.
 8            MR. HANNON:  And, Judge, we've provided you a
 9    binder with respect to this next witness.  It should be up on
10    the bench there.
11            THE COURT:  Kellyann has it.  I'll get it from her
12    when she gets back.
13            (Jury present.)
14            THE COURT:  Please be seated.  Everybody follow my
15    instructions, no, discussion, no independent research?  Good.
16            All right.  Next witness, Mr. Hannon?
17            MR. HANNON:  Plaintiff calls Chad St. John.
18            THE COURT:  Mr. St. John, if you would take the
19    witness stand.
20            THE DEPUTY CLERK:  Sir, if you could raise your
21    right hand.
22            (Witness duly sworn.)
23            THE DEPUTY CLERK:  And can you please state your
24    full name and spell your last name for the record.
25            THE WITNESS:  Sure.  Chad Douglas St. John, S-t,
```

1   period, J-o-h-n.

2            THE DEPUTY CLERK:  Thank you.

3            THE COURT:  Go ahead.

4                      **CHAD ST. JOHN**

5        having been duly sworn, testified as follows:

6        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

7   BY MR. HANNON:

8   **Q.**  Good morning, Mr. St. John.  Where do you currently

9   reside?

10  **A.**  I reside in Liberty Township, Ohio.

11  **Q.**  Okay.  And what do you do for work?

12  **A.**  I'm an HR director currently.

13  **Q.**  Where do you work?

14  **A.**  At JBT, John Bean Technology.

15  **Q.**  Okay.  And you were formerly employed by PPD; is that

16  correct?

17  **A.**  That's correct.

18  **Q.**  And during what time period were you employed at PPD?

19  **A.**  2013 to 2019.

20  **Q.**  And did you have the same role throughout that period?

21  **A.**  No.  Actually, I joined there as a senior manager, and I

22  was promoted to associate director of human resources.

23  **Q.**  When were you promoted to associate director of human

24  resources?

25  **A.**  I think within the last two years approximately.

1   **Q.**   The last two years of your employment at PPD?

2   **A.**   Correct.

3   **Q.**   So that would be sometime around 2016, 2017?

4   **A.**   Yes.  I don't recall exactly, but that sounds right.

5   **Q.**   Okay.  And when you were promoted, did you have

6   responsibility for the HR function for the Global Central

7   Labs?

8   **A.**   Yes, sir, I did.

9   **Q.**   Okay.  And you were -- you personally sat in

10   Highland Heights; is that right?

11   **A.**   Correct.

12   **Q.**   But your HR responsibility covered all of the labs, the

13   Global Central Labs across the world?

14   **A.**   Yes.

15   **Q.**   Okay.  And your employment with PPD ended in 2019, yes?

16   **A.**   Correct.

17   **Q.**   And that was because of a restructuring of the HR

18   function; is that right?

19   **A.**   Yes.  My role was eliminated.

20   **Q.**   Okay.  Did you do anything to prepare for your testimony

21   today?

22   **A.**   Not really.

23   **Q.**   Okay.  Did you meet with counsel for PPD?

24   **A.**   I did.

25   **Q.**   Okay.  How many times?

1    **A.**   Approximately three --

2    **Q.**   Okay.

3    **A.**   -- briefly.

4    **Q.**   When was the first time?

5    **A.**   A few weeks ago.

6    **Q.**   I'm sorry?

7    **A.**   Just a few weeks ago.

8    **Q.**   And who did you meet with?

9    **A.**   Rachel, sitting at the table here.

10   **Q.**   Anyone else?

11   **A.**   No, sir.

12   **Q.**   Okay.  And was that in person or was that remote?

13   **A.**   Remote.

14   **Q.**   Via Zoom?

15   **A.**   Yes.

16   **Q.**   And how long did that meeting last?

17   **A.**   I think it was maybe a couple hours.

18   **Q.**   And besides yourself and Ms. Mandel, was anyone else

19   present for that?

20   **A.**   No, sir.

21   **Q.**   When was the next time that you conferred with counsel

22   for PPD?

23   **A.**   It was all within the last couple of weeks, a few times.

24   **Q.**   Sure.  So we talked about the first time a few weeks ago.

25   When was the next time after that?

1    **A.**   I think it was within the last week, uh-huh.

2    **Q.**   And was that remote or in person?

3    **A.**   Remote, Zoom also.

4    **Q.**   Okay.  And who was there on behalf of PPD?

5    **A.**   Just Rachel and I.

6    **Q.**   And how long was that session?

7    **A.**   Approximately two hours.

8    **Q.**   And what was the next time that you met with someone from

9    PPD?

10    **A.**   I think later on in the week, I think it was Friday.

11    Zoom, two hours.

12    **Q.**   And who was that with?

13    **A.**   Also with Rachel.

14    **Q.**   Anyone else?

15    **A.**   No.

16    **Q.**   Do you know Attorney Wexelblatt?

17    **A.**   I do not.

18    **Q.**   Okay.  Were you chatting with him earlier this morning?

19    **A.**   First time I've talked with him, yes, just this morning.

20    **Q.**   Okay.  Do you know what he does for work?

21    **A.**   I think he's linked with maybe the new company.

22    **Q.**   Thermo Fisher?

23    **A.**   Correct.

24    **Q.**   Okay.  I want to talk to you about Dr. Menninger now.

25    And we're going to start with a document here.  So I'm

1   showing you now Joint Exhibit -- about to show you Joint

2   Exhibit -- I'm now showing you Joint Exhibit 47.  And this is

3   an email from Marianna Kessimian to you on January 31, 2018.

4   Do you see that?

5   **A.**  Yes, I do.

6   **Q.**  Okay.  Do you -- do you recall this email?

7   **A.**  Yes.

8   **Q.**  Okay.  Is this something that PPD's lawyers showed you in

9   preparation for today's testimony?

10  **A.**  No, but I think I recall it.

11  **Q.**  Okay.  And do you recall this was an email in which

12  Dr. Menninger's doctor provided you some information

13  concerning her -- her mental health issues?

14  **A.**  Yes.

15  **Q.**  Okay.  You'll see here on the document there's a

16  reference to "per our conversation."  Do you see that?

17  **A.**  Yes, I do.

18  **Q.**  Does that recall to a conversation you had had with

19  Dr. Kessimian?

20  **A.**  Yes.

21  **Q.**  Do you recall anything about that conversation?

22  **A.**  I do.  What was interesting is this was a call prior to

23  the forms being completed, which was a bit unique; but I

24  asked for her to follow up with the completed forms in an

25  email, which she clearly did.

1    **Q.**  Who called who?

2    **A.**  Dr. Kessimian called me.

3    **Q.**  Okay.  And did she indicate that if you wanted to speak

4    further, she was available to do so?

5    **A.**  Yes.

6    **Q.**  Did you have her phone number?

7    **A.**  She may have provided it.  I can't recall.

8    **Q.**  Okay.  But you had her email address, right?

9    **A.**  Indeed.  It's right here.

10   **Q.**  Okay.  I'm now going to show you Joint Exhibit 200.  So

11   this is an email exchange between you and Dr. Menninger on

12   January 31, 2018; is that right?

13   **A.**  Correct.

14   **Q.**  Okay.  And just to scroll to the middle of the page here,

15   we see that Dr. Menninger is providing you a form regarding

16   her medical condition.  Do you see that?

17   **A.**  Yes.

18   **Q.**  And she made reference to the fact that her doctor will

19   be sending you something that day, as well?

20   **A.**  That's correct, yes.

21   **Q.**  And in response to Dr. Menninger's email, you tell her

22   that you will move it forward while keeping all information

23   confidential.  Do you see that?

24   **A.**  I do, yes.

25   **Q.**  And you understood it was important to Dr. Menninger to

1    keep the information confidential?

2    **A.**   Yes.

3    **Q.**   Okay.  You didn't do so, did you?

4    **A.**   I -- I did.  I did.

5    **Q.**   Let's look at Joint Exhibit 174.

6              Excuse me.  That's the wrong document.

7              Joint Exhibit 174, so this is an email from you on

8    February 14, 2018.  Do you see that?

9    **A.**   I do, yes.

10   **Q.**   And it looks like you're forwarding some information to

11   Chris Clendening?

12   **A.**   You know, I don't recall, but it looks like I did.

13   There's no comment attached.

14   **Q.**   That's fine.  We'll take it step by step.  The person in

15   the "to" line is Chris Clendening?

16   **A.**   Correct.

17   **Q.**   That was Dr. Menninger's peer, right?

18   **A.**   Actually, they were named interim site head at the time.

19   **Q.**   Excuse me?

20   **A.**   They were named interim site head and they were involved

21   in that operations' leadership over the site at that

22   particular moment in time.  That's context.  I don't recall

23   this specific email, but I think that context is important.

24   **Q.**   Okay.  Well, let's -- let's close the loop on that.  Your

25   testimony is that, as of February 14, 2018, Mr. Clendening

1    was site head?

2    **A.**   Yeah.

3    **Q.**   Did I hear that right?

4    **A.**   Interim is what --

5    **Q.**   Okay.  Interim site head.

6    **A.**   Uh-huh.

7    **Q.**   Interim head of what site?

8    **A.**   The central lab, Global Central lab, uh-huh.

9    **Q.**   What did that mean, being interim site head?

10   **A.**   Well, he had been named to be the leader of that site.

11   That's all I can recall.  I don't have any additional detail.

12   **Q.**   What does that mean to be leader of the site, though?

13   **A.**   That means operational and functional responsibility of

14   the entire central laboratory.

15   **Q.**   Wasn't that --

16   **A.**   Global --

17   **Q.**   -- Mr. Mekerri's job?

18   **A.**   It was.

19   **Q.**   So it's your testimony that, as of this date,

20   Mr. Clendening was taking over for Mr. Mekerri?

21   **A.**   She was -- as we were building the bench, my

22   understanding is they were ramping up his responsibilities,

23   and so he was part of that chain of command at that point in

24   time.  I don't recall additional detail.

25   **Q.**   What chain of command?

1   **A.**   The interim site head for the Global Central Laboratory.

2   **Q.**   Who had he taken on that responsibility from?

3   **A.**   He was named at that point in time.  You'll have to ask

4   him about that.

5   **Q.**   Do you not know?

6   **A.**   I don't recall.

7   **Q.**   The information that you're providing to Mr. Clendening

8   here, this is -- we'll scroll the next page -- the -- two

9   pages ahead.  This is information that you'd received from

10  Dr. Menninger's doctor, correct?

11  **A.**   Correct.

12  **Q.**   Okay.

13  **A.**   Yes.

14  **Q.**   Did you think it was appropriate to share this

15  information with Mr. Clendening?

16  **A.**   You know, I can't recall this email.  But I must say

17  that, looking at it now, I probably wouldn't have forwarded

18  that.

19  **Q.**   Okay.  In terms of the documents you've been looking at,

20  these all pertain to Dr. Menninger disclosing her disability

21  and requesting accommodation, correct?

22  **A.**   Correct.

23  **Q.**   And that discussion, that had been prompted by a

24  conversation between Dr. Menninger and her then supervisor

25  Mr. Mekerri, correct?

1    **A.**   Correct.

2    **Q.**   And that conversation had surrounded areas in which

3    Dr. Menninger's role had been suggested that it may be

4    changing or expanding; is that right?

5    **A.**   Yes.

6    **Q.**   And in the course of this -- strike that.  Let me show

7    you another document here.

8              So we're now looking at Joint Exhibit 62.  And we

9    see here this is an email from Dr. Menninger to you on

10   February 4, 2018.  Do you see that?

11   **A.**   I do, yes.

12   **Q.**   Okay.  And Dr. Menninger, in this note to you, she

13   provides some detail in terms of what prompted her to

14   disclose her disability and request accommodation, correct?

15   **A.**   Yes, correct.

16   **Q.**   Okay.  Fair to say you have no reason to believe that

17   what she wrote here is inaccurate?

18   **A.**   That's correct.

19   **Q.**   And in response to this note from Dr. Menninger, you

20   asked Mr. Mekerri to provide some additional detail; is that

21   right?

22   **A.**   I did, yes.

23   **Q.**   I show you Joint Exhibit 194.  So if we look here in the

24   middle of the page -- I'm sorry -- look at the bottom of the

25   page, we have here the email we had just looked at from

1    Dr. Menninger, right?

2    **A.**   Yes.

3    **Q.**   Okay.  And then on the top here, we have your reaching

4    out to Mr. Mekerri, right?

5    **A.**   Correct.

6    **Q.**   Okay.  And you're asking here, in the second line,

7    "Please be specific bucketing any new duties and existing

8    duties that may have an increase beyond previous levels

9    expected in the role as the CL business continues to grow."

10           Do you see that?

11   **A.**   I do.

12   **Q.**   Okay.  And thereafter, Mr. Mekerri, he put together a

13   list of buckets, right?

14   **A.**   Yes.

15   **Q.**   I'll show you Joint Exhibit 350.  These are the buckets

16   that Mr. Mekerri put together in response to your request; is

17   that right?

18   **A.**   That is correct.

19   **Q.**   Okay.  And these were provided to Dr. Menninger; is that

20   right?

21   **A.**   Yes.

22   **Q.**   Okay.  And in response to these buckets, Dr. Menninger's

23   doctor proposed some accommodations; is that right?

24   **A.**   Correct.

25           Thanks for expanding the font, by the way.

**Q.**   Excuse me?

**A.**   Thank you for expanding the font.  I appreciate that.

**Q.**   No worries.  Yeah, if at any time you can't see anything or want to look at more of a document, please just let me know.  I'm happy to help.

And after receiving the proposed accommodations from Dr. Menninger's doctor, you worked with Mr. Mekerri on drafting a response; is that right?

**A.**   That's correct, yes.

**Q.**   And I'll show you Joint Exhibit 202.  So what we have here is an email from you to Mr. Mekerri on February 23, 2018, correct?

**A.**   That's correct.

**Q.**   And this was the sort of first draft, so to speak, of the response to the proposed accommodations?

**A.**   Yes.

**Q.**   And it looks like -- if I can highlight this sentence here -- you note, "I would need to further understand you [*sic*] wishes since I am interpreting some our previous conversations on the topic."

Do you see that?

**A.**   I do.

**Q.**   Okay.  So would that be right that this is -- this is your effort to sort of put into words what you had gathered from Mr. Mekerri concerning his views?

1    **A.**  Yes.  And I wanted them to be very specific with his

2    refined wishes, yes.

3    **Q.**  Okay.  Your initial draft here provided no accomodation

4    with respect to bucket 1; is that right?

5    **A.**  That's correct.

6    **Q.**  Did provide an accommodation with respect to bucket 2?

7    **A.**  Yes.

8    **Q.**  No accommodation with respect to bucket 3?

9    **A.**  Correct.

10    **Q.**  Some accommodation with respect to bucket 4?

11    **A.**  Yes, in this draft.

12    **Q.**  And then some accommodation with respect to bucket 5,

13    yes?

14    **A.**  Correct.

15    **Q.**  And you -- you and Mr. Mekerri subsequently had some --

16    well, strike that.

17          Mr. Mekerri, he -- he subsequently edited this

18    email, right?

19    **A.**  I don't recall.

20    **Q.**  Okay.

21    **A.**  If you have a final draft, I'm happy to review that.

22    **Q.**  Sure.  I'm happy to show you.  I'm going to show you

23    Joint Exhibit 338.

24          Can you see here, this is later that same day,

25    right, February 23, 2018?

1  **A.**  Yes, I see that.

2  **Q.**  And you see there he provides a revised version of your

3  email, right?

4  **A.**  Yes.

5  **Q.**  Okay.  And in the revised version, now there is an

6  accommodation for bucket 1, right?

7  **A.**  Yes.  That changed from the original draft.

8  **Q.**  Okay.

9  **A.**  Yes.

10  **Q.**  There's now no accommodation for bucket 2, correct?

11  **A.**  That's correct, uh-huh.

12  **Q.**  No accommodation for bucket 3?

13  **A.**  Correct.

14  **Q.**  No accommodation for bucket 4?

15  **A.**  Correct.

16  **Q.**  And there's actually a different accommodation for bucket

17  5, right?

18  **A.**  Yes, to 15 percent.

19  **Q.**  Okay.  So he actually lowered the amount of travel; is

20  that right?

21  **A.**  Correct.

22  **Q.**  Did he indicate to you why he did that?

23  **A.**  He did not, that I can recall.

24  **Q.**  Okay.  And subsequent to receiving this draft from

25  Mr. Mekerri, you sought the approval of your boss; is that

1    right?

2    **A.**  Yes.

3    **Q.**  And your boss at the time, that was Deborah Ballweg,

4    correct?

5    **A.**  Yes, Deb.

6    **Q.**  And you subsequently -- strike that.

7            Ms. Ballweg, she approved of the draft; is that

8    right?

9    **A.**  I don't recall.

10   **Q.**  Let me show you a document.  I'm going to show you Joint

11   Exhibit 192.  Do you see this is an email exchange between

12   yourself and Ms. Ballweg on February 26, 2018?  Yes?

13   **A.**  Yes.  Thanks for showing that.  It confirms it.

14   **Q.**  Sure.  And just for the record here, I'll just scroll

15   down a little bit.  You see that you had forwarded

16   Mr. Mekerri's email to Ms. Ballweg, yes?

17   **A.**  Correct, yes.

18   **Q.**  You had asked her for her thoughts, yes?

19   **A.**  Yes.

20   **Q.**  And she told you she was good with the draft, yes?

21   **A.**  Yes.

22   **Q.**  Okay.  And you thereafter provided it to Dr. Menninger;

23   is that right?

24   **A.**  Yes.

25   **Q.**  The date here --

1              THE COURT:  Bless you.

2              THE WITNESS:  Bless you.

3   BY MR. HANNON:

4   Q.   The date here is February 26, 2018; is that right?

5   A.   Correct.

6   Q.   Okay.  And you had a meeting with Dr. Menninger two days

7   later on February 28, 2018; is that right?

8   A.   That's what this indicates, yes.

9   Q.   Okay.  And in advance of that meeting, you had -- you had

10  met with Ms. Ballweg, correct?

11  A.   I -- I can't recall if I met with her there.

12  Q.   Okay.

13  A.   Whether it was Team, Zoom, phone, I don't recall.

14  Q.   I'm now showing you Joint Exhibit 186.  You see here this

15  was an email from you to Ms. Ballweg on February 28, 2018,

16  yes?

17  A.   Yes.

18  Q.   And in the first sentence, you reference a license

19  coverage grid that "I mentioned to you yesterday."  Do you

20  see that?

21  A.   I do, yes.

22  Q.   So would I be right that you at least had a conversation

23  with Ms. Ballweg on February 27, 2018?

24  A.   Yeah, this email is a communication, but I don't know

25  when the prior communication to this -- but this is certainly

1    an email to Deb talking about the license coverage and how

2    critical it is.

3    **Q.**  My question is a bit different, though.  I'm focusing on

4    that first sentence, where it uses the phrase, "I mentioned

5    to you yesterday."  Would I be right to read that to suggest

6    that you had spoken to Ms. Ballweg on February 27th?

7    **A.**  Yeah, I just don't know the method --

8    **Q.**  That's fine.

9    **A.**  -- phone, Zoom.

10   **Q.**  I want to scroll down here to the second-to-last

11   paragraph of your note, and you write to Ms. Ballweg, "All of

12   this is good contextual information as" -- I think you're

13   missing the word "we" -- "work with delicately working Lisa

14   out since we need to have her for coverage until someone else

15   is in the seat and ready and eligible for taking on the

16   various licensures."

17              Do you see that?

18   **A.**  I do see that.

19   **Q.**  Okay.  Now, this was something that you and Ms. Ballweg

20   had discussed in your conversation the day before?

21   **A.**  I don't know that we discussed that.  I don't recall the

22   specifics of the conversation.

23   **Q.**  Okay.

24   **A.**  I can say that what's very important is the coverage for

25   the business.  And, you know, to me, when her physician said

1    that she could not do the core elements of the job, that was

2    concerning and we had to protect the business.

3             So the question is:  Did she even want to continue?

4    And I think that that context is also very important to

5    state.

6    Q.  So you have a question in your mind:  Did Dr. Menninger

7    want to continue in her role?

8    A.  I think she probably wanted to.  I don't think her -- she

9    was aligned with her physician.  Her physician said all of

10   these elements of the job that were the main portion of the

11   job were not going to work for her.

12   Q.  So with that view in mind, your reference to "delicately

13   working Lisa out," that's a reference to her leaving her role

14   as medical director, correct?

15   A.  It could be her working herself out.  To me, I don't

16   recall -- I'm just sharing the context.  I think it's just

17   important.

18   Q.  And I'm just asking about those four words, "delicately

19   working Lisa out."  Those --

20   A.  Those four --

21   Q.  Let me finish the question, if I may.

22   A.  Yeah.

23   Q.  Those four words refer to Lisa Menninger leaving her role

24   as medical director at PPD, yes?

25   A.  As you point out, we don't -- the "we" is not included in

1    that email.  So I don't know that that sentence is complete.

2    I -- seems like there's some stuff missing there and I think

3    that's an important point.

4    **Q.**  What's missing?

5    **A.**  Well, you pointed out a word "we" are working out.  It

6    doesn't say "we."  I don't think that that sentence was

7    complete.

8    **Q.**  Well, tell us.  As of February 28, 2018, who was working

9    on delicately working Lisa out of the organization?

10   **A.**  I think it could have been herself.  She was, you know --

11   she said she could do the job.  The physician's saying she

12   can't do the job.  We just wanted to help.  I mean, we wanted

13   to help her.

14          I'm sure we'll go into a lot more on that, but I

15   look forward to sharing.

16   **Q.**  Sure.  Let's just stay with these four words before we

17   jump onto something else.  My question, which I'm not sure

18   I've gotten a clear answer to is --

19          THE COURT:  Just the question.

20   BY MR. HANNON:

21   **Q.**  -- when you wrote those four words, were you referring to

22   Lisa Menninger leaving PPD?

23   **A.**  I don't know that I can accurately say that.  Elements of

24   that sentence are missing.

25   **Q.**  Later on that same day, you had a meeting with

1    Dr. Menninger and Mr. Mekerri, correct?

2    **A.**  It does indicate that, yes.

3    **Q.**  Okay.  Do you recall the meeting?

4    **A.**  I do not.

5    **Q.**  You have no recollection of that meeting?

6    **A.**  Not every element of it.

7    **Q.**  Any elements?

8    **A.**  Just the high points of the accommodation.

9    **Q.**  Okay.  So one of the things that happened at that meeting

10   was you -- you presented Dr. Menninger with two options;

11   isn't that right?

12   **A.**  May I see that, if I could?

13   **Q.**  See what?

14   **A.**  Two options?

15   **Q.**  It was a question.

16   **A.**  I'm sorry?

17   **Q.**  What transpired at the meeting on February 28, 2018?  You

18   presented her two options, yes?

19   **A.**  I think we talked about many things.  We talked about a

20   couple of things in particular, to my recollection.

21   **Q.**  Sir, did you present her two options?

22   **A.**  I don't know that it was two.  We talked about many

23   things.  I could tell you what I can recall.

24   **Q.**  Did you provide her the option of taking an exit package?

25   **A.**  I did.

1    **Q.**  Did you provide her the option of doing a short-term

2    consulting arrangement while somebody else was brought in to

3    fill her role?

4    **A.**  I did.

5    **Q.**  Okay.  And Dr. Menninger told you that she didn't want to

6    leave, right?

7    **A.**  Yeah.  She told us that she could do the job.

8    **Q.**  Right.  She told you that her -- her doctor was just

9    providing recommendations, right?

10   **A.**  I believe so.

11   **Q.**  Okay.  She told you that, of the buckets for which PPD

12   did not want to provide accommodations, there were actually

13   lots of things in those buckets she could do, right?

14   **A.**  She said that, but she didn't provide specificity.

15   **Q.**  Well, sir, she asked questions, right?

16   **A.**  She asked for additional accommodation, but with no

17   specificity.  It became a very circular conversation.  We

18   said, "Let us help you.  We want to help you."  And she says,

19   "I can do this," and I said, "But I've got a note here that

20   says your physician is saying this will harm you.  What do I

21   do?"

22          It was a horrible quandary.  I mean, she's saying,

23   "I believe I can do this job."

24          And I said, "Can you go back and talk to your

25   doctor and align on, you know, what you can do," right?

1    "What are some ideas?  Give us something to look at," right?

2    "The core elements of this job are what the physician is

3    saying you can't do."

4    **Q.**  Well, let's take a look at some correspondence from the

5    day after that meeting.  I'm going to show you Joint

6    Exhibit 167.

7              JUROR:  Can I ask a question?

8              THE COURT:  You have a question?

9              JUROR:  Yeah.

10             THE COURT:  What you should -- can you -- what's

11   your question?

12             JUROR:  I -- I think --

13             Did you just mention you have no recollection about

14   the meeting with Lisa --

15             THE COURT:  Hold on.

16             JUROR:  -- just a moment ago?

17             THE COURT:  So your question is did he just say

18   that he has no recollection of the meeting with Dr. Menninger

19   on --

20             Was it February 28th -- on February 28th?  Is that

21   your question?

22             JUROR:  Yeah.  Yeah.

23             THE COURT:  Yeah, okay.  So you can -- that's

24   the -- so the way --

25             So, ladies and gentlemen, just so -- we'll go over

1    it again because this is the first time someone's had a

2    question.  So you can always write your question down.  I'll

3    take a look at it.  I'll pass it on to the lawyers, or I'll

4    address it in some way.  Or you can raise your hand, as you

5    did, and -- so that's a question that the juror would like

6    answered.

7           If either of you -- so the way -- because it's a

8    question coming from one of you rather than from one of the

9    lawyers, it's fair for them to have the chance to object to

10   the question, because the rules of evidence apply to your

11   questions.  This -- I'm not saying there's anything wrong

12   with your question, but the rules apply to your question just

13   the way they apply to questions from the lawyers, and they're

14   entitled to an opportunity --

15          So if either of you want to discuss it -- doesn't

16   mean you want to object -- but if you want to discuss it at

17   sidebar, I will; otherwise, you can just consider.

18          And what I do with questions is then just let the

19   lawyers ask the questions in -- as appropriate in the course

20   of their examination.

21          Do either of you wish to see me about that question

22   at sidebar?

23          MR. HANNON:  No, Your Honor.

24          MS. MANDEL:  No, Your Honor.

25          THE COURT:  All right.  So if you want to ask it,

1    you can.  You can fold it into your examination.

2             MR. HANNON:  Thank you, Your Honor.

3    BY MR. HANNON:

4    Q.   Mr. St. John, when I started to ask you about your

5    recollection of the February 28, 2018, meeting, didn't you --

6    didn't you indicate that you didn't recall the specifics?

7    A.   My apologies.  To clarify, I don't remember every element

8    of that meeting, but I do remember key elements, as I just

9    pointed out, the two elements that you stated that I do

10   recall, those two specific items, and shared that I did so.

11   So my apologies for the confusion.

12   Q.   Okay.  So let's -- let's get back to Joint Exhibit 167,

13   which I'm showing you here on the screen.  I actually want to

14   start here on the second page of the exhibit.  We have here

15   an email from Lisa Menninger to you on March 1, 2018, right?

16   A.   Correct.

17   Q.   Okay.  And she copies Mr. Mekerri?

18   A.   Yes.

19   Q.   Okay.  And in her March 1, 2018, email, she writes,

20   starting in the second sentence, "As I stated during our

21   conversation, while I greatly appreciate your agreement to

22   provide accommodations with respect to items 1 and 5 on

23   Hacene's list of duties/responsibilities, I need some

24   additional detail regarding items 2, 3, and 4.  As we

25   discussed, I think there are many tasks that could fall

1    within those items that would not implicate my disability.

2    If you can be more specific regarding the tasks that you

3    believe fall within these terms, I think we could have a more

4    productive dialogue regarding which specific tasks implicate

5    my disability and what reasonable accommodations may be

6    available with respect to those specific tasks."

7            Do you see that?

8    **A.**   I do.

9    **Q.**   Okay.  Now, that accurately reflects what Dr. Menninger

10   had said to you and Mr. Mekerri at that February 28, 2018

11   meeting, doesn't it?

12   **A.**   I believe so.

13   **Q.**   Okay.

14   **A.**   Yes.

15   **Q.**   And this was -- so with respect to the additional

16   information requested here, Dr. Menninger requested that

17   during your face-to-face meeting on 2/28, right?

18   **A.**   Yes.

19   **Q.**   Okay.  And you and Mr. Mekerri, you didn't provide the

20   information then, did you?

21   **A.**   We didn't.  You know, it's interesting to look at

22   items 2, 3, and 4.

23   **Q.**   You've answered my question, sir.  You didn't provide the

24   information, correct?

25   **A.**   Correct.

1    **Q.**   Okay.  And in response to this email from Dr. Menninger,

2    you didn't provide the information, right?

3    **A.**   Correct.

4    **Q.**   And Dr. Menninger, she made repeated subsequent requests

5    for that information, right?

6    **A.**   I believe so.

7    **Q.**   Okay.  And in all of those occasions, PPD did not provide

8    the information, right?

9    **A.**   I think we did provide information that we would not

10   provide accommodations for 2, 3, and 4.  There was no new

11   information to share.  I think that's a better way to put it.

12   **Q.**   Well, my question is more focused on answering this

13   specific inquiry, the additional detail regarding items 2, 3,

14   and 4.  That was never provided by PPD, correct?

15   **A.**   I wouldn't say never provided.  I just -- I think the

16   company had already shared the position.

17   **Q.**   Do you recall being deposed in this matter?

18   **A.**   I do.

19   **Q.**   Okay.  And if you look in front of you, there's a binder.

20   And if you open the binder to Tab Number 1, you'll find a

21   copy of your deposition.  And just for reference, if you look

22   at the first page of the deposition, would you agree with me

23   that this occurred back on July 28, 2020?

24   **A.**   Correct.  Yes.

25   **Q.**   Okay.  And it was -- it was via Zoom?

1   **A.**   Yes.

2   **Q.**   Back in the good old days of COVID?

3   **A.**   Yeah.

4   **Q.**   And after your deposition was done, you had an

5   opportunity to review your transcript, correct?

6   **A.**   I did.

7   **Q.**   Okay.  And if you look at the second tab there in your

8   binder --

9            MR. HANNON:  And I'll just note, Your Honor, that

10  your versions have some extra pages here.  So does

11  Ms. Mandel's.  Mr. St. John's version just has his errata

12  sheet.  I took out the excess pages, just so we're on the

13  same page.

14  BY MR. HANNON:

15  **Q.**   You see there, Mr. Mekerri -- I'm sorry -- Mr. St. John,

16  this was a document where you acknowledge that you had

17  reviewed your transcript and noted any changes that you

18  thought were necessary?

19  **A.**   Yes.

20  **Q.**   Okay.  And you didn't make any changes, right?

21  **A.**   No, sir.

22  **Q.**   Okay.  Let's start with page --

23           THE COURT:  I'm not sure the changes make a

24  difference, but I'm not sure -- there are --

25           MR. HANNON:  You're looking at the wrong errata

1    sheet.  So there was a --

2              THE COURT:  Tab 2, the second page is an errata

3    sheet.

4              MR. HANNON:  Correct.  It's the wrong witness.  So

5    there were -- there were multiple errata sheets provided to

6    us at the same time, and my parallel --

7              THE COURT:  So this errata sheet in the notebook

8    you gave me as to Mr. St. John doesn't apply to his

9    deposition?

10             MR. HANNON:  Just flip one more page, and you'll

11   get to his errata sheet.  Maybe two more pages.

12             THE COURT:  The next page is not --

13             MR. HANNON:  Maybe three?

14             THE COURT:  Three.  There's one that says "not

15   applicable."  You're saying that's the errata sheet for him?

16             MR. HANNON:  Correct.  Yes.

17             THE COURT:  I see.

18             MR. HANNON:  They were provided in all one package.

19   Apologize for that.

20   BY MR. HANNON:

21   Q.  So, sir, I was directing you to page 94 of your

22   transcript, and we'll start there on line 8.  And you see

23   there I -- I'm asking you questions about Dr. Menninger's

24   request at the February 28th meeting about additional detail

25   for buckets 2 through 4?

1    **A.**   Yes.

2    **Q.**   Do you see that?

3    **A.**   Uh-huh.

4    **Q.**   Yes?

5    **A.**   Correct.

6    **Q.**   Okay.  And if you can follow that questioning along, if

7    you turn to page 95, line 20, you see there I ask you whether

8    Dr. Menninger -- I'm sorry.  I asked you whether you had

9    received multiple emails thereafter from Dr. Menninger

10   continually asking for additional detail concerning the items

11   listed in 2 through 4.  Do you see that?

12   **A.**   I do.

13   **Q.**   Okay.  And you indicated that she had?

14   **A.**   I do see that, yes.

15   **Q.**   Okay.  And then if we continue on, page 96, line 10 --

16          MS. MANDEL:  Objection, Your Honor.  The question

17   and the answer weren't actually read with accuracy, and I

18   just ask that the answer, in particular, which begins at the

19   bottom of page 95 and continues to the top of page 96, was

20   not accurately recapped.

21          MR. HANNON:  I'm happy to read the whole section,

22   Your Honor.

23          MS. MANDEL:  I just want to make sure we have

24   clarity with regard to what was said.

25          THE COURT:  Fine.  You mean the whole section from

1   94, line 12, to 96:15?

2           MR. HANNON:  Yeah, that's great.

3           MS. MANDEL:  I don't know that he has to read all

4   of it.  I do object to --

5           THE COURT:  I don't think it's necessary to read

6   all of it.  I suspect it's -- I think what you should do is

7   you can ask the question you want.

8           You made your point and you can ask -- you can have

9   him on your examination read that part in completeness, if

10  you wish, but I don't know that we need the whole three

11  pages.  It would be a lot to read.

12          MR. HANNON:  Okay.  All right.

13          THE COURT:  I'm not objecting, but I'm just

14  advising that I'm not sure -- if either of you want to ask

15  the whole three pages, then why focus on the whole three

16  pages?

17          MR. HANNON:  Okay.  Let's do the whole three pages

18  just so there's no secrets here.

19  BY MR. HANNON:

20  Q.  Starting at page 94, line 8, please read along silently

21  as I read aloud:

22          "QUESTION:  During that meeting, Dr. Menninger --

23          THE COURT:  If you're going to do that, it might be

24  more interesting for the jury if you read -- I don't know

25  that it's necessary to read all three pages.  I don't

1   think -- and Ms. Mandel hasn't raised a challenge to the --

2   to you suggesting there's something that you're hiding, you

3   know, or -- that there's not hiding, but that there's some

4   incompleteness.

5           She only suggested incompleteness on that Q&A at

6   the bottom of 95 and 96.  But if you're going to do that

7   whole part, I suggest you read the question and he just read

8   the answer.  At least it would be more engaging.

9           MR. HANNON:  Sounds fine.  Thank you.

10  BY MR. HANNON:

11  **Q.**  All right.  Mr. St. John, you're ready?

12  **A.**  Yes.

13          THE COURT:  Starting at page 94?

14          MR. HANNON:  Starting at page 94, line 8.

15  BY MR. HANNON:

16  **Q.**  "During that meeting, Dr. Menninger asked for additional

17  information concerning the information listed in buckets

18  Number 2 through 4, correct?

19  **A.**  "Yes.

20  **Q.**  "Was that information provided to her?

21  **A.**  "To my recollection, yes, it was.

22  **Q.**  "And what specifically was provided to her with respect

23  to Bucket Number 2?

24  **A.**  "I don't recall the detail.

25  **Q.**  "Do you recall Number 3?

1   **A.**   "I don't recall the specificity, no.

2   **Q.**   "How about Number 4?

3   **A.**   "No.  I just -- I think he just covered what he had

4   already written.  That's the only thing I can remember.

5   **Q.**   "I'm sorry.  You think he just reiterated what was

6   already written for those buckets?

7   **A.**   "I believe so, yeah, but I can't recall for sure.

8   **Q.**   "Okay.  But fair to say Dr. Menninger was asking for more

9   information concerning those buckets, right?

10   **A.**   "I didn't -- I don't recall him being or him sharing

11   anything specific outside of what he has already provided her

12   with.

13   **Q.**   "But she was asking for something more, right?

14   **A.**   "She was, yes.

15   **Q.**   "And that was not given, correct?

16   **A.**   "Not to my recollection.

17   **Q.**   "Why not?

18   **A.**   "Don't know.

19   **Q.**   "Was that the last time that Dr. Menninger requested

20   additional information concerning the items listed in

21   buckets 2 through 4?

22   **A.**   "I don't recall.

23   **Q.**   "Didn't you receive multiple emails thereafter from

24   Dr. Menninger continually asking for additional detail

25   concerning the items listed in 2 through 4?

1    **A.**  "I know she requested, but I can't recall if it was

2    before the meeting or after, so I am foggy on the timeline.

3    She did ask more than once.  She asked several times, but I

4    don't know if it was after this meeting she continued to ask.

5    I don't recall.

6    **Q.**  "And she continued to ask you, right?

7    **A.**  "She did."

8              THE COURT:  You should read --

9    BY MR. HANNON:

10   **Q.**  There's another line.

11   **A.**  Oh.  "And I'm not sure if it was after this timeline.

12   **Q.**  "Did you ever provide the information?

13   **A.**  "I continued to reference what has already been provided

14   to her.

15   **Q.**  "Did you ever provide the additional information she was

16   asking for?

17   **A.**  "No."

18   **Q.**  So going back to the document we have up on the screen

19   here, which is Joint Exhibit 100 -- excuse me.  It's not

20   that.  It is Joint Exhibit 167.  After receiving this from

21   Dr. Menninger, you sent this to Ms. Ballweg, correct?

22   **A.**  Yes.

23   **Q.**  And you sent this to Ms. Ballweg that same day, right?

24   **A.**  Yes.

25   **Q.**  Okay.  And you provided the draft email; is that right?

1   **A.**   That is correct.

2   **Q.**   Okay.  And this was a draft response to Dr. Menninger,

3   correct?

4   **A.**   Yes.

5   **Q.**   Okay.  And in your draft response, you write in the third

6   sentence, "Adding additional detail would only present the

7   opportunity to select items in each bucket you believe you

8   can or can't do."  Is that right?

9   **A.**   Correct.

10   **Q.**   Okay.  And at least as of that the date, that was -- that

11   was something you didn't want Dr. Menninger to do, right, to

12   have the opportunity to select items in each bucket that she

13   believed she could or couldn't do?

14   **A.**   I -- I wouldn't say that.  We wanted additional

15   specificity to consider.  Adding additional detail would only

16   present the opportunity to select items in each bucket you

17   believe you can or can't do.

18   **Q.**   Isn't that what you wanted to know, though, what

19   Dr. Menninger could or couldn't do?

20   **A.**   Yeah, I just wanted to make clear that it wasn't shaded

21   in one direction or the other.  It was just stating we needed

22   more detail on what she could or couldn't do.

23   **Q.**   Well, you say you needed more detail.  Let's look back at

24   Dr. Menninger's note from March 1, 2018.  The bottom section

25   there I just highlighted, she writes, "Also, I wish to

```
1    reiterate that I'm capable of performing all functions of my
2    job with or without accommodation.  If you have any questions
3    regarding this or need confirmation from my physician that
4    this is the case, please let me know."
5               Do you see that?
6    A.  I do.
7    Q.  Okay.
8    A.  The problem is --
9    Q.  Now --
10   A.  But I'd like to make -- provide a complete answer, if I
11   could.
12              THE COURT:  If that's -- so here's the part --
13   if -- if you've answered the question he asked, that's all,
14   as the witness, you get to do.  You'll be examined by --
15              THE WITNESS:  Okay.
16              THE COURT:  -- I don't know if it's Ms. Mandel or
17   Mr. Curran -- Ms. Mandel.  And she'll ask you other
18   questions.  The difficult part about being the witness is you
19   only get to answer the question that's asked.
20              THE WITNESS:  Thank you, Your Honor.
21              THE COURT:  And so that's it.
22              Next question.
23              MR. HANNON:  Yes, Your Honor, so --
24              THE COURT:  You are free any time there's a
25   question, though, if it seems like it's framed as a yes-or-no
```

1    question, for example, to say, I don't feel I can answer it

2    as a yes-or-no question.  You can also say that.

3              THE WITNESS:  Thank you.

4              THE COURT:  You're welcome.

5              Go ahead.

6    BY MR. HANNON:

7    **Q.**  So now we're looking at your draft response to

8    Dr. Menninger's email from March 1, 2018.  Nowhere here in

9    your draft do you ask her to provide additional information

10   concerning her health issues, do you?

11   **A.**  You're correct.

12   **Q.**  Okay.  Nowhere in this draft message do you ask to have

13   her doctor send you additional information, right?

14   **A.**  Not in this email.

15   **Q.**  Okay.  You served in human resources for a long time,

16   right?

17   **A.**  Yeah.

18   **Q.**  You've been in human resources for -- was it 27 years

19   before joining PPD?

20   **A.**  Approximately, yes.

21   **Q.**  Okay.  And you dealt with accommodation requests before,

22   right?

23   **A.**  I have, yes.

24   **Q.**  And you were aware that, an employer, if they have

25   concerns about an employee's ability to do their job due to a

1    health reason, that they can request a certification from

2    their doctor, right?

3    **A.**  Yes.

4    **Q.**  Okay.  So as you're having this back-and-forth with

5    Dr. Menninger in March 1, 2018, you knew that if you had

6    concerns about her ability to do her job, you could ask her

7    doctor for a certification regarding that, correct?

8    **A.**  Correct.

9    **Q.**  Okay.  Going back to the March 1st -- actually, strike

10   that.  Let's stay with this exhibit for a moment.

11          So you received this email from Dr. Menninger on

12   March 1, 2018, and there had been a meeting planned for later

13   that day, right?

14   **A.**  That's correct.

15   **Q.**  Okay.  And that meeting was to be with yourself and

16   Dr. Menninger and Mr. Mekerri?

17   **A.**  Yes.

18   **Q.**  And after you received this email from Dr. Menninger, you

19   canceled that meeting, correct?

20   **A.**  Which meeting was this?  There -- we had one meeting.

21   The second meeting was canceled.  I just want to make sure

22   I'm clear.  We did talk with her.  It was the second meeting

23   that was canceled.  I want to make sure that that's clear.

24   Let me just take a look here.

25   **Q.**  Just so we're clear, you had the meeting on

1    February 28th, right?

2    **A.**   Yes.  There we go, yeah.

3    **Q.**   And when that meeting ended, you had asked her to

4    consider possible paths forward, right?

5    **A.**   Correct.  Yes.

6    **Q.**   Okay.  And then you got this email from Dr. Menninger on

7    March 1, 2018, right?

8    **A.**   Yes.  Thanks for clarifying the timeline.  Appreciate

9    that.

10   **Q.**   And then you canceled the follow-up meeting that had been

11   scheduled for later that day, right?

12   **A.**   I did, yes.

13   **Q.**   You eventually responded to Dr. Menninger's March 1st

14   email, right?

15   **A.**   I did.

16   **Q.**   Okay.  But that wasn't until March 12th, right?

17   **A.**   Can I take a look at that?

18   **Q.**   Sure.  Let me show you a document here.  I'm going to

19   show you Joint Exhibit 176.

20           Excuse me.  That's the wrong document.

21           Joint Exhibit 176 -- that's the one.  All right.

22   So this is your email response to Dr. Menninger's March 1st

23   email, right?

24   **A.**   Correct, on the 12th.

25   **Q.**   Okay.  And notably, this is -- this is a new email chain

1    that you created, right?

2    **A.**   Correct.

3    **Q.**   So if we look at the second page here, this isn't

4    actually responding backing back mail you had gotten from

5    her, correct?

6    **A.**   Correct.

7    **Q.**   Why was that?

8    **A.**   You know, I cannot recall.

9    **Q.**   And Mr. Mekerri, he was -- he was not actually involved

10   in drafting this email, right?

11   **A.**   I cannot recall.

12   **Q.**   If you can turn to page 111 of your deposition

13   transcript, and just for reference here --

14           THE COURT:  You just want him to read the bottom of

15   page 111 to the top of 112 to refresh his recollection?

16           MR. HANNON:  Yeah, I think that works, Your Honor.

17   Thank you.

18   BY MR. HANNON:

19   **Q.**   If you'd just read to yourself your testimony on page 111

20   carrying over to line 2 of the next page, and let me know if

21   that refreshes your recollection as to whether or not

22   Mr. Mekerri was involved in drafting this email.

23   **A.**   It was not.

24   **Q.**   I'm sorry?

25   **A.**   My testimony says --

```
 1              THE COURT:  Well, you've read it to yourself.  Now
 2    the question is, did that refresh your recollection?
 3              THE WITNESS:  It did.  Thank you, Your Honor.
 4              THE COURT:  Just ask him.
 5    BY MR. HANNON:
 6    Q.  And he was definitely not, right?
 7    A.  Correct.  That's what it says.
 8    Q.  Is it fair to say that people who were involved were HR
 9    leadership and legal?
10    A.  It indicates here could not recall if they were.
11    Q.  Okay.
12    A.  I cannot recall.
13    Q.  Okay.  As you sit here today, do you have a recollection
14    as to whether or not HR leadership and legal was involved in
15    drafting this document?
16    A.  I think legal was.
17    Q.  Okay.  What about your boss, Deborah Ballweg?  Was she
18    involved?
19    A.  I cannot recall.
20    Q.  I'm sorry?
21    A.  I can't recall that.
22    Q.  Okay.  I'm going to show you Joint Exhibit Number 87.
23    So, sir, this is an email that you sent to Ms. Ballweg on
24    March 7, 2018, yes?
25    A.  Yes, correct.
```

1    **Q.**  And am I right that this email concerns you gathering

2    information to send to PPD's legal team?

3    **A.**  Yes.  This looks like that's what it was.

4    **Q.**  Okay.  And you were working with Ms. Ballweg on that; is

5    that right?

6    **A.**  It looks like for this, yes.

7    **Q.**  Okay.  And if we turn to the attachment here -- there's a

8    few different attachments.  Let me get to the right one.  So

9    I am now -- I'm on page 14 of the exhibit.  Just for the

10    record, it has 4078 at the bottom right-hand corner.  And you

11    see here on the top, it starts "HRG."

12         Do you see that?

13    **A.**  I do.

14    **Q.**  Okay.  And these were instructions to the human resources

15    group concerning filling out this form?

16    **A.**  Looks like that way, yes.

17    **Q.**  Okay.  And this was related to a legal request concerning

18    Dr. Menninger, right?

19    **A.**  Yes.

20    **Q.**  Okay.  And if we scroll forward, on the last page of the

21    documents, there's a section for "request for accommodation

22    pending for which HR generalist is asking help."

23         Do you see that?

24    **A.**  I do.

25    **Q.**  Okay.  HR generalist, would that be you in this context?

1    **A.**   Yes.

2    **Q.**   Okay.  And you note, "HR is requesting guidance in

3    responding to Lisa and assisting us with potential options as

4    we seek a path forward to an exit strategy, with consultancy

5    as an element (or other options not being considered now) to

6    protect the business and the CL licensure requirements."

7          Do you see that?

8    **A.**   I do.

9    **Q.**   Okay.  Does that accurately state the advice that you --

10   that you wanted to get from legal at that point in time?

11   **A.**   Yes.

12   **Q.**   Okay.  Exit strategy, that refers to Dr. Menninger

13   leaving PPD, correct?

14   **A.**   I think that -- that's a general term, "exit strategy."

15   It's like separation versus termination or -- you see what

16   I'm saying?  So I think it's a -- I don't know that that is

17   as clear as what you might be inferring.

18   **Q.**   Well, do I hear you right that you're saying it could be

19   a -- it could mean a voluntary separation, or it could mean

20   an involuntary separation?

21   **A.**   Correct.

22   **Q.**   Okay.  But either way, it refers to a circumstance in

23   which Dr. Menninger is no longer working with PPD, correct?

24   **A.**   Could be, yeah.

25   **Q.**   You're not sure?

1    **A.**   Yeah, "seek a path forward to an exit strategy with

2    consultancy as an element," right?  So I don't -- I don't

3    know that it's as clear, but I'm comfortable with what you're

4    saying.

5    **Q.**   I'm not sure what you're comfortable with.

6    **A.**   I don't know that it's as clear, sorry.

7    **Q.**   So "exit strategy" refers to Dr. Menninger leaving the

8    company either voluntarily or involuntarily, right?

9    **A.**   I agree with that, yes.

10   **Q.**   Either quitting or getting fired?

11   **A.**   Yeah.

12   **Q.**   And in the bullet below here, now there's a section for

13   HR management's recommendation.  Do you see that?

14   **A.**   Yes.

15   **Q.**   Okay.  That would be one of your bosses, right?

16   **A.**   Correct.

17   **Q.**   So Deborah Ballweg?

18   **A.**   It doesn't specify Deb.  She's in the chain of command.

19   **Q.**   She was your direct supervisor, right?

20   **A.**   She was.

21   **Q.**   Okay.  And in terms of what that recommendation says,

22   first it notes that supporting the recommendation to only

23   provide reasonable accommodation for points 1 and 5; is that

24   right?

25   **A.**   Correct.

1   **Q.**   Okay.  And then it notes -- would I be correct in

2   interpreting that, the phrase that follows, as saying that

3   there's a preference to do a separation package with

4   Dr. Menninger that would allow her to consult for some time

5   to protect the licensure requirements?

6   **A.**   That's what it says, yes.

7   **Q.**   Okay.  And then it goes on to note that the business

8   believes Lisa can no longer fully service the CL business as

9   the senior lab leader to the degree that the business

10  requires to grow and hit aggressive business targets."

11          Did I read that right?

12  **A.**   Correct, yes.

13  **Q.**   So this request was sent off to PPD legal, right?

14  **A.**   Yes.

15  **Q.**   Okay.  And did they come up with an exit strategy?

16  **A.**   I don't believe that that's the way that this played out.

17  So I -- I don't think that's the way -- or what they

18  recommended or would have happened, right?

19  **Q.**   What did they recommend?

20          MS. MANDEL:  Objection.

21          THE COURT:  Sustained.

22          THE WITNESS:  You know, I honestly don't recall --

23          THE COURT:  There's no question pending.

24          THE WITNESS:  Okay.

25          THE COURT:  You can only answer the questions.

1          THE WITNESS:  Got you.

2    BY MR. HANNON:

3    **Q.**  Discussions regarding an exit strategy for Dr. Menninger,

4    those involved others within PPD as well, didn't they?

5    **A.**  They did.

6    **Q.**  Who else was involved in those discussions regarding an

7    exit strategy?

8    **A.**  I think within the chain of command of HR and legal.

9    **Q.**  Who was Christopher Fikry?

10   **A.**  Chris was a vice president of -- leading labs.

11   **Q.**  He was Mr. Mekerri's boss, yes?

12   **A.**  Yes.

13   **Q.**  And were you aware at some point in time that Mr. Fikry

14   was inquiring concerning Dr. Menninger's exit from the

15   company?

16   **A.**  I don't recall.  Do you have an email or something we --

17   I can reference?

18   **Q.**  Excuse me?

19   **A.**  Do you have an email or something I can reference?

20   **Q.**  I will in a moment, but just to start, did -- do you

21   recall Mr. Fikry reaching out concerning Ms. Menninger's

22   potential exit from the company?

23   **A.**  I don't recall the details of that.

24   **Q.**  Okay.  Was -- besides HR and legal, did you speak with

25   anyone else within PPD regarding Dr. Menninger potentially

1  exiting the company?

2  **A.**  I don't recall ever having a conversation with the --

3  outside of those folks --

4  **Q.**  Okay.

5  **A.**  -- the chain of command or legal.  I don't remember a

6  conversation at all.

7  **Q.**  So subsequent to the request for legal advice that we

8  just looked at concerning an exit strategy, you began to

9  coach Mr. Mekerri concerning --

10          MS. MANDEL:  Objection.  Your Honor, we didn't look

11  at any legal advice; and, in fact, it wouldn't be appropriate

12  for us to look --

13          THE COURT:  Sustained as to the form of the

14  question.

15  BY MR. HANNON:

16  **Q.**  Subsequent to looking back here at the memo we were

17  looking at earlier, subsequent to you sending this to

18  Ms. Ballweg, you began coaching Mr. Mekerri concerning

19  documenting performance criticisms of Dr. Menninger, didn't

20  you?

21  **A.**  I wouldn't -- I wouldn't say coaching.  I would say

22  understanding what his concerns were.

23  **Q.**  And instructing him to put concerns in writing, correct?

24  **A.**  Documentation practices.  I think that's a better way to

25  say it, yeah.

1    **Q.**  Let's look at Joint Exhibit Number 69.  And just to

2    orient us here, at the bottom of the page here we have an

3    email from Ms. Ballweg on March 28, 2018.  Do you see that?

4    **A.**  Yes, uh-huh.

5    **Q.**  And I'll put the next page so we see what it is.  It's to

6    you, right?

7    **A.**  Yes.

8    **Q.**  Okay.  And then there's a whole slew of stuff here

9    that's -- that's been redacted --

10               THE COURT:  So, ladies and gentlemen, there are

11   certain things you've seen that are redacted, like here.  And

12   then you've seen some other documents that have been admitted

13   that -- I think there was some from Dr. Kessimian's notes

14   that had little portions blacked out.

15               So the first thing is we're not hiding things from

16   you that, like -- and you shouldn't speculate about what's in

17   the blacked-out portions.  The reasons things are blacked out

18   is -- there's a couple reasons why something would be blacked

19   out.

20               One is, for example, people's Social Security

21   numbers would be blacked out, generally speaking, or

22   sometimes dates of birth are blacked out, just as a general

23   proposition, because we have general rules about certain

24   personal identifying information becoming exhibits and then

25   being public or something.

1          But another primary kind of information like that

2     is attorney-client communications, advice, because that

3     information is privileged whether it's -- whichever party

4     it's from.  And so that also gets redacted because it's not

5     admissible evidence and it's privileged.  And so you

6     shouldn't draw any conclusions about what it means or any

7     inference from it not being provided to you, either for or

8     against either party.  It's just the rules.

9          Go ahead.

10          MR. HANNON:  Thank you, Your Honor.

11     BY MR. HANNON:

12     Q.  So going back to this document here, what we're looking

13     at is this email to you from Ms. Ballweg.  She asked you,

14     "Can you get up with Hacene to explore Number 1 before our

15     call tomorrow?"

16          Do you see that there?

17     A.  I do.

18     Q.  And you tell her, "Will do"?

19     A.  Yes.

20     Q.  And then here's what you then tell Mr. Mekerri:  "Please

21     add some details to the details that you have discussed with

22     Lisa in your one-to-ones with her that she is referencing."

23          Do you see that?

24     A.  I do.

25     Q.  Okay.  And do you know what that refers to?

1   **A.**  I can't recall, but it's around good documentation

2   practices.  I mean --

3   **Q.**  So this is March 28, 2018, right?

4   **A.**  Yes.

5   **Q.**  Okay.

6   **A.**  Uh-huh.

7   **Q.**  Now, let's look at Joint Exhibit Number 49.  So this is

8   an email that Mr. Mekerri sent you the next day, right?

9   **A.**  It looks that way, yes.

10  **Q.**  Okay.  And this is in response to your email asking him

11  to provide you details about his one-to-one with Lisa, right?

12  **A.**  Yes.

13  **Q.**  And the reason for this documentation was you wanted to

14  build a record that would support a termination; isn't that

15  right?

16  **A.**  I don't think so.  I don't think that's right, as I read

17  through that.

18  **Q.**  There were other instances in which Mr. Mekerri was

19  provided instructions to document; isn't that right?

20  **A.**  Yeah, document, not leading to an outcome.

21  **Q.**  Let's look at Joint Exhibit 148.  In the middle of the

22  page here, this is you on April 3, 2018, right?

23  **A.**  Yes.

24  **Q.**  Okay.  And here you note in the second sentence, "It

25  will critically important to follow-up on your discussions

1    with Lisa with documentation to your manager file and to Lisa

2    directly."

3            Do you see that?

4    **A.**  Yes.

5    **Q.**  Okay.  And that was actually something that Ms. Ballweg

6    had told you to tell Mr. Mekerri, wasn't it?

7    **A.**  I think she was referencing that, yes.

8    **Q.**  And let's look at that record just to be clear.  So let's

9    look at Joint Exhibit 68.  So we're looking here at an email

10   exchange between you and Ms. Ballweg?

11   **A.**  Yes.

12   **Q.**  And if we look here, we see that same language, or

13   similar language, to what you wrote to Mr. Mekerri?  "He

14   needs to follow up those discussions with documentation to

15   his manager file and importantly to Lisa directly."

16           Do you see that?

17   **A.**  Yes.

18   **Q.**  Okay.  And in addition to providing Mr. Mekerri these

19   instructions, you also talked about it with him in person,

20   correct?

21   **A.**  I can't recall that.

22   **Q.**  I'll show you Joint Exhibit 125.

23   **A.**  Yes.  That's correct.  Thank you.

24   **Q.**  Okay.  So just for the record, so you're telling

25   Ms. Ballweg here, "This coaching has occurred in two ways (in

1    writing via email and now I can confirm that it has taken

2    place verbally in a conversation I had with him around

3    11:20 a.m. today)."

4              Do you see that?

5    **A.**  Yes.  Coaching.

6    **Q.**  And that's coaching regarding the importance of

7    documenting criticisms to his manager file, correct?

8    **A.**  Correct.

9    **Q.**  In early April of 2018, Mr. Mekerri decided to adapt

10   Dr. Menninger's goals; is that right?

11   **A.**  Correct.

12   **Q.**  And you were involved in that?

13   **A.**  Yes.

14   **Q.**  I now show you Joint Exhibit 121 and we'll start here on

15   the second page.  This is a draft email that Mr. Mekerri sent

16   to you regarding the adaptation of Dr. Menninger's goals,

17   yes?

18   **A.**  Yes.

19   **Q.**  Okay.  And flipping back to the first page, you see here

20   at the bottom you -- you have a suggestion that he note that

21   "goals may continue to adapt with ample ongoing

22   communication"?

23   **A.**  Correct.

24   **Q.**  Okay.  And you sent that to Ms. Ballweg for her approval?

25   **A.**  Yes.

1  **Q.** Okay.  And she approved?

2  **A.** Looks that way, yes.

3  **Q.** Okay.  Now, it was about this same time in early April of

4  2018 that Mr. Mekerri's boss was making inquiries about

5  Dr. Menninger.  Do you recall that?

6  **A.** No --

7  **Q.** Okay.

8  **A.** -- I don't --

9  **Q.** I show you Joint Exhibit 265.  Now, sir, you're not on

10  this email chain, correct?

11  **A.** Correct, I'm not.

12  **Q.** But if you look here, do you see that Mr. Fikry, he is

13  inquiring about Dr. Menninger's exit, right?

14  **A.** I see that.

15  **Q.** Okay.  Is that a coincidence that he uses that word,

16  "exit," that you had also used in that memo back in early

17  March?

18  **A.** You know, I can't speak to his email or his intent.

19  **Q.** You don't know?

20  **A.** I don't.  I can't speak to that.

21  **Q.** Okay.  So you don't know what he meant when he asked

22  "what's timing on Lisa Menninger's exit?"

23  **A.** You'll have to ask him.

24  **Q.** But you would agree that, in the context of talking about

25  an employee, that "exit" generally means separation?

1   **A.**   It does to me, but that's all I can say.   I don't know.

2   **Q.**   And if you look at Ms. Ballweg's response, she notes that

3   Mr. Mekerri had recently given some tough feedback.   Do you

4   see that?

5   **A.**   I do.

6   **Q.**   Do you know what that tough feedback refers to?

7   **A.**   I do not.

8   **Q.**   Okay.   Was that tough feedback that you and Ms. Ballweg

9   had coached Mr. Mekerri to provide?

10  **A.**   No.

11  **Q.**   Did that refer to the goals email?

12  **A.**   I have no idea.   I'm not on this email.

13  **Q.**   Mr. Fikry, he was also making inquiries of others within

14  HR as to when Dr. Menninger was going to be exiting, correct?

15  **A.**   Looks that way.

16  **Q.**   I show you Joint Exhibit 124.   This is an email exchange

17  between yourself and Ms. Ballweg?

18  **A.**   Yes.

19  **Q.**   This is April 12th, right?

20  **A.**   Correct.

21  **Q.**   Next day?

22  **A.**   Actually on my birthday.   Just a side note.

23  **Q.**   And just turning forward here, at the bottom of the first

24  page, and you relay to Ms. Ballweg a conversation you had had

25  with Jerry Williams, correct?

1    **A.**   That is correct.

2    **Q.**   And Mr. Williams, he had communicated to you that

3    Mr. Fikry was inquiring about the timing of Dr. Menninger's

4    exit, right?

5    **A.**   That's what this indicates, yes.

6    **Q.**   Okay.  And you gave him the same answer, it looks like,

7    that Ms. Ballweg had provided Mr. Williams, right?

8    **A.**   I don't see any tough feedback talk there.  That wasn't

9    referenced.

10   **Q.**   You don't see the tough feedback?

11   **A.**   I'm sorry.  I don't.

12   **Q.**   No worries.  That's what my highlighter is for.

13            THE COURT:  I think you only highlighted the part

14   you want.

15            THE WITNESS:  Thank you.

16   BY MR. HANNON:

17   **Q.**   "Tough feedback" there?

18   **A.**   Yes.

19   **Q.**   Okay.  And, right at the end, "We are not close to a

20   change unless she self-selects."  Do you see that?

21   **A.**   I do, yes.

22   **Q.**   Would a change in that context be an exit?

23   **A.**   Yeah, if she self-selects.

24   **Q.**   And self-selects would be if she quit, right?

25   **A.**   Correct, yeah.

1    **Q.**  Now, at the time that Dr. Fikry was making these

2    inquiries, you knew that he had knowledge of Dr. Menninger's

3    request for accommodation, correct?

4    **A.**  I didn't have much interaction with him, so I can't -- I

5    don't recall.

6    **Q.**  But you had had interaction with him updating him on the

7    status of Dr. Menninger's accommodation request, hadn't you?

8    **A.**  I don't recall.  Do you have something you can share with

9    me?

10   **Q.**  I'll show you Joint Exhibit 197.

11   **A.**  Okay.  Thank you.

12   **Q.**  You're welcome.

13          So this was an exchange between yourself and

14   Dr. Fikry back on February 7, 2018, yes?

15   **A.**  Yes, this is.

16   **Q.**  Okay.  And --

17   **A.**  Correct.

18   **Q.**  -- you write to him, "The ball is now in Lisa and her

19   doctor's court to provide specific limitations" -- I'm

20   sorry -- "specific limitations linked with Lisa's anxiety of

21   public speaking and social interactions.  Hacene has recently

22   provided specifics (see attached) in writing around what the

23   business needs."

24          Do you see that there?

25   **A.**  I do.

1    **Q.**   Okay.  And you go on to say, "Once we have the reply from

2    Lisa's doctor, we can review them and determine if we want to

3    provide any reasonable accommodation.  If not, we can

4    consider providing her a package to move her out."

5            Do you see that?

6    **A.**   I do.

7    **Q.**   Okay.  Do you recall any subsequent communications with

8    Dr. Fikry concerning this subject?

9    **A.**   I do not, no.

10   **Q.**   I'm now going to show you Joint Exhibit 146.

11           Sorry.  Wrong document.  Let's go here instead.

12           I'm now showing you Joint Exhibit 50.  And if you

13   look at the subject line, I think this was an email chain

14   concerning those -- the requests for adapted goals we looked

15   at earlier, right?

16   **A.**   Yes.

17   **Q.**   Okay.  And if we flip back to the first page here -- I'm

18   sorry.  This is actually the third page.  This was the actual

19   email that Mr. Mekerri had sent Dr. Menninger requesting the

20   adapted goals; is that right?

21   **A.**   It looks that way, yes.

22   **Q.**   Okay.  And you see here one of the stated goals in 1(a)

23   is "elimination of lab issues, client complain, and audit

24   findings."  Do you see that?

25   **A.**   I do.

1    **Q.**  Would you agree with me, sir, that was an impossible

2    goal?

3    **A.**  I can't speak to that.  I don't know enough about the

4    detail.  I know there were quality issues and other issues at

5    that time, but I don't know the possibility of eliminating

6    them.  I mean -- I don't know.

7    **Q.**  Did PPD use something called "SMART goals"?

8    **A.**  We do.

9    **Q.**  And what does the A stand for?

10   **A.**  Achievable.

11   **Q.**  And what does that mean?

12   **A.**  Well, they need to be achievable, right?  The M is the

13   tough one.  It's measurable, right?  But I can't speak to

14   some of -- I can't speak to the business side of this, if

15   that's possible or not.

16   **Q.**  But you'd agree with me that it's very important that

17   when a manager sets goals, that they be achievable?

18   **A.**  Yeah.

19   **Q.**  I'm now going to show you Joint Exhibit 126.  And looking

20   at the first page here, I just want to direct your attention

21   to the second email.  On April 17, 2018, Ms. Ballweg writes,

22   "Got your message and other email.  Please help draft a

23   response for Hacene and one for yourself."

24          Do you see that?

25   **A.**  I do, uh-huh.

1   **Q.**  Okay.  Would I be right that the other email refers to

2   Dr. Menninger's correspondence with Mr. Mekerri concerning

3   her goals?

4   **A.**  I can't say that for sure.  I'm sorry.

5   **Q.**  But you see here Ms. Ballweg instructs you to, "Ask

6   Hacene/draft response to be very specific about how she

7   didn't meet expectations."

8        Do you see that?

9   **A.**  I do.

10  **Q.**  I now show you Joint Exhibit 301.  And you see here this

11  is an email from Mr. Mekerri to Ms. -- Dr. Menninger on

12  April 25, 2018?

13  **A.**  Yes.

14  **Q.**  And he starts his email, "Lisa, I am very surprised and

15  somehow disappointed by your response."  Do you see that?

16  **A.**  I do.

17  **Q.**  Okay.  Let's take a look at what he's responding to.  So

18  the email below here, we have an email from Dr. Menninger to

19  Mr. Mekerri on April 17th, right?

20  **A.**  Correct.

21  **Q.**  Okay.  And she -- she starts her email by saying, "I am

22  happy to adapt my 2018 goals to address whatever concerns you

23  may have," right?

24  **A.**  Yes.

25  **Q.**  She says, "However, I think you may have some

1    misunderstanding concerning the 'recent lab issues' you

2    reference in your email."  Do you see that?

3    **A.**   I do.

4    **Q.**   Okay.  And you go to the next page, Dr. Menninger, she

5    goes on to provide her version of the lab issues, right?

6    **A.**   Looks that way, yes.

7    **Q.**   Now, fair to say you can't tell us if anything

8    Dr. Menninger wrote in here is wrong, can you?

9    **A.**   I can't.

10   **Q.**   And you would agree with me that Dr. Menninger's response

11   here, nothing about this is inappropriate, right?

12   **A.**   Wouldn't seem.

13   **Q.**   I'm sorry?

14   **A.**   It would not seem it's inappropriate.

15   **Q.**   Okay.  Can you tell us why, then, Mr. Mekerri said that

16   he was very surprised and somehow disappointed by her

17   response?

18   **A.**   I can't -- I can't speak to that sentence.

19   **Q.**   Well, this response we're looking here, the one that

20   starts with, "I'm very surprised and somehow disappointed by

21   your response," this wasn't -- this final version wasn't

22   drafted by Mr. Mekerri, was it?

23   **A.**   I don't recall.

24   **Q.**   Was this a document that you and Ms. Ballweg and in-house

25   counsel had all worked on together?

1    **A.**   You know, some of these elements, I do recall in the
2    email.  I don't recall that particular sentence.
3    **Q.**   I'm going to show you Joint Exhibit 118.  And if we look
4    here at the bottom, we have a draft response from
5    Mr. Mekerri, right?
6    **A.**   Yes.
7    **Q.**   Okay.  And he asked you to review, right?
8    **A.**   Yes.  He does have that sentence in here.  Thank you for
9    refreshing my memory.
10   **Q.**   He asked you to review, right?
11   **A.**   He does, yeah.
12   **Q.**   And you provide Ms. Ballweg a suggested revised version,
13   right?
14   **A.**   Correct.
15   **Q.**   You took out the thing about being disappointed, didn't
16   you?
17   **A.**   Well, my instinct now was my instinct then.
18   **Q.**   You didn't think it was appropriate?
19   **A.**   Correct.
20   **Q.**   But the folks above you, they didn't agree with that
21   assessment, did they?
22   **A.**   Maybe not.  Don't know.
23   **Q.**   We'll look at Joint Exhibit 67.  And, now, we've got some
24   more email correspondence between yourself and Ms. Ballweg,
25   yes?

**A.**   Yes.

**Q.**   She's asking you to work on a revised draft from Hacene to Lisa before you head out for your terrific vacation.  Do you see that?

**A.**   I do.

**Q.**   Okay.  And would you agree with me that that revised draft concerns the email we were just looking at?

**A.**   Yes.

**Q.**   I'll now show you Joint Exhibit 144.  And now we have an email from Mr. Mekerri with a -- with a new draft, right?

**A.**   Version 2 I see, yes.

**Q.**   Okay.  And was this something you had worked with him on?

**A.**   I think he recommended it.  I don't know who gave on what points, but ultimately this was the final second draft. That's all I know.

**Q.**   Okay.  And this is -- this is much, much lengthier than his first version; is that right?

**A.**   Looks that way.

**Q.**   And you sent it to Ms. Ballweg; is that right?

**A.**   Yes, uh-huh.

**Q.**   And just looking at this version, this version is two paragraphs long, right?

**A.**   Correct.

**Q.**   Okay.  And I think we saw in an email before that you had -- you had a terrific vacation coming up?

**A.**   I did.

**Q.**   Okay.  Do you recall if you were -- if you were present when the final version of the email was approved?

**A.**   I don't recall.

**Q.**   I'm going to show you Joint Exhibit 73.  And now we have an email from Ms. Ballweg to Mr. Mekerri copying you, right?

**A.**   Yes.

**Q.**   Ms. Ballweg writes, "Below is the email response Lisa Noecker drafted for you to reply to the latest exchange between you and Lisa Menninger," right?

**A.**   Yes.

**Q.**   Okay.  And a bit lengthier than the version to -- you and Mr. Mekerri came up with?

**A.**   Looks that way, yes.

**Q.**   Was it -- was it typical at PPD for in-house counsel to get involved in email communications with an employee about their annual goals?

**A.**   I don't quite recall.  I've not had it, that I can recall.

**Q.**   During the course of the back-and-forth with Dr. Menninger in April and May of 2018, Ms. Ballweg was -- was heavily involved in that dialogue, wasn't she?

**A.**   I don't know how involved.  I'm sorry.  I can't say.

**Q.**   Fair to say that you -- you weren't sending any emails out to Dr. Menninger unless Ms. Ballweg approved them first?

1    **A.**  I think at that time frame, that is correct.  I think --

2    **Q.**  And -- and fair to say that you didn't want Mr. Mekerri

3    sending any emails off to Dr. Menninger unless you approved

4    them first.

5    **A.**  I would think that's what he would do, but I cannot

6    recall.  I don't want to speculate.

7    **Q.**  I'm going to show you Joint Exhibit 139.  This is an

8    email exchange between yourself and Ms. Ballweg on April 30,

9    2018, yes?

10   **A.**  Yes.

11   **Q.**  And just to orient us, I suppose, a little bit, let me go

12   to the middle email first.  And she's asking you, "Have you

13   sent her anything yet?"  Do you see that?

14   **A.**  I do.

15   **Q.**  Okay.  And this is in response to an email chain with

16   Dr. Menninger that you had forwarded to Ms. Ballweg; is that

17   right?

18   **A.**  Yes, it looks that way, uh-huh.

19   **Q.**  Okay.  Excuse me.

20          And she instructs you, "You can use your PTO as a

21   'I'm working from bottom up' with emails."  Do you see that?

22   **A.**  I do, yes.

23   **Q.**  Do you know what that referred to?

24   **A.**  Honestly, no.

25   **Q.**  Am I right that Ms. Ballweg had instructed you to delay

1   in responding to Dr. Menninger?

2   **A.**   I don't want to speculate.  I don't recall.

3   **Q.**   Let's look at the email above.  "I can definitely respond

4   with 'I'm working from bottom up with emails,' but I haven't

5   responded to her at all, to date, as requested."

6             Do you see that?

7   **A.**   I do.

8   **Q.**   Does that refer to a request you'd received from Deb

9   Ballweg?

10  **A.**   I can't recall for sure.

11  **Q.**   Let's look at Joint Exhibit 71.  And you see here this is

12  an email from Ms. Ballweg to you on April 27, 2018?

13  **A.**   I do.  I see that.

14  **Q.**   Okay.  And she asked you to please hold off sending until

15  next week; is that right?

16  **A.**   Yes, I see that.

17  **Q.**   And am I right that what she's asking you to hold off on

18  sending is an email to Dr. Menninger that had been drafted by

19  in-house counsel?

20  **A.**   Yes.  Thanks for refreshing my recollection.

21  **Q.**   I now show you Joint Exhibit 132.  Looking at the bottom

22  half of the page, is that the email that you delayed sending

23  at Ms. Ballweg's instruction?

24  **A.**   It looks like it is.

25  **Q.**   And you begin by telling Dr. Menninger, "I regretfully

1  was not able to respond to your recent email sooner due to it

2  being out of the office on PTO and have been working through

3  my email from the bottom up."

4          Do you see that?

5  **A.**  I do.

6  **Q.**  That wasn't true, was it?

7  **A.**  I wouldn't say that's not true.

8  **Q.**  I'm sorry?

9  **A.**  I said I was out on PTO and I was working through my

10  email from the bottom up when you get back.

11  **Q.**  Well, you say due to being out of the office being on

12  PTO; is that right?

13  **A.**  Yeah.

14  **Q.**  That wasn't the reason for the delay, was it?

15  **A.**  I wouldn't say that.  I think that was -- it was some --

16  what everyone has when they come back, right, from PTO?

17  They're working through email.  I think they knew that.  I

18  mean, it doesn't strike me now as inaccurate.

19  **Q.**  Let's look at the email that Dr. -- that you were

20  responding to here.  So on April 17, 2018, looking here at

21  the middle of the third page of the exhibit, Dr. Menninger

22  had sent you a note, correct?

23  **A.**  Yes.

24  **Q.**  That was April -- sorry.  And she expressed some

25  frustration over the continued failure to provide additional

1    detail concerning buckets 2 through 4, right?

2    **A.**   Correct.

3    **Q.**   And among the frustration she expressed, she writes, "I

4    feel like you just keep twisting my doctor's words and

5    refusing to answer any of my questions."  Do you see that?

6    **A.**   I see that.

7    **Q.**   She also complains in this email about treatment she's

8    receiving from Mr. Mekerri, correct?

9    **A.**   I see that, yes.

10   **Q.**   She notes that his tone has drastically changed and he's

11   going out of his way to, quote, "document criticisms of my

12   performance that are utterly baseless."

13           Do you see that?

14   **A.**   I see that claim.

15   **Q.**   And she goes on, "It looks like he's trying to build a

16   case against me," right?

17   **A.**   I see that claim as well.

18   **Q.**   And she says, "Like you previously coached us to do when

19   dealing with a 'problem' employee."  Do you see that?

20   **A.**   I do.

21   **Q.**   Do you know what that references there?

22   **A.**   I do.  I coach all leaders on how to document and coach

23   so it doesn't get to disciplinary efforts, right?  Coaching

24   is having a conversation.

25   **Q.**   Who is Meredith James?

1    **A.**  I can't recall right now.

2    **Q.**  Was she one of Dr. Menninger's subordinates?

3    **A.**  In fact, I do remember the name.  Yes.

4    **Q.**  And you -- PPD had identified Ms. James as a poor

5    performer, right?

6    **A.**  It's been a long time ago.  I think so, yeah.

7    **Q.**  And you had coached Dr. Menninger in terms of how to go

8    about documenting performance issues with Ms. James, right?

9    **A.**  Yeah, when coaching was failing.

10   **Q.**  And Ms. James quit, right?

11   **A.**  I don't recall how she left.

12   **Q.**  Do you recall her filing an HR complaint regarding the

13   treatment that she was receiving?

14   **A.**  I don't remember those details, no, uh-uh.

15   **Q.**  Do you recall Ms. Ballweg investigating that?

16   **A.**  It's been a long time ago.  I don't.

17   **Q.**  Um --

18   **A.**  I know there was not an outcome.  I would have recalled

19   that if it were consequential to my career.

20   **Q.**  So that's Dr. Menninger's April 17th email, and there's

21   another email above that on April 27th, right?

22   **A.**  Yes.

23   **Q.**  And in those ten days, you -- you hadn't responded to

24   Dr. Menninger, correct?

25   **A.**  Yes.

1  **Q.**  Okay.

2  **A.**  That was -- that's correct.

3  **Q.**  And in the April 7th -- I'm sorry, April 27th email, she

4  raises additional concerns about Mr. Mekerri's treatment,

5  right?

6  **A.**  She does.

7  **Q.**  Okay.  And she notes that, "He is completely

8  mischaracterizing things and looking for any excuse possible

9  to criticize my 'leadership.'"

10            Do you see that?

11  **A.**  I do.

12  **Q.**  And she says, "He never treated me like this before I

13  told him about my disability."  Do you see that?

14  **A.**  I do see that.

15  **Q.**  That's true, isn't it?

16  **A.**  No.

17  **Q.**  Prior to Dr. Menninger disclosing her disability, there

18  had been no effort to document alleged performance concerns

19  of Dr. Menninger's, had there?

20  **A.**  I don't recall.

21  **Q.**  Well, at some point in time, sir, you were -- you were

22  interviewed by Ms. Ballweg in connection with an

23  investigation of Dr. Menninger's complaints, right?

24  **A.**  At some point, yes.

25  **Q.**  And she gave you a little bit of homework, didn't she?

1    **A.**  I don't recall.

2    **Q.**  She tasked you with going and seeing whether or not there

3    was any documentation of performance concerns before

4    Dr. Menninger disclosed her disability, right?

5    **A.**  Again, I don't recall.

6    **Q.**  Let's look at a document.  Let's look at Joint Exhibit

7    Number 75.

8    **A.**  Sure.

9    **Q.**  So this is an email you sent Ms. Ballweg on May 14, 2018,

10   yes?

11   **A.**  Yes.

12   **Q.**  Okay.  And you write, "Deb, I checked and cannot find any

13   additional emails from Hacene on Lisa's performance outside

14   of the one that I forwarded with Susan's feedback at that

15   time."

16          Do you see that?

17   **A.**  I do.

18   **Q.**  And the one document that you're referring to there, that

19   was 360 feedback that had been provided by a member of

20   Dr. Menninger's team, correct?

21   **A.**  I'm not looking at it, but if that's the one item that

22   you're sharing that was referenced, I --

23   **Q.**  Well, rather than take my word for it, let's look at a

24   document here.  So first, this one is May 14, 2018, right?

25   **A.**  It's the email date, yes.

1   **Q.**   Okay.  And now if we look at Joint Exhibit 245, so this

2   would be an email that you had sent Ms. Ballweg earlier that

3   day, right?

4   **A.**   Yes, it looks that way.  Yes.

5   **Q.**   And this is -- scrolling below, this is 360 feedback from

6   Susan Pattison; is that right?

7   **A.**   Yes.

8   **Q.**   Okay.  And Mr. Mekerri had sent that to you on

9   December 11, 2017, saying "only as FYI"; is that right?

10  **A.**   Correct.

11  **Q.**   I mentioned before Ms. Ballweg's interview of you that

12  you understood that Ms. Ballweg was the person on behalf of

13  PPD responsible for investigating Dr. Menninger's complaints?

14  **A.**   Yes.

15  **Q.**   Okay.  Did you find that odd?

16  **A.**   No.

17  **Q.**   Was that typical that Ms. Ballweg would investigate

18  workplace complaints, even if she'd been involved the whole

19  time?

20  **A.**   We didn't have a lot of those.  In fact, I don't recall

21  another one.  So as an executive director of labs, I was an

22  associate director in HR.  It seemed reasonable to me that

23  she would be the one investigating.

24  **Q.**   Your interview with Ms. Ballweg was rather short, wasn't

25  it?

```
 1    A.  I don't recall.

 2    Q.  She never asked you any specific questions, did she?

 3    A.  Again, I don't recall.  It's been a long time.

 4    Q.  Well, let's see what you wrote -- what you said back at

 5    your deposition.

 6    A.  Okay.

 7    Q.  If you can turn to page 188, please, line 8 --

 8              THE COURT:  So you're having him read this himself?

 9              MR. HANNON:  I'm going to read it out loud and ask

10    him to follow along.

11              THE COURT:  Are you just refreshing his

12    recollection?  He says he doesn't recall.

13              MR. HANNON:  Good point, Your Honor.

14              THE COURT:  I think you just have him read it to

15    himself.

16              MR. HANNON:  You're right.

17    BY MR. HANNON:

18    Q.  So if you can begin with 188, line 8, through 189,

19    line 2, please.

20              THE COURT:  Sometimes, ladies and gentlemen, people

21    don't remember things.  You can show them anything.

22    Typically lawyers show depositions, but you could show them

23    an ashtray.  You could show them anything you want, right?

24    An ashtray would seem odd, but anything that might prompt the

25    person to recall the events at the time.
```

1          And you probably have your own experience of things

2    you don't remember, but then you look back, and it could be a

3    note, it could be something, it could be an object that

4    related to the event, and it prompts you and you can recall.

5          So you just -- Mr. Hannon is having him look at it

6    or read it himself and when he's done, he'll ask the

7    question, not for him to read this, but just to see if that

8    refreshes his recollection.

9          Sometimes the depositions are used for a different

10   purpose where a witness says something -- what we call

11   impeached -- where you said something -- the witness said it

12   was sunny the day of the accident, and then they're

13   cross-examined, they're impeached with their deposition where

14   at their deposition they said it was raining at the time of

15   the accident.  That's not refreshing their recollection.

16   That's confronting them with a prior statement that's

17   different than what they said in the courtroom, and that's

18   why they would read it.

19          Tell us when you're done reviewing that.  You're

20   done?

21              THE WITNESS:  Yes, Your Honor.

22              THE COURT:  Go ahead and ask questions.

23              MR. HANNON:  Thank you.

24   BY MR. HANNON:

25   Q.  So do you -- do you now recall, sir, that, either in your

1    interview with Ms. Ballweg, she didn't ask you any specific

2    questions?

3    **A.**   I don't think there were questions provided to me, even

4    by Dr. Menninger, with specificity.  So I wouldn't know and I

5    didn't witness anything to provide any detail.

6    **Q.**   Sure.  My question is about your interview with

7    Ms. Ballweg during the course of her investigation --

8    **A.**   Uh-huh.

9    **Q.**   -- and specifically whether or not when Ms. Ballweg

10   interviewed you, she actually asked you any specific

11   questions.

12   **A.**   She asked me what I knew about it.

13   **Q.**   And she asked you if you ever witnessed anything that was

14   not fair and equitable in conversations between Dr. Menninger

15   and Mr. Mekerri, right?

16   **A.**   Correct.

17   **Q.**   And you said no?

18   **A.**   She asked that question, but I didn't witness anything.

19   **Q.**   And that was the end of your interview, right?

20   **A.**   It would seem.

21   **Q.**   I'm now going to show you Joint Exhibit 450, and I'm

22   showing you the third page of the document.  And so,

23   Mr. St. John, this is -- this is what Ms. Ballweg has told us

24   occurred during your interview and I want to direct your

25   attention to -- actually, strike that.

1       Let me show you instead the findings here.  And so,

2   just to orient everybody here, I'm showing you the part of

3   the exhibit that has the May 18, 2018 date, and you see here

4   it starts "Primary concerns provided by Lisa Menninger."  Do

5   you see that?  Do you see that, sir?

6   **A.**  I do.

7   **Q.**  Okay.  Great.

8       Now, just turning to the third page here, there's

9   some text here.

10  **A.**  Thanks for increasing the font.

11  **Q.**  Sure thing.  And Ms. Ballweg wrote, "Above information

12  and reinforcing the discussion I had with Lisa on 5/15 where

13  she asked the same question of 'What if I can't perform the

14  essential functions of my job?'"

15      Do you see that?

16  **A.**  I do.

17  **Q.**  Okay.  Did you ever tell Ms. Ballweg that during the

18  February 28th meeting with Dr. Menninger and Mr. Mekerri, she

19  had asked the question, "What if I can't perform the

20  essential functions of my job?"

21  **A.**  I just don't recall that specific comment.

22  **Q.**  At PPD in early 2018, there was a formal review process

23  for employees, right?

24  **A.**  Yes.

25  **Q.**  And that formal review process required managers to

1   complete a document online?

2   **A.**   I believe so.

3   **Q.**   Okay.  And the document was supposed to be completed by

4   the end of the year, right?

5   **A.**   Yes.

6   **Q.**   Not everyone did that, right?

7   **A.**   I don't recall.

8   **Q.**   Okay.  And when you were corresponding with Dr. Menninger

9   in January and February of 2018, she raised with you then

10   some concerns she had about her year-end review, right?

11   **A.**   I believe that's the case.

12   **Q.**   Okay.  She noted that Mr. Mekerri had never actually

13   reviewed it with her?

14   **A.**   I believe so.

15   **Q.**   She noted that there were sections that were never

16   actually completed?

17   **A.**   I don't recall that detail.

18   **Q.**   Okay.  Well, let's take a look at the document here.  I'm

19   going to show you Joint Exhibit 59.  And you see here this is

20   the 2017 performance review for Lisa Menninger?

21   **A.**   Yes.

22   **Q.**   And so here on the second page -- let's go to the third

23   page.  You see here there's a section on the review for the

24   manager to provide year-end comments, right?

25   **A.**   Yes.

1  **Q.**  And it looks like Mr. Mekerri, he had stopped

2  midsentence?

3  **A.**  Yes.

4  **Q.**  Okay.  And then looking below, the next box, he hadn't

5  provided any comments at all?

6  **A.**  Correct.

7  **Q.**  And then, in the next page, he hadn't provided any

8  comments at all?

9  **A.**  That is correct.

10  **Q.**  And then the next page, he hadn't provided any comments

11  at all?

12  **A.**  Correct.

13  **Q.**  And then the next page, he hadn't provided any comments

14  at all?

15  **A.**  Also correct.  I do see ratings for each category.

16  **Q.**  And then the next page, no comments?

17  **A.**  Correct.

18  **Q.**  And then -- well, let's back up a second here.

19        Now, one of the sections on this review concerned

20  recruiting; is that right?

21        Excuse me.  That's the wrong one.

22  **A.**  Yeah.

23  **Q.**  One page back.  I'll get there eventually.

24        All right.  I'm now showing you the second page of

25  the exhibit, the top half here, and we have a goal that is to

1  expand scientific expertise and technical depth for GCL; is

2  that right?

3  **A.**   That is correct.

4  **Q.**   And that involved recruiting and hiring people at the

5  PhD/MD level; is that right?

6  **A.**   Yes.

7  **Q.**   Okay.  And Dr. Menninger's year-end comments, she

8  provides a description of her efforts.  Do you see that?

9  **A.**   I do.

10  **Q.**   Okay.  Anything in there that you think is wrong?

11  **A.**   Looks correct.

12  **Q.**   And Dr. Menninger's overall rating for 2017, that was a

13  three, correct?

14  **A.**   Yes, fully meets expectation.

15  **Q.**   And you -- at the time you had no opinion one way or the

16  other as to whether or not that was -- that was a proper

17  rating, correct?

18  **A.**   Correct.

19  **Q.**   Okay.  Now, you -- you had some involvement in the

20  completion of this review, didn't you?

21  **A.**   I don't recall that I did.

22  **Q.**   Okay.  In the -- in the performance review system, you

23  had the ability to modify reviews in the system, didn't you?

24  **A.**   I -- I don't know.  That's not a function I normally

25  would do, so --

1   **Q.**   Okay.  I'm going to show you a document here -- well, let
2   me ask this question first.  Do you recall on January 15,
3   2018, going into the system and modifying this review?
4   **A.**   I don't recall, no.
5   **Q.**   Okay.  I'm going to show you a document to see if it
6   refreshes your recollection.
7           MR. HANNON:  Ms. Belmont, this document is not in
8   evidence.  So this is -- identification -- BI.
9   BY MR. HANNON:
10  **Q.**   So I'm just going to direct your attention here to a
11  highlighted portion of the document, sir.
12          MS. MANDEL:  Your Honor, we object to the use of
13  this exhibit.
14          THE COURT:  What's the objection?
15          MS. MANDEL:  This goes beyond the scope of what is
16  permissible in light of the summary judgment ruling on this
17  particular issue.
18          THE COURT:  Do you have anything else with this
19  witness, other than this topic, so I can look back at that at
20  the break?
21          MR. HANNON:  This is probably it.
22          THE COURT:  Why don't we take the morning break now
23  and then I'll look at it.
24          All rise for the jury.
25          (Jury not present.)

1          THE COURT:  Which part of the summary judgment
2   ruling rules this out?
3          MS. MANDEL:  Your Honor, just give me one moment to
4   pull out --
5          THE COURT:  Is, essentially, what you think this
6   document shows --
7          Can you put it back up?
8          Is this some sort of audit printout of the
9   performance review system?
10         MR. HANNON:  It is.
11         MS. MANDEL:  Your Honor, I'm just -- just directing
12   your attention to page 17 of the summary judgment decision.
13   And the one complete paragraph on that page --
14         THE COURT:  Let me --
15         (Pause in proceedings.)
16         THE COURT:  What's the relevance, Mr. Hannon?
17         MR. HANNON:  Well, I think most directly, it goes
18   to rebut an argument that PPD has made, which was that this
19   performance review was created before the disclosure of -- of
20   the disability.
21         The summary judgment order defines that I can't
22   prove that it was done after, but tie goes to them.  So it
23   doesn't mean that they can prove that it was done before.  So
24   they've -- they've offered evidence to try to suggest this
25   was done before.  At the very least, the jury is permitted to

1    know there is evidence that calls that into doubt and that

2    it's not clear one way or the other.  So that's --

3             THE COURT:  What would be the argument either way

4    from both of you on this?

5             MS. MANDEL:  Your Honor, just to Mr. Hannon's

6    point, this is not something that PPD has, in fact, put into

7    evidence.  We've responded to certain items that

8    Dr. Menninger has testified about, but we have not put this

9    into issue in front of the jury.  In fact, all we've done is

10   provide a little bit of responsive information.  In fact,

11   this is an attempt to put into evidence an issue that's

12   already been ruled on by the Court.

13            MR. HANNON:  May I address that, Your Honor?  It

14   doesn't bring it in because if you're not going to instruct

15   the jury, this is -- this is an adverse act, then they can't

16   reach that conclusion.  There's no risk that if they're going

17   to go there.

18            Really all this is important is for the jury to

19   understand that there were things going on here that

20   Dr. Menninger was perceiving in terms of the timing of things

21   and we've heard -- you've heard a lot of evidence in terms of

22   her sort of mental state and what was contributing to that.

23            If nothing else, the fact that this is modified on

24   January 15th goes to show she's not getting it until after

25   that.  She's not getting her review until after she's

1   disclosed her disability.  And they've tried to suggest that

2   her -- that her mental impairment was somehow influenced by

3   other factors besides what was going on at work.

4            THE COURT:  What's the date of her email disclosing

5   her disability?

6            MR. HANNON:  January 11th.

7            MS. MANDEL:  Your Honor, just to specifically

8   highlight the finding in the summary judgment decision that

9   Dr. Menninger does not sufficiently dispute this chronology

10  of events.  Trying to show this chronology, even if the jury

11  doesn't have the visual of this document, will simply serve

12  to confuse the jury because once they'll be receiving the

13  instructions --

14           THE COURT:  I just don't get the point -- you're

15  not arguing to the jury -- what are you arguing to the jury

16  about the timing of the completion of her --

17           MS. MANDEL:  Well, in fact, almost nothing because,

18  in our view, that issue is out, has already been ruled on.

19  We've responded to sort of show that the timeline of when she

20  disclosed her disability, the review was completed before

21  that time.  And, again, I think that's an issue that's

22  already been determined by the Court as not being before the

23  jury.

24           THE COURT:  Well, what I determined was simply that

25  Mr. Hannon -- Mr. Hannon didn't have enough evidence to prove

1      that there was an adverse action about that.  And he conceded

2      or -- maybe he didn't -- that the evidence was not really

3      disputed about the chronology that I described in the summary

4      judgment decision.

5              I think here's my general thought and you can

6      respond.  One, it's not going to the jury as an adverse

7      action.  I don't understand you to be proposing that,

8      Mr. Hannon, in any event.  I ruled that out, and whatever

9      rights you have from the summary judgment, but I don't

10     understand you to be asking me to revisit that.

11             What I understand you to be saying is -- and so --

12     and the draft instructions I'm almost done with don't

13     instruct them that that's a possible adverse event for them

14     to consider, because I'm instructing them on the things that

15     survive summary judgment.

16             What I understand you to be saying is that this is

17     just information that in some way there's been some evidence

18     about when it was completed and moved forward, and you wish

19     to sort of round out the picture on that.

20             MR. HANNON:  Yes.  And it also pertains to, you

21     know -- to the extent that this witness had a hand in

22     modifying this, the fact that it doesn't say certain things

23     that we expect he's going to say on cross-examination he had

24     concerns about, his involvement in this document and this

25     process is something that's going to be material to the jury

1    to have the full picture.

2            MS. MANDEL:  Your Honor, I actually think it can

3    simply confuse the jury or imply --

4            THE COURT:  I think at the moment -- I'm not saying

5    you can't do it at all, Mr. Hannon, but at the moment, I

6    think no, because it's just to -- I don't see that we've

7    really heard hardly anything about that.  We've heard this

8    issue about the -- but I don't understand you to be disputing

9    this is a business record, right?

10           MS. MANDEL:  We don't dispute this is a business

11   record.

12           THE COURT:  Simply a question of relevance?

13           MS. MANDEL:  Relevance and having a tendency to

14   confuse the jury when there's all the --

15           THE COURT:  I think I'd like to see what they do on

16   cross-examination, or their direct, and then see where we

17   are.

18           MR. HANNON:  Sounds good.

19           THE COURT:  Okay.  All right.  Anything else on

20   that or anything else?  No?

21           So we'll resume at 11:15.  Do you want a little --

22   just -- so my calculation of where we were yesterday, so my

23   calculation is that, Mr. Hannon, you used two hours and

24   50 minutes.  You each used two hours and 50 minutes

25   yesterday, so that you're at 11 minus two hours and

1    50 minutes.  And so far this morning, you're at one hour and

2    55 minutes, Mr. Hannon.

3              MR. HANNON:  Great.  Thank you.

4              MS. MANDEL:  Your Honor, would it be possible just

5    to take ten minutes so we can use the restroom and then come

6    back?

7              THE COURT:  Sure.  All right.  You want -- we'll be

8    back here just a little bit before 11:20 so we can resume at

9    11:20.

10             MS. MANDEL:  Thank you.

11             (Court in recess at 11:09 a.m.

12             and reconvened at 11:19 a.m.)

13             THE COURT:  Couple things.  First, Mr. Hannon, can

14   you put that document up again?

15             MR. HANNON:  Yes, Judge.

16             THE COURT:  And my question is this:  Does it

17   merely show, if I remember what it said, that on

18   January 12th, Mekerri submitted the performance review; and

19   on January 17th, Mr. St. John, like -- I don't know if signed

20   off is the right word or --

21             MS. MANDEL:  Is it possible to -- I just don't have

22   that particular --

23             THE COURT:  Put it up there?  Yeah, he's putting it

24   up.

25             If you can just reduce it a little so we can see it

```
1    a little more.
2                MR. HANNON:  Sorry.
3                THE COURT:  So this looks like on January 12th
4    there was a manual signature completed by Mekerri -- if I'm
5    saying his name right.
6                MR. HANNON:  No.  If you look --
7                THE COURT:  Oh, no.  For Mekerri by Ballweg.
8                MR. HANNON:  Yep.
9                THE COURT:  And then on the 15th, Mr. St. John
10   routed it somewhere, and on the 15th, something was skipped
11   and document completed, right?  So I guess my question is
12   what does all this show other than its status was changed to
13   completed on the 12th by Ballweg and Mr. St. John processed
14   it in some way on the 15th?
15               MR. HANNON:  Well, that's the question for the
16   witness.
17               THE COURT:  Right.  So you don't have any --
18               MR. HANNON:  I know that on January 15, 2018, he
19   did something to it, and I know the system says "modify."
20               THE COURT:  Where does it say "modify"?
21               MR. HANNON:  In the action.  Do you see that?
22               THE COURT:  Oh.  Right.
23               So I'm so con- -- there's been testimony about
24   this.  The general topic strikes me as relevant, when people
25   did things to it.  It just -- there's two concerns I have.
```

1     One is it's peripheral, and the second is you-all have your

2     time and you can choose to spend your time how you do it, but

3     nobody has on their witness list the architect or the person

4     who is expert in how this performance review software works.

5             And so what the -- I don't -- based on the

6     testimony so far, I would be surprised if this witness -- no

7     offense to the witness -- is able to tell us that there are

8     12 action codes, this is what each action code is, this is

9     all the different ways you can operate the software, and this

10    is what each one triggers, which action code.  And it's not

11    clear to me there's any witness left who could say that or

12    even whether -- other than the person who wrote the software

13    is capable of explaining that very well.

14            And so it -- I'm worried about it sort of, like,

15    leaving issues we then have to explain what the jury can't

16    infer from it if they don't know those things.  That's my

17    concern.  It goes down sort of that kind of road.  That's

18    what I was thinking about.  I'm happy to hear you both on

19    that.

20            MS. MANDEL:  Your Honor, if I may, I just wanted to

21    make one clarifying point --

22            THE COURT:  Yeah.

23            MS. MANDEL:  -- and I don't think that we have, to

24    Your Honor's point, any evidence or witness testimony that

25    would really speak to this.

```
1              But I just wanted to point out the upper
2     highlighting and next to it where it says "manual sign."
3     Next to that has Dr. Menninger's name.  I just wanted to
4     point out that it's not clear if that means that Dr.
5     Menninger entered a manual signature that day.  I know you
6     read the comments.
7              But I just wanted to be clear.  I mean, I think,
8     again, there's just a lot of room for confusion on the part
9     of the jury about what this means, how to interpret things
10    like the comments, the actions, and there's no explanation
11    for the jury about what any of that means.  And to
12    Your Honor's point, I don't believe that any of the witnesses
13    who will be appearing at this trial can explain that.
14             THE COURT:  You can ask him what, if anything, he
15    did to modify --
16             MR. HANNON:  At this point, I haven't offered the
17    document.
18             THE COURT:  Right.  I know.  I'm just anticipating
19    what to talk about it.  So I think that's fine to ask him
20    that, and then we'll see.
21             Okay.  One thing I wanted to bring up, the jurors
22    asked --
23             Or one or more jurors, Kellyann?
24             THE DEPUTY CLERK:  Three.
25             THE COURT:  -- asked Ms. Belmont during the break,
```

1    do they have to be unanimous?

2            I -- they have -- I have instructed them every

3    morning and at the end of every day they are not to discuss

4    the case among themselves or with anyone else, and they have

5    confirmed every morning that they've followed that

6    instruction.  There's nothing in the interchange with

7    Ms. Belmont that indicated to Ms. Belmont -- there was

8    nothing further to the exchange, as I understand it, and

9    nothing that indicated that they were discussing the case

10   among themselves.

11           I'm -- when I bring them out, I'm going to tell

12   them that they have to be unanimous since they asked the

13   question and that's the law and that I'm going to explain

14   that to them.  And then I'm going to remind them that I'm

15   going to explain everything about everything that has to be

16   proven in order to determine their verdict in this case and

17   the final instructions and remind them that they shouldn't be

18   discussing the case.

19           Is there anything else either of you wish to

20   address about that?

21           MS. MANDEL:  No, thank you.

22           MR. HANNON:  Nothing here.

23           THE COURT:  All right.  Go get the jury.

24           (Jury present.)

25           THE COURT:  So, ladies and gentlemen, I understand

1    one or more of you asked Ms. Belmont the question of whether

2    you have to be unanimous in your verdict and so the answer to

3    that question is yes.  You must be unanimous as to all of the

4    special questions that will be submitted to you on the

5    verdict form.

6            And so, more generally, at the conclusion of the

7    case on Friday -- no later than Friday -- when you receive

8    the case, the last thing that will happen in the courtroom, I

9    will deliver to you orally my instructions to you on the law.

10   That will explain to you the following general topics:  What

11   is the burden of proof, what is evidence, how to think about

12   evidence, things to consider about how to evaluate the

13   credibility of witnesses.  That's one big category of

14   instruction.

15           The second big category of instruction is what are

16   the claims that Ms. -- Dr. Menninger has advanced and what

17   are the elements of those claims?  What are the things

18   Dr. Menninger has to prove as the plaintiff in order to

19   prevail on each of her claims.  And I'll explain all of that

20   to you in detail.

21           And then the final part of the instructions will

22   explain to you some general guidelines about how to

23   deliberate and, among other things, that your verdict has to

24   be unanimous.

25           You will have -- although I will ask you to listen

1    closely to what -- my instructions to you in the courtroom.

2    You will have those instructions in writing with you in the

3    jury room.

4              In addition, you will have a separate document from

5    me called the verdict form.  The verdict form will have

6    questions for you to answer and the questions pair with the

7    instructions.  And those are the questions that you -- on

8    each of those questions, you will have to be unanimous.  And

9    those -- and those questions are your verdict, if you will.

10             And so all of that will be explained in more detail

11   to you.  And in the meantime, I remind you you should not be

12   discussing the case among yourselves.  You should keep an

13   open mind.  You haven't heard all the evidence, you haven't

14   heard the instructions, and, obviously, shouldn't be

15   discussing the case with anyone else either.

16             All right.  Mr. Hannon, go ahead.

17             MR. HANNON:  Thank you.

18   BY MR. HANNON:

19   Q.  So, Mr. St. John, we left off -- I was showing you a

20   document, and my question to you, sir, is simply does this

21   document refresh your recollection as to whether or not you

22   made some modification to Dr. Menninger's 2017 performance

23   review on January 15, 2018?

24   A.  It does.  It does.

25   Q.  Okay.  And you did, in fact, make a modification to her

1    performance review on January 15, 2018; is that right?

2    **A.**   No.  It would indicate to just manually moving it forward

3    in the process, no comment, no change, other than moving it

4    forward in the process.

5    **Q.**   Okay.  And you did that on January 15, 2018?

6    **A.**   Correct.

7    **Q.**   Just one last document -- I apologize, this is way out of

8    order.  I skipped over it earlier.  I'm going to show you

9    Joint Exhibit 146.  And I'm not going to beat a dead horse

10   here, but -- so this is an email exchange between you and

11   Ms. Ballweg on April 12, 2018; is that right?

12   **A.**   Yes.

13   **Q.**   You're describing for her a quick interaction you'd had

14   with Mr. -- Chris F.; is that right?

15   **A.**   Yes.

16   **Q.**   Would that be Dr. Fikry?

17   **A.**   Yes, I'm sure it would be.

18   **Q.**   Okay.  And he asked how everything was going?

19   **A.**   Yes.

20   **Q.**   And you told him that Hacene is holding Lisa accountable?

21   **A.**   Yes.

22   **Q.**   Setting clear expectations?

23   **A.**   Correct.

24   **Q.**   And monitoring her performance clearly; is that right?

25   **A.**   Closely, yes.

1    **Q.**  Closely.  Thank you.

2              MR. HANNON:  That's all I have, Your Honor.

3              THE COURT:  All right.  Cross-examination or . . .

4              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

5    BY MS. MANDEL:

6    **Q.**  Good morning, Chad.

7    **A.**  Good morning.

8    **Q.**  You testified earlier today about receiving

9    communications from Dr. Kessimian.  Do you recall that?

10   **A.**  Yes.

11   **Q.**  After the letter that you received from Dr. Kessimian

12   with accommodation requests dated February 14th, did you ever

13   receive another letter from Dr. Kessimian telling you that it

14   was okay for Dr. Menninger to engage in any particular work

15   tasks?

16   **A.**  No.

17   **Q.**  Did you ever receive any other communication from

18   Dr. Kessimian at all?

19   **A.**  No.

20   **Q.**  You testified a view moments ago -- or a little while ago

21   at this point, about some performance and quality issues that

22   you're aware of with respect to Dr. Menninger; is that

23   correct?

24   **A.**  I am.

25   **Q.**  Did Dr. Menninger ever receive any discipline in

1    connection with any of those issues?

2    **A.**  No.

3    **Q.**  And did PPD ever fire or threaten to fire Dr. Menninger

4    in connection with any of those issues?

5    **A.**  No.

6              MS. MANDEL:  Nothing further at this time,

7    Your Honor.

8              THE COURT:  All right.  Thank you very much.

9              Anything else?

10             MR. HANNON:  Nothing further of Mr. St. John, no.

11             THE COURT:  All right.  Thank you very much,

12   Mr. St. John.  You're excused.

13             THE WITNESS:  Thank you.

14             THE COURT:  Next witness?

15             MR. HANNON:  Christopher Fikry.

16             MR. CURRAN:  Mr. Fikry -- his flight got delayed,

17   and so he won't be here for a little while.  He's --

18             MR. HANNON:  Hacene Mekerri via read-on.

19             THE COURT:  All right.  So as you know, ladies and

20   gentlemen, we're -- some of the witnesses, like Mr. St. John

21   and Mr. Fikry, obviously, are coming from out of state, so

22   we're -- the lawyers, really, pick the schedule, but they're

23   working with each other to accommodate the schedule.

24             So the next is a reading of a portion of the

25   deposition of Mr. Mekerri.  And so the way that -- is way

1    that's going to work is --

2              MR. HANNON:  May I approach?

3              THE COURT:  Yes.  Just -- how do you anticipate it

4    working?

5              MR. HANNON:  What we have done, Your Honor, is we

6    have merged together the respective portions that both

7    parties want read in.  So we're just going to read in all

8    sections through a straight read.

9              THE COURT:  Okay.  So this is -- what you have seen

10   with other witnesses, right, is Mr. Hannon will ask questions

11   of what he wants to ask, and defense counsel will ask

12   questions of what they want to ask.

13             Here, Mr. Mekerri is not going to be here, so

14   they're reading his deposition.  And so it's just going to be

15   one read and you shouldn't -- you're going to read all the

16   questions?

17             MR. HANNON:  Yes, Your Honor.

18             THE COURT:  All right.  So, Mr. Hannon, is going to

19   read all the questions, but you shouldn't infer that these

20   are all things that he wants to put in, and it doesn't -- the

21   evidence, as I will tell you later, doesn't really matter who

22   put in the evidence.  The evidence is the evidence.  So he's

23   going to read all the questions and --

24             Is this someone from your office?

25             MR. HANNON:  Yes.  This is our paralegal, Your

1    Honor.

2              THE COURT:  So this is not, obviously, Mr. Mekerri.

3    This is a paralegal from Mr. Hannon's office and she will be

4    Mr. Mekerri for this purpose and she'll read the answers.

5              And so these are just what -- the two of them thing

6    should be presented to you.

7              Yes?

8              JUROR:  I just wondering why Mr. Mekerri is not

9    here.

10             THE COURT:  I think that's a question we're going

11   to circle back to.  I just want to confer with the lawyers

12   about that and I -- I have the sense more than one of you

13   would like the answer to that question, so let me talk to the

14   lawyers about that and see what, if anything, they have to

15   answer for you about that.

16             Go ahead, Mr. Hannon.

17             MR. HANNON:  Thank you, Your Honor.

18             THE COURT:  I'll confer with them about that at

19   lunch and then I'll give you the answer to that at

20   two o'clock.

21             Is the answer -- location?  Is that -- do you both

22   think that's the answer?

23             MR. HANNON:  I'm sorry?

24             THE COURT:  Location is the answer?  Or do you

25   think we should discuss it?

1      MR. HANNON:  I think we should discuss just so it's

2   consistent.

3      THE COURT:  Fine.  Go ahead.

4            The testimony of

5            **HACENE MEKERRI**

6   having been duly sworn previously, was read into the record as

7                    follows:

8   **Q.**  "Mr. Mekerri, good evening to you.  My name is Patrick

9   Hannon, I represent Lisa Menninger in connection with this

10  action.  Thank you for taking the time and speaking with us

11  via videoconference.  And just for the record, can you

12  identify where you are at present?

13  **A.**  "Sure.  I'm based in Singapore.

14  **Q.**  "Okay.  Are you currently employed?

15  **A.**  "Yes, I am.

16  **Q.**  "Okay.  Great.  So, Mr. Mekerri, how are you presently

17  employed?

18  **A.**  "I work for biomedical and life science solutions.  It's

19  a company that I set up when I came here in Singapore for

20  consistency, for supporting laboratory and pharmaceutical, to

21  support pharmaceutical companies, as well as, you know,

22  players from the clinical trials to work here in

23  Asia-Pacific.

24  **Q.**  "And, Mr. Mekerri, when did you form this consultancy?

25  **A.**  "It was in -- when I arrived here, some months after.  So

1    I would say probably May, May or June.  I'll have to come
2    back to you with the date.
3    **Q.**  "Would that be May or June of this year, 2020?
4    **A.**  "No, 2019, but it might be later.  I arrived here in
5    Singapore in April, so it took me some time, really, to
6    register the company.  But it might be that we registered in
7    summer, so probably July or August.  I don't have the date in
8    mind.
9    **Q.**  "Okay.  And what did you do for work prior to starting
10   this consultancy you referenced?
11   **A.**  "I was working for PPD, so I was the vice president of
12   Global Central Lab and vaccine.
13   **Q.**  "And what was your title immediately prior to leaving
14   PPD?
15   **A.**  "Prior to leaving PPD, vice president of Global Central
16   Lab and vaccine.
17   **Q.**  "For how long were you in that position?
18   **A.**  "Three years.
19   **Q.**  "How did you come to join PPD?
20   **A.**  "I've worked with LabCorp since 2015 and my former leader
21   at LabCorp had joined PPD as the global head of central lab,
22   and he informed me that they were looking for a global head
23   of central lab.  And that was end of 2015 and that's where we
24   started to have the discussions with the rest of the PPD
25   team.

1            "On November 2015, if I recall, I met with the

2    leadership team of PPD in Wilmington, North Carolina, at the

3    headquarters and -- yeah, I had to set up interviews with the

4    team.  They reviewed my experience with LabCorp, with MDS, my

5    experience in China as well, working as the leader of the

6    integration between LabCorp and Covance, my experience in

7    Germany as I worked there for about seven years, and,

8    obviously, all my experience for 20 years in the industry.

9            "And then I'd been selected and had the privilege

10   to serve as the vice president of Global Central Lab for PPD.

11   And we started to have a discussion in January 2016, if I

12   recall, but my starting date with PPD I flew from China to

13   France first in January.  And then in February, I flew from

14   France to US for work.  I worked with PPD on the visa as

15   well, so that I can work in the US.  I've had the great

16   privilege to receive an 01-Visa from the US homeland, the US

17   government, and then I was able to work in the US."

18           THE COURT:  Let me just pause you one second,

19   Mr. Hannon.

20           So, ladies and gentlemen of the jury, just so you

21   understand, obviously, there is a transcript of this

22   deposition.  That's what's being read.  You are not going to

23   have that transcript in the jury room.  You don't -- we

24   don't -- we won't have transcripts for the reasons I've told

25   you of all the other witness, and so for that reason, we

1    don't give you this transcript because all the witnesses are

2    equal, or to be treated equally, until you evaluate them.

3           So you're, obviously, paying close attention, but

4    that's an important -- I didn't want you to think that you'll

5    have that.

6           Go ahead, Mr. Hannon.

7           MR. HANNON:  Thank you, Your Honor.

8    Q.  "Okay.  And when you joined PPD, did you join as vice

9    president of Global Central Lab and vaccine?

10   A.  "No.  I was just the vice president of Global Central

11   Lab.  The vaccine team or business was added to my

12   responsibilities later.  I think it was in 2017, but this has

13   to be checked with the data PPD team.  I think it was in 2017

14   that I got an additional -- additional responsibilities

15   within PPD.

16   Q.  "Okay.  And was there a person who was serving as vice

17   president of Global Central Lab prior to you joining PPD?

18   A.  "I think so.  You know, yes, they had a leader, but when

19   I joined, I understand that there was no leader, right?  So

20   probably there was a gap between when I joined and that

21   former leader.

22   Q.  "What were your duties and responsibilities as vice

23   president of Global Central lab when you joined PPD?

24   A.  "It was to lead the four central labs, the clinical

25   topography PPD had in Singapore, China, US, Highland Heights,

1    and Belgium, Brussels' laboratory in Europe.

2           I was, in fact, in charge of the global operations,

3    reaching the company objectives for PPD, making sure that the

4    clinical trials that PPD was running were running smoothly,

5    that we delivered on time the results, that we met as well

6    the company business objectives from a financial perspective,

7    as well.

8           I was responsible, as well, for the quality that --

9    the centralized business was in a highly regulated

10   environment, so we had to meet some quality objectives for

11   CAP, for ISO as well, which are some regulations that we were

12   following, yeah.  As the leader, Patrick, there were

13   activities, responsibilities that come with the role and

14   together with team that I had at the time was to meet those

15   objectives.

16   Q.  "How were your duties and responsibilities at PPD

17   different from the duties and responsibilities you would have

18   in your prior employment?

19   A.  "Probably having to deal with four labs, like, you know,

20   having to -- before I was the head of Europe for data

21   management.  So it was Germany and France.  And then I was

22   the head of Canada, so one side.  And after that, I was the

23   head of China.  This time, probably the difference would be

24   the fact that I have four sides, so the whole business.

25   Q.  "And when you first joined PPD, to whom did you report?

1    **A.**   I reported to Dr. David Johnston.

2    **Q.**   "And did you have direct reports when you first joined

3    PPD?

4    **A.**   "Yes.

5    **Q.**   "And who were they?

6    **A.**   "The head of laboratory, Dr. Menninger; the head of IT;

7    the head of project management; the head of data management;

8    and I'm sure I -- I always forget some folks, but that -- and

9    some departments were reporting directly to the EVP.  The

10   sales force was reporting to the EVP, so that's a different

11   department that they have.

12   **Q.**   "So you mentioned that one of the roles reporting to you

13   was the head of lab; is that right?

14   **A.**   "Yes.  Lisa.

15   **Q.**   "And that was Dr. Menninger?

16   **A.**   "Yes.

17   **Q.**   "Okay.  And you mentioned there was also an IT role?

18   **A.**   "Yeah.  Patrick, I apologize.  I think that the IT was

19   reporting directly to -- excuse me -- to corporate group.  So

20   it was the data management.  But I'd like to correct that.

21   IT was not reporting to me.

22   **Q.**   "Okay.  But you mentioned there was a data management

23   role that reported to you?

24   **A.**   "Yes, uh-huh.

25   **Q.**   "And who was the individual in that role when you first

1    joined PPD?

2    **A.**   "It was Tracy, Tracy Watkins.

3    **Q.**   "And you mentioned there was also a product management

4    role that reported to you?

5    **A.**   "Project, -- project management.

6    **Q.**   "And who was it?

7    **A.**   "At the beginning, it was Els Pluymers, and I have, as

8    well, the head of Asia-Pac., Asia-Pacific.

9    **Q.**   "So the head of Asia-Pacific was also reporting to you?

10   **A.**   "Yes, the senior director of Asia.

11   **Q.**   "And who was the individual in that role?

12   **A.**   "Esther E.

13   **Q.**   "So besides Dr. Menninger, the project management leader,

14   the data management leader, and the director of Asia-Pacific,

15   did you have any other direct reports when you started at

16   PPD?

17   **A.**   "Oh, I'm sorry -- I'm sorry if I forget some.  I'm sure I

18   forgot.  Dr. Miriam Block, she was kind of in direct line

19   with me and with Lisa.  Actually, I appreciated that Lisa

20   worked with her because we have two great scientists working

21   together.  But I remember Dr. Miriam Block, who has been a

22   consistent for PPD in helping us with the oncology project.

23   **Q.**   "Any other direct reports who you can recall?

24   **A.**   "No, I don't recall at this time.

25   **Q.**   "Okay.  And just before you left PPD, who were your

1   direct reports at that time?

2   **A.**   "The team in China that was based in Beijing, so, you

3   know, the same as the people I described to you:  laboratory,

4   project management, data management.

5          So they had an indirect line with me and a direct

6   line to their head of different departments.  So I was based

7   in China as a managing director, and so all the departments

8   that were running in the sites were, you know, indirectly

9   reporting to me.

10  **Q.**   "When did your employment with PPD end?

11  **A.**   "It was February 2019.

12  **Q.**   "And how did the end of your employment come about?

13  **A.**   "It was my decision to leave PPD.  I worked there for two

14  years, and I've had, you know, the privilege to serve the

15  central lab, the vaccine business, and I've been working on

16  my succession plan for quite some time.  And we've -- I've

17  had -- you know, we've had great success with the team, so we

18  met our objectives.  We surpassed/exceeded our objectives,

19  financial objectives, from a quality perspective as well.  So

20  for me it was the right time, as well, to leave PPD after two

21  years.

22          "And I came from this region, too, in APAC, so I

23  wanted to return here in Asia to open my own business and see

24  how I can support the pharmaceutical companies here -- from

25  here in Asia.

1    "So when I left PPD, I thanked the team, I thanked

2    my leader, and prepared my move to Singapore.

3    **Q.** "Did you enter into any kind of agreement with PPD

4    concerning the termination of your employment?

5    **A.** "In fact" --

6    MR. HANNON:  You can keep going.

7    **A.** "Patrick, for me, it was the right time and it was pretty

8    much my decision here, so I completed my resignation letter.

9    I explained the rationale, and I sent to it my supervisor.  I

10   had three great years with PPD, you know, from a results

11   perspective; I think from an objective perspective and the

12   results.

13   "And, of course, it's not me alone.  It's the whole

14   team.  We had the best results, you know, we reached the best

15   results that PPD never had before from a central lab

16   perspective.  Never.

17   "From a sales perspective, we've added hundreds of

18   millions of sales.  From a testing perspective, we've added

19   months -- people assays.  And from a quality perspective,

20   we've added a lot of quality, regulatory requirements for CAP

21   or ISO.

22   "And I want to mention, as well, I've been

23   instrumental for that as well.  So for me, it was the right

24   time to leave PPD.

25   **Q.** "Well, for example, a separation agreement, an agreement

1   that provides you severance compensation, any kind of written

2   agreement in connection with the end of your employment?

3   **A.**   "No.  I didn't have any severance package, no.

4   **Q.**   "Okay.  Do you know who took your role?

5   **A.**   "I believe -- yeah, I know.

6   **Q.**   "Who?

7   **A.**   "Chris Clendening.

8   **Q.**   "And Mr. Clendening, what had his role been while you

9   were at PPD?

10  **A.**   "He was the head of project management and data

11  management.

12  **Q.**   "I'm sorry, was he head of both project management and

13  data management?

14  **A.**   "Project management, yeah.  And we asked him as well to

15  take the data management, too.  Yeah.

16  **Q.**   "What was your understanding of Dr. Menninger's duties

17  and responsibilities when you joined PPD?

18  **A.**   "She was the head of -- the executive director of the

19  whole laboratory services, so she led inside the -- the group

20  of directors or managers that are working in the laboratories

21  that we had, so she was in charge, in fact, of the operations

22  and support team, that team to test the sample on time, in

23  charge as well of the quality.  She's been helping.

24          "Dr. Menninger has been our CAP handler or CAP

25  director.  So she was in charge, in fact, of ensuring that

1    PPD met the CAP requirements so that we get the CAP

2    certification.

3         "So every two years we had an audit from the CAP

4    team, and Dr. Menninger had been working with direct reports

5    to ensure that we had that certification in Belgium and the

6    US, as well as in Singapore and China.  She was also working

7    with her peers to meet their objectives.  So from a project

8    management perspective, for example, reviewing the results or

9    reviewing the questions from the clients.

10        "With the QA team, she's been very helpful to reach

11   the certification of ISO that PPD got successfully.  So she

12   has worked with her team to get that certification in the US,

13   and that has been a great success, too, working with the

14   sales team, too, responding to the bids, the requests for new

15   proposal, yeah.  So she has multiple aspects of her role,

16   yeah.

17   Q.  "You mentioned the certification in the US that

18   Dr. Menninger worked on.  What was that certification?

19   A.  "CAP, the CAP accreditation, that is the same as ISO, the

20   ISO certification.  PPD, before I joined was -- PPD central

21   lab was working in getting the certification.  We had already

22   some audits from the ISO, CAP/ISO team, and we had some

23   findings, and one of the objectives that we put as a team was

24   to get that certification back to the central lab, and so

25   Lisa has worked -- and we got the certification in

1    Highland Heights.

2    **Q.**  "What is an ISO certification?

3    **A.**  "The ISO is kind of a regulation certification that

4    drives the central laboratories for the highest quality and

5    qualified labs, in fact, for handing samples with a different

6    analyzer than we have.  So it's truly kind of a

7    certification, I would say, for central labs.  Not a lot of

8    central labs had that when I joined PPD, so we were very

9    happy to get that certification.

10    **Q.**  "And is there a particular organization that gives that

11    certification?

12    **A.**  "Yeah.  It's the -- we went through CAP, CAP/ISO.

13    **Q.**  "Okay.  And do you know who the organization is that

14    gives the ISO certification?

15    **A.**  When you say do I know, like, personally or -- I know CAP

16    because I've been working with -- for the -- for the -- with

17    the CAP team for the certifications that happen every year,

18    every two years.  But for the ISO, I must say that as a

19    certification that I have not had the experience before.  So

20    it was a great learning for me and it takes, really, teamwork

21    to meet the certification.

22            "So Lisa's team, as well as the QA team, did a

23    great job to have that certification.

24            "To answer your question, I've never worked closely

25    for the ISO certification before, so it was a great

1    opportunity and great challenge for me.

2    **Q.**  "Okay.  Had PPD ever had the ISO certification in the

3    past?

4    **A.**  "Not the central lab, no.  No.

5    **Q.**  "And was there any reason why it wanted to obtain an ISO

6    certification?

7    **A.**  "Yeah.  I mean, it's like any certification, right?  It's

8    a great recognition for the lab to -- that we got quality

9    results and with a good -- yeah.  So it was key for us to

10   have that and to position PPD among, you know, the other

11   central lab as well.

12          "As I said, not all the central lab had that

13   certification, so this was a good -- a great achievement for

14   us together with all the other achievements related to the

15   business that we got.  So that was really, really great.

16   **Q.**  "Okay.  And you also mentioned a CAP certification.  What

17   is CAP?

18   **A.**  "CAP is another certification.  It's the College of

19   American Pathologists.  It's another accreditation provided

20   by a group of experts.  and I know that Lisa is also a CAP, a

21   CAP director.  So it's truly MDs, you know, PhDs, but many

22   MDs that are all scientists and have come up with really high

23   standards for laboratories and it's quite very -- which word

24   I could use? -- but with a high technicity, there's a high --

25   there's a documentation to follow.  There's data to review.

1        "And so it's -- it's -- so we have a group of

2    inspectors coming in every two years to recertify the

3    laboratories, interview the team, and I got to get

4    interviewed as well.  But I must say that most of the work is

5    done by Lisa and her team, as well as other departments, to

6    ensure that we meet the different criteria that CAP had set

7    up in order to be CAP accredited.

8            "The outcome of an inspection is either you have

9    zero findings and everything works perfect, or you can have

10    some deficiencies.  You know, I think Lisa would speak better

11    on this type of findings.

12            "But during my stay at PPD for the first inspection

13    that we had, we, in fact, got the -- the certification of

14    CAP, and that's for all the laboratories, not only one site,

15    but four sites.  So four times the CAP inspector come.

16    They're selected by the CAP director and they are usually

17    peers from the industry, and that's a team that goes to the

18    laboratory.

19            "We don't have the dates in the US.  They don't

20    inform us.  They will come and show up and then do their

21    audit.  I can take one day, two days usually, or more, and

22    they audit the different parts of the laboratory, the

23    different sections of the laboratory.

24    Q.  "You mentioned that part of Dr. Menninger's role at PPD

25    involved working with her peers; is that accurate?

1    **A.**  "Yeah, she -- we worked as a team, really.  If we met our

2    objectives, it was really like working together.  So working

3    with project management, data management, yes, we worked with

4    her peers" -- "she worked with her peers.

5    **Q.**  "And who in your review were Dr. Menninger's peers at

6    PPD?

7    **A.**  "Sorry, Patrick.  Can you repeat the question?

8    **Q.**  "Who would you view as having been Dr. Menninger's peers

9    at PPD?

10   **A.**  "Who are the peers of Dr. Menninger?  Is that the

11   question?

12   **Q.**  "Correct.

13   **A.**  "So the other department leaders.  For example, we spoke

14   about Chris Clendening earlier, but it can be, as well, the

15   head of data management, the head of -- so that's why they're

16   called 'peers,' right?  It's really like the different

17   leaders of the different departments that work with her.

18           "The clinical trial business is, I would say, quite

19   complex, right?  It takes a village to provide the results to

20   the sponsor, and so Lisa's team has to work, Lisa and her

21   team have to work with the kit production to make sure that

22   the kit goes to the site so that the sample is collected, the

23   patient sample is collected.

24           "Then you have to make sure that when the sample

25   comes back, it comes back on time, so there is logistical

1    aspects as well when the sample is collected, to make sure

2    that it's barcoded correctly, that it's entered correctly

3    into the database.  So the sample reception plays a big role.

4    And then it goes to the laboratory, to Lisa's team, for the

5    testing through the medical technologist and the machine.

6           "When the result is tested and released, then the

7    lab report is sent to the investigator, who are looking for

8    the results in order to deliver the information to the

9    patient.  And when potential data -- data is available, then

10   the results are sent to the data manager -- also data manager

11   by the data management groups.

12          "And, of course, all of this is within the IT

13   system.  So the IT part is instrumental.  And so is, as well,

14   the quality, the quality system for the central lab under the

15   laboratory, so working with the quality -- the QA as well.

16          "And finally, of course, at the end you have the

17   patient and the client.  So project management is aware

18   throughout of the sample life cycle about the status of the

19   sample.  So that's why the laboratory works closely with

20   other departments.

21   Q.  "And did you ever observe any difficulties that

22   Dr. Menninger had with working with her peers?

23   A.  "And when you say 'difficulties,' Patrick, what does it

24   mean?

25   Q.  "Any problems that Dr. Menninger had working with her

1   peers.  Did you ever observe any?

2   **A.**  "I'm not sure.  In fact, that -- of the question or how

3   to interpret the question here.  I've not seen myself, you

4   know, difficulties from Dr. Menninger working with the other

5   department leaders.  I think the communication was quite

6   good, you know, and so I don't see difficulties.

7   **Q.**  "Did any of Dr. Menninger's peers ever complain to you

8   about Dr. Menninger?

9   **A.**  "About Dr. Menninger -- again, you know, it's -- I'm not

10  sure about the question, because Dr. Menninger has been very

11  respected, you know, with PPD.  When I was with PPD, she -- a

12  CAP director, a CAP holder.  And so as a person, she has a

13  great reputation, and for me too.

14          "And so when you say Dr. Menninger, I would say no.

15  I think the people were working really well with her.

16  **Q.**  "Either prior to or around the time you started at PPD,

17  did anyone give you any information about Dr. Menninger's

18  performance in terms of if it was satisfactory or not

19  satisfactory, anything of that nature?

20  **A.**  "I don't recall, but as I said, Lisa's reputation was

21  great.  And I remember -- I walked in a lab with my leader at

22  the time; and we were aware, at that time, within the

23  oncology capabilities in Highland Heights for the anatomical

24  pathology unit, we were building the AP laboratory in

25  Highland Heights, the AP section, and Lisa and other team

1    members were working.

2              And I remember that it was really my first week,

3    right?  We even took a picture of the team together with my

4    leader with a helmet because of the construction.  And the

5    lab was a big success.  We had an AP section built in

6    Highland Heights.

7    **Q.**  "Did you hear anything negative about Dr. Menninger when

8    you joined PPD?

9    **A.**  "No.

10   **Q.**  "Would it be fair to say that all of the feedback that

11   you received concerning Dr. Menninger around the time of your

12   hire was very positive about Dr. Menninger's performance?

13   **A.**  "I would say yes.  When I joined PPD, I would say yes.  I

14   don't recall -- I don't recall any -- any wrong feedback.

15   **Q.**  "And what was your impression?

16              "Sorry to cut you off.

17              "What was your impression of Dr. Menninger when you

18   first met her?

19   **A.**  "Great.  Great.  Good impression.  I mean, very, very,

20   very knowledgeable.  She came, I believe, from another big

21   pharmaceutical company, Novartis -- I think it was Novartis.

22   I home it's Novartis -- with all the credentials that I

23   personally don't have.  So I'm really lucky to work with

24   people and scientists that have all that knowledge that I

25   need to run the business, right?  So very accomplished MD,

1    very accomplished CAP director, and very involved in the

2    laboratory.  So great.

3    **Q.**  "So when you became vice president of Global Central

4    Labs, where were you located geographically in terms of where

5    did you sit?

6    **A.**  "I was based in Highland Heights, so in northern

7    Kentucky, Highland Heights, where our central lab is located.

8    The main central lab is located in the US.

9    **Q.**  "And during your time as vice president of Global Central

10   Labs, did you also travel for work?

11   **A.**  "I did.  Yeah, I did travel in the different

12   laboratories, so Belgium, Singapore, and China, and also a

13   lot of travels with clients, too, within the US and in

14   Europe.  One of the clients even took me to east Europe.  So,

15   yeah, I traveled a lot.

16   **Q.**  "All right.  When you say that you traveled a lot, do you

17   have an estimate of how much time, either on a weekly,

18   monthly, or yearly basis you would be on the road?

19   **A.**  "I don't know, Patrick.  But I can tell you I was -- I

20   reached diamond status in one year and I've never had that

21   before.

22   **Q.**  "Okay.  Would it be accurate to say that half of your

23   time was spent on the road, or less than half of the time?

24   **A.**  "I don't think it was half of the time, because I needed

25   to be physically present in the US.

1    **Q.**   "Did you say that you needed to be physically present in

2    the US?

3    **A.**   "Yeah, yeah, yeah.  It's our main lab.  Most of our

4    business was out of the US, you know, like the main

5    activities were in the US, so I was most of the time in the

6    US, yeah.

7    **Q.**   "Dr. Menninger, she was at least originally also working

8    out of the Highland Heights location; is that right?

9    **A.**   "That's correct.  She had an office centimeters from my

10   office, like three doors.

11   **Q.**   "Okay.  And during the time period when Dr. Menninger was

12   working at Highland Heights as her primary location, how

13   frequently did you interact with her?

14   **A.**   "I would say we have kind of a weekly -- I think we had a

15   weekly meeting, you know, on our agenda.  So we met based on

16   our calendar.  She was very busy.  I mean, she also was the

17   lab director for the four labs, so a lot of responsibility.

18   So I would say, at a minimum, once a week, but it can happen

19   that we met, you know, during the week, right?  Her door was

20   open, you know, she had kind of an open-door policy, too, as

21   I have.

22           "So we could have also had some interaction when we

23   are not -- I mean, outside of our scheduled meeting.

24   **Q.**   "And based upon your observations of Dr. Menninger when

25   you were both working out of Highland Heights, did she

1    primarily work in her office?

2    **A.**   "Yes, uh-huh.

3    **Q.**   "And I think you indicated her office was just a few

4    doors down from yours?

5    **A.**   "That's right.  She would spend time in the lab.  She

6    went a lot.  You know, she was someone that was working face

7    to face with her team, so she'd go to the pit and she had a

8    meeting with her team.  I remember joining her for a meeting

9    in the laboratory.  So she takes everyone in the laboratory,

10   all the MTs, and then she speaks to them about, you know, any

11   new instrument, any -- so any achievements as well.

12             "And so I remember meeting in the pit as well.  So

13   she spent time in the laboratory, like, you know, where the

14   analyzers are.

15   **Q.**   "And based upon your observations when Dr. Menninger was

16   working out of Highland Heights, how much of her time was

17   spent in the laboratory itself?

18   **A.**   "I'm sorry; I can't quantify because I can't see her, you

19   know, like in the office or in the lab.  I have, as well, my

20   responsibilities, so I can't really tell you the frequency.

21   **Q.**   "Do you know if it was on a daily basis?

22   **A.**   "Oh, I'm sure, yeah.  I'm sure she would spend some time

23   in the lab at least once a day, yeah.

24   **Q.**   "Were you actually there to observe that?

25   **A.**   "As I said, sometimes I joined here, you know, we do a

1    lab tour, for example, and when we have visitors as well,

2    other leaders from PPD, other EVPs joining us, so we go

3    together.  So, yeah, sometimes I'm there, or you know,

4    sometimes we deliver messages to the lab, so sometimes I've

5    seen that, yeah.

6    Q.  "So how frequently would you join Dr. Menninger in a trip

7    to the lab?  And, again, this is during the time that you

8    were both working out of Highland Heights?

9    A.  "I don't recall, really, the frequency, but -- I don't

10   recall.  I can't give you an accurate number.  I'd love to

11   tell you once a week.  I'd love to tell you two times.  But I

12   don't recall, really.  But I think it was -- it was quite

13   often.  I liked, as well, going to the lab.  I did that

14   often, even, you know, after she was working remotely.  I

15   like to walk in the laboratory, so I had that in my agenda as

16   well.

17   Q.  "During the time that you and Dr. Menninger were both

18   working out of Highland Heights, what was your view of

19   Dr. Menninger's work performance?

20   A.  "Good.  Good.  During my time with -- during my time when

21   she was working with me and from my perspective as a leader,

22   you know, I -- again, you know, we had the best year for the

23   central lab in 2016 and 2017.  And each of my team leaders

24   was part of the success and certainly Lisa was part of that

25   too, so I would say good.

1   **Q.**   "During the time that you and Dr. Menninger both worked

2   out of the Highland Heights location, did you believe there

3   were any deficiencies in Dr. Menninger's work performance?

4   **A.**   "No, I don't believe so, not that I recall.  Again, it

5   has been three years, Patrick, but on top of my memory and

6   for Lisa as well, the 2016 year when we worked together in

7   Highland Heights was a great year.

8   **Q.**   "And for part of the year in 2017, you were both in

9   Highland Heights, right?

10  **A.**   "That's correct.

11  **Q.**   "And during that period of time, can you recall any

12  deficiencies you observed in her work performance?

13  **A.**   "Not on the top of my mind.  I'm sure, probably, there

14  were some challenges that we could have.  You know, as I

15  explained earlier, it takes a village -- right? -- to run a

16  clinical trial.  So it takes communications with the data

17  management, with the sales team, with the laboratory, with

18  everyone.  So I'm pretty sure that there were some challenges

19  that we had to tackle, but all in all, I must say that Lisa

20  had done a great job when she worked together on site.

21  That's my perspective.

22  **Q.**   "Okay.  Now at some point Dr. Menninger began working

23  remotely; is that correct?

24  **A.**   "That's correct.

25  **Q.**   "How did that change come about?

1    **A.**   "Can you -- may I ask you to rephrase your question?

2    **Q.**   "Well, how did it come to be that Dr. Menninger entered

3    into a remote working status?

4    **A.**   "Maybe it would be the best to ask Dr. Menninger, I

5    guess, here, because I want to respect her condition there.

6    But she had been asking to work from home, to work remotely

7    from Cincinnati.  And so I worked with the HR team to make

8    that happen.

9             "I worked with her as well to ensure how to

10   continue to deliver and to work with the team, so I don't

11   recall in detail some of the process, how it went, but I know

12   that there was dialogue, a lot of communication internally

13   and then, at the end, kind of an email to the team announcing

14   that Lisa would work remotely in another city.  That was a

15   request coming from Lisa that she wanted to work remote.

16   **Q.**   "Besides human resources and Dr. Menninger, who else was

17   involved in that dialogue?

18   **A.**   "But I don't recall any other kind of members that was

19   involved in the decision.  In fact, I think -- I think maybe

20   it was me, HR, and Lisa, and then I wanted to get the

21   assurance that it would work from remote.  Probably, at that

22   time I -- I do not think that -- I think I had the leader

23   because the decision ultimately was me -- right? -- to

24   approve but with some assurance from HR.  So I would say

25   maybe the HR team was involved in that and Lisa, of course --

1   right? -- making sure that she can continue to operate and

2   deliver from where she is.

3   **Q.**  "Okay.  Thank you.

4          "Am I correct that, when assessing Dr. Menninger's

5   request to work remotely, that part of that process involved

6   you trying to make sure that she'd be able to perform her

7   duties and responsibilities while working remotely?

8   **A.**  "Yeah.  Yeah, I was.  I was.  I'm involved, yeah.

9   **Q.**  "Okay.  And did you ultimately reach a determination as

10  to whether or not she could perform her duties and

11  responsibilities remotely?

12  **A.**  "Can you repeat the question, Patrick?

13  **Q.**  "Did you ultimately reach a decision as to whether or not

14  you believed Dr. Menninger could perform her duties and

15  responsibilities remotely?

16  **A.**  "Yes.

17  **Q.**  "And what did you decide?

18  **A.**  "I approved.  We approved the relocation.

19  **Q.**  "And when you approved it, were you making the decision

20  that you believe she could perform her duties and

21  responsibilities remotely?

22  **A.**  "Yes.

23  **Q.**  "Now, you had mention before that you believed that

24  Dr. Menninger had spent time in the pit, so to speak.  Did

25  you have any discussions with Dr. Menninger in connection

1   with her request to go on remote status about whether or not

2   she'd still be visiting the pit periodically?

3   **A.**  "I don't recall the details, Patrick.  It has really been

4   quite some time, but I believe we did, yeah.  We discussed

5   that.  I think so, yeah.

6   **Q.**  "Okay.  What do you recall about those discussions?

7   **A.**  "I think I recall about the fact that she would visit the

8   laboratory on a regular basis; that she would come to the

9   site when requested, when the operations requested her; and

10  that she will be able to travel to the laboratory as frequent

11  as it was needed for the laboratory, yeah.  But the details,

12  I don't remember.

13  **Q.**  "Okay.  Was there any discussion with Dr. Menninger in

14  connection with her remote status as to how frequently she

15  would need to travel to Highland Heights?

16  **A.**  "I don't remember.  I think we discussed the frequency,

17  but I don't recall.  I mean, I don't remember -- I don't

18  remember the numbers.  We were -- I mean, you have to, from

19  my perspective, see the -- it is difficult after two years,

20  to be frank, but I just want to make sure that I share with

21  you the moment, right?  It was really a request from

22  Dr. Menninger to move; and, again, she'd be the best one to

23  share why and everything.

24          "So my end was to help her as well as she help

25  PPD -- right? -- and to make that happen, to make her move

1    happen and continue to operate.  At that time, it was really

2    something that she wanted to pursue, and I did my best with

3    other team members to fulfill her needs.

4    **Q.**  "And when you approved Dr. Menninger's request to work

5    remotely, did you have a specific expectation as to how

6    frequently she would travel to Highland Heights?

7    **A.**  "Yeah.  For what level -- and it's the same way as with

8    many other questions that you asked me before for those types

9    of leaders, right?  She had been an executive director of

10   laboratories, and she's an MD; so she really knows what she's

11   doing, right?  I think there is a lot of trust too that she

12   knows when is the right time to come to the laboratory and to

13   support the team.

14          "So -- and so I believe we discussed the frequency.

15   But, again, you know, she has an impressive background that I

16   don't have in science, so I trust her capabilities and her

17   knowledge of when is the right time to come to the

18   laboratory.  So, yeah.

19          "And that's the same with every other EDs that I

20   have.  The type of leadership that I was exerting, that I

21   exert in my career was really to empower the people, to coach

22   and to make the best of them so that we can reach our

23   objectives.

24          "So, yeah, I really counted on her as well to see

25   when she could come to the laboratory.  And, frankly, it was

1    quite natural, because she was really saying that she would

2    come when it's needed and take a plane and come for the CAP

3    at least for the" -- "or for the requirements from the

4    laboratory.  So I was confident that everything would

5    continue to work smoothly.  And, again, the aim of PPD was to

6    support her because it was her request to move.

7    **Q.**  "Okay.  Did you have a role in determining

8    Dr. Menninger's bonus at PPD?

9    **A.**  "I do.  We have -- you know, we work -- you know, PPD has

10   set up a system, you know, where you have a certain budget

11   allocated, and based on the performance of the employee.  It

12   was the same for me as well and any other employee of PPD.

13   You can set up the amount for that employee, the amount of

14   the bonus, based on performance.

15   **Q.**  "Were you the one who ultimately decided how much of a

16   bonus Dr. Menninger got paid?

17   **A.**  "Yeah.  You know, again, I don't really recall the

18   details, but I worked with my -- the answer is, yes, Patrick.

19   And I'm the one who is really kind of suggesting or

20   recommending based on the performance.  But it would take,

21   you know, the involvement of the HR, you know, to explain

22   to -- how it works, the rating and how it translates into the

23   range for the compensation.  And you're there as well to

24   agree on the compensation for my leader.

25   **Q.**  "And in determining the amount of bonus that would be

1   paid, were you allotted some kind of a bonus pool?

2   **A.**  "I believe so, yeah.  Yeah.

3   **Q.**  "And was that bonus pool something that you had a hand in

4   determining, or was that just, essentially, told to you?

5   **A.**  "I believe it was told to me.  I'm not able to -- it's

6   really standard, and it's -- I think it's like that for every

7   company, right?  It's based on the company objectives and how

8   much we've reached of the objectives and then calculated.

9   It's calculated to the different departments.

10          "So, yeah, it's really based on the revenue that we

11   made, and they have agreed to follow.  So I'm not putting a

12   random number there.  It's really based on the range that is

13   given to the leader.

14   **Q.**  "And in terms of making compensation decisions relative

15   to Dr. Menninger, did you also play a role in deciding

16   whether or not she would receive annual adjustments to her

17   base salary?

18   **A.**  "'Annual adjustments.'  What do you mean by annual

19   adjustments?

20   **Q.**  "Pay raises.

21   **A.**  "Yeah.  Yeah.  But it's really based on performance.  So

22   if you -- and there are some guidelines with PPD, or with any

23   company, that based on the performance, when you allocate a

24   certain percentage, and then that percentage is part of a

25   pool that you have.  But it's really within a range that is

1  given to me by the system and based on the performance.

2  **Q.**  "Okay.  Thank you for that.

3  "Now, do you recall at some point in time

4  Dr. Menninger disclosed to you that she had a disability?

5  **A.**  "I do.  I do remember.

6  **Q.**  "And what's your best recollection as to how that came

7  about?

8  **A.**  "Yeah.  She -- she -- I think I was at that time

9  traveling, but I wanted to discuss with her.  I mean, I had

10  the equal agenda, but I wanted, actually, just to make it

11  short and postpone it because I think I was in between two

12  flights.  But I remember that Dr. Menninger shared with me

13  the disability, her disability.  Yeah, it's not an easy thing

14  to share, I can imagine, for her.  And for me to hear that

15  when I was at the airport.  So I told her that -- you know, I

16  asked her to -- I think I asked her to send me an email to

17  follow up.

18  "This is the kind of thing, like many other things,

19  that I need to work with other people that got the knowledge

20  and know how to act on such -- with such a situation and

21  making sure that we help Lisa.

22  "So the first thing I did was really making sure

23  that I inform with the agreement of Lisa.  I asked her if I

24  can share that, the information, with HR, with Chad.  So I

25  remember that I acknowledged the information, and then I

1    shared the information with HR.

2    **Q.**  "Okay.  And what do you recall Dr. Menninger telling you

3    about her disability?

4    **A.**  "I don't have -- I don't recall really the detail, you

5    know, of the disability right now after two years.  But she

6    shared with me that, you know -- about the facts that she had

7    some difficulty.

8              "Do you want me to share what I have in mind

9    about -- of what she shared with me?  Is that your question?

10   **Q.**  "Yes.  Tell me your best recollection.

11   **A.**  "Mainly the fact that she can't -- or that it takes a lot

12   of effort for her to speak in public.  That was one of the

13   key aspects, you know, that she wasn't able to speak in

14   public.  But" --

15              MR. HANNON:  Hang on.  Can you read that again,

16   please?

17              THE READER:  From the beginning?

18              MR. HANNON:  Beginning with "that was."

19   **A.**  "That was one of the key aspects, you know, that she --

20   that she's able to speak in public, but it would take a lot

21   of effort for her to -- you know, to act in public, you know,

22   with numbers of people related to anxiety related to that.

23   So I think she really -- you know, I sensed from the email

24   that she sent that it was something that has always been

25   there for her and that it took a lot of effort for her to

1   disclose that disability.

2   **Q.**   "Were you surprised to learn that Dr. Menninger had such

3   a disability?

4   **A.**   "I was not aware before.  It was really the first time.

5   It's never great to hear, you know, from one of your

6   colleagues that she has a disability, right?  So I was

7   surprised, yes, because I was not aware and because I had

8   worked with her for two years where she has -- I've never

9   seen, you know, any challenges related to public speaking or

10  anxiety about the number of people.  You know, I had never

11  seen that before.

12           So it was a surprise, the fact that she had that

13  role for two years and that she had that disability for --

14  yeah, that's kind of a surprise that I had in my mind at that

15  time.  Yeah.

16  **Q.**   "Prior to Dr. Menninger's disclosure of her disability to

17  you, had you ever seen her do any public speaking?

18  **A.**   "Yes.  I've seen her doing public speaking before.  We do

19  have town halls.  It's something that I really wanted to make

20  sure that she was able to deliver messages, the strategy, the

21  achievements to the PPD's employees, to PPD central lab

22  employees, and so I've seen her, you know, working on town

23  hall, or as I mentioned earlier, delivering a mentioned -- a

24  message to the pit lab as well, to the group.

25  **Q.**   "I'm sorry.  Go ahead.

1    **A.**  "The town hall, we are speaking of hundreds of people,

2    500, 600 people.  The total employees of the central lab, 500

3    or 600 that we had at the time.  Because every time we want

4    to include everyone, and so we have invited people from

5    Belgium, from Asia, and so we had hundreds of employees

6    joining over the phone or by video.

7    **Q.**  "And besides the town halls, you referenced and the

8    delivering the message to the lab that you've referenced,

9    were there any other instances of public speaking that you

10   saw Dr. Menninger engaged in prior to the disclosure of her

11   disability?

12   **A.**  "Yeah.  She did a great job when we had the CAP

13   inspection.  She was the one delivering, you know, hosting

14   the CAP inspector.  And we had a big auditorium in

15   Highland Heights, a big room, and we invited whoever wanted

16   to come.  So we had a large team joining from laboratories

17   and she was delivering the positive message of the outcome.

18          "I also recall such -- such meeting involving Lisa.

19   **Q.**  "So besides the town halls you've referenced, delivering

20   the messages to the lab that you referenced, and the CAP

21   inspection, can you think of any other instances in which you

22   saw Dr. Menninger engaged in public speaking prior to the

23   disclosure of her disability?

24   **A.**  "You know, she had worked for a large team globally.  I

25   believe she was speaking or addressing the laboratory team

1   over the phone, too.  We had the Excel team, the senior
2   management team, so my team, and so she also was involved in
3   providing the date from a laboratory perspective to the
4   senior management team.
5          "I'm sure I've forgotten some other instances, but
6   that's really a great example of where she actually did a
7   great job.
8   Q.  "So at least as you sit here today, what you can recall
9   in terms of Dr. Menninger's public speaking prior to
10  disclosure of her disability was the town halls, delivering
11  messages to the lab, CAP inspection, and then providing
12  updates to the senior management team; is that right?
13  A.  "Yeah.  And, again, you know, that's just an exhaustive
14  list.  I don't think we should just limit it to those ones,
15  because there can be, as well, some client visits or audits
16  as well.  So there can be other -- or a visitor from -- that
17  we meet at the office joining.  So there might be others that
18  I missed, Patrick.
19  Q.  "Sure.  But I'm just asking what you can actually recall
20  having taken place prior to the disclosure of her disability.
21  Anything else beyond what you've already listed?
22  A.  "I'm sure there are others.
23  Q.  "Okay.  You mentioned earlier that Dr. Menninger had been
24  involved with town halls prior to disclosure of her
25  disability.  How many town halls can you remember

1   Dr. Menninger having participated in?

2   **A.**  "I can't remember, you know, precisely these questions,

3   this question, but I think we tried to have a town hall once

4   every quarter.  I think that's the frequency that I put in

5   place.  It might be more.  It might be less, so I can't

6   respond to this precisely.

7   **Q.**  "Okay.  Do you know if Dr. Menninger had participated in

8   all of these town halls?

9   **A.**  "I believe so.  Yeah.  Yeah.  I have in mind that she was

10   there and she did a great job.

11   **Q.**  "Okay.  And is it your recollection that she presented at

12   all of these town halls?

13   **A.**  "Yes, she presented.

14   **Q.**  "Okay.  Do you have a recollection of how long her

15   presentations were?

16   **A.**  "I don't.  I don't.  Off the top of my mind, I would say

17   10 minutes, 10 to 15 minutes, but it might be less,

18   7 minutes.  It was about that time, because we have to have

19   all the department leaders presenting and then, you know, you

20   have some Q&A.  So I don't precisely -- I don't know.

21   Probably 7 to maybe 10 minutes.

22   **Q.**  "And did I hear you correctly before that you said she

23   did a great job with these presentations?

24   **A.**  "Yeah.  I mean, I think -- I think those -- those -- you

25   know, those town halls are very appreciated by the team,

1    because that's when you go over the achievements, the

2    objectives.  So every one of my team, at the time, I really

3    appreciated what they had done and what they had prepared,

4    and Lisa is certainly part of them.  Yeah, she did great.

5    **Q.**  "So she did a great job?

6    **A.**  "Mmm.

7    **Q.**  "Is that a yes?

8    **A.**  "From my perception, yes.  Yes.

9    **Q.**  "Okay.  You also mentioned that you saw her delivering

10   messages to the lab team.  What was your assessment of

11   Dr. Menninger's performance in performing that task?

12   **A.**  "Excellent.  Very good.  She was, you know, very -- yeah,

13   very good.  Good communication, good presence.  And it's a

14   really large team.  Very large team.

15   **Q.**  "And then you mentioned the CAP inspection, that there

16   was also a presentation component of that.  Is that right?

17   **A.**  "That's correct.

18   **Q.**  "How did Dr. Menninger perform with respect to the CAP

19   inspection presentation?

20   **A.**  "Very good.

21   **Q.**  "And then you indicated that you'd also observed

22   Dr. Menninger providing updates to the senior management team

23   periodically.  Did I state that correctly?

24   **A.**  "Uh-huh.

25   **Q.**  "Yes?

1    **A.**   "Yes.

2    **Q.**   "And do you have a recollection of how frequently she did

3    that?

4    **A.**   "No, I don't, because it depends as well on the agenda

5    items, you know, that we have.  So I wouldn't say that it's

6    always, you know, the lab to provide an update.  I tried to

7    let every team member to provide an update, and it's really

8    based as well on the type of information that we have to

9    share at the time.

10            "So, for instance, if there is a CAP inspection

11   coming, then that would take the role of presenting.  And if

12   there's any project related to the lab, then we have to -- we

13   heard from Lisa about it.  But I can't give you a number

14   because it's really based on the agenda of those meetings.

15   **Q.**   "And what was your assessment of Dr. Menninger's

16   performance in terms of providing those updates?

17   **A.**   "The same.  Good.  My assessment, good, very good.

18   **Q.**   "Let me direct your attention -- let me direct your

19   attention here to the second paragraph where it asked the

20   question, 'What specific accommodation are you requesting?'

21   Do you see that section?

22   **A.**   "I do.

23   **Q.**   "Okay.  And the first sentence reads, 'My psychiatrist

24   has recommended that any social interaction and/or public

25   speaking incident to my job be minimized/avoided as much as

1    possible.'

2            "Do you see that there?

3    **A.**  "Yes, I do.

4    **Q.**  "Okay.  Were there ways to minimize the amount of public

5    speaking that Dr. Menninger needed to perform in her role at

6    PPD?

7    **A.**  "I mean, the obvious answer is to say yes, right?  And I

8    don't recall the depth of the conversation.  I think I tried

9    as much as I can to accommodate, together with the HR team,

10   on her request based on that disability.  I believe we took

11   action.

12           "One of the difficulties, Patrick, that you have to

13   understand as well -- and this is the same with everyone, is

14   to make sure that, you know, that the business continues to

15   run as well, right?  So the unfortunate -- obviously, you

16   know, I want to tell you, yes, we have to help Lisa.  You

17   know, we have to make sure that she feels better and that,

18   you know, she -- you know, that we accommodate her needs.

19           "But it's difficult for PPD, as well -- you

20   know? -- to make sure that the business continues to operate,

21   but definitely we need to take into account her disability,

22   yes.  And I believe we discussed with her to make sure that

23   we take in account her request.  I hope that answers your

24   question, Patrick."

25   **Q.**  And then this is reading from a document:  "Further she

1    has recommended that my role not be changed in a manner that

2    would require increased social interaction and/or public

3    speaking.

4              "Do you see that?

5    A.   "Uh-huh.

6    Q.   "Yes?

7    A.   "Yes.

8    Q.   "As of the date of this document -- and I'll just scroll

9    down and show you it has a date of January 30, 2018 -- had

10   you and Dr. Menninger discussed the possibility of her role

11   being changed so as to require increased social interactions

12   and/or public speaking?

13   A.   "There were some discussions that we had with Lisa at the

14   end of the year related to those changes, but it was mainly

15   for her to be more included, you know, involved.

16             "What we've identified, the feedback that I

17   received, Patrick, was that the business needed more

18   scientific presence, more laboratory visibility, that we were

19   lacking in laboratory presence.  And so my aim was -- the

20   business aim was to -- we need to tackle that feedback and

21   that request for the business.

22             "As I mentioned earlier, the business had a

23   tremendous growth, which means, as well, more client

24   requests, more client interactions, more challenges, as well,

25   to tackle.  Presence from the lab was more welcome at that

1    time.

2              "I believe I had a discussion with Lisa in December

3    about that, and we've had as well some discussions related to

4    some feedback that I received from other departments about

5    that.

6              "So to answer your question, there are two aspects.

7    One is we need to make sure that we respect Lisa's

8    disability, and for that, I needed, you know, HR and really,

9    you know, to understand what's the -- what's the process

10   there, right?  You know, I need to understand as well how to

11   fulfill Lisa's requirements.  That's why I asked her to work

12   with Chad to provide -- to work with HR to provide the

13   information.

14             "The other aspect is we're a business, Patrick, and

15   we need to make sure that we continue to operate that

16   business -- that the business continues to operate.

17   Q.   "All right.  Let me unpack that a little bit.  So one of

18   the things that I think I heard you reference was that the

19   business needed more scientific presence.  Did I hear that

20   correctly?

21   A.   "Yes, that's correct.

22   Q.   "Okay.  And when you say more scientific presence, what

23   do you mean by that?

24   A.   "There was some more client needs.  There was some more

25   requests coming from the business as we grow, similar

1    requests from the team members.  I recall some more as well

2    requests from the sales team, as an example.  And so, yeah,

3    that's what I mean by having more scientific presence, is we

4    need to -- scientific is a pillar for the central lab, and so

5    that's why the business needed more scientific presence.

6    Q.   "You indicated there were more requests from customers,

7    and that was part of the need for additional scientific

8    presence?  Did I hear that correctly?

9    A.   "Yeah.  There were -- there were a lot of requests from

10   the sales team, for example, that required scientific

11   expertise or project management or from the team as well and

12   the lab from the employees themselves.

13   Q.   "Okay.  But is it your testimony that these additional

14   requests you referenced require Dr. Menninger to change the

15   way she was doing her job?

16   A.   "What I meant by "changing," because I knew -- I think.

17   That's the word I've mentioned in December.  Again, you know,

18   when you prepare for the performance appraisal and when you

19   prepare for the rating of your employee, you gather feedback,

20   right?  I mean, I don't make a decision alone.  I make a

21   decision by -- alone without information.

22            "I make decisions with getting feedback, getting

23   360s, and really entering that, all the information, in order

24   to provide a feedback and make a decision.  We'd done an

25   exercise in December with the whole senior leadership

management where I learned as well that the laboratory at PPD
central lab can provide more -- provide more -- that we can
increase our scientific presence there.

     "I've learned throughout the year that the sales
team requested, as well, some more support from the lab, the
same way project management or the same way with the
laboratory.  So, again, another two years after, you know,
the details and the specifics are not easy to remember, but I
want to convey that the changes that I made is really the
need of having more presence of -- in the lab leadership
outside based on the nature of our business, the growth, and
the requests from the clients internally and externally.

**Q.**  "So are you saying that when you -- that what you
communicated to Dr. Menninger was you wanted her on site more
at the labs?

**A.**  "Actually, what I said was more the feedback, right?  I
think this was a matter of discussions.  I always try to --
and I think I mentioned it earlier -- I have a great and I
still have a great respect for Lisa; and I want to make sure
that, you know, we work together on what is possible --
right? -- and what is -- what is possible for her and what is
good for PPD.

     "We have -- I mean, it's a company of 20,000
employees, right?  And they're all -- their responsibility in
the industry is crucial.  So my role is key to make sure that

1    we continue to deliver and continue to operate.  So the

2    conversation was more, yes, related to the performance of the

3    laboratory and the feedback that I received, so ensuring that

4    more presence and more visibility are ensured on the lab

5    leadership.

6    Q.   "But back to my question, sir, so when you were saying

7    more presence and more visibility, were you saying that you

8    wanted Dr. Menninger to spend more time at the lab?

9    A.   "Yeah, I don't recall the details, but I believe, you

10   know, that could have been a solution, too.  Yeah.  But I

11   don't recall the details of the conversation, sorry.

12   Q.   "You don't recall talking?

13   A.   "Yeah, I don't recall, you know, that we spoke really

14   about, you know, having her more present.  What I can share

15   with you is the fact that end of year in 2017 -- in 2017, you

16   know, at the end was -- with that growth, the need in the lab

17   was higher.  So we needed more presence.

18           "I'm sorry, Patrick, but I'm not sure if we

19   discussed this, really, you know, having her back to the

20   site, as long as, at least, you know, if we can tell that we

21   needed more visibility and more presence.

22           "And then I do believe that there were some -- you

23   know, some feedback from the teams requesting -- requesting

24   that too -- right? -- so requesting that presence and

25   visibility from the lab leadership.

1    **Q.**  "Let's just take a step back, Mr. Mekerri.  So you

2    referenced a few times a conversation you had with

3    Dr. Menninger concerning feedback?

4    **A.**  "I did.  I did.  We had the conversation.  I believe that

5    we had one in December 2017 after that 360 and based, as

6    well, on the performance.  So we had a conversation in

7    December, yeah.

8    **Q.**  "Okay.  So you have a conversation with Dr. Menninger in

9    December of 2017, and am I right that part of that

10   conversation concerned going over feedback you had received

11   through this 360 process?

12   **A.**  "Yeah.  That's what I -- you know, if memory -- it was a

13   performance appraisal, you know, discussion, where every time

14   I do for -- every time I do for performance, for an

15   appraisal, you know, I gather feedback, you know, from the

16   peers; and I ask them to, you know, give some names.  And

17   then I add to -- and then I gather feedback, and then, see,

18   based on that talent review exercise or other, you know,

19   conversations that I have had with Lisa during our

20   one-on-ones.

21           "So I think the outcome was really to discuss, you

22   know, how we can change that and how we can, you know, have

23   more presence and more visibility so that the team feels like

24   they receive, you know, what they are expecting and the same

25   from a client perspective.

1    **Q.**  "Okay.  So when you talked with Dr. Menninger about how

2    she could be more present and more visible, what did you talk

3    about?

4    **A.**  "I don't recall the specifics, Patrick.  I'm sorry.  I

5    don't really remember the details.  I'm pretty sure that I

6    had that 360 in front of me with the information.  I remember

7    that it went well.  I mean, I have -- again, I have a lot

8    of -- I have still -- I have a lot of respect for Lisa.  I

9    appreciate her support and her -- and that's my style, too,

10    that I recognize, you know, her effort and her support to me

11    and to PPD.  And I'm sure that I shared, as well, that there

12    were a lot of -- there was feedback as well from others

13    that -- there were some requests of presence and visibility

14    too.  And I believe we discussed that as well before I asked

15    her to connect more with sales or with other people.

16         "So, yeah, it's a conversation I had with them.

17    The details, I can't remember.

18    **Q.**  "Where did this meeting take place?

19    **A.**  "Over the phone.  Over the phone.  I believe it was over

20    the phone when I was in -- in -- oh, in Virginia in the

21    vaccine lab.  I think that was the day I had the meeting with

22    Lisa, so over the phone.

23    **Q.**  "Is it your testimony that prior to the 360 feedback you

24    referenced, that people within PPD had expressed concerns to

25    you that there was more supervision needed at the lab site?

1    **A.**  "From what I recall, yes.  That's why I asked for more

2    change in visibility, but I don't have the details with me

3    right now as we speak.  There were some more requests.  And I

4    think you asked me the question earlier, Patrick, to be

5    honest.  There was more requests for presence and visibility

6    in lab; and it was, you know, based on the needs of the

7    business, the growing number of clinical trials that we had,

8    and the challenges that we had at the time.

9           "And I'm going to repeat myself that my aim here,

10   as I said, is to make sure that Lisa finds peace here in this

11   process and understands that it's business actions --

12   right? -- and nothing -- nothing related to her disability,

13   but more related to the fact that the business was growing.

14   Lisa was working remotely and we needed to find a solution on

15   how to make sure the business could continue to operate based

16   on the challenges that we were having in the situation that

17   we were having.

18   **Q.**  "I had asked you who it was that told you or expressed to

19   you that the lab site needed more leadership prior to this

20   360 process.  Do you recall that question?

21   **A.**  "I do.

22   **Q.**  "Can you tell me now who it was?

23   **A.**  "I think my answer was that I don't remember, right?

24   Clearly the people, and it's still the same.  It may be that

25   I have the -- you know, the lab team, some people from the

1    lab, her peers, so all the sales team, I think the sales --
2    obviously, received that from the sales, you know, from the
3    project management.  I just don't recall the names.  That's
4    it.  But I did receive feedback from the business.
5    Q.  "Let's put the names aside and let's just talk about the
6    concerns.  What were the concerns that were expressed to you
7    prior to the 360 process concerning Dr. Menninger's
8    performance?
9    A.  "You know, it's the same, right?  So because you ask me
10   where those concerns come from and then you ask me names, but
11   from what I recall, there were some challenges, you know,
12   with some -- some -- some clients.  There were some
13   challenges from a sale perspective from some other business
14   units as well.  So there were growing concerns.
15          "I know you're taking notes, but at least I'm
16   providing a non-exhaustive list, all that I can recall, but
17   there were concerns at that time with having no leadership in
18   the lab, so --
19   Q.  "No leadership what?
20   A.  "No leadership in the lab outside and that we needed more
21   presence, more visibility; and that's what I conveyed to Lisa
22   during my call in December, that I wanted to help her to make
23   some changes and implore her to be more visible, to be more
24   present.  I believe that was really my -- my -- you know, our
25   intent at that time.

1    **Q.** "But backing up to the challenges that you say were

2    expressed to you prior to the 360 review process, you

3    indicated you thought some of those challenges related to

4    clients.  Did I hear that correctly?

5    **A.** "Yeah.  Yes.  Yes, related to clients.

6    **Q.** "And what did you hear in that regard?

7    **A.** "Two years, Patrick.  I can't go into the details as

8    precise as two years ago, but I can recall, for instance, the

9    need for the sales team to provide more support in this, in

10   meetings, for example, and challenges, you know, like you can

11   have -- challenges, you know, in the laboratory -- you

12   know? -- or working with other departments.  So, yeah.

13   **Q.** "What do you mean working with other departments?

14   **A.** "Well, the feedback came, as I explained earlier, you

15   know, it's really a teamwork, right?  It's not only one

16   department that you handle with PPD, but multiple departments

17   in order to run the clinical trials.  So many departments are

18   involved working with lab.  QA is one of them, for example.

19   So the QA aspect is key regarding the audit process, the

20   challenges, you know, related to all the Q aspects.

21        "So that's an example of another department, too,

22   that could have raised some -- some of the issues in the lab,

23   so the quality is too.

24   **Q.** "Let me just ask the question before you start to answer

25   it.  What I want to know is the concerns you actually

1   remember having been expressed to you.  Do you actually

2   remember having expressed to you concerns concerning

3   Dr. Menninger's work performance with respect to client

4   issues before the 360 review process?

5   **A.**  "I do remember.  I do remember there were concerns, but I

6   don't remember, as I said, and I'm sorry if I repeat myself.

7   I don't remember precisely what the details or the specific

8   of the contents.

9   **Q.**  "Okay.

10  **A.**  "I don't have anything else.  Many things happened in two

11  years, but I think the main thing that I want to share with

12  you, Patrick, is there were concerns.  And I worked with Lisa

13  and shared with Lisa there are some feedbacks that I'm

14  receiving and we need to -- we need to work together.

15        "And I'm always putting myself inside, because her

16  success is my success.  Her failure is my failure too, right?

17  I mean, that's how a leader is noted, right?  I remember that

18  I shared with her that I will work with her and will make the

19  change so there's more visibility and the feedbacks are

20  better.

21        "Going into the details of what were those

22  challenges, I don't remember, Patrick.  sorry.

23  **Q.**  "Okay.  That's fine.  And if you don't remember, you can

24  just tell me you don't remember.  That's perfectly fine.  So

25  you indicated that you have this"?

1      MR. HANNON:  So we can ignore that.

2      We'll go on to page 111, line 23.

3  Q.  "Okay.  You mentioned presence and visibility as being

4  two concerns that you have in December of 2017 with

5  Dr. Menninger's work performance.  Is that right?

6  A.  "That's right.  That's right.

7  Q.  "Okay.  Besides presence and visibility, do you have any

8  other concerns with Dr. Menninger's work performance as of

9  December 2017?

10  A.  "Yeah.  The presence.  The visibility.  I mean, the

11  challenges, right, that have been gathering in the 360 from

12  the other departments.  I'm so sorry that I repeat myself,

13  but, you know, I don't go to those meetings, and the

14  discussions without being unprepared and without gathering

15  the details, so that was based on feedback that we gathered

16  from the business.

17  Q.  "Okay.  But my question, sir, is just trying to identify

18  the concerns you had as of the time of that December 2017

19  meeting.  And so far, you've identified presence and

20  visibility.  Were there any other concerns you had concerning

21  Dr. Menninger's work performance as of December 2017?

22  A.  "The challenges that the lab was having, and when I say

23  presence and visibility, it's really the needs from other

24  departments to get the support from -- from -- for the

25  requests, right?  So, yeah.  Yes.

1  **Q.**  "Okay.  Besides the presence and visibility issues, the

2  challenges and the requests, any other concerns you had with

3  Dr. Menninger's performance as of your meeting with her in

4  December of 2017?

5  **A.**  "I would probably say that any other concern that the

6  business had and that I gathered and I don't remember, but

7  there may be some from others.  I don't recall.  I don't

8  recall.

9  **Q.**  "Okay.

10  **A.**  "I mentioned quality, Patrick.  I think that there was

11  some discussions related to the quality aspects, too, but the

12  best -- yeah.  Yeah.

13  **Q.**  "Okay.  Let's work through that list.  So you think there

14  may have been some concerns regarding quality aspects.  What

15  do you mean by that?

16  **A.**  "Quality is the, you know, response to the audits, the

17  findings, and I may miss, you know, some of the topics there;

18  but I do recall that there were some discussions related to

19  the quality, to the quality metrics, and required from

20  quality.  I don't recall the details.

21  **Q.**  "Okay.  And was there something that Dr. Menninger needed

22  to improve upon in order to address those quality issues?

23  **A.**  "She's a leader, you know?  She can -- I'm sure she can.

24  Yeah, she can provide support to the other department.

25  **Q.**  "Did you have any -- did you have reason to believe that

1    Dr. Menninger wasn't providing that support already?

2    **A.**   "Again, you know, we're speaking about 360 at that time

3    and the feedback that I received, right?  I would love to

4    tell you that, you know, everything was fine and everything

5    was great, but there were some challenges, and I needed to

6    share that with her, and we needed to have more -- you know,

7    some changes on the way we run that.

8    **Q.**   "What needed to change?

9    **A.**   "You know, more presence, more visibility, more actions

10   from the laboratory perspective working with the other

11   departments.  I think the response came from, you know,

12   working with Lisa, right?  Finding those actions to tackle

13   them.  Lisa is playing the role of the lab in working with

14   the other department in working on the -- on the job

15   descriptions, yeah.

16   **Q.**   "Wasn't she already doing that?

17   **A.**   "We had to -- you know, as I said, Patrick, you know, the

18   feedback comes from the business.  So I was just, you know,

19   kind of ensuring that we work together with Lisa to tackle

20   them, you know?  I would love to tell you everything was

21   fine, everything was great, but that was not the case, and

22   that's business growing -- you know? -- and -- yeah.

23   So . . .

24   **Q.**   "Sure.  I'm not asking you to tell me everything was

25   great.  I'm just asking you to answer my question, which is,

1    you know, what was it that you believed needed to change as

2    of December 2017 relative to Dr. Menninger's performance?

3    **A.**   "You know, I believe that was, you know, really related

4    to her presence, right? -- and visibility, right? -- and

5    interactions with the team.  Again, it's, I think, two years

6    ago, but having more presence in the lab and more

7    interactions with her colleagues, tackling the challenges

8    that we had, so helping her really to be more visible and

9    working more with the other departments.  That was the intent

10   of the changes.

11   **Q.**   "What was the issue regarding Dr. Menninger's presence?

12   **A.**   "I think the fact that she was remote probably didn't

13   really help.  You know, it's a very, you know, busy role --

14   right? -- and very key role that she had, and I think being

15   far from the laboratory didn't really help to support the

16   team -- you know? -- or to be kind of connected, I would say,

17   with her peers that were on site, or with the needs of the

18   business.

19   **Q.**   "Besides being remote, was there anything else with

20   respect to Dr. Menninger's presence that you found to be an

21   issue in December of 2017?

22   **A.**   "I think -- and, again, I'm sorry if I don't recall the

23   specifics, but the sales team, I remember that there were, as

24   well, requests for more interactions, you know, with the

25   clients, with the bids with the sales team, the sales team,

1    including the presence, the scientific presence to support

2    the sales team and the bids and proposals.

3    Q.   "Sure.  Was Dr. Menninger not being sufficiently present

4    something that you thought contributed to quality issues?

5    A.   "Yeah, I think so.  And, again, I don't have -- I don't

6    recall, really, the details, but quality is a result -- or,

7    actually, reaching quality excellence is the result of the

8    day-to-day involvement of the whole team and ensuring that

9    the processes are really well -- are respected throughout the

10   work that was done by the lab.

11          "Qualities are -- so audit findings that we were

12   having that needed, you know, our responses.  You know, it's

13   just too two examples.  There are many other aspects.  And

14   the QA team would be the best to provide the details.

15          "But, yeah, I mean, this is where the lab leader

16   can help ensure the quality aspect.

17   Q.   "And how does the lab leader, through being more present,

18   include quality, from your perspective?

19   A.   "From my perspective, providing, you know, training, you

20   know, reviewing the -- that's my perspective, by reviewing

21   the processes and reviewing how they're applied in the

22   laboratory, correcting any deficiencies that have been

23   detected, providing trainings to ensure that the employee

24   have the know-how, you know, and working with the QA

25   department on site -- right? -- to ensure that we're

1    responding to those challenges, resolving them.

2    **Q.**  "Was it your belief back in late 2017, early 2018 that it

3    was at least important to document any serious performance

4    concerns you had?

5    **A.**  "Hey, Patrick, serious, it's a very big word -- right? --

6    because her performance went well, you know?  And I think I

7    mentioned that the discussion -- the conversation I had with

8    her in December was and always -- has always been, you know,

9    very positive.

10          "You know, I tried, and that's also my style.  You

11   know, I tried to show the great things, tried to show what

12   needs to be done and performed better, and I believe that

13   wasn't so demonstrated, that wasn't so shown displayed in the

14   grid or in the notation that I gave her.  So the notation

15   that I gave her wasn't so negative.  You know, it was just

16   positive.  And so that shows up well that it was.

17          "So we have concern, you know?  But at that time I

18   was really trying to, you know, work together to tackle the

19   challenges and show her as well that we needed -- the

20   business needed more from her.

21   **Q.**  "Did you view the issues that you raised, the challenges

22   that you raised in December of 2017, as serious performance

23   issues?

24   **A.**  "I would say the business started to really notice, you

25   know, that there were, you know, serious concerns, yeah.

1   Yeah.  So there were serious concerns or challenges at that
2   time, you know?
3   Q.  "And did you think it was important to reflect those
4   serious performance concerns in Dr. Menninger's written
5   performance appraisal?
6   A.  "You know, what I thought was it was important to discuss
7   the trigger, the challenges -- and trigger the challenges
8   that I mentioned, you know, make sure that we change that and
9   we do change it.  So I took that really seriously and agreed
10  to support her and make sure that, you know, we change that
11  into a success story.
12          "We've done that in the past, you know, resolving
13  issues and making it -- making them a success story.  So,
14  yeah, it's --
15  Q.  "So back to my question, sir, which is did you think it
16  was important to reflect those serious performance concerns
17  in documenting this written performance appraisal?
18  A.  "I think I answered this question already, Patrick.  You
19  know, at that level in organization, I do believe that the
20  communication discussion is key.  At the follow-up, there's a
21  mutual trust.  There's a -- there's a -- you know, brilliant
22  people and smart people really know what they have to do
23  based on the feedback that you give them.  And so I provided
24  the feedback and I'm sure that, you know, she had already
25  that kind of feedback received from others, too.  And it's

1    not -- you know, it's why I was there with her, to discuss
2    her.  It was key for me to share that to them.  The
3    performance document has been used.  It is a tool there to
4    support the conversation with your employee and prepare the
5    next step.
6    **Q.**  "So is that a no?
7    **A.**  "It's a no.  I mean, it's a yes and a no.  I mean, I
8    answered that question.  It cannot be summarized to a yes or
9    a no here.  I'm sorry, not the way I see it.
10   **Q.**  "Was there any reason not to include your serious --
11   these serious performance concerns in Dr. Menninger's written
12   performance appraisal?
13   **A.**  "Oh, there was no reason.  Again, I have to -- you have
14   two years after that.  We had the conversation, Patrick.  I
15   received the feedback, the business quality feedbacks, and I
16   shared my notes in the feedback I received.  It's never easy,
17   you know, to hear that things haven't been going so well, but
18   I think the end was really to help the employee and resolve
19   them, so it's not about writing, you know, the serious
20   concerned content.  It's really to share them, to share what
21   was the situation at that time.
22   **Q.**  "So is that a no, there was no reason to include them in
23   the written performance appraisal?
24   **A.**  "No.  I'm not sure I understand.  Again, it's the same.
25   I don't think it can be summarized into a yes or a no.  It is

1   important.  I think most important is the conversation I had

2   with her and the feedback from the business.  That document

3   is a tool.

4   **Q.**  "Okay.  But in using that tool, my question, sir, is if

5   you can think of any reason why not to include the alleged

6   serious performance concerns that you had in Dr. Menninger's

7   performance appraisal.

8   **A.**  "I don't remember.  I don't recall, you know, any reason,

9   no.  I think the conversation happened.  The performance and

10  the feedback from the team was there and, you know -- and the

11  outcome was -- again, was not from me.  The rating was good.

12  It was not a bad rating, you know, so I -- you know --

13  **Q.**  "Okay.  Prior to Dr. Menninger's disclosing her

14  disability to you, were you aware of PPD's policies and

15  procedures relative to disability accommodation?

16  **A.**  "I don't recall that.  What I can share with you is that

17  this is, for me, areas where I need professionals to work

18  with and in that case, you know, HR to support.  I was new in

19  the US, and so it's really to make sure that I got support

20  from people who know how to deal with such a situation and

21  respect -- to the condition that we -- that I was made aware

22  of.

23  **Q.**  "And who did you get that the support from?

24  **A.**  "You know, as it's written here, I worked with HR to help

25  and who was -- who has the knowledge and fact of the

1  different -- the specifics on how to work in such a

2  situation.

3  **Q.**  "So that would have included Mr. St. John?

4  **A.**  "Yeah, that's correct.  And I believe I asked,

5  respectively, Lisa to allowed me to speak with HR, which she

6  approved, and that's why I informed HR.

7  **Q.**  "Okay.  Besides Mr. St. John, is there any other source

8  that you looked to to determine what you needed to do in

9  response to Dr. Menninger's disclosure of her disability?

10  **A.**  "No, HR.  Chad St. John was my main contact and support

11  for these cases, because he would know internally with whom

12  to work and what kind of documents to provide.  So he was my

13  main contact.  No one else.

14  **Q.**  "Prior to Dr. Menninger's disclosure of her disability,

15  had you received any training from PPD on the subject of an

16  employee's -- a disabled employee's rights?

17  **A.**  "I don't recall as well.  I don't recall.  PPD has a lot

18  of, you know, guidelines and -- provide trainings.  I

19  apologize, but after two years, I left PPD.  Again, I left

20  PPD in two years of this case.  I don't recall the specifics

21  trainings.

22  **Q.**  "Did PPD's HR representatives ever inform you that there

23  was an obligation to engage in an interactive dialogue with

24  Dr. Menninger for the purpose of trying to identify

25  reasonable accommodations?

1   **A.**   "I don't recall the details, Patrick.  I don't recall.

2   **Q.**   "So the email I want to direct you to, it begins on PPD

3   Menninger 001227, and you see here it's an email from

4   Dr. Menninger to Mr. St. John on February 4, 2018?

5   **A.**   "Yes.  I see it now.

6   **Q.**   "Okay.  Can you take a moment.  I'll let you read that

7   email.  And then I'm going to have a couple of questions for

8   you concerning this email.  Just let me know when you're done

9   reading it.

10  **A.**   "Sure.  Okay.

11  **Q.**   "Let me direct you to the first sentence of the message

12  that Dr. Menninger writes to Mr. St. John.  She writes,

13  'Hacene and I had a general discussion concerning changes

14  that he's considering to make my role "more visible."'

15          "Do you see that?

16  **A.**   "Yes.

17  **Q.**   "Is that accurate?

18  **A.**   "Yeah.  If she wrote it, I believe that was the content

19  of our conversation.

20  **Q.**   "Then in the next sentence, she writes, 'He didn't get

21  into specifics, but suggested that this might include

22  increased client visits/social interactions and presentations

23  (internal and external).'

24          "Do you see that?

25  **A.**   "I see it, yeah.

1   **Q.**   "Okay.  Is that accurate?

2   **A.**   "If she wrote it, yeah.  Yeah, I believe we discussed

3   that.  Yes.

4   **Q.**   "And then skipping over the next sentencing, but going to

5   the fourth sentence in the paragraph, she writes, 'we were

6   supposed to have a follow-up conversation to discuss

7   specifics and I wanted him to understand my situation so that

8   we could try to figure this out together.'

9          "Do you see that?

10  **A.**   "Say it again?  Can you repeat that sentence for me?

11  **Q.**   "Sure.  The fourth sentence reads, 'We were supposed to

12  have a follow-up conversation to discuss specifics, and I

13  wanted him to understand my situation so that we could try to

14  figure this out together.'

15         "Do you see that?

16  **A.**   "Yes.

17  **Q.**   "Is that accurate, that you and Dr. Menninger were

18  supposed to have a follow-up conversation to discuss

19  specifics?

20  **A.**   "I don't recall the specifics, the details, Patrick.

21  **Q.**   "So you don't know if you were supposed to have a

22  follow-up conversation to discuss specifics?

23  **A.**   "I believe we discussed, you know, the fact that, you

24  know, the business requested more presence and visibility,

25  you know?  I'm not sure how much specifics we can get, but

1    it's true that I don't recall the specifics.  I was -- I

2    was -- I mean I don't recall the details, Patrick.  But what

3    I can tell you is that we discussed the fact that we needed

4    more presence from Lisa with the sales team, which is what

5    she described here with the client visits and social

6    interactions and presentations, internal and external, and

7    visibility in the lab.

8              "So this is in line with what I shared earlier

9    about my discussion with her in December.

10   **Q.**   "Do you recall any conversations subsequent to this

11   February 5th email in which you and Dr. Menninger discussed

12   the clarification that's referenced here?

13   **A.**   "I don't recall, Patrick.

14   **Q.**   "Okay.  And now if I can direct your attention here to

15   the top of the exhibit, am I right, this is an email from

16   Mr. St. John to you on February 5, 2018?

17   **A.**   "Yes, that's correct.

18   **Q.**   "And if I could direct your attention to the third

19   sentence, he writes, 'We need clarity to obtain specific

20   parameters from her physician within the buckets causing her

21   concern" -- and there's a parenthetical, '(public speaking

22   and social interaction.)'

23             "Do you see that?

24   **A.**   "Yeah, I see that.

25   **Q.**   "Subsequent to receiving this email from Mr. St. John,

1   what, if anything, did you do to identify the areas of

2   clarification for Dr. Menninger?

3   **A.**  "I don't remember, Patrick.  I don't remember.  I don't

4   remember.

5   **Q.**  "Okay.  Do you know if you spoke to anyone in connection

6   with determining what the additional clarification would be?

7   **A.**  "I don't remember.

8   **Q.**  "All right.  So directing you back up to the first page

9   of the document.  This is an email from you to Dr. Menninger,

10  correct?

11  **A.**  "That's correct.

12  **Q.**  "And your email begins, 'It was nice discussing with you

13  yesterday.'

14          "Do you see that?

15  **A.**  "I see that, yeah.

16  **Q.**  And then directing your attention down to the bullet

17  points here, can you explain to me how you drafted these

18  bullet points?

19  **A.**  "It was two years ago, Patrick.  I don't remember.  I

20  don't remember, but I believe it's based on the job

21  description and the business needs.  But I don't remember the

22  detail.

23  **Q.**  "Did you work with anyone in terms of drafting up these

24  bullet points?

25  **A.**  "I don't remember.  I don't remember.

1  **Q.**  "Okay.  If I could direct your attention to the first

2  bullet point --

3  **A.**  "Sure.

4  **Q.**  "-- under 'frequency,' it references biweekly, monthly,

5  and/or quarterly.  Do you see that?

6  **A.**  "I see that, yeah.

7  **Q.**  Okay.  Were any of these activities referenced here

8  occurring biweekly in February of 2018?

9  **A.**  Yeah.  I believe the SLT.  I tried to remember the SLT

10  meeting.  We tried to have it every two weeks.

11  **Q.**  Okay.  And how about town halls?  What was the frequency

12  of town halls as of February 2018?

13  **A.**  I would say quarterly.

14  **Q.**  And about COO/EVP meetings?  What was the frequency of

15  those?

16  **A.**  You can have visits from, you know, some COOs.  You can

17  have -- you can -- EVPs coming more than once.  It depends on

18  their availability.

19  **Q.**  Was Dr. Menninger engaged in COO/EVP meetings as of 2018?

20  **A.**  I don't remember, Patrick, but if a COO or an EVP were

21  visiting, I tried to include everyone.  So, certainly, you

22  know, Lisa would be -- as she was the leader of the lab --

23  would be invited as well.  It was a great honor to receive

24  those emails.  And so, yeah, she would have been included,

25  but I don't remember as of February, in fact.

1   **Q.**  As of February 2018, were you anticipating that

2   Dr. Menninger's attendance in SLT presentations was going to

3   be increasing?

4   **A.**  Increasing?  I'm not sure.  I'm not sure if I was

5   expecting that.

6   **Q.**  Okay.  How about town halls?  Were you anticipating that

7   her visibility at town halls to increase?

8   **A.**  I don't -- I'm not sure.  I would think, you know, it's

9   the same, right?  She was the lab head, right?  So she would

10  be the one presenting in town hall.  Regarding increasing it,

11  I'm not sure, you know?

12  **Q.**  How about COO/EVP meetings?  Was this an area in which

13  you expected her visibility to increase in 2018?

14  **A.**  No, same, again, you know, wanted her as the lab leader,

15  and she'd be the right person to interact with the CEO and

16  EVP, with her knowledge and expertise.  She is the right

17  to -- person to present the lab.

18  **Q.**  But did you anticipate that her involvement in these

19  meetings would be increasing in 2018?

20  **A.**  Again, I'm not sure, Patrick.  All those meetings are

21  really based on -- the COO or EVP meetings are based on their

22  agenda, so I'm not the one inviting them.  I mean, of course,

23  I'd love if they could come every week, but it's based on

24  their agenda, so I can't answer that question.

25  **Q.**  Sir, I'm not asking you to predict what was going to

1    happen.  I'm just asking you what you were -- what your

2    understanding was when you wrote this and whether or not you

3    wrote this, your expectation -- excuse me -- or --

4            MR. HANNON:  Let me start over again.

5    **Q.**  Sir, I'm not asking you to predict what was going to

6    happen.  I'm just asking you what you were -- what your

7    understanding was when you wrote this and whether or not when

8    you wrote this your expectation was that COO/EVP meetings

9    were going to be a more frequent responsibility for

10   Dr. Menninger in 2018.

11   **A.**  Yeah, I -- I believe here, with the listing -- agreed to

12   try to help Lisa, you know, work out the, you know -- the

13   responsibilities and where, you know, she with her role can

14   help and then have the conversation with her physician as

15   well.

16           It was really the intent here, matching the

17   business needs with her -- you know, with her situation.

18   That's what's really the intent there.  And if I read the

19   tone of the email and the fact that I started with, "It was

20   nice discussing with you," I believe that was -- you know, I

21   shared, you know, those [*sic*] information, what I was

22   expecting, the details from her physician so that we can --

23   we can see where she was as well.

24   **Q.**  Looking up to the first paragraph of your email, the last

25   sentence reads, "As you already know, the percentage/scope of

1    interactions, internal or external, is increasing in 2018 due

2    to the needs of the business and aggressive commercial

3    goals."

4              Do you see that?

5    **A.**  I see that.

6    **Q.**  Did you have -- was it your expectation that

7    Dr. Menninger's involvement in COO/EVP meetings was going to

8    be increasing in 2018?

9    **A.**  I have a similar response, Patrick.  I don't know.  I

10   don't have their agenda.

11   **Q.**  When you wrote this email to Dr. Menninger, was it your

12   expectation that her involvement in client bid defenses was

13   going to be increasing in 2018?

14   **A.**   The needs of the business increased, yes, and I think

15   that's what we discussed in December.

16             Here you have the details that you're asking for

17   about, and that's exactly what, you know, I told you about

18   December -- right? -- and the needs from the business, so

19   more bid defense, yes, more issue resolution calls, more site

20   meetings in Highland Heights, and that's as the business

21   grows, as the team requests more from the lab, lab

22   leadership.

23             So I think it was really a follow-up of the

24   conversation I had with her in December.

25   **Q.**  So the answer is yes, you expected that in 2018

1    Dr. Menninger would have to be involved in client bid defense

2    work?

3    **A.**   The role of Lisa Menninger, the role of the lab

4    leadership would request more client bid defense, more issue

5    resolution calls, and more Highland Heights site meetings,

6    the role -- the lab leadership, you know, is there really to

7    respond to the sales needs and to the increased needs of the

8    business?  That's what I wrote down there.  Yeah, yes.

9    **Q.**   Okay.  But these goals, you had client bid defense, issue

10   resolution calls, HH/client site meetings, phone, these were

11   all things Dr. Menninger was already doing, right?

12   **A.**   Client bid defense, issue resolution calls, I believe,

13   you know, that's what I shared with you already, Patrick.

14   This is where the feedback I received in December was -- you

15   know, was pointing out -- right? -- the fact that we needed

16   more lab leadership.

17            So I would love to tell you, yes, she was involved;

18   and of course, you know, she was.  She was, yeah, helping.

19   But the business needed more, and that's why I wrote that

20   here as well, you know, so --

21   **Q.**   Go ahead.

22   **A.**   When you say you needed more -- oh.

23            MR. HANNON:  Oh, I'm sorry.  That's me.  My line.

24   **Q.**   When you say you needed more, do you mean more of doing

25   the same thing or doing something else to assist in these

1    tasks?

2    **A.**   Doing the same thing?  No.  If you did the same thing,

3    then you don't -- you know, you don't resolve that.  It's

4    really to do it, to make sure that you participate to a

5    client bid defense -- you know? -- and that you are involved

6    in the client site meetings and that you work with the team

7    and the issue resolution coming from the clients.

8            So it's not doing the same thing, because then we

9    would have the same problem, and we were pointing out that

10   earlier, right?  It's really to resolve to be more involved.

11   **Q.**   Be more involved how?

12   **A.**   By -- I mean, again, you know, here I go back to what I

13   said earlier.  When you lead a group of, you know, executives

14   and directors, they have, you know, the responsibility, and

15   it's part of the job description to find the response.

16           So I'm not here to say how -- right?  I'm just here

17   to make sure that I provide the support, the feedback on how

18   to make -- you know, on resolving those issues so -- and

19   that's why, you know, that we have those brilliant EDs,

20   right?  And so that's part of their role, to find out to how,

21   how to resolve those issues, being part of the client bid

22   defense and support -- you know? -- the sales team and be

23   part of the client site meetings in Highland Heights.

24   **Q.**   But you would agree there were -- there were different

25   ways that those goals could be achieved, right?

1    **A.**  I'm not sure I understand your question.

2    **Q.**  Are there different ways those goals could have been

3    achieve?

4    **A.**  You know, I'll answer the same way, Patrick.  Sorry.

5    You're asking the same question a different way, but you're

6    not -- you know, at that big level, you are working with

7    really brilliant and very -- or very bright.

8           They know how to resolve the solution, so here, you

9    know -- and it's really officers -- right? -- of the company.

10   So, you know, they have the highest responsibility within the

11   central lab.  So that question should be answered by the

12   employees here and by the EDs.  It was the same way with her

13   peers as well.

14   **Q.**  But, Mr. Kerri, this -- Mr. Mekerri, this whole dialogue

15   started with you indicating to Dr. Menninger that you wanted

16   her to be more visible, right?

17   **A.**  The business needed her to be more visible, yes, and me,

18   of course.  You know, I had to concur.  You're right.

19   **Q.**  All right.  And in response to urging her to be more

20   visible, this was one of the bullets you drafted in terms of

21   something she would need to work on, correct?

22   **A.**  That's correct.

23   **Q.**  What did you want her to do differently from what she was

24   already doing in terms of client bid defense, issue

25   resolution calls, and the rest of the items in this bullet?

1    **A.**  Well, that is where -- you know, I go back to what I

2    said, Patrick, you know, she has to find a -- I mean, in

3    every leader, I think that's part of the performance, you

4    know?  If we have more issue resolutions, if we have less

5    presence of the lab leader, any other leader, it would be

6    different.  So that leader, you know, would find the

7    solutions to tackle them.

8            So that's all part of the roles of the employee and

9    the part of the performance as well.  So, again, you know,

10   all of this is the results of 360 feedbacks, concerns that I

11   received from the team, and then we -- creating what is roles

12   and responsibility of the lab leader, you know?

13   **Q.**  Let's look at the next bullet point, which reads

14   "technical sales presentation, internal and external.  And

15   then (i.e., internal sales meeting) HH/client site meetings

16   phone."  Do you see that there?

17   **A.**  I do.

18   **Q.**  Okay.  Are those tasks that Dr. Menninger was already

19   performing as of February 2018?

20   **A.**  I don't remember, but -- I don't remember.  I -- I --

21   what I can share with you is that we had sales meetings where

22   each leader, you know, was preparing, you know, their section

23   or their strategy with the -- you know, the investment that

24   PPD has made to respond to the clients.  And all those

25   informations were very, very, very important for the sales

1    team.

2              So, yeah, it's the responsibility of every section

3    leader or department leader to cover their session during the

4    sales meeting.  So I believe that Lisa was always a part of

5    that, presenting to the sales team, the lab that section.

6              THE COURT:  I'm going to stop you here, Mr. Hannon.

7              Ladies and gentlemen, we'll break for lunch.  We'll

8    take a one-hour break.  We'll resume at two o'clock.  Thank

9    you for your attention.  Don't discuss the case among

10   yourselves or with anyone else.

11             (Jury not present.)

12             THE COURT:  Two quick questions -- you may be

13   seated -- for all of you.  One is how are we dividing the

14   time for my allocation of time for this or --

15             MR. HANNON:  We haven't decided.

16             THE COURT:  Why don't you talk to each other about

17   that.

18             MR. HANNON:  Sure.

19             THE COURT:  And, second, as to Mr. Mekerri, why

20   he's not here, as to that question, what do you each propose

21   I say?

22             MS. MANDEL:  I think indicating that he is in

23   Singapore, unavailable.

24             THE COURT:  Is he a US citizen?  You don't know.

25   It doesn't matter.  He's beyond the subpoena power of the

1    Court --

2            MR. HANNON:  Right.  Yeah.

3            THE COURT:  -- even if he is a US citizen.

4            MR. HANNON:  Right.

5            MS. MANDEL:  Right.  So he's not employed.  He's --

6            THE COURT:  Right.  He's not an employee of the

7    company, and he's not subject to subpoena.  Is there anything

8    else to say?  I think that's what I would say.  He's

9    simply -- that -- this is what I would probably say.  People

10   can come -- people who are parties are -- can be required to

11   testify.  People who are employees of parties can be required

12   to testify, period.

13           Then other people can be subpoenaed, but the

14   subpoena does not -- there's not worldwide service of

15   subpoenas, and he's beyond the reach of a subpoena from this

16   court, so he can't be compelled to come here.  And that's why

17   he's not here.

18           MS. MANDEL:  Can we just -- specifying that he is

19   in Singapore?

20           THE COURT:  Yes.  He's in Singapore.

21           Do you object to that?

22           MR. HANNON:  I don't.

23           THE COURT:  Okay.  So he's in Singapore.  He's

24   beyond the subpoena power of the Court.  He's not someone the

25   Court can compel to come or that either party can compel; and

1    that way, he stands differently than the parties or

2    employees, present employees of PPD.

3              MS. MANDEL:  I think that's okay.

4              THE COURT:  Okay.

5              MR. HANNON:  Sounds good.

6              THE COURT:  Fine.  See you just before 2:00.  We'll

7    resume at 2:00.

8              THE DEPUTY CLERK:  Court's in recess.

9              (Court in recess at 1:02 p.m.

10             and reconvened at 1:58 p.m.)

11             THE COURT:  So I just wanted to check in.  Do we

12   have -- is it Dr. Fikry?

13             MS. MANDEL:  Yes, Your Honor.

14             THE COURT:  All right.  He's arrived.  Okay.

15   Great.

16             So my suggestion -- how long is the examination of

17   him for you?

18             MR. HANNON:  Dr. Fikry?  My guess half an hour.

19             MR. CURRAN:  I would guess less than that.

20             THE COURT:  My suggestion is we start with him at

21   2:00, and then break this, and then return to the reading,

22   just so we're done with him before -- or did you want to

23   do -- did you want to finish him and -- it's up to you.  I

24   would defer to all of you.  If you want to do it the other

25   way, it doesn't affect me.

```
 1              MS. MANDEL:  I think, from our standpoint, we
 2    anticipate that those two things would still get done today
 3    and it might be a little bit less confusing for the jury to
 4    continue with the transcript.
 5              THE COURT:  I'm okay with that.  As long as you --
 6              MR. HANNON:  Sure.  I don't know how much is
 7    left --
 8              THE COURT:  You're on page 165, I think.
 9              MS. MANDEL:  It's like 30 pages, approximately.  A
10    little more.  35 pages.
11              MR. HANNON:  So I mean, I think what we can do is,
12    if we hit 2:45, we put a pause on this and go to Dr. Fikry.
13    I think an hour and 15 is --
14              THE COURT:  Fine.  We'll do that.  Okay.  I'm fine
15    with that.  All right.
16              Why don't you get your paralegal right back up
17    there.
18              And Kellyann, if they're ready, bring them in.
19              I think I'm going to give them a little tutorial.
20    I'll skip the bulge rule.  It might be a little complicated,
21    but just generally about subpoenas and subpoenas are for
22    civil cases, the district.  And then he's in Singapore, and
23    so he's beyond the subpoena power, and he's not a party.
24              MR. HANNON:  They're going to be trained lawyers by
25    the time they're done here.
```

```
1              THE COURT:  That's what I'm hoping.

2              MR. HANNON:  They've got the hearsay rule.  They've

3    got subpoena power.  They've got everything.

4              THE COURT:  Exactly.  They haven't got subject

5    matter jurisdiction.  We can get to that, maybe.

6              MR. HANNON:  I hope not.

7              THE COURT:  It's such a fascinating topic.

8              MR. HANNON:  That got me mid-trial last year, a

9    year and a half ago, not in a good way.

10             THE COURT:  Oh, you mean where you had no subject

11   matter jurisdiction?

12             MR. HANNON:  Middle of trial, and Judge Young's law

13   clerk pointed out, you know, there's a problem here, this is

14   a limited partnership and --

15             THE COURT:  Oh, one of the limited partners.

16             MR. HANNON:  Yup.

17             THE COURT:  Smart law clerk.

18             (The jury enters the courtroom.)

19             THE COURT:  Please be seated.

20             So I wanted to answer first the question that one

21   of you posed, that I think probably all of you or many of you

22   had from your nodding heads about why is Mr. Mekerri not

23   here, or Mekerri.  So here's the answer.  And it requires a

24   little bit of explanation of the law.  So a subpoena is,

25   essentially, just a court order to summon to appear.  So you
```

could issue, for example, a subpoena to testify.  And then
that's just a court order to come to court to testify at a
trial.  In civil cases and federal court -- and this is a
civil case, as I've explained to you, the Court can issue a
subpoena, or the lawyers, really, do it on their own, under
the Court's name, can issue subpoenas to anyone who's a
potential witness, but those subpoenas can only be served
within -- we're the federal court for the District of
Massachusetts, which means for the State of Massachusetts.
So the boundaries are the State of Massachusetts.  There's a
slight little expansion of it, minor contours that don't
really matter or apply here, but might reach southern New
Hampshire, or parts of Rhode Island.  But that's the gist of
it is the district.

So Mr. Mekerri is in Singapore and Singapore is way
beyond the State of Massachusetts, so he's not subject to a
subpoena from this court.  That is, there's no authority of
the Court to compel him to come to testify.

There are other ways that people can be required to
testify; for example, the parties to a lawsuit.  So
Dr. Menninger could be required to testify, because she's a
party to the lawsuit.  PPD or its representatives could be
required to testify.  But Dr. -- or Mr. Mekerri does not work
for PPD, so he doesn't fall within the -- a party to the
lawsuit and parties separate from the limits of subpoena

1    could be required.  So there's -- he's just beyond the reach

2    of the Court, which means he's beyond the reach of Mr. Hannon

3    and Ms. Mandel.  They can't make him come.  And so that's why

4    he's not here.  Okay.

5               All right.  We resume.

6               MR. HANNON:  Thank you.

7               THE COURT:  I take it neither of you have anything

8    else on that issue?

9               MS. MANDEL:  No, Your Honor.

10              MR. HANNON:  No, Your Honor.

11              THE COURT:  For you, Mr. Hannon?

12              MR. HANNON:  The next question is --

13              THE COURT:  Mr. Hannon, nothing else on that?

14              MR. HANNON:  Correct.  Nothing else on that.

15              THE COURT:  Okay.  Fine.  Go ahead.

16              MR. HANNON:  The next question is how often -- may

17   I back up one question and answer, Judge?  So we don't --

18              THE COURT:  Yes.

19              MR. HANNON:  Next I'll back up to:

20   Q.   "Let's look at the next bullet point" --

21              THE COURT:  Just remind me which page we're on.

22              MR. HANNON:  We are on page 163, line 14.

23              THE COURT:  163.  Okay.

24   Q.   "Let's look at the next bullet point which reads

25   'technical sale presentation, internal and external' and then

1    (i.e., internal sales meeting) HH/client site meetings

2    phone.'

3              "Do you see that there?

4    **A.**  "I do.

5    **Q.**  "All right.  Are those tasks that Dr. Menninger was

6    already performing as of February of 2018?

7    **A.**  "I don't remember.  But -- I don't remember.  I -- I --

8    what I can share with you is that we had sales meetings where

9    each leader, you know, was preparing, you know, their section

10   or their strategy with the, you know, the investment that PPD

11   has made to respond to the clients.  And all of those

12   informations were very, very, very important for the sales

13   team.  So, yeah, it's the responsibility of every section

14   leader or department leader to cover their session during the

15   sales meeting.  So I believe that Lisa was always a part of

16   that, presenting to the sales team, the lab, that section.

17   **Q.**  "How often?

18   **A.**  "I don't recall the frequency.

19   **Q.**  "How about client site meetings?  Had Dr. Menninger done

20   those as of February of 2018?

21   **A.**  "I don't remember.

22   **Q.**  "Let's look at the next bullet.  It says, 'For customer

23   visits lunch/dinner and social interactions may occur

24   (expected 60 to 80 percent of the time) in order to build

25   business relationships.'

1                    "Do you see that?

2    **A.**  "I do, yes.

3    **Q.**  "Was that something that Dr. Menninger was doing as of

4    February of 2018?

5    **A.**  "I don't remember.

6    **Q.**  "And then the next bullet, it says, 'travels up to

7    30 percent.'

8                    "Do you see that?

9    **A.**  "I do.

10   **Q.**  "Now, is there anything here in this list of items that

11   addresses your alleged concern that Dr. Menninger wasn't

12   spending enough time in the Highland Heights lab?

13   **A.**  "Can you repeat the question, Patrick?"

14            MR. HANNON:  And then the question gets reread.

15            THE WITNESS:  "Yeah, I'm not sure I understand

16   these questions.  Sorry.  Here again, we're listing the

17   expectations from the business based on the growth and, you

18   know, the discussion that I had with her back in December.

19   So it's -- it's, you know, nothing about my expectations.

20   It's really expectations of the business, based on the

21   feedback, and those challenges that we had in 2017.

22   **Q.**  "So is that a no?

23   **A.**  "Yeah.  It's not a yes or a no.  I can't answer that

24   question.

25   **Q.**  "Why can't you answer it?

1    **A.**   "Because, as I shared, Patrick, here is the outcome of

2    the conversation we had and the summary of the challenges or

3    the rules and responsibilities of that, you know.  They

4    expected from the lab leader and based on the challenges that

5    we had in 2017.

6          "I'm requesting a break, please.  Requesting a

7    break."

8          MR. HANNON:  And I'll move ahead to page 167,

9    line 7.

10   **Q.**   "Mr. Mekerri, during that break, did you speak to anyone?

11   **A.**   "Yes.

12   **Q.**   "Who did you speak to?

13   **A.**   "Rachel and Lisa.

14   **Q.**   "Did you speak to them about the e-mails that we were

15   just talking about?

16   **A.**   "Yeah.  It's -- no.

17   **Q.**   "Are you going to refuse to answer my question based on

18   that instruction?

19   **A.**   "Yes.  Can you repeat the question, Patrick?

20   **Q.**   "Did you at some point conclude that Dr. Menninger, given

21   her disability, was not capable of performing the essential

22   functions of her job?

23          "You can answer, sir.

24   **A.**   "The intent was really to discuss with Lisa and also

25   match the business needs, right?  The intent was only to

1    understand, you know, Lisa's, you know, accommodation or need

2    for accommodation.  We need to understand them and also match

3    them with the business needs.  That all will be verified that

4    we've done and my, you know -- the approach that we have.  No

5    conclusion of anything related to the disability, no.

6    Q.  "So even after you got all the information that you got

7    concerning Dr. Menninger's disability, you still understood

8    that she could do her job, right?

9    A.  "I don't remember, you know, the specifics here.  But

10   again, you know, it's all based on Lisa's kind of discussions

11   with her physicians and what she was able to do and what

12   would be the accommodations.  So it was all, you know, based

13   on the feedback that we received.

14   Q.  "Sure.  And I appreciate that's what it was based on, but

15   I'm just trying to get a clear sense in terms of what your

16   state of mind was, given the information that you had

17   received.  And I think you're saying is that even after you

18   got all of this information, you still believe that

19   Dr. Menninger was capable of doing her job.

20          "Is that accurate?

21   A.  "No, it's not accurate.  I don't -- I don't -- I'm not a

22   physician.  I'm not her physician.  I'm not Lisa.  I respect

23   her disability.  And to do the best that I can for the

24   business needs.  I try to make the best of both cases.  But

25   that's really based on Lisa's and her doctor's request of

1    accommodation, not me.

2    **Q.**  "Right.  But based upon the information that they gave

3    you, did you believe she was still capable of doing her job?

4    **A.**  "Counsel, for that question, I again, you know -- it's a

5    decision of her physician and her ability.  You know, I would

6    never make a decision for -- you know, on their behalf.  It's

7    Lisa, so...

8    **Q.**  "You didn't have a view one way or another as to whether

9    or not Dr. Menninger was capable of performing her job?

10   **A.**  "No view.  No view.  And your question is really for Lisa

11   and her physician, not for me.

12   **Q.**  "Okay.  At some point in time, did you meet with

13   Dr. Menninger to discuss the accommodations that PPD was

14   willing to provide to her?

15   **A.**  "I do not recall.  I do not recall.

16   **Q.**  "Do you have any recollection of Dr. Menninger asking you

17   for additional detail regarding the items that you had

18   identified for her?

19   **A.**  "I told you earlier, I think, if I remember, there was

20   some back and forth for us to understand what is it that we

21   needed to accommodate.  Because when I hear, I read that,

22   right?  I -- which to reiterate that I'm capable of

23   performing all functions of my job, with or without

24   accommodation.  So, you know, it's really making sure that we

25   are there to help her, right, and based on the physician's

1    feedback."

2           MR. HANNON:  And then I ask the witness to scroll

3    down.

4           THE WITNESS:  "Yes.  Okay.  And again, go down.

5    Yeah, and so that part, again, is linked to the conversation

6    we had in December, where I mentioned about those changes and

7    where I mentioned about the feedback from the team and the

8    more issues that we were having in 2017, right?  So that's

9    why, you know, this is there and mentioned there.  Right?

10   Regarding the client bid defense, the issue resolution, and

11   the Highland Heights client site meetings and phone to

12   support the team, internal or external.

13   Q.   "Okay, back to my question, though, sir, which is --

14   we're on page PPD Menninger 001760.  The sentence that reads,

15   'As I stated during our conversation, while I greatly

16   appreciate your agreement to provide accommodations with

17   respect to items one and five on Hacene's list of

18   duties/responsibilities, I need some additional detail

19   regarding items two, three, and four.'

20          "Do you see that?

21   A.   "I do see that, yes.

22   Q.   "Okay.  Do you recall Dr. Menninger requesting that

23   additional detail?

24   A.   "No.

25   Q.   "Did you ever provide that additional detail?

1    **A.**   "I don't remember.

2    **Q.**   "Is there any reason why you would not provide that

3    additional detail if she asked for it?

4    **A.**   "I don't remember, Patrick.

5    **Q.**   "Do you know what Dr. Menninger is referring to when she

6    writes 'the proposed options about an exit package and

7    consulting arrangement.'?

8    **A.**   "Yeah, I don't remember, really.  You know, that

9    specifics of that conversation, so I don't remember.

10   **Q.**   "Do you recall ever having any discussions with

11   Dr. Menninger concerning the subject of an exit package or

12   consulting arrangement?

13   **A.**   "I do not.  You know -- I do not.  I do not recall.

14   **Q.**   "Okay.  Well let me walk you through what Mr. St. John

15   wrote, and I'm going to ask you if you believe this is --

16   that the information that he's stating here is accurate.  His

17   draft e-mail here is, 'Lisa, as I stated in the meeting,

18   items two through four (specific accommodations from your

19   physician highlighted below) are all core items in the role

20   you are in and we need 100 percent in one through four for

21   the business to meet objectives.'

22             "Do you see that?

23   **A.**   "Yes.

24   **Q.**   "Do you know if that was an accurate statement as to what

25   was said to Dr. Menninger in the meeting that was referenced

1    here?

2    **A.**  "I do not recall.  I do not remember.

3    **Q.**  "Let's look at the next sentence.  'Adding additional

4    detail would only present the opportunity to select items in

5    each bucket you believe you can or can't do.'

6           "Do you see that?

7    **A.**  "I do, yes.

8    **Q.**  "Okay.  Were you reluctant to provide additional detail

9    concerning the items that were not being accommodated because

10    you did not want Dr. Menninger to select items in those

11    buckets that she believed she can or can't do?

12    **A.**  "No.  I do not remember, Patrick.

13    **Q.**  "Do you deny that was your concern, or are you just not

14    sure?

15    **A.**  "I do not remember.

16    **Q.**  "The next sentence says, 'There will be no accommodations

17    made outside of items one and five.'

18           "Do you see that?

19    **A.**  "Yes.

20    **Q.**  "Does that accurately reflect the determination that PPD

21    had made as of March 1, 2018, that there would be no

22    accommodations made outside of items one and five?

23    **A.**  "I do not remember.

24    **Q.**  "Mr. Mekerri, during the course of time that you were

25    talking with Dr. Menninger about her need for accommodations,

1  did you have discussions with anyone at PPD about potentially

2  moving her out of her role:

3  **A.**  "No, I don't remember.

4  **Q.**  "Is it possible you did and you just don't recall?

5  **A.**  "No, I do not remember.

6  **Q.**  "Do you recall beginning to look for a replacement for

7  Dr. Menninger in late February 2018?

8  **A.**  "I do not remember.  No, I do not remember that part.

9  **Q.**  "And as this dialogue was ongoing, did you ever direct

10  Dr. Menninger to spend more time in the Highland Heights lab?

11  **A.**  "I don't remember.  I don't recall.

12  **Q.**  "During the time that this dialogue was continuing, were

13  there additional requests being made by the sales team for

14  Dr. Menninger to participate in internal and external sales

15  meetings?

16  **A.**  "You'd have to ask the sales team, Patrick.  I don't

17  know.

18  **Q.**  "During the time that this dialogue continued, did

19  Dr. Menninger continue to perform her job?

20  **A.**  "I don't remember.

21  **Q.**  "At some point in time, Dr. Menninger took a medical

22  leave; is that right?

23  **A.**  "I don't remember.  I actually don't remember.

24  **Q.**  "Okay.  So you at least recall that at some point in

25  time, you needed to make arrangements to essentially cover

1   Dr. Menninger's duties; is that right?

2   **A.**   "I don't remember.

3   **Q.**   "Okay.  So you have no recollection if, at some point in

4   time, Dr. Menninger stopped performing the role that she was

5   performing at PPD?

6   **A.**   "Yeah, I don't -- you know, that part I think is -- I

7   don't remember the details, no.  I don't remember the -- you

8   know, no.

9   **Q.**   "I'm sorry, what don't you remember?

10  **A.**   "I don't remember.  I don't recall.

11  **Q.**   "Okay.  Did you make any significant changes to how the

12  labs were being operated between the time that Dr. Menninger

13  left and the time that you left PPD?

14  **A.**   "I don't remember.  I don't recall.

15  **Q.**   "Were there any new significant initiatives that were

16  started to improve lab quality, subsequent to Dr. Menninger

17  leaving her post?"

18  **A.**   I don't remember, no.

19              MR. HANNON:  You read that wrong.

20              THE WITNESS:  "I don't remember the details.  No."

21              THE READER:  Apologies.

22  **Q.**   "Did you feel that Dr. Menninger's symptoms deteriorated

23  after she disclosed her disability?

24  **A.**   "I can't answer that question.  I don't know.  I don't

25  remember a deterioration on the performance.  I don't

1    remember.  What I can recall again is the conversation we had

2    in December, and the feedback I gave and the need of more

3    presence, visibility, a tackling of the challenges.  So more

4    presence in the lab that I mentioned earlier to tackle the

5    issues that we were having, but I don't remember if the trend

6    was going downwards, upwards.  No.

7    BY MR. HANNON:

8    **Q.**  "I'm going to show you share with you another document

9    here, and I'll refer to this as Exhibit 6, and for the

10   record, this is an e-mail chain that is Bates stamped PPD

11   Menninger 000866 through 870.  And I'm going to work from the

12   bottom up, Mr. Mekerri, but as always, if you need to see

13   more of the document to answer one of my questions, please

14   feel free and I'll be happy to show you more.

15          "Right now I'm showing you the last page of the

16   document, which is what purports to be an e-mail from you to

17   Dr. Menninger with the subject 'one-to-one followup and

18   goals.'

19          "Do you see that?

20   **A.**  "I do, yeah.

21   **Q.**  "Okay.  Do you recall this e-mail?

22   **A.**  "No.  But I'm reading it now.

23          "So what's the question, then, Patrick?

24   **Q.**  "My question for now is if you remember this e-mail?

25   **A.**  "Now that you showed it to me, yes.  I see that I wrote

1    that e-mail.  But the details of those issues, I don't

2    remember.  It's been two years ago, right?  So I do not

3    remember this in detail.

4    **Q.**  "Okay.  If I could direct your attention to the first

5    sentence of your e-mail to Dr. Menninger, you write, 'As

6    discussed yesterday, I would like to adapt new goals for

7    2018, as I am concerned with the recent lab issues (Gedeon

8    Richter, BMS, and NGSP).'

9              "Do you see that?

10   **A.**  "I do.

11   **Q.**  "Now, the reference to goals for 2018, had you already

12   set goals for Dr. Menninger for 2018?

13   **A.**  "I do not remember.

14   **Q.**  "Was there a process in terms of how Dr. Menninger's

15   annual goals were to be set?

16   **A.**  "I do not remember.

17   **Q.**  "Would it refresh your recollection that the annual goals

18   were typically set at the beginning of the year?

19   **A.**  "It depends.  So I wouldn't, you know -- it depends on

20   the time frame that we have.  I don't remember, really, when

21   was the window for setting of the goals at that time.

22   **Q.**  "Okay.

23   **A.**  "It depends on when is the window of, you know, timeframe

24   when, you know, we are open in the system to enter the goals

25   and have those conversation and, as well, the availability of

1    the team members and the leader.

2    **Q.**  "Did you talk to anyone before you sent this e-mail to

3    Dr. Menninger?

4    **A.**  "I do not remember.

5    **Q.**  "Besides yourself, did anyone else play a role in

6    drafting it?

7    **A.**  "I do not recall.  I do not remember.

8    **Q.**  "In the existing goals for Dr. Menninger for 2018, did

9    they already address the concerns you referenced concerning

10   lab issues that you had discussed with her in December of

11   2017?

12   **A.**  "I do not remember again the specifics, but it's really,

13   again, linked with the conversation we had in December and

14   the growing concerns that I was hearing, you know, in the

15   lab, right?  And so this is really related to performance and

16   challenges that the lab was having.  And the same with all

17   the previous e-mails that you showed me, Patrick, with the

18   growth of the lab and the presence and visibility that we

19   needed.  So I do not remember, again, you know, how I wrote

20   that e-mail or when I wrote it.  But I do remember clearly

21   that we had issues and quite serious.  NGSP is very important

22   for the laboratory, as well as BMS.  Those are very serious

23   lab issues.

24   **Q.**  "Mr. Mekerri, my question, though, sir, is the 2018 goals

25   that you had originally set for Dr. Menninger, did those

1    address the issues that you claim to have raised with her in

2    December of 2017?

3    **A.**   "Yeah.  And that's -- that's -- you know, I think I

4    answered that question already, Patrick.  I don't remember,

5    you know, the goal setup.  I don't remember, really, that

6    process of setting up goals '18.  So I can't answer to your

7    question related to the goals of 2018, responding to the

8    challenges of 2017.

9    **Q.**   "But would that have been your normal practice, that if

10   an employee is having issues, to set goals to address those

11   issues?

12   **A.**   "If an employee have issues?  What -- what?  -- I'm

13   sorry.  I'm not clear on your question.  What kind of issues?

14   **Q.**   "Performance issues.  If a client -- if an employee that

15   reports to you has performance issues, would you normally try

16   to address those, at least in part, through the establishment

17   of their goals?

18   **A.**   "Yeah, I mean, it's what I said, Patrick.  I don't

19   remember the process of setting up goals for 2018.  I do

20   remember that I provided feedback in 2017 about the

21   challenges that we had.  And I was not the only one, but I

22   was the one making sure that I conveyed those to the lab

23   leader.  And with me providing -- be able to support, as

24   well, that we worked together to address them.  And here that

25   e-mail is a reflection of those issues that PPD was

1    experiencing in the lab, and ensuring that we have the right

2    level of support and dedication to tackle them.

3    **Q.**   "So Mr. Mekerri, I'm not asking you what the actual goals

4    were.  I'm just asking you if it was your practice as a

5    manager to, if you had an employee with performance issues,

6    to address those performance issues, at least in part,

7    through setting annual goals?

8    **A.**   "I do not recall, you know, Patrick, an example.  I do

9    not recall.  That's the answer to the question.

10   **Q.**   "Okay.  What led you to adopt Dr. Menninger's -- or

11   rather, ask Dr. Menninger to adapt her goals in April of

12   2018?

13   **A.**   "I do not remember.  I'm sorry.  I do not remember.

14   **Q.**   "Now, you write in the second sentence, 'I need your full

15   attention and dedication to resolve them and be more

16   proactive to prevent any further issues.'

17           "Do you see that?

18   **A.**   "Uh-huh.  I do.

19   **Q.**   "Okay.  As of April 11, 2018, did you believe that

20   Dr. Menninger was not providing her full attention to her

21   responsibilities?

22   **A.**   "Yeah.  It's linked to what I said for the December,

23   right?  You asked me if I had concerns.  I told you the

24   business had concern.  So here it's really to get Lisa to

25   pull through, you know.  And I tried to really gather the

1    details.  I believed that she -- I believed that that was the

2    exercise and the intent of that e-mail, based on the feedback

3    that I received from the team.

4    **Q.**  "My question, sir, is a little bit different.  I'm asking

5    if you had any reason to believe, as of April 11, 2018, that

6    Dr. Menninger was not providing her full attention to such

7    matters.

8         "Did you?

9    **A.**  "I do not know.  I do not know.  I do not remember that.

10   **Q.**  "And then in that second sentence, you also reference

11   being more proactive to prevent any further issues.  Was it

12   your belief that on April 11, 2018, that Dr. Menninger was

13   not being proactive to prevent lab issues?

14   **A.**  "I do not -- I do not remember.  And I don't recall.

15   Here again, you know, here is, really, the issues, a

16   reflection, an example of the issues that I was mentioning

17   earlier.  And I offer, as well, some -- here we can read this

18   e-mail.  I believe the intent was really to offer some --

19   some role, because they're asking about how to tackle them.

20   What's the root cause.  I believe the intent was really to

21   provide some support on how to tackle them.  But we had major

22   issues in the lab in 2018 that needed to be tackled.

23   **Q.**  "So do I understand your answer that this e-mail was

24   intended to help Dr. Menninger to find ways to address

25   issues?

1    **A.**   "I do not recall the details.  I'm just reading, you

2    know.  You see, you show it, right?  I'm just reading.  When

3    it says, you know, being more proactive to prevent any

4    further issues, proactive in elimination of lab issues, I

5    believe these are guidance to ensure that the lab challenges

6    that PPD was experiencing are tackled accordingly and making

7    sure, as well, that they don't reappear.  So having some

8    preventative and corrective action.

9    **Q.**   "Mr. Mekerri, didn't Dr. Menninger ask you for

10   clarification in terms of how you thought she could achieve

11   these kinds of objections -- objectives?

12   **A.**   "I do not recall.  I think I already responded to that.

13   **Q.**   "I'm sorry, what do you mean you responded to that?

14   **A.**   "I do not know if I responded to the clarification or

15   not.  I do not recall.

16   **Q.**   "Did you think it would be appropriate for Dr. Menninger

17   to reply to this e-mail you sent on April 11, 2018, by asking

18   you for clarification of how you wanted her to go about

19   achieving these objectives?

20   **A.**   "I don't know.  I don't know.

21   **Q.**   "In the first sentence of your e-mail, in the

22   parenthetical, you reference Gedeon Richter.  Do you see

23   that?

24   **A.**   "I do.

25   **Q.**   "Was that a lab issue that you believe Dr. Menninger

1   could have avoided?

2   **A.**  "I don't remember the detail of it.  I don't remember the

3   detail here.  I don't really recall the specifics.

4   **Q.**  "Okay.  How about BMS?  Was that a lab issue that you

5   thought Dr. Menninger could have prevented?

6   **A.**  "Sorry, I don't believe the -- I don't remember the

7   specifics.

8   **Q.**  "That wasn't quite my question, sir.  My question was

9   whether or not you believed that BMS was a lab issue that

10  Dr. Menninger could have prevented.

11  **A.**  "I don't know.  I don't remember, so I can't -- I can't

12  come back two years ago and talk to that question now.

13  **Q.**  "And MGSP, is the lab issue referenced there, is that

14  something that Dr. Menninger could have prevented?

15  **A.**  "Again, it has been two years, Patrick, and if I wrote

16  it, I think it reflects the challenges that the lab had and

17  the feedback that I was receiving from the team outside.

18  So -- and also from clients, but I don't remember, really,

19  though, the details.

20  **Q.**  "But back to my question, sir.  Was the NGSP issue that's

21  referenced here, do you believe that was something

22  Dr. Menninger could have prevented?

23  **A.**  "I do not remember the detail here.

24  **Q.**  "So you don't know?

25  **A.**  "I don't know.  I don't remember the details.

1          "I need a break, as well.

2    **Q.**  "Do you recall ever having discussions with Mr. Fikry

3    concerning deficiencies in Dr. Menninger's work performance?

4    **A.**  "No, I do not recall.

5    **Q.**  "All right.  You mentioned earlier Chris Clendening, do

6    you recall any communication that you ever had with

7    Mr. Clendening concerning deficiencies with Dr. Menninger's

8    work performance?

9    **A.**  "No.

10   **Q.**  "Did you ever have conversations with Mr. McKinnon

11   concerning deficiencies with Dr. Menninger's work

12   performance?

13   **A.**  "No."

14          THE COURT:  That's it?

15          MR. HANNON:  That's the end of the transcript, Your

16   Honor.

17          THE COURT:  Okay.  That concludes Mr. Mekerri's

18   deposition -- or testimony read from his deposition.

19          You can step down.  Thank you.

20          Next witness, Mr. Hannon.

21          MR. HANNON:  Dr. Christopher Fikry.

22          THE COURT:  Okay.  Dr. Fikry, if you'd come forward

23   to the witness box.

24          (The witness was duly sworn.)

25          THE DEPUTY CLERK:  And can you please state your

1    full name and spell your last name for the record.

2              THE WITNESS:  Christopher Fikry, F-, as in Frank,

3    i-k-r-y.

4              THE COURT:  Have a seat.

5              MR. HANNON:  I have a binder.

6              May I approach the witness?

7              THE COURT:  Yes.

8                        **CHRISTOPHER FIKRY**

9         having been duly sworn, testified as follows:

10             **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

11   BY MR. HANNON:

12   **Q.**  Good afternoon, Doctor.

13   **A.**  Good afternoon.

14   **Q.**  Could you please introduce yourself to the jury?

15   **A.**  My name is Chris Fikry.

16   **Q.**  And are you a doctor?

17   **A.**  I am.  And you can call my Chris.

18   **Q.**  Okay.  I have tend to be a little more formal than that,

19   so apologies if I call you Doctor, but --

20   **A.**  Whatever you like.

21   **Q.**  -- what do you do for work, sir?

22   **A.**  I work at Clario.  It's a drug development company.

23   **Q.**  And what's your role there?

24   **A.**  I'm the CEO.

25   **Q.**  And for how long have you been in that position?

1    **A.**   I joined July of last year.

2    **Q.**   And prior to that, had you been employed at PPD?

3    **A.**   Yes.

4    **Q.**   And tell us about your position at PPD?

5    **A.**   I ran the laboratory business at PPD from 2017 until

6    2022.

7    **Q.**   Okay.  And why did you leave PPD?

8    **A.**   I was offered the opportunity for my current role.

9    **Q.**   Did I hear you right that you ran the laboratory

10   business?

11   **A.**   That's correct.

12   **Q.**   Okay.  And am I right that, during your tenure at PPD,

13   there were sort of various laboratory units?

14   **A.**   That's right.

15   **Q.**   And the one that Dr. Menninger was involved in, that was

16   called Global Central Labs?

17   **A.**   That's correct.

18   **Q.**   Okay.  What were the others?

19   **A.**   We had a GMP business, which tested manufactured drug

20   product, a bioanalytical lab that did studies around the

21   dosing of drugs prior to use in humans.  We had a specialty

22   unit that did just vaccines work and another that did

23   biomarkers.  And the Central Lab is the one that actually

24   tested patient samples.  So these are both healthy and sick

25   people that have volunteered to participate in clinical

1    trials.

2    **Q.**  And with respect to your Global Central Labs

3    responsibilities, was there a -- was there a general manager

4    that reported to you?

5    **A.**  Yes.  There's a general manager and a commercial lead for

6    each of these businesses.

7    **Q.**  Okay.  So just focusing on Global Central Labs, the

8    general manager, what was their responsibilities, generally?

9    **A.**  Overall responsibility of the P&L.  So financial

10   responsibility and quality responsibility for the business.

11   **Q.**  And then did I hear you right that, in addition to the

12   general manager for GCL, there was also a business

13   development lead for GCL?

14   **A.**  That's correct.

15   **Q.**  And that person also reported directly to you?

16   **A.**  Yes.

17   **Q.**  And during your tenure at PPD, who were the general

18   managers of the Global Central Labs?

19   **A.**  At the time in question we're talking about, 2017/2018,

20   was Hacene Mekerri, and then over time it transitioned to

21   Chris Clendening.

22   **Q.**  When you say that it transitioned over time, what do you

23   mean by that?

24   **A.**  When Mr. Mekerri stepped down, he left the company, Chris

25   Clendening took over.

1   **Q.**   Okay.  And what's your understanding as to why

2   Mr. Mekerri left?

3   **A.**   He voluntarily left.

4   **Q.**   Okay.  And when you left PPD, was Mr. Clendening, was he

5   still the general manager of Global Central Labs?

6   **A.**   That's correct.

7   **Q.**   Okay.  You're familiar with Dr. Menninger?

8   **A.**   Yes, we've met.

9   **Q.**   Okay.  And she was the medical director of Global Central

10  Labs for a period of time?

11  **A.**   Correct.

12  **Q.**   And what was your understanding of Dr. Menninger's duties

13  and responsibilities in that role?

14  **A.**   When I started, Dr. Menninger was the medical director

15  for the Central Laboratory, so she was our pathologist, she

16  held the medical license for that lab.  And so there are

17  three populations within this business, right?  There's

18  medical and scientific staff, which she was in charge of,

19  operations staff that actually ran the tests during the day,

20  and then the commercial team that are tasked with selling the

21  work.

22  **Q.**   Okay.  So Dr. Menninger's responsibilities were tied to

23  the scientific stuff?

24  **A.**   That's correct.

25  **Q.**   Okay.  And at some point in time, you met Dr. Menninger

1    in person; is that right?

2    **A.**  Yes, we've met in person.

3    **Q.**  Okay.  And you were able to chat with her; is that right?

4    **A.**  That's correct.

5    **Q.**  Okay.  And do you recall any impression that you had

6    based upon your meeting with her?

7    **A.**  In person, we met very briefly.  We were there for some

8    sort of client interaction, either an audit or a commercial

9    meeting, and Dr. Menninger and I met in the hallway and had a

10   brief discussion there.  And we spent some time afterwards

11   and I then spent time with each of her direct reports that

12   day.

13   **Q.**  Okay.  You didn't form any kind of negative impression of

14   Dr. Menninger based upon that interaction, did you?

15   **A.**  No.

16   **Q.**  Okay.  So in 2007, Mr. Mekerri, that was Dr. Menninger's

17   boss, right?

18   **A.**  2007?

19           THE COURT:  2007?

20           MR. HANNON:  I'm sorry, 2017.  My mistake.  Sorry.

21   It's been a long day.  Let me ask the question again.

22   BY MR. HANNON:

23   **Q.**  In 2017, Mr. Mekerri was Dr. Menninger's boss, right?

24   **A.**  Yes, she reported to the general manager.  That's

25   correct.

**Q.**   Okay.  And during that same period, you were
Mr. Mekerri's boss?

**A.**   That's correct.

**Q.**   Okay.  And during 2017, you don't recall receiving any
feedback from Mr. Mekerri concerning Dr. Menninger's work
performance, do you?

**A.**   Work performance?

**Q.**   Yeah.

**A.**   No.  Not that I recall.

**Q.**   Okay.  And you -- during this time period, you didn't
work in Highland Heights, did you?

**A.**   I was based in North Carolina.  Our company's
headquarters were in North Carolina, but I did travel to the
Kentucky facility frequently.

**Q.**   Okay.  You -- at some point in time, you took some
interest in efforts to bring in more technical expertise into
the Global Central Labs; is that right?

**A.**   That's correct.

**Q.**   And you thought that was a good investment for PPD to
make?

**A.**   That's correct.  So we expanded the team, all three of
those groups, so the commercial, operational, and the medical
team.

**Q.**   Very good.  And part of the -- part of that expansion
involved having to recruit, to bring on board that additional

1    expertise, right?

2    **A.**   For -- yes, if we wanted to hire people, we had to

3    recruit, yes.

4    **Q.**   Okay.  And we're talking about technical expertise.

5    We're talking about either medical doctors or Ph.Ds, right?

6    **A.**   For the medical team?

7    **Q.**   Yeah.

8    **A.**   Yes.  You need to have some of the stuff, not all of the

9    technical staff are MDs or Ph.Ds, but there are some, yes.

10   **Q.**   The higher levels are, right?

11   **A.**   Yes, sir.

12   **Q.**   Okay.  And you would agree with me that recruiting for

13   those roles for the Highland Heights lab was somewhat

14   difficult, right?

15   **A.**   So it's in Kentucky.  It is not like recruiting for a

16   Cambridge Biotech.  It is tough to get people from the coast

17   to relocate to Kentucky, for sure.

18   **Q.**   Okay.  And you don't recall any communications you ever

19   had with Mr. Mekerri about Dr. Menninger's role in

20   recruiting, do you?

21   **A.**   I do not recall.  No.

22   **Q.**   Okay.  You never instructed Mr. Mekerri to have

23   Dr. Menninger stop being involved in recruiting, did you?

24   **A.**   I know in our deposition, you had presented some of these

25   e-mails, so I know there was some pressure I was applying to

1      them to expedite the hiring.

2      **Q.**  My question is a little bit different.  Do you recall

3      ever instructing Mr. Mekerri to remove Dr. Menninger from the

4      recruiting or hiring process?

5      **A.**  I don't recall that, no.

6      **Q.**  So in 2017, the Global Lab business itself, am I right

7      that you would describe that as a $700 million business?

8      **A.**  I don't remember the exact number.  It sounds like the

9      right ballpark.

10     **Q.**  Is that a reference to revenue?

11     **A.**  That is a reference to revenue, across all of the five

12     businesses.

13     **Q.**  Okay.  So that would be -- that would be PPD itself, just

14     to the best of your recollection, it would have been in the

15     approximately 700 millions of dollars of revenue in 2017?

16     **A.**  I would have to look, but that would not surprise me if

17     that was the number.  Right.

18             THE COURT:  I'm sorry, are you asking about PPD or

19     the lab business, or is there a difference?

20             MR. HANNON:  PPD.

21             THE WITNESS:  Oh, well, then --

22             MR. HANNON:  I'm sorry.

23             THE COURT:  Because the other question was the lab

24     business.

25             MR. HANNON:  Good point, Your Honor.

1    BY MR. HANNON:

2    **Q.**   So that $700 million estimate, that's just the lab

3    business that you ran; is that right?

4    **A.**   That's correct.

5    **Q.**   And then there were other businesses at PPD besides the

6    one you ran?

7    **A.**   That's correct.

8    **Q.**   Do you have a sense of what PPD's total revenue was in

9    2017?

10   **A.**   It would -- I don't know the exact number, it would be

11   multiple billion.

12   **Q.**   Do you have a sense of what its profit was?

13   **A.**   Of the whole business?

14   **Q.**   Yeah.

15   **A.**   I couldn't guess right now, but it was a public company,

16   so some of this is available.

17   **Q.**   Okay.  Do you know if the profit in 2017 would have

18   exceeded the billion dollars?

19   **A.**   I don't think, no.

20   **Q.**   Okay.  Exceeded 500 billion?

21   **A.**   For the entirety of the company?  I really can only speak

22   about the laboratory business.

23   **Q.**   Okay.  Let's focus on the laboratory business.  What was

24   the profitability of the laboratory business in 2017?

25   **A.**   You know, again, I don't have the exact number, but I

1    would gauge in between 25 and 30 percent of the revenue.

2    **Q.**  So about 25 to 30 percent of that 700 million figure?

3    **A.**  Would be the -- would be the EBITDA.  The company carried

4    a lot of debt, so the actual profit would be actually quite

5    low.

6    **Q.**  Sure.  Got it.  And then 2018, that was actually a

7    significant growth year for the business; is that right?

8    **A.**  I believe so, yes.

9    **Q.**  Okay.  And can you give us a sense of what the revenue

10   was in 2018?

11   **A.**  I'm sorry.  I can tell you that over my tenure there, it

12   roughly doubled.

13   **Q.**  So doubled between 2017 and -- what year did you leave?

14   **A.**  No, I would say from 2016 to 2022.  Again, if the numbers

15   are important, you know, we would have to look them up.  I

16   don't want to --

17   **Q.**  Understood.  And were you still at PPD when it got

18   acquired by Thermo Fisher?

19   **A.**  Yes.

20   **Q.**  And am I right that it got acquired for $17.4 billion?

21   **A.**  I don't know the exact number.  If it was in the press

22   release, then -- I just -- it sounds about right.

23   **Q.**  Okay.  When -- you mentioned earlier that PPD went public

24   at some point; is that right?

25   **A.**  Yes, sir.

1    **Q.**  And do you recall what year that was?

2    **A.**  I'm sorry, I should know.  2020.  I'm sorry --

3    **Q.**  You don't sound very sure of that.

4    **A.**  I'm not.

5    **Q.**  No worries.

6    **A.**  It roughly would have been 12 to 18 months prior to the

7    acquisition.

8    **Q.**  Okay.  Do you know when the acquisition by Thermo Fisher

9    was?

10   **A.**  It closed in December of 2021.

11   **Q.**  Okay.  After PPD went public, do you know if employees in

12   the Global Central Lab business were given any kind of equity

13   awards?

14                MR. CURRAN:  Objection.

15                THE COURT:  Overruled.

16                You can answer.

17                THE WITNESS:  I don't recall the comp structure.  I

18   don't think so, because I think we still had equity from

19   being a private entity there.  But the HR team would be able

20   to give you the sort of sequence of how that all played out.

21   BY MR. HANNON:

22   **Q.**  Okay.  Subsequent to the -- or in connection with the

23   Thermo Fisher transaction, do you know if there was any

24   equity award for leaders in the Global Central Lab business?

25   **A.**  Nothing would have been specific for the Global Central

1    Lab leaders, so that event -- the IPO wouldn't have done

2    anything material for the team or the employees.  The

3    acquisition would have triggered people's equity to vest.

4    **Q.**  Okay.  Do you know if folks in -- or rather, if leaders

5    in Global Central Labs got any kind of raises or bonuses in

6    connection with either the company going public or being

7    acquired?

8    **A.**  In connection with those, I believe when Thermo Fisher

9    acquired the business, they offered some retention bonuses to

10   the staff.  But I don't recall anything related to the IPO

11   nor to the close of the transaction.  So the company was

12   private, so those of us that had equity, the equity would

13   have vested after the acquisition, but nothing would have

14   happened after the IPO.

15   **Q.**  At some point in 2018, do you recall being aware of

16   discussions concerning Dr. Menninger potentially exiting PPD?

17   **A.**  In 2018?

18   **Q.**  In 2018.

19   **A.**  No, not to my recollection.  She was an employee in good

20   standing.

21   **Q.**  She was an employee in good standing in 2018?

22   **A.**  In the beginning part of the year.

23   **Q.**  Okay.  Was there a time during the year when she no

24   longer was an employee in good standing?

25   **A.**  I may misremember, but I believe she opted to leave the

1    company towards the middle part of the year, towards the back

2    end of the year.  I may have mixed up the date.

3    **Q.**  Would it -- would it refresh your recollection if I told

4    you that at some point she took a medical leave?

5    **A.**  So that wouldn't change her -- she would still be an

6    employee in good standing for that, yes.

7    **Q.**  Okay.  So just to be clear, in terms of your

8    understanding, is that Dr. Menninger remained an employee in

9    good standing as of time that she took her medical leave?

10   **A.**  She was never not an employee in good standing.

11   **Q.**  Okay.  And in fact, when Dr. Menninger took her medical

12   leave, you hoped that she would return.  Is that your

13   testimony?

14   **A.**  Yeah.  So we talked a little bit about Kentucky is an

15   extremely difficult position to recruit for.  This is why

16   earlier, when Dr. Menninger wanted to relocate to

17   Massachusetts, we did our best to accommodate that, because

18   it's quite an expensive proposition, and not easy to find the

19   right person that is a boarded pathologist, that has clinical

20   trials experience, and is willing to live in Kentucky.  So we

21   wanted to do -- it was in our interest to do everything

22   possible to make it work.

23   **Q.**  I'm going to show you Joint Exhibit Number 265.

24            Sir, I want to direct your attention to the e-mail

25   here in the middle of the screen.  Do you see this is an

1   e-mail from you to Jerry Williams on April 11, 2018?

2   **A.**  Yes.

3   **Q.**  And your subject is, "What's timing on Lisa Menninger's

4   exit?"

5          Do you see that?

6   **A.**  Yes, sir.

7   **Q.**  Can you tell us what you're referring to there?

8   **A.**  So this is April.  This is prior to Dr. Menninger's

9   medical leave.  There's some concern about servicing the

10  business and the clients that we have, so that's one element.

11  And then the second piece is just forecasting if

12  Dr. Menninger opted to leave the organization, which she did

13  ultimately, it's quite an expensive proposition to back-fill

14  the role, so we wanted to make sure that we had that in the

15  forecast going forward.  So we wanted to be prepared, either

16  way.

17  **Q.**  Okay.  So the exit, that's a reference to Dr. Menninger

18  leaving the company?

19  **A.**  So I wanted to make sure we understood, if she opted to

20  leave, what the cost would be.  And absent that, how we were

21  going to cover the rest of the business.  Because that would

22  also have financial implications if we had to hire more

23  people around.

24  **Q.**  Okay.  Was it your understanding as of April 11, 2018,

25  that Dr. Menninger was exiting the company?

1    **A.**  No, she was not.

2    **Q.**  Okay.  Did you ever ask Mr. Williams what the status of

3    Dr. Menninger's -- in terms of whether she is or isn't

4    leaving?

5    **A.**  I had concerns.

6    **Q.**  Okay.  And why did you have concerns?

7    **A.**  She had moved away from the laboratory and we were trying

8    to accommodate that, right?  So that had been going on for a

9    while.  And I had been getting some feedback from clients, as

10   well as the laboratory staff, that we needed more supervision

11   there.  And so I wanted to make sure we were prepared either

12   way.

13   **Q.**  Did it have anything to do with her disclosure of her

14   disability?

15   **A.**  No.

16   **Q.**  Okay.  By April 11, 2018, sir, you were aware that

17   Dr. Menninger had made a request for accommodation, aren't

18   you?

19   **A.**  I actually didn't recall the sequence of this, but at the

20   deposition, you had surfaced some e-mails that seemed to

21   indicate that I was notified by HR in the first quarter.

22   **Q.**  Okay.  So you agree with me that as of April 11th of

23   2018, you were aware that Dr. Menninger had disclosed her

24   disability?

25   **A.**  Prior, I had received an e-mail that she was seeking some

1    sort of accommodation, beyond just living in Boston.

2    **Q.**  Let's look at the e-mail that you referenced.  I'm going

3    to show you Joint Exhibit 197.

4            So this is the e-mail that you had received from

5    Chad St. John on February 7th of 2018; is that right?

6    **A.**  That's what it says, yes.

7    **Q.**  Okay.  Is this the e-mail you referred to earlier that I

8    showed you at your deposition?

9    **A.**  I believe so, yes.

10   **Q.**  And this refreshed your recollection that, in fact, you

11   had been made aware of the accommodation request in February?

12   **A.**  No, I still didn't recall, but I acknowledged the e-mail.

13   **Q.**  Okay.  But you agree with me that, after seeing this

14   e-mail at your deposition, that you know that as of

15   February 7, 2018, you were -- you were aware of her request

16   for accommodation, yes?

17   **A.**  Yes.

18   **Q.**  Okay.  And let's look at the information that you were

19   aware of.

20           I'm sorry, it's a terrible highlighting job.

21           But in the second sentence of the second paragraph,

22   Mr. St. John writes, "The ball is now in Lisa and her

23   doctor's court to provide specific limitations linked with

24   Lisa's anxiety of public speaking and social interactions."

25           Do you see that?

1    **A.**   Yes.

2    **Q.**   Okay.  So as of the time you received this e-mail, you

3    knew that Dr. Menninger's doctor was providing information,

4    right?

5    **A.**   Yes.

6    **Q.**   Okay.  And it had to do with her anxiety of public

7    speaking and social interactions, right?

8    **A.**   Uh-huh.

9    **Q.**   Yes?

10   **A.**   Yes.

11   **Q.**   Okay.  And then further on, Mr. St. John had written --

12   and again, this is terrible highlighting -- "Once we have the

13   reply from Lisa's doctor, we can review them and determine if

14   we want to provide any reasonable accommodation.  If not, we

15   can consider providing her a package to move her out."

16          Do you see that?

17   **A.**   I do.

18   **Q.**   Okay.  And so you know what a reasonable accommodation

19   refers to, right?

20   **A.**   Similar to allowing her to live in Boston.

21   **Q.**   I'm sorry?

22   **A.**   Similar to allowing her to live in Boston.

23   **Q.**   Okay.  Well, you understood that this had to do with her

24   anxiety with public speaking and social interactions, right?

25   **A.**   Yes.

1   **Q.**  Okay.  And where -- did you ask for any information about
2   what Dr. Menninger's doctors had provided?
3   **A.**  I don't recall.  I don't think I would have, because it
4   seems to suggest that we haven't received anything yet from
5   her physician, unless I'm misreading this.
6   **Q.**  Did you follow up at all between this e-mail and the one
7   in April, where you're inquiring about the exit, to check in
8   on the status of these discussions?
9   **A.**  Well, I believe the prior e-mail that you just showed was
10  from April, so following this, I wanted make sure that we
11  were covered, both in terms of having a medical director in
12  the lab, and that we were planning financially for if there
13  was some accommodations that we could meet and we have to
14  hire people around, that's one.  Or if we had to find another
15  medical director, that's another set of costs.  So we had to
16  be covered for any scenario.
17  **Q.**  Did you ever follow up with Mr. St. John to find out what
18  they had chosen, between whether they were going to
19  accommodate or whether they were going to provide her a
20  package to move her out?
21  **A.**  Not that I recall, no.
22  **Q.**  Weren't you interested in knowing?
23  **A.**  Of course.
24  **Q.**  Dr. Menninger had an important role in the lab, right?
25  **A.**  For sure.

1   **Q.**  And during this time period of February to April, you

2   were -- you were meeting with Mr. Mekerri on a regular basis,

3   weren't you?

4   **A.**  Yes.

5   **Q.**  How frequently?

6   **A.**  I tried to meet with my staff at least once a week, on

7   Mondays, and then individually.  And then the general

8   managers I would talk to throughout the week as issues came

9   up.

10  **Q.**  And during those regular meetings with Mr. Mekerri, did

11  Dr. Menninger's accommodation requests come up?

12  **A.**  No, not that I recall.

13  **Q.**  Can you think of any reason why during those one-to-ones,

14  regularly occurring, you wouldn't have checked in to see

15  about this medical director of Global Central Labs?

16  **A.**  I assumed he would surface it when we got the request

17  from the physician.  I didn't think this was going to be a

18  quick process.  So I don't know if this is something that

19  would be on the agenda every week.

20  **Q.**  And is it your testimony that as of the time that you

21  sent that e-mail in April inquiring about the timing of

22  Dr. Menninger's exit that you hadn't gotten any update

23  concerning this matter?

24  **A.**  Oh, I just don't recall.  This was six years ago, sir.

25  **Q.**  You mentioned earlier that you had -- you had -- you had

1    seen this e-mail here, the February 7th e-mail at your

2    deposition; is that right?

3    **A.**   I believe so.

4    **Q.**   Okay.  And if we turn -- if you open that binder in front

5    of you -- well, actually, strike that.

6              Before I ask that question, am I right that your

7    deposition was in July of 2020?

8    **A.**   Yes.

9    **Q.**   And do you recall subsequently providing an affidavit in

10   connection with this lawsuit?

11   **A.**   I did review the affidavit, yes.

12   **Q.**   Okay.  And if you turn to the second -- there's a tab two

13   in your binder, and if you flip to that, there's no tab one,

14   I've got to warn you.  But if you go to tab 2, is that a copy

15   of the affidavit you submitted?

16   **A.**   Yes.

17   **Q.**   And the date of that affidavit is March 22, 2021, right?

18   **A.**   Yes.

19   **Q.**   Okay.  So that's, what, nine months after your

20   deposition?

21   **A.**   Yes.

22   **Q.**   Is that right?

23             And if you could turn to paragraph 10 of your

24   affidavit.  And if you could read along silently as I read

25   aloud:

1           "I am aware that at some point during the first

2     quarter of 2018, Dr. Menninger disclosed a disability and

3     requested workplace accommodations.  I was not involved in

4     these discussions and I am only aware that they occurred as a

5     result of this litigation."

6           Did I read that right?

7     **A.**  Yes.

8     **Q.**  Would you agree with me that's not true?

9     **A.**  I'm sorry, what part of it is not true?

10    **Q.**  That you're only aware of the discussions as a result of

11    this litigation?

12    **A.**  Yes, I got the timing wrong.

13    **Q.**  Okay.  How long have you been involved in the lab

14    business?

15    **A.**  At PPD, from 2017 to 2022.

16    **Q.**  And prior to joining PPD, you worked for a company called

17    Quest?

18    **A.**  Quest Diagnostics.  Yes.

19    **Q.**  Is that a competitor of PPDs?

20    **A.**  No, but it is a laboratory business.

21    **Q.**  Okay.  For how long were you at Quest?

22    **A.**  Four and a half years.

23    **Q.**  Were you in the lab business prior to Quest?

24    **A.**  No.

25    **Q.**  Okay.  Would you agree with me, sir, that elimination of

1    all lab errors is an impossible goal?

2    **A.**   Yes.  In a laboratory of our type, it's not possible.

3              MR. HANNON:  That's all I have.

4              THE COURT:  All right.  Cross-examination?

5              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

6    BY MR. CURRAN:

7    **Q.**   Hi, Chris.

8    **A.**   Hello.

9    **Q.**   So you were asked some questions by Attorney Hannon about

10   Dr. Menninger and her position at the labs?

11   **A.**   Yes.

12   **Q.**   Could you tell me what the -- sort of the basic job

13   duties were that someone in Dr. Menninger's position had to

14   deal with before?

15   **A.**   So the medical director for the laboratory has overall

16   clinical responsibility for the laboratory.  So that is

17   basically certifying that the results that are coming out are

18   of high quality and that the physicians that are ordering the

19   tests can rely on them to make clinical decisions.

20             In our case, in addition to that, the data was

21   collected by pharmaceutical companies ultimately to be

22   submitted to the FDA to determine if new drugs were safe and

23   effective.

24   **Q.**   Okay.  And I think you testified earlier that you became

25   aware at some point after you started that Dr. Menninger was

1    working remotely from Massachusetts; is that right?

2    **A.**   Yes.

3    **Q.**   All right.  Did you have any concerns about that?

4    **A.**   I did.  It was not the type of working arrangement that I

5    had encountered in the past for that type of role.  These are

6    sort of complex operations there and they often require some

7    on-site support for both the staff, and then certainly we

8    have clients coming through the operation frequently, and so

9    they like to see that the medical director is there and

10   engaged.

11   **Q.**   And Dr. Hannon [sic] asked you some questions about --

12   becoming aware that Dr. Menninger had requested some

13   accommodations and had some disabilities.  Do you recall

14   that?

15   **A.**   So there were two pieces.  When I started accommodation

16   to move here.

17   **Q.**   Right.

18   **A.**   And then subsequently in 2018.

19   **Q.**   Right.

20   **A.**   Further, yes.

21   **Q.**   Yeah, February 2018, there was that e-mail that you saw,

22   where you saw that she had requested some additional

23   accommodations.

24           Did you want to force her to leave the company as a

25   result of that?

1    **A.**   No.

2    **Q.**   And what -- what was your reaction to hearing that, if

3    you recall?

4    **A.**   It's hard not -- so I don't recall the specifics of when

5    it actually happened.  It's hard not to be nervous about it,

6    right?  Because you're worried about continuity and coverage

7    in the operation, as well as just the financial impact of

8    having to recruit another pathologist.

9    **Q.**   Are you aware of any efforts by other people at the

10   company to force her to quit?

11   **A.**   No.

12   **Q.**   What is a quality control event in the context of the

13   Central Labs?

14   **A.**   I mean, broadly, you can think about it as anything that

15   would deviate from our written -- or standard operating

16   procedure, anything that would jeopardize the result that was

17   given to a physician, or anything that would delay the timing

18   of delivery.  Basically, anything going wrong in the process.

19   **Q.**   Got it.  Okay.

20            And during the first year of employment, so from

21   2017 to 2018, were there any quality control events in the

22   Global Central Labs?

23   **A.**   Yes, all laboratories have them, but we certainly did.

24   There was an uptick in events.

25   **Q.**   There was an uptick in events during that period.

1       Were there any that stick out to you that you

2   recall?

3   **A.**   There were -- just by the nature of my position, there

4   were a number of clients that had escalated issues.  And then

5   we would review these quarterly, so just the sheer number of

6   them became an issue.

7   **Q.**   And what did you do in response to hearing about these

8   events?

9   **A.**   Had discussions with both Mr. Mekerri, the general

10  manager of the business, as well as our quality lead and our

11  operations lead.

12  **Q.**   And who was the quality lead?

13  **A.**   Mr. McKinnon.

14  **Q.**   And who was the operations lead?

15  **A.**   So at -- we transitioned.  So there were different

16  leaders for different pieces of the laboratory, so whether it

17  was the lab in Europe or the lab in Highland Heights had

18  different leaders.  Part of the challenge is that there was

19  no clear operational lead when I started in Highland Heights.

20  **Q.**   Okay.  And Mr. Mekerri is one of the people that you

21  spoke with, correct?

22  **A.**   Yes.

23  **Q.**   Did you hear directly from clients about these issues?

24  **A.**   Yes.

25  **Q.**   Do you recall any clients you heard from specifically?

1    **A.**   The one that I still remember was GlaxoSmithKline.  They

2    were quite a large client for all of PPD.  They had a program

3    where they contacted me directly, because they had concerns

4    about how we were performing.

5    **Q.**   And were they upset?

6    **A.**   They weren't happy.  They were nervous that we were not

7    going to be able to deliver what they needed for their trial.

8    **Q.**   Was that unusual for you to be hearing directly from

9    clients about quality control issues?

10   **A.**   Clients would call me on a whole host of matters, so no.

11   I wouldn't say that's unusual.

12   **Q.**   Okay.  So you spoke to -- you said earlier that you spoke

13   to Mr. Mekerri about these.  And your purpose in speaking to

14   him was what?

15   **A.**   To try to come up with a plan for addressing these

16   concerns.  We had to, for that specific program, develop some

17   new tests.  And there was a tight timeline for when patients

18   were going to start showing up down the road, something like

19   six to nine months later.  So he to get the tests up and

20   running.  And if memory serves there were components that

21   were done, carried out outside the US.

22   **Q.**   And do you know whether Mr. Mekerri, in turn, spoke to

23   anyone about these issues?

24   **A.**   I don't recall.  But I do know that we changed the

25   project manager on the study as a first step towards

1    remedying the situation.

2    **Q.**   And do you know whether Mr. Mekerri spoke to

3    Dr. Menninger about these issues?

4    **A.**   I don't know how he dealt with it.

5    **Q.**   Would you have expected him to have done so?

6    **A.**   I would have, yes.

7    **Q.**   Because Doctor -- if I recall correctly, you said that

8    Mr. Mekerri reported to you?

9    **A.**   Yes.

10   **Q.**   And did Dr. Menninger report to Mr. Mekerri?

11   **A.**   Yes.

12   **Q.**   Now, did you do anything to determine whether any

13   particular employee was at fault for any of these events?

14   **A.**   No.  Because I -- I don't think that's really the right

15   framework for driving this forward, right?  If you want to

16   get to a place -- because remember, these issues pop up all

17   the time.  These are, effectively, science experiments.  So

18   you can't have an environment where people feel like they're

19   going to be called out to task.  And in reality, in this

20   situation, I don't think anyone was particularly at fault.

21   The client was not happy.  We had an issue we had to resolve

22   for them, and so we had to come up with a plan of how we were

23   going to address this.

24   **Q.**   And what responsibility, if any, did Dr. Menninger have

25   with respect to resolving these quality control events and

1    helping to resolve them?

2    **A.**   Well, if you recall, there's a couple of groups here,

3    there's operations folks, and there are medical folks.  So at

4    this stage of where we are in this study, we're trying to

5    develop two new tests, so there's a lot of issues.  The test

6    is not working reliably.  And we need some help in trying to

7    figure out how to make it work.  So there's only a handful of

8    things that you can do to really address that.

9    **Q.**   And did Dr. Menninger have any role in helping to resolve

10   that issue?

11   **A.**   You know, I would expect our medical director to weigh

12   in, for sure.  She's ultimately responsible for that.  And so

13   no individual person is going to be an expert in every area,

14   but I think just sort of helping to roll up your sleeves and

15   understand, well, what is the issue?  Is this something where

16   we can add a piece of equipment?  Is this something where we

17   need to add technical resources?  You know, you can't expect

18   one person to have all of the ultimate answers, but you can

19   certainly expect the management team to come up with a plan.

20   **Q.**   And was Dr. Menninger a member of that management team?

21   **A.**   Yes.

22   **Q.**   And other folks were members of the management team, as

23   well, correct?

24   **A.**   Yes.

25   **Q.**   And those folks were also responsible?

1    **A.**   Yes.

2    **Q.**   Along with Dr. Menninger?

3    **A.**   Yes.

4    **Q.**   All right.  And would you expect that they were getting

5    pressure, as well, to help resolve these problems?

6    **A.**   Yes, from both me and from the client.

7    **Q.**   To your knowledge, did Dr. Menninger ever receive any

8    kind of discipline due to any of these quality control

9    events?

10   **A.**   Not that I'm aware.

11   **Q.**   And do you think that she should have been disciplined in

12   connection with them?

13   **A.**   No.  She did not cause the issues.  The test was not

14   working.

15   **Q.**   Right.  And was her employment terminated due to any of

16   these quality control issues?

17   **A.**   No.

18   **Q.**   And was she ever in danger of being terminated due to any

19   of these issues?

20   **A.**   No.

21              MR. CURRAN:  That's all the questions that I have.

22              Thank you, Chris.

23              THE COURT:  All right.  Any redirect?

24              MR. HANNON:  Very briefly, Your Honor.

25              **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. HANNON:

Q.  Just a follow-up.  Dr. Fikry, you were talking about the issues involving GSK.  You identified the -- and am I right that they were in a variety of different functional areas; is that right?

A.  Yes, sir.

Q.  They had concerns about budgeting?

A.  Budgeting, timing, the assay working.

Q.  Okay.  And the area that I think you identified in terms of falling within Dr. Menninger's team concerned making the assay work; is that right?

A.  I think that would fall within her scope.  I think we're all ultimately responsible for the totality of the program, though.

Q.  Okay.  And with respect to the assay, this was -- this was a test for gonorrhea; is that right?

A.  The drug was for gonorrhea, I don't know if we were testing for gonorrhea itself, or how the drug reacts to gonorrhea.

Q.  Okay.  And was this an area requiring expertise in molecular microbiology?

A.  Yes.  Ultimately, I think you would need that.

Q.  And are you aware that in -- in that -- Dr. Menninger's team included someone with a particular expertise in that area?

1    **A.**   We had a microbiology department.

2    **Q.**   Okay.  And in 2018, was Dr. Paul Reddy, was he the person

3    with the most expertise in that area?

4    **A.**   I don't think so.  I'd have to check he resume.  I

5    believe Dr. Reddy was more of a -- he was a Ph.D, not an MD.

6    **Q.**   Okay.  But you mentioned before that you would have

7    expected there to be some kind of a plan developed; is that

8    right?

9    **A.**   That's right.

10   **Q.**   Okay.  Was there a plan developed?

11   **A.**   Ultimately, we did advance the program.  Yes.

12   **Q.**   Okay.  And then you mentioned -- I think I heard you use

13   a phrase, something to the effect of, "People shouldn't be

14   called out on the carpet for these quality events."

15              Did I hear that right?

16   **A.**   I did not use that phrase, but I think the sentiment I

17   would stand behind, unless it was malicious or -- but I don't

18   think that was the case in this -- with this GSK program.

19   **Q.**   Okay.  And is that concept sort of embedded in sort of

20   general policies?  And by that I mean that people who bring

21   forward lab errors that there shouldn't be punitive actions

22   taken against them?

23   **A.**   Just for bringing forth an issue?

24   **Q.**   Sure.

25   **A.**   No, you should not be penalized for identifying an issue.

1   **Q.**   Okay.  And generally when a root cause of a quality event

2   is discovered, am I right that the general policy at PPD is

3   not to take any kind of a punitive action against the person

4   who caused it, unless it was intentional?

5   **A.**   I'm sorry, unless it was intentional?  So certainly if it

6   was intentional, those are terminable offenses there.  But

7   generally, if you want a laboratory to be effective, you want

8   to create an environment where people are identifying issues

9   and coming up with solutions, as opposed to -- without fear

10  of retribution.

11              MR. HANNON:  That's all I have.

12              THE COURT:  Any recross?

13              MR. CURRAN:  No.

14              THE COURT:  All right.  Thank you very much.

15  You're excused.

16              MR. HANNON:  All right.  Your Honor, we have

17  another read on.  This one is going to be Mason Menninger,

18  played by my colleague, Hampton Watson.

19              I just need to touch base with opposing counsel for

20  one moment here.

21              (Counsel confers.)

22              MR. HANNON:  May I approach?

23              THE COURT:  Just one read of all -- whatever is

24  coming from this witness?

25              MR. HANNON:  All smashed together, Your Honor.

```
1              THE COURT:  Okay.  Do you want me to give the
2     similar explanation?
3              MR. HANNON:  Okay.  I think we're fine, Judge.
4              THE COURT:  All right.  Fine.
5              You can be seated.  We're not going to swear you in
6     as a reader.
7              THE WITNESS:  Okay.
8              MR. HANNON:  Since this is Ms. Mandel asking the
9     questions, Ms. Mandel, would you like to do the questioning?
10             MS. MANDEL:  Sure, I can do it.
11             I just need to consult for one moment.
12             (Counsel confers.)
13             THE COURT:  I'm not sure they read it for
14    Mr. Mekerri, and I'm not sure you're going to read it for
15    Mr. Menninger, but both -- at a deposition, a person takes an
16    oath just like the witnesses you've seen take an oath.  So
17    the testimony that you heard was under oath, the testimony
18    that you're about to hear is under oath.  It's the same oath.
19             MS. MANDEL:  I'm just going to lower the
20    microphone.
21             Forgive me.  It's just a bit small.
22                        The testimony of
23                      MASON MENNINGER
24       having been previously duly sworn, was read into the
25                      record as follows:
```

BY MS. MANDEL:

**Q.** "Good morning, Mr. Menninger.  I understand it is early there and we appreciate you making yourself available first thing in the morning.  My name is Rachel Mandel, and as you've just heard, I'm an attorney for PPD, the defendant in the lawsuit filed by your wife, Lisa Menninger.  The federal rules of civil procedure give me the right to ask you questions and require that you respond with complete and truthful answers, as you've just taken an oath to do.  Do you understand that?

**A.** "I do.

**Q.** "This format adds another layer of complication, which is that we need to account for any sort of electronic interference and delay.  And so as Justina just explained, you can give just a brief pause after I ask the question to make sure that Justina can get it down and we're not speaking over each other.  And of course, Mr. Hannon may want to put something on the record as well.  So we just need to account for that.  If at any point you cannot hear me or you can't hear Mr. Hannon and you see our lips moving on the screen, please let us know as quickly as possible, so that we can adjust for that.  In addition, if you do not understand any of my questions, please let me know.  If you respond to a question, I will assume that you've understood it.

"Does that make sense?

1    **A.**   "It does.

2    **Q.**   "Okay.  We can also take a break at any time, if you few

3    need to, if you need to run to the restroom or grab water,

4    whatever you need.  That's fine.  We'll just ask that you

5    respond to the question that's pending at the time.

6                "Mr. Menninger, have you ever given deposition

7    testimony before?

8    **A.**   "I have not.

9    **Q.**   "Have you ever provided sworn testimony?

10   **A.**   "Not that I recall.

11   **Q.**   "Another sort of rule of the road is that we should

12   discuss at the outset is Justina can only take down verbal

13   responses.  It's a little easier to remember when we're in a

14   Zoom format, instead of in-person, but I see you're nodding

15   right now to acknowledge what I've said, and that's

16   completely normal and fine, but any response that you give

17   that's not verbal, Justina cannot take down into the record,

18   so you just need to accompany any head or hand gestures with

19   verbal responses, as well.  And the other thing, as Justina

20   mentioned, we can't speak over each other, because Justina

21   can't take down what two of us say at the same time.

22               "Does all of that make sense?

23   **A.**   "It does."

24               MS. MANDEL:  Okay.

25               THE COURT:  You can skip that.

1          MS. MANDEL:  Okay.

2     BY MS. MANDEL:

3     **Q.**  "Mr. Menninger, you indicated to the court reporter a few

4     moments ago that you're currently located in Bend, Oregon; is

5     that correct?

6     **A.**  "Correct.

7     **Q.**  "Are you at home?

8     **A.**  "I am.

9     **Q.**  "Is there anyone there with you right now?

10    **A.**  "No, not in this room.

11    **Q.**  "Yes, I should have clarified.  Thank you for pointing

12    that out.  I meant is there anyone in that room with you?

13    **A.**  "No, there's not.

14    **Q.**  "Do you have any method of communication open in front of

15    you?

16    **A.**  "Other than Zoom, I do not.

17    **Q.**  "Okay.  Right.  I meant aside from Zoom, of course.

18    Mr. Menninger, have you taken any drugs or alcohol within the

19    past 24 hours that might impair your ability to testify

20    accurately today?

21    **A.**  "No, I have not.

22    **Q.**  "Can you state your full legal name, please?

23    **A.**  "Mason Daniel Menninger.

24    **Q.**  "Have you ever been known by any other names, aliases, or

25    nicknames?

1    **A.**   "No.

2    **Q.**   "What is your date of birth?

3    **A.**   "March 25, 1972.

4    **Q.**   "What is your current home address?

5    **A.**   "We are at 1496 Northwest Discovery Park Drive.  That's

6    in Bend, Oregon.

7    **Q.**   "Is that a single family residence?

8    **A.**   "It is.

9    **Q.**   "And do you rent that residence or own it?

10   **A.**   "We rent.

11   **Q.**   "And how long have you lived there?

12   **A.**   "About a month and a half.

13   **Q.**   "And who lives there with you?

14   **A.**   "My wife and my daughter.

15   **Q.**   "And is your wife Lisa Menninger?

16   **A.**   "It is.

17   **Q.**   "And is your daughter Maya?

18   **A.**   "Yes.

19   **Q.**   "And last name Menninger?

20   **A.**   "Yes.

21   **Q.**   "Before you lived at the home on Northwest Discovery Park

22   Drive, in Bend, Oregon, what was your previous residential

23   address?

24   **A.**   "We -- see if it's on my driver's license.  It is.  We

25   were at 340 Live Oak Road Northeast, in Albuquerque,

1   New Mexico.

2   **Q.**  "What was the reason for your move from Albuquerque,

3   New Mexico, to Bend, Oregon?

4   **A.**  "Lisa wanted to be closer to her family.

5   **Q.**  "Is it your intention that your -- is it your intention

6   that your wife has family that lives in Bend, Oregon?

7   **A.**  "Yes.

8   **Q.**  "And who are those family members aside from you and your

9   daughter?

10  **A.**  "Lisa's sister and Lisa's mother.

11  **Q.**  "Is her sister Tonya Hart?

12  **A.**  "It is.

13  **Q.**  "And what is your wife's mother's name?

14  **A.**  "Nancy.

15  **Q.**  "Last name also Hart?

16  **A.**  "I believe she goes by Warren.

17  **Q.**  "Since you moved to Bend, Oregon a month and a half ago,

18  have you seen the Tonya Hart in person?

19  **A.**  "Yes.

20  **Q.**  "Based on your knowledge, has your wife seen Tonya Hart

21  in person in that same time period?

22  **A.**  "Yes.

23  **Q.**  "Based on your knowledge, when was the last time your

24  wife saw Tonya Hart in person?

25  **A.**  "I don't recall exactly.  About a week and a half ago is

1    my best guess.

2    **Q.**   "And when is the last time before that?

3    **A.**   "I'd say at least a week before that.  Yeah, I'm a little

4    fuzzy on the exact dates, but I could figure that out.

5    **Q.**   "How could you figure that out?

6    **A.**   "I believe probably ask Lisa or Tonya.

7    **Q.**   "And you just testified that you believe your wife last

8    saw Tonya Hart about a week and a half ago, and before

9    that -- and before that, a week before that time.  When

10   before that incident?

11   **A.**   "I'm sorry, I didn't understand the question.

12   **Q.**   "Understood.  I did not ask it well.

13           "You just testified that your wife last saw

14   Tonya Hart a week and a half ago, and the time before that

15   was a week earlier.  When was the time before that, as far as

16   you know, that your wife saw Tonya Hart?

17   **A.**   "I don't know" -- excuse me -- "I don't recall exactly.

18   In general, the time spacing is a week or more, so I would

19   guess an additional week.

20   **Q.**   "Since moving to Bend, Oregon, have you seen your wife's

21   mother, Nancy Warren?

22   **A.**   "Yes.

23   **Q.**   "And to the best of your knowledge, has your wife seen

24   her mother, Nancy Warren?

25   **A.**   "Yes.

1   **Q.**   "And to your knowledge, when was the last time your wife
2   saw her mother, Nancy Warren, in person?
3   **A.**   "It was fairly recent.  It was a few days ago.
4   **Q.**   "And to the best of your knowledge, when before that did
5   your wife see Nancy Warren?
6   **A.**   "Yeah, again, it's tricky for me to keep track of these
7   visits, but at least a week previous.
8   **Q.**   "And the time before that?
9   **A.**   "About the same -- about the same time frame.
10  **Q.**   "Are you aware that your wife has brought a lawsuit
11  against her former employer, PPD?
12  **A.**   "Yes.
13  **Q.**   "Have you spoken about that lawsuit with Tonya Hart?
14  **A.**   "I don't recall.  I'm not sure how I should categorize
15  it.  If I did, it was minimal.
16  **Q.**   "When do you believe the last time you spoke to her about
17  the lawsuit was?
18  **A.**   "As I said, I don't recall, so I'm not sure how I could
19  put a time frame to something I'm not sure happened.
20  **Q.**   "Have you spoken about that lawsuit with Nancy Warren?
21  **A.**   "I don't believe so.
22  **Q.**   "You testified that you may have spoken with Tonya Hart
23  about your wife's lawsuit against PPD.  What do you recall
24  discussing with Tonya Hart about the lawsuit?
25  **A.**   "I don't recall.  Okay.  Sorry.  I would -- since I don't

1    recall for sure I've had this conversation, I certainly don't

2    recall content.

3    **Q.**  "Did you discuss with Tonya Hart that you were going to

4    testify in a deposition today?

5    **A.**  "No.

6    **Q.**  "Did you discuss with Tonya Hart that she plans to

7    testify in deposition?

8    **A.**  "No.

9    **Q.**  "Who have you spoken to about the fact that you were

10   testifying in deposition today?

11   **A.**  "Lisa.

12   **Q.**  "Meaning your wife?

13   **A.**  "Yes.

14   **Q.**  "Did you meet with an attorney to prepare for today's

15   deposition?

16   **A.**  "I'm not sure what constitutes "meet."  I spoke briefly

17   with Mr. Hannon on the phone regarding what to expect today."

18            MS. MANDEL:  Your Honor, I think could we skip --

19            THE COURT:  You're going to 15, line 14.

20   BY MS. MANDEL:

21   **Q.**  "Mr. Menninger, can you answer the question, please?

22   **A.**  "Yes.  That is my position.

23   **Q.**  "When did you last speak with Patrick Hannon before

24   today -- I should say, strike that.

25            "When did you last speak with Patrick Hannon before

1    the start of this deposition?

2    **A.**   "I believe it was the day before yesterday.

3    **Q.**   "Was that by phone?

4    **A.**   "Yes.

5    **Q.**   "And how long did that conversation last?

6    **A.**   "It was brief, 15 minutes, 20 minutes.

7    **Q.**   "Did you review any documents with Mr. Hannon?

8    **A.**   "I'm not sure I'm able to answer that question.

9    **Q.**   "You can answer that question.

10   **A.**   "No, I did not review any documents.

11   **Q.**   "Was anyone else present for that conversation?

12   **A.**   "Yes.

13   **Q.**   "Before that discussion that you've just described, when

14   did you last speak with Mr. Hannon?

15   **A.**   "I don't recall previously speaking with Mr. Hannon.

16   **Q.**   "Is it your testimony that your first communication with

17   Mr. Hannon took place the day before yesterday?

18   **A.**   "To the best of my recollection, yes.

19   **Q.**   "Mr. Menninger, are you currently employed?

20   **A.**   "Yes.

21   **Q.**   "Where are you employed?

22   **A.**   "You want the name of the company?

23   **Q.**   "Yes.

24   **A.**   "Okay.  It's Triangulate Labs.

25   **Q.**   "Okay.  And where is Triangulate Labs located?

1    **A.**  "The last I recall, it's based in Cincinnati, Ohio.  It

2    might be in transition, so that's why I'm a little uncertain.

3    **Q.**  "Are you a part owner of Triangulate Labs?

4    **A.**  "Yes.

5    **Q.**  "What percentage ownership do you have in the company?

6    **A.**  "I own five percent.

7    **Q.**  "I'm sorry, I didn't hear that.

8    **A.**  "Five percent.

9    **Q.**  "How long have you worked for Triangulate Labs?

10   **A.**  "It's a little tricky to state.  I can tell you when I

11   first got paid by Triangulate Labs, but we acted as a company

12   before that time, so I'm not sure where to draw the line.

13   **Q.**  "When did you first begin to draw salary from Triangulate

14   Labs?

15   **A.**  "In June of 2018.

16   **Q.**  "When did you begin to have an ownership in trust in

17   Triangulate Labs?

18   **A.**  At the same date.

19   **Q.**  Was there a time period before June of 2018 that you had

20   involvement with Triangulate Labs, but did not yet draw any

21   income from the company?

22   **A.**  "Yes.

23   **Q.**  "And what was that time period?

24   **A.**  "We informally started the company in late 2016.

25   **Q.**  "Is it accurate that from late 2016 to June 2018, you

1  performed work from Triangulate Labs, but did not receive an

2  income from the company?

3  **A.**  "Yes.

4  **Q.**  "As of now, what is your job title with Triangulate Labs?

5  **A.**  "I believe it is technical director.

6  **Q.**  "Have you ever held any other title with Triangulate

7  Labs?

8  **A.**  "No.

9  **Q.**  "Can you describe your job as technical director at

10  Triangulate Labs?

11  **A.**  "I would say that's my title.

12  **Q.**  "And what do you do as technical director?

13  **A.**  "Primarily software development and research.

14  **Q.**  "And what is the nature of the business in which

15  Triangulate Labs is involved?

16  **A.**  "Well, we're focused on computer vision and at the moment

17  finding clients who are interested in our product.

18  **Q.**  "Do you work on the design of 3D printing models?

19  **A.**  "Not currently.

20  **Q.**  "And did you previously work on that?

21  **A.**  "Yes.

22  **Q.**  "What is your annual salary from Triangulate Labs in

23  2020?

24  **A.**  "I don't think I've done the math.  My salary is 6,000 a

25  month, so multiply that by 12.

1    **Q.**   "And when did your salary from Triangulate Labs become

2    $6,000 a month?

3    **A.**   "In June of 2018.

4    **Q.**   "Has it remained $6,000 a month since June 2018?

5    **A.**   "Yes.

6    **Q.**   "Before June 2018, what sources of income did you have?

7    And let's start with the time period of January to June of

8    2018.

9    **A.**   "I did not have any sources of income.

10   **Q.**   "In 2017, did you have any sources of income?

11   **A.**   "No, I did not.

12   **Q.**   "In 2016, did you have any sources of income?

13   **A.**   "No, I did not.

14   **Q.**   "In 2015, did you have any sources of income?

15   **A.**   "No, I did not.

16   **Q.**   "Aside from your current employment at Triangulate Labs,

17   do you have any other employment currently?

18   **A.**   "No.

19   **Q.**   "In addition to the $6,000 a month in salary that you

20   received from Triangulate Labs, do you receive any income

21   from your part ownership interest?

22   **A.**   "No, I do not.

23   **Q.**   "Since June 2018, have you received any additional income

24   from Triangulate Labs as a result of your part ownership

25   interest?

1   **A.**  "I'm not sure what constitutes income.  I received

2   compensation for some equipment.

3   **Q.**  "Aside from that composition for some equipment and the

4   $6,000 a month that you have described, have you received any

5   other income from Triangulate Labs since June of 2018?

6   **A.**  "No, I have not.

7   **Q.**  "Do you currently receive medical benefits from

8   Triangulate Labs?

9   **A.**  "I do not.

10  **Q.**  "Mr. Menninger, have you received medical benefits from

11  Triangulate Labs?

12  **A.**  "I have not.

13  **Q.**  "Aside from the compensation that you have described

14  since June 2019, have you received any additional employment

15  benefits from Triangulate Labs?

16  **A.**  "No, I have not.

17  **Q.**  "Do you currently hold medical insurance?

18  **A.**  "Yes.

19  **Q.**  "What is the nature of that medical insurance?

20  **A.**  "It is through Lisa's insurance.

21  **Q.**  "What entity provides that insurance coverage?

22  **A.**  "I would have to look that up.

23  **Q.**  "Is it your understanding that the medical insurance that

24  you have just described is provided as part of a supplemental

25  Social Security benefits?

1    **A.**   "That is my understanding, yes.

2    **Q.**   "Since June of 2018, has either your daughter or your

3    wife received medical insurance benefits from Triangulate

4    Labs?

5    **A.**   "No, they have not.

6    **Q.**   "Mr. Menninger, you testified earlier that you moved from

7    Albuquerque, New Mexico, to Bend, Oregon, approximately a

8    month and a half ago, correct?

9    **A.**   "Correct.

10   **Q.**   "Did your wife and daughter make that move at the same

11   time that you did?

12   **A.**   "They did.

13   **Q.**   "Did you fly from Albuquerque, New Mexico, to Bend,

14   Oregon, approximately a month and a half ago?

15   **A.**   "No.

16   **Q.**   "How did you physically move from Albuquerque,

17   New Mexico, to Bend, Oregon?

18   **A.**   "We drove.

19   **Q.**   "And when you say 'we,' is that you, your wife, and your

20   daughter?

21   **A.**   "Yes.  My daughter didn't actually drive, but, yes.

22   **Q.**   "Fair point.

23        "And for the record, how old is your daughter?

24   **A.**   "She's 12.

25   **Q.**   "It's good that she didn't drive.

**A.**   "Yes.

**Q.**   "Did you utilize professional movers for your move from Albuquerque, New Mexico, to Bend, Oregon?

**A.**   "Yes.

**Q.**   "Did you and your wife personally pay for the expenses to move from Albuquerque to Bend, Oregon?

**A.**   "Yes.

**Q.**   "Did any other person or entity pay for any part of that move?

**A.**   "No.

**Q.**   "Mr. Menninger, is your wife currently employed?

**A.**   "No.

**Q.**   "Has your wife been employed in 2020?

**A.**   "No.

**Q.**   "Was your wife employed for any portion of 2019?

**A.**   "No.

**Q.**   "As far as you know, has your wife -- strike that.

"As far as you know, is your wife currently seeking employment?

**A.**   "No, she is not.

**Q.**   "As far as you know, has your wife sought employment during any portion of 2020?

**A.**   "No, she has not.

**Q.**   "As far as you know, did your wife seek employment during any portion of 2019?

1    **A.**   "No, she has not.

2    **Q.**   "Mr. Menninger, in what year did you marry Lisa

3    Menninger?

4    **A.**   "2006.

5    **Q.**   "In what year did you first meet Dr. Menninger?

6    **A.**   "2005.

7    **Q.**   "How did you meet Dr. Menninger?

8    **A.**   "We met online.

9    **Q.**   "Was that through a dating website?

10   **A.**   "No.

11   **Q.**   "How did you meet online?

12   **A.**   "Through a website for people with common interests.

13   **Q.**   "Where were you living at the time that you met

14   Dr. Menninger?

15   **A.**   "San Antonio.

16   **Q.**   "Texas?

17   **A.**   "Correct.

18   **Q.**   "And as far as you recall, where was Dr. Menninger living

19   when you met her?"

20              MR. HANNON:  I'm fine reading that answer.

21              MS. MANDEL:  I don't want to leave everyone in

22   suspense.

23              "In Richmond, Virginia."

24              THE COURT:  That's reading the answer, right?

25              MS. MANDEL:  I'm sorry, yes, that was the answer.

1          THE COURT:  That was the answer to the question.

2          MS. MANDEL:  Your Honor, the next line that is not

3 crossed out, it begins at the top.  It's sort of in the

4 middle.

5          THE COURT:  You really want page 20 -- what are you

6 reading next?

7          MR. HANNON:  Yeah.  I would just say to help with

8 the process, to the extent that we need to add something from

9 a previous page or something on to the next page just to get

10 a complete answer, that's fine.

11          THE COURT:  Just go ahead and do that, Ms. Mandel.

12          MS. MANDEL:  Sure.  Okay.  And so I'm just at the

13 bottom of page 27.

14 BY MS. MANDEL:

15 **Q.**  "And during what periods of time did you live in Overland

16 Park and maintain employment?

17 **A.**  "I maintained my job with New River Kinematics until

18 early 2008.

19 **Q.**  "Did you voluntarily leave that position in 2008?

20 **A.**  "The short answer is no.

21 **Q.**  "Were you terminated from that position in early 2008?

22 **A.**  "Yes.

23 **Q.**  "Where did you work after your termination from that

24 position?

25 **A.**  "I was not employed until I started a business.

1   **Q.**   "Is that Triangulate Labs that you reference as a new

2   business?

3   **A.**   "No.

4   **Q.**   "What was that new business?

5   **A.**   "It was Lifeform Studio.

6   **Q.**   "Is that light form studio?

7   **A.**   "Sorry, I get that a lot.  Lifeform.

8   **Q.**   "Lifeform?

9   **A.**   "L-i-f-e-f-o-r-m.

10  **Q.**   "And what type of business is Lifeform?

11  **A.**   "It was a challenging to describe business.  I took

12  photographs of individuals with a camera array, and turned

13  that into a 3D model, and turned those 3D models into a

14  printed model.

15  **Q.**   "And do you have any partners that business?

16  **A.**   "Lisa was a partner on paper, anyway, but it was my

17  studio.

18  **Q.**   "Did you draw income from that business?

19  **A.**   "Yes, in a sense, we had customers.

20  **Q.**   "During what years did you draw income from Lifeform

21  Studios?

22  **A.**   "It was only open in 2014.

23  **Q.**   "Does that mean that it did not operate in any calendar

24  year other than 2014?

25  **A.**   "Correct.

**Q.**  "What type of work did Dr. Menninger perform for Lifeform
Studios?

**A.**  "Mostly artistic decisions.  She helped design the layout
of the studio, helped with marketing material in some cases.

**Q.**  "How much income did you draw from Lifeform Studios in
2014?

**A.**  "I'm not sure how to qualify that.  The business was not
a success, so we ultimately -- it was all negative, so I'm
not sure how to state that.

**Q.**  "Did you draw any positive income from Lifeform Studios
in 2014?

**A.**  "In the sense that customers paid us for the work, we
did, yes.  But it didn't -- it never exceeded what we owed.

**Q.**  "Did Lisa Menninger draw any positive income from
Lifeform Studios?

**A.**  "The question is challenging for me.  I'm not sure how
to -- I'm not sure I understand positive income when we had
far more expenses than income.

**Q.**  "As far as you know, did Lifeform Studios pay a salary to
Lisa Menninger at any time?

**A.**  "No.

**Q.**  "During the time that Lisa Menninger had a business
interest in Lifeform Studios, was she otherwise employed?

**A.**  "Yes.

**Q.**  "And where was she employed while she was holding a

1   partnership in trust in Lifeform Studios?

2   **A.**   "I believe she was at CRL.

3   **Q.**   "As far as you know, did Lisa Menninger consider making

4   her wife at Lifeform Studios a full-time job?

5   **A.**   "No.

6   **Q.**   "Did you close Lifeform Studios at some point?

7   **A.**   "Yes.

8   **Q.**   "And when was that?

9   **A.**   "It closed to the public late 2014.  I think we

10  technically left the premises January 2015.

11  **Q.**   "After you closed Lifeform Studios, what is the next

12  employment that you held?

13  **A.**   "Triangulate Labs.

14  **Q.**   "Is it accurate that you did not hold any active

15  employment between Lifeform Studio and Triangulate Labs?

16  **A.**   "That is accurate, yes.

17  **Q.**   "Between the time that you worked at Lifeform Studio and

18  you began working at Triangulate Labs, did you have any

19  sources of income?

20  **A.**   "I think I had one or two consulting jobs, very limited.

21  **Q.**   "In what years did you hold those consulting jobs?

22  **A.**   "That I would have to look up, but it is in that time

23  span.

24  **Q.**   "Between 2014 and 2018, correct?

25  **A.**   "Yes.  Yes.  Certainly not in 2014.

1    **Q.**  "Mr. Menninger, I'm not asking for any specific details,

2    but can you describe briefly what the reason was from your

3    termination from the job that you held in Richmond, Virginia?

4    **A.**  "I'm not entirely sure.  I can only speculate.

5    **Q.**  "Was there a reason given to you at the time of your

6    termination?

7    **A.**  "My understanding is they -- what they referred to as the

8    remote work wasn't what they envisioned it would be.

9    **Q.**  "Between 2014 and 2018, you did not hold regular

10   employment, correct?

11   **A.**  "Correct.

12   **Q.**  "How did you spend your time between 2014 and 2018?

13   **A.**  "Primary raising our daughter.

14   **Q.**  "Is it accurate to say that you were primary caretaker

15   for your daughter during that time period?

16   **A.**  "I'm not sure if primary caretaker has special meaning.

17   I was with her throughout the day.

18   **Q.**  "What was the reason for your family's move from

19   Cincinnati, Ohio, to Dighton, Massachusetts?

20   **A.**  "We were struggling with Maya in school.  She experienced

21   bullying from students that we were unable to resolve fully.

22   She was given permission to work remotely, and we opened it

23   up to find a better school for her.

24   **Q.**  "Maya was given permission to work remotely?

25   **A.**  "Sorry.  Lisa, my wife, was given permission to work

1   remotely.

2   **Q.**   "Is that from her job at PPD?

3   **A.**   "Correct.

4   **Q.**   "During what calendar year did your daughter, Maya, begin

5   to have these struggles at school?

6   **A.**   "2015, the year we moved and she started school there.

7   **Q.**   "Did Maya remain at that school in Cincinnati, Ohio, for

8   two full years?

9   **A.**   "Yes.

10   **Q.**   "How did you and your family select Dighton,

11   Massachusetts, as a place to move to?

12   **A.**   "Indirectly.  We selected the school.

13   **Q.**   "That's a school for Maya?

14   **A.**   "Yes.

15   **Q.**   "And what was that school?

16   **A.**   "Wheeler.

17   **Q.**   "And where is The Wheeler School located?

18   **A.**   "It's located in Providence, Rhode Island.

19   **Q.**   "How did you select The Wheeler School for your daughter?

20   **A.**   "An intense Internet search is how we narrowed it down,

21   and then we researched that one as well as we could from

22   online materials.

23   **Q.**   "How did you choose Dighton, Massachusetts, as a place to

24   live?

25   **A.**   "It was a combination of proximity and price to The

1    Wheeler School.

2    **Q.**   "Did you and your family utilize professional movers for

3    your move from Cincinnati, Ohio, to Dighton, Massachusetts?

4    **A.**   "Yes.

5    **Q.**   "Did you and your family pay for those movers?

6    **A.**   "We did.

7    **Q.**   "As far as you recall, did PPD pay for any portion of

8    that move?

9    **A.**   "They did not.

10   **Q.**   "During the time period that you lived in Cincinnati, did

11   your wife work from home or in an office?

12   **A.**   "She commuted to an office.

13   **Q.**   "Was that office in Highland Heights, Kentucky?

14   **A.**   "That is my understanding, yes.

15   **Q.**   "Do you recall during the time period that you lived in

16   Cincinnati, your wife worked from home at any point?

17   **A.**   "Yes.

18   **Q.**   "Was there any regular schedule on which your wife worked

19   from home during the time that you lived in Cincinnati?

20   **A.**   "Not that I was aware.

21   **Q.**   "Mr. Menninger, did you ever meet any of your wife's

22   colleagues from PPD in person?

23   **A.**   "Yes.

24   **Q.**   "Who are those colleagues?

25   **A.**   "I doubt I could come up with most names, but I met her

1   boss, Hassan.

2   **Q.**   "Is that Hacene Mekerri?

3   **A.**   "Hacene.   Sorry.   Yes.

4         "I met the person who was in charge of HR.   I

5   believe it was Chad.

6   **Q.**   "Is that Chad St. John?

7   **A.**   "I believe so.

8         "A number of her other colleagues.   But we sat at a

9   restaurant, and it was loud, so I didn't really interact with

10  others who were at our table.

11  **Q.**   "Can you describe your wife's demeanor when you first met

12  her in 2005?

13  **A.**   "I would like to say she was excited to meet me.   Yes,

14  she -- we had talked on the phone, and it was a first-time

15  meeting, so she seemed excited to meet me in person.

16  **Q.**   "As far as you know, was your wife under the care of a

17  psychiatrist in 2005?

18  **A.**   "Not as far as I know.

19  **Q.**   "As far as you know, was your wife under the care of a

20  psychiatrist at 2006" -- "in 2006?

21  **A.**   "Um -- um -- I know she was at some point in Overland

22  Park, and I don't recall if it started in 2006.

23  **Q.**   "Mr. Menninger, I note that you laughed a little when I

24  asked that question.   Is there a reason for that?

25  **A.**   "Just me struggling with my memory.

1   **Q.**  "You testified earlier that you lived in Overland Park
2   from 2006 to 2015; is that correct?
3   **A.**  "That is correct.
4   **Q.**  "Was your wife under the care of a psychiatrist for the
5   majority of the time that you lived in Overland Park?
6   **A.**  "I am uncertainly if it was for the majority of the time.
7   **Q.**  "Do you recall whether your wife was under the care of a
8   psychiatrist in 2007?
9   **A.**  "Again, I don't recall at what point she began care.
10  **Q.**  "Dr. Menninger" -- "Mr. Menninger, during the time that
11  you lived in Overland Park, Kansas with your wife, did you
12  observe her to be in a state of mind that you understood lead
13  her to seek psychiatric care?
14  **A.**  "Yes.
15  **Q.**  "Please describe those observations.
16  **A.**  "I observed her uncomfortable in social situations.
17  **Q.**  "What else?
18  **A.**  "That's what I directly observed.
19  **Q.**  "When did you first begin to observe that discomfort in
20  social situations?
21  **A.**  "I don't recall the first instance, but it was consistent
22  when we were invited to children's parties, for example.
23  **Q.**  "By children's parties, are you referring to parties
24  given by friends of your daughter's?
25  **A.**  "Their parents, correct.

1   **Q.**  "Are there any other contexts in which you observed your
2   wife's discomfort in social situations?
3   **A.**  "Not that I recall.
4   **Q.**  "As far as you understand, based on those observations,
5   was it that discomfort in the context of children's parties
6   that your wife sought psychiatric care?
7   **A.**  "I'm not sure I can answer that without revealing
8   conversations.
9   **Q.**  "During the time you lived in Overland Park, Kansas, did
10  you observe your wife exhibit discomfort in any other setting
11  aside from children's parties?
12  **A.**  "Not that I recall.
13  **Q.**  "Mr. Menninger, when did you your wife begin
14  participating in ultra marathons?
15  **A.**  "I'm trying to recall the first instance.  The first I
16  can recall offhand is when we lived in Dighton in 2017, I
17  believe.
18  **Q.**  "What does it mean that you crew ultra marathons for your
19  wife?
20  **A.**  "It means I'm there to support her as needed.  It varies
21  on the race, but often if there is a loop, I will be there on
22  a certain part of the loop and give her what she needs to
23  help her continue the race.
24  **Q.**  "Before 2017, did you observe your wife participating in
25  ultra marathons?

1   **A.**   "No, not that I recall.

2   **Q.**   "In 2017, how many ultra marathons did your wife

3   participate in?

4   **A.**   "I believe just the one.

5   **Q.**   "Where did the ultra marathon take place?

6   **A.**   "Rhode Island.

7   **Q.**   "In 2018, did you observe your wife participate in any

8   ultra marathons?

9   **A.**   "Yes.

10   **Q.**   "How many?

11   **A.**   "Two that I recall.

12   **Q.**   "And where did those take place?

13   **A.**   "Again in Rhode Island and in Arizona.

14   **Q.**   "And in 2019, did you observe your wife take -- strike

15   that.

16          "In 2019, did you observe your wife participate in

17   any ultra marathons?

18   **A.**   "Yes.

19   **Q.**   "How many?

20   **A.**   "Again, two, I believe.

21   **Q.**   "And where did those take place?

22   **A.**   "Lakewood, Colorado, and Arizona.

23   **Q.**   "Putting aside the ultra marathons that you've described

24   in your time, the time since you've known your wife, have you

25   observed her participate in regular marathons?

1   **A.**  "I'm concerned your question is a little specific.  I

2   don't recall if it was specifically a marathon.

3   **Q.**  "What do you recall that you're not sure if it qualifies

4   as a marathon?

5   **A.**  "Just the distance.  Sometimes they are half marathons or

6   beyond.

7   **Q.**  "In the time since you've known her wife, have you

8   observed her participate in running races?

9   **A.**  "Yes.

10  **Q.**  "Is that in addition to the ultra marathons you've

11  already described?

12  **A.**  "Yes.

13  **Q.**  "In 2020, have you observed her participate in any

14  running races?

15  **A.**  "No.

16  **Q.**  "In 2019, did you observe her participate in any running

17  races --

18  **A.**  "Oh --

19  **Q.**  "-- aside from the ultra marathons that you've already

20  described?

21  **A.**  "No.

22  **Q.**  "In 2018, did you observe her participate in any running

23  races aside from the ultra marathons that you've already

24  described?

25  **A.**  "No.

1    **Q.** "In 2017, did you observe her participate in any running

2    races aside from the ultra marathon that you've already

3    described?

4    **A.** "No.

5    **Q.** "When did you last observe your wife participate in a

6    nonultra marathon running race?

7    **A.** "I don't recall the year, but it was while we were in

8    Overland Park.

9    **Q.** "Mr. Menninger, you testified earlier that your wife

10   received permission to work remotely during her employment at

11   PPD, which allowed you and your family to relocate from

12   Cincinnati to Dighton, Massachusetts, correct?

13   **A.** "That is my understanding, yes.  That is what I said,

14   yes.

15   **Q.** "As far as you understand -- strike that.

16          "As far as you understand, did PPD offer any direct

17   support for your wife's relocation to remote location?

18   **A.** "I would struggle to answer that without revealing

19   conversation.

20   **Q.** "Mr. Menninger, did you yourself ever review any

21   communications from PPD in connection with the granting of

22   permission for your wife to relocate to a remote location?

23   **A.** "I don't believe so.

24   **Q.** "As far as you understand, Mr. Menninger, was there a

25   time when your wife began to suffer from generalized anxiety

1    disorder?

2    **A.**  "Are you asking when I believe it started?

3    **Q.**  "Yes.

4    **A.**  "I would struggle to answer that because it involves

5    conversations.

6    **Q.**  "Mr. Menninger, to be clear, I am asking for information

7    based on your observations of your wife.  I'm not asking for

8    you to reveal any confidential conversations that you have

9    had with your wife?

10   **A.**  "Can you repeat the question?

11   **Q.**  "Was there a time when you became aware that your wife

12   was suffering from generalized anxiety disorder?

13   **A.**  "Yes.

14   **Q.**  "And when was that?

15   **A.**  "While we lived in Overland Park.

16   **Q.**  "So between 2006 and 2015, correct?

17   **A.**  "Correct.

18   **Q.**  "Do you recall more specifically when in that time period

19   you became aware that your wife suffered from generalized

20   anxiety disorder?

21   **A.**  "It would probably coincide with when she's sought

22   therapy for that purpose.

23   **Q.**  "And what specifically did you observe that lead you to

24   be aware that your wife suffered from generalized anxiety

25   disorder?

1    **A.**  "As far as direct observations, only what I've already

2    stated.

3    **Q.**  "Did you observe changes in your wife and her conduct

4    that lead you to be aware that she suffered from generalized

5    anxiety disorder?

6    **A.**  "No.

7    **Q.**  "At some point, did you become aware that your wife

8    suffered from a panic disorder?

9    **A.**  "Yes.

10   **Q.**  "And when did you become aware of that?

11   **A.**  "When we discussed it.

12   **Q.**  "In what calendar year?

13   **A.**  "I'm not sure which year, but during the time frame in

14   Overland Park.

15   **Q.**  "Between 2006 and 2015?

16   **A.**  "Correct.

17   **Q.**  "What specifically did you observe that led you to be

18   aware that your wife suffered from panic disorder?

19   **A.**  "Are you asking me to describe her panic attack?

20   **Q.**  "If that's the conduct that led you to understand that

21   she suffered from a panic disorder, yes.

22   **A.**  "During one of our social situations, she sought me out

23   and was unable to communicate clearly.  Her breathing was

24   rapid.  She did her best to hold back tears, unable to fully

25   communicate what was happening to her.  And it took several

1    minutes to recover enough to explain what she was

2    experiencing.

3    **Q.**   "In what calendar year did that take place?

4    **A.**   "I don't recall after -- after Maya was born.

5    **Q.**   "Was your daughter born in 2008?

6    **A.**   "Correct.

7    **Q.**   "Was your daughter a baby at the time?

8    **A.**   She would have -- if we were -- if we're attempting to

9    narrow it down, she would have started school.

10   **Q.**   "Does that mean that your daughter was over the age of

11   five at the time?

12   **A.**   "She started before five.  She started attending

13   preschool in 2011.

14   **Q.**   "Is it fair to say that it was between 2011 and 2015 that

15   you observed this panic attack?

16   **A.**   "Correct.

17   **Q.**   "What type of social situation was it that you were

18   attending with your wife when this happened?

19   **A.**   "One of the children's parties.

20   **Q.**   "Was it the party of a friend of your daughter's?

21   **A.**   "A classmate, yes.

22   **Q.**   "As far as you can recall, was there a specific incident

23   or interaction that led to this panic attack?

24   **A.**   "Not that I witnessed, no.

25   **Q.**   "When your wife exhibited the symptoms that you've

1  described, did you seek medical intervention?

2  **A.**   "Not at that moment, no.

3  **Q.**   "Was there a time after that, that you sought medical

4  intervention as a result of what you observed?

5  **A.**   "I'm uncertain if seeking therapy counts as medical

6  intervention.

7  **Q.**   "Yes.  Any type of intervention by healthcare

8  professional as a result of what you observed.

9  **A.**   "Yes.

10  **Q.**   "Can you please describe what you sought in the way of

11  medical intervention?

12  **A.**   "She found a therapist and was hopeful that that would

13  help her with these conditions.

14  **Q.**   "Do you recall the name of that therapist?

15  **A.**   "I do not.

16  **Q.**   "After the panic attack incident that you have just

17  described, did you observe any other such incidents affecting

18  your wife?

19  **A.**   "I don't recall if there were additional incidents that I

20  observed.

21  **Q.**   "In the time since you've known your wife, did you become

22  aware that she suffered from social anxiety disorder?

23  **A.**   "Yes.

24  **Q.**   "And when did you become aware of that?

25  **A.**   "Simultaneous with the generalized anxiety.

1  **Q.**  "Did you observe anything in particular that made you

2  aware that your wife suffered from social anxiety disorder?

3  **A.**  "Well, certainly the panic attack that I described, and

4  trying to separate conversations out.  She sought my company

5  whenever we were in social situations.

6  **Q.**  "In the time since you've known your wife, have you

7  observed changes in her willingness to attend social

8  situations?

9  **A.**  "Yes.

10  **Q.**  "When did those changes take place?

11  **A.**  "In early 2018.

12  **Q.**  "What changes did you observe in early 2018?

13  **A.**  "She was unwilling to participate in any social

14  situations.

15  **Q.**  "Prior to early 2018, did you -- strike that.

16          "After the panic attack that you've described, and

17  until early 2018, did you observe your wife attend children's

18  parties?

19  **A.**  "I am -- I don't recall for sure.

20  **Q.**  "From early 2018 to the present, have you observed your

21  wife attend children's parties?

22  **A.**  "She has not.

23  **Q.**  "Has your daughter attended children's parties from early

24  2018 to the present?

25  **A.**  "Yes.

1  **Q.**  "Has your daughter attended children's parties from early

2  2018 to the present that you attended?

3  **A.**  "Yes.

4  **Q.**  "I'm not asking about your confidential communications

5  with your wife.  Putting that aside, do you have any separate

6  knowledge as to why your wife has not attended children's

7  parties from early 2018 to the present?

8  **A.**  "I -- I'm not sure that I can -- I can respond to that

9  without involving her conversations.

10  **Q.**  "In the time since you've known your wife, have you

11  become aware that she suffers from depression?

12  **A.**  "Yes.

13  **Q.**  "And when did you become aware of that?

14  **A.**  "Early 2018.

15  **Q.**  "How did you become aware of that?

16  **A.**  "Through observation, through conversations.

17  **Q.**  "Please describe those observations.

18  **A.**  "She had trouble getting through the day.  What I mean is

19  she was not willing, in some cases, to get out of bed.

20  **Q.**  "Starting in early 2018, how often did you observe your

21  wife have difficulty getting out of bed?

22  **A.**  "I don't know how to quantify it, but frequently.

23  **Q.**  "More than once a week?

24  **A.**  "I would say yes.

25  **Q.**  "More than twice a week?

1  **A.**  "Yes.

2  **Q.**  "More than three times a week?

3  **A.**  "Possibly.

4  **Q.**  "More than four times a week?

5  **A.**  "I'm -- I am uncertain at that point.

6  **Q.**  "Between early 2018 and now, has your wife's inability to

7  get out of bed with the frequency that you've described

8  changed?

9  **A.**  "I can say that it varies.  It exists, but it varies.

10  **Q.**  "So from the early 2018 time period that you've described

11  and now, has there been any time period during which your

12  wife has had difficulty getting out of bed more than four

13  times a week?

14  **A.**  "I -- I don't have that kind of data.  I'm not sure.

15  **Q.**  "Is it fair to say that from early 2018 to now, your wife

16  has difficulty getting out of bed more than three times a

17  week on a consistent basis?

18  **A.**  "That is my understanding.  Again, it's a challenge to

19  quantify.

20  **Q.**  "Mr. Menninger, your testified that your wife has had

21  trouble getting through the day since early 2018.  Aside from

22  being unwilling to get out of bed, what else have you

23  observed that leads you to believe that she has trouble

24  betting through the day?

25  **A.**  "A general lack of motivation.  She struggles to take

1  care of herself, and much of the rest of it is through

2  conversations with her.

3  **Q.**  "What have you -- strike that.

4       "What steps have you observed your wife taking to

5  attend to her depression from early 2018 until now?

6  **A.**  "She has sought therapy.  She takes medication as part of

7  the therapy.  She seeks physical activity on the advice of

8  the therapists.

9  **Q.**  "As far as you understand, is your wife currently in

10  therapy?

11  **A.**  "Yes.

12  **Q.**  "And what is the name of the therapist that she currently

13  treats with?

14  **A.**  "I -- I don't know the name of her therapist.

15  **Q.**  "In the time period of early 2018 until now,

16  Mr. Menninger, have you observed any changes in your wife's

17  mental state?

18  **A.**  "I would say depression constitutes a change in mental

19  state.  Do you mean in addition?

20  **Q.**  "In what way has her depression changed from early 2018

21  to the present?

22  **A.**  "Oh, I'm sorry.  I misunderstood the question.  I thought

23  you meant before 2018 until after.  I have -- yes, I have

24  observed changes over that time span, but those changes vary.

25  **Q.**  "What do you mean that they vary?

1   **A.**  "She has good days and bad days.  Well, I might take that

2   back.  She has okay days and bad days.

3   **Q.**  "Can you describe the changes that you have observed

4   since early 2018?

5   **A.**  "Are you asking how it varies from day-to-day?

6   **Q.**  "Yes.

7   **A.**  "Some days she barely functions and cannot take care of

8   herself, or is uninterested in taking care of herself.  Other

9   days she can and is almost social with myself and my

10   daughter, and perhaps her sister or her mother, if they get a

11   chance to visit.  Those are the okay days.

12   **Q.**  "At present, on a weekly basis, how many days does your

13   wife typically have when she can barely function in your

14   words?

15   **A.**  "Again, I can't -- I'm challenged to quantify.  She can

16   have a week of bad days.  Some of it is driven by context.

17   If a lot is going on with this case, she tends to have bad

18   days.  Yeah, I'm not sure I should add any commentary to

19   that.

20   **Q.**  "I'm asking about your observations, Mr. Menninger.  I'm

21   not asking for you to share communications that you've had

22   with your wife or with Mr. Hannon.  I'm asking only about

23   your observations.

24   **A.**  "I understand.

25   **Q.**  "With that in mind, can you please answer the question,

1    which was, at present, on a weekly basis, how many days does
2    your wife typically have where she can barely function?
3    **A.**  "I think it's an unanswerable question.
4    **Q.**  "Last week, how many days did your wife have where she
5    could barely function?
6    **A.**  "It was not a good week, so.
7    **Q.**  "I'm sorry, I didn't hear your response.
8    **A.**  "It was not a good week.  I would say she had trouble
9    five out of the seven days.
10   **Q.**  "Has that been consistent for August of 2020?
11   **A.**  "We're only two weeks in, so, yes, I would say so.
12   **Q.**  "And was that the case for July of 2020?
13   **A.**  "I think she had some better days in July, so perhaps
14   not.
15   **Q.**  "If we go back to January 2018 --
16   **A.**  "Yes.
17   **Q.**  "-- on a weekly basis, how many days did your wife have
18   when she could barely function?
19   **A.**  "I would guess roughly half.
20   **Q.**  "From the period of January of 2018 to the present, has
21   the number of days on a weekly basis when your wife has
22   barely been able to function, in your words, has that number
23   fluctuated between approximately half -- half and five out of
24   seven days?
25   **A.**  "It -- sorry, it's the first time that I've thought about

1     the quantity of days that are good versus okay.  If you're

2     asking for a trend -- are you asking for a trend?

3     **Q.**  "Well, if you'd like to respond by describing a trend,

4     that would be your prerogative?

5     **A.**  "Okay.  I see no trend.

6     **Q.**  "Mr. Menninger, before we took a break, you were

7     answering questions regarding the frequency with which your

8     wife was unable to get out of bed since January 2018.  Do you

9     recall that?

10    **A.**  "Yes.  Specifically early 2018.

11    **Q.**  "What do you mean by 'specifically early 2018'?

12    **A.**  "I believe I started with answering questions referring

13    to early 2018.

14    **Q.**  "Has there been any time period since -- strike that.

15    Has there been any time period from early 2018 to the

16    present, when you observed your wife having difficulty

17    getting out of bed fewer than three times per week?

18    **A.**  "My best understanding is no.

19    **Q.**  "You have now testified about your wife's difficulty

20    getting out of bed many times a week from early 2018 until

21    now.  Have you observed your wife be able to utilize any

22    sorts of assistance to be able to get out of bed on those

23    days?

24    **A.**  "I'm not sure what constitutes 'assistance.'

25    **Q.**  "Have you observed anything help your wife be able to get

1    out of bed on those days?

2    **A.**   "No, nothing in particular.

3    **Q.**   "From early 2018 until now, have there been days when you

4    have observed your wife stay in bed the whole day?

5    **A.**   "No.

6    **Q.**   "You testified earlier, Mr. Menninger, about your wife

7    struggling to take care of herself from January of 2018 to

8    now, correct?

9    **A.**   "Early 2018, yes.

10   **Q.**   "Early 2018 to now?

11   **A.**   "Yes.

12   **Q.**   "In what ways have you observed your wife struggling to

13   take care of herself?

14   **A.**   "Sometimes she will not prepare food for herself.

15   **Q.**   "I'm sorry, I did not hear that answer.

16   **A.**   "Sometimes she will not prepare food for herself.  Sorry,

17   it switched.  Mostly, she will prefer to lay on the couch or

18   lay in bed and just not participate in normal daily

19   activities.

20   **Q.**   "Have you had to provide additional care for your wife

21   when she has not been able to care for herself?

22   **A.**   "Yes.

23   **Q.**   "And what has that care entailed?

24   **A.**   "Usually preparing something for her to eat, if she's

25   willing.

1  **Q.**  "What else?

2  **A.**  "Encouraging her to get out of bed or participate in a

3  family activity.

4  **Q.**  "Anything else?

5  **A.**  "Sometimes encouraging her to go to bed.  It seems a

6  little ironic.

7  **Q.**  "Anything else?

8  **A.**  "General encouragement.

9  **Q.**  "Anything else?

10  **A.**  "Nothing specific that I recall.

11  **Q.**  "Aside from your care for your wife, have you hired

12  outside day-to-day care for your wife?

13  **A.**  "No.

14  **Q.**  "Have you seen your wife's demeanor change since the

15  beginning of the COVID-19 pandemic?

16  **A.**  "That's hard to disentangle.  I think, generally, yes.

17  **Q.**  "In what way have you seen your wife's demeanor change

18  since the beginning of the COVID-19 pandemic?

19  **A.**  "She is less likely to venture out of the house.

20  **Q.**  "If we go back to the January of this year, how often on

21  a weekly basis did your wife leave the house?

22  **A.**  "I struggle a little, because it has varied quite a bit.

23  So that particular month, I am uncertain, but I can provide

24  general trends.

25  **Q.**  "What are those general trends?

1    **A.**   "In January, we were new to Albuquerque, and she was

2    excited to get out, but it did not last.

3    **Q.**   "Is that January of 2018 that you're referencing,

4    Mr. Menninger?

5    **A.**   "2019.  I believe you asked 2019.

6    **Q.**   "2019?

7    **A.**   "Yes.

8    **Q.**   "In January of 2019, how many times a week did your wife

9    leave the house in Albuquerque?

10   **A.**   "I really don't recall specific numbers.  She did leave

11   the house, weather permitting.

12   **Q.**   "What types of activities did she leave the house to do

13   as of January of 2019?

14   **A.**   "Almost exclusively running.

15   **Q.**   "Did she run alone?

16   **A.**   "Yes.

17   **Q.**   "Sat some point after January 2019, did the frequency

18   with which your wife left the house decrease?

19   **A.**   "Yes.

20   **Q.**   "And when did that change take place?

21   **A.**   "Probably within a couple of months.  Yeah, again, it's

22   tricky for me to recall because it varied a lot.

23   **Q.**   "Once it hit the point when that frequency decreased, how

24   many time a week did your wife leave the house?

25   **A.**   "Maybe once or twice.

1    **Q.**   "Since you observed that decrease take place, have there

2    been any further changes in the frequency with which your

3    wife leaves the house?

4    **A.**   "Yes.

5    **Q.**   "When did that change take place?

6    **A.**   "She start attempts to train for ultra marathons later in

7    the year.  So after, I'd say, May or June, she more

8    frequently ventured out for that purpose.

9    **Q.**   "In the latter half of 2019, did you observe your wife

10   leave the house for any other purpose other than ultra

11   marathon training?

12   **A.**   "She drove Maya to school in the later half, in the fall

13   of 2019.

14   **Q.**   "In the first half of 2019, did your wife drive your

15   daughter to school?

16   **A.**   "No.

17   **Q.**   "Is it your understanding that your wife did not drive

18   your daughter to school on the first part of 2019 due to her

19   mental state?

20   **A.**   "No.  Maya was able to take a bus.

21   **Q.**   "You testified that your wife has been less likely to

22   venture out of the house since the start of the COVID-19

23   pandemic.  Are there any other change that you've observed in

24   your wife since the start of the COVID-19 pandemic?

25   **A.**   "Again, tricky to answer.  I don't know of any changes

1    coincide or caused by the COVID situation.

2    **Q.** "Since January 2020, what changes have you observed in

3    your wife?

4    **A.** "She -- she is less likely to go outside now than she was

5    in 2019.  Currently, other than visiting family members

6    outside her house, she does not leave the house.

7    **Q.** "Have you observed your wife go running outside in 2020?

8    **A.** "Yes.

9    **Q.** "When did you last observe your wife run outside in 2020?

10   **A.** "I'd say at least a month ago.

11   **Q.** "Since you moved -- so since you moved to Bend, Oregon,

12   correct?

13   **A.** "Yes.

14   **Q.** "Is your wife currently planning to participate in any

15   upcoming ultra marathons?

16   **A.** "Not that I'm aware of.

17   **Q.** "Is your wife currently planning to participate in any

18   other upcoming running races?

19   **A.** "No.  I will put out there that most of these races have

20   been canceled.

21   **Q.** "But for the fact that races have been canceled in light

22   of the pandemic, was your wife scheduled to participate in

23   any races for the remainder of 2020?

24   **A.** "Was she?

25   **Q.** "Yes.

1    **A.**  "I don't believe so.  Our situation was too in flux for

2    us to plan that far ahead.

3    **Q.**  "Was that in light of your move from Albuquerque to Bend?

4    **A.**  "Correct.

5    **Q.**  "How has the move from Albuquerque to Bend affected your

6    wife's demeanor?

7    **A.**  "I believe it has helped her.  She enjoys being closer to

8    family.  We're all certainly frustrated that we can't do most

9    activities with them due to the COVID pandemic.

10    **Q.**  "Has the move from Albuquerque to Bend affected your

11    wife's demeanor in any other way?

12    **A.**  "I'm sorry; I think I missed a word.  Can you repeat?

13    **Q.**  "Has the move from Albuquerque to Bend affected your

14    wife's demeanor in any other way?

15    **A.**  "Not much that I understand.  Primarily, she's happy to

16    be closer to family.

17    **Q.**  "Did the move from Dighton, Massachusetts, to

18    Albuquerque, New Mexico, affect your wife's demeanor?

19    **A.**  "Yes.

20    **Q.**  "In what way?

21    **A.**  "We were concerned about being financially trapped in

22    Dighton, so it was a relief.

23    **Q.**  "Did you observe your wife's mental state improve after

24    moving to Albuquerque?

25    **A.**  "Initially, yes.

1    **Q.**  "Did you own a house in Dighton?

2    **A.**  "We rented.

3    **Q.**  "Did you own a house in Albuquerque?

4    **A.**  "Oh, I'm sorry; I take that back.  We owned a house in

5    Dighton.  We rented in Albuquerque.

6    **Q.**  "Did you sell the house in Dighton prior to your move to

7    Albuquerque?

8    **A.**  "We sold it after our move.

9    **Q.**  "After selling the house in Dighton, did that relieve the

10   feeling of being financially trapped?

11   **A.**  "Not totally.  To a degree.

12   **Q.**  "What else accounted for the relief of the feeling of

13   being financially trapped after moving from Dighton to

14   Albuquerque?

15   **A.**  "Are you asking me to describe why we felt that way?

16   **Q.**  "You testified that you had felt financially trapped in

17   Dighton, and that was alleviated upon moving to Albuquerque.

18   I'm asking you to describe what contributed to that.

19   **A.**  "We -- we moved to Dighton for a school that we could no

20   longer afford.  So not having to pay -- we wouldn't have been

21   able to pay tuition at that school, and we were concerned

22   that we would not have the funds to move if we stayed in

23   Dighton.

24   **Q.**  "How much was the tuition for your daughter's school on

25   an annual basis?

1   **A.**   "Oh, gosh.

2   **Q.**   "I should clarify, at The Wheeler School.

3   **A.**   "I don't have those numbers.  I'm sorry.

4   **Q.**   "More than $10,000 a year?

5   **A.**   "That is my understanding, yes.

6   **Q.**   "More than $20,000 a year?

7   **A.**   "I believe so.

8   **Q.**   "More than $30,000 a year?

9   **A.**   "I am not sure at that point.  I'm thinking that's

10   ballpark.

11   **Q.**   "Did your daughter attend a private school in

12   Albuquerque?

13   **A.**   "Eventually.

14   **Q.**   "Does that mean that for a period of time, your daughter

15   attended a public school in Albuquerque?

16   **A.**   "Yes.

17   **Q.**   "What is the name of the private school that she

18   attended?

19   **A.**   "At which location?

20   **Q.**   "Albuquerque?

21   **A.**   "Albuquerque Academy.

22   **Q.**   "For how many school years did she attend the Albuquerque

23   Academy?

24   **A.**   "She attended one semester.

25   **Q.**   "And what was the tuition for the semester that she

1    attended the Albuquerque Academy?

2    **A.**  "Again, I'm not the one who does the finances.  I don't

3    recall exactly.

4    **Q.**  "Was it more than $10,000?

5    **A.**  "I believe so, yes.

6    **Q.**  "More than $20,000?

7    **A.**  "I think so.

8    **Q.**  "More than $30,000?

9    **A.**  "I believe that -- I believe it's in that ballpark.

10                THE COURT:  I'm going to stop you here.

11                All right.  Ladies and gentlemen, don't discuss the

12   case among yourselves; don't discuss it with anyone else;

13   don't do any independent research.

14                Just a reminder, tomorrow is just 9:00 to 1:00; on

15   Wednesday, Thursday, 9:00 to 1:00; Friday you will get the

16   case, anticipate being here all day.

17                Thank you for your attention.

18                All rise for the jury.

19                Have a nice day.

20                (The jury exits the courtroom.)

21                THE COURT:  Please be seated.  So who's -- you

22   finish this tomorrow, and what else?

23                MR. HANNON:  So we have two out-of-state witnesses

24   who are lined up for tomorrow.

25                THE COURT:  Who are they?

```
 1              MR. HANNON:  They are Mr. Clendening and
 2    Mr. McKinnon.
 3              MS. MANDEL:  In the other order, though.
 4              MR. HANNON:  In the other order.  Whatever order.
 5              But I have a damages expert, which I agreed to
 6    provide on Thursday.  He's coming from out of town, to make
 7    sure that we could get those --
 8              THE COURT:  On and off.
 9              MR. HANNON:  -- tomorrow --
10              I'm sorry?
11              THE COURT:  He's coming on Thursday, the damage --
12              MR. HANNON:  Correct.  Right.
13              So I think I may run into a situation where I may
14    be resting, subject to calling my damages expert out of
15    order.
16              THE COURT:  Fine.  How long are the McKinnon and
17    Clendening?
18              MR. HANNON:  I would guess ten to 15 minutes on my
19    side.
20              THE COURT:  And for you?
21              MS. MANDEL:  I would think not more than a half
22    hour for each on our side.
23              THE COURT:  All right.  So you're resting -- so
24    essentially after those two witnesses -- is this witness your
25    witness?
```

```
 1                    MR. HANNON:  Both.

 2                    THE COURT:  Both.  Okay.

 3                    After this witness and those two witnesses, you

 4        rest, other than your damage expert?

 5                    MR. HANNON:  Correct.

 6                    THE COURT:  And then who would you be calling?

 7                    MS. MANDEL:  Our only other witness at that point

 8        is our psych expert, Dr. Martin Kelly.

 9                    THE COURT:  All right.  So will you call him

10        tomorrow, if there's time?

11                    MS. MANDEL:  We had him scheduled, holding

12        Thursday.  We can see -- we can check on his availability for

13        tomorrow.

14                    THE COURT:  It sounds like, otherwise, we'll finish

15        early tomorrow --

16                    MS. MANDEL:  Right.

17                    THE COURT:  -- because there's not that much more

18        with this, right?

19                    MS. MANDEL:  And we'll certainly -- and we'll

20        certainly check on availability.

21                    THE COURT:  It would be better, I think, if we

22        could go to 1:00.  I think the jury will be happier with us.

23                    MS. MANDEL:  Is Mr. Jonas available tomorrow?

24                    MR. HANNON:  No.  He's flying in, so -- we agreed

25        that he'd do Thursday, so he has a flight tomorrow.
```

```
1                 THE COURT:  All right.  So, then, we might finish
2        the evidence Thursday; and if not, we'll finish it Friday.
3                 How long is the damage expert?
4                 MR. HANNON:  Half an hour, 45 minutes.
5                 THE COURT:  And how long is Dr. Kelly?
6                 MR. CURRAN:  Half an hour.
7                 THE COURT:  Okay.  So we'll finish Friday morning,
8        for sure, maybe even Thursday.  Okay.  Good.  All right.
9        Have a nice day.  I'll see you tomorrow at 8:45, unless I
10       hear from you that you want to be earlier.
11                MR. HANNON:  Very good.  Thank you.
12                THE COURT:  Have a good day.
13                (Court in recess at 4:03 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1      **C E R T I F I C A T I O N**

2

3

4          I certify that the foregoing is a correct

5      transcript of the record of proceedings in the above-entitled

6      matter to the best of my skill and ability.

7

8

9

10     /s/ Rachel M. Lopez                      March 28, 2023

11     /s/ Robert W. Paschal

12

13

14     _____        _____

15     Rachel M. Lopez, CRR                     Date

16     Robert W. Paschal, CRR, RMR

17     Official Court Reporters

18

19

20

21

22

23

24

25