UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

      Plaintiff,                 Civil Action No.
                                     1:19-cv-11441-LTS

     v.

PPD DEVELOPMENT, L.P.,

      Defendant.

_____


    BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 8


Wednesday, March 29, 2023
8:53 a.m.




John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

1                    **A P P E A R A N C E S**

2

  On behalf of the Plaintiff:

3

      HARTLEY MICHON ROBB HANNON, LLP
4     BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
      155 Seaport Boulevard
5     2nd Floor
      Boston, Massachusetts  02210
6     (617) 723-8000
      phannon@hmrhlaw.com
7     hwatson@hmrhlaw.com

8

9  On behalf of the Defendant:

10     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
      BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11     One Boston Place
      Suite 3500
12     Boston, Massachusetts  02108
      (617) 994-5700
13     rachel.mandel@ogletreedeakins.com
      patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS

### TRIAL WITNESSES

On behalf of the Plaintiff:                                      Page

MASON MENNINGER                                                    11

BRENT H. MCKINNON

　　　　By Mr. Hannon                                              39

　　　　By Mr. Curran                                              50

　　　　By Mr. Hannon                                              59

CHRIS E. CLENDENING

　　　　By Mr. Hannon                                              66

　　　　By Ms. Mandel                                              90

　　　　By Mr. Hannon                                             132

　　　　By Ms. Mandel                                             156

### EXHIBIT

None

                    **P R O C E E D I N G S**

1          (In open court.)

2          THE DEPUTY CLERK:  The United States District Court

3   for the District of Massachusetts is now in session, the

4   Honorable Leo T. Sorokin presiding.

5          THE COURT:  Please be seated.

6          Okay.  So just in terms of scheduling, I think

7   that's the only issue Kellyann said.

8          Where are we?  We have a little more to read of

9   Mason Menninger, right?

10         MR. HANNON:  We're close to done.  Yeah.  I

11  understand the defense would like to take one of their

12  witnesses out of order this morning, which is fine on my end.

13         MS. MANDEL:  Not necessarily out of order.  Just,

14  as we had discussed yesterday, after -- I think we can

15  complete the Mason Menninger read-on.  And then after that it

16  was just to make sure Mr. McKinnon needs to be the next

17  witness just because of his flights.

18         MR. HANNON:  Okay.  So in terms of the schedule for

19  the day, we're going to finish Mason Menninger.  We're then

20  going to take Mr. McKinnon.  We will then do --

21         THE COURT:  You're going to call McKinnon?

22         MR. HANNON:  I will -- yeah.

23         THE COURT:  You're just going to call him out of

24  order.

```
 1              MR. HANNON:  Correct.  I'm then going to call
 2   Mr. Clendening.
 3              THE COURT:  Okay.
 4              MR. HANNON:  At that point, I'm going to rest,
 5   subject to --
 6              THE COURT:  Subject to you calling your --
 7              MR. HANNON:  My economics excerpt tomorrow.
 8              THE COURT:  Who's coming tomorrow?
 9              MR. HANNON:  Correct.
10              THE COURT:  Okay.  And then who are you going to
11   call?
12              MS. MANDEL:  And our -- and our witnesses have
13   really already been called, so our remaining witness will be
14   Dr. Martin Kelly, our psychiatric expert, who all -- because
15   of his schedule of patients and whatnot, is available to come
16   tomorrow morning.  I understand Mr. Jonas will testify first
17   and then we'll call Dr. Kessimian.
18              THE COURT:  Okay.  All right.  So you can rest, if
19   you wish, but what's -- I don't know that you -- you have to
20   rest then, because the next witness will be your witness.
21              MR. HANNON:  Sure.
22              THE COURT:  So we're likely to finish before
23   1 o'clock, is what you're telling me?
24              Will we finish those two witnesses by 1:00
25   tomorrow?
```

```
 1                    MS. MANDEL:  I think so.

 2                    MR. HANNON:  Probably.

 3                    MS. MANDEL:  Your Honor, the one thing that we

 4      spoke about just briefly, Dr. Kelly, he's the witness who

 5      recently had surgery and is a little bit concerned about if

 6      it will take some assistance to get to the witness stand, and

 7      so working this -- we have spoken about it -- we're confident

 8      we will be down before 1:00 tomorrow, if it would be possible

 9      to take the morning break just after Mr. Jonas.

10                    THE COURT:  Sure.

11                    MS. MANDEL:  Break briefly for the restroom break

12      and then we can make sure that Dr. Kelly has no problem

13      getting --

14                    THE COURT:  How long do you think the first person

15      will be, Jonas?

16                    MR. HANNON:  45 minutes.

17                    THE COURT:  And how long will you be with him?

18                    MS. MANDEL:  Probably about a half hour on our end,

19      Your Honor.

20                    THE COURT:  So an hour and a quarter.  Okay.  So

21      Kellyann, maybe the one thing to do is see if we can get the

22      refreshments and coffee and stuff for them a little earlier,

23      so that when we take the break at -- so that sounds like a

24      break between 10:00 and 10:30, depending on how it goes.

25                    MS. MANDEL:  And it's possible that it will be even
```

1    close to 11:00.  It's just --

2              THE COURT:  Right.  But we'll get them early, so

3    that then if we go early -- right.

4              And then how long will Kelly be?

5              MR. CURRAN:  Half hour, maybe.

6              THE COURT:  And then?

7              MR. HANNON:  Probably half hour, 45 minutes.

8              THE COURT:  Okay.  All right.  Fine.  Okay.  I'm

9    fine with that.

10             So basically, this is what we will do.  We'll

11   finish -- we'll go finish those witnesses you describe today,

12   essentially the read-in and the two other witnesses, and then

13   we'll be done for the day.  We'll do the two witnesses

14   tomorrow.  That will be all the evidence.  The -- I will -- I

15   don't -- I can't do the charge conference today, because I

16   have a sentencing this afternoon that is going to take

17   awhile.  And I'm going to -- and you haven't got the -- it's

18   not really fair for me to have the charge conference before

19   you've had an opportunity to read the instructions, it seems.

20   So I'm going to -- I will issue to you sometime today or this

21   evening the draft jury instructions in verdict form, and

22   you'll have them to chew over, and then we'll have the charge

23   conference tomorrow.

24             And give me one moment just to look.  I'm thinking

25   that -- I think what I want to do is have the charge

1    conference tomorrow and close on Friday for two reasons.

2    It's a really important case to Dr. Menninger.  It's a really

3    important case to PPD.  You spent a lot of time preparing

4    this case.  I don't really want to rush my response to your

5    comments, if any, to the jury instructions.  I will remind

6    you that, in the last case I had, just last week, they had

7    zero, neither side.  And -- but nonetheless, I recognize that

8    that's unlikely.  And so I just want to have the chance --

9    there's, you know, somewhat complicated claims, and I want to

10   have the chance to thoughtfully respond, and it gives you

11   more time to prepare.  And so then we'll come in Friday

12   morning and you'll do closing arguments.  It means a little

13   bit of like potentially two short days for the jury, but I

14   think it's the only way to do it well, especially given other

15   criminal proceedings I have today and tomorrow in the

16   afternoons that I can't fairly move.

17          MS. MANDEL:  And so in terms of charge conference,

18   you think --

19          THE COURT:  Sometime tomorrow.

20          MS. MANDEL:  Tomorrow afternoon.

21          THE COURT:  And I'll tell you -- it just depends.

22   Honestly, I'm not sure when.  Here's the constraints, it

23   depends on what time we finish.  If we finish before

24   1 o'clock, we'll go right into it.  The constraints I have is

25   I have a 2 o'clock sentencing.  And so we'll do it -- if we

1    can do it -- but we will -- you need to eat lunch and I need
2    to eat lunch, so we'll at least have a half-hour break for
3    that.  And so maybe we do it before the sentencing, maybe we
4    do it a little bit before.  It depends when we finish,
5    otherwise we do it after.
6           MS. MANDEL:  And Your Honor, just to make sure I
7    understand, we're talking about tomorrow, though?  Not --
8           THE COURT:  Right.  Not today.  We're not going to
9    have the charge conference today, because you don't have the
10   charge, and I have to do a little bit more.  It's just about
11   done.  And I'm not going to issue it and ten minutes later
12   have a charge conference, because that doesn't seem fair or
13   in the spirit of the rule.  And then you'll just come back to
14   me, anyway, the next day.  So might as well just do it the
15   next day.
16          Okay.  Kellyann, go see if they're all here.
17          THE COURT:  Just so you know, depending on how
18   tomorrow goes for your own planning, there's a chance that I
19   might start -- tell the jury to come at 9:30 or 10:00 if I --
20   so depending on when we have the charge conference and how
21   much there is and what -- so that -- if I thought I needed --
22   wanted a little more time to talk to you or something
23   before -- because how long do you think you're going to be in
24   your closes, roughly?
25          MR. HANNON:  40 minutes.

```
 1              THE COURT:  I'm not holding you right now, but a
 2   ballpark.
 3              MR. HANNON:  40, 45 minutes.
 4              MS. MANDEL:  Something similar on our end,
 5   Your Honor.
 6              THE COURT:  All right.  So even with all of that,
 7   it's an hour and a half, roughly.  And the charge, 45
 8   minutes, I think, whatever.  So there's plenty of time for
 9   them to get it reasonably.
10              (The jury enters the courtroom.)
11              THE COURT:  Good morning, ladies and gentlemen.
12   Everybody follow my instruction, no discussion, no
13   independent research?  Good.
14              So just a couple quick points before we resume.
15   One is I told you you're going to get the case on Friday.
16   You will.  I've been going over the schedule with the lawyers
17   just now.  We're very much on track.  And before you leave
18   today, I will give you all the details about the schedule.
19   But just to remind you, today is just 9:00 to 1:00.
20   Tomorrow -- today is 9:00 to 1:00 at the most.  Tomorrow is
21   9:00 to 1:00 at the most.  Friday you'll -- will be the end
22   of the case and you'll receive it for deliberations.  Okay?
23              So when we broke, we were reading -- they were --
24   Ms. Mandel was asking the questions, and Mr. Watson, right?
25              MR. WATSON:  Watson, yes.
```

1          THE COURT:  Mr. Watson was being Mr. Menninger and

2    reading his answers and there's a bit more to that.  So

3    they're going to continue that until they finish.

4          Go ahead.

5          MS. MANDEL:  And Your Honor, we're just going to,

6    for context, go back a couple of questions, because we were

7    sort of in the middle.

8          THE COURT:  That's fine.

9                    The testimony of

10                   **MASON MENNINGER**

11   having been duly sworn previously, was read into the record as

12                      follows:

13   BY MS. MANDEL:

14   **Q.**  "Did your daughter attend a private school in

15   Albuquerque?

16   **A.**  "Eventually.

17   **Q.**  "Does that mean that for a period of time your daughter

18   attended a public school in Albuquerque?

19   **A.**  "Yes.

20   **Q.**  "What is the name of the private school that she

21   attended?

22   **A.**  "At which location?

23   **Q.**  "Albuquerque.

24   **A.**  "Albuquerque Academy.

25   **Q.**  "For how many years did she attend Albuquerque Academy?

1    **A.**   "She attended one semester.

2    **Q.**   "And what was the tuition for the semester that she

3    attended at the Albuquerque Academy?

4    **A.**   "Again, I'm not the one who does the finances.  I don't

5    recall exactly.

6    **Q.**   "Was it more than $10,000?

7    **A.**   "I believe so, yes.

8    **Q.**   "More than $20,000?

9    **A.**   "I think so.

10   **Q.**   "More than $30,000?

11   **A.**   "I believe it's in that ballpark.

12   **Q.**   "Did your daughter attend the Albuquerque Academy for the

13   spring semester of 2020?

14   **A.**   "Yes.

15   **Q.**   "Is your daughter scheduled to begin school in Bend,

16   Oregon in the fall of 2020?

17   **A.**   "Yes.

18   **Q.**   "In a private school?

19   **A.**   "No.

20   **Q.**   "In a public school?

21   **A.**   "Yes."

22         MS. MANDEL:  Your Honor, if I may for context, just

23   read a couple of the questions at bottom of page 73?

24         THE COURT:  Yes.

25   BY MS. MANDEL:

1   **Q.**   "You mentioned earlier in passing that you have cats; is

2   that correct?

3   **A.**   "Yes.

4   **Q.**   "How many cats do you have?

5   **A.**   "Two.

6   **Q.**   "How long have you had those cats?

7   **A.**   "I'm trying to remember.  It's about two and a half

8   years, I think.

9   **Q.**   "Are those the only pets that you and your wife currently

10  have?

11  **A.**   "Yes.

12  **Q.**   "Have you previously had any other pets during the time

13  that you've been married to your wife?

14  **A.**   "Yes.

15  **Q.**   "What were those pets?

16  **A.**   "One other cat.

17  **Q.**   "When did you have that cat?

18  **A.**   "She had this cat when I met her, so from when we moved

19  in together until it died of old age.

20  **Q.**   "When did it die of old age?

21  **A.**   "I'm not sure I recall the exact year.  I want to say

22  about 2010.

23  **Q.**   "What effect did the cat's death have on your wife's

24  mental state that you observed?

25  **A.**   "Nothing long term.  She was sad at the time.

1  **Q.**  "Aside from the cats that you've mentioned, have you and

2  your wife had any other pets during the time that you've

3  known her?

4  **A.**  "No.

5  **Q.**  "You testified that you currently have two cats.  Does

6  your wife take care of those cats?

7  **A.**  "Some of the time, yes.

8  **Q.**  "Has your wife's ability to care for the cats changed in

9  the two and a half years that you've owned the cats?

10 **A.**  "Overall, no.  Occasionally I will feed the cats if it

11 looks like they need food.

12 **Q.**  "Have you observed your wife's ability to care for your

13 daughter change from 2000 -- strike that.

14       "Changed from early 2018 to the present?

15 **A.**  "Yes.

16 **Q.**  "In what way?

17 **A.**  "It is harder for her to be present for our daughter.

18 So, you know, as a 12-year-old, she would approach us, and

19 sometimes Lisa is just not there to be approached.

20 **Q.**  "Any other ways in which you've observed your wife's

21 ability to care for your daughter change from early 2018 to

22 the present?

23 **A.**  "Nothing specific.  Lisa has done her very best to make

24 sure none of this affects Maya.

25 **Q.**  "When you say none of this, are you referring to your

1    wife's anxiety and depression?

2    **A.**  "Essentially, yes.

3    **Q.**  "Are you referring to anything else?

4    **A.**  "It's exacerbated by the ongoing case, so indirectly.

5    **Q.**  "When you say it's 'exacerbated,' are you referring to

6    your wife's anxiety and depression?

7    **A.**  "Yes.

8    **Q.**  "And by 'The case,' are you referring to her lawsuit

9    against PPD?

10    **A.**  "Yes.

11    **Q.**  "Prior to January of 2018, did you ever observe your wife

12    have difficulty caring for your daughter?

13    **A.**  "I assume you mean early 2018.  Not that I recall.

14    **Q.**  "Mr. Menninger, did you ever meet your wife's father?

15    **A.**  "No, I did not.

16    **Q.**  "Was the last time that you observed your wife having

17    interaction with your sibling --"

18            MS. MANDEL:  Strike that.

19            Your Honor, I think just for context, if we read a

20    little more of page 77.

21            MR. HANNON:  I suggest page 77, line 19,

22    Your Honor.

23            THE WITNESS:  Sorry, there's a few pages that are

24    cut from our copy here.

25            THE COURT:  Why don't you just start there.

```
 1              MS. MANDEL:  That's fine.
 2    BY MS. MANDEL:
 3    Q.  "Have you observed your wife have interaction with your
 4    sibling who lives outside of Dallas?
 5    A.  "Yes.
 6    Q.  "When did you last observe that interaction?
 7    A.  "The same occasion, so whenever we visited in the
 8    timeframe we were in Overland Park.
 9              MR. WATSON:  Your Honor, I'm sorry.  There's some
10    pages that are missing, so it doesn't flow into the next.
11              MR. HANNON:  Oh, right.
12              THE COURT:  So ladies and gentlemen of the jury,
13    they're not reading the entire deposition, because not all of
14    it is -- the lawyers don't think all of it is relevant.  And
15    just as a general proposition, this is probably what I'm
16    going to tell you, and it comes as no surprise.  You are not
17    hearing everything that every human being knows about
18    everything in any way that is related to this.  You are
19    hearing the things that each lawyer thinks are relevant and
20    admissible.  And that's to focus you and give you what you
21    need.  And so they're only reading parts, and that's why
22    sometimes there's a question that they thought they weren't
23    going to read, but actually seems sensible to read for
24    context for something and that's what's going on.
25              And now -- and the notebook that Mr. Watson has and
```

1    that we all have these notebooks that they're reading from,

2    don't even have every page of the deposition, so that's what

3    they're looking at now.

4    BY MS. MANDEL:

5    **Q.**  "When did you last observe your wife have a conversation

6    with another person about her anxiety?

7    **A.**  "Other than family members?

8    **Q.**  "Anyone.  Period.

9    **A.**  "Oh, anyone.  Well, certainly that happened during one of

10   our visits with her family.

11   **Q.**  "When was that visit?

12   **A.**  "I'm not sure.  We've had a handful since we've been

13   here.  So, um, yeah, I struggle to think of one in which

14   there was a significant conversation on that topic.

15   **Q.**  "When did you last observe have a conversation with

16   another person about her depression?

17   **A.**  "Again, it would also certainly be with a family member,

18   since we moved here.  It's challenging for me to give

19   specific times.

20   **Q.**  "When did such a conversation last take place?

21   **A.**  "Again, it's challenging for me to answer that.

22   **Q.**  "What did you observe your wife say about her depression

23   during such a conversation?

24   **A.**  "Essentially the same things that I've told you, that she

25   struggles to get out of bed and have any level of enthusiasm.

1    She shares her ambitions with her family, and then feels bad

2    when she can't follow through because of depression.

3    **Q.**   "What ambitions have you observed your wife share with

4    her family?

5    **A.**   "She wants to run.  She wants to run races.

6    **Q.**   "Any other ambitions?

7    **A.**   "That's about it, yeah.  She struggles with just that

8    one.

9    **Q.**   "What have you observed your wife say to her family about

10   anxiety?

11   **A.**   "I'm not sure she necessarily separates that out

12   conversation-wise.  I think she has stated that she is

13   concerned about going out of the house because of her

14   anxiety.

15   **Q.**   "Have you heard your wife speak with anybody else about

16   her panic disorder?

17   **A.**   "Outside of family, no.

18   **Q.**   "How about within the family?

19   **A.**   "Yes.  Her sister and her mother.

20   **Q.**   "What have you observed your wife say to her sister about

21   her panic disorder?

22   **A.**   "I recall her describing what they're like and when they

23   can occur.

24   **Q.**   "What have you observed your wife say about her panic

25   disorder in conversations with her mother?

1   **A.**  "I think overall, less than what she tells her sister,

2  essentially the same things, but just possibly without the

3  same detail.

4  **Q.**  "What did your wife say to your sister -- strike that.

5         "What did your wife say to her sister about what it

6  is like when a panic attack occurs?

7  **A.**  "Basically what I've already described, how she has

8  trouble communicating, trouble catching her breath, often

9  cries through it, describes just trying to get through the

10  moment.  Certain things with temperature, you know.  She

11  feels very hot, can get sweaty.  You know, just her sister is

12  a nurse, and I think, you know, these sort of descriptive

13  things are meaningful to her.

14  **Q.**  "Mr. Menninger, you testified earlier that you and your

15  wife met online based on similar interests.  Do you recall

16  that?

17  **A.**  "Yes.

18  **Q.**  "What are those similar interests?

19  **A.**  "We're both vegan.

20  **Q.**  "Vegan?

21  **A.**  "Yes.

22  **Q.**  "Any other similar interests?

23  **A.**  "Do we share similar interests other than that, is that

24  what you're asking?

25  **Q.**  "I'm sorry?

1   **A.**   "Are you asking if we share any other interests other

2   than being vegan?

3   **Q.**   "I'm asking what similar interests you cited as the basis

4   for your meeting online?

5   **A.**   "Oh, oh, sure.  That.  It's essentially a lifestyle, so

6   that encompasses a lot.  It's more than just a diet.  I won't

7   go off on that tangent, but yes, we found it easy to

8   communicate with one another.

9   **Q.**   "During the time that you and your wife lived in Dighton,

10  Massachusetts, your wife worked primarily from home, correct?

11  **A.**   "Correct.

12  **Q.**   "Did you ever observe your wife's interactions with

13  Mr. Mekerri during the time that she worked from home in

14  Dighton, Massachusetts?

15  **A.**   "No, I'm not even sure I know who that is.

16  **Q.**   "I'm referring to Hacene Mekerri?

17  **A.**   "Oh, okay.  Sorry.  She's always referred to him by his

18  first name, as far as I can remember.  No, no, she had her

19  own office closed off, and when she worked, she -- yeah, I

20  had no interaction when she worked.

21  **Q.**   "Did you observe your wife's interactions with Chad St.

22  John during the time she worked from home in Dighton?

23  **A.**   "No, I did not.

24  **Q.**   "Did you ever observe your wife's interactions with any

25  other colleagues at PPD during the time she worked at home in

1  Dighton?

2  **A.**  "No, I did not.

3  **Q.**  "Were you aware that at some point your wife disclosed

4  anxiety disorder to PPD?

5  **A.**  "Yes.

6  **Q.**  "I'm not asking about the contents of the conversation, I

7  want to be clear about that.  Did you become aware of that

8  through a conversation with your wife or by some other means?

9  **A.**  "Through a conversation with my wife.

10  **Q.**  "When did you become aware that your wife had disclosed

11  an anxiety order to PPD?

12  **A.**  "As it occurred.  I was aware that she was about to.  I

13  was aware that she did afterward.

14  **Q.**  "In the time that you've known your wife, Mr. Menninger,

15  have you ever worried about danger of her harming herself?

16  **A.**  "Yes.

17  **Q.**  "During what time or times did you have that worry?

18  **A.**  "I think the first occasion was while she was on medical

19  leave, so sometime in the first half of 2018.

20  **Q.**  "Are you referring to her medical leave from her

21  employment at PPD?

22  **A.**  "Correct.

23  **Q.**  "What formed the basis of your concern that your wife may

24  harm herself during the first half of 2018?

25  **A.**  "Her demeanor and her words.

1  **Q.**  "What about your wife's demeanor during the first half of

2  2018 led you to worry that she may harm herself?

3  **A.**  "She seemed just very out of character for her.  She

4  seemed almost angry, frustrated, at a breaking point

5  essentially.

6  **Q.**  "Was that a change from her demeanor before that point?

7  **A.**  "In the sense that I had not seen that from her before,

8  yes.

9  **Q.**  "What behavior did she exhibit in the way of anger?

10  **A.**  "I think she felt angry that she had no means to escape

11  her situation.

12  **Q.**  "What situation?

13  **A.**  "That we had no ability or plans to sustain ourselves

14  financially and she felt -- yes, she felt there was no

15  obvious way to solve that.

16  **Q.**  "Is that no ability or plans to sustain yourselves

17  financially if she was unable to work?

18  **A.**  "Yes.

19  **Q.**  "Did your wife exhibit any specific behavior that showed

20  the anger that you described in the first half of 2018?

21  **A.**  "It was mostly conversationally, you know, directed

22  towards me.

23  **Q.**  "When you say directed towards you, are you referencing

24  conversations between you and your wife?

25  **A.**  "Yes.

1  **Q.**  "Any other behavior towards you that you're referencing?

2  **A.**  "No.

3  **Q.**  "What behavior did your wife exhibit in the way of

4  frustration in the first half of 2018?

5  **A.**  "Essentially the same.  I feel like it's a lower level of

6  anger.  She -- she felt there was injustice to her situation

7  and there was no obvious solution.

8  **Q.**  "What specifically led you to believe that your wife was

9  in danger of harming herself?

10 **A.**  "She said so.

11 **Q.**  "Are you still referring to the time period of early --

12 strike that.

13         "Are you still referring to the time period of

14 first half of 2018?

15 **A.**  "Yes.

16 **Q.**  "Did you take any steps in the first half of 2018 in

17 response to your fear that your wife may harm herself?

18 **A.**  "Yes.

19 **Q.**  "And what are those steps?

20 **A.**  "I contacted her therapist.

21 **Q.**  "Was that Dr. Kessimian?

22 **A.**  "Yes.

23 **Q.**  "During what month in the first half of 2018 did you

24 contact Dr. Kessimian?

25 **A.**  "I don't know based on my memory.

1  **Q.**  "Aside from the time period that you just described in

2  the first half of 2018, has there been any other time period

3  when you feared your wife may have harmed herself?

4  **A.**  "None to that amplitude, none to that effect.

5  **Q.**  "Aside from the contact that you just described with

6  Dr. Kessimian, have you ever taken any other steps in

7  response to your fear that your wife may harm herself?

8  **A.**  "I had very long conversations until I felt like she was

9  beyond that state of mind.

10  **Q.**  "Any other steps that you've taken in response to that

11  fear?

12  **A.**  "No.  Once I felt she was okay, no.

13  **Q.**  "Can you describe the contact that you had with

14  Dr. Kessimian in the first half of 2018?

15  **A.**  "I called her on the phone.

16  **Q.**  "Did Dr. Kessimian answer her phone?

17  **A.**  "I don't recall if it was right away, but eventually,

18  yes.

19  **Q.**  "Can you describe the conversation that you had with Dr.

20  Kessimian at that time?

21  **A.**  "I relayed to her Lisa's current state and asked what I

22  should do and asked if she could talk to her.

23  **Q.**  "And what did Dr. Kessimian say?

24  **A.**  "She was agreeable to talking with Lisa and they had a

25  conversation.

1   **Q.**  "What did Dr. Kessimian say to you during that
2   conversation?
3   **A.**  "Yeah, it was all very emotional, so it's hard to
4   remember specifically.  She -- in general, she indicated that
5   I did the right thing by contacting her and I should see if
6   Lisa was willing to talk with her.
7   **Q.**  "Do you recall any other communications that you had with
8   Dr. Kessimian regarding a fear that your wife may harm
9   herself?
10  **A.**  "No, certainly nothing like that.
11  **Q.**  "I am going to -- give me one moment.  I am going to
12  share an exhibit on the screen."
13         MS. MANDEL:  The transcript indicates in
14  parenthesis the introduction of an exhibit labeled Menninger
15  000608.
16  BY MS. MANDEL:
17  **Q.**  "Mr. Menninger, Justina has just marked Exhibit 1, the
18  document that is shared on the screen.  Do you see that
19  screen in front of you?
20  **A.**  "Yes.
21  **Q.**  "Okay.  I'm going to give you control of the mouse, so
22  that you can scroll up and down.  I will submit to you that
23  it is just a one page document that has a number at the
24  bottom that says Menninger 608.  Can you take a moment to
25  look at this document, and let us know when you've had a

1   chance to do so?

2   **A.**  "I do see the document.  Do you want me to read through

3   it?

4   **Q.**  "Just take a moment to review it.  Let us know when

5   you've had a chance to do so.

6   **A.**  "Okay.  I've seen this.

7   **Q.**  "Mr. Menninger, do you mean that you've previously seen

8   this document?

9   **A.**  "I wrote this document.

10  **Q.**  "Do you recognize this as e-mail correspondence that you

11  had with Dr. Kessimian?

12  **A.**  "Yes.

13  **Q.**  "If you look at the upper right corner of the document,

14  there's a little star.  Do you see that?

15  **A.**  "Actually, it's blocked by our images.

16  **Q.**  "Yeah, let me tell you how you can see all of it.  If

17  you're in your Zoom settings on the side, do you have a panel

18  that has all the pictures right now?

19  **A.**  "Yes.

20  **Q.**  "Okay.  If you click on the smallest line, it should

21  reduce the pictures so that they no longer block the

22  document?

23  **A.**  "Okay.  I did that.

24  **Q.**  "Does that work for you?

25  **A.**  "Yes.

1  Q.  "Okay.  Do you now see that little star on the upper

2  right-hand corner of the document marked as Exhibit 1?

3  A.  "By the date, October 15th?

4  Q.  "Yes.  Exactly.

5  A.  "Yes.

6  Q.  "Do you see how it just says October 15th and no year,

7  correct?

8  A.  "I do.

9  Q.  "Is it your understanding that this was October 15th of

10  2018?

11  A.  "That would make sense to me, yes, as far as our -- where

12  we lived, yes.

13  Q.  "What did -- what led you to write this e-mail to Dr.

14  Kessimian on October 15, 2018?

15  A.  "I believe at the time -- and I think this refers to the

16  occasion in which I asked her doctor to speak with her

17  directly.  So I was apparently off by the date of it.  And my

18  concern was that the conversation only temporarily resolved

19  the situation and I was concerned about long term.

20  Q.  "What conversation only temporarily resolved the

21  situation?

22  A.  "When I handed the phone to Lisa to talk with her doctor,

23  when Lisa was feeling suicidal.

24  Q.  "Mr. Menninger, was this October 15, 2018 communication

25  with Dr. Kessimian a second time that you communicated with

1    Dr. Kessimian about a fear that your wife may harm herself?

2    **A.**  "I don't recall.

3    **Q.**  "Is it your testimony that you communicated with Dr.

4    Kessimian in the first half of 2018 about a fear that your

5    wife may harm herself and in October 2018 about such a fear?

6    **A.**  "Oh, no.  This is definitely the occasion in which I

7    called the doctor to hopefully intervene.  I was simply off

8    in my estimate of time.

9    **Q.**  "Does looking at this e-mail, marked as Exhibit 1,

10   refresh your recollection as to when that communication took

11   place with Dr. Kessimian?

12   **A.**  "I mean, only in the sense that it provides a date and I

13   believe the date.

14   **Q.**  "Now that you've had an opportunity to review this

15   document, do you still believe that you had communication

16   with Dr. Kessimian in the first half of 2018 regarding

17   Dr. Menninger's potential harm to herself?

18   **A.**  "No.  This is the occasion that I was speaking of.

19   **Q.**  "Mr. Menninger, if you look farther down underneath the

20   line that's in the middle of this document?

21   **A.**  "Uh-huh, yes.

22   **Q.**  "Do you see there's another date.  It also says

23   October 15th?

24   **A.**  "Yes.

25   **Q.**  "And would you agree, this appears to be an e-mail

1  message written by Dr. Kessimian, if you look at the left

2  side of the page?

3  A.  "Yes.

4  Q.  "Based on your review of the lower half this document, do

5  you believe this is the entirety of your e-mail communication

6  from Dr. Kessimian about the management of your fear that

7  Dr. Menninger may harm herself?

8  A.  "The entirety of our e-mail conversation, yes, that seems

9  likely.

10  Q.  "And now that you've had an opportunity to review this

11  document, do you believe that after October 15, 2018, you had

12  any further spoken communication with Dr. Kessimian about

13  your fear that your wife may harm herself?

14  A.  "Well, as you can see, I'm very bad with dates.  I did

15  share a session with Lisa and this doctor, but I don't recall

16  if it was before or after this occasion.

17  Q.  "You testified earlier, Mr. Menninger, that your wife is

18  not currently employed, right?

19  A.  "Correct.

20  Q.  "And as far as you know, your wife has not sought

21  employment since she left PPD, correct?

22  A.  "That is correct.

23  Q.  "Based your observations of your wife's current mental

24  state, do you believe that she could work in a job outside

25  your home at this point?

1    **A.**   "I don't believe she could.

2    **Q.**   "And without commenting on your confidential

3    communications with your wife, what forms the basis of that

4    belief?

5    **A.**   "Part of it is her inconsistent days, having bad days and

6    having okay days.  That would not be compatible with most

7    working environments.  Also, what she has trained for, what

8    she is good at is now something that she has a great deal of

9    anxiety about.

10   **Q.**   "When you are referring to what she is trained for and

11   what she is good at, what are you referring to?

12   **A.**   "Working as a clinical pathologist, working in a

13   corporate setting, anything that is a direct reminder of her

14   time at PPD.

15   **Q.**   "Why do you believe that anything that is a direct

16   reminder of her time at PPD would be what she is good at?

17   **A.**   "Yeah, I'm a little confused by the phrasing.

18          "Could you restate the question?

19   **Q.**   "Mr. Menninger, you -- when asked what you were referring

20   to, you described what she is good at.  You described your

21   wife working as a clinical pathologist, working in a

22   corporate setting and anything that is a direct reminder of

23   her time at PPD.  I'm asking you to further explain that

24   answer.

25   **A.**   "Oh, you're asking why I believe that?

1   **Q.**   "Sure.  Start with that.

2   **A.**   "Okay.  That is essentially a description of her

3   nightmares.

4   **Q.**   "Is it your testimony that working as a clinical

5   pathologist, working in a corporate setting, and anything

6   that is a reminder of her time at PPD forms the basis of her

7   nightmares?

8   **A.**   "Yes.

9   **Q.**   "Based on your observations of your wife's current state,

10  do you believe that she is currently capable of working in a

11  job that could be performed from inside her home?

12  **A.**   "I'm uncertain.  It would depend on potentially the job,

13  how flexible the hours could be, if she could work around her

14  episodes of depression and anxiety.

15  **Q.**   "Between January of 2018 and the present, was there any

16  time period when you believe your wife could have worked in a

17  job outside the home?

18  **A.**   "I believe you're asking early January '18.  No, I don't

19  believe she could have done that.

20  **Q.**   "Between January '18 and the present, was there any time

21  period when you believed your wife could have worked in a job

22  that could be performed solely inside her home?

23  **A.**   "Between early 2018 and now, no.  The issue of -- the

24  basis of that is that working inside is not the primary

25  issue.

1  **Q.**  "What do you believe is the primary issue that has made

2  your wife unable to work in a job from early 2018 to the

3  present?

4  **A.**  "Anxiety, depression, the likely inability to schedule

5  around that, and she especially associates anxiety with her

6  career in pathology.  So it would -- it would almost

7  certainly have to be in a totally different field and I just

8  don't believe she is prepared mentally for a change like

9  that.

10 **Q.**  "Mr. Menninger, is it your belief as you sit here today

11 that your wife may never work again?

12 **A.**  "Yes.

13 **Q.**  "How has your wife's anxiety and depression affected your

14 marriage?

15 **A.**  "Not positively.  It's hard to be so close to someone who

16 feels so bad so much of the time.  That hasn't changed how I

17 feel about her, but that's just -- it's a struggle to have

18 that, yeah, in such close proximity, day in and day out.

19 **Q.**  "Did the nature of your marriage change between 2015 and

20 2018?

21 **A.**  "No.  Not that I can recall.  Not in any significant way.

22 **Q.**  "Mr. Menninger, why did you and your family move

23 specifically to Albuquerque, New Mexico, in 2018?

24 **A.**  "We -- we were concerned about being stuck in our current

25 location, unable to afford the school that we moved there

1   for.  Maya would have ended up in the local public school,
2   which we understood to not be very good.  So we took -- we
3   were concerned that if we continued to spend the money we had
4   where we were, we would no longer be able to afford to move.
5   So we chose to move someplace with a lower cost of living and
6   some place she would feel more at home.
7   Q.   "Did you look at other options, aside from Albuquerque,
8   New Mexico?
9   A.   "We looked at many options, including where we ended up
10  here.
11  Q.   "Meaning you considered Bend, Oregon at that time?
12  A.   "Yes.
13  Q.   "Why did you elect to live in Albuquerque, New Mexico,
14  instead of Bend, Oregon in 2018?
15  A.   "I'm a little fuzzy on that now.  I think at the time, it
16  was just her mom.  Her sister moved there fairly recently, so
17  there's a little less incentive family wise.  Bend is higher
18  cost of living than Albuquerque and we were unfamiliar with
19  it.  Neither of us had been here.  She had lived in
20  Albuquerque for a while and really enjoyed it there, so we
21  saw that as a better opportunity.
22  Q.   "Based on your current salary level that you've described
23  and your wife's receipt of Social Security benefits, do you
24  feel that you and your family are now in a comfortable
25  financial state?

1   **A.**  "Not long term, no.  My job is essentially a startup, so

2   there's always a little uncertainty with that.  And Bend is

3   relatively expensive.  So, yes, there's still uncertainty,

4   even now.

5   **Q.**  "If your employment becomes more definite, would you feel

6   comfortable with your family's financial state longer term?

7   **A.**  "Certainly.

8   **Q.**  "Let's break for about five minutes."

9            THE COURT:  Skip that part.

10           MS. MANDEL:  Thank you.

11  BY MS. MANDEL:

12  **Q.**  "Mr. Menninger, we're almost done.  I just have a few

13  more questions for you.  You testified a few moments ago

14  about a sense of financial uncertainty in connection with you

15  working for a startup, correct?

16  **A.**  "Yes.

17  **Q.**  "Are you currently looking for another job?

18  **A.**  "No, I'm not.

19  **Q.**  "Have you searched for any other employment since June of

20  2018?

21  **A.**  "June 2018?  I believe I considered a job at Maya's

22  school, at The Wheeler School.  They had an opening for a

23  math teacher at the -- it seemed like a way to keep her in

24  that school potentially, but that did not work out.

25  **Q.**  "Did you apply for that job?

1    **A.**  "I don't think it got to that point.  I contacted them,

2    and they essentially said they found someone for it.

3    **Q.**  "Have you applied for any job since June of 2018?

4    **A.**  "No.

5    **Q.**  "As you sit here today, do you have any plans to apply

6    for another job within the next six months?

7    **A.**  "I have no such plans.

8    **Q.**  "Are you currently seeking out any other employment

9    options beyond Triangulate Labs?

10   **A.**  "No, I'm not.

11   **Q.**  "Mr. Menninger, do you believe that it is important for

12   you or your wife to be at home for your daughter?

13   **A.**  "Certainly in the context of the current pandemic, yes.

14   **Q.**  "Prior to the current COVID-19 pandemic, did you believe

15   that either you or your wife should be primarily available

16   for your daughter at home?

17   **A.**  "I struggle to answer, because when she attended school,

18   she would not have been home.  So that wouldn't have applied.

19   Certainly during normal daily activities, when she is home,

20   one of us should be here.

21   **Q.**  "Before the onset of the COVID-19 pandemic, did your

22   daughter attend any sort of after-school care?

23   **A.**  "Not care so much.  She attended a club, I believe, at

24   one of her schools, so on certain nights, she would come home

25   later.

1   **Q.**   "Aside from you and your wife, did anybody else care for
2   your daughter in your home during calendar year 2020?
3   **A.**   "No.
4   **Q.**   "Is it your belief that either you or your wife should be
5   the only ones caring for your wife at home -- caring for your
6   daughter at home?
7   **A.**   "Again, without the context of the pandemic?
8   **Q.**   "Yes.
9   **A.**   "Okay.  I -- it really hasn't come up in our thoughts.
10  We -- I work from home, so it just isn't a question we
11  have -- we have discussed.
12  **Q.**   "In calendar year 2019, aside from you or your wife, did
13  anyone else care for your daughter in your home?
14  **A.**   "No.
15  **Q.**   "In calendar year 2018, aside from you and your wife, did
16  anyone else care for your daughter in your home?
17  **A.**   "No.
18  **Q.**   "What about calendar year 2017?
19  **A.**   "No.
20  **Q.**   "Do you anticipate, based on what you know now, that your
21  daughter will attend school in person for fall of 2020?
22  **A.**   "We anticipate she will not attend in person.
23  **Q.**   "Do you and your wife both intend to be home with your
24  daughter during the day throughout the remainder of 2020?
25  **A.**   "Yes."

1          MR. HANNON:  I have a couple of questions.  Maybe I

2     should read those in.

3          THE COURT:  Sure.

4          MR. HANNON:  If that works.

5          THE COURT:  So Mr. Hannon will read -- those

6     questions that Ms. Mandel read, she was asking those

7     questions.  Now we're just about at the end and there's a

8     couple of questions that Mr. Hannon asked, so just more -- I

9     think you will get a better feel if he --

10          MR. HANNON:  I'll just do them from here, if that's

11    okay.

12          THE COURT:  That's fine.

13    BY MR. HANNON:

14    **Q.**  "Mr. Menninger, in your questioning by Ms. Mandel, you

15    were asked about the timing of events that occurred in 2018,

16    and I think you indicated initially you thought there was a

17    conversation that happened in the first half, but now you

18    think it happened in October.  Do you recall that testimony?

19    **A.**  "I do.

20    **Q.**  "Okay.  And I think I also heard you say that your

21    estimate, in terms of when your wife's depression symptoms

22    started was some time in the early part of 2018.  Did I hear

23    you correctly?

24    **A.**  "Yes.

25    **Q.**  "Okay.  Are you able to provide any more specific

1    estimate in terms of when those symptoms started, besides
2    early 2018?
3    **A.** "Yes.  I recall the event of her receiving an exit
4    package offer and that being fairly traumatic for her.
5    **Q.** "Okay.  Besides your understanding that there was some
6    event, can you provide any additional detail in terms of your
7    estimate of when these symptoms started?
8    **A.** "No."
9          MR. HANNON:  That's all, Your Honor.
10         THE COURT:  Okay.  Thank you.  That concludes --
11         MR. HANNON:  Judge, just for the record, can we
12    note the date of the deposition?
13         THE COURT:  Yes.
14         MR. HANNON:  Which was August 13th of 2020.
15         THE COURT:  Okay.  That concludes that reading of
16    that deposition.
17         What's the next witness?
18         MR. HANNON:  The plaintiff calls Brent McKinnon.
19         THE COURT:  All right.  Mr. McKinnon, if you'd come
20    forward and take the witness stand.
21         (The witness was duly sworn.)
22         THE DEPUTY CLERK:  Can you please state your full
23    name and spell your last name for the record.
24         THE WITNESS:  It's Brent Harper McKinnon,
25    M-c-K-i-n-n-o-n.

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Thank you. |
| 2 | THE COURT:  Have a seat. |
| 3 | Go ahead, Mr. Hannon. |
| 4 | MR. HANNON:  Thank you, Your Honor. |
| 5 | **BRENT H. MCKINNON** |
| 6 | having been duly sworn, testified as follows: |
| 7 | **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF** |
| 8 | BY MR. HANNON: |
| 9 | **Q.**  Good morning, Mr. McKinnon. |
| 10 | **A.**  Good morning. |
| 11 | **Q.**  Sir, where do you live? |
| 12 | **A.**  I live in Pittsburgh, Texas. |
| 13 | **Q.**  Okay.  I might have guessed that. |
| 14 | **A.**  Yeah. |
| 15 | **Q.**  What do you do for work, sir? |
| 16 | **A.**  I work for Thermo Fisher Scientific. |
| 17 | **Q.**  And what do you do there? |
| 18 | **A.**  I'm vice president of quality assurance. |
| 19 | **Q.**  Okay.  And are you vice president of quality assurance |
| 20 | for any particular segment within Thermo Fisher? |
| 21 | **A.**  For the analytical services division. |
| 22 | **Q.**  Okay.  Were you previously employed by PPD? |
| 23 | **A.**  Yes. |
| 24 | **Q.**  And when were you employed by PPD? |
| 25 | **A.**  From March of 2015 until -- we were acquired by Thermo |

1    Fisher in late 2020.

2    **Q.**  And what was your role at PPD when you were first hired

3    there?

4    **A.**  Executive director of quality for Global Central

5    Laboratory.

6    **Q.**  And can you give the jury an overview of what your duties

7    and responsibilities were in that role?

8    **A.**  Yes.  So I was responsible for quality assurance and

9    compliance, making sure that we complied with the regulatory

10   requirements for the Central Labs business, as well as our

11   internal procedures.  And so we would -- my team would audit

12   the -- the laboratory and the other support functions to make

13   sure that we were following our -- our defined processes.

14   **Q.**  Okay.  And you -- you moved into that role in March of

15   2015; is that right?

16   **A.**  Say that again?

17   **Q.**  You moved into that role in March of 2015?

18   **A.**  Yes, sir.

19   **Q.**  And the jury has heard some testimony about a gentleman

20   named Hacene Mekerri.  Did you ever report to Mr. Mekerri?

21   **A.**  No.

22   **Q.**  To whom did you report?

23   **A.**  I reported to Jay Dixon.

24   **Q.**  Okay.  And what was Mr. Dixon's title?

25   **A.**  Senior vice president of quality for PPD.

1  **Q.**  Do you know if Mr. Dixon and Mr. Mekerri were essentially

2  peers?

3  **A.**  Um -- yeah, I would say they're -- I would say they were

4  peers.

5  **Q.**  Okay.  But during the time that both you and Mr. Mekerri

6  worked at PPD, you would interact with Mr. Mekerri

7  frequently; is that right?

8  **A.**  That's correct.

9  **Q.**  Okay.  And when did you leave that role that you've

10  described that you started in March of 2015?

11  **A.**  In March of -- yeah, I think it was March of 2019, I --

12  my role was expanded to include all of PPD laboratories, so

13  I -- my agreement changed and somebody else back-filled my

14  role, just as the Central Labs quality leader.

15  **Q.**  Okay.  So that was March of 2019?

16  **A.**  Yes, sir.

17  **Q.**  And was that essentially a promotion?

18  **A.**  Yes.

19  **Q.**  So did you go from having control over just Global

20  Central Labs to all of PPD's labs?

21  **A.**  Yes.

22  **Q.**  And then your role, was that filled by one of your former

23  subordinates?

24  **A.**  It was.

25  **Q.**  And was that Kathy Dick?

1    **A.**  Yes.

2    **Q.**  And when -- at some point in time -- well, strike that.

3          When you first started working at PPD, did you work

4    at the Highland Heights facility?

5    **A.**  Yes, sir.  I started at Highland Heights in March of

6    2015.

7    **Q.**  Okay.  But you had responsibility for the global labs

8    throughout the -- the Global Central Labs throughout the

9    world?

10   **A.**  Yes, sir.

11   **Q.**  And at some point you went remote; is that right?

12   **A.**  Shortly after my role expanded to include the -- all of

13   the labs, I started working remotely there in northern

14   Kentucky.

15   **Q.**  Okay.  And was that -- was that -- in terms of being in

16   northern Kentucky, was that a personal choice?

17   **A.**  Well, part of it was I wanted Kathy to be able to step

18   into her role as the quality leader for the business, and so

19   I needed to back away to give her room to, you know -- just

20   to take ownership of her position.  And I could still, you

21   know, visit the lab and had an office there occasionally.

22   **Q.**  Okay.  And when you went remote, am I right that your

23   time on site dropped to about 10 percent; is that right?

24   **A.**  That's correct.

25   **Q.**  Okay.  Part of your role in -- when you were executive

1    director of quality for the Global Central Labs -- did I get

2    that title right?

3    **A.**   Yes.

4    **Q.**   When you had that role -- that was the role you had in

5    2017 and 2018; is that right?

6    **A.**   That's correct.

7    **Q.**   And part of your role involved investigations of quality

8    control events; is that right?

9    **A.**   Yes.  Of quality events, yes.

10   **Q.**   Okay.  And in that time period, PPD had a -- had a plan

11   in terms of how to address quality events; is that right?

12   **A.**   We had a procedure, yes.

13   **Q.**   It was a sort of carefully defined process in terms of

14   what would happen once a quality event was identified?

15   **A.**   Yes, sir.

16   **Q.**   Okay.  So I just want to take a few minutes and kind of

17   walk the jury through what that procedure was.  So during the

18   time period, there was a daily call to discuss quality

19   events; is that right?

20   **A.**   Yes.

21   **Q.**   And that daily call, that was attended by representatives

22   of various functional groups within the Global Central Labs;

23   is that right?

24   **A.**   Yes.

25   **Q.**   So part of that would include project management?

1   **A.**   Yes.

2   **Q.**   Some of that would include medical folks, like from

3   Dr. Menninger's team?

4   **A.**   I'm not sure what you mean by "medical folks," but yes.

5   I mean, from our -- the scientific affairs, the laboratory.

6   **Q.**   Okay.

7   **A.**   Our sample management team.  All of those support

8   functions would have the opportunity to be present for that

9   daily call.

10  **Q.**   What other functional groups were sort of involved in

11  those?

12  **A.**   I'm sure I'll leave some out, but we have a site services

13  group that managed communications with the clinical sites,

14  sample management, data management, IT, the scientific

15  affairs, quality control, quality assurance.  I think that's

16  probably it.

17  **Q.**   Okay.  And so all these different groups would be able to

18  send someone to participate in this daily call, right?

19  **A.**   Yes.

20  **Q.**   And am I right that during the daily call, any -- any new

21  quality events would be -- would be raised, right?

22  **A.**   That's correct.  Anything that was entered within the

23  last 24 hours would be discussed.

24  **Q.**   Okay.  And that discussion would focus first upon

25  identifying who should investigate the issue, correct?

1    **A.**   That's correct.

2    **Q.**   And how would you go about deciding who should do the

3    investigation?

4    **A.**   Well, it was really, like, where the occurrence, where

5    the quality event occurred as part of our process.  So, you

6    know, if it was an issue with, you know -- in sample

7    receiving, for example, then maybe sample management would

8    take that on.  So for the most part, the attendees would

9    speak up if they recognized that the quality event would have

10   occurred in kind of their area.  And if we made a mistake

11   during that time, incorrect assignment, then there was

12   opportunity to reassign as, you know, later in the process.

13   **Q.**   Okay.  And so would it be fair to say that essentially

14   the group on the call tries to identify the most -- the most

15   appropriate investigator, based upon what's known about the

16   problem at that time?

17   **A.**   Yes.

18   **Q.**   Okay.  And once the investigator is assigned, what is

19   that person supposed to do?

20   **A.**   Well, the -- that person would work with members of my

21   team, other members of operations to complete their

22   investigation.  So with the goal being to identify the root

23   cause of the problem, so that corrective and preventative

24   actions could be established to prevent recurrence of that

25   error.

1    **Q.**  And can you explain for the jury what you mean by root

2    cause?

3    **A.**   Root cause is really an investigational technique to

4    really get at the root of the problem, you know.  If -- you

5    know, if an error occurred in shipping, for example, you

6    know, was -- you know, if a box was dropped, like, well, why.

7    So you keep asking why until you really get to the root of

8    the problem, so you can -- you can employ a corrective

9    measure to avoid that mistake in the future.

10   **Q.**   Okay.  And in terms of root causes for quality control

11   events, sometimes those were just caused by human error,

12   right?

13   **A.**   Yes.

14   **Q.**   Sometimes were they caused by issues in terms of poorly

15   established process?

16   **A.**   Yes.

17   **Q.**   Sometimes were they -- were they IT issues?

18   **A.**   Yes.

19   **Q.**   So there can be lots of potential root causes for a

20   quality control event, right?

21   **A.**   That's correct.

22   **Q.**   And those root causes could have fallen within any one of

23   the various sort of functional responsibilities of the lab;

24   is that right?

25   **A.**   That's correct.

1    **Q.**   So during this -- during this daily call, would there

2    also be a sort of timetable set in terms of when the

3    investigation should be completed?

4    **A.**   Yes.  If I recall at that time, it was generally 30 days

5    for what we classify as minor or major quality events.  And

6    if it was a critical issue, then I believe there was a little

7    bit more time that was allowed to be -- for just the

8    thoroughness that's required.  And I think it was 45 days,

9    but I may be wrong.

10   **Q.**   Okay.  And you mentioned the minor/major/critical.  Was

11   that a sort of rating system that was used to classify

12   quality control events?

13   **A.**   Yes.

14   **Q.**   And could you explain for the jury a little bit in terms

15   of how to distinguish between a minor, major, or critical

16   event?

17   **A.**   So really, it's about the overall impact, the risk

18   associated, if it was a patient safety concern; if it could

19   affect the quality of the result, the accuracy of the result

20   that we are sending back to a treating physician, then it

21   would move higher on that scale.  If it was a sample that was

22   compromised, but yet we had an alternate sample, then it

23   would be minor, because we can recover easily from that type

24   of event.

25   **Q.**   But fair to say that the classification, minor, major,

1  critical, that's done before you even know what the root

2  cause of the problem is; is that right?

3  **A.**  It is and it can change as you learn more about the

4  investigation -- as you dig into the problem more.  So, yeah.

5  **Q.**  Okay.  And the investigator, when he or she is done with

6  the investigation, were they required to do some kind of

7  report?

8  **A.**  I'm sorry, can you repeat the question?

9  **Q.**  Sure thing.

10        When the investigator completed his or her

11  investigation, would there be a report?

12  **A.**  There -- it would end up in a report, yes.  We had a

13  template that they would populate in the -- in the system

14  that we had programmed to, you know, create a final report

15  once -- once all parties were comfortable with the content.

16  **Q.**  Okay.  And that report, that would address root cause?

17  **A.**  Yes.

18  **Q.**  It would address corrective action?

19  **A.**  That's correct.

20  **Q.**  And that report, that would go to the investigator's

21  manager; is that right?

22  **A.**  That's correct.

23  **Q.**  Okay.  And the investigator's manager would be

24  responsible for reviewing the report?

25  **A.**  That's correct.

1   **Q.**  And signing off on it?

2   **A.**  Yes.

3   **Q.**  Okay.  And then after the report was done, that would

4   then go to someone in your organization; is that right?

5   **A.**  Yes, sir.

6   **Q.**  And then they would also review the report, right?

7   **A.**  That's correct.

8   **Q.**  And they would see if they agree with the assessment of

9   the root cause?

10  **A.**  Yes.

11  **Q.**  And if they agree with respect to the corrective action

12  recommended; is that right?

13  **A.**  That's correct.

14  **Q.**  Okay.  You met Dr. Menninger for the first time when she

15  interviewed at PPD; is that right?

16  **A.**  That's correct.

17  **Q.**  And your initial interaction with her was very positive;

18  is that right?

19  **A.**  Yes.

20  **Q.**  You enjoyed the conversation?

21  **A.**  I did.

22  **Q.**  You supported her hiring?

23  **A.**  I did.

24  **Q.**  During the time that you worked with her, you worked well

25  with her; is that right?

1    **A.**  I did, yeah.

2    **Q.**  You found her to be technically very astute and capable;

3    is that right?

4    **A.**  Yes.

5    **Q.**  You found her personable?

6    **A.**  I did.

7    **Q.**  Easy to work with?

8    **A.**  Yes.

9    **Q.**  You thought she was a good listener and partner; is that

10   right?

11   **A.**  That's right.

12          MR. HANNON:  And that's all I have, Your Honor.

13          THE COURT:  All right.  Cross-examination?

14          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

15   BY MR. CURRAN:

16   **Q.**  Good morning, Brent.

17   **A.**  Good morning.

18   **Q.**  Sorry.  I just have to get set up here.

19          So, Brent, could you explain what quality assurance

20   means in the context of the services that PPD Central Lab

21   business provides?

22   **A.**  For -- so quality assurance is really about not only

23   ensuring that we're complaint with the regulatory

24   accountabilities that, you know, we're -- that we're

25   controlled by and that we're governed by, but also just

1   ensuring that, you know, we are providing repeatable, you

2   know -- in the case of, you know, a clinical laboratory, that

3   we're providing accurate results, you know, based on a

4   controlled set of processes that we manage as part of our

5   overall quality system.

6   **Q.**   Okay.  And I think you mentioned, when Mr. Hannon was

7   asking you questions, that you -- that you interviewed

8   Dr. Menninger; is that right?

9   **A.**   I did.

10   **Q.**   Okay.  And when was that?

11   **A.**   It was in mid 20 -- mid 2015.  Sorry.

12   **Q.**   Okay.  And did she seem anxious or nervous to you?

13   **A.**   No.

14   **Q.**   And I think you testified that you recommended that she

15   be hired?

16   **A.**   I did.

17   **Q.**   And then you worked together after that?

18   **A.**   Yes.

19   **Q.**   What kind of things did you work together on?

20   **A.**   Well, one of the first things we worked on together was

21   we were seeking accreditation to -- a clinical laboratory

22   standard referred to as iso 15189, and Dr. Menninger had

23   experience with that.  So she worked closely with my team to

24   create some energy around and excitement around that program.

25   And then just day-to-day stuff, you know, being there at the

1    lab together, you know, quality issues would come up.  You

2    know, we would work together on that.  But just day-to-day

3    business operations, type opportunities we had to engage with

4    one another.

5    **Q.**   Okay.  And I think you testified earlier that you worked

6    with another individual named Hacene Mekerri; is that right?

7    **A.**   I did.

8    **Q.**   And who is Mr. Mekerri, again?

9    **A.**   Mr. Mekerri was our business leader.  So he was -- I

10   don't recall his title specifically, but he was a vice

11   president of the -- you know, Global Central Laboratories.

12   But he was more over the business side of things.

13   **Q.**   And you didn't report to him, correct?

14   **A.**   No.

15   **Q.**   Did Dr. Mekerri ever ask you to provide him with feedback

16   regarding Dr. Menninger's job performance?

17   **A.**   He did.

18   **Q.**   And when was that?

19   **A.**   It was -- I believe it was in late 2017, as we were

20   preparing for our annual performance reviews.

21   **Q.**   Okay.  I'm going to show you now a document that's been

22   marked as Joint Exhibit 427, hopefully, if I can get it to

23   come up here.  And I did.

24           All right.  So do you recognize this document?

25   **A.**   I do.

1   **Q.**   What is it?

2   **A.**   This is an e-mail from myself to Mr. Mekerri in November

3   of 2017 where I responded to his request for feedback on his

4   leadership team.

5   **Q.**   Okay.  And after that blacked-out portion there, there's

6   a bullet point?

7   **A.**   Yes.

8   **Q.**   Is that where you provided your feedback to Mr. Mekerri?

9   **A.**   It is, yes.

10   **Q.**   Okay.  And in the first line you describe your feedback

11   about Dr. Menninger as mixed.  Do you see that?

12   **A.**   Yes.

13   **Q.**   What did you mean by that?

14   **A.**   Well, I had worked with her for a year-plus at that

15   point, two years.  And so I had really positive interactions.

16   But there was also some opportunities I saw for improvement

17   that I wanted to, you know, share with Mr. Mekerri.

18   **Q.**   Okay.  So you wrote, in that first line there, the

19   sentence beginning, "While."  "While I feel that Lisa is

20   technically strong and a very nice amenable person, she has

21   not demonstrated a leadership strength that I would expect.

22   Lisa has been very indecisive on numerous important matters;

23   e.g.; lab training, competency documentation, supervisory

24   responsibilities that have resulted in lingering compliance

25   concerns raised by internal auditors, SLT peers and

1   customers."

2           Do you see that?

3   **A.**  Yes.

4   **Q.**  And could you explain to the jury what you meant by that?

5   **A.**  Yes.  So we -- through that second half of 2017, we had

6   had cases where there were weaknesses in training.  There had

7   been -- what I had discerned to be like kind of a general

8   lack of supervision that led to some quality errors.  And

9   then the lack of follow through and consistently achieving

10  our due dates for not only investigations, but also for

11  commitments that were made across, you know, through that

12  process.  So like a corrective action was planned, a due date

13  would be established, and then we wouldn't consistently hit

14  that date.  And that was really, you know, happening across

15  the board.

16  **Q.**  You also wrote that, "Since her decision to relocate, she

17  has been lackadaisical toward her time on-site in US lab."

18          Do you see that?

19  **A.**  Yes.

20  **Q.**  What were you referring to there?

21  **A.**  Well, the -- following her relocation, I rarely would see

22  her visit the lab, you know, following that relocation.

23  **Q.**  And do you recall approximately when it was that she

24  relocated?

25  **A.**  I think it was in mid 2017.

1   **Q.**   Okay.  And was there any problem with her being really

2   present on site at the lab, in your view?

3   **A.**   Yes.  In her role as the lab director for our New York

4   State Department of Health, there was an expectation that

5   there would be some on-site presence, and that concerned me.

6   **Q.**   Now, these were just your opinions that you expressed

7   here, correct?

8   **A.**   Absolutely, yes.

9   **Q.**   It's possible that other people might have disagreed with

10  them, correct?

11  **A.**   Correct.

12  **Q.**   For example, Dr. Menninger might have disagreed that

13  these were issues for her?

14  **A.**   Yes.

15  **Q.**   But these -- were these your generally held opinions?

16  **A.**   Yes.

17  **Q.**   And you didn't have any animosity towards Dr. Menninger

18  at that time?

19  **A.**   Absolutely not.

20  **Q.**   But you don't have any as you're sitting here today,

21  right?

22  **A.**   No.

23  **Q.**   Okay.  And I think you talked and testified in response

24  to some questions from Mr. Hannon about quality control

25  issues.  Do you recall that?

**A.**   Yes.

**Q.**   Do you recall there being quality control issues in the early part of 2018?

**A.**   Yes.

**Q.**   And did you interact with Dr. Menninger with respect to any of those issues?

**A.**   I don't recall.

**Q.**   Okay.  Were you ever interviewed in connection with an HR investigation into complaints by Dr. Menninger?

**A.**   Yes.

**Q.**   Who interviewed you?

**A.**   Our VP of HR, Ms. Ballweg.

**Q.**   And when was that?

**A.**   I think it was in early spring of 2018.

**Q.**   Okay.  I'm going to show you a document now that's been marked as Joint Exhibit 450.  And this is several pages into the document.

       But so this appears to be the notes by Ms. Ballweg of her interview with you, in May of 2018.  Do you see that?

**A.**   Yes.

**Q.**   Okay.  Now, you didn't play any part in drafting this, correct?

**A.**   No.

**Q.**   But does what's represented as -- so -- under (a), it says "Brent McKinnon," do you see that?

1  **A.**  Yes.

2  **Q.**  And after that, there's some text, and it goes on down

3  for the rest of the page?

4  **A.**  Yes.

5  **Q.**  And does that appear to be what you -- consistent with

6  what you told Dr. -- or Ms. Ballweg?

7  **A.**  Yes, it is consistent, yes.

8  **Q.**  Do you have any reason to believe that this does not

9  accurately reflect what you told Deb Ballweg during your

10  interview with her?

11  **A.**  No, sir.

12  **Q.**  So in the second line, after your name, it begins,

13  "currently lack of accountability by business on working to

14  close events timely."

15         Do you see that?

16  **A.**  Yes.

17  **Q.**  Is that consistent with your views at the time?

18  **A.**  Yes.

19  **Q.**  And what did you mean by that?

20  **A.**  Like I had mentioned earlier, we weren't consistently

21  hitting our due dates for closure of investigations, and

22  furthermore, for -- we weren't closing out the corrective and

23  preventative actions by the commitment dates.

24  **Q.**  And then the next sentence reads, "Hacene, through

25  leadership team meetings, is asking everyone to give this

1   priority and to work towards closing all events timely."  Do

2   you see that?

3   **A.**   Yes.

4   **Q.**   Is that an accurate statement?

5   **A.**   It is, yes.

6   **Q.**   So was Hacene asking everyone at the leadership team

7   meetings to prioritize the quality control issues and to work

8   towards closing them?

9   **A.**   Yes, everyone.

10  **Q.**   And was Dr. Menninger one of those who attended those

11  meetings and whom Hacene was asking to prioritize the issues?

12  **A.**   Yes.

13  **Q.**   And were those others who attended those meetings?

14  **A.**   Yes.

15  **Q.**   And was Hacene asking them to prioritize those issues, as

16  well?

17  **A.**   Yes.

18  **Q.**   I think you testified earlier your boss at the time was

19  Jay Dixon; is that right?

20  **A.**   Yes.

21  **Q.**   All right.  And was he directing you to prioritize those

22  issues in the spring of 2018?

23  **A.**   Yes.

24  **Q.**   And is it fair to say that he was putting some pressure

25  on you to get that done?

1   **A.**  Yes.

2   **Q.**  And at the time of your interview with Ms. Ballweg in the

3   spring of 2018, were you aware that Dr. Menninger had

4   informed the company that she had a disability?

5   **A.**  No.

6   **Q.**  Were you aware that she had asked for accommodations of

7   any kind?

8   **A.**  No.

9   **Q.**  Were you aware that Dr. Menninger had said she suffered

10  from an anxiety disorder or panic attacks?

11  **A.**  No.

12  **Q.**  Had you ever seen her suffer a panic attack?

13  **A.**  No.

14  **Q.**  When did you first learn that Dr. Menninger had said she

15  suffered from a medical condition or disability?

16  **A.**  I believe it was just like a day or two before my

17  deposition, when I had the opportunity to read the complaint.

18          MS. MANDEL:  I don't have any further questions.

19  Thanks, Brent.

20          THE COURT:  All right.  Redirect?

21          MR. HANNON:  Yes, Your Honor.

22          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

23  BY MR. HANNON:

24  **Q.**  Mr. McKinnon, when you were interviewed by Deborah

25  Ballweg in May of 2018, you didn't tell her that the lab

1    problems that have been occurring recently were

2    Dr. Menninger's fault, did you?

3    **A.** No.

4    **Q.** And just looking back at the document, Joint Exhibit 450

5    we were just looking at, the current lack of accountability

6    by business, was there reference just to Dr. Menninger's

7    group?

8    **A.** No.

9    **Q.** That was -- that was across the various functional areas

10   of the lab, right?

11   **A.** That's correct.

12   **Q.** Okay.  And the other functional areas of the lab, those

13   included the groups like sample management, right?

14   **A.** That's correct.

15   **Q.** And the various other groups we talked about early this

16   morning, right?

17   **A.** That's correct.

18   **Q.** Was one of those groups led by Chris Clendening?

19   **A.** Yes.

20   **Q.** Is he here in the courtroom?

21   **A.** Yes.

22   **Q.** Okay.  Is that him behind me?

23   **A.** That is.

24   **Q.** Okay.  I have never seen him before.  That was my next

25   question.

1              Okay.  And with respect to lab issues in 2018, why

2    is it that that -- that that call we talked about earlier

3    happens every single day?

4    **A.**  Well, the -- the triage call, as we refer to it, is

5    important to have those within a timely manner of identifying

6    the occurrence, so that the problem is not exacerbated,

7    meaning you don't experience another occurrence before we're

8    able to put a -- you know, stopgap measure in place, so

9    things can get out of hand if you don't address it with a

10   sense of urgency.

11   **Q.**  But why every single day do you have to have that triage

12   call?

13   **A.**  Same -- the same answer.  I mean, it's -- because we had

14   quality events submitted every day.  I mean, I'm sure there

15   are some exceptions, but -- and as long as there was a

16   quality event, there was a need for a meeting.

17   **Q.**  Do you still have those triage meetings every single day?

18   **A.**  I don't know.

19   **Q.**  Any reason to believe you don't?

20   **A.**  No.

21   **Q.**  With respect to the other issues you raised for

22   Mr. Curran's examination, we also looked at some 360 feedback

23   you had provided to Mr. Mekerri.  Let's take a look at that.

24              All right.  So I'm now showing you Joint

25   Exhibit 427.  This was the 360 feedback we looked at earlier;

1    is that right?

2    **A.**   Yes.

3    **Q.**   So this is from November 29, 2017, correct?

4    **A.**   Well, my e-mail to Mr. Mekerri was on the 17th.

5    **Q.**   Oh.  Thank you.  Sorry about that.  That wasn't -- that

6    wasn't a trick question.  All right.  So November 17, 2017,

7    is when you're giving him this feedback, right?

8    **A.**   Yeah.

9    **Q.**   And do you recall that there was a -- there was an

10   inspection later on this year conducted by the New York

11   State?

12   **A.**   Can you repeat the question?

13   **Q.**   Do you recall there was an inspection conducted later

14   this year -- later -- let me ask a better question.

15          Later in 2017, after you sent this e-mail, New York

16   State did an inspection of the Highland Heights lab; is that

17   right?

18   **A.**   I believe so, yes.

19   **Q.**   And this e-mail that you sent to Mr. Mekerri on

20   November 17, 2017, this partly reflected concerns you had

21   about that upcoming inspection, right?

22   **A.**   Yes.

23   **Q.**   You thought that Dr. Menninger's remote status might be a

24   problem, right?

25   **A.**   I did.

1    **Q.**   PPD passed that inspection, correct?

2    **A.**   Yes.

3    **Q.**   And in fact, Dr. Menninger, she was on-site for that

4    inspection, right?

5    **A.**   I believe so.

6    **Q.**   Okay.  In terms of your comment about Dr. Menninger

7    having been "lackadaisical toward her time on site in US lab"

8    were you aware of what Dr. Menninger's travel schedule had

9    been between the time she went on remote status and November,

10   17 of 2017?

11   **A.**   Not at all.

12   **Q.**   Okay.  You didn't know how much she had been traveling to

13   the other labs that she was responsible for?

14   **A.**   No.  No.

15   **Q.**   And in fact, after you sent this e-mail, Dr. Menninger

16   did travel to Highland Heights for that inspection for New

17   York State, correct?

18   **A.**   I believe so.

19   **Q.**   Okay.  With respect to your comment about "lack of bench

20   level supervision," were you aware of the efforts that

21   Dr. Menninger was making in 2017 to recruit additional bench

22   level supervision?

23   **A.**   I don't recall at this time.

24   **Q.**   Okay.  Do you know who Narine -- and I can't pronounce

25   her last name?

1    **A.**  I do.

2    **Q.**  You know who I'm talking about?

3    **A.**  I do, yeah.

4    **Q.**  Okay.  She was hired in early 2018; is that right?

5    **A.**  I don't -- I'm not sure.

6    **Q.**  Okay.  Do you recall what the role was that she was hired

7    into?

8    **A.**  It was a lab operations leadership role.  I'm not sure of

9    her title.

10   **Q.**  Okay, but essentially sort of an on-site lab operations

11   supervisor.  Is that fair to say?

12   **A.**  That's fair to say.

13   **Q.**  Okay.  And when you wrote this e-mail in November of

14   2017, were you aware that they were trying to fill that

15   position?

16   **A.**  I don't recall.

17   **Q.**  Okay.  Do you know who Dr. Paul Reddy is?

18   **A.**  I do.

19   **Q.**  And who is he?

20   **A.**  Well, he was brought in, I believe, to lead up our

21   molecular section of the lab.  That was his area of

22   expertise.

23   **Q.**  Okay.

24   **A.**  And then he also had some responsibility for our

25   biorepository, so our sample storage area.

1   **Q.**   Do you recall when he was hired?

2   **A.**   I do not.

3   **Q.**   Was it in 2017?

4   **A.**   I don't recall.

5   **Q.**   Do you recall at some point in time, Mr. Reddy, he became

6   the interim CAP director for the Highland Heights lab?

7   **A.**   Yes.

8   **Q.**   And that was shortly after this November 2017 e-mail;

9   isn't that right?

10   **A.**   I don't recall when he became interim director.

11   **Q.**   What does that mean, an interim CAP director?

12   **A.**   Well, it's just while you're waiting on a permanent

13   position to be filled, somebody can -- is qualified to step

14   into those shoes and play that role while you're searching

15   for a permanent director.

16   **Q.**   And when you say CAP director, what does that mean?

17   **A.**   Board certified pathologist that's capable of holding --

18   you know, has the credentials necessary to be designated the

19   CAP lab director, College of American pathologists.  And in

20   our case, for the US lab, also somebody that, you know -- we

21   needed somebody that could be in a similar lab director role

22   for New York State.

23   **Q.**   Okay.  And Mr. Reddy, is he still with PPD?

24   **A.**   I believe so.

25   **Q.**   But back in 2017/2018, did he -- he worked at Highland

1    Heights, right?

2    **A.**  Yes.

3              MR. HANNON:  Okay.  That's all I have, Your Honor.

4              THE COURT:  Any recross?

5              MR. CURRAN:  No, Your Honor.

6              THE COURT:  All right.  Thank you very much,

7    Mr. McKinnon, you're excused.

8              THE WITNESS:  Thank you.

9              THE COURT:  Next witness?

10             MR. HANNON:  Chris Clendening.

11             (The witness was duly sworn.)

12             THE DEPUTY CLERK:  Can you please state your full

13   name and spell your last name for the record?

14             THE WITNESS:  Chris Evan Clendening.

15   C-l-e-n-d-e-n-i-n-g.

16             THE COURT:  Have a seat.

17             Go ahead, Mr. Hannon.

18             MR. HANNON:  Thank you, Your Honor.

19                        **CHRIS E. CLENDENING**

20        having been duly sworn, testified as follows:

21        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

22   BY MR. HANNON:

23   **Q.**  Mr. Clendening, where are you from and what do you do?

24   **A.**  I'm from Cleves, Ohio and I'm the SVP of labs for PPD

25   Global Central Labs, division of Thermo Fisher.

1  **Q.**  Do you live in Ohio presently?

2  **A.**  I do.

3  **Q.**  And you said you're a senior vice president of Global

4  Central Labs?

5  **A.**  Correct.

6  **Q.**  Is that the position that Hacene Mekerri used to fill?

7  **A.**  Yes.  In essence, yeah.

8  **Q.**  Okay.  You say, "In essence," is it different now

9  somehow?

10  **A.**  Yeah, so it's a little bit different in that at the time

11  Hacene had purview over the Central Lab and part of what we

12  call the vaccines lab.  My purview is only with regard to the

13  Central Lab.

14  **Q.**  Okay.  So your role is a little bit narrower than

15  Mr. Mekerri's?

16  **A.**  Yeah.  Specific to Central Lab, yeah.

17  **Q.**  Okay.  And how many folks do you have that report to you?

18  **A.**  About 10, 12.

19  **Q.**  Okay.  And does that include the medical director for the

20  Global Central Labs?

21  **A.**  It does.

22  **Q.**  And who's that?

23  **A.**  Dr. Kashlan.

24  **Q.**  And where does Dr. Kashlan live?

25  **A.**  He lives in Highland Heights, Kentucky.

1   **Q.**   Okay.  And when did you move into your role as senior

2   vice president of Global Central Labs?

3   **A.**   That would have been April-ish of 2019.

4   **Q.**   And how did that come about?

5   **A.**   Dr. -- or Mr. Mekerri resigned and, at the time, I was

6   positioned for that role.

7   **Q.**   I'm sorry, you said you were positioned for that role?

8   **A.**   Yeah, so I've been -- you know, I've been working up

9   through the organization.  I've been with the organization 17

10  years, and so, you know, I was kind of in a role there, on a

11  leadership role that would be then kind of the next step

12  would be moving into that role.

13  **Q.**   Okay.  And what was your position before you -- you moved

14  into the SVP role?

15  **A.**   I was executive director of project management and

16  project design.

17  **Q.**   And you reported to Mr. Mekerri?

18  **A.**   I did.

19  **Q.**   And who -- is there someone that took your place as

20  executive director of project management and project design?

21  **A.**   Yes.  So there was -- we ended up putting -- I think at

22  that time, Olivia -- or Carolyn Jackson was put into that

23  role for project management and project design.

24  **Q.**   And what does that role -- what is the executive director

25  of project management and project design do?

1     **A.**   So it's an executive -- it's an executive director level

2     within the labs, so they're all kind of titled ED of labs.

3     And then each division within the lab then has, essentially,

4     an addendum that describes your positions.  And for project

5     design and project management, if I kind of give you the high

6     level, what that is, I'll start with project design.  So when

7     you receive a protocol from the client, which outlines the

8     general, how the study is going to work, how patients are

9     going to be recruited, all those types of things, we take

10    that protocol, and we translate that protocol into our IT

11    systems.  Those IT systems then drive kit production that's

12    going to go out to sites and collect the blood samples from

13    the patients, the logistics.  All of those types of things

14    are going to come back in and get tested and that's what the

15    project design group did.

16            And then their project management was day-to-day

17    operations of managing at sort of a client level.  During

18    a -- during a clinical study, what you will see is typically

19    there's a weekly meeting that is set up.  They have those

20    meetings.  You're having that meeting with a client or a

21    larger CRO.  And the project management of the labs is really

22    to make sure are we getting the kits out to the patients, the

23    patients are getting the correct kits, they're getting their

24    correct samples done, getting those put back into the lab,

25    and then receiving all of those.  So they're sort of the

1    conductor of the train yard, as it were.

2    **Q.**   Okay.  So in your current role, you have Dr. Kashlan

3    reporting to you.  You have a person who serves as this

4    executive director of project management and project design;

5    is that right?

6    **A.**   Correct.

7    **Q.**   And you heard Mr. McKinnon's testimony about the sort of

8    different functional groups represented at those daily calls?

9    **A.**   Yup.

10   **Q.**   Are there other folks that report to you that sort of

11   oversee those different functional groups he was alluding to?

12   **A.**   Yes.

13   **Q.**   And what are they?

14   **A.**   So if I go through the functional groups as they exist,

15   so you've got project management and project design, which I

16   described.  You'll have a data management group, so they're

17   responsible for transferring the data back to the client.

18   You have an operations lead.  That operations group consists

19   of multiple departments within operations and that would be

20   what you heard, sample management, so the people that are

21   responsible for collecting the samples when they come through

22   the door.  You had a GSS group, which is global site services

23   group.  They're really for interacting with the sites at that

24   level.  And by sites, so I clarify that, that's the doctor's

25   office, right?  So they're interacting with the doctor's

1    office to make sure that they're getting all the right data

2    and all of that type of stuff is going on.  You've got a

3    biorepository, which is in sample management as part of this

4    whole piece.  You also have kit production and logistics,

5    which is under operations, as well.  So that's manufacturing

6    that blood collection kit and getting it out.

7            The next group would be somebody like IT.  So IT

8    would be represented in that group.  Of course, quality

9    assurance would be there.  And then you've got the clinical

10   lab operations, which would be Dr. Kashlan's group, or --

11   just to make that distinction, when you talk about Global

12   Central Labs, that's a huge umbrella, but there's a -- the

13   core function is the laboratory function, which is a clinical

14   lab division.  So that's how all those groups would be kind

15   of stacked up around the Global Central Lab.

16   **Q.**  Okay.  And in terms of all of those functional areas that

17   you described, they all kind of work together in terms of the

18   functioning of the Global Central Labs?

19   **A.**  Absolutely.  And they're intimately interconnected.

20   **Q.**  Okay.  And since taking over as senior vice president of

21   Global Central Labs, do there still, on occasion, occur

22   quality control events?

23   **A.**  Sure.  Yup.

24   **Q.**  That daily triage call that Mr. McKinnon testified about,

25   does that still happen as of today?

1  **A.**  Yeah, unless there are no events, so there's no need to

2  have a call, if there's no events, right?

3  **Q.**  Okay.  But as of today, March whatever it is, 2023, no

4  one has yet succeeded in eliminating all of quality control

5  events within the Global Central Labs; is that correct?

6  **A.**  That is correct.

7  **Q.**  Dr. Kashlan, when did he first start working for PPD?

8  **A.**  I believe he was officially hired somewhere in the April

9  of 2019 time frame.

10  **Q.**  When did he first start working for PPD?

11  **A.**  Same.  April of 2019.

12  **Q.**  Okay.  He was working as a contractor before that?

13  **A.**  No.  Not that I'm aware of.  I think that we interviewed

14  him and then brought him on board.  And the only time -- the

15  only delay that I know in that was between the time that he

16  was moving from California to the Highland Heights office.

17  **Q.**  Do you recall who was filling his role before then?

18  **A.**  Dr. Reddy was acting CAP director.

19  **Q.**  With respect to Dr. Menninger, you learned in February of

20  2018 that Dr. Menninger had a -- had requested

21  accommodations; is that right?

22  **A.**  No.

23  **Q.**  When's the first that you learned that Dr. Menninger had

24  requested an accommodation?

25  **A.**  So the first I learned about the accommodations and the

1    details around those accommodations was only a few months

2    ago.

3    **Q.** You didn't get an e-mail from Chad St. John in February

4    of 2018?

5    **A.** I did.  I've subsequently seen that e-mail.

6    **Q.** Okay.  You've seen it since.  Did you see it then?

7    **A.** I did not.

8    **Q.** Do you believe that it just didn't go in your e-mail box

9    or you overlooked it?

10   **A.** It's completely possible that I overlooked it.

11   **Q.** Was it your practice to watch your e-mail box carefully?

12   **A.** Yeah.  On a daily basis, I triage e-mails and kind of

13   move those around, figure out what I'm going to work on on

14   that day.

15   **Q.** But you think that one you just overlooked?

16   **A.** Yeah, I don't recall receiving that e-mail.

17   **Q.** As Dr. Kashlan's supervisor, you're familiar with his

18   compensation?

19   **A.** Yes.

20   **Q.** How is he currently compensated?

21              MS. MANDEL:  Objection.

22              THE COURT:  How?  Like just the categories?

23              MR. HANNON:  We'll start there, yes.

24              THE COURT:  Overruled to the extent you're

25   objecting to the categories.

1          THE WITNESS:  So there's a base pay.  There would

2     be a bonus.  Depending on how he's performing, there could be

3     a merit increase at the end of the year for the subsequent

4     year.  And then there's some gradation of options in there

5     that I'm sure that he would receive.

6     **Q.**   Okay.  When you say "options," would that be some kind of

7     an equity component to his compensation?

8     **A.**   Yeah, like a stock option.

9     **Q.**   Okay.  Are you familiar with the stock options that

10    Dr. Kashlan has received in connection with his work as the

11    medical director for Global Central Labs?

12          MS. MANDEL:  Objection.

13          THE COURT:  You're asking about right now?

14          MR. HANNON:  Yes.

15          THE COURT:  Sustained.  He worked for Thermo

16    Fisher.

17          MR. HANNON:  That's not the testimony.

18          THE COURT:  He testified that he works for Thermo

19    Fisher.  You're asking him right now about the compensation

20    scheme right now, right?

21          MR. HANNON:  Yes.

22          THE COURT:  I thought he did.

23          Did you testify that you're now employed by PPD as

24    a division of Thermo Fisher?

25          THE WITNESS:  Correct.

```
 1              MR. HANNON:  It's still PPD.

 2              THE COURT:  Yes.

 3              MR. HANNON:  Just because they're under the Thermo

 4    Fisher umbrella doesn't make them no longer PPD.

 5              THE COURT:  Correct.  But for relevance -- I got to

 6    get at least for relevance purposes, you need a foundation

 7    before you get to the -- well, you just want to find out what

 8    the options are right now?

 9              MR. HANNON:  In the same position that

10    Dr. Menninger had, as it exists today, what's the

11    compensation?

12              THE COURT:  All right.  I see what you're saying.

13    Okay.  I'll let you have that, but I still think there's a

14    connection issue.

15              Go ahead, I'll overrule that for now.  You can

16    answer -- why don't you ask the question again.

17    BY MR. HANNON:

18    Q.  Do you know what the equity package is that Dr. Kashlan

19    has today?

20    A.  I do not.  I do not know how those stock options are

21    allocated.

22    Q.  Okay.  Working backwards a bit, at the time that PPD was

23    acquired by Thermo Fisher, was there an award of equity to

24    Dr. Kashlan then?

25    A.  If he had been allocated any stock options under the PPD
```

```
 1    and he held those, then, yes, there would have been, because
 2    it was a direct transition.
 3    Q.  Okay.  So people who had stock options prior to the
 4    acquisition by Thermo Fisher, those, in some respect, got
 5    transferred into options for --
 6    A.  No.  No.  No, no, no.  It was a hard line.  So anything
 7    that was -- that you had had prior to the acquisition was
 8    cashed out and done.  That was it.
 9    Q.  Okay.  So anything prior to the acquisition was cashed
10    out, right?  And then was --
11              MS. MANDEL:  Objection.
12              THE COURT:  What's the objection?
13              MS. MANDEL:  This is going far afield from anything
14    that relates to the time period when Dr. Menninger was
15    employed.  And we're now --
16              THE COURT:  Overruled.
17    BY MR. HANNON:
18    Q.  Okay.  So the old stuff got cashed out.  Was there a --
19    was there a new reward of equity?
20    A.  There's probably a performance award in there or a time
21    award in there.  I don't know what that award, the equity
22    award bucket is or what it looks like.
23    Q.  Okay.  You mentioned base pay.  What's Mr. Kashlan's base
24    pay currently?
25              MS. MANDEL:  Objection.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  I think he's in the range of 275.

3    BY MR. HANNON:

4    **Q.**  Do you know what his most recent bonus was?

5    **A.**  He probably would have been in the range of 30 to 40.

6    **Q.**  You say probably.  Are you sure about that?

7    **A.**  It's the best of my recollection.  I have to review all

8    of those, a thousand peoples worth of stuff at the end.  So I

9    get that all rolled up to me, and I have to review all of

10   those, but I think that's roughly about right.

11   **Q.**  Has compensation for that role, the medical director of

12   the labs, has that generally gone up, stayed the same, or

13   gone down since the time that you've been SVP of Global

14   Central Labs?

15   **A.**  So for the time that I've been in that role, it's been

16   about the same.  I mean, you get year on year merit

17   increases, but generally what the market bears is right

18   around that level.

19   **Q.**  And you were -- you had a role as executive director of

20   labs -- well, strike that.

21          I think you mentioned earlier -- and please tell me

22   if this is right -- that your sort of categorization within

23   the PPD structure, prior to your promotion, was executive

24   director of labs.  Did I hear that right?

25   **A.**  Correct.

1    **Q.**  Okay.  And that was a sort of -- that sort of didn't

2    describe your functional responsibility, but that's kind of

3    the categorization by PPD; is that right?

4    **A.**  Yeah.  So the level is really the hierarchy.  Right?  And

5    then you had your -- essentially your swim lane or your lane,

6    part of the business that you were in.

7    **Q.**  Okay.  And you were aware that Dr. Menninger, she was

8    also categorized as executor director of labs, right?

9    **A.**  Correct.

10   **Q.**  Okay.  As executive director of labs, you had a -- you

11   had a compensation package in that role, correct?

12   **A.**  Correct.

13   **Q.**  Okay.

14          MR. HANNON:  Your Honor, I think I have enough

15   foundation at this point to ask the question that I want to

16   ask next, but you asked me to flag it for you.

17          THE COURT:  You can go ahead and ask and I'll see.

18          MR. HANNON:  Sounds good.

19          So pause for your answer here and we'll see what

20   the Judge does with it.

21   BY MR. HANNON:

22   **Q.**  When you were the executive director of labs, you had

23   stock options, right?

24          THE WITNESS:  Can I answer?

25          THE COURT:  Take a pause.  I'll see you both at

1   sidebar just to clarify.

2           (Bench conference concluded.)

3           THE COURT:  So why can't he -- I guess the -- why

4   can't he answer this?

5           MS. MANDEL:  So there's absolutely no evidence on

6   the record or that could be introduced that their

7   compensation packages were relatable, that they were hired

8   with similar basis for compensation.

9           THE COURT:  I guess it does establish that it is --

10  that the compensation packages were related to their level,

11  as opposed to the individualized.

12          So as to the medical director, it's the same

13  position.  That's why I let that in.

14          MS. MANDEL:  He's not a medical director.

15          THE COURT:  But, right, he's not the medical

16  director.  So I think you should ask, like, we don't really

17  know how they -- I think -- something to suggest that he

18  believes or he knew that the compensation was, like, level.

19  He was at the same level at that time as Dr. Menninger.  He's

20  testified to that, executive director level, but he hasn't

21  testified that their compensation packages -- or particularly

22  what you focused on was the options and stocks, right?

23          MR. HANNON:  Right.

24          THE COURT:  That the options and stocks were

25  somewhat on a level basis, as opposed to individualized.

1          MS. MANDEL:  Your Honor, there's also the evidence

2     in the record that he's been employed by the company for a

3     lot of years, a lot of years longer than Dr. Menninger.  We

4     have no evidence as to the background of how compensation

5     levels was set, how equity was set.  This is all totally

6     speculative.  It's not information that's been established in

7     any way thus far.

8          MR. HANNON:  Well, I've got to build to it, right,

9     and the first question I have to ask is whether or not he had

10    stock options.

11         THE COURT:  And then I -- well, I think the first

12    question is not whether he had options, I think the first

13    question is whether he understands the -- well, I guess you

14    can ask him whether he had stock openings, yes or no, sure.

15    But the real question is does he know how -- for example, if

16    he says no, this isn't necessarily relevant to Dr. Menninger,

17    because the question is -- it's not evidence that she did,

18    but the real question, referring to Dr. Menninger, is what is

19    his understanding of how the compensation packages were set,

20    and were they set in a way that was class based, and what

21    were the factors that influenced it, so the jury, assuming

22    you get what you need, can infer it's what she had, right?

23    That's what you're looking for, isn't it?

24         MR. HANNON:  I don't think I need to show a perfect

25    apple-to-apples match.

1           THE COURT:  No.

2           MR. HANNON:  Right.

3           THE COURT:  But what do you want him to infer from

4    his testimony?  What do you want them to draw from this

5    testimony?

6           MR. HANNON:  It depends on what he knows, right?

7    You know, he might have information concerning what those

8    options that she had were worth.  He might have information

9    in terms of, you know, what they would have turned into or if

10   they would have gone to --

11          THE COURT:  So I guess there's two different

12   questions, what are they worth, and what might she have.

13          MR. HANNON:  Yeah.  Right.

14          THE COURT:  You can ask him about -- I think you

15   can -- you've established enough that you can ask him

16   questions about what they might be worth.

17          MR. HANNON:  Right.

18          THE COURT:  As to things that relate to what she

19   might have, I don't know that you have any basis that he

20   would know, necessarily -- I'm not saying he doesn't, but I

21   don't understand he has any basis to even know that as to

22   that time, which would be relevant.

23          MR. HANNON:  Understood.

24          MS. MANDEL:  Your Honor, I think there's still also

25   no basis from which the jury could infer and I think it could

1    confuse the jury that there's any correlation between, not

2    only base compensation or bonus, but also whether his equity

3    is relatable to his position.  They're --

4            THE COURT:  But he's not asking so much about how

5    much equity he has.  I don't think it's particularly relevant

6    how much equity he has, it's relevant as to what he knows

7    about either the price or about how it's ordered.  And if

8    it's ordered to a class base -- I mean, a level base is like

9    executive director.  Because that's what would be relevant.

10   Just he may -- not particularly.  I mean, there are too many

11   distinguishing factors between him and her that don't really

12   have much meaning to how -- as executive director.  Like he

13   wasn't the same level, but he's not an MD, I assume.

14           MS. MANDEL:  And their type of hire was completely

15   different.

16           THE COURT:  And so I don't know, like -- and you

17   already have information that goes to her compensation here,

18   but the relevant comparator.  The real issue is the stocks

19   and the options, I think, is what's driving it.

20           MR. HANNON:  Okay.  I think I have it clear sort of

21   picture of where you're wanting me to go.

22           (Bench conference concluded.)

23           THE COURT:  Go ahead.

24           MR. HANNON:  Thank you, Your Honor.

25   BY MR. HANNON:

1    **Q.**  So Mr. Clendening, when you were in that EVP -- I'm

2    sorry, when you were that ED of labs category, you were

3    awarded stock options; is that right?

4    **A.**  Correct.

5    **Q.**  Okay.  And you had -- do you recall the stock options

6    being broken up into Chapter 1 and Chapter 2?

7    **A.**  Yeah, I believe.

8          MS. MANDEL:  Objection.

9          THE COURT:  Overruled.

10          You can answer.

11    BY MR. HANNON:

12    **Q.**  And the Chapter 2 -- the Chapter 1 options, they had been

13    awarded some time in the 2015-'16 time frame; is that right?

14    **A.**  I don't recall the exact dates, but --

15    **Q.**  Okay.  And the Chapter 2 options, those came about

16    because there had been a -- within like a restructuring of

17    some sort; is that right?

18    **A.**  Correct.

19    **Q.**  Okay.  And I'm going to show you a document here, which

20    the jury saw a while back.  So this is Joint Exhibit

21    Number 33.  And I got to plug my thing in here.  I'm sorry.

22    And if you see here, these are options granted in July of

23    2017.  Do you see that?

24    **A.**  I do.

25    **Q.**  Okay.  And I'm going to show you -- well, the top here,

1    "Eagle I" options, do you see that?

2    **A.**  I do.

3    **Q.**  Do you recall that being the Chapter 2 options?

4    **A.**  I don't recall whether that was Chapter 2 or Chapter 1.

5    **Q.**  Okay.  I'm going to show you Joint Exhibit 35 and I'll

6    see if that refreshes your recollection.

7         So you see here, we have a document showing options

8    with a grant date of December 29, 2015.  Do you see that?

9    **A.**  Uh-huh.  Yes.

10   **Q.**  And you see these are called, "X-Co options."  Do you see

11   that?

12   **A.**  Yes.

13   **Q.**  Okay.  So would you agree with me, these are the Chapter

14   1 options and the Eagle I options are the Chapter 2 options?

15   **A.**  Yes, but I don't recall them being called "X-Co options,"

16   but...

17   **Q.**  Okay.  And in your role as ED of labs, did you have

18   Chapter 1 and Chapter 2 options?

19   **A.**  Yes.

20   **Q.**  Okay.  When PPD went public, what happened to your

21   Chapter 1 options?

22   **A.**  I don't recall how they handled those, whether they

23   rolled those over.  But there was no -- there was -- let me

24   think about that.  There may have been some pay out of those

25   at that time, if I recall.

1   **Q.**   Okay.  Do you have any knowledge or information
2   concerning the -- the value of those options at that time?
3   **A.**   No, I don't.
4   **Q.**   Okay.  Do you recall how many -- how many Chapter 1
5   options that you had at the time of the -- at the time PPD
6   went public?  Just a yes or no question first.
7   **A.**   I do not recall.
8   **Q.**   Okay.  And same question with respect to Chapter 2
9   options.  So let me show you P-94.  Do you have any knowledge
10  or information concerning what the Chapter 2 options were
11  worth at the time of PPD going public?
12  **A.**   No, I do not.
13  **Q.**   Okay.  Do you know how many Chapter 2 options you had?
14  **A.**   I do not.
15  **Q.**   You see here that Dr. Menninger had 25,660.  Do you see
16  that?
17  **A.**   I do.  About 25,000?
18  **Q.**   I'm sorry, it could be 25,000?
19          THE COURT:  I couldn't hear you.
20          THE WITNESS:  You said 25,000 -- oh, you're saying
21  the total options granted.  I was looking at the vested.
22          MR. HANNON:  No worries.
23  BY MR. HANNON:
24  **Q.**   To your recollection, is that approximately how many you
25  had?

1    **A.** I don't --

2            MS. MANDEL:  Objection.

3            THE COURT:  Sustained.

4    BY MR. HANNON:

5    **Q.** To your knowledge, did ED of labs, did that position

6    generally have equivalent equity packages?

7    **A.** I don't know if that's the case or not.

8    **Q.** Okay.  Currently, do folks at the ED of labs level have

9    equivalent equity packages?

10   **A.** I do not know if they do.

11   **Q.** Subsequent to -- well, strike that.

12           Were you still in -- in the ED of labs role when

13   PPD went public?

14   **A.** Yes.

15   **Q.** And at the time that PPD went public and you were in that

16   ED of labs role, did you receive any additional equity?  Just

17   yes or no.

18   **A.** I don't recall.

19   **Q.** Okay.

20           MR. HANNON:  That's all I have, Your Honor.

21           THE COURT:  All right.  Any cross-examination?

22           MS. MANDEL:  Yes.

23           THE JUROR:  I actually have a question.

24           THE COURT:  Sure.  I'll take it.

25           THE JUROR:  Just a little context, just to

1    understand the timeline.

2              THE DEPUTY CLERK:  Okay.  So part of it is a

3    question for the witness and part of it is for -- question, I

4    guess, for the two of you, why don't you -- Ms. Belmont will

5    let you take a look at it and I think the first

6    question is -- if you wish to ask --

7              THE JUROR:  The top part.

8              THE COURT:  Right.  The first part is the question

9    for the witness and I think -- you can take a look at it.

10   The first part seems like a perfectly permissible question to

11   me, if the two of you are amenable.

12             I think the second part is informational for the

13   two of you.

14             MR. HANNON:  If I may, I'll follow-up on that.

15             THE COURT:  The question, the first question.

16             MR. HANNON:  Yes.

17             THE COURT:  Go ahead.

18             We'll take that back.

19             If you want to look at it -- you can keep it for

20   now, Ms. Mandel.

21             MS. MANDEL:  I just wanted to write it down.

22             THE COURT:  Okay.  Go ahead.

23   BY MR. HANNON:

24   **Q.**  So you took over for Mr. Mekerri in April of 2019 you

25   said; is that right?

1    **A.**   Yeah, I think that's when I officially took the role.  He

2    had left prior to that.

3    **Q.**   Okay.

4    **A.**   He had left the organization -- I remember when he left.

5    I don't remember the exact day, but I remember when he left

6    because -- so that would have been in the -- probably in the

7    January/February time frame, I think, is when he left, only

8    because I remember having to do the merit bonus pool cycle to

9    get that completed in a timely manner for that to roll out.

10   So it would have been in it a time frame.  It could have

11   been -- I guess it could have been as late as February/March

12   time frame, but that's when he left.

13   **Q.**   But that's 2019?

14   **A.**   '19.

15   **Q.**   Right.  Okay.

16   **A.**   Yes.

17   **Q.**   The prior February, so February of 2018, Mr. Mekerri, he

18   hadn't left yet, right?

19   **A.**   Correct.

20   **Q.**   Okay.  Had you taken over any of Mr. Mekerri's

21   responsibilities as of that date?

22   **A.**   No.  Other than -- so if you're talking about what my

23   responsibilities were?

24   **Q.**   No, I'm asking about whether or not you had taken on any

25   of Mr. Mekerri's responsibilities, had you?

1    **A.**   No.

2    **Q.**   Had you started to transition into Mr. Mekerri's role as

3    of that date?

4    **A.**   No.

5    **Q.**   Was there some interim role that you had taken on as of

6    that date?

7    **A.**   I did take on additional -- so you're talking about

8    spring of 2018?

9    **Q.**   February of 2018?

10   **A.**   Yeah, I took on additional roles there, in February of

11   2018.

12   **Q.**   What were those additional roles then?

13   **A.**   So I took on what was called the North American site head

14   role.  And so that role was really to try to help and

15   buffer -- so having three locations and having communication

16   across all of those locations was tough.  And you had quality

17   issues, quality events, investigations that were going on.

18   So you really needed a site head for a North America, site

19   head for EU, a site head for APAC, and so I had taken on that

20   role as a site head for North America.

21   **Q.**   Okay.  And did you have folks that reported to you in

22   that role?

23   **A.**   No, it was purely a title role.  It was a dotted line,

24   having conversations with different folks.

25   **Q.**   Did you have any supervisory responsibilities over

1    Dr. Menninger in that capacity, in that role?

2    **A.**   No.

3    **Q.**   Did that role require you to have knowledge of any

4    disability she might have?

5    **A.**   No.

6    **Q.**   Did that role require you to have knowledge of any

7    requests for accommodations she had made?

8    **A.**   No.

9         MR. HANNON:  And that's all I have.

10        THE COURT:  All right.  Ms. Mandel.

11        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

12   BY MS. MANDEL:

13   **Q.**   Good morning, Chris.

14   **A.**   Good morning.

15   **Q.**   You testified a little while ago that you live in Ohio.

16   Did I get that right?

17   **A.**   Yeah.  So if you think about where the Central Lab is, in

18   Highland Heights, Kentucky, nobody knows where that is, so

19   that's actually across the river from Cincinnati, Ohio, so

20   it's right within the Kentucky, Ohio, and --

21   **Q.**   And I -- I heard you say that you do work daily in the

22   Highland Heights location?

23   **A.**   I do.

24   **Q.**   Is that right?

25        And how long have you worked for the company?

**A.**   17 years.

**Q.**   Can you please describe for the jury, so that we
laypeople can understand, what type of work is done out of
Central Labs in Highland Heights?

**A.**   So the primary focus, beyond all, is the clinical
laboratory testing.  So that is akin to if you went to your
doctor's office, you got a blood sample taken, you go, you
get your cholesterol back, you get all of those kind of
stats, that's the type of testing that we do.  It's a little
bit more in depth in that, in that we're looking for
particular markers that may show, you know -- that have
safety concerns, so liver enzymes would be a perfect example
for that.  You're looking for those types of markers, and
reporting those back to the physician, so that they can
provide care to their patient.  That's the primary focus of
the Central Lab.  But under that umbrella, there are multiple
departments or wrap-around services that then help us
actually obtain those samples.  We mentioned the project
management, the project design, they're setting up all of
that protocol.  And then there's kits that are being produced
that are specific to that protocol.  There's kits that are
then going out to the doctor's office.  That's part of your
logistics team and your operations team.  The samples are
being collected at the doctor's office.  Again, those are
coming back through the logistics team.  They come in through

1   the sample management team.  They're accepting those samples.

2   Those samples are then passed off and transitioned to the

3   clinical laboratory division within Central Lab.  They test

4   and run those samples.  Those results are then reported back

5   out to the doctor so that he can look at those and say, okay,

6   this is how it's going.  And then when the whole trial is

7   over, there's a data management team that takes all of that

8   data that's been collected through the entire trial, and we

9   pass that over to the client, which is typically a pharma

10  company, and they use that data to submit to the FDA to say

11  this is our drug.  We feel it's safe.  You know, here's all

12  the data that we have around that.  And there's also data --

13  our primary focus is around whether that's safety, but there

14  are other pieces of that that would say, well, is there an

15  efficacy here, right?  So is the drug doing what it's

16  supposed to do.

17  **Q.**  Can you describe the physical setup of the lab building

18  in the Highland Heights?

19  **A.**  So it's two floors.  But beyond that, it's really -- it's

20  really divided into office space, clean area, as we call it,

21  and dirty area.  And the dirty areas would be places where

22  you have to wear personal protective equipment.  You got to

23  remember that there's blood samples, urine samples, all kinds

24  of samples that are coming in there.  You have to assume that

25  those are infectious, right?  So there's infection and

1    control measures.  So there's dirty areas of the building and

2    then there are clean areas of the building.

3    Q.  And the clean area of the building, that's where there

4    are offices?

5    A.  Yes.

6    Q.  Do you have an office in that area?

7    A.  I do.

8    Q.  Who else has an office in that area of the building?

9    A.  So if I think down the wall, currently as it stands, so

10   you have Narine, who is the senior director, which she was

11   mentioned earlier.  She's a senior director of the lab.

12          We have a temporary office that gets shared between

13   a couple of folks from operations and from data management,

14   they're sharing that office, because we've run out of space.

15   Dr. Kashlan's office is there.  I'm trying to think if there

16   are any other offices available.  We have a facilities office

17   right there.  We have a health and safety person that's on

18   site in their offices there.  And then we have some general

19   offices that people can kind of pop in and out of.

20   Q.  In the lab space that you described, again, for us

21   laypeople, who is working in the lab, and what are they doing

22   on a daily basis?

23   A.  Mostly people that are working in the lab are -- really

24   from a supervisory level down.  So you do have some

25   supervisors that are spending time at the bench, and by

1   bench, I mean, you know, they're running samples.  And then

2   most of the other folks would be med techs or lab assistants.

3   **Q.**  Are any of those folks doctors?

4   **A.**  No.

5   **Q.**  Let's look at an organizational chart from the time

6   period of 2018.  You have in front of you -- this is a

7   document that's marked as agreed Exhibit 17.  Do you

8   recognize this document as an organizational chart from

9   around the time period of 2018?

10  **A.**  I do.

11  **Q.**  Can you please explain for us what is depicted in this

12  organizational chart?

13  **A.**  Yes.  So the -- I mean, we can go to the top level, David

14  Simmons and Bill Sharbaugh.  Those were the parent -- PPD

15  part of the organization, and then the PPD organization was

16  split into a lab services group and kind of nonlab services,

17  so Chris Fikry was over at the lab services group.  He

18  oversaw all of the divisions of labs that we had.  And then

19  Hacene Mekerri would have been over, as the VP of Global Lab

20  Services at that time, was over the Central Lab.  And you can

21  see all the folks, and I'll kind of go through those, left to

22  right, myself, Els Pluymers, Esther E.  All of those

23  divisions are -- even though they're monikered as ED of the

24  labs, they all have their swim lane, or they were their own

25  division.

1              For me, at the time, I would have been over project

2     management, project design.  Els would have been over

3     operations.  Esther headed up the APAC group.  John would

4     have been over data management.  Lisa would have been over

5     the clinical laboratory piece.  Megan would have been the

6     executive admin.  And then Pierre Joliceur was on the

7     vaccines, so it was a different business unit from Central.

8     **Q.**  And just for all of our edification, I know you said

9     Esther E. was over APAC.  Was that Asia Pacific?

10    **A.**  Oh, yes.  So that would have been our Singapore lab and

11    our China lab.

12    **Q.**  And you mentioned this, Chris, that a few of the folks on

13    that organizational chart, including you and Els and

14    Dr. Menninger, all have that title listed there as ED of

15    labs, or ED labs?

16    **A.**  Uh-huh.

17    **Q.**  Does that mean you all had the same job?

18    **A.**  No.

19    **Q.**  In what ways were your jobs distinguished?

20    **A.**  So really it was around the experience that you either

21    had to fulfill that role, or your credentials.  That's really

22    how it kind of boiled down.  So you know, there were distinct

23    lines within the business.  For me, project management, and

24    prior to this org chart, I had run operations, so I had --

25    Els and I were switched in 2017.  But in general, it really

1    depended on what your experience level was, to whether you

2    could fulfill the requirements of that job.  The one

3    exception of that would have been, really, around the

4    clinical lab division.  That is specially credentialed,

5    right?  You have to be credentialed with CAP, CLIA, iso -- we

6    won't go into iso, but New York State.  But all of those

7    credentials were necessary to be the lab director of the

8    clinical diagnostic.

9    **Q.**  And when you say "lab director," that's that swim lane

10   under Dr. Menninger's name?

11   **A.**  Correct.

12   **Q.**  And are you a medical doctor?

13   **A.**  I am not.

14   **Q.**  And safe to say you were not a medical doctor in

15   2017/2018?

16   **A.**  I am -- nope.

17   **Q.**  And to your knowledge, was Els a medical doctor in 2017

18   to 2018?

19   **A.**  No.

20   **Q.**  I'm going to show you a different document now, Chris.

21   This is a job description, Chris.  It should be showing up in

22   front of you, it says "ED labs"?

23   **A.**  Uh-huh.  Yup.  I see it.

24   **Q.**  Thinking back to that time period of 2017/'18, was this

25   your job --

```
 1              THE COURT:  What's the Exhibit number, just for the
 2    record?
 3              MS. MANDEL:  I'm sorry?
 4              THE COURT:  What Exhibit number?
 5              MS. MANDEL:  Oh.  171.
 6              THE COURT:  171.  Go ahead.
 7    BY MS. MANDEL:
 8    Q.  Was this your job description, Chris?
 9    A.  Is there only a single page to this?
10    Q.  No.  We can -- let's go through the pages.  So there's --
11    that's the first page.  This is the second page.
12    A.  Yeah, okay.  Go ahead.
13    Q.  This is the next page.  And then there's also an
14    addendum, as well.
15    A.  Yeah, and that's -- that would be the differentiator,
16    right?  Would be the addendum.
17    Q.  And how do you know, looking at this addendum, that this
18    wasn't your job description?
19    A.  You can't serve -- you have to be accredited, again, a
20    MD, a clinical pathologist to be able to be for New York
21    State accreditation, and to have those qualifications.
22    Q.  And I know you testified a little while ago that at times
23    you had done operations, at times you had done project
24    management.  Could you have taken over Dr. Menninger's role
25    over the lab itself?
```

1    **A.**   No, I could not.

2    **Q.**   Why is that?

3    **A.**   Because I don't carry those credentials.  I am not an MD

4    nor a Ph.D.

5    **Q.**   Chris, can you describe for the jury, what was the

6    trajectory of the Central Lab business in sort of the

7    2017/2018 time period?

8    **A.**   So 2017/2018 was a prepare for growth year.  Probably

9    even stretching back into 2016.  So all of those years, we

10   were really focused on how do we grow the business.  So it

11   was relatively flat, from a revenue/income standpoint.  And

12   so there was a lot of focus on what would we bring to market?

13   How would we differentiate ourselves from the other Central

14   Labs out there?  That's an important note.  It's not just one

15   Central Lab.  There are multiple Central Labs in the world.

16   And so how were we going to catapult ourselves into the next

17   level and transform the business to --

18   **Q.**   Did this require any changes in the approach that

19   business leaders were expected to take as you went from 2017

20   into 2018?

21   **A.**   Yeah, it was a tough -- because it was -- everybody --

22   the mantra around how we were running the business, so you

23   couldn't just run the part of the business that you needed to

24   run anymore.  We kind of had this mantra across the board

25   where everybody was in sales.  So not just your BD folks were

1   in sales, but you were in sales.

2   **Q.**  Let me just stop you there.  BD?

3   **A.**  Yeah, so that's your business development or sales force.

4   So we all participated in trying to sell to the client or

5   have interactions with the client, so that you could learn

6   what they needed so that we could then implement that in our

7   space and then grow the business.

8   **Q.**  And is that -- thinking back to likely 2017 and early

9   2018, did you feel that pressure to be more involved in

10  sales, even though your role at the time I think was project

11  management?

12  **A.**  Absolutely.  Every day.

13  **Q.**  And how did you come to sort of feel that pressure?

14  **A.**  You know, you were just -- you were getting -- so there

15  were multiple what we call bid defenses.  So really -- and if

16  I classify those, a bid defense is like how am I bidding on a

17  project.  But really what we were doing were operational

18  meetings, how we were talking about the client about what we

19  could offer.  So there was a lot of client meetings that we

20  were going to.  There was a lot of travel that was involved.

21  Because, really, the way that this system worked, right,

22  wrong, or indifferent, but this is the way that it was, is

23  that your BD folks, or your business development folks, were

24  really the ones that were connecting with the client and

25  their outsourcing teams.  So they made the initial

1    introduction, and hey, can I get a meeting with you, and can

2    we talk about what we can offer to you as a Central Lab.

3              The problem with that was was that they didn't know

4    the business well enough to speak to it, so they had to bring

5    all of us along.  Right?  So we would go on all of these

6    trips, did a lot of travel, having conversations with a lot

7    of the pharma companies to try and sell, you know, our part

8    of the business, or listen to them and say, well, what could

9    we do differently?

10   **Q.**   How did you come to be aware of this increased

11   expectation that you were feeling?

12   **A.**   Well, so that comes from the highest levels down, right?

13   So I think as an overall PPD business, right, there was a

14   push to make sure that we were hitting revenue targets and

15   stretch goals to make additional revenue.  And so that was an

16   overarching goal for all of PPD.  And then each business

17   unit, which labs, Global Central Labs would have been no

18   different, you know.  You would get a target on this is where

19   we think you guys need to be for the next year, and so you

20   would have to try and sell from that.  And so that would come

21   down through Chris Fikry and Hacene, and you -- that's kind

22   of your goals for the year is that, hey, we want you to take

23   on this.

24   **Q.**   And given this environment that you've described in

25   2017/2018, did the company's style of interacting with

1    customers change during this time period?

2    **A.**   Yeah, so we went from one of the things -- and it still

3    exists today, actually.  So one of the transitions that we

4    went through was that we became high touch with the clients.

5    So you can exist as a Central Lab and just do the kind of

6    meat and potatoes testing that you always do, but it's really

7    not going to get you anywhere as far as growth.  Right?  They

8    wanted to see, well, what kind of novel ideas were you

9    bringing to the market.  And so we were pushing new IT

10   systems out into the market.  We were having conversations

11   with clients about what do those IT systems need to look like

12   that better serves you.  From my perspective and project

13   management, I was having discussions about, well, how do you

14   want project managers to interact with you.  Do we need to

15   remodel or reshape the way the project management looks.  Are

16   there going to be new tests, right?

17          So one of the big things is that in clinical

18   trials, as we see today, it's an ever changing dynamic on

19   what you're going to be working on.  Prior to COVID, you

20   know, there was a lot of oncology research, diabetes,

21   metabolic research going on, and then boom, suddenly you had

22   COVID, and everybody switched gears to doing COVID work.  So

23   there was a lot of conversation going on about how do we do

24   that.  So it was a really high touch, a lot of interaction

25   with the outsourcing folks, a lot of the science folks would

1   get involved, because you're trying to figure out what test

2   you're going to bring out, because you wanted to have those

3   ready by the time you got the clinical trial ready.  So it's

4   pretty dynamic during that period.

5   **Q.**  Chris, you testified already a little bit this morning

6   about the time period where you and Dr. Menninger were both

7   reporting up to Hacene Mekerri; is that right?

8   **A.**  Uh-huh.

9   **Q.**  And just in sort of laymen's terms, how would you

10  describe your role relative to Dr. Menninger's role at that

11  time?

12  **A.**  Yeah, so we were just colleagues, right, working under

13  the same umbrella.  She led the clinical laboratory division

14  and I led the project management and project design division.

15  **Q.**  And you testified a little earlier that, at some point in

16  early 2018, you took on some additional administrative

17  responsibilities at Central Lab?

18  **A.**  Yeah, I took on the North American site head role.

19  **Q.**  And as site head, did you generally stay abreast of

20  staffing availability for the lab business?

21  **A.**  Yeah, that was one of the tasks that was part of that

22  role, was that even though maybe a function didn't report to

23  you, you were trying to keep the -- everything functioning at

24  a local level.  So not just a global level, so my purview for

25  project management and project design would have been

1    globals.  So I was managing all of the global project

2    management and project design.  Now, on a local level, in the

3    North America site, I would help, you know, manage if there

4    were staffing issues, in that period of time, as I remember

5    it, one of the things that came up was the high incidents of

6    flu.  That, oddly enough, was a precursor to COVID.  But one

7    of the things in that site role -- that North American site

8    head role would have done was do I need to send

9    communications out to sample management to make sure that

10   they're staffed, you know, get a pulse check, are you okay,

11   do you have a lot of folks that are out sick, we want to make

12   sure that we're still able to receive all the samples that

13   are coming in, just generally aware of what's going on within

14   the organization, so that you can make sure that there wasn't

15   anything that was -- where the wheel was going to fall off

16   the bus, as it were.

17   **Q.**  So even for people who didn't technically report to you,

18   you had to be aware of staffing availability?

19   **A.**  Yup.

20   **Q.**  And you testified earlier this morning that it was -- I

21   think you said a few months ago, that you learned that at

22   some point Dr. Menninger had disclosed a disability to PPD?

23   **A.**  That's correct.

24   **Q.**  So safe to say, were you aware at any point in 2018 that

25   Dr. Menninger had disclosed a disability at PPD?

1   **A.**  I was not.

2   **Q.**  Did Mr. Mekerri ever mention to you that Dr. Menninger

3   had disclosed a disability?

4   **A.**  Did not.

5   **Q.**  Do you recall learning at some point that Dr. Menninger

6   had asked to relocate to Massachusetts?

7   **A.**  I do, yes.

8   **Q.**  And prior to that, had you seen Dr. Menninger on a

9   regular basis in Highland Heights?

10  **A.**  Yeah, I would frequently visit her office down the hall.

11  **Q.**  Did you have an opinion as to whether Dr. Menninger's

12  request to move to Massachusetts would work for the business?

13  **A.**  I did have an opinion.

14  **Q.**  And what was that opinion?

15  **A.**  I was concerned that you would be able to have that role

16  being remote.

17  **Q.**  Did you communicate this to Mr. Mekerri?

18  **A.**  I did.

19  **Q.**  And how did Mr. Mekerri respond to you about that?

20  **A.**  So Mr. Mekerri had a way about him.  So it was in one of

21  our one-on-ones, and I said, "Look, is this something really

22  that's feasible," right, "based on how we're interacting and

23  doing a lot of things?"

24          And he would give me the -- he gave me the hand

25  signals a lot of times when he wanted me to essentially end

1   the discussion and say he's got it under control, and that

2   was kind of what I got.

3   **Q.**   From a practical standpoint, in your role in operations

4   and then in project management, how did it impact things for

5   your work when Dr. Menninger was no longer on site on a

6   regular basis?

7   **A.**   I think probably the biggest piece -- or the biggest

8   piece that it would have impacted were the interactions,

9   right?  So during that time, it was really important that we

10  were all having day-to-day interactions.  So there was a lot

11  of brainstorming that was going on.  They were having a lot

12  of discussions.  There were a lot of quality events that were

13  coming up in different departments.  And so you had to go

14  through and have those discussions to make sure that

15  everything was kind of staying on track.

16          And then in addition to that, I think you always

17  had the -- you had the looming New York State inspections and

18  CAP inspections and all of those types of things that we had

19  to make sure that we were doing, and I just felt that not

20  having that interaction on a daily basis and being able to

21  discuss the finer points of some of the things that you have

22  coming up, it made it tough.

23  **Q.**   Did you ever hear Mr. Mekerri say anything negative about

24  Dr. Menninger?

25  **A.**   No.

1   **Q.**   How would you describe Mr. Mekerri's management style?

2   **A.**   Mr. Mekerri was a bit hands-off.  So he liked to fly at

3   30 to 50,000 feet, as it were.  And then most of the time

4   what he would do is -- he relied on us heavily, right, and

5   delegated all of that, those actions to us.  So he really

6   just kind of delegated things to your swim lane.

7   **Q.**   What was your understanding of Mr. Mekerri's expectations

8   of his team of executive directors during that, sort of,

9   2017/2018 business build-out that you've described?

10  **A.**   So I think, in short, you know, we had these kind of mini

11  business units under the Central Lab, and you were

12  accountable for your business unit.  So he was looking to you

13  to -- if you needed to streamline something, if you had

14  quality events that you needed to deal with, if you had

15  innovations that you wanted to launch within your team, then

16  that was under your purview, and you were held accountable to

17  that.

18  **Q.**   And you said to be "held accountable"; what did that mean

19  to you, to be held accountable?

20  **A.**   I mean, at the end of the day, it's your part of the

21  business to run, and if you failed in that piece of the

22  business, then you, you know -- it was -- it ended up on your

23  year-end review.  And if you, you know, succeeded, that ended

24  up on your year-end review, as well.

25  **Q.**   And when you say be held accountable, was it your

1    understanding that being held accountable meant that you were

2    personally responsible for any issues that came up?

3    **A.**   Yeah.  To some degree, I think that was the case, right?

4    It was your part of the business to run it, so you're

5    accountable for running that piece of the business.

6    **Q.**   Let's look at another document.  This is Agreed

7    Exhibit 291?  And I'm just going to show you -- can you see

8    this document in front of you?

9    **A.**   Yes.

10   **Q.**   And I'll just show you, it's an e-mail correspondence

11   that goes back some time in May of 2018.  But I want to focus

12   your attention on the first page of this document.  You'll

13   see at the top, there's an e-mail from Dr. Menninger to

14   Mr. Mekerri and to you, and it copies Mr. McKinnon, who was

15   just in the courtroom a bit ago, and Mr. St. John.  And in

16   this e-mail, Dr. Menninger indicates, "Hi Hacene.  Yes, I've

17   been involved.  I was corresponding with Jay about this issue

18   last week.  We're meeting daily about the root cause for the

19   latest issue involving improper sample storage temperature is

20   under investigation."

21          And then beneath that, you see an e-mail from

22   Mr. Mekerri, and that went to Els Pluymers, whose name we

23   just saw a little while ago, you, and Dr. Menninger.  Can you

24   explain your understanding of what was going on in this

25   e-mail correspondence?

**A.**   Yeah.  If I recall --

            MR. HANNON:  Objection.

            THE COURT:  What's that --

            MR. HANNON:  Relevance to his understanding.  He can talk about what the underlying actions are, but in terms of what people meant in their e-mail, his interpretation isn't relevant.

            THE COURT:  Why don't you rephrase the question.

BY MS. MANDEL:

**Q.**   The e-mail that's in the bottom half of the page, Chris. Do you see that?

**A.**   Yes.

**Q.**   And you received that e-mail; is that right?

**A.**   I did.

**Q.**   And this e-mail, the first sentence says, "Lisa, Els, involving you here as well to make sure that you're on top of this serious issue."

            Do you see that?

**A.**   Yes.

**Q.**   And then the next sentence down says, "You and Chris." Is it your understanding that that Chris is you, given that you received this e-mail?

**A.**   Yes.

**Q.**   "Please work together with QA to resolve the shared responsibilities."

1    **A.**   Yes.

2    **Q.**   What do you recall understanding your role being when you

3    received this e-mail from Mr. Mekerri?

4    **A.**   So there's a lot of aspects to this.  I probably need to

5    explain why that's important.  So samples being stored

6    improperly, I think we talked about root cause.  So when that

7    happens, and occasionally it does, you need to be aware of

8    there are going to be multiple groups that are going to be

9    involved in that.  Number one, the group, sample management,

10   right?  Why did they store those improperly.  That's the

11   first issue, but we talked about how you have corrective

12   actions, right, and preventative actions.  But one of the key

13   things is that we'll rank whether this is minor or major or

14   critical, is are those samples still viable.  But that's a

15   lab component, so we're going to have -- so that's why you're

16   seeing many people involved here.  So from a lab standpoint,

17   do we feel like these samples are still viable.  From an

18   operations standpoint, which would have been Els at the time,

19   hey, what did you do in sample management, what do you got

20   going on there?  How did this happen?  And then why was I

21   involved would have been from a North American site head

22   standpoint, and probably my depth and breadth in running

23   operations six years prior to Els.

24   **Q.**   And when you received this e-mail on May 14, 2018, did

25   you understand this as indicating that you, yourself, were

1    responsible for any challenges with sample management or

2    sample storage?

3    **A.**   No, not me for sample storage.  That would have been on

4    Els's purview.

5    **Q.**   But you did receive this e-mail with a directive to you,

6    so why would you have gotten that e-mail, if you were not

7    responsible for sample storage?

8    **A.**   Because it happened in North America, and so they wanted

9    me to assist in that investigation, and help run that down.

10   **Q.**   When you received this e-mail correspondence that May,

11   did you perceive this as disciplinary towards you?

12   **A.**   No.

13   **Q.**   Why not?

14   **A.**   These kinds of things, I hate to say they happen all the

15   time, but these types of things happen.  And so really, it's

16   about, hey, can you get this investigation done.

17          The other piece of this, I think, that is

18   important, probably, to understand from a lab perspective --

19   and I mean Central Lab perspective, these investigations, I

20   think you heard before, are important because we are dealing

21   with patient samples.  It's not something where you can go

22   back and get this.  And there's an entire sense of urgency

23   around how you deal with that, when you have something that

24   is impacted.  Patients have spent time to donate this.

25   They've enrolled in these trials.  Clients have money that is

1    invested in these types of things.  It's super critical when

2    things like this happen.  And they reach -- if you read

3    through that e-mail, they reach the highest levels of the

4    organization, and then came back down to say, hey, can you

5    get this -- make sure that this is under control.

6              So there's a real sense of urgency around making

7    sure that you find out why this happened, how you stop it,

8    and how you're going to prevent it from happening again,

9    because it's dealing with patient samples.  And so when I see

10   these kinds of e-mails, in fact, I issue these kinds of

11   e-mails today, to say, hey, we got to get this taken care of,

12   and get it taken care of in a timely manner.

13   **Q.**  Is that what you meant by accountability?

14   **A.**  Yeah.

15   **Q.**  And you just referenced these kinds of e-mails that you

16   received.  As far as you recall during this time period, were

17   you receiving other e-mails along these lines from

18   Mr. Mekerri?

19   **A.**  Oh, yeah, I would have received -- so this would have

20   been an e-mail that I got pulled into from -- you know, from

21   a site head standpoint, but I would have also received

22   e-mails on the project management and project design front.

23   **Q.**  And thinking back to when you were working more on the

24   operations side of things, did you ever have occasion to

25   become aware of quality issues?

1    **A.**   Yes.

2    **Q.**   How would you become aware of those?

3    **A.**   So typically you become aware of quality issues in one of

4    two ways.  Either you find it internally and it's surfaced

5    that way, and there's an event created, and you go through

6    the event process.  Or it comes through external channels, so

7    typically, either from a contract research organization, so

8    somebody that's helping run the trial, or the client

9    themselves, will say, hey, we've spotted a problem, can you

10   take a look at this.  And then that rolls into the quality

11   event system.

12   **Q.**   And you've mentioned quality a number of times.  And we

13   heard from Mr. McKinnon this morning, why is quality so

14   important in the lab context?

15   **A.**   Well, because there's no -- there are no second chances,

16   right?  Again, these are patient samples.  There's no

17   do-overs, right?  It's super important that you get it right.

18   There are some opportunities, you know, to go back and maybe

19   get a blood sample, but some of these trials, you're talking

20   about oncology, you're talking about tumor biopsies, and

21   slides and things that you'll never get again once they're

22   taken.  So there's a sense of urgency around that whole

23   piece.

24   **Q.**   Does that mean that there is an expectation in the

25   business that quality is always perfect?

1    **A.**  No.  I mean, I think that -- I don't think that you can

2    ever have a perfect scenario, right?

3    **Q.**  If that's the case, how would you explain communications

4    about having zero errors as a goal?

5                MR. HANNON:  Objection.

6                THE COURT:  Overruled, if he knows.

7                THE WITNESS:  I'm sorry, the question was?

8    BY MS. MANDEL:

9    **Q.**  You testified just a moment ago, Chris, that it's not

10   achievable to have perfect quality, right?

11   **A.**  Uh-huh.

12   **Q.**  If that's the case, how would you explain communications

13   setting zero errors as a goal?

14   **A.**  Well, I think that's fine to have a goal, right?  I'm not

15   sure it's achievable.  And there's some realism there.  But,

16   you know, look, you -- again, these are patient samples, you

17   do want to try to get that right as much of the time as you

18   can.

19   **Q.**  What was Mr. Mekerri's role, as far as you understood in

20   2017/2018, with regard to quality issue in the lab?

21   **A.**  Mostly directing where the communication was going to go.

22   So if he were to find out something from either a client or

23   from the CRO side of the business, then typically he would be

24   receiving that and directing it to whatever department needed

25   to do the investigation particularly.

1    **Q.**  At some point did you learn that Dr. Menninger was taking

2    leave from her role as executive director of labs?

3    **A.**  I did.

4    **Q.**  Showing you a document that's Agreed Exhibit 287.  This

5    is an e-mail from Megan Groat, who you saw in that

6    organizational chart.  And this is from June 5th of 2018.

7           Do you have a recollection of receiving this

8    e-mail, Chris?

9    **A.**  Yes.

10   **Q.**  And looking at this e-mail, this came from Mr. Mekerri,

11   and it looks like it went to a very long list of folks

12   working in the lab business; is that right?

13   **A.**  Yeah, virtually everyone.

14   **Q.**  And from your standpoint in your role, what impact did it

15   have for you to receive this e-mail on June 5th?

16   **A.**  So my immediate thought would have been, you know, what

17   gaps are we going to have to fill, right, to keep things

18   going.  I think, you know, having Dr. Reddy on there from the

19   technical lab inquiries piece, that was fine.  But there were

20   probably other things that we would need to consider.

21   **Q.**  And you've testified this morning that at some point

22   after you were the site head, as indicated in this exhibit,

23   Mr. Mekerri left and you took over that role, correct?

24   **A.**  Correct.

25   **Q.**  What -- based on your experience working in Central Labs

1    for 17 years, what is the role of the executive director of

2    the lab itself, the medical director?

3    **A.**   First and foremost, right, is to oversee the lab with

4    regard to the licensures.  So you're talking about CAP, CLIA,

5    iso, New York State, probably some interactions with the

6    Ministry of Health in Asia Pacific and some of those places.

7    So that is their primary focus.  They're also really -- they

8    have to set the reference ranges.  Reference ranges are is

9    your blood level normal or not.  So if you get something back

10   on your cholesterol or your glucose, whatever you see on your

11   lab report, there's a little range there that tells you are

12   you normal or not.  And they set those reference ranges and

13   evaluate those.

14              And then beyond that, the day-to-day operations of

15   the lab, making sure that everything is running smoothly.

16              And then, really, the other piece of this is

17   interacting with the clients to make sure that we have

18   line-of-sight to what their pipeline is.  So oftentimes

19   you'll meet with clients and we'll say, "Okay.  This is the

20   test that we have," and capabilities meeting.

21              And they'll say, "But we need you to bring up test

22   X, Y, and Z."

23              And we would evaluate that and say, well, does it

24   make sense to bring that up?  Do we subcontract that out

25   through a different lab?  If we do decide to bring that up,

```
 1    and they're hoping to get that implemented, but having to
 2    have that conversation on why we would need that.
 3            Oftentimes there's a lot of scientific discussions,
 4    and discussions that most people aren't going to pay
 5    attention to from the clinical relevance to that, as far as
 6    what they're bringing up.  But those types of things are
 7    happening on a daily basis with the lab director.
 8    Q.  And you described earlier --
 9            THE COURT:  I'll stop you here.  We'll take the
10    morning break.
11            All rise for the jury.
12            (The jury exits the courtroom.)
13            THE COURT:  How much longer do you have?
14            MS. MANDEL:  A few moments.
15            THE COURT:  Okay.  And you?
16            MR. HANNON:  Five to ten.
17            THE COURT:  Okay.  So we'll take a break.  We'll
18    bring them back.  We'll finish with this witness.  That's it
19    for today, right?
20            MR. HANNON:  We have a jury question.
21            THE COURT:  So they would like to know why is PPD
22    HR CCed on this e-mail thread?  That's their question.
23            MS. MANDEL:  Did they say which e-mail thread?
24            THE COURT:  No.  You can look at it, but that's
25    just what it says.
```

1          MR. HANNON:  I know what they're referring to.

2          THE COURT:  But when they come back, I'll tell them

3     I gave it to all of you, and you'll follow up as you wish on

4     that.

5          MS. MANDEL:  Let me make sure I heard correctly.

6     Why was HR CCed, or why were they not CCed?

7          THE COURT:  Why was HR CCed.  So I'll tell them

8     we're done for the day, we'll go home.  I'll tell them

9     tomorrow we have two witnesses.  One more witness for you,

10    which is your damage expert.  And then you anticipate that's

11    the end of your evidence, and then you anticipate one

12    additional witness, which is your medical expert, right,

13    Ms. Mandel?

14         MS. MANDEL:  Yes.

15         THE COURT:  And then that that will be the end of

16    the evidence tomorrow, and it could be a shorter day

17    tomorrow.  And I'll explain to them I have to do -- I have to

18    go over the instructions with you, I can't finish them until

19    we're done with the evidence, then we'll have closing

20    argument and charge on Friday, and they'll begin

21    deliberations on Friday.

22         All right.  Anything else?

23         MR. HANNON:  May we hear who the juror was that

24    provided the note?

25         THE DEPUTY CLERK:  It is the juror in the second

1    seat in the front row, number 35.

2              THE COURT:  It's not signed, but that is the person

3    that gave it to her.

4              All right.  Anything else?  And the note that came

5    up, you had it, Ms. Mandel, which is fine, but did you give

6    it back?

7              MS. MANDEL:  I believe I returned it.

8              THE COURT:  Okay.  Perfect.  And you can look at

9    this one if you want, but then give it back to Ms. Belmont.

10             All right.  We'll stand in recess for 15 minutes.

11             (Court in recess at 11:17 a.m.

12             and reconvened at 11:31 a.m.)

13             THE COURT:  Kellyann, you can go get the jury.

14             (The jury enters the courtroom.)

15             THE COURT:  I passed along your question to the

16   lawyer, the lawyer -- the one you handed up as you were

17   walking out, and one or both of the lawyers will follow up on

18   that.

19   BY MS. MANDEL:

20   Q.  Chris, before we took a break --

21             THE COURT:  Just for everyone else, because they

22   might not have read it, the question was why was the HR

23   director or the HR person CCed on this e-mail.

24   BY MS. MANDEL:

25   Q.  Before we took a break, Chris, we looked at a couple of

1     e-mails, and we're going to look back at them to talk about

2     the question that's just come up.

3              First looking at Exhibit 287, this is the

4     announcement message that came from Mr. Mekerri -- actually,

5     sent by Megan Groat, but the message was from Mr. Mekerri.

6     Do you see that in front of you?

7     **A.**  Yes.

8     **Q.**  And as we mentioned, we looked at this document, and

9     there are a lot of people that are listed in the "to" line

10    and the "CC" line.  That's where we found your name.  Do you

11    see that?

12    **A.**  Yes.

13    **Q.**  And in addition to your name in the CC line, I see Chad

14    St. John?

15    **A.**  Yes.

16    **Q.**  And Chad St. John worked in HR?

17    **A.**  Correct.

18             THE COURT:  Keep your voice up.

19             THE WITNESS:  Sorry.

20             THE COURT:  No problem.

21    BY MS. MANDEL:

22    **Q.**  In your experience with PPD, did HR typically partner

23    with the business on things like staffing?

24    **A.**  Yeah, they partnered on the business related to

25    everything.  So they were involved in all the senior

 1    leadership team meetings.

 2    **Q.**  And so --

 3              THE JUROR:  Hold on.  That's not the e-mail.

 4              THE COURT:  That's not the e-mail.  Which e-mail is

 5    the one you --

 6              THE JUROR:  The prior document.

 7              MS. MANDEL:  We'll look at that one, too.

 8              THE COURT:  Fine.  Go ahead.

 9    BY MS. MANDEL:

10    **Q.**  And is it your understanding, Chris, that that's why Chad

11    would have been copied on an e-mail like this?

12    **A.**  Correct.

13    **Q.**  Okay.  And we'll bring up the other e-mail that we looked

14    at, as well.  And this is -- sorry, I'll bring this up so you

15    can actually see it better.

16              This is the e-mail that we looked at from May of

17    2018.  Do you recall that, Chris?

18    **A.**  Correct.  Yes.

19    **Q.**  And if you look down at the e-mail from May -- May 14th,

20    it starts kind of halfway down the page.  This is from Mr.

21    Mekerri and this went to you and Els Pluymers and to

22    Dr. Menninger.  Do you see that?

23    **A.**  Yes.

24    **Q.**  And it copied a number of people, Brent McKinnon, who

25    worked in quality; is that right?

1  **A.**  Yes.

2  **Q.**  And Kathy Dick also worked in quality?

3  **A.**  Yes.

4  **Q.**  And it copied Mr. St. John in HR.  Do you see that?

5  **A.**  Yes.

6  **Q.**  What is your understanding, having received this e-mail

7  in May of 2018, as to why Mr. Mekerri would have included

8  Chad St. John from HR in this type of communication?

9  **A.**  In general, you know, I think that HR is copied because

10  they're involved in all of the aspects of business, and if

11  there's any accountability issues, then they're copied in on

12  it.  Or if there's announcements for large announcements that

13  are going out regarding staffing changes, or those types of

14  things, they were frequently copied on e-mails.

15  **Q.**  And you testified that you now hold the role that is, you

16  know, roughly equivalent to the one that Mr. Mekerri held?

17  **A.**  Correct.

18  **Q.**  And in your role, do you send out e-mails to your staff

19  about being accountable for issues that come up?

20  **A.**  Yes.

21  **Q.**  And when you send out those e-mails, do you at times

22  include HR, as well?

23  **A.**  Yes.

24  **Q.**  And is that for the reasons that you've just described

25  around accountability?

1    **A.**   Yeah, for accountability, and for, you know, just general

2    awareness.

3    **Q.**   Before we took a break, you were talking about what the

4    ED of labs, executive director of labs does.

5           Do you recall that?

6    **A.**   Yes.

7    **Q.**   And earlier this morning, you also testified about the

8    executive director of labs having an increased role with

9    regard to business development.

10          Do you recall that?

11   **A.**   Yes.

12   **Q.**   Is that still something today that you expect of the

13   executive director of labs?

14   **A.**   Yes.

15   **Q.**   And why is that?

16   **A.**   Well, it's really because there's an expectation from our

17   clients, right, that they have that interaction with our

18   executive director of the labs, and the people that hold

19   those scientific certificates.  So those interactions can be

20   of a couple of levels.  One, is there a scientific aspect

21   that we need to discuss and what that looks like, or are

22   there particular tests that we want you to bring up or

23   particular platforms.  Without giving any details, there's a

24   recent example where I've just added two new platforms to the

25   testing that we're doing, that were both client requests that

1    Dr. Kashlan brought to me and said, hey, talking to this
2    client, they want us to do this, thought it warrants this
3    much work.  Are you willing to purchase the equipment?  Sure.
4    So you know, those are the types of things where he's -- he's
5    doing that unilaterally, right?  A lot of times having those
6    conversations, or in the context of some of these larger
7    meetings with bid defenses or capabilities meetings, and then
8    he's bringing that back to me and saying this is what I think
9    we need to do, and by the way, here's what diseases that
10   we're seeing are kind of hot, so this is where we need to --
11   what space we need to play in.
12   **Q.**  And you just mentioned the bid defenses, the client
13   meetings around bid defenses; is that right?
14   **A.**  Uh-huh.
15   **Q.**  And is that something that Dr. Kashlan is involved in?
16   **A.**  Yes.
17   **Q.**  And why is that specifically still important to the
18   business now?
19   **A.**  Because he has to assess that from a scientific level,
20   and the testing from a clinical pathology, right?  So if
21   you're looking at we oftentimes, when we're going into these
22   bid defenses or operational meetings that we're kind of
23   giving, you know, our spiel, as it were, he kind of knows --
24   he's done the research on what the clients, what space that
25   they're working in.  And so he brings that to the

1    conversation and says, well, what about this platform?  Or

2    they may have questions, if it's in an actual bid defense

3    where they're saying, well, we typically want to run it on

4    this platform, so you know, without getting into the minutia,

5    right?  There could be two or three different platforms that

6    you would run cholesterol on.  Well, which one is best,

7    right, or which one is germane to your study.  Which one --

8    so you know, there's all those types of those conversations.

9    They may say, well, we typically run it on this platform, how

10   does that correlate with your platform.  And so he adds those

11   types of pieces of information to this discussion.

12   **Q.**   And understanding that there's been a global pandemic in

13   the interim, has that been something that Dr. Kashlan has

14   done pretty consistently since he started in 2019?

15   **A.**   Yeah, for all -- well, through 2019, prior to the

16   pandemic, he was definitely, you know, having those

17   conversations with clients.  And then certainly during the

18   pandemic, it was a mad scramble, right, to say, well, what

19   platforms are we using?  We were talking to platform

20   manufacturers.  We were talking to -- there were many levels

21   of discussions that were happening there to talk to the

22   clients.  Well, which one is the gold standard for the

23   testing.  And so all of that around COVID was, you know,

24   really conversations that he was having with the clients.

25   **Q.**   And during that same time period, has Dr. Kashlan

1   continued to give presentations within the company, as well?

2   **A.**   Yeah.  So we have -- so there -- everybody has to come to

3   the senior leadership team meetings.  We have folks that are,

4   you know -- that are part of those discussions.  A lot of the

5   stuff now is around financial -- you know, looking at the

6   financials of each department.  And so as you're -- he's

7   participating in all of those.  And of course, he's hosting

8   CAP inspections, those types of things, you know, both here

9   and abroad.

10  **Q.**   And all of those types of presentations that you've just

11  described, do you view those as critical parts of

12  Dr. Kashlan's job?

13  **A.**   Yeah.

14  **Q.**   And why is that?

15  **A.**   Well, it's important for the business, right?  So not

16  only is he fulfilling the medical licensure piece of it, but

17  he's contributing to the growth of the business, which is

18  kind of all what we're accountable for, right?  You all have

19  to be accountable for having those interactions, making those

20  connections with clients, figuring out where do we need to be

21  next, and driving the business forward.

22  **Q.**   I believe you testified earlier that Dr. Kashlan

23  relocated from California when he came to PPD?

24  **A.**   He did.

25  **Q.**   And that was in 2019 you said?

**A.**   I believe so.  Yeah, 2019.

**Q.**   Since Dr. Kashlan began working at PPD in 2019, has he ever worked from a different location?

**A.**   No, he's always worked out of that office.  Other than, and I'll clarify, during COVID there was some restrictions that we put in place in the lab for infection control, and so we had people on and off site.

**Q.**   And even during that time period, was Dr. Kashlan on site with some regularity?

**A.**   Yes.

**Q.**   And why was that?

**A.**   A couple reasons.  Number one, I think that it was important -- so just from a general management standpoint, it's really important that the people, and especially during COVID, we were asking the boots-on-the-ground people, so that would be your med techs, your lab people, sample management, those folks, again, there's no second chances, COVID or no COVID.

         You had patient samples coming in that had to be tested.  These people were relying on us to provide them with test results for their care and their management of that care.  So when you're asking all of your people to come in every day, all day, and be there, it's important for them to see leadership there, as well.  Right?  They need to know that the kind of the head of the whole thing is leading them

1  through this.

2          So otherwise, you end up with a situation where,

3  you know, you're going to end up with a lot of turn over,

4  because people don't see that leadership is behind it.

5  There's no presence there.  So that -- that is a primary

6  focus.  And then, of course, all of the COVID discussions

7  that we were having with clients, right, and having, you

8  know, those interactions, as well.

9  **Q.**  And you said COVID discussions with clients.  What did

10  that entail?

11  **A.**  So, again, those were happening during the height of

12  COVID, it seemed like every day.  Maybe it was a little less

13  than that, but on a really constant basis, a couple times a

14  week, at least, you were having conversations about what

15  platforms, what test, what test was giving you the best

16  result, which one had the best sensitivity.  So all of these

17  tests and these, you know, vaccine programs that were gearing

18  up, you had to provide testing for those.  And so there was a

19  lot of discussions with clients about, well, what does that

20  look like?  And so there's also the piece where he would be

21  having those conversation not only with the client about how

22  does this work, but he would also have to talk to the lab

23  staff and go, okay, well, if we brought in this --

24          And we brought in probably four or five different

25  pieces of equipment during COVID, where are we going to put

1    it, how is that going to impact workflow?  How do you guys

2    feel about this?  So he's having those types of discussions

3    with the staff training around the instrumentation.  Most of

4    that was happening in molecular, which is high complexity

5    testing.  It's not as simple as throwing it on a machine and

6    you get your glucose and your liver and cholesterol results.

7    It's a lot more complex.  So there was a lot of that type of

8    stuff that was going on and it means having meetings

9    internally with folks on the lab staff.

10   **Q.**  In light of what you've just described, in your current

11   role, would you be open to the idea of a medical director not

12   working on site on a daily basis in Highland Heights?

13   **A.**  I wouldn't.

14   **Q.**  And at any point from when you took over that role in

15   2019 to now, has there been a situation where you haven't had

16   a medical director on site with some regularity?

17   **A.**  No.

18   **Q.**  Thinking back to 2018 and your role being a little bit

19   different at that time, do you recall how the lab's

20   accreditation -- I know you've mentioned CAP, and ISO, and

21   New York State.  Do you recall how the lab's accreditation

22   was handled from the time that Dr. Menninger began medical

23   leave in 2018 and the time that Dr. Kashlan came on board in

24   2019?

25   **A.**  Yeah, so Dr. Reddy, Paul Reddy was kind of posted up for

1  those positions.  So he was credentialed enough to hold CAP

2  and get a spy on the CLIA stuff.  He was not credentialed

3  enough to do the New York State.  So in those scenarios, I

4  think a lot of those organizations are -- I won't say

5  forgiving, but they give you a bit of a grace period, right?

6  They know sometimes these types of things happen.  And so

7  they -- they will give you a period to say, okay, we

8  understand.  You had somebody leave.  We do expect you to get

9  this up to snuff, you know, over the next six months, or

10  whatever that is, and then they'll allow that.

11      So he was enough for the interim piece of that, but

12  we were still on the hunt for making sure that we would have

13  everybody that would cover all of those bases.

14  **Q.**  And I know you talked about that sort of grace period.

15  If an accrediting organization, whether it's New York State

16  or ISO, CAP, any of those, determined that Central Lab was

17  not in compliance with its requirements around having a lab

18  director, could that result in the loss of accreditation?

19  **A.**  It could, yes.

20  **Q.**  What would that mean for the business?

21  **A.**  It would shut it down.  Just based on the one CLIA, so

22  CLIA is governed by the CDC, and it's mostly a US

23  organization.  Having that accreditation and licensure allows

24  you as a lab to report out diagnostic samples, right?  So

25  you're doing those samples, you're reporting out those tests

1    for clinicians or the doctors to make assessments about their

2    patient.  If you don't have that, it all goes full stop,

3    right?

4            So luckily, they have a lot of conversation with

5    you, and they want to know how you're going to manage that

6    and get through it.  But if they -- push came to shove and

7    they wanted to say, "That's it," it would be full stop.

8    **Q.**  "Full stop" meaning shut down Central Labs' business?

9    **A.**  Correct.

10   **Q.**  Have you spoken with Dr. Kashlan about hiring someone

11   else to work in lab leadership who can also carry that

12   licensure?

13   **A.**  Yeah.  So one of the things that we consistently do in

14   the organization is we have the conversation about succession

15   planning.  So there's often a yearly conversation about, hey,

16   if you were to win -- I think usually the way that HR puts it

17   to me is, if you were to win the lottery tomorrow, who would

18   we put in your place?  And so we do that across the

19   organization.

20           So I've had that conversation with Dr. Kashlan, and

21   we are looking for somebody to bring in and have as a

22   secondary level to him.

23   **Q.**  Does that mean you're looking to remove Dr. Kashlan from

24   his role?

25   **A.**  No.

1   **Q.**  Why would you having that conversation if you're not

2   planning to remove him from the role?

3   **A.**  Because anything can happen.  You have to be prepared

4   for -- you have to have contingency plans, whether it's my

5   role, any one of the other leaders' roles that we saw.  You

6   have to have contingency.

7           Specifically you have to have a contingency around

8   that one.  Because that -- so could I be replaced?  Yes.

9   Could a lot of the other folks be replaced in those roles?

10  Yes.  But that role is absolutely critical, because it's the

11  core of your business.  You can't report results, you can't

12  run the tests and get those out without having that role

13  covered.

14  **Q.**  So would this be like if my firm tries to find a backup

15  for me, since I'm a Massachusetts licensed attorney, they

16  want to be prepared?

17  **A.**  Yeah.  Only on steroids.  Right?  Because, again, my role

18  or somebody else's role is less -- if I'm being honest, is

19  less important than that medical director role.  That is the

20  key to how we run the entire operation is having that

21  licensure.

22          MS. MANDEL:  Thank you.  I have no further

23  questions at this time.

24          THE COURT:  All right.  Any redirect?

25          MR. HANNON:  Yes, Your Honor.

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

1    **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

2    BY MR. HANNON:

3    **Q.**  Mr. Clendening, let's start in February of 2018.  It was

4    in February of 2018 that you received that e-mail from

5    Mr. St. John that contained Dr. Menninger's request for

6    accommodation, right?

7    **A.**  Yeah.  I don't recall receiving it, but, yes, that was

8    the date on the document.

9    **Q.**  Well, let me show it to you, just so we're all on the

10   same page here?

11            MS. MANDEL:  Objection.  Scope.

12            MR. HANNON:  She covered this.

13            THE COURT:  Overruled.

14   BY MR. HANNON:

15   **Q.**  All right.  So we see here an e-mail from Mr. St. John to

16   you, yes?

17   **A.**  Correct.

18   **Q.**  That's your e-mail address?

19   **A.**  Yes.

20   **Q.**  Didn't make any mistakes in spelling it out?

21   **A.**  No.

22   **Q.**  You see there, this was sent just a few hours after

23   Mr. St. John had received it, right?

24   **A.**  Yes.

25   **Q.**  Okay.  And looking at the attachment, do you see here

1    it's something from a Dr. Marianna Kessimian.  Do you see

2    that?

3    **A.**  I do.

4    **Q.**  Yes?

5          MS. MANDEL:  Objection to scope.  This is beyond

6    anything --

7          THE COURT:  I don't think it was.  I think that you

8    didn't examine him about this specific e-mail, but I think

9    the topic came up.  So overruled.

10   BY MR. HANNON:

11   **Q.**  Was it part of your ordinary day --

12         THE COURT:  Just so you know, ladies and gentlemen,

13   so scope is, on redirect, Mr. Hannon -- the general rule is

14   Mr. Hannon is not allowed to go into topics that weren't gone

15   into by Ms. Mandel.  So that's why the objection -- and in

16   fact, as I'll tell you at the end, lawyers have a duty to

17   object.  They're supposed to object.  And the fact that they

18   object, you shouldn't infer anything from them.  And you

19   shouldn't -- other than the resolution of how I resolve it,

20   so either it's allowed or it's not allowed, but what it

21   means, it doesn't mean anything about either side, and you

22   don't infer anything about that.

23         So go ahead.

24   BY MR. HANNON:

25   **Q.**  Sir, in February of 2018, was it normal for you to

1    receive documents like this in your e-mail?

2    **A.**   No.

3    **Q.**   Fair to say that if you had read this in February of

4    2018, this was something that would have stuck out in your

5    memory?

6    **A.**   Yeah.

7    **Q.**   Okay.  And subsequent to receiving this document from

8    Mr. St. John, you were aware that there were efforts to try

9    to find people to replace Dr. Menninger, isn't that right?

10   **A.**   I don't know that it was to replace, but I know that it

11   was at least to have additional people.

12   **Q.**   And not just to have additional people, but to have

13   additional people who could fill her spot if she left,

14   correct?

15   **A.**   Correct.

16   **Q.**   Okay.  And you were involved in those discussions,

17   weren't you?

18   **A.**   In general, yeah.

19   **Q.**   Okay.  And when you were involved in those discussions,

20   you knew why they were happening, right?

21   **A.**   My understanding at the time as to why they were

22   happening is because of her not being on site.

23   **Q.**   Okay.

24   **A.**   Not with regard to this.

25   **Q.**   Well, sir, she stopped being on site in June of 2017,

1    right?

2    **A.**  I don't know when she -- well, whenever that -- I

3    actually don't recall what the exact date was.

4    **Q.**  It was months before you got that e-mail from Mr. St.

5    John in February, wasn't it?

6    **A.**  I don't recall that.

7    **Q.**  And then, sir, you learned that at some point

8    Dr. Menninger, she caught wind of the fact that PPD was

9    looking for people to potentially fill her spot.  Isn't that

10   right?

11   **A.**  I never had that discussion with her.

12   **Q.**  You didn't learn that she complained about that?

13   **A.**  I did not.

14   **Q.**  And then in May of 2018, Dr. Menninger, she sent out an

15   e-mail noting some specific areas where she thought PPD

16   should try to fill the gaps.  Isn't that right?

17   **A.**  I don't recall.  If you have a copy of that e-mail, I'm

18   happy to take a look at it, but I don't recall.

19   **Q.**  Sure thing.  I'm going to show you Joint Exhibit 106.

20           So this is an e-mail on June 1, 2018, from Chad St.

21   John, do you see that?

22   **A.**  Yes.

23   **Q.**  And that's to Jerry Williams.  Do you know who he is?

24   **A.**  Yes.

25   **Q.**  He was the head of HR back then, right?

1    **A.**  Correct.

2    **Q.**  Okay.  And if you look there in the subject, I'm sorry,

3    in the attachment line, you'll see a familiar name.

4    **A.**  Yes.

5    **Q.**  That's the resume of Basel Kashlan, right?

6    **A.**  Correct.

7    **Q.**  He was the gentleman who was eventually hired to replace

8    Dr. Menninger, correct?

9    **A.**  Correct.

10   **Q.**  Okay.  Let's take a look at how this e-mail chain began.

11          I'm sorry.  I went too fast.

12          So I'm showing you now the 12th page of the

13   exhibit, which has the stamp 809 in the bottom right-hand

14   corner.

15          Do you see that, Dr. Menninger, she had sent an

16   e-mail out on May 16, 2018.  Do you see that?

17   **A.**  Yes.

18   **Q.**  Okay.  And this was an e-mail that she sent to Mr. St.

19   John, copying you and Mr. Mekerri, right?

20   **A.**  Yes.

21   **Q.**  Okay.  And she identified some specific areas where she

22   thought there were compliance gaps; isn't that right?

23   **A.**  I don't know that these are compliance gaps, but whether

24   or not that was the intent, it appears to me she was making

25   recommendations on who we would need to cover some of these

1   areas.

2   **Q.**  And she's making specific reference to flow cytometry and

3   microbiology.  Do you see that?

4   **A.**  Yes.

5   **Q.**  Okay.  And when you got this e-mail, you saw an

6   opportunity, didn't you?

7   **A.**  An opportunity for what?

8   **Q.**  An opportunity for PPD to move forward with hiring an

9   individual to replace Dr. Menninger?

10  **A.**  I would read that as hey, this is where we have gaps, and

11  we would need to fill those.

12  **Q.**  So this e-mail is May 16, 2018.  Do you see that?

13  **A.**  Yes.

14  **Q.**  Okay.  I'm now going to show you an e-mail from the

15  following day, Joint Exhibit 290.  And it's the bottom of the

16  page here, so you see an e-mail there from you?

17  **A.**  Yes.

18  **Q.**  On May 16th.  Do you see that?

19  **A.**  Yeah, I don't see the bottom page.

20  **Q.**  Go to the next page here.  We'll look at the message.

21  And the subject is "AP and flow."  Do you see that?

22  **A.**  Yes.

23  **Q.**  And this is an e-mail to Mr. Mekerri and Mr. St. John; is

24  that right?

25  **A.**  Correct.

1    **Q.**   You didn't include Dr. Menninger in this e-mail, did you?

2    **A.**   No.

3    **Q.**   Why not?

4    **A.**   I don't recall.

5    **Q.**   Let's look at what you wrote.

6    **A.**   "Neo would have both.  We could potentially bake that

7    into our agreement to serve as our licensure that we can."

8            So --

9    **Q.**   Let me ask you a question, if we may.  Can you tell us

10   what that reference, "our agreement to serve as licensure"

11   refers to?

12   **A.**   So for -- during this period of time, AP and flow, so AP

13   is anatomical pathology, right?  That's oncology types of

14   studies.  And if I remember correctly, and I'd have to look

15   for these dates, but there -- we had another person that was

16   on board, Patrick Mann, that was helping on the AP side of

17   things.  He also subsequently left, and so we had a gap

18   across the board for anatomical pathology and flow cytometry.

19   NEO is a reference to Neo Genomics, which is a third party

20   lab that we could use, right, to do those types of services.

21   **Q.**   And your reference at the end of "then we can --"

22           Can you finish that sentence for us?

23   **A.**   I can't.

24   **Q.**   Looking back at the next page and the reference

25   is, "Looping in Lisa;" is that right?

1    **A.**   That's correct.

2    **Q.**   Okay.  And he notes that cost is the question, right?

3    **A.**   Yeah.  It's always a question.

4    **Q.**   And, in fact, looking back at the e-mail from a moment

5    ago that attached Mr. Kashlan's -- I'll show you Joint

6    Exhibit 106 again.  So this was the e-mail from a moment ago

7    that attaches Mr. Kashlan's resume; is that right?

8    **A.**   Yes.

9    **Q.**   Okay.  And Mr. Kashlan, as of this time, his most recent

10   experience, am I right, he had recently served as a medical

11   director?

12   **A.**   Yeah, I believe that's correct.

13   **Q.**   That was his background?

14   **A.**   Yes.

15   **Q.**   And as of this date, as of June 1, 2018, you'll see that

16   Mr. St. John reports that Mr. Mekerri had sent an e-mail

17   authorizing the funds to proceed; is that right?

18   **A.**   Yeah.  I'm assuming to recruit him.

19   **Q.**   Okay.  And you've testified today that Mr. Kashlan did

20   not start until 2019; is that right?

21   **A.**   Correct.

22   **Q.**   Okay.  I'd like to show you something here and see if it

23   refreshes your recollection as to that.

24            MR. HANNON:  Ms. Belmont, this is not in evidence.

25            And I'm just going to scroll down here, sir.

1        THE COURT:  Just read it to yourself.

2   BY MR. HANNON:

3   **Q.**  Have you reviewed the document, sir?

4   **A.**  Yes.

5   **Q.**  Okay.  Does that refresh your recollection as to when

6   Mr. Kashlan started?

7   **A.**  No.  It's a LinkedIn profile.

8   **Q.**  It doesn't refresh your recollection that he started in

9   2018?

10  **A.**  No, it's a LinkedIn profile.  I don't -- I mean, my -- my

11  linked in profile dates are probably subject -- I don't --

12  that's not controlled by the organization.

13  **Q.**  You mentioned earlier that you had concerns about

14  Dr. Menninger working remotely.  Did I hear that correctly?

15  **A.**  Yes.

16  **Q.**  I'm going to show you Joint Exhibit 392.  And I

17  appreciate you're not on this document here, but I just

18  wanted to show you something and see if you agree with it.

19        I highlighted the wrong part.  I'm sorry.

20        Mr. St. John wrote, "Lisa has also shared with all

21  CL key stakeholders that she will be moving to the Providence

22  area/New England region for compelling personal reasons the

23  weekend of the June 24th.  No concerns regarding her physical

24  move have been expressed or detected at this time."

25        Do you see that?

1    **A.**  Yes, I see that.

2    **Q.**  Okay.  And you see Mr. Mekerri is included on this

3    e-mail; is that right?

4    **A.**  That's correct.

5    **Q.**  And is it your testimony today that this e-mail is not

6    accurate?

7    **A.**  I expressed my concerns directly to Mr. Mekerri.  So what

8    Chad knew at that time, I don't know.

9    **Q.**  Okay.  But your testimony is that Mr. Mekerri knew of

10   your concerns at this time; is that right?

11   **A.**  Sure.

12   **Q.**  Okay.  Do you have any reason to suspect that Mr. Mekerri

13   would have kept that from Mr. St. John?

14   **A.**  I don't know that he would keep it from him, but I don't

15   know that he would communicate it, either.

16   **Q.**  Well, you told us earlier in looking at one of the later

17   e-mails about how it was routine for Mr. Mekerri to share

18   information with Mr. St. John, right?

19   **A.**  Yeah.

20   **Q.**  If a problem arose in the lab, I think your testimony was

21   that he would keep Mr. St. John in the loop, right?

22   **A.**  Correct.

23   **Q.**  If one of Mr. Mekerri's senior leaders had serious

24   concerns about Dr. Menninger working remotely, do you think

25   that's something he would have shared with Mr. St. John, as

1    well?

2    **A.**  I can't speak to that.

3    **Q.**  With respect to the importance of being on site in

4    Highland Heights, there was some staff changed being made in

5    connection with Dr. Menninger's departure, right?

6    **A.**  Excuse me.  Repeat it?

7    **Q.**  I shouldn't have said "departure."  There were some staff

8    changes being made in connection with Dr. Menninger taking on

9    remote status, right?

10   **A.**  Staff changes?

11   **Q.**  Yes.  Dr. Reddy, he took on the role of the -- of the

12   official CAP supervisor on site, right?

13   **A.**  Paul Reddy?

14   **Q.**  I'm sorry, Mr. Reddy, yes.

15   **A.**  Yes.

16   **Q.**  Okay.  And there was also an open supervisor that was

17   being recruited for, right?

18   **A.**  I don't recall if there was or not at that time.

19   **Q.**  You mentioned earlier someone by the name of Narine?

20   **A.**  Narine.

21   **Q.**  Can you pronounce her last name for us?

22   **A.**  Khachatryan.

23   **Q.**  Okay.  And Ms. Kachatryan?

24   **A.**  Yeah.

25   **Q.**  She was hired into that supervisor role, right?

1    **A.**   Correct.

2    **Q.**   Okay.  And that was early 2018.

3    **A.**   I don't recall the exact date.

4    **Q.**   Does that sound about right, early 2018?

5    **A.**   Roughly, yeah.

6    **Q.**   Okay.  And I think one of the things that you mentioned

7    in terms of your concerns about having Dr. Menninger not on

8    sight was the inability to brainstorm.  Did I hear that

9    right?

10   **A.**   Yeah.

11   **Q.**   Okay.  Did you and Dr. Menninger do lots of

12   brainstorming?

13   **A.**   I would stop in her office from time to time, yeah, and

14   discuss.

15   **Q.**   How frequently?

16   **A.**   I would say I was probably there once a week.

17   **Q.**   And were you able to pick up the phone and call her when

18   she wasn't on site?

19   **A.**   Typically, it's really hard when you're trying to -- you

20   know, a lot of these pop-ins, you're literally popping in.

21   So everybody's booked back to back most days.  So a lot of

22   times you were finding 15 minutes, 20 minutes here or there

23   to have discussions.

24   **Q.**   So you found it hard to pick up the phone then to walk

25   into her office?

1  **A.**  No, I have no problem picking up the phone.  It's just

2  harder to communicate and have those discussions.

3  **Q.**  It was harder to have the communications over the phone?

4  **A.**  Yeah.

5  **Q.**  Okay.

6  **A.**  For me, personally.  Yeah.

7  **Q.**  Okay.  Is that a common problem for you?

8  **A.**  No.  I mean, I -- usually, when you're doing a

9  brainstorming type of session, you would like to have

10  everybody kind of in the same room, right?

11  **Q.**  Well, you were running a Global Lab, right, sir?

12  **A.**  Correct.

13  **Q.**  You never had everybody in the same room?

14  **A.**  That's correct.

15  **Q.**  In fact, you had responsibilities for labs all over the

16  world, right?

17  **A.**  Correct.

18  **Q.**  And sometimes you had to brainstorm with your direct

19  reports?

20  **A.**  Yes.

21  **Q.**  And sometimes you did it over the phone?

22  **A.**  Correct.

23  **Q.**  You talked a bit about business development.  In 2018,

24  you weren't in charge of business development, were you?

25  **A.**  No.

1   **Q.**   That was ran by Andy Supp; is that correct?

2   **A.**   In 2018?  Yes, I think that's correct.

3   **Q.**   Okay.  And one of the things you talked about Mr. Kashlan

4   doing now is he gets involved in bid defenses; is that right?

5   **A.**   Yes.

6   **Q.**   How often does he do those?

7   **A.**   Probably weekly.

8   **Q.**   Okay.  And you know that for sure, he does them weekly?

9   **A.**   Yeah, I think there's at least one a week, on either some

10  sort of capabilities or client facing meeting.

11  **Q.**   Are you involved in those?

12  **A.**   Some I am and some I'm not.

13  **Q.**   Okay.  How do you decide which ones you're involved in

14  versus which ones you're not?

15  **A.**   Typically it's whether or not, you know, they require me

16  to speak to any of the pieces -- so a lot of times they're

17  going to pull me in.  If I need to make a larger commitment.

18  Right?  So if we're going to commit to doing something that's

19  going to have some sort of financial impact or the way that

20  we typically do things, then they would call me in so that I

21  can relay that commitment to the client.

22  **Q.**   Okay.  So if they're in a client bid defense and they

23  need someone who's not in the room, they can pull them in?

24  **A.**   Oh, that rarely happens.  I mean, usually the people are

25  set up in advance.  It's not a hey, call -- phone a friend

1    type of scenario.  You usually -- you have a cast of

2    characters, everyone that's going in there.  You know roughly

3    what's going to be discussed.  So typically they'll send you

4    an agenda that right, that says these are the things that

5    we're going to want to talk about.  And so then each kind of

6    person is lined up to speak to those.

7    **Q.**  So there's time to prepare, right?

8    **A.**  Yeah.

9    **Q.**  There's time to plan, right?

10   **A.**  Uh-huh.

11   **Q.**  Yes?

12   **A.**  Yes.

13   **Q.**  You can know in advance when these meetings are going to

14   take place?

15   **A.**  Yeah, usually you get about a one-, two-week period.

16   **Q.**  And you know what topics are going to be discussed?

17   **A.**  Yeah, typically slides aren't finalized until last

18   minute.  Usually you're seeing those the day of, or the day

19   before.

20   **Q.**  Well, that depends upon your work flow and how quick you

21   get the work done, right?

22   **A.**  Yeah, but I'm just telling you what it typically is.

23   That's how it usually pans out, that people are getting them

24   the day before.

25   **Q.**  Sure, I didn't ask that question, but that's fine.

1          You can find out who's going to be there, right?

2     **A.**   Yes.

3     **Q.**   You know what time of day it's going to happen?

4     **A.**   Yes.

5     **Q.**   Okay.  And those are -- that's -- that's all information

6     that you're able to communicate to Dr. Kashlan, right?

7     **A.**   He's involved in all the prep meetings.  So there's

8     multiple -- so nobody goes into these just cold, right?

9     There's prep meetings that happen.  There will probably be

10    three, four, five prep meetings before the actual event.

11    **Q.**   And all of that is more time to plan, right?

12    **A.**   It's more time to discuss.  You're having discussions

13    with the whole group.  So the whole cast of players is there

14    to talk about how should we present this, what the flow

15    should be like, what is your section, what kind of

16    information do we need from you, right?  All of that is

17    happening.

18    **Q.**   Sure.  And might there be opportunities -- well,

19    actually, strike that.

20          The nature of these bid defense meetings, these

21    didn't suddenly change in 2018, did they?

22    **A.**   The nature of them?

23    **Q.**   Yes.

24    **A.**   Well, I think we went from -- we had more -- we brought

25    more people in from the business, rather than just a few key

1    players, right?

2    **Q.**   Okay.  But in terms of the type of subject matter that

3    was being covered in client bid defense, that stayed the

4    same?

5    **A.**   No, I don't think that is the case.  Because you would be

6    talking about, again, during that period, you're talking

7    about what new assays, what new functionality.  So it's not

8    just the lab, right?  There was a ton of new functionality

9    that you would have.  So you had to bring in those folks to

10   have those discussions, as opposed to this is kind of the way

11   that we always do it.  So prior to that, you know, it was a

12   more high touch, more integrated model.

13   **Q.**   Well, that depends upon the specific client bid defense,

14   right?

15   **A.**   No, that was our general structure.

16   **Q.**   Well, you're defending bids for different types of

17   projects, right?

18   **A.**   Correct.

19   **Q.**   So some of them would have different specializations?

20   **A.**   Yeah, but you covered every group.  So you didn't -- you

21   covered the Central Lab and every piece within the Central

22   Lab, not just one.  So there was never a time where you would

23   go in and say this is our project management, our project

24   design, our sample management and data management, without

25   including lab and all the other pieces.  So everybody was

included.

**Q.**  Sure.  There was never a time that you would not do that, right?

**A.**  Right.  I mean -- because it's under the entire Central Lab umbrella.

**Q.**  Sure.  And who is actually responsible for planning these client bid defense meetings?

**A.**  A lot of times it falls on the business development person.

**Q.**  So it would be Andy Supp, right?

**A.**  Well, or one of the folks underneath Andy.  Because they're all -- they're regional, right?  So they're going to have a different region.  Somebody on the East Coast, that person is going to be dealing with the East Coast.  You might have one in Europe that's dealing with the ones in Europe.

**Q.**  Sure.  So if Andy Supp or his team thought that they needed Dr. Menninger for a client bid defense, they would be the ones reaching out to her, right?

**A.**  Yeah.

**Q.**  Okay.  To your knowledge, did they ever do that prior to her taking medical leave from PPD?

**A.**  I would assume so.  I don't have direct knowledge at that period of time of who they reached out to and who they didn't.  But, again, everybody was -- everybody was getting on these calls at that time.

1    **Q.**  You talked about an e-mail here, Joint Exhibit 291, which

2    is -- I'm going to show it to you.

3           So this is the e-mail that you looked at in

4    questioning for Ms. Mandel.  And we noted earlier that HR was

5    on Mr. Mekerri's e-mail on May 14, 2018.  Do you see that?

6    **A.**  Yup.

7    **Q.**  Okay.  This type of e-mail chain, it wasn't common for

8    Mr. Mekerri to include Mr. St. John on these e-mail chains,

9    was it?

10   **A.**  Yeah, it was common to include Mr. St. John.  He was part

11   of the senior leadership team.

12   **Q.**  Okay.  So if the jury is to look at other e-mails,

13   concerning other client issues throughout 2018, your

14   expectation is Mr. St. John is going to be on those, too?

15   **A.**  He may include him, he may not.  You know, depending on

16   what type of, whether it was minor, major, critical, what

17   Mr. Mekerri, as far as how he included people on that, I

18   mean, I -- I can't speculate on that.

19   **Q.**  I'm not asking you to speculate.  I'm trying to clarify

20   your testimony.  Is your testimony that it was common for

21   Mr. Mekerri to include Mr. St. John on e-mail correspondence

22   concerning the investigation of lab issues?

23   **A.**  Yeah.  Or other issues.

24   **Q.**  Okay.

25   **A.**  I don't know that it's specific to lab issues.  It would

1    be across the board.  So it could be in project management.

2    It could in data management.  Hacene was well-versed in data

3    management, so those would commonly come out.  So, yeah.

4    **Q.**  And it was typical for him to include Mr. St. John on

5    those?

6    **A.**  Depending on the gravity of the situation.

7    **Q.**  Okay.  You see here Dr. Menninger's response.

8    **A.**  Yes.

9    **Q.**  She writes, "Yes, I've been involved and was

10   corresponding with Jay about this issue last week.  We are

11   meeting daily while the root cause for the latest issue

12   involving improper sample storage temperature is under

13   investigation."

14          Do you see that?

15   **A.**  I do.

16   **Q.**  Was that accurate?

17   **A.**  I couldn't say whether she was meeting daily or not.

18   **Q.**  You don't have any insight into that?

19   **A.**  No.

20   **Q.**  Okay.  And she notes, "with respect to the meeting daily

21   while the root cause for the latest issue."

22          Do you see that?

23   **A.**  Yeah.

24   **Q.**  As of this point in time, am I right, that no root cause

25   had been identified yet?

1    **A.**   For this particular issue in 2018?

2    **Q.**   Yes.

3    **A.**   I would have to look at the log and the event to see if

4    it was resolved.

5    **Q.**   Okay.  This particular storage sample issue, do you

6    recall what the root cause of that was?

7    **A.**   I do not.

8    **Q.**   Okay.  Do you recall if it had something to do with the

9    design of the study?

10   **A.**   It could have.  There's multiple ways that this could

11   be -- that this could go, from a root cause standpoint.

12   **Q.**   Sir, was it your group that was involved in the design

13   study?

14   **A.**   My group would have been involved in designing studies.

15   **Q.**   Okay.  And your group would have been responsible for the

16   design study, right?

17   **A.**   Correct.

18   **Q.**   Okay.  So this could have been an error in your group?

19   **A.**   Could have been.

20   **Q.**   And this customer here, GSK, at some point in time, the

21   project manager on this study was replaced; is that right?

22   **A.**   I don't recall.

23   **Q.**   Were you the project manager for the GSK study?

24   **A.**   No.

25   **Q.**   Do you know who was?

1    **A.**  I don't.

2    **Q.**  Just one last bit here, sir.  I'm going to show you a

3    document.  And again, this is not a -- this is not an agreed

4    exhibit.

5             THE COURT:  Not in evidence you mean?

6             MR. HANNON:  So this is --

7             THE COURT:  Mr. Hannon, not in evidence?

8             MR. HANNON:  Correct.  This is not in evidence as

9    of yet.

10            Let me get the letter here, just so we -- this is

11   AD.

12            Safe to show?  Ms. Ballweg?

13            THE COURT:  Yeah, you can show.

14            MR. HANNON:  Okay.  Great.

15   BY MR. HANNON:

16   **Q.**  So Mr. Clendening, I see here -- I'm showing you a

17   document -- you see here this is dated November 9, 2018, yes?

18   **A.**  Yes.

19   **Q.**  Okay.  And you see here, the document has a -- has a

20   verification by Deborah Ballweg.  Do you see that?

21   **A.**  Yes.

22   **Q.**  Okay.  You know who Ms. Ballweg is, right?

23   **A.**  Yes.

24   **Q.**  Okay.  And you see here that her verification notes that

25   to the extent that she has personal knowledge of the facts

1  that she's affirming under the penalty of perjury, that the

2  facts are true and correct.  Do you see that?

3  **A.**  Yes.

4  **Q.**  Okay.  I want to direct your attention to one of the

5  facts stated here.

6           THE COURT:  Just highlight what you want to ask

7  about.

8           MR. HANNON:  I'm sorry, Your Honor?

9           THE COURT:  Just highlight what you want to ask

10  about before you --

11           It goes on to the next page?

12           What's the question, without repeating what's in

13  the highlight?

14           MR. HANNON:  Well, trying to establish if he

15  believes that's accurate or he disagrees with it.

16           THE COURT:  Well, you can ask him just that.

17           MR. HANNON:  Okay.

18  BY MR. HANNON:

19  **Q.**  Sir, do you agree that as of November of 2019 -- I'm

20  sorry.  As of November 9, 2018, that PPD had --

21           MS. MANDEL:  Objection.

22           THE COURT:  No, you can just ask him -- that's not

23  what I said.  You can ask him whether he knows if that's

24  correct or not, that statement that you've highlighted for

25  him, without repeating the statement.

1          MR. HANNON:  Okay.

2          THE COURT:  You can read the statement.  You know

3    what the statement is, but that document is not now in

4    evidence.  And you haven't offered the document, so I don't

5    think it would be proper to read the document as part of your

6    question, and particularly after the questions you've already

7    asked.  So I think you can just ask him what you want, what

8    your question purports to want to know is whether he agrees

9    that that's accurate or not.

10          So he's read it.  You've seen what's highlighted?

11          THE WITNESS:  It's hard to see because it's on two

12   separate pages.

13          THE COURT:  So he'll show you the next page.

14          So you've seen what's on this page and he'll show

15   you the next page.

16          And then your question is, is that accurate, right?

17   If he knows.

18          MR. HANNON:  Sure.

19   BY MR. HANNON:

20   **Q.**  Is that accurate?

21   **A.**  I don't recall if that's accurate.  I've never seen this

22   document before so I don't know.

23   **Q.**  Sure.  But the fact that it's there, if that were true,

24   that was something that you would know, right?

25   **A.**  Not necessarily.

```
1              MR. HANNON:  Okay.  Your Honor, I'd offer --

2              THE WITNESS:  What's the date on this?  November 9,

3      2018?

4              MR. HANNON:  Yeah.

5              Your Honor, I offer this as an exhibit.

6              MS. MANDEL:  We object, Your Honor.

7              THE COURT:  There aren't any other questions to ask

8      the witness about it, right?

9              MR. HANNON:  No.

10             THE COURT:  All right.  I'll reserve on that, so I

11     can hear you without wasting the jury's time.

12             Are you offering the document or just that one

13     sentence.

14             MR. HANNON:  Just that portion will be fine.  If

15     they want the whole document, we'll have the whole document,

16     but I just need that one --

17             THE COURT:  Okay.  We'll talk about that after.

18             Any other -- so you don't have any more question of

19     the witness?

20             MR. HANNON:  I'm done.

21             THE COURT:  Do you have questions?

22             MS. MANDEL:  Just a couple.

23             THE COURT:  Go ahead.

24             **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

25     BY MS. MANDEL:
```

1    **Q.**  Chris, in 2018, did you have any control over whether

2    Dr. Menninger remained employed?

3    **A.**  No.

4    **Q.**  In fact, at any point when you worked with Dr. Menninger,

5    did you have control over whether she remained employed?

6    **A.**  No.

7    **Q.**  In 2018, were you in charge of hiring a new medical

8    director for Central Labs?

9    **A.**  No.

10                MS. MANDEL:  No further questions, Your Honor.

11                THE COURT:  All right.  Thank you very much.

12   You're excused.

13                Am I right, so we have the two witnesses left?

14                MR. HANNON:  (Nods head.)

15                THE COURT:  And neither of them today.

16                So let me tell you where we are, ladies and

17   gentlemen, for the rest of the case.  So Mr. Hannon, on

18   behalf of Dr. Menninger, has one more witness.  That's your

19   damage expert, right?

20                MR. HANNON:  Economic damage expert.

21                THE COURT:  Economic damage expert, and that expert

22   is not available today.  So that's why we're not hearing from

23   them.  And after that, after he calls that witness, I expect

24   that that's the end of the presentation of his case.  And

25   then the defendants have one more witness to call, and that

1    witness is their medical expert, right?

2         MS. MANDEL:  Yes.

3         THE COURT:  All right.  And that witness also is

4    not available today.  Both of them are available tomorrow.

5    So today, we're done early.  So in terms of -- right.  It's

6    like being let out of school early, right?  So just to give

7    you the rest of the schedule.

8         So we're done today for the day.  Tomorrow we will

9    start at 9 a.m.  We'll have those two witnesses.  We'll

10   certainly be done with them by 1 o'clock.  That's my

11   expectation.  It's possible we will go right up to 1 o'clock.

12   It's possible we'll finish a little bit early.  Either way,

13   tomorrow will be just 9:00 to 1:00.  Friday, you'll come in

14   and we'll have closing arguments, my instructions on the law

15   to you, and you will begin your deliberations, so you should

16   anticipate staying all day.  So that's the schedule for the

17   rest of the case.

18        And just so you understand, part of the reason --

19   you might be thinking why don't we just go all day tomorrow,

20   Judge.  And so the reason is this, my instructions to you on

21   the law, I share with them before I share them with you, so

22   they can comment and give me suggestions or objections or

23   corrections, or all sorts of back and forth interaction, and

24   so I can't really do until I've heard all the evidence.  So

25   that happens, and we'll do that tomorrow after the evidence

1   is done.  And then that's why the next day we'll have closing

2   arguments and charge.  And it also gives the lawyers a chance

3   to prepare better after the evidence is done for their

4   closing arguments.

5           All right.  Yes.

6           THE JUROR:  How long do you expect closing

7   arguments to be?

8           THE COURT:  I would think that the closing

9   arguments would be in the zone between 45 minutes for each of

10  them, give or take a little bit.  And I would think that my

11  instructions on the law to you would be about 45 minutes or

12  so.  So you could expect to get the case certainly before

13  lunch.  All right.  Okay.

14          All right.  Don't discuss the case among

15  yourselves, don't discuss it with anyone else.  Keep an open

16  mind.  You haven't heard all the evidence or my instructions

17  on the law.

18          All rise for the jury and thank very much for your

19  attention.

20          And no independent research.

21          (The jury exits the courtroom.)

22          THE COURT:  Okay.  So your argument is it's a

23  statement of a party opponent on a relevant matter as to when

24  they hired.  It's relevant to some of your theories, right?

25          MR. HANNON:  Correct.

```
1              THE COURT:  Why wouldn't it be admissible?

2              MS. MANDEL:  Well, just the timing itself I think

3    has the potential to be quite confusing to the jury.  But as

4    we --

5              THE COURT:  Full timing of when it's offered?

6              MS. MANDEL:  Well, actually, the timing of the

7    document itself.  We heard today and saw today that this

8    document was dated November of 2018.  So, in fact, it was

9    before -- we've had testimony about Dr. Menninger's medical

10   leave actually ending in February of 2019, a permanent hire

11   being made after that time.  So this -- this was a document

12   that was created and signed by Ms. Ballweg sort of in the

13   midst of that.  And so statements made about the hiring of

14   the interim medical director or a replacement for

15   Dr. Menninger are sort of at a time that is prior to other

16   evidence that we've heard.  The document itself, and, you

17   know, there is case law to this effect, but the document

18   itself has created this position statement at the MCAD, which

19   is a different administrative process with different

20   standards, prior to the commencement of this litigation.  And

21   so statements that were made by PPD, signed by Ms. Ballweg at

22   that time, based on information that was available at that

23   time, should not necessarily be considered a sort of final

24   statements based on all information that would become

25   available to the company as the company is now aware of in
```

1   this litigation.

2         THE COURT:  Okay.  I'll think about it.  But

3   nothing really turns on me resolving it now or tomorrow

4   morning.  So let me think about it a little bit and I'll -- I

5   will -- I'll think about it, and I'll give you a ruling

6   tomorrow morning.

7         In terms of the instructions, I expect to issue the

8   draft instructions and verdict form some time today so you'll

9   have them.  And tomorrow we'll do those two witnesses and

10  we'll have a charge conference some time tomorrow.  I can't

11  tell you exactly what time because it all depends on how long

12  it takes.  If possible, we'll do it right after we're done

13  with the two witnesses and the jury leaves.  That will be the

14  best time to do it from my perspective, but if they go until

15  1:00, it depends a little bit on how long you go.  And

16  otherwise, we'll just fit it in some time in the afternoon.

17  Okay?  Anything else?

18        MR. HANNON:  Nope.

19        THE COURT:  Okay.  Just to go over -- so you can

20  anticipate this, so my view on the order of argument in civil

21  cases is -- differs from the order of argument in state

22  court.  I know in state court, in civil cases, in all cases,

23  I think at closing argument defendant goes first and

24  plaintiff goes last.  I don't follow that model.  I follow

25  what I view as the federal criminal model, which is plaintiff

1    has the burden of proof.  I never -- great respect for the

2    state system, it makes a lot of -- they do it and it seems to

3    work well for them, but my view is plaintiff goes first,

4    defendant goes second, because plaintiff has the burden of

5    proof.  A brief amount of time can be reserved by the

6    plaintiff.  They both get an equal amount of time, can be

7    reserved for a rebuttal.  So plaintiff, defendant, and

8    plaintiff can have a brief rebuttal.  But it's not like to

9    redo the whole argument.  It's supposed to be a brief

10   rebuttal.  So just so you can anticipate, that's how I would

11   do it, how I do do it.

12             All right.  Anything else?

13             MR. HANNON:  Nope.

14             THE COURT:  Okay.  Have a good day.  I'll see you

15   tomorrow morning.  8:45, unless I hear from you.

16             (Court in recess at 12:28 p.m.)

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                              Dated this 29th day of March, 2023.

14

15

16

17                         /s/ RACHEL M. LOPEZ

18

19

20          _____

             Rachel M. Lopez, CRR
21          Official Court Reporter

22

23

24

25