1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4     _____

5     LISA MENNINGER,

6            Plaintiff,                      Civil Action No.
                                             1:19-cv-11441-LTS
7         v.

8     PPD DEVELOPMENT, L.P.,

9            Defendant.

10    _____

11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                          JURY TRIAL
                             Day 9

15

16

17                   Thursday, March 30, 2023
                          8:59 a.m.

18

19

20

21    John J. Moakley United States Courthouse
      Courtroom No. 13
22    One Courthouse Way
      Boston, Massachusetts

23

24    Rachel M. Lopez, CRR
      Official Court Reporter
25    raeufp@gmail.com

1                        **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

        HARTLEY MICHON ROBB HANNON, LLP
4        BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
        155 Seaport Boulevard
5        2nd Floor
        Boston, Massachusetts  02210
6        (617) 723-8000
        phannon@hmrhlaw.com
7        hwatson@hmrhlaw.com

8

9    On behalf of the Defendant:

10        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11        One Boston Place
        Suite 3500
12        Boston, Massachusetts  02108
        (617) 994-5700
13        rachel.mandel@ogletreedeakins.com
        patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                    Page

BRUCE R. JONAS

     By Mr. Hannon                                      7

     By Mr. Curran                                     27

     By Mr. Hannon                                     44

MARTIN KELLY

     By Mr. Curran                                     54

     By Mr. Hannon                                     73

**EXHIBIT**

                                                        Admitted

Number 456                                          46

**MISCELLANEOUS**

                                                        Page

Jury Charge Conference                             109

```
 1                    P R O C E E D I N G S
 2              (In open court at 8:59 a.m.)
 3              THE COURT:  Ready to go?
 4              MR. HANNON:  Two quick things?
 5              THE COURT:  Yeah.
 6              MR. HANNON:  When we rest, Your Honor, we have a
 7    number of joint exhibits, as you know.  We've been showing
 8    some to the jury as we go.  Ms. Belmont has kind of kept
 9    track of those.  I'd like all of the joint exhibits in
10    evidence.  I'm not sure if I need to formally move for that.
11              THE COURT:  I think it's fine if you want to say
12    before you rest, that all of -- I will -- I think I said to
13    the jury at the beginning that the joint exhibits sort of all
14    are automatically in when you bring them up.  But I'll say
15    that the all -- well, you can just say we'd like to move all
16    of the joint exhibits into evidence, and then I'll say that
17    and I'll say to the jury the ones you've already referred to,
18    they're already in evidence.  These are other ones that are
19    all in evidence.  You'll have them all in the jury room.
20              MR. HANNON:  Okay.  And then there may be some
21    duplicates that we're going to work to try to take some junk
22    out.
23              THE COURT:  Sure.
24              MR. HANNON:  So we've talked to Ms. Belmont about
25    that, and so we'll address that prior to --
```

```
 1              THE COURT:  I don't think I need to tell the jury
 2     about them, but I think that makes sense to take out
 3     duplicates.
 4              MR. HANNON:  And then secondarily, this may require
 5     more time than we have, there's an issue regarding the
 6     collateral source doctrine which applies to Mr. Jonas's
 7     testimony; specifically, the disability benefits that
 8     Dr. Menninger receives and whether or not that counts as
 9     mitigation.
10              We suggest in our jury instruction that the jury
11     decide whether or not to apply those as mitigation.  The
12     Court hasn't included those.  And I'm just wondering if the
13     Court has already decided the position regarding collateral
14     source, if that's a --
15              THE COURT:  Your position is that -- there's no
16     dispute factually that she receives those benefits?
17              MR. HANNON:  Correct.
18              THE COURT:  And the question is whether -- your
19     position is what?
20              MR. HANNON:  Our position is that there's a sort of
21     threshold determination of whether or not to count those as
22     mitigation, essentially, to deduct that in determining her
23     harm.
24              THE COURT:  As the jury has a -- the right to
25     either -- let's say the jury, just to make it simple, came up
```

1    with a hundred dollars as harm, and her collateral benefits

2    were $12.

3            MR. HANNON:  Right.

4            THE COURT:  That the jury could make a -- they

5    could just say $100 in harm and ignore the 12, or they could

6    say we would like -- we view it as mitigation and therefore,

7    we're at $88?

8            MR. HANNON:  Correct.  And I think there's a fair

9    question whether that's a jury question or a question for the

10   Court.  So I -- I think the right answer is the jury decides,

11   but -- but anyhow, I just flag it because if Your Honor had

12   already made a determination on that, we can leave some stuff

13   out of the direct, but it sounds like the Court has not made

14   a determination on that, so it sounds like we should put

15   everything in now, and we'll address this --

16           THE COURT:  I think that makes sense.  Do you have

17   a view on this?

18           MR. CURRAN:  We think that that makes sense.  We

19   can address it later.

20           THE COURT:  Okay.  Fine.  Let's go get the jury.

21           (Jury present.)

22           THE COURT:  Good morning, ladies and gentlemen.  No

23   one discussed the case, no one did any independent research?

24           Good.

25           All right.  Mr. Hannon, call your next witness.

```
1              MR. HANNON:  The plaintiff calls Bruce Jonas.

2              THE DEPUTY CLERK:  If you could raise your right

3    hand.

4              (Witness duly sworn.)

5              THE DEPUTY CLERK:  Can you please state your full

6    name and spell your last name for the record.

7              THE WITNESS:  Bruce Robert Jonas, J-o-n-a-s.

8              MR. HANNON:  May I proceed, Your Honor?

9              THE COURT:  Yes.

10                         BRUCE R. JONAS

11             having been duly sworn, testified as follows:

12             DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

13   BY MR. HANNON:

14   Q.   Good morning, Mr. Jonas.

15   A.   Good morning.

16   Q.   Could you please explain to the jury what you do for

17   work?

18   A.   I'm a CPA, and for the last 30 years, I've been doing

19   damage calculations for litigation matters, working with

20   attorneys.

21   Q.   Okay.  Were you retained by my firm in connection with

22   this matter to do an economic damage calculation?

23   A.   Yes, I was.

24   Q.   Okay.  Before talking about that, I wanted to talk a

25   little bit about your background.  Could you describe your
```

1    educational background for the jury, please.

2    **A.**   I graduated from Hofstra University in 1969 with a BBA in

3    accounting.  That was the extent of my formal education.  I

4    did get my CPA certificate in the State of New York in 1972.

5    I went to work immediately for Peat Marwick Mitchell, which

6    is the predecessor of KPMG, one of the four big accounting

7    firms.  It was eight when I started.

8              And I -- at Peat Markwick, I was an auditor and I

9    was a consultant, and at that point, I started doing

10   litigation work about 1978.

11   **Q.**   Okay.  And after you started doing litigation work, would

12   that be sort of doing analysis in support of litigation

13   matters?

14   **A.**   That's correct.

15   **Q.**   Okay.  And did you continue to focus on that area going

16   forward?

17   **A.**   To the -- as much as I could control it, yes, I did.

18   **Q.**   Okay.  And at some point in time, did you start your own

19   firm?

20   **A.**   In 1991, I formed Jonas & Welsch with Donald Welsch, who

21   had been an associate of mine at Peat Marwick.

22   **Q.**   And for -- what did you do at Jonas & Welsch?

23   **A.**   Again, we did exclusively litigation support work.  Our

24   practice was pretty evenly split, revenue-wise, between

25   matters involving individuals, things like that wrongful

1   death, personal injury, and labor matters; and the other side

2   was commercial, breach of contract, thing like that.

3   **Q.**  Okay.  Any particular split between representing or

4   working on behalf of plaintiffs versus defendants?

5   **A.**  No.  We worked for either side.

6   **Q.**  Okay.  And in terms of the type of litigation support

7   matters, you mentioned about half -- half of the work,

8   revenue-wise, was personal; is that right?

9   **A.**  The three items I talked about, personal injury, wrongful

10   death, and labor.

11   **Q.**  And in those three areas, what kinds of litigation

12   support work did you do?

13   **A.**  Well, in the personal injury, wrongful death, and labor,

14   you're looking at a situation in which someone has allegedly

15   been harmed by someone else.  If the trier of fact were to

16   find that there was a wrongdoing which occurred, you're

17   trying to calculate what the losses were to the plaintiff,

18   what would they have earned had there been no wrongdoing,

19   versus what they can earn now, the difference being the

20   damages.

21   **Q.**  Okay.  And do you have any sense of how many of those

22   types of damage calculations you've done over the years?

23   **A.**  Thousands.

24   **Q.**  In connection with doing that damage calculation, did you

25   do any work with respect to the 9/11 Victims Fund?

1   **A.**   We did a tremendous amount of work with the VCF and Ken

2   Feinberg in the original victims compensation fund.   Ken

3   built the rules of the calculation around case law, which we

4   were very familiar with, because we had been doing that kind

5   of work.   And there were a number of times when he called us

6   in to help clarify some things and get it done the way he

7   wanted to do it.

8   **Q.**   Okay.   And you mentioned you started Jonas & Welsch in

9   1991.   What's the -- what's the status of Jonas & Welsch

10  today?

11  **A.**   At 12/31/2020, we kind of closed our doors.   My partner,

12  who is a few years older than I am, was having some medical

13  issues, and could not take the witness stand anymore.   So we

14  felt it was time to close the doors.   We contacted our

15  clients, told them that we would finish any work that was

16  in-house, but we weren't starting anything new.

17  **Q.**   And at that point in time, was this one of the projects

18  that was already started?

19  **A.**   Yes, that's correct.

20  **Q.**   Okay.

21  **A.**   I believe we wrote our report in October of 2020.

22  **Q.**   Okay.   And you expect this is probably the last time

23  you'll be testifying?

24  **A.**   This could be the last time.

25  **Q.**   Okay.   All right.   Can you describe for the jury, just as

1   a general overview, how it is that you go about doing a

2   damages calculation?

3   **A.**   Well, as I said, the objective is to try and figure out

4   what was lost, what would have been earned had there been no

5   wrongdoing versus what can now be earned in a harmed

6   situation, and the difference is damages.

7           It's really not rocket science.  There's a lot of

8   calculations, but there's not a lot of subjectivity in it.

9   You try and get an understanding of what the case is, the

10  fact patterns, amass as much data as is pertinent to that

11  case and pertinent to the calculations, and build a worksheet

12  and do the -- grind through the numbers.

13  **Q.**   Is this an exact science?

14  **A.**   No.  There's -- for example, in a case like this where

15  we're projecting forward, we don't have a crystal ball, so I

16  can't tell you exactly what's going to happen in 10 or

17  15 years from now.  But you try and build your calculations

18  and your estimates based on the historical patterns that have

19  existed, and that's the best information we have at the time

20  we're doing those calculations.

21  **Q.**   Very good.

22          And in the course of your -- doing your work in

23  this case, did you create some tables reflecting your

24  calculations?

25  **A.**   Lots of tables.

1    Q.   Okay.  I'm now going to show you Joint Exhibit 455.  And
2    is this one of the tables that you created based upon your
3    analysis in this case?
4    A.   Yes.  This accompanied my written report, the narrative,
5    and this was the exhibit that identifies -- excuse me -- what
6    the damages would be between 2018 and 2036 by each year.
7    Q.   Okay.  And we'll go through some of this in more detail,
8    but just to orient the jury a little bit, in calculating the
9    economic damages, did you take into account the value of any
10   stock options or equity that Dr. Menninger had?
11   A.   No.  You specifically indicated to me that that was not
12   part of my responsibility.
13   Q.   Okay.  Understood.
14          And then looking over here on the right side of the
15   table, you'll see here there's this fax reflecting this
16   was -- this was faxed yesterday.  Is that because you
17   identified an error in this table when you were preparing to
18   testify?
19   A.   Yes.  That last column that says "NPV," which stands for
20   net present value, the bottom number, which is the number
21   that we've concluded is the damage amount for the entire
22   period, that number is correct.  The intermediate numbers
23   were slightly off because we had one year in the past which
24   should have been in the future, which moved at discounting
25   very, very slightly.

1   **Q.**   Okay.  And just for the jury's reference, when you create

2   these tables, are these essentially Excel worksheets?

3   **A.**   Yes, they are.

4   **Q.**   So are there, you know, formulas imbedded in all these

5   various columns we see?

6   **A.**   Yes, there are.

7   **Q.**   Okay.  All right.  So let's dive in here and look here at

8   the -- one of the first columns.  So the first column here we

9   have is age.  And am I right that part of the work in doing a

10  calculation like this is trying to determine an individual's

11  expected work life?

12  **A.**   That's correct.  That's a critical part of the whole

13  calculation.

14  **Q.**   And --

15  **A.**   What you're trying to do, again, is what was lost because

16  of the alleged wrongdoing and for how long it was lost.

17  **Q.**   Sure.  And can you explain to the jury what -- what we

18  mean by "expected work life"?

19  **A.**   The technical definition is the point in time when an

20  individual voluntarily withdraws from the work force, what we

21  would call retirement.  I'm in that phase right now trying to

22  retire.

23          And there are tables that are prepared.  There's a

24  lot of science that goes into this, and we use recognized

25  authorities on calculating work life expectancy.  There are a

1    number of variables in that calculation, which is the current

2    age of the person, the gender of the person, and the highest

3    level of education, the top being a professional degree.

4    **Q.**   And when you look at those tables, is that, in part,

5    based upon what the current age of the individual is?

6    **A.**   Well, we've -- what we always do is we use the age at the

7    point of wrongdoing, so this was back in 2018.

8    **Q.**   Okay.  And the tables and materials that you've

9    referenced that you used in determining expected work life,

10   are -- to your knowledge, are those regularly relied upon by

11   experts in your field?

12   **A.**   Yes, sir, very frequently.  And they became the basis for

13   work life expectancy in the victims compensation fund.

14   **Q.**   Okay.  Looking here at wages and bonus, can you just tell

15   the jury what's -- what the components of that calculation

16   are?

17   **A.**   Wages and bonus.  We had to calculate what the calendar

18   year 2018 was, recognizing that there is a kick-up in salary

19   in April.  So we took information from compensation documents

20   provided by the defendant, took three months of one year,

21   nine months of the other year, and calculated what the

22   initial wages would be for the calendar year.

23           Then using a analysis of past performance, past

24   wages, we calculated what a growth rate was from one year

25   over the next, and that came out to 2.7 percent.  So we took

1    the 2018 wages and rolled them forward, adding 2.7 a year to

2    the wages.

3    **Q.**   Okay.  Just unpack that a little bit here.  So I think

4    you indicated that the first step was figuring out this 2018

5    number; is that right?

6    **A.**   That's correct.

7    **Q.**   Okay.  And I'm going to show you another document here.

8    This is going to be Joint Exhibit Number 14.  And you see

9    here this would be Dr. Menninger's 2018 compensation

10   statement.  Do you see that there?

11   **A.**   I do.

12   **Q.**   Okay.  And it includes a line showing what her salary was

13   going to be effective April 1, 2018?

14   **A.**   Correct.

15   **Q.**   Okay.  And so did I hear you right that, because the --

16   because the pay increase went into effect April 1st, that

17   you -- you took that into account in figuring out what the --

18   **A.**   Three months of the old and nine months of the new.

19   **Q.**   Okay.  And then you included the bonus that would be paid

20   in 2018; is that right?

21   **A.**   Correct.

22   **Q.**   Okay.  In determining the 2018 wage and bonus number, did

23   you make a reduction, going back to Exhibit 454 here, based

24   upon -- sorry -- that's the wrong button.  Here we are.

25           Did you make a reduction based upon labor force

1  participation?

2  **A.**  Yes.  Let me explain what labor force participation is.

3  I mentioned earlier that the tables that we use for work life

4  identify the point in time when an individual -- excuse me --

5  would voluntarily withdraw from the work force.

6         And it's recognized amongst economists that,

7  between now and then, there are likely going to be times when

8  you are not employed, either voluntarily or involuntarily.

9  Your spouse gets a great job on the other side of the

10  country, and you have to leave and take off with that spouse,

11  and you're now out of work for three or four months.

12         We don't know when that -- that absence from the

13  work force is going to take place, but there -- again, there

14  are a lot of tools that the economists use to identify what

15  that amount is, the percent is, and we take that percent --

16  in this case, it was 3.24 percent, I believe -- out of each

17  year, because we don't know if it's going to happen in the

18  third year or the fifth year or not at all.  But we reduce

19  each year by that labor force adjustment.

20  **Q.**  Okay.  And then in terms of projecting the years going

21  forward -- so, for example, going from what you calculated

22  for 2018 going forward to 2019 -- can you walk the jury

23  through how you did that computation?

24  **A.**  Sure.  The -- once we've established what the wages would

25  be for 2018 and we know what the historical growth rate was

1  year over year in wages, which was 2.7 percent, we grow the

2  wages each year by 2.7 percent.

3  The bonus is a percentage of the wages, so, again,

4  we took the historical performance of bonuses and applied

5  that to the wages to come up with the total wages and bonus.

6  **Q.** Okay. So to just unpack that a little bit, you indicated

7  that you determine the annual growth rate for salary would be

8  2.7 percent? Did I hear that right?

9  **A.** That's correct.

10  **Q.** And when you say that was "historic," what do you mean

11  that was historic?

12  **A.** In the years that Dr. Menninger was working for PPD, this

13  was year over year her wage growth.

14  **Q.** Okay. In your experience, is a calculation of

15  2.7 percent year over year wage growth, is that reasonable?

16  **A.** It is reasonable, yes.

17  **Q.** Okay.

18  **A.** Again, going back to the victims compensation fund where

19  they use a whole different methodology to calculate growth,

20  they level out at age 55 at 3 percent. So people who are 55

21  and older would recognize a 3 percent growth, so 2.7 is

22  certainly reasonable.

23  **Q.** Okay. And then you mentioned bonus, and I think I heard

24  you say that the bonus was a percentage of the salary; is

25  that right?

1    **A.**   The prior year salary, correct.

2    **Q.**   Okay.  And how did you determine what that -- what that

3    percentage would be?

4    **A.**   The same way.  We looked at the bonuses that were given.

5    We compared them to the base salaries and concluded that the

6    bonus was just under 20 percent of the salary.

7    **Q.**   Okay.  And did you review Dr. Menninger's offer letter in

8    connection with your work, as well?

9    **A.**   Yes, I did.  We read it.  And I think it indicated that

10   the target bonus was about 21 percent.

11   **Q.**   Okay.  So given the fact that Dr. Menninger's target

12   bonus was 21 percent, did you believe that using a target --

13   I'm sorry -- assuming a 20 percent bonus going forward was

14   reasonable?

15   **A.**   Yes, correct.

16   **Q.**   And then looking back here at your chart, so as these

17   numbers sort of grow year over year, is that -- is that based

18   upon those -- those same calculations you just described?

19   **A.**   Right.  It's principally the growth of 2.7 percent in the

20   salary, and then the corresponding growth of the bonus, which

21   is getting the 20 percent of that 2.7 bump each year.

22   **Q.**   What happens here in 2036?

23   **A.**   She turns 67.41 years, and that's the point in time that

24   we determined she would be withdrawing from the work force,

25   retiring, so it's only a partial year.

1    **Q.**  Okay.  All right.  Let's look at the next column here.

2    You have benefits.  Can you explain to the jury what -- what

3    the benefits here consist of?

4    **A.**  There are three components of benefits.  There's the

5    401(k), there's healthcare benefits, and there's the

6    employer-paid portion of Social Security.

7    **Q.**  Let's take the first one last.  Why do you consider

8    Social Security to be a benefit?

9    **A.**  Well, the employer is putting money into the

10   individual's, quote, account, which they will benefit from

11   when they retire.  Their benefits will be greater and there

12   is a cost to that greater benefit and we consider that a

13   benefit to be considered.

14   **Q.**  And is that benefit something that employers are required

15   by law to provide?

16   **A.**  Sure.

17   **Q.**  And in terms of calculating the amount of that Social

18   Security benefit, how did you do that?

19   **A.**  Well, we know what the percentage is, the employer

20   percentage.  We also know at the top what the maximum being

21   paid in Social Security is each year.  Over the past number

22   of years, we've calculated what the growth is in that base

23   number.

24          In other words, you're not paying Social Security

25   above a certain compensation amount.  We did that calculation

1    and we made sure that the amount of employer-paid Social

2    Security did not exceed the basis of the salary component.

3    Q.   Okay.  And then you mentioned healthcare.  How did you go

4    about determining the healthcare benefit value?

5    A.   There is a tool that we use called "expectancy data."

6    It's regularly used by economists, especially forensic

7    economists.  And it compiles data from the United States

8    government which aggregates it in an hourly cost for a

9    particular type of benefit.

10             We can't measure the benefit that Dr. Menninger

11   would receive from that healthcare because I don't know if

12   she's going to be sick.  I don't know if she's going to be

13   hit by a truck.  I don't know if she's ever going to use

14   those benefits.  But I can measure the cost, and the tables

15   that the expectancy data provide are based on the type of

16   employment.  In this case, we use the table that was private

17   companies and in the category of professional and technical

18   services.

19   Q.   And is that methodology that you use, is that regularly

20   relied upon by experts in your field?

21   A.   Yes, it is.

22   Q.   Okay.  And then you mentioned 401(k).  Can you explain

23   for the jury what the -- what the 401(k) benefit is?

24   A.   Yes.  We saw in the handbook that there's a 401(k)

25   benefit.  If I remember correctly, it's half of what the

1    employee puts in, up to a maximum of 3 percent, half of the

2    6 percent that the employee puts in.  And we noticed that

3    Dr. Menninger was, in fact, putting in the maximum, so we

4    took that 3 percent and added it to the benefits.

5    **Q.**  Okay.  And was that 3 percent of the base salary?

6    **A.**  Yes.  Excuse me.  Yes.

7    **Q.**  And here's a real tough one.  The total column?

8    **A.**  Yeah, well, that's a calculator, column A plus column B

9    equals column C.

10   **Q.**  Good.  Okay.

11            Next section here is -- oops.  I did it again.  I'm

12   sorry.

13            All right.  We're back on 454.  The next column

14   here, we have "actual/mitigation."  Can you explain for the

15   jury what this represents?

16   **A.**  Well, we started in 2018, and our calculation would

17   compute the entire amount of 2018, but we have to subtract

18   out what she actually earned during that year.  And the

19   285,000 we got from a W-2 that she received from PPD.

20   **Q.**  Okay.  And just sort of more -- more sort of generally,

21   when you're doing a damage calculation, is part of what you

22   look at the anticipated earnings of the individual moving

23   forward?

24   **A.**  Could you repeat that question?

25   **Q.**  Yeah, that was a tough question.  Why does -- why in

1    doing a damage calculation did you -- do you look at the

2    actual/mitigation?

3    **A.**   It's the best evidence of what she actually received.

4    **Q.**   Okay.

5    **A.**   I don't know, as I sit here today, exactly what was --

6    that 285, what made it up, but that's what she got.

7    **Q.**   Okay.  And in doing your analysis, did we ask you to do

8    two separate calculations relative to mitigation?

9    **A.**   Yes, you did.

10   **Q.**   Okay.  And let me show you another document here.  So I'm

11   now showing you Exhibit 455.  And so is this the other

12   calculation you did?

13   **A.**   Yes, it is.

14   **Q.**   Okay.  And am I right that, with respect to the last

15   exhibit we looked at, these columns concerning the expected,

16   that should all be the same, right?

17   **A.**   Those should be identical --

18   **Q.**   Okay.

19   **A.**   -- with Exhibit A.

20   **Q.**   Okay.  And here in the actual mitigation, this is

21   different, right?

22   **A.**   From 2019, down, it's different.

23   **Q.**   Okay.  And is that because in this calculation, you

24   included certain -- certain benefits that Dr. Menninger

25   received?

1   **A.**   Yes.   Yes, in 2019, she received 85,000 from Unum, which

2   I understand to be a disability insurer, perhaps; and

3   thereafter, the 29.9 is the Social Security disability that

4   she would get because she's disabled.

5   **Q.**   Okay.   And am I right that in conducting both analyses,

6   you were asked to make the assumption that Dr. Menninger

7   continues to receive disability and does not return to work?

8   **A.**   That's correct, for the remainder of her expected work

9   life.

10   **Q.**   And just so we're complete here, can you tell the jury

11   what happens here in 2036?

12   **A.**   Well, in 2035, I believe she hits 67; and the disability

13   becomes retirement Social Security, and you wouldn't get

14   both.   So we've terminated the disability in 2035, and there

15   would be none in 2036.

16   **Q.**   Okay.   I'm going to take you back to Exhibit 454 here for

17   a moment.   And just looking here at the top line, so you told

18   us this -- the wage and bonus number, that was taken from

19   Dr. Menninger's tax records; is that right?

20   **A.**   The W-2, correct.

21   **Q.**   Okay.   And with respect to the benefits number here, we

22   see that on your chart here you have the expected benefits

23   being less than the actual benefits; is that right?

24   **A.**   That's correct.

25   **Q.**   Okay.   And am I right that, when you were doing this, you

1    assumed that Dr. Menninger had lost her company sponsored

2    health insurance during 2018?

3    **A.**   That's correct.

4    **Q.**   Okay.  And if the facts were to show to this jury that

5    she actually kept her health insurance throughout 2018, would

6    that -- would that mean that your numbers are off by --

7    **A.**   $3,944.

8    **Q.**   So that amount right there?

9    **A.**   The -- yes.

10   **Q.**   Okay.  All right.  Now let's look here at the losses

11   column.  So is this just simple math here?

12   **A.**   Correct.  It's subtracting the middle columns from the --

13   the first columns.

14   **Q.**   Okay.  And we see here on 454, since you're not including

15   the disability payments going forward, that the losses aren't

16   being reduced from 2019 forward, right?

17   **A.**   Correct.

18   **Q.**   And if we look at the other exhibit you did, 455, this

19   shows the jury what the math would be if you took those into

20   account?

21   **A.**   Yes, sir.

22   **Q.**   Okay.  Back to 454, here in the last two columns, we have

23   nominal and NPV.  Do you see that?

24   **A.**   I do.

25   **Q.**   And can you explain to the jury why -- why we have those

1    columns?

2    **A.**   The nominal column is the cumulative year over year.   So

3    in -- we add 2026 losses to the cumulative amount

4    through 2025 to come up with that nominal amount.   The total

5    amount would have been 7,447,000.

6    **Q.**   Okay.   So that would have been the total if you just --

7    if you just -- just added up the numbers, right?

8    **A.**   If you just add up the numbers.

9    **Q.**   All right.   Why -- why do we have, then, this column here

10   for NPV?

11   **A.**   NPV is the net present value and it works off of the

12   theory that a dollar today is worth more than a dollar

13   tomorrow.

14        We see it most frequently when you go buy a lottery

15   ticket.   You can buy a lottery ticket that's going to pay a

16   hundred million dollars.   If you take it over 20 years,

17   you'll get the hundred million dollars; but if you take it

18   all today, you -- excuse me -- you may only get $78 million

19   because the dollar today is worth more than it would be

20   spread over time.

21        Theoretically, you could take that 78 million and

22   invest it; and after 20 years, you would have 100 million.

23   **Q.**   Okay.   So in performing damage calculations, is it

24   typically for experts in your field to take into account the

25   net present value of the future income streams?

1   **A.**   Yeah.  If you want the true economic loss, you would have

2   to go through this net present value calculation.

3   **Q.**   Okay.  And just broadly speaking, how do you determine

4   net present value?

5   **A.**   I use the Excel spreadsheet formula.  A lot of us can go

6   back to our college days and find these enormous tables in

7   the back of textbooks, but Microsoft has put those into an

8   Excel spreadsheet, so I can put the formula in and it will

9   calculate the net present value.

10  **Q.**   Okay.  Now, in calculating the net present value here,

11  you have -- you have discounted, for example, Dr. Menninger's

12  anticipated earnings in 2021.  Do you see that?

13  **A.**   Yes.

14  **Q.**   And why did you do that?

15  **A.**   2021 is -- I don't know if you've got it lined up right.

16  **Q.**   I don't.  I did a bad job highlighting that.

17  **A.**   Okay.  Through -- since we did our report in 2020, the

18  damages in '18, '19, and '20 would have been considered in

19  the past.  Any damages after 2020 would be considered in the

20  future and -- excuse me -- if it's the future, that's the

21  piece that has to be discounted.  You're not discounting the

22  past.

23  **Q.**   So if you were doing this calculation --

24  **A.**   Excuse me.

25  **Q.**   -- as of today, for example, in order to determine

1   Dr. Menninger's damages through 2022, would you -- would you

2   apply discounting?

3   **A.**   No, I would not.

4   **Q.**   Okay.

5   **A.**   But my discounting would start at 2023 instead of 2021.

6   **Q.**   Okay.   Good.

7           MR. HANNON:   That's all I have, Your Honor.

8           THE COURT:   Okay.   Cross-examination.

9           **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

10  BY MR. CURRAN:

11  **Q.**   Good morning, Mr. Jonas.   Sorry.   I'm just getting set up

12  over here.

13  **A.**   Take your time.

14  **Q.**   So, Mr. Jonas, my name is Patrick Curran.   I'm one of the

15  attorneys for PPD.

16          MR. CURRAN:   Oh.   May I approach the witness,

17  Your Honor?

18          THE COURT:   You may.

19          MR. CURRAN:   Thank you.

20          Here you go, sir.

21          And, Your Honor, I think you already have --

22          THE COURT:   I do.

23  BY MR. CURRAN:

24  **Q.**   So, Mr. Jonas, I think you testified that you were

25  retained by Dr. Menninger's attorney to provide your opinion

1    in this case; is that right?

2    **A.**  That's correct.

3    **Q.**  And you're being paid by Dr. Menninger's counsel to

4    provide your testimony today, correct?

5    **A.**  That's correct.

6    **Q.**  I understand -- let's -- from your expert report, like,

7    your offices are in New York and New Jersey; is that right?

8    **A.**  Well, there's only three of us in the company.  I'm in

9    Long Island, Don Welsch, who is in New Jersey, and then the

10   young lady that does a lot of our work is a CPA in

11   North Carolina.

12   **Q.**  Okay.  So it's fair to say you had to travel up here to

13   testify today?

14   **A.**  I traveled up yesterday, but yes.

15   **Q.**  Oh, okay.  That makes sense.  And who paid for your

16   travel expenses?

17   **A.**  Nobody yet.  I expect to bill them.

18   **Q.**  Okay.  So you expect to be reimbursed?

19   **A.**  Yes.

20   **Q.**  Okay.  Now, in forming your opinion about the amount of

21   Dr. Menninger's damages in this case, you made a number of

22   assumptions; is that right?

23   **A.**  Either I made them or they were given to me.

24   **Q.**  Okay.  So one of those assumptions was that Dr. Menninger

25   will be able to work -- won't be able to work for the

1    remainder of her working life?

2    **A.**   That's correct.

3    **Q.**   Is that one of the assumptions you made because

4    Dr. Menninger's counsel asked you to?

5    **A.**   That's correct.  I think it's a little broader than won't

6    be able to work.  It's won't be able to work in a comparable

7    field.

8    **Q.**   Okay.  So it's not that she won't be able to work at all;

9    the assumption is she won't be able to work in a comparable

10   field?

11   **A.**   Right.

12   **Q.**   So if she were able to work at all, would that affect

13   these numbers?

14   **A.**   I think that's a legal question, whether the duty to

15   mitigate -- if she flips hamburgers, would that be considered

16   mitigation for her job.

17   **Q.**   Well, putting aside whether she has a duty to flip

18   hamburgers, if she gets a job flipping hamburgers and makes

19   money doing it, would that reduce the numbers in your report?

20   **A.**   I guess it could.

21   **Q.**   And you said you traveled up here yesterday, right?

22   **A.**   Correct.

23   **Q.**   So you obviously weren't in court on Monday?

24   **A.**   No.

25   **Q.**   All right.  So were you made aware that Dr. Menninger's

1    medical expert testified on Monday testified that he can't

2    say for certain that Dr. Menninger won't be able to work

3    again for the rest of her working life and that it's possible

4    she may be able to work again?

5    **A.**   I'm unaware of any of that testimony.

6    **Q.**   All right.  And to be clear, you're not offering an

7    opinion today as to whether Dr. Menninger can or cannot work

8    today or --

9    **A.**   Clearly I'm not.

10    **Q.**   Okay.  All right.  I want to show you one of the

11    documents that Mr. Hannon was showing you.  And this is

12    Exhibit 455, and it's Exhibit B from your expert report, but

13    it's been admitted here as Joint Exhibit 455.

14            And Dr. Hannon [*sic*] went through the other version

15    of this one --

16            THE COURT:  Mr. Hannon.

17            MR. CURRAN:  Mr. Hannon.

18            MR. HANNON:  I've been called worse things,

19    Your Honor.

20            MR. CURRAN:  There is so many doctors in this case.

21    Sorry.  I keep getting -- getting mixed up.  So --

22            THE COURT:  Some people might think it's a

23    compliment for a lawyer to be called doctor.

24            MR. CURRAN:  Definitely.

25    BY MR. CURRAN:

1    **Q.**  So this was your calculation of the salary, bonus, and

2    benefit losses by Dr. Menninger on an annual basis starting

3    in 2018; is that right?

4    **A.**  That's correct.

5            MR. HANNON:  I'm sorry.  This one isn't on our

6    screen.

7            THE COURT:  It's not on your screens?

8            You have it.

9            You don't have it?

10           MS. MANDEL:  We don't have it over here.

11           MR. HANNON:  I don't need it.  That's fine.

12           MS. MANDEL:  We have other copies.

13           THE COURT:  Okay.  Fine.  As long as --

14           Ladies and gentlemen of the jury, you have it?

15           It's on my screen.

16           MR. CURRAN:  Okay.

17           THE COURT:  You have it there, right?

18           THE WITNESS:  I do.  I think this is terrific.

19   BY MR. CURRAN:

20   **Q.**  So this is Exhibit B.  This is the one in which you

21   subtracted the amounts that Dr. Menninger received and that

22   you expect to receive in Social Security disability --

23   **A.**  That's correct.

24   **Q.**  -- insurance?  Okay.

25           Now, am I correct that the numbers -- and you

1    testified about this, but I just want to make clear.  The

2    numbers in the column all the way to the right, those are

3    what you calculated the cumulative loss salary bonus and

4    benefit amounts to be each year, correct, at least in the

5    nominal field?

6    **A.**   Yes.

7    **Q.**   And the NPV is reduced for net present value?

8    **A.**   That's correct.

9    **Q.**   Okay.  So if the jury were to disagree with your

10   assumption that Dr. Menninger won't be able to work for the

11   rest of her working life through 2036 and instead finds that

12   Dr. Menninger would be able to return to work at some point

13   in the interim, so, for example, if she were able to return

14   to work in January 1, 2020, am I right that your opinion is

15   that her total lost salary, bonus, and benefits amount would

16   be $293,331?

17   **A.**   If she could go back to work on January 1, '20 -- 2020?

18   **Q.**   Correct.

19   **A.**   Yes, that's what the numbers would indicate, and I just

20   like to clarify; you said my assumption.  It was not my

21   assumption.  It was an assumption given to me.

22   **Q.**   Sorry about that.  Yes.  Okay.  Understood.

23           So if the jury were to disagree with the assumption

24   that you were provided by Dr. Menninger's counsel and were to

25   conclude that she would have been able to return to work on

1    January 1, 2020, her lost wages, benefits and -- lost wages,

2    bonus, and benefits would have been $293,331?

3    **A.**   Yes.  And they can do that for any year through 2036.

4    **Q.**   Right.  So if they determine that she could have -- she

5    could go back to work, you know, January 1 of next year, then

6    the amount would be, what?

7    **A.**   Next year?  2024?

8    **Q.**   Yeah.  So it would be the $1,639,797 number --

9             THE COURT REPORTER:  I'm sorry.  Could you say that

10   number again slower?

11            MR. CURRAN:  Sorry.  1,639,797.

12            THE COURT:  I think it's 1 million -- I see the net

13   present value number, yes.

14            THE WITNESS:  1,992,000, is that what you got?

15   BY MR. CURRAN:

16   **Q.**   I think that's through -- through the end of 2024?

17   **A.**   Excuse me.  1,639,000.

18   **Q.**   Okay.  All right.  And the same goes for the rest of the

19   -- we don't have to go through all the rest of the years, but

20   that's -- that's --

21   **A.**   That's the calculation.  We provide that in case the

22   trier of fact wants something other than the full amount.

23   **Q.**   Understood.

24            Now, these numbers in here all depend, of course,

25   on whether the jury agrees with all your other assumptions,

1    correct?

2    **A.**   I didn't make a whole lot of assumptions.

3    **Q.**   Okay.  But to the extent that any of the assumptions you

4    did make turn out to be wrong, these numbers would be

5    incorrect, right?

6    **A.**   For example, what assumptions are you talking about?

7    **Q.**   All right.  So, for example, you assumed that, if not for

8    PPD's alleged conduct, Dr. Menninger's would have remained

9    employed with PPD in the position that she held at PPD in

10   2018 or in a similar position until sometime in 2036.

11   **A.**   Right.  I mean, if there was no wrongdoing, there's no

12   damage calculation at all.

13   **Q.**   Right.  I'm not -- actually, it's a slightly different

14   question.  It's not about wrongdoing.  The assumption is that

15   she would have -- if there were no wrongdoing, she would have

16   remained employed at PPD or in similar position until 2036?

17   **A.**   Correct.

18   **Q.**   Okay.  And that she wouldn't have retired earlier?

19   **A.**   And she wouldn't have retired early.

20   **Q.**   And it also assumes she wouldn't have, you know, for

21   example, decided to try and find a different job that more

22   aligned with her values, like maybe something in the arts?

23   **A.**   Can you repeat that, please?

24   **Q.**   Yeah.  It assumes that she wouldn't, at some point, have

25   decided to find another job that aligned more with her

1   values, like something in the arts, for example, but that

2   paid less?

3   **A.**   Yes.  If she was making money into the future, yes, you

4   would consider that mitigation.

5   **Q.**   Okay.  And was the assumption that she would continue

6   working at PPD or in a similar job 'till 2036, was that

7   something that Dr. Menninger's attorneys asked you to assume?

8   **A.**   They didn't give me a date.  I had to decide and estimate

9   what her work-life was.

10  **Q.**   Okay.

11  **A.**   What -- the assumption that was given to me was that she

12  will not be able to work through the remainder of her work

13  life.

14  **Q.**   Okay.  And so that assumption was irrespective of when

15  the end of -- when you determined the end of her work life

16  would be, right?

17  **A.**   Correct.

18  **Q.**   Okay.  So you're asked to assume that she wouldn't work

19  for the rest of her life before you knew how long her work

20  life would be, right?

21  **A.**   In a similar position or a comparable position.

22  **Q.**   Right.

23         Your calculations also assume that the, despite her

24  disability, Dr. Menninger would have been able to perform all

25  the essential functions of her job at PPD or a similar job

1    with or without accommodations through 2036, right?

2    **A.**   I guess that's implicit, yes.

3    **Q.**   Okay.  Well, it's an assumption, right?

4    **A.**   I don't know that I specifically made that assumption.

5    She was working.  She was getting good reviews.  I assumed

6    that she would be able to continue that through her work

7    life.

8    **Q.**   Is it an implicit assumption?

9    **A.**   I guess it is, yeah.

10   **Q.**   Okay.  Now, after Dr. Menninger's attorneys hired you to

11   provide an opinion in this case, they provided you with

12   documents about Dr. Menninger's compensation and other things

13   relevant to your calculations, right?

14   **A.**   Correct.

15   **Q.**   Did they ever provide you with any documents or other

16   information about the fact that PPD was acquired by another

17   company called Thermo Fisher Scientific --

18   **A.**   No.

19   **Q.**   -- in 2021?

20   **A.**   No, sir.

21   **Q.**   They did not?  Okay.

22          So in forming your opinion about Dr. Menninger's

23   damages, you didn't consider the possibility that

24   Dr. Menninger wouldn't have remained in her position

25   following the acquisition by Thermo Fisher, right?

1    **A.**  I knew nothing of an acquisition.

2    **Q.**  All right.  Now, getting back to your assumptions, you

3    assumed that Dr. Menninger would have received wage

4    increases, I think you said, of 2.7 percent every year for

5    18 years; is that right?

6    **A.**  Correct.

7    **Q.**  All right.  And that was based on the fact that, during

8    the three-year period from 2016 to 2018, her annual average

9    wage increase was 2.7 percent; am I right about that?

10   **A.**  Correct.

11   **Q.**  Okay.  So, for example, if we look back at this exhibit,

12   455, it looks like you calculated that Dr. Menninger's salary

13   and bonus in 2023 would have been 360,000 -- $360,052, right?

14   **A.**  Correct.

15   **Q.**  Now, you got here yesterday, but did you come to court?

16   **A.**  No, I did not.

17   **Q.**  All right.  Were you informed that yesterday there was

18   testimony that the person who currently holds Dr. Menninger's

19   job is paid a base salary in the range of $275,000?

20   **A.**  I was unaware of that.

21   **Q.**  And that his most recent bonus was in the range of

22   $30,000 to $40,000?

23   **A.**  I was not informed about that, at all.

24   **Q.**  So the total of those two, on the high end of the bonus,

25   would be about $305,000, right?

1    **A.**  If that's the arithmetic, yeah.

2    **Q.**  Yeah, I mean, I got a C in math in college, so I --

3    **A.**  And that's why you became a lawyer.

4    **Q.**  Among -- among other problems, but yeah.

5            So am I right about that, my math?

6    **A.**  If your math is right, yes.

7    **Q.**  275 plus 40 is 305.  Does that sound right?

8    **A.**  275 and --

9    **Q.**  40?

10   **A.**  315, something like that.

11   **Q.**  Okay.

12           THE COURT:  You didn't get a C in math, did you?

13           MR. CURRAN:  You have better math than me.  Thank

14   you.  I'm glad you're here to check me math.  Obviously, I

15   got a C math.

16           THE WITNESS:  I am totally dependent upon Excel to

17   do arithmetic now.

18           MR. CURRAN:  Maybe I should have used Excel before

19   I wrote that down.

20   BY MR. CURRAN:

21   **Q.**  So 315.  But in any case, 315 is a lot less than 360,000,

22   right?

23   **A.**  Sure.

24   **Q.**  All right.  Now, after the three-year period from 2016 to

25   2018 that you used to project Dr. Menninger will receive

1  2.7 percent salary increases, PPD was acquired by

2  Thermo Fisher Scientific in 2021.  You don't know about that,

3  though, right?

4  **A.**  That's correct.

5  **Q.**  Okay.  And you don't know what Thermo Fisher's policies

6  or practices are with respect to salary increases for people

7  in the position that Dr. Menninger held?

8  **A.**  I have no knowledge of that at all.

9  **Q.**  All right.  But you're assuming that Dr. Menninger would

10  have continued receiving the same wage increases each year

11  after the acquisition?

12  **A.**  Yes, sir.

13  **Q.**  And now you also assumed that every year from 2019 to

14  2036, Dr. Menninger would have received an annual bonus equal

15  to 20 percent of her salary; is that right?

16  **A.**  Slightly less than 20.  Yes, sir.

17  **Q.**  Okay.  And the basis for that assumption was what?

18  **A.**  The bonuses she had received in the years preceding 2018.

19  **Q.**  And those years were 2016 and 2017?

20  **A.**  '16, '17, and '18, I believe.

21  **Q.**  And '18?  Okay.  So three years.

22      So you assumed that because Dr. Menninger received

23  an average bonus of 20 percent in three years, that she was

24  going to receive an equivalent bonus every year for 18 years?

25  **A.**  That's the best information we have.

1   **Q.**  All right.  And, again, the three-year period from 2016

2   to 2018, that was before Thermo Fisher acquired PPD?

3   **A.**  If you say so.

4   **Q.**  All right.  And you don't know anything about

5   Thermo Fisher's policies or practices with respect to

6   paying --

7   **A.**  Not at all.

8   **Q.**  So, you know, according to the testimony we heard

9   yesterday and that I was talking about a minute ago, the

10  person who currently holds Dr. Menninger's position received

11  a bonus in the range of 30 to 40,000, and his salary is in

12  the range of $275,000, right?

13  **A.**  You can't ask --

14          MR. HANNON:  Objection.

15          THE COURT:  You're asking him if it's right?

16  Sustained.  He doesn't know.

17  BY MR. CURRAN:

18  **Q.**  Do you recall that?

19  **A.**  I recall you just told me that.

20  **Q.**  Okay.  Now, if we assume that person's bonus is at the

21  higher end of that range, 40,000, is that -- am I right,

22  that's about 15 percent of 275,000?

23  **A.**  If that's what the arithmetic is, yeah.  I don't know.

24  **Q.**  So that's less than 20 percent, right?

25  **A.**  If that's the arithmetic.

1    **Q.**  All right.  Do you know what factors go into determining

2    whether someone in the position that Dr. Menninger held at

3    PPD receives a bonus at all, or if so, how much?

4    **A.**  I don't know the criteria for the bonus, what -- I do

5    know how much she was getting.

6    **Q.**  All right.  And you don't know whether the factors that

7    apply now are the same as those that applied in 2016 to 2018?

8    **A.**  I do not.

9    **Q.**  And you don't know whether the US economy is going to

10   enter into a recession or even a depression at some point

11   between now and 2036?

12   **A.**  Yeah, I would be in a different business if I knew that.

13   **Q.**  Yes, for sure.

14            But you would agree with me it's possible to have a

15   recession or a depression in the next 18 years?

16   **A.**  And we could have a boom also.

17   **Q.**  Right.  But you're assuming that Dr. Menninger would not

18   only have remained employed throughout the period, but also

19   she would have continued getting wage increases and

20   20 percent bonuses every year, right?

21   **A.**  That's correct.

22   **Q.**  Okay.  Now, in calculating Dr. Menninger's damages, you

23   considered the fact that, from 2016 to 2018, PPD matched

24   50 percent of Dr. Menninger's 401(k) contributions; is that

25   right?

1   **A.**   That's right.

2   **Q.**   And you assumed that because Dr. Menninger had

3   contributed 6 percent of her annual salary each year, that

4   she would continue doing that for the rest of her working

5   life?

6   **A.**   That's correct.

7   **Q.**   What's the basis for that assumption?

8   **A.**   The historical performance.  Again, I don't have a

9   crystal ball to know exactly what's going to happen in the

10   future, but if you can look into the past, that is an

11   indicator of what's likely to happen in the future.

12   **Q.**   And the past you looked to was three years, right?

13   **A.**   I don't recall how many years it was.

14   **Q.**   So it was 2016, 2017, 2018?

15   **A.**   I don't recall how many years of 401(k) data we had.

16   **Q.**   Did you look at her contributions prior to the time that

17   she started working at PPD?

18   **A.**   No.

19   **Q.**   All right.  So if she started working at PPD in 2015, you

20   wouldn't have looking at anything before that, right?

21   **A.**   That's correct.

22   **Q.**   And what did you base your assumption on that's -- or I'm

23   sorry.  One of your assumptions is that Dr. Menninger's

24   employer would have continued PPD's practice of making

25   50 percent contributions every year to a 401(k)?

1   **A.**   Again, it's the historical pattern in the past.

2   **Q.**   Okay.  And I think, looking at your report, I think you

3   based your assumption on your PPD's US employee handbook?

4   **A.**   Yes.

5   **Q.**   And that was last updated in December 2016?

6   **A.**   I don't have it in front of me, but it could be.

7   **Q.**   Okay.  If you look at your report, page 4, note 13.

8   **A.**   Yep.

9   **Q.**   And that's the handbook, right?

10   **A.**   That's correct.

11   **Q.**   All right.  And you don't know whether Thermo Fisher

12   matches 401(k) contributions for people in the job that

13   Dr. Menninger held --

14   **A.**   I don't know anything about this other company.

15   **Q.**   All right.  So it's fair to say that your calculation of

16   Dr. Menninger's lost wages and benefits depends on a number

17   of assumptions, correct?

18   **A.**   What I would consider reasonable assumptions based on the

19   past.

20   **Q.**   Okay.  And if any of those assumptions turn out to be

21   unreasonable, if the jury thinks they're unreasonable, then

22   they would have to disagree with your calculations, right?

23   **A.**   Certainly.  For all we know, the 401(k) may jump to

24   10 percent, and they match 100 percent.  I mean, I don't know

25   that.  I can only go by what we have in the past.

1          MR. CURRAN:  Thank you.  I don't have any further

2     questions at this time.

3          THE COURT:  All right.  Any redirect?

4          MR. HANNON:  Just a few questions, Your Honor.

5          THE WITNESS:  Do you want this back?

6          MR. CURRAN:  You can hang on to for now.

7          THE COURT:  Keep it for now.

8          THE WITNESS:  A souvenir?

9          MR. HANNON:  Something for your last hurrah.

10          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

11     BY MR. HANNON:

12     **Q.**  Mr. Jonas, you were asked questions about the acquisition

13     of PPD.  If I were to tell you that it was acquired for

14     $17.4 billion, would that make you more or less confident of

15     your calculations?

16     **A.**  I don't think it would impact my calculations, because I

17     don't know if that's a lot or not a lot.  It was a bargain

18     price.  I don't know anything about that.

19     **Q.**  Okay.  And then you were asked about some testimony

20     yesterday.  Am I right that when you do damage calculations,

21     that you try to rely upon reliable information?

22     **A.**  As most -- as best we can -- the term is the best

23     available information.

24     **Q.**  Okay.  And some of that is assessing the credibility of

25     the source of the information, right?

1   **A.**   Absolutely.

2   **Q.**   And if you found that a person provided you information

3   and that person wasn't credible, would you rely upon it?

4   **A.**   If I knew that the information was bad, I would

5   definitely not rely on it.

6   **Q.**   And if you knew that the source of the information was

7   not credible, would that also cause you potentially not to

8   rely upon it?

9   **A.**   I would look for other ways to justify what I was being

10  told --

11  **Q.**   Okay.

12  **A.**   -- and not rely on that one source.

13  **Q.**   Okay.  And then you were asked questions about that

14  20 percent bonus estimate.  I want to show you one -- one

15  document here.

16          MR. HANNON:  This is -- this is a letter document

17  that's not in evidence, Ms. Belmont.  This will be

18  Exhibit BC --

19  BY MR. HANNON:

20  **Q.**   And, sir, I'm showing you what's been marked for

21  identification as Exhibit BC.  Is this Dr. Menninger's offer

22  letter that you reviewed?

23  **A.**   I believe it is.

24          MR. HANNON:  Okay.  Your Honor, we offer this into

25  evidence.

1              THE WITNESS:  I mean, without reading the whole

2    thing, it looks familiar.

3              MR. CURRAN:  Sorry for the confusion, Your Honor.

4    The numbers aren't matching up with what we had for this

5    document.

6              THE COURT:  I see.

7              MR. CURRAN:  I don't think we have any objection to

8    the document that's in front of the witness.

9              THE COURT:  Fine.  So BC is admitted as -- what's

10   the next exhibit number?

11             THE DEPUTY CLERK:  456.

12             (Exhibit 456 admitted into evidence.)

13             THE COURT:  456.

14             Go ahead, Mr. Hannon.

15             And Ms. Belmont can display it to the jury.

16             MR. HANNON:  Thank you.

17   BY MR. HANNON:

18   **Q.**  So this is Dr. Menninger's offer letter from when she

19   started at PPD; is that right?

20   **A.**  I believe so.

21   **Q.**  Okay.  I'm just going to show you here, on the second

22   page, you mentioned before that there was something in here

23   regarding her bonus; is that right?

24   **A.**  That's correct.

25   **Q.**  And --

1    **A.**   I think that's the fourth line in the first paragraph.

2    **Q.**   Sure.  Sure.  So just looking at this -- and this is the

3    part that says that the bonus target for your position is

4    21 percent of your base salary earned in a given year?

5    **A.**   Correct.

6              MR. HANNON:  Okay.  That's all I have, Your Honor.

7              THE COURT:  All right.  Any recross?

8              MR. CURRAN:  No, Your Honor.

9              THE COURT:  All right.  Thank you very much.

10   You're excused.

11             THE WITNESS:  Thank you.

12             THE COURT:  This is when you wanted to take the

13   break, right?

14             MS. MANDEL:  Yes, Your Honor.

15             THE COURT:  All right.  So, ladies and gentlemen of

16   the jury, we have one more witness.  And so we're going to --

17   that's the last witness today, the one more witness.

18             We're going to take the morning break now, which is

19   early.  Hopefully the coffee and refreshments are there for

20   you.  We'll see if our efforts, Ms. Belmont and mine, to

21   arrange that early succeeded.  So we'll take the break now.

22   Then we'll return, we'll have the other witness, and then

23   when that's done, that will be one o'clock or earlier, we'll

24   be done for the day.

25             All rise for the jury.

```
 1                    (Jury not present.)
 2              THE COURT:  You know, Mr. Curran, you passed on
 3    what clearly would have been the most devastating attack on
 4    Mr. Jonas's credibility.
 5              MR. CURRAN:  What was that?  He's from New York?
 6              THE COURT:  Well, you could have asked him --
 7              You're from Long Island, right?
 8              THE WITNESS:  Right.
 9              THE COURT:  In fact, you've spent most of your life
10    in the New York metropolitan area?
11              THE WITNESS:  That's correct.
12              THE COURT:  And you are not a die-hard fan of the
13    Boston Red Sox?
14              THE WITNESS:  It's opening day at Yankee Stadium
15    today.
16              THE COURT:  There you go.  That question -- he gave
17    it to you, and it's like.
18              MR. CURRAN:  I could've impeach him --
19              THE COURT:  You could have stepped down.
20              MS. MANDEL:  Your Honor, without revealing our
21    confidences too much, I will say there is a note in my
22    notebook to Patrick about that exact question.
23              THE COURT:  There you go.  So it's all on
24    Mr. Curran.  He was told what to do by you and he didn't
25    follow the advice of his partner in what was an obvious line
```

```
 1    of cross-examination.
 2            MS. MANDEL:  Well, Patrick and I have worked
 3    together, I think at this point, for 14 years.  This is one
 4    area where we disagree, so it's a point of contention.
 5            MR. CURRAN:  I was afraid he might say he's a Mets
 6    fan and then I'd have to come and attack him.
 7            THE COURT:  So we have -- is there -- you're going
 8    to rest --
 9            MR. HANNON:  I have to rest technically, right?
10            THE COURT:  Yes.  So you'll rest when the jury
11    comes back.
12            MR. HANNON:  I'm just going the make that comment
13    regarding the exhibits and then I'll rest and --
14            THE COURT:  Why don't you make your -- assume he's
15    rested now.  I'll treat right now as if he's rested, so
16    whatever motions you want to make now, make them.  And I -- I
17    am now saying that they are deemed to have been made after he
18    rested, and after I've admitted the joint exhibits as if you
19    made it, so we don't have to spend time in front of the jury,
20    and after the jury leaves with Mr. Kelly if you want to renew
21    them -- but they are -- for the record, for the Court of
22    Appeals, they are as if whatever you say now is made after he
23    rests, which is what he's going to do when the jury comes
24    out.  I just don't see the point of having a sidebar in front
25    of the jury and make them sit there.
```

```
 1              Anything -- so he's effectively rested.  Are there
 2      any motions you want to make?  You don't have to, but I'm
 3      just giving you the chance.
 4              MR. CURRAN:  Yeah.  A motion for directed verdict,
 5      Your Honor.
 6              THE COURT:  All right.  Fine.  I will deny that.
 7              So anything else?  We're just going to get
 8      Mr. Kelly?
 9              MR. CURRAN:  Yes, Dr. Kelly.
10              THE COURT:  Okay.  So why don't we take a -- we'll
11      come back at 10:15.
12              How long do you think he's going to be?
13              MR. CURRAN:  Apparently, he's not here yet.  I know
14      he had a medical appointment this morning and so we're trying
15      to reach him and contact him, so -- hopefully he's walking
16      upstairs.
17              THE COURT:  So I'll come back at 10:15, and
18      hopefully he's on the witness stand, and if he's not,
19      hopefully you'll have an update as to where he is and
20      what his ETA.  Once he's on the witness stand, how long do
21      you expect him to be?
22              MR. CURRAN:  20, 25 minutes for me at most.
23              MR. HANNON:  A little bit longer than that.
24              THE COURT:  Okay.  All right.  Okay.
25              So assuming he's on at 10:15, we'll do the charge
```

1    conference.  When he's done, we'll send the jury home and

2    then we can do the charge conference then.  If he's not here

3    at 10:15, maybe we'll do the charge conference then.

4              Anything else?  Okay.

5              (Court in recess at 10:04 a.m.

6              and reconvened at 10:27 a.m.)

7              THE COURT:  You can sit down.

8              Dr. Kelly, are you able, when the jury comes back,

9    to stand up to take the oath, or do you prefer to sit?

10             THE WITNESS:  Say again?

11             THE COURT:  So ordinarily, we have witnesses stand

12   just when they take the oath, and then they sit down.  I'm

13   just asking you, because of the medical issue that counsel

14   referred to, whether you're able to do that.  And if you are,

15   I'll do that, but if you would like me to accommodate you to

16   have you just seated, I'll just have Ms. Belmont just say

17   raise your right hand.

18             THE WITNESS:  Should I stand now?

19             THE COURT:  You don't have to stand now.  I'm just

20   asking which you want to do when she administers the oath?

21             THE WITNESS:  When the jury comes in, I'll stand

22   and --

23             THE COURT:  All right.  And then you'll remain

24   standing while she administers the oath, and then you'll sit

25   down?  Is that fine?

```
 1              So there are two times ordinarily you would stand.
 2    I'm -- it's fine.  One is we all stand when the jury comes
 3    in.  It seems like you're saying you're able to stand when
 4    they come in, correct?
 5              THE WITNESS:  Yeah.
 6              THE COURT:  Okay.  Then you would ordinarily --
 7    Ms. Belmont will ask you to raise your right hand to
 8    administer the oath of truth-telling to you.  And ordinarily,
 9    I would have you stand up when you take the oath.  If that's
10    difficult for you and you prefer to take the oath sitting
11    down, that's fine.  There's no legal --
12              THE WITNESS:  I'll stand for the oath.
13              THE COURT:  Fine.
14              Go get the jury.
15              (Jury present.)
16              THE COURT:  Mr. Hannon, anything else for you?
17              MR. HANNON:  No more witnesses, Your Honor.  The
18    plaintiff does move into evidence the remainder of the joint
19    exhibits that have not yet been offered.
20              THE COURT:  Okay.
21              MR. HANNON:  And with that, the plaintiff rests.
22              THE COURT:  All right.  So, ladies and gentlemen,
23    let me explain.
24              You have heard various exhibits referred to --
25    all -- most all of the exhibits -- all the exhibits have been
```

1    referred to by number are -- were admitted into evidence

2    along the way.  I think I told you that at the beginning when

3    they referred to -- they had agreed to -- they were all

4    agreed to and I admitted them.  So those are all in evidence.

5            In addition, what Mr. Hannon has just referred to

6    is there are other joint exhibits that haven't been talked

7    about with witnesses, and those are admitted and in evidence.

8    All of the things that are exhibits in evidence you will have

9    in the jury room copies of them for you to look at during

10   your deliberations.  So that's one thing Mr. Hannon said.

11           The second he said is he rests.  What that means is

12   the plaintiff is done presenting their case and they have no

13   more evidence or witnesses.  So now we turn to the

14   defendant's case and their first witness.

15           MR. CURRAN:  The defense calls Dr. Martin Kelly.

16           THE COURT:  All right.  And so we've arranged

17   Dr. Kelly to already be in the witness box just to get going

18   and while we were taking care of some other things while you

19   were out.

20           So if you would just raise your right hand,

21   Dr. Kelly, for the oath.

22           (Witness duly sworn.)

23           THE DEPUTY CLERK:  And can you please state your

24   full name for the record?

25           THE COURT:  You can sit down.

1               **MARTIN KELLY**

2          having been duly sworn, testified as follows:

3          **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

4    BY MR. CURRAN:

5    **Q.**  Good morning, Dr. Kelly.

6               THE COURT:  Why don't you first state your name for

7    the record, Dr. Kelly.

8    BY MR. CURRAN:

9    **Q.**  Would you state your name for the record, sir?

10   **A.**  My name is Martin Kelly, K-e-l-l-y.

11   **Q.**  And Dr. Kelly, what do you do for work?

12   **A.**  Say again?

13   **Q.**  What do you do for work?

14   **A.**  I'm a physician who practices the specialty of

15   psychiatry.

16   **Q.**  Okay.  And how did you become involved in this case?

17   **A.**  Say again, please?

18   **Q.**  How did you become involved in this case?

19   **A.**  In the fall of 2000, I got a call from someone in your

20   law firm asking if I would serve as a consultant on this

21   case.

22   **Q.**  Okay.  It might help if you pull the microphone a little

23   closer to you.

24               There you go.  Thank you.

25               So were you asked to review facts and details about

1    the case?

2    **A.**   Say again, please?

3    **Q.**   Were you asked to review facts and details about the

4    case?

5    **A.**   Yes.

6    **Q.**   And are you being compensated for the time that you spend

7    on the lawsuit?

8    **A.**   I'm sorry; I -- I'm not hearing you well.

9    **Q.**   Okay.  Are you being compensated for the time that you've

10   spent on the lawsuit?

11   **A.**   I haven't been to law school.  Again, I'm --

12   **Q.**   No, no.  I'm sorry.  Are you being compensated for the

13   time spent on the --

14   **A.**   Oh.  Yes, I hope so.

15   **Q.**   And could you please walk us through your educational

16   background?

17   **A.**   I received my premedical education at Boston College and

18   graduated with a bachelor of science in biology.  I then

19   attended Tufts University school of medicine and received my

20   MD from Tufts.  When I finished my medical school, I did a

21   medical internship at St. Elizabeth's Hospital and then did a

22   psychiatric residency at the Massachusetts Mental Health

23   Center.

24   **Q.**   With respect to your work as a doctor, could you walk us

25   through your work history?

1   **A.**   I'm sorry.  I'm not hearing you well.

2   **Q.**   I'm sorry.  With respect to your work as a doctor, could

3   you walk us through your work history?

4   **A.**   With respect to my work as a doctor, what?

5   **Q.**   Can you walk us through your work history?

6   **A.**   Yes.

7   **Q.**   So what did you -- what did you do after finishing your

8   residency?

9   **A.**   When I finished my residency, I worked for a year and a

10   half at Boston State Hospital in Mattapan at the adolescent

11   unit there, and then in 1970, I went to the Brigham.  Then it

12   was the Peter Bent Brigham Hospital, and I've been on the

13   staff and had various positions at the Brigham and at Harvard

14   Medical School since that time.

15   **Q.**   Okay.  So how long approximately have you been working at

16   the Brigham and Women's Hospital?

17   **A.**   I think I'm starting my 54th year in July.

18   **Q.**   All right.  That's quite a while.  Can you explain to the

19   jury the status of your current engagement at Brigham and

20   Women's?

21   **A.**   Current status of my practice is I -- I have a very

22   small, private practice, which I'm going to be closing at the

23   end of May; and I have a forensic psychiatry practice.  I

24   have not taken any new cases for a couple years, but there

25   are a few in the pipeline.

1   **Q.**   So you're still seeing patients today?

2   **A.**   Yes.

3   **Q.**   Has any of your work with patients in your years as a

4   psychiatrist involved mood disorders?

5   **A.**   Yes.

6   **Q.**   And what are mood disorders?

7   **A.**   Mood disorders are conditions that the biochemistry of

8   the brain -- mood disorders used to be called

9   manic-depressive disorder.  Now it's call bipolar disorder.

10   It's a mood disorder and the primary disturbance is either

11   mania or depression.

12   **Q.**   Okay.  And have you diagnosed and treated people with

13   mood disorders?

14   **A.**   Yes.

15   **Q.**   Have you worked with patients who have anxiety disorders?

16   **A.**   Yes.

17   **Q.**   And could you explain to the jury what anxiety disorders

18   are?

19   **A.**   Could --

20   **Q.**   I'm sorry; could you explain to the jury what anxiety

21   disorders are?

22   **A.**   Anxiety disorders, there are many subtypes of anxiety

23   disorders.  There's generalized anxiety disorder, in which a

24   person just tends to be very nervous much of the time.

25   There's panic disorder, in which an individual will have

1    sudden panic reactions.

2           Panic disorder can come associated with

3    agoraphobia, so when someone is out and about, say, shopping

4    at a supermarket, they suddenly get a panic attack and they

5    just have to get out of the store.  They often will leave

6    their cart full of groceries and just -- "I got to get out of

7    here."

8           So those are the main anxiety disorders, and

9    there's also, which is at least an issue in this case, social

10   anxiety disorder, or social phobia.

11   **Q.**  Okay.  And in the course of your practice over the years,

12   have you diagnosed and treated people with anxiety disorders?

13   **A.**  Yes.

14   **Q.**  Now, aside from this case, are you currently doing any

15   other work that involves providing an expert opinion in

16   connection with a legal matter?

17   **A.**  I'm not -- I don't have any current patients that have

18   anxiety disorder.  I have a patient who has a mood disorder,

19   and I prescribed a prescription on Sunday to renew a

20   prescription for this gentleman.

21   **Q.**  Okay.  And are you currently doing any work aside from

22   this case that involves providing an expert opinion in a

23   lawsuit?

24   **A.**  I have a bunch of cases that are in my file cabinet and

25   many of them are pre-COVID.  So some of them may have settled

1    or gone away, but I don't -- have not been told about that.

2         I have recently been involved in helping out a

3    situation in which a four- to five-year-old youngster ran

4    down their driveway and was hit and killed by a Comcast

5    truck, and so I was advising the attorneys in that case.

6    **Q.**  Okay.  And currently about how much of your working time,

7    percentage-wise, do you spend on litigation-related work?

8    **A.**  My private practice has slowly diminished because I

9    haven't been taking new patients since 2005.  If I have seen

10   you before and you want to come back, that's okay; but I'm

11   not seeing new cases from scratch for the past 15-plus years.

12   **Q.**  Okay.  Have you published any articles in peer-reviewed

13   journals?

14   **A.**  Yes.

15   **Q.**  On what topics?

16   **A.**  Mostly in psychiatry, clearly, but a particular interest

17   in psychosomatic medicine, general hospital psychiatry.  The

18   Brigham does not have an inpatient psychiatric unit, and for

19   the first 25 years, we were a division of the department of

20   medicine and then got established as a department of

21   psychiatry.

22         So my publications are often in journals like the

23   *New England Journal of Medicine*, who's at risk for suicide

24   attempts in a hospital, who wants to read their record,

25   studying people who have signed out against medical advice

1    and what happens to them.

2            And I also coauthored a chapter in what was the

3    leading textbook of medicine about the psychiatric disorders,

4    a textbook that's called Harrison's textbook of medicine.

5    I've also published -- invited to do chapters in anesthesia

6    textbooks, how should you manage a patient who's receiving

7    psychiatric medications if they're going to be going under

8    anesthesia, do you continue them, do you stop them, things of

9    that sort.

10           So most of my publications have been in the medical

11   area and that's a core part of my identity and practice over

12   the years.

13   **Q.**   Okay.  Understood.

14   **A.**   As opposed to asylum psychiatry.  I did that at Boston

15   State Hospital for a year and a half, but we don't have an

16   inpatient unit, so I -- I don't do that kind of psychiatry.

17   **Q.**   Okay.  Do you hold any licenses or certifications?

18   **A.**   Yes.

19   **Q.**   What licenses or certifications do you hold?

20   **A.**   I have a license to practice medicine.  I've been board

21   certified in psychiatry.  And those are the main

22   certifications and licenses in the psychiatric profession.

23   **Q.**   Okay.  Have you held any teaching appointments?

24   **A.**   Say again, please.

25   **Q.**   Have you held any teaching appointments?

1    **A.**   Yes.

2    **Q.**   What teaching appointments have you held?

3    **A.**   When I was a resident at Mass Mental Health Center, I was

4    a teaching fellow in psychiatry for three years.  When I went

5    to Boston State Hospital, I had an appointment as an

6    instructor in psychiatry at Tufts University school of

7    medicine.  Tufts Medical School was kind of the department

8    that -- basically was the primary psychiatric department at

9    Boston State.

10             And then since I've been at the Brigham, I first

11   was an instructor in psychiatry and assistant professor of

12   psychiatry and currently associate professor of psychiatry at

13   Harvard Medical School.

14   **Q.**   Okay.  And what did you do to review the facts relevant

15   to this case?

16   **A.**   I'm sorry; please say again.

17   **Q.**   What did you do to review the facts relevant to this

18   case?

19   **A.**   I was sent, over the past now two or three years, many

20   records.  I'll try to remember most of them:  Dr. Kessimian,

21   who was the main treater around the time this situation

22   started; past psychiatric treatment with Michael Everson, who

23   is in Kansas City, where she was living at the time, and he

24   saw her, like, on three occasions and prescribed Valium;

25   Butler Hospital day hospital; Dr. Burbano in Albuquerque,

1  New Mexico.  Dr. Menninger moved from Massachusetts to

2  Albuquerque at the end of 2018, beginning of 2019.

3          And she's moved twice since then to Bend, Oregon,

4  where, apparently, she has family; and then approximately

5  2001/2002 [*sic*] moved to Portland, Oregon, and in both of

6  those situations was seen at a clinic by numerous

7  professionals.

8  **Q.**  And you reviewed the records in connection with that

9  therapy?

10  **A.**  Yes.

11  **Q.**  Did you review any deposition transcripts?

12  **A.**  I'm -- I -- I'm having trouble hearing you.

13  **Q.**  Oh, I'm sorry.

14  **A.**  Please.

15  **Q.**  Did you review any deposition transcripts?

16  **A.**  Oh, yes, yes.  I reviewed the deposition of

17  Dr. Menninger, Dr. Summergrad, my own deposition -- I was

18  deposed.  I reviewed various legal documents that were sent

19  to facilities to evaluate discrimination, positions of the

20  company PPD, and also Dr. Menninger's submission in regard to

21  this case.

22  **Q.**  And did you interview Dr. Menninger?

23  **A.**  Say again?

24  **Q.**  Did you interview Dr. Menninger?

25  **A.**  Yes, I did.

1   **Q.**  Okay.

2   **A.**  I interviewed her virtually December 9, 2020 --

3   **Q.**  Okay.

4   **A.**  -- I believe.

5   **Q.**  And are these the types of activities that you would

6   normally do, normally conduct, when you're evaluating a

7   patient?

8   **A.**  Clearly, doing an interview of the person is pretty

9   important if the person is around and, you know, is

10  accessible; but then you want to collect everything from some

11  factual matters.  I reviewed her requests for accommodations,

12  for example.  And I reviewed a bunch of emails in the

13  company, particularly in the spring of 2018 --

14  **Q.**  Okay.

15  **A.**  -- March, April, May -- several emails that involved her

16  and other people at the company.

17  **Q.**  And when you interviewed Dr. Menninger in December 2020,

18  for how long did you speak with her?

19  **A.**  The interview lasted approximately two hours and

20  20 minutes or so.

21  **Q.**  Now, Dr. Kelly, in the context of a mental health

22  evaluation, what is a disorder?

23  **A.**  Please say again.

24  **Q.**  What is a disorder in the context of a mental health

25  evaluation?

1    **A.**   The disorders that were in the records included primarily

2    social anxiety disorder, social phobia and treatment for

3    that.

4    **Q.**   Right.  But what I'm trying to ask, and I'm not doing it

5    very artfully, is what is a disorder, just sort of generally?

6    **A.**   I'm sorry; I just --

7    **Q.**   You can't hear me?  I'm sorry.

8    **A.**   The batteries in my hearing aids are running low, but I'm

9    having trouble.

10   **Q.**   I'll talk louder.  Sorry, I feel like I'm shouting.

11            THE COURT:  You're not.

12            MR. CURRAN:  What's that?

13            THE COURT:  You're not shouting.

14            MR. CURRAN:  I'm not.  Okay.

15   BY MR. CURRAN:

16   **Q.**   Just generally, what is a disorder?

17   **A.**   A disorder, a psychiatric disorder, is -- or a mental

18   disorder is a wide range of conditions.  They go from very

19   serious illnesses, such as schizophrenia, bipolar disorder,

20   paranoid disorders, and on the other spectrum, most of us

21   will be subject to some experience of grief.  In our

22   lifetime, we will lose someone who was important to us,

23   things of that sort.

24            I mean, in the news, in Nashville, that's a

25   terrible situation, and the parents have a disorder, which

1    is, you know, a grief disorder.  And that's not sensibly

2    thought of as an illness, like schizophrenia.

3            And then other disorders that are of concern can be

4    anxiety disorders, post-traumatic stress disorder,

5    personality disorders, who it's in the personality of the

6    individual.  And that often becomes problematic, often for

7    other people; and it can be a depressive personality, a

8    disgruntled, unhappy, gloomy individual pretty consistently.

9    There may be some variation.

10           And then there are other personality disorders:

11   hysterical personality disorder, narcissistic personality

12   disorder, antisocial personality disorder.  And so there's a

13   wide range of disorders, some of which are sensibly regarded

14   as illnesses -- bipolar disorder, schizophrenia -- and some

15   are reactive situations to events in the individual's life.

16   **Q.**  I see.

17           Now, in diagnosing mental health disorders

18   generally, in your practice, how do you go about forming a

19   diagnosis?

20   **A.**  Well, in a clinical setting, you -- the person makes an

21   appointment with you and you -- usually on the first

22   appointment, you may spend an hour or 90 minutes with the

23   individual clinically, and you take a history from the

24   individual.

25           And then you try to see if there are certain

1    patterns that lead to a particular diagnosis, highly

2    probable, but you also generally do a differential diagnosis.

3    If it's not A, it could be B, C, or D, and I will rule out

4    those conditions.

5    **Q.**   Okay.  Did you review the expert opinion that plaintiff's

6    medical expert, Dr. Summergrad, provided in this case?

7    **A.**   I did.

8    **Q.**   And did you see that Dr. Summergrad said in his opinion

9    that Dr. Menninger developed major depressive disorder in

10   2018?

11   **A.**   Yes.

12   **Q.**   What is major depressive disorder?

13   **A.**   Major depressive disorder is a mood disorder.  In the lay

14   press, it's often -- the person has a biochemical imbalance,

15   is the lay expression for it frequently.  But it's a

16   biological condition.  It tends to run in families, a high

17   probability of having a relative who's had it.  It typically

18   comes on in late adolescence, early adulthood, 20s.

19          And then over the course of the individual's

20   lifetime, they will have times when they are depressed.  And

21   in this day and age, people are aware of it, and so often

22   it's now spotted earlier.  And the biochemical dysregulation

23   of the mood is very frequently fixed with medications --

24   again, biological, genetic disorder, and a number of physical

25   symptoms that often goes with it -- early morning, you can

1    wake up too early, you don't need -- and you wake up often in

2    a gloomy situation or catastrophizing, "Oh, this could be a

3    problem for me today."

4          Sometimes there's tearfulness, withdrawal from

5    activities that you used to enjoy, withdrawal from

6    friendships, but it's time limited.  Before there were

7    medications, or shock treatments, the typical course was six

8    to nine months, occasionally longer.  So the person would be

9    depressed six or nine months later, they're coming up and

10   they're kind of back to themselves.

11   **Q.**  Okay.  Thank you.

12         So based on your evaluation of Dr. Menninger

13   through your interview of her and your review of her records

14   and other documents, did you form an opinion as to whether

15   Dr. Menninger has major depressive disorder?

16   **A.**  I did.

17   **Q.**  And what is your opinion on that question?

18   **A.**  In my opinion, she does not have this disorder.  I could

19   not find the typical life course of episodes of depression in

20   early adulthood and continued through life.

21         I don't know that she has a strong family history

22   of major depressive disorder.  When someone has a life event

23   that's distressing and depressing, that doesn't mean that

24   they have a major depressive disorder.  They may have some of

25   the symptoms -- they're sad, they don't want to be out and

1    about, they don't care to do things they used to do -- but

2    the general consensus, in my view, is that a major depressive

3    disorder is not precipitated by a life event, by a life

4    event.

5              It's the chemicals that control mood and how you

6    perceive your life get dysregulated, and they can be treated

7    with antidepressants, can be treated with shock treatments.

8    People can be very depressed and suicidal in both major

9    depressive disorder, but also situations that are reactive to

10   powerful, negative life events.

11   **Q.**  What sort of powerful negative life events are you

12   referring to there?

13   **A.**  Can you --

14   **Q.**  What sort of powerful negative life events are you

15   referring to there?

16   **A.**  I could not see -- well, I think she was very upset that

17   the accommodations -- some of the accommodations that she was

18   requesting, the company did not feel they -- it was

19   consistent with the job, apparently.  So -- but I think she

20   was shocked and surprised by that, and distressed.

21   **Q.**  Based on your interview with Dr. Menninger and your

22   review of her medical records and other documents, did you

23   form an opinion as to whether she was able to work?

24   **A.**  I did.

25   **Q.**  And what is your opinion?

1    **A.**   That she has no new condition that would prevent her from

2    working as a pathologist as she had during her residency, as

3    she did in a hospital setting for a few years, as she did in

4    a commercial laboratory, and then for a couple of years at

5    PPD; that she, by her own estimate, was able to do a good

6    job, and the company thought she was meeting their

7    expectations.

8    **Q.**   Dr. Kelly, do you believe that Dr. Menninger is faking?

9    **A.**   No.

10   **Q.**   So do you think that she genuinely believes that she has

11   mental health disorders that keeps her from working?

12   **A.**   I think she has a sincere but incorrect belief that she's

13   disabled.  Again, prior to asking for accommodations, she

14   went to meetings, senior leadership team, traveled to

15   Brussels on several occasions to supervise that laboratory

16   and meet with people.

17          So she was functioning, in her own estimate, pretty

18   well in September and October of 2017, and Mr. Mekerri

19   thought she was meeting their expectations.  There were some

20   things he would like her to do some more of, but there was,

21   in my view, no dramatic change in her job.

22          And, particularly, there was no -- she didn't

23   suddenly develop a condition -- Alzheimer's disease, had a

24   stroke, dementia -- that would interfere with her capacity to

25   do the job of a pathologist.  So there was no new condition.

1    She was surprised, tearful, very upset when they said to her

2    at a meeting at the end of February, we can do a couple of

3    things you want for accommodations, but there are several

4    that are just incompatible with being the scientific head,

5    main pathologist in this pretty big company that has

6    laboratories in Brussels and China and Singapore and in

7    Kentucky.

8    **Q.**  Now, I think you testified earlier that you had reviewed

9    the records, medical records from Bend, Oregon, and from

10   Albuquerque, New Mexico; is that right?

11   **A.**  Correct.

12   **Q.**  And do you have any concerns about the quality of

13   treatment that Dr. Menninger was receiving based on those

14   records?

15   **A.**  Well, many of the records are problematic, in my opinion.

16   There's a tremendous amount of cut and paste that goes on in

17   the records.  One example was Dr. Burbano, in Albuquerque,

18   literally took the paragraph that Dr. Kessimian had written

19   about her makeup, what kind of person she is, without

20   attributing it to Dr. Kessimian.

21          And most of the records are kind of chasing

22   symptoms rather than, okay, we have this woman who has

23   completed medical school, completed a residency, let's see if

24   we can get her back into the work force versus cataloging her

25   complaints and occasionally manipulating some of the

1    medications.

2    **Q.**  Are there certain kinds of treatment that she has not

3    received that you think might be beneficial?

4              MR. HANNON:  Objection.  This is beyond the scope

5    of the report, Judge.

6              THE COURT:  I think you should rephrase the

7    question, make it more focused.  There's a small piece, I

8    think, that would be within the report; but, mostly, I think

9    Mr. Hannon is correct.

10             If you look at the supplemental report, what I'm

11   referring to in the supplemental report in the second to last

12   paragraph, the last sentence --

13             So you understand, ladies and gentlemen of the

14   jury, while the lawyers look at that, so experts produce

15   written reports.  Generally speaking, juries don't see the

16   written reports.  The written reports are disclosures because

17   they're a different kind of witness, and I'll explain a

18   little bit more about this in the final instructions, they're

19   giving opinions, as you can see.  And you can see the experts

20   you heard in this case were not at PPD.  None of them ever

21   knew Dr. Menninger before they did their clinical interviews

22   or their forensic interviews for these evaluations, or what

23   have you.  And that's fine.  That's what experts do.

24             But because of that, there are certain requirements

25   about it because they're not the typical percipient witness,

 1    like the auto example, auto accident example, the person who

 2    saw the accident.  And so they make reports to disclose what

 3    their opinions are and that -- what they reviewed and what

 4    the basis of the opinion are, and then they are limited.

 5    They can't -- the whole point of that is to prepare the case

 6    so they're limited to the scope of that report.  They can't

 7    come up with new opinions, and that's the issue that's being

 8    addressed.

 9              Ready?

10              MR. CURRAN:  Yes.  Thanks, Your Honor.

11              THE COURT:  Go ahead.

12    BY MR. CURRAN:

13    Q.  Were you concerned about the treatment goals that her

14    treatment team has been setting for her?  Did you have any

15    concerns about that?

16    A.  Yes.  There was no kind of plan to get this graduate of a

17    medical school, completed a residency --

18              MR. HANNON:  Objection.  This is beyond the scope.

19              THE COURT:  Sustained.  I think this is beyond the

20    scope.

21              MR. CURRAN:  Okay.  All right.  I don't have any

22    further questions, Dr. Kelly.

23              THE COURT:  All right.

24              MR. CURRAN:  Thank you very much for your

25    testimony.

```
 1              THE COURT:  Cross-examination?

 2              MR. HANNON:  Yes, Your Honor.

 3              May I approach the bench?

 4              THE COURT:  Yes.

 5              MR. HANNON:  May I approach the witness?

 6              THE COURT:  Yes.

 7              MR. HANNON:  May I proceed, Your Honor?

 8              THE COURT:  Yes.

 9          CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

10   BY MR. HANNON:

11   Q.  Good morning, Doctor.

12   A.  (No response.)

13              THE COURT:  Can you hear him?

14              MR. HANNON:  I'm sorry.  I'll speak louder.

15   BY MR. HANNON:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Sir, you mentioned earlier that you're no longer seeing

19   new patients; is that right?

20   A.  That's not correct.  I have a very small private

21   practice.  I prescribe antidepressants on Sunday to a patient

22   with major depressive disorder.  I'm going to see that person

23   next week virtually, and I'll be wrapping up my private

24   practice at the end of May.

25   Q.  My question, sir, was a little bit different.  You're no
```

1   longer seeing new patients, right?

2   **A.**   Oh.  That's correct.

3   **Q.**   Okay.

4   **A.**   Correct.  Sorry.

5   **Q.**   In fact, sir, you stopped seeing new patients almost

6   20 years ago, right?

7   **A.**   Approximately.

8   **Q.**   Okay.  And when you stopped seeing new patients

9   approximately 20 years ago, there were about 20 patients in

10  your practice; is that right?

11  **A.**   Yes --

12  **Q.**   Okay.

13  **A.**   -- that --

14  **Q.**   And with when you were deposed in this matter a couple of

15  years ago, at that time, you were down to five patients,

16  correct?

17  **A.**   I'm sorry; say again, please.

18  **Q.**   At the time you were deposed in this matter a few years

19  ago, you were down to seeing about five patients; is that

20  right?

21  **A.**   That's correct.

22  **Q.**   And in the last 20 years, sir, you have not treated a

23  patient with social anxiety disorder, have you?

24  **A.**   I don't think so, no.

25  **Q.**   In the last 20 years, sir, you have not treated a patient

1   with panic disorder, correct?

2   **A.**  I -- I don't catalog things in that way.  I may have, at

3   any moment, 20 patients, or later, five patients, but that

4   can be a resolving cast, if you will.  Someone will ask to

5   come back and see me.  They have some issue that they think

6   I -- that I've treated 25 or 35 years ago.  So it's not like

7   they are the same five patients.

8        And those are just approximations of how my private

9   practice was.

10  **Q.**  Sure.  I'm not asking about the number right now.  I'm

11  asking about patients with panic disorder.  In the past

12  20 years, have you treated any patients with panic disorder?

13  **A.**  I think I might have, but I can't recall one off the top

14  of my head.  I don't catalog things that way, if you will.

15  **Q.**  Sure thing.

16       And since you stopped accepting new patients in

17  your practice, your work has largely focused on being an

18  expert consultant, correct?

19  **A.**  And mentor and teacher to residents in psychiatry and to

20  some relatively senior staff.  So I'm kind of the old guy,

21  let me run this case by him, and the like.  So I am active in

22  teaching, and that would involve residents and staff, people

23  who might be dealing with an anxiety disorder and they might

24  ask for my view of that.

25       But, again, I don't catalog things that way.  I

1    mean, how many of this and how many of that is not how I tend
2    to think.
3    **Q.**   When was the last time you were compensated for teaching?
4    **A.**   When was the last time I what?
5    **Q.**   You were compensated, you were paid for teaching?
6    **A.**   The system at Harvard Medical School is that the
7    hospitals are on the hook for the salary of the staff, and
8    you get a teaching appointment.  Currently, I'm associate
9    professor of psychiatry.  But the medical school doesn't pay
10   you for teaching.
11            So -- and I have -- I have not received a salary
12   for my teaching activities in, as you point out, close to
13   20 years.
14   **Q.**   Okay.  So in terms of where you earn your living, part of
15   that comes from your private practice; is that right?
16   **A.**   I didn't get the first part of that.
17   **Q.**   No worries.
18            In terms of how you earn your living, part of that
19   comes from your private practice?
20   **A.**   Yes.  And my forensic practice.
21   **Q.**   And that's it, right?
22   **A.**   Yes.
23   **Q.**   Okay.  So in terms of the way that you're compensated for
24   the mentoring and being available to ask questions, that's --
25   that's all part of your private practice, right?

1  **A.**   The acoustics for me in this courtroom are not very good.

2  Sorry.  Could you go through it again?  I'm sorry to ask you

3  to do that.

4  **Q.**   No -- no worries at all.

5          In terms of how you're compensated for mentoring,

6  that's -- that's solely from your private practice, correct?

7  **A.**   I'm not compensated for my mentoring.  Okay?  I don't

8  receive any salary for mentoring.  I do continue to teach.

9  Residents often will come to court with me, or I'll brief

10  them on the elements of the case.  So -- but I don't get any

11  money for that, yeah.  I'm tempted to say I do it as a

12  volunteer out of the goodness of my heart, but I don't.  I

13  don't need that.  And the forensic activities are very well

14  compensated.

15  **Q.**   Okay.  And we'll talk about the forensic activities in a

16  moment.

17          In terms of your teaching, do you actually teach

18  classes?

19  **A.**   Yes.

20  **Q.**   How often?

21  **A.**   COVID has interrupted things of that sort, so usually I

22  do a seminar, a two-hour block, one in the fall and one in

23  the spring.  One of them has to do with orienting the

24  residents to forensics psychiatry, and the one in the spring

25  tends to be about psychosomatic medicine and the like.

**Q.**  Okay.  Let's focus on the --

**A.**  I did much more of it, you know, in the past, but those are the main ones that I do now.

**Q.**  Very good.  Thank you.

In terms of the forensic psychiatry work that you do, how much of your professional time over the last ten years has been devoted to serving as an expert witness?

**A.**  Forensic psychiatry generally is about 90 percent of my income.

**Q.**  And one of your repeat clients, so to speak, is the Commonwealth of Massachusetts, right?

**A.**  Correct.

**Q.**  And the instances when you've worked on behalf of the Commonwealth typically involve instances concerning whether or not someone is competent to stand trial, correct?

**A.**  Correct.

**Q.**  And when the Commonwealth needs an expert to say that someone is competent to stand trial, you're the guy they call?

**A.**  Well, I wouldn't call them a client.  The Commonwealth is often a court or a district attorney, and they want -- they have some reason to question whether someone is competent to stand trial.  So I -- I wouldn't quite agree with they want someone to find the person "competent," kind of stuff.  For the most part, district attorneys and courts just want

1    competent opinions and --

2    **Q.**   I didn't mean to cut you off.

3            And when they want a competent opinion in that kind

4    of a case, they come to you, right?

5    **A.**   Say again, please.

6    **Q.**   When the Commonwealth wants a competent opinion in that

7    type of case, they come to you.   Yes?

8    **A.**   Yes.

9    **Q.**   You mentioned before a recent matter you became involved

10   with involving a child hit by a Comcast truck?

11   **A.**   Correct.

12   **Q.**   Did I hear that right?

13   **A.**   Correct.

14   **Q.**   Which side of the case were you retained on?

15   **A.**   The defense.

16   **Q.**   And what was the issue you were asked to examine?

17   **A.**   I -- I didn't examine anyone in that case.   I helped the

18   defense attorneys with understanding particularly the issues

19   for the mother of the child in anticipation of helping them

20   with a cross-examination of the plaintiff's expert.

21   **Q.**   So your work there surrounded trying to minimize the

22   impact on the mother of the child struck by the Comcast

23   truck?

24   **A.**   No.

25   **Q.**   Was there an allegation there that the mother had become

1  depressed as a result of the death of her child?

2  **A.**  Yes.

3  **Q.**  And was it your opinion there that she did not become

4  depressed?

5  **A.**  My opinion was that she was depressed, that this was a

6  tragic situation of a four- to five-year-old who ran down the

7  driveway going across the street to a friend's house, and

8  that she was in the house at the time, but her father was in

9  the driveway and saw the whole thing happening.

10          A terribly tragic situation.  But it was not my job

11  to minimize anything.  That was just tragic.  However, the

12  expert for the plaintiffs made some allegations that I

13  thought were exaggerations.

14  **Q.**  Did you believe the mother in that case had formed a

15  reactive depression?

16  **A.**  Yes.

17  **Q.**  And am I right it's your opinion in this case that

18  Dr. Menninger formed a reactive depression?

19  **A.**  Yes.

20  **Q.**  Now, you distinguish reactive depression from a major

21  depression disorder, correct?

22  **A.**  Major depressive disorder, yes.

23  **Q.**  And with respect to major depressive disorder, you take

24  issue with the word "major"?

25  **A.**  I do.

1  Q.  And in terms of the distinction that you draw between a

2  reactive depression and major depression -- I'm sorry --

3  major depressive disorder, really, the distinction to you is

4  what causes it, right?

5  A.  Correct.

6  Q.  In your opinion, sir, a reactive depression can be just

7  as painful as major depressive disorder.  Yes?

8  A.  It can be, depending on the circumstances, yes.

9  Q.  And, sir, it's your opinion that if someone develops

10  depression in response to some kind of life event, then that,

11  by definition, is not major depressive disorder, correct?

12  A.  Correct, basically.

13  Q.  That is not an opinion held by the entire psychiatric

14  community, correct?

15  A.  Nothing is held by the entire psychiatric community, but

16  I think it's generally thought that major depressive disorder

17  is a biological disorder, has genetic consequences; that it

18  responds to medications, antidepressant medications; has a

19  typical life history, onset in late adolescence, early

20  adulthood, over the decades, periods of being depressed, and

21  then getting treatment or spontaneously recovering.

22       But in terms of distress and painful, it depends on

23  the circumstances.

24  Q.  So let's unpack that a little bit.  So one thing you said

25  is that you believe that major depressive disorder has some

1  kind of a biological piece to it; is that right?

2  **A.**  Yes.

3  **Q.**  So normally a person with major depressive disorder,

4  there's some kind of family history that -- well, let me just

5  stop there.  There's some kind of family history, right?

6  **A.**  That's often the case, that there's a family history of

7  depressive disorders.

8  **Q.**  What about other psychological disorders?  Would that

9  also be a potential risk factor, so to speak, for a person

10  developing major depressive disorder?

11  **A.**  Yes, it can be.

12  **Q.**  Sir, were you aware in this case of the family history of

13  Dr. Menninger?

14  **A.**  Say again, please.

15  **Q.**  In your work in this case, did you become aware of

16  Dr. Menninger's family history of mental health issues?

17  **A.**  Yes.  That's in the records.  I don't -- I don't -- there

18  was a comment in -- I believe it's Dr. Kessimian's records

19  that, on her paternal side and maternal side -- side, not

20  parents, necessarily -- that there was a history of

21  psychological problems.

22  **Q.**  And would that history of psychological problems in

23  Dr. Menninger's family, would that be a risk factor for her

24  to develop major depressive disorder?

25  **A.**  It could be, but I don't know enough of the details about

1    her family history.  All of us have families that have some

2    individuals that have psychological problems.

3    **Q.**   But some more than others, right?

4    **A.**   Yes.

5    **Q.**   And the experiences you read about in Dr. Kessimian's

6    notes concerning Dr. Menninger's parents, that's the kind of

7    thing that would present a risk factor for major depressive

8    disorder, yes?

9    **A.**   Possibly.  You need to know more about what kinds of

10   problems, psychological problems, existed, their intensity,

11   their nature.  And in the records, I could not find any

12   comment other than on maternal and paternal side, there are

13   relatives that had psychological problems.

14   **Q.**   When you interviewed Dr. Menninger in this case, did you

15   ask her for additional detail concerning her parents' mental

16   health issues?

17   **A.**   I don't believe I did.

18   **Q.**   And in terms of the time frame that we're talking

19   about -- well, strike that.

20           Did you also see in the medical records that

21   Dr. Menninger's daughter also suffers from mental health

22   issues?

23   **A.**   There are comments in there that occasionally her

24   daughter has had problems in school and also has expressed

25   suicidal ideation.

1   **Q.**  So would that be a yes?

2   **A.**  Yes.

3   **Q.**  Sir, would you agree with me that Dr. Menninger's family

4   history between both her parents and her daughter presents a

5   clear risk sign for development of major depressive disorder?

6   **A.**  I would not.

7   **Q.**  In addition to her family history, you saw that

8   Dr. Menninger, over the course of her life, had been

9   diagnosed with several disorders, right?

10  **A.**  Dr. Kessimian?

11  **Q.**  Pardon me if I misspoke -- that Dr. Menninger, over the

12  course of her life, had been diagnosed with several

13  disorders, yes?

14  **A.**  The main one was anxiety disorder, general anxiety

15  disorder, GAD, and social phobia; and that was three

16  relatively brief visits in 2012 to 2015 in Kansas City.

17  **Q.**  Sir, would you agree that having generalized anxiety

18  disorder is also a risk factor for the development of major

19  depressive disorder?

20  **A.**  Not in my opinion.  I know that there are some people who

21  feel that in the field, but I don't think that there's a

22  strong correlation between generalized anxiety disorder and

23  major depressive disorder.

24  **Q.**  Have you done specific research on that issue?

25  **A.**  No.

1   **Q.**  Would you agree, sir, that having social anxiety disorder

2   also presents a risk factor for development of major

3   depressive disorder?

4   **A.**  You used the word "also."  I don't think that it is.

5   **Q.**  You'd agree that others in the psychiatric community

6   disagree with you?

7   **A.**  There are people in the psychiatric community that think

8   that that's a risk factor for depression, yes.

9   **Q.**  Well, not just depression, sir, major depressive

10   disorder, yes?

11   **A.**  Correct, yes.  There are some in the field.  I don't

12   subscribe to it, but there are some in the field that do.

13   **Q.**  Speaking of disagreements, you don't believe that

14   Dr. Menninger even had social anxiety disorder; isn't that

15   right?

16   **A.**  In my opinion, I think she is, in her makeup, an anxious

17   person.  If she has social anxiety disorder, it's been, over

18   the years, well managed with just taking a Valium pill for

19   some meetings.  So it's not a profound problem with her

20   functioning.  She believes she has functioned very well.  At

21   PPD, they thought her performance was fine.

22         So it's -- I could not find a major disruption in

23   her actual functioning doing what needed to be done.  Was she

24   experiencing some anxiety in meetings where she might have to

25   be more active?  Yes.  But that doesn't, for me, really get

1    to a serious social anxiety disorder, social phobia.

2    **Q.**  Sir, in your view, a person doesn't have social anxiety

3    disorder unless their symptoms are visible to others; is that

4    right?

5    **A.**  That's not my opinion.  I don't think they have to be

6    visible to others.  They have to have some problem with

7    functioning if you have a pretty well established social

8    phobia, social anxiety disorder.  It's got to be manifest in

9    your work activities in this situation.

10   **Q.**  And sometimes people with social anxiety disorder, they

11   can manage those manifestations through medication, yes?

12   **A.**  Yes.

13   **Q.**  Would Valium be one of those medications?

14   **A.**  Say again, please?

15   **Q.**  Would Valium be one of those medications?

16   **A.**  Yes.

17   **Q.**  Medications like Valium have side effects, yes?

18   **A.**  Yes.

19   **Q.**  What are the side effects?

20   **A.**  In my opinion, Valium is not a good drug for social

21   anxiety disorder.  Valium tends to come on a couple hours

22   after you take it and lasts for a couple of hours -- two to

23   four.  There are short-acting antianxiety drugs that will

24   come on in a half an hour and be washed out in two hours, and

25   there's no hangover.

1          And Dr. Menninger complained of kind of lingering

2     effects after a meeting from taking the Valium.  So, yes,

3     it's used that way, but my own sense is that there are better

4     drugs without significant side effects, such as a kind of

5     later-in-the-day hangover with the Valium.

6     **Q.**  My question is, sir, is what are the side effects of

7     Valium?

8     **A.**  Generally, there aren't many serious side effects.  You

9     can be sleepy.  You can be less cognitively efficient,

10    clouded kind of stuff.  Rarely, there are GI,

11    gastrointestinal problems, but those are the main ones that

12    occur to me.

13    **Q.**  Did Dr. Menninger report having side effects from taking

14    the Valium?

15    **A.**  Yes.

16    **Q.**  You also do not believe that Dr. Menninger had panic

17    disorder; is that right?

18    **A.**  Yes, I don't think she did.

19    **Q.**  You know that she reported having panic attacks?

20    **A.**  Say again, please.

21    **Q.**  You know that she reported having panic attacks?

22    **A.**  Yes.

23    **Q.**  Your opinion, sir, is those weren't actually panic

24    attacks, right?

25    **A.**  The context is she did not describe panic attacks prior

1    to the request for accommodations.  When they could not go

2    along with the accommodations, she was very anxious, "What's

3    going to happen to me?  What's going to happen to my family?"

4    and the like.

5                I would not call that a panic attack.  Panic

6    attacks are, again, conditions that tend to come on in early

7    adulthood and can be recurrent.

8    Q.   Let me describe for you an event, and please tell me if

9    this sounds consistent with a panic attack.  This would be

10   someone's observations of the individual.

11               "During one of our social situations, she sought me

12   out and was unable to communicate clearly.  Her breathing was

13   rapid.  She did her best to hold back tears, unable to fully

14   communicate what was happening to her, and it took several

15   minutes to recover enough to explain what she was

16   experiencing."

17               Doctor, does that sound like a person who's having

18   a panic attack?

19   A.   It would -- I would be curious as to the timing of that.

20   Was that before or after the request for accommodations?  If

21   it was before that she was having that experience, then that

22   would be a vote in the direction of panic attacks.

23   Q.   So it's only a panic attack if it happened before the

24   unlawful conduct she alleges?

25   A.   Again, I would be curious as to the timing of that

1    comment.  Was it before or after she requested accommodations

2    from PPD?  If it was before, then that would be a vote in the

3    direction of that she has panic attacks.

4    **Q.**  You know -- you know Dr. Summergrad, right?

5    **A.**  I do.

6    **Q.**  He has a good reputation in the psychiatric community?

7    **A.**  Yes.

8    **Q.**  Do you believe he was -- you -- strike that.

9         You read his expert report?

10   **A.**  Yes.

11   **Q.**  Based upon your knowledge of Dr. Summergrad, would you

12   agree that the opinions expressed in his report are genuinely

13   held by him?

14   **A.**  I would assume so, yes.

15   **Q.**  No reason to think otherwise?

16   **A.**  No.

17   **Q.**  Going back to reactive depression, you agree that

18   Dr. Menninger developed a reactive depression in 2018; is

19   that correct?

20   **A.**  Yes.

21   **Q.**  And prior to the development of that depression,

22   Dr. Menninger had not previously shown symptoms of

23   depression, right?

24   **A.**  Correct.

25   **Q.**  In fact, sir, that's the -- that's one of the reasons why

1    you disagree with the diagnosis of major depressive disorder,

2    correct?

3    **A.**  Correct.

4    **Q.**  And, sir, you agree that Dr. Menninger's development of

5    reactive depression in 2018 was caused by PPD, yes?

6    **A.**  No.  I have a problem with the term "caused by."  It's --

7    I mean, reactive depression is not mysterious.  Something bad

8    happens in your life, and you react with sadness and upset,

9    and you're depressed and you're unhappy.  It's not like some

10   really tricky, arcane kind of problem.

11   **Q.**  But my question, sir, concerns what was the bad thing?

12   What was the life event that caused her to form this reactive

13   depression?

14   **A.**  That PPD considered her requests and apparently felt that

15   the requests that she had, 2, 3, and 4 on the list, were

16   incompatible with being the senior scientist, head

17   pathologist at PPD.

18   **Q.**  So to be clear, sir, you would agree with me that there

19   wasn't some other major life event that caused Dr. Menninger

20   to form major --

21   **A.**  I have a problem with the "caused."

22   **Q.**  Let me get the question out.

23   **A.**  It was an occasion, okay, precipitant, trigger.  But

24   caused -- this is probably a multifactorial situation.

25   It's -- think for a second about a light switch.  You go to

1    the light switch and you flick it on and the light comes on.

2    Did flicking the switch cause the light to go on?  Not

3    really, because the electric company is on the street, there

4    are wires into the house, there's wires -- kind of thing.

5            So just because something happens after an event

6    doesn't mean it is a cause of that event.

7    Q.   Let's use your light switch analogy.  You'd agree with me

8    that PPD's response to Dr. Menninger's request for

9    accommodation was the light switch that brought on her

10   reactive depression?

11   A.   There's problems with analogies, but yes.  But, again,

12   "caused" is not something that I -- the cause could be that

13   her request was over the top.

14   Q.   Do you recall -- do you recall being deposed in this

15   matter?

16   A.   Say again?

17   Q.   Sorry.  Do you recall being deposed in this matter?

18   A.   Yes.

19   Q.   In the binder in front of you, at the first tab, you'll

20   find a copy of your deposition transcript.  If you could

21   please turn to page 59.

22   A.   Yes.  I have it.

23   Q.   And if you could look at -- it's actually page 58,

24   line 23 -- actually, I'm sorry.  Go to page 59.

25   A.   Page 51?

1  **Q.**  59, line 5.  And please read along silently as I read out

2  loud.  "What decision" --

3  **A.**  I'm on page 59.  What line?

4  **Q.**  Line 5, please.

5       "What decision of the company do you believe caused

6  her depression?"

7  **A.**  Okay.

8  **Q.**  "ANSWER:  --

9  **A.**  I hope I've made it clear my problem with the word

10  "caused."

11       THE COURT:  Let him just first finish the question.

12  Hold on, Dr. Kelly.

13       You read that part.  What's the question, or you're

14  not done?

15       MR. HANNON:  I'm not done yet.  Let me read the

16  question and answer.

17       THE COURT:  Go ahead.

18  BY MR. HANNON:

19    "QUESTION:  What decision of the company do you believe

20  caused her depression?

21    "ANSWER:  The decision that the accommodations that she

22  was requesting, she can meet some of them, but several were

23  incompatible with the position she held in the company."

24    Did I read that right?

25  **A.**  Yes.

1    **Q.**   Now, to be clear, sir, you go on to note that causation

2    here, you mean more precipitation, right?

3    **A.**   Well, their response to her request surprised her.  She

4    thought it would be no problem and she was very upset.  I

5    have a problem with the word "caused," because maybe her

6    request for accommodations were inappropriately --

7    inappropriate and excessive.

8            So maybe that's where the chain of events should

9    start; but, again, I have problems with the word "caused."

10   **Q.**   Following PPD's rejection of Dr. Menninger's

11   accommodation request, there was other conduct that

12   contributed to Dr. Menninger's depression; is that right?

13   **A.**   I don't know what you're referring to.

14   **Q.**   Well, you're aware that in early June of 2018,

15   Dr. Menninger's doctor recommended that she take a medical

16   leave, correct?

17   **A.**   Absolutely not.  Her doctor was against her taking

18   medical leave.  She had decided she was going to, but if you

19   look carefully at Dr. Kessimian's records -- particularly,

20   for example, May 25th -- there's a quotation in there, "I

21   discussed honestly with her that she has not tried the gold

22   standard for treatment of social anxiety disorder; namely,

23   exposure therapy," which is correct.

24           So Dr. Kessimian didn't recommend that she take

25   leave, but rather was saying, "Ooh, slow down.  Maybe you

1    ought to try some other approaches that will help you stay on

2    your job at PPD."  That's May 25th.

3    **Q.**  Sir, you would agree that Dr. Menninger became suicidal?

4    **A.**  She had passive suicidal ideation, which is described in

5    both Dr. Kessimian's record.  It was somewhat fleeting.  It

6    was expressed in the end of April and had resolved by

7    May 18th, which was her next visit.

8         And she reassured Dr. Kessimian that she was not

9    really suicidal.  It's just that this was weighing on her, it

10   was very hard, and the like; and that qualifies as passive

11   suicidal ideation.  "Some days, I wish I didn't wake up.  I

12   can't take this," as, in the field, can be regarded as

13   passive suicidal ideation.

14        "I know where my husband's gun is," that's suicidal

15   ideation, she's thinking about how she might do it, which is

16   not the case here.

17   **Q.**  Sir, you've seen instances in the past where a person

18   suffering from what you call "reactive depression" has taken

19   their own life, yes?

20   **A.**  Has taken?

21   **Q.**  Has killed themselves?

22   **A.**  Yes.

23   **Q.**  I'm going to show you Joint Exhibit Number 1.  Doctor,

24   this is an expert report that you prepared back in May of

25   2011; is that right?

1    **A.**   That's correct.

2    **Q.**   You prepared this report on behalf of a gentleman's -- on

3    behalf of the family of Jeffrey Chaput; is that right?

4    **A.**   Yes.

5    **Q.**   Do you recall this case?

6    **A.**   Somewhat, yes.

7    **Q.**   Mr. Chaput had gotten hurt at work?

8    **A.**   Yes, he did.  There was a heavy bucket full of weighty

9    materials, and he had a crush injury of his hand and ongoing

10   pain that was not able to be treated easily.

11   **Q.**   And then he lost his job?

12   **A.**   Yes.  He couldn't do the work.

13   **Q.**   And then he could no longer provide for his family?

14   **A.**   And then he developed?

15   **Q.**   I said and then he was no longer able to provide for his

16   family?

17   **A.**   Yes.  That weighed very heavily on him.

18   **Q.**   And then he developed depression?

19   **A.**   Yes.

20   **Q.**   And then he killed himself?

21   **A.**   Yes.

22   **Q.**   I show you now Joint Exhibit 2.  Is this an expert report

23   that you prepared on behalf of the family of Gilbert Dube?

24   **A.**   Yes.

25   **Q.**   Mr. Dube got hurt at work?

1   **A.**   Yes.

2   **Q.**   He went on total disability?

3   **A.**   I'm not recalling that.  He might have.  I think they let

4   him go.

5             Okay.  Let me just --

6   **Q.**   The bottom sentence there, you see it says, "On

7   December 4, 2001, while collecting total disability"?

8   **A.**   Okay.  Yes.

9   **Q.**   And then he lost his job?

10  **A.**   Yes.

11  **Q.**   And then he had difficulty providing for his family?

12  **A.**   Correct.

13  **Q.**   And then he killed himself.

14  **A.**   Yes.

15  **Q.**   In your opinion, you note how his suicide was a complete

16  shock and surprise to his family and people who knew him

17  well, right?

18  **A.**   Yes.

19  **Q.**   He had historically been a strong, positive, somewhat

20  happy-go-lucky individual who prided himself on hard work,

21  right?

22  **A.**   Correct.

23  **Q.**   In both of these instances that we just looked at,

24  Mr. Dube and Mr. Chaput, you opined that the suicides were

25  causally related to the loss of their job; is that right?

1    **A.**   Yes.

2    **Q.**   Now let's take a look at Dr. Kessimian's notes.  I'm

3    going to show you Joint Exhibit Number 18.  So we're looking

4    at here the 44th page of the exhibit.

5         Sorry, my highlighter is not working, but if you

6    look towards the top of the page, you'll see there the "DOS:

7    6/1/18."

8         Do you see that?

9    **A.**   Yes.

10   **Q.**   So you understand this is a note of a visit with

11   Dr. Kessimian on June 1, 2018?

12   **A.**   Yes.

13   **Q.**   The chief complaint of Dr. Menninger that day was, "I

14   just can't do it anymore.  I'm not sleeping, eating.  I'm

15   having thoughts about ending my life, but I wouldn't do it

16   because of Maya and Mason."

17         Do you see that?

18   **A.**   That's what the note says, yes.

19   **Q.**   My projector is not working right now, but are you aware,

20   sir, that that was the same visit on which Dr. Kessimian

21   recommended that Dr. Menninger take a leave of absence from

22   work?

23   **A.**   I have a notebook that's in the gallery with

24   Dr. Kessimian's notes in it.  Is it possible I could have

25   that on the stand?  It might solve the projection problems.

1    **Q.**  No.  If you can just tell the jury now if you recall if

2    it was on that visit on June 1, 2018 that Dr. Kessimian

3    recommended that Dr. Menninger take an immediate leave of

4    absence from work.

5    **A.**  Again, I'm -- the appointment right before this one,

6    May 25th, bottom of the first page, is very explicit, in my

7    opinion, about Dr. Kessimian's thoughts about how this ought

8    to be handled, not going on disability, not going into a day

9    hospital, not taking a leave of absence.

10            Again, I -- I'm a little bit at -- I'm having

11   difficulty dealing with it.  I have Dr. Kessimian's records

12   in my briefcase that an associate has and I could deal with

13   it directly to solve your projection problems.

14   **Q.**  Well, let me ask you a different question.  You'd agree

15   that a person suffering depression sometimes has good days?

16   **A.**  Yes.  There can be some fluctuation in things.

17   **Q.**  And they sometimes have bad days, right?

18   **A.**  Yes.

19   **Q.**  Yes?

20   **A.**  Yes.

21   **Q.**  And you mentioned before Dr. Kessimian's reference to

22   exposure therapy?

23   **A.**  Yes.

24   **Q.**  Did I hear that right?

25   **A.**  Yes.

1   **Q.**  And exposure therapy is --

2   **A.**  Oops.

3   **Q.**  Is that what it sounds like?

4   **A.**  Say again?

5   **Q.**  Is that essentially exposing a person to something that

6   sort of causes them pain or discomfort in order to help them

7   build a tolerance?

8   **A.**  Basically, that's the principle.  It can take various

9   forms.  Back in the '80s and '90s, people with a fear of

10  flying could go over to Logan Airport, could go into a

11  hangar, walk around an airplane, that kind of thing.  And

12  there's also the phenomena of habituation; namely, if you go

13  to meetings and master them, maybe with the help of

14  medication, then that's an exposure therapy that can be a

15  very effective treatment in social anxiety disorder.

16  **Q.**  Would you agree that, before engaging in exposure

17  therapy, you need to make sure that the person can withstand

18  the exposure without suffering self-harm?

19  **A.**  The exposure therapy initially causes -- likely -- I

20  should not use the word "cause."  A person will experience

21  anxiety; and then, over time, the exposure exercises lessens

22  the experience of anxiety.

23  **Q.**  My question, sir, though, is if you're going to treat

24  someone with exposure treatment, you want to make sure that

25  they're capable of handling the exposure, right?

1    **A.**  Yes.

2    **Q.**  And --

3    **A.**  You would not do it if you had serious concerns that this

4    would be very difficult, very, very difficult for the

5    individual and maybe we ought to go very slowly here.

6    **Q.**  And now that I've stalled long enough to fix my iPad,

7    let's take a look at Dr. Kessimian's recommendation on

8    June 1st.

9              So I'm showing you now Joint Exhibit 18 and you see

10   here, sir, Dr. Kessimian recommended immediate medical leave

11   starting on Monday -- it says "2/2" -- to level of anxiety

12   and safety issues, monitor GI distress and appetite.

13             Do you see that?

14   **A.**  It -- the reference to "2/2," that look like it's

15   February 2nd, which was, I think, the second appointment that

16   she had with Dr. Kessimian.  So I don't -- this may be in the

17   June time frame, but it doesn't kind of -- "Safety --

18   recommended immediate medical leave starting on Monday 2/2 to

19   level anxiety and safety issues, monitor GI distress and

20   appetite."

21   **Q.**  Well, let me help you orient in terms of when this is.

22   I'll turn back two pages.  And you'll see this is

23   Dr. Kessimian's note on June 1, 2018; do you see that?

24   **A.**  Then that probably is a typo of the 2/2, yeah.

25   **Q.**  So would you agree with me, sir, that on June 1, 2018,

1    Dr. Kessimian recommended immediate medical leave?

2    **A.**   Yes, it appears so.

3    **Q.**   Is it your opinion, sir, that Dr. Kessimian was -- was

4    wrong in concluding that that was necessary?

5    **A.**   It speaks for itself.  I mean, it at -- that is very

6    different from a May 25, 2018 note.

7    **Q.**   Sure.  I'm not asking you if it's different; I'm asking

8    you if you believe that Dr. Kessimian, that her advice here

9    was wrong.  Do -- do you have an opinion one way or the

10   other?

11   **A.**   I -- "recommended immediate medical leave," that's what

12   it says in that note.  Dr. Menninger had already decided to

13   go on medical leave.

14   **Q.**   That wasn't my question, sir.  My question is whether or

15   not you disagree with Dr. Kessimian's recommendation of

16   immediate medical leave.  Do you?

17   **A.**   I disagree that she should have had a medical leave.

18   **Q.**   I think I heard you say on examination from PPD's lawyers

19   that reactive depression should be treatable with drugs; is

20   that right?

21   **A.**   Reactive depression should -- what?

22   **Q.**   Is something you should be able to treat with drugs, yes?

23   **A.**   No.

24   **Q.**   You believe depression in general should be responsive to

25   drugs; is that right?

**A.**   In my opinion, major depressive disorder, a biological genetic condition, is the only depressive disorder that responds to medication via the chemical properties thereof.

Now, if you have a very sympathetic doctor and prescribes a medication to help you with your reactive depression and tells you, "I think it will help you," that, in my opinion, is more likely to be a placebo effect given the totality of those circumstances.

**Q.**   Well, sir, you've seen that over the course of Dr. Menninger's treatment, that she's been taking drugs, right?

**A.**   Off and -- well, for the most part, she has been taking medications.  Occasionally, she comes off medication, usually spontaneously, if she decides that she's going to stop the medication.

**Q.**   Spontaneously?  What do you mean spontaneously?

**A.**   There's a sequence in the Portland clinic in 2022 in which she decides when she's seeing the nurse practitioner who is prescribing medications, she says to the nurse practitioner, "I think I want to do this using the things that I've learned from my counseling," and she comes off the medication; and then a couple months later, she wants to go back on it.

So she is significantly influencing the medication choices.

1    **Q.**   She's trying to get better; isn't that right?

2    **A.**   I don't think she's malingering.  Okay?

3    **Q.**   So you'd agree --

4    **A.**   But --

5    **Q.**   -- that she's trying to get better?

6    **A.**   But she's resistant to talking about returning to any

7    medical-type activity in 2022, so even -- oops -- even

8    discussing it with her counselor.

9    **Q.**   And, sir, that's what people do when they have traumatic

10   events in their life, right?

11   **A.**   They can.

12   **Q.**   Your kid gets hit by a Comcast truck, you're probably not

13   ordering Comcast in the future, right?

14           THE COURT:  I think that's beyond the scope,

15   Mr. Hannon, of the medical expert's opinion, as to whether

16   you would be ordering Comcast or not.

17   BY MR. HANNON:

18   **Q.**   If you suffer a traumatic event that gives you suicidal

19   ideation, you're probably going to be concerned about putting

20   yourself back in that same position, yes?

21   **A.**   There was no evidence of suicidal ideation until the

22   April 23rd visit, and it was resolved two weeks later,

23   June 1st.  So at least until the end of April, there were no

24   suicidal issues while she was still active, albeit from a

25   distance, with PPD.

1    **Q.**  You believe that Dr. Menninger not -- strike that.

2              You believe that notwithstanding her depression

3    that Dr. Menninger is capable of returning to work; is that

4    right?

5    **A.**  Yes.

6    **Q.**  You're aware, sir, that Dr. Menninger was awarded

7    long-term disability benefits?

8    **A.**  Yes.

9    **Q.**  That was by Unum Insurance Company?

10   **A.**  Yes.

11   **Q.**  They concluded she couldn't work?

12   **A.**  Yes.

13   **Q.**  She was awarded Social Security disability benefits?

14   **A.**  I believe that's correct.

15   **Q.**  The United States government decided she was unable to

16   work?

17   **A.**  I don't know if it was the government.  It was the Social

18   Security Administration and the consultants.

19   **Q.**  They're notoriously tough to convince that someone with a

20   mental health disorder is unable to work, aren't they?

21   **A.**  Say again, please?

22   **Q.**  Social Security is notoriously difficult to convince that

23   a person with mental health problems is unable to work; isn't

24   that right?

25              MR. CURRAN:  Objection.

1          THE COURT:  Overruled.  If you know.

2          THE WITNESS:  They make a determination that she

3    was eligible for disability benefits.

4    BY MR. HANNON:

5    **Q.**  And you think they got that wrong?

6    **A.**  I do.

7    **Q.**  And you think Unum got it wrong?

8    **A.**  Say again?

9    **Q.**  You think Unum got it wrong?

10   **A.**  Sorry.  Again?

11   **Q.**  Unum, the insurance company, you think they got it wrong,

12   too?

13   **A.**  My opinion is that she has no condition that would

14   prevent her from returning to the workplace as a pathologist.

15   **Q.**  You think Dr. Everson, the doctor that saw her in

16   Kansas City, you think that he was wrong, right?

17   **A.**  No, I don't think that.

18   **Q.**  Well, he diagnosed her with generalized anxiety disorder,

19   right?

20   **A.**  Yes.  He didn't diagnose her with disability.

21   **Q.**  And you think he was wrong about the generalized anxiety

22   disorder, right?

23   **A.**  I think that that's defensible, but I think it's pretty

24   clearly social anxiety disorder as a more precise diagnosis.

25   **Q.**  Okay.  So now you would diagnose her with social anxiety

1    disorder?

2    **A.**   Say again?

3    **Q.**   So you would agree with the social anxiety disorder

4    diagnosis?

5    **A.**   I think it's possible, but if it's present, it's a

6    pretty -- it's not a really major disruption in her capacity

7    to function.  She takes a Valium pill, is able to go to some

8    meetings.  It's not clear that she always takes it, but

9    that's the level of the "disorder," if you will, that she was

10   able to do things with just a small amount of Valium.

11   **Q.**   You know that Dr. Menninger, when she went to Butler

12   Hospital, that they diagnosed her with major depressive

13   disorder?

14   **A.**   Yes.

15   **Q.**   You believe they got that wrong?

16   **A.**   Yes.

17   **Q.**   You know that when Dr. Menninger was being seen by

18   Dr. Burbano in New Mexico, that Dr. Burbano diagnosed her

19   with major depressive disorder?

20   **A.**   Yes.

21   **Q.**   You believe Dr. Burbano got it wrong?

22   **A.**   Yes.

23   **Q.**   You know that Dr. Menninger's doctors in Oregon, they've

24   diagnosed her with major depressive disorder, yes?

25   **A.**   I think that's carried on in the records, yes.

1    **Q.**   And you think they got that wrong, right?

2    **A.**   I don't think she has it.

3              MR. HANNON:  That's all I have, Your Honor.

4              THE WITNESS:  For the reasons I spelled out a few

5    times today.

6              THE COURT:  That's it.  There's no question

7    pending, Dr. Kelly.

8              Any redirect?

9              MR. CURRAN:  No, Your Honor.

10             THE COURT:  All right.  Thank you very much.

11             Is that the remainder of -- no other witnesses,

12   right?

13             MR. CURRAN:  Yeah.  No other witnesses.

14             THE COURT:  Okay.  So, ladies and gentlemen --

15             So the defense rests; is that correct?

16             MR. CURRAN:  Correct, the defense rests.

17             THE COURT:  No rebuttal case, right?

18             MR. HANNON:  None, Your Honor.

19             THE COURT:  So, ladies and gentlemen, that

20   concludes all of the evidence in the case.  You still need to

21   keep an open mind.  You still can't discuss among yourselves.

22   You still can't discuss it with anyone else.  You still can't

23   do any independent research.  You haven't heard everything,

24   so we're going to end for the day.

25             You are going to come tomorrow morning.  We'll

 1    start.  We'll have the closing arguments from the lawyers.

 2    That will run, in total, about an hour and a half, give or

 3    take a little bit.

 4            We'll also have my instructions to you on the law

 5    and then you'll retire to the jury room.  We'll bring in the

 6    exhibits so you have them, then you can commence your

 7    deliberations, then you can discuss the case -- at that

 8    point, you can then discuss the case, obviously, among

 9    yourselves.  All right.

10            But for the moment, don't discuss the case among

11    yourselves.  Don't discuss it with anyone else.  Keep an open

12    mind.  Although you have heard all the evidence in the case,

13    you haven't heard from the lawyers.  They do not provide

14    evidence, but they do provide arguments that can be helpful

15    to you, and you haven't heard my instructions on the law.

16            All right.  All rise for the jury.

17            Thank you for your attention.

18            (Jury not present.)

19                     **JURY CHARGE CONFERENCE**

20            THE COURT:  So, Dr. Kelly, you're free to step down

21    and go on your way.  I have some things to talk to the

22    lawyers about.

23            Okay.  Mr. Hannon, have anything on the jury

24    instructions?

25            MR. HANNON:  I do, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. HANNON:  So beginning with the section

 3     concerning request for accommodation --

 4              THE COURT:  What page are you on?

 5              MR. HANNON:  Page 9.

 6              THE COURT:  Okay.

 7              MR. HANNON:  So the Court has included the concept

 8     in terms of that the entitlement to accommodation is

 9     triggered irrespective of whether or not the employee needs

10     it in order to perform the essential functions of the job.

11              THE COURT:  Yes.  I think that's what you wanted,

12     right?

13              MR. HANNON:  Yes.  But it's not consistently

14     reflected throughout the instruction.

15              THE COURT:  Okay.

16              MR. HANNON:  So throughout the instruction, it sort

17     of repeatedly reads that there -- that the employee needs to

18     show a need for the accommodation.

19              THE COURT:  Can you point me to a spot?

20              MR. HANNON:  So the first one I have flagged here

21     is on page 9 in describing the third element of the claim, so

22     references notice of the need for that accomodation.  And

23     that's -- that phrase --

24              THE COURT:  Put on notice of that -- of that

25     request for accommodation?
```

1          MR. HANNON:  I think really the concept that we're

2     driving at is entitlement, that an employee who has a

3     disability and there's an accommodation available that will

4     either allow them to perform an essential function or will

5     alleviate the stress burden, et cetera, that that employee is

6     entitled to it.  So --

7          THE COURT:  Well, actually, that's not actually

8     quite -- as a complete statement of law, that's incorrect.

9          MR. HANNON:  Okay.

10         THE COURT:  Right?  Because it can't be an undue

11    burden.  You're not entitled to an accommodation that would

12    be an undue burden, and you didn't use the word "reasonable,"

13    right?  So an accommodation that would let you do the job, if

14    you have a disability, right, and you request an

15    accommodation, you're not entitled to that accommodation

16    unless that accommodation is also reasonable and that -- and

17    they don't prove that it's an undue burden.  You're entitled

18    to it, absent their proving that it's an undue burden, I

19    suppose.

20         MR. HANNON:  Your Honor --

21         THE COURT:  And it's the thing I'm thinking about

22    in the third -- what I was thinking about here is this.  And

23    one way to deal with it is to identify the specific

24    accommodations that are requested, but I was leery of doing

25    that, because it seemed to me hard to precisely do it in the

1   instructions.

2           But it seems to me that one of the issues here,

3   like, that comes out of the summary judgment -- and I don't

4   quite know what you're going to argue, but that

5   accommodations are -- have to be, for purposes of this case,

6   and I understand there's certain circumstances where what I'm

7   about to say wouldn't necessarily apply, but that they have

8   to be sufficiently requested.

9           So what the third element to me was driving at was

10  just the idea that -- not a complete statement of all the

11  things that Dr. Menninger needs to prove in order to win her

12  case, right?  And the third element we're not addressing the

13  first, second, and fourth.  It's simply that it has to be --

14          For example, they think of an accommodation that

15  was never discussed, never raised, not considered, that's not

16  a basis for finding that accommodation wasn't brought.  It

17  has to be one that was sufficiently direct and, like -- that

18  was put on notice of that accommodation.  That's what I was

19  thinking about from the footnote in the summary judgment.

20          MR. HANNON:  Understood.  Yeah.  And, again, just

21  the difficulty is the word "need" and --

22          THE COURT:  I totally understand.  So what if I

23  just said "to put the employer on notice of that

24  accommodation"?

25          MR. HANNON:  I'm fine with that.

```
 1              THE COURT:  Okay.  Are there other places that you
 2     think that occurred?
 3              MR. HANNON:  Yes.
 4              THE COURT:  Can you just tell me where they are now
 5     before we go on to the next?
 6              MR. HANNON:  Page 13 and 14.
 7              THE COURT:  So just on page 13, the third line
 8     under element 3, "So as to put the employer on notice of that
 9     accommodation"?
10              And then you say in 14?  Oh, right at the top on
11     the second line, "on notice of that accommodation."  Anywhere
12     else?
13              MR. HANNON:  In terms of the word "need," I don't
14     see it anywhere else right now.
15              THE COURT:  Okay.  What else?
16              MR. WATSON:  Sorry, Your Honor, it's 16 and
17     Number 4 in the summary section.
18              THE COURT:  Oh, right.  Thank you.  16, Number 4.
19     So I'll change it, Number 4, "so as to put PPD on notice" --
20     let me just read it.
21              "On notice of that accommodation," so it's parallel
22     to the others.
23              Okay.  What else?
24              MR. HANNON:  So let's go to the discussion of the
25     third element.
```

1          THE COURT:  This is page --

2          MR. HANNON:  Well, actually, so page 13, the

3    definition of what a reasonable accommodation is.

4          THE COURT:  Yes.

5          MR. HANNON:  So there, we -- it's being defined as

6    a modification or adjustment that would enable the plaintiff

7    to perform the essential functions of her job.  So that's --

8    that's missing the other half of the concept.

9          THE COURT:  Okay.  So or --

10         MR. HANNON:  My suggestion, Your Honor --

11         THE COURT:  Yes.

12         MR. HANNON:  -- would be to take this section that

13   we currently have that sort of explains that accommodations

14   are available even to those who can do their essential

15   functions.

16         THE COURT:  Which section?

17         MR. WATSON:  Bottom of 14, bleeding into 15.

18         MR. HANNON:  So I would -- I would suggest moving

19   that up, and that way you can create sort of a shorthand

20   reference to that sort of second concept.  You know, for

21   example, you can call it an equal benefit or something like

22   that just so we don't have to keep on repeating that verbiage

23   over and over again, which I think just will overcomplicate

24   the instruction.

25         THE COURT:  So just move that -- you're saying just

1    move the two sentence -- the qualified individual sentence at

2    the bottom of 14 and the one that follows to right after that

3    paragraph of reasonable accommodation or --

4            MR. HANNON:  So I think it goes in the definition

5    of what a reasonable accommodation is, so on 13 --

6            THE COURT:  I see.  Hold on one second.  Let me

7    just take a look at this for a second.

8            What if I just change on 13 -- hold on.

9            Before I do it, yes, Mr. Curran?

10           MR. CURRAN:  Yeah, can I be heard on this whole

11   topic, or should I wait?

12           THE COURT:  Sure.

13           MR. CURRAN:  Okay.  So the concept that's expressed

14   on -- at the bottom of 14 over to 15, I know that was

15   something you mentioned the other day that you were

16   considering working into the instructions.  To me, I mean,

17   that seems broader than the law, as I understand it.

18           You know, I understand that there's a reference in

19   the regulations --

20           THE COURT:  What do you propose?  Putting aside how

21   we do it in 13 or 14 on the -- like, the concept -- so what I

22   understand Mr. Hannon to be saying is, Judge, I'm fine with

23   the expression of the concept on page 14 and 15, but I just

24   think there's some tension with the way it's expressed in 14

25   and 15, given that in 13, it doesn't include that part of the

1    concept, so they don't mirror each other, and so square them

2    up in some way or other.

3                Is that fair, Mr. Hannon?

4                MR. HANNON:  It is.

5                MR. CURRAN:  My concern is with the concept that's

6    discussed on 14 and 15.

7                THE COURT:  Right.  So what do you say about the

8    concept?

9                MR. CURRAN:  So the concern is that I think it's

10   broad, to the extent it's saying --

11               THE COURT:  What do you propose it say?

12               MR. CURRAN:  -- stress or difficulties or other

13   disadvantages.

14               I think, you know, the regulations also have

15   benefits and privileges of employment, which the EEOC's

16   enforcement guidance refers to --

17               THE COURT:  Well, so, like, make it hypothetical.

18   You have an employee.  One of -- one function of the

19   employee's job is to give speeches at 500-person town hall

20   meetings, presentations -- not necessarily the whole

21   presentation, like if it's an hour-long meeting, but they're

22   going to speak at some portion of it, some meaningful portion

23   of it, right?  And let's just say that's an essential

24   function of their job.

25               And so the employee says, "I -- I've been doing

1    that fine," everyone's rated the person fine, there's no

2    issue with that; and they say, "But I have -- I have a social

3    anxiety disorder, general anxiety, and I would like a

4    reasonable accommodation.  I can continue doing this, but the

5    way I do this now is I take Valium," or whatever medication,

6    "and that has some issues and concerns, and I'd rather not

7    take medication, and so I want an accommodation.  I can do my

8    job, as is, without this accommodation.  I can keep doing

9    what I'm doing.  But I would like an accommodation because it

10   would make my job less stressful.  The accommodation I want

11   is I want a surrogate to speak."

12        Okay.  So putting aside -- let's assume that the

13   surrogate is reasonable in the sense that it doesn't pose an

14   undue burden on the company.  They can do it.  It doesn't

15   significantly limit the essential function in a material way.

16   Is the person -- the company could do it out of grace, right?

17        MR. CURRAN:  Right.  I mean, should they do it?  I

18   think they should.  Would I advised them to do it?  Yes.  I

19   don't think they're required to do it by the law.

20        THE COURT:  I see.  So you don't think in that

21   situation --

22        And you think they would be in that situation,

23   Mr. Hannon, required to do it?

24        MR. HANNON:  I do, yeah.  And my colleague,

25   Mr. Watson, has provided me some authority on that.  And one

1    would be *Bell v. O'Reilly Auto Enterprises, LLC*.  It's a

2    First Circuit 2020 case for federal law, and then under

3    Massachusetts --

4              THE COURT:  What does *Bell* say?  Just read me the

5    relevant part.

6              MR. HANNON:  "The district court erred here when it

7    instructed the jury that, for a disabled employee to make a

8    failure to accommodate claim he must demonstrate that he

9    needed an accommodation to perform the essential functions of

10   his job."

11             MR. CURRAN:  I'm not disagreeing with that.  I

12   think you also have to work at the concept of benefits and

13   privileges of employment.  So, for example, if an employee

14   can't access the cafeteria, but they can still perform the

15   essential functions of their job, you know, the employer has

16   an obligation to --

17             THE COURT:  To make that available in some way.  So

18   that's a benefit of the job.  I understand.  But here we're

19   not talking about --

20             MR. CURRAN:  Right.  That's why I'm saying it's not

21   that case.

22             So I think that the First Circuit principle that's

23   articulated there is correct.  I think that --

24             THE COURT:  But there, they use -- oh, you think

25   they limited it to benefits?

```
 1              MR. CURRAN:  So what they're saying there was it
 2    was error to say it can only be related to the essential
 3    functions, which I think is correct.  But to say that -- to
 4    go beyond that and say you have to -- anything that reduces
 5    stress in the job, I don't think is what the law says.
 6              THE COURT:  I guess the question is what -- if I
 7    include this concept, that's -- I think it makes -- well --
 8              MR. HANNON:  Can I get to the other case?
 9              THE COURT:  What did you say?
10              MR. HANNON:  Can I get to the other case I was
11    going to mention?
12              THE COURT:  Yeah.
13              MR. HANNON:  So Ocean Spray, that's the SJC case,
14    and that spells this out in a bit more sort of helpful
15    detail.
16              And it notes there -- it specifies that in that
17    case, the individual -- reading here -- "Because of his
18    handicap and the unmitigated condition of his work
19    environment, Reposa took significantly longer to do his
20    repair work and worked under considerable stress that posed a
21    specific and significant risk to his cardiac status.
22              "In these circumstances, Reposa was entitled to
23    request accommodation, and his employer was obligated to
24    engage in the interactive process."
25              THE COURT:  I guess that gets to one of the other
```

1    points I was thinking about, is what is the level -- like --

2    stress is sort of a huge range, right?  You could have tiny

3    little bits of stress and you could have huge amounts of

4    stress and anxiety.

5         And I'm not sure that the employer's -- a

6    reasonable accommodation, I wouldn't think, is a modification

7    or work adjustment to the work environment that relieves any

8    conceivable stress suffered by a person who is disabled from

9    their disability related to their work.

10        I would think there's some quantum, and I guess the

11   question is if -- I included the concept because I thought it

12   was correct and -- but -- and I see the tension.  I agree.

13   It makes sense to say something.

14        What I was thinking was saying is, in A, would

15   enable the plaintiff to perform the essential functions of

16   her job, or -- and then the question is the other way, but to

17   relieve or -- is it just to alleviate the added stress,

18   difficulties, and other disadvantages, like I said?

19        MR. HANNON:  I think you got it right.

20        MR. CURRAN:  To me, I think, you know, the

21   hesitation Your Honor was expressing a minute ago about

22   there's got to be some level of stress, at least, I mean,

23   just any amount of stress, I don't think that's what the

24   *Ocean Spray* case was saying, at least as represented by

25   Mr. Hannon.

1           THE COURT:  Hold on.

2           So --

3           MR. CURRAN:  And you know, the other thing about

4    the *Ocean Spray* case, at least as represented by Mr. Hannon,

5    is that what triggered the need for an interactive dialogue

6    in that case was -- was finding out about this.  It wasn't as

7    if they had to actually provide that accommodation.

8           THE COURT:  Just give me one moment.

9           Okay.  So I'm going to come back to that concept

10   here in just a minute, Mr. Curran.

11          MR. CURRAN:  Okay.

12          THE COURT:  So what I'm inclined to do at the

13   moment is to say, in (a), "would enable the plaintiff to

14   perform the essential functions of her job," just as it has

15   it on page 13, "or relieve the added stress, difficulties,

16   and other disadvantages a disabled employee may suffer in

17   performing their work."  That covers the concept on page 13

18   you wanted.

19          Then on page 14, "a qualified individual is

20   entitled to a reasonable accommodation even if they are able

21   to perform the essential" -- well, then do I even need this

22   definition here?

23          MR. HANNON:  I -- I think to -- rather than try to

24   jam everything in, I think the better approach is on 13 --

25          THE COURT:  Yeah.

```
 1            MR. HANNON:  -- you have the first sentence, "A

 2   reasonable accommodation is a modification or adjustment, the

 3   manner in which a job is performed," period.  And then I

 4   think you could -- you could introduce the concept from the

 5   following page, you know, that a qualified individual is

 6   entitled to an accommodation either, one, if it allows -- if

 7   it would enable them to perform an essential function of

 8   their job; or, two, if it would --

 9            THE COURT:  Relieve the --

10            MR. HANNON:  -- blah, blah, blah.

11            THE COURT:  But the whole -- so put a period and

12   then say, "A qualified individual is somebody who can do the

13   job with a reasonable accommodation that would enable them to

14   perform it, or if the reasonable accommodation would

15   alleviate the added stress, difficulties," what have you,

16   "and the reasonable accommodations must also be feasible for

17   the employer to provide under the circumstances."

18            MR. HANNON:  I think just stretching out, right,

19   rather than trying to jam everything into a single sentence,

20   I think, would be easier.

21            THE COURT:  Yes, but you're saying basically just

22   move the whole qualified individual.

23            MR. HANNON:  Yeah.

24            THE COURT:  Okay.  I see what you're saying.  That

25   might make more sense.
```

1          And then -- okay.  So then if I'm going to say

2     that, Mr. Curran, what do you say I should say about what

3     quantum?  Or do either of you have a suggestion about that?

4          MR. CURRAN:  "Significant stress"?

5          THE COURT:  What do you say to that?

6          MR. HANNON:  I don't think that's right.

7          THE COURT:  What do you propose?

8          MR. HANNON:  I think you got it right the first

9     time.

10          THE COURT:  Any stress?

11          MR. HANNON:  But keep in mind, it's only some

12     additional stress caused by the disability.  So we're not

13     talking about --

14          THE COURT:  I understand.  Not stress performance.

15          MR. HANNON:  Right.

16          THE COURT:  But so any stress --

17          MR. HANNON:  Specifically tied to the disability.

18          THE COURT:  But then any amount?

19          MR. HANNON:  Right, because the idea is we get on

20     equal footing, right?  I've got a disability, and he doesn't.

21     But because of my disability, there's something that makes my

22     job harder.  I'm entitled to equal footing.

23          THE COURT:  Okay.  Your objection is noted.  I

24     won't play with the paragraph while you sit here, but you get

25     the general idea about how I'm going to do it and --

```
 1              MR. CURRAN:  Could I address the modifications that
 2     you were discussing before about eliminating the phrase "the
 3     need"?
 4              THE COURT:  Of course.
 5              MR. CURRAN:  Okay.  So I think there has to be some
 6     nexus between the notice and the accommodation, right?  Like,
 7     you can't -- there has to be a nexus between the
 8     accommodation and whatever it is that the person needs it
 9     for, whether it's for -- to help to do an essential function
10     or to -- to alleviate stress or whatever, right?  Like, you
11     can't just --
12              THE COURT:  Right.  But I think -- unless I'm
13     missing it, that the third element where that "need" word
14     came up, the point of that is you can't -- you have -- in the
15     context of this case, the accommodations and issues are the
16     ones that were requested.  You can't -- like, Mr. Hannon
17     can't stand up and say, "You know what?" -- he's a creative
18     guy -- and say, "You know, here's another accommodation that
19     they could have done."
20              And the jury might think, "Oh, that accommodation
21     would be reasonable and meet all the elements."  It's too
22     late for that.
23              Like -- and so the point of the third element is
24     simply that there was a request for accommodation and the
25     request was sufficiently direct and specific that PPD knew of
```

1    that request, that accommodation request.  The fact that

2    the -- the requested accommodation, assuming they find -- I

3    mean, I would be surprised if they didn't -- if they came to

4    the conclusion that no accommodations were requested in this

5    case, but -- and that's not really, I don't think, your

6    position, but --

7            MR. CURRAN:  No, there isn't.  But there are a

8    number of things the jury might think were a request for

9    accommodation, but there was never any linking of that

10   articulation of "I need more specificity from you,

11   Mr. St. John."  There was no linking of that to her

12   disability.

13           So I --

14           THE COURT:  Well, but it says in the fourth

15   element, "The accommodations Dr. Menninger requested was

16   reasonable in that it was feasible for PPD to provide under

17   the circumstances and would have enabled Dr. Menninger to

18   perform the essential functions of her job."  And --

19           MR. CURRAN:  Where is that, Your Honor?  I'm sorry.

20           THE COURT:  On page 9, where I list the elements of

21   the first claim.

22           MR. CURRAN:  Yes.  No, I agree with that.  I think

23   the problem that crops up is that, when you're eliminating

24   the word "the need," for example, on page 16, in the

25   fourth -- summary of claim 1, fourth question, did

1    Dr. Menninger prove by a preponderance of the evidence that
2    she had made a request for an accommodation that was
3    sufficiently direct and specific so as to put PPD on
4    notice -- now it's going to say -- on notice of that
5    accommodation.
6                    There's no nexus required by that question to --
7                    THE COURT:  Hold on.  Let me look.
8                    I think two things about that.  One is that, in
9    order on the summary, the -- to find that -- to answer
10   question 5 yes, they find by preponderance of the evidence
11   that one or more of the accommodations was reasonable, for it
12   to be reasonable, it has to either enable her to perform the
13   essential functions of her job, or it has to relieve added
14   stress.
15                   MR. CURRAN:  I think that's true, but I think that
16   the request has to also be linked to that, doesn't it?
17                   THE COURT:  I don't know what you mean.
18                   MR. CURRAN:  I think the request for the
19   accommodation -- in order to sufficiently request the
20   accommodation, it has to be linked to the need for a relief
21   from stress or essential function.
22                   THE COURT:  I'm not sure -- suppose she requests
23   that she wants a blue -- a blue -- she wants like a blue
24   laptop and like -- and she says, "I'm -- I have the social
25   anxiety disability, agoraphobia, and generalized anxiety

1    disorder disability, and I can't do my job unless you give me

2    a blue laptop."

3              MR. CURRAN:  That would be linking that to the

4    disability.

5              MR. HANNON:  I think that's right, Judge.  If I

6    just ask for a blue laptop and don't give any indication of

7    why the blue laptop --

8              THE COURT:  All right.  I'm fine.  So what do you

9    want me to say?

10             MR. HANNON:  I don't know, but --

11             THE COURT:  I mean, I agree, but I would have

12   thought the linking comes in then, okay.  That, like, either

13   it's not reasonable or even if it is reasonable you could

14   provide a blue laptop, it doesn't -- like, you don't need it

15   to perform the essential functions of your job.  But I'm

16   happy to -- I don't -- I agree that -- I guess I agree that

17   the thing you request, in the end, you have to prove,

18   plaintiff has to prove, that it would either enable her to do

19   an essential function of her job or relieve the added stress

20   and I --

21             MR. HANNON:  I think -- sorry to cut you off.

22             THE COURT:  No.  Go.

23             MR. HANNON:  I think his point is that it has to --

24   that the request has to put them on notice that the request

25   is somehow linked to the disability.

```
1              THE COURT:  I see.  Is that what you're saying?
2              MR. CURRAN:  Yeah.  That's what I'm trying to say.
3     In fact, Mr. Hannon -- Dr. Hannon said it much more
4     articulately than I did.  But, yeah, I mean, I think there
5     has to be a link between -- in order to put the employer on
6     notice that this is a request for an accomodation --
7              THE COURT:  So what if we said to put the employer
8     on notice of --
9              MR. CURRAN:  I think "the need for" is okay, and I
10    think maybe your concern about that was that suggests it's
11    needed for essential functions; is that right?  And that's
12    too narrow?
13             So maybe the need -- and not to make it longer than
14    it is -- I know you want it to be shorter, but the need for
15    that accommodation in order to perform the essential
16    functions of the job, or to relieve stress, or alleviate
17    stress, or whatever the rest of that phrase was.
18             THE COURT:  What if we just said -- put employer on
19    notice of that accommodation because of the disability?  Or
20    the -- that accommodation and that it is requested because of
21    the disability?  Right?  That's really the issue?
22             MR. HANNON:  That does it for me, Judge.  I think
23    that's accurate.
24             MR. CURRAN:  I think -- I think that's okay,
25    Your Honor.
```

1          THE COURT:  All right.  I'll change that in the

2     third element on page 9, so it will read:  "So as to put the

3     employer on notice of that accommodation and that it is

4     requested because of the disability."

5          And then I'll change it to square with that on

6     page 13.  It will just be the same.  And on page -- carry

7     over on 14 and in the summary question 4.

8          MR. CURRAN:  I think that's right, Your Honor.

9          THE COURT:  Okay.  Fine.

10          So back to the -- we resolved the -- and -- all

11     right.  The second thing you resolve, which is the square on

12     page 13 and 16 -- I'm sorry, not -- 13 and 14.  I did that.

13     Your objection is noted.

14          What else do you have, Mr. Hannon?

15          MR. HANNON:  One thing -- so on page 14 -- sorry --

16     first, on page 13, just the phrase, "on the face of things."

17          THE COURT:  Where are you?

18          MR. HANNON:  So --

19          THE COURT:  Page 13?

20          MR. HANNON:  Yeah, so page 13, the section we were

21     just in, the -- B, "is feasible for the employer to provide

22     under the circumstances, at least on the face of things."

23          THE COURT:  You want to add at least on --

24          MR. HANNON:  Yeah, the "at least on the face of

25     things" is the -- is the phrase from the case law, and I

```
 1    think it's important in terms of informing --
 2              THE COURT:  Do you disagree, Mr. Hannon -- I mean,
 3    Mr. Curran?
 4              MR. CURRAN:  No, I don't, Your Honor.
 5              THE COURT:  All right.  "At least on the face of
 6    things."  Okay.
 7              MR. WATSON:  And the case law, Your Honor, was
 8    Reed v. --
 9              THE COURT:  Which page?
10              MR. HANNON:  He's already ruled in our favor on
11    that.  So no need to give him case law.
12              MR. WATSON:  Sorry.
13              THE COURT:  No problem.  You don't want to snatch
14    defeat from the jaws of victory.
15              MR. HANNON:  Exactly right.  So turning to page 14,
16    the one beginning "fourth, Dr. Menninger must prove."
17              THE COURT:  I'm sorry I just -- oh, okay.  Yes.
18    Sorry.  Go ahead.  I see where you are.
19              MR. HANNON:  "Under the circumstances," and we'd
20    ask that it again be "at least on the face of things."
21              THE COURT:  "At least on the face of things."
22              What else?
23              MR. HANNON:  Did we address that -- on page 14,
24    under element 4, we need to have both concepts, both the
25    essential functions and relieve stress?
```

1          THE COURT:  I was going to move that back to -- the

2     whole qualified individual would be back on what is a

3     reasonable accommodation.

4          MR. HANNON:  My reference is on page 14, the

5     paragraph that begins "fourth, Dr. Menninger must prove."

6          THE COURT:  Oh, I see.

7          MR. HANNON:  It's really just a conforming edit.

8     We just need to make sure we catch all the spots --

9          THE COURT:  I'll do something to conform --

10          MR. HANNON:  -- that's there.  And, again, I would

11     suggest considering some kind of a shorthand.

12          THE COURT:  Yes.

13          MR. HANNON:  Yeah, and just to note, there's a

14     similar conforming edit is needed in the summary of the

15     elements on page 9.  That same issue appears there.  It just

16     makes reference to performing the essential functions of the

17     job.

18          THE COURT:  All right.  Okay.  And question 3.

19          All right.  What else?

20          MR. HANNON:  The statement on page 14 that the

21     accommodation is not reasonable if it requires changing an

22     essential function of the job or shifting any of the

23     functions.  I believe that's an incorrect statement of the

24     law.

25          And we had a specific -- in our proposed jury

1    instruction with respect to identifying examples of what

2    constitutes a reasonable accommodation, we had included two,

3    which -- one of which is drawn --

4            THE COURT:  What page?  What instruction are you

5    on?

6            MR. HANNON:  I'm looking at -- in page --

7            THE COURT:  I mean, in your proposal.

8            MR. HANNON:  What proposal is this?

9            MR. WATSON:  Oh.  The plaintiff's proposal --

10           THE COURT:  What do you want me to say there,

11   either way?

12           MR. HANNON:  Well, I think it's an incorrect

13   statement of the law that it's not reasonable if it requires

14   changing, because the regulations specifically provide that a

15   reasonable accommodation includes modifying when and how an

16   essential job function is performed.

17           THE COURT:  Okay.  So you just want me to delete

18   the word "changing"?

19           MR. HANNON:  Yes.

20           THE COURT:  All right.  I'll eliminate that.

21           MR. HANNON:  And then -- yeah.  Yes.

22           And then --

23           Where are these in the instruction?  Where do we

24   add them?

25           MR. WATSON:  In our 13.

```
 1              MR. HANNON:  I know.  Where are they in the draft
 2    instructions?
 3              MR. WATSON:  Oh.  In this paragraph on 14.
 4              MR. HANNON:  Oh, okay.  Yeah.  So then the
 5    paragraph above on page 14, the one that begins, "depending
 6    on the circumstances" --
 7              THE COURT:  Uh-huh.
 8              MR. HANNON:  It provides a number of examples.  I
 9    think two examples were left out.  One is one I just
10    referenced, "modifying when or how an essential job function
11    is performed."  And that's taken from the regs.
12              THE COURT:  All right.  I'll add that.
13              MR. HANNON:  And then there's another one,
14    "Altering, reassigning, or eliminating marginal or
15    nonessential job functions."
16              THE COURT:  Read that again?
17              MR. HANNON:  "Altering, reassigning, or eliminating
18    marginal or nonessential job functions."
19              THE COURT:  "Altering" --
20              MR. HANNON:  -- "reassigning, or eliminating
21    marginal or nonessential job functions."
22              THE COURT:  All right.  I don't see why I
23    shouldn't -- I'll add those two things.
24              MR. HANNON:  And this -- I'm sorry.  There's one
25    more here.
```

1           THE COURT:  Uh-huh.

2           MR. HANNON:  This is all in your proposed

3   Instruction Number 13.  It includes the provision of

4   qualified readers or interpreters and that actually comes

5   from the statute.

6           THE COURT:  I'll add that as well.  Do you really

7   want "interpreters"?

8           MR. HANNON:  We don't need interpreters, Your

9   Honor.

10          THE COURT:  Okay.

11          MR. CURRAN:  Your Honor, I'm a little concerned

12  about that just because I think -- I mean, the language

13  "readers" there doesn't refer to the type of reader that

14  Dr. Menninger was requesting, like, someone to read for her,

15  like, read what she was going to say.  I think it -- my

16  understanding of what the regulations is referring to is

17  having someone read to you stuff that you can't read

18  yourself.

19          THE COURT:  It may be that the statute meant that,

20  but I think this is a paragraph that's giving them examples

21  of what a -- it might include.

22          So I certainly think a -- providing someone, not a

23  reader for a person who might have been what they were

24  envisioning in statute, assuming that a close reading of the

25  statute, that's what -- it was limited that way.

1            But it seems to me that a person who, under --

2    depending on the circumstances and the essential functions of

3    the job, having someone else read things in a sense that she

4    was asking for a speaker might be a reasonable accommodation.

5    It wouldn't necessarily be a reasonable accommodation.

6            MR. CURRAN:  Yeah, I'm not saying that it would be,

7    I'm just saying that if it's in the instructions, and the

8    jury might read that as being, oh, well, that must be what's

9    required.

10           THE COURT:  Well, no.  I think they won't read it

11   that way because it says, depending on the circumstances, a

12   reasonable accommodation might include these things and -- I

13   could add, potentially, a sentence at the end whether or not

14   something is a reasonable accommodation depends upon, you

15   know, a determination considering all the relevant facts and

16   circumstances.

17           MR. CURRAN:  That might be helpful, Your Honor.

18           THE COURT:  Do you object to that?

19           MR. HANNON:  I don't.

20           MR. CURRAN:  Would it be okay to add "interpreter,"

21   just to give it some context?

22           THE COURT:  Sure.  I'll add it if you want.

23           MR. CURRAN:  Thanks.

24           THE COURT:  Okay.  What else do you have,

25   Mr. Hannon?

1          MR. HANNON:  So I think the next is -- well,

2     actually, in -- on page 17, in terms of spelling out the

3     elements, the courts include an element specifying knowledge,

4     and that strikes me as being subsumed in the fourth element.

5          And I think my only -- my only quibble with it -- I

6     mean, it's -- aside from -- I'm not -- I'm not quite clear

7     why it's there, but just in terms of spelling out what the --

8     well, I'll just end there.  I just don't think it's -- I

9     don't think it's needed as an extra element.  I think if the

10    jury finds they did it in whole, or in part, because of her

11    disability, then they had knowledge of her disability.

12         I take that back.  Maybe -- maybe what I really

13    want --

14         THE COURT:  It doesn't really seem like in this

15    case -- like, I do think they have to know.

16         MR. HANNON:  Right.

17         THE COURT:  This isn't -- in this case, I think,

18    but I'll see what you all argue, there doesn't seem to be any

19    dispute that Dr. Menninger sent the emails she sent on

20    January 12th, and it was received by Mr. Mekerri and passed

21    on to Chad St. John; and that before then, she hadn't

22    notified anyone and that she wasn't regarded as having a

23    disability before then; and after that, it was expressly

24    clear.

25         So it does seem like they need to know.  In this

1 case, it just seems crystal clear, but --

2     MR. HANNON: Although, if they don't find -- they

3 could -- they could find regarded as, right? So --

4     THE COURT: Probably not before January 12th.

5     MR. HANNON: Correct. Right. But in terms of

6 alleged anxiety disorder --

7     THE COURT: Do you want me to say --

8     MR. HANNON: Dr. Menninger --

9     THE COURT: -- that they knew that she had --

10     MR. HANNON: Had a disability.

11     Well, no, I don't think that quite strikes it right

12 either.

13     I think the problem with it, it sort of -- you

14 know, they don't -- what if they're not sure, right? What if

15 they're not sure if she actually has it or not?

16     THE COURT: Which "they"?

17     MR. HANNON: What's that?

18     THE COURT: Which "they"?

19     MR. HANNON: PPD.

20     THE COURT: What if the jury is not sure if PPD --

21     MR. HANNON: Or to put it, the jury find that PPD

22 is not sure, right? So this is -- this is saying that PPD

23 knew that Dr. Menninger had an alleged anxiety disorder.

24     THE COURT: What do you say?

25     MR. CURRAN: How about "knew or regarded her as

1     having an alleged anxiety disorder"?

2               THE COURT:  How about that?

3               MR. HANNON:  What about "PPD had knowledge of

4     Dr. Menninger's" -- "Dr. Menninger's alleged anxiety

5     disorder"?

6               I think that captures the --

7               THE COURT:  Say that again?

8               MR. HANNON:  "Had knowledge of."

9               THE COURT:  That PPD --

10              MR. HANNON:  Had knowledge of, Dr. Menninger's

11    alleged anxiety disorder.  That would really address my

12    concern.

13              THE COURT:  You're okay with that, Mr. Curran?

14              MR. CURRAN:  I'm sorry.  So the change is from

15    PPD --

16              THE COURT:  "That PPD had knowledge of

17    Dr. Menninger's alleged anxiety disorder at the time it took

18    the alleged adverse action against her."

19              MR. CURRAN:  Yeah, that's fine, Your Honor.

20              THE COURT:  And then I'd make a conforming change

21    on page 18 to element 3, and I would make another conforming

22    change on page 22 to paragraph -- question 4.

23              Anything else?

24              MR. HANNON:  Two more things, Judge.  On page 18,

25    under the fourth element --

```
 1              THE COURT:  Yep.
 2              MR. HANNON:  -- the first paragraph of that
 3    section, the paragraph beginning, "fourth, Dr. Menninger must
 4    prove," the sentence that Dr. Menninger alleges that
 5    Mekerri's February 6, 2018 email -- I think that's too
 6    narrow.
 7              Our request is that -- is that the Court not
 8    attempt to define specifically what the -- what the adverse
 9    actions are, that -- you know, to just instruct the jury what
10    it takes to constitute an adverse employment action and let
11    them determine whether or not one exists, rather than try to
12    sort of constrain their analysis, which I think requires
13    some -- a lot of wordsmithing.
14              If the Court's not inclined to take that approach
15    and leave it to the jury and the Court wants to constrain
16    them in some regard, then I have some alternative proposed
17    language with respect to that.
18              THE COURT:  What would that be?
19              MR. HANNON:  That would be "Dr. Menninger alleges
20    that PPD's creation of new goals and expectations for her
21    role as executive director was an adverse employment action
22    taken because of her disability."
23              THE COURT:  What do you say?
24              MR. CURRAN:  I like it better the way you have it
25    here, Your Honor.  I mean, that's consistent with the summary
```

1    judgment ruling, as well.

2              THE COURT:  Read that back again, Mr. Hannon.

3              MR. HANNON:  Yes.  "Dr. Menninger alleges that

4    PPD's creation of new goals and expectations for her role as

5    executive director was an adverse employment action taken

6    because of her disability."

7              THE COURT:  That seems fair, because the goals --

8    that wasn't -- that's not seeking to put into the case

9    something I eliminated on summary judgment.  I don't think I

10   said at summary judgment that there are no other conceivable

11   adverse actions.  I -- there were the ones that were put out

12   and that seems to me there's evidence from which they could

13   make their own decision about goals.

14             And -- so -- hold on.  Read that back again.  So,

15   "Dr. Menninger alleges that" --

16             MR. HANNON:  "PPD's creation of new goals and

17   expectations" --

18             THE COURT:  "PPD's creation of new goals and

19   expectations" --

20             MR. HANNON:  -- "for her role as executive

21   director" --

22             THE COURT:  -- "for her role as executive

23   director" --

24             MR. HANNON:  -- and then continuing on what you

25   had, "was an adverse employment action taken because of her

1  disability."

2          THE COURT:  Okay.  What else?

3          MR. HANNON:  In the next paragraph, there's a

4  statement that "adverse employment action is one that,

5  standing alone, actually causes damage, tangible or

6  intangible, to an employee."

7          That's taken from a First Circuit decision that

8  said that it wasn't error to give it in that particular case.

9  I don't think it's a helpful statement of the law.  I think

10  it's confusing.  I don't know what it means.  I don't think

11  it's going to be helpful to the jury.

12          I think what it -- what it seems to suggest is that

13  if -- if two separate actions combined constitute an adverse

14  employment action -- well, rather, that the two actions

15  combined can't constitute an adverse employment action, that

16  you -- it has to be one discrete act, one time only, and

17  that -- and that thing in the whole -- in the whole --

18          THE COURT:  Are you objecting to the word "standing

19  alone" or to another part?  And what are you proposing?

20          MR. HANNON:  Yeah, I think the word "damages" is

21  misleading, as well.

22          THE COURT:  What do you want me to say?

23          MR. HANNON:  I -- I would take that sentence out.

24  And you give an example on the next page of a schedule

25  change -- right? -- that, of a schedule change of someone

1    whose a parent, whose a young parent of school-aged children,

2    that --

3              THE COURT:  What do you say, Mr. Curran?

4              MR. CURRAN:  I mean, I think the definition there

5    is helpful and I think it's a correct statement of the law,

6    so I'd be inclined to leave it in.

7              THE COURT:  I'm going to think about that.  I'm not

8    sure that -- I'm not worried that it's an incorrect statement

9    of the law, but it may not be necessary or helpful.  So let

10   me -- I'll think about that.

11             What else, Mr. Hannon?

12             MR. HANNON:  In the next page, on page 19, the

13   second line, the right-hand side begins, "Rather, an employer

14   takes" material -- "materially adverse action against an

15   employee only if it" -- the "only if it" is an incorrect

16   statement of the law.

17             I think the quote that appears here is taken from a

18   First Circuit case, which notes that typically an adverse

19   action is these two examples.  But I don't think it's an

20   accurate statement of the law to say that it has to be one of

21   these two.  And, in fact, I think the example below regarding

22   the young parent is inconsistent with that.

23             THE COURT:  So what if I just say "against an

24   employee when"?

25             MR. HANNON:  I would --

```
 1              THE COURT:  Or you're saying, "Typically when"?
 2              MR. HANNON:  Or --
 3              THE COURT:  "Rather, an employer takes a material
 4   adverse action against an employee typically when it" --
 5              MR. HANNON:  Right.
 6              MR. CURRAN:  That's fine.
 7              THE COURT:  Fine.  Okay.  Next?
 8              MR. HANNON:  On page 19 -- I want to make sure that
 9   my proposal here is -- so my ask here is on page 19 and sort
10   of giving these examples, I think there are -- there are
11   three more examples that the First Circuit has blessed.  One
12   is disadvantageous assignments.  Another is unwarranted
13   negative job evaluations.
14              THE COURT:  Is this in one of your instructions
15   that I can look at?
16              MR. HANNON:  I don't -- no?  It's not.
17              THE COURT:  Okay.  So you want me to add -- after 1
18   and 2 -- 3, 4, and 5?  Is that what you're saying?
19              MR. HANNON:  No.  So I think this would go in the
20   paragraph that begins, "For an employment action to be
21   adverse," and then the second sentence is, "However" --
22              THE COURT:  An assignment -- right.
23              MR. HANNON:  And then so somewhere in there, adding
24   a sentence, you know, "so to" or -- or just having a list
25   there, an assignment of more difficult job responsibilities.
```

1    So it could be, "However, an assignment of more difficult job

2    responsibilities, disadvantageous assignments, unwarranted

3    negative job evaluations, and toleration of harassment by

4    other employees."

5              THE COURT:  "Disadvantageous assignments" -- what's

6    the next?

7              MR. HANNON:  "Unwarranted negative job

8    evaluations."

9              THE COURT:  Next?

10             MR. HANNON:  "Toleration of harassment by other

11   employees."

12             THE COURT:  Okay.  All right.  Right there.

13             What else?

14             MR. HANNON:  Well, we'd ask also on 19, when you

15   say "more difficult job responsibilities," we'd ask that that

16   be changed to "responsibilities or expectations."

17             THE COURT:  I think it's enough.

18             Next?

19             MR. HANNON:  On page -- there's a -- where am I

20   here? -- does that bring us to pretext?  Yeah, okay.

21             So the next issue is page 20 here at the bottom

22   that the Court's proposed sort of *McConnell Douglas* burden

23   shifting --

24             THE COURT:  Yeah.  What do you have to say to it?

25             MR. HANNON:  We object to that.  We think the

1    strong authority noting that that's not -- that's not an

2    appropriate instruction.  It's not helpful to the jury.  It

3    distracts the jury from the -- from the proper analysis,

4    which is really looking at the elements of the claim.

5            I also think it's not a fit here, you know, given

6    that this is not -- you know, this is not really an instance

7    where they're claiming they did things for proper reasons.

8    They're more so claiming they didn't do the things we allege.

9    So it's not an analytical fit anyhow.

10           THE COURT:  What do you say, Mr. Curran?

11           MR. CURRAN:  I think we are saying we did things,

12   like, for example, you know, sending Dr. Menninger's emails

13   about quality control issues, you know, asking -- asking her

14   to change her goals.  I think that, you know, our whole

15   argument for that as to why that's, you know -- A, it's not

16   discriminatory or retaliatory; and, B, there's legitimate

17   business purpose for it.  I do think it's helpful.

18           THE COURT:  I think -- I'm not sure I -- to be

19   candid with you, I took this from what the defendants

20   proposed.  It was something they were interested in and I

21   wanted to spark some discussion from all of you.

22           I think it's a little bit too tracking of *McDonnell*

23   *Douglas* to be helpful to the jury.  I do think that this

24   is -- to me, this is the right place.  It's about causation,

25   and the causation, really, question is why did they do what

1    they did?  And that seems to be a critical question and one

2    of the critical questions in this case for the jury.

3            There really isn't a dispute, for example, that

4    they didn't accommodate Dr. Menninger on 2, 3, and 4, or that

5    she did request some sort of accommodation on 2, 3, and 4.

6            And so something about -- I'm inclined to revise

7    this in some way, something like that they need to think

8    about what the reason is, and if they determine it's the true

9    reason, it's -- they have to think about what -- without

10   being quite as prescriptive as this is, something about what

11   is the reason and what they can infer if they decide reason

12   is incorrect if -- to be shorter.  I think that's what I

13   might do, but not right in front of you, and then you'll look

14   at it.

15           MR. HANNON:  So just a couple of comments on that.

16   So even sort of a *McDonnell Douglas* version of this, a couple

17   of things to guard against.  One is, I think, as sort of

18   currently drafted, it gives the incorrect impression that

19   pretext analysis is the only way of inferring --

20           THE COURT:  I'm not -- I'm going to try to put it

21   more in vein of, like, you know, in thinking about -- you

22   know, I'm not sure how to -- I'll have to read it after

23   lunch, but thinking about this to, you know, think about what

24   is the reason, and if it's a stated reason, if -- and have

25   they proven if the stated reason is not true and what was the

```
 1    reason, you know, and if their reason that they advanced
 2    isn't true, you can infer -- or what you can infer from that.
 3    Something like that, more in a general way, but sort of
 4    apropos of the prior paragraph, like timing.
 5              You can consider these things, there's some things
 6    to consider, and it depends on what you do with them.
 7              MR. HANNON:  Yep.  And there's one more thought.
 8    In doing that, obviously, you know, making clear that there
 9    may be multiple reasons for an action and they may have one
10    legitimate reason, and they may have other illegitimate
11    reasons.  So it's not a matter of just looking at --
12              THE COURT:  Right.
13              MR. HANNON:  -- one reason alone.
14              THE COURT:  Okay.  What else?
15              MR. CURRAN:  Could I just point out something on
16    page 20?
17              THE COURT:  Yes.
18              MR. CURRAN:  Just a typo.  So it looks like that
19    last sentence that carries over to 21, it says
20    "Dr. Menninger."
21              MR. HANNON:  Yeah.
22              MR. CURRAN:  I think that should be "PPD."
23              THE COURT:  As of -- "PPD has only the burden of
24    stating"?
25              MR. CURRAN:  (Nods head.)
```

```
 1            THE COURT:  Yeah, okay.

 2            MR. HANNON:  And just a little bit higher up, so on

 3    page 20, in the section about Massachusetts law --

 4            THE COURT:  Yes.

 5            MR. HANNON:  We would just ask a sentence just

 6    noting that it need not be the only cause.  We say that with

 7    respect to federal law, but that -- that's not entirely clear

 8    under Massachusetts law, as stated here, so I think the

 9    sentence -- "need not be the only cause."

10            THE COURT:  Okay.

11            MR. HANNON:  Turning to --

12            THE COURT:  We have to move quickly, because I have

13    a two o'clock hearing and I need to break for lunch, too.

14            MR. HANNON:  So in the retaliation claim, so

15    similarly as before, the top of 24, the Court's proposed sort

16    of spelling out specifically what the materially adverse

17    actions are --

18            THE COURT:  Yes.

19            MR. HANNON:  -- and I have the same position as in

20    the prior section, but -- but this one has an extra wrinkle,

21    which is, as the Court notes later on in this instruction the

22    jury is allowed to look at these things cumulatively.

23            THE COURT:  Yeah.

24            MR. HANNON:  So spelling them out as you look at

25    each of these individually to assess with this one thing --
```

```
 1              THE COURT:  What do you want it to say?
 2              MR. HANNON:  To not identify what the materially
 3    adverse actions are, to simply instruct the jury on what
 4    the -- what the standard is in determining if they took a
 5    materially adverse action and then let the jury decide if --
 6    if they did so.
 7              THE COURT:  Why not do that?
 8              MR. CURRAN:  My turn?  Okay.  Great.
 9              THE COURT:  Uh-huh.  Why not do that as to what he
10    said?
11              MR. CURRAN:  Oh, I'm sorry.
12              THE COURT:  No problem.  He's saying on top on
13    page 24, just eliminate the sentence, "Dr. Menninger alleges
14    three adverse actions."
15              Essentially that's what you're saying.
16              MR. HANNON:  I'm sorry, Your Honor?
17              THE COURT:  That's what you're saying, Mr. Hannon,
18    just eliminate on top of --
19              MR. HANNON:  Correct.
20              THE COURT:  Like, just to prove material adverse
21    action and then delete the rest of that.
22              MR. CURRAN:  I mean, I think that comes from your
23    summary judgment --
24              THE COURT:  No, I understand.  It does.
25              MR. CURRAN:  Yeah, and so we think it's --
```

```
 1              THE COURT:  What are the other -- I guess, it comes
 2    back to the same thing as the other one.  Like, there's one I
 3    did throw out at summary judgment.
 4              MR. HANNON:  What was that?
 5              THE COURT:  Which one?
 6              MR. HANNON:  I don't recall.
 7              THE COURT:  I know I did.  I can't remember right
 8    at the --
 9              MR. HANNON:  I'm pretty sure you did, too.
10              MS. MANDEL:  The performance review.
11              THE COURT:  The performance review.
12              MR. HANNON:  Yeah.  And then if -- If the concern
13    is we don't want the jury drawing that inference, then you
14    can instruct them on that.
15              THE COURT:  Well, it's double.  One is a very
16    unlikely concern as to you, which is I wouldn't want you to
17    argue that.  I wouldn't think you would do that.
18              But the other is -- right? -- the jury shouldn't?
19              MR. HANNON:  Right.
20              THE COURT:  So what's your proposal?
21              MR. HANNON:  My proposal remains just to -- just to
22    leave it as it is.  I don't think there's any risk of the
23    jury doing that.  If -- if that's what you need to tackle,
24    then, you know, giving an instruction that, you know, there
25    is -- there is insufficient evidence to -- you know, to find
```

1    that it was -- that that was an act of retaliation, that

2    would be an accurate statement of the law and what the Court

3    found at summary judgment.

4              THE COURT:  I'll think about that.

5              What's -- what else?  Anything else?

6              MR. HANNON:  So just -- there needs to be a

7    conforming edit towards the bottom of 24.  There's a

8    reference there that she meets the burden if she meets any of

9    the one, three -- the one, two, three --

10             THE COURT:  Oh, if I change that?  Yeah.

11             MR. HANNON:  Yeah.

12             On 25, there's a typo in the summary of claim 3, it

13   says, in element 1, it says "that she that she."

14             THE COURT:  Oh, yes.  Thank you.

15             MR. HANNON:  In the description of back pay and the

16   potential elements of that, we'd ask that the jury be

17   instructed that they can consider lost equity, as well.

18             THE COURT:  What about that?

19             MR. CURRAN:  I just think that there's -- that

20   would be pretty tremendously confusing for the jury, because

21   I don't think there's been evidence presented as to how they

22   would go about considering the equity --

23             MR. HANNON:  That, Your Honor --

24             MR. CURRAN:  -- and how that could be calculated.

25             MR. HANNON:  On that, Your Honor, there is an

1    exhibit that's in evidence that does provide a calculation.

2    It provides -- it essentially provides the estimate that PPD

3    provided to her at the time that she got the equity.  So we

4    don't -- we don't need to prove damages with --

5              THE COURT:  I think I'll include that there, just

6    adding to the list "lost equity."  And this is in the first

7    paragraph.

8              MR. CURRAN:  Could you note our objection to that,

9    Your Honor?

10             THE COURT:  Yes.  Anything else?

11             MR. HANNON:  Your Honor, paragraph 29, just the --

12             THE COURT:  Page 29?

13             MR. HANNON:  Sorry, page 29.  Thank you, Judge.

14   I'm hungry, too.

15             Top of 29, the list -- this isn't a big deal, but I

16   would -- I'm not sure that that really makes a lot of logical

17   sense in terms of the way those are laid out.  I would

18   suggest making the fourth one first, keeping the second one

19   second, then putting the first one third, striking the third

20   one.  I think that makes it actually read with some -- some

21   more clarity.

22             But more of a suggestion than anything else.

23             THE COURT:  Okay.  I'll look at that.

24             MR. HANNON:  Yeah, so we had -- in Instruction

25   Number 32, we had a request.  Part of that request was --

1   this was our proposed Instruction Number 32.

2          THE COURT:  Yes.

3          MR. HANNON:  We asked the Court to instruct the

4   jury that you may award back pay if you find that PPD's

5   discriminatory or retaliatory conduct caused Dr. Menninger to

6   be able unable to work.

7          I think that that concept is sort of implicit in

8   the Court's instructions, but I think that's a useful

9   instruction and just sort of fills a bit of an analytical gap

10  that might otherwise exist.

11         THE COURT:  I think it says that in the first

12  sentence, "would have received but for their discriminatory

13  retaliatory conduct."

14         MR. HANNON:  Yeah, again, I think it's implicit.

15  What we've asked is a bit more explicit in terms of the

16  causal connection, making clear that if the --

17         THE COURT:  Yours is more like, though, you opened

18  the door, right?  That says, if this case, you may award; if

19  you don't find that, you can't award.  That would be

20  implicit.  It opens the door, but then it doesn't expressly

21  say what they could award.

22         I'm thinking, if they get to damages, they've found

23  that the question is something, right?  There's been a

24  liability finding if they're reading this.

25         MR. HANNON:  Yep.

1          THE COURT:  And so then what are the things they

2     can give?  They can give the things that are caused by or

3     because of the discriminatory retaliatory conduct.

4          MR. HANNON:  Yeah, but I think specifically the

5     point we're looking at is that if -- if the causal chain is

6     they engage in discrimination or retaliation, that that --

7     that that causes her to be unable to work, then they're

8     allowed to --

9          THE COURT:  What do you say, Mr. Curran?

10         MR. CURRAN:  I mean, I think it's already included

11    within the instruction, as it's, you know, written.  So I

12    don't think this is needed.

13         THE COURT:  I'll think about that.

14         Okay.  Anything else, Mr. Hannon?

15         MR. HANNON:  I mentioned this issue earlier,

16    Your Honor, regarding collateral source rule.

17         THE COURT:  Yes.

18         MR. HANNON:  And, again, I think the point is

19    someone has to decide -- we have a proposed Instruction

20    Number 35, would have the jury decide whether or not to --

21         THE COURT:  Right.  What do you say about that?

22         MR. CURRAN:  So I think there's a couple of

23    problems with this.  First --

24         THE COURT:  As a general proposition, though,

25    first, before we get to the specifics.

1          MR. CURRAN:  I mean, I think that the collateral

2     source rule can apply to some sorts of -- some kinds of

3     payments.

4          THE COURT:  So payments here are the Unum and the

5     Social Security.  I guess the question is just can I give it

6     to the jury.  It doesn't really explain it to them, but

7     presumably it's, like, for them to decide?

8          MR. HANNON:  Right.  But they're going to decide,

9     they need to be given --

10         THE COURT:  Some instructions.  So I guess the

11    question is do you agree it should go to the jury?

12         MR. CURRAN:  I agree; I don't agree with this

13    instruction, though.

14         THE COURT:  Okay.  So the jury should decide

15    whether to count those things or not.  Again, assuming they

16    reach damages or are awarding her the -- you all agree that

17    the jury should make the decision as to whether to deduct for

18    the Unum and/or Social Security disability payments?  That's

19    my understanding of both your positions right now, unless you

20    tell me otherwise.

21         MR. CURRAN:  I don't think they can consider the

22    short-term disability or the long-term disability.

23         THE COURT:  Okay.  So -- but he didn't factor that

24    in, your guy.

25         MR. HANNON:  He factored in the short-term, not the

1    long-term.

2         THE COURT:  You want me to say Instruction

3    Number 35 -- what do you want me to say?

4         MR. CURRAN:  Some version of this that I would --

5    I'm not sure exactly how to phrase it.  I think that the

6    concepts that are missing from this are first that they would

7    have to be -- in order to get the Social Security disability

8    benefits included in, you know, our -- taken out --

9         THE COURT:  What if I just put another heading

10   right before emotional stress damages:  Collateral source

11   rule, you -- something like this:  "You have heard testimony

12   that -- you've heard testimony that Dr. Menninger received

13   short-term disability benefits, long-term disability

14   benefits, and Social Security disability benefits.

15        "You may decide whether to deduct from any front or

16   back pay damage awards you make.  The payments -- one or more

17   of these categories of payments.  In deciding whether to make

18   such deduction, you should be aware of a principle called the

19   'collateral source rule,' which is a wrongdoer's liability to

20   an injured person is not ordinarily to be reduced by the

21   amount of compensation received by an injured person from

22   collateral sources such as insurance or Social Security

23   benefits.

24        "Applying the rule means that the plaintiff might

25   receive a double recovery and -- but you -- if you find that

1    there are countervailing circumstances that make it unjust to

2    apply this rule, you may decline to -- you may not apply --

3    you can determine not to apply it and you can make the

4    deductions."

5             MR. CURRAN:  I think the Social Security disability

6    payments to be a collateral source, there has to be a showing

7    of causation from the actions by us and her disability.

8             THE COURT:  For it to be a collateral source that's

9    been deducted?

10            MR. CURRAN:  Yes.

11            THE COURT:  Do you all even want to submit this to

12   the jury?  Do you want me to just say -- like, I'm not sure

13   what your position is.  Do you want them to deduct it or not?

14            MR. CURRAN:  I do want them to deduct it.

15            MR. HANNON:  I don't want them to deduct it.

16            THE COURT:  That, I understand.

17            Then my understanding of the general law is that

18   that they could deduct it if they find countervailing

19   circumstances, but the ordinary, like, default would be that

20   they don't deduct it.  How much -- what beyond that do you

21   want me to say to them?

22            MR. CURRAN:  I think that that's -- I think that's

23   right.  I think that's -- I don't think we need anything

24   beyond that.

25            THE COURT:  All right.  I'll say, You've heard this

1    testimony.  There's a thing this thing called the collateral

2    source.  Ordinarily, these are considered collateral source

3    payments; and, ordinarily, you don't deduct them from the

4    amount of front or back pay that you find, that you award to

5    the plaintiff, unless you find countervailing circumstances

6    that would make it unjust to do so.

7            But the mere fact that she might recover double is

8    not alone itself ordinarily enough to justify deducting.

9            MR. HANNON:  Sounds good to me.

10           THE COURT:  Okay.  Next?

11           MR. HANNON:  I think just two last bits.  For

12   punitive damages, we had requested an instruction advising

13   the jury they may award punitive damages even without

14   awarding compensatory damages.

15           THE COURT:  What's your view on that, Mr. Curran?

16           MR. CURRAN:  I think that the law is that there has

17   to be compensatory damages in order for --

18           THE COURT:  So my understanding of the law is that,

19   in Section 1983 cases, there doesn't -- there does not have

20   to be an award of compensatory damages in order to award

21   punitive damages; but there is an older First Circuit case

22   that has not been overruled as far as I can tell, *Kerr*, which

23   seems to say in other cases that it might be required to get

24   compensatory damages in order to get punitives.

25           And my thought was to just not say anything about

1    it, just instruct them, and they'll consider and decide.  And

2    then if we could -- if you want to press the legal issue that

3    they needed -- I personally think it's highly unlikely in

4    this case that you're going to get punitive damages without

5    any compensatory damages.  In fact, I'd be close to shocked.

6              MR. HANNON:  Say no more, Judge.  Let's go get

7    lunch.

8              But -- what else do we have?  Yeah, no.  I'm fine

9    with that.

10              We had requested -- sorry.  I'm backtracking, but

11    this is the very end of it, Judge.  Our requested Instruction

12    Number 27, we had, "You may also" -- this goes in the

13    causation section -- "You may also infer a causal link from

14    evidence that a pattern of discriminatory or retaliatory

15    conduct began soon after the protected activity and only

16    culminated later in actual adverse action."

17              THE COURT:  I think that's mostly covered.  I'll

18    think about that.

19              MR. HANNON:  Okay.  And then the last, last, last

20    thing, I messed up earlier.  The first thing we looked at

21    regarding need for accommodation, that phrasing you had --

22              THE COURT:  Yeah.

23              MR. HANNON:  -- that was the right phrasing.  We

24    shouldn't change it, and I was wrong to suggest otherwise.  I

25    think the language that we came up with actually misstates

1    the --

2           THE COURT:  So you want me just to go back to "put

3    the employer on notice of the need for that accommodation"?

4           MR. HANNON:  I think that's fine, because then

5    later on you explain exactly, when the need arises --

6           THE COURT:  Do you have any --

7           MR. CURRAN:  Yeah.

8           THE COURT:  Fine.  Then I'll undo the conforming

9    ones.

10          MR. HANNON:  Jury slip too?

11          THE COURT:  Yeah, do you have anything on the

12    verdict slips?

13          MR. HANNON:  Just a couple of things.  One is that,

14    for emotional distress damages, there's some recent case law

15    that says that, in order to do interest, we need to have the

16    jury apportion punitive damages -- rather, emotional stress

17    damages up till now and then emotional distress damages in

18    the future, because the emotional distress damages up till

19    now are going to be subject to prejudgment interest; and if

20    we don't have them apportioned, then there's no way to figure

21    out how much of those get the interest.

22          THE COURT:  Okay.  So you want me to do 4(c) as,

23    like -- in between 4(c) and 4(d) another question,

24    "What percent of this do you find attributable to emotional

25    distress she suffered up to and including today?"

```
 1              MR. HANNON:  I would suggest just doing it the same
 2    way you do back pay and front pay, so emotional distress up
 3    till now, emotional distress in the future.
 4              THE COURT:  Okay.  Okay.  I'll do that.
 5              MR. HANNON:  And then the verdict form says
 6    emotional distress in the near future, and I don't think
 7    limiting it to the near future is --
 8              THE COURT:  Okay.  So "Enter below the amount of
 9    emotional distress damages, if any, that she proved by a
10    preponderance that she suffered up to today because of PPD's
11    disability discrimination," and then a separate question,
12    "Enter below the amount of damages for emotional distress, if
13    any, that Dr. Menninger proved by the preponderance of the
14    evidence that she's reasonably likely to suffer in the
15    future" --
16              MR. HANNON:  Correct.
17              THE COURT:  -- "because of" -- yeah.  Okay.  Fine.
18              How much do you have?
19              MR. CURRAN:  Sorry.  Not a lot.
20              First is on page 12.
21              THE COURT:  Yep.
22              MR. CURRAN:  There's a paragraph in the middle of
23    the page there --
24              THE COURT:  Yes.
25              MR. CURRAN:  -- "if an employer has a concern."  We
```

1     think that's an instruction for a case where there hasn't

2     been any request for an accommodation, or a claim of

3     disability, but the employee appears to be unable to perform

4     their job, and so the employer can then, you know -- can then

5     ask -- you know, ask for a certification or something of that

6     kind.

7               I mean, that's -- and this is one of the ones they

8     requested.  And the cases that they cited for that, that was

9     a situation.  I mean --

10              THE COURT:  It seems like it's a correct statement

11    of the law that, like, you could have asked for -- that PPD

12    could have asked for a certification.

13              MR. CURRAN:  Right.  But, I mean, if we do that,

14    we're at risk of, you know, violating the ADA, which isn't

15    included in this instruction either.  I mean, if we ask for a

16    certification and it turns out that we were wrong to do that,

17    because you're not allowed to just go around asking people

18    for certifications.

19              THE COURT:  No.  The time to ask for the

20    certification would have been after she says she can do the

21    job.

22              MR. CURRAN:  After she said --

23              THE COURT:  She says -- I mean, why wouldn't it be

24    that, like, in late February, they have their meeting and

25    then you can say -- I mean, it seems like that was within

1    your ability to ask for.  That's what you're thinking about,

2    right, Mr. Hannon?

3              MR. HANNON:  Yes.

4              MR. CURRAN:  So at that point, we have this -- you

5    know, a note from the doctor saying she can't do --

6              THE COURT:  Well, it doesn't expressly have the

7    sentence, "She cannot do her job," right?

8              MR. CURRAN:  No, it doesn't say she can't do her

9    job.  It says these are the things that are required for her

10   to do her job, for her to do these aspects of her job.

11             THE COURT:  How would it violate the ADA to ask

12   for, at that point, a clarification or a medical

13   certification?  I'm not saying you have to do that, but --

14             MR. CURRAN:  I mean there's a risk, I mean, if it's

15   found to be unjustified.  I mean, I think, you know, to sort

16   of state that the employer always has an obligation to -- and

17   I understand here it's not saying obligation, but I'm

18   concerned that the jury could read it that way.

19             THE COURT:  Well, what do you want me to say

20   countervailing it?

21             MR. CURRAN:  So if the Court is inclined to keep

22   the instruction, then we would ask that it say, "In addition,

23   however, the law does not" -- and I can write this up and

24   give it to you, but I can also read it -- "However, the law

25   does not require an employer to make such a request under

1    these circumstances."

2          Also, "the law allows an employee who disagrees

3    with her medical provider that certain accommodations are

4    necessary to perform certain functions of her job, or who

5    believes that her employer has misapprehended her medical

6    provider's request for accommodations to ask her medical

7    provider, or another medical provider, to submit a further

8    certification or a clarification."

9          THE COURT:  What do you think about that?

10         MR. HANNON:  I think it's all misleading,

11   particularly the phrasing around "other."  There was -- there

12   was never any -- any certification --

13         THE COURT:  We're going to pause on this, because

14   this is a little bit more complicated.

15         Just run through, without detail, what else you

16   have?

17         I think we'll have to pause.

18         MR. CURRAN:  Punitive damages, we'd ask that the

19   Court not provide that instruction.  We don't think that

20   there's been sufficient evidence to support that.

21         And, then, one small thing, on page 24, the top of

22   the page, under -- there's a paragraph that begins "Second,"

23   and then there's a list.  And Number 2 --

24         THE COURT:  Yeah.

25         MR. CURRAN:  So "PPD excluded her from the hiring

 1    and recruiting decisions," comma, and we just ask that you

 2    add "which she alleges was a core component," because these

 3    are --

 4              THE COURT:  I see.  If I leave it, I'll add that.

 5              Okay.

 6              MR. CURRAN:  That was it.

 7              THE COURT:  Okay.  As to punitives, let me -- do

 8    you have any response on punitives?

 9              MR. HANNON:  We believe there's sufficient evidence

10    on that, Judge.

11              THE COURT:  All right.  I'll think about that.

12              As to the medical question, I think I need to stop

13    and have lunch and have a two o'clock hearing.  So why

14    don't --

15              You haven't heard more from them, have you,

16    Kellyann, about the two o'clock?

17              THE DEPUTY CLERK:  No.

18              THE COURT:  So the two o'clock, I don't quite know

19    how long it's going to last.  It's a sentencing.  If it were

20    just a sentencing, it would be 30 to 45 minutes, I'm just

21    thinking out loud, but he's trying to withdraw his guilty

22    plea, so it could be an evidentiary hearing.  It could be --

23    why don't you come at 2:45, and I'll talk to you about that

24    one issue and then -- then I'll revise the instructions and

25    issue them later.

1          You don't have anything on the form?  The verdict

2    form?

3          MR. CURRAN:  I'm sorry?

4          THE COURT:  Nothing on the verdict form?

5          MR. CURRAN:  Oh.  No.  Nothing, Your Honor.

6          THE COURT:  Okay.  Great.  I'll see you at 2:45.

7    Thanks.

8          (Court in recess at 1:32 p.m.

9          and court reconvened at 2:46 p.m.)

10         THE DEPUTY CLERK:  The United States District Court

11   for the District of Massachusetts is now in session, the

12   Honorable Leo T. Sorokin presiding.

13         THE COURT:  So one issue left to talk about, just

14   to turn back to.  I want to find that page, Mr. Curran.  This

15   is on page 12.  That's the paragraph that was left to talk

16   about.

17         MR. CURRAN:  Yes.

18         THE COURT:  So start over as to this.  So one

19   request is that you'd like me to take it out.  Putting that

20   aside, I'll think about that, but I think that's unlikely.

21         The second alternative is you'd like me to adjust

22   it, add language, or change it.

23         So tell me -- start again.  I know you said before,

24   but tell me again what you want to do there.

25         MR. CURRAN:  Yeah.  So what we'd like to add, if

1    it's going to stay in, would be the following:  I'll try to
2    read it slowly, "However, the law does not require" --
3              THE COURT:  Should this be at the end of the
4    paragraph, or somewhere else?
5              MR. CURRAN:  I think it should be at the end of the
6    paragraph.
7              THE COURT:  Okay.  Go ahead.
8              MR. CURRAN:  All right.  "However, the law does not
9    require an employer to make such a request under those
10   circumstances.  Also, the law allows an employee who
11   disagrees with her medical provider that certain
12   accommodations are necessary to perform certain functions of
13   her job, or who believes that her employer has misapprehended
14   her medical provider's request for accommodations, to ask for
15   her medical provider, or another medical provider, to submit
16   a further certification or a clarification."
17             THE COURT:  Okay.  What do you say about the
18   concepts and the words, Mr. Hannon?
19             MR. HANNON:  I'm sorry?
20             THE COURT:  What do you say about -- there's a
21   concept here that they want and then there's the words,
22   right?
23             MR. HANNON:  Yup.
24             THE COURT:  And do you have different views on the
25   two or the same.

1           MR. HANNON:  I do have different views.  I don't --

2    I don't think that there's any -- well, in terms of what the

3    law permits an employer -- an employee to do, I don't see

4    anything here that prompts that -- that instruction.  It's

5    stating an obvious -- an obvious fact.  And, you know, that

6    the employee can provide their employer any information that

7    they want, I don't think that's a principle of law.  I think

8    it's a -- again, it's just a -- it's just an obvious fact

9    that she's free to tell them whatever she wants to.

10          And to the extent that the Court thinks that

11   there's some benefit to instructing the jury on that obvious

12   issue, it shouldn't be phrased in a way to in any way sort of

13   suggest what the evidence in this case is.

14          So, for example, I think Mr. Curran's phrasing

15   references if the -- if they disagree with information

16   provided by their medical provider.  I don't think there's

17   any evidence here that she disagreed with her -- with her

18   medical provider.

19          So if there has to be any comment, I would suggest

20   that the -- that the comment be more general and just the

21   extent of, you know, the law does not impose any limits on,

22   you know, what information the employee may provide to their

23   employer concerning, you know, their disability or need for

24   accommodation, something like that.  I think that would

25   accurately describe it because there are some limits on what

1      the employer can do.  There are no limits in terms of what an

2      employee can provide.

3              MR. CURRAN:  But I think the juror is not going to

4      know that, you know, that there are limits on --

5              THE COURT:  Hold on one sec.

6              MR. CURRAN:  Sure.

7              THE COURT:  What if I just added to the end, "The

8      law imposes no limits on what an employee can provide -- what

9      information an employee can provide to an employer regarding

10     an employee's disability, medical conditions, or ability to

11     perform job-related functions?

12             MR. HANNON:  I'm fine with that.

13             MR. CURRAN:  I'm fine with that, Your Honor.

14             THE COURT:  Okay.  I'll add that there.

15             Okay.

16             MR. HANNON:  I thought of one other nit, I'm sorry,

17     over lunch.

18             THE COURT:  Uh-huh.

19             MR. HANNON:  So this is something that came up this

20     morning.

21             THE COURT:  Yes.

22             MR. HANNON:  So Mr. Curran, on his questioning of

23     Mr. Jonas, posited a hypothetical of "What if she gets a job

24     flipping burgers," in terms of front pay.  I think the law

25     focuses on comparable employment in terms with respect front

```
 1    pay.  And I would just ask that that be clarified in -- I
 2    think there are three spots for that clarification.  So one
 3    is at the bottom of 28.  The second-to-last paragraph ends
 4    with other similar employment.  I would request that
 5    "similar" be changed to "comparable," just so there's no
 6    confusion on what's being referred to there.
 7              THE COURT:  You don't object to that, do you,
 8    Mr. Curran?
 9              MR. CURRAN:  I don't object.  I'm not sure there's
10    much difference between "similar" and "comparable."
11              THE COURT:  Well, I'm not sure, either.
12              But what else?
13              MR. HANNON:  And 29 at the top -- so that's the
14    list of things to -- that the jury can consider, that the
15    concept of comparable employment needs to be included --
16              THE COURT:  Earn the amount of earnings from
17    comparable employment?
18              MR. HANNON:  Correct.  And that would apply to
19    what's currently 3 and also what's currently 4.
20              THE COURT:  Anything else?
21              MR. HANNON:  That's all.
22              THE COURT:  Okay.  All right.  I will issue a
23    revised of both documents when we're done and then you'll
24    have those.
25              And so you want 40 minutes and 5 minutes?
```

```
 1              MR. HANNON:  Can I do 35 and 10?

 2              THE COURT:  Okay.  A shorter 10, but yeah.  Okay.

 3         And 45 for you?

 4              MS. MANDEL:  Yes, Your Honor.

 5              THE COURT:  Okay.  Fine.

 6              I think somewhere between 5 and 10.  I'm not going

 7         to pull the hook out --

 8              MR. HANNON:  Yup.

 9              THE COURT:  -- but I'm mindful of too long becomes

10         like not rebuttal and independent argument.

11              MR. HANNON:  Understood.

12              THE COURT:  That's what I'm concerned with.

13              Okay.  And then what I'm going to do with the

14         instructions, I'll docket them, so you have them on ECF.  But

15         I'm going to -- I've been thinking about this.  I might have

16         referred a little bit about this, maybe in the last trial,

17         but I'm going to give part of the instructions before your

18         closing arguments.  I'm going to give what amounts to -- if

19         you look at the jury instructions, everything from page 1 --

20         I'll modify the introductory paragraph, up to, on page --

21         right now, page 8, where it says elements of the claims.  So

22         that first part about what is evidence, how to think about

23         evidence, credibility, I'm going to do that first.  There are

24         a couple of reasons that I'm going to do that.

25              And then when you're done with your closing
```

1   arguments, I'll turn to my instructions starting with the

2   elements of the claims, and then say the elements, and how to

3   deliberate.  I'm doing that for two reasons.  Honestly, one,

4   it's rather boring, the instructions, to listen to.  So it

5   breaks it up; and then number two, when they're done with

6   your closing arguments, what they really want to hear from me

7   is the elements and then I can go right into that.  So that's

8   what I'm going to do.

9           Anything about that?

10          MR. HANNON:  No, Your Honor.

11          THE COURT:  Okay.

12          MR. CURRAN:  Can I just ask one question?

13          THE COURT:  Of course.

14          MR. CURRAN:  So I take it you're going to charge on

15   damages?  Is that --

16          THE COURT:  Oh, I haven't had -- honestly, I

17   haven't spent four seconds on this case since I last saw you.

18   So I reserved on that and so -- but that's one of the things

19   that I'm going to think about.  I'm going to make all the

20   changes we discussed.  I'm going to make -- I'll reserve

21   on -- the ones I reserved on, I'll resolve.  And then I'll

22   take care of it and I'll issue it on E CF, as soon as I'm

23   done, so you'll have it.  And I'll tell you that just where

24   I'm leaning, I'm leaning to give it, not because I -- because

25   I think in --

1          Generally speaking, on these kinds of issues, it's

2     better to give things to the jury than see.  If they decide

3     no punitives, then that's the end.  And if they decide

4     there's punitives, I can -- then we can always engage in

5     briefing and discussion.  And if I think it's improper, I can

6     take it away.  It's -- punitives, of course, focus is on the

7     conduct, not the harm.  Right?  Because it's not the level of

8     harm that justifies punitives.

9          MR. HANNON:  It's a factor.

10          THE COURT:  Factor.  But just to borrow example, a

11    Comcast driver could be driving down the road, he could be

12    driving perfectly reasonably and appropriately, not texting,

13    not speeding, sunny dry day, totally appropriate, and a

14    five-year-old could independently run out into the street,

15    and boom he kills them.  The damages far exceeds -- like in

16    human consequence what we have here.  I mean, we have a dead

17    child.  But -- and that may be, under the law, a factor, but

18    it would strike me, on that set of facts, it would be

19    improper -- I would take punitives away if they were awarded

20    because there's no -- like there has to be some outrageous or

21    whatever conduct.

22          I understand that's not this case, but --

23          MR. HANNON:  I was going to point out.  It can also

24    mean what happens after.  So if after the child is struck,

25    there's an effort to cover it up, and driving records are

1    altered and on and on and on.

2          THE COURT:  Sure, there could be postevent coverup

3    and that could potentially be relevant.

4          MR. HANNON:  Yeah.

5          THE COURT:  So I'm mostly inclined -- but that,

6    too, is not focused primarily on harm.  I'm not saying harm

7    is irrelevant.  But I don't really understand the law to mean

8    that if the harm is really bad, that, alone, can justify

9    punitives.  I don't see how the harm in and of itself,

10   without misconduct, could justify punitives.  Because you're

11   punishing something and how can you punish if someone

12   didn't -- if they didn't do anything wrong, beyond the

13   ordinary wrong that gives rise to civil legal liability.  So

14   that's why I make that point.

15         So I will - I'm not -- I haven't conclusively

16   resolved it, but that's the way I think about it.  Would I --

17   if it were rewarded, is it obvious to me that I wouldn't make

18   a ruling about -- like would I entertain, seriously, a

19   motion?  I would.  But I don't know -- I haven't heard the

20   argument.  So maybe I would view it differently after I heard

21   the argument.  And so -- which isn't to say I have a view

22   about the merits of the case.  I don't, really.  I'm quite

23   happy that we have juries.  So -- but I'm inclined, it seems

24   to me that the more prudent and better course is to give it

25   to the jury.

1          MR. HANNON:  And one thing I just thought of, I
2    think you have some rulings under advisement with respect to
3    certain exhibits.
4          THE COURT:  One.
5          MR. HANNON:  So one of them, for example,
6    yesterday, the portion of the MCAD position statement, we had
7    offered that, the bit about they --
8          THE COURT:  Yes, I remember.
9          MR. HANNON:  -- had hired the interim director.  So
10   then you have the other advisement.  I think you have a
11   couple of their exhibits that are offered, as well, under
12   advisement.
13         MS. MANDEL:  Yes, Your Honor.  There are --
14         So the MCAD position statement is one.
15         THE COURT:  That's Mr. Hannon's.
16         MS. MANDEL:  Right.  And then the ones I have
17   listed here are the letters that we used to designate them --
18   I think.
19         Is that a BO?  This top one?  BO, AD, and BI are
20   the ones.  We just cross-referenced the transcripts with --
21         THE COURT:  The only one that I'm aware of -- I'm
22   not saying there aren't others, that I recall reserving on,
23   is the one, the MCAD one that Mr. Hannon has referenced.  You
24   think there are other ones that I reserved on?  I guess I
25   would ask you what are those documents and are you pressing

1    that they be admitted?

2            As to yours, Mr. Hannon, the requested admitted is

3    denied, your rights are saved.  It's denied, one, because I

4    think it's cumulative.  We've already heard a lot of

5    testimony on it.  Two, I think the time for it -- to the

6    extent it's partially impeachment of Ms. Ballweg, and so

7    insofar as that, it's with Ms. Ballweg.  It's also, at the

8    time -- I see sort of its cumulative and raising side issues.

9    I'm not saying I would have ruled the same way had it come up

10   at a different point in the trial, but at a point at the very

11   end.  So I see it more as a 403 issue, so for those reasons,

12   it's denied, and your rights are saved.

13           MR. HANNON:  Well, the one that Your Honor just

14   ruled on, that was the only exhibit that I'm pressing that

15   was reserved, so...

16           MS. MANDEL:  And I believe we had one of the

17   e-mails between Dr. Kessimian and Dr. Menninger that was --

18   we met one morning.  I believe there were four e-mails and

19   one of them we reserved on, the others --

20           THE COURT:  Can you show me the document?

21           MS. MANDEL:  Yeah, let me --

22           THE COURT:  Do you remember which document this is,

23   Mr. Hannon?

24           MR. HANNON:  I do.  It was an e-mail correspondence

25   between Dr. Kessimian and Dr. Menninger.  The witness was

1     questioned about it.  Attorney Mandel essentially kind of

2     walked her through the content of the e-mail.  I don't think

3     the e-mail was ever actually offered.  I think after

4     Ms. Mandel went through the content with the witness, she

5     moved on to something else.  So I don't think this is

6     something that the Court actually held under advisement.

7              MS. MANDEL:  Well, I believe during our morning

8     conference, our understanding was during the morning

9     conference is there were three of them we wanted to use as

10    exhibits on one, I believe the issue is whether there was

11    foundation --

12             THE COURT:  Well, do you want it or not?

13             MS. MANDEL:  We would like it, yes.

14             THE COURT:  Okay.

15             (Counsel confers.)

16             THE COURT:  E-mail Ms. Belmont the document or

17    documents, and I will --

18             Are you objecting, Mr. Hannon?

19             MR. HANNON:  I am, Your Honor.

20             THE COURT:  All right.  I'll look at them and then

21    I'll just issue an E-order that says if they're in or they're

22    out.

23             MR. HANNON:  Okay.  And just for the record, I

24    think part of my objection is it wasn't offered.  And if it

25    had been offered, I would like to have redirected on it, but

1    because it wasn't offered, I would --

2              THE COURT:  Fine.  Okay.  I'll -- e-mail them so I

3    can look at them.  I just don't have them fresh in my head as

4    to exactly which e-mails they were.  I would like to look at

5    them and just copy Mr. Hannon on it.  Send them to

6    Ms. Belmont.  And as soon as you do, I'll look at them, and

7    I'll resolve it today.

8              (Court in recess at 3:04 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Rachel M. Lopez                    March 30, 2023
/s/ Robert W. Paschal


_____          _____

Rachel M. Lopez, CRR                    Date
Robert W. Paschal, CRR, RMR
Official Court Reporters