<pre>
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MASSACHUSETTS

 3

 4     _____

 5     LISA MENNINGER,

 6              Plaintiff,                    Civil Action No.
                                             1:19-cv-11441-LTS
 7          v.

 8     PPD DEVELOPMENT, L.P.,

 9              Defendant.

10     _____

11

12        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                           JURY TRIAL
                              Day 10
15

16

17                     Friday, March 31, 2023
                            8:51 a.m.
18

19

20

21     John J. Moakley United States Courthouse
       Courtroom No. 13
22     One Courthouse Way
       Boston, Massachusetts
23

24     Rachel M. Lopez, CRR
       Official Court Reporter
25     raeufp@gmail.com
</pre>

1                        **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

       HARTLEY MICHON ROBB HANNON, LLP
4      BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
       155 Seaport Boulevard
5      2nd Floor
       Boston, Massachusetts  02210
6      (617) 723-8000
       phannon@hmrhlaw.com
7      hwatson@hmrhlaw.com

8

9  On behalf of the Defendant:

10     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
       BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11     One Boston Place
       Suite 3500
12     Boston, Massachusetts  02108
       (617) 994-5700
13     rachel.mandel@ogletreedeakins.com
       patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

1

# TABLE OF CONTENTS

2

3

4

## MISCELLANEOUS

5

6

7
                                                              Page

Jury Instructions                                              11

8  Closing Arguments By Counsel For Plaintiff                   22

9  Closing Arguments By Counsel For Defendant                   50

10 Rebuttal Argument By Counsel For Plaintiff                   81

11 Jury Instructions                                            84

12 Verdict                                                     129

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6          THE COURT:  Please be seated.

7          So one thing, Mr. Hannon filed a request for a

8    supplement or a change to page 24.  I revised page 24.  So

9    let me just tell you how I've revised it.  I've essentially

10   done three things.  I've -- Mr. Hannon, one thing he asked me

11   to do, was add basically -- I had three adverse actions, he

12   said make it five and the wording on some of them changed

13   slightly.  So I did that, I took his five.  I thought that

14   was fair.  But just for the record, I think that at

15   summary -- none of these were precluded by summary judgment.

16   I think the trial record supports it.  I'm not saying that I

17   do find it or anything, it's just for the jury to decide.  So

18   I think that's reasonable.  So I did that.

19          I deleted the paragraph at the end that you wanted

20   me to delete, Mr. Hannon, but in my wording of the change to

21   the first paragraph, I made a few other adjustments, in light

22   of -- I'll just read it to you and we're printing a copy so

23   you'll have them shortly.

24          So the first paragraph, the beginning of Element 2

25   on page four, the first part of it, it reads this way.

1    Second -- I'll speed read a little, it doesn't change.  "Dr.

2    Menninger must prove she suffered a material adverse action.

3    For the purposes of this retaliation claim, Dr. Menninger

4    alleges that the adverse action was comprised of one or more

5    of the following alleged actions."

6          Then it lists the five as Mr. -- six, sorry, as

7    Mr. Hannon proposed them.  I'm not going to read that for

8    you, because you have what he filed, right?

9          MS. MANDEL:  (Nods head.)

10          THE COURT:  All right.  Then the next sentence

11    says, "For this element, you must determine whether plaintiff

12    has met her burden to prove by a preponderance of the

13    evidence both that, (a), one or more of these alleged acts

14    occurred, and (b), if so, whether the proven acts amounted to

15    an adverse action, either individually or collectively."

16          MR. CURRAN:  No objection.

17          MR. HANNON:  Good here.

18          THE COURT:  Okay.  All right.  Fine.

19          All right.  Copies?

20          THE LAW CLERK:  Yeah.

21          THE COURT:  So if you can just give them to

22    Kellyann.

23          THE DEPUTY CLERK:  I can pass them out.

24          THE COURT:  It's a whole new copy, another tree

25    down, but it only changes on page 24.

```
 1            MR. HANNON:  I've got one issue to raise.

 2            THE COURT:  Okay.

 3            MR. HANNON:  One more question to run by you.

 4            THE COURT:  Yeah.

 5            MR. HANNON:  So during my closing, what I'd like to

 6    tell the jury, with respect to the exhibits, is given the

 7    number of them and the lack of a cohesive organization that,

 8    if they're having trouble finding something, that they are

 9    permitted to ask a question, in terms of where a particular

10    document is located.  I would tell them that answering those

11    questions is a bit of a hassle.  It would be best if they

12    kind of made a full, comprehensive list, but that's something

13    that I would like to mention in my closing.

14            THE COURT:  Do we -- yes?

15            MS. MANDEL:  Offhand, it strikes me as something

16    that might be more appropriate to come from the bench,

17    instead of from one of us during closing.  It's sort of a

18    neutral statement.

19            THE COURT:  Let me first -- Kellyann, do they get

20    the -- they'll get a list, right?

21            THE DEPUTY CLERK:  They should, yes.

22            THE COURT:  That has the description.

23            THE DEPUTY CLERK:  Right.

24            THE COURT:  And then that will be on the CD, too?

25    I mean, on the computer screen or just on paper?
```

1      THE DEPUTY CLERK:  It might be just on paper.

2      THE COURT:  Okay.

3      MR. HANNON:  It's like 450 documents, though.  It's

4  going to be like finding a needle in a haystack.

5      THE COURT:  So I think that's -- I'm happy to tell

6  them that.  I don't mind telling them that.  I mean -- in the

7  exhibits, you know, and that I'm certainly going to tell

8  them, even though it's not in the instructions, that part --

9  I try not to ad lib generally from the written instructions,

10  but like I'm going to tell them there's -- I'm going to

11  explain how the CD thing works, not in detail, but they have

12  it and -- they're not going to have paper copies, correct?

13      MR. HANNON:  Right.

14      MS. MANDEL:  Correct.

15      THE COURT:  So the exhibits will only be on there

16  and they can -- I don't -- are you objecting to him saying

17  it, or just -- I will say that.  I understand you to be

18  saying that you'd like me to say it.  I will say to them that

19  they have this list, and I'm not going to invite questions.

20  I don't think I would -- just my own preference, but mostly

21  because it is a hassle, but I'm going to tell them about the

22  process for a question, and I'm going to tell them they write

23  it out, and I'll tell them that it sometimes takes a few

24  minutes, because we gather everyone, and I talk to all of you

25  before I answer any questions.

1           And so, one, I will say something like that.  No
2    problem.  I understand that's what you're requesting of me,
3    right?
4           MS. MANDEL:  Yes.
5           THE COURT:  All right.  Are you objecting to
6    Mr. Hannon saying it or not?
7           MS. MANDEL:  I suppose I don't object to that
8    statement.  It seems pretty neutral.
9           THE COURT:  Okay.  So you can say it if you wish.
10          MR. HANNON:  Okay.  Thank you.  That's all I have.
11          THE COURT:  Sure.  Okay.
12          Anything for you?
13          MS. MANDEL:  No.  Thank you.
14          THE COURT:  Do you know if they're all there yet,
15    Kellyann?
16          THE DEPUTY CLERK:  I don't know.
17          THE COURT:  Why don't you go check and see.
18          If they are and they're ready, I'm happy to start a
19    little early, and if not --
20          THE DEPUTY CLERK:  Okay.
21          THE COURT:  So I was thinking about one thing, just
22    for both of you, I assume it's not coming up in the closings
23    this way, but I just wanted to bring it up.
24          So there's evidence that Dr. Menninger received
25    short-term disability, long-term disability, and Social

1    Security Disability.  And I think that's relevant evidence in

2    various ways.  The one issue that concerns me is that there's

3    not much evidence, if any, about what is the criteria for

4    awarding disability benefits under those policies and under

5    the law.  And my understanding of the law is that it's not

6    identical to the ADA for the -- what are the requirements to

7    obtain disability, or necessarily identical to what a jury

8    would have to determine to determine, say, that Dr. Menninger

9    couldn't ever work again.  And so the only thing -- if -- I

10   don't know if either of you are planning to argue that it is

11   the same.

12              MR. HANNON:  No.

13              THE COURT:  Okay.  Because if you did, then I'd

14   feel like I'd need to explain to them that that's not the

15   law.

16              MR. HANNON:  Understood.  I'm not going to touch

17   that.

18              THE COURT:  Okay.  Fine.

19              MS. MANDEL:  Your Honor, just one thing to note

20   about our closing.  We do have a chalk that we'll be using.

21   We have sent an image of it to Dr. Menninger's counsel, as

22   well.

23              THE COURT:  Fine.

24              MR. HANNON:  And just on that, we do dispute the

25   accuracy of some of the facts asserted on the chalk, and if

1    the Court could just give a very brief, you know, instruction

2    on that, just that it's not evidence.  It's --

3                THE COURT:  It's like part of the argument.

4                MR. HANNON:  Yeah.

5                (The jury enters the courtroom.)

6                THE COURT:  Good morning.  Please be seated.  No

7    one discussed the case among yourselves or with anyone else,

8    no one did any independent research.  Right?

9                Good.  Okay.  So we're ready to go.  Let me tell

10   you that -- the exact just sequence this morning, just so you

11   know how things are going to go and what's going to happen.

12               So my instructions are going to be -- I'm going to

13   break my instructions up into two parts.  I'm going to give

14   you, in a moment, the first part of my instructions, and

15   those instructions are about what is evidence, how to

16   understand the evidence, how to think about witnesses.

17   They're more general instructions like that.  And then that's

18   the first half of my instructions, you'll have everything

19   that I give you, you'll have it in writing when you go back

20   to the jury room, but that, essentially, the printed copy

21   that you'll get, it's like parts one and two.

22               And then you'll hear closing arguments and you'll

23   hear first from Mr. Hannon for the plaintiff, because they

24   bear the burden of proof, and then you'll hear from

25   Ms. Mandel for the defendants.  And then Mr. Hannon gets to

1    make a brief rebuttal, because they have the burden of proof.

2         And then you'll hear from me on the last two parts

3    of my instructions.  The main part of that is then what are

4    the things -- there are three claims here.  What does

5    Dr. Menninger have to prove for each of those claims.  And

6    I'll explain not only what the things are, but more detail

7    about how to understand each of those, and then I'll have the

8    last part of the instructions is a brief explanation of how

9    to think about -- what to do -- how to deliberate.  And then

10   you're done and you'll go back, and we'll give you the

11   exhibits and the instructions, and the verdict form, and

12   you'll start your deliberations.  Okay?

13        So first we'll begin with the first part of my jury

14   charge as I explained to you on those first two topics.

**JURY INSTRUCTIONS**

16        THE COURT:  So in defining the duties of the jury,

17   let me first explain the general rules.  It is your duty to

18   find the facts from all of the evidence in the case.  I will

19   describe the law to you and you must apply the law to the

20   facts as you find them.  You must follow the law as I

21   describe it, whether you personally agree with the wisdom of

22   the law -- whether or not you agree with the wisdom of the

23   law.

24        This instruction is a fundamental part of our

25   system of government by law, rather than by the individual

views of the judge and the jury.  It is your duty as jurors

to decide the case fairly and impartially regardless of any

person likes or dislikes, opinions, prejudices, bias, or

sympathy for one party or another.  You must make your

decision based solely on the evidence before you and

according to the law.

In following my instructions, you must follow all

of them.  They are all equally important.  The lawyers are

allowed to comment both on the evidence and on the rules of

law in their opening and closing statements.  But if what

they have said about the evidence differs from your memory,

then let your collective memory control.  If what they have

said about the law seems to differ in any way from my

instructions, you must be guided only by my instructions.

You must not read into these instructions or into anything

that I may have said or done during the course of the trial,

any suggestion from me as to the -- as to the verdict you

should return.  Whatever opinion I might have as to what your

verdict should be is utterly irrelevant.  The verdict is

yours, and yours alone, to render as the finders of the

facts.  While I intend to be as helpful as I can in providing

you with knowledge of the law that you will require to render

an intelligent and informed verdict, the law commits this

case to your sole determination as judges of the facts.

Plaintiff, you will recall, is the name we give to

the person or entity who brings a lawsuit.  In this case, the plaintiff is Dr. Lisa Menninger.  We referred to the parties sued as the defendant.  In this case, the defendant is PPD Development, LP, which I'll refer to as PPD.

In a civil case such as this, a plaintiff bears the burden of proving her case by a preponderance of the evidence.

As I explained earlier at the beginning of the trial, this is a much lower standard of proof than that of, quote/unquote, proof beyond a reasonable doubt, the very high standard that we apply in a criminal trial.  Proof by a preponderance of the evidence does not require Dr. Menninger to prove her case to any degree of mathematical certainty. Rather, she must produce evidence which, when considered in the light of all the facts and evidence in the case, leads you to believe that her claims are more likely true than not. If you find that Dr. Menninger meets this burden, your verdict must be for her.  Should she fail to meet this verdict -- this burden, your verdict must be for PPD.

In determining whether any fact at issue in this case has been proven by a preponderance of the evidence, you may consider the testimony of all witnesses, regardless of who may have called them, and you may consider all exhibits received in evidence, regardless of who may have produced them.

1          Next is evaluating evidence.

2          Let me first review for you what is and is not

3    evidence in a civil case.

4          Evidence is presented at trial in one of three

5    ways:

6          First, through the sworn testimony of witnesses on

7    both direct and cross-examination.

8          Second, evidence is presented through physical

9    objects, such as documents, photographs, and videotapes that

10   are identified by a witness and admitted as exhibits during

11   the trial.

12         And third, evidence is presented by stipulation;

13   that is, by agreement between the parties that certain facts

14   are true and need not be independently proven as such at

15   trial.

16         Certain things are not evidence and should have no

17   influence on your verdict.

18         One, arguments and statements by lawyers, as I

19   cautioned several times, are not evidence.

20         What the lawyers have said over the course of the

21   trial or what they say in a few moments in closing argument

22   you may find helpful, even persuasive, but the facts are to

23   be determined from your own evaluation of the testimony of

24   the witness and exhibits, and from any reasonable inferences

25   that you choose to draw from the facts as you find them.

1          Two, questions to the witnesses are not evidence
2     and may only be considered in the sense that they give
3     context or meaning to a witness's answer.

4          Three, objections to questions are not evidence.
5     Attorneys have a duty to their clients to object when they
6     believe that a question is improper under the rules of
7     evidence.  You should not be influenced by the fact that an
8     objection was made.  If I sustained the objection, you should
9     ignore the lawyer's question and any assertion of fact it
10    might have contained.  If I overruled the objection, you
11    should treat the witness's answer like any other.

12          Four, testimony that I excluded, struck, or which I
13    instructed you to disregard is not evidence.  If you heard an
14    answer to the question before my ruling sustaining an
15    objection, you are to disregard it.  That answer is not
16    evidence.  You should also ignore editorial comments made by
17    the attorneys during their presentations, particularly those
18    intended to characterize the testimony of witnesses.  Whether
19    or not a witness's testimony was believable on any particular
20    point is a determination that only you can make.

21          Five, notes, if you have kept them, are not
22    evidence.  They are a personal memory aid to be used to
23    refresh your recollection of the evidence during the
24    deliberations.

25          And finally, anything you may have seen or heard

1   outside the courtroom during the course of the trial is not

2   evidence.

3           There are two kinds of evidence:  Direct and

4   circumstantial.  Direct evidence is direct proof of a fact,

5   such as testimony of a witness that the witness saw or did

6   something.  Circumstantial evidence is indirect evidence;

7   that is, proof of a fact or facts from which you could draw a

8   reasonable inference that another fact exists, even though it

9   has not been proven directly.

10          You all have experience in your everyday life

11  drawing inferences based on circumstantial evidence.  For

12  instance, imagine it was sunny when you arrived here this

13  morning, but just now someone walked into the courtroom

14  wearing a wet raincoat and carrying a dripping umbrella.

15  Without any words being spoken and without looking outside

16  for yourself, you might draw the reasonable inference that it

17  is now raining outside.  In other words, the facts of the wet

18  raincoat and the dripping umbrella would be circumstantial

19  evidence that it is raining.

20          You are entitled to consider both direct and

21  circumstantial evidence.  Neither type of evidence is

22  considered superior or inferior to the other.  The law

23  permits you to give equal weight to both.  It is for you to

24  decide how much weight to give to any piece of evidence.

25          Most evidence received at trial is offered through

the testimony of witnesses.  As the jury, you are the sole judges of the credibility of these witnesses.  If there are inconsistencies in the testimony, it is your function to resolve any conflicts and to decide where the truth lies. You are not required to believe the testimony of any witness simply because the witness was under oath.  You may choose to believe everything that a witness said, only part of it, or none of it.  If you do not believe a witness's testimony that something happened, that, of course, is not evidence that it did not happen.  It simply means you must put aside that testimony and look elsewhere for credible evidence before deciding where the truth lies.

Often, it may not be what a witness says, but how he or she says it that might give you a clue whether or not to accept his version of the event as believable.  You may consider:

A witness's character; his or her appearance and demeanor on the witness stand; his or her frankness or lack of frankness in testifying; whether the witness was contradicted by anything that he or she said before trial; whether his or her testimony is reasonable or unreasonable, probable or improbable, in light of all the other evidence in the case; how good an opportunity the witness had to observe the facts about what he or she testifies; and whether his or her memory seems accurate.

You may also consider the witness's motive for
testifying, whether he or she displays any bias in doing so,
and whether he or she has any interest in the outcome of the
case.  Simply because a witness has an interest in the
outcome of the case does not mean the witness is not trying
to tell you the truth.  But a witness's interest in the case
is a factor you may consider along with everything else.  You
may also consider the fact that a witness may be perfectly
sincere in his or her account of an event, and simply be
mistaken as to the truth.

In deciding whether or not to believe a witness,
keep in mind that people sometimes forget things, get
confused, or remember an event differently.  Memory is not
always reliable, and when someone recounts a story twice, it
will seldom be identical in every detail, unless it is a
memorized lie, or the witness is possessed of extraordinary
perception and recall.  It is for you to decide whether any
contradictions in a witness's testimony are innocent lapses
of memory or intentional falsehoods.  That may depend on
whether important facts or small details are at issue and how
important the facts might have appeared to the witness at the
time they were perceived.

The weight of the evidence does not necessarily
depend on the number of witnesses testifying for one side or
the other.  The law does not require any party to call as

witnesses all persons who may have been present at any time
or place involved in the case or who may appear to have some
knowledge of the matters in issue at this trial.  Nor does
the law require any party to produce as exhibits all papers
and things mentioned by the witnesses in the case.  You must
determine the credibility of each witness who testified and
then reach a verdict based on all of the believable evidence
in the case.

You should consider and decide this case as a
dispute between persons of equal standing in the community,
of equal worth, and holding the same or similar stations.
The defendant is a type of corporate entity known as a
limited partnership.  A limited partnership is entitled to
the same fair trial as a private individual.  All persons,
including equal limited partnerships stand equal before the
law and are to be treated as equals.

Expert witnesses.  I want to talk to you briefly
about that topic.  The rules of evidence, ordinarily, do not
permit witnesses to express opinions or conclusions.
Normally, witnesses testify as to the facts and the jury
draws conclusions from the testimony.  An exception to this
rule is testimony from those we call experts.  Witnesses who,
because of special training, education, skills, or knowledge,
have been expert in some art, science, profession, or
calling.  Such persons may state their opinions as to

relevant and material matters in which they process to be

experts, and they may state their reasons for their opinions.

In this case you heard expert opinions.  You should

consider each of the expert opinions received in evidence in

this case and give it as much weight as you think it

deserves.  An expert opinion is subject to the same rules

concerning reliability as the testimony of any other witness.

Just because a person is testifying as an expert does not

mean that you, the jury, have to accept that person's

opinion.  A person may be learned in some profession, but if

you should decide the opinion of this expert witness is not

based upon sufficient education and experience, or if you

conclude that the reasons given in support of his or her

opinion are not sound, or if you feel that the expert's

testimony is outweighed by other evidence, or if you find the

expert witness is not believable or credible, you may give

the opinion only so much weight, if any, as you think it

deserves.

Expert testimony must have a sound factual basis.

An expert's opinion amounting to speculation unsupported by

subordinate facts must be disregarded.  It is your

responsibility as jurors to determine what the facts are.

The fact that the Court has permitted an expert to testify

should not be seen by you, the jury, as any indication of the

weight you should accord with the expert testimony.

1             So that concludes the first parts of my

2    instructions to you.

3             So now we'll have the closing arguments and then,

4    after the closing arguments, I'll deliver to you my

5    instructions on the law, which is essentially what are

6    Dr. Menninger's claims, what does she have to prove for each

7    claim, and how to understand in a little more detail, maybe a

8    lot of detail, the specific elements of each of her claims

9    and then some directions on deliberations.

10            A reminder now as we turn to the closing arguments,

11   I told you, the closing arguments can be helpful, they can be

12   persuasive, but they're not evidence.  And it's your

13   collective memory of the evidence in the end that controls if

14   it differs from what the lawyers say.  The lawyers are not

15   only entitled to speak to you, as I expect they will, but

16   they're also entitled, if they wish, to present to you what

17   we call chalks.

18            So you've seen documents in evidence and those will

19   be going to you in the jury room.  A chalk is a reference to

20   sort of what some of you might remember from grade school.

21   Literally things written on the chalkboard, right -- so, in

22   this era, sometimes people write things on a blackboard, but

23   sometimes they have an electronic copy.  And so you -- one or

24   both of the parties might present something like that, and

25   it's just like their words.  It's just something that is part

1    of their argument.  They're entitled to present it and you

2    treat it just the same.  It's not -- you won't have a copy --

3    you won't have a transcript of what they say, and you won't

4    have a copy of whatever they present to you in closing

5    argument, unless it's already in evidence.  Then, of course,

6    you will.  If they pull up an exhibit, you'll have that,

7    because it's an exhibit, not because they pulled it up in

8    closing argument.

9            So -- and you view any argument and any chalks of

10   that nature they present, just like their argument in

11   totality.

12           Okay?  All right.

13           Go ahead, Mr. Hannon.

14           MR. HANNON:  Thank you, Your Honor.

15           **CLOSING ARGUMENTS BY COUNSEL FOR PLAINTIFF**

16           MR. HANNON:  Good morning.  I know it's been two

17   weeks since we started this adventure together and I know

18   you've seen a lot of documents, a lot of highlighting and all

19   of that.  I don't have time right now, thankfully for you, to

20   go back through all of that and I'm not going to try to.  I

21   might have the urge to show you a handful of documents and

22   I'll try to make those brief and not be too repetitive.  But

23   as the Judge alluded to, this is sort of our opportunity to

24   talk over the evidence that -- from our sort of perspective.

25   And I know you've all been paying very, very close attention,

1    so I'd like to spend my time right now sort of walking you

2    through not just the evidence, but how I sort of see it

3    fitting in with respect to the questions you have to answer.

4            Once we're done and the Judge instructs you on the

5    law, you're going to get a verdict slip that's going to have

6    a number of questions for you to answer, and that's going to

7    be your verdict.  And the Judge has already kind of shared

8    with us that, and what we expect he's going to instruct you

9    on.  So let me just sort of jump in there.

10           The first question you're going to have to answer

11   has to do with reasonable accommodation, specifically whether

12   or not PPD violated the law by failing to provide

13   Dr. Menninger a reasonable accommodation.  Reasonable

14   accommodation, I suspect, you're going to find is probably

15   the most complicated claim in this case.  And just by way of

16   preview, there's sort of three questions on sort of

17   liability, three questions on whether or not PPD acted

18   unlawfully.  The first one is going to be whether or not they

19   failed to provide a reasonable accommodation.  The second one

20   is going to be whether or not they, on the basis of

21   Dr. Menninger's disability, subjected her to an adverse

22   action, and the third one is going to be whether or not they

23   retaliated against her.

24           So it's going to be reasonable accommodation,

25   adverse employment action, retaliation.  And the sort of

1    different analytical ways to sort of approach those different

2    three claims, I think you're going to find that they go from

3    most complicated to least complicated.  But I'm going to take

4    them in order just to hopefully make some of this make sense.

5              With respect to the accommodation claim, the first

6    question surrounds Dr. Menninger's entitlement to an

7    accommodation.  And as you're going to hear, part of that has

8    to do with whether or not she had a disability.  And the

9    Judge will instruct you in terms of what constitutes a

10   disability under the law.  I suspect -- I'm already showing

11   you something here.  I suspect you're going to find a

12   particular document helpful in addressing those questions.

13   So this is Joint Exhibit 47.  And you'll recognize here, this

14   was the initial request for accommodation form submitted

15   by --

16             It's not on your screen?

17             THE DEPUTY CLERK:  Are you on HDMI-1?

18             MR. HANNON:  I am on HDMI-1, yeah.

19             THE DEPUTY CLERK:  Okay.

20             THE COURT:  Something popped up for a second on my

21   screen, but it's gone.  I see your logo.

22             MR. HANNON:  We're there?

23             THE COURT:  No.

24             MR. HANNON:  Forget that.  You've seen the

25   document.

1          THE JUROR:  It's there.

2          MR. HANNON:  Of course it is.  I think

3   Ms. Belmont's messing with me.

4          So you'll recall seeing this document.  This was

5   the initial correspondence of Dr. Kessimian with respect to

6   the accommodation request.  You'll recall that this form kind

7   of walks through a series of questions, mental impairments,

8   substantially impairs a major life activity.  I expect that

9   you're going to find that those questions largely track with

10  what the Judge is going to instruct you with respect to the

11  law, in terms of what qualifies someone as being disabled

12  under the law.

13         A couple of things that I'd ask you to keep in mind

14  and listen closely with respect to the Judge's instructions

15  on this issue.  One is that we talk about a major life

16  activity.  We include things like speaking, like breathing,

17  interacting with others.  It's a very broad list of the types

18  of things.  I expect you're going to hear from the judge

19  that, when you're deciding whether or not the impairment

20  substantially limits a major life activity, pay close

21  attention to what the judge says regarding this not being a

22  demanding standard; that this is intended to be applied

23  broadly in favor of expansive coverage.

24         I expect you're also going to hear that you have to

25  take into account instances that are episodic, and by

1  "episodic," meaning you know, things that don't happen

2  constantly, but there are episodes.  And I would suggest

3  that, from the evidence in this case, the best example of

4  that is like a panic attack, right?  That's not something

5  that Dr. Menninger suffered constantly, it was an episode

6  that would arise on occasion.  It was an episode that as you

7  would -- as you heard, would restrict her ability to breathe,

8  to talk, to think.  And I would suggest to you, that's really

9  the sort of easiest example here, and when you look at these

10  different elements, to understand that she did, in fact, have

11  a disability under the law.

12         You'll also note that having a disability doesn't

13  necessarily have to prevent you from success.  Right?  There

14  are lots of people who have disabilities who, nonetheless,

15  are able to achieve, you know, fantastic things.  I expect

16  the Judge will provide a specific example, you know, for

17  example, somebody with a learning disability.  Just because

18  they're able to overcome that disability with extra study and

19  extra effort, doesn't mean they don't have a disability

20  within the meaning of the law.  Again, this is expansive

21  coverage.

22         So with respect to having a disability, I

23  anticipate that that should be a fairly easy question to

24  answer.

25         Moving on, you'll have to decide whether or not she

1  was a qualified individual.  And you're going to hear there's

2  sort of two pieces to that.  One is that she has sufficient

3  education, skill, experience, qualifications for the job.

4  And obviously, she did, right?  We know this was a job that

5  she had been in for several years, she had been performing

6  successfully, has a very impressive resume.  She was clearly

7  qualified.

8       The second piece of that same element concerns

9  whether or not she could perform the essential functions of

10  the job.  And this is where the accommodation claim gets a

11  little bit complicated.  You heard the Judge mention earlier

12  the burden of proof, the more likely true than not true, and

13  you're going to find that on most elements, as the plaintiff,

14  we have the burden.  This one is a little bit different.

15  You're going to hear that with respect to establishing what

16  the essential functions of the job are, that that's going to

17  be PPD's obligation, to convince you it's more likely true

18  than not true that something was an essential function.

19       And the Judge will tell you what it means, an

20  essential function.  We expect he's going to tell you it's a

21  fundamental job duty of the position, and you're going to

22  hear there are essential functions, and then there are

23  nonessential functions, what we call marginal functions.  And

24  you'll have to decide what constitutes an essential function

25  versus a marginal one.

1          I would submit that, based upon the evidence

2     presented here, that's really not much of an issue.  Again,

3     Dr. Menninger was in the role for many years.  I submit to

4     you that there is no evidence that she was ever given a

5     particular assignment, a particular task that she was unable

6     to do.  She did the job.  It wasn't always easy.  Sometimes

7     it was hard.  Sometimes it caused her pain and distress, but

8     she got the job done.  There's no claiming here that she

9     didn't.  So I would submit to you that the evidence certainly

10    establishes that she was a qualified individual.

11          Turning to the next element, which has to do with

12    her request for an accommodation.  And you're going to hear

13    that the evidence has to show that she made a sufficiently

14    direct and specific request.  And I think one way of thinking

15    about that is if you all go back in the jury room, and you

16    guys think of an awesome idea of something that she could

17    have requested, it doesn't do me any good.  So the actual

18    request that they denied has to be something that's here in

19    the evidence, something that was actually talked about or

20    discussed during the time of the events at issue.  We can't

21    start new from whole cloth.  So you're going to have to

22    consider the things that are actually in the record that are

23    being talked about at the time.

24          Next comes to the actual accommodation itself.  Was

25    it reasonable.  And this is complicated, too.  So you're

1    going to hear that, in the first instance, we have the burden

2    of showing that it was reasonable, at least on its face.

3    Right?  And this is something that they could do, taking into

4    account some of the various factors that the Judge is going

5    to provide you.  He's going to give you an example of what a

6    reasonable accommodation is, and what a reasonable

7    accommodation isn't, and then you have to evaluate what side

8    of the ledger it falls on.

9          If you find that it's reasonable on its face, then

10   the burden is going to shift to them to show that, providing

11   it wouldn't be an undue hardship.

12         So turning to the fact here, when we're talking

13   about a reasonable accommodation, I suspect that the first

14   inclination might be to look at the buckets and look at Dr.

15   Kessimian's proposed accommodations with respect to that.

16   And I suggest to you that that's fine.  I suggest to you that

17   if you look there that you're going to find that those were,

18   at least on their face, reasonable accommodations, in part

19   because the Judge is going to tell you that reasonable

20   accommodations include modifying when and how a function is

21   performed.  It's going to include altering, reassigning,

22   eliminating nonessential job functions.  He's going to tell

23   you that it includes things like that provision of qualified

24   readers.  I expect, if you look at Dr. Kessimian's e-mail

25   that, yes, those are, at least on their face, reasonable.

1    And we -- I expect when you consider the evidence you've

2    heard, there's been no evidence to establish that they've met

3    their burden to prove that any of that would cause an undue

4    hardship.

5           But I don't think this case is really about that

6    set of requests of accommodations.  I would submit to you

7    that what this case is really about is the first set of

8    request for accommodations, the one that Dr. Kessimian made

9    on January 31, 2018.  And if you recall what those were,

10   fundamentally two things.  Right?

11          First, try to minimize the public speaking and

12   social interaction to the extent that we can.  Right?  You're

13   going to see, there's no specific thing that has to be an

14   accommodation, right?  An accommodation doesn't need to fit

15   within a certain box, right?  So something like this

16   proposing that let's just simply try, to the extent we can,

17   to minimize public speaking.  I submit to you that's a

18   perfectly fine reasonable accommodation, right?  That's an

19   easy ask.  It's not a big one.  Right?  Let's just think

20   through what are the tasks that you really need her to do,

21   and can we try to alleviate some of her stress and some of

22   her symptomology by taking some of the other stuff off of her

23   plate.  That's a pretty good request, I would submit.

24          And then she says, and if you can't, right, if it's

25   deemed necessary, let's make a plan.  Right?  And let's

1    figure it out.  Let's find a way that she can do those things

2    and she can do these things in a way that's not going to

3    cause her undue burden, undue stress.  Right?

4            I submit to you from the evidence that you heard,

5    that was a pretty good accommodation request, as well, that

6    that's facially reasonable.  Right?  And the reason why I

7    point to these, I suggest, as really being what this case is

8    about, is because this is the way things actually played out.

9    Right?

10           So we have the five buckets, right?  The five ways

11   that Mr. Mekerri said that the job was going to change and

12   grow, and all of that.  But none of those things ever

13   actually happened, right?  He gives her that list in

14   February.  By the time that she leaves at the start of June,

15   she hasn't been asked to do any of those extra new things.

16   Right?

17           Really, where those things come into play here is

18   that it's the anticipation.  It's the fear that those things

19   are going to happen.  It's the uncertainty.  And I'm going to

20   talk more about that in a moment.

21           But as we're talking about that, keep in mind what

22   Dr. Menninger is doing.  She's asking questions, right?

23   She's saying, can we talk about these things, can you give me

24   some more information regarding buckets two, three, and four.

25   She's doing exactly what Dr. Kessimian recommended.  Right?

1    If you're going to tell us that these are things she has to

2    do, let's make a plan.  Let's communicate.  Let's talk about

3    it.

4         Over and over again, she asked them, "Can you tell

5    me?  Can we talk about it?  These are things that I can do.

6    We can work with these things."  And time and again, they

7    didn't respond.

8         I'd submit to you that, in answering the first

9    question with respect to accommodation, that that is the

10   violation here that's most easily recognized.  And that's the

11   violation here that I would submit to you is the one that

12   really caused Dr. Menninger the most harm.  It was the -- it

13   was the not knowing.  It was the lack of a plan.  It was the

14   lack of understanding.  And Dr. Kessimian told them right

15   here, on January 31, 2018, that that was something that would

16   help alleviate the symptoms and stress of her disability.

17   And they denied it to her.

18        And they had no good reason for doing so.  You've

19   heard no explanation here in terms of why they couldn't give

20   her that extra detail.  You've heard no explanation here in

21   terms of why they couldn't just talk to her like a normal

22   human being.  What the evidence has shown was the reason why

23   they didn't talk to her, they didn't answer those questions,

24   they just didn't want her to succeed.  Right?  Because they

25   had decided in February of 2018 that she was going to exit

1    the company.  That was the strategy that they were pursuing.

2    And they denied her that accommodation, the one that they

3    knew was going to help her do her job, help alleviate the

4    stress and symptomology of her illness, and they did that

5    because they wanted her to fail, and they broke the law.

6            That's reasonable accommodation.

7            The next claim, as I mentioned, is discrimination

8    through an adverse employment action.  And this one has some

9    similarity to the first one.  So, again, you have to answer

10   questions about was she disabled?  Was she a qualified

11   individual with a disability?  Same law applies.  Same facts

12   apply.  So if you found that for the first one, you kind of

13   get to jump ahead a little bit when you get to the second

14   claim.

15           And really, assuming that you've -- you've answered

16   the first question the way that I suggest, when you get to

17   the second claim, really, the question is going to be whether

18   or not they subjected Dr. Menninger to an adverse employment

19   action.  And I think it's worth pausing with that

20   phrase "adverse employment action."

21           You're going to hear about two kinds of actions

22   here.  For the second question, you'll hear about "adverse

23   employment action," when we get to the retaliation piece,

24   we're going to talk about adverse action.  And the Judge will

25   instruct you in terms of what the distinction is.  I would

1    suggest that one easy way of thinking of it is adverse

2    employment action is just a higher standard.  And when we're

3    talking about adverse employment action, you're talking about

4    a material change to the terms and conditions of the

5    employment.

6              When we talk about retaliation, we're going to talk

7    about something different and I'll save that for then.

8              In evaluating whether or not Dr. Menninger was

9    subjected to an adverse employment action, you're going to be

10   asked to consider basically two things.  One concerns the

11   expectations for her role as executive director and the other

12   concerns the goals for her role as executive director.  And I

13   would submit to you that the evidence has shown that, after

14   they found out that Dr. Menninger had her disability, that

15   they took adverse employment action with respect to both.

16             And let me walk you through what I mean.  So first

17   concerns the buckets, the five buckets.  Right?  So prior to

18   Dr. Menninger disclosing her disability, there was supposed

19   to be an accommodation.

20             If you go back to Joint Exhibit 366.

21             Is that up on the screen?

22             THE JUROR:  (Affirmative responses).

23             MR. HANNON:  All right.  So this is the thing that

24   started it all, right?  This was Dr. Menninger's e-mail to

25   Mr. Mekerri, disclosing her disability.  You heard about what

the events were that led up to sending this e-mail and all of
that.  I want to highlight for you one little piece of
this -- I know I said I wasn't going to highlight --  "As you
mentioned that you'd like to discuss some ideas you have
regarding how to make my role more visible, I think it's
important that I make you aware of a medical condition that
I've been suffering from."

        You'd like to discuss some ideas.  This was the
state of affairs prior to Dr. Menninger disclosing her
disability to PPD, that there was going to be a discussion
regarding how to potentially change or adapt her role in
order to allow her to provide more support towards these
business goals.  After she disclosed her disability, that
changed dramatically, right?  There was no -- there was no
discussion, there was no brainstorming, there was no back and
forth.  Right?  It became a very cold, very distant, very
arm's length sort of process.  Right?  Rather than have a
discussion about ideas, it became a list of buckets.  And
when Dr. Menninger asked for additional detail regarding
those list of buckets, they wouldn't talk to her about it.

        Why does that matter?  Well, knowing what your job
is, I submit to you, is a material part of your employment.
And you heard that with respect to this particular role, that
the job descriptions were written very broadly, right?  You
heard Mr. Clendening, when he was up on the stand, I think he

1     confirmed that for you, that, you know, they all had these

2     sort of same general things, but then everyone had their own

3     swim lane.  I believe that's the phrase he used.  The idea

4     that, yes, it was broad, but they all had their own sort of

5     defined area that this was -- this was their role.

6           Prior to disclosing her disability, Dr. Menninger

7     had a swim lane.  Right?  She knew what her job was, she knew

8     what was expected of her, clearly defined, just like every

9     other employee was entitled.

10           After she disclosed her disability, she didn't have

11     a swim lane, anymore, right?  They gave her a general sense

12     of it was going to be broader, but they wouldn't tell her

13     exactly what it is, right?  Rather than have her own swim

14     lane, she had the whole pool.  And when she asked them for

15     clarity in terms of helping her to understand where the ropes

16     were, what her swim lane was, they wouldn't tell her.  And I

17     submit to you, that's a materially adverse employment action,

18     that the evidence shows that other employee, they got to know

19     what their job was, they got to understand what was expected

20     of them.  But once Dr. Menninger disclosed her disability,

21     they were no longer willing to give her that clarity.  They

22     were no longer willing to have that discussion.

23           And why was that?  We'll get to that in a moment in

24     terms of the causation of this.  But that's one of the

25     adverse employment actions that I submit the evidence

1    supports.

2            The other concerns the goals.  Right?  So we see on

3    the front end of this with respect to the changes to her

4    role, what they do there.  Let's look at the back end, right?

5    Because we see that later on in the year, into April and May,

6    they start talking about adapting goals.  They start talking

7    about, well, the expectation for your role now, the goal for

8    your role now is going to be eliminating lab issues.

9            That was never the expectation before, that was

10   never the requirement before, right?  They were moving the

11   goal posts on her in terms of trying to set an expectation,

12   trying to set a requirement that she achieve that objective.

13           And make no mistake, that's exactly what they did.

14   You go back and look at the criticisms that they offer of

15   her, look at the goals that they're trying to make.  The

16   standard that they're setting for her in April of 2018 is

17   that, if lab errors occur, that is reflective of a deficiency

18   on your part.  They changed the rules.  That had never been

19   like that prior to her disclosing her disability.  Prior to

20   her disclosing her disability, you heard what they did in

21   terms of lab errors.  You heard that lab errors happen all

22   the time.  You heart about that daily triage meeting.  You

23   heard about the extensive process they had for invetigating,

24   finding root cause, looking at corrective action.  Right?

25   There was a process, that was the expectation.  That was the

way she was judged.  And after she disclosed her disability,
they moved the goal posts.  That wasn't going to be good
enough anymore.  They were going to judge her by a different
standard and I submit to you that was an adverse employment
action.

A couple things to note as you listen to the
instructions from the Judge on this, listen carefully in
terms of from the perspective that you judge this, that
you -- you judge the adversity of these actions from
Dr. Menninger's perspective, someone in her circumstances,
someone who's living this the way that she lived it.

After finding that there was an adverse employment
action, obviously it turns to the question of why was that?
Why was it that they wouldn't give her the swim lane?  Why
was it that they moved the goal posts?  And I submit to you
that the evidence clearly shows it was because they knew she
was disabled.  There is a stark contrast between how they
treated Dr. Menninger before she disclosed her disability and
how they treated her after.  She went from being an asset in
the organization to being a liability.  Right?  PPD has told
you all the wonderful things that they did for Dr. Menninger
in terms of supporting her move from Kentucky to
Massachusetts, paying for her move when she started her job.
She was well compensated.  She was well respected.  Everyone
loved her.  And then they found out she was disabled and then

1    they stopped talking to her.  And then they started planning,

2    well, we got to have a backup plan here.  And then you heard

3    what they did.  You saw their own words.  You saw in writing

4    what they decided.  You saw in that February 28th e-mail, the

5    one that Mr. St. John sent to Ms. Ballweg, the one that

6    attached the coverage grid.

7           You saw those words, "delicately work Lisa out."

8    They made a decision.  They made a decision once they found

9    out she was disabled, they didn't want her anymore.  And that

10   was their choice.  And they started delicately, they float

11   the offer of a separation package and, you know, some

12   short-term consulting.  They tried it delicately.  She said,

13   no, I don't want -- I don't want a payoff.  I'm not doing

14   this because I want money or I want -- I want my job.  Right?

15   I just want to be able to care for my family and do the

16   things I've been doing.  And when the delicate approach

17   didn't work, they went for the tougher one, right?  Because

18   she wasn't going to go easy.

19          And they have no excuse for that.  When I

20   confronted Ms. Ballweg with those four words, "delicately

21   work Lisa out"?  What did she say?  Did she admit what was

22   obvious?  Did she admit that the words mean what they mean?

23   She didn't, because she couldn't.  Because if she did, she

24   would be admitting to breaking the law.  So what did she say?

25   "We were trying to help Lisa.  We were just trying to help

her."

Does that make sense based upon this evidence that they were trying to help Lisa?  If they were trying to help Lisa, wouldn't they have answered her questions?  If they were trying to help Lisa, wouldn't they have treated her -- wouldn't they have talked to her?  Would they have done what they did if they were trying to help Lisa?

They made the decision they didn't want her anymore.  And that's directly related in terms of time and sequence and all of that, to the disclosure of her disability.

And they're going to try to tell you a different story.  They're going to try to look at the past and say maybe this all started when she started working remotely.  Well, okay, so we have this one e-mail with this one other person who had concerns about her remote status, and maybe we can tell a different story.  I submit to you, members of the jury, those dots don't connect.  Right?

Consider this.  If they had concerns about Dr. Menninger's remote status, why isn't that reflected in the five buckets?  Right?  When Dr. Menninger is asking them, okay, what are the things -- what are the new, additional things you want me to do?  And Mr. Mekerri sits down to write those, why doesn't he write down travel to Highland Heights more frequently?  Why doesn't he say go and supervise your

staff more?  Why doesn't he say visit the pit more?  He
doesn't do any of that, because this had nothing to do with
that.  This was about taking more of a customer-facing role.
That's what the conversation was about in December, that's
what his e-mail was about in February when he laid out those
five buckets.  And they're trying to tell you a different
story now.

And consider, too, how the accommodation discussion
worked out, right?  What were the ones they agreed to
accommodate?  Well, one of them was the travel.  Does that
make sense?  If all of this had to do with their concern that
she wasn't coming to Highland Heights enough, right, to do
the most essential feature of her job, to provide scientific
oversight, if that was the concern, if that was a problem, do
they reduce her travel by half?  From 30 to 15 percent?  That
doesn't make any sense.

If that was a concern, if that was a problem, there
would be something reflected here in the documents to show
it.  Somebody would have asked.  We want you to go to
Highland Heights every month.  We want you to go to Highland
Heights more frequently.  That had nothing to do with this.
They came up with all of that later.  They came up with all
of that as a means of trying to justify what they did at the
end, of blaming her for lab errors.  It's not a true story.

The true story here, members of the jury, is that

1    they found out that she was disabled and it was scary.

2    Right?  We talked about that at the end of my opening

3    statement, when people find out that folks have disabilities,

4    especially mental health disabilities, our first reaction is

5    not, you know, great, come run my laboratory.  If that was

6    our first reaction, we wouldn't need laws like this, we

7    wouldn't need juries like you.  Right?  The natural reaction

8    is to have a little bit of fear, right?  The natural reaction

9    is to be a little bit ignorant, right?

10          But the law requires us to do better.  The law

11   requires us to put that fear aside, to put that ignorance

12   aside, and to rely upon actual facts.

13          And this wasn't some person they weren't familiar

14   with, this wasn't some person off the street that they didn't

15   have experience with.  This was Lisa.  They knew Lisa.  They

16   knew her talent, they knew her abilities.  They had seen it.

17   They judged her high.  They thought she was brilliant.  They

18   thought she was so good they wanted her out in front of

19   clients more.  That's how they viewed her.  Those were the

20   facts that they had.  But once they found out she was

21   disabled, once they got that scary information, they put the

22   facts aside, they let the fear -- they let the ignorance

23   dictate their actions, and that's how they broke the law.

24          Let me pause there for a moment about the law and

25   just say this.  This isn't about being woke.  Okay?  This

1    isn't about creating safe spaces and some kind of snowflake

2    culture.  All right?  This is about helping people work,

3    right?  This is about people who want to have jobs, who want

4    to earn money, who want to take care of their families, who

5    want to pay taxes -- maybe don't want to pay taxes, but will

6    pay taxes.  Right?  This is about allowing people like

7    Dr. Menninger to be productive members of society.  Right?

8    To add to our economy, not to be a drain on us, not to be

9    what she is now, in terms of relying upon public assistance.

10           So as you consider this evidence and what we're

11   talking about here, this isn't about coddling, right?  This

12   is about allowing an individual to do their job because

13   they're good at it, because notwithstanding their

14   disabilities, they have talents, they have abilities, and

15   they can contribute, just like Dr. Menninger did for the

16   years before they found out she was disabled.

17           Let's talk about retaliation.  And I mentioned

18   before that I would submit to you this is the easiest one.

19   So for retaliation, it's really about this:  In response to

20   Dr. Menninger requesting an accommodation, did they then take

21   action against her, which a reasonable person doing that

22   action might be dissuaded from coming forward?

23           Can you say that a little -- the judge will say

24   that better.  But I submit to you that that sort of concept

25   is this.  If Dr. Menninger knew that once she disclosed her

disability that they were going to stop talking to her about

her role changes.  If she knew that after she disclosed her

disability they were going to start trying to formulate a

plan to delicately work her out; if she knew that after she

disclosed her ability, they were going to be looking for an

exit strategy to get her out of the company.  If she knew

that after she disclosed her ability, that they were going to

start increasingly scrutinize her actions, blaming her for

things that were not her fault, and changing her goals, would

she have ever raised her hand?  Would she have ever said, "I

have a disability and I would like an accommodation."

            The answer is no.  Right?  No one would do that if

they knew that your employer could do that in response.  And

that's what the retaliation claim really kind of comes down

to, is whether or not the actions they took in response to

her making those requests, whether those are the kinds of

things that would dissuade someone from raising their hands

and coming forward.

            It's a scary thing to do.  You heard it was a scary

thing for Dr. Menninger to do and you heard that she was

right to be scared, because they did exactly what she was

afraid they would do.

            Which brings us to the issue of damages.  There's

three kinds of damages here.  One is financial.  It's the

economic damages, in terms of her lost compensation.  You've

1    seen the numbers on that.  There's no exact science, right?

2    There's no way of predicting with exactitude in terms of what

3    would have transpired in the future, but that doesn't prevent

4    you from awarding damages, right?  If that would prevent us

5    from awarding damages, I wouldn't be here.  Right?  So you

6    need to make a reasonable judgment based upon the evidence

7    and the judge will talk to you a bit about that.

8            Keep in mind the standard, right?  More likely true

9    than not true.  And I would submit to you that the evidence

10   that we've presented on that, it's all based in fact, right?

11   It's all based in the record.  Mr. Jonas's numbers were based

12   upon her actual comp in 18.  You heard the estimates are all

13   kind of reasonable within ranges.  And you heard a little bit

14   of different evidence from Mr. Clendening.  I would ask you

15   all, consider the source.  I think you heard what the Judge

16   mentioned, part of your role here is to determine the

17   credibility of witnesses.  Did you find Mr. Clendening

18   credible?  Was there anything about his testimony that caused

19   you to believe that maybe he's not telling the truth, and I

20   would respectfully submit that his denial of remembering

21   seeing that e-mail from Mr. St. John would strongly suggest

22   that he's not a person you should trust or you should

23   believe.

24            THE COURT:  You're at 35, Mr. Hannon.

25            MR. HANNON:  I'm sorry, Your Honor?

1          THE COURT:  You're at 35.

2          MR. HANNON:  Okay.  Thank you.

3          So very quickly, front pay, again, this is not an

4     exact science.  Might Dr. Menninger, again, maybe someday be

5     able to return to work?  I certainly hope so.

6          Is she ever going to go back to working in a lab

7     like she did at PPD, one that has an HR function like they

8     did, that subjected her to what they did?  I submit to you

9     she's not.

10         As you heard from the -- from Dr. Summergrad in

11    this case, what she went through was her worst nightmare.

12    Right?  He told you about the underlying sort of phobic

13    concerns of this disability, the idea of sort of exposing

14    one's self and then being rejected and being humiliated.  I

15    submit to you, it's sort of like someone who's afraid of

16    flying.  Right?  It's not the flying that they're afraid of.

17    It's the crash.  Right?  And Dr. Menninger's fears here

18    surrounding social encounters and public speaking, it was the

19    fear that they were kind of like going to see her and reject

20    her.

21         And that's exactly what happened here; that when

22    she raised her hand and disclosed her disability, she showed

23    herself to them in a way that she didn't even show her own

24    sister, right?  And she took that huge risk and exactly what

25    she was afraid of is what happened, that when they saw her

1  true self, that they said, look, and they rejected her and

2  they humiliated her.

3        And the fear of going back into an environment to

4  suffer that rejection again, the fear of getting back on the

5  airplane after it crashed, I subject to you that's not easy

6  to overcome, especially when those fears and when that pain

7  gets to you a point where you start considering suicide,

8  where you have to be constantly medicated, where you're in

9  five years of treatment, and not doing so well.

10       So I would submit to you that judge the more likely

11  true than not true standard, that with the way the evidence

12  lies is that she's not likely to earn comparable employment.

13       And as you listen to the Judge's instructions, I

14  ask that you keep in mind that word "comparable."  You heard

15  in the cross of Mr. Jonas the idea of, well, what if she goes

16  and flips burgers?  That's not the question before you.  The

17  question is comparable employment, something similar to what

18  she had before.  And again, given her experience and given

19  her trauma, and given her physical health, I submit to you

20  that there is next to zero likelihood that she would ever

21  return to a job like this again, particularly a corporation

22  with an HR function.

23       Emotional distress.  You've heard a lot of the

24  psychological, psychiatry evidence, underlying phobias and

25  all of that.  And some of that may be hard to get, but some

of it we can understand in our common experience.  Our jobs
matter to us.  We take pride in our jobs.  And when you
succeed, despite your difficulties, dispute your drawbacks, I
submit you take more pride.  The fact that she had overcome
so much to get to this spot in her life.  The fact that she
was able to be the breadwinner, she was able to care for her
child, care for her husband, that's the kind of thing that
everyone takes pride in.  You saw from her expert witness,
Dr. Kessimian, hates seeing examples with, you know, people
who didn't already have disabilities and they went through
that kind of thing, and they kill themselves.

Here it's magnified.  Again, this wasn't just an
ordinary situation of somebody losing their job.  This was
someone's worst nightmare coming true and she has decent
days, and she has bad days.  And you've seen her ability --
you put her in fight or flight mode, she fights, and she's
good at it.

But consider this, what happened when she closes
her eyes at night, when she thinks back to what she's been
through, what her family's been through, when she considers
where she was, and where she is now.  When she thinks about
the impact on her daughter, and when she thinks about why it
all happened, right?  You heard Dr. Summergrad talk about
part of the concern being this sort of blaming yourself?  Why
did this all happen?  It happened because she raised her

hand?  It happened because she asked for help.  And I submit
to you every time she closes her eyes, that's what she has to
see, and that's what she has to live with.  And you heard
about her dreams and you heard about her nightmares, and
that's the life that she's lived for five years.  And I
submit to you, that's not going to change anytime soon.

The last issue with respect to damages you'll have
to consider is punitive damages.  And just a few comments on
that.  The judge will give you instructions there.  This is
outrageous behavior.  This was not an accident on PPD's
fault.  This wasn't just one person acting by themselves
doing something stupid.  This was a concerted effort, at
multiple levels of the organization, by some very, very,
smart, very, very experienced people.  They knew what the law
was.  They knew what their obligations were.  They knew
exactly what they were doing.

You saw the e-mail exchange between Dr. Fikry and
Ms. Ballweg, asking when is her exit.  What does she say?
We're a long way off unless she self-selects.  Unless she
quits.  Right?  That was the -- that was the strategy here.
That was the game.  Turn up the heat.  The delicate approach
didn't work.  Let's take the more aggressive approach.  Let's
drive her out.  Let's make it harder on her.  And they did
it, knowing she was disabled.  They did it, knowing she had
an anxiety disorder.  They knew they were playing with fire.

1    They just didn't care.  It was a choice.  It was deliberate.

2    It was outrageous.

3            And they still do it today.  Have they shown any

4    remorse?  Have they come here to this court?  Have they told

5    you the truth?  Or have they continued to try to deflect?

6    Have they continued to try to mislead?

7            Again, this is important.  This is important to

8    Dr. Menninger.  This is important to disabled people in

9    general.  These are laws that have significant impact,' we

10   rely on people to follow them, and when they don't, they

11   cause harm, they cause significant harm here, and I submit

12   that an award of punitive damages is appropriate and

13   necessary, applying the factors as the Judge is going to tell

14   you in a few moments.

15           I might have a couple of minutes to respond after

16   the other side goes, depending on how much time I've taken,

17   but I do thank you for your time and attention, and that's

18   all for now.

19           THE COURT:  All right.  Thank you, Mr. Hannon, I

20   remind you, you do have three minutes.

21           Ladies and gentlemen, the statements of lawyers can

22   be helpful and persuasive, but they're not evidence.

23           Ms. Mandel.

24           **CLOSING ARGUMENTS BY COUNSEL FOR DEFENDANT**

25           MS. MANDEL:  This is a hard case.  You have

1    listened to testimony for two weeks about Dr. Menninger's

2    mental health challenges and her belief that her struggles

3    are all the fault of PPD.  It isn't easy to see Dr. Menninger

4    cry.  I'm sure you feel badly for her.  I know I do.  But

5    sympathy is not the legal standard here, as you will hear

6    from the Judge.

7           In fact, even if Dr. Menninger herself truly

8    believes that PPD is to blame for all of her challenges and

9    her struggles, that is not the legal standard.

10          No one questions that Dr. Menninger believes PPD is

11   at fault.  But the fact is, Dr. Menninger's troubles, her

12   challenges are not on the shoulders of PPD, as much as her

13   situation is sad and as much as she has internally believed

14   that PPD is to blame.  Merely asking an employee to do the

15   job that she has done well in the past, and even expanding

16   the job to include more tasks, is not discrimination.  It is

17   not retaliation.  It is simply what happens at work.

18          Listening to Mr. Hannon, you might have been

19   expecting to hear the moment when Dr. Menninger was

20   disciplined.  That never happened.  You might have been

21   waiting to hear about the moment when Dr. Menninger was

22   fired.  That never happened.  Let's look at the actual facts

23   that we've learned.

24          Dr. Menninger's job as an executive running a

25   global set of labs around the world, evolved as PPD's

1    business grew, and she worried that she couldn't do the

2    version of the job that the company needed.  As soon as she

3    heard about these evolving expectations, back here, in

4    December 2017, she didn't tell PPD that she couldn't do the

5    job.  She didn't go see a psychiatrist.  She hired

6    Mr. Hannon.  She hired a lawyer.

7            As soon as she learned that PPD expected more of

8    her, that was her first move.

9            And then, weeks later, she told PPD for the first

10   time that she has anxiety and was worried about whether she

11   could do the job.  That didn't happen until here.

12   (Indicating).  Only after that, she went to see a

13   psychiatrist, Dr. Kessimian, the first psychiatrist that she

14   had seen in years.  We heard repeatedly that the mere act of

15   telling PPD about her anxiety sent Dr. Menninger into a

16   downward spiral.  No one disputes that that happened, but

17   that's not something that PPD caused.  That's not something

18   that PPD controlled.

19           Dr. Menninger's husband testified that she couldn't

20   get out of bed starting in January 2018.  That happened back

21   here (indicating), before PPD had done any of the bad things

22   that Mr. Hannon said happened here.  At that point, in

23   January of 2018, Dr. Menninger's own husband said she

24   couldn't get out of bed.  Is that PPD's fault?  PPD certainly

25   feels badly for Dr. Menninger that that happened, but it's

1    not PPD's fault.

2            PPD simply asked Dr. Menninger to do more of what

3    she had already been doing well.  Dr. Menninger told PPD that

4    she thought that that would be a problem because of her

5    anxiety and that is the point when she spiralled downward.

6    PPD hadn't done anything at that point, and she already

7    decided that PPD was to blame.

8            Mr. Hannon wants you to believe that PPD's meeting

9    with Dr. Menninger in late February 2018 is what sent

10   Dr. Menninger into the downward spiral.  But we know that

11   isn't true.  It's not just not supported by any evidence.

12   Again, Dr. Menninger's husband and her psychiatrist, Dr.

13   Kessimian, described that spiral starting weeks before, in

14   January of 2018.  Even Dr. Menninger's psychiatric expert,

15   Dr. Summergrad, he said that, too.  In fact, Dr. Menninger

16   had panic symptoms simply being in the airport on her first

17   trip to Highland Heights, in fact, the only trip to Highland

18   Heights in 2018, just being in the airport caused those panic

19   symptoms.  PPD didn't cause that.

20           The second that Dr. Menninger told PPD she had an

21   anxiety disorder, she had already convinced herself things

22   were terrible.  Her doctor talked about her catastrophic

23   thinking about that time and PPD hadn't done anything.

24   Dr. Menninger had disclosed her disability, but that's the

25   moment when the catastrophic thinking began.  Her husband

1   knew that, her psychiatrist knew that.  And remember, she had

2   already hire a lawyer before PPD did anything.

3          In her mind, PPD never had a chance.  You've heard

4   a lot of noise, but let's look at what we've actually learned

5   through the evidence.

6          Dr. Menninger's boss, Hacene Mekerri, cared about

7   her and wanted to support her.  When Dr. Menninger asked PPD

8   to accommodate her and let her live a thousand miles away

9   from her primary lab to take care of her daughter's mental

10  health needs and stop her from being bullied at school,

11  Mr. Mekerri said sure, pick up your family, move across the

12  country if that's what you need to do.  I'll support you,

13  even though others in the company are telling me it's a bad

14  idea.  I'll support you, move across the country to

15  Massachusetts, just come back here and run the lab.  And

16  Mr. Mekerri supported her.  The evidence is very clear.

17  There's no question that Mr. Mekerri supported that.

18         When Dr. Menninger didn't hold up her end of the

19  arrangement to come to Highland Heights regularly to run the

20  lab and lead her team, PPD didn't discipline her.  They

21  didn't give her a warning.  Mr. Hannon himself just told you

22  that.  They didn't tell her to move her family back to

23  Kentucky.  They simply asked her to be a more present leader.

24         When the business needs picked up for everyone, as

25  you've heard from multiple witnesses, Mr. Mekerri told all of

1    his executive directors, all of them, that they needed to be

2    more visible and work with customers.  Everyone got that same

3    message, not just Dr. Menninger.

4         And once Dr. Menninger said she couldn't do those

5    things, Mr. Mekerri never made her do them.  She was never

6    asked to do any of the things she said she couldn't do, not

7    one of them.  The discussions about whether Dr. Menninger

8    could and needed to do those things went on for four months.

9    That's what was happening in the spring of 2018.  But in

10   reality, Dr. Menninger traveled to Highland Heights,

11   Kentucky, where she was running a lab once during that time

12   period, just once, but no one disciplined her, no one told

13   her that he had to get on a plane and come more often.  She

14   came once.  You haven't heard any evidence, and there is no

15   evidence, that the company turned the screws to her and said

16   hey, you got to get on a plane, you have to get here, you

17   have to have more panic attacks, because it didn't happen.

18        PPD even said, "You can't come to our senior

19   leadership meetings?  Okay.  We'll hire a surrogate, we'll

20   have a surrogate do that.  We are not going to make you do

21   that if that's too hard for you.  It's hard for you to travel

22   to Highland Heights?  We'll just cut your travel requirement

23   in half.  PPD said we will do those things.  What they

24   couldn't do and what they said they couldn't do, kindly and

25   professionally, but firmly, is that they wouldn't have a

surrogate, they wouldn't hire another person to do her job as
the medical leader of the lab, talking to customers, helping
them get business from customers, answering the medical
questions.  Why?  Because Dr. Menninger, a clinical medical
pathologist, who is an executive in the company, she was the
top medical leader for the company, for their lab business,
and she needed to have those conversations for the business.
They simply couldn't let that go, even though they helped her
in all of the ways they could, she still needed to represent
the company's lab.  That was something they just couldn't
change.

         We have seen many times the only two letters that
Dr. Menninger's physician ever sent to PPD.  The first, in
January of 2018, told PPD that Dr. Menninger had two types of
anxiety, a panic disorder and agoraphobia.  Mr. Hannon
reminded you of that letter this morning.  Dr. Kessimian said
in that letter that any need to increase social interaction,
any need to increase social interaction or public speaking
would worsen Dr. Menninger's symptoms.  She also said that
Dr. Menninger simply couldn't do those things without her
doctor's input.

         She was an executive in the company, the top
medical leader in a set of global labs, and any increased
social interaction was a problem.  The company wanted to help
her, but that's a very serious instruction from her doctor.

1          Then, after looking at the specifics of
2    Dr. Menninger's job, and remember, not even knowing where her
3    job was located, that it was a thousand miles away in a lab
4    that Dr. Kessimian didn't even know about, she said, "In the
5    weeks leading up to social interaction and public speaking,
6    Dr. Menninger had serious physical symptoms, insomnia, panic
7    attacks, gastrointestinal problems, and weight loss.  Her
8    doctor's own words were that she couldn't tolerate these
9    activities.  Doing them made it as if her vocal cords and
10   brain became paralyzed, while her blood pressure, heart rate,
11   and breathing all increased.  Those were her doctor's words.
12   And in fact, the last letter that she ever sent to PPD, they
13   were very worried.  They were concerned that Dr. Menninger
14   being asked even to do the basic parts of her job would
15   physically harm her.
16          Then her doctor said there were three categories --
17   that the three categories -- there were three categories that
18   require the company to put in place a surrogate.  A
19   surrogate, meaning not Dr. Menninger.  She would no longer do
20   those parts of her job.  She wouldn't speak to customers, she
21   wouldn't present internally for the company.  She wouldn't
22   help the company get new business for customers, even though
23   she was the top medical executive for the labs.
24          For one category, she even said Dr. Menninger can't
25   do it at all.  She can't go to dinner, she can't go to

1    lunches.  She can't be socializing with the clients.  That's

2    what the doctor said.  This worried PPD.  They weren't sure

3    what to do.  They couldn't have Dr. Menninger in a position

4    where she exposed herself to significant risk of physical

5    harm, but they still needed to run a business.  This was

6    confusing for them.  They wanted to help her, but they still

7    needed to run their business.

8         From Dr. Menninger's perspective, the company had

9    three options.  First, she thought they should never have

10   asked her to do these things that were clearly part of her

11   job, and then she thought that if they did ask her to do

12   these things, they should actually have someone else spoke

13   for her, come to the meeting, speak to the customers, and

14   that she would prepare slides from Massachusetts for someone

15   else to present to the customers.  And when they said they

16   couldn't do, that they needed her to actually do this job,

17   then she wanted them to forget everything her doctor said,

18   forget about the terrible symptoms that her doctor described,

19   and say, actually, it's okay, I can do all the parts of my

20   job.

21        The company was legitimately confused.  Can you do

22   the job safely?  Can you not do the job safely?  What is it

23   that you actually want?  So were the conversations perfect?

24   Were they scripted by lawyers?  No.  They weren't perfect,

25   ideal conversations, because the company was confused, and

they were trying to help Dr. Menninger and follow her
doctor's instructions, and at the same time, run a business.
It wasn't easy.

There's one thing that's clear, though.  They had
Dr. Menninger's best interests at heart the whole time.
Remember.  Dr. Menninger herself testified, no one ever said
anything negative to her about having a disability.  And this
is the same company that, when she came forward and said my
daughter is having challenges, my daughter is distressed, my
daughter is being bullied, they said, no problem, move across
the country with your family.

Yet, again, when it was Dr. Menninger herself, the
company didn't say anything negative to her about her mental
health challenges.  They respected her greatly because of her
professional background and what she offered to the company,
and they just wanted to help her.

But, in fact, no matter what PPD did, Dr. Menninger
was never satisfied.  She had convinced herself that PPD was
out to get her the second she disclosed her disability in
January of 2018, before PPD even had a chance to help.  And
when PPD told her that they could do some, but not all, of
what her doctor had asked for, that still wasn't good enough.
When she desperately asked them what will happen if I can't
do my job?  What will happen if my mental health condition
stops me from doing what you need, they said don't worry, we

1    will probably help you be a consultant or work out an exit
2    package.  Don't worry.
3              Mr. Hannon wants you to believe that that was the
4    company trying to push her out.  But actually the company was
5    trying to help her figure out how to navigate this difficult
6    situation, and no matter what they said, she thought they
7    were out to get her.
8              And then she blamed them for assuming that she
9    couldn't do her job, but it was her doctor who said, "She
10   cannot tolerate the job."  Again, PPD's hands were tied.
11   Nothing they did seemed to please Dr. Menninger.
12             When Dr. Menninger said that Mr. Mekerri was being
13   unfair to her, the company immediately jumped in with an
14   investigation, in May of 2018.  Mr. Hannon wants you to
15   believe that PPD's investigation of Dr. Menninger's complaint
16   of unfair treatment was a sham.  A sham investigation is a
17   legal term and you'll hear from Judge Sorokin, there's a
18   legal standard to be a sham.  This simply doesn't apply here.
19   No investigation is perfect.  Certainly hindsight is 2020.
20   We can all sit here now and we can look at ways that it could
21   have been better.  Sure.  That's how life works.  Us sitting
22   in a courtroom five years later can say these are all the
23   ways things could have been done better.  But you heard
24   testimony about how this investigation lasted for two weeks,
25   involved -- actually, more than two weeks, involved the input

1    of multiple witnesses, review of documents.  Human resources

2    met with Dr. Menninger three times, more than they met with

3    any other witness.  Dr. Menninger had an opportunity to

4    provide her side of what happened, any information about what

5    she thought witnesses knew.  HR followed up on that.

6            The past two weeks, we've spent a lot of time

7    looking at that investigation, pouring over the details.

8    Whether it was perfect isn't the question.  But was it a

9    sham?  It went on for multiple weeks, involved multiple

10   witnesses, and a lot of documents.  What Dr. Menninger didn't

11   like about it was the conclusion.  She didn't like that the

12   investigation found that Mr. Mekerri hadn't been unfair.

13   Again, she didn't like the conclusion, but that does not make

14   the investigation a sham.

15           Mr. Hannon also wants you to believe that PPD's

16   e-mail about a focus on the desire to keep the lab running,

17   to keep quality levels high, to keep the business accountable

18   to customers are somehow evidence of a scheme to remove

19   Dr. Menninger from her job.  In fact, the company was

20   terrified that Dr. Menninger would leave her job.  And as

21   you've heard from multiple witnesses, if Dr. Menninger left

22   her job, if Dr. Menninger wasn't available to license the

23   lab, they couldn't operate their business.  There are no

24   second chances.  They had tissue samples, blood samples,

25   patient blood samples in the lab that couldn't be tested if

Dr. Menninger didn't give the lab licensure.  That was
critical to the company.  They didn't want Dr. Menninger to
leave, but they needed a plan in case she did.  It would have
been imprudent of them not to have some type of plan once
they understood that Dr. Menninger might not be able to do
her job.

Most likely, each and every one of you, and all of
us in this courtroom have written e-mails five, six years
ago, that could be misinterpreted now by a room full of
strangers.  You can put e-mails up in different orders and
show you parts of one e-mail or another e-mail, and without
context, they might look terrible.  Sure.  That's
Mr. Hannon's job to make you think that some of the e-mails
in this case were designed with malicious intent toward
Dr. Menninger, but it's just not the truth.

You've seen that Dr. Menninger -- that
Dr. Menninger wasn't fired.  She wasn't disciplined.  In
fact, she went out on a medical leave that lasted for eight
months, and during that time, the company patched together
different people to cover the licensure of the lab.  They
didn't fire her.  They were hoping that she would come back.
So when they talked about an exit, when they talked about
what would happen if she left, that was important to them,
because her job wasn't easily replaceable.  They needed to
know what would happen and how to plan for that.  That's not

1    retaliation, that's not discrimination.  That's just good

2    business planning.  And you heard witnesses talk about how

3    they don't have a choice.  They always have to be in that

4    mode.  Because if they don't have a pathologist to run the

5    lab, they can't run a business.

6              Let's talk about what else was happening at this

7    same time.  We've heard Mr. Hannon himself was advising and

8    directing Dr. Menninger's psychiatrist through this whole

9    time period.  Dr. Menninger's psychiatrist and Mr. Hannon

10   actually started talking about Dr. Menninger taking a leave

11   weeks before she did.  This was all going on in the

12   background, being orchestrated to set PPD up for failure.

13   Dr. Menninger's psychiatrist herself said, and it's in the

14   notes that you have access to when you go back to the jury

15   room, that the timing of the leave actually would allow

16   Dr. Menninger to participate in an ultra marathon walk with

17   her friends.  Dr. Menninger's psychiatrist also sent

18   Mr. Hannon an e-mail saying that she, herself, regretted the

19   language that she had use in the accommodation letter.  Mr.

20   Hannon knew that, Dr. Menninger knew that, but PPD never knew

21   that.  No one ever sent a followup letter to PPD to say,

22   actually, forget it.  We don't need those accommodations.

23             And Dr. Kessimian never sent another letter saying

24   maybe you can try some other accommodations.  As Mr. Hannon

25   just said himself, the only accommodations that you can

1    consider are the ones that Dr. Kessimian herself recommended
2    in black and white, meaning hire a surrogate to do the key
3    parts of Dr. Menninger's job.  Mr. Hannon says now that Dr.
4    Kessimian's real request for accommodation was just minimize
5    the amount of public speaking.
6            But you've seen the documents.  You've seen so many
7    times in this courtroom, the letter from February 14th, that
8    Dr. Kessimian herself wrote, saying you need to have a
9    surrogate, someone else, do these key parts of
10   Dr. Menninger's job.
11           When Dr. Menninger went out on leave, PPD scrambled
12   to cover the management of the lab.  The leave started here.
13   They didn't actually hire someone new until here.  Months
14   after Dr. Menninger's medical leave ended.  They patched
15   together that coverage.  Does it make any sense that a
16   company that wanted to push her out of her job didn't hire
17   someone new for months after she went out on leave, and in
18   fact, months after her leave ended and she was on Social
19   Security benefits?  That doesn't make any sense.  Think
20   logically about that.  If the company wanted to push her out,
21   if the company had someone in the wings that they wanted to
22   put in place instead, they would have hired that person
23   before April of 2019.  It just doesn't make sense.
24           And again, Mr. Hannon can't point to any decision
25   to terminate or discipline Dr. Menninger.  It just didn't

1    happen.  I'm sure that during this trial, you are waiting for

2    that uh-huh moment of, oh, this is when she was disciplined.

3    This is when she was fired.  But it just never happened.  The

4    company continued to try to support Dr. Menninger.  It was

5    confusing.  They weren't sure if she could do her job or

6    couldn't do her job, what she wanted from them.  And they

7    tried their best.  In fact, they kept Dr. Menninger's job

8    open for her for eight months.  And only then, when she said

9    I'm not coming back, did they say, okay, now we have to hire

10   someone new.

11           In just a little bit, Judge Sorokin will give you a

12   list of questions that only you, members of the jury, can

13   consider.

14           You clear away all the noise, all the excitement,

15   and all the distractions that Mr. Hannon has worked so hard

16   to create, here is what you'll see through the evidence.

17           First, for Dr. Menninger's claim that PPD

18   wrongfully denied her accommodation request, based on the

19   statements of her own doctor, and the letters that that

20   doctor wrote to PPD, it was clear that Dr. Menninger could

21   not perform the essential functions of her job as an

22   executive in the company, starting in January of 2018, way

23   back here.  That's just black and white.  It's in Dr.

24   Kessimian's notes.  And not only that, but you heard

25   Dr. Menninger's husband's testimony that she couldn't get out

1    of bed starting in January of '18.  That is very sad.  No one

2    wants to hear that, but that's not anything that PPD did.

3            The accommodations that Dr. Menninger's doctor

4    asked for in writing, plain and simple, were not reasonable.

5    Just because a lawyer stands up in the courtroom and tells

6    you they were reasonable, and just because Dr. Menninger says

7    she really wanted those accommodations, that doesn't make

8    them reasonable.  The Judge will give you instructions about

9    what is a reasonable accommodation.  Dr. Menninger was an

10   executive at PPD.  She was the highest level person running a

11   lab, in fact, a global set of labs.  If she could not present

12   to people, could not talk to her colleagues, company

13   leadership, customers, she couldn't do the job.  An

14   accommodation that asked to excuse her from those

15   obligations, that's not reasonable.

16           PPD didn't have a legal obligation to hire a

17   surrogate to do major parts of Dr. Menninger's job in her

18   place.  The Judge's instructions will tell you exactly that

19   an accommodation is not reasonable if it requires shifting

20   any of the essential functions to another person.  Again,

21   shifting essential functions of a job to another person, that

22   is not something PPD had to do under the law.

23           The accommodations requested by Dr. Menninger's

24   doctor and rejected by PPD would have placed a burden on the

25   company that the law does not require.  PPD's lab business,

1    at its core, as we heard from everybody who testified,

2    including Dr. Menninger herself, relies on a doctor to

3    license the lab.  The job involves marketing to customers,

4    answering customer questions, presenting to company

5    leadership.  They cannot operate the lab if they don't have

6    an executive director of labs who can do those things.

7         The lab leader's visibility is critical to the

8    business.  With her requested accommodations, Dr. Menninger

9    was asking PPD to compromise its ability to run its business.

10   That is an undue burden under the law, as you will hear from

11   the Judge, and not something that PPD needed to do.

12        To be clear, this means that you can and should

13   find that PPD did not discriminate against Dr. Menninger by

14   not granting her the accommodations that she and her doctor

15   requested.

16        Second, for Dr. Menninger's claim that PPD took an

17   adverse action against her, based on her disability.  Asking

18   Dr. Menninger to do people-facing presentations and interact

19   with customers was not an adverse action.  The evidence is

20   clear that PPD told Dr. Menninger that she would need to do

21   this here (indicating) before she ever disclosed her

22   disability.  In addition, all the company ever did was ask

23   Dr. Menninger to do her executive level job.  She didn't feel

24   comfortable doing what she was being asked to do, but that's

25   all the company asked her to do.

1        In addition, we heard that the company was asking
2   all of its executive directors to do this at that time.  The
3   business was expanding, they were growing.  They were working
4   with more customers.  They needed their executives to be
5   boots on the ground with customers.  It wasn't just about
6   Dr. Menninger.  And again, they told her she was going to
7   need to do this here (indicating), before she disclosed a
8   disability to them.
9        There is simply no evidence that PPD somehow
10  targeted Dr. Menninger or treated her differently because she
11  disclosed a disability when they told her you need to be more
12  present, you need to be in the lab where you were hired to
13  work, and you need to be present with customers.
14       Mr. Hannon just tried to convince you that --
15  describing five buckets of job tasks was, itself, somehow
16  cold and icing out Dr. Menninger.  This doesn't make any
17  sense.  We've seen evidence that it was Dr. Menninger who
18  said, "Tell me more about what this job entails.  Tell me
19  more about how you need me to interact with people."  So the
20  company did that.  They gave her a list of things that she
21  needed to do that involved public-facing interactions and
22  social interactions, exactly as she asked, exactly as her
23  doctor said we need.  And once they did that, now, five years
24  later, Mr. Hannon is saying that was somehow icing out
25  Dr. Menninger.  It wasn't icing her out.  It was giving her

the information that she asked for.  Giving her that
information that she could take back to her doctor and talk
to her about.  In fact, if PPD hadn't done that, then
Dr. Menninger would have been saying that was wrong, too.
They just gave her the information that she asked for.

Asking Dr. Menninger to be accountable for the
lab's functioning and meet business goals was not an adverse
action.  You saw that Mr. Mekerri asked his other executive
directors to do exactly the same thing.  You even saw
e-mails.  The e-mails that Mr. Hannon showed you, they
weren't only directed to Dr. Menninger.  They were also
directed to the other executive directors.  Everyone needed
to make sure that they were stepping up their business
objectives, that they were doing what the customers needed.
It wasn't only Dr. Menninger.

And again, as you saw, no one made Dr. Menninger do
the things she said she couldn't do or her doctor couldn't
do.  They said these are the business directives; these are
the goals.  We need you as an executive to be held
accountable and hold your people accountable and help us meet
them.  There's nothing discriminatory about that.

The lab had increasing quality problems.  Customers
were complaining.  You heard this from three different PPD
witnesses, including witnesses who don't work for the company
anymore, have no vested interest in the outcome of this case.

1    They all told you, and the e-mails speak for themselves,

2    there were customer complaints.  No one fired Dr. Menninger.

3    No one disciplined Dr. Menninger.  No one told her it was all

4    her fault.  They just said, "You're an executive.  You have

5    to hold your people accountable, help us fix this."  That's

6    all the company did.  There's nothing wrong with that.  They

7    have to be able to run their business.  If they couldn't tell

8    Dr. Menninger, "We need you to work with us to help fix these

9    problems," they couldn't run their business.

10           And if the company had wanted to set up

11   Dr. Menninger for failure, why didn't they tell her she could

12   no longer live remotely?  Let's think about that imaginary

13   scenario for a minute.  If the company was trying to set up

14   Dr. Menninger to make it so that she couldn't function as she

15   disclosed her disability, and they felt that she wasn't

16   leading in the lab, that she wasn't there with her people,

17   why didn't Mr. Mekerri say, you know what, we're revoking

18   your remote work status, come back and live in Kentucky?

19   They never said that.  They just said you have to hold your

20   people accountable, you have to be accountable, help us fix

21   these problems.

22           You also heard no evidence to tell you that PPD's

23   reasons for asking Dr. Menninger to do these things wasn't

24   truthful.  You heard multiple witnesses sit here and talk

25   about how all of the executive directors were asked to do the

1    same thing.  And in fact, the current medical director today

2    is also asked to do those things.  You have no reason to

3    doubt that this is simply part of PPD's business model.

4           Next, for Dr. Menninger's claim of retaliation,

5    there is no evidence that PPD tried to somehow coerce

6    Dr. Menninger to quit her job.  Sure, Mr. Hannon has thrown a

7    lot of e-mails in front of you to make you think that's what

8    PPD was doing, but let's think about it for a minute.  The

9    company never disciplined her.  They didn't tell her she had

10   to move her family back from Massachusetts.  They didn't fire

11   her.  In fact, you heard multiple levels of management,

12   including people who don't work for the company anymore, talk

13   about how contrary to wanting her to leave, even the person

14   who sent that e-mail about what is the exit plan, he said in

15   that chair, Mr. Fikry, and he told you, that was just about

16   planning.  We need to know if the medical director isn't

17   going to be here, because we have to plan for that.  We

18   cannot run this business without a medical director.

19          And think about it logically.  Would they have

20   waited all this time to hire a new medical director if they

21   wanted to push her out?  If PPD was somehow trying to

22   retaliate against Dr. Menninger for telling them she had

23   disability, they should have been right on it.  Hiring

24   someone new immediately when she left and trying to offer her

25   a package then.  They didn't do that.  They let her stay out

1      on leave for eight months before they hired someone new.

2              And there's no evidence that the company excluded

3      Dr. Menninger from hiring and recruiting decisions.  Simply

4      never happened.  Dr. Menninger herself told you that in

5      November of 2017, way back here (indicating), she told her

6      boss that she was having trouble doing all her work.  That

7      was Dr. Menninger's own report.  She sat here and testified

8      about that.  We've seen the evidence that Mr. Mekerri was

9      trying to help her out by taking over the recruiting efforts.

10     And when PPD was ready to make offers, they included her, and

11     they asked for her input.

12             Also, let's take a step back and think about

13     whether this makes any sense.  Mr. Hannon is asking you to

14     find that Dr. Menninger should have been included in hiring

15     meetings and interviews, during the same time that her doctor

16     said it would harm her to have more interactions with

17     strangers.  If Mr. Mekerri had asked her to do that

18     interviewing, had asked her to do the recruiting, we would be

19     here with Dr. Menninger actually telling us that that was the

20     problem.  Again, whatever PPD did was never good enough for

21     Dr. Menninger.  She just wasn't happy.  None of their

22     decisions seemed to please her.

23             Finally, there's no evidence that PPD did a sham

24     investigation when Dr. Menninger complained about doctor --

25     Mr. Mekerri's treatment.  As I said earlier, was the

1    investigation perfect?  Of course not, but that's not the

2    legal standard.  This investigation was not a sham and it was

3    not retaliation.  Plain and simple.

4              Now let's talk about what Mr. Hannon is asking you

5    to do with damages and why it is simply wrong.  The events

6    you heard about in this case happen five years ago.

7    Dr. Menninger last actively worked at PPD five years ago.  A

8    lot of time has passed.  Many of the key players in this

9    case, other people who used to work for the company, they

10   don't work for the company anymore, either.

11             When Dr. Menninger last worked at PPD, COVID hadn't

12   happened, Putin hadn't invaded Ukraine, the world was a

13   different place.  But Mr. Hannon wants you to believe that

14   everything bad in Dr. Menninger's life, everything that has

15   happened in the last five years, it all rests on the

16   shoulders of PPD.  That doesn't make very much sense, does

17   it?  Mr. Hannon doesn't stop there.  Once he's done trying to

18   put PPD on the hook for all the bad things over the last five

19   years, he wants you to find that PPD is responsible for

20   paying Dr. Menninger's wages and benefits until 2036.

21             Think about that.  2036.  It's now 2023.  That

22   means Mr. Hannon is asking you to decide that even though

23   Dr. Menninger only worked for PPD for a few short years, PPD

24   should pay her wages until she would have retired, and that

25   that might not be until 2036.  Dr. Menninger turned 50 in the

1    last year that she worked for PPD, and Mr. Hannon wants you

2    to say that PPD should pay her wages until she would retire

3    at the age of 67.

4          Now, let's look at what we do know about

5    Dr. Menninger, and consider whether that makes any sense.

6    After her medical training, Dr. Menninger worked in the field

7    of pathology for a total of 12 years.  Dr. Menninger worked

8    as an executive director at PPD for less than three years.

9    Dr. Menninger is a licensed medical doctor.  She has

10   specialized training as a medical pathologist.  She went to

11   medical school and completed a residency program.  And,

12   despite what she claims and all of the sadness that she

13   reports in this case, she flew here from Oregon, where she

14   lives now.  She stayed in a hotel and she sat in this

15   courtroom for two weeks.  She spoke to all of you from the

16   witness stand, clearly and thoughtfully for the majority of

17   last week.  And she did so, even with streams of high school

18   students walking in and out of the room.

19         Is that somebody who can't work from now until

20   2036?

21         Mr. Hannon wants you to conclude that Dr. Menninger

22   cannot work at all during that time.  That doesn't seem

23   right.  Should PPD pay her until 2036?

24         Above all else, Mr. Hannon is asking you to

25   speculate.  In fact, the Judge will specifically instruct you

that you cannot speculate in awarding damages in this case.
It must be proven with reasonable certainty that those
damages are payable.  That did not happen here.
Dr. Menninger actively worked at her executive role for less
than three years.  She worked in her last job before PPD for
five years, and the job before that, for four years.  She's
never stayed in a job for more than a handful of years.  Yet,
Mr. Hannon wants you to award her pay for 18 years.

Well, that would be a nice story to tell, there's
simply no evidence to support such a speculative award.  He
has presented no evidence to show that if PPD had done
something different, Dr. Menninger could have continued at
PPD or in a similar job for 18 years.  In fact, the only
evidence we do have is that Dr. Menninger has only stayed in
each job for a handful of years.

Mr. Hannon also wants you to speculate that even
though, as Dr. Menninger's own husband testified, she could
barely get out of bed in January of 2018, she would have been
able to continue to work as an executive at PPD, directing a
lab in Kentucky, through three years of the COVID pandemic,
and for years to come.  We heard just the other day from the
current head of the lab business that the medical director
now goes to work, in person, in Highland Heights, Kentucky,
every day.  He actively leads and manages the lab staff,
meets with customers to present business proposals, and

answer medical and scientific questions, and presents to
company leadership.  These were all things that
Dr. Menninger's own doctor said she was not able to do.  And
that was in January of 2018, before even she claims PPD did
anything wrong.

And remember that even when Dr. Menninger was still
employed by PPD, she moved multiple times.  She doesn't live
in Massachusetts, anymore, she doesn't live in Kentucky, she
moved to New Mexico, and then she moved twice within Oregon.
Dr. Menninger is no longer in a position where we can believe
she would have been doing this job at PPD for years to come.

Next, Mr. Hannon wants you to speculate that,
despite Dr. Menninger's anxiety disorders, agoraphobia, and
panic attacks that are triggered just at the thought of
answering the door, picking up the phone, that she would have
remained in an in-person job in Highland Heights, Kentucky
through the business's continued expansion, and three years
of a global pandemic.  While lots of jobs allow people to
hunker down in their basements during a pandemic, this is not
one of them.  The current medical director was there in
person on a regular basis throughout the heart of COVID.  The
person in charge of the business testified that this was
actually critical, even when the pandemic raged.  Why?
Because the blood, tissue, and tumor samples of patients
don't wait, and they don't give second chances.

1            The evidence is clear that Dr. Menninger could not

2      work in Highland Heights, even in January of 2018, and

3      there's simply no question that this wouldn't have gone on

4      through the pandemic with Dr. Menninger able to go and work

5      in-person in the lab.

6            Mr. Hannon also wants you to speculate that

7      Dr. Menninger would have stayed on as executive director

8      through the departure of her former manager Hacene Mekerri,

9      who hasn't worked for the company for years, and PPD's

10     eventual sale to Thermo Fisher.  Can we really speculate

11     about whether she would have stayed in the job through those

12     changes?

13            We heard about the clear expectation that the

14     medical director of working person would have near constant

15     dialogue with senior leadership and customers, and we have

16     heard no evidence at all that Dr. Menninger could or would

17     have stayed employed through those changes.  Plain and

18     simple.

19            We even heard that the only salary increases for

20     medical directors have been modest, just a little bit to

21     account for cost of living adjustments.  But Mr. Hannon wants

22     you to believe that, in a hypothetical world, Dr. Menninger

23     would have a base salary completely out of whack with what

24     the current medical director was making --

25            THE COURT:  Ms. Mandel, five minutes.

1          MS. MANDEL:  Thank you.  You heard Dr. Menninger's

2     expert say that his calculations didn't even account for

3     whether PPD's business would be sold.  His calculations were

4     speculation that ended several years ago, before the most

5     recent changes.

6          We also heard the testimony of Dr. Menninger's

7     husband that both he and Dr. Menninger have stayed home with

8     their daughter, and that they have no plans to change that.

9     They both work to homeschool their daughter.  Yet, Mr. Hannon

10    wants to you speculate that if PPD had done something

11    different over a few brief months in 2018, somehow

12    Dr. Menninger would have stayed in an executive level job,

13    running a global set of labs.

14         Perhaps most importantly, Mr. Hannon is asking you

15    to assume that there is no comparable work that Dr. Menninger

16    can do, even now.  She testified that she has not explored

17    working as a clinical pathologist in a home-based role,

18    something that wouldn't require her to ever leave her

19    basement.  You heard no testimony about her attempts to do

20    that because she hasn't.

21         These are huge assumption and they don't make any

22    sense.  Dr. Menninger is trained as a clinical pathologist.

23    She worked, for a few short years, in industry, trying a job

24    that was not compatible with her needs, but that doesn't mean

25    she can't work as a pathologist between now and 2036.  And in

1    fact, she has made no efforts to try.

2              Mr. Hannon wants you to give Dr. Menninger money

3    for what she claims are her lost wages from 2018 to 2036.

4    Think about whether that makes any sense.  He also wants you

5    to give Dr. Menninger money for what she and her team have

6    decided her stock options and her equity might be worth

7    today.  In fact, you've heard almost no actual evidence about

8    this, just a couple of documents, but no witnesses have even

9    been able to say what that would have been worth.  In fact,

10   Dr. Menninger's own economic expert sat right there yesterday

11   and told you that he, himself, was told not to consider the

12   value of those options in writing his report.

13             I don't think you have enough information to say

14   what Dr. Menninger's equity would be worth today.  I know I

15   don't.

16             There is no question, Dr. Menninger has had a lot

17   of sadness in her life.  In her childhood, she, her mother,

18   and her sisters escaped an abusive father, they moved across

19   the country from Georgia to Wisconsin to get away from him.

20   Dr. Kessimian described this as trauma in Dr. Menninger's

21   life.  She has long struggled with anxiety and panic attacks.

22   They were severe before she ever worked at PPD.  She couldn't

23   even go to children's birthday parties without having a panic

24   attack.  And we heard that Dr. Menninger's daughter was

25   bullied and had a lot of emotional turmoil throughout her

1    childhood into adolescence.  This is all very sad.  This is

2    all reason that Dr. Menninger's life has been difficult, but

3    it's not on the shoulders of PPD.

4           Dr. Menninger's own therapist in Oregon has

5    described her as having paranoia about PPD and her work

6    there.  All of her therapists note that she focuses intently

7    on PPD and this case.  Her own husband talked about that in

8    his testimony.  That is difficult for Dr. Menninger.  There's

9    no question about it.  But that does not entitle her to money

10   from PPD now.

11          Even if PPD had some missteps here and didn't

12   always say the right thing, you heard from the company's

13   witnesses that they just wanted to help her.  This is the

14   same company that let Dr. Menninger move across the country

15   when that's what her daughter needed.  It's the same company

16   that let her stay out on medical leave for eight months.

17   They're not evil.  They're not malicious.  They didn't act

18   with indifference to her legal rights --

19          THE COURT:  One minute.

20          MS. MANDEL:  They didn't know what to do and they

21   did the best they could.

22          Why does this matter?  Because Dr. Menninger is

23   here, asking you to award her more money than most of us will

24   ever see in our lives.  You need to think about whether that

25   makes any sense, whether you've seen any evidence to support

1   that request, that claim.

2          Members of the jury, we submit to you that you

3   haven't seen that evidence.  We thank you for your service

4   and request that you return a verdict in PPD's favor.  Thank

5   you.

6          THE COURT:  Thank you, Ms. Mandel.  I remind you,

7   ladies and gentlemen, what the lawyers have to say can be

8   persuasive and helpful, but it's not evidence, and you decide

9   what the evidence is and what it shows.

10          So Mr. Hannon gets a brief rebuttal.

11          You have three minutes, Mr. Hannon.

12          MR. HANNON:  Three minutes.  Can I start when I get

13   my microphone on?

14          THE COURT:  Yes.

15          MR. HANNON:  Feel free to hit the buzzer when I hit

16   three.

17          THE COURT:  I'll tell you while he's getting ready,

18   so each side gets 45 minutes.  So it's a question of --

19   there's a limit.  Mr. Hannon can't say I'll do five minutes

20   and reserve 40 for rebuttal, when he needs to go first, it's

21   supposed to be a rebuttal, a response, so it depends on how

22   much time he spends on the first round, so that's why he gets

23   three.

24          Ready to go?

25          MR. HANNON:  Ready.

1          **REBUTTAL ARGUMENT BY COUNSEL FOR PLAINTIFF**

2          MR. HANNON:  So what was the light switch?

3   Remember the testimony from Dr. Martin yesterday?  What was

4   the light switch that put Dr. Menninger in this state?  It

5   wasn't her daughter getting bullied.  It wasn't the trauma

6   that she suffered as a child.  It wasn't her cat dying, as

7   you heard them question her husband about extensively.  It

8   wasn't President Putin invading Ukraine.  It was PPD.  It was

9   what they did in response to her after she took that risk;

10  after she exposed herself to them; after they rejected her,

11  after they humiliated her, after they subjected her to her

12  worst fears.  That was the light switch.  Don't take my word

13  for it.  Take their expert's word for it.

14          There's some allegation here that some of these

15  e-mails have not been presented to you fairly or somehow

16  these are being misinterpreted.  You'll have them back out

17  there.  I invite you to look at Joint Exhibit 167.  That's

18  going to be the draft e-mail that Mr. St. John sent to

19  Ms. Ballweg following the 2/28 meeting.  Joint Exhibit 186.

20  That's the one about delicately working Lisa out.  Joint

21  Exhibit 109.  This is going to answer the question about why

22  did they wait to officially hire Dr. Kashlan to replace her.

23  You're going to see Ms. Ballweg instructs Mr. St. John to try

24  before you buy.  Let's bring him on board in a smaller role,

25  see how you like him before we officially hire him and commit

1   to him.

2          Joint Exhibit 332, that's the exchange from

3   Dr. Fikry.  You heard Ms. Mandel characterize that.  She

4   characterized it as what is the exit plan.  That's not what

5   he asked.  He didn't ask what is the exit plan.  He asked

6   when is the exit.  It wasn't a matter of if she was going to

7   exit, it was a matter of when.

8          Joint Exhibit 194, that's critical in terms of

9   understanding what those buckets are that Mr. Mekerri came up

10  with.

11         Joint Exhibit 126.  You're going to see when they

12  were doing this criticism towards the end of her employment,

13  when they were changing these goals, they were telling her,

14  you're not meeting expectations.  You're failing.  The fact

15  that these errors are happening are your fault.  We're going

16  to hold you accountable and you'll see it there in that

17  document.

18         THE COURT:  Just over 30 seconds.

19         MR. HANNON:  Joint Exhibit 394, that's going to

20  answer the question regarding equity.  She made the reference

21  regarding the husband's testimony about January.  You recall

22  he clarified that.  It was early 2018, some time after a

23  meeting.  He told you he wasn't good with dates.

24         You've seen this for two weeks.  Right?  She has

25  seen this for five years.  Seeing what they've done over the

1    last two weeks, you've seen how they've lied, how they've

2    mischaracterized things, how they've trying to avoid

3    responsibility.  It's not speculation to give her damages.

4    It's not speculation to --

5              THE COURT:  Mr. Hannon.

6              MR. HANNON:  She's done her part and I ask you now

7    to do yours.

8              Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Hannon.

10             Same reminder, arguments of counsel can be

11   persuasive, but they're not evidence.

12                          **JURY INSTRUCTIONS**

13             THE COURT:  All right.  That brings us to the last

14   part, which are my instructions to you.

15             So you'll have, in the jury room a document --

16   first of all, you'll have a written copy of what I'm reading

17   to you, and when you'll go to the jury room, you'll have one

18   copy of what I'm reading to you, but you will be -- I will be

19   printing 11 additional copies of the instructions, and you'll

20   get them however fast the printer is, essentially.  So a few

21   minutes after, so you know that that's coming.  So then you

22   just have -- you each have your own copy and it makes it a

23   little easier.

24             So I want to turn to the principles of law that

25   govern the specific claims and defenses made in this case.

1           Dr. Menninger has presented three claims for your

2      decision.  First, she alleges she faced disability

3      discrimination because PPD, her employer, failed to provide

4      her with a reasonable accommodation.  Second, she alleges

5      that she faced disability discrimination because she

6      experienced disparate treatment based on an adverse

7      employment action PPD took against her.  And third, she

8      alleges PPD retaliated against her for requesting an

9      accommodation for a disability.

10          And I'll now explain the elements of each of these

11     claims one by one.

12          Claim 1 is the disability discrimination for

13     failure to reasonably accommodate.  Federal law and

14     Massachusetts law both require employers, upon request, to

15     provide reasonable accommodation to employees who are

16     disabled, unless the accommodation would impose an undue

17     hardship on the employer.  To succeed on her claim that

18     defendant engaged in disability discrimination by failing to

19     provide her with a reasonable accommodation, plaintiff need

20     not show that defendant had discriminatory intent, but she

21     must instead prove by a preponderance of the evidence all of

22     the following.

23          First, Dr. Menninger had a disability within the

24     meaning of anti-discrimination laws.

25          Second, Dr. Menninger was a quote/unquote,

qualified individual for the job, meaning that she both, one,
possessed the necessary skill, experience, education, and
other job related requirements for the position of executive
director for defendant's Global Central Labs, and two, could
have performed the essential functions of the executive
director position with or without reasonable accommodation.

Third, that Dr. Menninger made a request for an
accommodation that was sufficiently direct and specific so as
to put the employer on notice of the need for that
accommodation.

And fourth, the accommodation that Dr. Menninger
requested was, quote/unquote, reasonable, and PPD failed or
refused to provide the requested accommodation.

If Dr. Menninger proves all four of these elements
by a preponderance of the evidence, then PPD bears the burden
of proving, by a preponderance of the evidence, that the
accommodation Dr. Menninger proposed would have been an undue
hardship on PPD.

First, Dr. Menninger must prove that she had a
disability within the meaning of anti-discrimination laws.
Dr. Menninger suffered a disability if any of the following
are true:

One, she suffered from a physical or mental
impairment, that quote/unquote, substantially limited one or
more of her, quote/unquote, major life activities.

1          Two, she had a record of such impairment.

2          Or three, she was regarded by PPD as having a

3    physical or mental impairment.

4          A physical or mental impairment is any

5    psychological disorder or condition, cosmetic disfigurement,

6    or anatomical loss affecting one or more body systems, such

7    as neurological, musculoskeletal, special sense organs,

8    respiratory, including speech organs, cardiovascular,

9    reproductive, digestive, genitourinary, immune, circulatory,

10   hemic, lymphatic, skin, and endocrine.

11         Or two, any mental or psychological disorder such

12   as intellectual disability, formally termed -- formally

13   termed, quote/unquote, mental retardation, organic brain

14   syndrome, emotional or mental illness, and specific learning

15   disabilities.

16         The term major life activity includes, but is not

17   limited to:

18         Caring for one's self, performing manual tasks,

19   seeing, hearing, eating, sleeping, walking, standing,

20   sitting, reaching, lifting, bending, speaking, breathing,

21   learning, reading, concentrating, thinking, communicating,

22   interacting with others, and working.

23         And the operation of a major bodily function,

24   including functions of the immune system, special sense

25   organs and skin, normal cell growth, and digestive,

1    genitourinary, bowel, bladder, neurological brain,

2    respiratory, circulatory, cardiovascular, endocrine, hemic,

3    lymphatic, musculoskeletal, reproductive functions.  The

4    operation of a major bodily function includes the operation

5    of an individual organ within a body system.

6           The requirement that a disability substantially

7    limit a major life activity is not intended to be a demanding

8    standard and the phrase should be construed broadly in favor

9    of expansive coverage.  An impairment need not prevent or

10    significantly or severely restrict the individual from

11    performing a major life activity in order to be considered

12    substantially limiting.  Further, the determination of

13    whether an impairment substantially limits a major life

14    activity must be made without regard to the ameliorative

15    effects of mitigating measures.  An impairment that is

16    episodic or in remission is a disability if it would

17    substantially limit a major life activity when active.

18           The non-ameliorative effects of mitigating

19    measures, such as negative side effects of medication, or

20    burdens associated with following a particular treatment

21    regime may be considered when determining whether an

22    individual's impairment substantially limits a major life

23    activity.

24           In determining whether an individual has a

25    disability, the focus is on how major life activity is

1  substantially limited and not on what outcome an individual

2  can achieve.  For example, someone with a learning disability

3  my achieve a high level of academic success, but may

4  nevertheless be substantially limited in the major life

5  activity of learning because of the additional time or effort

6  he or she must spend to read, write, or learn compared to

7  most people in the general population.

8       An individual meets the standard for, "Regarded as

9  having" a physical or mental impairment, if the individual

10  establishes that she has been subjected to unlawful

11  discrimination because of an actual or perceived physical or

12  mental impairment, whether or not the impairment limits or is

13  perceived to limit a major life activity.

14       The second element Dr. Menninger must prove is that

15  she was a qualified individual for the job under the law.  As

16  stated above, in order to be a qualified individual,

17  Dr. Menninger must prove by a preponderance of the evidence

18  that she both, one, possessed the necessary skill,

19  experience, education, and other job-related requirements for

20  the position of executive director for defendant's global

21  labs.  And two, could have performed the, quote/unquote,

22  essential functions of the executive director position at the

23  time that PPD took the alleged adverse employment action

24  against her, with or without reasonable accommodation.  While

25  Dr. Menninger bears the burden to prove by a preponderance of

the evidence these two requirements to be considered a
qualified individual, PPD bears the burden to prove by a
preponderance of the evidence what the essential functions of
Dr. Menninger's position were.

If an employer has a concern about whether an
employee with a known disability can perform her job, the law
permits the employer to make inquiries about the employee's
ability to perform job-related functions.  Permissible
inquiries include asking for a medical certification from the
employee that the employee is able to perform essential job
functions with or without accommodation.  Additionally, if
the employer has a reasonable belief, based on objective
evidence, that a medical condition will impair an employee's
ability to perform the essential functions of her job, then
the employer may require the employee to submit to an
independent medical examination.  The law imposes no limits
on what information an employee can provide to an employer
regarding her disability, medical conditions, or ability to
perform job-related functions.

The term "essential functions" means the
fundamental job duties of the employment position the
individual with a disability holds or desires.  The
term "essential functions" does not include the marginal,
that is, nonessential functions of the position.  In
determining the essential functions of the plaintiff's job,

1    you may consider the plaintiff's job description, as well as

2    the nature of the employer's particular business.  You may

3    also consider, one, the employer's judgment as to which

4    functions of the job are essential; two, the amount of time

5    spent on the job performing the function in question; three,

6    the consequences of not requiring a person to perform the

7    function; four, the work experience of people who have held

8    the job; five, the current work experience of people in

9    similar jobs; six, whether the reason the position exists is

10   to perform the function; seven, whether there are a limited

11   number of employees available among -- available -- a limited

12   number of employees available for the performance of the

13   function that can be distributed; eight, whether the function

14   is highly specialized and the individual in the position was

15   hired for his or her expertise or ability to perform the

16   function.  No one factor is necessarily controlling.  You

17   should consider all of the evidence in deciding what

18   functions, if any, PPD has established, by a preponderance of

19   the evidence, were essential functions of Dr. Menninger's job

20   as executive director of PPD's Global Central Labs.

21          A reasonable accommodation is a modification or

22   adjustment to the work environment or to the manner in which

23   a job is performed.  A reasonable accommodation enables a

24   plaintiff to perform the essential functions of her job.  Or

25   a reasonable accommodation is something that alleviates the

1    added stress, difficulties, and other disadvantages that

2    arise from a disability, even when the employee can perform

3    the essential functions of the job without the reasonable

4    accommodation.  In all cases, a reasonable accommodation must

5    be feasible for the employer to provide under the

6    circumstances, at least on the face of things.

7            Please refer to the section coming up under

8    Element 4 for further explanation of what qualifies as a

9    reasonable accommodation.

10           The third element is -- regards sufficiently direct

11   or specific requests.  As to each accommodation she seeks to

12   prove was reasonable but denied to her, Dr. Menninger must

13   prove she made a request for that accommodation that was

14   sufficiently direct and specific so as to put the employer on

15   notice for the need of that accommodation.  Any

16   accommodations not sufficiently requested at the time of the

17   underlying events cannot be considered as possible reasonable

18   accommodations for purposes of this claim.

19           In other words, when you move on to the fourth

20   element below, you may only consider those accommodations you

21   believe were requested in a sufficiently direct and specific

22   way so as to put the employer on notice of the need for that

23   accommodation, and you may not consider any potentially

24   reasonable accommodations that Dr. Menninger did not

25   sufficiently request from PPD at the time of the underlying

1  events.

2          Fourth, or the fourth element, Dr. Menninger must

3  prove that the accommodation she requested was reasonable.

4  In evaluating this, you'll refer back to the definition I

5  read to you a moment ago under Element 2.  Dr. Menninger must

6  also prove -- as well as the factors I describe in a moment.

7  Dr. Menninger must also prove that PPD failed or refused to

8  provide the requested accommodation.

9          Depending on the circumstances, a reasonable

10  accommodation might include, among other things, one,

11  modifying or adjusting a job application process to enable a

12  qualified applicant with a disability to be considered for

13  the position; two, making the existing facilities used by

14  employees readily accessible to and usable by persons with

15  disabilities; three, job restructuring; four, a part-time or

16  modified work schedule; five, reassignment to a vacant

17  position; six, acquisition or modification of equipment or

18  devices; seven, the adjustment or modification of

19  examinations, training materials, or policies; eight,

20  modifying when and how an essential job function is

21  performed; nine, altering, reassigning, or eliminating

22  nonessential job functions; or ten, the provision of

23  qualified readers or interpreters.  Whether something is a

24  reasonable accommodation is a determines you make based upon

25  your consideration of all the surrounding circumstances.

1          An accommodation is not reasonable if it requires
2     eliminating or excusing an inability to perform any essential
3     functions of the job, if it requires shifting any of the
4     essential functions of the job to other employees, if it
5     requires creating a new position for the disabled employee,
6     or if it creates an undue hardship for the employer.

7          Finally, as to any requested accommodation you find
8     to be reasonable, you must determine whether PPD failed to
9     provide that accommodation to Dr. Menninger.

10         Undue hardship.  If you find Dr. Menninger has
11    proven by a preponderance of the evidence all four elements
12    of this claim, you must consider whether the reasonable
13    accommodations that you found PPD failed to provide imposed
14    an undue hardship on PPD.  On this question, PPD bears the
15    burden to prove that all of the accommodations that you found
16    were both reasonable and not provided by PPD imposed an undue
17    hardship.

18         An accommodation imposes an undue hardship if it
19    would create significant difficulty or expense for PPD,
20    considering the nature and cost of the accommodation, the
21    overall financial resources of PPD, the effect of the
22    accommodation on expenses and resources, and the impact of
23    the accommodation on the operations of PPD.  This last
24    consideration, the impact of the accommodations on PPD's
25    operations includes the accommodation's impact on the ability

1     of other employees to perform their duties, and the impact

2     that the accommodation has on PPD's ability to conduct its

3     business.

4             If you find that there was at least one reasonable

5     accommodation, that satisfied all of the elements above, but

6     that did not impose an undue hardship on PPD, then that

7     reasonable accommodation can support liability on this claim,

8     even if other reasonable accommodations would impose an undue

9     hardship.  In other words, for PPD to win this claim based on

10    undue hardship, they must show that all, not just one, of the

11    reasonable accommodations sufficiently requested by and

12    denied to Dr. Menninger would have imposed an undue hardship.

13            Now I'm going to give you a summary of some of

14    the -- of the questions that you'll need to think about in

15    order to resolve the first claim, which is the discrimination

16    based on failure to reasonably accommodate.

17            One, did Dr. Menninger prove by a preponderance of

18    the evidence that she had a disability within the meaning of

19    anti-discrimination laws?

20            Two, did Dr. Menninger prove by a preponderance of

21    the evidence she possessed the necessary skill, education,

22    experience, and other job-related requirements for the

23    position of executive director of defendant's Global Central

24    Labs?

25            Three, did Dr. Menninger prove, by a preponderance

of the evidence, she could have performed the essential

functions of the executive director position with or without

reasonable accommodation?  PPD bears the burden to prove by a

preponderance of the evidence which functions of the

executive director position were essential.

Four, did Dr. Menninger prove, by a preponderance

of the evidence, she made a request for accommodation that

was sufficiently direct and specific so as to put PPD on

notice of the need for that accommodation?

Five, did Dr. Menninger prove by preponderance of

the evidence that one or more of the accommodations you found

that she sufficiently requested was reasonable?

Six, did Dr. Menninger prove by a preponderance of

the evidence that PPD failed to provide at least one

accommodation that you found to be both reasonable and

sufficiently requested?

If you answer to -- if your answer to one or more

of Questions 1 to 6 above is "no," then you must answer "no"

to Question 1 on the verdict form.

And Question 1 is your resolution of this claim.

If your answer to all of Questions 1 to 6 above is

"yes," then you must answer "yes" to Question 1 on the

verdict form, unless you find that for all of the

accommodations you found to be reasonable, sufficiently

requested, and denied to Dr. Menninger by PPD, that PPD has

proven, by a preponderance of the evidence, that all of these accommodations would have imposed an undue hardship on PPD, in which case you answer "no" to Question 1.

Claim 2.  Dr. Menninger also accuses PPD of discriminating against her based on her disability by taking adverse employment action against her.  To succeed on this claim, Dr. Menninger must prove by a preponderance of the evidence all of the following:

First, Dr. Menninger had a disability within the meaning of anti-discrimination laws.

Second, she was a qualified individual for the job, meaning that she both possessed the necessary skill, experience, education, and other job-related requirements for the position of executive director of defendant's Global Central Labs, and could have performed the essential functions of the executive director position at the time that PPD took the alleged adverse employment action against her, with or without reasonable accommodation.

Third, that PPD had knowledge of Dr. Menninger's alleged anxiety disorder at the time it took the alleged adverse employment action against her.

And fourth, that PPD took an adverse employment action against Dr. Menninger and that PPD did so in whole or part because of her disability.

First, Dr. Menninger must prove she had a

disability within the meaning of the anti-discrimination
laws.  Here you refer back to the definition I already gave
to you on the first claim.

Element 2, which is qualified individual, you refer
back to the definition of qualified individual provided under
Claim 1, Element 2.  The same definition here.

Knowledge, which is the third element,
Dr. Menninger must prove, by a preponderance of the evidence,
that PPD had knowledge of Dr. Menninger's alleged anxiety
disorder at the time it took the alleged adverse employment
action against her.

Element 4, adverse employment action and causation.
Fourth, Dr. Menninger must prove by a preponderance of the
evidence that PPD took an adverse employment action against
Dr. Menninger and that PPD did so, in whole or in part,
because of her disability.  Dr. Menninger alleges that PPD's
creation of new goals and expectations for her role as
executive director was an adverse employment action taken
because of her disability.

To determine whether Mr. Mekerri has proven this
element, you must first decide whether PPD took an adverse
employment action against her.  A trivial harm is
insufficient.  The fact that an employee is unhappy with
something that his or her employer did or failed to do is not
enough to make that act or omission an adverse employment

action.  Likewise, subjective feelings of disappointment or disillusionment concerning an employment action do not constitute an adverse action.  Rather, an employer takes materially adverse action against an employee typically when it, one, takes something of consequence away from the employee; for example, by discharging or demoting the employee, reducing his or her salary, or taking away significant responsibilities.  Or two, fails to give the employee something that is a customary benefit of the employment relationship; for example, by failing to follow a customary practice of considering the employee for a promotion after a particular period of service.

For an employment action to be adverse, it must have materially changed the conditions of Dr. Menninger's employment, which means that it must be more disruptive than a mere inconvenience, or an alteration of job responsibilities.  However, assignment of more difficult job responsibilities, disadvantageous assignments, unwarranted negative job evaluations, or toleration of harassment by other employees could qualify as adverse actions.  Likewise, an employee may meet this standard by showing that her employer intentionally assigned new job duties to target her known disability, such as by selecting tasks that would be more difficult due to the disability.

Whether an action is materially adverse should be

1    judged from the perspective of a reasonable person in

2    Dr. Menninger's position, considering all of the

3    circumstances and the context in which the events took place.

4    For example, a schedule change in an employee's work schedule

5    may make little difference to many workers, but may matter

6    enormously to a young parent with school-aged children.

7         If you find that PPD took an adverse employment

8    action against Dr. Menninger, you must next determine whether

9    Dr. Menninger's disability was a cause of the adverse action.

10   The definition of "cause" here differs under federal and

11   state law.  You will have to determine separately whether she

12   has met her burden under federal and state law.

13        For this claim, under federal law, you must decide

14   whether Dr. Menninger's disability was a but-for cause for

15   the adverse action you found.  To prove that her disability

16   was a but-for cause, Dr. Menninger does not have to prove

17   that disability was the only reason for the adverse action.

18   It is enough if Dr. Menninger proves by a preponderance of

19   the evidence that if not for her disability, the adverse

20   actions would not have occurred.

21        Under Massachusetts law, you must decide whether

22   Dr. Menninger's disability was a determinative cause of the

23   adverse action.  Dr. Menninger's disability was a

24   determinative cause if it contributed significantly to the

25   adverse actions; that is, that it was a material and

1    important reason for the adverse action.  To prove that

2    disability was a determinative cause, Dr. Menninger need not

3    prove that disability was the only reason for the adverse

4    action.

5         Under both federal and state law, you are permitted

6    to consider the timing and sequence of events when assessing

7    causation.  For example, if adverse action is taken against a

8    satisfactorily performing employee in the immediate aftermath

9    of the employer's becoming aware of the employee's disability

10   or protected activity, where adverse actions follow closely

11   on the heels of protected activity, or where there's an

12   evidence of a pattern of discriminatory or retaliatory

13   conduct that began soon after the protected activity, and

14   only culminated later in actual adverse action, you may

15   consider the timing and sequence of those events in your

16   analysis of whether Dr. Menninger has proven causation under

17   either the federal or the Massachusetts causation standard.

18        Under both federal and state law, you may consider

19   any legitimate, nondiscriminatory reason or explanation

20   stated by PPD for any employment decision that you determine

21   was an adverse action.  You may assess whether the reasons

22   stated were a pretext for discrimination or retaliation; that

23   is, whether it was the true reason for the decision.  Not all

24   pretexts are necessarily designed or intended to conceal

25   discrimination or retaliation, though that may be the purpose

1    the of a pretext.  Regarding pretext, your focus is on PPD's

2    state of mind, not on whether PPD's reason was, in your view,

3    a good, foolish, or unprofessional business decision.

4            Remember that Dr. Menninger bears the burden to

5    prove by a preponderance of the evidence that disability

6    discrimination or retaliation was under federal law the

7    but-for cause of the adverse action, and under Massachusetts

8    law the determinative cause of the adverse action.  Neither

9    law requires her to prove that disability discrimination or

10   retaliation was the only cause, though she must prove that it

11   was the but-for cause under federal law or determinative

12   cause under Massachusetts law.

13           And the reason here I refer to discrimination and

14   retaliation is because you use the same causation instruction

15   not only for this discrimination claim, but for the

16   retaliation claim that I'm going to talk to you about in a

17   minute.  So that's why, even though it might seem a little

18   confusing at first.

19           So a summary of the questions for Claim 2 are the

20   following of what Dr. Menninger must prove:

21           One, did Dr. Menninger prove by a preponderance of

22   the evidence she had a disability within the meaning of the

23   anti-discrimination laws?

24           Two, did Dr. Menninger prove by preponderance of

25   the evidence that she possessed the necessary skill,

experience, education, and other job-related requirements for
the position of executive director for defendant's Global
Central Labs?

Three, did Dr. Menninger prove by a preponderance
of the evidence that she could have performed the essential
functions of the executive director position, with or without
reasonable accommodation?

Here, PPD bears the burden to prove by a
preponderance of the evidence which functions of the
executive director position were essential.

Four, did Dr. Menninger prove by preponderance of
the evidence that PPD had knowledge of Dr. Menninger's
alleged anxiety disorder at the time it took the alleged
adverse employment action against her?

Five, did Dr. Menninger prove by a preponderance of
the evidence that PPD took an adverse employment action
against Dr. Menninger?

Six, causation.  Under the federal law, did
Dr. Menninger prove by a preponderance of the evidence that
her disability was a but-for cause of the adverse employment
action, and by Massachusetts law, did she prove by a
preponderance of the evidence that her disability was a
determinative cause of the adverse employment action?

If your answers to any one or more of Questions 1
to 5 and 6(a), that's the federal causation question, was

1    "no," then you must answer "no" to Question 2A on the verdict

2    form.  2A is your verdict on the federal claim, Claim 2.  If

3    your answer to question -- and if your answers to Question 1

4    to 5 and 6(a) were all "yes," then you must answer "yes" to

5    Question 2A on the verdict form.

6         Similarly, for 2B on the verdict form, which is the

7    Massachusetts claim, if any one of more of your answers to

8    these Questions 1 to 5 and 6(b) were "no," then you must

9    answer "no" to Question 2B.  But if your answers to questions

10   1 to 5 and 6(b) were all "yes," then you must answer "yes" to

11   Question 2B.

12        So for the second claim, there's two questions on

13   the verdict form, one for federal law and one for

14   Massachusetts law.

15        Retaliation, the third claim.  Dr. Menninger's

16   third claim is that PPD retaliated against her for requesting

17   an accommodation for a disability.  A claim for retaliation

18   is separate and distinct from a claim for discrimination.

19   Accordingly, Dr. Menninger does not need to succeed under a

20   discrimination claim in order to prove retaliation.  In order

21   to recover for retaliation, Dr. Menninger must prove all of

22   the following by a preponderance of the evidence:

23        First, that she engaged in conduct that is

24   protected under the anti-discrimination laws; second, that

25   she suffered a materially adverse action; and third, that

there was a causal connection between the materially adverse
action and Dr. Menninger's protected conduct.

Dr. Menninger must first prove she engaged in
conduct that is protected under the law.  An employee's
request for accommodation constitutes protected conduct as a
matter of law.  This is true even if the employee does not
meet the statutory definition of disability, or is otherwise
not entitled to any accommodation, so long as the employee
makes the request in good faith.

Element 2.  Second, Dr. Menninger must prove she
suffered a materially adverse action.  For the purposes of
this retaliation claim, Dr. Menninger alleges that the
adverse action was comprised of one or more of the following
alleged actions:

One, PPD tried to coerce her to quit; two, PPD
tried to manufacture grounds for her termination; three, PPD
refused to clarify the anticipated changes to her role; four,
PPD established unrealistic expectations and goals for her
role; five, PPD diminished her involvement in hiring and
recruiting decisions which she alleges was a core component
of her role; and six, PPD conducted a sham investigation into
her complaints of mistreatment.

For this element, you must determine whether
plaintiff has met her burden to prove by a preponderance of
the evidence both that, (a), one or more of these alleged

1    acts occurred, and (b), if so, whether the proven acts

2    amounted to an adverse action, either individually or

3    collectively.

4            With respect to showing an adverse action,

5    Dr. Menninger's burden under her retaliation claim is

6    different than under her claim for discrimination.  To be

7    actionable as retaliation, an adverse action does not need

8    to, quote, relate to the terms and conditions of employment,

9    quote.  Instead, Dr. Menninger need only prove that a

10   reasonable employee would have found the challenged action

11   materially adverse, which, in this context means it well

12   might have dissuaded a reasonable worker from engaging in

13   protected conduct.  Material adversity is judged from the

14   standpoint of a reasonable person in the employee's position,

15   meaning a person with all of the same conditions as

16   Dr. Menninger and in light of all the relevant circumstances.

17           In determining whether PPD subjected Dr. Menninger

18   to a materially adverse action, you should consider all of

19   the relevant evidence; that is, you should consider whether

20   PPD's cumulative actions in response to her protected request

21   for accommodation might well have dissuaded a reasonable

22   person with her disabilities from requesting an

23   accommodation.

24           Causation.  Third, if you find that Dr. Menninger

25   engaged in protected conduct and suffered a materially

adverse action, you must determine whether Dr. Menninger

proved that protected conduct caused one or more of the

actions that you found to be materially adverse.

Please refer to the explanation of causation

provided under Claim 2, Element 4, including the explanation

of the differing legal standards under federal and

Massachusetts law.  That same definition applies here; except

that, instead of consideration whether her disability was a

but-for and/or determinative clause as you did under Claim 2

above, here you must consider whether Dr. Menninger proved by

a preponderance of the evidence that her alleged protected

conduct was the but-for and/or determinative cause of any

materially adverse actions that you found under this

retaliation claim.

Here is a summary of the questions for the

retaliation claim:

One, did Dr. Menninger prove by a preponderance of

the evidence that she engaged in conduct that is protected

under anti-discrimination law?

Two, did she prove by a preponderance of the

evidence that she suffered a materially adverse action?

And three, causation under federal law, did she

prove by preponderance of the evidence that her protected

conduct was a but-for cause of at least one materially

adverse action; or under Massachusetts law, did she prove by

1    a preponderance of the evidence that the protected conduct

2    was a determinative cause of at least one adverse action.

3              If your answers to any one or more of these

4    Questions 1, 2, and 3(a) was "no," then you must answer "no"

5    to Question 3A on the verdict form.

6              Just as Claim 2 and Claim 3, there's two questions

7    on your verdict form, one for federal claim, and one for the

8    state law claim.

9              If your answers to Questions 1, 2, and 3(a) were

10   all "yes," then you answer "yes" to Question 3A, which is the

11   federal law question.

12             Similarly, for Question 3B, if your answers to

13   Questions 1, 2, and 3(b), any one of them were "no," then you

14   answer "no" to Question 3B.  And if your answers to 1, 2, and

15   3(b) were all "yes," then you answer "yes" to 3B on the

16   verdict form.

17             That brings me to damages.  We're at 11:22.  I'm

18   done with most of the instructions, but there's a bit more to

19   go.  If you're game, I'll keep going and we'll just finish,

20   and then we'll be done.

21             Does that sound fine?

22             THE JURORS:  (Indicating affirmatively.)

23             THE COURT:  Good.  Okay.  Great.

24             Damages.  If you find that PPD discriminated

25   against Dr. Menninger based on her disability or retaliated

against her for engaging in protected activities, then you must determine whether it has caused Dr. Menninger damages, and if so, you must determine the amount of those damages. In addition to proving her claims, except where I instruct you otherwise, she bears the burden to prove her damages by a preponderance of the evidence.

Uncertainty in the amount of damages does not bar recovery, and mathematical precision is not required. However, you must not speculate, conjecture, or guess in awarding damages. The award is acceptable, as long as it is based on just and reasonable inferences from the evidence. You will reach the damages issue only if you find that PPD is liable to Dr. Menninger for discrimination or retaliation or both.

The fact that I am instructing you on damages does not mean that I am attempting in any way to suggest to you what your verdict should be. Any suggestion from any of the lawyers in this case during opening or closing statements as to the value of this case or the amount of damages you should award is not evidence, and is not binding upon you in any way. If you award damages, you should do so in accordance with my instructions and based on your determination of an appropriate damage award.

The categories of damages that you may consider awarding to Dr. Menninger, if you find that PPD is liable to

1   Dr. Menninger, are as follows:

2          One, back pay; two, front pay; three, emotional

3   distress; and four, punitive damages.

4          I will now instruct you as to each of these

5   categories.

6          Back pay.  If you determine that PPD discriminated

7   against Dr. Menninger based on a disability, or retaliated

8   against her for requesting an accommodation of a disability,

9   then Dr. Menninger may be entitled to recover back pay, which

10   is the amount of the lost salary, bonuses, equity, the value

11   of employment benefits and health insurance benefits that

12   Dr. Menninger would have received, but for PPD's

13   discriminatory or retaliatory conduct, from the date of the

14   adverse employment decision or the failure to provide a

15   reasonable accommodation until today.

16          The plaintiff has a duty to limit or,

17   quote/unquote, mitigate her damages by seeking other

18   comparable employment.  A comparable job is one that offers

19   similar compensation, long-term benefits, opportunities for

20   promotion, job responsibilities, working conditions, and

21   status.  However, if you find that Dr. Menninger was unable

22   to mitigate her damages because PPD's discriminatory and/or

23   retaliatory conduct caused her to be unable to perform

24   comparable work, then so long as you find that to be the

25   case, Dr. Menninger does not have a mitigation duty, and you

1    should not reduce her recovery for that period of time.

2         If and only if you find that some at point in time

3    Dr. Menninger was able to perform comparable work, then it is

4    still PPD's burden to prove to you that Dr. Menninger failed

5    in her duty to mitigate damages by seeking other comparable

6    employment.  PPD meets this burden only if it is proven to

7    you that:

8         One, one or more discoverable opportunities for

9    comparable employment were available in a location at least

10   as convenient as the place of former employment; two,

11   Dr. Menninger unreasonably made no attempt to apply for any

12   such job; and three, it was reasonably likely that

13   Dr. Menninger would have obtained one of those comparable

14   jobs.

15        The duty of mitigation does not require plaintiff

16   to go into another line of work, accept a demotion, or take a

17   demeaning position.  If PPD has proven the three elements of

18   mitigation that I have just read to you, then you should

19   reduce any back pay awards to Dr. Menninger by the amount

20   that PPD has proven that she could've earned in wages and

21   benefits at the comparable job.

22        Please write the amount of back pay, if any, that

23   you award to Dr. Menninger on Question 4A of the verdict

24   form.

25        Front pay.  If you determine that PPD discriminated

1    against Dr. Menninger based on a disability or retaliated

2    against her for requesting accommodation of a disability,

3    then you must also calculate separately, as future damages, a

4    monetary amount equal to the present value of the wages and

5    benefits that Dr. Menninger reasonably would have earned in

6    the future in her employment with PPD, but for PPD's

7    discrimination and/or retaliation against Dr. Menninger,

8    minus the amount of wages and benefits that Dr. Menninger may

9    reasonably be expected to earn in the future via other

10   comparable employment.

11            You cannot speculate in awarding front pay.

12   Rather, the determination of the amount of the award, if any,

13   must be proven with reasonable certainty.  In determining

14   front pay, you should consider and weigh the following

15   factors:

16            One, the availability of other comparable

17   employment opportunities; two, Dr. Menninger's probable date

18   of retirement or date of future employment; three, the amount

19   of earnings, including salary and benefits, that

20   Dr. Menninger probably would have received between now and

21   her projected retirement date or date of future comparable

22   employment; and four, the possibility of inflation and wage

23   increases in the future.

24            If you award damage to Dr. Menninger for losses she

25   will suffer in the future, keep in mind that the plaintiff

1   cannot be awarded damages that overcompensate the losses that

2   she suffered because of the defendant's conduct.  In order to

3   avoid overpaying Dr. Menninger, you must consider that the

4   amount of money you give her today for future losses can be

5   put in the bank, where it can earn interest.  So in making an

6   award for future damages, you must determine the amount of

7   money, that, if invested today at a reasonable rate of

8   interest, would in the future provide Dr. Menninger with the

9   amount of money that you calculated she will lose in the

10  future as a result of PPD's conduct.

11          Please write the amount of front pay, if any, that

12  you award to Dr. Menninger on Question 4B of the verdict

13  form.

14          You have -- collateral sources.  You have heard

15  testimony that Dr. Menninger received compensation from

16  sources such as short- or long-term disability insurance,

17  Social Security Disability benefits, and unemployment

18  insurance.  These are considered, quote/unquote, collateral

19  source payments under a principle called the collateral

20  source rule.  Ordinarily, under that rule, you do not deduct

21  these collateral source payments from the amount of front or

22  back pay that you decide to award to the plaintiff, unless

23  you find that there are countervailing circumstances that

24  would make it unjust to apply the collateral source rule.

25  The mere fact that the plaintiff may receive a double

recovery is not alone enough to justify a deduct in the
collateral source payments from the front or back pay award.

Emotional distress damages.  Third, if you find
that Dr. Menninger has been discriminated against, retaliated
against, or both, you may also award her reasonable damages
for her physical and emotional distress.  Physical and
emotional distress includes pain, discomfort, indignity,
depression, fear, anxiety, or humiliation, suffered as a
result of the discrimination, retaliation, or both.  Although
uncertainty in the amount of damages does not bar discovery
and mathematical precision is not required, you must not
speculate, conjecture, or guess in awarding damages.

To recover for physical and emotional distress,
Dr. Menninger may, but is not required to, present evidence
of physical injury or physical manifestation of her distress,
nor is she required to show that she sought psychiatric
consultation.  That said, an award of emotional distress
damages must rest on substantial evidence, and its factual
basis must be made clear on the record.  Some factor that is
you should consider include, but are not limited to:

One, the nature and character of the alleged harm;

Two, the severity of the harm;

Three, the length of time that Dr. Menninger has
suffered and reasonably expects to suffer;

And four, whether Dr. Menninger has attempted to

1    mitigate the harm, for example, by counseling or by taking

2    medication.

3           In addition, Dr. Menninger must show a sufficient

4    causal connection between PPD's unlawful acts and her

5    emotional distress.  Dr. Menninger is not entitled to

6    compensation for any emotional distress or related symptoms

7    which preexisted PPD's actions.  She is entitled to full

8    compensation for the full emotional distress that you find

9    that PPD caused her, even if it is greater than what a

10    reasonable person in her position would suffer, including

11    exacerbation of preexisting symptoms.

12           In other words, she is entitled to full

13    compensation for the increase in her anxiety, depression, or

14    other distress that is caused by PPD's unlawful actions, even

15    if you determine that an average person in her situation

16    would not have experienced the same level of emotional

17    stress.  However, she is not entitled to compensation for

18    emotional distress that arises from causes other than PPD's

19    actions.

20           You may award Dr. Menninger damages for her

21    emotional distress, even if you do not award back pay or

22    front pay.

23           For emotional stress damages you award, if any, you

24    will need to determine which portion arose up to and

25    including today and which portion, if any, she is likely to

suffer in the future.  Please write the amount of emotional

distress damages, if any, that you award to Dr. Menninger for

emotional stress she suffered up to today because of PPD's

discrimination and/or retaliation on Question 4C of the

verdict form.

Please write the amount of emotional distress

damages, if any, that you award to Dr. Menninger for

emotional distress that she is reasonably likely to suffer in

the future because of PPD's discrimination and/or retaliation

on Question 4D of the verdict form.

Punitive damages.  Lastly, if you find that PPD has

intentionally discriminated or retaliated against Dr.

Menninger, or both, you may consider whether punitive damages

are warranted.  Punitive damages are different from

compensatory damages.  Unlike compensatory damages, which

compensate the victim for the harm she has suffered, the

purpose of punitive damages is to punish the defendant for

conduct that is outrageous, because of the defendant's evil

motive or reckless indifference to the rights of others.

To find that punitive damages should be awarded,

you must find that more than intentional discrimination or

retaliation occurred.  Punitive damages may be awarded only

where the defendant's conduct is outrageous or egregious.

Punitive damages may be awarded only when

Dr. Menninger has proven by a preponderance of the evidence

that, one, the individual who engaged in the discriminatory

act or practice was acting in a managerial capacity; two, he

or she engaged in the discriminatory act or practice while

acting in the scope of his or her employment; and three, that

his or her conduct was not only intentional, but also was

outrageous or egregious, or that he or she acted with malice

or with reckless indifference to the rights of the disabled.

If Dr. Menninger has proved these facts, then you

may award punitive damages, unless PPD proves by a

preponderance of the evidence that the conduct or action by

the managerial employee was contrary to its good-faith

efforts to prevent discrimination in the workplace.  In

determining whether an employee of PPD was a supervisor or

manager for PPD, you should consider the type of authority

that he or she had over Dr. Menninger, and the type of

authority for employment decisions PPD authorized him or her

to make.

In determining the amount of a punitive damage

award, if any, you should also consider:

One, the egregious or outrageous character or

nature of PPD's conduct; PPD's wealth in order to determine

what amount of money is needed to punish PPD's conduct, and

to deter any future acts of discriminates or retaliation;

three, the actual harm suffered by Dr. Menninger; four, the

magnitude of any potential harm to other victims if similar

1    future behavior is not deterred; five, whether there was a

2    conscious or purposeful effort to demean or diminish the

3    class of which Dr. Menninger is a part, or if there was a

4    conscious or purposeful effort to demean or diminish

5    Dr. Menninger because she was a member of that class; six,

6    whether PPD was aware that the discriminatory or retaliatory

7    conduct would likely cause serious harm or recklessly

8    disregarded the likelihood that serious harm would arise;

9    seven, PPD's conduct after learning that the initial conduct

10   would likely cause harm; and eight, the duration of the

11   wrongful conduct and any concealment of that conduct by PPD.

12          If you do award punitive damages, you should fix

13   the amount by using calm discretion and sound reason.  Keep

14   in mind that you're not required to award punitive damages.

15   The amount of the award must not reflect bias, prejudice, or

16   sympathy toward any party, but the amount can be as large as

17   you believe necessary to fulfill the purpose of punitive

18   damages.

19          If you find punitive damages are warranted against

20   PPD, please answer yes to Question 4E on the verdict form,

21   and then write the amount of punitive damages you award to

22   Dr. Menninger in Question 4F.  If you find that punitive

23   damages are not warranted against PPD, please answer no to

24   Question 4E on the verdict form, and skip Question 4F.

25          So lastly, with respect to your deliberations, it's

1    almost time for you to begin those deliberations.

2              Here are a few words about that.

3              Each of you brings to your jury service your life

4    experiences and knowledge.  This serves only as a background

5    for your common sense and judgment.  In rendering your

6    verdict, you must consider only and decide the case solely

7    upon the evidence you heard in court in light of my

8    instructions.  Each of you must decide the case for yourself,

9    but you should do so only after considering all of the

10   evidence and listening to the views of your fellow jurors.

11   Do not be afraid to change your opinion if you think that you

12   are wrong after hearing the opinions of your fellow jurors,

13   but do not come to a decision simply because other jurors

14   insist that it is right, and do not surrender an honest

15   belief about the weight and effect of the evidence simply in

16   order to reach a verdict.

17             The case has taken a great deal of time and effort

18   to prepare and to try.  There is no reason to think that it

19   could have been better tried, or that another jury would be

20   better qualified than you are to decide it.  It is important,

21   therefore, that you reach a verdict if you can do so

22   conscientiously.  Your verdict must be unanimous as to each

23   of the special questions on the verdict form that I am going

24   to ask you to answer.  Your answers will be recorded on the

25   verdict slip by your foreperson.  The fact that one of you is

1    the foreperson does not give that person special status in

2    your deliberations.  You are all equal.

3           Your first order of business will be to select a

4    foreperson.  The foreperson will have the same voice and the

5    same vote as the other deliberating jurors.  The foreperson

6    will act as the moderator of the discussion and will serve as

7    the jury's spokesperson.  The foreperson's most important

8    obligation is to ensure that any juror who wishes to be heard

9    on any material issue has a full and fair opportunity to be

10   heard by his or her fellow jurors.  When the jury has reached

11   a verdict, the foreperson will fill in the appropriate

12   answers, sign and date the verdict slip, and inform the court

13   officer that the jury is read to return to the courtroom.

14          Whenever you need a recess for any purpose, your

15   foreperson may declare a recess.  Do not discuss the case

16   during a recess.  All of your discussions of the case should

17   occur only when you're all together, and your foreperson has

18   indicated that deliberations may proceed.

19          If it becomes necessary during your deliberations

20   to communicate with me, you may do so by sending a note

21   through the court officer.  The note must be signed by your

22   foreperson.  No member of the jury should ever attempt to

23   communicate with me, except by such a signed writing.

24   However, in doing so, do not tell me how you stand, either

25   numerically or otherwise, on any issue before you, until you

1   have reached a verdict.

2           On matters touching simply on the arrangements for

3   your meals, schedule, and convenience, you are free to

4   communicate with the court officer or Ms. Belmont orally,

5   rather than in writing.  You are not to communicate with

6   anyone but me about the case, however, and then only in

7   writing.

8           When you have reached your verdict, your foreperson

9   should fill in, date, and sign the verdict slip to state the

10  verdict upon which you all agree.  You will then return with

11  your verdict to the courtroom.  Your verdict must be

12  unanimous; that is, you must be unanimous as to each of the

13  answers that you answer on the jury form.

14          Let me pause here.  That is the end of my

15  instructions to you.  I need to talk briefly to the lawyers

16  at sidebar for a moment before you retire to the jury room.

17  And let me explain, just logistically, one last point about

18  the exhibits, and the like.

19          So when you return to the jury room --

20          Is it already all set, Kellyann?

21          THE DEPUTY CLERK:  No.

22          THE COURT:  How long do you think it will be?  He's

23  having a problem?

24          THE DEPUTY CLERK:  Ten to 15.

25          THE COURT:  So when you retire to the jury room, in

1    a minute or two, you're actually not going to be able to

2    start your deliberations yet.  Let me tell you why, because

3    you're not going to have the evidence yet.  You're going to

4    have the verdict form; you're going to have the instructions

5    that I just read to you; but the exhibits aren't going to be

6    ready for you.  Let me tell you why.

7            The answer is this:  We have a digital system.

8    You've seen that TV in there?  You probably might have wanted

9    to watch like Comcast or who knows what, and you discovered

10   that it doesn't do that.  It's not connected to the Internet.

11   There's no YouTube.  There's no cable TV.  It's an internal

12   system.  And we can load, just like you've seen in court, all

13   of the exhibits, we can load the exhibits onto that.

14   Ms. Belmont is doing that.

15           Ordinarily, Ms. Belmont has it already all done

16   before now.  But there's been a little, today, snafu with the

17   technical system.  As you haven't already figured out, while

18   we have a lot of resources, we're not Microsoft, Amazon, or

19   Google.  So we're working on that.  We think in ten minutes,

20   or so, we'll have it.

21           Once we have them, you'll have a remote.

22   Ms. Belmont will show you how to use it, and you'll be able

23   to see, call up on the screen all the exhibits.  You'll also

24   have a printed index to all the exhibits.  There are a lot of

25   exhibits in this case.  You've seen a lot of them, but there

1    is also more than the ones you've seen.

2            A couple cautions about this:  One, the numbers

3    mean nothing.  I think I told you that during the trial.

4    There is no significance to the numbers that -- don't draw

5    any conclusions.  Don't draw any conclusions because there

6    could be blank numbers.  There could be missing numbers.  It

7    could be 100 to 110.  It doesn't mean anything.  There are

8    lots of different reasons throughout the case and different

9    purposes, and they're not renumbered now because that would

10   make life too difficult for the lawyers.  So don't draw any

11   conclusions about that.

12           All right.  I think that's all I have for you.

13   I'll see counsel at sidebar.

14           (The following discussion held at the bench.)

15           THE COURT:  Anything for you, Mr. Hannon?

16           MR. HANNON:  Just one clarification.  And this was

17   right here at the top of 26.

18           THE COURT:  What page?

19           MR. HANNON:  Page 26.  It's a little unclear in

20   terms of which questions you're referring to.

21           THE COURT:  Oh.

22           MR. HANNON:  So -- because this actually, oddly,

23   corresponds to what's on the verdict slip, as well.  So I

24   think you mean "Questions 1, 2, and 3(a) above."  So you say

25   that everywhere else, you just didn't say it here.  I'm fine

 1    simply making the notation on the copy that goes back with

 2    the jury.

 3              THE COURT:  Okay.  And then here (indicating).

 4              MR. HANNON:  Yes.  Yup.

 5              THE COURT:  I'm going to print eleven more copies,

 6    and we'll put that word in the printed copies.

 7              All right.  That's it for you?

 8              MR. HANNON:  That's it for me.

 9              THE COURT:  Anything for you?

10              MR. CURRAN:  Nothing.

11              MS. MANDEL:  No.

12              THE COURT:  Okay.

13              (Bench conference concluded.)

14              THE COURT:  So two more minor things.  One, you'll

15    notice on page 26, there's a handwritten word I've just

16    written in.  It's not a substantive word.  It's just a slight

17    clarification for you.  I don't think I need to explain it to

18    you, it will be more than obvious to all of you what it

19    means.  And you'll have this copy in the jury room.

20              We are going to print eleven more copies.  That's

21    my practice.  I don't wait -- the reason that I don't have

22    them right now is I wait until the very end, because

23    sometimes, like this correction that the lawyers have pointed

24    out to me about this one word that's just, like,

25    clarification.  So we'll print the eleven copies now.  The

1    printed eleven copies won't have the handwritten, because

2    they'll have it typed in.  So that will be different.  It's

3    not significant, just so you know.  And the eleven copies

4    will come shortly.

5                How are we doing?

6                THE DEPUTY CLERK:  I actually need to go downstairs

7    to do it.

8                THE COURT:  So what's going to happen is

9    Ms. Belmont will take you back to the jury room, she has to

10   go downstairs because this computer is not working to create

11   the electronic copy that goes to that system.  And so -- but

12   once she brings you in, she'll go down and she'll do that,

13   and she'll be back and once it's ready and give you that.

14               You're not going to have paper copies of the

15   exhibits, because there were too many to print.  Okay?

16               All rise for the jury.  Thank you for your

17   attention.

18               (The jury exits the courtroom.)

19               THE COURT:  Have you all given your contact

20   information to Ms. Belmont?

21               MR. HANNON:  We have.

22               THE COURT:  All right.  So you're all set.

23               MR. CURRAN:  We have.

24               THE COURT:  Okay.  So I'll let you know when

25   there's a question, and if for some reason this -- loading

1    the documents on to the system turns into some bigger problem

2    that -- electronically, I don't know quite what the issue is,

3    but if it isn't resolved in 10 or 15 minutes, Ms. Belmont

4    will let you know and we'll figure out what to do.

5           MR. HANNON:  Okay.  And you want us within five

6    minutes?

7           THE COURT:  Five -- well, five is great, if you can

8    do five.  If you're offering five, accepted.  I'm surprised

9    you offered that --

10          MR. HANNON:  It wasn't an offer, Your Honor.

11          THE COURT:  I think that was an offer.

12          MR. HANNON:  It wasn't an offer.

13          THE COURT:  Was that not an offer and acceptance

14    counsel?

15          MR. CURRAN:  We're going to stay here.

16          MS. MANDEL:  We'll be here.

17          THE COURT:  So I'm surprised, Mr. Hannon, you'd

18    make that offer, because, you know, have you read this book

19    called *Never Split the Difference.*

20          MR. HANNON:  I haven't, no.

21          THE COURT:  It's written by the retired FBI's lead

22    hostage negotiator, and never split the difference comes

23    from -- he says when I'm negotiating to release people and

24    they have four hostages, he can't say, you know, you can kill

25    two and I'll take two.  His answer is I want all four, plus

```
1    you.  So it's all about how to negotiate with people.  He
2    would tell you, don't start with five minutes, when what you
3    want is 15.  So five is great, but a little more than five, I
4    know it -- but not like a half hour.
5              MR. HANNON:  Okay.
6              THE COURT:  Because as soon as they get it -- as
7    soon as we get it, I'll want to hear from all of you.
8              MR. HANNON:  Understood.
9              THE COURT:  So I have -- I know the case is not
10   over, but I had -- I'm fine to say something to all of you
11   about a couple of things, since I'm not the finder of fact,
12   that I don't think bears on any possible post-trial motions
13   or appeals, recognizing that at least one of you will be
14   unhappy -- well, there's a reasonable likelihood that one of
15   you would be unhappy, potentially both of you are unhappy.
16   In my experience, oftentimes when people leave the courtroom
17   and I decide things, I've left everybody unhappy.  But if you
18   want me to -- if you're okay with that, I'll do that.  If you
19   want me to do it on the record, I'll do it on the record.  If
20   you're comfortable with me doing it off the record, I'll do
21   it off the record.
22             MR. HANNON:  No difference here, Your Honor.
23             MS. MANDEL:  No difference here, as well.
24             THE COURT:  So you can be seated.  So I think I
25   would prefer to do it just for the six of you at sidebar.
```

1    I'll do it off the record, and then if you want to put

2    anything on the record afterwards, or something, we could.

3                (Discussion held off the record.)

4                THE COURT:  I just want to say, I had an

5    off-the-record discussion with both counsel and their

6    clients.  Both counsel, as I understand it, agreed to go off

7    the record and were comfortable going off the record.  What I

8    explained off the record was just sort of some compliments

9    with respect to counsel's performance and their closing

10   arguments.  I made some personal comments to Dr. Menninger

11   with respect to my hope for her ability to be able to get

12   better.  I made some comments to Dr. Menninger and

13   Ms. Ballweg with respect to sort of how the system of justice

14   works and how it can be hard for people, even though we're

15   not intending it to be hard for them.  And some suggestions,

16   irrespective of the verdict, which I have no view on, as

17   to -- at the moment, as to PPD one way to learn from this is

18   try to look back and try to learn from experiences.

19               And does any of you want to add anything to the

20   record regarding what happened off the record?

21               MR. HANNON:  Nothing here, thank you.

22               MS. MANDEL:  Nothing here, thank you.

23               THE COURT:  All right.  Fine.  That's it.  Thank

24   you.

25               (Court in recess at 11:55 a.m.

```
 1                and reconvened at 3:23 p.m.)
 2                              VERDICT
 3           THE COURT:  So we have a verdict, I understand.
 4           So, Kellyann, go get the jury.
 5           Do you need to wait for Ms. Ballweg or no?
 6           MS. MANDEL:  No.  She had to get on her flight
 7   home, so --
 8           THE COURT:  Okay.
 9           (Pause in proceedings.)
10           (Jury present.)
11           THE COURT:  Ladies and gentlemen, I understand you
12   have a verdict.  All right.
13           JUROR:  Yes.
14           THE COURT:  Okay.  Ms. Belmont, if you would get
15   the verdict form.
16           Careful.
17           Okay.
18           THE DEPUTY CLERK:  Ladies and gentlemen of the
19   jury, please listen to the verdict as it is recorded.
20           In the matter of Lisa Menninger v. PPD Development,
21   L.P., Civil Action Number 19-11441:
22           Question 1:  Discrimination -- Failure to Provide
23   Reasonable Accommodation Claim.
24           Question 1:  Did Dr. Menninger prove by a
25   preponderance of the evidence that PPD unlawfully
```

discriminated against her by failing to provide her with a
reasonable accommodation?

       Yes.

       Question 2:  Discrimination -- Disparate
Treatment/Adverse Employment Claim.

       Question 2A:  Did Dr. Menninger prove by a
preponderance of the evidence that PPD unlawfully
discriminated against her by taking an adverse employment
action against her under federal law (applying the federal
"but-for" causation standard)?

       Yes.

       Question 2B:  Did Dr. Menninger prove by a
preponderance of the evidence that PPD unlawfully
discriminated against her by taking an adverse employment
action against her under Massachusetts law (applying the
Massachusetts "determinative cause" causation standard)?

       Yes.

       Question 3:  Retaliation Claim.

       Question 3A:  Did Dr. Menninger prove by a
preponderance of the evidence that PPD unlawfully retaliated
against her under federal law (applying the federal "but-for"
causation standard)?

       Yes.

       Question 3B:  Did Dr. Menninger prove by a
preponderance of the evidence that PPD unlawfully retaliated

1    against her under Massachusetts law (applying the

2    Massachusetts "determinative cause" causation standard)?

3           Yes.

4           Question 4:  Damages.

5           Question 4A:  Enter below the amount of "back pay,"

6    if any, that Dr. Menninger proved by a preponderance of the

7    evidence that she lost because of PPD's disability

8    discrimination and/or retaliation.

9           1,565,000.

10          Question B:  Enter below the amount of "front pay,"

11   if any, that Dr. Menninger proved by a preponderance of the

12   evidence that she will lose because of PPD's disability

13   discrimination and/or retaliation.

14          $5,465,000.

15          Question 4C:  Enter below the amount of damages for

16   emotional distress, if any, that Dr. Menninger proved by a

17   preponderance of the evidence that she suffered up to today

18   because of PPD's disability discrimination and/or

19   retaliation.

20          $5 million.

21          Question 4D:  Enter below the amount of damages for

22   emotional distress, if any, that Dr. Menninger proved by a

23   preponderance of the evidence that she is reasonably likely

24   to suffer in the future because of PPD's disability

25   discrimination and/or retaliation.

```
 1                    $2 million.

 2                    Question 4E:  Do you find that punitive damages are

 3      warranted against PPD?

 4                    Yes.

 5                    Question 4F:  Enter below the amount of punitive

 6      damages that you award to Dr. Menninger.

 7                    $10 million.

 8                    Signed by the foreperson and dated March 31, 2023.

 9                    So say you, Mr. Foreperson?

10                    JUROR:  Yes.

11                    THE DEPUTY CLERK:  So say you all members of the

12      jury?

13                    THE JURY:  Yes.

14                    THE COURT:  Ms. Mandel, do you wish the jury be

15      polled?

16                    MS. MANDEL:  Yes, Your Honor.

17                    THE COURT:  All right.  Ms. Belmont, if you would

18      poll the jury.

19                    THE DEPUTY CLERK:  So, ladies and gentlemen of the

20      jury, please listen for your juror number.  When it is

21      called, please indicate whether you agree with the verdict as

22      it has been recorded.

23                    Juror Number 2.

24                    JUROR:  Yes.

25                    THE DEPUTY CLERK:  Juror Number 35.
```

```
 1                    JUROR:  Yes.

 2                    THE DEPUTY CLERK:  Juror Number 30.

 3                    JUROR:  Yes.

 4                    THE DEPUTY CLERK:  Juror Number 7.

 5                    JUROR:  Yes.

 6                    THE DEPUTY CLERK:  Juror Number 32.

 7                    JUROR:  Yes.

 8                    THE DEPUTY CLERK:  Juror Number 12.

 9                    JUROR:  Yes.

10                    THE DEPUTY CLERK:  Juror Number 33.

11                    JUROR:  Yes.

12                    THE DEPUTY CLERK:  Juror Number 34.

13                    JUROR:  Yes.

14                    THE DEPUTY CLERK:  Juror Number 16.

15                    JUROR:  Yes.

16                    THE DEPUTY CLERK:  Juror Number 24.

17                    JUROR:  Yes.

18                    THE DEPUTY CLERK:  And Juror Number 27.

19                    JUROR:  Yes.

20                    THE COURT:  All right.  Do either of you have any

21      business which you think we need to do with the jury?

22                    MR. HANNON:  Nothing here, Your Honor.

23                    MS. MANDEL:  No, Your Honor.

24                    THE COURT:  All right.  Ladies and gentlemen of the

25      jury, thank you very much for your service.  Thank you very
```

1    much for your time and your attention during these two weeks.

2    You are now discharged from jury service, and you're free to

3    go.  You are free from my instructions to you of don't

4    discuss the case, obviously, among yourselves or with anyone

5    else.  You can do that.

6            I do have one suggestion, one request.  The

7    suggestion is that you -- simply, the conversations that you

8    all had among yourselves in the jury room, you -- that's for

9    your own decision as what to do about them, but I suggest to

10   people that they keep that among themselves, that there's --

11   that's just -- you don't have to.  There's no court rule that

12   says you can't.

13           The lawyers are not allowed to talk to you about it

14   without my permission, but -- which they haven't asked and I

15   haven't given.  But you're not limited from talking about it;

16   on the other hand, I suggest you respect sort of each other

17   in terms of the joint decision you came to.

18           And then the request I have is simply, while you're

19   done with me, you're free of me and any of my directions or

20   instructions, my request is you wait a few minutes.  I have a

21   minute or two with the lawyers, and then I will come back,

22   and I just like to thank jurors personally for the time and

23   service that you've rendered.

24           And now, though you're no longer a jury,

25   nonetheless, out of respect for your service and your

1    verdict, we all rise for the jury.

2              (Jury not present.)

3              THE COURT:  Two things -- one, anything else to be

4    addressed before we stand in recess?

5              MR. HANNON:  Just in terms of timing for an

6    application for attorney's fees, we -- there could be a

7    judgment first and then the application and then an amended

8    judgment with the attorney's fees, or do you want to hold on

9    the judgment while we do the application for attorney's fees?

10             THE COURT:  I don't care.  I could enter a final

11   judgment on Monday that had the -- the verdict, we'll enter

12   today.  The final judgment, there's more claims in the case

13   than were resolved by the jury, so the final would encompass

14   the jury's verdict plus the other claims that I ruled out at

15   summary judgment, if I ruled the claims out or just issues,

16   but whatever.

17             And then -- so I'm indifferent.  I'm happy to wait,

18   do the application for fees, and then include that, or I

19   could do an amended, whatever you prefer.

20             MR. HANNON:  I think it would be easier just to

21   wait for the fees, but --

22             THE COURT:  Fine.  So we'll enter the verdict, but

23   we won't enter judgment.  So you-all set a date when you want

24   to file your motion.

25             MR. HANNON:  Ten days?

```
 1                    THE COURT:  Fine.  No problem.

 2                    MR. HANNON:  I'm a terrible negotiator.

 3                    THE COURT:  I don't believe that, but -- but

 4          nonetheless, if you want more --

 5                    MR. HANNON:  No.  Ten days is good, Your Honor.

 6          Thank you.

 7                    THE COURT:  Fine.  I'll say two weeks to respond,

 8          and if you need more time, then you can.

 9                    Is there anything else to address at the moment?

10                    MS. MANDEL:  Not at the moment.

11                    THE COURT:  All right.  Fine.

12                    I -- it's my practice to go back and thank the

13          jurors and to ask them if they have suggestions in two ways.

14          I don't talk to them about their decision.  I tell them I

15          meant what I said.  I'm really not interested -- it's their

16          verdict and for them to decide.  I do ask them if they have

17          suggestions for us and suggestions for lawyers.

18                    If I hear anything, if you stick around, I'm happy

19          to share what they said with you, but you don't have to stick

20          around.  It's up to you, and I won't tell them whether you

21          stick around or not.  I just tell you that so, if you want

22          to, you can wait and I'll come back.

23                    I meant what I said at sidebar, I thought -- what I

24          told you all before the verdict.  I told you before, I had no

25          idea what they would do, and I often don't; but in any event,
```

```
 1    that's where it stands.

 2              Is there anything else?

 3              MR. HANNON:  Nothing here, Your Honor.

 4              MS. MANDEL:  Nothing here.

 5              THE COURT:  All right.  Should I come back out or

 6    not?  I'll only come back out if you're going to wait.

 7              MR. HANNON:  I'll wait, Your Honor.

 8              MR. CURRAN:  We'll wait, Your Honor.

 9              THE COURT:  Fine.  I'll be back in a few.

10              (Court in recess at 3:36 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/ Rachel M. Lopez                    March 28, 2023

/s/ Robert W. Paschal



_____          _____

Rachel M. Lopez, CRR                    Date

Robert W. Paschal, CRR, RMR

Official Court Reporters