**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LISA MENNINGER,

                    Plaintiff,

v.                                                Civil Action No.  1:19-CV-11441-LTS

PPD DEVELOPMENT, L.P.,                            *Leave to File Granted on May 18, 2023*

                    Defendant.

**DEFENDANT'S COMBINED MEMORANDUM OF LAW IN SUPPORT OF ITS
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION
<u>FOR A NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 5

I.  PPD HIRES MENNINGER TO RUN ITS LABORATORIES AND
    ENGAGE IN A VARIETY OF PUBLIC-FACING ACTIVITIES. ........................... 5

II. MENNINGER INFORMS PPD OF HER MENTAL DISABILITY AND
    PPD ATTEMPTS TO REASONABLY ACCOMMODATE HER;
    MENNINGER ABANDONS HER POSITION AND SUES PPD. ......................... 6

III. THE COURT GRANTS PARTIAL SUMMARY JUDGMENT THAT
     PPD ENGAGED IN A GOOD FAITH INTERACTIVE PROCESS AND
     DID NOT FOSTER A DELIBERATE PLAN TO REMOVE
     MENNINGER, BUT SENDS THE CASE TO A JURY THAT
     AWARDS MENNINGER $24 MILLION. .................................................. 9

ARGUMENT ON RULE 50(B) MOTION ............................................................ 11

I.  THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF
    LAW IN FAVOR OF PPD AS TO MENNINGER'S
    DISCRIMINATION CLAIMS. .................................................................. 11

    A.  The Trial Record Forecloses a Jury Finding That Menninger Was
        a Qualified Disabled Person Under State or Federal Law, Thus
        Defeating Both Discrimination Claims............................................ 12

    B.  Menninger Failed to Demonstrate That PPD Refused To Provide
        Her With Any Requested Reasonable Accommodations. ................... 17

    C.  Menninger Failed to Establish That She Suffered an Adverse
        Employment Action by PPD Because of Her Disability. .................. 19

II. THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF PPD ON
    MENNINGER'S RETALIATION CLAIMS BECAUSE SHE FAILED
    TO PROVE ANY ADVERSE ACTION CAUSALLY CONNECTED
    TO A PROTECTED ACTIVITY. ............................................................... 23

    A.  Menninger Did Not Present Sufficient Evidence That PPD Tried
        to Coerce Her to Quit....................................................................... 24

    B.  Menninger Did Not Present Sufficient Evidence That PPD
        Attempted To Manufacture Grounds For Her Termination—And

i

The Court's Legal Conclusions at Summary Judgement Foreclose
Such A Finding. ..............................................................................25

C.   Menninger Failed To Establish That PPD Refused To Clarify The
Anticipated Changes To Her Role—And Her Own Evidence
Disproves It..................................................................................25

D.   Menninger Did Not Present Sufficient Evidence That PPD
Established Unrealistic Expectations For Her Role.......................26

E.   Menninger Did Not Present Sufficient Evidence That PPD
Excluded Her From Hiring and Recruiting Decisions...................26

F.   Menninger Did Not Present Sufficient Evidence That PPD
Conducted A "Sham" Investigation Of Her Complaints. ..............26

III.   THE COURT SHOULD STRIKE THE PUNITIVE DAMAGES
AWARD BECAUSE IT IS EXCESSIVE, UNSUPPORTED BY
EVIDENCE, AND CONTRARY TO LAW. ..........................................28

ARGUMENT ON MOTION FOR NEW TRIAL ..................................................32

I.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE
COMPENSATORY DAMAGES AWARD IS EXCESSIVE AND NOT
SUPPORTED BY THE EVIDENCE. ....................................................32

A.   The Jury's Award of Nearly $5.5 Million in Front Pay Is
Excessive, Not Supported by the Evidence, And Contradicted By
The Verdict. ................................................................................33

B.   The Jury's Award Of $7 Million For Emotional Distress
Damages Is Excessive And Untethered To PPD's Conduct...........35

II.   THE COURT SHOULD ORDER A NEW TRIAL DUE TO
INSTRUCTIONAL ERRORS THAT TAINTED THE VERDICT..........36

III.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE
MENNINGER'S LEGALLY DEFICIENT DISCRIMINATION
CLAIMS TAINTED THE JURY'S EVALUATION OF HER
RETALIATION CLAIMS.....................................................................38

ARGUMENT ON REMITTITUR ........................................................................39

CONCLUSION.....................................................................................................40

135880656_41

## INTRODUCTION

In every critical respect, the evidence at trial was clear and not genuinely disputed.  Even before PPD Development, L.P. ("PPD") had any knowledge of Plaintiff Dr. Lisa Menninger's ("Menninger") emotional disorder, it informed her in December 2017 of the need to increase her focus on client outreach and business development due to the evolving needs of the company and growing client demands.  As PPD explained, these expectations applied to senior management generally, not just Menninger.  Nor were these responsibilities new to Menninger herself.  Indeed, they comprised the first two "Essential Functions" listed in her job description when she joined PPD as its Executive Director of Global Laboratories in August 2015.

Several weeks after being informed of the need for increased client engagement, Menninger informed PPD of her mental disabilities for the very first time.  Menninger's psychiatrist wrote to PPD, in no uncertain terms, that "any changes to [Menninger's] role that increase the need for public speaking and/or social interactions . . . would make it substantially more difficult, if not impossible, for [her] to perform her job."  In other words, Menninger's doctor told PPD that Menninger was incapable of participating in the client outreach and business development that PPD needed.  Instead, Menninger requested that PPD hire a second qualified employee, or burden an existing one, to stand in for Menninger in critical public-facing roles, including during almost all client interactions.  While the facial unreasonableness of this request strongly suggested that a reasonable accommodation would not be possible, PPD nonetheless initiated a dialogue with Menninger in an effort to accommodate her as best it could.  Those discussions abruptly ended due to Menninger's request that they be postponed indefinitely.  Menninger does not contend, and the record does not suggest, that PPD required Menninger to perform *any* task she felt unable to perform.  Yet Menninger claimed that this interactive process (which the law mandated) itself caused her significant emotional distress.  In light of that distress,

1

she requested, and PPD granted, six months of paid medical leave.  It was not until two months after her paid leave had ended, when Menninger still had not returned to work and informed PPD she had no intention of doing so, that PPD finally ended her employment.  At summary judgment, the Court ruled that PPD had undisputedly engaged in a good-faith effort to accommodate Menninger and that its termination of her employment was entirely unrelated to her disability.  Nonetheless, based on these same facts, the jury awarded Menninger $24 million in damages, including *$10 million in punitive damages*.

Because no reasonable interpretation of the trial record supports a verdict for Menninger, PPD is entitled to the entry of judgment in its favor.  Several critical, undisputed facts underscore why.  For instance, Menninger's psychiatrist requested five accommodations for Menninger's disability:  (1) a "reader" to give all internal "town hall" and Senior Leadership Team presentations on Menninger's behalf; (2) a "surrogate or reader" to give all client presentations and attend client meetings or phone calls involving more than two persons; (3) a "surrogate" to give all technical sales presentations to PPD personnel or clients; (4) a "surrogate" to attend all client visits and social gatherings; and (5) a reduced travel schedule (typically required to perform on-site laboratory visits).  PPD readily accepted the first and fifth requests.  The three requests to hire a "surrogate" to interact with and present to clients, however, went far beyond what the law requires—and for good reason.  For the "surrogate" to be effective in developing business, PPD would, in effect, have had to employ a second Executive Director, capable of engaging with sophisticated clients and presenting on complex medical issues concerning PPD's offerings, for the sole purpose of performing *Menninger's* job responsibilities.

Menninger's case rests on her claim that PPD's failure to accept these requested accommodations was unlawful.  The law says otherwise: "[A]n employer is not required to assign

135880656_41

existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." *Krennerich v. Inhabitants of Town of Bristol*, 943 F. Supp. 1345, 1351 (D. Me. 1996) (internal quotation omitted). Despite her unreasonable demands, PPD did not end its dialogue with Menninger. Instead, it asked Menninger to suggest other accommodations that might enable her (rather than a "surrogate") to perform the necessary public-facing responsibilities. It was at this point that Menninger summarily cut short the discussions. Rather than respond with other ideas for accommodation, Menninger requested that she and PPD table their discussions indefinitely. Shortly thereafter, she went on six months of paid medical leave. Only when Menninger expressed no intention of ever returning to work did PPD end her employment.

These undisputed facts, most of which come directly from Menninger and her psychiatrists' testimony at trial and contemporaneous statements, preclude a finding that any reasonable accommodation would have permitted Menninger to perform the essential functions of her job. And, even if such a reasonable accommodation were conceivable, Menninger failed to satisfy her burden of showing that she both proposed, and PPD rejected, it during her employment. Nor did Menninger produce evidence that she ever experienced an adverse employment action—let alone an adverse employment action taken *because of* her mental disability. Indeed, the record does not support a finding that *any* harm Menninger may have experienced was actually caused by PPD's allegedly unlawful conduct, rather than by the debilitating symptoms that define her underlying condition. In short, the trial record confirms that Menninger's claims never should have gone to the jury.

Even apart from its untenable finding of liability, the jury's outsized award of $24 million must be set aside. Not only is the award excessive to the point of being unmatched in any

comparable case—it is internally inconsistent and otherwise unsupported by the evidence. For instance, the jury's front pay award of nearly $5.5 million cannot be reconciled with its own verdict. Menninger cannot be a "qualified handicapped person" capable of performing the demanding role of Executive Director at PPD and, at the same time, so fragile that the legally required dialogue about accommodations rendered her incapable of performing any gainful employment for the next eighteen years of her life. Yet the jury's verdict presupposes both.

The jury's $10 million punitive damages award is even more egregious. At trial, the Court rightfully expressed hesitancy to even instruct the jury on punitive damages—emphasizing during the charging conference that, if punitive damages were awarded, the Court would "entertain, seriously, a motion" challenging the award and consider "tak[ing] it away." (Doc. No. 159 at 171:24-172:7, 173:7-19.) It should do so now. Punitive damages require a showing that PPD's actions were not merely actionable, but willful, maliciously motivated, outrageous, or recklessly indifferent to Menninger's fundamental rights. Nothing in the trial record even remotely supports such a finding. To the contrary, the evidence establishes that PPD attempted to accommodate Menninger, kept the lines of communication open, provided a lengthy medical leave, and did not end Menninger's employment until she expressed no intention of ever returning to work. This Court's prior finding that PPD engaged in a good faith effort to accommodate Menninger (Doc. No. 81 at 12 ("Order")) is irreconcilable with the jury's award of punitive damages.

It is evident that the jury had great sympathy for Menninger and her condition. But that sympathy appears to have blinded the jury to the legal standards it was required to apply. Now that we have seen the entirety of Menninger's evidence, there is no doubt that the jury's verdict is excessive and inconsistent with the evidence at trial. It should be set aside. Judgment should be entered for PPD, or a new trial ordered, or at the very least the punitive damages award should be

4

set aside and other excessive damages award significantly reduced.

## FACTUAL AND PROCEDURAL BACKGROUND

I.     **PPD Hires Menninger to Run its Laboratories and Engage in a Variety of Public-Facing Activities.**

In August 2015, PPD hired Menninger as the Executive Director for Laboratory Operations for its Global Central laboratories.  (Doc. No. 151 at 164:2-4, 167:11.)  Her written job description outlined six "Essential Functions," the first two of which included: "business development," "operational leadership," and "Support[ing] Business Development in obtaining new customers and maintaining [client] relationships."   (Ex. 350.)   The position also expressly required Menninger to possess "Excellent communication/***interpersonal skills with [the] ability to participate in business development activities***," to "***present capabilities and solutions to clients***, respond to regulatory audits, prepare ***and present*** budgets/forecasts to senior management," to have "***Excellent marketing and negotiation skills***," and to frequently interact with others.  (*Id.* (emphasis added).)

Approximately one year after Menninger was hired, she requested to work exclusively remotely due to family circumstances.  (Doc. No. 153 at 73:17-23.)  PPD accommodated her request, and Menninger relocated across the country in June 2017.  (Doc. No. 157 at 122:22-25, 123:2-8; Doc. No. 153 at 75:8-10.)   Approximately five months later, Menninger told her supervisor, Hacene Mekerri ("Mekerri"), that she was "overwhelmed," and Mekerri asked her to provide a list of her daily responsibilities to assess how best to help her manage them.  (Doc. No. 155 at 67:21-68:6; Doc. No. 151 at 178:1-4; Ex. 378.)  At this time, Mekerri also received mixed feedback about Menninger's performance from several colleagues.  (Exs. 372-75, 377.)   In December 2017, Mekerri discussed these and other related issues with Menninger during her annual performance review.  (Doc. No. 152 at 32:19-22, 33:2-13.)

135880656_41

Menninger admitted at trial (and the Court similarly found in its ruling on summary judgment) that during their December 2017 meeting, before Menninger had informed PPD of her disability, Mekerri informed Menninger that PPD "was bolstering efforts to encourage more visibility and productivity among its senior leadership to increase sales and support business development."  (Order at 3 (citation omitted); *see also* Doc. No. 152 at 32:19-33:5.)  The trial testimony likewise confirmed that Mekerri had informed Menninger that this shift in emphasis was in response to the evolving "needs of the business" and that "it was the same way with [Menninger's] peers as well."  (Doc. No. 157 at 138, 140, 145, 152-53, 169.)

## II. Menninger Informs PPD of Her Mental Disability and PPD Attempts to Reasonably Accommodate Her; Menninger Abandons Her Position and Sues PPD.

On January 11, 2018, several weeks *after* PPD informed Menninger of the need to be more public facing, Menninger told PPD for the first time that she suffered from emotional and psychological disorders and would not be able to perform the public-facing responsibilities of her role.  (Doc. No. 152 at 43:7-21, 44:5-25.)  PPD immediately connected Menninger with its Human Resources department, which provided her with PPD's disability accommodation request form.  (Ex. 201.)  As the jury heard, according to both Menninger and her psychiatrist, Dr. Kessimian, Menninger's mental health continued to deteriorate significantly at this time.  (Doc. No. 153 at 155-58.)  She was engaged in "catastrophic thinking," did not leave the house for weeks, and struggled to get out of bed each morning.  (*Id.* at 155-56.)  Shortly after PPD provided Menninger with an accommodation request form, she submitted the form along with a letter from Dr. Kessimian, which stated that "***any changes*** to [Menninger's] role that increase the need for public speaking and/or social interactions" would make it "substantially more difficult, ***if not impossible*** for Lisa to perform her job."  (Doc. No. 153 at 105:1-17, 110:4-8; Ex. 405 (emphasis added).)

Menninger subsequently requested additional information on PPD's expectations going

6

forward.  (Ex. 201.)  In response, Mekerri sent an email to Menninger in early February 2018 listing five categories of public-facing responsibilities: (1) Senior leadership team presentations, "Town Hall" meetings, and meetings with the Chief Operating Officer and Executive Vice President ("Bi-weekly, monthly and/or quarterly"); (2) "Client Bid Defense," "Issue resolution calls," meetings at Highland Heights Laboratory, and client meetings in-person and by phone ("Once a month at a minimum [per] client"); (3) "Technical Sales presentation[s] internal and external," including client presentations in-person and over the phone ("Monthly, Quarterly, as needed"); (4) meals and "social interactions" during "customer visits . . . in order to build business relationships" ("expected 60-80% of the time"); and (5) "Travels" ("Up to 30%").  (Ex. 350.)  Mekerri also explained: "As you already know, the percentage/scope of interactions, internal or external, is increasing in 2018 due to the needs of the business and our aggressive commercial goals."  (*Id.*)  Menninger does not dispute that she was already engaged in each of these responsibilities to some extent.  (Doc. No. 151 at 182:24-183:11.)

Menninger's psychiatrist responded by making five accommodation requests related to each of these categories: (1) a "reader" (i.e., surrogate employee) to give all internal town hall and Senior Leadership Team presentations on Menninger's behalf (acknowledging that this would require PPD to prohibit real-time questions); (2) a "surrogate" employee to give all client presentations and attend client meetings or phone calls involving more than two persons; (3) a "surrogate" employee to give all technical sales presentations, including to PPD's clients and Menninger's colleagues; (4) a "surrogate" employee to attend all client visits and social gatherings; and (5) a reduced travel schedule (typically required for on-site laboratory visits).  (Ex. 48.)

PPD accepted the first and fifth of these requests, permitting Menninger to forego giving many internal presentations and agreeing to significantly reduce her travel.  (Ex. 182.)  PPD

7

declined, however, to accept the other three requests, explaining that those responsibilities for engaging with PPD's clients "are critical for your level and for the growth of the business."  (*Id.*) Shortly thereafter, on February 28, 2018, Menninger met with Mekerri and PPD's Associate Director of HR to discuss next steps.  (Doc. No. 152 at 68:18-69:13.)  During the meeting, the HR Associate Director proposed the possibility of transitioning to a consultant role, which would not require public-facing responsibilities, or an exit package.  (*Id.* at 69:15-70:21.)  Menninger declined and requested additional detail regarding PPD's denial of the three requested accommodations.  (*Id.* at 70:22-71:9.)  PPD referred to the job description applicable to the role for which she was hired, and stated that "it is not reasonable for PPD to . . . do away with core requirements such as that you attend business development meetings, dinners, bid defenses, etc. [because] [t]hese are not 'behind the scenes' functions."  (Ex. 157.)  PPD asked her, however, to let it "know if there are other accommodations that would allow [her] to perform the essential functions of [her] job."  (*Id.*)  About a month later, Menninger emailed the HR Associate Director indicating that she was currently not being asked to do anything which she felt unable to do—*i.e.*, she was "capable of performing all of [her] responsibilities with or without accommodation"— and suggested they "table this discussion." (Ex. 271.)  As Menninger testified at trial, she received an annual salary raise, effective April 1, 2018.  (Doc. No. 153 at 13-14.)  She also testified that she received a yearly performance bonus "every year" that she worked for PPD.  (*Id.* at 14:12-14.)

Several weeks after Menninger ended their accommodation discussions, she informed PPD's HR Associate Director that she believed Mekerri was "starting to target [her] because of [her] disability."  (Ex. 132.)  This complaint was escalated to Deborah Ballweg, PPD's Executive Director of Human Resources, who promptly investigated.  (Ex. 450.)  Ballweg interviewed Menninger, PPD's Associate Director of HR, Mekerri, and three other employees—and concluded

that Mekerri was not targeting Menninger because of her disability.  (*Id.*)  Just over one week after

her claim was unsubstantiated, Menninger informed PPD that her psychiatrist advised she take

medical leave.  (Ex. 233.)  According to Menninger and her psychiatrist, the process of determining

how to accommodate her disability had, itself, caused severe emotional distress requiring a medical

leave.  (Exs. 459-60.)  PPD did not object, and Menninger remained on leave for the next eight

months, six of which were paid.  (Ex. 90.)  Menninger then informed PPD that she did not intend

to return to work.  (*Id.*)  After receiving this notification, PPD ended its employment of Menninger

in February 2019.  (Doc. No. 151 at 163:23-24.)

The trial record establishes that Menninger's current replacement, Dr. Basel Kashlan,

performs each of the public-facing responsibilities described in Menninger's job description and

Mekerri's February 2018 email as "critical parts" of his role.  (Doc. No. 158 at 122:3-127:8.)

On June 28, 2019, Menninger sued PPD alleging disability discrimination and retaliation

in violation of the Americans with Disabilities Act ("ADA") and Chapter 151B of the

Massachusetts General Laws.

### III.   The Court Grants Partial Summary Judgment that PPD Engaged in a Good Faith Interactive Process and Did Not Foster a Deliberate Plan to Remove Menninger, But Sends the Case to a Jury That Awards Menninger $24 Million.

In partially granting PPD's motion for summary judgment, the Court determined that the

record was undisputed on several critical points: (1) PPD engaged in a good-faith interactive

process in an attempt to reasonably accommodate Menninger's disability (Order at 12); (2) PPD

did not engage in a "'deliberate plan to remove' Menninger from her position" (*id.* at 15); and (3)

PPD did not lower Menninger's 2017 performance rating due to her disability, since the reduced

performance rating pre-dated PPD's knowledge of her disability (*id.* at 17).

The Court then set the case for trial in order for the jury to determine the following

questions: (1) whether Menninger was a "qualified handicapped person" capable of performing

135880656_41

the essential functions of her job (*id.* at 10-11); (2) whether any of the following constituted an unlawful adverse action: (a) Mekerri's February 2018 email outlining five categories of public-facing responsibilities in response to Menninger's request for additional detail on PDD's expectations for 2018 (*id.* at 14-15); (b) PPD's HR director proposing the possibility of a severance package or transitioning to a consultant role, which would not require public-facing responsibilities (*id.* at 16-18); (c) PPD allegedly "exclud[ing] Menninger from hiring and recruiting decisions within her unit" after she informed Mekerri that she felt "overwhelmed" in 2017 (*id.* at 3, 18); or (d) PPD allegedly conducting a "sham investigation" into Menninger's complaint to HR that Mekerri was targeting her due to her disability (*id.* at 19-20).

At the close of Menninger's case, PPD challenged the sufficiency of the evidence supporting her claims, moving for a directed verdict. (Doc. No. 159 at 50:4-5.)  The Court denied the motion. (*Id.* at 50:6.)  In addition, the Court instructed the jury, over PPD's objection and despite the Court's own hesitancy, on the issue of punitive damages. (Doc. No. 160 at 116:11-118:24; Doc. No. 159 at 171:24-172:7, 173:7-19.)

The Court also instructed the jury, over PPD's objections, that the definition of a reasonable accommodation includes the provision of a "reader." (Doc. No. 160 at 93:22-23.)  While the statute includes the provision of "readers or interpreters" as a method for relaying information to a visually or hearing-impaired person, it does *not* suggest that it is reasonable to require an employer to hire another qualified employee to *stand in* and perform her substantive public-facing responsibilities, which is the type of "reader" Menninger requested. 42 U.S.C. § 12111(9)(B); *see also* MCAD Guidelines § III.D.  In his closing, Menninger's counsel highlighted this instruction as validating Menninger's request for a "reader." (Doc. No. 160 at 29:19-25.)

The jury returned a verdict against PPD on both the federal and state claims of

10

discrimination and retaliation.  (*Id.* at 129:22-131:3.)  It awarded Menninger $1,565,000 in back

pay, $5,465,000 in front pay, $5,000,000 in past emotional distress, $2,000,000 for future

emotional distress, and $10,000,000 in punitive damages.  (*Id.* at 131:4-132:7.)

<u>**ARGUMENT ON RULE 50(b) MOTION**</u>

Federal Rule of Civil Procedure 50 provides that a defendant may move for judgment as a

matter of law ("JMOL") if "a reasonable jury would not have a legally sufficient evidentiary basis"

to find for the plaintiff on that issue.  Fed. R. Civ. P. 50(a)(1).  If the Court does not grant the

motion under Rule 50(a), the defendant may renew its motion under Rule 50(b) "[n]o later than 28

days after the entry of judgment." *Id.* at 50(b).  In response to a Rule 50(b) motion, the Court may

allow the jury's verdict to stand, order a new trial, or direct the entry of judgment as a matter of

law on one or more issues for which the jury's verdict lacked a legally sufficient evidentiary basis.

*Id.* at 50(b)(1)-(3).  The First Circuit instructs that courts should grant the motion if "the evidence

could lead a reasonable person to only one conclusion, namely, that the moving party was entitled

to judgment" on the issue at hand.  *Primarque Prods. Co. v. Williams W. & Witts Prods. Co.*, 988

F.3d 26, 34 (1st Cir. 2021) (internal quotations and citation omitted).

**I.     The Court Should Grant Judgment as a Matter of Law in Favor of PPD as to Menninger's Discrimination Claims.**

Menninger's disability discrimination claims are premised on two theories of liability

under both state and federal law:[1] (1) PPD failed to reasonably accommodate her disability; and

(2) PPD subjected her to disparate treatment as a result of her disability.  (Doc. No. 160 at 85:1-

9.)  To prevail under either theory, Menninger was required to show that she "was a 'qualified

---

[1] As the First Circuit has explained, "Massachusetts's handicap discrimination statute [Chapter 151B] . . . is nearly identical to the ADA" and "we analyze the statute in exactly the same manner as the ADA."  *Audette v. Town of Plymouth*, 858 F.3d 13, 20 n.8 (1st Cir. 2017) (internal quotations omitted); *see also Mulloy v. Acushnet Co.*, 460 F.3d 141, 154 (1st Cir. 2006) ("[F]ederal case law construing the ADA should be followed in interpreting the Massachusetts disability law."  (internal quotation omitted)).

135880656_41

handicapped person' capable of performing the essential functions of [her] job with reasonable accommodation." *Smith v. Bell Atl.*, 63 Mass. App. Ct. 702, 711 (2005); *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009).

The evidence at trial forecloses such a finding—and thus both theories necessarily fail. Even if Menninger were able to overcome this issue (which she cannot), her discrimination claims fail for several independent reasons as well. As to her discrimination claim alleging a failure to accommodate, Menninger did not establish that PPD "refused to provide" any *reasonable* accommodations that she actually "requested," and that "as a result of this refusal, [she] suffered some harm." *Smith*, 63 Mass. App. Ct. at 711. As for her disparate treatment theory, Menninger did not show that PPD ever took "an adverse employment action against her because of, in whole or in part, her protected disability." *Sensing*, 575 F.3d at 154 (quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002)). Each of these fatal shortcomings is described in turn.

### A. The Trial Record Forecloses a Jury Finding That Menninger Was a Qualified Disabled Person Under State or Federal Law, Thus Defeating Both Discrimination Claims.

There is no violation of discrimination law unless the disabled employee is *otherwise qualified* for the employment position in question. *See Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017). Both state and federal law define a "qualified" disabled person as one who is capable of performing the "essential functions" of the employment position with or without a reasonable accommodation. 42 U.S.C. § 12111(8); Mass. Gen. Laws c. 151B, §§ 4, 1(16). A disabled employee who *cannot* fulfill her essential job functions, even with reasonable accommodation, is not a "qualified individual" and thus discrimination law does not apply. *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 27 (1st Cir. 2019).

An "essential function" is a "fundamental job duty," including any "individual or idiosyncratic characteristics of the job." *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001) (internal

quotations and citations omitted).   Courts routinely hold that an employer's "view of [the employee's] job requirements" is owed "substantial weight."  *Mulloy v. Acushnet Co.*, 460 F.3d 141, 150 (1st Cir. 2006); *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).   This deference to the employer's determination takes into account the employer's unparalleled insight into what tasks are necessary, and how to allocate them among positions, to best serve the company's needs.   Such deference also reflects the general principle that, even in employment discrimination law, courts and juries do not sit as "super personnel departments." *Arroyo-Audifred v. Verizon Wireless, Inc*., 527 F.3d 215, 221 (1st Cir. 2008).

Here, PPD's "view of [Menninger's] job requirements" was encapsulated in a job description provided to her at the time of her hiring, years before it learned of her disability.  That job description unequivocally describes her "Essential Functions" as including the following: providing "operational leadership to laboratory services," including "***business development***"; "Support[ing] ***Business Development in obtaining new customers and maintaining relationships***"; providing "***business updates to senior leadership***"; overseeing the "quality assurance and quality control aspects of the lab"; interacting "***frequently with internal personnel and outside representatives*** at various levels"; and participating and presenting "***at meetings with internal and external representatives***."  (Ex. 350 (emphasis added).)  Moreover, the Executive Director position expressly required Menninger to possess "excellent communication/***interpersonal skills with [the] ability to participate in business development activities***," to "***present capabilities and solutions to clients***, respond to regulatory audits, prepare ***and present*** budgets/forecasts to senior management," to have "***Excellent marketing and negotiation skills***," and to frequently interact with others.  (*Id.*)

These public-facing responsibilities, which Menninger does not dispute were always part of her role as Executive Director (Doc. No. 152 at 57:11-21, 76:1-17), were essential when Menninger was hired in 2015, and were even *more* so in 2018 due to the growing "needs of the business." (Ex. 350.) PPD required her to "be more involved": to "participate [in] client bid defense[s]," be personally "involved in the client site meetings," and "work with the team and the issue resolution [requests] coming from the clients." (Doc. No. 157 at 168.) These expectations were not unique to Menninger: "It was the same way with her peers"; it was "part of the job description" of "executives and directors" to help "find the response" to issues as they arose, by "being part of the client bid defense and support" and "part of the client site meetings." (*Id.* at 168-69; *see also id.* at 138, 140, 145, 152-53 (describing how PPD resolved to focus on these areas due to repeated feedback from clients and its sales team that increased client interactions and a strong "scientific presence," including involvement of laboratory leadership, were necessary to meet the growing demands of an expanding client base); Ex. 350; Order at 3.) Trial testimony similarly established that Menninger's current replacement, Dr. Basel Kashlan, performs each of these duties as "critical parts" of the position today. (Doc. No. 158 at 122:3-127:8.) This "experience of [the employee] who ha[s] taken over [Menninger's] job functions since h[er] termination" is an objective indicator of how the employer has defined the role and "supports the conclusion" that those functions are essential. *Mulloy*, 460 F.3d at 153.

Nonetheless, Menninger argued at trial that because these public-facing responsibilities had previously comprised a relatively small part of her day-to-day activities, they could not be deemed essential. (Doc. No. 152 at 44:7-12, 57:11-21, 76:13-17.) This argument fails for at least two legal reasons. *First*, the frequency of a task is not determinative of whether it is essential; even tasks "which are in fact rarely or *never* performed" may still be considered essential if

removing the function "would fundamentally change the nature of the job."  MCAD Guidelines §
II.B (emphasis added); *see also*, *e.g.*, *Cox v. New England Tel. & Tel. Co.*, 414 Mass. 375, 390
(1993) (finding that pole climbing was an essential function for telephone technicians even though
the duty was performed on relatively "few occasions").

*Second*, "past [job] performance" is not a reliable indicator of what tasks "are essential"
going forward.  *Jones v. Walgreen Co.*, 679 F.3d 9, 16 (1st Cir. 2012).  The precise mix of a
position's essential tasks may—and frequently does—evolve over time, such as in response to
market dynamics and a growing client base like what occurred here.  *See*, *e.g.*, *Kvorjak*, 259 F.3d
at 55-58 (affirming dismissal of discrimination claim where employer's evolving economic needs
led it to close certain field offices, requiring plaintiff employee to undergo significantly longer
commute that caused severe pain in light of physical disability).

Even if there were room to dispute whether every aspect of these public-facing
responsibilities was essential to Menninger's position, there is no reasonable dispute that *some*
amount of increase in Menninger's public-facing responsibilities was essential to her Executive
Director role.  Indeed, the trial record shows that by the end of 2017, PPD had concluded, as it was
entitled to, that adjusting the balance of job responsibilities in favor of these public-facing roles
was essential to the company's evolving economic needs.  And the trial record shows that this
conclusion was reached *prior* to its knowledge of Menninger's disability, and that these activities
were expected not just of Menninger, but of every "executive and director" on PPD's management
team.  (Doc. No. 157 at 168-69, 138, 140, 145; Doc. No. 152 at 42:14-18; Ex. 350; Order at 3.)

Nor is it disputed that Menninger's own psychiatrist confirmed, in the clearest of terms,
that Menninger could not undertake any more social interactions to meet PPD's evolving needs:
"any changes of [Menninger's] role that increase the need for public speaking and/or social

15

135880656_41

interaction . . . [would] make it substantially more difficult, if not impossible for [her] to perform her job." (Doc. No. 153 at 109:24-110:8; Ex. 405.)

That central, uncontested fact is devastating to Menninger's discrimination claims. The only accommodations Menninger requested and that PPD declined were those that would have required PPD to either hire an additional employee with comparable qualifications, or burden an existing, qualified employee to fulfill Menninger's public-facing duties. (*See*, *e.g.*, Ex. 182.) Yet the law is clear that neither constitutes a "reasonable accommodation." Employers are not required "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job." *Krennerich*, 943 F. Supp. at 1351 (internal quotations and citations omitted); *Laurin v. Providence Hosp.*, 150 F.3d 52, 60 (1st Cir. 1998).

Menninger's attempt to obfuscate the nature of her request by characterizing it as merely providing a "reader" cannot withstand scrutiny. A "reader," as contemplated by discrimination law, provides auxiliary support; it does not *stand in for* an employee in the exercise of critical functions requiring the same substantive knowledge and judgment for which the employee was hired. Menninger has nineteen professional licenses and certifications, including a board certification in pathology. (Ex. 3.) She has worked as a physician, staff pathologist, and laboratory director. (Doc. No. 151 at 165:18-166:19.) That experience was not incidental to her role as Executive Director of PPD's laboratory operations—it is *why* she was hired. Simply because another person can "read" Menninger's prepared notes does not mean that person could fulfill Menninger's responsibilities to engage with sophisticated clients, or present on and answer questions relating to complex medical issues. As Mekerri testified at length, client development is about *interacting with* the client, listening to their concerns, answering their questions, following up to identify opportunities for improved service, and generally providing confidence that PPD is

135880656_41

the appropriate company to handle the client's needs.  (Doc. No. 157 at 138, 140, 145, 152-53; Ex. 350.)  As common sense suggests, and PPD's client feedback confirmed—these functions can only be performed with the active involvement of someone with the appropriate skill, qualifications, experience, and familiarity with the company.  (Doc. No. 157 at 138, 140, 145, 152-53, 167-69.)

To state more fully Menninger's proposal is to refute it.  We have now seen the extent of Menninger's evidence and this much is clear: She was not a "qualified handicapped person capable of performing the essential functions of [her] job with reasonable accommodation."  *Smith*, 63 Mass. App. Ct. at 711 (citation omitted).  Based on the trial evidence, her discrimination claims (on either theory) never should have been submitted to the jury—and the Court should now enter judgment for PPD.

### B.   Menninger Failed to Demonstrate That PPD Refused To Provide Her With Any Requested Reasonable Accommodations.

As described above, there is no evidence to suggest that any reasonable accommodation existed that would have permitted *Menninger* (rather than someone else) to perform the essential public-facing responsibilities of her job.  Indeed, Menninger's own psychiatrist believed firmly that no such accommodation existed, and the only option was to outsource those responsibilities to a "surrogate" (Doc. No. 153 at 109:14-110:8; Ex. 405)—which the law expressly does not require, *supra* section I.A.

Yet even if a reasonable accommodation did conceivably exist, Menninger's failure-to-accommodate theory still fails because she never proposed it to PPD during her employment.  *See Feliciano v. State of Rhode Island*, 160 F.3d 780, 787 (1st Cir. 1998) (plaintiff could not proffer accommodation at trial absent evidence "she sought the [accommodation]" during employment); *Canis v. Coca-Cola Enters., Inc.*, 49 F. Supp. 2d 73, 81 (D.R.I. 1999) ("The issue is not whether 20-20 hindsight suggests accommodations in addition to those that [defendant] considered.").

17

Instead, Menninger only ever proposed two *reasonable* accommodations—both of which PPD readily accepted, but which proved insufficient to enable Menninger to perform the responsibilities of her role.  That PPD accepted some of Menninger's requested accommodations, while declining only those that the law expressly does not require, does not establish that PPD failed to reasonably accommodate her.  "[A]n employer is neither required to provide an employee with an accommodation of her choice nor to create a new position."  *Enica v. Principi*, 544 F.3d 328, 342 (1st Cir. 2998).  Instead, the law requires an employer to engage in a good-faith "interactive process" with the employee in an effort to identify a reasonable accommodation that is both feasible and sufficient.  *See* 29 C.F.R. § 1630.2(o).  As the Court held at summary judgment, there is no reasonable dispute that PPD satisfied this requirement.  (Order at 12.)

On the other hand, the burden to come forward with a reasonable proposal that "would [have] enable[d] *her* to perform the essential functions of *her* job, but also that, at least on the face of things, [was] feasible for the employer under the circumstances"—unequivocally belonged to Menninger.  *Echevarria*, 856 F.3d at 127 (emphasis added); *Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 259 (1st Cir. 2001) (collecting cases); *see also Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 n.8 (1st Cir. 2005).  Indeed, the "failure to accommodate" theory of disability discrimination requires a plaintiff to demonstrate that she participated in the process by "request[ing] such accommodation," and that the defendant "refused to provide it."  *Alba v. Raytheon Co.*, 441 Mass. 836, 843 n.9 (2004); *see also Flaherty v. Entergy Nuclear Operations, Inc*., 946 F.3d 41, 55 (1st Cir. 2019).  But here, the trial record establishes that the *only* requested accommodations PPD declined were those that are unreasonable as a matter of law.  *Krennerich*, 943 F. Supp. at 1351 (Employers are not required "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job."  (internal

18

quotations and citations omitted)); *see also Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 603 (1st Cir. 2017) (Where a requested accommodation is facially unreasonable in terms of its impact "on [the employer's] operation of the business," the employer is not required to adopt it.).

As the Court ruled at summary judgment, there is no reasonable dispute that PPD engaged in a good faith effort to identify a reasonable accommodation.  (Order at 12.)  It was *Menninger* who unilaterally stopped the accommodation discussions, requesting they be put on hold until she was asked to do something she felt she could not.  (Doc. No. 152 at 81:14-24.)  That time never came.  The reason it never came is that PPD *never* asked Menninger to do anything she felt uncomfortable doing; and the reason those discussions never resumed is because Menninger subsequently left on an extended medical leave before informing PPD that she would not return to work.  (Exs. 271, 233, 90.)  Thus, as a matter of law, Menninger failed to demonstrate that she proposed a reasonable accommodation that PPD refused to implement.

### C.    Menninger Failed to Establish That She Suffered an Adverse Employment Action by PPD Because of Her Disability.

Not only does the record *foreclose* a finding that Menninger was a qualified employee capable of performing the essential functions of her position—Menninger has also failed to establish that PPD ever took an adverse employment action against her because of her disability. Thus, her discrimination theory premised on disparate treatment fails for that reason as well.  *See Sensing*, 575 F.3d at 154 (To prevail under a disparate treatment theory, a plaintiff must show that "her employer took an adverse employment action against her because of, in whole or in part, her protected disability." (cleaned up) (quoting *Carroll*, 294 F.3d at 236)).

The only potential adverse employment action on which the Court submitted Menninger's discrimination claims to the jury was PPD's setting "new goals and expectations for [Menninger

in her] role as Executive Director."  (Doc. No. 160 at 98:16-19.)  Menninger argued throughout trial that Mekerri's February 2018 email outlining five categories of expectations for 2018 constituted the imposition of new responsibilities, and thus materially and adversely altered the conditions of her employment.  (Doc. No. 152 at 57:2-64:20.)  But the trial evidence establishes that those responsibilities were neither *new* nor ever *imposed*.

The law defines an adverse employment action as "any material 'disadvantage[] in respect to salary, grade, or other objective terms and conditions of employment.'"  *Sensing*, 575 F.3d at 154 (citation omitted); *Kleya v. Karl Storz Endovision, Inc.*, 385 F. Supp. 3d 99, 106 (D. Mass. 2019) (citation omitted) (describing the ADA's substantively identical conception of an adverse employment action as "one that affects employment or alters the conditions of the workplace, and typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits").  The adverse action must be "substantial enough to have materially disadvantaged [the] employee."  *Yee v. Mass. State Police*, 481 Mass. 290, 296-97 (2019) (internal quotations and citations omitted).   "There must be 'real harm'; 'subjective feelings of disappointment and disillusionment' will not suffice."  *King v. City of Boston*, 71 Mass. App. Ct. 460, 468 (2008) (citations omitted).

As described above, each and every one of the responsibilities described in Mekerri's email and discussed subsequently with Menninger was also part of her position when she was hired in 2015.  (Ex. 350.)  In fact, those responsibilities  were expressly described as "Essential Functions" in her job description.  (*Id.*)  Menninger does not dispute this—and acknowledged (as she must) that she engaged in most of these responsibilities from the beginning of her tenure at PPD.  (Doc. No. 151 at 182:24-183:11.)  Her contention is merely that the *frequency* of those responsibilities

was expected to increase.  (*Id.* at 183:18-21.)  An increased focus on, or frequency of, pre-existing responsibilities does not constitute an adverse employment action.  Such a conception would cripple every employer's ability to evolve to meet market demands, just as PPD did here.  *See*, *e.g.*, *Burns v. Johnson*, 829 F.3d 1, 10 (1st Cir. 2016) ("The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." (citation omitted)); *Morales–Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) ("Reassignment . . . may be actionable" only if it involves "significantly different responsibilities.").  Indeed, while Menninger complained about Mekerri's supervision of her job performance, such as compliance and quality controls in the lab (Doc. No. 152 at 113:4-8), that type of routine personnel function, even if the employee does not welcome it, does not constitute an adverse employment action.  *See King*, 71 Mass. App. Ct. at 469 ("'[T]he mere fact that an employee is displeased by an employer's act . . . does not elevate that act . . . to the level of a materially adverse employment action.'" (citations omitted)).

Nor were these alleged "changes" to Menninger's responsibilities ever imposed.  Once again, Menninger does not dispute that PPD never required her to perform increased public-facing duties before she began her extended medical leave.  Instead, these changes were merely *discussed* between Menninger and PPD.  And the only relevant discussions that post-dated PPD's awareness of Menninger's disability are those that occurred pursuant to the interactive process to evaluate potential reasonable accommodations.  Those discussions cannot possibly constitute an adverse employment action—they are specifically required by law.  Not only do they present no "material disadvantage" related to the "objective aspects of the work environment," *id.* at 468—*but the law requires that they take place*, 29 C.F.R. § 1630.2(o) (describing an employer's duty to "initiate an informal, interactive process with the individual with a disability in need of the accommodation").

135880656_41

What's more, even if Menninger had shown that PPD's conduct constituted an adverse employment action (which she has not), the evidence unequivocally precludes finding that this action was taken "because of" her disability. *Sensing*, 575 F.3d at 154; *Carroll*, 294 F.3d at 236. This is so for at least three reasons. *First*, Menninger was notified of the changes in PPD's expectations in December 2017—weeks *before* Menninger informed PPD of her disability. (Doc. No. 152 at 43:7-21, 44:5-25; Ex. 62.) After Menninger disclosed her disability, Mekerri's February 2018 email was sent as part of the ensuing interactive process, and in direct response to Menninger's request for additional detail regarding PPD's expectations. (Doc. No. 152 at 70:22-71:9.) "[A]n adverse employment decision that predates a protected activity cannot be caused by that activity." *See Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, 671 F.3d 49, 56 (1st Cir. 2012). So too where "the adverse employment decision was contemplated but 'not yet definitively determined' before the protected activity took place." *Id.*

*Second*, it was undisputed at summary judgment, and further confirmed by Mekerri's testimony at trial, that these were expectations of *all* "senior leadership" employees—not just Menninger—in order to "increase sales and support business development" company-wide. (Order at 3; Doc. No. 157 at 168-69.) That PPD "required the same from other [employees] in similar circumstances" is strong evidence that the action was taken "for legitimate non-retaliatory reasons" and unrelated to her disability. *Cherkaoui v. City of Quincy*, 877 F.3d 14, 29 (1st Cir. 2017); *Joseph v. Wentworth Inst. of Tech.*, 120 F. Supp. 2d 134, 141 (D. Mass. 2000) (finding no adverse employment action in a Title VII case where plaintiff failed to show the action "was targeted at her in any way," as it applied to "entire department").

*Third*, the record establishes that Dr. Basel Kashlan, who replaced Menninger following her eight months of medical leave, performs each of the public-facing responsibilities described in

Mekerri's February 2018 email as "critical parts" of his role today.  (Doc. No. 158 at 122:3-127:8.)  This "experience of [the employee] who ha[s] taken over [Menninger's] job functions since h[er] termination also supports the conclusion" that those functions are "essential," and thus were imposed for a legitimate, non-discriminatory purpose.  *Mulloy*, 460 F.3d at 153.  Disparate treatment law prevents an employer from treating a disabled employee worse than similarly situated employees because of her disability; it does not entitle her to be exempted from the same duties that are expected of similarly situated employees, including her replacement.

## II. The Court Should Grant Judgment In Favor Of PPD On Menninger's Retaliation Claims Because She Failed To Prove Any Adverse Action Causally Connected To A Protected Activity.

To prevail on her retaliation claim, Menninger was required to prove that: (1) she "engaged in a protected activity"; (2) she experienced an "adverse action"; and (3) "the protected activity was causally connected to the adverse action."  *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 85 (1st Cir. 2019); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 35 (1st Cir. 2010).  While "[r]equesting an accommodation is protected conduct," Menninger did not establish any adverse action by PPD or the requisite causal connection to her protected activity.  *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007).

Unlike an "adverse employment action" in the discrimination context, an "adverse action" in the retaliation context need not be "directly related to [the terms of] employment."  *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 49 (1st Cir. 2015).  As to Menninger's retaliation claim, the Court submitted six allegedly adverse actions to the jury for consideration: (1) PPD attempted to coerce Menninger to quit her position; (2) PPD attempted to manufacture grounds for Menninger's termination; (3) PPD refused to clarify the anticipated changes to Menninger's role; (4) PPD established unrealistic expectations for her role in an effort to drive her out of the company; (5) PPD excluded Menninger from hiring and recruiting decisions; and (6) PPD

23

conducted a sham investigation into her complaint to human resources.[2]  (Doc. No. 160 at 105:10-22.)  None was sufficiently supported by evidence at trial, such that judgment should be entered in PPD's favor as to Menninger's retaliation claims as well.

### A.  Menninger Did Not Present Sufficient Evidence That PPD Tried to Coerce Her to Quit.

As evidence for this proposition, at trial Menninger pointed to the fact that PPD's HR Associate Director proposed the possibility of transitioning to a consultant role that would not require public-facing responsibilities, or accepting a severance package, during their February 28, 2018 meeting.  (Doc. No. 152 at 123:25-124:10, 69:15-70:11.)  But there is no indication or evidence whatsoever that PPD pressured Menninger to accept these proposals—nor is there any dispute that Menninger immediately declined them.  (*Id.*)  "Merely proposing a change," as PPD did, "does not, in and of itself, constitute a materially adverse action.  To qualify, *the proposal must be brought to fruition*."  *Ahern v. Shinseki*, 629 F.3d 49, 56 (1st Cir. 2010) (emphasis added) (citations omitted) (confirming that a "propos[ed] [] change in an employee's schedule" could not constitute an adverse action for retaliation claim under Title VII because not implemented).  This is true even where, unlike here, the record shows an employer levied a "threat" against an employee that "never materialized."  *Goguen v. Quality Plan Adm'rs*, No. 975874, 2000 WL 282485, at *6 (Mass. Super. Ct. Feb. 11, 2000).  And even where, unlike here, the record shows an employee "was *pressured* to sign the severance agreement" or otherwise accept the proposal, there is no adverse action if not consummated.   *Saari v. Allegro Microsystems, LLC*, 436 F. Supp. 3d 457, 465 (D. Mass. 2020) (emphasis added).  Thus, PPD's offer to transfer Menninger to a consulting

---

[2] As with Menninger's discrimination claims, courts routinely look to federal law in considering Chapter 151B retaliation claims. *See Brader v. Biogen Inc*., 983 F.3d 39, 54 (1st Cir. 2020) ("The Massachusetts Supreme Judicial Court [ ] consistently applies federal law in evaluating disability discrimination and retaliation claims.").  The First Circuit has also held that Title VII cases provide "guidance on the proper analysis of ADA retaliation claim[s]." *Soileau v. Guilford of Maine, Inc*., 105 F.3d 12, 16 (1st Cir. 1997).

135880656_41

position that did not involve client interactions, or to accept a severance package, as a matter of law cannot qualify as a materially adverse action.

> **B.      Menninger Did Not Present Sufficient Evidence That PPD Attempted To Manufacture Grounds For Her Termination—And The Court's Legal Conclusions at Summary Judgement Foreclose Such A Finding.**

This theory lacks any legal basis whatsoever.  Even if Menninger showed at trial that PPD had attempted to manufacture grounds for her termination—which she did not—it still is not actionable because any such plan was never "brought to fruition" and thus not "materially adverse."  *Ahern*, 629 F.3d at 56.  As the Court held at summary judgment: "No reasonable jury could find . . . . that [Menninger's] termination nearly eight months after she took a medical leave, and where she showed no sign of intending to return to work, was discharge under the pretext of performance issues."  (Order at 15 (quotations and citations omitted).)  There was no evidence at trial to the contrary.

> **C.      Menninger Failed To Establish That PPD Refused To Clarify The Anticipated Changes To Her Role—And Her Own Evidence Disproves It.**

Menninger herself testified that Mekerri promptly responded to her request for additional clarity with his email in February 2018.  (Doc. No. 152 at 70:22-71.)  That email organized PPD's expectations into five distinct categories of duties and included information on the expected frequency of each task, as well as expected number of attendees at the anticipated meetings and presentations.  (Ex. 350.)  That alone would suffice to disprove this claim.  Yet the record establishes that PPD also engaged in ongoing discussions with Menninger regarding its expectations and possible accommodations until *she* emailed PPD in March 2018 requesting that those discussions be tabled.  (Ex. 271.)

**D.     Menninger Did Not Present Sufficient Evidence That PPD Established Unrealistic Expectations For Her Role.**

This claim also fails.  The record establishes that the expectations which Menninger now contends were part of an effort to push her out of her position, were adopted prior to PPD's knowledge of Menninger's disability (*see*, *e.g.*, Ex. 428), in response "to the needs of the business" (Ex. 350) and client feedback (Doc. No. 157 at 138, 140, 145, 152-53), made applicable to all senior management (Order at 3; Doc. No. 157 at 168-69), and continue to apply with equal force to Menninger's replacement after her departure (Doc. No. 158 at 122:3-127:8).

**E.     Menninger Did Not Present Sufficient Evidence That PPD Excluded Her From Hiring and Recruiting Decisions.**

Menninger also contended that after disclosing her disability to PPD, she was excluded from key hiring and recruiting decisions that had previously been a core role of her job.  (Doc. No. 152 at 84:18-23.)  Yet the trial evidence showed that, to the extent Menninger was excluded from any interviews with potential candidates, it resulted from her specific request to reduce her on-site visits to the Kentucky lab in November 2017, before PPD knew of her disability, due to her "fe[eling] overwhelmed" in her position as Executive Director.  (Doc. No. 155 at 67:21-68:6, 97:3-6.)  An action taken *at an employee's request*—particularly one taken *prior to the employer's knowledge of her disability*—cannot possibly be a retaliatory adverse action.  *See Rivera-Rocca v. RG Mortg. Corp.*, 535 F. Supp. 2d 276, 288 (D.P.R. 2008) (finding no adverse action for ADA retaliation claim where plaintiff "requested a change in employment" and change "took place before plaintiff [engaged in protected conduct]"); *Muñoz*, 671 F.3d at 56 (Where an "adverse employment decision was contemplated but 'not yet definitively determined' before the protected activity took place," it "cannot be caused by that activity." (citation omitted).)

**F.     Menninger Did Not Present Sufficient Evidence That PPD Conducted A "Sham" Investigation Of Her Complaints.**

Menninger's final alleged adverse action concerns a so-called "sham" investigation PPD

conducted into her complaint that Mekerri was "targeting her" because of her disability.  In April 2018, Menninger complained to HR that Mekerri's communications regarding her job performance were impermissibly related to her request for accommodation.  (Doc. No. 152 at 122:9-14; Doc. No. 154 at 72:20-73:5.)  PPD's Executive Director of HR investigated the complaint, interviewing PPD's HR Associate Director, Mekerri, three other employees, as well as Menninger herself numerous times.  (Ex. 450.)  The Executive Director then detailed her findings in writing; concluded that Mekerri's concerns regarding Menninger's performance were unrelated to, and predated his knowledge of, Menninger's disability; and promptly communicated this conclusion to Menninger.  (*Id.*)  Nonetheless, Menninger contends that this investigation was a "sham."  (Doc. No. 155 at 5:15-6:8.)  The trial record shows otherwise.

A "sham investigation" is a term of art—and merely because an employee disagrees with the investigator's conclusion, or even where the investigation was flawed, the investigation does not qualify as a sham unless a higher standard is met.  *See*, *e.g.*, *Billings v. Town of Grafton*, 515 F.3d 39, 53 (1st Cir. 2008) ("[A]n employee's displeasure at a personnel action cannot, standing alone, render it materially adverse."); *see also Forsythe v. Wayfair Inc.*, 27 F.4th 67, 70, 74 (1st Cir. 2022) (rejecting employee's disagreement with outcome of employer's investigation as an indication that it was deficient).

Where, as here, the employer considers corroborating evidence, including by interviewing a host of key witnesses, there is no basis under the law for concluding the investigation was conducted in bad faith or as a "sham."  *See Forsythe*, 27 F.4th at 74-76; *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 302-03 (2016).  Here, Menninger's characterization of the investigation as a "sham" amounts to nothing more than her disagreement with its outcome, which is legally insufficient.  *See*, *e.g.*, *Billings*, 515 F.3d at 53; *Forsythe*, 27 F.4th at 73.

135880656_41

In sum, because the trial record establishes that PPD attempted to accommodate Menninger's disability, granted her six months of paid medical leave, only ended her employment after she expressed no intention of ever returning—*and* never undertook any adverse action against her, let alone because of any protected activity, the jury's retaliation verdict cannot stand, and the Court should enter judgment as a matter of law in favor of PPD on Menninger's retaliation claim.

### III. The Court Should Strike The Punitive Damages Award Because It Is Excessive, Unsupported By Evidence, And Contrary To Law.

Before the Court submitted this case to the jury, it expressed significant hesitancy to even provide a punitive damages instruction given the state of the record, and stated that, should punitive damages be awarded, it would "entertain, seriously, a motion" challenging the award and could always "take it away":

> "I'm leaning to[ward] giving [the punitive damages instruction], not because I— because I think in—Generally speaking, on these kinds of issues, [it] is better to give[] things to the jury th[e]n see. If they decide no punitives, then that's the end. And if they decide there's punitives, I can, then we can always engage in briefing and discussion. And if I think it's improper, ***I can take it away***. It's—punitives, of course, [the] focus is on the conduct, not the harm." (Doc. No. 159 at 171:24-172:7 (emphasis added).)
>
> *****
>
> "But I don't really understand the law to mean that if the harm is really bad, that, alone, can justify punitives. I don't see how the harm, in [and] of itself, without misconduct, could justify punitives. Because you're punishing something and how can you punish if someone didn't—if they didn't [do] anything wrong, beyond the ordinary wrong that gives rise to civil liability. . . .Would I—if it were rewarded, is it obvious to me that I wouldn't make a ruling about—***like I would entertain, seriously, a motion? I would***." (*Id.* at 173:7-19 (emphasis added).)

The Court proceeded to give the instruction (over PPD's objection (*id.* at 163:18-20)), and the jury awarded Menninger an astounding $10 million in punitive damages (Doc. No. 160 at 132:5-7.) Yet even if the Court believes that PPD's conduct was actionable, no reasonable interpretation of the evidence supports *any* punitive damages award, let alone one so excessive.

Not all discrimination or retaliation claims warrant punitive damages. *See Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 110 (2009). "An award of punitive damages requires a heightened finding beyond mere liability," and *even* "beyond a knowing violation of the statute." *Id.* To support a punitive damages award, Menninger was required to prove that PPD's conduct was "so offensive that it justifies *punishment* and not merely compensation." *Id.* (emphasis added). PPD's conduct must have been "outrageous, because of [its] evil motive or [its] reckless indifference to the rights of others." *Dartt v. Browning-Ferris Indus.*, 427 Mass. 1, 17 (1998). There must be evidence that PPD engaged in "a *conscious or purposeful effort to demean*" Menninger because of her protected class, and that PPD *knew* its conduct would cause significant harm. *Haddad*, 455 Mass. at 111 (emphasis added).

The trial record shows that PPD's conduct did not even come close to meeting this standard. As the Court found in its summary judgment decision, PPD attempted to accommodate Menninger by reducing some of her responsibilities and placing her on an extended medical leave at her request. The Court stated:

> PPD allowed two of her requested accommodations. Mere rejection of the other proposed accommodations, however, does not necessarily mean that PPD did not engage in an interactive process. . . . PPD engaged, responded, and gave explanations for why it could not grant the other accommodations. . . . PPD responded that it remained 'committed to an open dialogue' and would continue to review requests for accommodation as she raises them.

(Order at 12-13.) Indeed, Menninger herself conceded that PPD never actually required her to engage in any duty that she said she could not perform. (Ex. 271.)

Courts routinely reject punitive damages awards in similar circumstances. For example, in *Smith v. Bell Atlantic*, 63 Mass. App. Ct. 702, the Court affirmed the trial court's refusal to issue a punitive damages instruction in a reasonable accommodation action. In affirming the trial court, the appellate court invoked the well-established standard that punitive damages may be awarded

29

only for conduct that is "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 721.  The Court explained:

> On the facts presented, there was no basis for finding that the company intentionally or willfully violated the law or that its conduct was evil in motive.  [Plaintiff] contends, however, that 'outrageousness' in the form of 'reckless indifference' reasonably could be found based upon the evidence that she repeatedly requested the same accommodations, they were endorsed by the company's doctors, and yet the company, through its supervisors, failed to support her work-at-home arrangement after nominally agreeing to it.  Although the evidence was sufficient to demonstrate that [Plaintiff's] immediate supervisors should have been more attentive to her needs, we agree with the trial judge that no reasonable jury could find that the company's behavior rose to the level of reckless indifference.

*Id.*  The Court added that, "[e]ven if the jury could have found that the company's accommodations fell short in all the ways alleged, the company's behavior, while actionable, was not so egregious as to warrant the condemnation and enhanced deterrence that underlie the imposition of punitive damages." *Id.* at 722.  The same is equally true here.

Similarly, in *Tobin v. Liberty Mutual Insurance Co.*, the First Circuit held that punitive damages were improper because the evidence showed the employer had considered potential accommodations.  553 F.3d 121, 148 (1st Cir. 2009).  The *Tobin* court stated: "At each point, ***consideration was given—whether or not correctly, but consideration was given***—by the defendant to the relevant factors.  This is not one that comes within either the federal or the state definition of punitive damages." *Id.* (emphasis added).  It made no difference that the evidence showed "that the company was unjustified" in denying the requested accommodation. *Id.* at 149.  Indeed, the Court expressly noted there was "troubling evidence," "implausible testimony" from the employer's witnesses, and allegations tending to support that the employer attempted to "orchestrate[]' [the employee's] discharge." *Id.* at 148-49.  And yet, it held punitive damages were improper.

In a similar context, the First Circuit in *Heagney v. Wong* affirmed a jury's judgment for a plaintiff on his Chapter 151B claim, yet reversed the jury's award of punitive damages.  915 F.3d 805 (1st Cir. 2019).  *Heagney* explained that there was simply "no basis for a reasonable jury to find that the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise . . . . Nor could a jury have reasonably concluded that the defendants engaged in a *conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class)*."  *Id.* at 824-25 (cleaned up) (emphasis added).  So too here.

In contrast, those cases where courts have upheld punitive damages awards reflect a degree of egregiousness altogether absent here.  *See Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 70 (1st Cir. 2021) (upholding punitive damages award where employer entirely *ignored* three separate requests from its paraplegic employee for automatic door accommodation, and employee "experienced difficulty with the doors every day for months until he resigned"); *Arrieta-Colon v. Wal-Mart P.R., Inc.*, 434 F.3d 75, 83 (1st Cir. 2006) (upholding punitive damages award for hostile work environment claim where plaintiff was subjected to continuous harassment, complained to three supervisors, and "[n]o investigation was ever undertaken").

This controlling case law cannot be reconciled with the jury's award of *any* punitive damages—let alone its astounding award of $10 million.  For the reasons discussed above, there is no basis to find that PPD violated the law *at all*.  But, even if Menninger did make out a claim, it is impossible to conclude that PPD's conduct was egregious.  As the Court itself recognized in its summary judgment decision, PPD engaged in a good faith interactive process with Menninger and accepted two of her accommodations requests.  While PPD expressed commitment to a continued dialog, Menninger put their discussions on hold indefinitely.  PPD also took reasonable

31

steps to investigate Menninger's claim of retaliation and never forced Menninger to engage in activities that she said she could not perform.  While the jury might have sympathized with Menninger, or doubted the sufficiency of PPD's response, none of the evidence Menninger presented at trial demonstrated the malice or reckless indifference required to warrant punitive damages.  More simply put, as the Court itself suggested during the charging conference, the award should be vacated.  Allowing it to stand would constitute a serious miscarriage of justice.

## ARGUMENT ON MOTION FOR NEW TRIAL

"[A] district court wields 'broad legal authority' when considering a motion for a new trial"—"much broader than its power to grant a JMOL." *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (quoting *de Pérez v. Hospital del Maestro*, 910 F.2d 1004, 1006 (1st Cir. 1990)). "[U]nlike review of JMOL, the new trial motion standard of review is concerned with whether the verdict is against the weight of the evidence, an assessment made through the lens of abuse-of-discretion review and not requiring that [courts] take the evidence in favor of the verdict." *Id.* at 438.  To that end, the Court is expected "to *independently* weigh the evidence." *Id.* at 436 (emphasis added); *see also MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 132 (1st Cir. 1989).  And "whenever, in its judgment, the action is required in order to prevent injustice," the court "has the power *and duty* to order a new trial." *Jennings*, 587 F.3d at 436 (emphasis added) (internal quotations and citations omitted).  The record in this case compels the Court to exercise its broad authority to grant a new trial here.

## I.    The Court Should Order a New Trial Because the Compensatory Damages Award Is Excessive and Not Supported by the Evidence.

The jury awarded Menninger a staggering $14 million in compensatory damages: $1,565,000 in back pay; $5,465,000 in front pay; and $7,000,000 in past and future emotional distress. (Doc. No. 160 at 131:4-132:1.)  Yet Menninger worked for PPD for just over three years

from August 2015 to February 2019—*including* her eight-month medical leave.  Moreover, as the Court itself found, after PPD was made aware of Menninger's disability, it engaged in a good-faith interactive process in an effort to reasonably accommodate her (Order at 12) and never engaged in any "'plan to remove' Menninger from her position" (*id.* at 15-16).  For these and other reasons discussed below, any reasonable interpretation of the record confirms that the jury's award far exceeds that which is "causally related to the defendant's wrongdoing" and impermissibly renders Menninger "more than whole."  *Conway v. Electro Switch Corp.*, 402 Mass. 385, 388 (1988) (internal quotations and citations omitted).

    **A.**    **The Jury's Award of Nearly $5.5 Million in Front Pay Is Excessive, Not Supported by the Evidence, And Contradicted By The Verdict.**

Economic damages "may not be determined by speculation or guess"—but must instead be "proved with reasonable certainty as attributable to the employer's misconduct."  *Id.* at 389-90 (citations omitted).  Future lost earnings are subject to particular scrutiny.  *Tobin*, 553 F.3d at 141. "An award of front pay that extends over many years to an estimated retirement date should be examined carefully . . . since the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer."  *Cummings v. Std. Reg. Co.*, 265 F.3d 56, 66 (1st Cir. 2001) (internal quotations omitted).

Menninger's expert economist, Dr. Jonas, testified that Menninger's actual economic losses equaled $5,758,267 when factoring in Social Security and disability benefits.  (Doc. No. 159 at 35:5-13; Ex. 455.)  To reach that conclusion, he employed an analysis that cannot withstand the prescribed level of scrutiny—and which depends entirely on a series of assumptions that are not merely unsubstantiated, but directly contradicted by the factual record.

135880656_41

*First*, Dr. Jonas assumed that Menninger, who was 49 years old when she last worked for PPD, would be unable to work in any comparable position for the "remain[ing] [18 years] of her working life." (Doc. No. 159 at 28:24-29:7; Exs. 26, 233.)  This assumption informed every one of Dr. Jonas's findings—and is directly contradicted by the factual record.  Menninger's psychiatric expert declined to support Dr. Jonas's assumption.  Instead, the expert stated merely that he did not "know" and "can't predict" whether Menninger would ever be able to return to work.  (Doc. No. 156 at 199:9-12.)  And while his testimony might have been equivocal— Menninger's was not.  At trial, Menninger testified that, during her paid medical leave (which post-dated her last interactions with the company), she submitted multiple job applications and was actively seeking employment.  (Doc. No. 154 at 38:22-24, 39:9-40:2.)  And yet Dr. Jonas based the entirety of his economic analysis on the assumption that Menninger would never work for the next two decades of her life.

*Second*, Dr. Jonas assumed that Menninger, a three-year employee of PPD, would have continued to work for PPD for the next 18 years past the standard retirement age of 65, in the same position, and earning the same salary. (*Id.* at 34:7-12; Ex. 455.)  The record shows, however, that Menninger had never lasted with any employer for more than five years.  (Ex. 3.)  And, even before there was any discussion of more public-facing activities, Menninger already felt "overwhelmed," her mental health had declined considerably leading to an additional diagnosis, and her performance rating had dropped.  (Doc. No. 153 at 106:8-19; Doc. No. 155 at 67:21-68:6, 97:3-6.)  And what's more, Menninger testified at trial that in January 2018, even before she and PPD began discussing potential accommodations, Menninger's psychiatrist documented that she was engaged in chronic "catastrophic thinking," she had trouble getting out of bed, and had not left the house for weeks due to her psychological decline.  (Doc. No. 153 at 155-58.)  All of these facts

34

strongly suggest Menninger would not have lasted as Executive Director for another 18 years, even if PPD had hired a surrogate employee to perform her public-facing responsibilities.

Even more fundamentally, the jury's front pay award of nearly $5.5 million is logically inconsistent with the jury's own verdict. Menninger cannot have been *both* a "qualified handicapped person," capable of performing the demanding role of Executive Director at PPD for another 18 years, and, at the same time, have been so fragile that the legally required process of discussing accommodations was enough to render her incapable of working for the rest of her life. Yet the jury's verdict presupposes both. For all of these reasons, the jury's wildly excessive front pay award should be set aside and a new trial ordered.

### B. The Jury's Award Of $7 Million For Emotional Distress Damages Is Excessive And Untethered To PPD's Conduct.

PPD cannot be held liable for any emotional harm that lacks a "sufficient causal connection" to its alleged "*unlawful* act." *Stonehill Coll. v. Mass. Comm'n Against Discrimination*, 441 Mass. 549, 576 (2004) (emphasis added). It is not enough that Menninger may have genuinely experienced emotional suffering during and following her employment at PPD. Nor is it enough that Menninger may have experienced emotional suffering due to PPD's *lawful* acts, such as informing her of its expectations regarding senior management's responsibilities. Damages for emotional harm are only valid when they are specifically linked to an employer's *unlawful* and *discriminatory* conduct. *Id.* This required causal connection is wholly absent from the trial record.

Menninger's own expert psychiatric witness could not identify a specific action or omission by PPD that caused Menninger's alleged psychological harm. (Doc. No. 153 at 190-93.) Rather, he opined that Menninger's injuries resulted from her own self-perpetuating anxiety that PPD might somehow reject her. (*Id.*) At trial, Menninger described how she has suffered from

135880656_41

social anxiety disorder and panic attack disorder since childhood.  (Doc. No. 156 at 161:1-5.)  Her expert psychiatric witness explained at length how 20 to 40 percent of "people with anxiety disorder will go on to develop depressive disorders, major depression" at some point in their lives. (*Id.* at 188:19-23.)  The trial record also establishes that Menninger's emotional state was declining by January 2018, prior to any of the alleged adverse actions, when she was diagnosed with agoraphobia (Doc. No. 153 at 106:8-19), felt unable to leave the house for weeks on end (*id*. at 155-56), and was engaging in chronic and debilitating "catastrophic thinking" (*id.* at 155).  While Menninger claimed at trial that she later experienced severe emotional distress due specifically to the interactive process with PPD (Exs. 460, 459)—that process is not merely lawful, it is *required* by law.  What's more, Menninger testified that she was actively seeking other employment *after* she had unilaterally terminated that interactive process.  (Doc. No. 154 at 38:22-24, 39:9-40:2.)

PPD has never disputed that Menninger suffers from severe mental disabilities.  However, discrimination cases, like this one, present a unique challenge.  Unlike cases of discrimination against a physically disabled employee, where any emotional harm resulting from an employer's allegedly unlawful conduct is easily distinguishable from the pre-existing physical disability, Menninger's debilitating emotional distress is part of her underlying condition.  PPD cannot be held responsible for Menninger's pre-existing disability, nor the debilitating symptoms that define it.  The jury's award did just that.  It is this Court's duty to set such an unjust award aside.

## II.    The Court Should Order A New Trial Due To Instructional Errors That Tainted The Verdict.

Granting a motion for a new trial is appropriate where a jury instruction was "misleading or gave an inadequate understanding of the law" and thus "affected the outcome of the trial." *First Act, Inc. v. Brook Mays Music Co*., 429 F. Supp. 2d 429, 432 (D. Mass. 2006) (internal quotation and citation omitted).  Jury instructions that are correct as a matter of law yet "made unduly

confusing" are also grounds for a new trial.  *Teixeira v. Town of Coventry*, 882 F.3d 13, 16 (1st Cir. 2018).  This is particularly so where the jury instruction pertains to a critical issue.  *Id.*

That standard is easily met here.  One of the most central issues at trial was whether PPD failed to reasonably accommodate Menninger's disability.  Over PPD's objection, the Court instructed the jury that a reasonable accommodation could include, for instance, "the provision of qualified *readers* or interpreters."  (Doc. No. 160 at 93:22-23; Doc. No. 159 at 133:11-134:21 (emphasis added).)  This is deeply problematic.  Throughout trial, Menninger referred to her requested accommodations that PPD hire a surrogate to give presentations on her behalf as a request for a "reader."  (Doc. No. 153 at 128:4-18; Ex. 433.)  As the Court noted during the charging conference, the MCAD Guidelines and Title 42 indeed state that a "'reasonable accommodation' may include . . . the provision of qualified readers."  42 U.S.C. § 12111(9)(B); *see* MCAD Guidelines § III.D.  Yet it is undisputed that the term "reader," as it appears in the statute and Guidelines, refers to an individual provided for purposes of *reading* material that a disabled employee is otherwise incapable of reading herself, including, for instance, due to the employee's vision impairment.  42 U.S.C. § 12111(9)(B); *see* MCAD Guidelines § III.D.  These sources do *not* suggest that hiring the type of "reader" Menninger requested, i.e., another qualified employee to stand in for Menninger in performing her essential client-facing functions, is *per se* reasonable.  Yet because the Court's jury instruction invoked the same term without drawing this critical distinction—it strongly suggested something the statute and Guidelines do not.

It is difficult to overstate how much this instruction jeopardized the fairness of the jury's deliberations.  For context, during Menninger's closing argument at trial, her attorney told the jury that "the Judge is going to tell you that reasonable accommodations include . . . things like that provision of qualified readers.  I expect, if you look at Dr. Kessimian's e-mail that, yes, those are,

at least on their face, reasonable." (Doc. No. 160 at 29:19-25.) Moments later, the Court instructed the jury that reasonable accommodations can include precisely what Menninger had requested of PPD: the provision of a "reader." (*Id.* at 93:22-23.) The prejudice to PPD warrants a new trial.

### III.   The Court Should Order A New Trial Because Menninger's Legally Deficient Discrimination Claims Tainted The Jury's Evaluation Of Her Retaliation Claims.

As discussed at length above, the undisputed trial record—including ample evidence submitted by Menninger herself—forecloses several elements required to sustain her discrimination claims. Accordingly, those claims never should have been submitted to the jury. Yet despite the inadequacy of the evidence as a matter of law, the jury heard over and over, including in the Court's instructions, that they could find PPD had unlawfully discriminated against Menninger, which became the context for PPD's supposed retaliation against her. If the Court does not enter judgment for PPD on Menninger's retaliation claim as a matter of law, it should grant a new trial so that a new jury can evaluate the evidence allegedly supporting Menninger's retaliation claim on its own merits.

There is no doubt that these claims were inextricably linked within the evidence submitted at trial; *and* in the narrative Menninger presented to the jury; *and* in the jurors' minds during their deliberations. For instance, one of the potential adverse actions submitted to the jury in support of Menninger's retaliation claim was that PPD's investigation into her complaint against Mekerri constituted a "sham." The sole support for this contention was the investigator's conclusion that no discrimination had occurred. Yet all the evidence submitted at trial supports the same conclusion. The investigation cannot have been a sham purely for failing to find discrimination where none existed. It is impossible to discern to what extent Menninger's "sham" investigation theory contributed to the jury's verdict, just as it is impossible to discern how much of the jury's single damages award was tied to Menninger's inadequate discrimination theory. And given the

38

nature of Menninger's narrative—which revolved heavily around her allegations that PPD had failed to accommodate her disability and subjected her to disparate treatment because of it—it is entirely plausible, if not probable, that the jury never would have found for Menninger on her retaliation claim had it been tried on its own.

"It is settled law that, when multiple claims are submitted to a jury . . . , a new trial is required if some of the claims should not have been submitted and the jury's consideration of those claims may have affected the verdict. . . . [because] it is impossible to tell whether consideration of the improperly submitted claims may have affected the verdict." *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 468 (1st Cir. 1996); *see also*, *e.g.*, *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 30 (1st Cir. 2002) (remanding for new trial on damages after affirming ruling for plaintiff on hostile work environment and constructive discharge claims but reversing as to retaliation: "We have no way of knowing what portion, if any, of the compensatory and punitive damages awards was based on the jury's erroneous finding of retaliation. Accordingly, we have no choice but to remand for a new trial <u>as to damages</u> for the hostile work environment and the constructive discharge." (emphasis added)).  Under these circumstances, the jury's verdict is not valid.

## <u>ARGUMENT ON REMITTITUR</u>

If the Court declines to award PPD judgment as a matter of law or order a new trial, it should, at the very least, remit the jury's patently excessive verdict.  Remittitur is warranted where, as here, a damages award "fails to exhibit a 'rational appraisal or estimate of the damages that could be based on the evidence before the jury.'"  *First Act*, 429 F. Supp. 2d at 437 (citations omitted); *see also Koster v. TWA*, 181 F.3d 24, 34 (1st Cir. 1999) (remittitur is appropriate where an award is "grossly disproportionate" to the "injury established by the evidence").  The jury's $24 million verdict is wholly unjustified and bears no relation to PPD's actual conduct.

"Awards in comparable cases are instructive" in considering remittitur.  *Aponte-Rivera v.*

*DHL Sols. (USA), Inc.*, 650 F.3d 803, 811 (1st Cir. 2011); *see also*, *e.g.*, *Soto-Lebron v. Fed. Express Corp.*, 538 F.3d 45, 69 (1st Cir. 2008) (affirming that courts frequently consider comparator judgments in evaluating the appropriateness of a jury's damages award).

Recent awards in Massachusetts and elsewhere confirm that the instant verdict is unmatched in *any* comparable case.[3]   This damages award—which is unmatched in any comparable case in this district—is grossly excessive in every conceivable respect.  Permitting it to stand would be a miscarriage of justice.

## CONCLUSION

Based on the evidence presented at trial, no reasonable jury could conclude that Menninger established her claims of disability discrimination or retaliation, or the propriety of punitive damages.  For the foregoing reasons, the Court should enter judgment in favor of PPD in its entirety; in the alternative, the Court should order a new trial on the matter; or, at the very least, the Court should strike the punitive damages award and significantly remit the jury's astounding damages award.  The law compels the Court to act.  We respectfully implore it to do so.

---

[3] *See*, *e.g.*, *Kelley v. Airborne Freight Corp.*, Case No. 1:94-cv-10137-WAG (D. Mass. 1996) (awarding **$3,326,858 total damages** for age discrimination and wrongful termination); *Eustace v. Springfield Pub. Schools*, Case No. 17-30158 (Mass Sup. Ct. 2022) (awarding **$903,599 total damages** where school's volatile environment caused teacher to develop disabling anxiety, depression, and high blood pressure); *DaPrato v. Mass. Water Res. Auth.*, Case No. 1584CV03687 (Mass. Sup. Ct. 2018) (awarding **$1,235,000 total damages** where employer refused long-time employee medical leave to undergo surgery and terminated him immediately afterwards); *Dimanche v. Boston Carmen's Union*, Case No. 1584CV03219 (Mass. Sup. Ct. 2018) (awarding **$490,500 total damages** to employee terminated on basis of race and national origin); *Pellegrino v. Nat'l Assn. of Govt. Emps.*, Case No. CV2003-00438 (Mass. Sup. Ct. 2006) (awarding **$630,000 total damages** for sexual harassment and failure to accommodate inability to drive due to physical disability); *Edwards v. City of Boston*, Case No. 1684CV02365 (Mass. Sup. Ct. 2021) (awarding **$945,190 total damages** for failing to investigate claims against him before termination and retaliation for filing suit); *Russo v. Shaw's Woodworking Inc.*, Case No. 1583CV00144 (Mass. Sup. Ct. 2018) (awarding **$61,250 total damages** for sexual harassment and unwanted touching, retaliation, and wrongful termination); *Heagney v. Wong and City of Fitchburg*, Case No. 4:15-cv-40024 (D. Mass. 2017) (awarding **$1,500,000 total damages** for employment discrimination, defamation, emotional distress, and damage to reputation and earning capacity); *Haddad v. Wal-Mart Stores*, Case No. CV2005-00274 (Mass. Sup. Ct. 2007) (awarding **$1,972,774 total damages** for gender-based wage discrimination, retaliation, and wrongful termination).   *Cf. Luppold vs. Flores, N.P.*, Case No. 1681CV01287 (Mass. Sup. Ct. 2023) (awarding **$20 million total damages for medical malpractice resulting in wrongful amputation of limb**).

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.


/s/ *Rachel Reingold Mandel*
Rachel R. Mandel (BBO# 660495)
Patrick M. Curran (BBO# 659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701

Jack S. Sholkoff (admitted *pro hac vice*)
Catherine L. Brackett (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
400 S. Hope Street
12th Floor
Los Angeles, CA 90071
Telephone: (213) 239-9800
Facsimile: (213) 239-9045


ROPES & GRAY, LLP

Douglas H. Hallward-Driemeier (BBO# 627643)
ROPES & GRAY, LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

John P. Bueker (BBO# 636435)
ROPES & GRAY, LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050


Attorneys for Defendant
PPD DEVELOPMENT, L.P.

Dated:  June 9, 2023

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on June 9, 2023.

*/s/ Rachel Reingold Mandel*
Rachel Reingold Mandel

135880656_41