<pre>
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   LISA MENNINGER,

 5         Plaintiff,                    Civil Action No.
                                         1:19-cv-11441-LTS
 6         v.

 7   PPD DEVELOPMENT, L.P.,

 8         Defendant.

 9   _____

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                        FINAL PRETRIAL CONFERENCE
13

14

15
                     Thursday, March 16, 2023
16                          2:01 p.m.

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25
</pre>

1                      **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

        HARTLEY MICHON ROBB HANNON, LLP
4       BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
        155 Seaport Boulevard
5       2nd Floor
        Boston, Massachusetts  02210
6       (617) 723-8000
        phannon@hmrhlaw.com
7       hwatson@hmrhlaw.com

8

9  On behalf of the Defendant:

10       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11      One Boston Place
        Suite 3500
12      Boston, Massachusetts  02108
        (617) 994-5700
13      rachel.mandel@ogletreedeakins.com
        patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (In open court.) |
| 3 | THE DEPUTY CLERK:  The United States District Court |
| 4 | for the District of Massachusetts is now in session, the |
| 5 | Honorable Leo T. Sorokin presiding. |
| 6 | THE COURT:  Please be seated. |
| 7 | THE DEPUTY CLERK:  Today is Thursday, March 16, |
| 8 | 2023, and we are on the record in civil case number 19-11441, |
| 9 | Lisa Menninger versus PPD Development, LP. |
| 10 | And would counsel please identify themselves for |
| 11 | the record. |
| 12 | MR. HANNON:  Good afternoon, Your Honor, Patrick |
| 13 | Hannon on behalf of the plaintiff. |
| 14 | MR. WATSON:  Hampton Watson on behalf of the |
| 15 | plaintiff. |
| 16 | THE COURT:  Good afternoon. |
| 17 | MR. MANDEL:  Good afternoon, Your Honor, Rachel |
| 18 | Mandel on behalf of Defendant PPD. |
| 19 | MS. CURRAN:  And Patrick Curran on behalf of the |
| 20 | defendant, as well. |
| 21 | THE COURT:  I'm sorry, I didn't catch your last |
| 22 | name. |
| 23 | MR. CURRAN:  Curran. |
| 24 | THE COURT:  Curran.  Sorry.  Thank you.  Good |
| 25 | afternoon. |

1            So let me tell you what I want to go over, and then

2    I'm happy, when we're done with all of that, to go

3    over anything else you want to raise.

4            I'm assuming you didn't come here, the five of you,

5    to tell me that you had settled the case, and so I'm assuming

6    that means we're going forward.

7            And I'll just say one thing about that.  I know you

8    went -- you went to mediation, like, awhile ago.  I forget

9    with whom.  A private mediator, right?

10           MR. HANNON:  Yeah.  It was Mr. Maffei, Tom Maffei.

11           THE COURT:  So some of you -- I think Mr. Hannon,

12   maybe in January, tried a case in front of me, a different

13   kind of case, somewhat different than this, and might have

14   heard my longer, like, "think about it" speech.  And I'm not

15   going to give you -- I usually say that, if I give it -- I

16   don't give it in every case.  And when I give it, I usually

17   prefer to only give it when the parties are present if I

18   think there's a good reason.  And I'm not -- I'm not going

19   to -- I'm not giving it now, and I'm not going to tell you to

20   bring your clients in to hear it.  And I'm not inclined to

21   give it on Monday when they're here before we have the jury,

22   mostly because you all seem familiar with the case, you

23   understand what the issues are.

24           And what's important to me, I'll just tell you, is

25   not whether you settle the case or you don't settle the case,

1   what's important for me is that you, Mr. Hannon, and your

2   client, and for you, Ms. Mandel, your client, whoever is the

3   determining person for the company, makes an informed and

4   intelligent decision about whether to settle the case on the

5   best terms they can get or to go to trial.  Those are the

6   only two choices.  Right?  And that people -- and that the

7   only way to make an informed, intelligent decision to do that

8   is to appreciate -- appreciating the risks and benefits.

9          And so I have no reason -- there's nothing about

10  this case that makes me think that either counsel or the

11  parties aren't appreciating the risks and benefits.  And I

12  sometimes do it even if I think people do appreciate the

13  risks and benefits, because sometimes I think it's helpful to

14  hear it from the judge.  But that is what I think is really

15  important, that people appreciate that.

16         And I will tell you that when I have cases that go

17  to trial where I think someone didn't appreciate that, it's

18  troubling, concerning, because it means they weren't well

19  counselled, usually.  Sometimes they were well counselled and

20  they wished not to listen to the counsel.  And that's a

21  different issue, and that's, like, people's choice.  Right?

22         So I'm not going to give you all that.  I don't

23  have any -- my sense is that people -- that you've talked to,

24  you went through an experienced mediator.  You had it, it

25  didn't settle, that's fine.  And I can see that the issues --

1    that there are issues here, and I can see -- there are

2    triable issues.

3           The only thing that I just leave for your

4    consideration is that -- an observation, and you do with it

5    what you will.  And if you wish to do something about it, you

6    can come to me, but otherwise I'm done with the topic, I

7    think.  Which is, in my experience, that in cases in which

8    there are individuals who are parties, particularly

9    individuals who are wronged, sometimes there is an extra

10   power, in an odd way, of wearing a black robe and trying to

11   settle a case.  And the combination of wearing a black robe,

12   in your courthouse, trying to settle a case, that that gives

13   you, with both sides, a little more, like -- makes people

14   think more about all the things that you talk about.  It

15   doesn't mean you're better at mediating.  It doesn't -- but

16   it does mean that people listen a little more and think about

17   it a little more.

18          So I say to that, as -- which isn't to any -- I

19   don't mean that as a criticism of Mr. Maffei or of any

20   private mediator.  And there are things that private

21   mediators probably can do that a judge can't do.  And I will

22   confess to you that I have almost zero experience with

23   private mediation, just in terms of my career and as a judge,

24   so it's not something on which I can really fairly give much

25   of an opinion.  But I can tell you from some experience that

1    I found that effect in, like, certain categories of cases.

2           Subcontractor to contractor in construction

3    litigation, I don't know if there's any benefit to -- there

4    may be benefit to have a private mediator who's deeply

5    skilled and specialized in that area of law.

6           So I just make that observation to you.  You can

7    think about that.  If, for some reason, that caused you to

8    think you want to do something about that and you wanted to

9    see one of the magistrate judges, I'm happy to try to arrange

10   it.  But you don't have to do anything.  I'm not saying,

11   like, get back to me by Monday morning or anything.  You're

12   all experienced and professional.

13          That's my observation.  That's the only thing that

14   occurred to me as I was thinking about the case in realizing

15   that you had mediated.  And I don't know if that would make a

16   difference.  And it won't -- if you came to me and you both

17   wanted that, fine.  If you didn't both come to me to want

18   that, fine.  You won't hear from me about it, I don't think,

19   again.

20          So anyway, that's all I have to say about that.

21          In terms of the -- we want to go through all the

22   issues.  So voir dire and picking the jury, I just want to go

23   over this, a couple things.  This is the general process that

24   we'll follow --

25          For you, Mr. Hannon, probably similar to what we

1    did in Benchmark, with a slight tweak.  I can't remember how
2    many people we picked in Benchmark.
3           So we'll bring in the venire into the courtroom
4    Monday morning, whenever we get the jurors, hopefully around
5    9:30 or 10:00.  I'll ask the general questions.  I'll go over
6    those with you in a minute.
7           But the general questions will be all yes/no
8    questions where they raise their hand.  Each juror will
9    identify themselves by number.  They'll have their number
10   written on a piece of paper and they'll hold it up, and we'll
11   say "juror number 2, juror number 20."
12          When we're done with that, I'll send them all out
13   to an adjacent courtroom, and I'll bring them back in one by
14   one.  But the only people that I'm calling in are the people
15   who raised their hand.  So if juror number 1 didn't raise her
16   hand to any question, I'm not bringing her in.  I'm going to
17   go right into bringing in juror number 2, who did raise their
18   hand.
19          And I'll put the juror in the witness box, and I'll
20   ask follow-up questions about whatever it is that brought
21   them there.  And you can ask -- I'll then give you both a
22   chance to ask follow-up questions.  And follow-up questions
23   are on the topics that brought them into the courtroom, not
24   on, "What books do you read?" or whatever other topics.
25          And then they'll fall into, like, two categories.

1    There will be a few people I'm going to excuse on the spot,

2    because they -- it's so -- they have an obvious, serious,

3    scheduling issue, or an obvious, serious cause

4    disqualification that I basically -- either I'm not going to

5    even look to you, or I'm just going to briefly look to you

6    like, "I'm excusing this person."  And unless you jump up in

7    and down, I'm going to excuse the person.  But otherwise,

8    they fall into the second category; I'm just going to send

9    them out.

10            When they go past those two doors and they're not

11   in the room anymore, so you don't have to worry about them,

12   then stand up if you want to object for cause.  That's the

13   time to object for cause.  And if somebody -- if the -- of

14   course the staff person who's doing this is so efficient,

15   they might already have the next juror coming in.  Just stand

16   up.  I know what that means, and I'll tell them to take the

17   next juror out of the courtroom.  And I'll hear you, and

18   we'll talk about it.  And that's the time to make your motion

19   for cause.

20            If the next juror gets to the witness box and I

21   start to ask questions, the last juror is cleared.  Okay?

22   Because if you raise that, they're fresh in my mind and I can

23   rule, and because your issues might make me think we should

24   ask them more questions and I can bring them back.  But I

25   don't want to bring them back after we've started with other

1     people.  So then I'll either excuse them for cause, or I

2     won't excuse them for cause.  I'll once in awhile say, "Let

3     me think about that," and then I'll reserve and then we'll go

4     to the next one.

5             So we'll keep doing that until -- you each get

6     three strikes.  What we're going to do is seat no alternates.

7     And we'll seat ten to 12 jurors, and at least ten, maybe 12.

8     And how will I decide?  It's really going to be how fast jury

9     selection goes.  So we're certainly -- I'm going to clear for

10    sure 16 to 17 jurors, because that will mean that we have

11    ten -- at least ten for the jury, and you're done with your

12    strikes.

13            If it's going pretty quick and it's easy to clear

14    enough to get to eleven or 12 jurors, I'm going to do that.

15            On the other hand, if we're doing this for a long

16    time, we got jurors late, we cleared 16 or 17 to get to our

17    ten, and the next nine people have raised their hand to five

18    questions each, I might say, "You know what?  We're going to

19    stop here.  This will give us ten or eleven, and we should

20    get going."  And so we'll see.  And I'll just talk to you

21    about that, and you can say something about it, if you want.

22            So once we get to the -- we've cleared enough,

23    however many we've cleared, 16 to 20, we'll stop talking to

24    people.  I'll probably clear one more than we need and --

25    just in case.  And then I'll bring them all back into the

1   courtroom, or at least bring everybody into the courtroom

2   through the last cleared juror and maybe one or two more.

3   And then I'll fill the jury box with the cleared jurors,

4   starting with the lowest number juror.  So if 1 was cleared,

5   1 going to be in the first seat, and then whatever, okay, up

6   to however many we're putting in, ten or 12, whatever number.

7           And then --

8           (The Court and the deputy clerk confer.)

9           THE COURT:  So then strikes.  So you each get

10   three.  So the first round, plaintiff goes.  And plaintiff

11   goes first, and you'll exercise -- I forget -- I forget how I

12   did it -- I'm sorry I'm a little confused, because this trial

13   I just did, it's a pro se plaintiff who's in custody, and I

14   did it a little differently, just to accommodate that.

15           So in any event, you'll go first.  I think I did

16   you do two strikes -- no, no, you do one and one.  Yeah.

17   Because it's a civil case.

18           You'll go first, Mr. Hannon.  You'll be -- you'll

19   strike somebody, if you want.

20           And then you'll go and strike.

21           And just go back and forth, one by one, until

22   you're either out of strikes or you say there's no one else

23   in the box that you want to strike.  And same for the

24   defendants.

25           And then I'm going to excuse everybody you struck.

1    Anybody you didn't strike, they're on the jury.  No

2    back-strikes.

3              And so then round two, I'll fill the empty seats.

4    And in round two, defendants will go first, and we'll do

5    defendant, plaintiff, defendant, plaintiff back and forth,

6    same thing.  We'll just alternate rounds like that until we

7    have the jury.

8              When people get into the box, I will ask everyone

9    to say what they did for work -- what they do or did for work

10   and what their spouse, significant other, whatever person

11   they live with, did or does for work, just so you -- that way

12   you've at least heard from someone who never raised their

13   hand.

14             And then we'll have the jury, and then we're done

15   with that.  We'll take a five minute break, we'll come back.

16   I'll do preliminary instructions, which I'm not going to

17   review with you.  They're -- they're just like what is

18   evidence, what is not, the burden of proof.  I'm not

19   precharging on the elements of the claims.  And then opening

20   statements and evidence.

21             And so, generally speaking in terms of a schedule,

22   9:00 to 1:00 -- well, for the jury, 9:00 to 1:00 each day.

23   For all of you, 8:30 to 1:00.  We'll meet at 8:30 to talk

24   about whatever issues need to be talked about.  If it turns

25   out after time that we don't need to meet at 8:30, we'll meet

1    later, or what have you.  And if we need to meet earlier --

2    that's the time to, like, give me the -- if you can, on the

3    day before -- we'll talk about this later -- you give me the

4    documents if you think I need to read something.  I want to

5    go over the evidentiary issues that you anticipate will come

6    up that day.  Because I can either resolve them, and even if

7    I can't resolve them, you can preview them for me.

8              My goal is from 9:00 to 1:00, the jury is hearing

9    evidence the whole time.  In a perfect world, there would be

10   no sidebars.

11             I don't have a no sidebar rule.  That's just, if we

12   do it well, we would -- that's what we'd accomplish.

13   Sometimes there will be sidebars and they'll have to sit

14   there, but we'll try to do that before 9:00, at the break at

15   11:00, because we'll break around 11:00 for about 15 minutes,

16   or after 1 o'clock.

17             Monday, we might go all day, just because they're

18   going to expect to be here all day.  So we'll talk a little

19   more about that during the pretrial conference, depending on

20   how fast we get the jurors and how far we should go.  And

21   I'll talk to you a little bit about it about how far we might

22   go on Monday.

23             (The Court and the docket clerk confer.)

24             THE COURT:  So we'll keep going for now, but I have

25   a jury that's deliberating and they've reached a verdict.

1    And so one we have everyone, we have the defendants and their

2    lawyers here -- but as I said, the plaintiff is pro se and

3    he's in custody, so he has to be brought up.  So once they're

4    ready for that, then we'll break.  You can stay, but then

5    we'll break, I'll take the verdict, and then we'll resume.

6              Okay.  Any questions about the process?

7              MR. HANNON:  Just when do you expect to decide

8    regarding whether Monday is all day or not?  Is that going to

9    be Monday morning you decide, you think?

10             THE COURT:  No, I'm thinking of talking to you

11   about it today.

12             MR. HANNON:  Okay.

13             THE COURT:  What I'm really thinking, aloud, is

14   simply this.  If we get the jurors at 9:30 and we're done

15   with -- I would love to get as far as we can on Monday, and

16   part of it depends how long you think the trial is going to

17   last.  So the real question in my mind would be, like, do we

18   go past openings.  Right?  And witnesses.  And because -- but

19   we'll talk about that when -- I guess that's --

20             How long do you think the trial will be?

21             MR. WATSON:  I would expect that we're going to be

22   done within the two-weeks allotment.  I would prefer that we

23   go longer on day one, in part because I anticipate that the

24   plaintiff will be the first witness, and given her condition,

25   I think the more her testimony is broken up, the more

1   difficult it's going to be on her, given her anxiety.

2           THE COURT:  Well, if you're willing to do that, I'm

3   fine to go until 4:00 or 4:30 on Monday.  And then each day

4   thereafter, we go 9:00 to 1:00, in part because it's not so

5   hard on the jury, the first day, because they expect it, but

6   also because they won't be sitting, listening to evidence

7   from 9:00 to 4:30.  They'll be listening to evidence only

8   part of the day.

9           Okay.

10          Is that fine with you?

11          MR. CURRAN:  Yes.

12          THE COURT:  So plan on going all day until from

13  4:00, 4:30.  So plan on going something like, subject to the

14  juror issues --

15          Are you ready?  Are they ready with him, or not

16  yet?

17          THE MARSHAL:  He's not here yet.

18          THE COURT:  Okay.  That's fine.

19          9:00 to 1:00, break 1:00 to 2:00 for lunch, 2:00 to

20  4:00, 4:30.  And okay.  And then each day thereafter, we'll

21  go 9:00 to 1:00, until they -- the last day.  And that day

22  will be all day, even if it -- not only for deliberations,

23  but even if that's for closing arguments or whatever.

24          Okay.  Anything else about that?

25          MR. HANNON:  Nothing here, Your Honor.

```
 1              THE COURT:  Okay.  So voir dire.  Let me just tell
 2    you what -- I'm going to give them a little statement about
 3    jury service and the like.  I'll introduce the parties.  I
 4    will -- I'll have you introduce your client, and your
 5    clients.
 6              Are you going to have somebody from the company
 7    who's at counsel's table?
 8              MS. MANDEL:  We will have a representative from the
 9    company.
10              THE COURT:  Okay.  Fine.  So you can introduce that
11    person, and that's fine.
12              And I'll have you introduce yourselves and whomever
13    you're with or your assistants, whoever is going to -- if
14    you're going to have someone like that, that's fine.  And
15    I'll ask them if you they know them.
16              I'll read the list of witnesses that I have.  And
17    you'll just -- I think I have everybody from the list, but if
18    there's another name that you want read, you can tell me.
19              I'll ask them then anything that they know about
20    the case, interest in the case.
21              I'll ask them if they know each other.
22              Okay.  So there's two questions that I wanted to
23    sort of talk to you about.  One is sort of -- one of you
24    asked for a question, something about -- something like this.
25    This is my reframing of it:  Have you, a family member, or a
```

1    close friend ever worked in the fields of psychology,

2    psychiatry, social work, other licensed therapy providers,

3    pathology, or pharmaceuticals?

4              And then I guess my question is why?  And what

5    would we do with that if they answer yes?

6              MR. HANNON:  I would expect that we would ask

7    follow-up questions in terms of what their experience has

8    been.

9              THE COURT:  So I guess I break it apart in two

10   parts.  As to pharmaceuticals, I understand I think this

11   business was pharmaceuticals in some way?

12             MR. HANNON:  It's -- they're a testing business.

13             THE COURT:  Testing business for pharmaceutical

14   companies.

15             MR. HANNON:  I believe that's accurate.

16             THE COURT:  Is that roughly right?

17             MS. MANDEL:  Roughly.  For these purposes, yes.

18             THE COURT:  Okay.  So, like, what -- like -- but

19   what difference -- what would we ask them if they worked for

20   a pharmaceutical company that would possibly bear on whether

21   they could be fair and impartial, which wouldn't be got at,

22   "Do you know these people?  Do you work with PPD?  Do

23   business with PPD?"  Like the number of people who work for

24   pharmaceutical companies -- you can tell me, I'm just try to

25   go figure out, as to that category, as opposed to the therapy

1    category.

2              MR. HANNON:  Sure.  So I think it's the follow-up

3    question the might elicit helpful information.

4              THE COURT:  Like what would the follow-up question

5    be?

6              MR. HANNON:  In terms of what their involvement is.

7    So, for example, are they in a role at a pharmaceutical

8    company where they interact with lab businesses?  Do they

9    interact with PPD's corporate parent, Thermo Fisher?  They

10   might have interacted with companies that some of the

11   witnesses at issue might work for.  So if they're --

12             THE COURT:  So I could see -- but that could be

13   true -- like, Thermo Fisher, I don't know much about them,

14   but I read about them a little bit in the paper, I think

15   they're like a massive employer and a huge company with lots

16   of subsidiaries is my sense.

17             Sound right to you?

18             MR. HANNON:  It does, yup.

19             THE COURT:  If that's an issue, which I'm not

20   sure -- but why don't you just ask them if they've had

21   dealings with them?  That would be more direct.  Why wouldn't

22   that be more direct?

23             MR. HANNON:  Sure.  Because it wouldn't necessarily

24   just be Thermo Fisher.  So during the course of the

25   testimony, they're likely to hear about other companies in

```
 1    this same sort of space.
 2              THE DEPUTY CLERK:  They're here.
 3              THE COURT:  Ready?  Okay.  We'll break now.
 4              Probably you should -- certainly you should take
 5    your things, because he's going to be sitting there.
 6              (Court in recess at 2:21 p.m.
 7              and reconvened at 3:06 p.m.)
 8              THE COURT:  So I guess what I'm wondering about it,
 9    there are two things about the two categories -- you can say
10    whatever you want.  For the pharmaceuticals and pathology,
11    I'm just wondering, like there's so many people, what is it
12    that we're looking for, and could we ask a more specific
13    question if there's something to ask.  Because otherwise, it
14    seems the case is much more not about pharmaceuticals or even
15    labs.  It's much more about her.  Maybe was she able
16    disabled?  What was the extent of her disability?  How does
17    it effect -- what are the essential features of her job?
18    What were the reasonable accommodations?  Were they
19    reasonable?  All those issues.
20              And you can introduce something about it, but I
21    think of all the people that I've just run into in my life in
22    the pharmaceutical industry -- and honestly, none of them
23    strike me as, like, because of that experience, they know
24    anything about anything related to this.  Like I might want
25    to know if they have a -- they're business has a -- like they
```

 1    work with PPD or Thermo Fisher, because of like -- I might

 2    want to know that if that was a lawyer.

 3              MR. HANNON:  Yeah, I think that's a fair

 4    observation, particularly given the number of jurors that may

 5    be inclined to raise their hand given the breadth of the

 6    pharmaceutical piece of it.

 7              THE COURT:  Right.

 8              MR. HANNON:  And I think given your observations,

 9    maybe the better approach is we could be a bit more

10    thoughtful in terms of making sure that all of the potential

11    companies that are going to get mentioned, that the jurors

12    are asked whether or not they have any affiliation.

13              THE COURT:  Yeah.  Like if you give me a list of

14    companies, for example, I'm happy to read them when I read

15    the witness list and just say, "These are the people and

16    companies that you are going to hear about.  If you work

17    with, you know these people or this company -- or you know

18    these people or work with these companies, tell us."  And

19    then we can see.  Like, you know, we'll get the accountant

20    who does accounting work for whatever the other company is,

21    or whomever.  And I'm fine with that.  Why don't you just see

22    what you think about that.

23              And then the other part -- so the therapist, what I

24    call the therapist category of people, I'm wondering is the

25    point that if they're on the jury, they should understand

1     that they're not in there as an expert and they're there --

2     like they might -- whether they work with people with this

3     particular disorder or they work in a totally different

4     aspect of those fields, they might view themselves as, like,

5     "Well, I know about that.  I know what the DSM says about

6     that."  Or, "I know how to read medical records."  And they

7     might bring that expertise to bear in some way.  And is it

8     that you don't want them to be an expert, or is there

9     something else?

10          MR. HANNON:  I think it's similar to the concern

11    that you just raised.  It's not just that those folks are

12    inclined to view themselves as experts, but -- but they're

13    more likely to have experiences that -- that may give them

14    some bias with respect to the issues in this case.

15          So, for example, you know, they may have a family

16    member who pursues a certain field of psychiatry or a certain

17    discipline within it, and may, even if they themselves don't

18    know it, they have some tangential knowledge.

19          So again, the point of the question is not the

20    original question itself of simply screening out everyone

21    that's got any experience.

22          THE COURT:  Sure.

23          MR. HANNON:  But the follow-up question of, "Well,

24    tell us what that is," and finding out if that experience is

25    something that we may have some concerns, they may have some

preconceived notions, And if so, asking them, "Despite that, are you able to set that aside?  And rather than judge this based upon your own experiences, based upon the evidence" --

THE COURT:  Sort of like the law enforcement question -- a cousin of the law enforcement question in a criminal case?

MR. HANNON:  Right.  Yeah.

THE COURT:  Okay.  So I'll ask them:

Have you, a family member, or a close friend ever worked in fields of psychology, psychiatry, social work, or other" --

Are there other licensed therapy providers besides those?

MR. HANNON:  That's not necessary.

THE COURT:  Okay.  So psychology, psychiatry, or social worker.

And then if they say yes, we'll -- "Just tell me a little bit" -- the follow-up question is, "Tell me a little bit -- who it is, and tell me a little bit about what it is." If they work -- they, themselves are licensed, I get it, they shouldn't be, just like a lawyer is not a legal expert on the jury.  I'll just tell them, and can they do that, and we'll see.  And otherwise, what's the level of it, and we'll see.

Is it really, like, family member or any close friend that you're thinking?  I'm just thinking about are

1    they really likely to have acquired much -- it's not sort of

2    quite such a strong identification as sort of law enforcement

3    that sometimes runs in families.

4          MR. HANNON:  I don't know.  I think my experience

5    is doctors tend to talk with their families a lot about

6    interesting cases and approaches and all of that.

7          THE COURT:  Okay.  I'll leave it, see what happens.

8          That's the only -- then I'm going to ask them:

9          Have you, a family member, or a close friend ever

10   been fired from a job for reasons that you believe were

11   unfair, discriminatory; been accused of discriminating or

12   retaliating against someone in the workplace; been involved

13   in any kind of investigation at work of the same as

14   management, witness, or employee requesting an accommodation

15   for disability in the workplace or requested --

16         I think I'm going to skip the medical leave,

17   because that is -- there's -- I understand she did take

18   medical leave here.  But medical leave is so broad that I

19   think with so many people raising their hand for things that

20   have nothing to do with this case.  And I think the other

21   encompasses it, as well as the general question:  Is there

22   anything about this case that would make it difficult for you

23   to be fair and impartial, having told them about the case.

24         I'll ask them if they've ever worked in a

25   supervisory position where you received or considered a

1    request for accommodation for an employee's disability.

2            Then there's some general questions:  Have you

3    formed an opinion about the case?  Has anyone talked to you

4    about the case?  Are you aware of any bias or prejudice?  Or

5    anything about the facts or parties in this case that might

6    make it difficult for you to be fair and impartial?

7            The rest of the stuff is just general legal

8    principles, like can you follow the law and you may only

9    decide it based on what happens in the courtroom.  Have you

10   ever been involved in -- you, a family member, or a close

11   friend in a civil lawsuit as a party or witness or in a

12   lawsuit similar to this one.

13           I'll ask them if they've ever served as a juror in

14   any way and if such service might make it difficult for them.

15   So rather than bringing everyone up who's been on a jury,

16   only bring people up who think that might make it difficult

17   to serve here.

18           Language question, hearing question, schedule

19   question.

20           Let me read to you what I was thinking of saying as

21   the neutral description, and you can tell me if there's

22   something else or different that I should say:

23           This is a civil case.  The plaintiff is the person

24   bringing the case.  In this case, the plaintiff is Dr. Lisa

25   Menninger.  The defendant is the party being sued.  Here the

1  defendant is PPD Development, LP, which I will refer to as

2  PPD for short.

3           Dr. Menninger is a former employee of PPD.  PPD

4  hired Dr. Menninger in August of 2015 to work as the

5  executive director of its global central labs based in

6  Kentucky.

7           In January of 2018, Dr. Menninger disclosed to PPD

8  that she suffered from social anxiety disorder and panic

9  disorder, and she requested that PPD provide her with

10  accommodations for these conditions.  She alleges that

11  thereafter, PPD failed to provide her with reasonable

12  accommodations for her medical condition, discriminated

13  against her on the basis of her conditions, and retaliated

14  against her for requesting accommodations.

15           Dr. Menninger further allegations that PPD's

16  actions severely exacerbated her preexisting medical

17  conditions, caused her to develop major depression, and

18  ultimately rendered her enabled to work.  She seeks to

19  recover for the lost wages and emotional distress that she

20  alleges she suffered as a result of PPD's alleged actions.

21           PPD denies Dr. Menninger's allegation.

22           Fine?  Any changes, additions, subtractions?

23           MR. HANNON:  That's fine from our perspective,

24  Your Honor.

25           MS. MANDEL:  And fine from ours.

1          THE COURT:  Fine.  Okay.  So that's pretty much
2     everything for the voir dire.  The only follow-up that you'll
3     get me -- you'll file some -- talk to each other, what list
4     of company names I should read when I read the names of the
5     witnesses.
6          MR. HANNON:  Okay.  And you want that before Monday
7     morning or --
8          THE COURT:  Honestly, I -- I just need it before
9     the jurors come in.
10         MR. HANNON:  Okay.
11         THE COURT:  It doesn't really matter when.  I just
12    need to have in my hand before they come in the room just so
13    I can read it.
14         But if all of you agree, I'm going to read the
15    names.  I don't have a problem with that.  It makes sense to
16    me.  I generally think we should read names of people, even
17    if they're not witnesses, if they're someone they're going to
18    hear a lot about, where they might have to make a decision
19    about that person.
20         So, for example, in this trial, I read the names of
21    the perpetrators, even though one of the perpetrators in no
22    way was he going to be a witness.  Because if they knew him,
23    if they were the victim, they shouldn't be on the jury.
24         So fine.  Just give me the names.  No problem.
25         All right.  So that brings us to the motions in

1    limine.  Let me --

2              One thing back about the schedule.  So if we start

3    on Monday and we go 9:00 to 4:00, 4:30.

4              Do you know, Kellyann, how many people are

5    impaneling on Monday?

6              THE DEPUTY CLERK:  Just us.

7              THE COURT:  Oh.  Great.

8              So we're the only people right now impaneling on

9    Monday, which means we should get the jurors 9:30, 9:45.

10             So what time did we finish with Rice with the jury?

11   Like 11:00?

12             THE DEPUTY CLERK:  Like 11:30.

13             THE COURT:  So if we figure we have the jury by

14   11:30, I think two -- those two questions about the -- are

15   going to -- engender some number of raised hands.  And if you

16   figure 20 minutes for the preliminary instructions, how long

17   are you each going to be for openings, about?

18             MR. HANNON:  I would expect about 15, 20 minutes.

19             MS. MANDEL:  Similar for us.

20             THE COURT:  So say an hour to do the preliminary

21   instructions and the openings.  So hopefully we're done with

22   all of that by 1 o'clock.  And then we'd have 2:00 to 4:00,

23   4:30.  So two, to two and a half hours for witness testimony.

24   And thereafter, 9:00 to 1:00 -- like, are you --

25             I'm going to tell the jury in the voir dire how

1      long it lasts, but I'm going to present it as a promise, like

2      that they will get it by -- we're starting on Monday, by the

3      Friday the following week.  That that means that no later --

4      that means that we start closing arguments on that Friday

5      at -- no later than at 2 o'clock, really, ideally at 9:00 or

6      10:00.  And that will give you time for closing arguments,

7      instruction.  And they will get it by 4:00, 4:30, I would

8      feel like I met my promise.  They would have at least a half

9      hour to deliberate.

10             If they get it earlier, they'll be happy.

11             My experience is that if we tell them Friday and

12     they get it Friday, they're okay.  If they get it Thursday

13     earlier, they're thrilled.  If they get it after Friday, then

14     they get grumpier.  So it's better to tell them in advance

15     longer, than it is to extend it afterwards.  Sometimes we

16     have to extend it.  Snowstorms are different, and that

17     doesn't count.  That doesn't count in my mind as an

18     extension.

19             So I'm just -- so does that seem -- you all know

20     the case better than I.  Like if we do that, and efficiently,

21     will we -- like you're comfortable and reasonable with that?

22             MR. HANNON:  I am, Your Honor.

23             MS. MANDEL:  We are, as well.  Thank you.

24             THE COURT:  Good.  Okay.

25             Motions in limine.  I've read them all.  I want to

1    talk first about defendant's motion to exclude documents

2    produced on February 24th, number 103.  And let me just

3    explain the -- what I discern from this, and maybe you have

4    an explanation, Mr. Hannon.  But I looked through this, and

5    so on the Rule 26 disclosures that I have, that were

6    submitted with these exhibits, you list backpay, front pay.

7    Are these stock options -- the stock and the stock options,

8    are they within pay?  I don't know.  They're not wholly

9    different, but I don't ordinarily think of them exactly as

10   pay.  But I understand she gets them as pay in a way.  And

11   there's no particular computation there, though, of that.

12           And then there's the interrogatory answer, where

13   clearly you say she would have been entitled to -- you not

14   only lost salary, and so forth, but other things she would

15   have been entitled to, in connection with her employment with

16   defendant, i.e., stock options, equity, et cetera.  If I read

17   that, I would think he was going to be claiming that.  That's

18   what he said in response to the interrogatory.

19           And then you then say the essential facts

20   establishing, that is answering the other part of the

21   interrogatory, that's for the computation of damages to these

22   categories that are reflected in the documents produced by

23   plaintiff.  Plaintiff anticipates expert testimony will be

24   provided to further illuminate it.

25           But the expert specifically carves out, as you

1    point out, he's not rendering an opinion about those things,

2    so they can't find that computation damages in the expert

3    report about options or equity.  And the document, the P-101

4    document, is, I have the impression, explains the basis for

5    the claim; that is, that that's the document that gives her

6    openings and grants.

7          And I'm wondering about the computation.  Like how

8    do they -- I don't really know, I can't really tell.  This

9    could be a super simple mathematical computation, or it could

10   be fairly complicated.

11         And anyway, so I'm wondering about that, because

12   it's not -- I'm not persuaded that it's a -- you had no idea

13   he might be talking about that.  He said something there.

14   But I can also see how you -- like if I read that and I

15   didn't have any document showing entitlement and I didn't

16   have any document that explained what your calculation was

17   and the expert didn't address it, I might come to the

18   conclusion that it's not in play.  And I would probably also

19   come to the conclusion, I don't need my expert to address it.

20   And I'm wondering about that.

21         That seems to me in part, in a way, what they're

22   saying, and a little more significant than just the timing of

23   documents.

24         MR. HANNON:  Sure.  So to clarify, the production

25   of documents included many documents demonstrating what her

1 equity rights were and what she had in terms of stock and
2 options; that all of that was timely disclosed with our
3 productions in this case.

4    P-101 is just sort of a better version of that.
5 It's sort of a clearer, kind of, one-stop shopping sort of
6 thing.

7    If you take P-101 out, we've still got all the same
8 information with respect to the documents that's out there.

9    THE COURT:  You mean that she got this many shares
10 of stock and that she has this many options; and that she had
11 to sell the stock when she got terminated, and otherwise she
12 wouldn't have had to then sell the stock.  And then she would
13 have had it -- absent termination on the day of termination,
14 she would have had this many options and this many grants.

15    Are you claiming that she would have accumulated
16 more before Thermo Fisher purchase, putting aside stock
17 splits?

18    MR. HANNON:  We don't have any information of that
19 right now.  Part of the problem is that discovery closed
20 several years ago.  The Thermo Fisher acquisition happened in
21 the meantime.  So there's a certain level of sort of an
22 unknown here in terms of what, if any, equity or additional
23 compensation was issued to this category of employee at the
24 time of the acquisition.

25    THE COURT:  I see.  So she didn't have a contract

1    that said, you know, after three years, you get 25 years, and

2    the fourth year you get another 25, and the fifth year -- so

3    if she was terminated at year three, you could say, oh, well,

4    year four, and she would have gotten this, and year five.  If

5    she gets more shares than she had at the time she was

6    terminated, she only gets them because there was a

7    class-wide, so to speak, decision that everyone at her level

8    or every employee or every of some category that she would

9    have fallen into would receive some additional shares?

10           MR. HANNON:  That's accurate, Your Honor.

11           THE COURT:  All right.

12           MR. HANNON:  Back to what I was saying about kind

13   of what was disclosed in the documents.  So even if you take

14   P-101 out, we already have all the information there in terms

15   of what she owned.  P-101 is just sort of a cleaner way of

16   presenting to the jury.

17           In terms of the sort of calculation, you know, the

18   problem there is that the actual calculation is largely

19   dependent upon things that have happened more recently,

20   particularly relative to the Thermo Fisher acquisition and

21   the stock actually having value.

22           THE COURT:  But wouldn't you have had to, like, at

23   the close of, say, fact discovery, or some time, say, this is

24   our computation now, as of now.  Sure, like, it could -- it

25   might, given Thermo Fisher acquisition, maybe you update

1    that, maybe it changes.  But, like, I'm wondering, there

2    doesn't seem to be any computation.

3            MR. HANNON:  Right.  Only because it's a moving

4    target, right?  In terms of what her equity rights are worth.

5    If we're picking a number based upon a particular day, that's

6    not going to be the value at the time of the trial.  That's

7    sounds like a value that she's seeking.  So certainly with

8    respect to categories like backpay, we know what was being

9    paid.

10           THE COURT:  Sure.

11           MR. HANNON:  But things like equity, we know what

12   she had for equity.  We don't know what that equity is going

13   to be worth at the time of trial.  So we could certainly give

14   a -- a value at any particular point in time, but that's not

15   really a disclosure that does anything.  They know what their

16   stock is worth.  So they're not -- they're not losing

17   anything in terms of us doing the math and telling them what

18   the math is.

19           THE COURT:  So is your -- like at trial, assuming

20   you get to do whatever you want, is your calculation she had,

21   like -- I don't recall the numbers, but she had X number of

22   shares in your papers on this motion, and there was a 25,000,

23   or something, options.  And so she had these two things, and

24   it's just the stock times 47.5.  And the options -- the

25   number of options times 47.5, 47.5 being the Thermo Fisher

1  purchase price for all of those things.  And as to the

2  options then minus the strike price, or whatever you had to

3  pay for them under the contract.

4          MR. HANNON:  It's a little more complicated than

5  that, because there was a conversion done in connection with

6  the acquisition.  So it's not a one-for-one tradeoff.  So you

7  have to do a little bit of math to figure out how many shares

8  in PPD equates to how many shares in Thermo Fisher.

9          THE COURT:  Okay.

10          MR. HANNON:  But once you do that math, then I

11  believe the you math that you described is all that's left.

12          Is that right?

13          MR. WATSON:  Are you talking about the stock split?

14          MR. HANNON:  Yes.

15          MR. WATSON:  Sorry.  The stock split was in 2020.

16  But it's just simply multiplying by 1.8 or dividing by 1.8.

17  So it's quite simple math.  That was before the Thermo Fisher

18  acquisition.  But as long as you account for the stock split

19  and then two adjustments to the strike price, which are just,

20  again, adding and subtracting type calculations, you can

21  figure out the price you would have gotten at the time of the

22  Thermo Fisher acquisition.

23          THE COURT:  But why don't you have to at least say,

24  "Here's our calculation"?  Like it's this -- like at the end

25  of fact discovery -- maybe fact discovery ended, I forget,

1  before the stock split or after, but either without that

2  calculation or with the calculation, depending on the timing,

3  and then, like, "What we're claiming is like the value.  And

4  the value -- we'll be claiming the value, you know, at" --

5  that she could just hold on to it, and it has this value.  So

6  the value at trial, minus whatever she was paid for it.  And

7  then you could update it with, "Well, there a stock split,"

8  or update it with -- why wouldn't you have to commit that

9  way?

10         MR. HANNON:  Because there was no definitive value.

11  Right?  We're talking about shares in a privately held

12  company.  So until the acquisition actually takes place and

13  there's -- there's no sort of ascertainable.

14         THE COURT:  All right.  Well, so it was a privately

15  held company.  But wouldn't you then have to say, "We want

16  either" -- wouldn't you then have to say, "We want -- one of

17  the things that we want is the value of this."  Right?  "And

18  then so we -- this is what we know.  We think she's entitled

19  to this many options and this many shares, and we want the

20  value of that.  And the value of that, we're going to have,

21  probably, an expert."  Or, "We say it's worth this because of

22  some" -- whatever, you got venture financing or whatever.

23  Right?  There are a lot of different ways you could do it.

24  It was a non -- presumably a nonzero number.

25         And then presumably you could change that position

1   because of events, right?  That's what I'm taking from there.

2   I don't know if I'm putting words in their mouth, but I'm

3   wondering if that's what they're thinking.

4          MR. HANNON:  So in terms of what we could have

5   done, I think you're right, that you can -- you know, you can

6   do a sort of valuation of a private company to come up with a

7   value of --

8          THE COURT:  Here's what I'm wondering, though,

9   then, right --

10         MR. HANNON:  But that doesn't necessarily get you a

11  price, because there's no actual buyer for it, right?  It's

12  not until someone actually comes and buys the company that

13  you really have an ascertainable value to it.

14         THE COURT:  Sure.  But if it were a private

15  company, right, you would be -- you could be seeking the

16  value of those shares, and there are a variety of proof

17  methods that you could use to prove it.  Like you could get

18  a -- you could have a company valued or you could look at

19  different things that they did.  They got bank loans against

20  assets or their revenue is -- and you got to say, "Well, it's

21  20 X of revenue," or whatever.  And when they paid somebody

22  else, they bought somebody out.  Whatever.  There are

23  different method that you could use to try to ascertain the

24  value of those shares that she didn't have anymore, that she

25  would have gotten.

1          And I understand those more -- like I guess what

2     I'm wondering is I could see them thinking, well, that's how

3     you would have to do one method like that for private

4     company.  You didn't do that.  You didn't have your expert do

5     it.  So ah-ha, you must not be seeking it.  We don't have any

6     way to figure out what it's worth.  That's like a conclusion

7     that they might have come to.  And if it were a private

8     company still, you'd probably be out of luck.  Right?

9          MR. HANNON:  I think that's right, Your Honor.  If

10    it was a private company still, then we would be relying on

11    some kind of a valuation, and we didn't do that kind of

12    valuation.  So you're right.

13         THE COURT:  So then what I'm wondering is they're

14    sort of thinking you're not doing it, and all of a sudden --

15    I understand it's a simpler evaluation now than it was then,

16    but they might have come to that conclusion.  And what would

17    they have done if they had known you were seeking it?  Maybe

18    they would have done something differently.  I don't know.

19    What do you think about that?  That's what I'm wondering

20    about.  That's what I sense when you narrowed it down to the

21    biggest issue.

22         MR. HANNON:  One, I don't think that there's

23    anything that they could have done differently, because we

24    aren't talking about something that is disputed or

25    disputable.  Right?  The value of their stock is the value of

1    their stock.  The stock split, it's reported in there, in

2    their documents.  It's not a contested or contestable fact.

3    There's -- this isn't an issue where we're looking at

4    something that's a matter of opinion or a matter of judgment

5    here.  What we're looking at is a mathematic computation.

6              THE COURT:  What do you all have to say?

7              MS. MANDEL:  Your Honor, I actually do think it's

8    more complicated.  What the value would have been -- right,

9    first of all, it's entirely speculative at this point,

10   looking back.  And indeed, the company's actions --

11             THE COURT:  Which is speculative?

12             MS. MANDEL:  What the value of what Dr. Menninger

13   would hold now.  The company would have taken different

14   steps, had we had any idea that this was a direction --

15             THE COURT:  So two different parts.  One, what

16   would you have done if -- if --

17             Mr. Hannon has essentially conceded that if the

18   company were still private, he would be out of luck.  He

19   couldn't be seeking the value for options, because in order

20   to do that, he would have had to have some expert or

21   something like that or point to something for valuation to

22   determine.  And he said --

23             So tell me -- and if he had done that, then he

24   would have probably changed his methodology of proof, because

25   then the company sold and he would -- rather than rely on the

1    valuation of what PPD was, he might then switch to times the

2    47.5 and the, quote, simple math that he described.

3            So what would you -- had he done all of that, what

4    would you have done differently?

5            And then I guess second, why is the calculation

6    speculative or not so simple?  Because those seem to me like

7    somewhat different questions.

8            MS. MANDEL:  Understood, Your Honor.  And what we

9    would have done is a little bit hard to say at this point.

10   Right?  But we certainly would have done more to understand

11   what Dr. Menninger thought this value was, where she had that

12   information from, consulted our own people within the

13   company, both PPD and Thermo Fisher, to understand if that

14   was accurate.  In any and all likelihood, we would have had

15   some type of information from Dr. Menninger's own economic

16   expert about how these numbers play out and what value it

17   might have going forward.  And then we would have had our

18   expert respond, all of the things that you do during expert

19   discovery to better understand from both parties.  That's one

20   thing that we would have done.

21           And I will just note that in terms of doing further

22   exploration within PPD and Thermo Fisher to understand what

23   that value is from our perspective is really no small task,

24   because we're talking about following through with people

25   who, in some instances, are no longer there.  After the

1    acquisition, different things happened with that type of

2    department in the company.  Right?  So really, this is

3    information that, in some ways, we were no longer able to

4    obtain once we got this late disclosure of sort of this

5    approach.

6              THE COURT:  So what you're saying is the following

7    is beyond hypothetical, it's fantasy.  But if I said, "Oh,

8    I'm going to move the trial for three months" --

9              I'm not doing that.  Okay.  That's why it's

10   fantasy, but just saying.

11             If I were to move the trial for three months and I

12   said to you, "Okay.  I'm moving the trial for three months.

13   I'm going to let him do this.  But tell me what you need."

14   What you're telling me that you would need is you would want

15   to serve him an interrogatory that says -- or you'd either

16   need a motion to compel or an interrogatory that says, "Give

17   me the exact computation about how you're computing the stock

18   option grant and the stocks as the evaluation.  Lay it out in

19   a piece of paper."  That's what you would want.  Essentially

20   a supplemented interrogatory 10, where you asked for that.

21             And then you would want to take that, and you would

22   go to the people in-house at PPD or Thermo Fisher and say --

23   and look at these documents, P-101 or the other documents, as

24   well as the computation, and say, "Okay.  Is this right?  Is

25   this how you would calculate it, assuming that -- and what

1    are the things that you see, whether" -- even if it's correct

2    or there were different dates or however you would calculate

3    it.

4           And then you would understand it and decide you

5    have -- like you agree, if she gets that far, that's the

6    right calculation.  Or, no, you don't, and you would

7    calculate it this way, or whatever -- and then you would also

8    decide whether you needed your expert to opine on that.

9           Would that pretty much be what you need to do?

10          MS. MANDEL:  That's right, Your Honor.

11          And part of this might have involved not only

12   additional interrogatory questions, but also trying to

13   understand was there another witness in the background,

14   perhaps a financial advisor, giving Dr. Menninger information

15   and advice to help her understand what the value of this

16   might be.  This is all -- we've heard from counsel what they

17   have determined, but we really don't know where this

18   information is coming from, whether Dr. Menninger has done

19   this exploration on her own, if there's someone else helping

20   her.  This has all been a bit of a black box.

21          We received 1,400 documents on February 24th, less

22   than a month before trial, and we really don't know what else

23   is going on behind the scenes in Dr. Menninger's

24   calculations.  And that really shouldn't be, given the

25   lengthy discovery in the case and the opportunity for

1    additional discovery in the intervening period, if it was

2    called for by a change in business circumstances.

3         THE COURT:  What do you want to say?

4         MR. HANNON:  The SEC, that's where they go to find

5    the information.  They don't need to go to Dr. Menninger or

6    somebody else.  They go to the SEC.  And the SEC has it

7    because they gave it to them.  And we outlined in our

8    opposition the exact reports, the 1,400 documents, 1,400

9    pages that they got, and it's all those lengthy SEC reports.

10   And we sort of spelled out, you know, which ones have the

11   sort of necessary numbers here.

12        But this isn't a fact issue.  It's not a disputed

13   issue.  They can provide hypotheticals of different things

14   they might have wanted to ask or places to look, and all of

15   that.  They didn't to look in any of those places; it's in

16   their own report.

17        THE COURT:  Is there a document now that explains

18   the computation of this amount of the damages?  The damages

19   arise from these two things, the options and the stock?

20        MR. HANNON:  No.  There's no one single document

21   that I can show you that has the precise computation.  We

22   could provide that, but we've not -- there's no document like

23   that that exists.

24        THE COURT:  Okay.  All right.  I want to think

25   about this a little bit.  I think this is a -- I just want

1    to -- I want to think about it.  That's why I started with

2    it.

3            I think the three LinkedIn documents, they strike

4    me as a different category.  As I understand it, you said two

5    things for them, Mr. Hannon, but I'm not sure you can get

6    both things out of those documents.  One thing you said is

7    there are other people working remotely, and that seems to me

8    something that you could ask people anyway.  For those

9    purposes, like maybe they should have been disclosed earlier,

10   I'm not sure.  It's a duty to supplement.  Maybe you just

11   learned about it.  I don't view it as a big issue.

12           I think that you're on notice now that he's going

13   to say those three people work remotely.  And he could ask

14   anybody, I think -- or not anybody, but within the zone of

15   relation of the kind of work she did in the company, or

16   whatever, she could ask if anyone else was -- he could ask if

17   anyone else was working remotely.

18           You cited for also that they're working remotely

19   well.  I don't think that their LinkedIn -- like I don't

20   think their LinkedIn can be introduced for that purpose, and

21   I'm not even sure whether the LinkedIn is admissible to

22   establish that they're working remotely or what.  Because

23   it's not the defendant's LinkedIn.  And these are employees,

24   and their LinkedIn isn't really their official page on their

25   website.  So I don't even know if their LinkedIn pages are

1    admissible.

2            But as to them working well, I don't -- well, I

3    mean, Dr. Menninger's LinkedIn, if she had one, presumably

4    might have said she was working remotely, but I don't know

5    that the defendants could infer or argue that the LinkedIn

6    establishes that she was working -- or you could argue that

7    she was working well from that.

8            And people are on LinkedIn, you know, right up to

9    the moment they're fired.  And that doesn't really prove

10   anything about that.

11           So I don't know what -- I don't know if it's

12   admissible or not.  I'm not excluding it because of the

13   timing of the disclosure.  Because I think the only thing it

14   really stands for is it's a piece of -- as I read it, you're

15   saying to them, "I learned this information about these three

16   people, that they are working remotely," and that's a fact

17   that, like, you can get at in the trial, with or without

18   those documents.  Whether those documents are actually

19   admissible, I'm not sure.  I don't think so, but I'm not

20   ruling on that now.  But I don't see how they're admissible

21   to show that they're working well or successfully.

22           MR. HANNON:  You're right.

23           THE COURT:  Okay.  Okay.  So the other part of the

24   motion, which is the larger and relates to this other issue,

25   I just want to think about it a little bit.

1        Let me run through all the other motions.  And I'm

2    happy to hear you about them, but let me just maybe, for the

3    interest of time, first, give you some sort of overview

4    thoughts.  So the first -- just going through them in order

5    of docket number.

6        Number 100, the motion to exclude unrequested

7    accommodations.  In some sense, the motion is moot.  You both

8    agree with what I said in the footnote, which is that the

9    plaintiff is limited to those that are sufficiently

10   requested.  And the real question is what's sufficiently

11   requested.

12       The -- there are two aspects to that that seem

13   like, from what -- the opposition, that might actually be in

14   dispute.  That's what I took.  Those are the things that you

15   think.  One is, are plaintiff's -- Dr. Menninger's repeated

16   request for more detail about items 2 to 4 of Mekerri's

17   February 6th e-mail a sufficient request for accommodation

18   such that it goes to the jury?

19       I think that there's -- the way I think about this

20   issue is there are some things that are, like, so far beyond

21   the bounds that I would rule them out essentially on a

22   preliminary -- like 104 basis, that no jury could reasonably

23   conclude that's a sufficient request for an accommodation.

24       On the other hand, anything that's closer, like the

25   jury gets to decide whether it's a sufficient.  And if

1    there's a dispute about it, there will be evidence.  And the

2    jury -- I can instruct the jury what is a sufficient request.

3    And then they'll decide.  And only those that are sufficient

4    will they consider in terms of requests.

5              So I'm -- that one I'm inclined to leave to the

6    jury, I'll just tell you.

7              As to conducting a good-faith investigation into

8    the internal complaints, whether that's a sufficient

9    request -- is by that you mean, Mr. Hannon, is her request

10   for an investigation itself a request for a reasonable

11   accommodation?

12             MR. HANNON:  Yes.  And not just the initial

13   request, but the communications and the context of why she

14   was asking for the investigation and what she wanted

15   investigated.  And I'm not saying that every time someone

16   requested an investigation, it's a request for accommodation.

17   My argument would be that based upon what they knew at that

18   point about her disability and about the way different things

19   would negatively impact her health, that a reasonable jury

20   could find that they should have recognized that this is

21   something that she needed as -- in order to sort of fully

22   enjoy the -- whatever the language is in terms of what gives

23   you an accommodation.

24             THE COURT:  All right.  I'm going to -- probably

25   going to think about all of these things.

1           And I'll hear you.  Go ahead.

2           MR. CURRAN:  Thanks, Your Honor.  I don't know that

3      there's any evidence or any indication that I've ever seen

4      that she asked for an investigation.  She said, "I have this

5      complaint," and the company performed an investigation, as

6      it's required to do under the law.  So I'm not sure that

7      there was ever even a request for accommodation.  It doesn't

8      sound to me, based on what I know about the case, like there

9      was one.  In terms of asking for an investigation, that was

10     not something that I think there's any indication that was

11     ever requested.

12           Also, as I'm sure Your Honor knows, there has to

13     be -- the request has to --

14           THE COURT:  Never be so sure.  I appreciate the

15     thought, but never be so sure that I know.

16           MR. CURRAN:  Well, I was looking at *Jones v.*

17     *Nationwide Insurance*, a First Circuit case, and it says that

18     the request has to not only provide notice of the conditions,

19     but of a causal connection between the major life activity

20     that it limited and the accommodation sought.  And there was

21     never any -- there wasn't even a request, but there certainly

22     wasn't any linking between, "I need this -- I need you to do

23     an investigation so that I can -- because of my anxiety, so

24     that I can do my job."

25           THE COURT:  Okay.  I'm going to think about this.

1    I think the general rubric that I'm thinking about is that

2    there needs to be some basis that, like, preliminary I could

3    look at to say that I might be able to infer sufficiency.

4    And if this is, then I'm likely to let it in and give it to

5    the jury.  But if there isn't, then no.

6            As to the two specific examples, I'll think about

7    it.  And -- but that's to the extent there are other issues.

8    To the extent the motion affects other issues, that's how I

9    would think about it, and we'll just resolve it as we go.

10           The second motion to exclude compensation date of

11   other employees.  As I understand this, what -- what I

12   understand is Mr. Hannon's not seeking generally to put in

13   how much other people are paid.  What he's seeking to put in

14   is the -- well, first, the people who are at a similar level

15   or held the position she held after she was left or

16   terminated, what kind of increases they received in terms of

17   percentage increases?  Were those bonuses and equity plan,

18   and were those either awarded to people because of the level

19   that she was on, and therefore, it would support a reasonable

20   inference that the jury could choose to draw that she would

21   have received them, or were they somewhat discretionary, but

22   awarded to people who had the same kind of performance level

23   reviews at her?

24           Is that pretty much -- that's my sense of what

25   you're looking for.

1          MR. HANNON:  Correct.

2          THE COURT:  So as to that, why wouldn't that be

3    permissible?  Which is different than from how much does her

4    boss make?  Which I don't see -- I don't think he's asking

5    for that.  And that's -- wouldn't -- there wouldn't be

6    evidence of that.

7          MR. CURRAN:  Okay.  Well, that was one of the

8    things that we were trying to exclude.  So that's helpful to

9    know.

10          THE COURT:  What I'm thinking it's narrowed to is

11    the percentage increases people at her level received, or

12    people -- if there's some categorical -- like every federal

13    employee on January 1st received an X percent increase,

14    right?  So if there's things like that, that seems fair in

15    terms of her front pay argument.

16          MR. CURRAN:  If there are things like that.  My

17    concern is that, you know, to the extent it's based on

18    performance, she worked there for two and a half years.  I'm

19    not sure there's enough of a -- of a foundation for anyone to

20    say that she was going to continue, whatever her performance

21    reviews were, and they varied.  I mean, it was good the first

22    two years, bad the second year -- not bad, but okay.  The

23    second year, it went down.

24          THE COURT:  Yes.

25          MR. CURRAN:  I don't think there's any basis to say

1    that she would have had any particular performance level

2    going forward, so I think the foundation issue would be

3    difficult.

4              THE COURT:  For the discretionary kind of things,

5    as opposed to bonuses, equity, and percentage increases

6    awarded either across the board or to people in her category.

7              MR. CURRAN:  To the extent that, yeah, things would

8    have been -- to the extent it showed --

9              THE COURT:  So I guess what I have to say about

10   that, to some extent, that depends on the facts.

11             MR. CURRAN:  Right.

12             THE COURT:  The closer you can tie it, and the

13   better your chance.  The further more removed it is, the

14   harder it is.  And I think that would be the line.  I don't

15   think I could -- excuse me -- resolve that now.  But as to

16   how much did the boss make or how much did other people make,

17   it's moot because Mr. Hannon's not offering that.

18             MR. CURRAN:  Understood.

19             THE COURT:  So the only thing that he's seeking is

20   these three things.  And what I understand the nature of the

21   real issue now between the parties is the discretionary

22   increases, the ones that weren't automatic to her category or

23   automatic to every employee.  And that, I think, depends on

24   sort of enough evidence to support a reasonable inference if

25   the jury chose to offer it -- draw it, that it would apply to

1    her, given how you have shown that it applied to people who

2    were similarly situated.  And the closer they are to her, the

3    more likely they could draw the inference.  Okay.

4              As to -- we talked about the motion to exclude

5    documents.  The motion to bar the adverse -- an adverse

6    inference on Mekerri's absence.

7              I think that's unopposed?

8              MR. HANNON:  It is, Your Honor.

9              THE COURT:  M-e-k-e-r-r-i, is that how you spell

10   his name?

11             All right.  Fine.  So that's allowed as unopposed.

12             The motion to exclude stray remarks.

13             That one is number 105, Kellyann.

14             The motion to exclude stray remarks by

15   nondecision-makers, number 107.  So what I understand is

16   there's really one thing that you want.  And from there,

17   they -- defendants cited a couple comments.  They had an

18   e-mail -- some of it is repeating.  But there's one

19   particular comment that I understood you to want.  It was the

20   one you mentioned in your opposition.

21             MR. HANNON:  Yeah.  I think there's really two.  So

22   there's the statement directly by Dr. Fikry, the caption of

23   his e-mail, where he says, "What's the timing of the exit?"

24   But then there are -- in other communications there are

25   statements attributed to him, where he's inquiring, following

1    up asking.

2            And the importance there, since we already know

3    what he's asking about, really the significance there is what

4    their response is to the question.  It --

5            THE COURT:  The person's response to the question.

6            MR. WATSON:  That's exactly right.

7            THE COURT:  That -- I don't think that's a stray

8    remark.  That's -- he's the boss of her boss.  And her boss

9    is somebody involved in the decision, as I understand it, or

10   the -- and the issues.  And so I think that it strikes me as

11   close enough to allow it in.

12           And the jury might -- I'm not saying that it is --

13   I'm not saying he is a decision-maker and they have to factor

14   it in that way, but it seems to me that it's close enough

15   to -- that it would not be excluded as a stray remark.  But

16   I'm happy to hear you.

17           MS. MANDEL:  Your Honor, I just wanted to add one

18   important fact there.  Dr. Menninger was not terminated.  She

19   went out on a leave --

20           THE COURT:  Right.

21           MS. MANDEL:  -- June 3, 2018.  And then she stayed

22   out on leave for eight months.  So it's not a situation

23   where, say, her boss terminated her, and her boss's boss had

24   been asking --

25           THE COURT:  Right.  But she's claiming that in this

1    time period, she was discriminated against.  Like I
2    understand her claim -- the discrimination claim in part to
3    be:  I told my employer I had these two disabilities.  That's
4    her position.  And that then they started looking -- their
5    response was, "Let's get rid of her."  And my understanding,
6    which isn't necessarily -- I'm not saying that's -- in no way
7    am I saying that's the truth.
8            But I think that's fair as part of what your theory
9    is?
10           MR. HANNON:  Yes, Your Honor.
11           THE COURT:  And he's the boss's boss.  And my
12   understanding, in part, of your theory, is that her
13   performance was declining before you knew anything about her
14   disability, and you were just -- there were two things going
15   on.  Her performance was not on the rise anymore, but it was
16   dipping; and second, there were things going on at the
17   company that were causing changes that weren't specific to
18   her that were -- that were going to apply to her, but they
19   weren't adopted because of her.
20           And that then those, like, led to this, like -- and
21   the -- the explanation might be that the people in the
22   company's view was these are essential functions of your job,
23   and we don't think we can accommodate exempting you or
24   accommodate them in some other way.  Right?  And that -- and
25   of course -- or any accommodation we made would be an undue

 1    burden.

 2                So that might be, I think -- but it's still during

 3    that time period and fits with -- could fit with both

 4    theories.

 5                That's fair, in part, as to what I -- am I

 6    understanding of, in part, your theory, correct?

 7                MS. MANDEL:  Actually, Your Honor, our theory and

 8    what we think the evidence will show is slightly different,

 9    which is that this really wasn't a case that was very much

10    about Dr. Menninger's performance at all.

11                THE COURT:  All right.

12                MS. MANDEL:  Some of those issues had come up in

13    2017.  Those issues continued into 2018.  But, in fact, these

14    questions were about something completely different.  Which

15    is that after January 2018, when Dr. Menninger said, "I have

16    these disabilities, and I can't do these job functions," that

17    that became a challenge for the company to understand.  Is

18    she going to stay in this job?  Is she not going to say in

19    this job?  We need someone in this job from a licensing

20    standpoint, so we're just trying to understand what she's

21    saying.  So.  In fact, Mr. Fikry's comment were exactly that,

22    trying to understand.

23                THE COURT:  And I have no doubt you will very ably

24    tell the jury that.  I think that's why -- I can see how the

25    statements potentially support your position, though you

1  might prefer to support your position without them.  But I

2  think they support -- potentially support Mr. Hannon's

3  position.  And they don't --

4        I think of stray remarks as if, you know, the

5  person who runs -- who reported to her and runs some -- one

6  of the labs just makes a comment to a co-worker, and neither

7  of them are involved in these reasonable accommodation

8  decisions or anything else, about whatever, a comment that

9  could be inferred to be evidencing bias against people with

10  social anxiety disorder or disabled people generally, that

11  would be a stray remark.  It wasn't said to the

12  decision-makers.  It wasn't someone part of the process.

13  There wasn't evidence that they heard it.  I think that's --

14        But he's in a different category.  And the comment

15  is in the time period.  And so I think that that motion is

16  denied.

17        The motion to exclude evidence about dismissed

18  claims.  So again, I think this comes down to really what the

19  evidence is.  You both agree to the obvious, which is that

20  evidence that is only relevant to the dismissed claim is not

21  admissible.  And evidence that's relevant to a live claim is

22  not inadmissible, because it's also relevant to a dismissed

23  claim.  But it can only be offered if it is relevant to a

24  live claim.

25        That seemed like the evidence is partly about the

1    evidence about a potential departure, and that might be what

2    you're all thinking about right now.  I'm not sure if that's

3    the only thing or if I'm right about that.

4            Is that really what's in play in the motion?

5            MR. CURRAN:  I think it's one of the main things,

6    Your Honor.  And so just to --

7            THE COURT:  Explain.

8            MR. CURRAN:  Just to recap a little bit.

9            So in the summary judgment decision, you dismissed

10   the claim that the supposed, you know, scheme to get her to

11   leave was an adverse action in the context of the

12   discrimination claim, because you held that no reasonable

13   jury could find that it was.

14           And then with respect to the retaliation claim, you

15   looked at a specific event that occurred in February, which

16   was the meeting between Mr. Mekerri, one of the HR people,

17   and Dr. Menninger, where the HR person allegedly said

18   something about -- you know, offered her a severance package

19   and said, "Maybe you can work as a consultant or something."

20   And you ruled that that could be an adverse action for the

21   retaliation claim.

22           THE COURT:  Say that again?  I ruled that -- oh,

23   that the statement at the beginning of the meeting, "Do you

24   want to leave," as Dr. Menninger's version, that could be an

25   adverse action.

```
 1              MR. CURRAN:  That could be an adverse action --
 2              THE COURT:  For retaliation.
 3              MR. CURRAN:  -- for retaliation purposes.  And so,
 4   you know, I suppose, that's different than saying that, you
 5   know, evidence of a scheme to get her to leave is an adverse
 6   action for purposes of the retaliation claim.
 7              I'm not sure how relevant those e-mails are to, you
 8   know -- to the -- you know, what was said in February of
 9   2018.  To the extent they are, we would argue that it's
10   unduly prejudicial, because a jury could be confused into
11   thinking that those -- there some evidence of a scheme was,
12   you know --
13              THE COURT:  Not with my jury instructions written
14   at a Ph.D. level.
15              MR. CURRAN:  Well, yes, jury instructions could
16   potentially --
17              THE COURT:  So it's -- the focus is on --
18              MR. CURRAN:  Fikry.
19              THE COURT:  -- Fikry e-mail and some other related
20   e-mails?
21              MR. CURRAN:  Yeah.  I believe that there are some
22   other e-mails, not just the Fikry ones.
23              THE COURT:  All right.  I want to think about --
24              Anything you want to say about that, Mr. Hannon,
25   beyond what's in the papers?
```

1          MR. HANNON:  So two points.  One is I -- I don't

2     think that your ruling on the summary judgment is as narrow

3     as defendants argue.  I don't think you argue that only one

4     particular instance --

5          THE COURT:  Decided.  I don't argue.

6          MR. HANNON:  I'm sorry?

7          THE COURT:  Decided.  I don't argue.

8          MR. HANNON:  I'm sorry.

9          THE COURT:  It's okay.

10         MR. HANNON:  I was thinking ahead here.

11         The issue that you decided was that only one

12    particular instance could have been an act of retaliation.

13    My recollection is that you dealt generally with the theory

14    of the scheme to coerce to quit.  So all of the evidence of

15    that scheme, I would suggest, is admissible for that reason.

16         But even if you had limited it to just to one

17    event, certainly the fact of all of these other things that

18    happened both before and after at least is some evidence of

19    what they were attempting to do in that February 28th meeting

20    and further what their motive and intent was.

21         As Your Honor pointed out, there is a factual

22    dispute in terms of what actually happened at that meeting,

23    and whether or not there was, indeed, the scheme to get her

24    to quit.  And if that was their aim, that would certainly be

25    pertinent to the jury in determining who to believe as to

1    what happened.

2              THE COURT:  Okay.  I want to think about that.

3              The next one is number 111, the motion to exclude

4    evidence, the relationship.  That's agreed upon.  I'm just

5    allowing that motion.  It's without prejudice, Mr. Hannon, to

6    what you suggested, which is if you think it becomes

7    relevant, bring it up outside the presence of the jury and we

8    can talk about it and we'll see.  But for now, it's excluded.

9              And kudos for reserving it.  It's hard to see how

10   it would be relevant, but I'm happy to hear you if you think

11   it is.

12             The motion to exclude the voluntary

13   self-identification answer.  So one question that I have is,

14   as I understand it, Dr. Menninger's position is, I was then,

15   when I filled out that form; I was at the time of these

16   events in 2017/2018, suffering from this disability.  That's

17   the position in court today.  And there's no dispute that the

18   defendants didn't know, before she sent that January 12th

19   e-mail.  Right?  You're not claiming they knew before then.

20             MR. HANNON:  Correct.

21             THE COURT:  And you're not saying your client knew

22   before that.  Like the first anyone in your client knew was

23   before they got that e-mail, right?

24             MS. MANDEL:  Correct.

25             THE COURT:  Okay.  So I don't think you need it to

1    show that -- to prove that you didn't know before

2    January 2018, because they're not going to -- he's not

3    claiming it.  It's practically stipulating that -- they're

4    going to argue the first time.

5              So the other part of it, if there's something about

6    that, I'll hear you.  But it seems to me the real issue is

7    credibility.

8              MR. CURRAN:  I think that's right, Your Honor.

9    Although, I do think that, you know, we certainly intend to

10   offer evidence.  It hasn't been officially stipulated to that

11   we didn't know, as far as I'm aware.

12             THE COURT:  You're going to elicit from witnesses

13   that --

14             MR. CURRAN:  Yeah, I want people to say, you

15   know --

16             THE COURT:  "Did you know."  Right.  And I think

17   that's fair.  You can do that.

18             But my only point is that the -- if he crosses

19   those witnesses to challenge those statements, it could be

20   different.  But it's hard to see how Mr. Hannon is going

21   to -- why or how he would do that.  So it strikes me the real

22   weight and force of the document is not to have that extra

23   piece of paper when she's concedes -- she's going to concede,

24   she's going to say on the witness stand, "This e-mail is the

25   first time I said it," that no witness is going to say they

1   learned about it before.  He's not going to cross anyone and

2   challenge that.

3           It's really -- the significance of that document,

4   it comes down to the credibility that she said "no" at a time

5   when she says now she was then disabled.  Right?

6           MR. CURRAN:  That's correct, Your Honor.

7           THE COURT:  And her credibility is an issue, like,

8   obviously, in the case.  I don't mean that there's anything

9   wrong with her credibility, but that's obviously something

10  that the jury is going to have to evaluate.

11          So why wouldn't it be -- I guess one argument is

12  the law about the regulation.  You can tell me something

13  about that.  I haven't dug into that enough to rule on that

14  now.  And I'll look at that, and obviously if the regulation

15  limits it in some way, then that might be different.  I'm not

16  saying it does or doesn't.  But why wasn't it -- why wouldn't

17  it be relevant for credibility?

18          MR. HANNON:  Because it would not be a permissible

19  inference for the jury to draw from her filling that out,

20  that in some way she was doing something that's different

21  from what she's saying now.

22          The form doesn't define what a disability is.  It

23  doesn't explain the very technical definition in terms of the

24  now fairly low bar, after the ADAAA, in terms of what

25  constitutes a disability under the law.  And actually, if you

1   look at the form, it has some examples there, which are very,

2   very different from the disability that Dr. Menninger had and

3   has.  So that's sort of one issue, is whether or not it would

4   even permissibly support an inference that she was, in some

5   way, not telling the truth.

6          Another issue concerns, really, the sort of

7   confusion and undue prejudice to be drawn from all of this.

8   As I think some of the case law that we cite in our brief

9   points out, you know, there's an inherent reluctance on the

10  part of employees to disclose disabilities.  That's why the

11  law says what it says in terms of the limited use of these

12  documents.  By permitting employers to have employees fill

13  these things out, it's not intended to be a "gotcha."  It's

14  not intended to be something that you can later say, "Ah-ha,

15  you didn't tell us then, you can't tell us now."

16         And that's another reason why it's not reliable,

17  and it's also a reason why it's prejudicial.  To the extent

18  that a jury looks at this and says, "Well, it's unfair that

19  Dr. Menninger didn't tell them at the outset," she had no

20  obligation to tell them at the outset.  And there are a host

21  of inferences that --

22         THE COURT:  Well, that would be a different thing,

23  right?

24         MR. HANNON:  Right.

25         THE COURT:  This -- like to say that her failure to

1     tell them is -- somehow prejudiced them is different.  You're

2     not claiming any damages or anything wrong done by them

3     before January 12th.  That would be a different --

4              Who gets the form?  Is it submitted directly to the

5     government, or does the employer get it?

6              MR. CURRAN:  I believe it goes to the employer.

7              THE COURT:  So somebody in HR, or something,

8     typically would receive it back.

9              MR. CURRAN:  Yeah.  My understanding is that one of

10    the purposes of it is to allow the federal contractor to

11    evaluate their efforts to recruit people with disabilities.

12             THE COURT:  And when they -- when the contractor --

13    so it's a requirement that federal contractors do this.

14             MR. CURRAN:  That's my understanding.

15             THE COURT:  And when a federal contractor --

16    presumably, they provide this to the government, in some way,

17    at least in a -- like we have 100 -- we hired 100 people this

18    year.  The next percent said yes to this question.

19             MR. CURRAN:  Yeah.  I believe they're required to

20    report statistics.  I don't think they send the actual forms,

21    I think they provide statistics to the government.

22             THE COURT:  Suppose somebody says yes to this form,

23    and they check off -- they don't have to check off, I guess,

24    the particular disability, but they say yes.  Does that --

25    like how is that known to people?  Other than the statistical

1   importance to the government, what, if anything, does the

2   company do with that?

3            MR. CURRAN:  I don't know the answer to that

4   question, but I assume that, you know, if this was on the

5   other side and the plaintiff had checked "yes" and the

6   company was claiming that they didn't know that she was

7   disabled, then this would be evidence that the company knew

8   that she was disabled, you know, and that they had some

9   obligation to follow-up.

10           THE COURT:  Somebody in a wheelchair and works

11   in -- like you can't move this person's office to the second

12   floor in a building with no elevator.

13           MR. CURRAN:  Right.  Or something that's visible,

14   and the person puts on the form, "Yes, I have a disability,"

15   that, potentially, could be argued to raise a -- an

16   obligation on the part of the company to follow-up and say,

17   which, "You know, does this disability, you know, interfere

18   with your ability to do the job?" or something like that.

19           THE COURT:  Okay.  Anything else you want to add,

20   Mr. Hannon?

21           MR. HANNON:  Disability is a -- a bit of a loaded

22   word, and certainly to anybody filling out an employment

23   application, I -- I think there are a lot of disabled people

24   who don't identify as disabled.  And for the jury to draw any

25   kind of an inference based upon the fact that when

1    Dr. Menninger got this job she did not identify herself as

2    disabled would not be a proper inference that wouldn't be

3    supported by the evidence.

4           And there are a host of other inferences that the

5    jury could draw from this evidence which would be clearly,

6    impermissible.  And if this is offered, it needs to be

7    offered with a number of instructions, concerning what the

8    purpose of the form is, concerning what it can properly be

9    used for, concerning the fact that the failure to disclose

10   this doesn't change PPD's obligations.  And I would submit

11   that we would spend more time instructing the jury on this

12   particular point than this has any relevance whatsoever to

13   the claims.

14          THE COURT:  Okay.  I want to think about this one,

15   too.

16          Then there's the motion to exclude the medical

17   expert testifying to what was not in his original report.

18   And that doesn't -- and that applies to the time period of

19   his original report.  That's what I understand the scope of

20   the motion to be.

21          MR. HANNON:  Yeah.  Whatever is new, we agree

22   that's fair game.  But in terms of new and --

23          THE COURT:  Why can't he, though -- as I understand

24   the facts, everybody -- both sides had experts, did expert

25   reports.  Presumably you might have done depositions or at

1    least had the opportunity.  And then in January, there were

2    some more medical records that you disclosed.  And then in

3    early/mid January, a little bit, pretty quickly thereafter,

4    your expert did probably a short -- I haven't read it --

5    supplemental expert report saying, "I've reviewed these

6    additional records," and either, "I stand by all of my

7    opinions, or I modify them however I modify them.  Or I

8    augment them however I augment them."

9         And two weeks later, their expert says, "I've

10   reviewed those extra things," and says, "this is" -- like, "I

11   reaffirm, and this is what I do.  And I have these -- one

12   opinion about the caliber of certain reports, of certain

13   medical records or documentation, and one about sort of this

14   control," which you point out.

15        But why can't they revisit what they've done about

16   the original time period?  They could have a new view based

17   on additional evidence.

18        MR. HANNON:  If -- if the expert said that these

19   new records led him to form a conclusion, then I think you're

20   right, that that's fair game.  He doesn't say that.  What he

21   says is he specifically attributes his opinion not to these

22   new records, but to prior records.

23        And it is -- it's a -- it's a significant change

24   from what his testimony was before.  We did oppose him -- I'm

25   sorry, we did depose him.  I specifically asked him at his

1    deposition whether or not he had the opinion that she was

2    faking it, and he said "no."  And now, in their expert

3    disclosure, they have, under the guise of a supplement,

4    really had him go back in time to the start and now offer a

5    whole new category of opinion, really without even explaining

6    what necessarily the, you know, sort of opinion is.  It's

7    somewhat vague in and of itself.

8              THE COURT:  So what you're really saying is that in

9    the second page of his opinion, in the part that

10   starts, "Overall," you're saying he's just saying, "By the

11   way, now I have a new opinion or additional opinion about

12   her," and it's based on all the old records.  And that

13   happened after the deposition, and that's not fair.

14             MR. HANNON:  Right.  If he had an opinion based

15   upon the old records, he was obligated to give that opinion

16   at his first -- in his first report.  And the idea that, you

17   know --

18             THE COURT:  And you're saying this is different

19   than if he had read these new records and said, "I've read

20   these new records.  And now in light of these new records, I

21   reread the old records.  And the combination of the two

22   causes me to come to the paragraph, and it's given me an

23   insight that I didn't have before," then he could do that.

24             MR. HANNON:  I think he could.

25             THE COURT:  And you're saying but that's not what

1    this is?

2              MR. HANNON:  Correct.

3              THE COURT:  What do you say?

4              MS. MANDEL:  Your Honor --

5              THE COURT:  Just so we're clear, I understand this

6    to be a dispute not about the entirety of his supplemental

7    report, but basically just about, on the page 2, the

8    paragraph that begins -- that's really two paragraphs, "As

9    mentioned," or, "Overall."  Those two paragraphs?

10             MR. HANNON:  I believe that's right, Your Honor.

11   It's the issue about, I want to say, faking it.  That's not

12   the medical term.

13             THE COURT:  Malingering.

14             MR. HANNON:  Malingering, yeah.

15             THE COURT:  But that's the paragraph overall, about

16   control and dictating.

17             MR. HANNON:  Correct.

18             THE COURT:  Right.

19             MS. MANDEL:  Your Honor, I think what you just said

20   a moment ago is exactly right, which is that Dr. Kelly, in

21   this paragraph, seems to be going back and saying, "If we

22   look back, now we have a retrospective that goes from 2017

23   until now, and I see this pattern that I'm describing."  That

24   is not in any way inconsistent with what he said earlier, and

25   it's not based only on records that he had at the time of his

1          original report several years ago.  It's saying, "Now I have

2          a fuller set of data."

3                   In fact, the data in this case that relates to the

4          time period following Dr. Menninger's employment really only

5          runs from 2018-2019 until now.  So at the time expert

6          discovery was done, not as much of that time period has

7          passed.  There's now a bigger picture, and he's describing a

8          pattern that he saw.  And in fact, that's exactly what he

9          does in this paragraph.

10                  And it's really no different from what

11         Dr. Summergrad, who is plaintiff's expert, did in his report,

12         which is to talk about looking at the documents and the data

13         and seeing a direct line back to 2018.  That's exactly what

14         Dr. Summergrad did.  Right?

15                  So I think this is equivalent.  It's looking at the

16         totality of the information in front of me.  I am now looking

17         back at everything, including information that we've just

18         learned from 2021 and 2022 and rendering an opinion about

19         that.  It's not a new or different opinion about the earlier

20         documents.

21                  MR. HANNON:  I respectfully disagree and -- but

22         there might be an ambiguity here, in terms of whether or not

23         this is something new that he just saw now, based upon these

24         new records that he hadn't seen before, versus something that

25         he saw before but didn't put it in his report.

1          And I would suggest that the appropriate way to

2     address that would be to provide an opportunity for voir dire

3     of the witness prior to his testimony to determine what of

4     those two it is.  Is this something new that he just found

5     out, based upon what he read in these new supplemental

6     documents?  Or --

7          THE COURT:  You mean in the sense that he says

8     either, "I didn't see a pattern," or, "I perceived the

9     possible pattern, but not sufficient to opine on to a

10    reasonable degree of medical certainty.  And then when I read

11    these additional records, it was either sufficient pattern or

12    for the first time I saw the pattern because I had a bigger

13    time scope.  And if it's either of those, he had gets to do

14    it.  It resolves the ambiguity.  If he says, "Look, this is

15    just based -- it was there before," then he doesn't.

16         MR. HANNON:  Right.

17         THE COURT:  What do you say about that?

18         MS. MANDEL:  Your Honor, respectfully, that sounds

19    like what we have here is a plaintiff who disclosed these

20    documents less than two months before trial, even though

21    plaintiff had them in her possession on a rolling basis for a

22    very a long time, produces her expert's view of these

23    documents.  Then we produce our expert's view of these

24    documents.  And this was all a rush before trial due to what

25    plaintiff produced.  There's no time for supplemental

1    depositions, additional inquiries about what these reports

2    might mean.  And now approximate plaintiff is trying to get a

3    quick bite of the apple on that right before trial.

4    Respectfully, it seems a very inappropriate way for plaintiff

5    to be handling these late produced documents.

6              THE COURT:  I'll think about it.  Okay.

7              Anything else either of you -- I'll resolve, before

8    the end of the day tomorrow, a short order resolving all the

9    motions in limine, other than the easy ones that I took care

10   of today.

11             Is there anything else either of you want to

12   address?

13             MR. HANNON:  Nothing here, Your Honor.

14             Oh, actually, just one thing to mention.  So we did

15   submit a witness -- I'm sorry, exhibit lists with our

16   pretrial memo.  We've been working to take out some

17   duplicates on that.  I think there were some things that were

18   unintentionally excluded, as well.  So anyhow, long story

19   short, we're going to be submitting a joint amended exhibit

20   list, hopefully end of day tomorrow.

21             THE COURT:  Fine.

22             MR. HANNON:  But I think we're on the same page

23   regarding that.

24             THE COURT:  Okay.  Just I haven't -- I'm not even

25   sure I have the exhibits, but I haven't reviewed them.  And

1    with respect to the contested exhibits, I can't -- I don't

2    intend -- though there weren't -- there are still a fair

3    number.  I certainly can't rule on them without reading them,

4    having them.  I don't have them, that's fine.  You don't have

5    to give them to me right now.  But my thought, generally, is

6    to rule on them as we go.

7             And to the extent that you can preview those issues

8    for me, like what's coming up on Monday, Monday morning

9    before we get the jurors.  Or you can preview it Tuesday

10   morning, what's coming in Tuesday.  And if you think you're

11   going to preview Tuesday morning, give Ms. Belmont or me the

12   documents Monday afternoon or evening so I can read them.  To

13   the extent that it's the kind of thing that that would be

14   useful to do, that's helpful.  And that will speed the

15   resolution and let me talk to you.  It will avoid having

16   lengthy sidebars, maybe even avoid any sidebars.  In a

17   perfect world, we won't have any.  That's my suggestion about

18   the ones that are contested.

19             Anything else for you?

20             MS. MANDEL:  Your Honor, two quick things.  The

21   first is just to draw your attention, in the pretrial memo,

22   it was not a contested issue at all, but just one particular

23   issue with a witness who will certainly be testifying in a

24   second week.  So it's not an urgent issue.

25             THE COURT:  Oh, the one about coming up -- yeah,

1    that's fine.  I have no problem with that.  Happy to do that.

2    I really leave that to all of you.  I won't remember that,

3    necessarily.  But so just -- I think what you -- what you

4    should try to do is either call that witness at 9 o'clock,

5    like first thing, and then we'll just put the witness on the

6    witness stand before the jury comes in.  Or, you know, we

7    could call -- I'm happy to say, like, we break at 11:00 one

8    morning, and you're in the middle of a witness, we could stop

9    that witness, have him come in, have him start, you know, so

10   then he can get settled in the witness box during the break.

11   And then when he's done, he leaves, and we could resume with

12   the other witness.  I have no problem doing that.  I suggest

13   that the two of you figure it out.

14          The only issue -- how long is the witness going to

15   testify for?

16          MR. CURRAN:  I don't anticipate more than 30

17   minutes.

18          THE COURT:  So here's the -- total or just direct?

19          MR. CURRAN:  I would think so; I can't predict the

20   cross.

21          THE COURT:  More than 30 minutes of cross?

22          MR. HANNON:  Probably not, no.

23          THE COURT:  So the one issue -- the practical issue

24   that you're going to face is if you call him at 9:00, he's

25   going to be done before the break.  And if you call him --

1   it's easy to get him in the box with the jury out, but then

2   he's done.  And if he's going to be -- it sounds like he's

3   going to be 45 minutes, you know, to an hour, that isn't

4   going to take us to another ordinary break time.

5          And so how hard is it for this person to move?

6          MS. MANDEL:  Your Honor, it's not so much -- he's

7   indicated to us that he'll be able to get in and out of the

8   witness box without a lot of assistance.  It just depends on

9   how he's feeling that day.  It's postsurgery for him.  I

10  think the real question is we just wouldn't want any

11  prejudicial assumptions made by the jury about his, sort of,

12  slow movement.

13         THE COURT:  Who is the witness?

14         MS. MANDEL:  It's our expert psychiatrist.

15         THE COURT:  Oh, Kelly.  Oh.

16         What kind of -- like did he have hip surgery or

17  back surgery?

18         MS. MANDEL:  He's walking -- after some surgery,

19  he's walking with a cane to assist with his mobility while he

20  heals.  So I think the concern is that it might affect the

21  view of his sort of stature.

22         THE COURT:  He doesn't need to listen -- you're not

23  planning to have him listen to testimony before he testifies.

24  He's just testifying, coming and going for testimony?

25         MS. MANDEL:  Yes.

1        THE COURT:  He won't be coming -- he comes later in

2    the case.

3        MS. MANDEL:  Correct.

4        THE COURT:  So let's think about that.  Here's a

5    couple of thoughts that you could think about.  One is, he

6    could -- you might be using the TV, right?  To display

7    things.  We could have the TV moved.  See that chair over

8    there in the corner?  Maybe there's one, actually, right next

9    to the witness.  He could also just step down and sit in the

10   chair right there and watch.  He's free to do that.  And I

11   have no problem with that.  And he doesn't have to go too

12   far.

13       We could potentially break.  It's a lot to send

14   people in and out.  I'm not -- kind of like, maybe, like the

15   day he's going to testify, I don't know how, like -- how

16   difficult -- I don't have a sense of how hard it is for him

17   to move with a cane, like how weak it would make him look.

18   Like I don't -- just that he's walking with a cane, it

19   doesn't really bother me, and I'm not really sure why it

20   would bother the jury.

21       MS. MANDEL:  I think, Your Honor, part of this is

22   that it's a little hard to know day-to-day.  He's in the

23   period recovering from surgery, so I think it is a little bit

24   difficult to predict.  So we wanted to --

25       THE COURT:  So I'm happy, generally, to accommodate

1    it.  And I'd say let's see.  And it's easy to accommodate the

2    first part; take him out of order, he starts at 9:00 or

3    11:00, or what have you.  We could think about what to do for

4    him to get out of the witness box.

5              I'm not -- I don't want to make it difficult.  I'm

6    happy to try to accommodate.  To break -- to send him out is

7    to spend 15 minutes.  Right?  It's not -- even if he's out in

8    a minute, but then they get up, they go, then they're going

9    to want to hang out and go to the bathroom and do whatever.

10   There's no way we get them back in in probably less than 15.

11             So let's see where we are and how it goes and how

12   we can work it out.  I'm sure we can solve it in some way.

13             Anything else?

14             MS. MANDEL:  Your Honor, one more issue, just to

15   raise an ask about any preferences in this regard.  There are

16   two witnesses who will be presented through deposition

17   testimony.

18             THE COURT:  Uh-huh.

19             MS. MANDEL:  So we just want to understand if

20   Your Honor has any specific requests or procedures for them.

21             THE COURT:  Are you -- is it video or transcript?

22             MS. MANDEL:  Spoken -- read in, not video.

23             THE COURT:  Read in.  Just the transcript that

24   people are going to read.

25             So my suggestion -- I'm open to other ways to do

1    it.  My suggestion is the lawyer asks the questions, and

2    somebody, a paralegal or someone who works for you, play the

3    witness and read the answers.  And then, you know, it's fine

4    to read them in normally.  You don't have to read them in the

5    most boring voice possible.  But it's not the Academy Awards,

6    and don't over play it.  And just like that, and just do

7    that.

8          And I would explain to the jury, it's a deposition,

9    and so Mr. or Mrs. So-and-So works for the law firm and is

10   reading the answers.  And they're not the deponent, but

11   that's their answers they're reading, and you take it that

12   way.  And you're going to ask questions, or something like

13   that.

14         I'm happy to do it another way if you want, but

15   that's the way I've done it in the past, or other lawyers

16   have done it in cases before me.  It seems reasonable and

17   fine.  And so if you have another idea, I'm open to it, but

18   otherwise, that's what I would say.

19         MS. MANDEL:  And that's fine, Your Honor.  I think

20   the question -- and we haven't had an opportunity to fully

21   discuss this yet, but each side has designated sort of some

22   different portions of two different deposition transcripts,

23   and so the question is if the Court has a preference about

24   whether --

25         THE COURT:  Oh.  You mean, like, so it's --

1          Give me the name of the witness.

2          MS. MANDEL:  Hacene Mekerri.

3          THE COURT:  Mekerri.  Okay.  So you want one part,

4     and Mr. Hannon wants a different part.  Right?  Surprisingly.

5     And so -- I suppose what I would say is you have one witness,

6     and you ask the questions --

7          Are the questions being asked ones you asked or

8     ones that Mr. Hannon asked or -- no.

9          MS. MANDEL:  We sort of trade.  So the questions of

10    Mr. Mekerri were all questions that Mr. Hannon asked.  And

11    then Mason Menninger, who is Dr. Menninger's husband, is the

12    other witness, and those were all questions that I asked.

13         THE COURT:  I see.  I'd leave it to you first to

14    talk to each other.  I don't think you should switch witness

15    speakers.  That's confusing.  So whoever is Mekerri should

16    be -- I think should be Mekerri for whatever questions are

17    asked of the person.

18         And whether you want to have -- whether you each

19    ask -- maybe you want to ask the questions that you want to

20    ask, and you ask the questions that you want to ask.  I don't

21    have a strong preference about how you do that.  All of you

22    can figure it out.  And if you agree, it will probably be

23    fine with me.  If you don't agree, then I'll decide if I have

24    to.

25         But I think my instinct is the witness shouldn't

1    change, the person being the witness, just because that will

2    be confusing to them.  It could be different for Mekerri and

3    for Dr. Menninger's husband, but not within that.

4            Anything else?

5            MR. HANNON:  Just one thing on that, on the

6    transcript.  There is some objections to some of the

7    designations, and I think it's possible we might get to

8    Mr. Mekerri's testimony on Monday.  So I was --

9            THE COURT:  I thought you were going to have your

10   client testify on Monday.

11           MR. HANNON:  There's a chance that I might have

12   some of Mekerri's testimony read first.

13           THE COURT:  I see.

14           MR. HANNON:  I'm thinking through in my head the

15   order here a little bit.

16           THE COURT:  Okay.

17           MR. HANNON:  But anyhow, just so --

18           THE COURT:  So if there are disputes, it's probably

19   better if I resolve them, rather than live.  So I would say

20   give me the transcript, the portion, just -- well, certainly

21   give me the portion that you want to read.  All I really care

22   about is the portion that you want to read that's objected

23   to, and enough around it to have a little bit of context, or

24   something.

25           You could give me the whole transcript, if you

1    want, and just say, "Look, the disputed parts we want to

2    read, you know, page 22, line 3 to 5, and they object."  And

3    tell me why.  And maybe file that end of day tomorrow.  And

4    I'll kind of look at it, and we can talk about it Monday

5    morning.  You don't have to brief it.  We can just discuss

6    it.

7            How many objections are we talking about?

8            MR. HANNON:  These are my objections, by the way.

9    Just for the record.

10           If that's whether we land, yeah, I'm trying to

11   think ahead.

12           THE COURT:  If I allow them to read it, then you're

13   going to read it first.  Maybe.

14           MR. HANNON:  No, I'm thinking more so if they

15   want -- if where we land is we sort of read it all in at

16   once, rather than breaking up and having one section read and

17   another section read later, then we should probably have all

18   the objections resolved earlier.

19           THE COURT:  So I hadn't thought of that.  I don't

20   have a -- I have no view on that; that is, if you want to

21   read in your case the portions that you want to read of a

22   deposition; and then later in the case, on your portion, you

23   want to read your portions, that's fine.  To me -- because

24   we're not recalling anyone.  And then it could be a different

25   person reading it, because it happened later.  And I'm fine

1     with it.  You don't have to read the deposition all at once,

2     necessarily.  I defer to all of you which way you want to do

3     that.

4           As to the witnesses, my -- you know, somewhat I'm

5     curious of your view, but I'll tell you what I did in a trial

6     that I just did.  Mr. Rice called the three defendants who

7     were percipient witnesses, obviously, to what just happened.

8     He called them, and I said to the defendants, "Just once.  On

9     your cross, ask whatever you want to ask."  And then Rice,

10    the plaintiff, got to ask on his redirect whatever came up.

11    So they were extensive.

12          So there is a benefit to sort of once calling the

13    witness, as opposed to twice calling the witness.  I probably

14    would lean that way.  But I'm open to -- I do lean that way,

15    but I'm open to hearing you, if you want to do it a different

16    way.

17          MR. WATSON:  I prefer all at once.  But that's my

18    position.

19          THE COURT:  Do you care?

20          I don't think that what we do with deponents has to

21    necessarily apply to people who are live.  I view them

22    differently.

23          (Counsel confers.)

24          THE COURT:  You can think about that.  You don't

25    have to necessarily answer that right now.  I don't need to

1   know now.

2        MS. MANDEL:  Yeah, we would like to think about

3   that.  Thank you.

4        THE COURT:  That's fine.

5        I have one other question for you.  So there are

6   federal law and state law parallel claims.  Based on my

7   general view and based on what you submitted as instructions,

8   unless you tell me otherwise I'm assuming you agree that I

9   just submit, like, one claim and explain the federal law

10   discrimination claim.  And their verdict determines the

11   federal law claim and the state law parallel claim, rather

12   than explaining it twice and asking for separate answers.

13        That's generally what I do.  I find that people are

14   generally agreeable to that.  It keeps it focused for the

15   jury.  It's simpler.  It makes the jury instructions shorter

16   and less -- they are already complicated, but less

17   complicated.  And so you can -- that's what I'm intending to

18   do.

19        And I didn't see that you really submitted

20   separately, like, state law.  I don't think it really makes a

21   difference on the legal -- on what the jury would have to

22   decide.  So that's what I'm intending to do.

23        And I'm doing your submissions as agreeing to that.

24   And you will have been deemed to agreed unless you object at

25   a reasonable time in advance of me -- I mean, you can object

1    for the circuit whenever you want.  But if you object at the

2    charge conference, then it's kind of hard to, like, then

3    write the state law part.  And you're going to have to tell

4    me what's different and why and what should I be instructing

5    them on that would be better.  Like if you want that, tell me

6    now or Monday morning and submit something.

7         But I don't think you submitted separate things,

8    which is fine.  Like no one -- I'm not sure I've ever

9    separately instructed people on parallel state law claims,

10   because there's no -- I can't think of a reason why to do

11   that, and so no one asks.  But I'm just telling you that

12   because the claims are in there.

13        And the way you resolve that, since the claims

14   exists, is if the defendants win, you get judgment on the

15   federal claim and the state law claim.  And if the plaintiff

16   wins, you get judgment on the federal and state law claims.

17   And you don't get extra damages, and it is what it is.  And

18   then sometimes there's issues about prejudgment interest, or

19   something, and those follow from the -- they aren't for the

20   jury.  Or if we need to ask the jury something, we can.

21        All right.  I think that's it.  Okay.  I'll see you

22   Monday morning at 9:00.  And have a good day and weekend.

23   Thanks.

24             (Court in recess at 4:27 p.m.

25             and reconvened at 4:34 p.m.)

1          THE COURT:  Okay.  We're back in session in the

2     Menninger case, and I understand there's a possible issue

3     about witness availability or something?

4          MR. HANNON:  Yeah.  So I just consulted with

5     opposing counsel regarding some logistics.

6          And backstory:  So a number of the witnesses that

7     we intend to call are individuals represented by PPD's

8     counsel, Ogletree.  We asked Ogletree whether or not they

9     would produce those witnesses at trial.  They agreed to do so

10    in person.  They're on our exhibit lists.

11         THE COURT:  On your witness list.

12         MR. HANNON:  I'm sorry -- I'm sorry, on the witness

13    list.  Excuse me.

14         I was just advised, though, that none of those

15    witnesses are going to be made available until the second

16    week of trial, which creates possible problems just in terms

17    of our -- whether or not we're going to finish our

18    case-in-chief by the time they are made available.

19         I can certainly arrange things and arrange all of

20    them at the back to accommodate travel schedules.  I'm happy

21    to do that.  But there might be a situation where I'm simply

22    done with my other witnesses before the end of next week.

23         These are all individuals that I've deposed.  I'm

24    happy to present them to the jury via deposition transcript.

25    We expected to call them live, because they told us they

1    would produce them live.  But it just creates a logistical

2    issue, given that now they're not available until the second

3    week.

4              THE COURT:  What do you want from me?

5              MR. HANNON:  That's an excellent question.  I don't

6    have an answer for you, except for this:  Would -- would

7    Your Honor permit us to present these witnesses via

8    deposition, if they're not going to be made available next

9    week during our case-in-chief, to have their deposition

10   transcripts read in?

11             MS. MANDEL:  Your Honor, we strenuously object to

12   that.  These are witnesses who will be here in person.  And

13   we did say that we would have them in person at trial.  They

14   all live out of town.  They're not at all local.  And we have

15   arranged for them to be here based on our general calculus of

16   when we thought we would be getting to the time that would be

17   appropriate for us to call them and as part of our defense,

18   and that is when they arranged their travel.

19             They are people who are leaving their families,

20   their homes in other states and coming here, and they've

21   arranged travel to be here.  So they're available.  They're

22   going to be here, and they are going to testify live.  There

23   is no reason that they should be presented through deposition

24   testimony.

25             In fact, we just learned for the first time now

1    that one of plaintiff's witnesses, plaintiff's sister, who we

2    had asked about, will, in fact, only be available to testify

3    live a week from this Monday.  So it's no different, a

4    situation with that particular witness.

5              THE COURT:  Slightly different, in that presumably

6    that will be during your case -- during your defense, not

7    necessarily when you exactly wished to call her, in terms of

8    the order.

9              This -- the concern I think Mr. Hannon is raising

10   is that he will possibly complete his case-in-chief before

11   he's -- his case-in-chief, other than these witnesses, will

12   be done, and those witnesses will be the -- like one or

13   several days later.

14             So my suggestion is this.  I'd like the -- that

15   we're going to be going quickly, and that, therefore, your

16   case is -- you anticipate that your case is going to be done

17   before next Friday, in chief, other than these witnesses.

18   And so I think you could --

19             And what I understand is that you're prepared to

20   put them at the end of your case, Mr. Hannon, and that you're

21   prepared -- you're willing, but that might still leave them

22   being called before they're available -- before they're

23   practically available.

24             MR. HANNON:  Right.

25             THE COURT:  And you're prepared to call them by

1   deposition and read the parts that you want.  They -- under

2   that variation, they could still be called live during the

3   defendant's case for whatever the defendants want.

4           And you wish that procedure not to be used.  Would

5   that be fair?

6           MS. MANDEL:  That's right, Your Honor.

7           THE COURT:  So my suggestion is, first, just think

8   about, like -- here's one practical solution you could all

9   reach, which is that if you finish your case on Wednesday or

10  Thursday, then you go to your case.  But your case is not --

11  you haven't rested.  And you go to your case, present who you

12  will.  And then the witnesses are going to be available.  And

13  when they're available, you call them.  And we'll just

14  rearrange the order.  And I'll tell the jury, we're doing

15  this to accommodate people's schedules because people are

16  coming from different places.

17          So you can call -- I don't know who these witnesses

18  are, which ones, but Witness X lives in California, and is,

19  you know, represented by defense counsel.  And they're not

20  available on Thursday, which is when, if you put them at the

21  end, you would call them Thursday morning at 9:00.  So

22  they're available on Tuesday.  So on Tuesday, we'll break

23  from defendant's case, you'll call them.

24          And then you can either -- you can call them and --

25  you know, some of this depends on whether they're testifying

1    once or twice, but those people -- one of the reasons we have

2    people once is to not make them, especially if they live far

3    away, to come here twice, which is a burden for people other

4    than true parties.

5         So we could have them -- you could have them

6    come -- you could call them on Tuesday, you could do your

7    part.  You could either cross them or just reserve it all.

8    We could have them presented once, or they're your people, if

9    you're willing to have them come twice, you could have them.

10   And then if you don't want to get to them until Wednesday,

11   that person, you could get to them on Wednesday.  So we could

12   essentially take them out of order in your case, right?  Keep

13   going.  That's an easy solution.

14        And live is generally better than transcript,

15   transcript being a little better than TV, in my experience.

16        But does that work for all of you?

17        MR. HANNON:  I just -- I think the issue is I don't

18   expect them to have any other witnesses, besides the same

19   folks.

20        THE COURT:  So in other words, if you finished --

21   when do you think you might finish before those people?

22   Rough idea.

23        MR. HANNON:  It would be, you know, Thursday or

24   Friday.  It's -- most likely a Friday morning kind of thing.

25        THE COURT:  I see.  So we're really talking about

1    just Friday, probably.

2            MR. HANNON:  Probably.

3            THE COURT:  Maybe a little bit on Thursday.

4            MR. HANNON:  Yeah.

5            THE COURT:  So the issue is that, at that point,

6    all of the witnesses that you wish to call, who are under

7    their control, are -- you don't have other witnesses that you

8    would be calling.  Like say he finished Thursday -- Thursdays

9    before 1 o'clock or Friday morning, is there anybody that you

10   would have to call who doesn't fall into this category of

11   people he wants to call who are available only the following

12   week?

13           MS. MANDEL:  I'm just trying to understand the --

14           THE COURT:  In other words, he -- like let's say he

15   said to me, "Judge," -- it's Thursday at 10:30 or Friday

16   morning at 10 o'clock, and he says, "Judge, I'm done with all

17   the witnesses that I have.  There are some more witnesses,

18   but they're not available until next week."

19           They're the, I'll call it, five people who do or

20   did work for your client, who you've agreed to produce, but

21   they're not available until the following week.  So then I

22   would turn to you and say, "Okay.  Is there anyone for you to

23   call."

24           MS. MANDEL:  Right.  So we have -- there's one

25   witness -- the person who will be our client representative

1    with us through the case is also a witness who we plan to

2    call, and she'll be here through the duration.

3            THE COURT:  And how long of a witness is she?  Is

4    she like ten minutes or is she like --

5            MS. MANDEL:  No, I'd say she's probably more like

6    an hour.

7            MR. HANNON:  Can I ask who that is, Judge?  Because

8    that's one of the people on my list.

9            MS. MANDEL:  That's Deborah Ballweg.

10           MR. HANNON:  Okay.  All right.  Well, that's

11   helpful to know that she'll be available all week.

12           THE COURT:  So she's going to be here anyway.

13   She's one person who solves -- partway.

14           So I think, in the first instance, let's see if

15   this issue arises.  Move quickly.  I'm happy to phase this

16   issue, because it means we're going quickly.  So don't slow

17   down to avoid the issue.

18           MR. HANNON:  I'm just sensitive to the if we stop

19   at 12:40, you want another witness on the stand.

20           THE COURT:  Yes, I'm glad you're sensitive to that.

21           And that is my view.  I didn't say that this

22   morning.  Mr. Hannon knows that from the last trial.  So not

23   only at 12:40, at 12:55 call another witness.  So 9:00 to

24   1:00 means 9:00 to 1:00, not 9:00 to 12:30, not 9:00 to

25   12:55.

1          So let's see where we are at the end of the day

2     Monday or Tuesday morning, and then we'll see and figure out

3     if there's some solution.  It might depend, also, how long

4     it's going to take and how much time there might be and

5     whether there's someone else we could substitute it.  I think

6     that's the time -- we'll have a better handle on it then.

7               MR. HANNON:  Okay.  Thank you.

8               THE COURT:  Okay.  Anything else?  No.  All right.

9               MR. HANNON:  Bye again.

10              THE COURT:  Bye again.

11              THE DEPUTY CLERK:  Court is in recess.

12              (Court in recess at 4:43 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4           I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                        Dated this 13th day of June, 2023.

14

15

16

17                   /s/ RACHEL M. LOPEZ

18

19

20           _____

             Rachel M. Lopez, CRR
21           Official Court Reporter

22

23

24

25