UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

      Plaintiff,

    v.

PPD DEVELOPMENT, L.P.,

      Defendant.

Civil Action No: 1:19-CV-11441-LTS

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S POST-TRIAL MOTIONS UNDER RULES 50(b) AND 59(a)**

## INTRODUCTION

PPD blames everyone but itself. Armed with a bevy of new lawyers, it takes aim at the jury's verdict with an "everything but the kitchen sink" attack, often misstating the facts and, in every instance, ignoring the evidence (and permissible inferences) that support the jury's verdict.

This was a well-tried case, presented to an attentive and thoughtful jury. They were focused, they asked good questions, and, in the end, they unanimously determined that PPD has no one to blame but itself. The jury's award was very substantial, but for good reason. *PPD broke Lisa Menninger.* The depth of harm she has suffered is difficult to imagine, let alone articulate, but everyone who sat in that courtroom knows that it is extraordinary.

PPD did not cause this suffering by accident. The evidence shows that PPD executed on a coordinated "exit strategy" formulated at the highest levels of its organization. PPD knew it was breaking the law. It knew that, given Dr. Menninger's mental health, it was likely going to cause her significant harm. And PPD did it anyway.

The jury's verdict was the product of evidence, not error. It should be left intact and PPD's efforts to cast itself as the victim in this tragic story should be roundly rejected.

## ARGUMENT

### I.   The "Renewed" Motion for Judgment as a Matter of Law Should Be Denied.

A renewed motion for judgment as a matter of law may only be granted if the evidence "points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Crane Sec. Techs., Inc. v. Rolling Optics AB, 337 F. Supp. 3d 48, 51 (D. Mass. 2018) (Sorokin, J.) (quoting Monteagudo v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 170 (1st Cir. 2009) (citations omitted). The Court must examine "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." Id. (quoting

Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 8 (1st Cir. 2001) (citations omitted)). Further, "As the name implies, a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is bounded by the movant's earlier Rule 50(a) motion," and the movant "cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Monteagudo, 554 F.3d at 171.

### A. Aside From the Punitive Damages Issue, PPD's Arguments Have Been Waived Because it Failed to State any Grounds for its "Directed Verdict" Motion, as Required by Rule 50(a).

Rule 50(a) requires the moving party to "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Here, PPD merely requested "a directed verdict" without stating any basis. Tr. 9, 50:4–5. That is not enough under First Circuit precedent, which requires that a Rule 50(a) motion be "sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." Parker v. Gerrish, 547 F.3d 1, 11–13 (1st Cir. 2008).

PPD's failure to state any grounds for its "Directed Verdict" request precludes it from making a "renewed" motion under Rule 50(b). Jones ex rel. U.S. v. Massachusetts Gen. Hosp., 780 F.3d 479, 487–88 (1st Cir. 2015) ("It is well-established that arguments not made in a motion for judgment as a matter of law under Rule 50(a) cannot then be advanced in a renewed motion for judgment as a matter of law under Rule 50(b).") (quoting Costa–Urena v. Segarra, 590 F.3d 18, 26 n. 4 (1st Cir. 2009)).

In Jones, a party (Mr. Jones) orally moved under Rule 50(a) solely on the issue of damages at the close of the evidence, and later filed a Rule 50(b) motion challenging the sufficiency of the evidence to support the verdict. 780 F.3d at 488. The First Circuit held that Mr. Jones waived his Rule 50(b) sufficiency-of-the-evidence challenge by omitting it from his Rule 50(a) motion. Id.

Here, PPD raises a number of arguments in its post-trial Rule 50(b) motion challenging the

sufficiency of the evidence supporting Dr. Menninger's discrimination (ECF Doc. No. 181 at 15)[1]

and retaliation claims (Id. at 27). But, exactly as in Jones, PPD did not raise a sufficiency-of-the-

evidence challenge, or indeed any specific challenge, in its Rule 50(a) motion, which results in

waiver. PPD's groundless Rule 50(a) motion for judgment as a matter of law left nothing to be

"renewed," thus, its Rule 50(b) contentions are waived and not properly before this Court.

Of note, PPD cannot claim that it somehow preserved a Rule 50(b) argument by raising

similar arguments at summary judgment; that argument is foreclosed by binding precedent. Jones,

780 F.3d at 488; Parker, 547 F.3d at 12 ("we have held that even if a defendant raises qualified

immunity at summary judgment, the issue is waived on appeal if not pressed in a Rule 50(a)

motion.")

Arguably, PPD's Rule 50(b) argument with respect to punitive damages stands on different

footing. PPD asserted at the charge conference that there was insufficient evidence to warrant an

instruction on punitive damages. The First Circuit has not recognized the raising of arguments at

a charge conference to negate the need for a proper Rule 50(a), Santos-Arrieta v. Hosp. Del

Maestro, 14 F.4th 1, 11 (1st Cir. 2021), and at least one Court in this District has rejected that

argument. Bradley v. Cicero, No. CV 18-30039-MGM, 2021 WL 294286, at *3 (D. Mass. Jan. 28,

2021) ("His objection was to jury instructions. . . . counsel for Defendants should have explicitly

raised a motion for judgment as a matter of law based on qualified immunity. . . Accordingly, the

court deems Defendants to have waived qualified immunity for purposes of a Rule 50 motion.").

Nonetheless, the Court clearly stated that it would reserve ruling on the issue until after the jury

had returned its verdict.[2] Plaintiff did not object to that approach then, so she will not do so now.

---

[1] These page numbers are those stated in the header, not the footer of the page.

[2] PPD repeatedly claims that the Court was "hesitant" to instruct the jury on punitive damages, but that is not what the Court expressed during the charge conference. The Court simply said it was reserving on the issue because that made the most practical sense.

For the foregoing reasons, however, all other arguments raised by PPD challenging the sufficiency of the evidence at trial have been waived, and its Rule 50(b) motion should be denied on that basis.

B.  The Evidence Overwhelmingly Supported the Award of Punitive Damages.

Under the highly deferential standards of Rule 50(b), the punitive damages award must be upheld if, when reading the evidence in the light most favorable to the verdict, and drawing the inferences in Dr. Menninger's favor, a reasonable jury could have concluded that PPD's actions met the legal standard for punitive damages. Burnett v. Ocean Properties, Ltd., 987 F.3d 57, 69–70 (1st Cir. 2021). Here, PPD does not argue that there was any instructional error on the standard, and both parties agree that punitive damages could be awarded if PPD's actions were "outrageous, because of its evil motive or its reckless indifference to the rights of others," as determined by the factors listed by the Court in its charges to the jury. see Tr. 10, 116:18–19, 117:18–118:11. Those factors are:

> **One**, the egregious or outrageous character or nature of PPD's conduct; [**two**,] PPD's wealth in order to determine what amount of money is needed to punish PPD's conduct, and to deter any future acts of discriminates or retaliation; **three**, the actual harm suffered by Dr. Menninger; **four**, the magnitude of any potential harm to other victims if similar future behavior is not deterred; **five**, whether there was a conscious or purposeful effort to demean or diminish the class of which Dr. Menninger is a part, or if there was a conscious or purposeful effort to demean or diminish Dr. Menninger because she was a member of that class; **six**, whether PPD was aware that the discriminatory or retaliatory conduct would likely cause serious harm or recklessly disregarded the likelihood that serious harm would arise; **seven**, PPD's conduct after learning that the initial conduct would likely cause harm; and **eight**, the duration of the wrongful conduct and any concealment of that conduct by PPD.

Id. (emphasis added).[3]

---

[3] PPD incorrectly argues that "There **must** be evidence that PPD engaged in "a conscious or purposeful effort to demean" Menninger because of her protected class, and that PPD "knew its conduct would cause significant harm." ECF Doc. 181 at 32 (emphasis added). These considerations are **factors** in a multi-factor test, but neither is a prerequisite in itself to awarding punitive damages. Haddad, 455 Mass. at 111.

Notably, PPD focuses its argument entirely on the sufficiency of the evidence supporting Dr. Menninger's **failure to accommodate** claim, but the punitive damage award must be upheld if the evidence supporting **<u>any</u>** of her successful claims supported an award of punitive damages. Bell v. O'Reilly Auto Enterprises, LLC, 626 F. Supp. 3d 141, 168 (D. Me. 2022). PPD's failure to address <u>any</u> argument to Dr. Menninger's retaliation claim is especially striking, as evidence of intentional retaliation will typically suffice to support a punitive damages award. Che v. Massachusetts Bay Transp. Auth., 342 F.3d 31, 41 (1st Cir. 2003).

Circumstances that have justified awarding punitive damages have included those where "upon learning of the plaintiff's [disability] condition, the defendant endeavored to bring about the plaintiff's termination." Handrahan v. Red Roof Inns, Inc., 43 Mass. App. Ct. 13, 23, 680 (1997). Punitive damages were also upheld in Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 305 (2016), in which the defendant undertook a "woefully insufficient" sham investigation after learning of unlawful harassment.

Here, the jury was presented with overwhelming evidence from which it could have properly found that PPD's actions were outrageous or at least recklessly indifferent to Dr. Menninger's rights. Focusing particularly on Dr. Menninger's retaliation and disparate-treatment claims, the evidence permitted the jury to find that PPD tried to coerce Dr. Menninger to quit; manufactured false grounds for Dr. Menninger's termination; and established new goals and expectations for Dr. Menninger's role that PPD knew were impossible—all evidence of a purpose to demean a disabled employee (Factor 1). When Dr. Menninger complained of mistreatment and expressed that PPD's actions were already causing severe panic attacks, PPD <u>doubled down</u> on its misconduct by undertaking a sham "investigation." (Factor 7). The evidence showed that PPD took these actions with knowledge of Dr. Menninger's disorder and awareness or reckless

disregard for how much its conduct would harm her (Factor 6); that PPD tried to cover up its misconduct in the Spring of 2018 and consistently continued to cover up its actions through trial, where its witnesses gave false and contradictory testimony[4] (Factor 8); and as discussed below that PPD's actions actually did cause profound harm to Dr. Menninger that has lasted for over 5 years and will continue to harm her significantly into the future (Factors 3 and 8). Not only that, the evidence permitted the jury to find that PPD knew of its legal obligations not to discriminate and retaliate against a disabled employee who requested accommodations, yet did so anyway—thereby acting in the face of a perceived risk of unlawfulness. Indeed, PPD *consciously perceived* the risk that its actions would violate the law, because its HR officials **asked its own lawyers to help foment an "exit strategy" to get rid of Dr. Menninger**, in which its in-house counsel actively participated. The jury could properly have found this conduct egregious and outrageous in character (Factor 1) justifying and necessitating deterrence (Factor 3). See Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 82 (1st Cir. 2001) (evidence "that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful," supports a jury finding "that strong medicine is required to cure the defendants' disrespect for the law." (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576–77 (1996)).

There is a strong evidentiary basis for these findings. To begin, PPD knew it is illegal to discriminate and retaliate against a disabled employee who requested an accommodation for a disability; and PPD knew that it had a legal obligation to extend a reasonable accommodation. Tr. 4, 148:13–15, 153:24–153:11 (Ms. Ballweg). Cf. Bell v. O'Reilly Auto Enterprises, LLC, 626 F. Supp. 3d 141, 174–76 (D. Me. 2022) (evidence that company officials received ADA training

---

[4] See Ciccarelli v. Sch. Dep't of Lowell, 70 Mass. App. Ct. 787, 798 (2007) (jury free to draw conclusion that superintendent's testimony denying earlier knowledge was an act of lying to cover up wrongdoing).

supported punitive damages award under federal standard). PPD was aware of the risk of harm to Dr. Menninger because it was put on notice of Dr. Menninger's anxiety disorder on January 11, 2018 when Dr. Menninger disclosed her disability, Exhibit 366; again on January 31st when Dr. Menninger and Dr. Kessimian submitted the initial accommodation request, Exhibits 47, 220; and on February 14th when Dr. Menninger and Dr. Kessimian submitted the second accommodation request (responsive to Mr. Mekerri's five buckets) that included Dr. Kessimian's "psychoeducation" about social anxiety disorder. Exhibit 180 (Mr. St. John forwards the request to Ms. Ballweg and her boss Jerry Williams).

By February 27th Mr. St. John and Ms. Ballweg were discussing "*delicately working Lisa out*" (emphasis added), directly showing that PPD was planning to try to get Dr. Menninger out of its company. Exhibit 186 at 1177; see also Tr. 4, 88:21–23 (Ms. Ballweg). The next day, on February 28th, Mr. St. John and Mr. Mekerri tried to coerce Dr. Menninger to quit. Mr. St. John began the meeting with Dr. Menninger and Mr. Mekerri by immediately presenting her with just two options: an exit package, or a consulting arrangement for a couple of months "until they could find somebody who could replace me who had my qualifications." Tr. 2, 69:14–25 (Dr. Menninger); Tr. 7, 24:24–25:4 (Mr. St. John). Neither option would allow Dr. Menninger to keep her job. Id. Mr. Mekerri tried even harder to coerce Dr. Menninger to quit by telling her that PPD "did not want to hurt my reputation," Tr. 2, 75:5–8, a thinly veiled threat that she would be fired (and her reputation tarnished) if she did not quit.

The next day, March 1st, Dr. Menninger sent a follow-up email asking for more detail about buckets 2–4, reiterating her ability to do her job without accommodation, and offering to provide confirmation from her physician that she could do her job. Exhibit 332. Mr. St. John cancelled the follow-up meeting that was scheduled for 3:30 PM that day and lied to Dr. Menninger

that he was going to be "considering the items conveyed in your email." Exhibit 333. What Mr. St. John actually did first was to email Mr. Mekerri and Ms. Ballweg a draft response to Dr. Menninger **explicitly refusing** to answer her question about buckets 2–4, which showed that Mr. St. John, Mr. Mekerri and Ms. Ballweg had no intention whatsoever of clarifying the changes to Dr. Menninger's role or responding appropriately to her request for accommodation. Exhibit 167 at 1116 ("Adding additional detail would only present the opportunity to select items in each bucket you believe you can or can't do").

Ms. Ballweg (copying her boss Jerry Williams) then instructed Mr. St. John to prepare a packet for PPD's in-house counsel Lisa Noecker, Tr. 4, 97:12–15, Exhibit 65. Mr. St. John's packet, Exhibit 87, explicitly asked Attorney Noecker for help with an "**exit strategy**" (emphasis added) to get rid of Dr. Menninger. Id. at 4083; Tr. 7, 47:7–11 (Mr. St. John). As Mr. St. John testified, this packet was sent to legal, Id. 48:13–14 Ms. Ballweg meanwhile lied under oath that St. John did not want to pursue an "exit strategy," Tr. 4, 95: 23–25; and lied that she did not "recall" sending the packet to counsel, Id. 98:6, even though her contemporaneous email (Exhibit 65 at 3950) said she would be sending the packet to Attorney Noecker. Ms. Ballweg admitted at trial that looking for an "exit strategy" was an "inappropriate" response to Dr. Menninger's accommodation request, Tr. 4, 104:3. The jury could have found she knew at the time that she was violating the law. Further, the jury could have found that Ms. Ballweg, Mr. Mekerri, and Mr. St. John lied—outrageously—when they attempted to claim that Mr. St. John and Mr. Mekerri were just trying to "help" Dr. Menninger during the February 28th meeting when they tried to coerce her to quit and subsequently when they were actually asking PPD's lawyers to help them get rid of her. See Tr. 4, 87:19–88:23 (Ms. Ballweg); Tr. 7, 23:10–13 (Mr. St. John); Tr. 7, 129:18–21, 182:25 (Mr. Mekerri).

Later in March PPD began trying to manufacture grounds for Dr. Menninger's termination. Ms. Ballweg worked as a go-between with Attorney Noecker, Tr. 4, 109:23–110:24, Exhibit 69, as she coached Mr. St. John, Tr. 5, 36:16–17 ("I was . . . coaching Chad"), to in turn coach Mr. Mekerri to begin subjecting Dr. Menninger to increased scrutiny and documentation of alleged performance issues. Tr. 4, 114:25–115:12; see Exhibits 68 at 4257); Exhibit 148; Tr. 7, 53:24–54:7 (Mr. St. John). Shortly after this coaching began, Mr. Mekerri's boss (Chris Fikry) emailed Ms. Ballweg's boss (Mr. Williams) to ask "**Whats timing on Lisa Menninger's exit?**" Exhibit 265. Mr. Williams then forwarded the message to Ms. Ballweg asking her "Where is Chad on this one. . .??" Id. Ms. Ballweg responded matter-of-factly that "Hacene gave her some tough feedback" but that "We are not close with term[ination]" because Dr. Menninger got a "3 rating for 2017 and just now starting to document) unless she self-selects." Id. Ms. Ballweg admitted it would have been inappropriate to terminate someone who just got a 3 rating, and that "self-selects" meant quit. Tr. 4, 119:14–25.

This evidence permitted the jury to find that Dr. Menninger's supervisor, along with his supervisor, three levels of the human resources department, ***and in-house counsel***, were all colluding to achieve Dr. Menninger's "exit" because she was disabled and had requested accommodation. Further demonstrating PPD's duplicitousness, Mr. Fikry admitted that at the time of PPD's summary judgment motion, he submitted a false affidavit to this Court claiming that he was "not involved" in the "discussions" about Dr. Menninger's request for workplace accommodations, and that he was "only aware" that those discussions occurred "as a result of this litigation." Tr. 7, 217:1–12.

In furtherance of their unlawful scheme, Mr. Mekerri then adjusted Dr. Menninger's annual goals on April 11, 2018 to include "elimination of lab issues." Exhibit 50 at 300. Multiple

witnesses confirmed that PPD had an established practice requiring goals to be "achievable," which is the A in the acronym SMART, Tr. 4, 140:25–141:14 (Ms. Ballweg), Tr. 7, 61:7–10 (Mr. St. John), and that "elimination of lab issues" was an <u>impossible</u> goal. E.g., Tr. 7, 218:2 (Mr. Fikry). Mr. Mekerri made this change with the help of Mr. St. John and approval of Ms. Ballweg. Tr. 7, 55:9–56:2 (Mr. St. John). The jury could have found PPD deliberately imposed this *impossible* term or condition of employment on Dr. Menninger in April with conscious desire to set her up for failure to "justify" a termination, and/or to pressure her to "self-select" by quitting.

After Dr. Menninger complained in writing on April 27, 2018 that Mr. Mekerri's treatment of her was getting "worse" and was causing her to experience increased panic attacks, Exhibit 115—providing PPD with additional notice that its actions <u>were</u> causing, and <u>would cause</u> Dr. Menninger severe harm (Factor 6)—Mr. St. John told her that PPD would launch a "fair and impartial" investigation. Tr. 2, 122:9–18 (Dr. Menninger). The jury heard overwhelming evidence, including serially contradictory and dishonest testimony from Ms. Ballweg, that PPD conducted this "investigation" as a sham, with intent to cover up its wrongdoing and achieve Dr. Menninger's exit (Factor 7).

PPD knew how important the investigation was to Dr. Menninger and that she was very anxious about its outcome. Tr. 5, 6:7-9:19 (Ms. Ballweg). (Factor 6). PPD also knew conducting a sham investigation was unlawful: Ms. Ballweg had received training on how to conduct investigations, including from PPD's in-house counsel and outside counsel who represented PPD at trial, and understood the need to be objective and impartial. Tr. 4, 73:18–74:15 (Ms. Ballweg). There were other people within HR who could have conducted the investigation besides Ms. Ballweg. Tr. 4, 130:25–131:3 (Ms. Ballweg). Ms. Ballweg admitted it would be inappropriate to

investigate a matter in which she was personally involved, id. 74:20–24, but disingenuously testified that she was merely "aware" of the situation rather than "involved." Id. 75:20.

The evidence showed Ms. Ballweg had not only been deeply "involved" from the outset, but had *personally directed and coordinated* many of the very actions about which Dr. Menninger complained. Mr. St. John had kept Ms. Ballweg closely informed after Dr. Menninger disclosed her disability and through each step of Dr. Menninger's requests for accommodation, through PPD's February 26th rejection email, which Ms. Ballweg approved in advance. Exhibits 60, 223, 213, 193, 180, 172, 277, 192. Ms. Ballweg knew back in February that Mr. St. John was trying to "delicately work[] Lisa out," and received his email saying so in writing, Exhibit 186. She worked closely with Mr. St. John on the packet he drafted for Attorney Noecker seeking help with an "exit strategy." Exhibits 65, 87. She worked as a go-between with Attorney Noecker starting in late March to plan Mr. Mekerri's deliberate efforts to "document" pretextual issues with Dr. Menninger's performance. Exhibits 68, 69, 148. And she coordinated and reported on the status of these "exit strategy" efforts with Mr. Williams (her boss) and Mr. Fikry (Mr. Mekerri's boss) so that they would know the "timing" of when Dr. Menninger's "exit" was finally achieved. Ex. 265.

Dr. Menninger's April 27th email to Mr. St. John (Exhibit 115) that triggered Ms. Ballweg's investigation combined two email threads that PPD had been trying to keep separate and "compartmentalized"— one about her request for accommodation (Ex. 115 at 861–65) and one about Mekerri's changes to her annual goals (Ex. 115 at 866–71). **The evidence showed that Ms. Ballweg was directly involved in reviewing and approving PPD's communications to Dr. Menninger in both of these threads**. Exhibits 119 (reasonable accommodations) and 118 (Goals). Not only that, Ms. Ballweg specifically had forwarded to Mr. Mekerri a draft for him to send (which became Mr. Mekerri's April 25th email in the Goals thread) that was written by Attorney

Noecker. Exhibit 73.  But when Ms. Ballweg was confronted with Exhibit 118 she falsely denied being aware in advance of Mr. Mekerri's April 25th email. Tr. 4, 122:9–12, 123:7–9. She further denied that Mr. Mekerri's April 25th email was part of PPD's efforts to document alleged performance deficiencies with Dr. Menninger, which the jury could find was a lie. Id. 122:13–16.

Ms. Ballweg continued to contradict herself, initially refusing to give a straight answer when asked to acknowledge that Mekerri's April 25th email was one of the emails Dr. Menninger had asked to be investigated, Tr. 4, 125:7–126:9; then claiming she was not "involved" in Mr. Mekerri's email because she had merely served as a "conduit" between Attorney Noecker and Mr. Mekerri, id.; but then admitted that she did know Dr. Menninger had attached Mekerri's email because it related to Dr. Menninger's complaint. Id. 130: 11–13. Ms. Ballweg implausibly lied that she "would have had a conversation" with Attorney Noecker "If Lisa Noecker's name would have been attached to any of" the seven matters about which Dr. Menninger complained. Id. Ms. Ballweg did not investigate Attorney Noecker even though Ms. Ballweg knew Attorney Noecker was helping to craft this and other responses from PPD to Dr. Menninger. Id. 126:10–127:7.

There was also evidence that Ms. Ballweg's "investigatory" interviews were a mockery. Mr. St. John admitted that her only question was whether he "witnessed anything that was not fair and equitable in conversations between Dr. Menninger and Mr. Mekerri," and that was it. Tr. 7, 77:13–20. The jury could have inferred that Ms. Ballweg actually used this "investigatory interview" to ask Mr. St. John for help finding documentation that would show performance feedback from Mr. Mekerri pre-dating Dr. Menninger's disclosure of disability—in other words, she was not investigating Dr. Menninger's complaint but rather, trying to find evidence PPD could use to help cover up its efforts to achieve Dr. Menninger's "exit." Exhibits 75, 245; Tr. 7, 72:25–74:10 (Mr. St. John).

There were many more contradictions in Ms. Ballweg's testimony about her investigation even on basic issues. Ms. Ballweg signed a sworn declaration to the MCAD that her "prompt and thorough" investigation had included an investigation of whether PPD had properly handled Dr. Menninger's accommodation requests. Tr. 4, 91:12–93:10. But she claimed at trial that she did not investigate PPD's handling of Dr. Menninger's request for accommodation. Id. 91:1–5. Then she testified that she did investigate PPD's handling of Dr. Menninger's accommodation requests, id. 93:11–13, and that the February 28, 2018 meeting between Mr. St. John, Mr. Mekerri, and Dr. Menninger was within her investigation's scope. Id. 142:6–9. Then she contradicted herself again, denying that investigating the actions of Mr. St. John fell within her investigation's scope. Id. 144:12–18.

Ms. Ballweg admitted that it would have been material to her investigation's findings if she knew that Mr. St. John and Mr. Mekerri's conduct in their February 28, 2018 meeting with Dr. Menninger were part of an effort to gently work Dr. Menninger out of the company, or as part of an exit strategy, because *PPD was at that point supposed to be working with Dr. Menninger to determine how it could have accommodated her in her job*. Id. 142:22–145:9. But her investigation made no mention of the facts that Ms. Ballweg knew from her own personal involvement that showed she, Mr. Mekerri, Mr. St. John, Attorney Noecker, Mr. Williams, and Mr. Fikry all shared those exact motives. The jury could have found that Ms. Ballweg knew there was a "concerted plan to move Dr. Menninger out of her position," and indeed Ms. Ballweg did not even explicitly deny knowing there was such a plan when asked directly. Tr. 5, 77:11–17. The jury could have found that Ms. Ballweg uttered an egregious and outrageous lie, with conscious intent to demean Dr. Menninger, when she claimed that the discriminatory and retaliatory conduct Dr. Menninger complained about "just wasn't there." Tr. 5, 102:11–13.

14

The jury could also have found Ms. Ballweg lied when she testified that she "held out hope" that Dr. Menninger would return from medical leave, Tr. 5, 146:5–8, because on June 4, 2018 (at the same time Dr. Menninger took medical leave) Ms. Ballweg's boss was already emailing her about logistics for "the new guy" who became Dr. Menninger's replacement—Dr. Basel Kashlan. Tr. 6, 47:2–48:13; Exhibit 231.

As discussed below, the reason Dr. Menninger had taken medical leave in early June was that PPD's conduct had caused her to no longer want to live. She suffered severe emotional distress with frequently periods of suicidality for five years and continues to suffer today.

The jury was overwhelmingly justified in concluding that "strong medicine" is needed to punish PPD for its brazen, duplicitous, and harmful conduct.

### C. Even if PPD's Other Arguments had not Been Waived, They Would Also Fail

PPD's other arguments challenge the sufficiency of the evidence on four issues: (1) whether Dr. Menninger was a "qualified" disabled person, meaning capable of performing the essential functions of her job with or without accommodation, (2) whether she was denied a "reasonable" accommodation, (3) whether she was subjected to an adverse action and (4) whether she was subjected to retaliation. We address each argument in turn.

#### 1. Qualified

It was undisputed at trial that Dr. Menninger's disability had not historically prevented her from successfully performing the essential functions of her role. This included many of the client-facing activities identified in Mr. Mekerri's "buckets." Thus, the primary questions for trial were (1) to what extent, if any, were Mr. Mekerri's desired expansion of these responsibilities "essential" and (2) to what extent could Dr. Menninger tolerate any such "essential" activities, with or without reasonable accommodation.

PPD bore the burden of proof on the first question, and the jury could have rightfully determined that PPD failed to meet it. Indeed, even in its post-trial briefing, PPD does not identify the specific task(s) that it was "essential" for Dr. Menninger to either start doing or start doing more of. Further, it offers no explanation for why, if such activity was essential to Dr. Menninger's role, she was never asked to do it (or do more of it) in the months that followed Mr. Mekerri's "buckets" email. At bottom, PPD rests on nothing more than the vague, self-serving testimony of Mr. Mekerri and his former colleagues, all of which the jury could find lacking credibility.

But even if the jury were compelled to find that some increase in Dr. Menninger's client-facing responsibilities was "essential," there was ample evidence from which the jury could infer that Dr. Menninger could have tolerated such an increase. In particular, the jury heard evidence from Dr. Summergrad concerning the "coping" mechanisms that Dr. Menninger had developed, which included the use of medication. Further, the jury heard that certain accommodations—such as allowing Dr. Menninger to plan for and recover from her customer facing activities—would have helped her utilize these coping skills to deal with increases to her customer facing responsibilities. Viewing the evidence as a whole, and in the light most favorable to the verdict, the jury could properly infer that—more likely than not—Dr. Menninger could have utilized her coping mechanisms to tolerate any essential changes to her role, either with or without accommodation.

PPD's arguments to the contrary are without merit. First, contrary to PPD's suggestion otherwise, evidence of how Dr. Menninger had historically performed her job is highly relevant to determining what functions are "essential." As the Court instructed the jury, numerous factors may be considered to determine what functions are essential, including "the amount of time

16

spent on the job performing the function" and "the work experience of people who have held the job." PPD not only failed to object to these instructions—PPD included these factors in its own requested jury instruction. (ECF 114-1, 18).[5]

Second, Dr. Kessimian's statement concerning how Dr. Meninger *might* be impacted by changes to her role is hardly the "devastating" evidence that PPD wishes it were. Dr. Kessimian simply stated that (1) increasing Plaintiff's customer-facing responsibilities would have made it more difficult for her to do her job, and (2) at some unspecified level of increase, it might become impossible for Dr. Meninger to do her job. Exhibit 54. Neither statement precluded the jury from finding that, whatever increase may be "essential" (if any) was within Dr. Menninger's ability to tolerate using her coping mechanisms (with or without accommodation).

The evidence, particularly when viewed in the light most favorable to the verdict, fully supports the jury's factual findings.

### 2.   "Reasonable" Accommodation

As it must, PPD builds its argument by brazenly misstating the evidence. Particularly breathtaking is its assertion that "Menninger's own psychiatrist believed firmly that…the only option was to outsource [Dr. Menninger's]  responsibilities to a 'surrogate.'" (Doc. No. 181 at 20.) Dr. Kessimian never said that, and in fact her testimony was quite the opposite. (Doc. No. 153 at 68-69.)

It is also remarkable that PPD makes no mention of the reasonable accommodations suggested by Dr. Kessimian on January 31, 2018. Exhibit 28. As the Court will recall, it was these accommodations that Plaintiff's counsel focused on in closing arguments—specifically the

---

[5] The Court should take note of PPD's citation to <u>Jones v. Walgreen Co.</u>, 679 F.3d 9, 16 (1st Cir. 2012), for the proposition that "past job performance is not a reliable indicator of what tasks are essential going forward." The case says nothing of the sort, and PPDs misleading description of its hold (without even a <u>see</u> cite) is emblematic of the liberties it has taken with misstating the trial record.

requests that Dr. Menninger's "role not be changed to require any increased public speaking or social interactions" and, if that was not possible, "a plan be developed for these activities…" Id. As it did at trial, PPD makes no argument as to why these requested accommodations were not "reasonable" or otherwise could not have been provided.

But a more fundamental gap in PPD's argument is its failure to acknowledge the burden shifting framework at play. Again, it is PPD's burden to first show that a particular job function is essential. If the jury could have reasonably found that PPD failed to meet that burden with respect to any of the items in buckets 2-4, the failure to accommodate Plaintiff by removing or altering that one non-essential task would be enough to sustain the jury's verdict. See MCAD Guidelines § II.C. Put differently, PPD needed to pitch a perfect game on the "essential function" issue in order to have any hopes of avoiding liability for failure to accommodate.

Whether PPD sustained its burden was obviously a question for the jury to decide, and the evidence relied upon by PPD was hardly overwhelming. Further, as discussed above, the jury was permitted to consider how Plaintiff had historically performed her job in deciding whether all of the items in buckets 2-4 were essential. Viewing the evidence in the light most favorable to the verdict, the jury could rightfully conclude that one or more of the items in those buckets were non-essential, and that PPD broke the law by failing to accommodate that non-essential task.

Of course, even if the evidence had been so overwhelming as to require the jury to find that PPD proved each and every facet of buckets 2-4 were essential (it wasn't), there was still ample evidence from which the jury could find that at least one of the proposed accommodations was reasonable. (Again, only one is needed to sustain the jury's verdict) For example, Dr. Kessimian's request that Dr. Menninger be permitted to "develop a plan" for these increased activities is something that PPD could have easily done. Instead, however, PPD refused to

provided Dr. Meninger any additional detail concerning the items in these buckets and effectively made it impossible for to develop such a plan.

Similarly, while PPD takes great umbrage with the possible provision of a "reader," that was an appropriate accommodation for the jury to consider, and which was supported by the evidence. There is no rule of law that limits a particular accommodation to a particular disability. If providing a "reader" for any of the tasks in items 2-4 would have ameliorated the burden of Dr. Menninger's disability, and if it would not have imposed an "undue burden" on PPD, the jury was right ruling in her favor.

Again, these were factual issues for the jury to consider and decide based on the hundreds of exhibits and days of testimony provided at trial. PPD advances no credible argument to suggest that this issue should have removed from the jury's consideration.

### 3. Adverse action.

PPD argues that the evidence could not have supported a finding in Dr. Menninger's favor on her disparate treatment claims for three reasons: (1) the new goals and expectations contained in Mr. Mekerri's February 6, 2018 email (Exhibit 350, i.e., the five buckets) were already part of Dr. Menninger's job and yet also—contradicting the foregoing claim—were never "imposed"; that (2) increasing of "pre-existing responsibilities" for some reason "does not constitute an adverse employment action"; and (3) the evidence did not support causation. Each of these arguments is without merit.

As an initial matter, Dr. Menninger presented evidence of more adverse actions than just the February 6, 2018 email, as PPD seems to assume. Dr. Menninger's theory was that PPD created "new goals and expectations" for her role as Executive Director in the Spring of 2018 because of her disability. See Tr. 10, 98:12-19 (final jury charges). But as the Court made clear at the charge

19

conference, those new goals and expectations were <u>not</u> limited only to the five buckets in Mr. Mekerri's February 6, 2018 email; the Court noted that its summary judgment order (ECF Doc. 81 at 14) had not found that Mr. Mekerri's February 6, 2018 email was the only conceivable adverse employment action. Tr. 9, 138:19–140:2. PPD <u>did not object</u> to Dr. Menninger's trial theory of adverse action based upon "new goals and expectations" and <u>did not argue</u> that the evidence could only support the February 6, 2018 email theory of adverse action alone. <u>Id.</u>

The evidence that PPD ignores included that beginning on March 26, 2018 (see Exhibit 49), Mr. Mekerri's tone drastically changed to harsh and accusatory (where it had previously been friendly and informal) and he began launching a fusillade of "tough feedback" to Dr. Menninger on various lab issues. Tr. 2, 92–113; Exhibits 49, 50, 301, 320. Mr. Mekerri had never involved himself in lab issues in that manner before and had never "documented" issues in that manner. <u>Id.</u> 93:3–11. <u>Citing</u> these "lab issues," on April 10, 2018, Mr. Mekerri announced he wanted to change Dr. Menninger's 2018 annual goals—the core expectations of her job for that year, on which she would have been evaluated at year's end, see Tr. 1, 190:3–7—to include <u>impossible</u> "new goals and expectations" such as "elimination of lab issues" as well as eliminating client complaints and "quality issues." Exhibit 50. Indeed on April 10th, he told Dr. Menninger that he expected her to prevent the labs from having issues in the future. Tr. 2, 98. Mr. Mekerri later instructed that Dr. Menninger's "job" was to, essentially, personally involve herself in lab issues and "handle" them, which was both unrealistic and totally outside of PPD's standard processes. <u>Id.</u> 108–10. As discussed above, the jury could have found this conduct was part of PPD's deliberate "exit strategy" to set Dr. Menninger up for failure and justify termination. This evidence alone, which PPD does not challenge in any way, was sufficient to support the jury's liability on Dr. Menninger's disparate treatment claim by itself.

The evidence also supported the jury finding that Mekerri's February 6, 2018 email was an adverse employment action. As to PPD's contradictory first argument, that Mekerri's new expectations were both already in existence and yet were never imposed, the evidence (including Mr. Mekerri's email, Exhibit 350) supported a finding that Mr. Mekerri's email represented an announcement of new expectations of Dr. Menninger's job with present effect. Cf. Burns v. Johnson, 829 F.3d 1, 11 (1st Cir. 2016) (rejecting similar argument that officially announced, changed job duties could not be adverse). There is no evidence that PPD considered these expectations to be only potential or hypothetical ideas for the future; rather, Mr. Mekerri described the expectations as being newly imposed for "2018," in light of PPD's changing business goals. Id.

Second, PPD cites no authority for the notion that a vast, sudden increase in certain job responsibilities cannot be adverse if the employee had already performed those responsibilities on a limited basis. The governing test, as the Court observed at summary judgment (ECF Doc. 81 at 14–15), is whether an employer's action would be materially adverse to a reasonable employee in Dr. Menninger's circumstances. The jury could have found the drastic increase in scope in public speaking and other social interactions, that were inherently difficult for an employee with Social Anxiety Disorder, was materially adverse. Further, the evidence easily showed that the new expectations described in Mr. Mekerri's February 6, 2018 email were "significantly different" from the job that Dr. Menninger had been performing, as required to be material. See Burns, 829 F.3d at 10. For example, Mr. Mekerri suggested Dr. Menninger might have to give public SLT presentations as often as "biweekly" and technical sales presentations as often as "monthly." Exhibit 350. Dr. Menninger had at that point only participated in two or three SLT presentations, Tr. 2, 58:18–23, and just one internal technical sales presentation, id. 62:21–25.

Third, PPD's causation argument simply misrepresents the record. In 2017, Mr. Mekerri did not implement the job expectations captured by his February 6, 2018 email. Rather, he told Dr. Menninger vaguely that there would be some changes to her role, involving more public speaking and social interactions, to make her more "visible." Tr. 1, 183:24–184:3. Dr. Menninger disclosed her disability on January 11, 2018, and it was in response to that disclosure, and Dr. Menninger's initial accommodation request of January 31st, that Mr. Mekerri announced <u>for the first time</u> the expectations captured by his email on February 6th. Lastly, PPD falsely claims that the expectations in Mr. Mekerri's February 6, 2018 email were imposed on all "senior leadership" employees as well as Dr. Menninger's replacement, Dr. Kashlan. The testimony PPD cites does not support that claim, as there is no evidence that <u>the specific scope and frequency expectations</u> described in Mr. Mekerri's February 6, 2018 email were imposed on anyone but Dr. Menninger.

### 3.   The evidence supported Dr. Menninger's retaliation claims.

PPD argues that the jury's verdict on Dr. Menninger's retaliation claims must be overturned because the evidence did not support a finding that PPD engaged in <u>*any*</u> of the six forms of retaliatory conduct that the Court sent to the jury. Those were:

> (1) PPD tried to coerce Dr. Menninger to quit; (2) PPD tried to manufacture grounds for her termination; (3) PPD refused to clarify the anticipated changes to her role; (4) PPD established unrealistic expectations and goals for her role; (5) PPD diminished her involvement in hiring and recruiting decisions; and (6) PPD conducted a sham investigation into her complaints of mistreatment.

Tr. 10, 105:15–22. Beyond the "sufficiency of the evidence" contention, PPD also raises a variety of newly formed arguments—never articulated at trial—for why some of these theories could not have been materially adverse as a matter of law.

As a threshold matter, PPD raised no objection to the Court instructing the jury on <u>each</u> of these theories, either at the charge conference on Day 9 or on Day 10 when the jury was charged. PPD's arguments are therefore waived for multiple reasons. But even if the Court entertains PPD's

arguments, they are without merit. The evidence supported the jury finding that PPD engaged in each of the 6 alleged adverse actions, and that they were materially adverse.

To be clear, Dr. Menninger was not required to prove <u>all</u> of the 6 theories of retaliation in order to prevail on her retaliation claims. The Court correctly instructed the jury, without objection from PPD, that Dr. Menninger's burden was to prove that "one or more" of those six alleged acts occurred, and that the proven acts amounted to an adverse action "either individually or collectively." Tr. 10, 105:23–106:3. The Court also correctly instructed the jury, without objection from PPD, on the *contextual* standard for material adversity:

> . . .Dr. Menninger need only prove that a reasonable employee would have found the challenged action materially adverse, which, in this context means it well might have dissuaded a reasonable worker from engaging in protected conduct. Material adversity is judged from the standpoint of a reasonable person in the employee's position, meaning a person with all of the same conditions as Dr. Menninger and in light of all the relevant circumstances.

Tr. 10, 106:4–16. <u>See</u> <u>also</u> Summary Judgment Order (ECF Doc. 81 at 16–19). This standard correctly stated the law under <u>Burlington N. v. White</u>, 548 U.S. 53, 69 (2006), which holds that "Context matters. . . a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others."

For these reasons, the Rule 50(b) motion must be denied if the evidence, read in the light most favorable to Dr. Menninger and granting all permissible inferences in her favor, supported a finding that PPD engaged in one or more acts that individually or collectively might well have dissuaded Dr. Menninger from requesting an accommodation. The evidence clearly supported that finding.

First, for the reasons discussed above concerning PPD's Rule 50(b) punitive damages argument, the evidence easily supported a jury finding that PPD engaged in the retaliatory conduct captured by points (1), (2), (4), and (6). PPD is wrong to suggest that the adverse actions of (1)

pressuring an employee to quit and (2) attempting to manufacture grounds for her termination can never be materially adverse as a matter of law. That ignores the *contextual* standard of <u>Burlington Northern</u> on which the Court instructed the jury—again, without objection from PPD. The jury was well warranted in finding that a reasonable employee in Dr. Menninger's position, that is, with Social Anxiety Disorder, would have been dissuaded from disclosing her disability and requesting an accommodation if she knew that her employer would immediately try to get rid of her. As Dr. Menninger testified, she was "terrified of disclosing my condition. I didn't know what would happen. I thought I would be viewed . . . differently, viewed as defective and maybe even lose my job." Tr. 4, 61:19–22. Like the hypothetical "mother with school-age children" referred to in <u>Burlington Northern</u>, 548 U.S. at 69, Dr. Menninger was a mother and wife and sole financial provider for her family and was "devastated" by the efforts to pressure her to quit on February 28th, Tr. 2, 71:18–72:12 and "terrified" by Mr. Mekerri's new efforts to document her, <u>Id.</u> 94:3–12, and impose impossible goals for her job. <u>Id.</u> 97:22–98:11. And as explained below in the emotional distress discussion, Dr. Menninger experienced essentially a confirmation of the fears of being judged and humiliated that are the core aspects of her Social Anxiety Disorder. On point (4), as discussed above the evidence showed that PPD imposed unrealistic expectations and goals on Dr. Menninger's role, including that she might have to give presentations as often as biweekly, that she would "eliminate" lab issues, quality issues, and even client complaints—which was impossible in a lab like PPD's—and that she would "handle" lab issues so that they would never happen.

On point (6) PPD argues baselessly that an investigation cannot be a "sham" if the investigator interviews witnesses and considers evidence. That is incorrect as a matter of law, as the same could be said of the investigation that the jury permissibly found to be a "sham" in

Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 301–04 (2016). In Gyulakian, some of the reasons that the investigation was a "sham" included that the investigator was biased against the plaintiff from the outset; the investigator failed to interview witnesses that were likely to have witnessed the alleged harasser's conduct; and the investigator somehow failed to find evidence of a sexualized workplace even though a former manager had circulated a memo regarding the harasser's inappropriate behavior. Id. at 303. Here for the reasons discussed above, Ms. Ballweg's bias against Dr. Menninger, resulting from her own extensive personal participation in PPD's "exit strategy" was orders of magnitude worse than the bias of the investigator in Gyulakian, who merely said that he "honestly didn't believe" the plaintiff's allegations when he first heard them. Id. at 302. There was evidence that Ms. Ballweg failed to interview any of Mr. Mekerri's direct reports to determine if he was truly holding all of his reports accountable as opposed to targeting Dr. Menninger, even though Ms. Ballweg knew that lab problems were not happening only under Dr. Menninger's purview. Tr. 4:131:7–138:9. And as discussed at length above Ms. Ballweg's investigation, predictably, did not examine any of the evidence of PPD's "exit strategy" to "delicately work Lisa out" that she had personally participated in behind Dr. Menninger's back. See, e.g., Id. 121:9–18 (admitting she failed to investigate Mr. Fikry's "timing of Lisa Menninger's exit" email).

The evidence supported a jury finding of retaliation on point (3), that PPD refused to clarify the changes to Dr. Menninger's role. Mr. Mekerri's February 6, 2018 email was anything but clear, given his  bizarre "frequency" ranges such as "biweekly, monthly and/or quarterly." Exhibit 350. As Dr. Kessimian cogently explained, "That doesn't give me information. .. that's a frequency I cannot define, actually." Tr. 6, 114:9–16. In the February 28th meeting Dr. Menninger begged Mr. Mekerri and Mr. St. John to provide more clarity about the items in Mr. Mekerri's email, but "They

said they could not. They would not go into further detail." Tr. 2, 71:1–9. She asked Mr. St. John for more detail in her follow-up email on March 1st, Exhibit 332, but his response (Exhibit 176) did not answer her question. Id. 78:8–15. Mr. St. John's draft response, Exhibit 167, showed that he was deliberately refusing to do so because "Adding additional detail would only present the opportunity to select items in each bucket you believe you can or can't do." The jury saw, including in Exhibit 119, that St. John continually refused to provide any more detail to Dr. Menninger about the changes to her role. Dr. Summergrad and Dr. Kessimian both testified that due to the nature of her anxiety, it would have been very helpful to Dr. Menninger to understand what level of public speaking and social interactions was going to be expected of her. Tr. 6, 95:1–22 (Dr. Kessimian); 181:23–182:4 (Dr. Summergrad), and Dr. Summergrad found that PPD's "lack of clarity" contributed significantly to Dr. Menninger developing major depression. Tr. 6, 189:4–20. PPD was deliberately refusing to answer Dr. Menninger's questions because it was orchestrating an "exit strategy," and that lack of clarity was materially adverse because it exacerbated Dr. Menninger's anxiety.

Finally, the evidence supported retaliatory theory (5), that PPD excluded Dr. Menninger from recruiting and hiring decisions that were material to her role. Recruiting was an important part of Dr. Menninger's job, and one of her explicit annual performance goals for 2017, because at the time Dr. Menninger went remote PPD decided to hire new scientific expertise to hold certain certifications (CAP director and New York stakeholder) for the Highland Heights lab. Tr. 1, 197:13–198:18; Tr. 3, 16:21–18:16 (Dr. Menninger); Exhibit 59 (2017 performance review) at 482. Despite this, in 2018, contrary to typical practices, Dr. Menninger was left out of the recruiting and hiring process completely for two pathologists who were being interviewed to hold those very sorts of certifications, as well as the process for another associate director who replaced Dr.

Menninger's former direct report and took on a dotted-line reporting to Dr. Menninger. Tr. 2, 83:19–84:22, 88:1–89:11. Dr. Menninger was blindsided by these decisions and learned about them from a text message from her direct report. Id.; Exhibit 41. The exclusion prevented her from being able to use her specialized expertise to evaluate the qualifications of the candidates PPD was interviewing, and Mr. Mekerri was unprepared to do that. Id. at 89:1–11. PPD's brief falsely suggests that Dr. Menninger *requested* that Mr. Mekerri exclude her from hiring and recruiting after a conversation in November 2017 where she told Mr. Mekerri she was "overwhelmed." But there was no evidence that Dr. Menninger made any such "request." What the evidence did show was that in November 2017 Mr. Mekerri asked Dr. Menninger about the duties of her job; she sent him a list of duties; and then he never brought that up again. Tr. 1, 177:1–178:5. The only evidence PPD cites to show that Mr. Mekerri supposedly told Dr. Menninger about his purported plan to "help" her by taking the lead on recruiting was Ms. Ballweg's testimony from her "investigation." The jury was entitled to disregard Ms. Ballweg's testimony, which was contradictory and nonsensical: in almost the same breath she claimed that Mr. Mekerri had "no conscious effort" to exclude Dr. Menninger from the interview process, but also that Mr. Mekerri excluded Dr. Menninger because he consciously wanted to "help [Dr. Menninger] lessen the workload." Tr. 5, 67:21–68:15.

## II.     The Motion for New Trial or Remittitur Should Be Denied.

As with its Rule 50(b) motion, PPD bears a heavy burden to succeed on its request for a new trial or remittitur. "A district court should only grant such motions if the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 174 (1st Cir. 2009). The Court must "review the evidence in the light most favorable to the prevailing party" and may "grant remittitur or a new trial on damages only when the award

exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it." E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 502 (1st Cir. 1994).

> A. The Overwhelming Evidence of Dr. Menninger's Extreme Emotional Distress Supported the Jury's Award of Emotional Distress Damages.

PPD does not contend that the evidence was insufficient to show severe emotional distress—PPD actually concedes in its Memorandum that Dr. Menninger suffers from severe mental disabilities and suffered severe distress during and after 2018.[6] Rather, PPD challenges the jury's emotional distress award solely on grounds of causation.

The evidence at trial left no doubt that PPD caused Dr. Menninger's severe emotional distress. PPD's own expert characterized PPD's response to Dr. Menninger's request for accommodation as the "light switch" that triggered Dr. Menninger's depression. Tr. 9, 91:7–13, 92:19–25 (Dr. Kelly).[7] That causal connection was supported by trial testimony of several witnesses and further documented in Dr. Kessimian's contemporaneous treatment notes (Exhibit 18), as well as Dr. Kessimian's June 2018 statement in support of Dr. Menninger's medical leave (Exhibit 19).

In January 2018, Dr. Menninger had anxiety about the anticipated changes to her role and about her disclosure of her disability. Tr. 1, 184:5. But she was not depressed and had no suicidal ideation. Tr. 2, 50:3–20; Ex. 18 at MENNINGER000665 (Jan. 22, 2018). Rather, she loved her job, which gave her a feeling of purpose, and she worked very hard. Tr. 2, 125:24–125:14. Her job

---

[6] PPD falsely claims that it "has never disputed that Menninger suffers from severe mental disabilities." In fact, PPD hired an expert who opined that Dr. Menninger did not have major depression and had no mental condition that was severe enough to prevent her from working. Tr. 9, 67:12–70:7 (Dr. Kelly) ("**I think she has a sincere but incorrect belief that she's disabled"**) (emphasis added) and repeatedly elicited testimony at trial apparently intended to show that Dr. Menninger's running of ultramarathons was inconsistent with her claims of severe emotional distress.

[7] Of course, expert testimony on this point was not required to meet Plaintiff's burden. Causation only needed to be proved by a preponderance of the evidence, not to a reasonable degree of scientific certainty.

was important to her because she was the sole income provider for her family. Id.; see also Tr. 1, 188:7–9. After requesting accommodations, taking medication, and visiting Dr. Kessimian three times, Dr. Menninger was showing improvement in her anxiety as of February 16, 2018. Ex. 18 at MENNINGER000671; Tr. 6, 147:20–148:15.

The circumstances changed markedly for the worse starting at the February 28, 2018 meeting. When St. John immediately presented her with the two options of an exit package or consulting role, Dr. Menninger was "in shock" and became "very emotional." Tr. 2, 69:23. She was scared, and was crying and panicking, and pleaded with St. John and Mekerri to talk about the tasks in the buckets that they had said they could not accommodate. Id.  70:25–71:7. She felt the weight of being the sole financial provider for her family and felt as if she were pleading for her family's survival. Id. 71:18–72: 12. After this meeting Dr. Menninger began having "severe and frequent" panic attacks as she awaited Mr. St. John's response to her March 1, 2018 follow-up email. Id. 78:3–7. She was shocked when during this interim she received a text (Exhibit 41) from her direct report Dr. Reddy telling her that PPD had made offers to two pathologists, which was a sign PPD was moving fast to replace her. Id.  83:5–18. After Mr. St. John's unresponsive March 12, 2018 email arrived, Dr. Menninger felt even worse. Id. 79:19. Dr. Menninger's decline was documented in Dr. Kessimian's treatment notes, which reported her distress about the "email from Chad [St. John]" and how her social anxiety worsened so that she could no longer walk around the neighborhood. Ex. 18 at MENNINGER000677.

By March 30th she felt worse than ever before. Id. at 683. Around this time, Dr. Menninger called her sister Tonya Hart and told her about the February 28th meeting, and Dr. Menninger was shaky, tearful, and devastated. Tr. 5, 109:10–110:12. Then, in April, Dr. Menninger was "terrified" when Mr. Mekerri began sending her aggressive emails to "document" her performance, Tr. 2, 94:

3–7, and was even more terrified when Mr. Mekerri changed her annual performance goals to include impossible tasks like "eliminating lab issues." Id. 100:13–16. She accurately perceived that PPD was trying to force her out of the company. Id. 103:22–23.

By late April Dr. Kessimian documented Dr. Menninger's first onset of thoughts about killing herself, as Dr. Menninger's suffering was at times unbearable. Ex. 18 at 695–96. Dr. Menninger testified at length about the suffering and rapid deterioration to her health that this caused: among other things she couldn't sleep, suffered gastrointestinal distress, and was afraid of losing her job; she had multiple panic attacks per day; and would wake up in the middle of the night with sweating, shaking, rapid heart rate, and rapid breathing. Tr. 2: 113:11–115:14. Her sister Ms. Hart corroborated this testimony, reporting that Dr. Menninger was struggling with severe depression and suicidal thoughts—a state in which Ms. Hart had never seen her sister before in her life. Tr. 5, 111:20–112:8.[8]

Dr. Menninger decided to report her concerns about PPD's treatment of her to HR, which felt like the last chance she had to try to save her job and protect her family. Tr. 2, 125:18–22. But when Ms. Ballweg told her that "no evidence" of discrimination or retaliation had been found Dr. Menninger felt "hopeless." Id. Worse, she felt she had failed her family and did not want to live anymore. Id. 114:5–10. Dr. Kessimian saw Dr. Menninger on June 1st and recommended immediate medical leave because Dr. Menninger was so suicidal that continuing to work was a risk to her safety. Ex. 18 at 706, 708; Tr. 6, 70:8–71:8 (Dr. Kessimian); Ex. 19 at 777. Dr.

---

[8] Dr. Menninger explained what a panic attack feels like: "Some are worse than others, but in general, my breathing becomes very rapid. My heart rate becomes very rapid. I start sweating. I get shaky. My voice gets shaky. Sometimes I'm unable to talk if it's really bad, and I just -- I'll have tears come down my face. And it's very scary. I get GI distress, which is embarrassing because then I feel like I have to go to the bathroom; and, you know, I'm, like, embarrassed by that. And the more the symptoms escalate, it just makes me panic more and more. So it's just this awful spiral of, like, the symptoms just keep escalating, and you can't stop it. And it's like feeling trapped, and sometimes you feel like you have like an out-of-body experience, and you are just, like, not even aware of what's going on around you." Tr. 1, 186:9-23.

30

Kessimian specifically identified the reason for Dr. Menninger's mental state as "decline to accommodate, now with hostile work environment." Ex. 19 at 777; Tr. 6, 74:14–20.

Dr. Menninger had by this point developed Major Depressive Disorder. Tr. 6, 187:6–10 (Dr. Summergrad); Ex. 25 at 119 (Butler Hospital treatment notes dated July 11, 2018). Dr. Summergrad explained that the causes of Dr. Menninger's major depression included the "lack of clarity" with which PPD had left her about the changes to her role, and her feeling that PPD was looking to have her "exit the organization." Tr. 6, 189:4–20. Further, Dr. Menninger's disclosure of her disability caused her to experience the realization and confirmation of the very fears that are the "cardinal" elements of her social anxiety disorder: fears of being seen, exposed, and humiliated. This made her feel even more negatively about herself and contributed significantly to her feelings of hopelessness, a cardinal symptom of major depression. Id. 189:15–193:11.

The jury heard evidence that Dr. Menninger has tried desperately to get better. Tr. 2:127:17–21 (Dr. Menninger); Tr. 5, 126:1–15 (Ms. Hart); Tr. 6, 69:16–21, 72:16–25 (Dr. Kessimian); Tr. 6, 194:11–14 (Dr. Summergrad); see also Exhibits 22–27 (medical treatment notes). Tragically and despite this, Dr. Menninger continued to suffer profoundly for the nearly five-year period from June 2018 through the time of trial.

Dr. Menninger struggled for years with her sleep. See, e.g., Tr. 2, 130:7–8. She has recurring, frequent nightmares involving people she works with at PPD, in which she has to hide or run away, and fears being harmed or killed. Tr. 2, 129: 3–14 (Dr. Menninger); Tr. 196:8–23 (Dr. Summergrad). She was diagnosed with Post-Traumatic Stress Disorder, see, e.g., Ex. 23 at 7 (Dr. Burbano medical records), Tr. 2, 127:6 (Dr. Menninger), and has for years experienced post-traumatic symptoms such as startle responses to noise or unexpected activities, avoidance of the triggers of trauma, and the aforementioned dreams whose content presents the cause of the trauma

nakedly (i.e., a dream literally about PPD and people who she used to work with there). Tr. 6, 195:25–196:23 (Dr. Summergrad).

Dr. Menninger's mental distress brought her weight down by a full quarter, from 120 pounds to 90. Tr. 2, 129:23–130:2. The jury could visually compare Dr. Menninger's gaunt physical appearance and strained affect with that of her sister Ms. Hart, who is just 12.5 months older, Tr. 5, 104:1 (Ms. Hart), who had a healthy weight and happy affect, almost as if presented with before-and-after frames showing the effects of Dr. Menninger's suffering. Dr. Menninger described her present mental state in heartbreaking terms:

> But I don't know if I'm going to be able to experience happiness again. I don't know what the statistics are on that. I -- I just want my family to be okay and happy. I just -- this is so unfair to my child. And I really just want -- I want them to have a happy life.
>
> [. . .] there's days when I'm just curled up in the fetal position in bed and I cannot get out of bed because of fear. It's hard to trust anyone. I don't know who I can trust. I feel like everyone's out to hurt me, whether it's intentional or not. And so I just don't want to even put myself in the position where that might happen.

Tr. 2, 128:6–23.

Most seriously, Dr. Menninger experienced serious feelings of wanting to kill herself, not every day, but frequently between 2018 and the trial. Tr. 3, 29:23–30:5; Tr. 4, 53:7–8. In August 2018 Dr. Menninger's husband described to her sister his deep worry about Dr. Menninger because Dr. Menninger was having multiple panic attacks daily, was significantly depressed, and had thoughts of self-harm. Tr. 5, 113:9–15. In October 2018, Dr. Menninger's suicidal thoughts resulted in a terrified call from her husband Mason to her psychiatrist Dr. Kessimian. Exhibit 453; Tr. 6, 143:3–145:2 (Dr. Kessimian). Dr. Menninger continued to have passive suicidal ideation after moving to New Mexico. See, e.g., Ex. 23 at 25 (Feb. 7, 2020 treatment notes). Later, in 2021 when Dr. Menninger moved to Bend, Oregon, her husband spoke again to her sister about his worry that she would hurt herself, and Ms. Hart gave him a list of emergency facilities' addresses

and phone numbers so that he would know where to take her. Tr. 5, 124:11–125:13. Worst of all, shortly before the trial Dr. Menninger felt so suicidal that she began drafting a suicide note to her child, who had been the reason Dr. Menninger was so determined to get better. Tr. 3, 19–24; Tr. 2, 128:6–16.

The evidence, in sum, overwhelmingly supported the jury's finding that PPD caused Dr. Menninger profound emotional distress that will continue to affect her in the future.

### B. The Evidence Supported the Jury's Front Pay Award.

PPD first argues that there was insufficient evidence that Dr. Menninger would be unable to perform comparable work through the remainder of her work life.[9] The jury's findings are reviewed under a deferential standard: "Massachusetts law is clear that uncertainty in the award of future damages does not bar their recovery, and we have said that the generousness of a jury's award does not alone justify an appellate court in setting it aside' unless it is shown to exceed any rational appraisal or estimate of the damages." Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998) (cleaned up).

The evidence supported the inference that Dr. Menninger would, more likely than not, be unable to perform comparable work for the remaining 13 years until her projected date of retirement (PPD does not challenge Mr. Jonas's determination of Dr. Menninger's projected retirement date). Dr. Menninger testified that she wanted to work at PPD until her retirement. Tr. 2, 53:19–20. Cf. Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 104 (2009) (citing similar testimony and affirming 19-year front pay award). Yet the evidence showed PPD's discriminatory and retaliatory responses to her disclosure of disability and request for accommodation left her deeply traumatized. She experienced panic in her old Massachusetts home merely for being in the

---

[9] It bears mention that PPD did not object to the jury being instructed as to the availability of a front pay award and, further, made no objection to the admission of Mr. Jonas' projections regarding the same.

basement where she had worked for PPD. Tr. 3, 25:20–24. She was diagnosed with PTSD by multiple providers, see, e.g., Ex. 23 at 7 (Dr. Burbano medical records), Ex. 27 at 254 (Portland, Oregon treatment records), and suffered traumatic triggers from things associated with her former career. Tr. 4, 45:23–46:2. Her experience left her with "a lot of fear" and "a lot of lack of trust," and she testified that a major reason for being unable to work was that she was "too traumatized to trust . . . that I won't get hurt like this again." Tr. 2, 130:5–7. The jury could have inferred that Dr. Menninger's trauma from her last work experience will prevent her from holding a similar job.

The jury heard additional evidence supporting its finding that Dr. Menninger will, more likely than not, be unable to perform comparable work again.[10] Dr. Menninger's husband Mason's testified that Dr. Menninger's anxiety and depression were closely tied with her career in pathology—i.e., precluding her ability to perform comparable work—and that she would not be able to work again. Tr. 8, 32:1–12. Dr. Summergrad confirmed that there was a "significant risk" that Dr. Menninger would not be able to work again. Tr. 6, 199:15. As Dr. Summergrad explained, PPD's conduct directly hit Dr. Menninger in exactly this "cardinal aspect" of her social anxiety, which included "fear of being rejected"; Dr. Summergrad believed this would "certainly" inhibit her ability to work again. Tr. 6, 200:23–201:6 (Dr. Summergrad). Dr. Summergrad further explained that Dr. Menninger had anxiety, a hopeless mood about the future, "persistent" depressive symptoms, agoraphobia, and a crystallized pattern of being significantly if not completely housebound, and that all of these things together would be cumulatively very difficult to come back from. Id. 193-200.

---

[10] Dr. Menninger's social anxiety disorder was defined by a fear of exposure to scrutiny, judgment, embarrassment, and humiliation. E.g., Tr. 6, 86:3–8 (Dr. Kessimian), 162:18–21, 184:9–12 (Dr. Summergrad). Those were exactly the fears (along with hurting her career or losing her job) that made Dr. Menninger fearful of disclosing her disability in the first place: "There's a stigma with mental illness, and I was afraid that people would view me as defective and that that might hurt my career opportunities, my job." Tr. 1, 187:25–188:2; see also Tr. 2, 44:20–23.

There was nothing improper or unusual about the length of this front pay award. "Lengthy front pay awards have been sustained under G.L. c. 151B, as well as under Federal law, where circumstances indicated that plaintiffs would have difficulty in obtaining comparable employment." Haddad, 455 Mass. at 104 (collecting cases affirming 14, 30, 19, over 20, and 17-year front-pay awards).

Second, PPD argues that the evidence shows Dr. Menninger would not have continued to work at PPD until her retirement, and therefore that the assumptions on which her front pay award was calculated were flawed. This challenge fails because the basis of calculating Dr. Menninger's front pay was supported by the evidence and did not exceed any rational appraisal of her damages, Kelley, 140 F.3d at 355. As stated above the jury was entitled to credit Dr. Menninger's testimony that she wanted to remain at PPD through retirement, and using her projected PPD earnings was both a rational and commonplace methodology to calculate front pay. See, e.g., Haddad, 455 Mass. at 102–104 (in determining front pay the jury should consider the "amount of future earnings, including salary, bonuses and benefits that the [p]laintiff would have received but for the [d]efendant's unlawful discrimination,"); Kelley, 140 F.3d at 355. It is also a methodology to which PPD did not object at trial.

PPD's suggestion that Dr. Menninger would "not have lasted" at PPD is meritless, as the jury properly could have considered that Dr. Menninger loved her job, Tr. 2, 125:24–25, had just received a great performance rating for 2017, Tr. 4, 113:5 (Ms. Ballweg), and was fully capable of thriving at PPD as she had for the first 2.5 years of her employment. Tr. 2, 46:2–9 (Dr. Menninger).

Third, PPD contends that Dr. Menninger's inability to work precludes her receipt of front pay. That argument is frivolous[11] because the First Circuit has repeatedly held that plaintiffs may recover back and front pay when they become unable to work (and unable to mitigate their losses) due to disability caused by the employer. Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 142 (1st Cir. 2009) (affirming front pay award through plaintiff's projected retirement date); Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 384 (1st Cir. 2004); Blockel v. J.C. Penney Co., 337 F.3d 17, 27–28 (1st Cir. 2003). PPD cites no authority to the contrary.

### C.   The Jury Was Correctly Instructed on Reasonable Accommodations.

PPD's complaint about the "reader" instruction merits little comment. The Court's instruction accurately stated that a "qualified reader" is a type of accommodation that may be reasonable under appropriate circumstances. The Court's instructions made clear that it was for the jury to decide whether, based on the fact and circumstances here, such an accommodation would have been "reasonable." That is an accurate statement of the law, and there was no error or other prejudice. Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 80 (1st Cir. 2001) ("the central inquiry reduces to whether, taking the charge as a whole, the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury."

### III.   There is No Basis for Remittitur and PPD Provides None.

PPD asks the Court to remit the jury's verdict based on mere conclusory assertions that the jury's verdict was "grossly excessive" and did not exhibit a "rational appraisal or estimate of the damages that could be based on the evidence before the jury." PPD offers no developed reasoning or argumentation to explain these contentions aside from a single argument that the jury's verdict

---

[11] The Court rejected a similar argument at summary judgment, Order (ECF Doc. No. 81) at 10 n.10 premised on alleged "estoppel" by Dr. Menninger's receipt of Social Security disability benefits.

exceeded the "total damages" allowed in other "recent awards." PPD provides one string-cited footnote of unrepresentative and hand-picked cases, but offers no analysis of the verdicts and does not even bother to explain the separate components of damages that they contained.

This paltry argument fails to present the Court with a reasoned basis for remittitur, and the issue should be deemed to have been waived. The standard that the Court must apply is not whether the "total damages" in this award was greater than some other case, but whether the damages awarded were adequately supported by the evidence presented at trial. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 579 (1st Cir. 1989) (affirming verdict for over $5 million). Indeed, both the First Circuit and the SJC have cautioned against the dangers of blindly comparing verdicts. See id. at 579–80; Griffin v. Gen. Motors Corp., 380 Mass. 362, 371 (1980) (reasoning from "comparative verdicts" from various jurisdictions "is a dangerous game, to say the least."); see also Charles v. Leo, 96 Mass. App. Ct. 326, 350 (2019) (defendants bore the burden to demonstrate excessiveness and to the extent they sought to have the judge compare the verdict with others, "they were required to address the relevant dimensions along which the awards might be compared.").

Beginning with back pay and front pay, PPD cites no specific evidence or argument challenging the jury's calculations. There is no basis to judicially un-do the jury's front-pay and back-pay awards because the jury was entitled to find that PPD caused Dr. Menninger to be unable to work through its unlawful discriminatory and retaliatory actions, and that she will be unable to work through her date of projected retirement for the reasons stated above.

Turning to emotional distress, the Court's power to review a jury's determination of emotional distress damages is limited. As the First Circuit has held, a jury verdict should not be disturbed merely because it is extremely generous or because the court thinks that the damages are

considerably less. Diefenbach v. Sheridan Transp., 229 F.3d 27, 32 (1st Cir. 2000). "[C]onverting feelings such as pain, suffering, and mental anguish into dollars is not an exact science" and, consequently, the jury's assessment will be upheld so long as it "'does not strike such a dissonant chord that justice would be denied were the judgment permitted to stand.'" Correa v. Hosp., S.F., 69 F.3d 1184, 1198 (1995). "[M]erely showing that the damage award is generous in comparison to other (hand-picked) cases is insufficient to warrant relief." Id. Again, PPD offers no specific argument to challenge the jury's award and fails to explain why the hand-picked verdicts it cites offer a meaningful basis for comparison.

In any event, the evidence of Dr. Menninger's profound suffering fully supported the jury's substantial award of emotional distress damages. The jury demonstrated thoughtfulness and care in dividing its award between a more robust award of $5 million for past distress, which was supported by voluminous testimony and documentary proof summarized above, compared to a more modest figure of $2 million for the emotional distress Dr. Menninger is likely to continue suffering in the future that is inherently a matter of projection. And contrary to PPD's argument, other courts have indeed sustained emotional distress awards of similar sizes. Osorio v. Source Enterprises, Inc., No. 05 CIV. 10029 (JSR), 2007 WL 683985, at *5 (S.D.N.Y. Mar. 2, 2007) (upholding total $7.877 million in damages for emotional distress and harm to reputation on claims for retaliation under Title VII and New York law, and defamation); Griffey v. Dep't of Corr., No. 354322, 2022 WL 2900390, at *43 (Mich. Ct. App. July 21, 2022) (upholding two emotional distress awards of $4.25 million and $4.35 million respectively for husband and wife co-plaintiffs on race discrimination and retaliation claims where plaintiffs suffered chronic conditions including PTSD and major depression from which they were unlikely to recover); Brovont v. KS-I Med. Servs., P.A., 622 S.W.3d 671, 683 (Mo. Ct. App. 2020) (upholding award of $6 million in non-

economic losses to medical doctor in whistleblower retaliation case and allowing punitive damages of $5 million versus one defendant and $10 million versus another defendant); <u>Coachman v. Seattle Auto Mgmt., Inc.</u>, No. C17-187 RSM, 2019 WL 4695660, at *1 (W.D. Wash. Jan. 3, 2019), <u>aff'd</u>, 787 F. App'x 416 (9th Cir. 2019) (sustaining and affirming award for $4,697,248 in noneconomic losses in disability discrimination and failure-to-accommodate claims).[12] The cases PPD cites are not factually comparable. <u>E.g.</u>, <u>DaPrato v. Massachusetts Water Res. Auth.</u>, 482 Mass. 375, 394 (2019) (plaintiff got a new job in just three months and merely "consulted" a doctor for anxiety); <u>Haddad v. Wal-Mart Stores, Inc.</u>, No. 05-0274, 2007 WL 6027568 (Mass. Super. Jan. 18, 2007) (plaintiff got new job in 6 months).

The recent $20 million verdict in a medical malpractice case cited by PPD also bears some consideration. While PPD likely cites the verdict to suggest that Dr. Meninger's recovery should <u>not</u> be on par with an individual who lost their leg, that is a point on which reasonable minds may differ. As our societal view of mental health has evolved, we now recognize that afflictions like depression and PTSD are no less "real" or debilitating than other forms of bodily harm. If offered the choice of losing a limb or suffering the unabating anguish that Dr. Menninger has suffered for the past five years, many might very well surrender the leg.

Finally, to the extent PPD requests the Court to remit the jury's award of punitive damages, PPD offers no developed argument or case law whatsoever that would justify the Court's interference with the jury's reasoned decision to set the amount of punitive damages at $10 million. Particularly given the jury's decision to award **less** in punitive damages than it awarded in compensatory damages, and considering the significant noneconomic portion of the compensatory

---

[12] Because the Coachman court opinions do not discuss the emotional distress evidence in any detail, Dr. Menninger attaches here as Exhibit A a copy of the plaintiff's post-trial opposition to the defendant's motion for new trial in Coachman, which at pp. 12–13 summarizes the evidence of emotional distress. That evidence is significantly less severe than the evidence presented in this case at trial.

damages, the Court has no basis to disturb the jury's award here. See Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 415 (2013) (so long as the award is within a single-digit ratio of punitive to compensatory damages, that is, no more than 9:1, the award will not typically qualify as impermissibly excessive, particularly if the award contains a substantial non-economic component) (affirming $18 million punitive damages award at 7:1 ratio where harm was primarily noneconomic).

It is PPD's burden to demonstrate excessiveness, and PPD plainly cannot meet that burden here without developed argument. Charles v. Leo, 96 Mass. App. Ct. 326, 351 (2019) (**reversing** lower court's remittitur of $10 million punitive damages award to $2 million where jury awarded $888,159.83 in compensatory damages).[13] Punitive damages awards are by definition qualitative and intangible, which is why the jury, not the Court, is entrusted with the responsibility to "make the difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system," and to determine the amount that appropriately declares its "moral condemnation." Id. (cleaned up; citations omitted). The jury is permitted to take the financial position of the defendant into account when determining the amount of punitive damages, which means that much higher awards may properly be assessed against much wealthier defendants even where all other considerations are equal. DaPrato v. Massachusetts Water Res. Auth., 482 Mass. 375, 393 (2019).

---

[13] Massachusetts law controls this analysis to the extent it provides the rule of decision. See McMillan v. Mass. Soc. For Prevention of Cruelty to Animals, 140 F.3d 288, 306 (1998) (citing Browning–Ferris Ind. v. Kelco Disposal, 492 U.S. 257, 278 (1989)). Here, the Court gave one instruction on punitive damages applicable to both the federal and Massachusetts-law claims, and Dr. Menninger prevailed on all counts under both federal and Massachusetts law. The Court has a duty under First Circuit case law to allocate the punitive damage award between Dr. Menninger's state and federal-law claims (treating it as "fungible" between state-law and federal law claims) so as to maximize her recovery. Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 66 (1st Cir. 2005); accord Burnett v. Ocean Properties, Ltd., 422 F. Supp. 3d 400, 428 (D. Me. 2019), aff'd, 987 F.3d 57 (1st Cir. 2021); Bell v. O'Reilly Auto Enterprises, LLC, 626 F. Supp. 3d 141, 185 (D. Me. 2022). Putting these principles together, nearly all of the punitive damages award should be construed as awarded under Massachusetts law and therefore Massachusetts law controls the issue of whether the jury's award is grossly excessive or shocking to the conscience.

In this case, the ratio of punitive to compensatory damages was substantially **less** than 1:1 (specifically it was 1 to 1.403), and the compensatory damages included a large noneconomic component. That ratio comes nowhere close to the legal definition of excessive.[14] The jury properly considered the undisputed evidence that PPD was acquired by Thermo Fisher Scientific in 2021 for $17.4 billion, Tr. 6, 50:10–12 (Ms. Ballweg), in assessing a significant award. Finally, the Defendant's conduct easily qualified as outrageous for all of the reasons discussed above. In any event it was PPD's burden to show excessiveness, and PPD did not do so.

## CONCLUSION

For the reasons set forth above, Defendant's post-trial Motions should be denied.

Respectfully submitted,
Lisa Menninger,
By her attorneys,

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
(617) 723-8000
Attorneys for Plaintiff Lisa Menninger

Date: July 7, 2023

---

[14] Compare Toussaint v. Brigham & Women's Hosp., No. SUCV20142253B, 2018 WL 4760536, at *1 (Mass. Super. Aug. 21, 2018) where the jury awarded $3.213 in total compensatory damages including $2.75 million in emotional distress, and $25 million in punitive damages. The precedents suggest this award, at about a 7.78:1 ratio, would have been affirmed if challenged. That ratio applied here would have meant the punitive damages were $108 million. The jury's punitive damages award of $10 million reflected its calm and dispassionate judgment as to the degree of damages necessary to punish an extremely wealthy defendant for outrageous conduct, while keeping the punitive figure rationally tethered to the size of compensatory harm and coming nowhere close to the boundaries of what has been considered excessive.

## **CERTIFICATE OF SERVICE**

I Patrick J. Hannon certify that on July 7, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Defendant by electronically serving its counsel of record.

*/s/ Patrick J. Hannon*
Patrick J. Hannon