**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LISA MENNINGER,<br><br>                       Plaintiff,<br><br>v.<br><br>PPD DEVELOPMENT, L.P.,<br><br>                      Defendant. | Civil Action No.  1:19-CV-11441-LTS<br><br>**Oral Argument Requested**<br><br>**Leave to File Granted<br>on July 12, 2023** |

**DEFENDANT'S REPLY IN SUPPORT OF RENEWED**
**MOTION FOR JUDGMENT AS A MATTER OF LAW AND**
**MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I.      PPD DID NOT WAIVE ITS RIGHT TO SEEK JUDGMENT UNDER
        RULE 50(B).............................................................................................................. 3

II.     THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER
        OF LAW AS TO MENNINGER'S DISCRIMINATION CLAIMS
        BECAUSE SHE WAS NOT A "QUALIFIED HANDICAPPED
        PERSON" AND PPD ATTEMPTED TO REASONABLY
        ACCOMMODATE HER.............................................................................................. 5

        A.      Menninger Was Not a Qualified Handicapped Person, and Thus
                Both Her Discrimination Theories Fail as a Matter of Law. .............................. 6

        B.      Menninger's Failure-to-Accommodate Claim Also Fails for the
                Independent Reason That PPD Met Its Legal Duty to Attempt to
                Reasonably Accommodate Her. .......................................................................... 8

III.    THE COURT'S "READER" JURY INSTRUCTION WAS
        MISLEADING AND HIGHLY PREJUDICIAL UNDER THE
        CIRCUMSTANCES OF THIS CASE........................................................................ 10

IV.     THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER
        OF LAW AS TO MENNINGER'S RETALIATION CLAIM BECAUSE
        SHE DID NOT SUFFER AN ADVERSE ACTION BECAUSE OF
        PPD'S CONDUCT. .................................................................................................. 13

V.      THE JURY'S $24 MILLION DAMAGES AWARD IS CONTRARY TO
        LAW, UNSUPPORTED BY THE EVIDENCE, EXCESSIVE, AND
        WELL OUTSIDE THE RANGE OF *ANY* COMPARABLE DECISIONS
        IN THIS JURISDICTION. ........................................................................................ 16

        A.      The Court Should Strike the Jury's Punitive Damages Award as
                Contrary to Law. .............................................................................................. 16

        B.      The Jury's Award of $7 Million in Emotional Distress Damages
                Is Excessive. .................................................................................................... 19

        C.      Menninger's Front Pay Award Is Speculative and Contradicts the
                Evidence........................................................................................................... 20

        D.      Menninger Offers No Comparable Verdict in This Jurisdiction. ...................... 20

CONCLUSION..................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bain v. City of Springfield*,
424 Mass. 758 (1997) ...........................................................................................15

*Bell v. O'Reilly Auto Enters., LLC*,
626 F. Supp. 3d 141 (D. Me. 2022) ....................................................................17

*Benson v. Wal-Mart Stores E., L.P.*,
14 F.4th 13 (1st Cir. 2021) .....................................................................................6

*Billings v. Town of Grafton*,
515 F.3d 39 (1st Cir. 2008) ..................................................................................15

*Blockel v. J.C. Penney Co.*,
337 F.3d 17 (1st Cir. 2003) ....................................................................................4

*Bryant v. Caritas Norwood Hosp.*,
345 F. Supp. 2d 155 (D. Mass. 2004) ..................................................................14

*Burnett v. Ocean Props., Ltd.*,
987 F.3d 57 (1st Cir. 2021) ..................................................................................17

*Che v. Mass. Bay Transp. Auth.*,
342 F.3d 31 (1st Cir. 2003) ..................................................................................17

*Ciccarelli v. Sch. Dep't of Lowell*,
70 Mass. App. Ct. 787 (2007) .............................................................................17

*Dixon v. Int'l Bhd. of Police Officers*,
504 F.3d 73, 81 (1st Cir. 2007) ...........................................................................14

*Forsythe v. Wayfair Inc.*,
27 F.4th 67 (1st Cir. 2022) ..................................................................................15

*Freadman v. Metro. Prop. & Cas. Ins. Co.*,
484 F.3d 91 (1st Cir. 2007) .................................................................................10

*Gauthier v. Sunhealth Specialty Servs., Inc.*,
555 F. Supp. 2d 227 (D. Mass. 2008) ..................................................................14

*Gessy Toussaint v. Brigham & Women's Hospital*,
Case No. SUCV2014-2253-B (Mass. Sup. Ct. 2018) ..........................................20

*Gonzalez-Bermudez v. Abbott Labs P.R., Inc.*,
    990 F.3d 37 (1st Cir. 2023) ................................................................5

*Gyulakian v. Lexus of Watertown, Inc.*,
    475 Mass. 290 (2016) ...............................................................5, 17

*Handrahan v. Red Roof Inns, Inc.*,
    43 Mass. App. Ct. 13 (1997) ................................................................18

*Heagney v. Wong*,
    915 F.3d 805 (1st Cir. 2019) ................................................................17

*Jennings v. Jones*,
    587 F.3d 430 (1st Cir. 2009) ................................................................13

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
    322 F.3d 26 (1st Cir. 2003) ................................................................12

*Jones ex rel. United States v. Massachusetts Gen. Hosp.*,
    780 F.3d 479 (1st Cir. 2015) ...............................................................5, 6

*Jones v. Nationwide Life Ins. Co.*,
    696 F.3d 78 (1st Cir. 2012) ................................................................10

*Jones v. Walgreen Co.*,
    679 F.3d 9 (1st Cir. 2012) ...............................................................6, 7

*Jones v. Walgreen Co.*,
    765 F. Supp. 2d 100 (D. Mass. 2011) ................................................................8

*Kelley v. Airborne Freight Corp.*,
    Case No. 1:94-cv-10137-WAG (D. Mass. 1996) ................................................20

*Kiely v. Teradyne, Inc.*,
    85 Mass. App. Ct. 431 (2014) .........................................................16, 17

*Krennerich v. Inhabitants of Town of Bristol*,
    943 F. Supp. 1345 (D. Me. 1996) ................................................7, 10, 11

*Lattimore v. Polaroid Corp.*,
    99 F.3d 456 (1st Cir. 1996) ................................................................13

*Laurin v. Providence Hosp.*,
    150 F.3d 52 (1st Cir. 1998) .........................................................8, 10, 11

*Marinelli v. Potter*,
    661 F. Supp. 2d 69 (D. Mass. 2009) ................................................................14

*Mulloy v. Acushnet Co.*,
    460 F.3d 141 (1st Cir. 2006)........................................................................................7

*O'Connor v. Huard*,
    117 F.3d 12 (1st Cir. 1997)........................................................................................12

*Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*,
    853 F.3d 599 (1st Cir. 2017)......................................................................................10

*Parker v. Gerrish*,
    547 F.3d 1 (1st Cir. 2008)..........................................................................................5

*Pena v. Honeywell Int'l, Inc.*,
    923 F.3d 18 (1st Cir. 2019)........................................................................................5

*Russell v. Cooley Dickinson Hosp., Inc.*,
    437 Mass. 443 (2002)...............................................................................................14

*Sepúlveda-Vargas v. Caribbean Rests., LLC*,
    888 F.3d 549 (1st Cir. 2018)................................................................................15, 16

*Smith v. Bell Atl.*,
    63 Mass. App. Ct. 702 (2005)..........................................................................5, 12, 16

*Stonehill Coll. v. Mass. Comm'n Against Discrimination*,
    441 Mass. 549 (2004)...............................................................................................19

*Tobin v. Liberty Mut. Ins. Co.*,
    553 F.3d 121 (1st Cir. 2009)......................................................................................18

*Tompson v. Dep't of Mental Health*,
    76 Mass. App. Ct. 586 (2010).....................................................................................5

*Trinh v. Gentle Comms., LLC*,
    71 Mass. App. Ct. 368 (2008)...................................................................................15

*Zimmerman v. Direct Fed. Credit Union*,
    262 F.3d 70 (1st Cir. 2001)........................................................................................17

**Statutes**

42 U.S.C. § 12111(9)(B)....................................................................................2, 10, 13

**Other Authorities**

29 C.F.R. 35.104.......................................................................................................10

*Black's Law Dictionary* (11th ed. 2019)........................................................................5

iv

Fed. R. Civ. P. 50(a) ................................................................................................4, 5

Fed. R. Civ. P. 50(b) ............................................................................................3, 4, 5

**INTRODUCTION**

Menninger suffers from a debilitating condition that prevented her from performing the essential functions of her position without accommodations that are, as a matter of law, unreasonable.  PPD tried in good faith to find ways that might permit Menninger to continue in her role, or to find another role for which she was suited.  But, while Menninger's illness is lamentable, PPD was not required to, in effect, hire another employee to fulfill essential functions of Menninger's job.  As the evidence at trial showed, PPD tried to reasonably accommodate Menninger and did not retaliate against her.

When Menninger and her psychiatrist told PPD that it was "impossible" for Menninger to increase her public-facing duties without incurring significant risk to her mental health, PPD took them at their word, as it was entitled to do.  As the trial evidence established, and as this Court observed at summary judgment: "In contrast to situations where an employer 'completely disregarded' an employee's requests for help, 'extended no response at all to [employee's] requests, and failed to give any explanations for its failure to do so,' PPD engaged, responded, and gave explanations for why it could not grant the other accommodations." (Doc. No. 81 at 12-13.) Simply put, PPD engaged in good faith in the legally required interactive process.

Indeed, far from engaging in some grand conspiracy to exit Menninger, as her Opposition tries to suggest, the evidence at trial established exactly what this Court found at summary judgment: "No reasonable jury could find that [the] predominantly internal communications allegedly showing that PPD was trying to force Menninger out affected the terms and conditions of her employment.  Neither could they find that her termination nearly eight months after she took a medical leave, and where she showed 'no sign of intending to return to work,' was [a] discharge under the pretext of performance issues." (Doc. No. 81 at 15 (citations omitted).)  Instead, when Menninger and her psychiatrist made clear that no reasonable accommodation existed, PPD did

1

not terminate Menninger—as happened in almost every case the Opposition cites.  PPD offered her the opportunity to transition to a consulting role that would not require Menninger to perform any of the public-facing duties that Menninger's psychiatrist stated she was incapable of performing.  Unlike hiring a surrogate employee to perform essential aspects of Menninger's job, PPD's proposal of an alternative role is not merely *reasonable* under the law—it is precisely the kind of accommodation the ADA contemplates.  42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to include "reassignment" to another position).  Faced with a truly impossible situation, PPD believed that this was the best available option under the unfortunate circumstances—as it provided Menninger with an opportunity to keep working.  Menninger's attempt now to portray these, and PPD's other good faith efforts, as acts of unlawfulness—and as so egregious as to support punitive damages—is contrary to law and highlights how, if this jury's verdict were upheld, the law would put employers like PPD in an impossible position.

What this case has always come down to is this:  Menninger could not do the job that PPD needed her to do.  PPD's business needs had legitimately evolved; and unfortunately, in the words of Menninger and her psychiatrist, Menninger's mental disorders made it "impossible" for her to meet these needs.  While PPD sympathizes with Menninger for her medical situation, PPD did not cause it, and cannot be held liable for it.  Menninger ignores salient facts evidencing good faith on the part of PPD, relies on outdated and irrelevant case law, seeks to benefit from an erroneous jury instruction that all but guaranteed the jury's flawed verdict, and leans on emotional appeals that cannot form the basis of liability.

Menninger failed to meet her burden of establishing that she was capable of performing her job with reasonable accommodation.  This failure defeats both of her discrimination claims.  In her Opposition, Menninger omits her psychiatrist's dispositive statement that it was "impossible" for her to perform her public-facing duties.  She omits that PPD readily accepted two

of her five accommodation requests—denying only those that the law deems categorically unreasonable. She further ignores that it was she who ended the accommodations discussions as part of the interactive process. And, among other things, she ignores this Court's finding at summary judgment that PPD engaged in a good faith effort to accommodate her.

Menninger's legally insufficient discrimination claims inevitably tainted the jury's consideration of her retaliation claim as well, which at the very least must be retried. PPD should, however, be granted judgment on the retaliation claim, as Menninger was unable to prove any adverse impact, or any causal connection to her disability. Instead, Menninger complains of the very things the law requires, such as PPD's attempt to identify accommodations, including an alternative role, and engagement with legal counsel to ensure compliance with the law.

At an absolute minimum, these facts, which are fully substantiated by the evidence in the trial record, are irreconcilable with the jury's punitive damages award. The Court was right to be hesitant about sending the punitive damages question to the jury in the first place. (Doc. No. 159 at 171-73.) In defense of that award, Menninger cites outdated case law to suggest that facts establishing *liability* are sufficient to support *punitive damages*—a proposition that countless more recent cases explicitly reject. The jury's verdict is improper as a matter of law, excessive as a matter of fact, and tainted by error. It is this Court's duty at this point to correct those improprieties, excessiveness, and errors by setting aside the jury's unjust verdict.

## ARGUMENT

### I.   PPD DID NOT WAIVE ITS RIGHT TO SEEK JUDGMENT UNDER RULE 50(B).

PPD did not waive its right to seek judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court should reject Menninger's assertion that, merely because PPD moved for a directed verdict without specifying the precise reasons, PPD cannot challenge the sufficiency of the evidence in its Rule 50(b) Motion. This assertion has been squarely rejected by the First

3

Circuit under identical circumstances.

In *Blockel v. J.C. Penney Co.*, a case on all fours with the instant action, Blockel sued her former employer, J.C. Penney, for retaliation and failure to reasonably accommodate her disability. 337 F.3d 17, 21 (1st Cir. 2003). Like PPD, J.C. Penney orally moved for "directed verdict." *Id.* at 25 n.2. Before J.C. Penney specified its grounds, the court immediately noted that the "[m]otion for directed verdict has been filed, and it's on the record, and the Court denies it." *Id.* On appeal, Blockel argued that J.C. Penney had somehow waived its arguments under Rule 50(b) by failing to specify any grounds for judgment as a matter of law under Rule 50(a). *Id.* at 24-25. The First Circuit disagreed, rejecting an argument identical to Menninger's argument:

> "J.C. Penney's Rule 50(a) motion was *cut short by the judge's pronouncement that the motion was considered filed and denied*. Although generally it is incumbent upon a party to enunciate the specific basis for a motion for judgment as a matter of law, *see* Fed. R. Civ. P. 50(a)(2), here, the district court foreclosed J.C. Penney's opportunity to make its arguments with any specificity. *Under these circumstances J.C. Penney cannot be faulted for failing to provide more detail*."

*Id.* at 25 (emphasis added) (footnote omitted). That is exactly what happened here:

| ***Blockel* Transcript** | ***PPD* Transcript** |
| --- | --- |
| COUNSEL: [W]e did want to proceed with our motions for directed verdict on certain issues.<br><br>THE COURT: I never noticed that you filed one at the close of plaintiff's evidence.[1] I said at the time that I believed after the evidence was complete.<br><br>COUNSEL: I believe that we—<br><br>THE COURT: Motion for directed verdict has been filed, and it's on the record, and the Court denies it.<br><br>*Blockel*, 337 F.3d at 25 n.2. | THE COURT: Are there any motions you want to make? You don't have to, but I'm just giving you the chance.<br><br>MR. CURRAN: Yeah. A motion for directed verdict, Your Honor.<br><br>THE COURT: All right. Fine. I will deny that. So anything else? We're just going to get Mr. Kelly?<br><br>MR. CURRAN: Yes, Dr. Kelly.<br><br>(Doc. No. 159 at 50:4-9.) |

As in *Blockel*, the Court's immediate denial of PPD's motion for a directed verdict

---

[1] Despite the *Blockel* court's reference to a motion for directed verdict being "filed," J.C. Penney only ever moved for directed verdict orally, without specifying any grounds. *See* Defendant-Appellant's Reply Brief, *Blockel v. J.C. Penney Co.*, Nos. 02-1927 and 02-1946 (1st Cir. Mar. 14, 2003), 2003 U.S. 1st Cir. Briefs LEXIS 17, at *5.

indicated that no further specification was required.  Thus, PPD "cannot be faulted for failing to provide more detail" in order to preserve its arguments as to the insufficiency of Menninger's trial evidence.  *Id.*  There was no confusion on the Court's part as to the meaning of PPD's "motion for directed verdict."[2]  And there is no basis for confusion now.  Nonetheless, in an attempt to manufacture confusion, Menninger cites decisions in which the moving party: (1) was provided ample opportunity to specify the grounds for its Rule 50(a) motion, but did not; or, (2) did do so, but then sought to raise *other* grounds in its Rule 50(b) motion.  (Opposition ("Opp.") at 3-4 (citing *Parker v. Gerrish*, 547 F.3d 1, 11-13 (1st Cir. 2008); *Jones ex rel. United States v. Massachusetts Gen. Hosp.*, 780 F.3d 479, 487-88 (1st Cir. 2015)).  Such circumstances do not exist in this case.

The Court should consider and grant PPD's motion for judgment pursuant to Rule 50(b).

## II.  THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER OF LAW AS TO MENNINGER'S DISCRIMINATION CLAIMS BECAUSE SHE WAS NOT A "QUALIFIED HANDICAPPED PERSON" AND PPD ATTEMPTED TO REASONABLY ACCOMMODATE HER.

Menninger did not, and cannot, show that she was a "'qualified handicapped person' capable of performing the essential functions of [her] job with reasonable accommodation."  *Smith v. Bell Atl.*, 63 Mass. App. Ct. 702, 711 (2005) (internal quotations and citations omitted).  This legal shortcoming is fatal to both of her discrimination claims.  *See, e.g.*, *Tompson v. Dep't of Mental Health*, 76 Mass. App. Ct. 586, 593-94 (2010); *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 27 (1st Cir. 2019).  Her failure-to-accommodate claim also fails for the independent reason that the evidence shows PPD met its legal obligation to attempt to reasonably accommodate her.

---

[2] Menninger ignores that the term "directed verdict" possesses a particular meaning—that "there is no legally sufficient evidentiary foundation on which a reasonable jury could find for the other party."  Motion for Directed Verdict, *Black's Law Dictionary* (11th ed. 2019).  Thus, moving for "directed verdict" preserved challenges to the "sufficiency of the evidence as to a finding of liability" as well as the appropriateness of punitive damages.  *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 299-300 (2016); *see Gonzalez-Bermudez v. Abbott Labs P.R., Inc.*, 990 F.3d 37, 45 (1st Cir. 2023) (arguing "no evidence to support" claim preserved all arguments in renewed motion regarding insufficiency of the evidence; Rule 50 does not require "technical precision").

### A. Menninger Was Not a Qualified Handicapped Person, and Thus Both Her Discrimination Theories Fail as a Matter of Law.

Both Menninger and her doctor told PPD that Menninger could not perform the additional public-facing duties required for her position. An individual unable to perform the essential duties of her job is not a "qualified handicapped person" under the law. Thus, the threshold viability of both her discrimination theories depends on her assertion that these public-facing duties were not essential—or in the alternative, that they were essential, but that PPD should not have believed Menninger and her psychiatrist when they stated it would be "impossible" for Menninger to perform them. (Opp. at 16-17.)

The first problem with Menninger's position is that her own view of the essentiality of the job functions must give way to PPD's judgment on that issue. *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012) ("[T]he applicable statutory and regulatory framework accords *a significant degree of deference* to an employer's own business judgment regarding which functions are essential." (emphasis added)); *Benson v. Wal-Mart Stores E., L.P.*, 14 F.4th 13, 27 (1st Cir. 2021) ("We are not tasked with second-guessing an employer's legitimate business judgment about what is required of its employees."). Thus, it matters little whether Menninger believed that the public-facing duties were essential to her job; PPD did, and its judgment is not only afforded substantial deference, but is also supported by the other evidence at trial.

In fact, the *only* evidence that these public-facing duties were not essential is Menninger's own self-serving testimony that they weren't essential *prior to 2018*. This does not change the fact that PPD deemed these duties essential *as of 2018*, and that PPD made this determination *before* it knew of Menninger's social anxiety and panic disorders.[3] As the evidence established at

---

[3] In the Opposition, Menninger characterizes as "misleading" PPD's description of the holding in *Jones*. (Opp. at 17.) PPD cited *Jones* for the proposition that Menninger's "past [job] performance" is not a reliable indicator of what tasks "are essential" going forward. (Combined Memorandum of Law ("Motion") at 15 (quoting *Jones*, 679 F.3d at 16).) PPD accurately quoted and characterized *Jones*. Here, as in *Jones*, Menninger's status as a "qualified handicapped person" must be assessed at the time of the alleged adverse action. 679 F.3d at 20. As in *Jones*, Menninger's

trial, Menninger's increased public-facing duties were in response to client feedback and essential to PPD's continued growth, and PPD made the decision to emphasize these duties among its senior leadership before it ever learned of Menninger's disability.  (*See*, *e.g.*, Ex. 350; Doc. No. 157 at 138, 140, 145, 152-53; Doc. No. 158 at 98:5-101:16.)

These duties were not new.  Indeed, they appear on the face of Menninger's job description (Ex. 350)—which is the starting point for the essential-functions inquiry, *Jones*, 679 F.3d at 14. The evidence also established that the employee currently serving in Menninger's position, Dr. Basel Kashlan, continues to perform the public-facing duties as a *core* part of his role (Doc. No. 158 at 122:3-127:8).  *Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006) (essentialness of duties may be shown through evidence of successor's work experience).

Incredibly, Menninger asserts that even if the increased public-facing duties were essential, the "jury could infer that Dr. Menninger could have tolerated such an increase."  (Opp. at 16.) Menninger makes this assertion after she and her doctor explicitly told PPD (as confirmed at trial) that she suffered from a mental illness that made it impossible to perform the public-facing responsibilities that PPD required.  (*See*, *e.g.*, Doc. No. 153 at 105:1-17, 110:4-8; Ex. 405.)  The record conclusively establishes that the *only* accommodations Menninger specifically requested and that PPD declined (which is all that is legally relevant)—were those that would have required PPD to either hire an additional employee with comparable qualifications, or burden an existing, qualified employee who would be tasked with fulfilling Menninger's public and client-facing duties.  (*See*, *e.g.*, Ex. 182.)  Neither action constitutes a "reasonable" accommodation.  *Krennerich*

---

restrictions were revealed by her doctor's communications, on January 31 and February 14, 2018 (Exs. 405, 48)—and PPD was "on firm ground" in relying on her doctor's own words.  679 F.3d at 20.  "*Even if we assume that [she] was fully capable of performing the essential functions of her job [in 2017], . . . competent evidence foreclosed the same conclusion after that date.*"  *Id.* (emphasis added).  Whether Menninger was capable of performing her essential functions as they existed in 2017 is irrelevant to whether she was capable of doing so in 2018, after PPD's business needs changed and Menninger's condition had worsened, as confirmed by her own doctor.  (Ex. 18.)

*v. Inhabitants of Town of Bristol*, 943 F. Supp. 1345, 1351 (D. Me. 1996); *Laurin v. Providence Hosp.*, 150 F.3d 52, 60 (1st Cir. 1998). Yet Menninger's own psychiatrist confirmed repeatedly that these accommodations—categorically unreasonable as a matter of law—were the *only* ones that would permit Menninger to perform her job, since "[a]ny changes to her role that increase[d] the need for public speaking and/or social interactions . . . would make it substantially more difficult, if not ***impossible***, for [Menninger] to perform her job." (Ex. 405 (emphasis added); Doc. No. 153 at 109:24-110:8.) The law is clear that an "employer is obviously not obligated to offer an 'accommodation' to an employee that is contrary to medical advice and would place the employee at risk." *Jones v. Walgreen Co.*, 765 F. Supp. 2d 100, 108 n.3 (D. Mass. 2011), *aff'd*, 679 F.3d 9 (1st Cir. 2012). Internal PPD e-mails reflect that its HR department was rightly concerned that Menninger's psychiatrist's statement foreclosed Menninger from participating in functions that were already "a large part of her standard role but ***increasing due to our growth***." (Ex. 280 (emphasis added).)

In short, the evidence establishes beyond any doubt that Menninger was not capable of performing the public-facing duties that were essential to her role as Executive Director of Global Laboratories. The law thus forecloses a finding that she was a qualified handicapped individual. The Court should therefore grant judgment in PPD's favor on both her disparate treatment and failure-to-accommodate theories of discrimination.

## B. Menninger's Failure-to-Accommodate Claim Also Fails for the Independent Reason That PPD Met Its Legal Duty to Attempt to Reasonably Accommodate Her.

Despite Menninger's attempt to manufacture confusion in her Opposition, the undisputed evidence at trial proves the following sequence of events: (1) In November 2017, Menninger informed her supervisor, Mekerri, that she felt "overwhelmed" in her current position, and Mekerri asked her to provide a list of her daily responsibilities to assess how best to help her manage them (Doc. No. 155 at 67:21-68:6; Doc. No. 151 at 178:1-4; Ex. 378); (2) Menninger's mental health

8

was declining, and, unbeknownst to PPD, she was suffering from the mental disorder agoraphobia (Doc. No. 153 at 106:8-19); (3) In December 2017, before PPD had any knowledge of Menninger's condition, Mekerri informed Menninger that, as a member of senior leadership, she would need to perform additional public-facing duties in response to client feedback and in support of PPD's continued growth (Doc. No. 157 at 138, 140, 145, 152-53); (4) On January 11, 2018, Menninger informed Mekerri of her disability for the first time (Ex. 366); (5) As of January 22, Menninger was formally diagnosed with agoraphobia, and her mental health had worsened precipitously, as "[t]he very prospect of making Menninger more visible with increased client visits and social interactions caused great distress for Menninger resulting in increased anxiety" and a litany of "somatic symptoms"  (Ex. 405; Ex. 18 (Menninger's January 22, 2018 psychiatric evaluation stating her distress was related to a "year review at her job where she was encouraged to be 'more visible' and 'think about doing more public speaking'")); (6) At this time, and prior to any alleged misconduct by PPD, Menninger was unable to leave the house for weeks on end (Doc. No. 153 at 155-56) and was engaged in chronic and debilitating "catastrophic thinking" (*id.* at 155); (7) On January 31, Menninger provided a note from her psychiatrist stating it was *impossible* for her to perform the public-facing duties of her job (Ex. 405); (8) On February 14, Menninger proposed five specific accommodations (Ex. 48), two of which PPD readily accepted, but it declined those the law deems categorically unreasonable, and provided reasoned explanations for why it could not provide Menninger with a surrogate in the remaining areas due to the nature of its business (Exs. 182, 158); (9) On February 28, PPD offered Menninger the opportunity to transition to a consulting role, which she rejected (Doc. No. 152 at 69:15-70:21).

Through no fault of anyone, the situation was untenable: PPD needed an Executive Director of Global Laboratories who could actively engage with clients, which Menninger was unable to do.  Under such circumstances, the law is clear: employers are *not* required to adopt

every accommodation a disabled employee requests.  *See, e.g.*, *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 103 (1st Cir. 2007) ("In addition to making a sufficient request concerning a known limitation, the plaintiff must also show that the proposed accommodation is reasonable— that it 'would enable her to perform the essential functions of her job.'"); *Ortiz-Martinez v. Fresenius Health, PR, LLC*, 853 F.3d 599, 602-603 (1st Cir. 2017).  This principle applies with even greater force in this case, where the *only* specific accommodations Menninger requested and that PPD denied are those the law deems unreasonable.  *See, e.g.*, *Laurin*, 150 F.3d at 60.  The law does not require PPD to abandon its legitimate business strategy in order to permit Menninger to remain in her current role while "contribut[ing] in a more behind the scenes fashion" (Ex. 451). *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012) ("[R]easonable accommodation by the employer does not require the elimination of an essential function of the job." (internal quotations omitted)).  Menninger's failure-to-accommodate claim rests entirely on her legally erroneous contention that PPD's refusal to either hire a "surrogate," or abandon its business strategy, was unlawful.  (Doc. No. 153 at 109:24-110:8; Ex. 405.)  The law says otherwise.  *See, e.g.*, *Freadman*, 484 F.3d at 103; *Laurin*, 150 F.3d at 60; *Krennerich*, 943 F. Supp. at 1351.

PPD sought to reasonably accommodate Menninger, but due to her disability, no reasonable accommodations would enable her to perform the job.  The Court should grant judgment as a matter of law on Menninger's claim for failure to reasonably accommodate.

## III.  THE COURT'S "READER" JURY INSTRUCTION WAS MISLEADING AND HIGHLY PREJUDICIAL UNDER THE CIRCUMSTANCES OF THIS CASE.

It is undisputed that the term "reader," as it appears in the statute and Guidelines, refers to an individual (or, in some instances, a software program) provided to read material that a disabled employee is otherwise incapable of reading—typically due to a vision impairment.  42 U.S.C. § 12111(9)(B); MCAD Guidelines § III.D; *see also* 29 C.F.R. 35.104 (defining "auxiliary services" under ADA regulations as including: "Qualified readers; taped texts; audio recordings;

Braille materials and displays . . . or other effective methods of making visually delivered materials available to individuals who are blind or have low vision."). These sources do not suggest that hiring the type of "reader" Menninger requested—*i.e.*, another qualified employee to stand in as Menninger's surrogate—is per se reasonable. In fact, the law specifically says that hiring a "surrogate" in this fashion is not "reasonable," and hence not required. *Laurin*, 150 F.3d at 60; *Krennerich*, 943 F. Supp. at 1351.[4] The heavy burden imposed on an employer by hiring a second stand-in employee, or burdening an existing one with additional tasks, simply does not compare with the relatively light burden of making available software or a "reader" for a visually impaired but otherwise qualified employee.

Over PPD's objection, the Court instructed the jury that a reasonable accommodation, as a matter of law, could include "the provision of qualified *readers* or interpreters." (Doc. No. 160 at 93:22-23; Doc. No. 159 at 133-34.) PPD objected, concerned that the instruction's use of the same term Menninger had used to mean something quite different—"reader"— might mislead the jury into believing the statute and Guidelines *require* something that the case law explicitly rejects.

While the Court may have believed it was merely offering the jury an example of what might constitute a reasonable accommodation under certain circumstances, PPD's concern was validated when Menninger's attorney exploited this very ambiguity in the instruction in closing:

> "So turning to the fact here, when we're talking about a reasonable accommodation, I suspect that the first inclination might be to look at the buckets and look at Dr. Kessimian's proposed accommodations with respect to that. . . . [I]f you look there . . . you're going to find that those were, at least *on their face, reasonable accommodations, in part because the Judge is going to tell you* that reasonable accommodations include modifying when and how a function is performed. . . .

---

[4] Due to the nature of PPD's business and Menninger's particular role, her request that PPD hire a "surrogate" or "reader" to stand in for her is even *more* patently unreasonable than in the average case. Menninger has nineteen professional licenses and certifications, including a board certification in pathology. (Ex. 3.) She is a medical doctor who has worked as a staff pathologist and laboratory director. (Doc. No. 151 at 165:18-167:19.) That experience was not incidental to her role as Executive Director of PPD's laboratory operations—it is *why* she was hired. (*Id.* at 164:7-9.) Simply because another person can "read" Menninger's prepared notes does not mean that person could fulfill Menninger's responsibilities for presenting to sophisticated clients or answering questions on complex medical issues.

*He's going to tell you that it includes things like that provision of qualified readers. I expect, if you look at Dr. Kessimian's e-mail that, yes, those are, at least on their face, reasonable.*" (Doc. No. 160 at 29:12-25 (emphasis added).)

On this point, the Opposition makes only one defense: that the Court's instruction is "an accurate statement of the law." (Opp. at 36.) But that misses the point. A jury instruction may offer an *accurate account of law*—yet still be erroneous because it is confusing or, as here, actually misleading. *See, e.g., John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 49 (1st Cir. 2003) (a jury instruction is improper, warranting reversal, where it misleads, misstates, or "unduly complicates the correct legal standard"); *O'Connor v. Huard*, 117 F.3d 12, 15 (1st Cir. 1997) (Jury instructions must "adequately reflect the law applicable to the controlling issues *without tending to confuse or mislead the jury*." (emphasis added)).

It is difficult to overstate how much Menninger's counsel's exploitation of this instruction affected the fairness of the jury's deliberations. Whether Menninger was a qualified handicapped individual—*i.e.*, one capable of performing her essential functions with reasonable accommodation—is among the <u>*most critical*</u> issues in this case, because both of her discrimination theories depend on it. Central to the parties' dispute is whether Menninger's requested accommodations were indeed reasonable; if they were not, then she is not a qualified handicapped person, and the anti-discrimination laws do not apply, *Sensing*, 575 F.3d at 153; *Smith*, 63 Mass. App. Ct. at 711. The jury was misled to believe—*contrary* to what the law actually states—that Menninger's request for a "reader" to substitute for her in public-facing roles was reasonable under the law, and that she was capable of performing her job with this "reasonable" accommodation.

Counsel's subsequent exploitation of this jury instruction tainted the entirety of the jury's verdict. This error alone warrants granting PPD's motion for new trial.[5]

---

[5] Despite Menninger's suggestions to the contrary (*see, e.g.*, Opp. at 27-28), the Court has broad authority to order a new trial. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). In ruling on a new trial motion, the Court does <u>*not*</u> give deference to the jury's verdict, and must instead "independently weigh the evidence." *Id.* "[W]henever, in its

**IV.** **THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER OF LAW AS TO MENNINGER'S RETALIATION CLAIM BECAUSE SHE DID NOT SUFFER AN ADVERSE ACTION BECAUSE OF PPD'S CONDUCT.**

At a minimum, PPD is entitled to a new trial on Menninger's retaliation claim. For the reasons described above and in PPD's Motion, Menninger's own evidence forecloses a finding that she was capable of performing her essential functions with *reasonable* accommodation as of 2018; and it establishes that the only accommodations she specifically requested, and that PPD denied, are those deemed unreasonable as a matter of law. It is clear that Menninger's discrimination claims never should have proceeded to a jury. That they did, particularly with the instruction suggesting that Menninger's request for a "reader" was reasonable as a matter of law, inevitably tainted the jury's consideration of her retaliation claim. If the Court does not direct a verdict for PPD on Menninger's retaliation claim, it should order a new trial so that the claim may be considered without the taint of the deficient discrimination theories. *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 468 (1st Cir. 1996).

To try to preserve her retaliation claim, Menninger asserts that actions taken by certain PPD personnel—including the very efforts PPD made to accommodate her disability—constituted retaliatory conduct. (Opp. at 20.) For instance, Menninger emphasized at trial and throughout her Opposition that PPD offered her an exit package or opportunity to transition to a consulting position, arguing this alone demonstrates unlawful retaliation. (Opp. at 8, 29.) That turns the law on its head. To accommodate Menninger's disability, PPD was willing to offer her a position that would not require the public-facing duties she stated she could not perform. This is precisely the kind of "reasonable" accommodation the ADA contemplates. 42 U.S.C. § 12111(9)(B) ("reasonable accommodation" includes reassignment to open positions). Indeed, "[w]hen a

_____

judgment, the action is required in order to prevent injustice," the Court is not only empowered, but has a "*duty*," to order a new trial. *Id.* (emphasis added).

plaintiff employee rejects a reasonable accommodation offered by her employer, as [plaintiff] did here [by rejecting a new position], she is precluded from recovering under the ADA for her employer's alleged failure to provide a reasonable accommodation." *Bryant v. Caritas Norwood Hosp.*, 345 F. Supp. 2d 155, 168-69 (D. Mass. 2004).  Massachusetts is even "less generous" to plaintiffs, *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 454 (2002)—as it "does not require that an employer provide a 'reasonable accommodation' in the form of a reassignment to new or different position," *Gauthier v. Sunhealth Specialty Servs., Inc.*, 555 F. Supp. 2d 227, 240 (D. Mass. 2008).  The Court should reject Menninger's invitation to punish PPD for suggesting another appropriate position as a reasonable accommodation.

Menninger also emphasizes, at length, that PPD engaged with its counsel to develop an "exit strategy" for Menninger.  (*See*, *e.g.*, Opp. at 7.)  Yet as this Court held at summary judgment, "No reasonable jury could find that predominantly internal communications allegedly showing that PPD was trying to force Menninger out affected the terms and conditions of her employment." (Doc. No. 81 at 15.)  Based on the evidence at trial, that statement is equally true in the retaliation context: No reasonable jury could find that these internal communications had *any* adverse impact on Menninger whatsoever, let alone the "materially adverse" impact the law requires.  *See Marinelli v. Potter*, 661 F. Supp. 2d 69, 78 (D. Mass. 2009); *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007).

Most critically, as described above, PPD reasonably (and correctly) believed Menninger was unqualified for her position, and that her inability to perform her public-facing duties (with or without reasonable accommodation) would undermine PPD's business needs.  It could, lawfully, have terminated her at that point.  It did not.  Instead, PPD engaged its legal department to ensure that its actions were consistent with law—not, as Menninger claims, to retaliate against Menninger. To hold that involving counsel supports a retaliation claim would create adverse incentives,

*discouraging* precisely what the law should want to *encourage*.

Menninger also suggests that Ballweg's investigation of her complaint against Mekerri was, itself, an adverse action sufficient to prove retaliation.  (Opp. at 24-25.)  Yet Ballweg, who interviewed five individuals as a part of the investigation (Ex. 450), cannot be faulted for failing to uncover evidence of Mekerri's alleged discriminatory or retaliatory behavior—when the entirety of Menninger's trial evidence has failed to uncover the same.[6]  *See, e.g.*, *Trinh v. Gentle Comms., LLC*, 71 Mass. App. Ct. 368, 378 (2008) (investigation not a "whitewash," "where [plaintiff's] contentions were not corroborated"); *Billings v. Town of Grafton*, 515 F.3d 39, 53 (1st Cir. 2008) ("[A]n employee's displeasure at a personnel action cannot, standing alone, render it materially adverse."); *Forsythe v. Wayfair Inc.*, 27 F.4th 67, 70, 74 (1st Cir. 2022) (employee's disagreement with outcome of investigation does not indicate it was deficient).

Menninger next points to Mekerri's designation of "eliminating lab issues" as one of her annual performance goals, labeling that an act of retaliation.  (Opp. at 6, 11, 30.)  But every company must be able to set *goals* for employees (Doc. No. 158 at 112-13, 109-11), and asking Menninger to try to eliminate issues in the labs—which had arisen in her absence (Ex. 377; Doc. No. 158 at 105)—is a far cry from the "impossible" hurdle Menninger claims it to be.  And in any event, setting this goal caused Menninger no harm.  *See, e.g.*, *Sepúlveda-Vargas v. Caribbean Rests., LLC*, 888 F.3d 549, 555 (1st Cir. 2018) ("[P]laintiff must show that a reasonable employee would have found the challenged action materially adverse," which means "*it must produce a significant, not trivial harm*." (emphasis added) (internal quotations and citations omitted)).

---

[6] It is well established that an employee's mere impressions that, after a protected activity, her supervisor began conveying "hostility" and "second-guess[ing]" her *cannot*, as a matter of law, demonstrate retaliatory animus or establish retaliation.  *Bain v. City of Springfield*, 424 Mass. 758, 766 (1997).  An employee's "subjective and intangible impressions . . . must not be considered," as they are "too easy to imagine," and therefore "have no place in defining the standards for legal intervention in the often fraught and delicate domain of personnel relations."  *Id.* Thus, the mere fact that Mekerri questioned aspects of Menninger's performance while PPD was trying to reasonably accommodate her does not establish a claim of retaliation.  And, notably, Menninger admitted the veracity of some of Mekerri's criticisms.  (*See* Ex. 300 at 2-3; Ex. 291.)

Finally, Menninger claims, without legal support, that Ballweg's knowledge that PPD believed Menninger to be unqualified (a belief the law squarely supports), and of its consequent desire that she transition to a new position or leave the company, makes Ballweg's investigation a "sham." (Opp. at 11-13, 25.)  Yet Ballweg's awareness of these facts does *not* constitute awareness of any alleged *misconduct* by Mekerri, despite Menninger's efforts to suggest otherwise.  Nor is Ballweg's awareness legally relevant—because neither her investigation nor its findings had *any adverse impact on Menninger whatsoever*.  *See, e.g.*, *Sepúlveda-Vargas*, 888 F.3d at 555.

In short, because she failed to come forward with meaningful evidence of any adverse action, Menninger failed, as a matter of law, to prove that PPD retaliated against her for informing the company of her disability or engaging in any other protected conduct.  The Court should grant judgment to PPD on her retaliation claim or order a new trial on that claim.

## V.     THE JURY'S $24 MILLION DAMAGES AWARD IS CONTRARY TO LAW, UNSUPPORTED BY THE EVIDENCE, EXCESSIVE, AND WELL OUTSIDE THE RANGE OF *ANY* COMPARABLE DECISIONS IN THIS JURISDICTION.

### A.  The Court Should Strike the Jury's Punitive Damages Award as Contrary to Law.

The law is clear: "An award of punitive damages requires a heightened finding *beyond mere liability* and also beyond a knowing violation of the statute."  *Kiely v. Teradyne, Inc.*, 85 Mass. App. Ct. 431, 440 (2014) (internal quotations and citations omitted) (emphasis added).  Punitive damages require conduct that is "'outrageous, *because of the defendant's evil motive or his reckless indifference to the rights of others*.'"  *Smith*, 63 Mass. App. Ct. at 721 (emphasis added).  A finding of **both** "*intentional* **and** *outrageous*" misconduct is "*a precondition for punitive damages*."  *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 93 (2009) (emphasis added).  There is nothing in the record that even *approached* the high bar required for imposing punitive damages.

Unsurprisingly, Menninger cannot cite a single decision where punitive damages were held appropriate under circumstances analogous to this case.  Instead, Menninger's defense of the jury's

16

punitive damages award rests on a critical misstatement of the law: that "evidence of intentional retaliation will typically suffice to support a punitive damages award." (Opp. at 6.) Massachusetts and the First Circuit have expressly rejected that standard.  In *Haddad*, 455 Mass. at 110, the Supreme Judicial Court "set forth a new standard describing the circumstances in which punitive damages may be awarded."  Since then, a finding of intentional discrimination or retaliation, alone, is *never* sufficient to award punitive damages.  *Kiely*, 85 Mass. App. Ct. at 440.  Indeed, the First Circuit has stated that "no post-*Haddad* case" has "sustain[ed] an award of punitive damages" based solely on "a defendant's deliberate or knowing violation of Chapter 151B"—on either a discrimination or a retaliation claim.  *Heagney v. Wong*, 915 F.3d 805, 822 n.4 (1st Cir. 2019).

With no applicable case law to support her award of punitive damages, Menninger relies on a hodgepodge of cases that either predate *Haddad* or are wholly inapplicable to the Chapter 151B context—and that, in any event, involve employer conduct far more egregious than anything proven here: *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57 (1st Cir. 2021) (non-binding Maine decision that did not consider Chapter 151B's punitive damages standard, and where employer willfully *ignored* each of plaintiff's requests for accommodation); *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31 (1st Cir. 2003) (pre-*Haddad* decision where plaintiff was subjected to racial slurs and other abuse and demoted in retaliation for complaints); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2001) (pre-*Haddad* decision where employee was demoted, shunned, and reassigned to an undesirable office in response to her pregnancy and complaints); *Bell v. O'Reilly Auto Enters., LLC*, 626 F. Supp. 3d 141 (D. Me. 2022) (non-binding Maine decision where employer rejected disabled employee's request for accommodation and instead terminated him outright); *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290 (2016) (employer knew of ongoing sexual harassment and continuously refused to address it); *Ciccarelli v. Sch. Dep't of Lowell*, 70 Mass. App. Ct. 787 (2007) (pre-*Haddad* decision where employee was terminated after

agreeing to testify against employer in another action); *Handrahan v. Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13 (1997) (pre-*Haddad* decision where employer terminated disabled employee for violating a new rule adopted *after* the disclosure of her disability).

As evidence of allegedly "egregious" misconduct, Menninger points to some internal PPD e-mails that she says show PPD sought to "delicately work [her] out" after she stated she could not perform her job.  (Opp. at 25.)  But not only was PPD's desire to do so based on its reasonable— and legally supported—belief that Menninger was unqualified for her position, the law is clear that an employer's "orchestrated" discharge of an employee is, alone, insufficient to uphold a punitive damages award.  *See Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 148 (1st Cir. 2009).

Not one of the decisions Menninger relies upon—including even those that predate *Haddad*—involve the situation in the instant action, where the employer: (1) never terminated, demoted, or took any other identifiable adverse action against the employee; (2) engaged in a good-faith interactive process, as this Court found at summary judgment (Doc. No. 81 at 12-13); (3) investigated the employee's complaint, complete with interviews and written findings (Ex. 450); *and* (4) allowed an eight-month medical leave, until she communicated she did not plan to return (Ex. 90).  Menninger's authorities all involve a degree of *undeniably intentional* harm that is altogether absent from this case.  Indeed, here there is no evidence of any kind that PPD had an "evil motive" or "reckless indifference" toward Menninger.  (*See* Motion at 28-32.)  To the contrary, this is the same employer who readily permitted Menninger to work remotely from the other side of the country when she needed to care for her daughter (Doc. No. 157 at 122:22-24, 123:2-8; Doc. No. 153 at 69:8-11); accepted Menninger's requested accommodation in two of five areas, declining only those that are deemed unreasonable as a matter of law (Exs. 182, 158); sought advice from counsel to ensure it was adequately accommodating Menninger's disability (Ex. 87); and ultimately granted her *eight months* of medical leave (Ex. 90).

The Court's hesitancy to send the punitive damages question to the jury in the first place was well-founded.  (Doc. No. 159 at 171-73.)  And, in the end, the Court should strike the punitive damages because Menninger failed to meet the truly high legal standard for "evil motive" or "reckless indifference" necessary to uphold it.   While the jury may have sympathized with Menninger, or doubted the sufficiency of PPD's response, it did not possess evidence supporting a claim for punitive damages.  Even if Menninger's evidence would support a finding of liability, Massachusetts has *rejected* that mere liability is enough to support imposing punitive damages.

## B.   The Jury's Award of $7 Million in Emotional Distress Damages Is Excessive.

Menninger's emotional distress award is improper because she failed to "show a sufficient causal connection" between any *unlawful* act and her resulting emotional distress.  *Stonehill Coll. v. Mass. Comm'n Against Discrimination*, 441 Mass. 549, 576 (2004).  Menninger's psychiatrist stated that Menninger, whose debilitating emotional disorders long predate any affiliation with PPD (Doc. No. 156 at 161:1-5; Doc. No. 153 at 106:13-19), was suffering increased mental health symptoms merely because PPD informed her she would need to take on a more public-facing role. (Ex. 18.)  This occurred before PPD ever learned of Menninger's disability, before Menninger requested any accommodations, and before Menninger complained about Mekerri's attitude towards her.  In fact, *Menninger's own expert trial witness declined to confirm whether any of PPD's actions actually "play[ed] any role in Dr. Menninger developing major depressive disorder*" (Doc. No. 156 at 189:2-3 (emphasis added)); could not link a specific action, comment, or failure to reasonably accommodate to any alleged psychological harm (*id.* at 190-93); and conceded that Menninger's debilitating anxiety arose from the very act of disclosing her disability and concern for the future, *even absent any response from PPD* (*id.*).  On this record, no reasonable jury could find Menninger's emotional harm occurred *because of* PPD's conduct—let alone allegedly *unlawful* conduct.  The jury's $7 million emotional damages award cannot stand.

### C. Menninger's Front Pay Award Is Speculative and Contradicts the Evidence.

The jury's economic damages award made Menninger far more than whole and is grossly excessive. The jury's front pay award of nearly $5.5 million is logically inconsistent with the jury's own verdict. Menninger cannot have been *both* a "qualified handicapped person," capable of performing the demanding role of Executive Director of Global Laboratories at PPD for another 18 years and, at the same time, have been so fragile that PPD's mere request for more public-facing activities, and then participating in the legally required process of discussing accommodations, was enough to render her incapable of working for the rest of her life. Yet the jury's verdict presupposes both.

### D. Menninger Offers No Comparable Verdict in This Jurisdiction.

Menninger criticizes PPD's selection of damages awards in comparable decisions in this district (Motion at 40), claiming the cited decisions are distinguishable. (Opp. at 39.) Menninger purports to establish a more comparable list of decisions, but unlike PPD's list, not a single one is from the Commonwealth of Massachusetts or the First Circuit. (*Id.* at 38-39.) Neither PPD nor Menninger has identified a single employment decision in this district in which the jury's verdict exceeded approximately $3.3 million and was upheld. *See Kelley v. Airborne Freight Corp.*, Case No. 1:94-cv-10137-WAG (D. Mass. 1996) (awarding $3,326,858 for age discrimination and wrongful termination).[7] The instant award, on its face, is grossly excessive and improper.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant judgment for PPD, or in the alternative, order a new trial. At a minimum, it must strike the punitive damages and remit the verdict.

---

[7] The matter of *Gessy Toussaint v. Brigham & Women's Hospital*, Case No. SUCV2014-2253-B (Mass. Sup. Ct. 2018), involved an award of $176,000 in back pay; $287,000 in front pay; $2.75 million in emotional distress damages; and $25 million in punitive damages. The defendants' motions for judgment and new trial or remittitur were never adjudicated, because the parties settled for an undisclosed amount.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


/s/ *Rachel Reingold Mandel*
Rachel R. Mandel (BBO# 660495)
Patrick M. Curran (BBO# 659322)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701

Jack S. Sholkoff (admitted *pro hac vice*)
Catherine L. Brackett (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 S. Hope Street
12th Floor
Los Angeles, CA 90071
Telephone: (213) 239-9800
Facsimile: (213) 239-9045


ROPES & GRAY, LLP

Douglas H. Hallward-Driemeier (BBO# 627643)
ROPES & GRAY, LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

John P. Bueker (BBO# 636435)
ROPES & GRAY, LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050


Attorneys for Defendant
PPD DEVELOPMENT, L.P.

Dated:  July 28, 2023

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the within document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing on July

28, 2023.

*/s/ Rachel Reingold Mandel*
Rachel Reingold Mandel

22