UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 19-11441-LTS |
| | ) |
| PPD DEVELOPMENT, L.P., | ) |
| | ) |
| Defendant. | ) |

ORDER ON DEFENDANT'S POST-TRIAL MOTIONS (DOC. NOS. 179, 180)

November 1, 2023

SOROKIN, J.

Before the Court are two post-verdict motions by the defendant, PPD Development, L.P., alternatively seeking judgment as a matter of law, a new trial, or remittitur. Doc. Nos. 179, 180. The plaintiff, Lisa Menninger, has opposed the motions, Doc. No. 186, and PPD has replied, Doc. No. 189. As explained below, PPD's motions are DENIED.

I.    INTRODUCTION

Twelve impartial and attentive jurors awarded Lisa Menninger approximately $24 million, a total that includes both compensatory and punitive damages, after finding PPD had violated state and federal law by discriminating and retaliating against Menninger based on her disability. The verdict came at the end of a ten-day trial featuring testimony by thirteen witnesses. Menninger herself provided detailed and credible testimony in support of her claims, including powerful descriptions of the harm she suffered at PPD's hands. Now, having added a new cadre of lawyers to its defense team, PPD seeks to undo the jury's verdict and escape liability for every category of damages the jury awarded to Menninger. In a pair of post-trial

motions, PPD advances a series of challenges, supporting them with flawed legal arguments that the Court previously rejected or that PPD has waived, and a selective recitation of the record which ignores evidence presented to the jury that plainly supports the verdict.

The Court will explain below why all of the challenges in both of PPD's motions fail. These rulings are rendered after careful consideration of the parties' papers related to the motions now pending; the many motions filed by the parties and resolved by the Court throughout all phases of this case, including summary judgment and in the course of this vigorously contested trial; and review of the trial record informed by the undersigned's firsthand observation of the trial. The Court will not, in this Order, set out an exhaustive summary of the evidence presented to the jury. A few points merit comment, though, to fill gaps in PPD's narration of the evidence and provide crucial context for the Court's evaluation and resolution of the pending motions.

<u>First</u>, this case arose from the way PPD responded after Menninger disclosed an anxiety disorder and requested accommodations to help manage her symptoms while performing her job. Menninger's symptoms were triggered by public speaking, among other things. Pursuit and proof of her claims at trial required Menninger to do something that is inherently difficult for a person with her condition: speak, at length, to a room full of strangers. During testimony that began after opening statements on the first day of trial and continued until the early part of the fourth day, Menninger told jurors about her work (as a clinical pathologist and laboratory director), her family (for whom she was the sole source of financial support), her history of mental health treatment (including how her symptoms and conditions evolved over time), and her experience of the events that led to the end of her employment at PPD (and, ultimately, this

lawsuit).[1]  In the Court's view, Menninger was an articulate, credible, and extremely effective witness.  The verdict strongly suggests the jury felt the same.  Her testimony, standing alone, supported many of the elements on which she had the burden of proof at trial.[2]

Second, Menninger's testimony, of course, did not stand alone.  It was supported by her own expert witnesses and corroborated by various documents admitted as exhibits at trial (and marshaled by Menninger in her opposition to the pending motions).  E.g., Doc. No. 186 at 6-15. Especially noteworthy, though, was the manner in which her evidence was bolstered—rather than undermined—by an expert witness offered by the defense.  That expert was Dr. Martin Kelly, a psychiatrist with more than five decades of experience in his field, and he was the last witness from whom the jurors heard.  See generally Trial Tr. vol. 9 at 54-107.[3]  The omission of any reference to Dr. Kelly's memorable testimony in PPD's post-trial papers is unsurprising. Two examples will suffice to illustrate the ways in which Dr. Kelly validated core elements of Menninger's claims.  He opined that Menninger's anxiety disorder posed no major disruption in

---

[1] She also was cross-examined about her ability to provide testimony and to travel alone to Boston from Oregon for the trial despite her anxiety.  These facts, which PPD suggested undermined Menninger's description of the effects of her anxiety, were before the jury to consider and weigh as it evaluated the evidence presented, as were Menninger's explanations offered in response to such questioning.

[2] For example, Menninger described her role at PPD and the daily responsibilities of her job in time before she disclosed her disability, and she explained how she managed her anxiety when it posed challenges (which, before 2018, was rare).  She explained the ways her supervisor and others at PPD made it seem as though they were trying to force her out of her job after she disclosed her condition.  She described changes in her relationships and interactions with her supervisor and others in the wake of her disclosure.  She spoke about the impact of those events on her condition—at the time of the events and continuing in the years since then.  And, she told the jury she had hoped to continue working at PPD until her retirement.

[3] The ten volumes of the trial transcript appear on the electronic docket in this action at: Doc. No. 151 (vol. 1, Mar. 20, 2023); Doc. No. 152 (vol. 2, Mar. 21, 2023); Doc. No. 153 (vol. 3, Mar. 22, 2023); Doc. No. 154 (vol. 4, Mar. 23, 2023); Doc. No. 155 (vol. 5, Mar. 24, 2023); Doc. No. 156 (vol. 6, Mar. 27, 2023); Doc. No. 157 (vol. 7, Mar. 28, 2023); Doc. No. 158 (vol. 8, Mar. 29, 2023); Doc. No. 159 (vol. 9, Mar. 30, 2023); and Doc. No. 160 (vol. 10, Mar. 31, 2023).

her ability to function, including at work, before the events at issue arose in early 2018 (thereby supporting Menninger's claim that she was a qualified individual able to perform her essential work functions with or without accommodation at the relevant time).  E.g., id. at 85-89, 106. And, he disagreed with the diagnosis of major depressive disorder endorsed by Menninger's doctors, opining instead that she suffers from "reactive depression" following a "powerful, negative life event[]"—here, PPD's response to her request for accommodations (thereby supporting Menninger's claim that PPD's conduct caused her substantial and identifiable harm). Id. at 68-70; see also id. at 87-88 (observing Menninger "did not describe panic attacks prior to the request for accommodation," but became "very anxious" about what would happen to her and her family after her request was denied); id. at 91 (referring to "PPD's response to Menninger's request for accommodation" as "the light switch that brought on her reactive depression").  It would be difficult to overstate the conspicuously unhelpful effect Dr. Kelly's testimony had on PPD's position as it was elicited live at trial.[4]

Third, several other witnesses who are or were key figures at PPD provided testimony that was as imprecise and implausible as Menninger's was clear and sincere.  Deborah Ballweg, the human resources officer who investigated Menninger's complaint of unfair treatment after she disclosed her disability, testified immediately after Menninger.  Almost from the start, Ballweg staked out a series of positions that she promptly had to revise or retreat from entirely when confronted with exhibits that called her statements into question.  See, e.g., Trial Tr. vol. 4 at 80-83 (defending her role as the investigator of Menninger's complaint by stating she was "aware" of the underlying events but not "involved" in them, then agreeing she was the primary

---

[4] Menninger's counsel understood the power of this testimony, wielding it to great effect in his rebuttal argument at the conclusion of trial.  Trial Tr. vol. 10 at 82.

recipient on various relevant emails and had approved PPD's response to Menninger's request for accommodations); id. at 91-93 (denying she had seen Menninger's MCAD complaint, then acknowledging she had personally signed PPD's answer to that complaint); cf. Doc. No. 186 at 9, 11-15 (detailing numerous credibility problems apparent from Ballweg's testimony).  Of the two PPD witnesses who were present at an important February 2018 meeting, neither remembered the event in any detail or offered an account that differed from Menninger's.[5] Compare Trial Tr. vol. 7 at 24-26, 184, with Trial Tr. vol. 2 at 69-72 (describing being "immediately" confronted with only "two options," neither of which involved Menninger remaining in her position).[6]  And, the PPD executive to whom Menninger's own boss reported provided fuel for Menninger's theory that PPD was less concerned with honoring its legal obligations to her than it was with growing its business by pointing her toward the door.  See, e.g., Trial Tr. vol. 7 at 210-11 (justifying email sent in April 2018 asking about the "timing" of Menninger's "exit," even though she had not then expressed any intent to leave, by explaining preparation was required because her position would be "expensive" to fill "if she opted to leave"); see also id. at 22 (reflecting statement by human resources representative that PPD "had to protect the business").  Put simply, the jury had plenty of reasons to view each of these witnesses' renditions of the underlying events with considerable skepticism.

---

[5] The jury received the testimony of one of these witnesses—Menninger's direct supervisor and a central figure in the underlying events—through deposition testimony that was read to them in the courtroom.  Thus, they were not able to assess his testimony with the benefit of in-person observations of him on the witness stand, or even an opportunity to evaluate his demeanor via a videotaped examination.

[6] The Court notes that the significant gaps in the memories of both PPD witnesses—as evidenced by the myriad times each responded to a question with some version of "I don't recall"—were not limited to the specifics of this one meeting.

Finally, as the Court noted in its summary judgment ruling, this case presented several material factual disputes that a reasonable jury could have resolved in favor of either party. See Doc. No. 81 at 11, 14-15, 18-20. On the paper record presented by the parties at that time, the Court observed that some of those disputes appeared "close" or would require reconciling apparent "tension" between Menninger's position and other evidence. Id. at 11 n.11, 19. Those observations, however, were neither findings of fact pursuant to Rule 56(g) nor otherwise binding on the parties or the jurors at trial. With "the full record developed in court" at trial, Ortiz v. Jordan, 562 U.S. 180, 184 (2011), gaps in the summary judgment record were filled, conflicts and context explained, and observations of the various witnesses' demeanors provided a vital lens through which the jurors (and the Court) could view and understand the paper exhibits.[7] In that context, though the same fact-bound questions remained open for jurors to determine, the relative strength of the parties' positions appeared much different than it had on a written discovery record unilluminated by live witness testimony. Questions that had once appeared close no longer seemed so. Possible tension was mitigated or contextualized. Menninger's credible and detailed testimony was measured against accounts by PPD representatives that were often vague, suffered from troubling inconsistencies, or tended to corroborate Menninger's position rather than undermine it.

These overarching observations inform the Court's evaluation of PPD's motions. In the sections that follow, the Court explains why each of PPD's challenges is meritless.

---

[7] Because of this development in the record, a "summary judgment denial" becomes "ancient history" after a trial has occurred and a jury verdict rendered. Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 831 F.3d 815, 823-24 (7th Cir. 2016); accord Dupree v. Younger, 598 U.S. 729, 734 (2023). To the extent this Court granted summary judgment on any discrete legal theory or claim, its instructions to the jury carefully described the law in a manner entirely consistent with those rulings, and PPD has not suggested or demonstrated otherwise.

II.     RULE 50(B)

Invoking Federal Rule of Civil Procedure 50(b), PPD presents four challenges to the sufficiency of evidence supporting elements of Menninger's claims.  Doc. No. 180 at 1-2 (arguing no reasonable jury could find Menninger was "capable of performing the essential functions of her job with or without reasonable accommodation," had been "subjected to any 'adverse employment action' as a result of her disability," was denied "any 'reasonable accommodation' to which [she] was legally entitled," and had "experienced any 'adverse action' as a result of any protected activity").  Besides seeking entry of judgment in its favor as a matter of law for those reasons, PPD also asks the Court to strike the award of punitive damages, urging there was "insufficient evidence at trial to warrant an instruction" on such damages.  Id. at 2.

The first problem for PPD is that it altogether failed to articulate any of the four challenges it now raises to the elements of the discrimination and retaliation claims when it moved for a directed verdict at the close of Menninger's evidence.  As explained in the first subsection below, that failure results in waiver under the plain language of Rule 50 and decisions of the First Circuit interpreting it.  The only challenge PPD arguably did not waive—the request to strike the punitive damage award—is meritless for reasons the Court notes in the second subsection below.

A.     Renewal and Waiver

PPD's motion for judgment as a matter of law is governed—and largely foreclosed—by several well-established principles.  First, a defendant may move for judgment as a matter of law on any issue or claim as to which "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the plaintiff at "any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a).  When making such a motion, the defendant must articulate its challenges

in a manner that is "sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004); cf. Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995) (noting Rule 50(a) motion "at the close of all the evidence preserves for review only those grounds specified at the time" (emphasis added)). This requirement serves a dual purpose. It "informs the [plaintiff] of the challenge to the sufficiency of the evidence" at a time when there remains "a clear opportunity to provide additional evidence that may be available." Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment. And, it "alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury." Id.

Second, "the scope of a Rule 50(b) motion is confined to those grounds raised in the Rule 50(a) motion." Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 8 (1st Cir. 2021). Indeed, Rule 50(b) expressly allows only for "renewing" a motion for judgment as a matter of law after trial. It does not create a process through which parties may advance new requests for judgment as a matter of law for the first time in a post-verdict motion. See Fed. R. Civ. P. 50 advisory committee's notes to 1991 and 2006 amendments (emphasizing post-verdict motion is limited to "renewal" of earlier challenges and "can be granted only on grounds advanced" in Rule 50(a) motion). The First Circuit has repeatedly warned that a party "cannot use" a Rule 50(b) "motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Correa, 69 F.3d at 1196 (emphasis added).

Besides including the word "renewed" in its opening post-verdict submissions, e.g., Doc. No. 180 at 1, PPD at first ignored these threshold requirements. See Doc. No. 181 at 14. As Menninger persuasively explains at the outset of her opposition memorandum, though, PPD's one-sentence "motion" at the close of Menninger's evidence in this case failed to preserve any of

the sufficiency-of-evidence challenges PPD now seeks to air with respect to Menninger's discrimination and retaliation claims.  Doc. No. 186 at 2-5.  Confronted with this virtually inescapable reality, PPD endeavors to avoid its waiver by engaging in revisionist history and relying on inapposite precedent.  Doc. No. 189 at 9-11.  Its efforts miss the mark.

On the penultimate day of this trial, the Court spoke with counsel when the jurors were excused for their morning break.  Trial Tr. vol. 9 at 48-51.  The break came at the conclusion of the testimony of Menninger's final witness.  After confirming that the only thing her counsel intended to do before resting was move in a group of exhibits by agreement of the parties, the Court asked PPD's counsel to "assume [Menninger has] rested now," and "treat right now as if [counsel had] rested, so whatever motions you want to make now, make them."  Id. at 49.  This is an approach the Court routinely employs to permit defense counsel in civil trials to make Rule 50(a) motions outside the presence of the jury, and without delaying the proceedings when trial is in session.  Cf. id. ("I just don't see the point of having a sidebar in front of the jury and make them sit here.").  Having explained that, the following exchange occurred:

> THE COURT:  . . . [S]o he's effectively rested.  Are there any motions you want to make?  You don't have to, but I'm just giving you the chance.
>
> [PPD'S COUNSEL]:  Yeah.  A motion for directed verdict, Your Honor.
>
> THE COURT: All right.  Fine.  I will deny that.  So anything else?

Id. at 50.  The conversation then turned to Dr. Kelly (whose testimony would come next and would end the presentation of all evidence in the case), the time the break would end, and the Court's intent to meet with the lawyers for a charge conference after the jury was excused for the day.  Id. at 50-51.

Once the lawyers were excused at the conclusion of that conversation, Court was in recess for more than twenty minutes.  Id. at 51.  Before the jurors entered the courtroom after the

break, the Court conversed with Dr. Kelly about logistics like the administration of the oath.  Id. at 51-52.  The jurors returned, the remaining exhibits were admitted, and Menninger's counsel rested.  Dr. Kelly then testified.  At the conclusion of his testimony, PPD rested, and Menninger confirmed she wished to present no rebuttal case.  Id. at 107.  The jurors and the witness were then excused, and the Court met with the lawyers in the courtroom immediately thereafter to discuss the final jury charge.  Id. at 107-65.  When the conference was nearing its end, the Court recessed for lunch and an unrelated proceeding, later resuming its discussion with the lawyers about the remaining issues related to the final charge.  Id. at 165-69.  The Court then went over logistics related to closing arguments, reiterated that certain issues raised by the parties about the final charge (including punitive damages) were under advisement and would be resolved later that day, and then adjourned.  Id. at 169-77.

The morning of the next—and final—day of trial, the Court met with the lawyers before the jurors arrived to discuss additional issues Menninger's counsel had raised late the previous day and other logistical matters related to the final stage of the trial.  Trial Tr. vol. 10 at 4-10. Trial then resumed with jury instructions and closing arguments.  Before the jury was excused to deliberate, the Court spoke with the lawyers at sidebar.  Id. at 123-24.  Only after that conversation occurred were jurors excused to deliberate.  Only then was the case "submitted to the jury."  Fed. R. Civ. P. 50(a).

At no point did PPD's counsel seek to revisit its Rule 50(a) motion.  At no point did PPD ask the Court to reconsider its denial of the motion, seek an opportunity to articulate specific sufficiency challenges, or supplement its cursory oral request with a concise written version identifying one or more grounds (as parties often do, in the Court's experience).  There were many opportunities for it to do so.  PPD pursued none of those courses in open court during any

of the proceedings that occurred on March 30, 2023, after the motion was denied or on March 31, 2023, before the case was given to the jury.  PPD pursued none of those courses in any written communication or submission to the Court during any break or recess in the proceedings on either of the final two days of trial.  Indeed, PPD expressed no objection or complaint that it had been prevented from articulating or fairly litigating a Rule 50(a) motion until its post-verdict reply brief, after being confronted with the effects of its waiver.

In these circumstances, the Court finds that PPD waived the sufficiency challenges presented in its post-verdict motion, except for its challenge to the Court's decision to instruct the jury on punitive damages.  That argument—and only that argument—was advanced by PPD before submission of the case to the jury, such that it is preserved for renewal via Rule 50(b).

The Court further finds that there is simply no basis to excuse PPD's waiver in this case. To the extent PPD seeks shelter in the First Circuit's decision in Blockel v. J.C. Penney Co., that case is plainly and materially distinguishable from the circumstances outlined above.[8]  The trial transcript of the underlying exchange in Blockel unambiguously depicts an effort by counsel to "proceed with" a motion "for directed verdict on certain issues," promptly followed by the trial judge literally interrupting counsel mid-sentence, preventing them from identifying those issues. 337 F.3d 17, 25 n.2 (1st Cir. 2003).  PPD's counsel certainly understands this context, as they excerpted this very exchange in its entirety in their papers.  Doc. No. 189 at 10.  No such thing happened in this case.  The Court distinctly recalls the salient exchange—in part because PPD's failure to specify any ground whatsoever for its motion was noteworthy in the moment.  It was the Court's perception that, had it not invited PPD to make "any motions" it wished to make,

---

[8] Indeed, PPD's characterization of Blockel as presenting "identical circumstances" that are "on all fours with the instant action" is just plain wrong.  Doc. No. 189 at 9-10.

PPD would have made no Rule 50(a) motion at all.  When PPD's counsel did summarily request a "directed verdict" in response to the Court's invitation—an invitation accompanied by an explanation of why the Court raised the issue when it did—counsel offered no indication that they wished to say anything more in support of the request.  As the transcript confirms, the Court neither interrupted counsel nor in any other way acted to prevent further argument.  When no stated basis or further argument was forthcoming, the Court denied the motion.

Immediately after stating its ruling, the Court asked whether there was "anything else." Trial Tr. vol. 9 at 50.  Nothing about this exchange was rushed.  The jurors were not in the courtroom or waiting in the hallway; they were in a conference room having coffee and snacks. As noted already, PPD's counsel did not then, or at any other time before the jury began deliberating, seek to expand on, revive, or return to its motion for a directed verdict.  These events in no way resemble the exchange at issue in Blockel.[9]  PPD's misguided effort to fault the Court for its waiver are altogether unsupported by the transcript or the Court's recollection of the relevant exchange.

Beyond blaming the Court, PPD suggests counsel's incantation of the phrase "directed verdict" was adequate to preserve all conceivable sufficiency challenges that might be raised in this case, leaving "no basis for confusion" by Menninger or the Court.  Doc. No. 189 at 10-11.

---

[9] There are other distinctions between this case and Blockel.  For example, the trial judge in Blockel entertained in its entirety, and denied on its merits, a post-trial motion for judgment as a matter of law.  See Mem. & Order, Blockel v. J.C. Penney Co., No. 01-cv-30027, ECF No. 52 (D. Mass. June 27, 2002).  Only on appeal did the plaintiff seek to prevent further review of the defendant's challenges by invoking the concept of waiver based on the lack of specificity in the pre-verdict motion.  337 F.3d at 24-25.  And, without conducting a legislative-history-style analysis of the evolution of Rule 50, the Court notes that amendments to that rule in 2006 included changes to Rule 50(b), with reasons described in notes from the advisory committee. Thus, the version of these rules applicable at the time of the Blockel trial, and the practices of lawyers in civil cases at that time, quite possibly differed in material respects from the rules and practices existing now.

This argument fares no better and merits little discussion.  An unadorned request "for directed verdict," as PPD made here, facially and entirely fails "to apprise the district court of the grounds relied on in support of the motion," as the Rule and various decisions of the First Circuit require. Parker, 547 F.3d at 12; see Fed. R. Civ. P. 50(a)(2) ("The motion must specify . . . the law and facts that entitle the movant to the judgment."); see also, e.g., Jones ex rel. United States v. Mass. Gen. Hosp., 780 F.3d 479, 487-88 (1st Cir. 2015); cf. Gonzalez-Bermudez v. Abbott Lab'ys P.R. Inc., 990 F.3d 37, 45 (1st Cir. 2021) (finding no waiver where moving party did not expressly refute a certain category of evidence in arguing pre-verdict motion but had "specifically asserted that there was no evidence to support" the particular claim as to which challenges were renewed post-verdict).  This case involved multiple claims with various disputed elements.  PPD failed to specify, at any point before the jury began deliberating, which claim(s) and/or which element(s) it believed were unsupported by the trial record.  This failure justified denial of the Rule 50(a) motion, such as it was, and prevents PPD from litigating such challenges for the first time now.

In sum, PPD has waived its claims that the discrimination and retaliation claims were not supported by sufficient evidence at trial.  Insofar as its Rule 50(b) motion raises such challenges, the motion is DENIED.[10]

---

[10] Were the Court's analysis of the sufficiency challenges to proceed beyond PPD's waiver and reach the merits of those claims, the result would be unchanged.  The Court's recollection and review of the record confirms the recitation of the trial evidence, and the Court endorses the application of the relevant legal principles to that evidence, that Menninger ably lays out in her memorandum.  Doc. No. 186 at 15-27.  In other words, the Court agrees and finds that there was ample evidence from which jurors reasonably could have found that Menninger was a "qualified individual," that she suffered at least one adverse employment action, that she was denied at least one reasonable accommodation, and that the elements of retaliation were satisfied (including, for example, by the "sham HR investigation" theory developed and powerfully argued by Menninger at trial and in her memorandum).

B.    Punitive Damages

The only challenge pressed in PPD's Rule 50(b) motion that it has not waived is a request

that the Court strike the jury's award of punitive damages "because it is excessive, unsupported

by evidence, and contrary to law."[11]  Doc. No. 181 at 31.  As the "party seeking to overturn a

jury verdict," PPD "faces an uphill battle."  Marcano Rivera v. Turabo Med. Ctr. P'ship, 415

F.3d 162, 167 (1st Cir. 2005).  In evaluating PPD's motion, the Court examines the trial record,

including all reasonable inferences that may be drawn from the evidence presented at trial,

through a lens "weighted toward preservation of the jury verdict."  Crowe v. Bolduc, 334 F.3d

124, 134 (1st Cir. 2003).  PPD is entitled to the relief it seeks only if "the evidence was so

strongly and overwhelmingly inconsistent with the [award of punitive damages] that no

reasonable jury could have returned it."  Id.  Here, the series of flawed positions PPD advances

in support of its challenge to the punitive damage award do not come close to surmounting these

demanding standards.[12]

PPD begins and ends its argument by relying on inaccurate characterizations of the

Court's position as to a punitive damages instruction in this case.  To the extent there was

tentativeness on the Court's part regarding such an instruction, it was grounded in the

consideration and caution the Court routinely employs when assessing whether to instruct on

---

[11] Though PPD made no reference to punitive damages in its motion for a directed verdict, it did
argue during the charging conference that no instruction on punitive damages should be given
because, in PPD's view, the evidence would not support an award of such damages.  Trial Tr.
vol. 9 at 163.  In responding to that argument, the Court noted PPD could raise it after the
verdict, if appropriate, and the Court would entertain it at that time.  Id. at 172.  These facts,
along with the absence of an objection by Menninger to the Court considering this issue now,
distinguish it from the other sufficiency challenges the Court has deemed waived.
[12] It bears noting that PPD does not object now, and did not object at trial, to the specific content
of the Court's punitive damages instruction.  The only objection it ever has raised on this topic is
to the appropriateness of instructing on punitives at all.

14

punitive damages.  Such an instruction is a serious matter and is not appropriate in every case (as PPD correctly notes).  The Court neither expressed nor harbored "significant hesitancy to even provide a punitive damages instruction given the state of the record."  Doc. No. 181 at 31.  In this particular case, the Court's view of the evidence and of Menninger's claims—including her claim for punitive damages—shifted substantially as the Court heard the evidence at trial and thereafter evaluated it.  The comments by the Court that PPD has block-quoted in its papers do not reveal any "significant" or case-specific reservations.  Rather, they reflect the Court impartially expressing its view of the law, including the option for PPD to challenge any award after the trial.  That the Court voiced its willingness to "entertain, seriously" such a post-trial challenge was not an invitation or a signal that it would endorse such a challenge.  It was simply a statement that, were such a challenge presented, the Court would do its job: consider the parties' arguments and resolve the questions presented to it.  The Court has now undertaken that serious consideration of PPD's challenge and determines it falls short.

PPD's invocation of the Court's position surpasses mere exaggeration when, at the end of its argument, it asserts "the Court itself <u>suggested</u> during the charging conference" that "the award [of punitives] <u>should be vacated</u>."  <u>Id.</u> at 35 (emphasis added).  To be absolutely clear, the Court suggested no such thing.  The Court included a punitive damages instruction because it was persuaded that the evidence might support an award of such damages, depending on the jury's determinations of the facts.  It bears noting that the viability of Menninger's punitive damages request appeared, in the Court's view, to increase as the trial progressed.  This case was something of a perfect storm for PPD, gradually building momentum from the start of Menninger's opening statement to the conclusion of her rebuttal argument.  Practically each wave, it seemed, broke in Menninger's favor and washed away the foundation of PPD's defense,

bit by bit.[13]  The steady crescendo was orchestrated by Menninger's lead trial counsel, who was adept at marshaling the evidence and eliciting testimony necessary to support his theory of the case.

By the end of trial, and after hearing Menninger's closing argument weaving together the evidence presented during the preceding two weeks, it came as no great surprise when the jury returned a verdict that included an award of punitive damages.  Though the total damages awarded in this case was obviously remarkable compared to run-of-the-mine civil cases courts encounter each day, that alone is not a reason to strike or reduce the award.  As Menninger details in her memorandum, the evidence in this case justified an instruction on punitive damages and supported the jury's award of them.  See Doc. No. 186 at 6-15 (recounting in a manner consistent with the record, as well as with the Court's recollection and perception of the testimony, the evidence supporting the various considerations that govern whether to award punitive damages and permitting a reasonable jury to conclude PPD acted with malice or reckless indifference to Menninger's rights in the course of its responses to her request for an accommodation and/or her HR complaint); cf. Gyulakian v. Lexus of Watertown, Inc., 56 N.E.3d 785, 797-99 (Mass. 2016) (vacating post-verdict order by trial court striking punitive damage award and reinstating jury verdict, where amount awarded was more than ten times the compensatory damages, based in part on evidence that reasonably supported a jury finding that

---

[13] Examples from the start and end of the trial make the point.  At the outset, the contrast in demeanor and credibility of Menninger (the first witness) and Ballweg (the second witness) was stark.  These two witnesses supplied a week's worth of testimony that substantially bolstered the plaintiff's narrative of the relevant events and undermined that of the defendant.  At the finish, the jury heard an expert called by the defense make statements that so strongly supported Menninger's theory of the case that her lawyer quoted some of them verbatim in his closing argument.

the employer's investigation of sexual harassment complaint was a sham).  PPD's arguments to the contrary are meritless.[14]

Accordingly, the only preserved challenge presented in PPD's Rule 50(b) motion fails. PPD's post-verdict motion for judgment as a matter of law (Doc. No. 180) is DENIED.

III.     RULE 59(A) AND (E)

PPD separately seeks a new trial or remittitur, invoking Rule 59.  Doc. No. 179.  The Court may grant a new trial only if it concludes that doing so "is required in order to prevent injustice," including where "the verdict is against the weight of the evidence."  Jennings v. Jones, 587 F.3d 430, 436-38 (1st Cir. 2009) (cleaned up); accord Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 174 (1st Cir. 2009).  Where a party uses Rule 59 as a vehicle for challenging a damages award, they face a "heavy burden" to show the "award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999) (cleaned up); accord Monteagudo, 554 F.3d at 174.  The Court may not "disturb an award of damages because it is extremely generous or because" the Court believes "the damages are considerably less."  Koster, 181 F.3d at 34.

---

[14] To the extent PPD ties this challenge to its belief that the record did not support a finding that it violated the law at all, it has waived that argument (and the Court would reject it on its merits anyway, as noted previously, for the reasons expressed in Menninger's papers).  To the extent PPD urges that its own view of the facts would not support an award of punitives, that view ignores evidence unfavorable to PPD, was plainly rejected by the jury, and is inconsistent with the standard applicable to a Rule 50(b) motion.  To the extent PPD suggests the punitive award was excessive, it presents no developed argument in support of that position, relying entirely on the amount at issue without citing precedent that would permit the Court to reduce an award of punitives where that award is less than the total awarded compensatory damages.  See sections III(C) & IV, infra; cf. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (noting absence of "rigid benchmarks that a punitive damages award may not surpass," but suggesting that if "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages," might mark "the outermost limit of the due process guarantee").

In its Rule 59 motion, PPD advances five arguments it believes justify ordering a new trial.  The first three are assertions that the amounts the jury awarded in front pay, back pay, and emotional distress damages are "excessive," "unsupported," and/or "legally deficient."  Doc. No. 179 at 1-2.  The next two are claims that the verdict was tainted by "misleading and prejudicial instructional errors" and by inclusion of "legally deficient discrimination claims."  Id. at 2. Finally, and in the alternative, PPD urges the Court to reduce what it characterizes as a "grossly excessive" and irrational damage award.  Id.  Each of these challenges fail for reasons Menninger has identified and the Court will summarize in the subsections that follow.

    A.    <u>Jury Instructions</u>

Though PPD asserts the verdict in this case was tainted by "instructional errors" (plural), Doc. No. 181 at 39, it identifies only one supposed error: the Court's inclusion of "the provision of qualified readers or interpreters" in a list of ten accommodations that might be deemed reasonable "[d]epending on the circumstances."  Trial Tr. vol. 10 at 93; <u>see</u> Doc. No. 181 at 40-41.  PPD does not—and could not—contend that this portion of the closing charge was legally inaccurate.  As PPD concedes, the language at issue was taken directly from 42 U.S.C. § 12111(9)(B), which lists examples of what "[t]he term 'reasonable accommodation' may include."  The problem, from PPD's perspective, is that the instruction was "deeply problematic" (despite being accurate) in this case because Menninger had requested accommodations that in some instances included having readers or surrogates appear in her stead at events requiring substantial public speaking.  Doc. No. 181 at 40.

PPD's position is without any legal or factual support.  This case did not hinge, entirely or even significantly, on whether Menninger was entitled to have a "reader" make presentations

on her behalf.[15]   Other determinative issues that featured prominently included whether various

new responsibilities described by PPD were "essential functions" of Menninger's position; the

quantum of public speaking that was, in fact, "essential" to her job; whether PPD undertook a

course of conduct intended to force Menninger to quit instead of accommodating her disability;

and whether PPD conducted an adequate, good-faith investigation of Menninger's HR

complaint.   In any event, as the record of the charging conference confirms, the Court included

"or interpreters" at PPD's request, rather than just listing "readers" as an example, "to give it

some context."  Trial Tr. vol. 9 at 134.  Also in response to PPD's concerns regarding the

"reader" reference, the Court added a sentence following the list of examples to make clear that

the reasonableness of any accommodation was a matter for the jury to assess "based upon [its]

consideration of all the surrounding circumstances."  Trial Tr. vol. 10 at 93.  In this context, there

is simply no basis to conclude that anything about the challenged (but concededly accurate)

instruction was so confusing or prejudicial that it tainted the verdict and justifies a new trial.

    To the extent PPD attempts to revive in this context the sufficiency challenges the Court

deemed waived for purposes of the Rule 50(b) motion, those challenges do not provide an

avenue to relief from the jury's verdict.  PPD urges that the jury's ability to "evaluate the

evidence allegedly supporting Menninger's retaliation claim on its own merits" was impaired by

the fact that "the jury heard over and over" again—"including in the Court's instructions"—

about discrimination claims that were legally deficient.  Doc. No. 181 at 41-42.  This theory was

---

[15] A word search of the parties' closing arguments returns only one use of the word "readers" by
Menninger's counsel, and it is a passing reference appearing seven pages into an argument that
spanned twenty-eight pages.  Trial Tr. vol. 10 at 29.  PPD's counsel did not use the term at all,
applying the term "surrogate" instead (a word which, in the Court's view, evokes something
more than a mere "reader") in arguing the accommodations Menninger asked for were neither
reasonable nor legally required.  E.g., id. at 55-57.

not raised by PPD at any point during the trial, including during the charging conference or at the sidebar after the Court had instructed the jury. If that is not enough reason to reject it now, the Court again endorses and incorporates Menninger's recitation of the facts and law which supported the jury's verdict on her discrimination claims. See supra note 10 and cited portion of Menninger's opposition memorandum.

      B.    <u>Compensatory Damages</u>

The bulk of PPD's Rule 59 motion focuses on the damages awards. The Court will address each component of the compensatory damages in turn. <u>First</u>, PPD makes cursory reference to the jury's award of $1,565,000 in back pay in its motion, claiming a new trial is required because the award "is excessive and unsupported by the evidence at trial." Doc. No. 179 at 1. In its memorandum and subsequent reply, however, PPD merely mentions the back-pay amount but offers no argument at all—developed or otherwise—with respect to that award. <u>See generally</u> Doc. No. 181 at 35-39; Doc. No. 189 at 22-20. Thus, any challenge to the back-pay award is waived.

<u>Second</u>, PPD asks the Court to set aside "the jury's wildly excessive front pay award," urging the expert testimony on which it was apparently based suffered from flawed assumptions that render it incapable of supporting the award. Doc. No. 181 at 36-38. The jury's front-pay award of $5,465,000 was just about $300,000 less than the amount of forward-looking economic loss Menninger's expert calculated. It is fair to assume, then, that jurors largely accepted and relied on the testimony of that expert in determining the appropriate front-pay award. As Menninger notes, PPD did not object before or during the trial to the admission of this expert's testimony or to the Court instructing the jury on front pay as an available category of compensatory damages. Doc. No. 186 at 33 n.9. Despite having filed no motion in limine

seeking to limit or exclude the expert's opinion, PPD now complains that he rendered an opinion based on "a series of assumptions that are not merely unsubstantiated, but directly contradicted by the factual record." Doc. No. 181 at 36. PPD goes on to briefly articulate only two assumptions it believes are flawed: the assumption Menninger would be unable to return to work for the thirteen years remaining in her "working life," and the assumption that Menninger would have continued working at PPD until her retirement.

For reasons outlined in Menninger's papers, the Court finds there was ample evidence that, if credited by the jury, supported both assumptions. Doc. No. 186 at 33-36. For example, Menninger herself testified she had hoped and planned to remain at PPD for the remainder of her career. Trial Tr. vol. 2 at 53. And there was evidence, including from doctors treating her for her anxiety, of the severe and lingering effects she suffered as a result of her mistreatment by PPD.[16] A jury could find, and an expert could assume, based on that evidence that Menninger had been a qualified individual capable of performing her job at PPD during the relevant period, but that the trauma she experienced because of PPD's discriminatory and retaliatory acts more likely than not rendered her incapable of returning to similar work in the future. Those two findings are not "logically inconsistent." Doc. No. 181 at 38. PPD's challenge to the front-pay award fails.

Third, PPD seeks to avoid the jury's award of $7 million to Menninger for emotional distress (with $5 million allocated for distress she suffered before the trial, and $2 million for the distress she would likely experience in the future). In advancing this challenge, PPD does not contest Menninger's proof that she has suffered, and will continue to suffer, profound emotional

---

[16] That there also was evidence from which jurors could have found Menninger likely would be able to return to work at some point in the future is of no great assistance to PPD. The jury did not reach—and was not required to reach—that conclusion.

distress.  Rather, it limits its argument to one centered on causation.[17]  According to PPD, evidence linking Menninger's emotional suffering to unlawful conduct by PPD "is wholly absent," and "PPD cannot be held responsible for Menninger's pre-existing disability, nor the debilitating symptoms that define it."  Doc. No. 181 at 38-39.  This position, of course, ignores substantial evidence in the record that supports a finding of such causation—including, as noted previously, the testimony of PPD's own expert witness.[18]  On this, again, Menninger's brief recites the evidence in a manner consistent with the record and the Court's recollection of the proceedings.  Doc. No. 186 at 28-33.  Menninger suffered profoundly, and the record supports a finding that the lion's share of her suffering was either caused or meaningfully exacerbated by PPD's discriminatory and retaliatory conduct.  The jury's award of emotional distress damages in this case, though certainly generous, is neither conscience-shocking nor "so high that it would be a denial of justice to permit it to stand."  Koster, 181 F.3d at 34.

In sum, the Court finds no basis to nullify the jury's compensatory damages awards and order a new trial in this case.  PPD's selective recitation of the evidence and invocation of hyperbolic language simply do not meet the burden PPD bears under Rule 59.

C.    Remittitur

As noted above, in "seeking remittitur," PPD "bears the heavy burden of showing that the award is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'"  Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 187 F. Supp. 3d 217, 225 (D. Mass. 2016) (quoting Koster, 181 F.3d at 34).

---

[17] The Court notes that PPD did not object at trial to the Court instructing the jury on emotional distress damages or to the particulars of that instruction.

[18] Notably, some of Dr. Kelly's testimony that supports a finding of causation was elicited on direct examination by PPD's own counsel.  E.g., Trial Tr. vol. 9 at 68.

22

A party cannot satisfy that burden by simply pointing to other cases in which the total damages awarded was less (without examining the similarity of those precedents to the case at issue), or even by pointing out that few juries have awarded total damages that meet or exceed the award at issue.  See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 579 (1st Cir. 1989).  "If a jury's award has a foundation in the record, it will not be overturned except in the most egregious of circumstances."  Id. at 580; see also Koster, 181 F.3d at 34 (noting remittitur is appropriate only if the award "is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law").

In an argument that is barely a page long, PPD invites the Court to "remit the jury's patently excessive verdict."  Doc. No. 181 at 42.  Its failure to develop this argument in any meaningful way risks waiving yet another of its post-verdict challenges.  Assuming it is not waived, the Court finds no basis for remittitur under the standards governing such a request.  This is so for the same reasons articulated above in rejecting each of PPD's challenges to the separate components of the jury's damages award, and for all of the reasons capably expressed by Menninger.  Doc. No. 186 at 36-41.  PPD's request for relief under Rule 59(e) is denied.

IV.    CONCLUSION

The Court listened closely to the evidence during trial and has reviewed and evaluated it carefully in considering PPD's motions.  The findings and conclusions the jury reached are unassailable when the governing legal standards are applied to the trial record.  Nor does the Court have any hesitancy in upholding the verdict, including all its components, when considered through the lens of the "interests of justice" or any other measure.  The jury in this case did not merely conclude that PPD intentionally discriminated and retaliated against Menninger.  It found that the foregoing was an organized, considered effort by a number of

executive-level employees who were well aware that their conduct violated the law <u>and</u> that the course of action they were undertaking was inflicting real and substantial harm.  The jury agreed that "PPD broke Lisa Menninger."  Doc. No. 186 at 2 (italics omitted).  It concluded that PPD's employees—during the course of the relevant events and again on the witness stand at trial—disingenuously claimed otherwise, demonstrating a flagrant disregard for the requirements of the law and the effects of their conduct.

To be sure, the sum total of the verdict is quite large.  The evidence presented and the jury's findings therefrom, however, reasonably and fairly support each component of the award.  As is often true, the evidence adduced at this trial could have permitted a jury to make different findings and reach different conclusions than this jury did.  But the Court finds that this jury's determinations and conclusions are amply supported under the facts and law.  Nothing that occurred, in the Court's view, warrants a new trial.  Nor, again in the Court's considered view, is there a basis for suspecting a so-called "runaway jury," blinded by emotion.  This jury diligently attended to the evidence presented to it, then rendered a considered and thoughtful verdict grounded in that evidence.  Each category of damages is fairly and reasonably supported.  The award in total is large, but so is the harm PPD inflicted on Menninger.

For all of the foregoing reasons, the Court DENIES PPD's Motions for Judgment as a Matter of Law (Doc. No. 179) and for New Trial or Remittitur (Doc. No. 180).

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

24