1          UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
2

3      _____

4      LISA MENNINGER,

5           Plaintiff,                    Civil Action No.
                                          1:19-cv-11441-LTS
6           v.

7      PPD DEVELOPMENT, L.P.,

8           Defendant.

9      _____

10

11       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                          MOTION HEARING
13

14

15

                     Tuesday, March 8, 2022
16                        10:04 a.m.

17

18

19

20

       John J. Moakley United States Courthouse
21     Courtroom No. 13
       One Courthouse Way
22     Boston, Massachusetts

23

       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25

1                          **A P P E A R A N C E S**

2

     On behalf of the Plaintiff:

3
          HARTLEY MICHON ROBB HANNON, LLP
4         BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
          155 Seaport Boulevard
5         2nd Floor
          Boston, Massachusetts  02210
6         (617) 723-8000
          phannon@hmrhlaw.com
7         hwatson@hmrhlaw.com

8

9    On behalf of the Defendant:

10         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
          BY:  RACHEL REINGOLD MANDEL
11        One Boston Place
          Suite 3500
12        Boston, Massachusetts  02108
          (617) 994-5700
13        rachel.mandel@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2             (In open court.)
 3             THE DEPUTY CLERK:  The United States District Court
 4     for the District of Massachusetts is now in session, the
 5     Honorable Leo T. Sorokin presiding.
 6             Today is Tuesday, March 8, 2022, and we are on the
 7     record in civil case number 19-11441, Lisa Menninger versus
 8     PPD Development, LP.
 9             And would counsel please identify themselves for
10     the record.
11             MR. HANNON:  Good morning, Your Honor.
12     Patrick Hannon behalf of the plaintiff.
13             I'm with my colleague, and I'll let him introduce
14     himself.
15             MR. WATSON:  Good morning, Your Honor.
16     Hampton Watson for the plaintiff.
17             THE COURT:  Good morning.
18             MS. MANDEL:  Good morning, Your Honor.
19     Rachel Mandel for Defendant PPD.
20             THE COURT:  Good morning.
21             MS. MANDEL:  Good morning.
22             THE COURT:  Okay.  So I've read all the papers, and
23     I'll hear you on -- I'll hear you first, Ms. Mandel, because
24     it's your motion.
25             And let me ask you this, just to jump into it.  So
```

1    one of the questions here is what are the essential

2    functions.  Okay.  So --

3         And I'll just tell you, because some of this,

4    Mr. Hannon or Mr. Watson, I'll be looking to you to respond

5    to, too.

6         The way I -- I want to -- maybe correct me if I

7    don't have it right or you see a different way to look at it,

8    but the way I see this is, it's conceded that in December of

9    2017, Mr. Mekerri -- is that how you say his name?

10        MS. MANDEL:  Mekerri, Your Honor.

11        THE COURT:  Mekerri.  Mr. Mekerri has a

12   conversation with her and says, "You're going to have to do

13   more public-facing things.  Business isn't as good as it was,

14   and everybody's going to do more public-facing things."  And

15   then in February, he sends an e-mail that -- much more

16   specific about what kinds of things.

17        And of course, in between those two things, after

18   the first conversation and before the e-mail, she discloses

19   the disability that she has and indicates that it impacts her

20   ability to do these public-facing kind of client larger

21   gatherings, and so forth.

22        So what I'm wondering is, on the one hand for you,

23   Ms. Mandel, given that -- that she hadn't done these things

24   before -- not zero, but she hadn't been doing that much of

25   them before, at least viewing the record favorably to her, as

1    I must, why doesn't that create -- what I'm wondering is why

2    doesn't, on the one hand, that create a disputed issue as to,

3    (a), whether all of those things are really essential?  Or

4    even if they are essential, whether they're essential to the

5    extent described?

6            And given, (a), that she hadn't been doing them,

7    that it's not -- it doesn't mean that you don't win that at

8    trial, but it's not crystal clear -- is it -- I'm wondering

9    if it isn't insufficiently clear on a summary judgment record

10   that to the extent -- it's not as if there's like this CEO

11   sends an e-mail to every senior executive that says

12   everyone's increasing, everyone has to do the following 22

13   things, and it applies to her, too.  And then you might still

14   have a reasonable conversation discussion, or is it essential

15   to her.  So that's one thing I'm wondering.  Why isn't that

16   essentially a fact question?

17           And -- and the other part is, what's the

18   significance -- it also seems, in the record, that then she

19   responded by saying, on the one hand -- I mean, there's a

20   resolution as to a couple things, a reasonable accommodation

21   requested and agreed to as to some of the items.  And as to

22   the other items, the companies says, "Well, those aren't," --

23   like, "Can't do that."  And at least facially the company is

24   saying, "We want to be in dialogue."  And she's saying,

25   facially, "I can do everything that's required of my job, no

1    problem, without any accommodation.  Why don't we wait and

2    see."  And then there isn't -- before she goes out on leave,

3    unless I'm missing it, there isn't an instance where she

4    someone says, "Hey, go do this client meeting," and she says,

5    "I can't do it without" -- "I can't do it at all," or, "I

6    can't do it without an accommodation."

7            So I'm wondering about the significance of that, if

8    I'm right about that factually.

9            MS. MANDEL:  Excuse me just one minute.  I'm just

10   making sure --

11           THE COURT:  Sure.  Take your time.

12           MS. MANDEL:  Thank you, Your Honor, for raising

13   those questions.

14           THE COURT:  Sure.

15           MS. MANDEL:  So Your Honor, the essential functions

16   of the job come up, both in the context of the summary

17   judgment papers, as well as brother counsels' motion to

18   strike.  Right?  This question of what were the essential

19   functions of the job and where there may be a factual issue

20   there.  We think the record is absolutely full of numerous

21   pieces of evidence that demonstrate that there are very, very

22   basic essential functions of the job that are established in,

23   you know, human resources recounting of the job description.

24   Right.

25           And as I'm sure Your Honor is familiar with --

1            THE COURT:  So what I'm struggling with is not
2      whether -- the idea that someone at her level would never
3      communicate with more than one human being at a time and
4      never communicate with a client, except by e-mail, seems
5      rather not that reasonable.  And that doesn't seem to be the
6      record.  But that's not really the question.  Right?
7            The question, I think -- or what I'm struggling
8      with is that it -- it seems like she wasn't doing a lot of
9      client-facing -- I mean, she wasn't going to a lot of client
10     site visits, a lot of sales pitches.  You could see why
11     someone in a company would want someone in her role to do
12     that.  They might not, but if someone told me they did, that
13     would just seem like in the ordinary course.  And some it
14     wouldn't surprise me at all.  But they clearly are asking her
15     to do more.  Right?  That seems plain.
16            And so the -- what I'm wondering is whether that
17     more -- like let's say that the e-mail were simplified and
18     said, "We want you to do a client meeting with -- with the
19     sales teams going out to do all of these client pitches.  We
20     want you to do one of those pitches every month.  Okay?  And
21     each time there's a pitch, there's five sales -- people from
22     the sales team, there's you, and there's going to be
23     typically ten to 15 people from the client.  And it's a --
24     you know, a two-hour presentation, and you're going to have a
25     15-minute role, but you're also there the whole --

1    presentation there, you're there the whole time also to do Q

2    and A."  That would be very discreet and fixed, and we could

3    have an argument whether that's essential or not and whether

4    there's a reasonable accommodation or not.

5           So that's what I'm wondering.  It seems like an

6    increase, so how do I decide on summary judgment that all

7    these things, as described in the February 6th e-mail, are

8    essential?  Or how do I decide what she can and can't do?

9           MS. MANDEL:  Well, Your Honor, there's ample

10   evidence that in 2017, before Mr. Mekerri was aware in any

11   way that Dr. Menninger had an alleged disability, that he

12   said quite clearly that she needed to be involved in more

13   client-facing interactions and that that was a goal we know,

14   the record is as clear, that 2017 --

15          From 2016 into 2017, the company discovers some

16   challenges --

17          THE COURT:  But what is one thing -- okay.  I agree

18   with you, the record is clear that the company wasn't fully

19   happy with her in 2017.  And the record is clear that in

20   2017, he told her, "You have to do more client-facing

21   things."  But which of those additional client-facing things

22   is essential, and which couldn't she do without an

23   accommodation?  And which -- like that's the question that

24   I'm wondering.  How do I know?

25          MS. MANDEL:  Well, Your Honor, if I may jump ahead

1   a minute, because I think it will help.

2            THE COURT:  Go ahead.  Wherever you want.

3            MS. MANDEL:  I you want to jump to Dr. Kessimian's

4   recommended accommodations, which were actually the only

5   requested accommodations that the company received, even

6   though the company sought additional clear, perhaps more

7   practical, accommodations.  The only ones that they ever

8   received were from Dr. Kessimian.  And Dr. Kessimian

9   specifically said that -- I'm just looking for the language,

10  Your Honor -- for client visits, issue resolution calls, and

11  meeting at the Highland Heights lab, that plaintiff will be

12  available via e-mail, text, remote video conferencing for a

13  representative of the client, one to two audience maximum.

14  If it is a site meeting, surrogate or reader, with all

15  necessary information, will be available.

16            So in other words, the documentation from

17  Dr. Menninger's physician and the requested accommodations

18  essentially removed Dr. Menninger from, really, any client

19  meetings.

20            THE COURT:  So your position is, from that, then

21  that's saying, "I'm not going to do in-person, any client

22  meetings."

23            MS. MANDEL:  It's very clear that that's what

24  Dr. Kessimian --

25            THE COURT:  But what I do with her e-mail later --

1    "her," being the plaintiff's e-mail later, that says, "Look,

2    I can do everything that's essential and required of me,

3    without an accommodation"?  And -- and then it's not as if

4    someone said to her, "Go to this client meeting," and she

5    said no.

6             MS. MANDEL:  Well, Your Honor, Dr. Menninger really

7    took the position -- there's great evidence on the record

8    that she took the position that she really didn't need to

9    engage in these client meetings, even though predisclosure of

10   disability, it's clear the company said you do need to be

11   more involved.

12            THE COURT:  Correct.

13            MS. MANDEL:  In fact, the only documentation

14   received from a medical standpoint said she can't do any of

15   that.

16            So I actually think that this Court need only find

17   that there was a piece -- a piece of the required elements of

18   the job that required those in-person, interactive

19   communications with clients.  It doesn't have to necessarily

20   be a finding that it is, you know, 25 percent of the job.

21   Right?  Something that you might say is a factual

22   determination --

23            THE COURT:  You mean, even if I decided that an

24   essential part of her job was once a year to go to one client

25   meeting, that if I decided that was an essential feature of

1    her job, then you would say -- first you would say I should
2    find at least that much is an essential feature because of
3    what Mekerri said to her in December, and that then I should
4    decide that she can't do that based on the doctor's letter.
5    And then that's it.
6              MS. MANDEL:  Well, Your Honor, I think that -- I
7    mean, I guess the simple answer is sort of, but I think it's
8    probably a little bit more nuanced than that.  Right?
9              So standing here today as a lawyer, as a litigator,
10   right, this is part of my job to be here.  Right?  And there
11   are sometimes when I may have to do more of this and
12   sometimes when I have to do less of this.  But if I could
13   never do this, that might truly interfere with me being able
14   to work as a litigator.  Right.
15             So it's a similar finding here that I think is
16   quite clear for the record.  It wasn't necessarily every day,
17   every hour that Dr. Menninger was being asked to have this
18   type of interaction, but it was truly a part of her job.
19   That's well documented, as I mentioned, before there was ever
20   a disclosure of disability.  And I don't think it requires a
21   factual interpretation of exactly how often or with exactly
22   how many people to find that the company reasonably required
23   that Dr. Menninger be able to have these interactions.
24             I mean, Dr. Menninger, it's clear from the record,
25   again, was a senior, highly paid physician, running a set of

1    labs.  So to have this expectation that Dr. Menninger would

2    be able to interact with clients, it's clearly -- it's quite

3    clear on the record that that was a requirement.

4            THE COURT:  So how do I deal with the fact that she

5    says, "Can't do that" -- I'm sorry, "I can do that"?

6            MS. MANDEL:  And the record, again, in this regard,

7    the Court could look at it and say, "Well, it looks

8    complicated."  Right?  These cases often, plaintiffs say,

9    "Oh, look at how complicated" --

10           THE COURT:  Sadly, that's how every case looks to

11   me.

12           MS. MANDEL:  But it's actually fairly

13   straightforward.  Dr. Menninger presents documentation.  She

14   says, "I have this disability," presents, documentation

15   saying quite clearly, cannot do the following things.  Right?

16   For lack of a better way to describe it, a Cyrano de Bergerac

17   type of assistance to do the required meetings; you know,

18   seeking a surrogate, a reader, right, those are the words

19   that are used.

20           And then the company goes back and says, "We

21   actually will allow you to do that for internal meetings.  We

22   will reduce your -- we will work something.  You cannot" --

23   right, which was a patently reasonable position for the

24   company to say, "We cannot prevent you from every having to

25   interact with clients in meetings."

1               And at that point, Dr. Menninger, it takes a couple

2     of communications, although it's not actually over a very

3     long period of time, that Dr. Menninger says, you know, "You

4     need to be clear about what I have to do in my job."

5               The company is clear.

6               She says, again, "These are my requested

7     accommodations," and then Dr. Menninger removes herself from

8     the process.  Dr. Menninger says, "No, wait a second, I can

9     do this job.  Let's wait until something comes up that sort

10    of pushes me on this."

11              Well, in the meantime, Dr. Menninger's physician

12    has said Dr. Menninger cannot do these things and requires

13    these accommodations, puts the company into essentially an

14    impossible position.  Right.  Do they have to wait until it

15    is moments before a client meeting to see if Dr. Menninger is

16    or is not able to do these things?  Even though medical

17    documentation, signed by her physician, says she can't do

18    these things.

19              So Dr. Menninger sort of wanted to be able to push

20    the issue forward, kick the can down the road, and say,

21    "Let's wait and see what I'm able to do," when the only

22    information available to the company was that she couldn't do

23    these required things.

24              And then, in fact, Dr. Menninger removed --

25              THE COURT:  Well, she says she can do those things

1    in that e-mail where she says kick the can down the road.

2          MS. MANDEL:  Except she doesn't present any updated

3    medical documentation to say that she can.  And then she

4    removed herself altogether.  Right.  She says, "Actually, I

5    can't be part of this process," and she removed herself.  And

6    the additional documentation --

7          THE COURT:  Can't be part of which process?  The

8    back and forth?

9          MS. MANDEL:  The back and forth or work at all.

10   Right.  She goes out voluntarily on leave.

11         THE COURT:  But that's a couple months later.

12         MS. MANDEL:  It is, but she's -- she sort of

13   refuses to continue to engage with the company, doesn't

14   really give it a chance to play out.  And in fact, it's quite

15   clear from all of the evidence, there's really no factual

16   question that as of at least June 2018, perhaps earlier, she

17   was completely unable to work in the job at all.  So really,

18   from a legal standpoint, sort of ties the company's hands.

19         If they had said --

20         THE COURT:  You mean she wasn't working in April

21   and May?

22         MS. MANDEL:  She was -- she was working -- well,

23   there was a leave.  She did take a leave.  She went out on

24   complete leave without coming back at all.

25         THE COURT:  In June.

```
 1              MS. MANDEL:  Right.  And in fact, her own
 2    physician -- there's multiple pieces of physician evidence
 3    that show that she was not able to work at all as of
 4    June 2018.
 5              I think we can -- we can still be exactly here, in
 6    different -- perhaps different factual allegations, if the
 7    company had said, "Okay.  You're saying you can still do
 8    these things.  Your doctor says you can't.  Fine.  We're
 9    making you stay in the job.  We're making you still have
10    these requirements placed on you," and sort of wait until
11    Dr. Menninger would essentially break under that pressure,
12    because the company allegedly made her --
13              THE COURT:  Well, I'm just wondering, does it put
14    the onus on the company to say, "Okay.  Fine.  Your doctor
15    says you need a reasonable accomodation.  You need these
16    accommodations," as to the three that they didn't agree to.
17    "You need these accommodations.  We're not prepared -- we
18    don't think those accommodations are reasonable.  You can
19    tell us a different accommodation, if you think there's
20    something else we can do to meet our needs and enable you to
21    do it.
22              "You said -- you said to us, 'Well, I can do
23    everything, and let's just table this.'  But we're not
24    prepared to table it, because we don't want" -- as you point
25    out, we don't want to find out that there's a hearing for
```

1    summary judgment at 10 o'clock, and at 9:55, we don't want

2    you to tell us, "Oh, I need a surrogate," because at that

3    point, we're not able to be prepared and ready.  And right,

4    that's your job, an essential part of your job.  And so we

5    want to be prepared in advance.

6              And we see, coming up, some so-called summary

7    judgment hearing or the sales meeting, or whatever, in a

8    month.  So are you telling us you're withdrawing?  The

9    doctor's advice is no longer accurate?  Are you telling us

10   that you can do that and sort of, like -- that's what I'm

11   wondering.  Did they need to press that point?

12             MS. MANDEL:  Well, in fact, they did really press

13   that point, right?  Throughout those e-mails in March and

14   April, the company is saying, "Give us" -- you know, "Give us

15   more.  If there's some other accommodation that you think

16   that we can provide, your doctor thinks that we can provide,

17   tell us."  That's where the company absolutely is pushing

18   back and saying, "You know, please tell us more.  Tell us

19   what other accommodations we could provide."

20             And that's when -- Dr. Menninger never does that.

21   She never comes back and says, "Here's additional information

22   from Dr. Kessimian," or, "Here is a different list of

23   potential accommodations.  Let's have a discussion about,

24   perhaps, I could do the client visits that are coming up in

25   the next couple of months.  But longer term, my doctor thinks

1    that's detrimental to my health, so we have to have a

2    different plan going forward."

3            That conversation, she never picks up on it.  She

4    simply says, "Let's kick the can down the road.  I think I

5    can do the job," in an apparent fight to save her employment,

6    her position with the company, and it puts the company, as I

7    said, into, essentially, an impossible position.  Because I

8    think we would still be here on factual allegations if the

9    company had said, "Fine.  Continue to put your nose to the

10   grindstone.  Let's plow forward."  Right?  She would have

11   said, "You're putting me in a position where you're not

12   accommodating me and making me jeopardize my health, because

13   you're continuing" --

14           THE COURT:  Well, but wouldn't the -- why wouldn't

15   they say, "Okay.  The doctor says you need these

16   accommodations to do the -- go to the site visit," right?

17   Because that's one of the things at the client that they

18   didn't agree to an accommodation to, right?

19           MS. MANDEL:  (Nods head.)

20           THE COURT:  You just have to say "yes" or "no" for

21   her.  I know what you mean.

22           MS. MANDEL:  I'm sorry.  Yes.

23           THE COURT:  And then she has said, "Well, I can do

24   it."

25           Well, does that put the onus on them to say, "Okay.

1   There's a client sales meeting coming up in May, and it's the

2   kind of -- it's not made up.  It's one we think that -- one

3   we think we want you to come to.  It's part of your job.

4   This is one you should come to."  It's a summary judgment in

5   your case, to borrow your example, as opposed to a summary

6   judgment in somebody else's case.  Right?

7            And so, you know, "You tell us" -- "that

8   accommodation you propose, that your doctor proposes, no

9   good.  You tell us you can do it?  Okay.  Are you going to be

10  able to do that, because that's one we're going to want you

11  to come to.  And if there's another accommodation that you

12  can think of, we're happy to engage in that process."

13           And then now I hear what you're saying; the company

14  doesn't have to wait for her to, like, fail -- quote/unquote

15  fail and lose the client in order to resolve the issue.  But

16  I'm just wondering if they had to -- like one more round like

17  that, so to speak.

18           MS. MANDEL:  And I think that's a very reasonable

19  question, Your Honor.  On March 24, 2018, what Dr. Menninger

20  said was, "Let's stable this discussion until a particular

21  task arises."  So she's asking the company to sort of, as

22  Your Honor says, just wait, right, until something comes up.

23           So to put that in greater context, though, which

24  is, again, really clearly shown in the factual record and

25  does not require any additional factual showing before the

1    finder of fact, previous to this time, the company had been

2    allowing Dr. Menninger to severely limit her travel, to step

3    back from some of these tasks -- some that had already been

4    happening.  Right?  Dr. Menninger had not been sort of

5    working in every capacity requested of her up until March 24,

6    2018, and then said let's kind of see how things go.  There

7    had already been really a pulling back from some of these

8    requirements.  So the company had already been, you know,

9    accommodating that and letting that be while this

10   conversation was playing out.

11            At this point, what Dr. Menninger says is not, you

12   know, "Never mind.  I retract all of that.  I think I can do

13   all of it."  What she said is, "Well, I think I can still do

14   the job tasks required of me.  Let's see how it plays out in

15   context."

16            Dr. Menninger, as the record also shows, said,

17   "Those were not really requirements of my job."  Right?  So

18   there was a dispute there, where Dr. Menninger was saying, "I

19   shouldn't have to do those things, and you shouldn't be

20   requiring those things of me."  She wasn't saying, "I will be

21   able to show up and do all the things that senior management

22   is asking of me, and I'll be able to get it done, don't

23   worry."  What she's saying is, "You're not being reasonable

24   in asking me to do these things from the get-go."

25            And I think that's an important, sort of, piece of

1    the factual story to keep in mind, that she didn't actually

2    acknowledge that some of these things were required of her

3    position.  She wanted to be able to sit at her home, in

4    Dighton, Massachusetts; be working in a lab in Highland

5    Heights, Kentucky, where she wasn't present; and she wasn't

6    present at client meetings.

7            And of course, this is all before the pandemic, so

8    this was at a time when real in-person interaction was a

9    significant portion of, essentially, every company's business

10   model, including PPDs, and she was saying, "I shouldn't have

11   to do that.  So for now, let's wait.  I can still do my job."

12           I think she saw the writing on the wall that she

13   wasn't going to get everything that she had asked for, so she

14   said, "Well, let me do my job the way I think I should do my

15   job, and when this comes up in context, we'll address it."

16   That is unreasonably asking PPD to essentially accept

17   Dr. Menninger's view of what the job required, which they had

18   been doing for some time, expecting them to continue to do

19   so, and then wait until, as Your Honor says, the morning of

20   the summary judgment hearing to find out whether she can or

21   can't do it.  And that's not a reasonable expectation of a

22   business trying to stay operational and work with clients and

23   customers.

24           THE COURT:  So your bottom line is -- so what

25   you're saying, though, is, essentially, preknowing about the

1    disability, they made clear that client-facing meetings were

2    a significant part of her role, whether you want to call that

3    a shift in priority or a new essential function that

4    wasn't -- because she wasn't doing a lot of that before,

5    right?

6            But one way or another, it was other -- it's for

7    the company to decide what's essential.  They did.  They laid

8    that out.  The big picture, they said that this is happening

9    in December.  They specified it after they learned about her

10   disability, specific things.  But she didn't want to do any

11   of it and wasn't really able to do the external part.  The

12   internal part, they're willing to accommodate, and they

13   could.  And so that's why she can't do an essential function

14   of a job, and without that, there's no discrimination claim.

15           MS. MANDEL:  Correct, Your Honor.  And in fact,

16   Your Honor just touched on an important piece, which is that

17   Dr. Menninger, herself, and her counsel has quickly

18   dispensed, repeatedly, what the company did to accommodate

19   the request regarding internal meetings, which I think is

20   important for the context here, again, to think about what

21   might need to go to a finder of fact.

22           If the company had said -- which I actually think

23   is legally supported -- if the company said, "Actually, we

24   can't really allow this kind of surrogate-type of

25   communication for any of your communications," right, it was

1     one thing if you were, perhaps, not the face of the lab, if
2     you were lower level.
3              This is a very high-level position that allows for
4     the -- it's the licensing of the labs across the world.  So
5     this is a really important role.  We can't sort of remove you
6     from those internal discussions.  But the company said we'll
7     do it.  We'll eliminate that requirement for you, so we can
8     sort of help you here.  And I think that shows the greater
9     context.
10             Again, we may be have a different discussion if the
11    company had just said no to everything.  But it shows that
12    the company was trying to make these adjustments where it
13    could, right, and say we'll help you when it comes to these
14    internal meetings, because basically we can, sort of, cover
15    for the fact that the executive director of labs is not
16    really present for some of these meetings.  But for the
17    external ones, we can't, which is part of doing business.  I
18    mean, that is a reasonable thing for the company to say, and,
19    in fact, the company really did more than was reasonable or
20    required under the law in that regard.
21             I think that it's also, again, looking at that
22    timeline, I understand Dr. Menninger has tried to, sort of,
23    paint that timeline differently now, but the evidence is
24    quite clear that in, really, the sort of end of that
25    discussion between Dr. Menninger and the company about the

1    accommodations, at the beginning of April 2018, when HR

2    reiterated to Dr. Menninger that the company would remain

3    open to discussing accommodations and that she should let

4    them know if she had questions.

5         At that point, Dr. Menninger sort of pivots.

6    That's when she makes her complaint that Mr. Mekerri wasn't

7    treating her fairly.  But that conversation really just, sort

8    of, ends.  Dr. Menninger doesn't come back and say, you know,

9    "Let me ask for something different.  Let's continue this

10   discussion."

11        THE COURT:  So for retaliation, the protected

12   conduct is that complaint that you just referred to?  Or is

13   the protected conduct the claim of disability or both?

14        MS. MANDEL:  I would like to limit it, of course,

15   right, on my side of the case, and say it's really quite

16   limited, right, that in April of 2018, she makes this

17   complaint, understanding the complaint, as it's been alleged,

18   and the record.

19        And I know brother counsel will make the argument

20   that it's broader; that she brought forth a -- showed that

21   she had a disability in January of 2018, and after that, she

22   claims that Mr. Mekerri began to treat her differently.

23        I think that it doesn't matter, sort of, which lens

24   you take.  It's quite clear that she -- first of all, that

25   her complaint, in its entirety, was fully and thoroughly

1    investigated.  It's not, as brother counsel says, a sham

2    investigation.

3            And that, in addition, there was absolutely a

4    reasonable finding that there was no retaliation, no adverse

5    treatment.  In fact, Dr. Menninger had no adverse employment

6    action that really impacted her, until the company,

7    reasonably, after eight months of this extended leave,

8    separated her from employment.  She moved on to -- she was

9    moving on to long-term --

10           THE COURT:  What about the hiring decisions?

11           MS. MANDEL:  Again, the record is clear that

12   Dr. Menninger herself, before disclosing a disability, had

13   said, "This is all too much for me to manage"; and that

14   Mr. Mekerri reasonably said --

15           THE COURT:  But isn't there a disputed issue of

16   fact as to -- I know he says -- both of them agree, she said

17   she was overwhelmed.  But whether she said she was

18   overwhelmed in the vein of -- like somebody says, "Oh, my

19   God, I'm overwhelmed at work today," or, "I'm overwhelmed; I

20   need to shed responsibilities," she suggests that it's the

21   first, rather than the second.

22           But either way, what is the record evidence that he

23   told her that, "I'm removing these responsibilities because

24   you're overwhelmed," as opposed to he understood it that way

25   and just went off and did that?

1          MS. MANDEL:  So Your Honor, I think the record

2     evidence is clear that she said, essentially, "I kind of

3     can't do everything being asked of me," in December of 2017,

4     be so before disclosing the disability.  Very, very

5     credibility evidence that Mr. Mekerri had no idea that

6     Dr. Menninger had a disability before that point and that she

7     said, "I'm overwhelmed I can't do this."  It was a clear

8     requirement that he had for her, and he said, "Okay.  Let's

9     kind of redistribute the work.  I'll help with that hiring

10    piece."  I think that record evidence is clear.

11         But I would also say it really doesn't matter,

12    because, first of all, all of this happened prior to the

13    disclosures of the disability.  And the record evidence is

14    clear, I don't think there's any dispute --

15         THE COURT:  When you say all this happened, the

16    "this" being the decision to take that responsibility away?

17         MS. MANDEL:  Yes.  I'm sorry.  Right, the decision

18    that that would be, sort of, pulled off to Mr. Mekerri,

19    right, that he would just take care of that piece and not

20    include Dr. Menninger.

21         There's also this other piece of the evidence,

22    which I think helps shed light on this, which is that the

23    company had concluded -- Mr. Mekerri had concluded, and

24    others within management, that there were certain aspects of

25    Dr. Menninger's job --

1        The company, as a whole, was kind of taking a

2    closer look in 2017 at to where they felt that there was some

3    failings that led to business losses, and they decided that

4    focusing more on client-facing meetings, focusing more sort

5    of on the functioning of the lab, that was really important

6    for the company and for Dr. Menninger.  And so to, sort of,

7    take some of these ancillary tasks that were more --

8        I believe one of the piece of testimony talks about

9    it being more a HR-type of test, taking it out of her hands

10   and letting someone else handle it, was going to be good

11   overall so that Dr. Menninger could focus on the real needs

12   of her position.

13       But either way, all of that happened prior to the

14   disclosure of the disability.  It all happened in 2017,

15   squarely in 2017, up until December of 2017.  So it really --

16   whether it was, you know, Dr. Menninger said "X," which led

17   Mr. Mekerri to do "Y," it doesn't matter, kind of, which

18   version of the facts prevailed there because that --

19       THE COURT:  It's not a retaliatory decision if it

20   happened beforehand.

21       MS. MANDEL:  Exactly.  And the record evidence was

22   also clear that that was not a fundamental portion of

23   Dr. Menninger's job.

24       I would also point out an additional factor there,

25   which is that given the evidence is quite clear that

1    Dr. Menninger's own treating physician, and, in fact, expert

2    physician, talk about -- have both testified at length about

3    Dr. Menninger's, sort of, difficulty, really inability, to

4    have that type of external communication.  There could be an

5    additional finding that Dr. Menninger really wouldn't have

6    been able to do that, even if she had that task assigned to

7    her in 2018.

8            I mean, there are just a number of reasons that

9    there's no nexus between the decision for Mr. Mekerri to take

10   over that hiring and Dr. Menninger disclosing a disability in

11   January of 2018.

12           THE COURT:  What about the fact that there's a fair

13   bit of evidence in early 2018, after they've learned about

14   the disability, that they're basically looking to get rid of

15   her?

16           MS. MANDEL:  Your Honor, could I just ask for a

17   clarification about what specifically?

18           THE COURT:  Well, there's e-mails and statements

19   about how do we ease her out.  There's a disputed issue of

20   fact as to how much of the conversation that first -- that

21   conversation in February about the accommodations, how much

22   of it to start out with.  Maybe it could be a consultant or

23   an exit package.

24           But I have to take her version of it for summary

25   judgment purposes, so that's a stronger version of it.  You

1    know, walk into the meeting and talk about accommodations and

2    say, "How would you like to segue to a different,

3    outside-the-company role?"

4         So it seems that people were unhappy with her and

5    that they were -- so I guess my question is, what -- how does

6    that fit into the retaliation analysis?

7         MS. MANDEL:  Well, Your Honor, first of all, the

8    evidence is clear that the company never took any steps to

9    move Dr. Menninger out of her position.  In fact, even once

10   Dr. Menninger herself said, "I'm, kind of, removing myself.

11   I'm going on out on a leave," the company did everything in

12   its power to keep her employed in that position for months,

13   paying her.  She was receiving full pay for months.

14        And so even if Dr. Menninger now says, "Oh, the

15   company was trying to push me out in that February time

16   period," even if we jump to June, she was still employed;

17   even if we jump six months later, she was still employed.  So

18   if the company was truly looking for a way to push her out,

19   it seems quite clear that they would have done something

20   earlier to try to ease her out.

21        In addition to that, even taking Dr. Menninger's

22   version of what happened in that February meeting, again to

23   put it back into that context of, you know, the lawyer who

24   can't make a summary judgment argument in person, it would

25   be -- I think the record is quite clear, it would be like

1    walking in and saying, you know, "I understand you can no

2    longer speak in court.  Let's explore some other things that

3    you might do.  Like, how can we help you in this situation?

4    Do you want to stop being a lawyer?  Do you want to be a

5    different type of lawyer?"  It wasn't saying, "You are unfit

6    to do this job.  We need to move you out.  Here's a severance

7    package."  It's, "Let's have a more global discussion about

8    what the options might look like."

9            Could it be done more artfully to prepare us for

10   litigation?  I suppose.  But that's not real life.

11           THE COURT:  Well, that's every case.

12           MS. MANDEL:  Exactly.  Exactly.  And there's no

13   indication that the company was taking any steps to move

14   Dr. Menninger out, that they took steps to demote

15   Dr. Menninger.  Often, Your Honor, of course, we're here with

16   facts where there's some time of demotion or attempted

17   demotion.  There's nothing like that at all.

18           Dr. Menninger stays in that position, even when the

19   company essentially had to scramble to cover her job over a

20   lengthy period of time when she was gone all together.  The

21   company did that.  So it sort of belies this allegation that

22   the company was trying to move her out even after the

23   February of 2018.  It just doesn't match up with what

24   actually happened.

25           THE COURT:  Okay.  Let me see what the plaintiffs

1    have to say.

2              MS. MANDEL:  Thank you, Your Honor.

3              MR. HANNON:  Thank you, Your Honor.

4              Any place in particular you care for me to start?

5              THE COURT:  No.  Same -- I have sort of the same

6    basic questions.

7              MR. HANNON:  Sure.

8              THE COURT:  First, with respect to essential -- I

9    mean, what about essential?  Why isn't Ms. Mandel right, that

10   2017, he said to her that more public facing, the client

11   meetings.  Okay, fine.  The internal stuff is accommodated or

12   they're willing to accommodate.  But they said they can't

13   accommodate it on the client facing, and she's essentially

14   saying, "Can't do that."  And why doesn't that matter to

15   discrimination, not retaliation?

16             MR. HANNON:  Sure.  Specifics matter, particularly

17   in the area that we're talking about accommodating

18   disabilities.  And to simply say that we want more certainly

19   begs the question of what more do you want.  And to the point

20   of essential accommodations, what more do you need?  And they

21   never answered that question of what the more was.

22             There's been a lot of talk about Ms. --

23   Dr. Menninger's e-mail on March 14th, where she suggests

24   maybe they sort of step back from the discussion.  But a lot

25   happened before then.  Dr. Menninger asked, over and over and

1    over again, for PPD to provide additional detail concerning

2    the items listed in buckets two through four.  She did that

3    in that February meeting that was referred to earlier, where

4    they only wanted to talk about a separation package.

5            She followed that meeting up with --

6            THE COURT:  I don't know if the record suggests

7    that they only want to talk about --

8            MR. HANNON:  Correct, Your Honor.  I was

9    paraphrasing.

10           THE COURT:  Right.  Yeah.

11           MR. HANNON:  But they certainly made clear that

12   they did not want to talk about what she could or could not

13   do in those buckets two through four.  In fact, there's an

14   internal e-mail that's in the record here, where it's sort of

15   made clear they don't want to engage in that discussion

16   because they don't want to have a tit for tat about you can

17   do this, but you can't do that.  They simply didn't want to

18   get down to that level of, sort of, granular detail, which is

19   what the law requires them to do.

20           Immediately after that meeting ends, she writes

21   them an e-mail.  She tells them, "I like my job.  I want to

22   keep my job.  I think we can work this out.  I just need to

23   know more about buckets two through four."

24           They respond to that e-mail by cancelling the

25   follow-up meeting that had been scheduled to talk about the

1    accommodation requests.

2              Days, perhaps a week, week and a half pass.  They

3    come back with an e-mail.  Did they provide any additional

4    detail about buckets two through four?  No.  It's like an

5    auto bot response, "Thank you for this continued dialogue.

6    We appreciate working with you.  Here are the references in

7    your -- in your job description of what you're required to

8    do.  If there's anything that you think we can do to help,

9    please let us know."

10             She responds to that, and she says, again, "Thank

11   you for telling me about the job description.  My question

12   pertains to buckets two through four.  If we can just talk

13   about some additional detail about what's involved in there,

14   we can try to work something out."

15             Again, they don't respond.  She gets back the same,

16   essential, auto bot response of, "We enjoy this continued

17   dialogue.  We're going to work with you.  As you know, your

18   job description requires X, Y, and Z."

19             To your question about what are the specifics in

20   bucket two through four, PPD's counsel didn't answer that

21   question then.  They didn't answer that question ever during

22   this ongoing dialogue -- this alleged dialogue they were

23   having with Dr. Menninger.  She asked the question over and

24   over again.

25             THE COURT:  But isn't it sort of like Ms. Mandel's

1   analogy in the sense that, okay, they decided -- and you

2   didn't dispute this fact; I assume, because it's not

3   disputable -- that they told her in 2017, "You have to do

4   more public-facing activities."  Now they've specified it a

5   little bit in 2018, and she's -- her doctor is saying she

6   can't do public-facing things.  We have to have a surrogate.

7          It's not unreasonable, especially in the preCOVID

8   world that they were operating in, to think that if we're

9   flying one or several people out from this big company to a

10  client for a face-to-face meeting, that we can't have a

11  surrogate.  You know, without further evidence, that's

12  like -- it seems like a reasonable position.

13         So the more details, like I could see her saying --

14  her responding, "If, like, okay, I can't do that, I can do --

15  I can do other things for the company that isn't that, and

16  here's a way to shift my role to some degree."

17         There are -- to take Ms. Mandel's analogy, there

18  are lawyers who perform supreme services at law firms, and

19  they never walk into a courtroom and they work on cases that

20  go to court.  They're the -- you know, for lack of a better

21  term, they're the people who write the briefs.  Sometimes

22  they're the brains of the operation, as opposed to the -- no

23  disrupt to the two of you -- the talking head.  But right,

24  there are firms that work that way or lawyers that work that

25  way and have relationships that way.

1          And so -- but that's not a pressing for more

2     granular detail of how many more oral arguments; it's other

3     things that I can do.  Right?

4          I'm just wondering how you get around her point of

5     the public facing.

6          MR. HANNON:  Sure.  So just to correct a couple

7     things from the record, first, there's certainly evidence

8     that there was a proposal in 2017 that she might include

9     increased marketing activities as a goal.  I don't think it's

10    fair to characterize that as that being some kind of a --

11    some kind of a demand or something that they --

12         THE COURT:  Well, all executives -- paragraph 19,

13    "All executives are being asked to become more proactive,"

14    comma, "especially with respect to outward-facing meetings

15    and presentations."

16         You've disputed -- I'm not -- it doesn't really

17    matter.  You had a dispute about how unsuccessful,

18    relatively, 2017 was.  I confess, between the two of you, I

19    was struggling a little bit to understand the difference, but

20    it doesn't matter because you then said otherwise your

21    dispute is only with respect to the first sentence, where it

22    says that 2017 was relatively unsuccessful.  What I just

23    quoted was the last -- third sentence of paragraph 19.  You

24    said otherwise undisputed.

25         So she is being asked to be more proactive and

1    doing more outward-facing meetings.

2              MR. HANNON:  That that was suggested as the goal.

3    Correct.  So then you actually look at the goals that were

4    actually agreed upon for that year, and it's not reflected

5    there as actually being something that they decided to make a

6    goal for her.

7              THE COURT:  Well, but that's in December of 2017,

8    before 2018.

9              MR. HANNON:  Correct.  And there's talk about,

10   again, renewed idea of maybe this is somewhere where you can

11   potentially contribute more.  And there's no doubt that they

12   would have liked her to contribute more to marketing

13   activities; the somewhat ironic part of that is because they

14   thought she was good at it.  When she was in front of people,

15   it came across how incredibly smart and --

16             THE COURT:  Well, some of them sort of -- most

17   senior executives, it's always the -- the business is to get

18   business.

19             MR. HANNON:  Not always, Your Honor.  This was a

20   very, very technical role.

21             THE COURT:  Sure.  Technical role, but I can see

22   why -- I don't know, Pfizer, or some big pharmaceutical

23   company, hires them to do lab work, but whoever, they must

24   have big customers, right?  They're a big company.  I can see

25   how those -- like somebody in the company says, "I want

1    to meet with the -- "who's doing the lab work that we're

2    paying you this millions or hundreds of millions or tens of

3    millions of dollars?  And I want to take a tour of the lab,

4    and I want to meet with -- I want to have your lab director,

5    who has all of your certifications, meet with our people to

6    talk about it."

7          And that's not the person who is sort of the

8    salesman in the used car sales sense, right?  But, like, I

9    could see how that's part of the marketing process, right?

10          MR. HANNON:  Sure.  And certainly if that's

11    something that they came to her and said, "This is that we

12    want you to do," that would be more specificity, right, in

13    terms of what those buckets two through four are.  Or

14    examples of, "Hey, we have clients who are coming in, saying

15    they want to meet with you."  There is no evidence of that.

16          There was a general urge of, "Hey, we have this

17    really, smart, awesome person who's in charge of our lab.

18    Let's try to get her out in front of clients more."  And I

19    think you're right, that makes a lot of business sense.

20          But getting down to the more specific --

21          THE COURT:  But it seems like it wasn't -- well,

22    actually, I don't have any reason to dispute what you say,

23    that she was a really smart, talented person, who was good

24    with clients.  But it seems that the focus was that 2017

25    wasn't a banner year, and they wanted to make more money.

1   And so the decision was made to get more executives, senior
2   people more involved in marketing and sales and that that was
3   going to mean more -- some more client-facing meetings.
4           MR. HANNON:  Sure.
5           THE COURT:  And that's what -- and then she
6   doesn't -- and then her doctor says, "She can't do that.  Get
7   a surrogate."
8           MR. HANNON:  No, Your Honor.  No one ever said she
9   couldn't do these things.  Simply suggesting accommodations
10   is not an assertion that someone is incapable of performing
11   those tasks.
12           THE COURT:  Well, it seems -- if the task -- if the
13   task is to meet with the clients, and the suggestion is that
14   that creates increased heart rate to the point of paralysis
15   of the vocal cords -- I think that was the language of the
16   doctor -- and the way to resolve that is to have someone else
17   go speak for her, that might be a reasonable accommodation or
18   it might not be.  It's an accommodation for sure.
19           MR. HANNON:  But it's not a statement that she's
20   incapable of performing the task.  And there's sort of been
21   a --
22           THE COURT:  So the -- so what you're saying is she
23   could do the task; that is, the task is to go meet with 50
24   people at Pfizer or where -- I don't know if Pfizer is a
25   potential customer, but whomever, 50 people.  The statement

1    of the doctor that her anxiety that comes from social

2    situations leading to -- I think paralysis was her word -- is

3    not a statement that Ms. -- Dr. Menninger can't do that task,

4    it's a statement that it would be a reasonable accommodation

5    to allow her to have a surrogate.

6              MR. HANNON:  It was a proposed accommodation.

7              And just to step back in terms of the back and

8    forth of all of this --

9              THE COURT:  Sure.  Okay.

10             MR. HANNON:  -- because I think the context

11   matters, not just focusing on.

12             THE COURT:  But then how do I -- if I'm the company

13   or I'm me, -- thinking more about me -- I'm trying to resolve

14   what -- okay.  So that was an accommodation proposed.  Right?

15             MR. HANNON:  If I can just step back one bit,

16   Your Honor?

17             THE COURT:  Yeah.

18             MR. HANNON:  So Dr. Menninger makes the initial

19   disclosure to her boss.  PPD, the employer, comes back, and

20   they ask her to provide, essentially, information from her

21   doctor.  They give her a form.

22             THE COURT:  Okay.

23             MR. HANNON:  She goes and she gets the form.  She

24   provides that to PPD.  That is in the record as Exhibit 20.

25   And you'll see there that it identifies, you know, doing the

1    best to sort of minimize public speaking, and things of that

2    sort, and references that if those things can't be avoided,

3    trying to come up with some kind of a plan to minimize her

4    symptoms.  So that's the -- that's where the second volley

5    from Dr. Menninger is.  Her first e-mail was herself to

6    Mr. Mekerri, and then there's this response to her initial

7    request.  She sends that in.

8         The response from PPD is, "Well, tell us what

9    accommodations you're proposing."

10        THE COURT:  That came in on January 31st, the

11   doctor's letter.

12        MR. HANNON:  Correct.  And that's when you get

13   this, sort of, list from the doctor of, "Okay.  Here are my

14   ideas of things that you can do."

15        THE COURT:  Yeah.

16        MR. HANNON:  To characterize that as a statement of

17   she cannot do all of these things --

18        THE COURT:  So you're saying those are statements

19   of things that would be solutions to the -- to the issues

20   presented, but not necessarily the only solutions, because

21   she's willing to engage in this reasonable accommodation

22   process; and might doesn't necessarily mean that she can't do

23   those things, it just would be better if done that way.

24        MR. HANNON:  Correct.

25        THE COURT:  All right.  So then he responds with

1    the, sort of, itemized, public-facing things, somewhat more

2    detail, even if it's not as much detail as you want.  Right?

3              MR. HANNON:  Actually, the --

4              THE COURT:  Or did that come the other way?

5              MR. HANNON:  It came the other way.  So Dr. K's

6    list of proposed accommodations, that was in a response to

7    Mr. Mekerri's.

8              THE COURT:  Okay.  And they say, "Well, several we

9    can accept, and some we can't."

10             MR. HANNON:  They say yes on one and five, and they

11   say no to the rest.

12             THE COURT:  Right.

13             MR. HANNON:  And she asks, "Can we talk about two

14   through four?"  And they say, "Thank you for your inquiry.

15   We appreciate this dialogue, and here is your job

16   description."

17             THE COURT:  Right.

18             MR. HANNON:  Over and over again, which

19   simultaneously with she's seeing various signs that they're

20   trying to push her out.  She sees that she's not being kept

21   in the loop with respect to hiring decisions.

22             And by the way, there's a lot of talk about when

23   did they cut her out.  There's a lot of evidence in the

24   record that shows that part of the reasons why they're, like,

25   doing this particular hiring decision without her is they're

1    sort of planning for life without her.  Right?  They, very

2    early on in this process, recognize we're either going to

3    accommodate her disabilities, or we're going to a move her

4    out of her job.

5           And once they decide that we don't want to

6    accommodate buckets two through four, they shut down any

7    further discussion regarding two through four, and they

8    simply reach the assumption:  She can't do this job --

9           THE COURT:  Of course they can do that if there's

10   no reasonable accommodation.

11          MR. HANNON:  They have to have a dialogue first.

12          THE COURT:  Well, but if they -- right.  So there's

13   a fact question, I suppose, or a question about how much,

14   under the law and the facts, how much dialogue is required.

15          If they -- they could be wrong.  But if they're

16   right, that those two through four are things that are

17   needed, that are essential, if they're right, and if they're

18   right that the accommodations proposed by Dr. K are not

19   reasonable, then the question is how much -- I'm not saying

20   that -- if you're right, that they terminate a dialogue, that

21   they terminated at the right time.  But at some point,

22   they're entitled to stop dialogue.  They're don't have to

23   talk forever.

24          MR. HANNON:  Well, it depends upon what the

25   dialogue is.

1          THE COURT:  Of course, if it's reasonable dialogue.

2          MR. HANNON:  Right.

3          THE COURT:  For example, it certainly -- they could

4     have responded, "No to that.  Tell us what -- if you have

5     another proposal.  We don't see another way to accommodate

6     this.  Because, in the present role, we think it's important,

7     these things are really important to us, and we don't see how

8     a surrogate," or in a preCOVID world as part of this, it's

9     not surprising that they wouldn't imagine a video appearance.

10    And so -- and if she -- and put the ball back in her court

11    and say, "Well, this is what we thought about.  We don't see

12    another pathway.  Do you see one?  And we're happy to hear

13    you.  And then tell us what you think."  Right?

14          They could have some back and forth like that, and

15    if it's in good faith, at some point they could say, "Well,

16    those things, you're either not proposing anything, or what

17    you're proposing is no good."

18          And if they're right, it's different than if

19    they're wrong.

20          MR. HANNON:  Sure.  Just to clarify one little

21    thing.  Simply saying, "No.  Propose something else," that,

22    as a matter of law, is not sufficient dialogue.  At the very

23    least, they were required, as a matter of law, to answer her

24    question.

25          THE COURT:  Which question?

1          MR. HANNON:  "Can you give me more specifics

2     regarding what your -- what buckets two through four mean,"

3     the ones she asked over and over again.  Or if not answer

4     that question --

5          THE COURT:  Well, they only have to answer that

6     question if it's not clear, right?

7          MR. HANNON:  If it wasn't clear, why is she asking

8     the question?

9          THE COURT:  Well, people ask a lot of questions.

10    Sometimes they -- my experience, no disrespect intended, but

11    the fact that someone asked a question, doesn't mean that the

12    thing that they're asking about wasn't clear.  I'm not saying

13    that it wasn't clear here.

14         MR. HANNON:  Sure.

15         THE COURT:  But I don't think the fact that someone

16    asked a question -- it's a piece of evidence from which one

17    could see that it's not clear.

18         But I read contacts sometimes, and I think they're

19    plain and unambiguous, and it turns out that there's three

20    circuit judges that agree with me, but somebody said they

21    weren't.  Well, the fact that they said it wasn't, doesn't

22    make it so.

23         So what I mean by that is the fact that she asked

24    the question, the piece of evidence from which it raises a

25    question about whether it's unclear or not -- but I don't

1    know that that's dispositive, even on summary judgment,

2    necessarily, as to whether or not it is unclear.  And I

3    guess --

4            MR. HANNON:  Well, but that also --

5            I'm sorry, I didn't mean to cut you off,

6    Your Honor.

7            THE COURT:  No, go ahead.

8            MR. HANNON:  It also goes back to your question of

9    what are the essential functions here, right, and this all

10   kind of goes in a circular loop.

11           THE COURT:  Sure.

12           MR. HANNON:  That's ultimately what this dialogue

13   was about -- was supposed to be about.  It's:  Tell me the

14   things that you really need me to do.  And tell me why it is

15   that what I've proposed doesn't work.

16           So when you give the example of we can't find out

17   five minutes before a summary judgment hearing that you can't

18   argue the case, well, you get notices for summary judgment

19   hearings weeks before the argument happens.

20           And this wasn't just about her not doing it.  I

21   think this is really important.  She could take medication.

22   Right?  There were ways for her to otherwise alleviate her

23   symptoms.  Medication wasn't a great thing for her because

24   there was downtime afterwards.  It took away from her time

25   doing other responsibilities.

```
 1              She could also just plow through it.  Having to go
 2    and do these things took tremendous physical stress on her,
 3    but she could do it.  And this idea that someone who has a
 4    disability, who is entitled to an accommodation, that doesn't
 5    make you incapable of doing your job.  Even people --
 6              THE COURT:  Agree.
 7              MR. HANNON:  -- can perform their jobs without
 8    accommodations --
 9              THE COURT:  And the question is what is the job.
10              MR. HANNON:  What are the essential functions?
11    What is the real nitty-gritty?  And part of the reason that
12    they can't meet that burden here is because that dialogue
13    nerve happened, and those new responsibilities never actually
14    came into place.
15              You heard that they pulled back from those
16    requirements as part of this dialogue.  There's no evidence
17    of that whatsoever, Your Honor.  You can look through all of
18    these binders, Judge; you're not going to find any evidence
19    that there was some way to push those things off from
20    happening.
21              I submit to you what a jury can find is they found
22    out that she had this mental health disorder.  They
23    recognized that she was a very important person in the
24    organization.  They simply didn't want her in that role
25    anymore.  They came up with a list of some very scary
```

1    described things, knowing her disability; these are all the

2    things that you're going to have to do.  And when she tried

3    to have the dialogue about it, they said, "No, everything's

4    clear.  We appreciate you.  Here's your job description.

5    Tell us if there's something else we can do."  That is a

6    violation of the law in the most fundamental sense,

7    Your Honor.

8             THE COURT:  Okay.  What about the retaliation?

9             MR. HANNON:  I'm sorry?

10            THE COURT:  What about the retaliation?

11            MR. HANNON:  So the retaliation -- the retaliation

12   certainly goes back to the disclosure of the disability.  I

13   mean, simply, you know, noting that she was -- that she was

14   entitled to the protections under the law, that, in and of

15   itself, is a protected activity.

16            THE COURT:  So why is the investigation a sham

17   investigation?

18            MR. HANNON:  Because the person who did it was the

19   one who was calling the shots throughout the whole time that

20   they were trying to move her out.  The person, Ms. Ballweg.

21   She was involved from the very, very start.  She was the

22   person that Chad St. John was reporting back to, getting

23   guidance on.  We're going to have --

24            THE COURT:  So as a matter of law, that person

25   can't do the investigation.

```
 1              MR. HANNON:  Well, she, herself, admitted that it
 2    would have been inappropriate for her to do that, if she was
 3    involved.
 4              THE COURT:  Inappropriate.
 5              MR. HANNON:  Yeah.
 6              THE COURT:  Why?
 7              MR. HANNON:  But then she claims that she wasn't
 8    involved.
 9              THE COURT:  So you're saying she says she wasn't
10    involved.  You say she was.  And if she was -- but why does
11    that make it under the law a sham investigation?  In other
12    words, just because she was involved -- let's say she was
13    involved in discussions in February to -- how do we get rid
14    of Dr. Menninger.  Okay?  For whatever reason, whether it's a
15    performance reason or a -- whether it's we don't want to
16    accommodate.  We don't want to have a person in a high level
17    position with this disability.  Okay.  If she's involved in
18    those discussions, what makes it -- I mean, what are the
19    things that I look to -- I should be looking to, to determine
20    it's a sham investigation?
21              MR. HANNON:  I think most fundamental the question
22    was, was she investigating herself.  And that's what it
23    amounts to her, given her level of involvement that a
24    reasonable jury could find, that, in essence, she was
25    investigating herself.  And that is not a good-faith effort
```

1    on the part of a company to determine whether or not

2    something unlawful has taken place.

3          And coupled with the fact -- and, you know, this is

4    really the rub of it is, there's an element of, sort of,

5    gaslighting here, right, in that here you have Dr. Menninger,

6    who is bringing these issues forward, and, you know, being

7    told that PPD is, you know, conducting an investigation, you

8    know, they're reviewing this, doing it the right way.

9          And in reality, you have the person who is, sort

10   of, Wizard of Oz of all of this from the start, standing

11   behind the curtain, who comes back and says, "No, we did a

12   thorough investigate, and none of this is actually

13   happening."

14         That's -- that, I think, from the evidence here

15   that a jury can reasonably conclude that that's what

16   occurred, and that's unlawful.

17         THE COURT:  So your damage theory -- is your damage

18   theory essentially that she was disabled?  They then violated

19   the law by not sufficiently engaging with her on the

20   reasonable accommodation process; that exacerbated her

21   symptoms; that then they retaliated against her.  And then

22   they said what's -- what was happening wasn't happening in

23   the form of the report, and then that further exacerbated her

24   symptoms and that caused her to take leave and then that's

25   why she can't -- I don't know if she's working now or not.

1          MR. HANNON:  I would summarize it as you break it,

2    you own it, which is the -- I think the rule by the *Tobin v.*

3    *Liberty Mutual* case, on page 14, the footnote of our brief,

4    that through all of their violations of the ADA and 151(b),

5    that the causal impact of that was that she was no longer

6    able to work because of her disability.

7          I wouldn't necessarily limit it to accommodation in

8    retaliation.  I think there's, sort of, a bit of a broader,

9    you know, forest for the trees perspective here of having

10   decided that because of her disability that they did not want

11   her employed; that they took steps that were intended to and

12   did, indeed, have the impact of causing her to be unable to

13   work; that there was a sort of broader theme to all of this.

14   And it could be compartmentalized and considered analytically

15   in different ways, but at the end of the day, just because

16   someone has a disability doesn't mean you can jump to the

17   conclusion that they can't do their job and try to force them

18   out.

19          THE COURT:  Okay.  Ms. Mandel, anything else?

20          MS. MANDEL:  Thank you, Your Honor.

21          On that last point that brother counsel raised, I

22   just want to be clear that the evidence is -- is rife with

23   indicators that Dr. Menninger couldn't do a number of the

24   portions of the job, if any of it, even as of January 2018.

25   In fact, Dr. Menninger's own husband testified under oath

1    that she was not able to work at all as of January of 2018.
2    Obviously, her husband wasn't an expert, but he was someone
3    who was close to her and --
4           THE COURT:  Here's a thing about that, though.
5    That strikes me as good evidence for you at trial, right, if
6    her husband, you have him under oath, under the Social
7    Security process, saying that in his view, she wasn't capable
8    of working in January of 2018.  But I think what I have on
9    the record here is she's saying I could work in January 2018.
10   And to the extent that's a disputed issue of fact, I have to
11   draw the inference in her favor.  And so I don't see how -- I
12   don't think I have a record that's sufficiently clear that on
13   summary judgment I could say, you know what?  She wasn't
14   working on January 2018.  She wasn't capable of working on
15   January 2018, before they knew about the disability; that all
16   of these things that happened, that they were, like, engaging
17   in a process to terminate her because -- or that, you know,
18   because of things that happened before they got the e-mail.
19          And so that strikes me as you could defend the case
20   at trial, if it goes -- I'm not saying that it does go to
21   trial.  But if it does go to trial, I could see a defense at
22   trial, part of what was going on is she wasn't performing.
23   And -- but I don't know how I can decide that on summary
24   judgment.
25          MS. MANDEL:  Understood, Your Honor.  And in fact,

1    we're not asking --

2              THE COURT:  Right.  I know you're not asking on

3    performance.

4              MS. MANDEL:  I actually think that's ultimately

5    more on damages, which was the last point that brother

6    counsel was raising.

7              THE COURT:  Okay.  Fair.

8              MS. MANDEL:  I don't think that's terribly -- I do

9    think that to the extent that Dr. Menninger and her counsel

10   are now trying to paint this a little bit differently, as she

11   was essentially fine in January of 2018, and sort of -- I

12   believe that the brother counsel used the term "you break it,

13   you own it," by June of 2018.  That's not actually borne out

14   in the record at all.  So I just wanted to --

15             THE COURT:  Sure.  Fair enough.  I'm not resolving

16   anything on this decision on damages.  I'm just curious.

17   I've been thinking about, sort of, where does this go in

18   terms of damages, because they didn't -- like, they didn't,

19   in 2018, fire her.  And so I was wondering if the theory was

20   more like what you described.

21             MS. MANDEL:  And in fact, from our perspective,

22   even if this goes to trial -- even if there were some type of

23   legal finding of wrongdoing, I think the damages question is

24   essentially, you know, another reason that this case doesn't

25   really prevail for Dr. Menninger.  But I do think that's sort

1    of beside the point right now.

2                I do want to respond to a few things that brother

3    counsel said.

4                THE COURT:  Yes.

5                MS. MANDEL:  And most specifically, I wanted to

6    make sure to draw this Court's attention to paragraph 39, in

7    the statement of undisputed facts, which is -- it's actually

8    noted as undisputed by plaintiff.  This is the paragraph

9    laying out Dr. Kessimian's recommended accommodations, which

10   were sent in February of 2018.  And I just really wanted to

11   point to the beginning of that.

12               It's a written message, and this is a direct quote,

13   so I'm not sure how it could be disputed anyway.  But I just

14   wanted to be clear that that e-mail -- or that written

15   communication from Dr. Kessimian specifically stated, at the

16   outset, that, "Dr. Menninger's brain and body are not able to

17   tolerate public speaking engagements and socializing."  And

18   this is where Your Honor points out, it says, "It is as if

19   her vocal cords become paralyzed."

20               And so to the extent --

21               THE COURT:  Wait.  Are you looking at 38 or 39?

22               MS. MANDEL:  39.  It's at the top of page 12.

23               THE COURT:  Top of page what?

24               MS. MANDEL:  12.

25               THE COURT:  I have 21 at the top of page 12.

1          MS. MANDEL:  I'm actually looking at defendant's
2     statement of undisputed facts, but we can absolutely jump to
3     the --
4          THE COURT:  Oh.  39.  I have it.  It starts, "The
5     assertion of fact is, on February 14, 2018, Dr. Kessimian
6     sent her recommended" --
7          MS. MANDEL:  Exactly.  Exactly.
8          THE COURT:  Okay.  Sorry.  Go ahead.  I'm with you.
9          MS. MANDEL:  And in stepping back for a moment, I
10    think that brother counsel paints a set of facts that, if
11    true, and if supported by the record, would, perhaps, make
12    for a different case.  But it's not at all what the record
13    here shows.
14          Your Honor raised this question of didn't
15    Dr. Menninger's own physician say that Dr. Menninger couldn't
16    perform the job tasks.  And brother counsel said, no, that's
17    not -- that Dr. Kessimian was simply laying out
18    accommodations that would allow Dr. Menninger to better
19    perform her job.
20          But in fact, Dr. Kessimian -- this document, which
21    became sort of the main focus of this case, really begins by
22    Dr. Kessimian saying that Dr. Menninger cannot engage in
23    these fundamental job tasks.  It says it in black and white.
24          And it's undisputed -- for legal purposes of
25    undisputed by the plaintiff, but it's also in this exhibit in

1    the case, where Dr. Kessimian states that Dr. Menninger is
2    simply unable.  It says that her brain and body don't allow
3    her to do this.  I'm not sure what other evidence could
4    possibly exist in the case to show more clearly that the
5    plaintiff was not able to perform these fundamental job
6    tasks.
7              And so, you know, jumping forward to what the
8    company had to do or could have done to engage in a better
9    dialogue about the job tasks, brother counsel said that the
10   company didn't want to have a tit for tat.  And brother
11   counsel also said that's what the law requires.
12             First of all, I think that's very clearly not what
13   the law requires, to engage in a tit for tat.  There's an
14   obligation to have an interactive dialogue.  But once the
15   dialogue has really started out with the statement that
16   Dr. Menninger cannot do this category of things, to require
17   the company to come back and now try to tease out which part
18   of the -- of the tasks you might be able to do, and it says
19   she can't do any -- her brain does not even allow her to
20   engage in this type of public dialogue or private discussion,
21   it wouldn't be practical.
22             And to take this back -- I know it may seem a bit
23   silly, but take this back to the lawyer analogy because it's
24   something that I think that all of us here can understand
25   more directly.  Right?  Let's say a law firm decides we're

1   going to get more into an appellate litigation, and we're

2   going to have more focus on those types of arguments.  Right?

3   In the coming year, that's going to be a goal of ours.

4   That's nondiscriminatory and completely permissible for the

5   law firm to do.

6            For a lawyer to come back and say, "Well, I'm going

7   to need you to spell out in more detail.  Will there be men

8   in the room?  Women in the room?  How many people will be in

9   the room?  Will it be cases about this type of topic or X

10  type of topic"; that wouldn't be a reasonable obligation for

11  the law firm to have, to say all of our lawyers need to be

12  able to engage in this type of appellate argument.  Right?

13  That's just a requirement that we have.

14           That's facially neutral.  It in no way gets at

15  someone's protected disability.  And to require that type of

16  granular discussion in a theoretical sense wouldn't be,

17  really, very logical or --

18           THE COURT:  Well, but if the lawyer came back and

19  said, "I had a particular type of experience that was

20  particularly traumatic, so a particular kind of criminal

21  cases that involve that experience being done to other people

22  are the kind of cases that would be -- that would trigger my

23  trauma.  But I could do any other kinds of cases, so I'd like

24  to know whether we're going to be going into -- focusing on

25  that area, which might be, like, you know, I need a big

1    accommodation, or whether that's just within the range.  And

2    if it's within the range, I just want the reasonable

3    accommodation not to do those."  And that seems like a

4    reasonable inquiry.

5         And the firm would be reasonably required to

6    respond, I think, to say, either, "No, we're focusing on that

7    kind of case," or, "That will be in the mix," or, "We don't

8    have any of those right now.  We can deal with it.  But,

9    like, we can make sure that you don't have to work on those."

10        MS. MANDEL:  Absolutely.  And to kind of bring the

11   analogy back to the facts of this case, if the documentation

12   had said interactions with a certain type of business is

13   traumatic.

14        THE COURT:  You mean because it says any kind of a

15   public.

16        MS. MANDEL:  Right.  It says very clearly brain and

17   body are not able to tolerate public speaking engagements,

18   socializing.  It's a very broad statement.

19        In fact, at no point did either the treatment or

20   her treating physician come back and say, "Actually, it would

21   be limited in the following way."  The response was

22   essential, "That's not really part of my job that I should

23   have to do, so you can't tell me that I should have to do

24   that."  Instead of saying, "No, no, no, it's a little bit

25   more limited than this.  Some things would work, and some

1    things wouldn't."  That conversation never happened.  To the
2    extent we're really looking at the evidence in the record for
3    summary judgment purposes, this evidence is quite clear that
4    the plaintiff's own treating physician said that she was
5    unable to do this.  Right.

6         So it's not -- I understand brother counsel wishes
7    the facts were different today, but they're not.  This is
8    what the evidence shows.  And to have a requirement that the
9    company come back and make some sort of alternate proposal
10   around the details of what each engagement would require is
11   not reasonable, and it's not something that they're obligated
12   to do.

13        And in fact, Dr. Menninger completely removed
14   herself from that.  Right?  She said repeatedly, "That's not
15   really part of her job.  It's not something she should have
16   to do," while her doctor was saying she can't do that.  So it
17   really puts the company into, essentially, an impossible
18   position.  It's not required by law at all.

19        I also wanted to just bring up something else that
20   brother counsel mentioned.  He said that the outward-facing
21   goal of more client interaction wasn't something that was
22   agreed upon.  There's no legal requirement that an employee
23   agree to any facially neutral requirement.

24        THE COURT:  Right.

25        MS. MANDEL:  The company could decide this is part

1    of our future.  This is why we're headed.

2              THE COURT:  Sure.

3              MS. MANDEL:  And in fact, the other thing that I

4    think is really important to note here, which is factually

5    important, as the evidence shows, Dr. Menninger's role is --

6    she was the executive director of labs.  She wasn't in, say,

7    a law firm with ten litigators who could kind of divide and

8    conquer.  Right?  She was the person in this role, this

9    person responsibility for the accreditation of multiple labs

10   and multiple locations.  There wasn't a whole team of people

11   where the company would have reasonably been required to come

12   back and say, "Okay, what if we divided up this way?  And

13   what if you only had the obligation to go to this kind of

14   presentation?"  It wouldn't have made any sense.

15             There's a whole body of law around these kind of

16   high-level executive accommodations.  It's not something

17   where her job could have been or should have been open to

18   being subdivided in that way.

19             And I also just wanted to touch on the retaliation

20   piece, as well.  Again, brother counsel wants to retest the

21   facts of being different now.  There's absolutely no

22   indication that Ms. Ballweg was investigating herself, should

23   have been investigating herself.  I believe the term

24   "gaslighting" was used.  Again, that's really

25   recharacterizing the facts in a way that's not borne out by

1    the record at all.  And I know that the plaintiff would now

2    like to, sort of, try to save that claim by explaining or

3    describing the facts in a different way, but that's not at

4    all borne out by the facts.

5             The sham investigation cases talk about not

6    actually speaking to any witnesses, not going through a

7    thorough process to get to the bottom of what the employee is

8    complaining about.  There is absolutely no evidence of that

9    here at all.  The company is not required to have 50 HR

10   employees or to engage an outside investigator for every

11   employee complaint.  That would be an unreasonable

12   expectation, and it's not borne out by any law regarding

13   retaliation or investigations.

14             THE COURT:  Okay.

15             MS. MANDEL:  Thank you, Your Honor.

16             THE COURT:  Real quickly?

17             MR. HANNON:  Very quickly, Your Honor.

18             The evidence is what I'd like the Court to look at,

19   Your Honor.  And rather than taking a small little bit of

20   what Dr. K said, you can look at the whole thing.  Dr. K did

21   not say that Dr. Menninger's brain and body are not able to

22   tolerate public speaking engagement and socializing.  What

23   she did was, after describing what her disorder was, she

24   said, "A concrete way of thinking of this disability is that

25   her brain and body are not able to tolerate public speaking

1    engagements/socializing.  And it is as if her vocal cords and

2    brain will paralyze, while her blood pressure, heart rate,

3    and breathing all increase.  And it is for all of the above

4    reasons that I recommend the following reasonable

5    accommodations."  Whenever she can't do that.

6              She was trying to convey to them, sort of teach

7    them that this isn't about Dr. Menninger being shy.  Right?

8    That's the problem you deal with people with mental health

9    disorder, they think it's made up, it's not real.  And she's

10   trying to impress upon them that there are physiological

11   aspects of that.  But to take that and turn it around and to

12   conclude, as a matter of law, that that is a statement that

13   she is incapable of doing these things is not accurate.

14             If they had a question about whether or not she

15   could do these sort of things, they could ask her those

16   questions.  They could have gone back to Dr. K and got more

17   information.

18             Dr. K finishes her note, "I am available for

19   further discussion."  They didn't take her up on that.

20             This wasn't about them being confused.  This wasn't

21   about them having to deal with one alternative versus the

22   other.  They, sort of, paint this horrific scenario where, in

23   order to accommodate her, they're going to have to do all of

24   these things.  Judge, there are miles and miles of

25   possibilities in between, and they didn't pursue any of them.

1    They simply threw up their hands, and they said, "Game over."

2    And they can't do that.

3                THE COURT:  Okay.  Thank you.

4                I'll take it under advisement.  This is really

5    helpful, the argument from both of you.  I appreciate it a

6    lot.

7                I'll think about it, and I will promise that it

8    will not take me as long to resolve this, as it did for me to

9    get to a hearing.  And I'm sorry it's taken me to long to get

10   to a hearing.  It really shouldn't take that long.  And I

11   have no good -- no good excuse for that.  So I'm sorry.

12               All right.  Thank you.  We're adjourned.

13               THE DEPUTY CLERK:  All rise.  Court is in recess.

14               (Court in recess at 11:16 a.m.)

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4              I, Rachel M. Lopez, Certified Realtime Reporter, in

5      and for the United States District Court for the District of

6      Massachusetts, do hereby certify that pursuant to Section

7      753, Title 28, United States Code, the foregoing pages

8      are a true and correct transcript of the stenographically

9      reported proceedings held in the above-entitled matter and

10     that the transcript page format is in conformance with the

11     regulations of the Judicial Conference of the United States.

12

13                    Dated this 12th day of February, 2024.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20     _____
       Rachel M. Lopez, CRR
21     Official Court Reporter

22

23

24

25