# United States Court of Appeals
## For the First Circuit

No. 23-2030

LISA MENNINGER,

Plaintiff, Appellee,

v.

PPD DEVELOPMENT, L.P.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Aframe and Kayatta,*
Circuit Judges.

Douglas Hallward-Driemeier, with whom John P. Bueker and
Ropes & Gray LLP were on brief, for appellant.
Stephanie Schuster, Douglas W. Baruch, Jennifer M.
Wollenberg, and Morgan, Lewis & Bockius LLP on brief for National
Association of Manufacturers, amicus curiae.
Patrick J. Hannon, with whom Hartley Michon Robb Hannon LLP
was on brief, for appellee.

July 24, 2025

* Judge Selya heard oral argument in this case and
participated in the initial semble thereafter. His death on
February 22, 2025, ended his involvement in this case. The
remaining two panelists issued this opinion pursuant to 28 U.S.C.
§ 46(d).

KAYATTA, **Circuit Judge**. Dr. Lisa Menninger was the Executive Director for Laboratory Operations at a clinical laboratory division of PPD Development, L.P. (PPD). Menninger claims that PPD discriminated and retaliated against her because of her social anxiety disorder, in violation of the Americans with Disabilities Act (ADA) and Massachusetts antidiscrimination law. A jury agreed and awarded Menninger more than twenty-four million dollars in damages. PPD then moved for judgment as a matter of law, a new trial, and remittitur, but the district court denied those motions. For the reasons detailed below, we affirm.

**I.**

**A.**

Because PPD challenges the sufficiency of the evidence supporting the jury's verdict, we recount the events in the light most favorable to Menninger, "drawing all factual inferences and resolving all credibility determinations in her favor." Dimanche v. Mass. Bay Transp. Auth., 893 F.3d 1, 4 n.2 (1st Cir. 2018); see also Franchina v. City of Providence, 881 F.3d 32, 38 (1st Cir. 2018) ("[O]ur recounting of the facts . . . defer[s] to the jury's discernible resolution of disputed factual issues." (quotation marks and citation omitted)).

**B.**

PPD is a clinical research organization. It assists pharmaceutical companies in testing new drugs, researching

vaccines, and organizing and analyzing data from clinical trials. One of its divisions, Global Central Labs, focuses on clinical laboratory testing. Menninger was its Executive Director for Laboratory Operations.

In 2017, its business stagnating, PPD's senior management decided to implement a plan focusing on client relationships. As part of that plan, PPD tasked its operational leads -- including Menninger -- with increasing their involvement in client pitches, bid defenses, and other engagements with clients.

When Menninger's supervisor, Hacene Mekerri, told her about the planned change in her duties, Menninger balked. She explained to Mekerri that public presentations in front of large crowds "ma[d]e [her] anxious." Mekerri "tried to reassure [her]" that she was capable of the public speaking he had in mind, and he suggested that they return to the discussion "after the holidays." On January 11, 2018, Menninger emailed Mekerri to continue the conversation. She informed him that she suffered from generalized anxiety disorder, social anxiety disorder, and panic attacks, which she treated with medication as needed. She also explained that increased client visits, social interactions, and presentations would be "difficult in light of [her] disability," and that she was "open to discussing whatever ideas" Mekerri had for her role.

PPD proposed that Menninger have her doctor recommend accommodations that might allow Menninger to perform her new duties.  After consulting with an attorney and her doctor, she agreed.

On January 31, 2018, Menninger's psychiatrist, Dr. Marianna Kessimian, submitted a written accommodation request on Menninger's behalf.  The request noted that Menninger could "tolerate" public speaking and social interaction "to the extent that they [were] necessary for her job."  However, it cautioned that expanding Menninger's public-speaking and social-interaction responsibilities would "increase her anxiety and worsen her somatic symptoms," making it "substantially more difficult, if not impossible, for [Menninger] to perform her job."  Kessimian suggested three possible accommodations: (1) minimizing social interaction or public speaking "to the extent possible"; (2) not changing Menninger's role to require more public speaking or social interactions; and (3) developing a "plan" for any necessary public speaking and social interactions, in consultation with Kessimian or another qualified healthcare provider, so as to "minimize [Menninger's] anxiety and somatic symptoms."

In response, Human Resources (HR) Associate Director Chad St. John asked Menninger for additional information from her physician regarding the specific duties Mekerri had raised that Menninger could not perform.  St. John also prompted Mekerri to

send Menninger an email, on February 6, listing five broad categories of public-speaking and social tasks that Menninger would be expected to perform (specifying the frequency and number of attendees for some, but not all, of the tasks).  Some of the listed activities were ones that Menninger performed "regularly without issue," whereas others -- like being physically present for client site visits -- marked a sharp departure from her previous role.

Menninger worked with Kessimian to request a second set of accommodations specifically tailored to Mekerri's emailed list. Kessimian's additional suggestions included providing a "surrogate or reader" to attend client meetings or make presentations on Menninger's behalf.  Kessimian also said that Menninger was "able to build business relationship[s] in a more 'behind the scenes' fashion and would like [to] brainstorm other potential avenues where she [could] add value" in the business-development context. Kessimian submitted the request on February 14, 2018.

St. John responded by email to Menninger twelve days later, stating that PPD could accommodate Menninger's requests for a surrogate to present at internal meetings, as well as her request to reduce travel expectations.  However, he indicated that PPD could not make any accommodations with regard to "Client Bid Defense," "Issue resolution calls," "HH/Client site meetings,"

"phone," "Technical Sales presentation internal and external," and "Lunch/dinner and social interactions" during customer visits.

Two days later, Menninger was scheduled to meet with St. John and Mekerri to discuss the accommodation requests. Before the meeting, St. John emailed Deborah Ballweg, HR Executive Director, and mentioned "delicately working [Menninger] out," explaining that he and Mekerri "[g]ave only slightly on two out of five items that her physician requested" as reasonable accommodations.

During the meeting with St. John and Mekerri, Menninger sought more information about the specific responsibilities for which PPD stated that no accommodations were possible, because -- as she put it in a follow-up email -- she thought there were "many tasks that could fall within those items that would not implicate [her] disability." However, PPD would not provide those details. Instead, PPD focused on "working [Menninger] out," with St. John asking Menninger to either transition to "a temporary consulting role" or take an "exit package."

Predictably, matters deteriorated from there. Menninger made clear that she did not want to leave PPD. St. John sent a memorandum to PPD's legal department seeking guidance in pursuing an "an exit strategy" with Menninger. St. John also sent the legal department a draft email stating that to provide Menninger with further information about her new public-facing responsibilities

"would only present [Menninger] the opportunity to select" responsibilities that she "believe[d she could or could not] do." Meanwhile, PPD stayed its course of refusing to provide further details about the public-facing responsibilities at issue.

In the months that followed, St. John coached Mekerri on "documenting criticisms [of Menninger] to his manager file," and helped him draft an email to Menninger instructing her to modify her 2018 goals to include "[e]liminat[ing] Lab Issues, client complain[ts,] and audit findings" and "proactively eliminat[ing] quality issues." Menninger viewed these criticisms of her performance as unfounded, and she saw the "goals" Mekerri had laid out as impossible standards that would set her up for failure. She complained of potential discrimination or retaliation, but the PPD representative who investigated her complaint -- Ballweg -- told Menninger that Ballweg had found no evidence of wrongdoing.

That spring, as tensions rose between Menninger and her employer, Menninger developed major depressive disorder -- what PPD's own medical expert would later classify as a "reactive depression" triggered by PPD's response to Menninger's accommodation requests. On June 2, 2018, Menninger informed PPD that she would need to take medical leave on her doctor's advice, effective immediately. After exhausting her available paid and

unpaid leave, Menninger was still medically unable to return to work.  In February 2019, PPD fired her.

Four months later, Menninger sued PPD for disability discrimination and retaliation under both state and federal law. She claimed that PPD failed to reasonably accommodate her; that it took adverse action against her because of her disability; and that it retaliated against her for disclosing her disability and seeking accommodation.

After discovery, the district court granted partial summary judgment for PPD on two points:  It rejected Menninger's theory that PPD could be liable solely for failing to engage in an interactive process, and it limited Menninger's disparate-treatment claims to a single adverse action, Mekerri's February 6, 2018, email describing the five categories of public-facing responsibilities he expected Menninger to take on.[1]  Otherwise, the court denied PPD's motion for summary judgment, and the case proceeded to trial.

Trial did not go well for PPD.  As the district court recounted, "the relative strength of the parties' positions appeared much different than it had on a written discovery record unilluminated by live witness testimony."  In particular, explained the district court, "Menninger's credible and detailed

---

[1]  Menninger has not appealed that entry of partial judgment paring down her claims.

testimony was measured against accounts by PPD representatives that were often vague, suffered from troubling inconsistencies, or tended to corroborate Menninger's position rather than undermine it." At the end of the ten-day trial, the jury found in Menninger's favor in all respects. It concluded that PPD unlawfully failed to provide a reasonable accommodation, unlawfully discriminated against her under Massachusetts and federal law, and unlawfully retaliated against her under federal and state law. It awarded Menninger more than $24,000,000 in damages, comprised of $1,565,000 in back pay, $5,465,000 in front pay, $5,000,000 in past emotional distress, $2,000,0000 in future emotional distress, and $10,000,000 in punitive damages.

With a new set of lawyers, PPD moved for judgment as a matter of law, a new trial, and remittitur. The district court denied those motions, and this appeal followed.

## II.

Menninger's claims -- and the resulting jury verdict -- arise under the ADA, as well as analogous provisions of Massachusetts state law. The ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In enacting the ADA, Congress sought to dismantle barriers that might otherwise prevent individuals with actual or perceived disabilities "from contributing, according to their

talents, to our Nation's social, economic and civil life." Ortiz-
Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604
(1st Cir. 2017) (quoting Ramos-Echevarría v. Pichis, Inc., 659
F.3d 182, 186 (1st Cir. 2011)).  The ADA and its state-law analog,
Massachusetts General Laws chapter 151B, forbid a covered employer
from discriminating against a qualified disabled individual in
hiring, firing, promotions, compensation, and other terms and
conditions of employment.  See id.; 42 U.S.C. § 12112(a); Mass.
Gen. Laws ch. 151B, § 4 (2025).  An employer also discriminates
against a disabled employee when it refuses to make reasonable
accommodations for the employee's disability, so long as the
employer knows about the disability and the accommodation would
not impose an undue hardship on its business.  See 42 U.S.C.
§ 12112(b)(5); Mass. Gen. Laws ch. 151B, § 4 (2025).  Finally,
federal and state laws forbid covered employers from retaliating
against employees who request or use reasonable accommodations, or
who oppose disability discrimination.  See 42 U.S.C. § 12203;
Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st
Cir. 2007); Mass. Gen. Laws ch. 151B, § 4(4) (2025); Rae v. Woburn
Pub. Schs., 113 F.4th 86, 100 (1st Cir. 2024) (explaining that the
ADA and chapter 151B's antiretaliation provisions are analogs and
can be analyzed in tandem).[2]

_____

[2]  The parties identify no relevant distinctions between the
federal and state-law schemes -- leaving us at liberty to analyze

PPD appeals the judgment against it on three grounds. First, it argues that Menninger's disability-discrimination claims were insufficient as a matter of law and should never have gone to a jury.  Second, it claims that the verdict was tainted by "misleading" jury instructions, entitling PPD to a new trial. Third, it asserts that the punitive-damages award is "unsupported" by the evidence.  We address each argument in turn.

**A.**

The Federal Rules of Civil Procedure provide a clear, two-step process for a party who believes that the evidence presented at trial in a civil action is legally insufficient to support a jury verdict.  First, the party must move for judgment as a matter of law under Rule 50(a), which it may do "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a). When the party makes this motion, it "must specify the judgment sought," as well as "the law and facts that entitle [it] to the judgment."  Id.  This mandated specificity matters, because it "apprise[s the opposing party] of the materiality of the dispositive fact" and gives it "an opportunity to present . . . evidence bearing on that fact."  Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment.  Second, if the district court

the two sets of claims jointly for purposes of this appeal.  See Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 12 n.1 (1st Cir. 2024).

denies the Rule 50(a) motion, the party has another chance:  It
may "renew[]" its motion after the entry of judgment or, in some
circumstances, after the jury is discharged.  Fed R. Civ. P. 50(b).
Crucially, "[b]ecause the Rule 50(b) motion is only a renewal of
the preverdict [Rule 50(a)] motion, it can be granted <u>only on
grounds advanced in the preverdict motion</u>."  Fed. R. Civ. P. 50
advisory committee's note to 2006 amendment (emphasis added); <u>see
also</u> <u>Zachar</u> v. <u>Lee</u>, 363 F.3d 70, 73 (1st Cir. 2004) ("[A] motion
for judgment as a matter of law at the close of the evidence
'preserves for review only those grounds specified at the time,
and no others.'" (quoting <u>Correa</u> v. <u>Hosp. S.F.</u>, 69 F.3d 1184, 1196
(1st Cir. 1995))).

   PPD's entire Rule 50(a) motion consisted of the
following exchange, which took place at the close of Menninger's
evidence:

> THE COURT:  Are there any motions you want to
> make?  You don't have to, but I'm just giving
> you the chance.
>
> MR. CURRAN:   Yeah.   A motion for directed
> verdict, Your Honor.[3]
>
> THE COURT:  All right.   Fine.   I will deny
> that.  So anything else?  We're just going to
> get Mr. Kelly?
>
> MR. CURRAN:  Yes, Dr. Kelly.

---

[3]  "Directed verdict" is the older term for a motion for
judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 50 advisory
committee's note to 1991 amendment. As the district court properly
noted, this is a distinction without a difference.  <u>See</u> <u>id.</u>

The foregoing exchange was not necessarily PPD's last chance to put forward, under Rule 50(a), reasons for granting judgment as a matter of law.  Ordinarily, a party may supplement an initial oral Rule 50(a) motion with subsequent oral or written statements of the basis for that motion, so long as it does so "before the case is submitted to the jury." Fed. R. Civ. P. 50(a); cf. Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 10 (1st Cir. 2021).  During the full day that passed before the case went to the jury, the trial judge met repeatedly with counsel for both parties to discuss remaining issues, including jury instructions and "additional issues Menninger's counsel had raised late the previous day." As the district court recounted, at no point during these discussions -- or at any other time -- did PPD attempt to explain the basis of its Rule 50(a) motion, ask the court to reconsider its denial of the motion, or "supplement its cursory oral request with a concise written version identifying one or more grounds (as parties often do . . . )." PPD suggests that the district court erred by "focusing on" these additional opportunities for PPD to articulate the basis for its 50(a) motion. But PPD's silence on the matter of a directed verdict in subsequent meetings with the court supported the conclusion that PPD had already said all it had to say on the matter.

Only after the jury verdict did PPD explain (in a Rule 50(b) motion) why it contended that the evidence presented at trial was insufficient to support a verdict on at least some counts. The Rule 50(b) motion argued that no reasonable jury could find from the evidence that Menninger was capable of the essential functions of her job, nor that PPD subjected her to adverse treatment because of her disability. PPD's prior one-sentence, oral request for a "directed verdict" specified neither of these grounds.[4] Consequently, PPD neither provided Menninger the required opportunity to offer further evidence, nor permitted the district court to consider those arguments before submitting the issues to the jury. Because PPD entirely failed to identify the grounds for its Rule 50(a) motion, let alone "the law and facts that entitle[d it] to the judgment," Fed. R. Civ. P. 50(a)(2), it had no arguments to renew at the Rule 50(b) stage.

Seeking to escape this self-imposed bind, PPD casts blame on the district court, which -- it claims -- prevented PPD from articulating the grounds for its initial motion by

---

[4] As we have previously observed, "[i]t is not clear from our precedent what standard of review we should apply in evaluating a trial court's determination [of whether] an argument made in a Rule 50(b) motion was preserved in a Rule 50(a) motion." Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP, 830 F.3d 18, 25 (1st Cir. 2016). We need not decide that here, because "whatever the standard of review -- de novo, abuse of discretion, or even clear error" -- we find no error in the trial court's ruling that PPD failed to preserve its sufficiency-of-the-evidence challenge. Id. at 25-26.

"immediately and summarily" denying the motion.  The situation, PPD contends, is "precisely the same" as that in <u>Blockel</u> v. <u>J.C. Penney Co.</u>, 337 F.3d 17 (1st Cir. 2003).  The relevant exchange in <u>Blockel</u> was as follows:

> COUNSEL:  Your Honor . . . we did want to proceed with our motions for directed verdicts <u>on certain issues</u>.
>
> THE COURT:  I never noticed that you filed one at the close of plaintiff's evidence.  I said at the time that I believed after the evidence was complete.
>
> COUNSEL:  <u>I believe that we --</u>
>
> THE COURT:  Motion for directed verdict has been filed, and it's on the record, and the Court denies it.

<u>Id.</u> at 25 n.2 (emphases added).  "Under [those] circumstances," we found that the trial court "foreclosed" the party from explaining the basis of its motion, and we elected not to "fault[ the party] for failing to provide more detail."  <u>Id.</u> at 25.

Here, the circumstances materially differ.  The district court actually invited PPD to make a Rule 50(a) motion.  Indeed, the district court's perception was that, "had it not invited PPD to make 'any motions' it wished to make, PPD would have made no Rule 50(a) motion at all."  Furthermore, the record does not suggest that the court cut counsel short.  Rather, as the district court explained, it denied the motion only upon realizing that

"no . . . further argument was forthcoming."  PPD does not even now explain how that finding was erroneous.

As PPD correctly points out, where "so much rides on a procedural rule, parties must be able to rely on clearly defined lines."  Rule 50 provides just such a line, requiring in plain terms that a party in a civil action "specify the judgment sought and the law and facts that entitle [it] to the judgment."  Fed. R. Civ. P. 50(a)(2).  This, PPD did not do.

PPD alternatively contends that even if it failed to comply with Rule 50(a), this court should review its sufficiency-of-the-evidence arguments for plain error -- which, it argues, will "differ only negligibly" from "customary appellate review."  But as a general rule in a civil proceeding, this court does not consider even on plain-error review an argument raised for the first time in a Rule 50(b) motion.  See, e.g., Full Spectrum Software, Inc. v. Forte Automation Sys., Inc., 858 F.3d 666, 674 (1st Cir. 2017); RFF Fam. P'ship, LP v. Ross, 814 F.3d 520, 536 (1st Cir. 2016); Costa-Urena v. Segarra, 590 F.3d 18, 26 n.4 (1st Cir. 2009).

Prior to 2006, we acknowledged the possibility of a departure from this general rule in "an exceptional case," to prevent "a miscarriage of justice."  Correa, 69 F.3d at 1196 (citations omitted).  In Chestnut v. City of Lowell, 305 F.3d 18 (1st Cir. 2002), we provided an example of such an exceptional

- 16 -

case, where (1) the nonmoving party shared responsibility for its opponent's failure to raise the relevant defense; and (2) the error came at the expense of "innocent taxpayers of the City," the "very ones" for whose benefit the defense was adopted.  Id. at 20.

More recently, and in the wake of the Supreme Court's decision in Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 405 (2006), several other courts of appeals have found that federal courts have no authority to consider sufficiency-of-the-evidence arguments not timely advanced in Rule 50(a) motions.  See, e.g., Mountain Dudes v. Split Rock Holdings, Inc., 946 F.3d 1122, 1131 (10th Cir. 2019); Miller v. Huron Reg'l Med. Ctr., 936 F.3d 841, 847-48 (8th Cir. 2019); see also United States v. Maldonado-García, 446 F.3d 227, 230 n.4 (1st Cir. 2006) (discussing Unitherm's implications in the context of Rule 50's criminal analog).

This court has yet to determine Unitherm's implications for cases like Chestnut.  See Chestnut, 305 F.3d 18.  Nor need we do so now.  Even if we had the authority to entertain, in exceptional cases, sufficiency challenges not preserved in accordance with Rule 50, this case would not qualify for such dispensation.  Both parties had counsel below, and PPD's counsel had numerous opportunities to comply with a plain and clear rule well known to trial lawyers.  In fact, the trial judge actively ensured that PPD's counsel had an opportunity to voice a Rule 50(a)

motion.  The case itself was reasonably complicated, and it is not patently clear how the plaintiff would have responded had PPD timely spelled out the holes that it now contends exist in Menninger's evidence.  For all these reasons, we decline to consider on the merits PPD's unpreserved sufficiency-of-the-evidence arguments.

### B.

PPD next claims that an improper jury instruction tainted the verdict, warranting a new trial.  Specifically, PPD takes issue with the court's instruction that a reasonable accommodation "might include," among other things, "the provision of qualified readers or interpreters."  PPD acknowledges that the quoted language comes directly from the ADA's definition of reasonable accommodation.  See 42 U.S.C. § 12111(9).  It argues, however, that the instruction was misleading in the context of this case because one of Menninger's requested accommodations was for a "surrogate or reader" to present at meetings on her behalf.  In this context, PPD suggests, the "reader" instruction "effectively direct[ed] a judgment in Dr. Menninger's favor" by indicating that her requested accommodation was presumptively reasonable.  This is a problem, PPD argues, because the statutory language about "readers" applies only to vision-impaired employees.

We need not assay the full merits of this argument, because, once again, PPD failed to preserve its objection. Federal Rule of Civil Procedure 51 requires "[a] party who objects to an instruction" to "do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). Our "interpretation of Rule 51 is quite strict," for "good reason." Flynn v. AK Peters, Ltd., 377 F.3d 13, 25 (1st Cir. 2004) (quoting Connelly v. Hyundai Motor Co., 351 F.3d 535, 544 (1st Cir. 2003)). "Our strict enforcement of the object-or-forfeit rule serves 'to compel litigants to afford the trial court an opportunity to cure [a] defective instruction and to prevent the litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error.'" Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 41 (1st Cir. 2010) (quoting Flynn, 377 F.3d at 25).

Here, PPD did raise a concern with a proposed "reader" instruction during the charge conference, arguing that the statutory reference to "readers" does not "refer to the type of reader that Dr. Menninger was requesting," but rather to "having someone read to" the disabled employee. But when the district court pointed out that the listed accommodations were merely examples and not per se reasonable in any given case, the following exchange ensued:

> THE COURT:  . . . I could add, potentially, a
> sentence at the end [saying that] whether or
> not something is a reasonable accommodation
> depends upon, you know, a determination
> considering all the relevant facts and
> circumstances.
>
> [PPD'S COUNSEL]:  That might be helpful, Your
> Honor.
>
> THE COURT:  Do you object to that?
>
> [MENNINGER'S COUNSEL]:  I don't.
>
> [PPD'S COUNSEL]:  Would it be okay to add
> "interpreter," just to give it some context?
>
> THE COURT: Sure.  I'll add it if you want.
>
> [PPD'S Counsel]:  Thanks.

Following that conversation, PPD raised no further objections to the "reader" instruction, nor did it indicate in any way that it continued to take issue with the instruction as modified by the court and supplemented by PPD's suggestion.

Where a district court "add[s] instructional language to address" a party's concern with a jury instruction, and the party does "not object after being apprised of the court's proposed modification or after hearing the modified instruction given to the jury," the party forfeits its objection to the instruction. Booker, 612 F.3d at 42.  Such is the case here.  By failing to object to the modified instruction, PPD deprived the district court of the opportunity to cure the alleged defect.  See Flynn, 377

F.3d at 25.[5]  Indeed, as the above colloquy makes clear, PPD's limited post-revision request and its silence otherwise signaled that it was not pressing an objection to the negotiated, revised version.

Because PPD forfeited its argument as to the jury instruction, we review the "reader" instruction for plain error only.  In reviewing for plain error, we "resuscitate a forfeited argument only if the appellant demonstrates that (1) an error occurred (2) which was clear or obvious and which not only (3) affected the appellant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 14-15 (1st Cir. 2007) (cleaned up).

---

[5]  PPD suggests that Menninger has, in turn, waived her forfeiture argument by failing to raise it in her opposition to PPD's posttrial motions.  For support, it cites United States v. Tiru-Plaza, 766 F.3d 111, 118 n.12 (1st Cir. 2014), and Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 233 n.32 (1st Cir. 2016).  In Tiru-Plaza, we elected to "skip over any possible waiver argument and . . . treat the claim on its merits" where the opposing party apparently "did not raise a claim of waiver" at all, even on appeal.  766 F.3d at 118 n.12.  Similarly, in Rivera-Carrasquillo, we declined to treat an argument as waived, despite "superficial treatment" of the argument, where the opposing party "ha[d] not asked us to find" waiver on appeal.  812 F.3d at 233 n.32.  Neither rationale applies here, because Menninger did identify and brief the forfeiture issue before us, giving PPD the opportunity to raise its own arguments in reply. We therefore decline PPD's invitation to treat the forfeiture issue as, itself, waived.

We see no "clear or obvious" error in the lower court's accurate quotation of the ADA's statutory text, see 42 U.S.C. § 12111(9)(B), nor do we think the instruction "seriously impaired the fairness, integrity, or public reputation of the judicial proceeding[]," Dávila, 498 F.3d at 14-15.  It is true that under some circumstances, a legally accurate jury instruction may nonetheless be misleading.  For example, in Drumgold v. Callahan, 707 F.3d 28 (1st Cir. 2013), we held that a plaintiff was entitled to a new trial where the jury instructions accurately described a causation standard that did not apply to the plaintiff's claims. Id. at 53-54.  In this vein, PPD argues that the "reader" example could have misled the jurors, because the ADA uses "reader" to mean something different from what Menninger's expert meant when she described a reader as someone who would make presentations on Menninger's behalf.   PPD  contends  that  such  presentations constituted essential functions of Menninger's job.  And as PPD correctly observes, it is generally not reasonable to expect an employer to accommodate a disability by relieving an employee of the responsibility to perform essential functions.  See Mulloy v. Acushnet Co., 460 F.3d 141, 153 (1st Cir. 2006); Kvorjak v. Maine, 259 F.3d 48, 57 (1st Cir. 2001).

It is by no means clear, however, that jurors would have construed the court's reference to a "reader" as including a person who would perform Menninger's essential job functions.   Our

precedent instructs us to evaluate a jury instruction "in the context of the instruction as a whole." Richards v. Relentless, Inc., 341 F.3d 35, 48 (1st Cir. 2003). Here, the court's list of examples was immediately followed by its qualifying statement that "[a]n accommodation is not reasonable if it requires eliminating or excusing an inability to perform any essential functions of the job, if it requires shifting any of the essential functions . . . to other employees, if it requires creating a new position for the disabled employee, or if it creates an undue hardship." Nor does the hiring of a reader, however construed, appear to have played any significant role in closing arguments. Menninger's counsel mentioned it once, immediately followed by the statement that the case was not "really about" that accommodation request. Instead, Menninger's counsel primarily argued that PPD refused to exchange information or seek, in good faith, a way for Menninger to perform her essential job functions. All in all, there was no plain error here.

## C.

As its final sally, PPD seeks to overturn the ten-million-dollar punitive-damages award. First, it contends that the award was "almost certainly the direct result of the erroneous 'reader' instruction." For the reasons discussed above, we discern no plain error in the district court's "reader" instruction, and thus PPD cannot prevail on that basis.

Second, PPD argues that as a matter of law, Menninger failed to show PPD's "malice" or "reckless indifference." The district court found that PPD preserved this particular claim of error, and Menninger does not challenge that conclusion. We therefore proceed to the merits of PPD's argument that the evidence could not have supported the state-of-mind elements of Menninger's punitive-damages claim.[6] We review de novo a preserved challenge to the sufficiency of the evidence underlying a punitive-damages award, viewing the evidence "in the light most hospitable to the jury's verdict." Méndez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 40, 48 (1st Cir. 2009) (citation omitted).

Punitive damages are sometimes either unavailable, see, e.g., Barnes v. Gorman, 536 U.S. 181, 189 (2002) (holding that punitive damages are not available in private suits brought under Title VI of the Civil Rights Act), or are subject to heightened burdens of persuasion, see, e.g., Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 n.11 (1991) (observing that many states require "clear and convincing evidence" to justify a punitive-

---

[6] While PPD describes the punitive-damages award as "grossly excessive," it does not develop any argument that the award was unlawfully excessive. See Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 85 (1st Cir. 2006) (explaining the "three guideposts" for determining whether a punitive-damages award is unlawful). It has thus waived any such argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

damages award). But the federal law under which Menninger has sued expressly authorizes the recovery of punitive damages, and it imposes no heightened burden of proof. 42 U.S.C. § 1981a(b)(1). That law permits punitive damages when an employee demonstrates that her employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Id. Where the "discriminatory practice involves the provision of a reasonable accommodation," an employer can avoid punitive damages if it "demonstrates good faith efforts . . . to identify and make a reasonable accommodation." Id. § 1981a(a)(3). Because "[t]he Massachusetts standard is similar[,] . . . [o]ur discussion of [punitive damages] under federal law . . . embraces the state-law issue as well." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 148 n.40 (1st Cir. 2009). A plaintiff must prove not only that her employer intentionally discriminated against her, but also that it did so "in the face of a perceived risk that its actions would violate federal law." Id. at 148 (cleaned up).

### 1.

The district court rejected PPD's post-verdict challenge to the punitive-damages award because "the evidence . . . permitt[ed] a reasonable jury to conclude PPD acted with malice or reckless indifference to Menninger's rights in the course of its responses to her request for an accommodation and/or her HR

complaint." Specifically, the district court endorsed Menninger's arguments that the evidence supported findings that PPD (1) sought to coerce Menninger to quit, (2) manufactured false grounds to terminate her, and (3) established new goals and expectations for her role that it knew were impossible, all because of Menninger's disability or in retaliation for disclosing her disability and requesting accommodations. The district court further adopted Menninger's argument that a reasonable jury could have concluded that PPD perceived a substantial "risk that its actions would violate federal law," as evidenced by its decision to conduct a sham investigation of her complaint, as well as its witnesses' contradictory testimony at trial. Tobin, 553 F.3d at 148.

After carefully reviewing the record, we agree with the district court that a reasonable jury could have viewed the evidence in a manner supporting the punitive-damages award.

We note at the outset that we see no evidence of malice in PPD's decision to increase Menninger's public-facing responsibilities before ever learning of her disability, nor in its initial response to her first request for accommodation on January 11, 2018. Instead, the trouble began when Menninger submitted a second request for accommodations on February 14. On February 28, St. John sent an email to Ballweg in which he referenced "delicately working [Menninger] out," stated that Mekerri was meeting with Menninger that day, and noted that PPD

had "[given] only slightly on two out of five items that [Menninger's] physician requested." That same day, Mekerri and St. John met with Menninger and, according to Menninger's testimony, gave her only two options: take an immediate exit package, or transition into a temporary consulting role before exiting.

An employer does not necessarily act with malice when it illegally attempts to terminate an employee. As the Supreme Court has explained, "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability . . . [because the employer] discriminates with the distinct belief that its discrimination is lawful." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536-37 (1999). Thus, in Tobin, we rejected a proposed punitive-damages instruction where the employer had at most "misjudged the reasonableness of the accommodations requested," and there was no evidence of the employer's "intentional or reckless indifference to [the plaintiff's] federal rights" beyond its failure to accommodate him and "general insensitivity to his circumstances." 553 F.3d at 149. Similarly, if PPD believed that it had no legal duty to further accommodate Menninger's disability -- for example, because her disability prevented her from completing her job's essential functions -- its failure to accommodate her further would not have been malicious.

But the jury had reason to doubt whether PPD so believed. At trial, Ballweg testified that it would have been "inappropriate" for PPD to seek an exit strategy for Menninger at the time of the February meeting and emails, because "[t]he interactive dialogue, discussions with Dr. Menninger, had not resolved." She further testified that if Mekerri had sought, in the February 2018 meeting, "to work Dr. Menninger out of the organization," that would have been "unfair treatment" of Menninger, the kind that Ballweg was tasked with investigating later that spring. She testified that St. John had not informed her of his efforts to seek an exit strategy for Menninger (despite an email from St. John to Ballweg plainly referencing his efforts to "work[ Menninger] out"). She also testified that the email about "working [Menninger] out" might refer to the fact that Menninger worked remotely and "wasn't on site at the Central Lab." In light of this puzzling testimony from PPD's head of HR, the jury might reasonably have concluded that PPD did not, in fact, believe that it could lawfully terminate Menninger upon receiving her second request for accommodations. To the contrary, the jury might have found that as of February 2018, PPD believed that it was still in the midst of the interactive process to determine whether it could reasonably accommodate Menninger's disability. And the jury could further have concluded that by nonetheless seeking to "work[ Menninger] out" in February 2018, PPD acted "in the face of a perceived risk

that its actions would violate federal law." Tobin, 553 F.3d at 148 (cleaned up).

PPD's subsequent behavior provided further support for Menninger's claim that, rather than believing it could lawfully discharge Menninger because of her disability, PPD instead sought to fabricate other grounds to terminate her or else pressure her to quit. The jury saw evidence that in April 2018, Mekerri's supervisor emailed Ballweg's supervisor to ask about the "timing on Lisa Menninger's exit." The email was forwarded to Ballweg, who responded that termination was "not close" unless Menninger "self-select[ed]" (i.e., quit), because Menninger got a "3 rating for 2017" and PPD was "just now starting to document" her supposed performance issues. The jury also heard testimony from St. John suggesting that he had been "coaching" Mekerri to document performance issues for Menninger. It heard testimony from Ballweg and St. John that St. John helped Mekerri draft new performance goals for Menninger, saw a document indicating that those goals included "Elimination of Lab Issues," and heard testimony that "elimination of all lab errors" was "an impossible goal," supporting Menninger's theory that she was being set up to fail. Taken together, this evidence could have permitted the jury to infer that -- far from believing it could legally fire Menninger because her social anxiety prevented her from doing her job -- PPD sought to conceal its unlawful motivations by manufacturing

performance-based grounds for terminating Menninger, or creating conditions so unpleasant that she would "self-select" (that is, quit).

Finally, in weighing this evidence, the jury could have also considered PPD's response to Menninger's discrimination complaint in the spring of 2018. When Menninger made an internal complaint that she was facing unfair criticism at work because she had disclosed her disability and requested accommodations, Ballweg was the PPD employee who investigated the complaint. Ballweg testified that it would be "inappropriate" for an internal investigation of a discrimination complaint to be conducted by someone who was "involved directly in" the events complained of. But emails in evidence and Ballweg's own testimony indicated that Ballweg was deeply involved in PPD's efforts to "work[ Menninger] out." The evidence supported an inference that Ballweg oversaw the efforts to reduce Menninger's performance rating and document criticisms of Menninger's work, updated higher-ups on the progress of "Menninger's exit" and the efforts to create a record of poor performance, and helped draft communications from Mekerri assigning Menninger new, allegedly impossible goals and identifying supposed performance issues. Thus, the jury could have concluded not only that Ballweg was an inappropriate person to investigate Menninger's complaint, but also that by conducting

the investigation herself, Ballweg deliberately sought to conceal any wrongdoing.

We emphasize that the jury was by no means required to draw these inferences. A reasonable jury could have believed that Menninger could not do the job as newly envisioned without accommodations that were unreasonable. The jury could have elected not to credit Ballweg's assessment that it would have been "inappropriate" to seek an "exit strategy" for Menninger in February 2018; it could have found, instead, that PPD believed in good faith that it could lawfully "work[ Menninger] out" because her condition prevented her from doing her job. And it could have credited Ballweg's testimony that she conducted a fair and impartial investigation of Menninger's complaint. But on appeal, we are bound to draw our factual inferences "in the light most hospitable to the jury's verdict." Casillas-Díaz v. Palau, 463 F.3d 77, 79 (1st Cir. 2006); see also Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 30 (1st Cir. 2015) ("A rational jury could draw either inference, regardless of which may be the stronger of the two. But we may not supplant the jury's role by weighing the strength of those competing inferences for ourselves.").

In sum, the jury could reasonably have found that PPD, fearing demands by Menninger that it make unwanted accommodations, began a campaign to manufacture termination grounds or pressure

Menninger to quit and then sought to cover up those efforts, thus demonstrating its knowledge "of a perceived risk that its actions would violate federal law." Tobin, 553 F.3d at 148 (cleaned up); cf. Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000) (holding that punitive damages were available against an employer where the jury could reasonably "have found that defense witnesses lied (both to [the plaintiff] and at trial) about their actions, as part of a continuing effort to cover up their campaign against her"); Brown v. Advanced Concept Innovations, LLC, No. 21-11963, 2022 WL 15176870, at *5 (11th Cir. Oct. 27, 2022) (per curiam) (holding that an ADA punitive-damages award was supported by evidence that, among other things, the employer "created documentation falsely suggesting that [the plaintiff] had voluntarily resigned, rather than been terminated for not being able to perform the duties of the position"). On the record before us, these determinations were not beyond the jury's ken. See United States v. Mehanna, 735 F.3d 32, 47 (1st Cir. 2013) ("It is the jury's role -- not that of the Court of Appeals -- to choose between conflicting hypotheses, especially when such choices depend on the drawing of inferences and elusive concepts such as motive and intent.").

**2.**

PPD last claims that because the district court rejected Menninger's theory that her employer failed to engage in an

interactive process, Menninger cannot show malice or reckless
indifference.  PPD is correct that the district court granted
partial summary judgment on Menninger's no-interactive-process
theory.  But the court simultaneously refused to grant PPD summary
judgment on some of Menninger's disparate-treatment and
retaliation theories and on the issue of pretext, in a manner
difficult to reconcile with PPD's view that the district court
issued a blanket finding of good faith.  Specifically, the district
court found triable issues of fact as to whether PPD decided to
make Menninger's job "more difficult" in February 2018 because of
her disability; sought to coerce her to quit in retaliation for
disclosing her disability and requesting accommodations; excluded
her from hiring and recruitment responsibilities in retaliation
for disclosing her disability; and deliberately conducted a "sham
investigation" of Menninger's complaint to obscure its actions.
And it found that a jury could view "internal communications among
senior leadership and HR showing efforts to push Menninger out" as
evincing "pretext for discrimination based on [Menninger's]
disability."

     In this context, we read the district court's summary-
judgment ruling as simply rejecting a standalone claim that PPD
violated state (and possibly federal) law by failing to engage in
any interactive process whatsoever.  This legal
conclusion -- resting on the district court's finding that PPD did

not "completely disregard[]" Menninger's request for accommodations -- is a far cry from the factual finding that PPD wishes to attribute to the district court, i.e., that PPD engaged in "good faith" in all its dealings with Menninger. Indeed, the district court itself offered a different understanding of its summary-judgment holding: In its response to PPD's posttrial motions, the court found that the evidence permitted a finding of malice or reckless indifference, and it stated that "[t]o the extent [the district court had] <u>granted</u> summary judgment on any discrete <u>legal</u> theory or claim, its instructions to the jury carefully described the law in a manner entirely consistent with those rulings, and PPD has not suggested . . . otherwise" (emphases in original). We are thus loath to reach beyond the plain language of the district court's summary-judgment ruling to infer an implicit finding of good faith.

We therefore decline to strike the jury's punitive-damages award.

### III.

For the foregoing reasons, we <u>affirm</u> on all counts the district court's final judgment and its order denying PPD's posttrial motions.